**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **FREDERICK J. GREDE**, as Chapter 11 Trustee for Sentinel Management Group, Inc.,          Plaintiff, v. **THE BANK OF NEW YORK** and **THE BANK OF NEW YORK MELLON CORP.,**          Defendants. | Case No. 08 C 2582  Honorable James B. Zagel  (On withdrawal of reference from the Hon. John H. Squires, Bankr. Adv. Pro. No. 08-127) |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO RECONSIDER
WITHDRAWAL OF REFERENCE IN ITS ENTIRETY, OR IN THE
ALTERNATIVE, TO REFER ALL BUT THE NON-TITLE 11 ISSUES TO THE
<u>BANKRUPTCY COURT</u>**

## <u>OVERVIEW</u>

Almost all of the counts in this case are core bankruptcy claims, seeking to avoid fraudulent transfers, to equitably subordinate BONY's alleged lien and secured claim, and to disallow its claim against the Estate. BONY's key defenses are also bankruptcy defenses. One of these, that the funds fraudulently transferred to BONY are supposedly not "property of the Debtor's estate," and thus not subject to avoidance by the Trustee, is a highly technical Title 11 issue that is already being fought out in the underlying bankruptcy and other adversary proceedings. The property of the estate issue, *Garrity v. Leffler* (*In re Neuman*), 71 B.R. 567, 573 (S.D.N.Y. 1987), and the countless other bankruptcy issues involved here, should be decided by the Bankruptcy Court, which has both special expertise in such matters and familiarity with the underlying bankruptcy, see *Union Carbide Corp. v. Viskase Corp.* (*In re Envirodyne Indus., Inc.*), 1994 WL 654662, at *1-2 (N.D. Ill. Nov. 10, 1994) (Zagel, J.).

In its Motion to Dismiss filed in the Bankruptcy Court, BONY sought to recast the Complaint as one fundamentally depending on interpretation of non-Title 11 federal law, specifically, the Commodity Exchange Act ("CEA") and the Investment Advisers Act of 1940 ("IAA"). Judge Squires, who had the issues fully briefed and argued before him on the Motion to Dismiss, was having none of it, and on June 10, 2008, denied the Motion to Dismiss without opining on any non-Title 11 issues.

BONY employed the same premise – the supposed primacy of allegedly critical and unresolved issues under the CEA and the IAA – in filing in this Court its Motion to Withdraw the Reference. Indeed, the point of BONY's Motion to Withdraw the Reference was to prevent the Bankruptcy Court from ruling on non-Title 11 issues in connection with the Motion to Dismiss. The parties appeared before this Court on BONY's Motion to Withdraw on May 13, 2008. The Court advised the Trustee that if the Court needed a responsive brief on the motion, it would ask the Trustee to submit one. The Court did not ask for a responsive brief, and thus none was submitted. On June 20, 2008, this Court made a minute entry on the docket withdrawing the reference in its entirety. (At the same time, the Court also granted a motion to withdraw the reference in a separate adversary proceeding the Trustee brought against Sentinel's auditors. That motion was fully briefed, and the defendants' claimed basis for withdrawal was entirely different than BONY's.)

Because the BONY adversary proceeding is a case in which the overwhelming preponderance of issues are within the special expertise of the Bankruptcy Court, it should remain in the Bankruptcy Court until the non-Title 11 issues need to be decided, which will presumably be at summary judgment or trial. Meanwhile, the Bankruptcy Court, which has charge of key issues in other proceedings that overlap with those in the BONY adversary, has

managed discovery, set a pretrial date and promised a trial in 2009. It makes little sense to have two courts deciding the same issues, and even less to withdraw a case at a time when the Court's principal role would be to manage discovery disputes.

At a minimum, this Court should keep only the issues relating to the CEA and the IAA and refer the rest of the case back to the Bankruptcy Court. If BONY's motion to withdraw is really aimed at having an Article III court decide the non-Title 11 issues, instead of simply trying to derail and delay the proceedings, it should have no objection to such a procedure.

## THE COMPLAINT AND THE MOTION TO DISMISS

On March 3, 2008, the Trustee filed an eight-count complaint against BONY. (Ex. A.) The first seven counts are core proceedings under the Bankruptcy Code and 28 U.S.C. § 157(a), including claims for avoidance of fraudulent transfers (Counts 1-3), equitable subordination and disallowance of the claim BONY filed on January 18, 2008 for over $312 million (Counts 4-6), and determination of the validity and extent of BONY's purported lien and turnover of property (Count 7). Count 8 is a claim for aiding and abetting certain Sentinel insiders' breach of their fiduciary duties to Sentinel arising under Illinois law. The gravamen of the Trustee's Complaint is that BONY misused assets that it was supposed to maintain in trust for Sentinel's customers to reap tens of millions of dollars in interest income for itself, knowingly accepted hundreds of millions of dollars in fraudulent transfers, and wrongfully asserted liens over assets it helped insiders steal from Sentinel and its customers. One aspect of the Trustee's allegations regarding BONY's misconduct involves BONY's participation in violations of the Commodity Exchange Act ("CEA"), Investment Advisers Act of 1940 ("IAA") and accompanying CFTC and SEC segregation requirements. The Trustee alleges that violation of those statutes is part of the proof of inequitable conduct warranting subordination of BONY's lien.

On May 2, 2008, BONY moved to dismiss the Trustee's complaint, contending, *inter alia*, that the CEA and CFTC segregations requirements did not apply to Sentinel, or thus derivatively, to BONY.  BONY also raised numerous bankruptcy defenses, including that the transfers the Trustee sought to avoid were not "property of the estate."  (Ex. B.)

After over a hundred pages of briefing (Exs. B-D) and oral argument, the Bankruptcy Court denied BONY's motion to dismiss on June 10, 2008.  At the June 10 hearing and by orders dated the same day, the Bankruptcy Court directed BONY to answer by July 22, 2008, set a pretrial conference for September 23, 2008, and indicated that it would set a trial date in 2009.

## ARGUMENT

The circumstances surrounding BONY's Motion to Withdraw the Reference and the present posture of the adversary proceeding given the Bankruptcy Court's June 10 rulings warrant referral of the adversary proceeding to the Bankruptcy Court in whole or, at a minimum, for all purposes other than deciding the questions raised under the CEA and IAA.

**I.     BONY's Motion to Withdraw the Reference Presents Entirely Different Issues From Those Presented by McGladrey & Pullen's Motion in Another Adversary Case.**

At the outset, it is important to understand that determination of whether to withdraw the reference of this adversary against BONY stands upon an entirely different footing than the determination whether to withdraw reference of the Trustee's separate adversary proceeding against McGladrey & Pullen LLP and G. Victor Johnson ("the McGladrey action"), which the Court also decided by minute entry on June 20.

The McGladrey action involves two counts, both of which are non-core counts arising under Illinois law.  McGladrey sought withdrawal of the reference primarily based on its jury demand and the fact that both counts are non-core.   This Court decided, after a full briefing by the parties, to withdraw the reference of the McGladrey action.

4

BONY's motion to withdraw the reference was fundamentally different. BONY, which filed a proof of claim in the Bankruptcy Court, has thereby undisputedly waived any right to a jury trial. Moreover, BONY faces many bankruptcy claims and only a single common-law claim, and thus could not credibly contend that the case is fundamentally a common-law dispute.

## II.    BONY's Request to Withdraw Is Based on a Specious Attempt to Avoid the Plain Meaning of the CEA, the Policy Behind the Act, a Twenty-Five Year Regulatory History, and Its Own Written Promises To Be Bound by the CEA.

BONY's motion to withdraw rested upon three specific issues involving the CEA and IAA.[1] BONY primarily contended that there were open and unresolved issues regarding whether the segregation requirements that the CEA imposes were applicable to Sentinel (and thus BONY) here because Sentinel did not engage in commodities trading. (Ex. E at 6-9.)

BONY's far-fetched contention was wrong from the start given the plain language of the CEA and CFTC regulations. Under Section 4d(a) of the CEA, "a futures commission merchant" ("FCM") who receives customer funds or property must treat such property as "belonging to such customer." 7 U.S.C. § 6d(a). In addition, such funds "shall be separately accounted for and shall not be commingled with the funds of such futures commission merchant." *Id.* This means that customer funds must be deposited in a segregated account. 17 C.F.R. § 1.20.

Sentinel is a registered FCM. Contrary to BONY's contention, the statute does not say that only FCMs who are actually operating on a particular day by soliciting or accepting commodity trade orders and accepting money to margin such orders are subject to the statute. Indeed, under BONY's view, an FCM could be subject to regulatory requirements on one day, not subject to them the next day, and again under the CEA regime on the third. BONY's proposed reading of the statute would make it impossible for the CFTC to regulate FCMs or

---

[1] Although McGladrey made a makeweight argument regarding alleged significant open and unresolved issues under the CEA and IAA, it did not identify what those issues were.

protect customer funds.  Worse, it would mean that in order to receive the protection of the segregation requirements, customers who deposit money with a duly registered FCM would have to undertake an investigation to determine whether the FCM was in fact "operating" as an FCM by engaging in commodities trading and accepting funds for margin or on account of commodities trading.  Nothing in the statutory language suggests such a bizarre Congressional intent.

In analyzing nearly identical language under the CEA, the Ninth Circuit held that the obligation to comply with the requirements imposed on FCMs "flows from the registrant's status as an FCM and not from the nature of its current activities."  *Premex, Inc. v. CFTC*, 785 F.2d 1403, 1406 n.7 (9th Cir. 1986); *see also CFTC v. Forefront Invs. Corp.*, 2007 WL 21555739, at *3-4 (E.D. Va. Jul. 25, 2007) (CFTC could enforce requirements because of Forefront's "status as a registered FCM, without regard to the type of transactions in which Forefront engages").[2]

In addition to misreading the language of Section 4d(a) of the CEA, BONY's argument ignores its policy, which is to protect commodity customer funds.  The fact that a customer deposits funds with an FCM, who in turn places the funds with a money-manager FCM like Sentinel, cannot possibly be understood to eviscerate the customer-protection requirement of segregation and leave a depository bank like BONY free to take such funds for its own purposes.

The Trustee's reading of the statute is also the only one consistent with Sentinel's 25-year regulatory history.  The CFTC issued a no-action letter to Sentinel in 1981, allowing it to receive customer funds from other FCMs on the express conditions that it segregate customer funds and

---

[2] In order to trump up uncertainty where there is none, BONY relies on *Premex* and *Forefront*, which squarely contradict its position, and seeks to draw distinctions based on *de minimis* differences in the provisions of the CEA at issue.  BONY also relies on *New York Currency Research Corp. v. CFTC*, 180 F.3d 83 (2d Cir. 1999), in which the Court held that a party that had formerly and mistakenly registered as a commodity trading adviser was not subject to the recordkeeping provisions of the CEA governing CTAs.  Here, unlike in *Currency Research*, Sentinel was registered at the relevant time.

that it not engage in commodity trading.  (Ex. C at 10.)  The CFTC has reinforced its view that Sentinel is subject to the CEA by bringing an enforcement action against Sentinel and certain of its insiders for violating the CEA.  (Ex. F, *CFTC v. Sentinel et al.*, No. 08 C 2410, ¶ 17 (N.D. Ill. Apr. 28, 2008) (Kocoras, J.) ("As a registered FCM, Sentinel was required under the [CEA] and Commodities Regulations to adhere to the standards of segregation and handling of customer funds . . . .")).

Thus, the plain terms of Section 4d(a) of the CEA apply to Sentinel, but even if they did not, BONY is estopped from asserting its current position.  BONY bid for and acquired Sentinel's custody business by expressly recognizing the application of the CEA to the funds it was to receive  and promising to keep such property in segregated accounts, pursuant to a letter required to be filed under CFTC Rule 1.20.   (Ex. G.)  *See Remcor Prods. Co. v. Scotsman Group, Inc.*, 860 F. Supp. 575, 578 (N.D. Ill. 1994) (party estopped from taking positions inconsistent with representations made "pursuant to a statutory scheme as a pre-condition to achieving some desired result").    It is simply too late for BONY, having failed to adhere to the requirements of the Act that it promised to follow, to now claim that they never applied in the first place.

Even if BONY were correct about Section 4d(a) of the CEA, and not estopped, the segregation requirements apply to BONY by virtue of Section 4d(b), thus making withdrawal of the reference to decide the issue under Section 4d(a) unnecessary.  Section 4d(b) provides, "It shall be unlawful for any person, including . . . any depository, that has received any money, securities, or property for deposit in a separate account as provided in [§ 4d(a)(2)], to hold, dispose of or use any such money, securities or property as belonging to the depositing futures commission merchant or any other person other than the customers of such futures commission

merchant."  7 U.S.C. § 6d(b).  Even if Sentinel were not an FCM at all, the funds at issue are indisputably property "accruing to [the] customer[s] as the result of [commodity] trades or contracts."  7 U.S.C. § 6d(a)(2).  Sentinel is just as clearly a person who has received such funds "for deposit in a separate account."  It is therefore required to treat it as separate property. BONY, in turn, is also a person who has received this customer money as the result of commodity trades or contracts – indeed, it recognized that fact explicitly in its 1997 segregation letter agreements with Sentinel – and thus is also under a duty to segregate.  (Ex. G.)

BONY's other arguments in support of withdrawing the reference were equally meritless. BONY's second non-Title 11 issue was whether the Trustee can rely on violations of federal statutes which do not afford him a <u>damages</u> remedy to support its claim for <u>equitable relief</u>.  The United States Supreme Court has held that he can.  *See Kaiser Steel Corp. v. Mullins*, 455 U.S. 72 (1982); *see also Cox v. Zale Delaware, Inc.*, 239 F.3d 910, 913-14 (7th Cir. 2001).[3]  BONY's final non-Title 11 issue is the burden of proof applicable to violations of the CEA and IAA. Because the Trustee is not asserting claims under those statutes, that question is irrelevant to this litigation.

## III.    There Is No Pressing Reason to Withdraw the Reference Now, and There Are Compelling Reasons Not to Do So.

In any event, the Bankruptcy Court has already denied BONY's motion to dismiss, which raised these issues regarding the applicability of the CEA and CFTC segregation requirements. Thus, the issues BONY contended required immediate withdrawal of the reference to the

---

[3] BONY ignored that authority and relied on an inapposite line of cases holding that a party cannot seek <u>damages</u> under one statutory scheme when a separate, comprehensive statutory scheme forecloses such a remedy.  (Ex. E at 9-10.)

Bankruptcy Court for consideration by this Court are not pressing.[4]   As this Court has held, withdrawal of the reference based on non-Title 11 issues of federal law should not occur merely because the issues are lurking and may ultimately need to be resolved, but should only occur "[i]f and when the bankruptcy court cannot adjudicate [the claims] without considering [those issues]."   *Union Carbide Corp. v. Viskase Corp.* (*In re Envirodyne Indus., Inc.*), 1994 WL 654662, at *2 (N.D. Ill. Nov. 10, 1994) (Zagel, J.).   Here, the parties will be spending the next several months conducting discovery, with which the Bankruptcy Court is already intimately familiar.  The next time the so-called significant open and unresolved issues BONY raised will matter is at the summary judgment stage, at which time BONY can renew its request to withdraw the reference of those issues to the Bankruptcy Court.

Because any non-Title 11 issues are secondary in this case, withdrawal of the reference of the adversary proceeding is not warranted.  *See In re Baldwin-United Corp.*, 57 B.R. 751, 757 (S.D. Ohio 1985) (denying motion to withdraw reference where claim for disallowance of claim under Section 502 involved but did not require consideration of non-title 11 federal law).  Here, even if BONY's contention that the CEA and CFTC segregation requirements did not apply to Sentinel and BONY was correct (which it is not), that would not be dispositive of any of the Trustee's claims against BONY.   BONY's violations of those regulations are <u>only one</u>

---

[4] On Friday, June 20, 2008, BONY filed a motion in the Bankruptcy Court for leave to appeal the denial of the motion to dismiss to this Court, again citing these same issues.  That motion did little but pile on another unnecessary level of procedural complexity.  There is rarely, if ever, merit to a request for an interlocutory appeal from denial of a motion to dismiss.  Here, of course, the CEA issues cannot be controlling because they have nothing to do with half the counts and are only part of the support for the others.   Moreover, an appeal now would do nothing but prolong the litigation and multiply the proceedings.  Because the CEA issues will not arise again until summary judgment or trial, the Court can (if necessary) decide them then without prejudice to anyone.

<u>component</u> of the misconduct alleged in <u>some of</u> the counts.  (*See* Ex. C at 2.)[5]  For instance, whether the CEA and CFTC segregation regulations applied to Sentinel and BONY has nothing to do with whether BONY received fraudulent transfers.  Thus, because "resolution of the issues involves predominantly the bankruptcy laws as opposed to other federal law, mandatory withdrawal is inappropriate."  *Baldwin-United*, 57 B.R. at 757.

In particular, one of the major issues raised in BONY's motion to dismiss is whether certain assets that were supposed to be, but were not in fact, segregated for customers are "property of the Debtor's estate" within the meaning of Section 541 of the Bankruptcy Code. (Ex. B at 24-26.)  That issue has been raised by numerous parties in proceedings before the Bankruptcy Court (Ex. H at 16-21; Ex. I) and is one of the major issues that is likely to be before the Bankruptcy Court at the hearing to confirm the Trustee's proposed plan of distribution on August 12, 2008.  (Ex. J at 27-30; Ex. K.)

The Bankruptcy Court has expertise in applying these concepts.  Indeed, "the Bankruptcy Court, rather than another court, should be the forum to decide whether an asset is property of the estate."  *Garrity v. Leffler* (*In re Neuman*), 71 B.R. 567, 573 (S.D.N.Y. 1987); *see also Chateaugay Corp. v. Bd. of Educ. of Cleveland City Sch. Dist.* (*In re Chateaugay Corp.*), 93 B.R. 26, 29 (S.D.N.Y. 1988).  Moreover, withdrawing the reference to the Bankruptcy Court – and therefore litigating identical property of the estate issues before both this Court and the Bankruptcy Court – would run the risk of inconsistent rulings and would waste judicial resources.  There is no cause for withdrawing the reference in its entirety.  *Levey v. McIntyre* (*Matter of J. O'Brien Leasing, Inc.*), 1997 WL 414099, at *4 (N.D. Ill. Jul. 17, 1997) (withdrawal of reference inappropriate if "there might be a danger of inconsistent results"); *see*

---

[5] On the other hand, if the CEA and CFTC regulations are found to have applied to Sentinel and BONY, then the agreements on which BONY relies for its purported security interests would be illegal and unenforceable, and proof of BONY's claim would therefore not be allowable.

*also Hedstrom Corp. v. Wal-Mart Stores, Inc.* (*In re Hedstrom Corp.*), 2006 WL 1120572, at *3 (N.D. Ill. Apr. 24, 2006).

Thus, at the very least, the Court should withdraw only the non-Title 11 statutory issues that BONY has claimed require withdrawal, not the whole case. As this Court has stated, "bankruptcy-related defenses [should be] considered by a court with general expertise in bankruptcy law and particular familiarity with the Chapter 11 proceedings in this case." *Envirodyne*, 1994 WL 654662, at *1-2; *see also Baldi v. Longview Aluminum*, 2002 WL 31834491, at *1 (N.D. Ill. Dec. 12, 2002) (referring adversary proceeding to Bankruptcy Court "until pre-trial matters and discovery have been completed") (Zagel, J.). Accordingly, this adversary proceeding should be referred to the Bankruptcy Court in whole, or, at a minimum, for everything except decision on the non-Title 11 issues.

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests that the Court reconsider its June 20 Order granting BONY's motion to withdraw the reference in its entirety, or, in the alternative refer all matters to the Bankruptcy Court other than the non-Title 11 issues of federal law raised in the Motion to Withdraw the Reference.

Dated: June 24, 2008                         Respectfully submitted,

                                             FREDERICK J. GREDE, not individually
                                             but as Chapter 11 Trustee of Sentinel
                                             Management Group, Inc.


                                             By:  s/ Chris C. Gair
                                                  One of his attorneys

Chris C. Gair (ARDC # 6190781)
Vincent E. Lazar (ARDC # 6204916)
Jeffrey S. Eberhard (ARDC # 6276471)
JENNER & BLOCK LLP

330 N. Wabash Ave.
Chicago, IL  60611
Phone: (312) 222-9350
Facsimile: (312) 527-0484

# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **SENTINEL MANAGEMENT GROUP, INC.,** | ) | **CASE NO. 07 B 14987** |
| | ) | |
| Debtor. | ) | Hon. John H. Squires |
| | ) | |
| ———————————————— | ) | |
| | ) | |
| **FREDERICK J. GREDE**, as Chapter 11 Trustee | ) | |
| for Sentinel Management Group, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | **ADV. NO. _____** |
| **THE BANK OF NEW YORK** and | ) | |
| **THE BANK OF NEW YORK MELLON** | ) | |
| **CORP.,** | ) | |
| | ) | |
| Defendants. | | |

**COMPLAINT**

Plaintiff Frederick J. Grede, not individually but as Chapter 11 Trustee ("the Trustee")

for Sentinel Management Group, Inc. ("Sentinel" or "Debtor"), hereby states for his Complaint

as follows:

**NATURE OF THE ACTION**

1.      This is an adversary proceeding by the Trustee against The Bank of New York

and The Bank of New York Mellon Corp. (hereafter collectively referred to as "BONY"). For

more than ten years BONY performed three roles for Sentinel, acting as custodian of securities

on behalf of Sentinel and its customers, clearing agent for Sentinel's securities transactions, and

lender to Sentinel.

2.      In August 2007, Sentinel's business collapsed, costing Sentinel and its customers

hundreds of millions of dollars. BONY's misconduct played a pivotal role in that collapse, in at

least four distinct ways.

3.      First, ***BONY established a fundamentally flawed account structure for Sentinel's accounts in violation of its obligations under federal law and its duties to Sentinel.*** The account structure: (a) commingled customer assets,[1] which should have been strictly segregated, with Sentinel's own assets and the assets of other customers; (b) facilitated the misuse of customer assets as security for BONY's loan to Sentinel; and (c) allowed BONY, on a daily basis, to apply the proceeds of virtually every securities transaction involving customer assets to pay down a portion of Sentinel's debt to BONY.

4.      Second, ***BONY aided and abetted breaches of fiduciary duty committed by certain Sentinel insiders***.  These Sentinel insiders misused what were supposed to be customer securities for their own financial benefit, causing Sentinel hundreds of millions of dollars in losses.  BONY colluded in and knowingly facilitated this misconduct.

5.      Third, ***BONY knowingly accepted fraudulent and preferential transfers as part of the Sentinel insiders' scheme***, disregarding the overwhelming evidence that the insiders were acting improperly.

6.      Fourth, ***BONY engaged in inequitable conduct***.  BONY's bad faith and inequitable conduct included:  (a) violating the Commodity Exchange Act and participating in violations of the Investment Advisers Act of 1940; (b) extending credit to Sentinel far in excess of any reasonable line of credit for Sentinel's business, having actual knowledge that Sentinel did not have sufficient assets to secure that credit and would need to use customer assets to secure those loans; (c) illegally transferring securities from a segregated customer account to a collateral account in order to secure its own loan; (d) consistently preferring its own pecuniary

---

[1]      Unless noted otherwise, the terms "customer assets" and "customer securities" are used in this Complaint to describe assets and securities which were supposed to be, but were not, separately accounted for and segregated for the benefit of customers.

interests as a lender to its obligations under federal law and its duty to segregate and hold in custody Sentinel's customer assets; and (e) asserting liens over assets which it knew were intended to be segregated for customers.

7.      BONY's motive to participate in this misconduct was pecuniary:  it generated tens of millions of dollars in interest income on its ever-increasing loan to Sentinel.   Indeed, as a BONY officer explained in an email to colleagues on April 24, 2006:   "Sentinel Investment Management is one of SIBD (and the Bank's) biggest customers in regard to Credit (loans)."

8.      Absent the unlawful account structure established by BONY and BONY's other misconduct, Sentinel's collapse would not have occurred, and Sentinel would not have suffered hundreds of millions of dollars in losses and increased liabilities.

9.      The Trustee brings this action for, among other causes of action, avoidance and recovery of fraudulent and preferential transfers, equitable subordination and transfer of subordinated lien, aiding and abetting breaches of fiduciary duty, disallowance of proof of claim, and a determination that the liens asserted by BONY cannot be enforced and are invalid.

10.      This Complaint seeks damages exceeding Five Hundred and Fifty Million Dollars ($550,000,000).

## JURISDICTION AND VENUE

11.      This Court has jurisdiction pursuant to 28 U.S.C.  §  1334(b) because this adversary proceeding arises in, is related to, and arises under the Chapter 11 case, *In Re Sentinel Management Group, Inc.*, pending in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, as Case No. 07 B 14987.

12.      Venue is proper in this District pursuant to 28 U.S.C. § 1409(a).

3

13.    This Complaint is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (C), (E), (F), (H), (K) and (O).

14.    BONY has expressly submitted itself to the equitable jurisdiction of this Court by, *inter alia*, filing a proof of claim and demanding adequate protection and by filing a complaint for declaratory judgment.

15.    The Trustee is the representative of the Debtor's estate and has standing to bring each of the claims set forth in this Complaint pursuant to section 323 of the Bankruptcy Code. To the extent any of the claims set forth herein seek recovery of, or arise from or relate to, any transfers of customer assets to or for the benefit of BONY, such transferred assets are property of the Debtor's estate by virtue of, among other things, the Debtor's failure to separately account for those assets, the commingling of those assets, Sentinel's treatment of those assets, and the other facts and circumstances of the Debtor's case.

16.    The Debtor's case is pending as a case under chapter 11 of the Bankruptcy Code. In the event that this Court converts the Debtor's case to a case under subchapter III of chapter 7 of the Bankruptcy Code (Stockbroker Liquidation) and/or subchapter IV of chapter 7 of the Bankruptcy Code (Commodity Broker Liquidation), the Trustee reserves the right to assert any additional claims and causes of action which he may be entitled to assert under such subchapters of chapter 7 of the Bankruptcy Code, including but not limited to claims under sections 749 and 764 of the Bankruptcy Code.

4

## THE PARTIES AND RELATED ENTITIES

17.     Plaintiff Frederick J. Grede is the chapter 11 trustee for the Debtor, duly appointed under section 1104 of the Bankruptcy Code by Orders of this Court dated August 23 and 29, 2007.

18.     Defendant The Bank of New York is, on information and belief, a state-chartered bank with its principal place of business in New York, New York.  It is a subsidiary of Defendant The Bank of New York Mellon Corp.

19.     Defendant The Bank of New York Mellon Corp. is a corporation organized under the laws of Delaware, with its principal place of business in New York, New York.  It is the successor-in-interest to The Bank of New York, Inc. and was formed in July 2007 by a merger between The Bank of New York, Inc. and Mellon Financial Corporation.

20.     BONY has offices in 34 countries on six continents.  It holds itself out to the public as one of the world's leading banks, with more than $20 trillion in assets under custody and administration.  BONY claims on its website that it "has a rich and long history of providing custody and investment services."  It also claims that its "ability to support the highest quality securities processing solutions almost anywhere in the world ensures that we remain the provider of choice for leading institutions around the globe."

21.     Sentinel is an Illinois corporation, headquartered in Northbrook, Illinois.  Sentinel is registered with the Securities and Exchange Commission ("SEC") as an investment adviser ("Investment Adviser"), and with the U.S. Commodity Futures Trading Commission ("CFTC") as a futures commission merchant ("FCM").  It is also a member of the National Futures Association ("NFA"), which is Sentinel's designated self-regulatory organization ("DSRO").

5

22.     Philip Bloom, Eric Bloom, and Charles Mosley (the "Sentinel Insiders") were officers and directors of Sentinel who participated in a scheme to defraud Sentinel and to breach their fiduciary duties to Sentinel.   There were at all relevant times one or more officers and employees of Sentinel who were not part of the Sentinel Insiders' scheme.

## BACKGROUND

A.     Sentinel's business and the customer "SEGs"

23.     Sentinel managed investments of cash for various clients, including commodity brokers (also known as futures commission merchants or "FCMs"), hedge funds, financial institutions, pension funds, and individuals.

24.     Sentinel divided its customers into three groups and was supposed to strictly segregate the investments of these three customer groups from each other and from Sentinel's own funds.

25.     The first customer group, known within Sentinel as SEG 1, was supposed to consist solely of the funds and property of customers of other FCMs, which typically invested their customers' funds through Sentinel in order to take advantage of Sentinel's purported cash management and investment expertise.

26.     The second customer group, known within Sentinel as SEG 2, was supposed to consist solely of the funds and property of customers of other FCMs that were engaged in trading at foreign exchanges.

27.     The third customer group, known within Sentinel as SEG 3, was supposed to consist of the funds and property of all other types of clients, including FCM house (*i.e.*, non-customer) funds, as well as the funds and property of hedge funds, trust accounts, endowments and individuals.

6

28.     In addition to managing investments for the SEG 1, SEG 2, and SEG 3 customer portfolios, Sentinel owned  a "House" or "Street" portfolio of securities traded by Sentinel for the ultimate benefit of the Sentinel Insiders.

B.     <u>Regulatory requirements applicable to Sentinel's business</u>

   i.     *The Commodity Exchange Act and CFTC Rules*

29.     FCMs are permitted to deposit their customer funds only with certain types of banks, depositories or other FCMs.  Sentinel registered with the CFTC as an FCM, and thus was able to manage customer funds belonging to other FCMs.  Unlike traditional FCMs, however, Sentinel did not engage in any commodities trading for its customers, but instead only invested funds deposited by other FCMs and Sentinel's other customers.

30.     Because Sentinel was an FCM managing funds required to be segregated for the benefit of customers, Sentinel and any depository bank selected by Sentinel as custodian for funds belonging to customers were subject to the provisions of the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.* ("the CEA") and CFTC rules and regulations promulgated pursuant to the CEA, 17 C.F.R. §§ 1.1-190.10, with respect to such funds.

31.     Section 4d(a)(2) of the CEA provides that money, securities and property of customers must be separately accounted for and not commingled with the funds of the FCM.  7 U.S.C. § 6d(a)(2).

32.     Section 4d(b) of the CEA provides that "it shall be unlawful for any person, including . . . any depository, that has received any money, securities and property for deposit in a  separate account as provided for in [section 4d(a)(2) of the CEA], to hold, dispose of, or use any such money, securities or property as belonging to the depositing futures commission

merchant or any person other than customers of such futures commission merchant." 7 U.S.C. § 6d(b).

33.    CFTC Rule 1.20(a) provides that all customer funds shall be segregated as belonging to commodity customers, and that when deposited with any bank, shall be deposited under an account name which clearly identifies them as customer property.

34.    CFTC Rule 1.20 requires that any bank acting as custodian for FCM customer funds must acknowledge in writing that the funds are customer funds and are being held in accordance with the provisions of the CEA.

35.    CFTC Rule 1.20(a) also provides that "Under no circumstances shall any portion of customer funds be obligated to . . . any depository except to purchase, margin, guarantee, secure, transfer, adjust or settle trades, contracts or commodity option transactions of commodity or options customers." CFTC Rule 1.20(a) thus prohibits the pledging of customer funds to secure a loan for any purpose other than for customer commodity transactions.

36.    The investment of FCM customers' funds is subject to the strict investment standards embodied in CFTC Rule 1.25, 17 C.F.R. § 1.25, and generally is restricted to only the highest grade corporate and government securities and similar highly liquid investments. (Prior to an amendment to Rule 1.25 which became effective on December 28, 2000, the CFTC's investment standards were even stricter, and FCM customer funds could be invested only in government securities and certain other limited instruments.)

37.    CFTC Rule 1.25 permits FCMs to acquire securities constituting permitted investments under CFTC Rule 1.25 by using repurchase agreements, and to invest customer funds under reverse repurchase agreements. Customer securities delivered pursuant to any repurchase or reverse repurchase transaction, however, are limited to types of investments

8

otherwise permitted under Rule 1.25 and are subject to concentration limits and numerous other limitations. *See generally* 17 C.F.R. § 1.25(d). Moreover, any funds received under repurchase agreements or securities received under reverse repurchase agreements are required to be segregated for the benefit of customers (17 C.F.R. §§ 1.20(a) and 1.25(d)), and the delivery of securities to or from the customer segregated account must take place simultaneously with the offsetting transfer of funds to or from the customer segregated account. 17 C.F.R. § 1.25(d)(8). The CEA and CFTC regulations thus prohibit any repurchase or reverse repurchase transactions from taking place outside of customer segregated accounts, and require that all repurchase transactions for the benefit of customers take place and settle solely in segregated accounts.

38.     Under CFTC Rule 1.26, any securities in which customer funds are invested also must be maintained in segregation. Like CFTC Rule 1.20, CFTC Rule 1.26 requires that any bank acting as custodian for FCM customer securities must acknowledge in writing that the securities are customer securities and are being held in accordance with the provisions of the CEA.

39.     Funds of FCM customers engaged in trading at foreign exchanges also must be separately segregated and invested in accordance with CFTC Rule 30.7, 17 C.F.R. § 30.7, which imposes certain restrictions on the investment of customer funds.

40.     Subject to the segregation and other requirements of the CEA and CFTC Rules, under CFTC Rule 1.49 (adopted in 2003), FCM customer funds may be held in certain foreign depositories, namely institutions in the "G-7" countries (the United States, Canada, France, Italy, Germany, Japan, and the United Kingdom), and in the currency denominations of those countries, as well as the Euro.

9

41.    The CEA and CFTC regulations do not authorize customer funds or securities to be pledged to a bank or other third party to secure loans or other obligations incurred to meet "haircuts" imposed by a repurchase agreement counterparty.

42.    Effective December 31, 1980, the CFTC promulgated regulations which required FCMs to maintain adjusted net capital (essentially liquid assets in excess of customer funds) of no less than 4% of all funds required to be segregated by FCMs for the benefit of its customers. *See generally* 17 C.F.R. § 1.17.  On May 7, 1981, based upon (among other things) Sentinel's representations to the CFTC concerning the trust structure described in paragraphs 50-51 below, Sentinel obtained from the CFTC a "no action" letter exempting Sentinel from the 4% net capital requirement applicable to other FCMs, and requiring that Sentinel maintain only the minimum capital required for FCMs that are not a member of a contract market (at that time $100,000). (Exhibit A attached).

    ii.    *The Investment Advisers Act and SEC Rules*

43.    Sentinel was also registered as an Investment Adviser, and Sentinel was subject to the provisions of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq.* (the "Investment Advisers Act"), and the rules and regulations of the SEC promulgated thereunder, 17 C.F.R. §§ 275.0-2 – 275.222-2.

44.    Section 206 of the Investment Advisers Act makes it illegal to "employ any device, scheme, or artifice to defraud any client or prospective client" and to "engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." 15 U.S.C. § 80b-6.

45.    The regulations promulgated by the SEC under section 206 provide that it is a "fraudulent, deceptive, or manipulative act, practice, or course of business" to have custody of

10

client funds or securities except as provided in SEC Rule 206(4)-2. SEC Rule 206(4)-2, 17 C.F.R. § 275.206(4)-2, requires that client funds and securities be maintained at a "qualified custodian," which includes a depository bank, "[i]n a separate account for each client under that client's name" or "[i]n accounts that contain only [the investment adviser's] clients' funds and securities, under [the investment adviser's] name as agent or trustee for the clients."

46.     SEC Rule 206(4)-2 further provides that if an investment adviser opens an account with a qualified custodian, either under the client's name or its name as agent, it must "notify the client in writing of the qualified custodian's name, address, and the manner in which the funds or securities are maintained, promptly when the account is opened and following any changes to this information."

47.     It also is a violation of Section 206 of the Investment Advisers Act to use one client's assets to cover or secure securities purchases for another client when the former client does not have sufficient cash in its account to cover securities purchases on the settlement date.

     *iii.*     *BONY's conduct in violation of federal law*

48.     BONY knowingly violated the CEA and CFTC Rules by permitting customer assets to be pledged to secure BONY's loan to Sentinel, by commingling customer assets with Sentinel's own assets, by clearing customer securities transactions through BONY accounts that were not segregated and on a daily basis applying the proceeds of those transactions to Sentinel's loan balance, and by facilitating billions of dollars of repo transactions outside of the segregated account structure.

49.     BONY also knowingly participated in conduct that violated the Investment Advisers Act and SEC Rules by permitting customer assets to be commingled with Sentinel's own assets, by permitting customer assets to be cleared through and maintained in BONY

accounts which were not registered in Sentinel's name as agent or trustee for its customers, by maintaining customer assets in a manner different than that disclosed to customers, and by assisting Sentinel in the use of assets of members of one SEG group to cover or secure securities purchases for other SEGs, or for Sentinel itself, when they did not have sufficient cash to cover securities purchases on the settlement date.

## SENTINEL'S RELATIONSHIP WITH BONY
## AND THE UNLAWFUL ACCOUNT STRUCTURE

A.    The Inception of the Sentinel-BONY Relationship

50.    Prior to 1980, Sentinel's business consisted almost exclusively of providing cash management services to other FCMs, and Sentinel had established two trust accounts at Continental Illinois Bank and Trust Company of Chicago into which its clients' funds were placed and invested.  One trust account was used to hold the customer funds of other FCMs (SEG 1 funds), and the other trust account was used to hold the house funds of other FCMs (SEG 3 funds).

51.    FCMs for which Sentinel provided cash management services executed trust agreements designating Sentinel as the trustee for funds deposited by them.  Under this trust arrangement, participating FCMs directly notified Continental Bank of the amounts they wished to deposit or withdraw from the trust account and Sentinel merely directed the investment of those funds. Sentinel subsequently moved its custodial business to the First National Bank of Chicago.

52.    In early 1997, the First National Bank of Chicago decided to exit the custodial account business and close its custody division.  BONY competed with several other banking institutions to win Sentinel as a client of BONY's Institutional Custody Division.  Sentinel moved its custodian account business to BONY in or about March 1997.

53.    At the outset of the relationship, BONY and Sentinel entered into a Global Custody Agreement, dated March 13, 1997, appointing BONY as the custodian of securities and cash held for the benefit of Sentinel's customers. (Exhibit B attached). Under this arrangement, customer cash and securities were maintained by BONY in custodial accounts, and securities purchased and sold were settled by cash credits and debits to those custodial accounts.

54.    As required by CFTC Rules, on or about March 14, 1997, BONY and Sentinel entered into a letter agreement, attached as Exhibit C, in which Sentinel proposed to open an account designated as "Sentinel Management Group, Inc. Customer Segregated Funds Account I (§4.d-2)," into which it would deposit money and securities that were supposed to be segregated for its SEG 1 customers.  BONY acknowledged and agreed that this segregated account was being opened to meet the requirements of the CEA, which provides that such assets must be segregated and treated as belonging solely to Sentinel's SEG 1 customers, rather than to Sentinel itself.  In addition to the requirements set forth in CFTC Rules 1.20(a) and 1.26, BONY further agreed that "the funds in said accounts will not be subject to [its] lien or offset for, and on account of, any indebtedness now or hereafter owing [by] (*sic*) us to [BONY] and shall not be applied by [BONY] upon any such indebtedness nor will [BONY] apply the funds in said accounts to the indebtedness of either our so-called Seg II or Seg III accounts."  BONY further agreed that the letter agreement would supersede any other documents related to the account that conflict with it.

55.    On the same date, Sentinel and BONY entered into two additional letter agreements, one pertaining to "Sentinel Management Group, Inc. Customer Segregated Funds Account II (Part 30)" established for funds and securities attributable to Sentinel's SEG 2 customers, and another pertaining to "Sentinel Management Group, Inc. Customer Segregated

Funds Account III" established for funds and securities deposited by Sentinel's SEG 3 clients. These letter agreements, attached as Exhibits D and E, respectively, are identical in material respects to the SEG 1 segregation letter.

56.    In or about March 1997, BONY opened the three segregated custodial accounts contemplated in the segregation letter agreements and began accepting funds and securities from Sentinel. Sentinel also established a house or street account.

B.    BONY begins ignoring its custodial obligations

57.    As part of its arrangement with Sentinel, and consistent with Sentinel's arrangements with BONY's predecessors, BONY from time to time made short-term extensions of credit to Sentinel so that Sentinel could meet customer requests for redemption, and thereafter sell the securities that had been attributable to the redeeming customers. BONY's extensions of credit were made in the form of daytime "overdrafts" which would be eliminated upon sale of the applicable securities. If necessary, the daytime overdrafts would be converted to short-term overnight loans.

58.    Within a few months of the commencement of BONY's relationship with Sentinel, BONY personnel began to express concern about the custodial account structure required under applicable law. Specifically, BONY was extending credit in the form of daytime "overdrafts" so that Sentinel could satisfy customer redemptions sought on short notice, and it was difficult for BONY personnel to determine whether there were sufficient "excess" customer securities in the segregated custodial accounts to repay BONY's advances of credit. In an email dated August 18, 1997, a BONY officer described Sentinel's custodial account structure as "an accident waiting to happen," indicated that he was no longer comfortable clearing Sentinel's

transactions, and insisted on an immediate response from the BONY official in charge of the Sentinel business.

59.    As a result, less than six months after having won Sentinel's custodial business, BONY caused Sentinel to move its business from BONY's Institutional Custody Division to its Broker/Dealer Services Division ("SIBD"), where Sentinel would buy and sell securities through a typical broker/dealer and securities clearing account.  BONY did so even though Sentinel was not a broker/dealer and Sentinel's business as an FCM and Investment Adviser was fundamentally different from the business of a broker/dealer because it involved customer funds and securities that were subject to strict custodial and segregation requirements.  As set forth below, the new SIBD account structure violated the segregation requirements imposed by applicable law and was inconsistent with BONY's commitments in its segregation letter agreements that customer funds would at all times be segregated and not be subject to BONY's lien.

60.    After BONY insisted that Sentinel move its business from BONY's Institutional Custody Division to its Broker/Dealer Services Division, in October 1997 BONY required Sentinel to execute a clearing agreement appointing BONY as Sentinel's clearing agent "in furtherance of [Sentinel's] business as a broker/dealer of securities."  (Exhibit F attached). Sentinel and BONY also entered into a Security Agreement, dated October 21, 1997 (Exhibit G attached), giving BONY a security interest in Sentinel's securities clearing account.

61.    BONY knew that Sentinel was not a broker/dealer and that its form broker/dealer agreement did not fit Sentinel's FCM and Investment Adviser business.  Moreover, the architecture BONY established for Sentinel's accounts guaranteed that BONY could not keep its

contractual promises and meet its statutory obligations to keep customer funds and securities segregated from Sentinel's own assets or from those of other customers.

C.    The unlawful account architecture established by BONY

62.    BONY established segregated cash accounts for U.S. denominated funds held for Sentinel's customers in SEGs 1, 2 and 3, respectively.  BONY also established segregated securities accounts for government and government agency securities (hereinafter collectively referred to as "government securities"), such as U.S. Treasury notes, Fannie Mae and Ginnie Mae notes held for Sentinel's customers in SEGs 1, 2, and 3, respectively.

63.    However, BONY improperly established a single, non-segregated clearing account for all government securities transactions.  Thus, all purchases and sales of government securities had to be processed through this single account, whether they were on behalf of SEGs 1, 2 or 3 or Sentinel itself.  As a result, government securities and cash held by BONY on behalf of one customer SEG were routinely commingled with those belonging to other SEGs or Sentinel's own portfolio, in direct contravention of applicable law and the segregation letter agreements.  This structure led to and facilitated the conduct of Sentinel insiders in commingling customer assets and led to BONY maintaining client funds and securities in an account which was neither segregated as required under Sections 4d(a)(2) and 4d(b) of the CEA and CFTC Rule 1.20, nor registered as a custodial account under SEC Rule 206(4)-2.

64.    BONY also improperly established this government securities clearing account as the collateral account securing all loans made by BONY to Sentinel.  Indeed, the account is identified in BONY's records and reports as the "SEN Clearance Coll A/C FBO BNY" (Sentinel Clearance Collateral Account For the Benefit Of Bank of New York), and also was known within Sentinel and BONY as the "SLM-SEN Clearance Coll A/C FBO BNY," the "SLM"

account, the "Street" account, "the clearance account," the "collateral account," the "SEN" account, and the "box." (Hereafter, this account is referred to in this Complaint as the "Clearing/ Collateral Account.")

65.    BONY continued to make short-term loans to Sentinel, initially so that Sentinel could meet customer requests for redemption. Those loans took place in the form of daytime "overdrafts" of Sentinel's Clearing/Collateral Account, which BONY then converted to overnight loans as necessary. The overnight loans were reversed the next morning, putting the Clearing/Collateral Account back into an overdraft situation if sufficient funds were not deposited (or securities liquidated) to pay off the loan. BONY accepted and took as security for its overnight loans to Sentinel any government securities that were in the Clearing/Collateral Account, without regard to whether those securities were Sentinel House securities or customer securities. Under CFTC Rule 1.20(a), however, customer assets never could be used as security for the BONY loans.

66.    To effect a sale of a government security held in a segregated customer account, Sentinel was required to request that BONY "desegregate" the security and move it into the Clearing/Collateral Account. Once there, BONY could take the position that the security was subject to its lien, regardless of whether that security was a customer asset. Worse, because BONY's daytime advances of credit to Sentinel were made in the form of an "overdraft" (negative) balance in the Clearing/Collateral Account, and any sales of customer government securities would automatically settle to the Clearing/Collateral Account, the proceeds of customer securities sales (instead of being available for the applicable customers) were automatically applied against, and reduced the amount of, BONY's "overdraft" loan to Sentinel.

17

67.    When a government security was purchased for a segregated account, BONY's account structure similarly required that the security be purchased in the Clearing/Collateral Account, and then Sentinel would request that the security be "segregated" to the applicable customer segregated account.  Under the account structure established by BONY, however, BONY retained the ability to refuse to segregate customer securities purchased through the Clearing/Collateral Account if Sentinel did not post sufficient collateral for BONY's loans to Sentinel.

68.    Further, BONY's clearing account structure required that any customer security purchased or sold pursuant to a repo or reverse repo transaction also clear and settle through the Clearing/Collateral Account, instead of directly into the applicable segregated custodial account.

69.    BONY thus established a clearing structure in which it could not fulfill its contractual promises and which violated applicable law including Sections 4d(a)(2) and 4d(b) of the CEA and CFTC Rule 1.20 (which requires that customer funds at all times be segregated as belonging to commodity customers, and be deposited only in accounts which clearly identifies them as customer property); CFTC Rule 1.20(a) (which expressly prohibits the pledging of customer funds to secure a loan for any purpose other than for customer commodity transactions); CFTC Rule 1.25 (which prohibits any repurchase or reverse repurchase transactions from taking place outside of customer segregated accounts, and requires that all repo transactions for the benefit of customers take place and settle solely in segregated accounts); Section 4d(a)(2) of the CEA and CFTC Rule 1.26 (which mandates that any securities in which customer funds are invested must be maintained at all times in segregation); and Section 4(b) of the CEA and CFTC Rule 30.7 (which requires that funds of FCM customers engaged in trading at foreign exchanges also be separately segregated and invested).

70.    In addition, the Clearing/Collateral Account was not registered in the name of Sentinel as agent or trustee for its clients, and therefore, no customer funds or securities could be cleared through or maintained in the Clearing/Collateral Account, even briefly, without violating Section 206 of the Investment Advisers Act and SEC Rule 206(4)-2.

## THE CHANGE IN SENTINEL'S BUSINESS AND BONY'S EXPANSION OF THE UNLAWFUL ACCOUNT STRUCTURE TO CORPORATE SECURITIES

A.    CFTC Rule 1.25 Amendments and Adoption of CFTC Rule 1.49

71.    Historically, Sentinel typically directed the investment of client funds in high-quality, low-risk government securities, and did not engage in significant repo or reverse repo transactions. Sentinel's borrowings from BONY typically were used to provide liquidity for customer redemptions, and Sentinel's loan balances (if any) were relatively modest.

72.    However, at the end of 2000, CFTC Rule 1.25 was modified substantially to permit FCMs to invest customer funds in, among other things, high-grade corporate securities, and also to enter into repo and reverse repo agreements utilizing such securities. Sentinel was a strong proponent of these changes and provided written comments to the CFTC concerning the rule changes.

73.    In addition, with the 2003 adoption of CFTC Rule 1.49, Sentinel began to direct investments in Euroclear registered securities and certain customer funds were held by BONY in Euro and G-7 currency denominations in non-U.S. bank accounts.

B.    The new accounts

74.    Following the implementation of changes to CFTC Rule 1.25 and the adoption of CFTC Rule 1.49, both Sentinel's business and its relationship with BONY changed dramatically.

75.    In order to accommodate the changes to Sentinel's business, BONY opened a series of new BONY accounts to hold corporate securities registered with the Depository Trust

Corporation (or DTC), corporate securities registered in the Euroclear system, and securities that were not registered in electronic clearing systems (so-called "physical" securities).

76.     Sentinel executed a new broker/dealer clearing agreement with BONY known as the Global Clearing and Custody Agreement. (Exhibit H attached). BONY and Sentinel also executed a new Security Agreement. (Exhibit I attached). Both agreements were dated January 9, 2003.

77.     Article II, Section 1(a) of the Global Clearing and Custody Agreement appointed BONY as Sentinel's clearing agent. In Article II, Section 2(a), BONY acknowledged that it "will not have, and will not assert, any claim or lien against Securities held in a Segregated Account." Article III, Sec. 1(a) authorized BONY to act as custodian of the segregated accounts.

78.     The 2003 Security Agreement provided that BONY, at its discretion, could make loans or otherwise extend credit to Sentinel. Under Schedule A to the agreement, the collateral for that loan was to be: "Any and all Securities and other property held in the Account, as these terms are defined in the Global Clearing and Custody Agreement between the Debtor and the Bank, and any cash balances held in any cash account maintained by the Bank in connection therewith."

79.     The Global Clearing and Custody Agreement and the 2003 Security Agreement establish that there is to be only a single combined clearing and collateral Account, against which BONY may assert a lien.

C.      The DTC securities accounts

80.     BONY established three segregated securities accounts to hold DTC-registered corporate securities for Sentinel's customers in SEG 1, SEG 2 and SEG 3, respectively.

81.    BONY also established a DTC clearing account, also known as the "FC1 account" or the "Street Securities Account" ("the DTC Clearing Account" hereafter) to clear both customer and House transactions in DTC securities.    Just like the Collateral/Clearing Account, however, the DTC Clearing Account was not a segregated account.

82.    The DTC Clearing Account was not used for cash transactions.    Cash deposits, withdrawals and settlement payments relating to DTC corporate transactions were processed in the Clearing/Collateral Account.

83.    Because the DTC Clearing Account was not segregated, BONY could not fulfill its statutory duties and promises to Sentinel to keep assets pertaining to different customer SEGs separate from each other and from Sentinel's house assets.    DTC-registered securities clearing through the DTC Clearing Account, like the government securities clearing through the Clearing/Collateral Account, were necessarily commingled with securities belonging to other customer SEGs and with House assets.

84.    In addition, the DTC Clearing Account was not registered in the name of Sentinel as agent or trustee for its clients, and therefore, no customer funds or securities could be cleared through or maintained in the DTC Clearing Account, even briefly, without violating SEC Rule 206(4)-2.

85.    Moreover, because the DTC Clearing Account was not a segregated customer account, it specifically could not be used under CFTC Rules 1.20(a), 1.25(d) and 1.26 to effectuate the delivery of customer securities to or from counterparties in connection with repo or reverse repo transactions.

86.    Further, under the DTC Clearing Account structure, every time a customer security was sold, the cash proceeds of that sale were automatically credited to the

Collateral/Clearing Account and served to reduce the overdraft loan balance in that account, instead of being immediately credited to the appropriate SEG.

87.    In addition, under the DTC Clearing Account structure, every time a customer security was purchased, the customer security cleared into the DTC Clearing Account, against which BONY has asserted a lien.

D.    The Euroclear securities and foreign currency accounts

88.    In 2003, Sentinel also established a series of Euroclear and foreign currency accounts at BONY to hold customer securities registered in the Euroclear system and settled in foreign currencies. Account number 521010 (the "Euroclear Securities Clearing Account") was denominated as a clearing account for all Euroclear securities, and two other accounts, 521011 and 521012, were denominated as customer segregated Euroclear securities accounts for SEG 1 and SEG 3, respectively. A series of corresponding cash accounts also were opened in various foreign currency denominations.

89.    Under the structure it established for Euroclear securities, BONY could not fulfill its promise to Sentinel to keep assets pertaining to different customer SEGs separate from each other and from House assets. Euroclear-registered securities clearing through the Euroclear Securities Clearing Account, like the government securities clearing through the Clearing/Collateral Account and DTC securities clearing through the DTC Clearing Account, were necessarily commingled with securities belonging to other customer SEGs and with House assets.

90.    In addition, Sentinel specifically advised BONY that each of the Euroclear and foreign currency accounts, including the Euroclear Securities Clearing Account, needed to be denominated as customer segregated accounts, and provided segregation acknowledgements for

BONY's execution.  Although BONY did execute segregation letters with respect to the SEG 1 and SEG 3 Euroclear securities accounts and certain corresponding foreign currency accounts, BONY failed to provide executed segregation acknowledgements for the Euroclear Securities Clearing Account and some related foreign currency accounts.

91.     Notwithstanding the foregoing, the account statements provided by BONY to Sentinel specifically indicated that the securities maintained in the Euroclear Securities Clearing Account were held in a "segregated" account.  Further, not a single customer transaction ever took place in the SEG 1 and SEG 3 Euroclear securities accounts, and it appears that those accounts were never even activated.  Thus, all Euroclear securities purchased for customers were held by BONY in the Euroclear Securities Clearing Account.

92.     BONY acknowledged in internal communications that the Euroclear Securities Clearing Account was not intended to hold any material amount of securities, and was being used solely for clearing customer transactions.  Nonetheless, BONY has now taken the position that the securities in the Euroclear Securities Clearing Account are not customer securities, and that it may assert a lien against securities held in the Euroclear Securities Clearing Account and related foreign currency accounts.

93.     Moreover, if (as BONY claims) the Euroclear Securities Clearing Account is not a segregated customer account, it specifically could not be used under CFTC Rules 1.20(a), 1.25(d) and 1.26 to effectuate the delivery of customer securities to or from counterparties in connection with repo or reverse repo transactions.

94.     Further, if (as BONY claims) the Euroclear Securities Clearing Account was not a segregated account in the name of Sentinel as agent or trustee for its clients, no customer funds

or securities could be cleared through or maintained in the Euroclear Securities Clearing Account, even briefly, without violating SEC Rule 206(4)-2.

      E.     <u>Physical securities</u>

    95.    In addition to the DTC and Euroclear securities and related accounts, in connection with the change in Sentinel's business, BONY also established an account to clear and hold physical securities (*i.e.,* certificated securities that were not registered in the DTC or Euroclear systems) (the "Physical Clearing/Custodial Account"). Unlike with the U.S. government, DTC and Euroclear securities, no separate segregated accounts were ever established for physical securities. Thus, all House and customer transactions in physical securities cleared through the single Physical Clearing/Custodial Account, and all physical securities were held by BONY in that account. Like the DTC Clearing Account, the Physical Clearing/Custodial Account was not used for cash transactions. Cash deposits, withdrawals and settlement payments relating to physical securities transactions were processed in the Clearing/Collateral Account.

    96.    As a result of the fact that the Physical Clearing/Custodial Account was not segregated (and BONY made no attempt to establish any segregated accounts for physical securities attributable to Sentinel customers), BONY could not fulfill its statutory duties and promises to Sentinel to keep assets pertaining to different customer SEGs separate from each other and from Sentinel's house assets. Physical securities held in or clearing through the Physical Clearing/Custodial Account were necessarily commingled with securities belonging to other customer SEGs and with House assets.

    97.    In addition, the Physical Clearing/Custodial Account was not registered in the name of Sentinel as agent or trustee for its clients, and therefore, no customer funds or securities

could be cleared through or maintained in the Physical Clearing/Custodial Account, even briefly, without violating SEC Rule 206(4)-2.

98.    Moreover, because the Physical Clearing/Custodial Account was not a segregated customer account, it specifically could not be used under CFTC Rules 1.20(a), 1.25(d) and 1.26 to effectuate the delivery of customer securities to or from counterparties in connection with repo or reverse repo transactions.

99.    Further, under the Physical Clearing/Custodial Account structure, every time a customer security was sold, the cash proceeds of that sale were automatically credited to the Collateral/Clearing Account and served to reduce the overdraft loan balance in that account, instead of being immediately credited to the appropriate SEG.

## THE SENTINEL INSIDERS' SCHEME AND THE BONY LOAN

A.    The Repo Activity

100.    Following the opening of the DTC Clearing Account, the Euroclear Securities Clearing Account, and the Physical Clearing/Custodial Account, Sentinel radically changed its investment strategies and borrowing.

101.    Sentinel's actions in this regard, and the conduct described in paragraphs 102-167, were undertaken at the instance of the Sentinel Insiders and were adverse to the interests of the company.  (For purposes of clarity and conciseness, that allegation is not reiterated each time Sentinel's actions are described.)

102.    Among other things, Sentinel began purchasing a substantial amount of securities for the Sentinel "House" account, which ultimately benefited the Sentinel Insiders.  Sentinel also dramatically increased its use of leverage, which put both Sentinel and its customers at risk if the market moved adversely.

103.     No later than 2003, Sentinel began financing the acquisition of many of the securities it controlled using overnight repurchase agreements.  In a typical overnight repurchase or "repo" transaction, the repo borrower (in this case Sentinel) acquires and transfers a security to a repo lender, which in turn makes a repo "loan" to Sentinel and holds the security as collateral.  Under most overnight repo agreements, absent a default, Sentinel was entitled to all principal and interest payments received on account of the security that was the subject of the repo transaction.

104.     Repo counterparties imposed a "haircut" on the amount loaned to Sentinel in order to provide a sufficient collateral cushion above market value to satisfy Sentinel's repo obligations in the event of a default.  Thus, a repo lender advanced to Sentinel, for example, only 90% of the current market value of the security subject to the repo transaction (a 10% "haircut").  Because Sentinel had virtually no capital, the Sentinel Insiders financed the balance of the acquisition cost for securities that were the subject of a repo transaction (*i.e.* the haircut) using Sentinel's overnight loan facility with BONY.  Thus, beginning no later than 2003, instead of funding short-term liquidity needs related to Sentinel customer redemptions, Sentinel began using the BONY loan for Sentinel's highly-leveraged speculation in securities, a fact which BONY knew.

105.     Although prior to the summer of 2007 most of Sentinel's overnight repo positions were rolled over each day, both Sentinel and the repo counterparty had the right to close out an overnight repo position at any time, in which case the repo counterparty was contractually obligated to return the security to Sentinel, and Sentinel was contractually obligated to pay off the funds borrowed plus interest.

106.    At times, Sentinel also participated in so-called "reverse repo" transactions, in which Sentinel was the repo lender holding securities as collateral for a loan made by Sentinel to a repo borrower.

107.    Over time, Sentinel controlled an ever-increasing number of securities pursuant to repo transactions, subjecting Sentinel and its customers to substantial risk arising from the leverage associated with repo transactions. All of the securities that were the subject of repo activity cleared through the BONY Collateral/Clearing Account, DTC Clearing Account, Euroclear Securities Clearing Account, and Physical Clearing/Custodial Account.

108.    By the end of 2003, Sentinel had purchased and controlled more than $242 million in securities under repo agreements. By the end of 2004, that amount had increased to more than $922 million; by the end of 2005 it had increased to more than $1.3 billion; and by the end of 2006 it had increased to more than $2.0 billion. This $2.0 billion+ repo position put Sentinel, which at all times had, at best, only a few million dollars of capital, at tremendous risk in the event of a decrease in the value of the securities that it controlled.

B.    The BONY Loan

109.    Beginning no later than the end of 2003, the Sentinel Insiders began exploiting the flawed account structure established by BONY and used that account structure to unlawfully and without disclosure to their clients: (a) commingle customer assets among SEGs and with Sentinel's House assets; (b) use securities that were supposed to be held in segregated customer accounts to collateralize loans from BONY, including loans that were used to purchase House securities and to engage in billions of dollars of undisclosed repo transactions; and (c) pay down Sentinel's debt to BONY using customer assets.

110.   The Sentinel Insiders' scheme to use customer assets to secure the purchase of securities for the Sentinel House account and to increase leverage using repo agreements resulted in a dramatic increase in Sentinel's loan balance with BONY.  For example, while Sentinel's loan balance stood at $23 million at the end of 2002, by the end of 2003 the loan had more than doubled to $55 million.  By the end of 2004, the loan had more than doubled again to over $120 million, and by the end of 2005 it had more than doubled yet again, to approximately $280 million.  By June 2007, the loan balance had again more than doubled, to over $570 million.

111.   BONY allowed Sentinel to continue borrowing amounts far in excess of the overnight loan credit limit BONY set for Sentinel, and far in excess of any reasonable line of credit for Sentinel's business (and its very small capital), and continually increased that limit.  In 2000, Sentinel's overnight loan credit limit was $30 million.  By the end of 2004, that limit had increased to $95 million.  By the end of 2005, Sentinel's credit limit with BONY was $175 million, although the credit extended by BONY routinely exceeded $300 million.  In 2006, BONY increased the overnight credit limit to $300 million.  When Sentinel's loan blew through the $300 million credit limit in January and February 2006, BONY extended more credit, notwithstanding the fact that BONY knew that Sentinel's net capital was, at best, only a few million dollars.

112.   Moreover, BONY imposed no daytime overdraft limit whatsoever upon Sentinel.  Thus, the Sentinel Insiders could run up tens of millions (and on certain days hundreds of millions) of dollars in additional liability to BONY during any given day.

113.   BONY required that Sentinel post collateral to secure its overnight loans to Sentinel.  Because Sentinel House securities and other House funds Sentinel held were insufficient to secure the loan, and because of the commingling permitted by BONY's account

28

structure, the insiders began collateralizing the BONY loan with hundreds of millions of dollars

in customer securities, in violation of Sections 4(b), 4d(a)(2), and 4d(b) of the CEA and CFTC

Rules 1.20, 1.25, 1.26, 1.49 and 30.7, as well as Section 206 of the Investment Advisers Act and

SEC Rule 206(4)-2.

       C.      BONY's Knowledge of the Misuse of Customer Assets
               and False Statements to Regulators and the Public

114.    BONY was well aware that Sentinel had fundamentally changed its business

model, that it was purchasing large amounts of securities for the House account and for repo

activities using credit provided by BONY, and that the Sentinel loan was financed almost

exclusively with customer securities that were supposed to be segregated.

115.    BONY, including (as of November 23, 2005) the managing director of BONY in

charge of Financial Institutions Credit, was well aware that Sentinel had a leveraged trading

strategy.

116.    BONY received and reviewed Sentinel's year-end financial statements for 2005

and 2006. Those statements, *inter alia*, reflected that "Sentinel purchases securities for

customers and for its own account. . . ."

117.    BONY also received copies of numerous financial statements and regulatory

reports from Sentinel that revealed that Sentinel was providing false and misleading information

to regulators and its customers.

118.    Specifically, at least between September 2005 and June 2007, BONY received

from Sentinel nearly every monthly CFTC Form 1-FR report submitted to regulators by Sentinel,

which filed each statement approximately three weeks after the end of the month-long period

covered by the statement. BONY routinely received copies of these monthly reports within a

few days of the filing date.

119.　　Each monthly CFTC Form 1-FR submitted by Sentinel included several different financial reports, including a Statement Of Financial Condition (Sentinel's assets and liabilities); a Statement Of Computation Of Minimum Capital Requirements imposed upon Sentinel; and a Statement Of Segregation Requirements And Funds In Segregation.

120.　　Each and every one of the financial reports comprising the Form 1-FR provided by Sentinel to regulators and BONY contained patently false information.  Among other things, each and every Statement Of Financial Condition included as part of Sentinel's monthly Form 1-FR filings reflected that Sentinel owed $0 in loans to BONY (Statement of Financial Condition, Lines 21.A-C).  Each and every Statement Of Financial Condition included as part of Sentinel's monthly Forms 1-FR filings reflected that Sentinel engaged in no repo activity whatsoever (Statement Of Financial Condition, Lines 3, 4 and 29). Each and every Statement Of Computation Of Minimum Capital Requirements included as part of Sentinel's monthly and annual Forms 1-FR carried through the false information provided in the corresponding Statement Of Financial Condition. And each and every Statement Of Segregation Requirements And Funds In Segregation included as part of Sentinel's monthly and annual Forms 1-FR indicated that all of Sentinel and its customers' funds and securities were held in segregated accounts. Statement Of Funds In Segregation, Lines 7.A-C).  Every one of these assertions, as BONY knew, was patently false.

121.　　BONY also knew that Sentinel was making flagrant misrepresentations to actual and potential customers about Sentinel's relationship with BONY and how customer assets were held at BONY.  For example, on June 27, 2007, a senior BONY official in charge of Sentinel's account received by email from another BONY officer a Sentinel marketing brochure that included statements that BONY knew were patently untrue.

122.    Among other things, the brochure said that Sentinel currently had "over $1.8 billion under management held in fiduciary accounts at our custodian, The Bank of New York." BONY knew that that assertion was untrue and that of the $1.8 billion held by BONY, hundreds of millions of dollars worth of customer assets were not held in fiduciary accounts but instead were held in BONY's Clearing/Collateral Account and subject to BONY's lien or were held in other non-fiduciary accounts.

123.    The brochure also falsely stated that a Sentinel "client retains a pro-rata undivided interest in the underlying securities pool held in a segregated account at The Bank of New York" and that "Securities are held in segregated, bankruptcy proof accounts." BONY knew that these statements were false because substantial customer assets were held in the BONY Clearing/Collateral Account and the DTC Clearing Account, not in a segregated account.

124.    And the brochure indicated that the sale and purchase of securities on behalf of customers at BONY involved movement only between a "Sentinel Client Segregated Cash Account" and a "Sentinel Segregated Client Securities Account." BONY knew that this representation was false and that in fact whenever securities were bought or sold, the cash and securities had to run through clearing accounts which were not segregated and as to which BONY asserted a lien.

125.    BONY also knew that, in order to collateralize Sentinel's loan, Sentinel at times was transferring hundreds of millions of dollars of securities from segregated customer accounts in bulk transfers to the BONY Clearing/Collateral Account under circumstances which plainly could not have related to legitimate investment activities or other transactions authorized by Sentinel's customers. BONY also knew or should have known that Sentinel Insiders caused Sentinel to make these transfers of hundreds of millions of dollars from segregated customer

31

accounts to the BONY Clearing/Collateral Account or other non-segregated accounts with the intent to hinder, delay or defraud Sentinel's other creditors, including Sentinel's customers.

126.   BONY also knew of but deliberately ignored numerous red flags relating to Sentinel's activities, including: (a) the dramatic increase in the amounts borrowed by Sentinel from BONY, unrelated to customer redemption requests or other short-term liquidity needs; (b) the fact that Sentinel routinely exceeded its large credit limit with BONY; (c) the fact that Sentinel's leverage with repo counterparties had exponentially increased, such that by 2006 more than $2.0 billion in securities were the subject of repo agreements, almost all of which had been financed in part using the BONY loan; (d) Sentinel's purchase of lower-grade and illiquid securities, which was inconsistent with Sentinel's stated purpose of acting as a cash manager; (e) Sentinel was declaring dividends in excess of Sentinel's already minimal net capital; and (f) customer assets were posted to Sentinel's balance sheet as Sentinel assets.

## BONY'S PARTICIPATION IN THE RAIDING OF SEGREGATED ACCOUNTS AND THE COLLAPSE OF SENTINEL

A.   Overview

127.   Leading up to 2007, the unlawful account structure established by BONY, as well as BONY's willingness to turn a blind eye to wrongdoing at Sentinel and its extension of hundreds of millions of dollars in credit, permitted certain Sentinel insiders to reap tens of millions of dollars in profit through the wrongful pledge of customer assets to BONY and excessive leverage.

128.   In the spring and summer of 2007, following a downturn in the credit market and a decrease in the value of the billions of dollars of securities controlled by Sentinel through excessive leverage, Sentinel's business quickly collapsed. BONY's actions played a pivotal role in the collapse of Sentinel.

129.   BONY's actions were motivated by its own financial interests, at the expense of its duties as custodian of customer assets.  From January 2004 through August 2007, BONY charged Sentinel over $38 million in interest.  More than $28 million of that amount was charged by BONY in just the period January 2006 through August 2007.

B.   Sentinel's collapse

130.   Many of the securities that Sentinel purchased during the 2004 - 2007 time-period were acquired using repurchase agreements under which repo counterparties such as Fimat and Cantor Fitzgerald lent money to Sentinel to finance most of Sentinel's acquisition costs of the securities, with the balance financed by BONY.  Many of the securities that were the subject of those repo agreements were illiquid, highly-structured investments and not the subject of material secondary market trading, and many (the physical securities) were not even registered in the DTC system.

131.   As of May 2007, Sentinel had incurred over $2.4 billion in obligations to repo counterparties.   As the credit market tightened in the spring and summer of 2007, repo counterparties began to refuse to accept these lower-grade securities from Sentinel under repo agreements, increasing their margin (haircut) requirements or simply refusing to continue to engage in repo transactions in such securities.

132.   At the end of May 2007, Fimat became the first major Sentinel counterparty to refuse to continue financing certain securities.  Fimat closed out the repo transactions related to those securities, and returned more than $100 million (face value) in securities to Sentinel through the BONY clearing system.  Pursuant to its repo agreements with Fimat, Sentinel was obliged to pay its repo obligation to Fimat or risk a default.  Because Sentinel could not finance

its repo payment to Fimat in any other way, on June 1, 2007, it borrowed an additional $94 million from BONY, increasing the BONY total loan balance to more than $353 million.

133.    Thereafter, on every business day from June 1, 2007 until August 13, 2007, when Sentinel's business finally collapsed, BONY allowed Sentinel to exceed its already excessive $300 million overnight loan credit limit by tens (and sometimes hundreds) of millions of dollars. At all relevant times during that period, however, BONY attempted to ensure that its loan was fully secured, even though its security was provided by customer assets that BONY had promised would not be used to secure Sentinel's loan.

134.    To secure the increased loan, on June 1, Sentinel and BONY desegregated large blocks of government securities from both the SEG 1 and SEG 3 segregated government securities accounts, with a face value of almost $87 million, and moved those securities into the Clearing/Collateral Account (the "June 1 Transfers"). These transfers took place at the end of the day, and did not coincide with any large customer redemptions or other potentially legitimate customer transactions. This also left less than $15 million in face value of government securities in the SEG 1 segregated government securities account.

135.    BONY personnel recognized that the Sentinel Insiders must be improperly using customer securities to collateralize Sentinel's loan obligations to BONY. After receiving a report on Sentinel's collateral position on June 13, 2007, a senior BONY credit official asked subordinates: "How can they have so much collateral? With less than $20MM in capital I have to assume most of this collateral is for somebody else's benefit. Do we really have rights on the whole $300MM?" (Emphasis added.)

136.    On June 25, 2007, Fimat informed Sentinel that it would no longer finance an additional batch of securities through repo agreements, and it returned another $140 million (face

34

amount) in securities to Sentinel's physical account at BONY.   As a result, Sentinel was obligated to repay Fimat under its repo agreements with Fimat.   In order to do so, it once again borrowed additional funds from BONY using customer funds as collateral.

137.   Sentinel's loan balance at the end of the day on June 25, 2007 was already a remarkably high $358 million.   By June 27, Sentinel's loan with BONY ballooned to $573 million.   BONY and Sentinel attempted to secure the massive loan in the manner described below.

138.   At first, BONY temporarily accepted the physical securities that had been returned by Fimat as security for the BONY loan.   BONY quickly determined, however, that there was no market for the physical securities.   It therefore demanded additional collateral.

139.   Recognizing that BONY was under-collateralized, on June 26, 2007, Sentinel and BONY transferred virtually all of the remaining government securities in the SEG 1 and SEG 3 segregated government securities accounts, totaling in excess of $66 million in face value, out of segregation and into the Clearing/Collateral Account.   This left no government securities in the SEG 1 government securities account, and only $15,000 face value of government securities in the SEG 3 government securities account.   By this date, of some $463.6 million in face value of government securities held at BONY in connection with the Sentinel accounts, $463.1 million – more than 99% of all of Sentinel's government securities – were being held in the Clearing/Collateral Account for the benefit of BONY, not in segregated customer accounts.

140.   On June 28, BONY informed Sentinel that considering the size of the loan for that day, which was $546 million, the wires still due to go out from Sentinel, and the collateral currently held by BONY, Sentinel's collateral position still was substantially short. Sentinel agreed to post additional securities as collateral for the loan.   Because virtually all customer

government securities already had been moved to the Clearing/Collateral Account, Sentinel agreed to permit BONY to take securities in the DTC Clearing Account as collateral for the loan, and if necessary to move additional securities from segregated accounts into the DTC Clearing Account to collateralize the loan.

141.    On June 29, BONY determined that it would no longer accept any of the physical securities that had been returned by Fimat as collateral for Sentinel's loan. As a result, at the close of business on June 29, 2007, Sentinel was short $145 million in collateral. In order to fully collateralize the loan, Sentinel and BONY desegregated approximately $170 million in face value of corporate securities from the SEG 1 DTC account, representing one-half of the total value of that account, and transferred them into the DTC Clearing Account to be used as collateral for the BONY loan (together with the transfers described in paragraph 139 above, the "June 25-29 Transfers"). In the DTC Clearing Account, these customer assets, which were supposed to be segregated, were commingled with assets belonging to the insiders' House account and the assets of other SEGs.

142.    These transfers took place at the end of the day, after the amount of that evening's overnight loan was determined, and did not coincide with any large customer redemptions or other potentially legitimate customer transactions. BONY further knew that under CFTC Rule 1.20(a), customer assets never could be used as security for the BONY loans. BONY also knew that Sentinel needed the massive loan in order to pay for the physical security repo positions that had been closed by Fimat and cleared into the Physical Clearing/Custodial Account – an account with no linked customer segregated accounts and which had been used solely to clear House securities trades. Despite its knowledge and the fact that it was unlawful under Section 4d(b) of the CEA for BONY to hold, dispose of, or use any customer assets as belonging to Sentinel or

any person other than Sentinel's customers, BONY allowed and participated in the bulk movement of SEG 1 DTC securities into the Clearing/Collateral Account, where they could then be pledged as collateral to BONY.

143.    Between the end of June and mid-July, Sentinel reduced its loan from BONY to approximately $383 million.  However, on July 17, the loan increased to almost $497 million when another repo counterparty, Cantor Fitzgerald, closed out over $150 million (face amount) in repo positions with Sentinel.

144.    In order to provide additional collateral for the increased loan resulting from this close-out, on July 17, 2007 Sentinel and BONY again moved customer securities from the segregated SEG 1 DTC account into the DTC Clearing Account, this time more than $84 million in face value of DTC securities (the "July 17 Transfers").

145.    BONY knew that Sentinel was desegregating customer assets and transferring them to the DTC Clearing Account for the sole purpose of covering a shortfall in collateral. BONY further knew that under CFTC Rule 1.20(a), customer assets never could be used as security for the BONY loans.  Again, these transfers took place at the end of the day, after the amount of that evening's overnight loan was determined, and did not coincide with any large customer redemptions or other potentially legitimate customer transactions.  Despite its knowledge, BONY again allowed and participated in the bulk movement of SEG 1 DTC securities into the Clearing/Collateral Account, where they could then be pledged as collateral to BONY.

146.    By mid-July, the SEG 1 DTC account, which had held about $338 million in face value of securities in segregation until late June, had only $85 million in face value of securities remaining.  All told, over a period of less than seven weeks, Sentinel and BONY had transferred

in bulk transfers, for the sole purpose of providing BONY with securities for its loan to Sentinel, more than $150 million in customer government securities and $250 million in DTC securities from segregated accounts. These transfers were in addition to the more than $300 million in customer government securities BONY already was improperly holding as collateral as of the beginning of May 2007.

147.    Sentinel managed to reduce its loan balance to $362 million by late July. However, BONY continued to hold as collateral for its loan more than $500 million in DTC and government securities that were supposed to be segregated.

148.    On about July 30, Sentinel's chief financial officer determined that SEG 1 customer assets should not have been used as collateral for the bank loan. Sentinel then began a program, with BONY's assistance, to move huge blocks of securities serving as BONY collateral back into segregation. In order to ensure that BONY was fully collateralized on its loan, however, Sentinel and BONY undertook this program at the expense of Sentinel's SEG 3 customers and removed from segregation essentially all remaining SEG 3 customer assets that had not already been pledged for the BONY loan.

149.    As part of this program, on July 30, Sentinel and BONY moved $248 million (face value) in securities out of the DTC Clearing Account, where they had been used as collateral for the loan, and transferred them to the segregated SEG 1 DTC account. On the following day, July 31, Sentinel and BONY moved $264 million (face value) in government securities, which had been sitting in the Clearing/Collateral Account, from that account to the SEG 1 government securities account.

150.    The transfer of over $500 million (face value) of securities to SEG 1 segregated accounts over this two-day period would have created a gaping shortfall in BONY's collateral.

In order to plug that hole, on July 30 Sentinel and BONY took $289 million (face value) of securities from the segregated SEG 3 DTC account and moved them to the DTC Clearing Account, where these customer assets were commingled with assets belonging to the Insiders' House portfolio and were posted to the Clearing Collateral account as security for Sentinel's loan (the "July 30 Transfers"). This action virtually emptied the SEG 3 DTC account, leaving only $900,000 (face value) of DTC registered securities in a segregated account which for months had consistently held more than $250 million (face value) worth of securities.

151.    BONY knew that Sentinel and BONY were desegregating essentially everything in the SEG 3 DTC account and moving it into the DTC Clearing Account in order to secure the BONY loan. BONY personnel expressed surprise at Sentinel's request to desegregate but did nothing to question or prevent it.

152.    BONY further knew, because Sentinel expressly told BONY personnel, that Sentinel's policy was simply to desegregate sufficient customer assets and put them in the DTC Clearing Account so that they could serve as collateral for the BONY loan.

153.    On or about August 7, a BONY officer asked Eric Bloom, the chief executive officer of Sentinel, what would happen to Sentinel if BONY insisted on cutting its loan to $300 million, Sentinel's supposed credit limit. Bloom informed BONY in substance that Sentinel would not be able to meet its obligations to its customers.

154.    On August 9, Sentinel entered instructions to move a substantial amount of customer securities from the DTC Clearing Account back to the DTC SEG 1 and SEG 3 accounts. BONY refused those instructions because carrying them out would have meant that Sentinel would not have enough collateral remaining to cover the BONY loan.

155.    On August 10, Sentinel emailed the assistant treasurer at BONY and asked for a list of all securities that were being held in the DTC Clearing Account that were not being used as collateral "so that we can seg all the securities that you are unable to use as collateral." This email again explicitly told BONY what it already knew: that customer securities were being moved into and out of segregation based on BONY's need for collateral, not based on customer redemptions or any other legitimate customer transactions.

156.    On August 13, 2007, Sentinel was unable to meet customer redemption requests and issued a letter to customers stating that redemptions had been suspended. The BONY loan for that date was $415 million.

157.    On August 14, BONY officers traveled from New York to Northbrook, Illinois and met with Sentinel personnel. At that time, BONY configured its systems so that Sentinel personnel could not effect any further transactions without BONY's express approval. Government regulators also were on Sentinel's premises by that date.

158.    As of August 14, approximately $113 million in customer funds had been delivered to counterparties pursuant to overnight reverse repo agreements; the counterparties had delivered to Sentinel government securities to secure their payment obligations. These overnight reverse repos had been undertaken for the benefit of certain SEG 1 customers and unwound on a daily basis unless they were renewed. Although some of the government securities (those securing reverse repo loans totaling $36.2 million) were held in the SEG 1 segregated government securities account, additional government securities securing reverse repo loans of $77.2 million were held in the Clearing/Collateral Account in violation of CFTC Rules 1.25 and 1.26.

159.    On August 14 and 15, Sentinel allowed these overnight reverse repos to unwind. As a result, the securities were returned to the counterparties through the Clearing/Collateral Account.    The counterparties paid their repo obligations to Sentinel through the Clearing/Collateral Account.

160.    Because of the account architecture established by BONY, these reverse repo proceeds initially were not made available to Sentinel's customers, but were instead automatically credited against Sentinel's loan (overdraft) balance, reducing the daytime overdraft in the Clearing/Collateral Account by more than $113 million.    Apparently recognizing the serious flaws in the unlawful account structure that had been established by BONY, BONY permitted Sentinel's overdraft (loan) balance to increase by $36.2 million (the amount of reverse repo proceeds associated with securities that had been held in the SEG 1 government securities account as of August 14, 2007), and permitted Sentinel to transfer that amount to SEG 1 cash accounts.    BONY did not release, however, the more than $77.2 million in reverse repo proceeds associated with securities that had been held in the Clearing/Collateral Account.    Instead, those funds were used to reduce Sentinel's loan balance at the expense of the Sentinel customers.

161.    On August 14, BONY wired $25 million on behalf of Sentinel to Fimat in order to meet a repo agreement margin call by Fimat.    Eric Bloom had informed a bank officer that Bloom would move positions from a DTC SEG account into the DTC Clearing Account in order to provide additional collateral to cover the wires, but did not do so.

162.    On August 15, in blatant violation of Section 4d(b) of the CEA and CFTC Rules 1.20 and 1.26, BONY acted unilaterally to secure its loan.    Without receiving any desegregation instructions from Sentinel or customer instructions, BONY unlawfully moved approximately $52

million (face value) in corporate securities out of the SEG 1 DTC account and into the DTC Clearing Account to serve as collateral for the loan.

163.    The following day, Sentinel contacted BONY's assistant treasurer seeking the return of those securities to the SEG 1 DTC account. The assistant treasurer said that he would only do so upon the instructions of the high-ranking BONY officer who had unilaterally authorized the moves in the first place. That officer approved the return of the securities, and they were in fact returned to the SEG 1 DTC account.

164.    On August 16, 2007, Eric Bloom entered into an agreement with Citadel Equity Fund, Ltd. and Citadel Limited Partnership to sell the SEG 1 portfolio to Citadel, and thereafter consummated that sale. Even though BONY plainly knew that the securities being sold to Citadel were supposed to be segregated for SEG 1 customers, BONY nonetheless refused to release all of the proceeds of the Citadel sale to Sentinel. Instead, beginning on or about August 16, 2007, and continuing thereafter, BONY asserted a lien against the Euroclear Securities Clearing Account. As a result, BONY continued to hold, *inter alia,* $16.1 million in proceeds from the Citadel sale in a cash account associated with the Euroclear Securities Clearing Account.

165.    In addition, BONY asserts a lien against all other securities in the Euroclear Securities Clearing Account, as well as all securities in the DTC Clearing Account and Physical Clearing/Custodial Account. Although on the petition date BONY's loan balance was approximately $312 million, BONY has asserted a lien against, and has refused to release to the Trustee, cash and securities worth hundreds of millions of dollars in excess of that amount.

166.    The transactions described herein and BONY's assertion of liens over funds and securities held in Sentinel's accounts have irreparably harmed Sentinel and have created losses to Sentinel and liabilities of Sentinel to its customers.

167.    BONY has filed a proof of claim in the Debtor's case, which has been assigned claim no. 76 by the Clerk of the Court, in an amount not less than $312,252,000 (the "BONY Proof of Claim'), and alleges that it holds a secured claim against the Debtor's estate by virtue of the Loan Documents (as defined in the BONY Proof of Claim) and sections 506(a) and 553 of the Bankruptcy Code. BONY further seeks in the BONY Proof of Claim pre- and post-petition interest, indemnification, and other amounts.

## COUNT ONE

### Avoidance and Recovery of Fraudulent Transfers Pursuant to §§ 548(a)(1)(A) and 550(a) of the Bankruptcy Code

168.    Plaintiff restates and realleges paragraphs 1 through 167 of this Complaint as though fully set forth herein.

169.    Each and every transfer of cash or securities made by Sentinel from a segregated account to the Clearing/Collateral Account, DTC Clearing Account, the Euroclear Securities Clearing Account, and the Physical Clearing/Custodial Account made within two years before the Petition Date constituted a transfer of an interest in Sentinel's property.

170.    Without limiting the foregoing, each of the June 1 Transfers, the June 25-29 Transfers, the July 17 Transfers and the July 30 Transfers (the "June-July 2007 Transfers") constituted a transfer of an interest in Sentinel's property.

171.    Each of the transfers made within two years before the Petition Date (other than transfers made in connection with legitimate customer redemptions), and specifically the June-July 2007 Transfers, were made, mediately or immediately, to or for the benefit of BONY.

172.    Each of the transfers made within two years before the Petition Date (other than transfers made in connection with legitimate customer redemptions), and specifically the June-July 2007 Transfers, were made with the actual intent to hinder, delay, or defraud Sentinel's creditors.

173.    The Trustee may avoid each of the transfers made within two years before the Petition Date (other than transfers made in connection with legitimate customer redemptions), and specifically the June-July 2007 Transfers, pursuant to section 548(a)(1)(A) of the Bankruptcy Code.

174.    The Trustee may recover, for the benefit of the estate, each of the transfers made within two years before the Petition Date (other than transfers made in connection with legitimate customer redemptions), and specifically the June-July 2007 Transfers, or their value, from BONY as the party that received the transfers or benefited therefrom as described in this Complaint, as either (1) the initial transferee of the transfers or the entity for whose benefit the transfers were made, or (2) the immediate or mediate transferee of such initial transferee, pursuant to section 550(a) of the Bankruptcy Code.

WHEREFORE, Plaintiff respectfully requests that the Court enter an Order: avoiding each of the transfers made within two years before the Petition Date (other than transfers made in connection with legitimate customer redemptions), and specifically the June-July 2007 Transfers, pursuant to section 548(a)(1)(A) of the Bankruptcy Code; ordering the return and recovery of such transfers, or entering judgment against BONY pursuant to section 550(a) of the Bankruptcy Code in the amount of such transfers; awarding the Trustee punitive damages in an amount to be determined by the Court, pre- and post-judgment interest, costs and attorneys' fees and expenses; and granting such other equitable relief as may be just and proper.

## COUNT TWO

**Avoidance and Recovery of Fraudulent Transfers Pursuant to 740 ILCS 160/5(a)(1)
and 160/8(a), and §§ 544(b)(1) and 550(a) of the Bankruptcy Code**

175.    Plaintiff restates and realleges paragraphs 1 through 174 of this Complaint as though fully set forth herein.

176.    Each and every transfer of cash or securities made by Sentinel from a segregated account to the Clearing/Collateral Account, DTC Clearing Account, the Euroclear Securities Clearing Account, and the Physical Clearing/Custodial Account on an after January 1, 2004 constituted a transfer of an interest in Sentinel's property.

177.    Without limiting the foregoing, each of the June 1 Transfers, the June 25-29 Transfers, the July 17 Transfers and the July 30 Transfers (the "June-July 2007 Transfers") constituted a transfer of an interest in Sentinel's property.

178.    Each of the transfers made on and after January 1, 2004 (other than transfers made in connection with legitimate customer redemptions), and specifically the June-July 2007 Transfers, was made, mediately or immediately, to or for the benefit of BONY.

179.    Each of the transfers made on and after January 1, 2004 (other than transfers made in connection with legitimate customer redemptions), and specifically the June-July 2007 Transfers, was made with actual intent to hinder, delay, or defraud Sentinel's creditors within the meaning of section 5 of the Illinois Uniform Fraudulent Transfer Act ("UFTA"), 740 ILCS 160/1 *et seq.*

180.    A creditor exists that could avoid such transfers, and could obtain further relief, pursuant to section 8(a) of the UFTA.

181.    Such creditor could obtain a judgment against BONY for the value of the transfers received by BONY as described in this Complaint, as either (1) the first transferee of

the asset or the person for whose benefit the transfers were made, or (2) a subsequent transferee, pursuant to section 9(b) of the UFTA.

182.　The Trustee may avoid the Transfers pursuant to section 544(b)(1) of the Bankruptcy Code and may recover, for the benefit of the estate, each of the transfers made on and after January 1, 2004 (other than transfers made in connection with legitimate customer redemptions), and specifically the June-July 2007 Transfers, or their value, from BONY, as either (1) the initial transferee of the transfers or the entity for whose benefit the transfers were made, or (2) the immediate or mediate transferee of such initial transferee, pursuant to section 550(a) of the Bankruptcy Code.

WHEREFORE, Plaintiff respectfully requests that the Court enter an Order: avoiding each of the transfers made on and after January 1, 2004 (other than transfers made in connection with legitimate customer redemptions), and specifically the June-July 2007 Transfers, pursuant to 740 ILCS 160/8(a) and section 544(b)(1) of the Bankruptcy Code; ordering the return and recovery of the transfers, or entering judgment against BONY pursuant to section 544(b)(1) and 550(a) of the Bankruptcy Code in the amount of the transfers; awarding the Trustee punitive damages in an amount to be determined by the Court, pre- and post-judgment interest, costs and attorneys' fees and expenses; and granting such other equitable relief as may be just and proper.

## COUNT THREE

### Avoidance and Recovery of Preferential Transfers Pursuant to §§ 547(b) and 550(a) of the Bankruptcy Code

183.　Plaintiff restates and realleges paragraphs 1 through 182 of this Complaint as though fully set forth herein.

184.　The June 25-29 Transfers constituted transfers of an interest in Sentinel's property.

185.    The June 25-29 Transfers were made, mediately or immediately, to or for the benefit of BONY.

186.    The June 25-29 Transfers were made on account of antecedent debt owed by the Debtor before the June 25-29 Transfers were made.

187.    The June 25-29 Transfers were made while Sentinel was insolvent.

188.    The June 25-29 Transfers were made on or within 90 days before the Petition Date.

189.    The June 25-29 Transfers enabled BONY to receive more than it would receive if this case was a case under chapter 7 of the Bankruptcy Code, the June 25-29 Transfers had not been made, and BONY received payment in such chapter 7 case to the extent provided by the Bankruptcy Code.

190.    The Trustee may avoid the June 25-29 Transfers pursuant to section 547(b) of the Bankruptcy Code.

191.    The Trustee may recover, for the benefit of the estate, the June 25-29 Transfers or their value from BONY, as either (1) the initial transferee of the June 25-29 Transfers or the entity for whose benefit the June 25-29 Transfers were made, or (2) the immediate or mediate transferee of such initial transferee, pursuant to section 550(a) of the Bankruptcy Code.

WHEREFORE, Plaintiff respectfully requests that the Court enter an Order: avoiding each of the June 25-29 Transfers pursuant to section 547(b) of the Bankruptcy Code; ordering the return and recovery of the June 25-29 Transfers, or entering judgment against BONY pursuant to section 550(a) of the Bankruptcy Code in the amount of the June 25-29 Transfers; awarding the Trustee pre- and post-judgment interest, costs and attorneys' fees and expenses; and granting such other equitable relief as may be just and proper.

## COUNT FOUR

**Equitable Subordination of Claims and Transfer of Subordinated
Lien Pursuant to § 510(c) of the Bankruptcy Code**

192.    Plaintiff restates and realleges paragraphs 1 through 191 of this Complaint as
though fully set forth herein.

193.    BONY established an account structure for Sentinel that violated applicable law
and its own contractual promises, in contravention of its duties and responsibilities as a custodian
for customer securities, which permitted Sentinel Insiders to engage in wrongdoing that
benefited them and BONY.

194.    In addition, as set forth in detail in this Complaint, prior to the Petition Date,
BONY engaged in transactions with or involving Sentinel solely for its own benefit and gain, in
violation of its duties to Sentinel and Sentinel's customers, and to the extreme detriment of
Sentinel and its other creditors, which conduct was inequitable under the circumstances.

195.    The following actions by BONY, among others, constitute inequitable conduct:
(a) establishing an account structure that violated the CEA and the Investment Advisers Act and
permitted segregated customer funds and securities to be commingled with Sentinel "House"
assets and with the assets of other customer segregated accounts in the clearing accounts; (b)
establishing an account structure under which, when securities were sold on behalf of segregated
customer accounts, the proceeds of those sales automatically reduced the overdraft on Sentinel's

48

loan, instead of being immediately credited to the segregated customer account; (c) establishing an account structure under which customer cash deposits remaining in the Clearing/Collateral Account at the end of the day would automatically be credited against Sentinel's loan; (d) permitting customer assets to be pledged for the BONY loan in violation of the CEA and CFTC regulations; (e) permitting assets in each of the customer SEGs to be transferred out of segregation and into the Clearing/Collateral Account or the DTC Clearing Account for the sole purpose of collateralizing BONY's loan to Sentinel; (f) permitting Sentinel Insiders to use customer assets to collateralize the House loan; (g) unilaterally moving securities out of segregation and into the DTC Clearing Account in order to permit BONY to assert a lien against those securities; (h) refusing to transfer securities from the Clearing/Collateral Account or the DTC Clearing Account to segregated customer accounts despite instructions to do so, in order to ensure the BONY loan was fully collateralized; (h) clearing repurchase transactions involving customer assets outside of segregated accounts; (i) failing to use account names that clearly identified accounts as belonging to customers, despite its legal obligations and explicit requests by Sentinel that BONY do so; (j) asserting a lien against the segregated customer accounts and against securities in those accounts; and (k) failing to perform its obligations under its contract in good faith.

196.   BONY continued to extend new credit to Sentinel, knowing that Sentinel was undercapitalized and was already in financial trouble. BONY's actions caused other creditors, who were unaware of Sentinel's undercapitalization, its debt and its financial problems, to continue to deposit additional funds with Sentinel and/or to fail to withdraw funds from Sentinel.

197.    BONY took advantage of its position to obtain hundreds of millions of dollars in customer assets as security for its loans to Sentinel, which were delivered to BONY in violation of applicable law.

198.    As a proximate and foreseeable result of BONY's conduct, Sentinel has been damaged in an amount exceeding the amount of BONY's claims.

199.    As a result of BONY's inequitable and unlawful conduct, good cause exists to subordinate payment of all of BONY's claims to a level below all other creditors.

200.    Subordination of BONY's claims is not inconsistent with the Bankruptcy Code.

201.    Pursuant to section 510 of the Bankruptcy Code, BONY's liens, to the extent valid, should be transferred to the estate.

WHEREFORE, Plaintiff respectfully requests that this Court enter an order subordinating, pursuant to 11 U.S.C. § 510(c)(1), all claims asserted by BONY (including the claims set forth in the BONY Proof of Claim) to a level below all other creditors, transferring, pursuant to 11 U.S.C. § 510(c)(2), any lien supporting such claims to the estate, and granting such other and further relief as this Court deems equitable and just.

## COUNT FIVE

### Disallowance of Proof of Claim

202.    Plaintiff restates and realleges paragraphs 1 through 201 of this Complaint as though fully set forth herein.

203.    BONY has filed the BONY Proof of Claim in the Debtor's case, seeking an amount not less than $312,252,000 and alleging that it holds a secured claim against the Debtor's estate by virtue of the Loan Documents (as defined in the BONY Proof of Claim) and sections

506(a) and 553 of the Bankruptcy Code.  BONY further seeks in the BONY Proof of Claim pre- and post-petition interest, indemnification, and other amounts.

204.    BONY has failed to turn over to Plaintiff property of the Debtor's estate which is recoverable by the Plaintiff, namely the amounts demanded in Counts One through Eight herein.

205.    Pursuant to Section 502(d) of the Bankruptcy Code, each claim asserted by BONY must be disallowed because property of the Debtor's estate is recoverable from BONY and BONY has not turned over that property to Plaintiff.

206.    In addition, as set forth in detail in this Complaint, prior to the Petition Date, BONY engaged in transactions with or involving Sentinel solely for its own benefit and gain, in violation of its duties to Sentinel and Sentinel's customers, and to the extreme detriment of Sentinel and its other creditors, which conduct was inequitable under the circumstances.

207.    The following actions by BONY, among others, constitute grounds for the disallowance of BONY's claim:  (a) establishing an account structure that violated the CEA and the Investment Advisers Act and permitted segregated customer funds and securities to be commingled with Sentinel "House" assets and with the assets of other customer segregated accounts in the clearing accounts; (b) establishing an account structure under which, when securities were sold on behalf of segregated customer accounts, the proceeds of those sales automatically reduced the overdraft on Sentinel's loan, instead of being immediately credited to the segregated customer account;  (c) establishing an account structure under which customer cash deposits remaining in the Clearing/Collateral Account at the end of the day would automatically be credited against Sentinel's loan; (d) permitting customer assets to be pledged for the BONY loan in violation of the CEA and CFTC regulations; (e) permitting assets in each of the customer SEGs to be transferred out of segregation and into the Clearing/Collateral

Account or the DTC Clearing Account for the sole purpose of collateralizing BONY's loan to Sentinel; (f) permitting Sentinel insiders to use customer assets to collateralize the House loan; (g) unilaterally moving securities out of segregation and into the DTC Clearing Account in order to permit BONY to assert a lien against those securities; (h) refusing to transfer securities from the Clearing/Collateral Account or the DTC Clearing Account to segregated customer accounts despite instructions to do so, in order to ensure the BONY loan was fully collateralized; (h) clearing repurchase transactions involving customer assets outside of segregated accounts; (i) failing to use account names that clearly identified accounts as belonging to customers, despite its legal obligations and explicit requests by Sentinel that BONY do so; (j) asserting a lien against the segregated customer accounts and against securities in those accounts; and (k) failing to perform its obligations under its contract in good faith.

208.    BONY's claim against the Debtor's estate should also be disallowed because the clearing and custody agreements, the security agreements, and the account structure established by BONY contradict the express provisions of and are unlawful under Sections 4(b), 4d(a)(2), and 4d(b) of the CEA and CFTC Rules 1.20, 1.25, 1.26, 1.49 and 30.7, and the agreements are therefore illegal, void and unenforceable by BONY.

209.    As a proximate and foreseeable result of BONY's conduct, including but not limited to the conduct described in paragraphs 1 through 167 of the Complaint, Sentinel has been damaged in an amount exceeding the amount of BONY's claims.

210.    As a result of BONY's conduct, including but not limited to the conduct described in paragraphs 1 through 167 of the Complaint, good cause exists to equitably disallow any and all of BONY's claims against Sentinel.

211.   As a result of BONY's inequitable and improper conduct, the BONY Proof of Claim should be disallowed.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment disallowing each and every claim asserted by BONY against the Debtor's estate, expressly including but not limited to the BONY Proof of Claim, and for such other relief as this Court deems equitable and just.

## COUNT SIX

### Equitable Disallowance of Proof of Claim

212.   Plaintiff restates and realleges paragraphs 1 through 211 of this Complaint as though fully set forth herein.

213.   BONY established an account structure for Sentinel that violated applicable law, in contravention of its duties and responsibilities as a custodian for customer securities, which permitted Sentinel Insiders to engage in wrongdoing that benefited them and BONY.

214.   In addition, as set forth in detail in this Complaint, prior to the Petition Date, BONY engaged in transactions with or involving Sentinel solely for its own benefit and gain, in violation of its duties to Sentinel and Sentinel's customers, and to the extreme detriment of Sentinel and its other creditors, which conduct was inequitable under the circumstances.

215.   The following actions by BONY, among others, constitute grounds for the equitable disallowance of BONY's claim:  (a) establishing an account structure that violated the CEA and the Investment Advisers Act and permitted segregated customer funds and securities to be commingled with Sentinel "House" assets and with the assets of other customer segregated accounts in the clearing accounts; (b) establishing an account structure under which, when securities were sold on behalf of segregated customer accounts, the proceeds of those sales

automatically reduced the overdraft on Sentinel's loan, instead of being immediately credited to the segregated customer account; (c) establishing an account structure under which customer cash deposits remaining in the Clearing/Collateral Account at the end of the day would automatically be credited against Sentinel's loan; (d) permitting customer assets to be pledged for the BONY loan in violation of the CEA and CFTC regulations; (e) permitting assets in each of the customer SEGs to be transferred out of segregation and into the Clearing/Collateral Account or the DTC Clearing Account for the sole purpose of collateralizing BONY's loan to Sentinel; (f) permitting Sentinel insiders to use customer assets to collateralize the House loan; (g) unilaterally moving securities out of segregation and into the DTC Clearing Account in order to permit BONY to assert a lien against those securities; (h) refusing to transfer securities from the Clearing/Collateral Account or the DTC Clearing Account to segregated customer accounts despite instructions to do so, in order to ensure the BONY loan was fully collateralized; (h) clearing repurchase transactions involving customer assets outside of segregated accounts; (i) failing to use account names that clearly identified accounts as belonging to customers, despite its legal obligations and explicit requests by Sentinel that BONY do so; (j) asserting a lien against the segregated customer accounts and against securities in those accounts; and (k) failing to perform its obligations under the contract in good faith.

216.    BONY continued to extend new credit to Sentinel, knowing that Sentinel was undercapitalized and was already in financial trouble. BONY's actions caused other creditors, who were unaware of Sentinel's undercapitalization, its debt and its financial problems, to continue to deposit additional funds with Sentinel and/or to fail to withdraw funds from Sentinel.

217.    BONY took advantage of its position to obtain hundreds of millions of dollars in customer assets as security for its loans to Sentinel, which were delivered to BONY in violation of applicable law.

218.    As a proximate and foreseeable result of BONY's conduct, Sentinel has been damaged in an amount exceeding the amount of BONY's claims.

219.    As a result of BONY's inequitable and unlawful conduct, good cause exists to equitably disallow any and all of BONY's claims against Sentinel.

220.    Equitable disallowance of BONY's claims is not inconsistent with the Bankruptcy Code.

WHEREFORE, Plaintiff respectfully requests that this Court enter an order equitably disallowing all claims asserted by BONY, including the BONY Proof of Claim, and granting such other and further relief as this Court deems equitable and just.

## COUNT SEVEN

### Action to Determine Validity and Extent of Lien and for Turnover of Property under 11 U.S.C. §§ 542 and 506

221.    Plaintiff restates and realleges paragraphs 1 through 220 of this Complaint as though fully set forth herein.

222.    BONY has asserted in the BONY Proof of Claim and otherwise that Sentinel granted it a valid, perfected and enforceable security interest in the Clearing/Collateral Account, the DTC Clearing Account, the Euroclear Securities Clearing Account, and the Physical Clearing/Custodial Account, the securities contained therein, and in certain cash accounts linked or associated with the foregoing accounts (collectively, the "Alleged Collateral Accounts").

55

223. BONY knew that the cash and securities now held in the Alleged Collateral Accounts were supposed to be the property of Sentinel's customers and that Sentinel could not pledge or deliver that property as collateral for BONY's loans to Sentinel.

224. The clearing and custody agreements and the agreements purportedly granting BONY a security interest in one or more of the Alleged Collateral Accounts contradict the express provisions of the CEA and Investment Advisers Act, including Sections 4d(a)(2) and 4d(b) of the CEA and CFTC Rule 1.20 (which requires that customer funds at all times be segregated as belonging to commodity customers, and be deposited only in accounts which clearly identifies them as customer property); CFTC Rule 1.20(a) (which expressly prohibits the pledging of customer funds to secure a loan for any purpose other than for customer commodity transactions); CFTC Rule 1.25 (which prohibits any repurchase or reverse repurchase transactions from taking place outside of customer segregated accounts, and requires that all repo transactions for the benefit of customers take place and settle solely in segregated accounts); Section 4d(a)(2) of the CEA and CFTC Rule 1.26 (which mandates that any securities in which customer funds are invested must be maintained at all times in segregation); and Section 4(b) of the CEA and CFTC Rule 30.7 (which requires that funds of FCM customers engaged in trading at foreign exchanges also be separately segregated and invested), and are therefore illegal, void and unenforceable by BONY.

225. The clearing and custody agreements and the agreements purportedly granting BONY a security interest in one or more of the Alleged Collateral Accounts, as well as the account structure established by BONY, are unlawful under Sections 4(b), 4d(a)(2), and 4d(b) of the CEA and CFTC Rules 1.20, 1.25, 1.26, 1.49 and 30.7, and Section 206 of the Investment

Advisers Act and SEC Rule 206(4)-2, and are therefore illegal, void and unenforceable by BONY.

226.    To the extent BONY asserts liens or rights of set-off by reason of its possession or control over cash and securities in the Alleged Collateral Accounts, such liens or rights of set-off are unlawful and cannot be enforced.

227.    In the alternative, the agreements purportedly granting BONY a security interest in one or more of the Alleged Collateral Accounts do not grant BONY a security interest in any of the Alleged Collateral Accounts or the assets held therein.

228.    Further, in the alternative, BONY's claims against the Debtor are not allowed secured claims, and pursuant to section 506(d) of the Bankruptcy Code any liens securing such claims are void.

229.    Pursuant to section 542 of the Bankruptcy Code, BONY is required to turn over the cash and securities held in the Alleged Collateral Accounts to the Trustee.

WHEREFORE, Plaintiff respectfully requests that this Court enter an order, pursuant to 11 U.S.C. § 506, determining that BONY does not have a valid, perfected and enforceable security interest in any of Alleged Collateral Accounts or the securities or cash held therein, ordering pursuant to 11 U.S.C. § 542 the immediate turnover and delivery of all securities and cash held in the Alleged Collateral Accounts to the Trustee, and granting such other and further relief as this Court deems equitable and just.

## COUNT EIGHT

### Aiding and Abetting/Knowing Participation in Breach of
### Fiduciary Duty by Sentinel Insiders

230.    Plaintiff restates and realleges paragraphs 1 through 229 of this Complaint as though fully set forth herein.

231. At all times relevant to this Complaint, Philip Bloom, Eric Bloom and Charles Mosley were officers, directors and/or controlling shareholders of Sentinel.

232. As directors, officers and controlling shareholders of Sentinel, Philip Bloom, Eric Bloom and Charles Mosley owed a fiduciary duty of loyalty to Sentinel.

233. As directors, officers and controlling shareholders of Sentinel, Philip Bloom, Eric Bloom and Charles Mosley owed a fiduciary obligation to act with due care and to deal honestly and fairly with Sentinel.

234. Philip Bloom, Eric Bloom and Charles Mosley breached their fiduciary duties to Sentinel, by among other things, commingling customer securities and money with securities and money belonging to the House, commingling customer securities and money from one segregated account with those from another segregated account, pledging customer funds to secure the BONY loan, clearing and maintaining customer funds and securities in accounts that were not registered in Sentinel's name as agent or trustee of its clients, transferring securities out of segregation to collateralize the BONY loan, pledging customer securities to collateralize a loan for the benefit of the Sentinel Insiders themselves, and borrowing funds from BONY far in excess of Sentinel's ability to repay.

235. BONY colluded with the Sentinel Insiders and knowingly participated in, aided, assisted and benefited from Philip Bloom's, Eric Bloom's and Charles Mosley's breaches of their fiduciary duties to Sentinel.

236. Sentinel has been damaged as a result of BONY's participation in each of Philip Bloom's, Eric Bloom's, and Charles Mosley's breaches of their fiduciary duties.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and against BONY for compensatory damages, plus punitive damages in an amount to

be determined by the Court, interest, costs and attorneys' fees, and grant such other equitable

relief as may be just and appropriate.

Dated:  March 3, 2008

Respectfully submitted,

FREDERICK J. GREDE, not individually but
as Chapter 11 Trustee of Sentinel Management
Group, Inc.

By: _____
     One of his attorneys

John F. Kinney (ARDC # 1467867)
Daniel R. Murray (ARDC # 1999951)
J. Kevin McCall (ARDC # 3125685)
Catherine L. Steege (ARDC # 6183529)
Chris C. Gair (ARDC # 6190781)
Vincent E. Lazar (ARDC # 6204916)
JENNER & BLOCK LLP
330 N. Wabash Ave.
Chicago, IL  60611
Phone: (312) 222-9350
Facsimile: (312) 527-0484

# EXHIBIT  B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **SENTINEL MANAGEMENT GROUP, INC.,** | ) | Case No. 07 B 14987 |
| | ) | |
| Debtor. | ) | Hon. John H. Squires |
| | ) | |
| **FREDERICK J. GREDE**, as Chapter 11 Trustee for Sentinel Management Group, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. 08-127 |
| | ) | |
| v. | ) | |
| | ) | |
| **THE BANK OF NEW YORK** and **THE BANK OF NEW YORK MELLON CORP.,** | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
OF THEIR MOTION TO DISMISS THE COMPLAINT**

Brian Trust
Hector Gonzalez
Matthew D. Ingber
MAYER BROWN LLP
1675 Broadway
New York, New York 10019
(212) 506-2500

Sean T. Scott
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, Illinois 60606
(312) 782-0600

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... iv

PRELIMINARY STATEMENT ...............................................................1

STATEMENT OF FACTS ......................................................................3

ARGUMENT .........................................................................................6

I.  THE ALLEGATIONS THAT BNY VIOLATED FEDERAL LAW SHOULD BE REJECTED .......................................................................................6

    A.  The Trustee Has No Right to Recover Directly Under Either the Advisers Act or the CEA..............................................................................7

    B.  The Trustee Cannot Assert Claims Against BNY that are Premised Upon Non-Actionable Alleged Regulatory Violations.............................9

    C.  The Complaint Does Not Adequately Plead Violations of the CEA and the Advisers Act ....................................................................................11

        1.  The CEA and CFTC Rules do not apply ....................................11

            a.  The Complaint fails to allege that Sentinel was engaged in the business of an FCM ...............................................11

            b.  The Complaint fails to allege that the funds deposited by Sentinel were "customer funds" subject to the segregation requirement ................................................................14

        2.  The Complaint fails to allege that BNY "substantially assisted" Sentinel's violations of the Advisers Act and SEC Rules .........................15

    D.  As a Matter of Law, BNY's Alleged Regulatory Violations Did Not Cause Sentinel's Customers' Losses ................................................................17

II.  THE COMPLAINT SHOULD BE DISMISSED PURSUANT TO SECTION 8-503 OF THE UNIFORM COMMERCIAL CODE ................................................19

    A.  The Trustee's Right to Enforce the Property Interests of Sentinel's Customers is Limited by Section 8-503.................................................19

    B.  The Trustee's Claims are Barred by Section 8-503 .............................20

        1.  Sentinel is a "Securities Intermediary," its customers are "Entitlement

**TABLE OF CONTENTS**

Page

Holders" and BNY is a "Purchaser" under UCC Section 8-503 ...............20

2. This is an action based on the entitlement holder's property interest
   with respect to a particular financial asset held by BNY ...........................21

3. Because BNY gave value, obtained control and did not act in
   collusion with Sentinel, the Complaint must be dismissed........................21

III. EACH INDIVIDUAL COUNT OF THE COMPLAINT FAILS TO STATE A
     CLAIM UPON WHICH RELIEF MAY BE GRANTED ...................................................24

A. Avoidance and Recovery of Fraudulent Transfers (Counts I-II) ............................24

1. The Trustee has failed to allege that any purportedly fraudulent
   transfers were transfers of an "interest of the debtor in property".............25

2. The Trustee has failed to allege that any purportedly fraudulent
   transfers were made with the intent to defraud Sentinel creditors.............26

3. The Trustee has failed to identify virtually all of the challenged
   transfers with specificity ..........................................................................28

B. Avoidance and Recovery of Allegedly Preferential Transfers (Count III)............28

1. The Trustee has failed to allege that the purportedly preferential
   transfers were transfers of an "interest of the debtor in property".............28

2. The Complaint is self-contradictory as to whether the purportedly
   preferential transfers were made "on account of an antecedent debt".......29

C. Equitable Subordination of BNY's Claim (Count IV) .........................................29

1. BNY did not engage in inequitable conduct ..............................................30

2 BNY's alleged conduct did not injure creditors or confer an unfair
  advantage on BNY .....................................................................................33

D. Disallowance of BNY's Proof of Claim (Count V)................................................33

E. Equitable Disallowance of BNY's Proof of Claim (Count VI) ..............................34

F. Action to Determine Validity and Extent of Lien and for Turnover
   of Property (Count VII) ......................................................................................36

ii

## TABLE OF CONTENTS

**Page**

G.  Aiding and Abetting/Knowing Participation in Breach of Fiduciary
Duty by Sentinel's Insiders (Count VIII)..............................................................37

   1.  The aiding and abetting claim is barred by the *Wagoner* rule ...................37

   2.  The Complaint fails to allege that BNY knew of Sentinel's insiders'
   fiduciary breaches and provided "substantial assistance" ........................38

CONCLUSION......................................................................................................................40

# TABLE OF AUTHORITIES

**Page**

**Cases**

Alexander v. Sandoval,
    532 U.S. 275 (2001)..........................................................................................................8, 10

Aluminum Mills Corp. v. Citicorp N. Am., Inc. (In re Aluminum Mills Corp.),
    132 B.R. 869 (Bankr. N.D. Ill. 1992) ..................................................................................31

Am. Agric. Movement, Inc. v. Bd. of Trade,
    977 F.2d 1147 (7th Cir. 1992) ............................................................................................12

Badger Freightways, Inc. v. Cont'l Ill. Nat'l Bank and Trust Co. of Chi.
(In re Badger Freightways, Inc.),
    106 B.R. 971 (Bankr. N.D. Ill. 1989) .......................................................................30, 31, 32

Bank One, Chic., NA v. Flowers,
    183 B.R. 509 (N.D. Ill. 1995) ............................................................................................36

Barnhill v. Johnson,
    503 U.S. 393 (2002)...........................................................................................................19

Begier v. IRS,
    496 U.S. 53 (1990).............................................................................................................25

Bell Atlantic Corp. v. Twombly,
    127 S. Ct. 1955 (2007).................................................................................................15, 24

Benjamin v. Diamond (In re Mobile Steel Co.),
    563 F.2d 692 (5th Cir. 1977) ....................................................................................30, 35, 36

Bennett v. Johnson,
    No. 92-C-6880, 1993 U.S. Dist. LEXIS 8996 (N.D. Ill. June 30, 1993)................................19

Borsellino v. Goldman Sachs Group, Inc.,
    477 F.3d 502 (7th Cir. 2007) .............................................................................................27

Breeden v. Kirkpatrick & Lockhart (In re Bennett Funding),
    336 F.3d 94 (2d Cir. 2003).................................................................................................38

Butner v. United States,
    440 U.S. 48 (1979).............................................................................................................19

City of Rancho Palos Verdes v. Abrams,
    544 U.S. 113 (2005)...................................................................................................... 10, 11

iv

**TABLE OF AUTHORITIES**
(continued)

**Page**

Conder v. Union Planters Bank, N.A.,
    NO. IP01-0086-C-D/F,  2003 U.S. Dist. LEXIS 22215 (S.D. Ind. Sept. 26, 2003)
    *aff'd*, 348 F.3d 397 (7th Cir. 2004)...................................................................................17, 18

Cromer Fin. Ltd. v. Berger,
    137 F. Supp. 2d 452 (S.D.N.Y. 2001)...............................................................................38

Daly v. Kennedy (In re Kennedy),
    279 B.R. 455 (Bankr. D. Conn. 2002) .........................................................................26, 27, 28

Dickerman v. N. Trust Co.,
    176 U.S. 181 (1900).........................................................................................................22

Dunham v. Kisak,
    192 F.3d 1104 (7th Cir. 1999) ..................................................................................25, 26, 29

Ernst & Young v. Bankr. Servs. (In re CBI Holding Co., Inc.),
    311 B.R. 350 (S.D.N.Y. 2004).....................................................................................37, 38

First Nat'l Bank of Barnesville v. Rafoth (In re Baker & Getty Fin. Servs., Inc.),
    974 F.2d 712 (6th Cir. 1992) ........................................................................................32

Galey & Lord, Inc. v. Arley Corp. (In re Arlco, Inc.),
    239 B.R. 261 (Bankr. S.D.N.Y. 1999).......................................................................21

Georgou v. Fritzshall,
    994 WL 685065 (N.D. Ill. Dec. 6, 1994)...................................................................2

Glidden Co. v. Jandernoa,
    5 F. Supp. 2d 541 (W.D. Mich. 1998) .......................................................................39

Great Am. Ins. Co. v. Bailey (In re Cutty's-Gurnee, Inc.),
    133 B.R. 934 (Bankr. N.D. Ill. 1991) ........................................................................30

Grumman Allied Indus., Inc. v. Rohr Indus., Inc.,
    748 F.2d 729 (2d Cir. 1984).........................................................................................17

Helms v. Arboleda (In re Arboleda),
    224 B.R. 640 (Bankr. N.D. Ill. 1998) ........................................................................26

Herzog v. Leighton Holdings, Ltd. (In re Kids Creek Partners, L.P.),
    200 B.R. 996 (Bankr. N.D. Ill. 1996) ........................................................................31

v

**TABLE OF AUTHORITIES**
(continued)

<u>**Page**</u>

<u>Holloway v. IRS (In re Odom Antennas, Inc.)</u>,
    340 F.3d 705 (8th Cir. 2003) .................................................................34

<u>In re Busman</u>,
    5 B.R. 332 (Bankr. E.D.N.Y. 1980)........................................................36

<u>In re Dana Corp.</u>,
    367 B.R. 409 (Bankr. N.D. Ill. 2007) ....................................................19

<u>In re FBN Food Servs., Inc.</u>,
    82 F.3d 1387 (7th Cir. 1996) .................................................................19

<u>In re Giffune</u>,
    343 B.R. 883 (Bankr. N.D. Ill. 2006) ....................................................13

<u>In re Sharp Int'l Corp.</u>,
    302 B.R. 760 (Bankr. E.D.N.Y. 2003)...............................................39, 40

<u>Katchen v. Landry</u>,
    382 U.S. 323 (1966)..............................................................................34

<u>Khalid Bin Alwaleed Found. v. E.F. Hutton & Co., Inc.</u>,
    709 F. Supp. 815 (N.D. Ill. 1989) ............................................................8

<u>Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting</u>,
    908 F.2d 1351 (7th Cir. 1990) ......................................................30, 31, 32

<u>Kolbeck v. LIT Am., Inc.</u>,
    939 F. Supp. 240 (S.D.N.Y. 1996) .....................................................16, 39

<u>Log on Am., Inc. v. Promethean Asset Mgmt. L.L.C.</u>,
    223 F. Supp. 2d 435 (S.D.N.Y. 2001).....................................................16

<u>Lone Star Indus., Inc. v. Compania Naviera Perez Companc, S.A.C.F.I.M.F.A.</u>
<u>(In re New York Trap Rock Corp.)</u>,
    42 F.3d 747 (2d Cir. 1994).....................................................................22

<u>Marseilles Hydro Power v. Marseilles Land & Water Co.</u>,
    2003 U.S. Dist. LEXIS 1652 (N.D. Ill. Feb. 4, 2003) ............................17

<u>Matrix IV, Inc. v. Am. Nat'l Bank and Trust Co. of Chi. (In re S.M. Acquisitions Co.)</u>,
    2006 WL 2290990 (N.D.Ill.Aug. 7, 2006) ............................................30

# TABLE OF AUTHORITIES
(continued)

**Page**

Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n,
　453 U.S. 1 (1981)............................................................................ 9, 10

Mohr v. WCKG, Inc.,
　462000 U.S. Dist. LEXIS 19595 (N.D. Ill. Oct. 17, 2000)........................ 6

Monetta Fin. Servs., Inc. v. SEC,
　390 F.3d 952 (7th Cir. 2004) .............................................................16

Neiman v. Irmen (In re Irmen),
　379 B.R. 299 (Bankr. N.D. Ill. 2007) ..............................................24, 27

Nelson v. Monroe Reg'l Medical Center,
　25 F.2d 1555 (7th Cir. 1991) ...............................................................2

Nisselson v. Ford Motor Co. (In re Monahan Ford Corp.),
　340 B.R. 1 (Bankr. E.D.N.Y. 2006).....................................................38

N.W. Bank Worthington v. Ahlers,
　485 U.S. 197 (1988)..........................................................................35

O'Connell v. Arthur Andersen LLP (In re AlphaStar Ins. Group Ltd.),
　383 B.R. 231 (Bankr. S.D.N.Y. 2008)..............................................37, 38

Olson v. Potter (In re Potter),
　88 B.R. 843 (Bankr. N.D. Ill. 1988) ....................................................27

Palombo Farms of Colo., Inc. v. Nat'l Acceptance Corp. of Am., Inc.
(In re Palombo Farms of Colo., Inc.),
　43 B.R. 709 (Bankr. D. Colo. 1984) ................................................ 36-37

Parker N. Am. Corp. v. Resolution Trust Corp. (In re Parker N. Am. Corp.),
　24 F.3d 1145 (9th Cir. 1994) ..............................................................34

Premier Transp., Ltd. v. Nextel Commc'ns, Inc.,
　2003 WL 21267096 (N.D. Ill. May 30, 2003) ........................................17

Raleigh v. Ill. Dep't of Revenue,
　530 U.S. 15 (2000)............................................................................35

Shearson Lehman Hutton, Inc. v. Wagoner,
　944 F.2d 114 (2d Cir. 1991)............................................................37, 38

**TABLE OF AUTHORITIES**
(continued)

Stevenson v. J.C. Bradford & Co. (In re Cannon),
  277 F.3d 838 (6th Cir. 2002) ................................................................. 25-26

Stoneridge Inv. Partners v. Scientific-Atlanta, Inc.,
  128 S. Ct. 761 (2008) ................................................................................10

Tamari v. Bache & Co. (Lebanon) S.A.L.,
  730 F.2d 1103 (7th Cir. 1984) ............................................................. 12-13

Town of Thornton v. Winterhoff,
  92 N.E.2d 163 (Ill. 1950) ...........................................................................17

Transamerica Mortgage Advisors, Inc. v. Lewis,
  444 U.S. 11 (1979) .......................................................................7, 8, 10-11

Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.,
  127 S. Ct. 1199 (2007) ...............................................................................35

Trepanier v. Ryan,
  No. 00 C 2393, 2004 WL 1102417 (N.D. Ill. May 17, 2004) .................10

Tzaras v. Evergreen Int'l Spot Trading, Inc.,
  No. 01-Civ-10726, 2003 U.S. Dist. LEXIS 2550 (S.D.N.Y. Jan. 25, 2003) ...........17

Unsecured Creditors' Comm. v. Banque Paribas (In re Heartland Chem., Inc.),
  136 B.R. 503 (Bankr. C.D. Ill. 1992) ......................................... 30-31, 33

Voiland v. Gillissie (In re Gillissie),
  215 B.R. 370 (Bankr. N.D. Ill. 1997) .......................................................24

Wight v. BankAmerica Corp.,
  219 F.3d 79 (2d Cir. 2000) ........................................................................37

**Statutes**

7 U.S.C. ch. 1 ..............................................................................................6, 8

7 U.S.C. § 1a(20) ...........................................................................................12

7 U.S.C. § 6d ....................................................................................... 11, 14-15

7 U.S.C. § 9 ......................................................................................................8

TABLE OF AUTHORITIES
(continued)

**Page**

7 U.S.C. § 13b ............................................................................................... 8

7 U.S.C. § 25(a) ............................................................................................ 8

11 U.S.C. § 101(6) ....................................................................................... 14

11 U.S.C. § 103(d) ....................................................................................... 14

11 U.S.C. § 502(b) ....................................................................................... 35

11 U.S.C. § 502(d) ................................................................................. 33, 34

11 U.S.C. § 506 ..................................................................................... 36, 37

11 U.S.C. § 510(c) ........................................................................... 29-30, 35

11 U.S.C. § 544 ..................................................................................... 25, 26

11 U.S.C. § 547(b) .............................................................................. 2, 28- 29

11 U.S.C. § 548 ............................................................... 24, 25, 26, 27, 28

11 U.S.C. § 550 ............................................................................................ 34

11 U.S.C. § 761(9) ....................................................................................... 14

15 U.S.C. § 80b-6(4) ........................................................... 6, 15, 16, 17

42 U.S.C. § 1983 ........................................................................................... 9

740 Ill. Cons. Stat. Ann. 160/5(a)(1) ..................................................... 24

740 Ill. Cons. Stat. Ann. 160/8(a) .......................................................... 24

N.Y. U.C.C. § 1-201(29) ..................................................................... 20-21

N.Y. U.C.C. § 1-201(30) ..................................................................... 20-21

N.Y. U.C.C. § 1-201(44) ........................................................................... 21

N.Y. U.C.C. § 8-102 .................................................................................. 20

# TABLE OF AUTHORITIES
(continued)

**Page**

N.Y. U.C.C. § 8-102(7) ...............................................................................................20

N.Y. U.C.C. § 8-102(14) .............................................................................................20

N.Y. U.C.C. § 8-503 ..............................................................................................*passim*

N.Y. U.C.C. § 8-503(e) .........................................................................................*passim*

N.Y. U.C.C. § 8-504 ..............................................................................................*passim*

N.Y. U.C.C. § 8-511(b) ...............................................................................................19

**Regulations**

17 C.F.R. §§ 1.1-190.10 ...............................................................................................6

17 C.F.R. § 1.20(a) .....................................................................................................14

17 C.F.R. § 1.23 ..........................................................................................................18

17 C.F.R. § 275.206(4)-2(a) .........................................................................................6

**Rules**

FED. R. BANKR. P. 7009 .................................................................................................1

FED. R. BANKR. P. 7012 ..........................................................................................1, 24

FED. R. CIV. P. 9(b) .....................................................................................1, 26, 27, 28

FED. R. CIV. P. 12(b)(6) ..........................................................................................1, 24

**Other Authorities**

1997 N.Y. A.L.S. 566 ..................................................................................................23

1997 N.Y. Sess. Laws ch. 566, § 1 (Oct. 10, 1997) ...............................................22-23

H.R. Rep. No. 97-565(l) (1982), *reprinted in* 1982 U.S.C.C.A.N. 3871 .......................8

H.R. Rep. No. 975, 93d Cong., 2d Sess. 1 ..................................................................12

*Views of Our Readers*, 55 A.B.A.J. 818 (1969) ..........................................................13

**TABLE OF AUTHORITIES**
(continued)

**Page**

CFTC Release, Financial and Segregation Interpretation No. 7-1 .................................................18

CFTC Release, Securities Representing Investment of Customer Funds
Held in Segregated Accounts by Futures Commission Merchants,
62 Fed. Reg. 42,398 (Aug. 7, 1997)..............................................................................................18

BLACK'S LAW DICTIONARY (8th ed. 2004) ..................................................................................22

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (G.&C. Miriam Co. ed. 1976)................22

Defendants The Bank of New York ("BNY") and The Bank of New York Mellon Corp. respectfully submit this memorandum of law in support of their motion to dismiss the complaint ("Complaint" or "Cmplt.") of Plaintiff Frederick J. Grede, as Chapter 11 Trustee (the "Trustee") for Sentinel Management Group, Inc. ("Sentinel"), pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), as incorporated by reference in Fed. R. Bankr. P. 7009 and 7012.

## PRELIMINARY STATEMENT

This case should be nothing more than an ordinary dispute between a secured lender and a debtor in bankruptcy over a pool of collateral that was used to secure a loan. Under the governing agreements between BNY and Sentinel and by operation of law, BNY has a valid, first-priority, perfected security interest in and lien upon all assets held in Sentinel's non-segregated accounts, including its clearing, or "street," accounts at BNY (collectively, the "Collateral"). That fact is supported by established law and by the plain language of the agreements themselves, in which Sentinel represented to BNY, among other things, that it was authorized to pledge assets to BNY to secure loans and other extensions of credit; that to the extent anyone other than Sentinel once had a beneficial interest in the assets, those rights had been extinguished; and that BNY was granted a first lien and security interest subject to no setoffs, counterclaims or other liens.

By necessity, the Trustee's 59-page, 236-paragraph Complaint purports to tell a much different story, one that culminates in eight separate claims against BNY that share one common thread: they rise or fall with allegations that BNY violated the Commodity Exchange Act and the Investment Advisers Act of 1940 by "permitting" Sentinel to maintain an account structure – one implicitly, if not explicitly, blessed by Sentinel's outside auditors and various government regulators for more than 10 years – in which Sentinel, if it chose to, could commingle assets.

1

These central allegations fail as a matter of law. There is no private right of action under the CEA and Advisers Act, and no mechanism for subverting that fact by seeking to enforce these statutes through the broad remedial provisions of the Bankruptcy Code. Even if there were, the Trustee comes nowhere near alleging the necessary facts to support a violation of these statutes. And under the Trustee's theory of liability (or any theory), as a matter of law BNY was not and cannot have been the proximate cause of any losses to Sentinel or its customers. Once these central allegations fail, as they must, the Complaint collapses in its entirety.

But even accepting all of these factual allegations as true[1] , the Complaint should still be dismissed as a matter of law:

- *First,* all of the Trustee's claims are barred by Article 8 of the Uniform Commercial Code ("UCC"). BNY is a "purchaser" of the Collateral, "gave value" to Sentinel in the form of loans and other extensions of credit, maintained "control" of the Collateral, and did not engage (and is not alleged to have engaged) in the type of affirmative misconduct that rises to the level of "collusion" as that term is defined by UCC § 8-503. Accordingly, the Trustee can assert no action to enforce the purported rights of Sentinel's customers.

- *Second,* Counts I and II of the Complaint, for recovery of fraudulent transfers, should be dismissed because the Complaint fails to allege fraud with particularity. Moreover, because the property that was pledged to BNY as collateral was, according to the Complaint, the property of Sentinel's customers, and not of Sentinel itself, the Complaint does not allege any transfer of "an interest in property of *the debtor,*" Consequently, these Counts – along with Count III – must be dismissed.

- *Third,* the allegedly preferential transfers in Count III are not alleged to have been made on account of an antecedent debt and therefore do not fall within 11 U.S.C. § 547(b)(2).

- *Fourth,* because BNY was not an insider of Sentinel, a claim for equitable subordination of BNY's claim (Count IV) must allege conduct that is "egregious" and "severely unfair" to Sentinel's other creditors. The Complaint, which alleges no affirmative misconduct on the part of BNY, does nothing of the sort.

- *Fifth,* the Trustee's causes of action for disallowance (Count V) and for determination of BNY's lien and turnover of the Collateral (Count VII) are not ripe. Disallowance of

---

[1]    *See Nelson v. Monroe Reg'l Med. Ctr.,* 925 F.2d 1555, 1559 (7th Cir. 1991) ("[W]e are not required to accept legal conclusions either alleged or inferred from the pleaded facts.") (citation omitted); *Georgou v. Fritzshall,* 1994 WL 685065, at *7 (N.D. Ill. Dec. 6, 1994) (while discussing the standard for a Rule 12(b) motion to dismiss, the court noted that "[it] need not accept as true conclusory legal allegations").

BNY's claim is appropriate only if the Trustee successfully proves his other claims in the Complaint (which he cannot do), and then only if BNY refuses to return the Collateral. Turnover is not ripe because this Court has not disallowed BNY's claim.

- *Sixth*, the Trustee's cause of action for equitable disallowance (Count VI) must be dismissed because that cause of action is not authorized by the Bankruptcy Code.

- And *finally*, Count VIII – aiding and abetting/knowing participation in breach of fiduciary duty – must be dismissed because the Complaint does not (and cannot) adequately allege that BNY knew of the alleged breaches by Sentinel's insiders or that BNY provided substantial assistance to the Sentinel insiders.

## STATEMENT OF FACTS

Before filing for bankruptcy in August 2007, Sentinel was a money manager that accepted deposits of cash from a variety of sophisticated customers in exchange for proportionate interests in its investment accounts. Cmplt. ¶ 23.    It was a futures commission merchant ("FCM") in name only.   It never, in its history, "engage[d] in any commodities trading for its customers, but instead only invested funds deposited by other FCMs and Sentinel's other customers," including individuals and hedge funds. *Id.* ¶ 29.

For more than 10 years, Sentinel was a BNY customer, first as a client of its custodial services division and then, just months into the relationship, as a client of its clearing services division, which offered Sentinel same-day settlements and credit arrangements that Sentinel viewed as essential to its business model. *Id.* ¶¶ 53, 60. When Sentinel first became one (among hundreds) of BNY's clearing customers, Sentinel's custody accounts were closed, its custody contract was replaced with new agreements (the "1997 Agreements") and Sentinel opened a new set of accounts that remained in place, without incident, for 10 years. *Id.* ¶ 60, Exs. F, G.

BNY was Sentinel's clearing bank and its secured lender. *Id.* Exs. F, G.  As a secured lender, BNY provided Sentinel with loans and other extensions of credit on a daily basis and Sentinel pledged collateral to BNY to secure its debt. *Id.* ¶ 65.  To pledge assets as collateral to

BNY, Sentinel had only to transfer them to Sentinel's non-segregated accounts – commonly referred to as the "clearing" or "street" accounts ("Street Account") (*id.* Ex. F, § 3.04) – by issuing a "Desegregation Instruction" that only Sentinel was authorized to issue. *Id.* Ex. F, § 2.04(b). In the 1997 Agreements, Sentinel made a number of dispositive representations and warranties about its authority to transfer assets to the Street Account and BNY's rights to the Collateral held in that account. For example, Sentinel represented and warranted that:

- It was "authorized to issue [a] Desegregation Instruction and by so doing to transfer and pledge to [BNY] the full value of any and all such Securities." *Id.* When a Desegregation Instruction was executed, "any and all claims to such Securities by any third party, including without limitation, claims of or by customers or counterparties of [Sentinel, were] discharged, extinguished, released and terminated." *Id.*

- It owned all of the securities transferred to the Street Account "free and clear of all liens, claims, security interests and encumbrances (except those granted herein)." *Id.* Ex. F, § 4.01(d). If any of these securities were beneficially owned by others, Sentinel had "the right to pledge such Securities to the extent financed by [BNY] hereunder, free of any right of redemption or prior claim by the beneficial owner." *Id.*

- BNY's security interest in the pledged assets "shall be a first lien and security interest subject to no setoffs, counterclaims or other liens prior to or on a parity with it in favor of any other party" and agreed to "take any and all additional steps which [BNY] requires to assure itself of such priority and status, including notifying third parties or obtaining their consent." *Id.*

In January 2003, Sentinel entered into additional agreements with the clearing services division that permitted Sentinel to expand its money management activities into the global markets (the "2003 Agreements"). *Id.* ¶¶ 75-76, Exs. H, I. The 2003 Agreements are substantially identical to the 1997 Agreements and contemplated no material change in the way Sentinel's accounts were managed. *Compare id.* Exs. F, G, *with id.* Exs. H, I. Indeed, from the time of Sentinel's transfer to the clearing services division through the Summer of 2007 – during numerous audits by government agencies, including the Commodity Futures Trading Commission ("CFTC") and the National Futures Association ("NFA"), and by experienced

accountants – Sentinel's relationship with BNY was routine:   BNY accepted and executed Sentinel's instructions for the receipt, delivery and transfer of cash and securities, debited and credited Sentinel's account balances accordingly, and made loans to Sentinel after Sentinel's pledge of sufficient collateral to secure such loans. Cmplt. ¶ 57.

By the summer of 2007, however, Sentinel began to experience financial difficulties and, on August 13, 2007, announced that it was halting all redemptions of customer assets.  Cmplt. ¶¶ 128, 156.  Four days later, on August 17, 2007 (the "Petition Date"), Sentinel filed for Chapter 11 bankruptcy protection in the this Court.  As of the Petition Date, Sentinel's outstanding principal indebtedness to BNY was $312,247,000, and on January 18, 2008, BNY filed a proof of claim in Sentinel's bankruptcy case setting forth the secured indebtedness owing to BNY from Sentinel. *Id.* ¶ 167.

The Trustee has since filed an adversary complaint against Sentinel's principals alleging that they devised and participated in a series of interrelated schemes to defraud Sentinel and its customers. *Grede v. Bloom et al. (In re Sentinel Mgmt. Group)*, No. 07 B 14987, Adv. No. 07-981 (Bankr. N.D.Ill. Filed Oct. 11, 2007), Ex. A.   Specifically, that complaint alleges that Sentinel's principals, *inter alia*, made fraudulent misrepresentations about the nature of customer investments; kept inconsistent records of allocations of securities in various bank accounts; fraudulently concealed the existence of leveraging through bank loans; fraudulently diverted income from customers' securities; fraudulently extracted customers' trading gains for personal accounts by insiders; issued false account statements; and engaged in a raft of other fraudulent and wrongful conduct. *Id.* ¶ 4.

On March 3, 2008, the Trustee filed the instant Complaint against BNY.  The thrust of the Complaint is that BNY "established a fundamentally flawed account structure for Sentinel's

accounts in violation of its obligations under federal law and its duties to Sentinel." Cmplt. ¶ 3. According to the Complaint, BNY "facilitated" Sentinel's misuse of customer funds via the flawed account structure, in particular by "allowing" Sentinel to pledge customer funds to secure BNY's loan to Sentinel and commingling customer assets with Sentinel's own assets. *Id.* ¶ 3. The Trustee alleges that BNY's conduct caused in excess of $550 million in damages. *Id.* ¶ 10.

**ARGUMENT[2]**

## I.     THE     ALLEGATIONS     THAT     BNY     VIOLATED     FEDERAL     LAW     SHOULD BE REJECTED

The Complaint relies principally on allegations that BNY violated the Commodity Exchange Act ("CEA"), 7 U.S.C. ch. 1, and the rules and regulations promulgated thereunder by the CFTC, 17 C.F.R. §§ 1.1-190.10 (the "CFTC Rules"). To a lesser extent, the Complaint also relies on allegations that BNY "participated in" violations of Section 206 of the Investment Advisers Act of 1940 (the "Advisers Act"), 15 U.S.C. § 80b-6(4), and Rule 206(4)-2 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 275.206(4)-2(a) ("SEC Rule 206(4)-2").

These allegations of statutory violations are a smokescreen. The Trustee does not bring any actual claim under the CEA or the Advisers Act. Indeed, for reasons explained *infra*, the Trustee *cannot* bring such a claim because there is no private right of action for the statutory and regulatory violations the Trustee alleges. Rather, the Trustee seeks to imbue BNY's conduct with the *aura* of illegality, and to use these purported "violations" to underpin other claims for relief. But there is no mechanism for the Trustee to assert indirectly what the law clearly forbids

---

[2]       As an initial matter, defendant The Bank of New York Mellon Corp. should be dropped from this case because it is an improperly named party. The Bank of New York Mellon Corp. is a holding company, and none of the allegations in the Complaint relate to its activities as opposed to those of its subsidiary, BNY. An entity should not be a co-defendant simply by virtue of the fact that another defendant is a subsidiary of that entity. *See Mohr v. WCKG, Inc.*, 2000 WL 1535991, at *1 (N.D. Ill. Oct. 17, 2000) (dismissing parent company as a party defendant pursuant to misjoinder provisions of Rule 21).

6

him from asserting directly.  In any event, because the Trustee's factual allegations do not support his conclusory legal assertions that these statutes and regulations have, in fact, been violated, the alleged violations cannot serve as a basis for any of the Trustee's claims against BNY, however those claims are framed.  In other words, those legal conclusions must be ignored for purposes of evaluating BNY's motion to dismiss.

Once this Court rejects the conclusion that BNY's alleged conduct violates the CEA and the Advisers Act, the threadbare nature of the Complaint becomes readily apparent.  Absent these allegations, the Complaint deflates to near-nothing and the counts that wholly depend upon BNY's purported statutory violations – in particular, the claims for equitable subordination (Count IV), disallowance of BNY's secured claim (Count V), and equitable disallowance (Count VI), and the Trustee's action to determine the validity and extent of BNY's lien (Count VII) – must be dismissed outright.  *See, e.g.*, ¶¶ 195, 207, 208, 215, 224, 225 (relying on purported violations of the CEA and Adviser's Act to state claims).

**A.      The Trustee Has No Right to Recover Directly under Either
         the Advisers Act or the CEA**

The Trustee has not asserted any claims under the Advisers Act or the CEA, and for good reason:  no private right of action under either statute could arise out of BNY's alleged conduct.

Indeed, there can never be a private right of action for violations of Section 206 of the Advisers Act.  *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 19-20 (1979).  In *Transamerica*, the U.S. Supreme Court held that the Advisers Act confers no private remedies other than the limited right to rescind a contract deemed to be void under Section 215.  *Id.* at 24-25.  That right of rescission does not include "compensation for any diminution in value of the rescinding party's investment alleged to have resulted from the adviser's action or inaction[,]"

because such relief "could provide by indirection the equivalent of a private damages remedy that we have concluded Congress did not confer." *Id.* at 25 n.14.

Unlike the Advisers Act, the CEA does provide a private right of action, but only for violations arising directly out of a limited set of transactions not at issue here. *See* 7 U.S.C. § 25(a). Specifically, in order to recover in a private action under the CEA, "the violation must have arisen from a transaction on the futures markets, a regulated option or leverage contract, or participation in a commodity pool." H.R. Rep. No. 97-565(l), at 56-57 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3871, 3905-06. Otherwise, enforcement, if any, falls generally to the CFTC. *See* 7 U.S.C. ch. 1; *see also id.* §§ 9, 13b (authorizing the *CFTC* to issue a cease and desist order, prohibit the violator from trading, suspend or revoke its registration, assess civil penalties, and require restitution to customers of damages proximately caused by the violations).

Under this framework, there can be no private right of action against *Sentinel*, much less a non-FCM depository like BNY that, by definition, does not engage in the activities described in Section 25(a). Cmplt. ¶ 29. The purported violations of the CEA arose out of the allegedly flawed account structure, BNY's clearing activities and BNY's acceptance of certain assets as collateral for Sentinel's loan, which is a far cry from conduct arising from a "transaction on the future markets, a regulated option or leverage contract, or participation in a commodity pool." 7 U.S.C. § 25(a); *see also* Cmplt. ¶ 48. There unquestionably is no private right of action against BNY.[3]

---

[3]    Because the Trustee has no private right of action for BNY's alleged violations of the Advisers Act and the CEA, he likewise has no private right of action for BNY's alleged violations of the CFTC and SEC Rules. *See Alexander v. Sandoval*, 532 U.S. 275, 291 (2001); *Khalid Bin Alwaleed Found. v. E.F. Hutton & Co., Inc.*, 709 F. Supp. 815, 818-19 (N.D. Ill. 1989).

**B.**    **The Trustee Cannot Assert Claims Against BNY that**
**Are Premised upon Non-Actionable Alleged Regulatory Violations**

The majority of the Complaint's 236 paragraphs, 59 pages, and eight separate claims for relief relate to BNY's alleged regulatory violations.    They are the underpinning of Counts IV-VII of the Complaint.    Paragraphs 23 through 99 of the Complaint address *only* those alleged violations.    And on eight separate occasions in the Complaint, the Trustee accuses BNY of having violated federal law.[4]    In short, the Trustee seeks to make an end-run around settled law and unambiguous Congressional intent by pleading bankruptcy claims and seeking damages based on BNY's alleged violations of these statutes.    Because the Trustee cannot do indirectly what he is forbidden from doing directly – namely, obtaining relief for the alleged violations of the CEA and the Advisers Act – Counts IV, V, VI and VII of the Complaint must be dismissed.

There is not a single federal opinion that has allowed a party to privately enforce the CEA or the Advisers Act through the broad remedial provisions of the Bankruptcy Code notwithstanding the fact that those statutes contain comprehensive enforcement schemes of their own.    Under closely analogous facts, the U.S. Supreme Court has uniformly *rejected* such efforts to thwart Congressional intent.    In *Middlesex County Sewerage Authority v. National Sea Clammers Association*, the Court held that the comprehensive enforcement schemes found in the Federal Water Pollution Control Act and the Marine Protection, Research, and Sanctuaries Act of 1972 could not be privately "bypassed" by asserting claims under another federal statute – specifically, 42 U.S.C. § 1983.    *See* 453 U.S. 1, 20 (1981).    In so doing, the Court stated that "[w]hen the remedial devices provided in a particular statute are sufficiently comprehensive,

---

[4]    However, the Trustee does not, and cannot, cite to a single instance over the course of a 10-plus year relationship in which any governmental agency (including the SEC and CFTC), any self-regulatory body (including the NFA), Sentinel's independent accounting firm, or any customer of Sentinel claimed, advised, or notified BNY that the account structure at BNY was flawed or that BNY's management of the accounts was improper or violated any law or regulation.

they may suffice to demonstrate congressional intent to preclude the remedy of suits under §
1983." *Id.*

Likewise, in *City of Rancho Palos Verdes v. Abrams*, the Court held that Congress did
not intend for a judicial remedy expressly authorized by the Communications Act of 1934 to
"coexist with an alternative remedy available in a § 1983 action." 544 U.S. 113, 120-21 (2005).
In dismissing the complaint, the Court invoked *Sea Clammers*, emphasizing that the statutory
remedies were more restrictive than the broad remedy provided by Section 1983. *Id.* at 121; *see
also Stoneridge Invest. Partners v. Scientific-Atlanta, Inc.,* 128 S. Ct. 761, 774 (2008) (declining
to extend primary liability under a federal statute so as to be "consistent with the narrow
dimensions [the Court] must give to a right of action Congress did not authorize when it first
enacted the statute and did not expand when it revisited the law"); *Sandoval*, 532 U.S. at 290
("The express provision of one method of enforcing a substantive rule suggests that Congress
intended to preclude others."); *Trepanier v. Ryan*, 2004 WL 1102417, at *3 (N.D. Ill. May 17,
2004) (precluding a claim under one federal statute that relied on violations of a separate statute
that contained a comprehensive enforcement scheme).

The Supreme Court's rationale in *Sea Clammers* and *Abrams* applies equally here.  Like
the allegations in those cases, the core of the Trustee's allegations arise under federal statutes
that have restrictive private remedies.  Like the plaintiffs in *Sea Clammers* and *Abrams*, the
Trustee relies on a separate federal statutory scheme to seek remedies not available under the
statutes that he claims were violated.  And like the claims in those cases, the Trustee's claims
under the separate statutory scheme – here, the Bankruptcy Code – should fail as a matter of law.

In sum, in both the CEA and the Advisers Act, Congress provided comprehensive
enforcement schemes with limited or no private rights of action.  Enforcement of these statutes

10

through the Bankruptcy Code to reorder creditors' rights and settled property interests would be wholly inconsistent with these statutory schemes and would "provide by indirection the equivalent of a private damages remedy that . . . Congress did not confer." *Transamerica*, 444 U.S. at 24 n.14; *see also Abrams*, 544 U.S. at 120 ("The crucial consideration is what Congress intended.") (citation omitted). Accordingly, this Court should dismiss Counts IV-VII of the Complaint.

### C.    The Complaint Does Not Adequately Plead Violations of the CEA and the Advisers Act

To the extent the Trustee could, somehow, subvert Congressional intent and assert bankruptcy claims that are wholly premised upon alleged violations for which there is no private right of action, Counts IV-VII still must be dismissed because the Trustee has not adequately pleaded the alleged statutory or regulatory violations.

#### 1.    The CEA and CFTC Rules do not apply

It is axiomatic that there can be no violation of a statute if it does not regulate the activity in question. In support of the Trustee's position that the CEA and CFTC Rules governed Sentinel's activities with BNY (and Sentinel's activities with its own customers), the Complaint alleges only that Sentinel was registered with the CFTC as an FCM and was "managing funds required to be segregated for the benefit of customers." Cmplt. ¶¶ 29-30. Neither of these allegations is sufficient to establish the applicability of the CEA to BNY.[5]

##### a.    The Complaint fails to allege that Sentinel was engaged in the business of an FCM

The CEA governs the activities of FCMs. An FCM is "an individual, association, partnership, corporation, or trust that –

---

[5]    Notably, our research has revealed no decision, reported or otherwise, in which any party – including the CFTC – has brought an action against a depository for an alleged violation of Section 4d(b) of the CEA.

(A)   is engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any contract market or derivatives transaction execution facility; and

(B)   in or in connection with such solicitation or acceptance of orders, accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom.

7 U.S.C. § 1a(20).

The Trustee does not allege that Sentinel functioned as an FCM; rather, the Complaint asserts merely that Sentinel was registered with the CFTC as such. There is no allegation that Sentinel did any of the above activities. Sentinel neither solicited nor accepted orders for the purchase or sale of commodities or commodity options. *See id.* It never made orders on or subject to the rules of a contract market or derivatives transaction execution facility. *See id.* It never accepted money, securities or property in or in connection with such orders. *See* 7 U.S.C. § 1a(20)(B). And it never used any such money, securities or property to margin, guarantee, or secure any trades or contracts resulting from such orders. *See id.* In fact, the Trustee effectively concedes that Sentinel was not an FCM within the meaning of the CEA: "Sentinel did not engage in any commodities trading for its customers, but instead only invested funds deposited by other FCMs and Sentinel's other customers." Cmplt. ¶ 29.

Because Sentinel was not functioning as an FCM, its activities did not fall within the scope of conduct regulated by the CEA or CFTC Rules, which establish "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Am. Agric. Movement, Inc. v. Bd. of Trade*, 977 F.2d 1147, 1155 (7th Cir. 1992) (quoting H.R. Rep. No. 975, 93d Cong., 2d Sess. 1); *see Tamari v. Bache & Co. (Lebanon) S.A.L.*, 730 F.2d 1103, 1106 (7th Cir. 1984) (observing that the CEA's regulatory regime governs "domestic futures exchanges

12

and the trading of futures contracts on those exchanges"). As a result, the "strict custodial and segregation requirements" of the CEA and CFTC Rules – the alleged basis for BNY's purported violations (Cmplt. ¶¶ 59-61) – did not apply, either to Sentinel's investments of its customers' assets or, by extension, to BNY's conduct as Sentinel's clearing agent and custodian.

It is a bedrock principle that "the applicable statutory language . . . is the best evidence of the purpose of the statutes. Where a provision is unambiguous, courts must give effect to the plain meaning of the statutory language." *In re Giffune*, 343 B.R. 883, 891 (Bankr. N.D. Ill. 2006). Courts should "interpret words and phrases in such a way as to avoid rendering them redundant, superfluous, or meaningless." *Id.* In accordance with these principles, this Court should apply the plain language of the CEA's definition of FCM. There is no ambiguity in that definition, and there can be no dispute that Sentinel did not and does not fall within it.

\* \* \*

A story is told of Abraham Lincoln during his trial lawyer days. Lincoln is said to have cross-examined a witness as follows:

> Q:    How many legs does a horse have?
> A:    Four.
> Q:    Now, if you call the tail a leg, how many legs does a horse have?
> A:    Five.
> Q:    No. The answer is still four. Calling a tail a leg doesn't make it a leg.

*See Views of Our Readers*, 55 A.B.A.J. 818 (1969).

\* \* \*

So it is here. The Trustee can call Sentinel an FCM all he wants, but it was not an FCM because it never met the statutory definition of an FCM. The CEA's segregation requirements simply did not apply. [6]

---

[6]    Along those lines, Sentinel could not have qualified for, and did not file under, the "commodity broker" liquidation provisions of Chapter 7 of the Bankruptcy Code because, to be eligible, it would have

b.   The Complaint fails to allege that the funds deposited by Sentinel were "customer funds" subject to the segregation requirement

The CEA's segregation requirements are not applicable for the additional reason that Sentinel did not accept (and is not alleged to have accepted) "customer funds" for deposit. Under the plain language of the statute, the segregation requirement applies only to "money, securities, and property received by [the person acting as an FCM] to margin, guarantee, or secure the trades or contracts of any customer of such person, or accruing to such customer as the result of such trades or contracts." CEA § 4d(a)(2) (7 U.S.C. §6d(a)(2)).[7] Collectively, these assets are referred to as "customer funds." *See* 17 C.F.R. § 1.20(a) (clarifying that the segregation requirements of Section 4d apply only to "customer funds").

As noted above, the Trustee alleges that Sentinel's only activity was as a depository of funds belonging to, among others, Sentinel's FCM customers (Cmplt. ¶ 29), and that Sentinel was required to treat any assets received for deposit pursuant to CEA Section 4d(a)(2) as belonging exclusively to the depositing FCM's customers. Cmplt. ¶¶ 30-32. But the Complaint does not allege that Sentinel received any such funds "to margin, guarantee, or secure the trades or contracts" of its customers. To the contrary, the Trustee concedes, as he must, that Sentinel did not receive any funds for the purpose of engaging in commodities trading for its customers.

---

had to have been an FCM with at least one "customer" holding claims against it based on either: (1) commodity contracts "made, received, acquired, or held by or through [Sentinel] in the ordinary course of [its] business as a futures commission merchant from or for the commodity futures account" of such customer; or (2) "the making, liquidation, or change in the value of a commodity contract," "a deposit or payment of cash, a security, or other property with [Sentinel] for the purpose of making or margining such a commodity contract" or "the making or taking of delivery on such a commodity contract." 11 U.S.C. §§103(d),101(6) and 761(9).

[7]   The CEA makes it unlawful for any person to act in the capacity of an FCM unless "such person shall have registered [with the CFTC]" *and* "such person shall, if a futures commission merchant . . . treat and deal with all money, securities, and property received by such person to margin, guarantee, or secure the trades or contracts of any customer of such person, or accruing to such customer as the result of such trades or contracts, as belonging to such customer." 7 U.S.C. § 6d(a)(1)-(2).

Cmplt. ¶ 29.[8]   Even if, at best, Sentinel's FCM customers might have accepted deposits of "customer funds" from their customers (which is not even alleged), there is not a shred of support for the notion that the money retained that character when it was later deposited with Sentinel in its role as money manager, and then again with BNY as a clearing bank.

Accordingly, because Sentinel was not an FCM within the meaning of the CEA and did not receive funds from its customers for the purpose of margining its customers' futures and options trading (*i.e.*, "customer funds"), the segregation regime contemplated in CEA Section 4(d)(2) did not apply.

        2.      The Complaint fails to allege that BNY "substantially assisted" Sentinel's violations of the Advisers Act and SEC Rules

Section 206 of the Advisers Act provides that it "shall be unlawful for any investment adviser . . . directly or indirectly . . . to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative." 15 U.S.C. § 80b-6(4).  The Trustee alleges that BNY "knowingly participated in" Sentinel's conduct that violated this section, in particular by permitting customer assets to be commingled with Sentinel's own assets, by permitting customer assets to be cleared through, and maintained in, accounts that were not properly registered in Sentinel's name, allowing Sentinel to maintain customer assets in a manner different than that disclosed by Sentinel to its customers, and by providing a mechanism for Sentinel to use

---

[8]     Rather than alleging that any of the assets accepted for deposit by Sentinel were accepted for the purposes delineated in Section 4d(a)(2), the Trustee attempts to plead around the statute by means of a footnote that purposefully avoids the statutorily defined term "customer funds" and instead defines "customer assets" and "customer securities" (two terms not defined in the CEA or the CFTC Rules) as any assets that were supposed to be segregated for the benefit of Sentinel's customers. Cmplt. ¶ 3, n.1. This circular definition fails to satisfy even the most liberal notice pleading standard because it does not explain whether, and to what extent, Sentinel received deposits of "customer funds," as that term is defined in the CEA. *See Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (holding that a complaint must include "more than labels and conclusions").  That is hardly surprising, given that Sentinel's agreements with its customers never referred to the funds deposited with Sentinel as "customer funds" as defined in the CEA.

customer assets to cover or secure securities purchases for other customer accounts or for Sentinel itself. Cmplt. ¶ 49. But, as noted *supra* Part I.A, there is no private right of action for violations of Section 206; any violations of Section 206 are actionable by the SEC alone, and then only upon a showing that BNY aided and abetted the violation.

Even operating under this non-existent statutory framework, the Trustee's allegations fail to satisfy the basic elements of an aiding and abetting claim – namely, that (1) Sentinel directly violated Section 206 and SEC Rule 206(4)-2; (2) BNY "generally was aware or knew that [Sentinel's] actions were part of an overall course of conduct that was improper or illegal"; and (3) BNY "substantially assisted the primary violation." *Monetta Fin. Servs., Inc. v. SEC*, 390 F.3d 952, 956 (7th Cir. 2004).

Even assuming *arguendo* that Sentinel's conduct violated Section 206 and SEC Rule 206(4)-2 and that the Trustee's conclusory allegations of "knowledge" are sufficient, as a matter of law BNY's alleged participation did not rise to the level of "substantial assistance" required under *Monetta*. The Trustee alleges nothing more than a series of omissions by BNY. *See, e.g.*, Cmplt. ¶¶ 48-49, 67-70, 83-87, 89-91, 96-99. But "inaction, or a failure to investigate, constitutes actionable participation only when a defendant owes a fiduciary duty directly to the plaintiff; that the primary violator owes a fiduciary duty to the plaintiff is not enough." *Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 247 (S.D.N.Y. 1996) (citation omitted).

There is no allegation (nor could there be) that BNY owed a fiduciary duty to Sentinel, especially given the plain language of the parties' agreement expressly disclaiming any fiduciary duties. *See* Cmplt. Ex. F, § 4.05(a) ("It is expressly understood and agreed that in exercising its rights and performing its obligations hereunder, Bank owes no fiduciary duty to [Sentinel].").[9]

---

[9]    *See also Log on Am., Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp. 2d 435, 450 (S.D.N.Y. 2001) (holding that pursuant to the agreement of the parties, there was no fiduciary duty between

There is also no allegation (nor could there be) that BNY owed a fiduciary duty to Sentinel's customers. *See Conder v. Union Planters Bank, N.A.*, 384 F.3d 397, 399 (7th Cir. 2004) (refusing to impose on banks a general duty of care toward persons who are not their customers and to whom therefore they have no contractual obligations) (citations omitted); *Tzaras v. Evergreen Int'l Spot Trading, Inc.*, 2003 WL 470611, at *6 (S.D.N.Y. Feb. 25, 2003) (holding that, as a matter of law, a bank owes no duty of care to a non-customer defrauded by a bank customer) (citation omitted). As a result, even if it were the SEC seeking to bring a claim based on the Trustee's allegations rather than the Trustee attempting to create a new private right of action, the allegations fall far short of stating a claim for aiding and abetting Sentinel's alleged violations of Section 206 and SEC Rule 206(4)-2.

### D. As a Matter of Law, BNY's Alleged Regulatory Violations Did Not Cause Sentinel's Customers' Losses

It is a fundamental principle that liability cannot attach to conduct that did not cause the harm sought to be redressed. *See Premier Transp., Ltd. v. Nextel Commc'ns, Inc.*, 2003 WL 21267096, at *4 (N.D. Ill. May 30, 2003). "[I]n order to [find] a right of action there must be a wrongful act done and a loss resulting from that wrongful act; the wrongful act must be the act of the defendant, and the injury suffered by the plaintiff must be the natural and not merely a remote consequence of the defendant's act." *Town of Thornton v. Winterhoff*, 92 N.E.2d 163, 166 (Ill. 1950); *see also Marseilles Hydro Power v. Marseilles Land & Water Co.*, 2003 WL 259142, at *5 (N.D. Ill. Feb. 4, 2003). Where private rights of action are available, claims for violations of regulatory statutes are no exception. *See, e.g.*, 7 U.S.C. § 25(a) (providing (under circumstances not present here) for private recovery of damages "caused by" violation of CEA).

---

defendants and plaintiffs); *see also Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 735 (2d Cir. 1984) ("[W]here the parties to an agreement have expressly allocated risks, the judiciary shall not intrude into their contractual relationship.").

Here, the Trustee alleges that BNY violated two federal statutes and various regulations by knowingly facilitating Sentinel's misuse of customer funds via a "fundamentally flawed account structure." Cmplt. ¶¶ 3, 48-49, 61. In particular, the Trustee contends that the account structure was flawed because it was intended for broker-dealer customers, not FCMs or investment advisers, and therefore did not satisfy the purported "strict custodial and segregation requirements" of federal law. *Id.* ¶ 59. In the absence of the allegedly flawed account structure, the Trustee claims, Sentinel would not have collapsed and Sentinel's customers would not have suffered any losses. *Id.* ¶ 8.

This argument does not withstand the most basic scrutiny. Regardless of how the accounts were structured, Sentinel would still have had the ability – and, in some cases, the obligation – to transfer funds out of the segregated accounts.[10] Under the governing agreements, no matter how many segregated accounts had been established or in whose name they were maintained, Sentinel would have had the exclusive power to transfer assets between accounts by issuing the same type of Desegregation Instruction that it issued to BNY under the existing account structure. *See* Cmplt., Ex. F. Thus, the allegedly flawed account structure was not, and cannot have been, the proximate cause of Sentinel's customers' losses. *See, e.g., Conder*, 2003 U.S. Dist. LEXIS 22215, at *43 (the acts or omissions of a bank used to facilitate a fraudulent scheme are not the proximate cause of any loss to the investors in the scheme), *aff'd* 348 F.3d 397 (7th Cir. 2004). And if that structure did not cause the injury complained of, then BNY's alleged regulatory violations provide no basis for the relief sought in Counts IV-VII. Those

---

[10]    *See, e.g.,* 17 C.F.R. § 1.23 (regarding FCM transfers of proprietary funds into and out of segregated accounts); CFTC Release, Financial and Segregation Interpretation No. 7-1 (Sept. 10, 1997) (discussing permissible transfers of securities between segregated and non-segregated accounts by an FCM); CFTC Release, Securities Representing Investment of Customer Funds Held in Segregated Accounts by Futures Commission Merchants, 62 Fed. Reg. 42,398 (Aug. 7, 1997) ("prudent and efficient funds management typically requires an FCM to make frequent transfers of funds into and out of segregation").

counts should therefore be dismissed. *See Bennett v. Johnson,* 1993 U.S. Dist. LEXIS 8996, at *26 (N.D. Ill. June 30, 1993) (dismissing claim for failure to adequately plead proximate cause).

## II.   THE COMPLAINT SHOULD BE DISMISSED PURSUANT TO SECTION 8-503 OF THE UNIFORM COMMERCIAL CODE

As discussed (*supra* at p. 1), despite the length and apparent complexity of the Complaint, at its core, this is a simple dispute between a secured lender and a debtor in bankruptcy over a pool of collateral that was used to secure a loan. It is governed by Section 8-503 of the UCC, which prohibits the Trustee from bringing any action to enforce the property interests of Sentinel's customers in the Collateral unless it can show that BNY colluded with Sentinel in violating its statutory obligations to its customers under Section 8-504.[11] Because the Trustee has not met that burden, all counts in the Complaint should be dismissed.

### A.   The Trustee's Right to Enforce the Property Interests of Sentinel's Customers is Limited by Section 8-503

"Property interests are created and defined by state law." *Butner v. United States,* 440 U.S. 48, 55 (1979); *see also Barnhill v. Johnson,* 503 U.S. 393, 398 (2002) ("In the absence of any controlling federal law, 'property' and 'interests in property' are creatures of state law.") (citation omitted). They are, therefore, enforceable only to the extent provided for by state law. *See In re FBN Food Servs., Inc.,* 82 F.3d 1387, 1396 (7th Cir. 1996) (looking to state law to determine the scope of a claimed property interest); *In re Dana Corp.,* 367 B.R. 409 (Bankr. S.D.N.Y. 2006) (same).

---

[11]    The UCC also makes clear that BNY's claim to the Collateral takes priority over any claim brought on behalf of Sentinel's customers. *See* U.C.C. § 8-511(b) ("A claim of a creditor of a securities intermediary who has a security interest in a financial asset held by a securities intermediary has priority over claims of the securities intermediary's entitlement holders who have security entitlements with respect to that financial asset if the creditor has control over the financial asset.").

Section 8-503 of the UCC has been adopted as state law in New York. *See* N.Y. U.C.C. § 8-503.[12] Section 8-503 limits the circumstances under which a bankruptcy trustee may bring a claim based on an "entitlement holder's" interest in a financial asset against a "purchaser" of that asset. Specifically, "[a]n action based on an entitlement holder's property interest with respect to a particular financial asset" may not be asserted against any purchaser of such asset or an interest therein who gave value for the purchase, obtained control and did not act in collusion with the entitlement holder's securities intermediary in violating the securities intermediary's statutory obligations to its customers under Section 8-504. § 8-503(e). This prohibition applies to *any* action based on an entitlement holder's interest in a financial asset, regardless of whether it is "framed in conversion, replevin, constructive trust, equitable lien, or other theory." *Id.*

## B.  The Trustee's Claims Are Barred By Section 8-503

### 1.  Sentinel is a "Securities Intermediary," its customers are "Entitlement Holders" and BNY is a "Purchaser" under UCC Section 8-503

A "securities intermediary" is either a clearing corporation or "a person, including a bank or broker, that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity." § 8-102(14). Because Sentinel maintained securities accounts for its customers in the ordinary course of its business (Cmplt. ¶¶ 23-27), Sentinel was indisputably a "securities intermediary" within the meaning of Section 8-102.

Sentinel's customers are "entitlement holders" – defined under Section 8-102(7) as any person "identified in the records of a securities intermediary [here, Sentinel] as the person having a securities entitlement against the securities intermediary" – because only Sentinel's customers are alleged to have had a property interest in the assets Sentinel deposited in the BNY accounts (Cmplt. ¶¶ 23-27). And finally, BNY is a "purchaser" because it has taken assets "by sale, lease,

---

[12]    BNY applies New York law in accordance with the parties' contractual agreements. *See* Cmplt., Ex. F at § 4.12; Ex. G at 3; Ex. H at § 9.6; Ex. I at 3.

discount, negotiation, mortgage, *pledge*, *lien*, *security interest* . . . or any other voluntary transaction creating an interest in property." § 1-201(29), (30) (emphasis added); *Galey & Lord, Inc. v. Arley Corp. (In re Arlco, Inc.)*, 239 B.R. 261, 268 (Bankr. S.D.N.Y. 1999) ("[T]he definition of purchaser is broad enough to include an Article 9 secured party.").

  2. This is an action based on the entitlement holder's property interest with respect to a particular financial asset held by BNY

This is unquestionably "[a]n action based on the entitlement holder's property interest with respect to a particular financial asset" because the Complaint seeks recovery of the value of financial assets. § 8-503(e). The Complaint states repeatedly that the Trustee is seeking to recover the alleged property interests of Sentinel's customers in the particular financial assets that comprise the Collateral. *See, e.g.*, Cmplt. ¶¶ 3, 48, 113, 148; Cmplt. at pp. 44, 46, 47 (seeking recovery of transfers); at p. 57 (seeking turnover of securities and cash held in BNY accounts).

  3. Because BNY gave value, obtained control and did not act in collusion with Sentinel, the Complaint must be dismissed

As discussed, under Section 8-503(e), an entitlement holder is *forbidden* from asserting claims against a "purchaser" – BNY – who "gives value, obtains control, and does not act in collusion with the securities intermediary in violating the securities intermediary's obligations under Section 8-504." Because all three conditions have been satisfied here, the Complaint should be dismissed in its entirety.

First, the Trustee concedes, as he must, that BNY gave value to Sentinel – namely, by giving money in the form of loans to Sentinel in consideration for a security interest in the pledged financial assets. Cmplt. ¶ 111; *see also* 127; U.C.C. § 1-201(44) (defining "value" to include "the extension of immediately available credit"). Second, by alleging that the Collateral

was both maintained in accounts established with BNY (Cmplt. ¶¶ 62-63) and pledged as security for extensions of credit to Sentinel by BNY, (*Id.* ¶¶ 48, 65, 127), the Trustee admits that BNY obtained "control" over the Collateral.

Finally, BNY did not act (and is not alleged to have acted) in collusion with Sentinel to violate its duties under Section 8-504. Collusion is a standard legal term that means an "*agreement* to defraud another or to do or obtain something forbidden by law." BLACK'S LAW DICTIONARY (8th ed. 2004) (emphasis added); *see also Dickerman v. N. Trust Co.*, 176 U.S. 181, 190 (1900) (defining collusion as "an agreement between two or more persons to defraud a person of his rights by the forms of law, or to obtain an object forbidden by law"); *Lone Star Indus. v. Compania Naviera Perez Companc, S.A.C.F.I.M.F.A. (In re N.Y. Trap Rock Corp.)*, 42 F.3d 747, 752 (2d Cir. 1994) (defining collusion as "secret cooperation for a fraudulent or deceitful purpose") (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, 446 (G.&C. Miriam Co. ed. 1976)).  The drafters of the UCC embraced this definition:

> The use of the collusion test in Section 8-503(e) furthers the interests of investors generally in the sound and efficient operation of the securities holding and settlement system.  The effect of the choice of this standard is that customers of a failed intermediary must show that the transferee from whom they seek to recover *was affirmatively engaged in wrongful conduct, rather than casting on the transferee any burden of showing that the transferee had no awareness of wrongful conduct by the failed intermediary.*  The rule of Section 8-503(e) is based on the long-standing policy that *it is undesirable to impose upon purchasers of securities any duty to investigate whether their sellers may be acting wrongfully.*

N.Y. U.C.C. § 8-503, cmt. 3 (emphasis added).

In addition to adopting this Official Comment, the New York legislature also discussed the meaning of collusion in a statement of legislative intent when it adopted UCC Article 8:

> The legislature intends collusion to include acting in concert, acting by conspiratorial arrangement, or acting by agreement for the purpose of

> violating the entitlement holder's rights or with actual knowledge that the
> securities intermediary is violating those rights.

1997 N.Y. Sess. Laws ch. 566, § 1 (Oct. 10, 1997).

The clear message of these various definitions of "collusion" is that a purchaser must do something substantially more than passively fail to protect an entitlement holder from a securities intermediary's violation of its duties. Instead, the purchaser must have "affirmatively engaged in wrongful conduct," and is under no independent obligation to investigate whether the securities intermediary is acting wrongfully. *See* 1997 N.Y. A.L.S. 566, *1 (declaring that "nothing in this [collusion] standard imposes a duty of inquiry" and that "a purchaser's knowledge of the precarious financial situation of the financial intermediary coupled with rumors, allegations, or reports of suspected wrongdoing does not amount to collusion").

Based upon the above, it is clear that a purchaser who failed to protect an entitlement holder from a securities intermediary's violation of its duties to that entitlement holder did not collude with the securities intermediary within the meaning of Section 8-503(e). The Complaint nowhere alleges a specific breach by Sentinel of any duty under Section 8-504, and BNY's alleged failure to act in the face of certain alleged "red flags" clearly does not constitute "collusion" within the meaning of the UCC.[13]   The Trustee's attempt to shift to BNY (and its shareholders) the losses suffered by Sentinel's customers arising out of Sentinel's wrongful acts and those of its principals is precisely the kind of loss shifting that Article 8 rejects. N.Y. U.C.C. § 8-503 cmt. 3. Accordingly, the Complaint should be dismissed in its entirety.

---

[13]     Furthermore, even if this Court were to consider the alleged violations of federal law, which it should not, those allegations do not even suggest the existence of an illicit agreement between Sentinel and BNY.

**III.    EACH INDIVIDUAL COUNT OF THE COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED**

Under Fed. R. Civ. P. 12(b)(6), as made applicable in this Court by Fed. R. Bankr. P. 7012(b), the Complaint must be dismissed unless it contains "factual allegations that show a right to relief above the speculative level" and states a claim to relief that is "plausible on its face." *Neiman v. Irmen (In re Irmen)*, 379 B.R. 299, 307-08 (Bankr. N.D. Ill. 2007) (citing *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1969, 1974 (2007)).   A complaint must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 308 (quoting *Twombly*, 127 S. Ct. at 1964-65).   As discussed below, even accepting as true the Trustee's allegations that BNY violated the CEA and the Advisers Act, the Complaint still fails to satisfy the minimum pleading requirements (much less the heightened pleading standard that applies to Counts I and II) and should be dismissed in its entirety.

**A.    Avoidance and Recovery of Fraudulent Transfers (Counts I-II)**

Counts I and II of the Complaint assert claims to avoid and recover allegedly fraudulent transfers from Sentinel to BNY under Section 548(a) of the Bankruptcy Code and the Illinois Uniform Fraudulent Transfer Act ("UFTA"), 740 Ill. Cons. Stat. Ann. 160/5(a)(1), 160/8(a), respectively.[14]   Specifically, the Trustee seeks to avoid and recover, under the actual fraudulent transfer prongs of those statutes, each and every transfer of cash or securities made by Sentinel from a segregated account to any non-segregated clearing account on or after January 1, 2004, unless it was made in connection with a legitimate customer redemption.  Cmplt. ¶¶ 168-74, 175-82.

---

[14]    Because courts have recognized that Section 5 of the UFTA is largely analogous to section 548(a)(1) of the Bankruptcy Code, cases decided under Section 548 are applicable to those decided under the UFTA.  *See, e.g., Voiland v. Gillissie (In re Gillissie)*, 215 B.R. 370, 374 (Bankr. N.D. Ill. 1997) (Squires, J.) ("[P]recedent under § 548(a)(1) is equally applicable to the Illinois version of the UFTA.").

1.   The Trustee has failed to allege that any purportedly fraudulent transfers were transfers of an "interest of the debtor in property"

Both Counts I and II must be dismissed because the Trustee cannot avoid, and recover as fraudulent, Sentinel's transfers of property interests that were not its own. Because the whole underlying predicate for the Trustee's fraudulent transfer claims is that Sentinel originally held all the transferred property *in trust* for its customers, his claims fail as a matter of law.

To state a claim for avoidance of a fraudulent transfer under Section 548(a)(1)(A) or under the UFTA (pursuant to Section 544(b)(1)), the Trustee must allege, as a threshold matter, that there was a transfer of "an interest of the debtor in property." Importantly, as the Seventh Circuit has held, a debtor's prepetition transfer "of a property interest that the debtor *holds in trust for another person* will not qualify for this purpose." *Dunham v. Kisak*, 192 F.3d 1104, 1109 (7th Cir. 1999).[15]

Here, the Trustee's bare allegation that transfers from the segregated accounts to the Street Account "constituted a transfer of an interest in Sentinel's property," (Cmplt. ¶¶ 169-70, 176-77), is belied by the Complaint itself. The Trustee elsewhere alleges that Sentinel provided cash management services to its customers pursuant to a written trust agreement that expressly designated Sentinel as the trustee of its customers' assets. *Id.* ¶ 51. The Trustee also alleges – repeatedly – that the Collateral should not have been transferred out of segregated accounts *because it belonged to Sentinel's customers, and not to Sentinel itself. Id.* ¶¶ 3, 48, 127, 135.[16]

Based on those allegations, the Trustee's case, even if proven, would be factually indistinguishable from *Stevenson v. J.C. Bradford & Co. (In re Cannon)*, 277 F.3d 838, 843-45

---

[15]   *See also Begier v. IRS*, 496 U.S. 53, 59 (1990) ("Because the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate.'").

[16]   That allegation is at the very core of the Trustee's case. *See, e.g.*, Cmplt. ¶¶ 3, 48, 127, 135. Although BNY obviously does not concede the allegation, it is clear that, taking it as true, Counts I, II and III all nonetheless fail as a matter of law.

(6th Cir. 2002), where the Sixth Circuit held that similar claims for fraudulent transfer were properly dismissed. There, the debtor attorney opened a brokerage account with an FCM and embezzled funds from his client escrow accounts to use in his trading activities. 277 F.3d at 843-45. The trustee in the debtor's Chapter 7 case brought an adversary proceeding against the FCM, seeking to recover the client assets under Section 548. In affirming the district court's dismissal of the claim, the Sixth Circuit agreed that because the funds in the client escrow accounts had been maintained in an express trust, (*id.* at 850), they were never part of the debtor's bankruptcy estate and, therefore, the alleged transfers did not constitute "an interest of the debtor in property" for purposes of Section 548. *Id.* at 852; *see also Daly v. Kennedy (In re Kennedy),* 279 B.R. 455, 458 (Bankr. D. Conn. 2002) ("It is axiomatic that funds held in trust by one person for another do not constitute the beneficial property of the former. . . . Consequently, funds held in trust by a debtor are not property of his bankruptcy estate or, for the specific purposes of Code Section 548 . . . property of the debtor.") (citations omitted).

In sum, because the challenged transfers here were, on the face of the Complaint, transfers "of a property interest that the debtor [held] in trust for another person," *Dunham,* 192 F.3d at 1109, they cannot be avoided as fraudulent transfers under either Section 548 or under the UFTA through Section 544.

        2.     The Trustee has failed to allege that any purportedly fraudulent transfers were made with the intent to defraud Sentinel creditors

Claims for avoidance of fraudulent transfers are subject to the heightened pleading standard of Fed. R. Civ. P. 9(b). *See, e.g., Helms v. Arboleda (In re Arboleda),* 224 B.R. 640, 650 (Bankr. N.D. Ill. 1998) (Squires, J.) (dismissing fraudulent transfer claims on the grounds that conclusory, "bare bones" allegations of fraudulent intent did not satisfy the particularity requirement). Moreover, "[m]ere conclusory allegations without a description of the underlying

fraudulent conduct will not satisfy the requirements of Rule 9(b) and may warrant dismissal." *Id.* (citation omitted).

The Complaint fails to support the Trustee's conclusory allegation that the transfers to BNY were made with actual fraudulent intent. Although the Trustee loosely alleges that each of the transfers sought to be avoided was "made with the actual intent to hinder, delay, or defraud Sentinel's creditors" (Cmplt. ¶¶ 125, 172, 179), it is well-established that Rule 9(b) "requires facts supporting the allegations; a quotation from a statute will not suffice." *Neiman*, 379 B.R. at 309 (citing *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007)); *see also Olson v. Potter (In re Potter)*, 88 B.R. 843, 847 (Bankr. N.D. Ill. 1988) (holding that Rule 9(b) requires "something more than a quotation from the statute") (citations omitted).

The Complaint provides no such support. The Trustee alleges only that Sentinel made the allegedly fraudulent transfers in order to secure its loan from BNY. *See, e.g.*, Cmplt. ¶¶ 114, 125, 134, 137-51. But a desire to obtain credit in connection with Sentinel's money management activities is compatible with many states of mind that are not culpable under Section 548(a) and have nothing to do with hindering creditors, including an intent to continue to conduct its business, to be able to satisfy its obligations to its customers or to attempt to exceed their expectations – namely, effective business strategy. The fact of the "transfer" to BNY suggests nothing about Sentinel's state of mind. Moreover, the mere intent to use others' funds for one's own benefit is not sufficient to create fraudulent transfer liability. *See In re Kennedy*, 279 B.R. at 462.[17] The Trustee's allegations fail to satisfy Rule 9(b).

---

[17]    In *In re Kennedy*, an attorney holding client funds in trust accounts misappropriated them for his own personal use. After the attorney went bankrupt, the trustee sued the debtor's wife to recover the funds as fraudulent transfers. In finding for the wife, the bankruptcy court concluded that there was no evidence that the attorney made the transfers with fraudulent intent as to his creditors. 279 B.R. at 462. As the court explained, "the Debtor's intent *in appropriating* the Trust Account Funds neither proves nor implies anything with respect to his intent vis-à-vis his creditors in *transferring* those funds to the

3.    The Trustee has failed to identify virtually all of the challenged transfers
with specificity

Counts I and II should also be dismissed because the Trustee fails to identify the transfers

he seeks to avoid and recover.  Indeed, the Complaint describes only a small number of them

with any detail – the so-called "June-July 2007 Transfers."  Cmplt. ¶¶ 134-50.  Beyond that, the

Trustee alleges only that all transfers after January 1, 2004, other than those "made in connection

with legitimate customer redemptions," are avoidable.[18]  But the Complaint does not identify, as

it must, which transfers were "made in connection with legitimate customer redemptions" and

which were fraudulent.  As a result, Counts I and II do not satisfy the heightened pleading

standards of Rule 9(b) and should be dismissed.[19]

## B.    Avoidance and Recovery of Allegedly Preferential Transfers (Count III)

1.    The Trustee has failed to allege that the purportedly preferential transfers
were transfers of an "interest of the debtor in property"

Count III of the Complaint asserts a claim to avoid and recover allegedly preferential

transfers from Sentinel to BNY under Section 547(b) of the Bankruptcy Code.  Specifically, the

Trustee seeks to avoid transfers made by Sentinel to BNY on June 26 and 29, 2007 (the "June

25-29 Transfers").  Cmplt. ¶¶ 183-91.  However, to avoid a preferential transfer under Section

547(b), a plaintiff must show, *inter alia*, that the allegedly preferential transfer was a transfer of

Defendant. . . .  And, although he may have *created* creditors by those acts at that time, his intent in
transferring was not to evade them, or preexisting creditors, but rather to use the stolen funds for his own
benefit."  *Id.* (footnote omitted).  Here, even if Sentinel's transfers had the effect of creating creditors (i.e.
of Sentinel's customers), the Complaint fails to support, with particularity, the Trustee's conclusory
allegation that they were made with the intent to defraud those customers.

[18]    If this Court were to allow such a catch-all claim to withstand a motion to dismiss, it would, in
effect, bless the Trustee's improper attempt to shift the burden to BNY to demonstrate the legitimacy of
each of the transfers it received from Sentinel.  The Trustee's claims stand each of Section 548(a)'s
statutory elements on its head.

[19]    Moreover, Section 548(a)(1) limits the Trustee's potential recovery to transfers made "within two
years" of the Petition Date.  Accordingly, Count I must, at a minimum, be dismissed with respect to all
transfers made on or before August 17, 2005.

"an interest of the debtor in property." 11 U.S.C. § 547(b). As discussed above, a debtor's prepetition transfer "of a property interest that the debtor holds in trust for another person will not qualify for this purpose." *Dunham*, 192 F.3d at 1109. Because the Complaint alleges that Sentinel's transfers out of its segregated accounts were of property of Sentinel's customers (Cmplt. ¶¶ 3, 48, 127, 135), Count III similarly fails as a matter of law.

2.    The Complaint is self-contradictory as to whether the purportedly preferential transfers were made "on account of an antecedent debt".

To avoid a preferential transfer under Section 547(b), a plaintiff must also show that the transfer was made "for or on account of an antecedent debt owed by the debtor before such transfer was made." 11 U.S.C. § 547(b)(2). Here, the Trustee seeks to avoid and recover as preferential the June 25-29 Transfers. Cmplt. ¶¶ 184-91; *see also* ¶¶ 139, 141. Although the Trustee alleges in conclusory fashion that the June 25-29 Transfers were made on account of an antecedent debt (Cmplt. ¶ 186), once again, his specific allegations demonstrate precisely the opposite, namely that BNY extended an independent loan to Sentinel every night. *See, e.g., id.* ¶ 113 (alleging that BNY "required that Sentinel post collateral to secure its overnight loans to Sentinel"); ¶¶ 137-41 (acknowledging that the June 25-29 Transfers were each made to secure Sentinel's overnight loan). The Complaint thus pleads that the June 25-29 Transfers were made in exchange for extensions of new credit, and not on account of "antecedent" debt. Count III thus fails to state a colorable claim under Section 547.

C.    **Equitable Subordination of BNY's Claim (Count IV)**

Count IV of the Complaint seeks to equitably subordinate BNY's secured claim to all other claims of Sentinel's customers pursuant to Section 510(c) of the Bankruptcy Code. Under Section 510(c), a court may, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim" or "order that any lien securing such a

subordinated claim be transferred to the estate." 11 U.S.C. § 510(c). As the Seventh Circuit has noted, equitable subordination is an "extraordinary remedy" that is appropriate against a non-insider only upon a showing of misconduct. *Matrix IV, Inc. v. Am. Nat'l Bank and Trust Co. of Chi. (In re S.M. Acquisitions Co.)*, 2006 WL 2290990, at *8 (N.D.Ill. Aug. 7, 2006); *see also Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990).

Here, the Trustee has failed to state a claim for equitable subordination. In the Seventh Circuit, a claim may only be equitably subordinated if (1) the claimant engaged in "inequitable conduct"; (2) such conduct injured creditors or conferred an unfair advantage on the claimant; and (3) subordination of the claim would not be inconsistent with the Bankruptcy Code. *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 700 (5th Cir. 1977); *see also Great Am. Ins. Co. v. Bailey (In re Cutty's-Gurnee, Inc.)*, 133 B.R. 934, 958 (Bankr. N.D. Ill. 1991) (applying *Mobile Steel*). The Complaint satisfies neither of the first two *Mobile Steel* factors.

### 1.    BNY did not engage in inequitable conduct

Courts have distinguished between the level of "inequitable conduct" required for equitable subordination based upon the nature of the legal relationship between the debtor and the creditor whose claim is subject to attack. Critically, when the claimant is neither an insider nor a fiduciary of the debtor (which BNY is not), the party challenging the claim "must prove that the claimant is guilty of gross misconduct tantamount to fraud, overreaching or spoliation to the detriment of others." *Badger Freightways, Inc. v. Cont'l Ill. Nat'l Bank and Trust Co. of Chi (In re Badger Freightways, Inc.)*, 106 B.R. 971, 976 (Bankr. N.D. Ill. 1989) (citation omitted); *see also Unsecured Creditors' Comm. v. Banque Paribas (In re Heartland Chem., Inc.)*, 136 B.R. 503, 516 (Bankr. C.D. Ill. 1992) (claimant's "inequitable conduct" must have been

"egregious and severely unfair in relation to the other creditors.") (citation omitted)).[20]
Allegations of "sharp dealing" are insufficient to support a claim for equitable subordination
against a non-fiduciary. *Badger Freightways,* 106 B.R. at 976.

Here, the Trustee does not and cannot allege that BNY was an insider or a fiduciary of, or
that it otherwise exercised control over, Sentinel. As a result, the Complaint must allege that
BNY engaged in conduct that constituted "gross misconduct" or was "egregious and severely
unfair." It unquestionably does not. The majority of the Trustee's allegations of inequitable
conduct relate to or arise out of BNY's alleged violations of federal law.[21] The Trustee also
alleges that BNY unilaterally transferred segregated assets to collateralize Sentinel's loan (in a
single instance, which was immediately corrected), refused (just prior to the Petition Date)
Sentinel's instructions to segregate assets in order to ensure that it was fully secured, asserted a
lien against segregated accounts, and extended credit to Sentinel despite knowing that Sentinel
was undercapitalized and having financial difficulties. Cmplt. ¶¶ 195-96. These allegations fall
far short of alleging "gross misconduct" or "egregious and severely unfair" conduct by BNY in
relation to Sentinel's creditors.

*First,* it is well-settled that a creditor has every right to act to advance its own interests
within its contractual rights. *See Kham,* 908 F.2d at 1357-58 (reversing the equitable
subordination of a bank's claim, reasoning, in part, that "[f]irms that have negotiated contracts
are entitled to enforce them to the letter" and "do not need to put the interests of [others] first");

---

[20]     *See also Herzog v. Leighton Holdings, Ltd. (In re Kids Creek Partners, L.P.),* 200 B.R. 996, 1015
(Bankr. N.D. Ill. 1996) (stating that a court may equitably subordinate a non-insider claim only if the
claimant's misconduct was "much more egregious" than is required to subordinate a claim of a fiduciary);
*Aluminum Mills Corp. v. Citicorp N. Am., Inc. (In re Aluminum Mills Corp.),* 132 B.R. 869, 896 (Bankr.
N.D. Ill. 1992) (same).

[21]     As discussed in detail *supra* Part II, however, these allegations are not a proper basis for relief
under the Bankruptcy Code and, in any event, do not adequately plead the violations they assert. They
should be disregarded by this Court.

31

*Badger Freightways*, 106 B.R. at 976 (finding that a "non-fiduciary claimant can act strategically to protect its interest to the potential detriment of similarly situated claimants"). Contractual obligations of good faith are not "an invitation to the court to decide whether one party ought to have exercised privileges expressly reserved in the document." *Kham*, 908 F.2d at 1357.

Under these authorities, the Trustee's allegations with respect to BNY's single alleged "refusal" to segregate assets and its decision to extend additional credit to Sentinel do not support a finding of inequitable conduct. Indeed, as the Trustee concedes (Cmplt. ¶ 67), BNY had the contractual right both to refuse to segregate assets to ensure that it was fully secured (Cmplt., Ex. F at §3.04; Ex. H at § 5.2.), and to extend credit to Sentinel as it saw fit, (Cmplt., Ex. F at Art. III; Ex. H at Art. V). Even if the Court were to find that BNY's lending policies with respect to Sentinel were liberal or imprudent, that "falls short of imposing culpability for the results which [Sentinel's] actions eventually occasioned." *First Nat'l Bank of Barnesville v. Rafoth (In re Baker & Getty Fin. Servs. Inc.)*, 974 F.2d 712, 718-19 (6th Cir. 1992).

*Second*, even if this Court were to accept as true the alleged regulatory violations, it is absurd to suggest that violations of federal regulatory regimes that have been the subject of virtually no jurisprudence in this context constitutes "egregious" misconduct. At best, any regulatory violation would amount to nothing more than a flawed decision by BNY to rely on Sentinel's unambiguous contractual representations that it was authorized to transfer and pledge segregated assets, rather than to intervene on the basis of purported "red flags." In the absence of any duty to act (and the Trustee has alleged none), such inaction cannot be "gross misconduct tantamount to fraud, overreaching or spoliation." *Badger Freightways,* 106 B.R. at 976.

*Finally,* with respect to BNY's alleged unilateral transfer of segregated assets, the Complaint itself suggests that it was a mistake and acknowledges that it was reversed

32

immediately upon Sentinel's request. *See* Cmplt. ¶¶ 162-63. And the Trustee's allegation that BNY asserted a lien against *segregated* accounts is not only false, but is contradicted by the Trustee's numerous allegations that Sentinel had to transfer assets *out* of the segregated accounts in order for those assets to be subject to BNY's lien. *See, e.g., id.* ¶ 109(b).

In short, assuming *arguendo* that every one of the Trustee's allegations is true, as a matter of law the alleged misconduct still falls woefully short of the type of "gross" and "egregious" misconduct that is required. Because the Complaint fails to state a foundational element of its equitable subordination claim, Count IV should be dismissed.

> 2.    BNY's alleged conduct did not injure creditors or confer an unfair advantage on BNY

The Trustee's claim for equitable subordination similarly fails because the Trustee has not alleged how BNY's purportedly improper conduct "injured creditors or conferred an unfair advantage" on it. As discussed *supra* Part I.C, the allegedly flawed account structure was not, and cannot have been, the proximate cause of Sentinel's customers' losses. However, a creditor's claim can only be subordinated to the extent that actual harm was suffered by the other creditors as a result of its alleged inequitable conduct. *See In re Heartland Chem., Inc.*, 136 B.R. at 520. Here, the Complaint fails to allege any facts even suggesting how BNY's conduct resulted in actual harm to any specific creditors of Sentinel.

**D.    Disallowance of BNY's Proof of Claim (Count V)**

Count V of the Complaint asserts a claim seeking disallowance of BNY's proof of claim under Section 502(d) of the Bankruptcy Code, 11 U.S.C. § 502(d). In large part, the Trustee regurgitates the allegations of BNY's "inequitable conduct" (Cmplt. ¶¶ 206-07), most of which should be disregarded by this Court for the reasons stated above (*supra* at Part II). In addition, however, the Trustee claims that BNY has failed to turn over property of the estate that is

recoverable by the Trustee, "namely the amounts demanded in Counts One through Eight" of the Complaint.  Cmplt. ¶ 204.

By its terms, however, Section 502(d) provides that disallowance is appropriate only *after* a determination has been made that BNY was the recipient of a fraudulent or preferential transfer and only then if BNY refused to turn over the unlawfully transferred property or to otherwise comply with Section 550.  *See Katchen v. Landry*, 382 U.S. 323, 330 (1966) ("Unavoidably and by the very terms of the [statute], when a bankruptcy trustee presents a [§ 502(d)] objection to a claim, the claim can neither be allowed nor disallowed until the preference matter is adjudicated.").[22]  Here, no determination has been made that BNY was the recipient of any avoidable transfers and, as noted above, the Trustee's avoidance claims fail as a matter of law. Even if that were not the case, Count V should be dismissed for failure to state a claim upon which relief may be granted because Section 502(d) provides no independent basis for relief.  *In re Parker N. Am. Corp.*, 24 F.3d 1145, 1155 (9th Cir. 1994) ("Section 502(d) operates to disallow claims of transferees who do not surrender their avoidable transfers.  It does not compel the surrender, nor permit affirmative relief of any kind.").

### E.    Equitable Disallowance of BNY's Proof of Claim (Count VI)

Count VI of the Complaint seeks equitable disallowance of BNY's proof of claim.  This claim fails as a matter of law because the Bankruptcy Code nowhere explicitly or implicitly

---

[22]    As the Eighth Circuit has explained,

> [T]he purpose of section 502(d) is to ensure compliance with judicial orders.  The language of section 502(d) expressly provides that the entity's claim is not disallowed if the entity or transferee "paid the amount, or turned over any such property, for which such entity or transferee is liable."  This language indicates section 502(d) should be used to disallow a claim *after the entity is first adjudged liable*; otherwise, the court could not determine if the exception applies.

*Holloway v. IRS (In re Odom Antennas, Inc.)*, 340 F.3d 705, 708 (8th Cir. 2003) (emphasis added) (internal citations omitted).

authorizes such a claim. As the Supreme Court has noted, the equitable powers of bankruptcy courts are not limitless; such powers "must and can only be exercised within the confines of the Bankruptcy Code." *N.W. Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988). And under that statutory framework, a creditor's claims are to be allowed or disallowed by a bankruptcy court pursuant to the terms of Section 502(b). *See* 11 U.S.C. § 502(b) (a court "shall allow" a claim in the amount set forth in the proof of claim unless it falls within any one of the nine statutory exceptions); *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 127 S. Ct. 1199, 1204-05 (2007) (same). Inequitable conduct does not constitute a ground for disallowance of a claim under Section 502 or any other provision of the Bankruptcy Code.

Because Congress has made clear the bases on which a bankruptcy court may disallow a claim in its entirety, bankruptcy courts have no discretion to fashion extra-statutory reasons for a disallowance. *See, e.g., Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 24-25 (2000). As the U.S. Supreme Court stated in *Raleigh*:

> [T]he scope of a bankruptcy court's equitable power must be understood in light of the principle of bankruptcy law . . . *that the validity of a claim is generally a function of underlying substantive law*. Bankruptcy courts are not authorized to make wholesale substitution of underlying law controlling the validity of creditors' entitlements, *but are limited to what the Bankruptcy Code itself provides*.

*Id.* (emphasis added). Inequitable conduct, if present, may in certain circumstances provide a basis for equitable subordination of a claim under Section 510(c) (as discussed above), but it simply does not empower a court to disallow a claim in its entirety. *See In re Mobile Steel Co.*, 563 F.2d at 699 ("[E]quitable considerations can justify only the subordination of claims, not their disallowance.").[23] As such, the Trustee's action for equitable disallowance of BNY's claim

---

[23]    The *Mobile Steel* court explained as follows:

is not a viable cause of action under the Bankruptcy Code, and consequently Count VI should be dismissed.

**F.    Action to Determine Validity and Extent of Lien and for Turnover of Property (Count VII)**

Although Count VII of the Complaint asks this Court to rule that BNY has no valid security interest in the Collateral pursuant to Section 506 of the Bankruptcy Code, 11 U.S.C. § 506, that section provides no independent basis for the relief sought. By its terms,[24] Section 506 defines the dividing line between secured and unsecured portions of an allowed claim. *See Bank One, Chi., NA v. Flowers*, 183 B.R. 509, 514-15 (N.D. Ill. 1995). It also provides a basis for a bankruptcy court to void a lien that secures a claim that has already been disallowed. The statute has no applicability at all, however, to any claim that has yet to be allowed or disallowed by the court. *See In re Busman*, 5 B.R. 332, 340 (Bankr. E.D.N.Y. 1980) ("Prior to any determination of the value of the secured creditor's collateral under § 506(a), the secured claim must first be allowed."); *accord Palombo Farms of Colo., Inc. v. Nat'l Acceptance Corp. of Am., Inc. (In re Palombo Farms of Colo., Inc.)*, 43 B.R. 709, 711 (Bankr. D. Colo. 1984) ("It would be a great waste of judicial resources to make a value determination under § 506 only to have the

---

> Disallowance of claims on equitable grounds would add nothing to the protection against unfairness already afforded the bankrupt and its creditors. If the claimant's inequitable conduct is directed against the creditors, they are fully protected by subordination. If the misconduct directed against the bankrupt is so extreme that disallowance might appear to be warranted, then surely the claim is either invalid or the bankrupt possesses a clear defense against it. Thus, where the bankrupt is the victim it has an adequate remedy at law. It follows that disallowance of a wrongdoer's claim on nonstatutory grounds would be an inappropriate form of equitable relief.

563 F.2d at 699 n.10 (citations omitted).

[24]    Section 506 provides, in pertinent part, that "[a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim." 11 U.S.C. § 506(a). Section 506 further provides that a lien is void to the extent that it "secures a claim against the debtor that is not an allowed secured claim." § 506(d).

entire claim disallowed at some future point in time."). Because there has been no determination as to the allowability of BNY's claim, Section 506 provides the Trustee no basis for relief.

### G.   Aiding and Abetting/Knowing Participation in Breach of Fiduciary Duty by Sentinel's Insiders (Count VIII)

#### 1.   The aiding and abetting claim is barred by the *Wagoner* rule

Count VIII of the Complaint asserts a claim for compensatory and punitive damages on the grounds that BNY aided, abetted, and knowingly participated in Sentinel's insiders' breach of their fiduciary duties. Specifically, the Trustee claims that certain Sentinel insiders owed fiduciary duties of loyalty, care, honesty and fairness to Sentinel, that those insiders breached those duties and that BNY "colluded with the Sentinel Insiders and knowingly participated in, aided, assisted and benefited from " their breaches. Cmplt. ¶¶ 232-35.

Under New York law (which applies here, *see supra* note 12), "[a] claim against a third party for defrauding a corporation with the cooperation of management accrues to the creditors, not to the guilty corporation." *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 120 (2d Cir. 1991). This principal, known as the *Wagoner* rule, "derives from the fundamental principal of agency that the misconduct of managers within the scope of their employment will normally be imputed to the corporation." *Wight v. BankAmerica Corp.*, 219 F.3d 79, 86-87 (2d Cir. 2000). Under *Wagoner* and its progeny, a claim for aiding and abetting a breach of a fiduciary duty to a corporation may not be asserted by the corporation or its trustee if (i) any corporate purpose was served by the breach, and (ii) all of the individuals with authority to prevent the breach instead participated in it. *See Ernst & Young v. Bankr. Servs. (In re CBI Holding Co., Inc.)*, 311 B.R. 350, 370 (Bankr. S.D.N.Y. 2004); *O'Connell v. Arthur Andersen, LLP (In re AlphaStar Ins. Group, Ltd.)*, 383 B.R. 231, 273 (Bankr. S.D.N.Y. 2008).

37

*Wagoner* requires dismissal of the aiding and abetting claim. *First*, the alleged fiduciary breaches by Sentinel's insiders unquestionably served a corporate purpose – they allowed Sentinel to obtain the financing it needed to settle its transactions and continue its business. According to the Complaint, if BNY had not extended credit to Sentinel, Sentinel would not have been able to meet its obligations to its customers. Cmplt. ¶ 153; *see Ernst & Young*, 311 B.R. at 370 (*Wagoner* rule applies if "*any* corporate purpose was served by the fraud").

And *second*, the Complaint completely fails to allege that any "innocent" Sentinel officers and employees had authority to prevent the fiduciary breaches. As the Second Circuit has explained, the *Wagoner* rule applies "unless at least one decisionmaker in a management role or amongst the shareholders is innocent and could have stopped the fraud." *Breeden v. Kirkpatrick & Lockhart (In re Bennett Funding)*, 336 F.3d 94, 101 (2d Cir. 2003). Thus, the Complaint fails to demonstrate the inapplicability of the *Wagoner* rule to the Trustee's claim. For that reason alone, Count VIII should be dismissed.

> 2.    The Complaint fails to allege that BNY knew of Sentinel's insiders' fiduciary breaches and provided "substantial assistance"

To prevail on a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must demonstrate that (1) the fiduciary breached his obligations to the plaintiff; (2) the defendant knew of the breach and provided substantial assistance to the fiduciary; and (3) the plaintiff suffered damages as a result of the breach. *In re AlphaStar Ins. Group, Ltd.*, 383 B.R. at 272 (citing cases). The knowledge required for liability to attach is "knowledge as to the primary violator's status as a fiduciary and knowledge that the primary violator's conduct contravenes a fiduciary duty." *Nisselson v. Ford Motor Co. (In re Monahan Ford Corp.)*, 340 B.R. 1, 43 (Bankr. E.D.N.Y. 2006) (citations omitted). "A defendant provides 'substantial assistance' when he 'affirmatively assists, helps conceal, or by virtue of failing to act when required to do so

enables the fraud to proceed.'" *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001). However, as discussed above (*supra* at p. 20), "inaction, or a failure to investigate, constitutes actionable participation only when a defendant owes a fiduciary duty directly to the plaintiff; that the primary violator owes a fiduciary duty to the plaintiff is not enough." *Kolbeck*, 939 F. Supp. at 247-48 (citation omitted); *see also In re Sharp Int'l Corp.*, 302 B.R. 760, 777 (Bankr. E.D.N.Y. 2003) (finding no "substantial assistance" as a matter of law and dismissing aiding and abetting breach of fiduciary duty claim, reasoning that "although [the bank] may have anticipated that the [the debtor's management] would continue to loot the company, [it] had no duty to intervene to prevent breaches of fiduciary duty by [the debtor's] management").[25]

Here, the Complaint does not allege an essential element of the Trustee's claim – namely, that BNY (i) knew that the actions of Sentinel's insiders violated their fiduciary duties to Sentinel, and (ii) substantially assisted them in spite of that knowledge. On the contrary, under the 1997 and 2003 Agreements, BNY had every reason to believe that Sentinel had the requisite authority to transfer assets between and among its BNY accounts and to pledge assets to BNY to secure its loans. *See* Cmplt. Ex. F, § 2.04(b), Ex. H, Art. II § 2(b) (representing, among other things, that (i) Sentinel was "authorized to issue [a] Desegregation Instruction and by so doing to transfer and pledge to [BNY] the full value of any and all such Securities," and (ii) "any and all claims to such Securities by any third party, including without limitation, claims of or by customers or counterparties of [Sentinel, were] discharged, extinguished, released and terminated."). To the extent the Trustee alleges the existence of certain "red flags," absent a fiduciary duty (*see supra* at Part II.B.3), BNY's mere failure to investigate does not amount to "substantial assistance." *See Kolbeck*, 939 F. Supp. at 246 (FCM had no duty to investigate

---

[25]    *Accord Glidden Co. v. Jandernoa*, 5 F. Supp. 2d 541, 557 (W.D. Mich. 1998) ("A bank cannot be held liable for aiding and abetting fraud or a breach of fiduciary duty merely on the basis that it knew that the party it was lending to was not being forthright in its dealings with others.").

trader's conduct and "no corresponding duty to non-clients, including [the trader's customers]");

*In re Sharp*, 302 B.R. at 775-77 (finding no "substantial assistance" as a matter of law and dismissing aiding and abetting breach of fiduciary duty claim where lender owed no fiduciary duty to debtors or its noteholders to cut off line of credit, despite allegedly having received notice of debtor's fraud).  For all of these reasons, Count VIII should be dismissed.

## CONCLUSION

For all the foregoing reasons, BNY respectfully requests that this Court dismiss the Trustee's Complaint in its entirety with prejudice and grant any other relief that this Court deems just and proper.

Dated:  May 2, 2008

Respectfully submitted,

**THE BANK OF NEW YORK and**
**THE BANK OF NEW YORK MELLON CORP.**

By:  /s/ Sean T. Scott
Sean T. Scott (ARDC #6273516)
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL  60606
(312) 782-0600

-and-

Brian Trust (admitted *pro hac vice*)
Hector Gonzalez (admitted *pro hac vice*)
Matthew D. Ingber (admitted *pro hac vice*)
MAYER BROWN LLP
1675 Broadway
New York, New York  10019
(212) 506-2500

# EXHIBIT  C

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **SENTINEL MANAGEMENT GROUP, INC.,** | ) | **CASE NO. 07 B 14987** |
| | ) | |
| Debtor. | ) | Hon. John H. Squires |
| | ) | |
| | ) | |
| **FREDERICK J. GREDE**, as Chapter 11 Trustee | ) | |
| for Sentinel Management Group, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | **ADV. NO. 08-127** |
| **THE BANK OF NEW YORK** and | ) | |
| **THE BANK OF NEW YORK MELLON** | ) | |
| **CORP.,** | ) | |
| | ) | |
| Defendants. | ) | |

**TRUSTEE'S MEMORANDUM OF LAW
IN OPPOSITION TO BONY'S MOTION TO DISMISS**

Chris Gair (ARDC # 6190781)
Vincent E. Lazar (ARDC # 6204916)
Jeffrey S. Eberhard (ARDC # 6276471)
JENNER & BLOCK LLP
330 N. Wabash Ave.
Chicago, IL  60611
Phone: (312) 222-9350
Facsimile: (312) 923-8439

## TABLE OF CONTENTS

Introduction....................................................................................................................1

Argument ......................................................................................................................1

I.    THERE IS NO GROUND FOR DISMISSING THE COMPLAINT BASED ON
BONY'S ARGUMENTS CONCERNING THE CEA AND IAA. .................................1

   A.    Counts 1-3 And 8 Do Not Even Refer To The CEA Or The IAA.......................2

   B.    Violations Of The CEA And IAA Are Relevant To Establishing BONY's
Inequitable Conduct Under Counts 4 And 6.............................................................3

   C.    Because The Complaint Alleges A Plethora Of Other Inequitable Conduct, There
Would Be No Basis For Dismissing Counts 4 And 6 Even If BONY's "Private Right
Of Action" Argument Were Correct..........................................................................5

   D.    BONY's Agreements Are Illegal And Therefore Are Void And Unenforceable
(Counts 5 And 7)......................................................................................................6

   E.    BONY's Fallback Position That The Complaint Does Not Adequately Plead A
Violation Of The CEA And The IAA Is Incorrect. ....................................................8

     1.    The CEA Applies To Sentinel And BONY. .....................................................9

     2.    The Complaint Properly Alleges That BONY Substantially Assisted Sentinel's
Violations Of The IAA And SEC Rules. ......................................................14

     3.    There Is No Basis For Dismissal On Proximate Causation Grounds. ..........16

II.   SECTION 8-503(e) OF THE UNIFORM COMMERCIAL CODE BARS NONE OF
THE CLAIMS ALLEGED BY THE TRUSTEE. ......................................................18

III.  EACH INDIVIDUAL COUNT STATES A CLAIM UPON WHICH RELIEF MAY
BE GRANTED. .......................................................................................................22

   A.    The Fraudulent Transfer Counts (Counts 1 And 2) State A Claim....................22

     1.    The Trustee Has Alleged That The Transfers Were Of An Interest In The
Property Of The Debtor. ..............................................................................22

     2.    The Trustee Has Properly Alleged Intent To Defraud Creditors...................24

   B.    Count 3 Properly States A Claim For Avoidance Of Preferential Transfers......26

   C.    The Trustee Has Stated A Claim For Equitable Subordination  (Count 4). .......27

   D.    There Is No Basis For Dismissing Count 5 (Disallowance Claim). ...................29

E.    Count 6 Properly Alleges Equitable Disallowance..............................................30

F.    Count 7 Properly States A Claim To Determine The Validity And Extent Of Lien
And For Turnover Or Property Under Sections 506 And 542.................................................32

G.    The Trustee Has Stated A Claim For Aiding And Abetting/Knowing Participation
In Breach Of Fiduciary Duty (Count 8)..................................................................................33

    1.    The *Wagoner* Rule Does Not Apply In This Circuit. ....................................34

    2.    The Complaint Properly Alleges That BONY Knew Of The Sentinel Insiders'
Fiduciary Breaches And Provided "Substantial Assistance."..................................37

Conclusion ...............................................................................................................................38

# TABLE OF AUTHORITIES

## Federal Cases

*Appley v. West,*
    832 F.2d 1021 (7th Cir. 1987) .................................................................15, 16

*Badger Freightways, Inc. v. Cont'l Ill. Nat'l Bank and Trust Co. of Chicago (In re Badger Freightways, Inc.),*
    106 B.R. 971 (Bankr. N.D. Ill. 1989) .......................................................28

*Bank of America v. Moglia*
    (*In re Outboard Marine Corp.*), 278 B.R. 778 (Bankr. N.D. Ill. 2002)....................34

*Baselski v. Paine, Webber, Jackson & Curtis, Inc.,*
    514 F. Supp. 535 (N.D. Ill. 1981) ..........................................................25

*Brennan v. Midwestern United Life Ins. Co.,*
    286 F. Supp. 702 (D. Ind. 1968) ............................................................18

*Brown v. Stacy (In re Stacy),*
    227 B.R. 272 (Bankr. N.D. Ill. 1998) .......................................................26

*Brownlee v. Conine,*
    957 F.2d 353 (7th Cir. 1992) ..............................................................16

*Butner v. United States,*
    440 U.S. 48 (1979).........................................................................19

*Cary Oil Co. v. MG Refining & Mktg., Inc.,*
    230 F. Supp. 2d 439 (S.D.N.Y. 2002)........................................................7

*CFTC v. Forefront Invs. Corp.,*
    2007 WL 21555739 (E.D. Va. July 25, 2007) ..............................................10, 11

*Chaveriat v. Williams Pipe Line Co.,*
    11 F.3d 1420 (7th Cir. 1993) ..............................................................14

*Columbia Gas & Electric Corp. v. United States,*
    151 F.2d 461 (6th Cir. 1945) ...............................................................4

*Cox v. Zale Delaware, Inc.,*
    239 F.3d 910 (7th Cir. 2001) ...............................................................5

*Cunningham v. Brown,*
    265 U.S. 1 (1924).........................................................................23

*Daly v. Kennedy (In re Kennedy)*,
    279 B.R. 455 (Bankr. D. Conn. 2002) ................................................................ 24

*Daly v. Radulesco*
    (*In re Carrozzella & Richardson*), 247 B.R. 595 (2d Cir. B.A.P. 2000) ................ 23

*Danning v. Bozek*
    (*In re Bullion Reserve of N. Am.*), 836 F.2d 1214 (9th Cir. 1988) ........................ 23

*Dexia Credit Local v. Rogan*,
    2003 WL 22349111 (N.D. Ill. Oct. 14, 2003) ............................................... 15, 16

*Fisher v. Apostolou*,
    155 F.3d 876 (7th Cir. 1998) ................................................................... 34, 36

*Gavin v. AT&T Corp.*,
    2008 WL 400697 (N.D. Ill. Feb. 12, 2008) ....................................................... 16

*Grigsby v. Cardone Indust. (In re Apex Auto. Warehouse, L.P.)*,
    2000 WL 640780 (Bankr. N.D. Ill. May 17, 2000) ............................................. 29

*In re 604 Columbus Ave. Realty Trust*,
    119 B.R. 350 (Bankr. D. Mass. 1990) ......................................................... 3, 4

*In re Benninger*, 357 B.R. 337 (Bankr. W.D. Pa. 2006) ........................................ 30

*In re Betz*, 273 B.R. 313 (Bankr. D. Mass. 2002) .............................................. 19

*In re Bright*, 241 B.R. 664 (9th Cir. B.A.P. 1999) ............................................. 19

*In re Dana Corp.*, 367 B.R. 409 (Bankr. S.D.N.Y. 2006) ...................................... 20

*In re Envirodyne Indus., Inc.*, 79 F.3d 579 (7th Cir. 1996) ............................... 17, 28

*In re FBN Food Services, Inc.*, 82 F.3d 1387 (7th Cir. 1996) ................................. 20

*In re Grand Builders, Inc.*, 122 B.R. 673 (Bankr. W.D. Pa. 1990) ............................. 4

*In re Granite Partners, L.P.*, 210 B.R. 508 (Bankr. S.D.N.Y. 1997) ....................... 3, 6

*In re Halpert & Co., Inc.* 254 B.R. 104 (Bankr. D.N.J. 1999) ................................. 19

*In re KDI Holdings, Inc.*, 277 B.R. 493 (Bankr. S.D.N.Y. 1999) .............................. 28

*In re Kreisler*, 331 B.R. 364 (Bankr. N.D. Ill. 2005) ......................................... 28

*In re Lifschultz Fast Freight*, 132 F.3d 339 (7th Cir. 1997) ............................... 3, 28

*In re Midway Airlines, Inc.*, 175 B.R. 239 (Bankr. N.D. Ill. 1994) ........................... 20

*In re OODC, LLC*, 321 B.R. 128 (Bankr. D. Del. 2005) ........................................................6

*In re Outdoor Sports Headquarters, Inc.*, 168 B.R. 177 (Bankr. S.D. Ohio 1994).......................31

*In re T.E. Mercer Trucking Co.*, 16 B.R. 176 (Bankr. N.D. Tex. 1981)..........................................4

*Jackson v. E.J. Brach Corp.*,
      176 F.3d 971 (7th Cir. 1999) ........................................................................................26

*JP Morgan Chase Bank v. Winnick*,
      350 F. Supp. 2d 393 (S.D.N.Y. 2004)......................................................................37, 38

*Kaiser Steel Corp. v. Mullins*,
      455 U.S. 72 (1982)......................................................................................................7, 8

*Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*,
      908 F.2d 1351 (7th Cir. 1990) ......................................................................................27

*Koch Refining v. Farmers Union Cent. Exch., Inc.*,
      831 F.2d 1339 (7th Cir. 1987) ......................................................................................34

*Krol v. Wileck*
      (*In re H. King & Assoc.*), 295 B.R. 246 (Bankr. N.D. Ill 2003) .............................................34

*Lerner v. Fleet Bank, N.A.*,
      459 F.3d 273 (2d Cir. 2006)....................................................................................15, 16

*Lettinga v. Agristor Credit Corp.*,
      686 F.2d 442 (6th Cir. 1982) ........................................................................................13

*Lindsey v. Fed. Land Bank of St. Louis (In re Lindsey)*,
      64 B.R. 19 (Bankr. C.D. Ill. 1986)....................................................................................32

*M.S.V., Inc. v. Bank of Boston-Western Mass. (In re Martin Specialty Vehicles, Inc.)*, 71 B.R. 221 (Bankr. D. Mass. 1987)..........................................................................32

*Martino v. Edison Worldwide Capital*
      (*In re Randy*), 189 B.R. 425 (Bankr. N.D. Ill. 1995)......................................................25

*Matter of Mobile Steel Co.*, 563 F.2d 692 (5th Cir. 1977).........................................................31

*Murray v. Prescott, Ball & Turben, Inc. (In re Chicago, Mo. & W. Ry. Co.)*,
      124 B.R. 769 (Bankr. N.D. Ill. 1991) ..............................................................................29

*New York Currency Research Corp. v. CFTC*,
      180 F.3d 83 (2d Cir. 1999)..............................................................................................11

*Official Comm. of Unsecured Creditors of Adelphia Commc'ns Corp. v. Bank of*
*America, N.A. et al. (In re Adelphia Commc'ns. Corp.),*
365 B.R. 24 (Bankr. S.D.N.Y. 2007) .................................................................30, 31, 34, 35

*Palay v. United States,*
349 F.3d 418 (7th Cir. 2003) ...................................................................................16, 17, 18

*Pepper v. Litton,*
308 U.S. 295 (1939).........................................................................................................30, 31

*Pharm. Sales and Consulting Corp. v. J.W.S. Delavau Co.,*
59 F. Supp. 2d 398 (D.N.J. 1999) ...........................................................................................13

*Practico v. Portland Terminal Co.,*
783 F.2d 255 (1st Cir. 1985) ....................................................................................................4

*Premex, Inc. v. CFTC,*
785 F.2d 1403 (9th Cir. 1986) ...............................................................................................10

*Remcor Prods. Co. v. Scotsman Group, Inc.,*
860 F. Supp. 575 (N.D. Ill. 1994) .........................................................................................14

*Richardson v. Lenick (In re Richardson),*
121 B.R. 546 (Bankr. S.D. Ill. 1990) ....................................................................................33

*Schacht v. Brown,*
711 F.2d 1343 (7th Cir. 1983) ...............................................................................................35

*Scholes v. Lehmann,*
56 F.3d 750 (7th Cir. 1995) ............................................................................................34, 36

*Sears, Roebuck and Co. v. Malony,*
1998 WL 214689 (N.D. Ill. Apr. 22, 2998) ..........................................................................34

*Shearson Lehman Hutton, Inc. v. Wagoner,*
944 F.2d 114 (2d Cir. 1991)....................................................................................................33

*Simon Wrecking Co., Inc. v. AIU Ins. Co.,*
2008 WL 638175 (E.D. Pa. Mar. 10, 2008)...........................................................................14

*Sonnenschein v. Reliance Ins. Co.,*
353 F.2d 935 (2d Cir. 1965).....................................................................................................23

*Stevenson v. J.C. Bradford & Co. (In re Cannon),*
277 F.3d 838 (6th Cir. 2002) ...................................................................................................23

*Taylor v. Standard Gas and Electric Co.,*
306 U.S. 307 (1938)..................................................................................................................31

*U.S. Nursing Corp. v. Saint Joseph Med. Ctr.*,
   39 F.3d 790 (7th Cir. 1994) ...............................................................................7

*United States v. Miss. Valley Generating Co.*,
   364 U.S. 520 (1961).............................................................................................7

*Wade v. Midwest Acceptance Corp. (In re Wade)*,
   219 B.R. 815 (8th Cir. B.A.P. 1998).................................................................19

*Wieboldt Stores, Inc. v. Schottenstein*,
   94 B.R. 488 (N.D. Ill. 1988) .............................................................................26

## State Cases

*Boslow Family Ltd. P'ship v. Glickenhaus & Co.*,
   860 N.E.2d 711 (N.Y. 2006)..............................................................................13

## Statutes and Regulations

7 U.S.C. § 5........................................................................................................9, 11

7 U.S.C. § 6d................................................................................................. *passim*

17 C.F.R. § 1.20.......................................................................................................9

17 C.F.R. § 1.25.....................................................................................................22

17 C.F.R. § 1.26.....................................................................................................22

17 C.F.R. § 240. 206(4)-2.....................................................................................21

N.Y. C.L.S. U.C.C. § 8-102...................................................................................21

N.Y. C.L.S. U.C.C. § 8-115...................................................................................21

N.Y. C.L.S. U.C.C. § 8-503...................................................................................20

Fed. R. Civ. P. 18............................................................................................29, 30

## Treatises

3 Collier on Bankruptcy § 506.07, at 506-71 (15th ed. 1988) .......................33

## Introduction

The Complaint sets forth in painstaking detail BONY's egregious misconduct, alleging that BONY[1] itself broke the law, colluded in a breach of fiduciary duties by Sentinel insiders, misused assets that it was supposed to maintain in trust for Sentinel's customers to reap tens of millions of dollars in interest income for itself, knowingly accepted hundreds of millions of dollars in fraudulent transfers, and wrongfully asserted liens over assets it helped insiders steal from Sentinel and its customers.

Thus, despite BONY's spin, this is no "ordinary dispute between a secured lender and a debtor in bankruptcy over a pool of collateral . . . ." (BONY at 1.) BONY's motion ignores those allegations which it does not like, liberally adds its own factual allegations and inferences, and asserts its innocence. But a motion to dismiss requires the Court to accept the allegations of the Complaint as true and to draw all inferences in favor of the plaintiff, and the proper forum for determining disputed facts is a trial.

BONY's legal theories, like its improbable assertions that the CFTC cannot protect commodity customers' funds and that a state's UCC preempts federal bankruptcy law claims, are equally meritless. The motion should be summarily denied.

## Argument

### I.  THERE IS NO GROUND FOR DISMISSING THE COMPLAINT BASED ON BONY'S ARGUMENTS CONCERNING THE CEA AND IAA.

BONY suggests that the entire Complaint "rise[s] or fall[s]" with the allegations that BONY's conduct violated the Commodity Exchange Act ("CEA") and the Investment Advisers Act of 1940 ("IAA") (BONY at 1), and argues that the Complaint

---

[1] BONY makes a footnote argument that the Bank of New York Mellon should be dismissed. This argument fails to take the factual allegations of the Complaint as true.

must be dismissed because there is no private right of action under these statutes. Alternatively, BONY claims that even if the Trustee had a right to sue, the CEA applies neither to Sentinel nor BONY. For good measure, BONY asserts that as a matter of law, its conduct did not cause any harm.

In fact, each count of the Complaint would state a claim even if neither the CEA nor the IAA existed. Half of the counts do not even refer to these statutes. Even with respect to the counts that do, the absence of a private right of action is irrelevant because the Trustee is not asserting one. Rather, the Trustee's Complaint alleges that the violations of those federal laws are factors relevant to establishing inequitable conduct supporting equitable subordination and disallowance of BONY's claim (Counts 4 and 6), and that BONY cannot enforce the unlawful agreements giving rise to its purported liens and secured claims (Counts 5 and 7). The lack of a private right of action under a statute does not affect such claims.

BONY's fallback position is that Sentinel was never subject to the CEA and so neither Sentinel nor BONY could be regulated under the CEA. On this point, BONY's argument requires the Court to overlook three decades of regulatory history, BONY's own express written acknowledgement that both parties are subject to the CEA, the plain text and purpose of the statute, and the relevant case law. BONY's proximate causation argument, which cannot be determined on a motion to dismiss in any event, is equally without merit.

### A.     Counts 1-3 And 8 Do Not Even Refer To The CEA Or The IAA.

BONY's suggestion that if the CEA and IAA are irrelevant here "the Complaint collapses in its entirety" (BONY at 2), is simply unsupported. Counts 1 through 3 allege

straightforward claims for avoidance of fraudulent and preferential transfers. Count 8 is a common-law claim alleging that BONY aided and abetted the Sentinel insiders in breaching their fiduciary duties to Sentinel. None cites violations of the CEA or IAA, and therefore even if there were no federal laws regulating futures commission merchants or investment advisers, the Trustee would still be entitled to recover on those claims. Indeed, BONY essentially concedes the point. (See BONY at 7.)

**B.      Violations Of The CEA And IAA Are Relevant To Establishing BONY's Inequitable Conduct Under Counts 4 And 6.**

The Trustee is not asserting any claim or seeking any remedy under the CEA or IAA. Counts 4 and 6 are bankruptcy causes of action for subordination and disallowance that are based on inequitable conduct. It is well established that *inequitable conduct includes illegal conduct*. Thus, violations of the CEA and the IAA are relevant not because the violations entitle the Trustee to a statutory remedy, but because their violation is part of the proof of BONY's inequitable conduct.

Inequitable conduct sufficient to subordinate a claim in bankruptcy includes "fraud, *illegality* [and] breach of fiduciary duties . . . ."  *In re Lifschultz Fast Freight*, 132 F.3d 339, 344-45 (7th Cir. 1997) (emphasis added); *see also In re Granite Partners, L.P.*, 210 B.R. 508, 515 (Bankr. S.D.N.Y. 1997) (complaint alleging "'fraud, illegality or breach of some other legal duty owing by [the defendant creditor]'" to the debtor sufficient to withstand motion to dismiss). Illegality constitutes grounds for equitable subordination regardless of whether the offending claimant is an insider of the debtor. *In*

3

re 604 Columbus Ave. Realty Trust, 119 B.R. 350, 377 (Bankr. D. Mass. 1990), rev'd on other grounds, 968 F.2d 1332, 1363 (1st Cir. 1992).[2]

In Columbia Gas & Electric Corp. v. United States, 151 F.2d 461, 469 (6th Cir. 1945), the Sixth Circuit rejected the very argument BONY advances here.   There, Columbia had tried to acquire control over the debtor companies through securities purchases that violated antitrust laws.  In bankruptcy, other creditors sought to preclude Columbia from enforcing its contracts with the debtors, based on the antitrust violation. Columbia argued that the antitrust laws "provide their own penalties to which the [bankruptcy] court may not add." Id. at 466.  The Sixth Circuit rejected that argument and held the contracts unenforceable because it is "the power and duty of equity, to reject demands arising out of illegal or inequitable conduct whenever such conduct is subject to legal penalties imposed by state or federal law . . . ." Id.; see In re T.E. Mercer Trucking Co., 16 B.R. 176, 189 (Bankr. N.D. Tex. 1981) (finding creditor's claim could be equitably subordinated for violation of Interstate Commerce Act even though no private right of action available to trustee under Act); see also In re Grand Builders, Inc., 122 B.R. 673, 677 (Bankr. W.D. Pa. 1990) (subordinating creditor's unpaid wage claim where creditor's withdrawal of corporate assets had been the subject of criminal charges).

BONY ignores these principles and cites instead an inapposite line of cases under 42 U.S.C. § 1983.  (BONY at 9-11.)  In those cases, the plaintiffs tried to invoke a general civil rights statute to assert a private damages claim foreclosed under the

---

[2] There is, of course, nothing novel about looking to statutes under which there is no private cause of action to define applicable standards of conduct. See, e.g., Practico v. Portland Terminal Co., 783 F.2d 255, 266-67 (1st Cir. 1985) (although OSHA does not create private right of action, violation of OSHA standards are properly used as guides in negligence claim).

4

pertinent statutory regulatory scheme. Here, by contrast, Counts 4 and 6 do not seek a damages remedy forbidden by Congress, or indeed, any damages remedy at all. Instead, they seek equitable relief that is authorized by the Bankruptcy Code and merely cite, as evidence of inequity, BONY's violations of federal law. Where no statutory damages remedy is being sought, whether a private right of action exists under the statute is irrelevant. *Cox v. Zale Delaware, Inc.*, 239 F.3d 910, 913-14 (7th Cir. 2001).

> **C.    Because The Complaint Alleges A Plethora Of Other Inequitable Conduct, There Would Be No Basis For Dismissing Counts 4 And 6 Even If BONY's "Private Right Of Action" Argument Were Correct.**

Even if the Court accepted BONY's novel contention that violations of federal law must be ignored in deciding whether BONY acted inequitably, it would not support dismissal. BONY's motion pretends that the *only* inequitable acts alleged are the violations of federal law, but that premise is indisputably false. The Complaint also charges that:

- "BONY colluded in" and aided and abetted the insiders' misuse of customer securities for their own benefit. (¶¶ 4, 230-236.)

- BONY, acting together with Sentinel insiders, moved hundreds of millions of dollars worth of securities out of segregated customer accounts into BONY's collateral accounts for the purpose of collateralizing the loan, <u>knowing</u> that the movements had nothing to do with any legitimate customer transactions, <u>knowing</u> that the collateral did not belong to Sentinel, and <u>knowing</u> the transfers were made with intent to defraud creditors. (¶¶ 134-35, 139-45, 148-52, 172, 179.)

- BONY refused to move customer securities out of its collateral account into the appropriate customer segregated account, despite instructions from Sentinel to do so. (¶ 154.)

- BONY unilaterally, without any instructions from anyone at Sentinel, misappropriated $52 million worth of securities from a segregated customer account and took it as collateral. (¶ 162.)[3]

---

[3] BONY argues that this allegation should be ignored because BONY simply made a "mistake" (BONY at 31) in stealing $52 million in customer funds and rectified this

- "BONY established an account structure for Sentinel that violated . . . *its own contractual promises*, in contravention of its duties and responsibilities as a custodian for customer securities. . . ." (¶ 193 (emphasis added).)

- "BONY continued to extend new credit to Sentinel, knowing that Sentinel was undercapitalized and was already in financial trouble. BONY's actions caused other creditors, who were unaware of Sentinel's undercapitalization, its debt and its financial problems, to continue to deposit additional funds with Sentinel and/or to fail to withdraw funds from Sentinel." (¶ 196.)

- BONY participated in the misconduct for a pecuniary motive. (¶¶ 6, 129.)

The allegations that BONY aided and abetted a breach of fiduciary duty, standing alone, are sufficient to state a claim for equitable subordination. *In re OODC, LLC*, 321 B.R. 128, 146 (Bankr. D. Del. 2005); *Granite Partners*, 210 B.R. at 515. Here, of course, the Complaint alleges far more. Because the Complaint alleges a variety of inequitable conduct in addition to the fact that the account structure was unlawful under the CEA and IAA, there is no basis for dismissing Counts 4 and 6.

### D.    BONY's Agreements Are Illegal And Therefore Are Void And Unenforceable (Counts 5 And 7).

BONY has filed a Proof of Claim and asserted in various pleadings that it has a valid, perfected and enforceable security interest in certain accounts. (Complt. ¶ 222.) Whether that proof of claim should be allowed and whether valid and enforceable liens exist depends in large part on whether the contracts between BONY and Sentinel and BONY's performance under those agreements violate the relevant provisions of the CEA or the IAA. (Complt. ¶¶ 206-08, 224-225.) The Complaint alleges that the agreements

---

"mistake" by giving the money back when it was caught by Sentinel's CFO. That claim of "mistake" is one for trial.

are illegal and unenforceable and that BONY's claim and the security interests therefore cannot be recognized.  (Complt. ¶¶ 207-08, 224.)

It is beyond dispute that "illegal promises will not be enforced . . . ." *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77 (1982).  As the Supreme Court explained in *Kaiser*:

> The authorities from the earliest time to the present unanimously hold that no court will lend its assistance in any way towards carrying out the terms of an illegal contract.  In case any action is brought in which it is necessary to prove the illegal contract in order to maintain the action, courts will not enforce it . . . .

*Id.*  The rule extends to contracts, like those at issue here, which while based on legitimate subject matter, are performed in an unlawful manner. See *U.S. Nursing Corp. v. Saint Joseph Med. Ctr.*, 39 F.3d 790, 792 (7th Cir. 1994).  In this case, BONY is plainly attempting to enforce claims and security interests that were created in violation of federal law, and the Trustee is entitled to seek a declaration that the contracts and the resulting claims and security interests are unenforceable.

That the CEA does not specifically provide for the invalidation of illegal contracts is irrelevant where, as here, enforcement of the contract would "offend the essential purpose of the statute . . . ." *United States v. Miss. Valley Generating Co.*, 364 U.S. 520, 563 (1961) (finding contract that offended purpose of criminal conflict of interest statute unenforceable).  Indeed, in *Cary Oil Co. v. MG Refining & Mktg., Inc.*, 230 F. Supp. 2d 439, 451-52 (S.D.N.Y. 2002), the court held contracts that violated Section 4a of the CEA, 7 U.S.C. § 6a, which prohibits off-exchange futures contracts, were unenforceable because that provision was "central to the Act's primary purpose of preventing fraud and protecting investors."  Here, Section 4d of the Act, 7 U.S.C. § 6d, which is designed to

7

protect investors even more directly – by protecting their funds from being misappropriated or pledged to support obligations to a bank – is plainly just as central.

Nor can BONY rely on the absence of a private right of action under the CEA or the IAA to preclude the Court from finding the purported security interest to be unenforceable. In *Kaiser*, the party seeking enforcement of the contract argued that the express remedies under the Sherman Act should not be added to by including avoidance of contracts as a sanction. 455 U.S. at 81. The Supreme Court rejected that view, holding that "[r]efusing to enforce a promise that is illegal under [federal law] is not providing an additional remedy contrary to the will of Congress." *Id.* at 81 n.7.

### E. BONY's Fallback Position That The Complaint Does Not Adequately Plead A Violation Of The CEA And The IAA Is Incorrect.

BONY next asserts that even if the Trustee were entitled to bring causes of action under the CEA and the IAA, he has failed to adequately plead (1) that the CEA actually applies to Sentinel and BONY, (2) that BONY's conduct was sufficient to qualify as substantial assistance under the IAA, and (3) that its misconduct caused the losses. In the first place, as explained above, the Trustee is not bringing private causes of action for violation of these statutes, so BONY's argument is a strawman. In any event, BONY's arguments about the sufficiency of the Complaint fail.[4]

---

[4] BONY asserts in a footnote that the Trustee's claims fail because no one else, including "Sentinel's accounting firm . . . notified BNY that the account structure at BNY was flawed or that BNY's management of the accounts was improper or violated any law or regulation." (BONY at 9 n.4.) BONY's argument is unavailing because no such facts are alleged in the Complaint. Moreover, it is ironic that BONY seeks absolution for its own misconduct because the auditors, against whom the Trustee has filed a separate adversary proceeding, negligently failed to report violations of the CEA and IAA.

### 1.    The CEA Applies To Sentinel And BONY.

Congress has established a statutory scheme governing the commodity industry designed to protect against "misuses of customer assets." 7 U.S.C. § 5(b). Under that statutory scheme, entities registered as futures commission merchants ("FCMs") are required to segregate customer funds and treat funds deposited by customers only as belonging to those customers, and are prohibited from pledging customer funds for the benefit of others. *Id.* § 6d(a); 17 C.F.R. § 1.20. To further protect customer assets, Congress expressly provided that those protections apply not only to registrants, but also to any person, including a depository "that has received any money, securities, or property for deposit in a separate account . . . ." 7 U.S.C. § 6d(b).

BONY first contends that the CEA, and its requirements that customer property be segregated, not commingled, and not pledged for the benefit of others, do not apply here because Sentinel is not "really" acting as an FCM and because it supposedly does not handle "customer funds." (BONY at 11-15.) Thus, BONY concludes, neither Sentinel nor its depository bank, BONY, are subject to the requirements of Section 4d(a)(2) and (b) of the CEA, 7 U.S.C. §§ 6d(a)(2) and (b).

BONY offers no authority supporting its standing to collaterally attack the determination of the CFTC, which has stood for more than 25 years, that Sentinel is an FCM subject to the CEA's requirements. BONY's argument also fails to credit the allegations of the Complaint and misunderstands the statutory scheme and the purpose behind the segregation requirements. Perhaps most importantly, BONY is estopped by its own prior statements and actions from asserting that the CEA does not apply to its business with Sentinel.

The Complaint alleges, and BONY cannot deny, that Sentinel is in fact a registered FCM. (Complt. ¶¶ 21, 29.) The Complaint also alleges that many of the funds managed by Sentinel were commodity customers' funds, invested through Sentinel by other FCMs. (Complt. ¶¶ 25, 29.) For decades Sentinel has been registered as an FCM for the express purpose of managing customer funds held by other FCMs. (Complt. ¶ 29; Ex. A.) In 1981, the CFTC determined that Sentinel was subject to regulation as an FCM, but would be exempt from certain net capital requirements. (Complt., Ex. A.) That regulatory decision was premised on several conditions, including Sentinel not accepting orders of its own for commodity contracts. (*Id.*)

BONY suggests that only some subset of registered FCMs, those who are "really" operating as FCMs, are subject to the requirements of the CEA. On the contrary, the duty to segregate is triggered not by any particular activity of an FCM, but by *its status as a registered FCM.* See *Premex, Inc. v. CFTC*, 785 F.2d 1403 (9th Cir. 1986). In *Premex* the CFTC filed a complaint against an FCM and one of its officers alleging that they had failed to comply with the CEA's minimum capital requirements. The officer made the same argument BONY is advancing here:  because the company was not actually "operating as a futures commission merchant," the regulatory requirements did not apply. 785 F.2d at 1406 n.7.  The court rejected that argument, noting that the FCM's "obligation to meet the minimum financial requirements *flows from the registrant's status as an FCM and not from the nature of its current activities.*" *Id.* (emphasis added.); see also *CFTC v. Forefront Invs. Corp.*, 2007 WL 21555739, at *3-4 (E.D. Va.

July 25, 2007) (CFTC could enforce requirements because of Forefront's "status as a registered FCM, without regard to the type of transactions in which Forefront engages").[5]

Accepting BONY's reading of the statute would eviscerate its purpose of protecting the funds of commodity customers. *See* 7 U.S.C. § 5. To protect such funds, the CEA requires that they be held in a segregated account, not commingled with the FCM's own funds, and not be pledged to secure credit for anyone besides the customer. *Id.* § 6d(a)(2). The CFTC granted Sentinel an exemption from the net capital requirement otherwise applicable to Sentinel as a registered FCM on the express condition that Sentinel not accept its own orders for commodity contracts, and as part of that finding expressly assumed that customer funds would be held in segregated accounts in accordance with the CEA and CFTC regulations. (Complt., Ex. A.)

In addition, the CFTC has recently and emphatically affirmed the applicability of the CEA to Sentinel by bringing an enforcement action against Sentinel and certain of its insiders for violating the CEA. *See CFTC v. Sentinel Management Group, Inc. et al.*, No. 08 C 2410 (N.D. Ill. Apr. 28, 2008). In that Complaint, the CFTC alleged that registration as an FCM triggers the segregation requirements of the CEA: "As a registered FCM, Sentinel was required under the [CEA] and Commodities Regulations to

---

[5] *New York Currency Research Corp. v. CFTC*, 180 F.3d 83 (2d Cir. 1999), is both factually distinguishable and unpersuasive. There, the question was whether a firm that had formerly and mistakenly registered as a commodity trading adviser and commodity pool operator was subject to a CFTC demand for records made after its registration had lapsed. The court there, perhaps influenced by its view that the CFTC had prosecuted the case in "a fit of pique from what it viewed as petitioner's intransigent refusal to do its bidding and unwilling to consider any other reason than its own will," *id.* at 85, read the relevant provision of the CEA as requiring both registered status and function as a CTA/CPO to trigger the duty to respond. Here, unlike in *Currency Research*, Sentinel was registered at the relevant time. In addition, the court's reading of Section 4a of the CEA in *Currency Research* is far from obvious on its own terms and, in any event, does not govern Section 4d, which is at issue here.

adhere to the standards of segregation and handling of customer funds as outlined in Sections 4d(a)(2) and 4d(b) of the [CEA] . . . and Commission Regulations . . . ." (Ex. A, CFTC Complt. ¶ 17.)

In any event, whether Sentinel should have been registered and regulated as an FCM is largely beside the point. Even if Sentinel was not an FCM subject to Section 4d(a) of the CEA, both Sentinel's and BONY's activities fall under Section 4d(b), which makes it unlawful for "*any person*, including but not limited to . . . any depository, that has received any money, securities, or property for deposit in a separate account as provided in [Section 4d(a)] of this section, to hold, dispose of, or use any such money, securities or property as belonging to . . . any person other than the customers . . . ." 7 U.S.C. § 6d(b) (emphasis added). Here, the Complaint plainly alleges that BONY accepted money for deposit in a separate account for commodity customers of FCMs (¶¶ 25, 54), and it is beyond dispute that BONY was informed of the nature of the customer funds being deposited with BONY. Thus, BONY is a "person" subject to the requirement that it not "use any such money" as belonging to BONY or anyone else other than the commodity customers themselves. The Complaint alleges a variety of conduct by BONY that violated that provision. (¶¶ 3, 6, 48-49, 63-70, 132-65.)

Finally, BONY is estopped by its own contractual promises from asserting that Sentinel and BONY were not subject to the CEA. In 1997, BONY bid for and acquired Sentinel's custody business. (Complt. ¶ 52.) In order to get the business, BONY was required to and did sign a series of segregation letter agreements with Sentinel required by CFTC Rule 1.20. (Complt. ¶ 54; Exs. C-E.) In those 1997 letter agreements, BONY expressly <u>acknowledged and agreed</u> that: (a) Sentinel was a "futures commission

merchant [ ] under the [CEA]"; (b) Sentinel would deposit money and securities "deposited by or accruing to [Sentinel's] customers which are commodity customers"; (c) all investments would be made in accordance with the CEA; (d) these "accounts are being opened to meet the provisions of the [CEA]"; (e) the statute requires that such funds be "segregated and treated as belonging to our customers"; (f) and the funds in these accounts would not be subject to BONY's lien or off-set on account of any debt owed by Sentinel or other segregated customer groups to BONY. In addition, BONY agreed that it understood the nature of the assets in the accounts and that it agreed that the letter would supersede any other conflicting documents relating to the accounts. (Complt., Exs. C-E.) Having gotten Sentinel's business by recognizing the application of the CEA to the funds it was to receive, BONY cannot now assert the opposite.

A party that has contracted or dealt with an entity as a particular type of entity— as BONY clearly has—is estopped from later turning around and denying that entity's nature. *See Lettinga v. Agristor Credit Corp.*, 686 F.2d 442, 446 (6th Cir. 1982) (party that dealt with entity as corporation estopped to deny its corporate existence); *Boslow Family Ltd. P'ship v. Glickenhaus & Co.*, 860 N.E.2d 711, 713 (N.Y. 2006) (defendant estopped from contending plaintiff was not limited partnership where defendant was "using that sword to escape liability after benefiting from its contract with plaintiff"). This principle "is premised upon the courts' desire to effectuate the parties' intent in entering into the contractual arrangement at issue." *Pharm. Sales and Consulting Corp. v. J.W.S. Delavau Co.* 59 F. Supp. 2d 398, 407 (D.N.J. 1999).

BONY's attempt to repudiate its acknowledgement that Sentinel was an FCM and that the funds BONY received from Sentinel were customer funds subject to the CEA is

13

also precluded by the doctrine of regulatory estoppel. Where a party has made a statement to a regulatory entity, it is estopped from subsequently arguing the opposite. See *Simon Wrecking Co., Inc. v. AIU Ins. Co.*, 2008 WL 638175, at *2 (E.D. Pa. Mar. 10, 2008). This principle is recognized in the Seventh Circuit. See *Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1427-28 (7th Cir. 1993) (acknowledging estoppel could apply because of earlier representation to EPA). Dealing with a regulator "pursuant to a statutory scheme as a pre-condition to achieving some desired result" triggers application of the doctrine if the party subsequently takes an inconsistent position. *Remcor Prods. Co. v. Scotsman Group, Inc.*, 860 F. Supp. 575, 578 (N.D. Ill. 1994).

That is precisely what happened here. Before, and as a precondition to Sentinel opening any accounts or depositing any funds with BONY, BONY was required by law to sign letters acknowledging that both it and Sentinel were subject to the segregation and other provisions of Section 4d of the CEA. (Complt. ¶¶ 54-56; Exs. C-E.) This acknowledgement was specifically required by the CFTC: "Each registrant shall obtain and retain in its files . . . a written acknowledgment from such bank . . . that it was informed that the customer funds deposited therein are those of commodity or option customers and are being held in accordance with the provisions of the Act and this part . . . ." 17 C.F.R. § 1.20(a). Having made that representation required by the CFTC, BONY cannot now deny it.

### 2. The Complaint Properly Alleges That BONY Substantially Assisted Sentinel's Violations Of The IAA And SEC Rules.

BONY next asserts that the Trustee has not alleged that BONY "substantially assisted" violations of Section 206 of the IAA and SEC Rule 206(4)-2, but only alleges a "series of omissions" by BONY that amount to no more than a "failure to investigate."

14

(BONY at 16.)   BONY has apparently failed to read the Complaint, which specifically alleges active, fraudulent and collusive conduct by BONY, not mere omissions or failures to investigate.  See Section I.C, pp. 5-6 above, detailing numerous examples of active misconduct by BONY alleged in Complaint.  This active misconduct is all <u>in addition to</u> the numerous red flags relating to Sentinel's activities.  (See Complt. ¶ 126.)

Even if BONY were correct in arguing that the Complaint only charges a "failure to investigate" red flags, BONY's failures here would still amount to substantially assisting a violation of the IAA.  "Illinois recognizes a cause of action against a bank that has actual knowledge of a fiduciary's misappropriation of funds or that has knowledge of facts that render its failure to inquire bad faith."  *Appley v. West*, 832 F.2d 1021, 1031 (7th Cir. 1987) (reversing grant of summary judgment); *see also Dexia Credit Local v. Rogan*, 2003 WL 22349111, at *8 (N.D. Ill. Oct. 14, 2003) (banks liable for mere inaction or for "engaging in activities that are perfectly usual and legal" as long as there is "evidence suggesting that the bank knew" that fiduciary was acting improperly).  The law is the same in New York: "banks *do* have a duty to safeguard trust funds deposited with them when confronted with clear evidence indicating that those funds are being mishandled."  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 295 (2d Cir. 2006) (bank's knowledge that attorney overdrawn on client fiduciary accounts sufficient to establish aiding and abetting breach of fiduciary duty claim).  The "duty 'to prevent a diversion'" can render a bank liable for aiding and abetting based on "mere inaction." *Id.*

Here, the Complaint alleges smoking gun correspondence in which BONY personnel recognize that the collateral being transferred into the Clearing/Collateral Account must have been "for somebody else's benefit." (Complt. ¶ 135.)  The transfer of

15

assets that should have been segregated for clients, without more, violates the IAA and

SEC Rule 206(4)-2 (Complt. ¶¶ 43-47), and therefore, no additional knowledge was

necessary to trigger a duty to investigate on BONY's part.    Therefore, as in *Appley*,

*Dexia*, and *Lerner*, even inaction would still suffice to state a claim for aiding and

abetting violations of the IAA and SEC rules.

### 3.    There Is No Basis For Dismissal On Proximate Causation Grounds.

BONY next contends that, as a matter of law, its violations of the CEA and the

IAA could not have caused the losses at issue here.    (BONY at 17-19.)    BONY's

argument must be rejected for a variety of reasons.

First, the question of causation is inherently factual.    "Whether or not the

defendant's conduct proximately caused the plaintiff's injury ordinarily is a question for

the finder of fact to decide; only rarely are the facts so clear that the court can resolve the

issue as a matter of law."  *Palay v. United States*, 349 F.3d 418, 432-433 (7th Cir. 2003);

*Gavin v. AT&T Corp.*, 2008 WL 400697, at *22 (N.D. Ill. Feb. 12, 2008).  To withstand a

motion to dismiss, all the complaint need do is to outline a violation of the statute and

connect the violation to the named defendants.  *Brownlee v. Conine*, 957 F.2d 353, 354

(7th Cir. 1992).    The Trustee has clearly done this and more.  (See, e.g., Complt. ¶¶ 2-6,

8, 113, 133-163, 198, 209, 218-36.)

Second, BONY's motion attempts to conflate counts as to which there is no

causation requirement (Counts 1-3, 5 and 7), counts as to which the relevant question is

whether its conduct caused harm to customers or creditors (Counts 4 and 6), and the

single count (Count 8) which requires an allegation of harm to the Estate proximately

caused by BONY's misconduct. Its causation arguments are not well-taken as to any of these counts.

Counts 1-3 are actions for avoidance of fraudulent transfers and preferences. These counts do not require proof of any harm to anyone caused by BONY's conduct; the mere fact of fraudulent transfers entitles the Trustee to prevail.

Counts 5 and 7 merely seek a declaration that the contracts and the claimed security interests are unenforceable. There is no claim for damages and no requirement of proximately caused harm.

Counts 4 and 6 are equitable claims for subordination and disallowance. To plead such claims, the Trustee need only allege that the inequitable conduct proximately caused harm to the customers or creditors and need not show harm to the debtor. See *In re Envirodyne Indus., Inc.*, 79 F.3d 579, 583-84 (7th Cir. 1996). Proximate causation means that the defendant's conduct is a substantial factor in bringing about the injury and that the injury is foreseeable. *Palay*, 349 F.3d at 432. Here, the Trustee has alleged that BONY's conduct was a substantial factor in causing hundreds of millions of dollars in losses to Sentinel and its customers. (Complt. ¶¶ 2, 8, 194.) The injury to the customers was obviously the foreseeable result of BONY's conduct in setting up the flawed account structure that allowed assets the customers had deposited to be taken and commingled and participating in the transfer of such assets to its own collateral account.

Count 8 alleges that BONY aided and abetted a breach of fiduciary duty by the Sentinel insiders, which caused losses to Sentinel. With respect to this count, BONY contends that the only misconduct attributable to BONY is setting up a flawed account

structure in violation of the CEA and the IAA and argues that the losses could have occurred under a different account structure. (BONY at 18.)

BONY's factual predicate, that its only misconduct was setting up the account structure, is false. See Section I.E.2 above. The argument also badly misunderstands the concept of proximate causation. The fact that the harm could have occurred under a different set of circumstances without BONY's connivance does not negate a showing that BONY's actions in fact contributed to the harm that occurred. See *Palay*, 349 F.3d at 433 (reversing dismissal of complaint for lack of causation); *Brennan v. Midwestern United Life Ins. Co.*, 286 F. Supp. 702, 725-27 (D. Ind. 1968). Here, the Trustee has properly alleged that BONY's misconduct caused a loss to Sentinel. (Complt. ¶ 236.) Funds that were supposed to be segregated for customers were used, as a result of the account structure and BONY's active participation in the transfer of assets, to support the insiders' massive leveraging scheme and speculative trading strategy. (Complt. ¶¶ 102, 107, 110.) BONY was aware of both. (Complt. ¶ 114.) When the schemes collapsed, Sentinel suffered massive losses and was unable to pay its debts. (Complt. ¶¶ 4, 8, 236.)

## II.    SECTION 8-503(e) OF THE UNIFORM COMMERCIAL CODE BARS NONE OF THE CLAIMS ALLEGED BY THE TRUSTEE.

BONY next asserts that a state statute, which prohibits some types of common-law claims, like replevin, in some circumstances, also precludes federal law claims arising under the Bankruptcy Code, including the Trustee's claims for avoidance of fraudulent transfers and preferences, disallowance and equitable subordination. Because Section 8-503(e) of the Uniform Commercial Code, like all other state laws, is subject to

the Supremacy Clause of the Constitution, BONY's argument is frivolous. And even if Section 8-503(e) did apply here, it would not require dismissal of any claim.

Section 8-503(e) cannot protect BONY from fraudulent transfer or preference claims brought under the Bankruptcy Code (Counts 1 and 3). "Federal law trumps state law where it conflicts with policies of the federal law . . . . This approach comports with the fact that Congress has plenary power to enact uniform federal bankruptcy laws." *In re Betz*, 273 B.R. 313, 324 (Bankr. D. Mass. 2002); *see also Butner v. United States*, 440 U.S. 48, 54 n.9 (1979) ("[I]t has been settled from an early date that state laws to the extent that they conflict with the laws of Congress, enacted under its constitutional authority, on the subject of bankruptcies are suspended."). While state law creates and defines property interests, *Butner*, 440 U.S. at 55, it does not exclusively govern *enforcement* of those property interests. See *In re Bright*, 241 B.R. 664, 666 (9th Cir. B.A.P. 1999) (while state law determines existence of property interest, court exercises power to avoid fraudulent transfer in accordance with federal-law determination of whether "transfer" occurred); *Wade v. Midwest Acceptance Corp. (In re Wade)*, 219 B.R. 815, 821 (8th Cir. B.A.P. 1998) ("[W]hile state law may create certain rights to property, federal preference law may act to alter those rights."). Nor will state law protection of a property right trump the explicit remedies provided by the Code. See, *e.g., In re Halpert & Co., Inc.*, 254 B.R. 104, 126 (Bankr. D.N.J. 1999) (denying motion to dismiss fraudulent transfer claim on grounds of Florida homestead exemption which "is a creation of state law and may be superseded by the Bankruptcy Code should the facts of this case warrant it"). "[S]tate common or other law to the contrary must defer to the relevant provisions of the Bankruptcy Code enacted by Congress, pursuant to the

Supremacy Clause of the United States Constitution." *In re Midway Airlines, Inc.*, 175 B.R. 239, 243 (Bankr. N.D. Ill. 1994). BONY's contention, if accepted, would utterly eviscerate all the avoidance rights set forth in Chapter 5 of the Code.

BONY cites two cases, neither of which supports its proposition that state law trumps the avoidance powers set forth in the Bankruptcy Code. In *In re FBN Food Services, Inc.*, 82 F.3d 1387 (7th Cir. 1996), a surplus remained after payment of all claims, and the question was how that surplus should be distributed among equity claimants and the recipient of a fraudulent transfer. The court noted that "[o]nce the rules established by the Code have been exhausted, remaining entitlements come from outside bankruptcy, which is to say from state law." *Id.* at 1396. Here, of course, the entitlement rules established under the Code are far from exhausted. *In re Dana Corp.*, 367 B.R. 409, 418 (Bankr. S.D.N.Y. 2006), finding that the amended 546(c) did not create a new, independent federal right of reclamation that replaced state law, is equally irrelevant.

Even as to counts implicating state law (Counts 2 and 8), Section 8-503(e) still would not require dismissal. That statute provides:

> An action [1] based on the entitlement holder's property interest [2] with respect to a particular financial asset under subsection (a), whether framed in conversion, replevin, constructive trust, equitable lien, or other theory, may not be asserted against any purchaser of a financial asset or interest therein who gives value, obtains control, and [3] does not act in collusion [4] with the securities intermediary in violating the securities intermediary's obligations under Section 8-504.

N.Y. C.L.S. U.C.C. § 8-503(e) (emphasis and internal numbering added). Here, the preconditions in Section 8-503(e) have not been met.

First, neither claim is based on "an entitlement holder's property interest." Rather, they are grounded in the Trustee's rights to avoid fraudulent transfers under UFTA and to bring breach of fiduciary claims for the benefit of the Estate.

Second, neither cause of action is a claim like replevin, conversion or the others specified by the statute that seeks recovery of "a particular financial asset."

Third, BONY did act in collusion[6] with Sentinel's insiders. As explained in Section I.E.2 above, the Trustee has explicitly charged that BONY "colluded" in the Sentinel insiders' misconduct (Complt. ¶¶ 4, 235), and those allegations are backed up with detailed factual averments. (Complt. ¶¶ 3-6, 117-29, 133-42, 148-54, 162, 172, 179.) BONY's brief ignores all of those allegations of affirmative misconduct and attempts to rewrite the Complaint as charging only that it ignored red flags. For the reasons previously explained, that contention is flatly untrue.

Fourth, Section 8-503(e) only applies if Sentinel was a "securities intermediary." To be a securities intermediary, Sentinel would have to have "maintaine[d]" securities accounts for others. N.Y. U.C.C. § 8-102(14). The Complaint clearly alleges that *BONY*, and not Sentinel, maintained the accounts at issue (Compl. ¶¶ 53, 62-63, 80-81). That is because under SEC Rule 206-4(2), 17 C.F.R. 240. 206(4)-2, with respect to customer deposits that were managed by Sentinel as investment adviser, a "qualified custodian [was required to] maintain[] those funds and securities" in segregated accounts. Here, BONY was the "qualified custodian" that "maintained" those segregated accounts. Likewise, under the CEA, Sentinel was allowed only to invest customer funds in certain

---

[6] The standard for "collusion" is the same as for aiding and abetting a tort. N.Y. U.C.C. § 8-115, cmt. 5. BONY incorrectly relies on out-of-context excerpts from the UCC Article 8 legislative sessions stating that certain scenarios, such as a "conspiratorial arrangement," might also constitute collusion. (BONY at 22.)

securities in accordance with the Act and CFTC regulations, but did not "maintain" securities accounts for any of its customers.  7 U.S.C. § 6d; 17 C.F.R. §§ 1.25, 1.26.

### III.    EACH INDIVIDUAL COUNT STATES A CLAIM UPON WHICH RELIEF MAY BE GRANTED.

#### A.    The Fraudulent Transfer Counts (Counts 1 And 2) State A Claim.

##### 1.    The Trustee Has Alleged That The Transfers Were Of An Interest In The Property Of The Debtor.

BONY next argues that the Trustee cannot avoid any fraudulent transfers because the property transferred is not property of the Estate.  (BONY at 25.)    This Court has already rejected an identical argument made by the Sentinel insiders (Ex. B, 02/28/08 Hrg. Tr. at 43-48), and the contention has not improved with age.

The Complaint explicitly alleges that the fraudulent transfers constituted a transfer of interest in Sentinel's property (Complt. ¶¶ 5, 9, 169-170), as well as detailed facts supporting that allegation (Complt. ¶¶ 63-72, 83, 86, 99, 109, 130-62).  As the Court stated in denying the Sentinel insiders' motion, "that's a matter to sort out later on . . . . And clearly the complaint alleges that [this is] the debtor's property . . . [s]o I have to reject, at this stage anyway, the standing challenge."  (Ex. B, 02/28/08 Hrg. Tr. at 46-48.)[7]

---

[7] Ironically, in response to a putative class action filed against it, BONY asserted that dismissal or a stay was required "to allow the court-appointed trustee in the bankruptcy proceedings in the first instance, to elect to assert the claims alleged in the complaint or to recover the assets at issue here" – namely, the assets "wrongfully pledged as collateral for loans from [BONY] to [Sentinel]." *Shatkin v. BONY*, Case No. 07 C 7928 (S.D.N.Y. Feb. 29, 2008) (attached as Ex. C).  Thus, BONY seeks dismissal or a stay in the *Shatkin* action on the theory that the Trustee has standing to recover what it now claims is not property of the Estate.

Like the Sentinel insiders, BONY relies on the fact that Sentinel <u>was supposed to</u> hold funds in trust for its customers.  (BONY at 25.)  But in determining whether transfers a bankruptcy trustee seeks to avoid and recover were of property of the Estate, "it is irrelevant whether an express trust had been formed when [a customer] gave the money to the Debtor . . . ."  *Daly v. Radulesco* (*In re Carrozzella & Richardson*), 247 B.R. 595, 600 (2d Cir. B.A.P. 2000).  BONY must show that the property <u>retained</u> its trust character at all times.  See *Cunningham v. Brown*, 265 U.S. 1, 11-12 (1924); *Sonnenschein v. Reliance Ins. Co.*, 353 F.2d 935, 936 (2d Cir. 1965) ("It is not enough, therefore, to show merely that the funds or property came into the bankrupt's hands . . . .").

When trust assets are commingled with the debtor's property, all of the property, including the assets that should have been held in trust, presumptively becomes property of the estate.  *Id.*; *Danning v. Bozek* (*In re Bullion Reserve of N. Am.*), 836 F.2d 1214, 1217-18 (9th Cir. 1988).  BONY has no way to rebut such a presumption on a motion to dismiss, and does not even try.[8]  Such an argument would be futile given the Complaint's extensive allegations of the commingling of customer assets among customer groups and with Sentinel's own assets (Complt. ¶¶ 109, 130-62) and use of those assets to reduce the amount of BONY's loan to Sentinel (Complt. ¶¶ 66, 99).[9]

---

[8] In fact, BONY ignores the entire 80-year-old body of law on commingling and instead relies on cases in which no commingling is alleged to have occurred.  For example, BONY relies on *Stevenson v. J.C. Bradford & Co.* (*In re Cannon*), 277 F.3d 838 (6th Cir. 2002), in which the court held that because the funds embezzled by the debtor were *in fact* maintained in an express trust account, they never became property of the estate and therefore were not subject to avoidance.

[9] BONY disingenuously contends that the Complaint alleges that the assets transferred to the Clearing/Collateral account "*belonged to Sentinel's customers, and not to Sentinel*

2.     **The Trustee Has Properly Alleged Intent To Defraud Creditors.**

BONY's contention that the Trustee has failed to allege that any of the fraudulent transfers were made with the intent to defraud Sentinel's creditors fails for the same reasons as many of its other claims:  it ignores the allegations of the Complaint.

BONY asserts that the *only* allegation the Trustee makes regarding the Sentinel insiders' intent to defraud creditors is that "Sentinel made the allegedly fraudulent transfers in order to secure its loan from BONY."  (BONY at 27.)  In fact, the Trustee asserts that the Sentinel insiders transferred hundreds of millions of dollars worth of securities that should have been segregated for customers to the accounts over which BONY then asserted a lien.  (Complt. ¶¶ 114, 125, 134-35, 139-55.)  Those transfers were fundamental to the insiders' massive, undisclosed commingling and leveraging scheme in which they used property that they had been given to hold in trust to secure a bank loan for themselves, which was then used to finance repurchase transactions that added undisclosed leverage to customer portfolios and led to hundreds of millions of dollars in losses.[10]

---

*itself.*" (BONY at 25, emphasis in original.)  On the contrary, the Complaint merely uses the phrase "customer assets" or "customer securities" as shorthand to "describe assets and securities which were supposed to be, but were not, separately accounted for and segregated for the benefit of customers" – a point which the Trustee makes clear in a footnote that BONY conveniently fails to mention.  (Complt. ¶ 3 n.1.)  Thus, the Complaint in no way alleges that the transfers were of anything other than property of the estate.

[10] BONY cites *Daly v. Kennedy (In re Kennedy)*, 279 B.R. 455, 462 (Bankr. D. Conn. 2002), for the proposition that "*appropriating*" trust assets is not the same thing as "*transferring*" those assets.  In *Kennedy*, the Trustee failed to state a claim under Section 548(a)(1)(A) because the debtor misappropriated trust assets at one point in time and then at some point in the future transferred them to his wife.  Here, in contrast, the transfer of the securities into the non-segregated clearing accounts *was* the misappropriation.

Contrary to BONY's novel theory, allegations that the insiders stole creditors' assets, lied to them, and caused them hundreds of millions of dollars in losses is obviously sufficient to allege intent to hinder, delay, or defraud creditors. "[I]ntentionally carrying out a transaction with full knowledge that its effect will be detrimental to creditors is sufficient for actual intent to hinder, delay, or defraud . . . ." *Martino v. Edison Worldwide Capital (In re Randy)*, 189 B.R. 425, 438-39 (Bankr. N.D. Ill. 1995).

BONY's assertion that the Trustee has failed to allege its fraudulent transfer claims with particularity is equally meritless. The Complaint sets forth in painstaking detail in over 40 paragraphs how the Sentinel insiders and BONY caused Sentinel to fraudulently transfer hundreds of millions of dollars in securities. (Compl. ¶¶ 127-167.) The Complaint walks through five sets of such fraudulent transfers in detail – the "June 1 Transfers" (¶¶ 132-35); the "June 25-29 Transfers" (¶¶ 136-41); the "July 17 Transfers" (¶¶ 137-44); the "July 30 Transfers" (¶¶ 145-50); and a series of transfers between August 9 and August 16 (¶¶ 151-64). And, the Complaint alleges that all other transfers made within two years of the Petition Date that were made in the same manner should be avoided. (Complt. ¶¶ 169-73.)[11]

Nothing more is required. The Trustee is not required to list every single one of the transfers that he might at trial prove was fraudulent. See *Baselski v. Paine, Webber, Jackson & Curtis, Inc.*, 514 F. Supp. 535, 541 n.2 (N.D. Ill. 1981) (denying motion to dismiss under Rule 9(b) and holding that requirement "to identify each transaction at

---

[11] BONY mistakenly contends that the Trustee seeks to avoid transfers pursuant to Section 548 that took place more than two years before the petition date. (BONY at 28 n.19.) Count 1 very clearly is limited to transfers made within two years of the petition date. (Complt. ¶¶ 169-73.) The Trustee does seek to avoid certain transfers after January 1, 2004 under UFTA (Complt. ¶¶ 175-82), which is well within the four-year statute of limitations provided under that statute. 740 ILCS 160/10(a).

issue . . . would be unduly burdensome"). A contrary rule would substitute the Complaint for trial and require bankruptcy trustees to drain the resources of the estate by filing needlessly duplicative and lengthy pleadings. "Pleadings are not intended to supplant the process of discovery; nor is [debtor] required to plead the evidence it plans to present to support its claims." *Wieboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488, 498 (N.D. Ill. 1988) (denying motion to dismiss under Rule 9(b)).

### B.   Count 3 Properly States A Claim For Avoidance Of Preferential Transfers.

In addition to recycling its property of the estate argument, BONY also asserts that Count 3 should be dismissed because the Complaint fails to allege that the transfers at issue were made on account of antecedent debt, and therefore the Trustee has not stated a preference claim under section 547. Although BONY is forced to acknowledge that the Complaint does explicitly allege an antecedent debt (BONY at 29), it attempts to skirt the Trustee's unambiguous pleading by pointing to other allegations in the Complaint as evidence that the transfers actually were contemporaneous exchanges for new credit (rather than transfers on account of antecedent debt). (BONY at 29.) But this is not the standard for determining whether a complaint survives a motion to dismiss. Rather, all well-pled allegations – including the allegations in Paragraph 186 of the Complaint that the transfers were made on account of antecedent debt – must be accepted as true. *Brown v. Stacy (In re Stacy)*, 227 B.R. 272, 275 (Bankr. N.D. Ill. 1998). Moreover, all inferences must be drawn in favor of the plaintiff, *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 977-78 (7th Cir. 1999); *Brown*, 227 B.R. at 275, and the inference BONY asks this Court to make is not even supported by the allegations to which BONY refers.

BONY conveniently ignores that the paragraphs of the Complaint to which it points actually allege that BONY was under-collateralized, and demanded additional securities to serve as collateral. (Complt. ¶¶ 138-145.) In other words, the securities were transferred to secure pre-existing extensions of credit that already had been made by BONY to Sentinel, and the "booking" every evening of an overnight loan – the fact upon which BONY relies to make its disingenuous contemporaneous exchange argument – was simply the nightly documentation of pre-existing extensions of credit. Thus, the Trustee's Complaint plainly alleges transfers on account of antecedent debt, and there is no basis for dismissal of Count 3.

### C.    The Trustee Has Stated A Claim For Equitable Subordination (Count 4).

BONY next contends that the first factor of the test for equitable subordination is unsatisfied here because BONY engaged in no inequitable conduct. BONY's argument rests on three, equally unsustainable propositions: (1) that BONY's violations of federal law are irrelevant; (2) that the Court should ignore the other forms of misconduct alleged; and (3) that BONY's misconduct was not sufficiently blameworthy. As explained in Section I.B above, illegal conduct is inequitable, and the absence of a private right of action under the statute at issue is immaterial. As explained in Section I.C, there is a plethora of misconduct alleged in support of Count 4 that is not based on the federal law violations. BONY's remaining suggestion that its conduct was not bad enough to be considered inequitable is simply ludicrous on a motion to dismiss.[12]

---

[12] The allegations of inequitable conduct in the cases upon which BONY relies fell far short of the variety, extent, and culpability of misconduct alleged here. See, e.g., *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990) (debtor alleged that bank acted inequitably by terminating line of credit, but bank had

The second factor requires allegations that a claimant's misconduct "resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant." *Lifschultz*, 132 F.3d at 344. BONY's argument on this point is nothing but a reworking of its failed "proximate cause" argument. See Section I.E.3 above. Courts have consistently found injury to creditors where the offending claimant's claim would dilute or lessen the other creditors' recovery from the estate. See *Envirodyne*, 79 F.3d at 583-84 (subordinating claim where distribution to defendant would have diluted value of shares distributed to unsecured creditors); *In re Kreisler*, 331 B.R. 364, 384 (Bankr. N.D. Ill. 2005) (Squires, J.) (subordinating claim where allowing offending claimant to recover would have effectively precluded chance of recovery by unsecured creditors upon sale of estate assets); *In re KDI Holdings, Inc.*, 277 B.R. 493, 514 (Bankr. S.D.N.Y. 1999) (complaint "need only allege 'that general creditors are less likely to collect their debts' as a result of the alleged inequitable conduct").

Here, the Complaint plainly pleads both harm to other creditors <u>and</u> unfair advantage to BONY. BONY "consistently preferr[ed] its own pecuniary interests as a lender to its obligations under federal law and its duty to segregate and hold in custody Sentinel's customer assets." (Complt. ¶ 6.) BONY participated in the transfer of funds to its collateral account which it knew had no relationship to any customer transaction. (See, e.g., Complt. ¶¶ 142, 145, 150.)    BONY knew that Sentinel insiders were improperly using customer assets to secure the loan. (Complt. ¶ 135.) BONY's conduct

---

contractual right to do so "for any reason satisfactory to itself"); *Badger Freightways, Inc. v. Cont'l Ill. Nat'l Bank and Trust Co. of Chicago (In re Badger Freightways, Inc.)*, 106 B.R. 971, 979 (Bankr. N.D. Ill. 1989) (debtor's allegations that bank recommended operating officers, routinely covered overdrafts and eventually set-off outstanding loans against debtor's account reflected, "[a]t worst," typical actions of a creditor, and arguably demonstrated that bank was being "generous").

operated "to the extreme detriment of Sentinel and its other creditors" (Complt. ¶ 194), and, specifically, BONY's improper extension of new credit "caused other creditors, who were unaware of Sentinel's undercapitalization, its debt and its financial problems, to continue to deposit additional funds with Sentinel and/or to fail to withdraw funds from Sentinel." (Complt. ¶ 196.) Further, "BONY took advantage of its position to obtain hundreds of millions of dollars in customer assets as security for its loans to Sentinel[.]" (Complt. ¶ 197.) Given that BONY has asserted a lien over those very assets, the value of other creditors' recovery has clearly been impacted. Indeed, a clearer instance of "unfair advantage" to BONY vis-à-vis other creditors is difficult to imagine.

### D.    There Is No Basis For Dismissing Count 5 (Disallowance Claim).

Apart from repeating arguments already discredited elsewhere, BONY incorrectly asserts that the Trustee's disallowance of claim count should be dismissed because no determination has been made that BONY was the recipient of any avoidable transfers. Clearly, only if the Trustee prevails on the fraudulent or preferential transfer counts will the Trustee's Section 502(d) claim be considered by this Court. However, that does not preclude the Trustee from including such a claim in his Complaint. *See Grigsby v. Cardone Indust. (In re Apex Auto. Warehouse, L.P.)*, 2000 WL 640780, at *10 (Bankr. N.D. Ill. May 17, 2000) (noting that is was improper to rule on Section 502(d) count of complaint where summary judgment was not being granted on avoidable transfer counts); *Murray v. Prescott, Ball & Turben, Inc. (In re Chicago, Mo. & W. Ry. Co.)*, 124 B.R. 769, 773 (Bankr. N.D. Ill. 1991) (denying motion to dismiss avoidance claims and 502(d) claim). In fact, the Federal Rules of Civil Procedure contemplate such pleading. FED. R. CIV. P. 18(b) ("A party may join two claims even though one of them is contingent on the

disposition of the other; but the court may grant relief only in accordance with the parties' relative substantive rights."). The Trustee has adequately alleged a contingent claim for disallowance of BONY's proof of claim.

Count 5 also alternatively pleads that the agreements underlying BONY's claim are illegal and therefore unenforceable by BONY. BONY's motion ignores that allegation, which, in and of itself, sustains a cause of action for disallowance of BONY's claim. *See In re Benninger*, 357 B.R. 337, 356 (Bankr. W.D. Pa. 2006) (disallowing claims based on illegal or unenforceable contract).

### E.      Count 6 Properly Alleges Equitable Disallowance.

BONY asserts that the Court does not have the power to disallow a claim on equitable grounds because Section 510(c) only authorizes a bankruptcy court to subordinate (but not disallow) a claim.

No post-Bankruptcy Code decision from this Circuit has addressed whether a bankruptcy court may equitably disallow a claim. However, in a recent decision on a motion to dismiss an equitable disallowance claim, Judge Gerber thoroughly analyzed the history of the concept of equitable disallowance and whether it survived the enactment of the Bankruptcy Code, and determined that bankruptcy courts indeed continue to have the authority to equitably disallow claims in appropriate cases. *Official Comm. of Unsecured Creditors of Adelphia Commc'ns Corp. v. Bank of America, N.A. et al. (In re Adelphia Commc'ns. Corp.)*, 365 B.R. 24, 71-73 (Bankr. S.D.N.Y. 2007). The *Adelphia* court determined that in enacting the Bankruptcy Code, Congress did not expressly preclude or override the judicially-created remedy of equitable disallowance. *Id.* at 72. In a detailed review of pre-Code case law, including *Pepper v. Litton,* 308 U.S. 295 (1939), and its

progeny, the Bankruptcy Court then concluded that equitable disallowance was a pre-Code remedy recognized by the Supreme Court. *Adelphia,* 365 B.R. at 73 ("In *Pepper,* an order disallowing—not just subordinating—a claim was affirmed. And as the quoted language from *Pepper* makes clear, subordination and disallowance, which were linked by an "or" no less than five times, were perceived by that court as separate remedies, each of which was available.").

Even more importantly, and as the *Adelphia* court recognized, the legislative history of section 510(c) could not be clearer on this point: "[Section 510(c)] is intended to codify case law, such as *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939) and *Taylor v. Standard Gas and Electric Co.,* 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1938), *and is not intended to limit the court's power in any way .... Nor does this subsection preclude a bankruptcy court from completely disallowing a claim in appropriate circumstances.*" *Adelphia,* 365 B.R. at 71 (citing H.R. Rep. No. 595, 95th Cong., 1st Sess. 359 (1977)) (emphasis added by court). Thus, bankruptcy courts continue to enjoy the power, in appropriate circumstances, to completely disallow claims on equitable grounds.[13]

---

[13] BONY relies on a footnote from *Mobile Steel,* where the Fifth Circuit, pre-Code, in *dicta* questioned a court's equitable authority to disallow, rather than subordinate, a claim. See *Matter of Mobile Steel Co.,* 563 F.2d 692, 699 n.10 (5th Cir. 1977). This aspect of *Mobile Steel*—which stands in direct conflict with the Supreme Court's *Pepper* decision that the Code was intended to codify, as noted above—has not withstood more recent development of the case law under Section 510(c). See, *e.g., In re Outdoor Sports Headquarters, Inc.,* 168 B.R. 177, 181-82 (Bankr. S.D. Ohio 1994) (noting conflict between *Pepper* and *Mobile Steel* and concluding that Section 510(c) incorporated equitable power to disallow, not merely subordinate, a claim).

**F.    Count 7 Properly States A Claim To Determine The Validity And Extent Of Lien And For Turnover Or Property Under Sections 506 And 542.**

Count 7 of the Complaint pleads alternatively that (1) BONY's liens or rights of set-off are unlawful and cannot be enforced (¶ 226), (2) BONY's agreements do not grant it a security interest in the Alleged Collateral Accounts (¶ 227), and (3) BONY's claims are not allowed, and therefore any liens securing such claims are void (¶ 228).

In order to move to dismiss Count 7, BONY pretends that the first two alternative bases for relief were not even pled by the Trustee. BONY's willingness to ignore these allegations is particularly surprising in light of the fact that a month ago, BONY argued to this Court in connection with the Trustee's motion to dismiss BONY's preemptive declaratory judgment action that the relief sought in Count 7 of this Complaint was substantially identical to the declaratory relief sought in the declaratory judgment action (04/10/08 BONY Resp. at 4, 10), a fact specifically recognized by the Court in dismissing the declaratory judgment action. (04/22/08 Hrg. Tr. at 7 ("Count VII is in substantial part the mirror image inopposite [sic] of what the bank seeks in all of its counts.")). In any event, Section 506(d) plainly is the appropriate procedural vehicle for challenging the validity of a lien. *M.S.V., Inc. v. Bank of Boston-Western Mass. (In re Martin Specialty Vehicles, Inc.)*, 71 B.R. 221, 224 (Bankr. D. Mass. 1987) ("Title 11 expressly provides for the determination of the validity of liens and the estimation of disputed claims in sections 502 and 506(d)."); *Lindsey v. Fed. Land Bank of St. Louis (In re Lindsey)*, 64 B.R. 19, 22 (Bankr. C.D. Ill. 1986) ("Section 506(d), however, allows a party in interest to petition the bankruptcy court to rule on the validity of a lien . . .").

BONY's argument fails even as to the third alternative claim. This is not a situation involving a 506(a) valuation, which sometimes may be appropriate to delay until after the validity and amount of the underlying claim has been determined. Here, the Trustee plainly is challenging the validity of the lien itself, and therefore Section 506 properly is invoked. *Richardson v. Lenick (In re Richardson)*, 121 B.R. 546, 549 (Bankr. S.D. Ill. 1990) (holding that Section 506(d) was proper means to challenge lien even though no separate proceeding to disallow claim has been held); *accord* 3 COLLIER ON BANKRUPTCY § 506.07, at 506-71 (15th ed. 1988) (the view that only liens based on disallowed claims may be voided by section 506 "is directly contrary to the clear language of section 506(d) and the majority of cases which have considered the matter"). In any event, again, the Trustee has alleged this contingent claim as is proper under the Federal Rule of Civil Procedure 18(b).

### G. The Trustee Has Stated A Claim For Aiding And Abetting/Knowing Participation In Breach Of Fiduciary Duty (Count 8).

The Complaint alleges that BONY "colluded with the Sentinel Insiders and knowingly participated in, aided, and assisted and benefited from [their] breaches of their fiduciary duties to Sentinel." (Complt. ¶ 235.) BONY contends (BONY at 37) that this claim is barred by the "*Wagoner* rule," under which "[a] claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation." *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 120 (2d Cir. 1991). The beginning and end of the matter is that the "*Wagoner* rule" simply is not the law in this Circuit. Moreover, even if it were applicable, the *Wagoner* rule does not apply under the facts alleged in the Complaint.

33

1.    The *Wagoner* Rule Does Not Apply In This Circuit.

This Court has unequivocally held that it "is not bound by the Second Circuit's decision in the *Wagoner* case." *Krol v. Wileck* (*In re H. King & Assoc.*), 295 B.R. 246, 266 (Bankr. N.D. Ill 2003) (Squires, J.); *see also Bank of America v. Moglia* (*In re Outboard Marine Corp.*), 278 B.R. 778, 786 (Bankr. N.D. Ill. 2002). On the contrary, in the Seventh Circuit, a bankruptcy trustee "has the sole responsibility to represent the estate, by bringing actions on its behalf to marshal assets for the benefit of the estate's creditors," *Fisher v. Apostolou*, 155 F.3d 876, 879 (7th Cir. 1998), and therefore has standing "to bring suits for the benefit of the estate and ultimately of the creditors," *Koch Refining v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1342 (7th Cir. 1987). This is true even for suits against third parties accused of engaging in wrongdoing with the cooperation of management. *See Scholes v. Lehmann*, 56 F.3d 750, 753-54 (7th Cir. 1995) (claims stemming from use of corporation as engine for Ponzi scheme accrue to corporation).

BONY attempts to avoid this binding authority by citing a choice-of-law provision in "the parties' contractual agreements." (BONY at 20 n.12.) However, the Trustee's aiding and abetting claim is not based on the duties that BONY owed Sentinel under those unlawful agreements, but is premised on BONY's collusion with the Sentinel insiders in breaching *their* duties to Sentinel, which are governed by Illinois law. Therefore, the Trustee's claim is governed by Illinois law, notwithstanding the contractual choice-of-law provision. See *Sears, Roebuck and Co. v. Malony*, 1998 WL 214689, at *6 (N.D. Ill. Apr. 22, 1998) (Illinois law applies to claims against third parties premised on underlying fiduciary duties governed by Illinois law); *see also Adelphia*, 365

34

B.R. at 31 (Despite New York contractual choice-of-law provision, Pennsylvania law governed aiding and abetting breach of fiduciary duty claim where debtor's principal place of business located and debtor's injuries suffered in Pennsylvania).

Sentinel's place of business was Illinois, Sentinel's injuries were suffered in Illinois, and the underlying fiduciary duties whose breach the Trustee alleges BONY aided and abetted arose under Illinois law. Accordingly, Illinois law governs the Trustee's claim, and the *Wagoner* rule, which Illinois law does not recognize, does not apply.

Even if BONY asserted an Illinois *in pari delicto* defense, which provides that a party who engaged in wrongdoing cannot recover from third parties for the same wrongdoing, it would still be unavailing. In this Circuit, when an innocent successor sues third parties in order to recover for innocent creditors, any wrongdoing committed by the corporation's former managers does not bar those claims. For example, in *Schacht v. Brown*, 711 F.2d 1343, 1348 (7th Cir. 1983), the Seventh Circuit held that a statutory liquidator could maintain claims against third parties that engaged in wrongdoing with the corporation's insiders that "had the effect of continuing [the corporation] past the point of insolvency to the detriment of outside creditors . . . ." The Court's holding was supported by the fact that innocent creditors, and not "the corrupt officers themselves," would benefit from any recovery from the third parties. *Id.*

Moreover, it makes no sense to bar claims brought by an innocent successor, such as the Trustee. As the Seventh Circuit has held, "the defense of *in pari delicto* loses its sting when the person who is *in pari delicto* is eliminated . . . . Now that the corporations created and initially controlled by [the corrupt insider] are controlled by a receiver whose

35

only object is to maximize the value of the corporations for the benefit of their investors and any creditors, we cannot see an objection to the receiver's bringing suit . . . ." *Scholes*, 56 F.3d at 755-56. The same principle applies to claims brought by bankruptcy trustees. See *Fisher*, 155 F.3d at 880. Accordingly, BONY cannot avoid liability for its wrongdoing based on conduct committed by Sentinel insiders who have been eliminated and would not share in any recovery by the Trustee.

Finally, BONY's argument fails under the facts alleged in the Complaint. According to BONY, *Wagoner* and its progeny bar claims where the wrongdoing at issue benefited the corporation and where there were no innocent insiders who could have stopped the wrongdoing. (BONY at 37.) BONY contends that the Trustee has no claim against it because the Sentinel insiders' and BONY's misconduct benefited Sentinel because it "allowed Sentinel to obtain the financing it needed to settle its transactions and continue its business." (BONY at 38.) But this was not the purpose of BONY's extension of hundreds of millions of dollars in financing, which had nothing to do with Sentinel's legitimate cash management business. Rather, the extensions of credit were made to finance the underlying activities of certain insiders, from which Sentinel did not benefit in any way.

As the Complaint clearly alleges, Sentinel "suffered hundreds of millions of dollars in losses and increased liabilities." (Complt. ¶ 3.) The Complaint is replete with allegations that BONY knowingly extended credit to Sentinel far in excess of its ability to secure that credit and demanded that Sentinel secure the loan with securities BONY knew should have been segregated for customers. (Complt. ¶¶ 3-6, 127-167.) As a result, BONY "permitted certain Sentinel insiders to reap tens of millions of dollars in profit

through the wrongful pledge of customer assets to BONY and excessive leverage" at the expense of Sentinel and its customers. (Complt. ¶ 127.) Moreover, BONY itself benefited by, on a daily basis, applying the proceeds of virtually every securities transaction to reduce the BONY loan. (Complt. ¶ 127.) Clearly, that conduct harmed Sentinel and precludes application of the *Wagoner* rule or any similar imputation or *in pari delicto* defense.

The Complaint also alleges that "[t]here were at all relevant times one or more officers and employees of Sentinel who were not part of the Sentinel Insiders' scheme." (Complt. ¶ 22.) Thus, to the extent an "innocent" Sentinel officer or employee is necessary to preclude application of the *Wagoner* rule, the Complaint alleges such an officer.

### 2. The Complaint Properly Alleges That BONY Knew Of The Sentinel Insiders' Fiduciary Breaches And Provided "Substantial Assistance."

BONY reprises its argument that the Complaint fails to state a claim for aiding and abetting. For the same reasons discussed above at Section I.E.2., BONY's argument is unavailing. The only wrinkle BONY adds here is that it did not know that the Sentinel insiders "violated their fiduciary duties" because "under the 1997 and 2003 Agreements, BNY had every reason to believe that Sentinel had the requisite authority to transfer assets between and among its BNY accounts and to pledge assets to BNY to secure its loans." (BONY at 39.) But BONY cannot avoid liability at this stage merely by invoking the provisions in the clearing agreements. Rather, it is well-settled that a party cannot rely on representations that it knew to be false, and that whether a party's reliance was reasonable is an issue of fact precluding dismissal. See, *e.g.*, *JP Morgan Chase Bank*

*v. Winnick*, 350 F. Supp. 2d 393, 405 (S.D.N.Y. 2004).  Here, the Complaint contains detailed allegations of BONY's collusion with the Sentinel insiders and disregard of their breaches in the face of extensive evidence of wrongdoing.  (Complt. ¶¶ 3-6, 20, 117-24, 134-35, 139-52.)  Further, the Complaint alleges that BONY's motivation was pecuniary in that it reaped tens of millions of dollars in interest income.  (Complt. ¶ 7.)  Thus, the Trustee has stated a claim for aiding and abetting/knowing participation in a breach of fiduciary duty.

## Conclusion

For the reasons stated, BONY's motion to dismiss should be denied in its entirety.


Dated: May 23, 2008                        Respectfully submitted,

                                           FREDERICK J. GREDE, not individually
                                           but as Chapter 11 Trustee of Sentinel
                                           Management Group, Inc.


                                           By: _____
                                                 One of his attorneys

Chris Gair (ARDC # 6190781)
Vincent E. Lazar (ARDC # 6204916)
Jeffrey S. Eberhard (ARDC # 6276471)
JENNER & BLOCK LLP
330 N. Wabash Ave.
Chicago, IL  60611
Phone: (312) 222-9350
Facsimile: (312) 923-8439


38

## CERTIFICATE OF SERVICE

I, Jeffrey S. Eberhard, an attorney, hereby certify that I caused the foregoing

**Memorandum of Law in Opposition to BONY's Motion to Dismiss** to be served by

ECF to:

Hector Gonzalez
Matthew D. Ingber
1675 Broadway
New York, NY 10019
(212) 506-2500
hgonzalez@mayerbrown.com
mingber@mayerbrown.com

Sean T. Scott
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600
stscott@mayerbrown.com

_____s/ Jeffrey S. Eberhard_____

39

# EXHIBIT  D

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **SENTINEL MANAGEMENT GROUP, INC.,** | ) | Case No. 07 B 14987 |
| | ) | |
| Debtor. | ) | Hon. John H. Squires |
| | ) | |
| **FREDERICK J. GREDE**, as Chapter 11 | ) | |
| Trustee for Sentinel Management Group, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. 08-127 |
| | ) | |
| v. | ) | |
| | ) | |
| **THE BANK OF NEW YORK** and | ) | |
| **THE BANK OF NEW YORK MELLON** | ) | |
| **CORP.,** | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT

Brian Trust
Hector Gonzalez
Matthew D. Ingber
MAYER BROWN LLP
1675 Broadway
New York, New York 10019

(212) 506-2500
Sean T. Scott
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, Illinois 60606
(312) 782-0600

*Attorneys for Defendants*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................... 1

ARGUMENT ............................................................................................................... 2

I.    THE TRUSTEE'S RELIANCE ON ALLEGED REGULATORY VIOLATIONS REQUIRES DISMISSAL OF THE COMPLAINT. ............................................................... 2

    A.    The Trustee may not Collaterally Enforce the CEA or the Advisers Act .............................................................. 2

    B.    The Alleged Violations of the CEA and Advisers Act Are Not Properly Pleaded .............................................. 5

        1.    The CEA's segregation requirements do not apply as a matter of law .................................................. 5

        2.    The Complaint fails to allege that BNY "substantially assisted" Sentinel's violation of the Advisers Act ........................................... 9

    C.    The Alleged Regulatory Violations Did Not Cause the Losses In Question .......................................... 11

II.    THE TRUSTEE'S CLAIMS ARE BARRED BY UCC SECTION 8-503 ............................................................................ 12

III.    EACH INDIVIDUAL COUNT FAILS TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED .................... 15

    A.    Avoidance of Allegedly Fraudulent and Preferential Transfers (Counts I–III) ............................................. 15

        1.    The transfers at issue were not of an "interest of the debtor in property" .......................................... 15

        2.    The Complaint fails to allege that the allegedly fraudulent transfers were made with the intent to defraud Sentinel's creditors ...................... 17

        3.    The Complaint fails to allege that the allegedly preferential transfers were made "on account of an antecedent debt" .................................. 17

    B.    Equitable Subordination (Count IV) .............................. 18

        1.    The Complaint fails to allege sufficient inequitable conduct .................................................. 18

    C.    Disallowance (Count V) ................................................ 20

    D.    Equitable Disallowance (Count VI) ............................... 21

    E.    Action to Determine Validity and Extent of Lien and for Turnover of Property (Count VII) .................... 21

i

**TABLE OF AUTHORITIES**
(continued)

Page(s)

F.    Aiding and Abetting/Knowing Participation in
Breach of Fiduciary Duty by Sentinel's Insiders
(Count VIII) ............................................................................ 23

    1.    Under conflicts of law principles, the *Wagoner*
rule applies ................................................................... 23

    2.    The Complaint fails to allege knowledge or
substantial assistance ................................................... 24

CONCLUSION ........................................................................................ 25

ii

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Amakua Dev. LLC v. H. TY Warner,*
411 F. Supp. 2d 941 (N.D. Ill 2006) ................................................................. 23, 24

*Appley v. West,*
832 F.2d 1021 (7th Cir. 1987) .................................................................................. 10

*Badger Freightways, Inc. v.Cont'l Ill. Nat'l*
*Bank & Trust Co. of Chi.,*
106 B.R. 971 (Bankr. N.D. Ill. 1989) ...................................................................... 19

*Bell Atl. Corp. v. Twombly,*
127 S. Ct. 1955 (2007)............................................................................................... 25

*Boslow Family Ltd. P'ship v. Glickenhaus & Co.,*
860 N.E.2d 711 (N.Y. 2006)................................................................................... 8-9

*Breeden v. Kirkpatrick & Lockhart LLP*
*(In re Bennett Funding Group, Inc.),*
336 F.3d 94 (2d Cir. 2003) ...................................................................................... 24

*Brennan v. Midwestern United Life Insurance Co.,*
286 F. Supp. 702 (N.D. Ind. 1968) ......................................................................... 12

*Butner v. United States,*
440 U.S. 48 (1979)..................................................................................................... 12

*Cary Oil Co. v. MG Refining & Marketing, Inc.,*
230 F. Supp. 2d 439 (S.D.N.Y. 2002) .................................................................... 22

*CFTC v. Forefront Investments Corp.,*
2007 WL 2155739 (E.D. Va. July 25, 2007) ............................................................ 6

*Chaveriat v. Williams Pipe Line Co.,*
11 F.3d 1420 (7th Cir. 1993) ...................................................................................... 9

*City of Rancho Palos Verdes v. Abrams,*
544 U.S. 113 (2005)................................................................................................. 3, 4

*Columbia Gas & Electric Corp. v. United States,*
151 F.2d 461 (6th Cir. 1945) ...................................................................................... 3

*Commissioner of Revenue v. The Kelly-Springfield Tire Co.,*
643 N.E.2d 458 (Mass. 1994) ..................................................................................... 5

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Cox v. Zale Delaware, Inc.*,
239 F.3d 910 (7th Cir. 2001) ................................................................................. 4

*Cunningham v. Brown*,
265 U.S. 1 (1924)................................................................................................ 16

*Daly v. Kennedy (In re Kennedy)*,
279 B.R. 455 (Bankr. D. Conn. 2002) .................................................................. 17

*Dexia Credit Local v. Rogan*,
2003 WL 22349111 (N.D. Ill. Oct. 14, 2003) ........................................................ 10

*Dudnikov v. Chalk & Vermilion Fine Arts*,
514 F.3d 1063 (10th Cir. 2008) ............................................................................ 18

*Gonzalez-Jiminez De Ruiz v. United States*,
378 F. 3d 1229 (11th Cir. 2004) ........................................................................... 23

*Graham v. Bodine Elec. Co.*,
782 F. Supp. 74 (N.D. Ill. 1992) ............................................................................. 5

*Helms v. Arboleda (In re Arboleda)*,
224 B.R. 640 (Bankr. N.D. Ill. 1998) .................................................................... 17

*In re 604 Columbus Ave. Realty Trust*,
119 B.R. 350 (Bankr. D. Mass. 1990) ..................................................................... 4

*In re Atchison*,
925 F.2d 209 (7th Cir. 1991) ................................................................................ 12

*In re Bright*,
241 B.R. 664 (9th Cir. 1999) ................................................................................ 12

*In re Clark Pipe & Supply Co.*,
893 F.2d 693 (5th Cir. 1990) ................................................................................ 20

*In re Grand Builders, Inc.*,
122 B.R. 673 (Bankr. W.D. Pa. 1990) ..................................................................... 3

*In re Lifschultz Fast Freight*,
132 F.3d 339 (7th Cir. 1997) ................................................................................ 19

*In re S.N. Acquisitions Co.*,
332 B.R. 346, 355 (Bankr. N.D. Ill. 2005) ............................................................ 20

*In re Smart World Techs., LLC*,
423 F.3d 166 (2d Cir. 2005) ................................................................................ 21

iv

## TABLE OF AUTHORITIES
(continued)

Page(s)

*In re T.E. Mercer Trucking Co.,*
   16 B.R. 176 (Bankr. N.D. Tex. 1981).......................................................................... 3

*Kaiser Steel Corp. v. Mullins,*
   455 U.S. 72 (1982)..................................................................................................... 22

*Lerner v. Fleet Bank, N.A.,*
   459 F.3d 273 (2d Cir. 2006) ..................................................................................... 10

*Lettinga v. Agristor Credit Corp.,*
   686 F.2d 442 (6th Cir. 1982) ...................................................................................... 9

*Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.,*
   969 F.2d 1384 (2d Cir. 1992) ..................................................................................... 8

*M. Block & Sons, Inc. v. Int'l Bus. Mach.,*
   2004 WL 1557631 (N.D. Ill. July 8, 2004)............................................................... 23

*Middlesex County Sewerage Authority v.*
   *National Sea Clammers Association,*
   453 U.S. 1 (1981)................................................................................................... 3, 4

*N. Ind. Pub. Serv. Co. v.*
   *Carbon County Coal Co.,*
   799 F.2d 265 (7th Cir. 1986) ................................................................................... 22

*New York Currency Research Corporation v. CFTC,*
   180 F.3d 83 (2d Cir. 1999) ........................................................................................ 6

*Official Committee Of Unsecured Creditors of*
   *Adelphia Communications Corp. v. Bank of America, N.A.,*
   365 B.R. 24 (Bankr. S.D.N.Y. 2007)....................................................................... 21

*Palay v. United States,*
   349 F.3d 418 (7th Cir. 2003) ................................................................................... 11

*Pepper v. Litton,*
   308 U.S. 295 (1939)................................................................................................. 21

*Pharm. Sales & Consulting Corp. v.*
   *J.W.S. Delavau Co.,*
   59 F. Supp. 2d 398 (D.N.J. 1999) .............................................................................. 8

*Pine Top Ins. Co. v.*
   *Bank of Am. Nat'l Trust & Sav. Ass'n,*
   969 F.2d 321 (7th Cir. 1992) ................................................................................... 18

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Premex, Inc. v. CFTC,*
  785 F.2d 1403 (9th Cir. 1986) .................................................................... 5

*Remcor Products v. Scotsman Group, Inc.,*
  860 F. Supp. 575 (N.D. Ill. 1994) .............................................................. 9

*Rylander v. Bandag Licensing Corp.,*
  18 S.W. 3d 296 (Tex. App. 2000) ............................................................. 5

*Shalala v. Guernsey Mem. Hosp.,*
  514 U.S. 87 (1995) .................................................................................... 8

*Shearson Lehman Hutton, Inc. v. Wagoner,*
  944 F.2d 114 (2d Cir. 1991) ..................................................................... 23

*Sonnenschein v. Reliance Ins. Co.,*
  353 F.2d 935 (2d Cir. 1965) ..................................................................... 16

*Travelers Cas. & Sur. Co. of Am. v.*
*Pac. Gas & Elec. Co.,*
  127 S. Ct. 1199, 1206 (2007) ................................................................... 21

*U.S. Nursing Corp. v. Saint Joseph Med. Ctr.,*
  39 F.3d 790 (7th Cir. 1994) ..................................................................... 23

*United States v. Hicks,*
  2008 WL 1990436 (S.D. Ill. May 5, 2008) ............................................. 18

*United States v. Miss. Valley Generating Co.,*
  364 U.S. 520 (1961) ................................................................................. 22

*Vacuum Indus. Pollution, Inc. v. Union Oil Co.,*
  764 F. Supp. 507 (N.D. Ill. 1991 .............................................................. 11

*Venture Assocs. Corp. v. Zenith Data Sys.,*
  987 F. 2d 429 (7th Cir. 1993) ................................................................... 11

## STATUTES

7 U.S.C. § 6d .............................................................................................. 5, 6, 7

7 U.S.C. § 6f .................................................................................................... 6

7 U.S.C. § 6n ................................................................................................... 6

11 U.S.C. § 502 .............................................................................................. 20

## TABLE OF AUTHORITIES
(continued)

Page(s)

11 U.S.C. § 544 ....................................................................................................... 12

11 U.S.C. § 547 ....................................................................................................... 12

11 U.S.C. § 548 ....................................................................................................... 12

15 U.S.C. § 15 .......................................................................................................... 3

740 Ill. Stat. Ann. 160/5 ......................................................................................... 12

740 Ill. Stat. Ann. 160/8 ......................................................................................... 12

N.Y. U.C.C. § 8-102 ............................................................................................... 14

N.Y. U.C.C. § 8-503 ......................................................................................... 13, 14

N.Y. U.C.C. § 8-504 ............................................................................................... 14

## REGULATIONS

17 C.F.R. § 1.20 ....................................................................................................... 7

17 C.F.R. § 1.49 ....................................................................................................... 7

17 C.F.R. § 275.206(4)-2 ....................................................................................... 11

## OTHER AUTHORITIES

4 COLLIER ON BANKRUPTCY ¶ 70.25(2) (14th ed. 1964) ............................................. 16

## PRELIMINARY STATEMENT[1]

In its opening brief, BNY[2] argued that this case should be a simple dispute between a secured lender and a debtor in bankruptcy over a pool of collateral. Through all of the rhetoric in the Trustee's opposition brief ("Opp."), the distortions of the allegations in his own Complaint, and the blatant misstatements and mischaracterizations of settled law, that fact remains unchanged. The governing agreements between BNY and Sentinel are clear that BNY has a valid, first-priority, perfected security interest in the Collateral and that Sentinel represented that it was authorized to pledge the Collateral to BNY free and clear of any prior claim or interests, and that any claims to the Collateral had been extinguished.

The Trustee, of course, has alleged much more, asserting by careful design that BNY violated the CEA and CFTC Rules, and then shoehorning those allegations into claims under the Bankruptcy Code and state law. The Trustee can argue all he wants that the Complaint also alleges other misconduct by BNY, but any reading of it makes plain that the CEA allegations are unquestionably its centerpiece, providing the near-exclusive underpinning of four Counts and support for the remainder. It is therefore surprising, and telling, that in the 64 paragraphs of the Complaint devoted to the CEA issue and 38 pages of briefing in response to BNY's motion, the Trustee nowhere quotes the full CEA language – including the definition of "futures commission merchants" – that governs whether the statute applies to BNY or Sentinel in the first place.

The fact is that it does not apply, and no amount of discovery – documents, depositions or expert testimony – will change that fact. This purely legal question requires the application of a

---

[1]    Capitalized terms not defined herein have the meaning accorded to them in Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Complaint, dated May 2, 2008 ("Defs. Br." or "opening brief").

[2]    For the reasons stated in BNY's opening brief, BNY reiterates that The Bank of New York Mellon Corp. should be dropped from this case as an improperly-named party. *See* Defs. Br. at 6 n.2.

single undisputed fact to the plain, unambiguous language of the CEA. The undisputed fact is that Sentinel was an FCM in name only; it does not meet the statutory definition of an FCM. The plain language of the CEA states that only FCMs that meet the statutory definition of and that receive customer funds are subject to the CEA's segregation requirements. Sentinel was not an FCM under the CEA, did not receive "customer funds" and so the CEA's segregation requirements unquestionably do not apply to it. This is the only plausible reading of the statute.

As discussed below, once this central allegation fails, as it must, the Trustee is left with flimsy allegations that, even if accepted as true, cannot support the Trustee's theories of liability.

## ARGUMENT

I.    **THE TRUSTEE'S RELIANCE ON ALLEGED REGULATORY VIOLATIONS REQUIRES DISMISSAL OF THE COMPLAINT**[3]

A.    **The Trustee may not Collaterally Enforce the CEA or the Advisers Act**

A key question presented in BNY's opening brief (at 9-11) was whether, by using alleged violations of the CEA and Advisers Act to underpin Counts IV-VII of the Complaint, the Trustee has improperly attempted an end-run around statutes he has no private right of action under, contravening clear Congressional intent and ignoring established Supreme Court jurisprudence. The Trustee – who does not dispute that he has no private right of action under either the CEA or Advisers Act (Opp. at 3) – chose not to respond to this question. Instead, he relies on a series of cases standing for the unremarkable proposition that illegality may in some instances be grounds

---

[3]    As an initial matter, the Trustee's argument that Counts I-III and VIII do not depend upon the alleged regulatory violations is deeply misguided. Every Count of the Complaint expressly incorporates all previous allegations by reference, including each and every allegation regarding the alleged regulatory violations. Additionally, the Trustee would have no basis to challenge the allegedly fraudulent and preferential transfers in the absence of the alleged regulatory violations, which are the entire foundation for the Trustee's position that customer assets were improperly transferred, commingled and pledged. Likewise, Sentinel's insiders' alleged breaches of their duties to Sentinel stem from the same conduct that is repeatedly alleged to violate the CEA and the Advisers Act. *See* Cmplt. ¶ 234.

for equitable subordination.  BNY does not dispute the general proposition that illegality, if sufficiently egregious and severely unfair, may provide such grounds.  But where, as here, Congress has intentionally left the Trustee out of the comprehensive remedial scheme designed to enforce the statutes allegedly violated, he may not circumvent that prohibition through bankruptcy or state law claims.  *See* Defs. Br. at 9-11.  To this the Trustee has no response.

Instead, the Trustee asserts that his lack of a private right of action under the CEA or the Advisers Act is irrelevant, but the cases he cites completely miss the mark.  For example, in *Columbia Gas & Electric Corp. v. United States*, 151 F.2d 461, 469-70 (6th Cir. 1945), the Sixth Circuit – contrary to the Trustee's distorted synopsis of the case – never considered whether the party challenging the contracts that allegedly violated the antitrust laws had the right to enforce those laws directly against the alleged violator.  That issue was not presented to the court. Beyond that, the Clayton Act – unlike the CEA and Advisers Act – has since 1914 provided an extremely broad private right of action to enforce the antitrust laws.  *See* Antitrust Act, ch. 323, 38 Stat. 730, 731 (1914) (codified as amended at 15 U.S.C. § 15).[4]

In his weak attempt to distinguish *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113 (2005) and *Middlesex County Sewerage Authority v. National Sea Clammers Association*, 453 U.S. 1 (1981) as "an inapposite line of cases under 42 U.S.C. § 1983," he completely ignores their fundamental holding.  Opp. at 4-5.  Indeed, the fact that the cases involved 42 U.S.C.

---

[4]    In addition, in *In re T.E. Mercer Trucking Co.*, 16 B.R. 176, 183 189-90 (Bankr. N.D. Tex. 1981), for example, far from finding that a creditor's claim could be equitably subordinated for a violation of the Interstate Commerce Act in the absence of a private right of action, the court dismissed the trustee's direct claim under the Act for lack of standing and analyzed the trustee's equitable subordination claim without even once referring to the alleged statutory violation.  Similarly, in *In re Grand Builders, Inc.*, 122 B.R. 673, 677 (Bankr. W.D. Pa. 1990), the bankruptcy court equitably subordinated the claim of an insider who had diverted debtor assets and thereby caused the debtor's insolvency.  Although the insider's conduct had been the subject of criminal charges, those charges were dropped and the issue of whether the equitable subordination claim improperly allowed indirect enforcement of the state penal code was never before the court.  *Id.*

§ 1983 is beside the point; the Supreme Court's explicit focus in both *Sea Clammers* and *Abrams* was to enforce Congressional intent as expressed in expansive statutory enforcement schemes, and to prevent plaintiffs from seeking other remedies outside those schemes.[5]  Although the Trustee makes much of the fact that the plaintiffs in those cases sought damages remedies (Opp. at 4-5), neither *Sea Clammers* nor *Abrams* ever relied on the fact that Section § 1983 provides a right of action for damages as opposed to some other type of remedy, and thus the only case cited by the Trustee is wholly irrelevant.  *See Cox v. Zale Del., Inc.*, 239 F.3d 910, 915-17 (7th Cir. 2001).  Thus, the distinction the Trustee seeks to draw makes no difference to this case.

In any event, the Trustee's argument that he is entitled to circumvent Congressional intent not to provide him a private right of action under the CEA or the Advisers Act on the theory that illegality is grounds for equitable subordination ignores settled law that even an illegal act must be "egregious and severely unfair" to the debtor's other creditors in order to support equitable subordination of a non-insider's claim.  *See* Defs. Br. at 30-33.  In fact, the single case cited by the Trustee makes this very point.  *See In re 604 Columbus Ave. Realty Trust*, 119 B.R. 350, 377 (Bankr. D. Mass. 1990) (observing that, for illegality to be grounds for equitable subordination of a non-insider's claim, it nonetheless must be "egregious and severely unfair to other creditors").  The purported violations of the CEA and Advisers Act come nowhere close to meeting that standard.

---

[5]    *See Abrams*, 544 U.S. at 120-21 (noting that question presented was whether Congress intended an express statutory remedy "to coexist with ***an alternative remedy*** available in a § 1983 action") (emphasis added); *Sea Clammers*, 453 U.S. at 21 (holding that the existence of express statutory remedies "demonstrates not only that Congress intended to foreclose implied private actions but also that it intended to supplant any remedy that otherwise would be available under § 1983").

4

**B.    The Alleged Violations of the CEA and
The Advisers Act Are Not Properly Pleaded**

    1.    The CEA's segregation requirements do not apply as a matter of law

As discussed in BNY's opening brief, neither the CEA nor the CFTC Rules apply to the conduct alleged in the Complaint. In response, the Trustee argues that the segregation provisions were triggered by Sentinel's status as a registered FCM, regardless of its actual business activities. This argument ignores the plain language of the statute and fails as a matter of law.

"To determine Congressional intent, a court must first look to the plain language of the statute." *See Graham v. Bodine Elec. Co.*, 782 F. Supp. 74, 75 (N.D. Ill. 1992). According to Section 4d(a)(2), the segregation requirement is directed not simply at registrants, but at persons who are registrants *and* are engaged in the business activities of either an FCM or an introducing broker. *See* 7 U.S.C. § 6d(a).[6] By the Trustee's own admission, Sentinel was engaged in neither. *See* Cmplt. ¶ 29. Accordingly, the Trustee has failed to allege that segregation requirements were applicable to Sentinel or to BNY. *See* Defs. Br. at 11-15; 7 U.S.C. § 6d(b).[7]

Relying on *Premex, Inc. v. CFTC*, 785 F.2d 1403 (9th Cir. 1986), the Trustee claims that an FCM's status as a registrant triggers *all* of the "regulatory requirements" of the CEA. *See* Opp. at 10. But that proposition appears nowhere in the *Premex* opinion (nor in the CEA) and is actually contradicted by that court's limited conclusion that the "obligation to meet the minimum financial requirements" as set forth *in a separate provision of the CEA* flows from registration, not business activities. *Premex*, 785 F.2d at 1406 n.7. That conclusion, like BNY's analysis

---

[6]    For the Court's convenience, we have appended to this memorandum the relevant text of the key statutory provisions and regulations discussed herein.

[7]    This is not unlike the situation where a corporation registers as an entity qualified to do business within a state but is not subject to any state tax because the entity was not also "doing business" there. *See Rylander v. Bandag Licensing Corp.*, 18 S.W. 3d 296 (Tex. App. 2000); *Comm'r of Revenue v. The Kelly-Springfield Tire Co.*, 643 N.E.2d 458 (Mass. 1994).

above, is dictated by the plain language of the relevant provision which, quite unlike Section 4d, provides only that "each person … *so registered* [as an FCM] shall at all times continue to meet … minimum financial requirements." 7 U.S.C. § 6f(b) (emphasis added); *see also CFTC v. Forefront Invs. Corp.*, 2007 WL 2155739, at *3 (E.D. Va. July 25, 2007) (holding that the CFTC could enforce Section 6f(b) against a *registered* FCM because that provision is expressly directed only to registrants).[8]    In other words, the provision at issue in both of those cases does not contain the additional requirement that the registrant also "engage as [an FCM] or introducing broker." 7 U.S.C. § 6d(a).    Accordingly, these cases only bolster BNY's position.

In a last-ditch attempt to avoid the plain language of Section 4d(a), the Trustee argues that, whether it was acting as an FCM within the meaning of the CEA is irrelevant because its segregation obligations (and, by extension, BNY's) arose from Section 4d(b), which the Trustee reads as applying to "any person" that has received "customer funds" for deposit in a segregated account.    As an initial matter, this argument flies in the face of the Trustee's own allegations, which acknowledge that Sentinel's segregation obligations flowed from *its status as an FCM*. *See* Cmplt. ¶ 29 ("FCMs are permitted to deposit their customer funds only with certain types of banks, depositories or other FCMs.    Sentinel registered with the CFTC as an FCM, and thus was able to manage customer funds belonging to other FCMs.").

Beyond these admissions by the Trustee, a plain reading of the statute further undermines the Trustee's position.    First, the "any person" language of Section 4d(b) does not apply to just

---

[8]    Another case that the Trustee tries to discredit – *New York Currency Research Corp. v. CFTC*, 180 F.3d 83 (2d Cir. 1999) – bolsters BNY's "plain language" argument.    In that case, the CFTC sought to enforce Section 6n(3)(A) of the CEA, which provides, in pertinent part, that "[e]very *commodity trading advisor* and *commodity pool operator* registered under this chapter shall maintain books and records ".    7 U.S.C. § 6n(3)(A) (emphasis added).    The Second Circuit concluded that to impose liability for violating the provision, therefore, the CFTC had to prove *both* that the defendant was registered *and* that it was functioning as either a commodity trading advisor or commodity pool operator within the meaning of the CEA. *N.Y. Currency*, 180 F.3d at 89.

*anyone* that has received "customer funds."  Instead, as Section 4d(b) notes, it applies only where the "customer funds" were received "for deposit in a separate account *as provided in paragraph (2) of [Section 4d(a)]*." § 6d(b) (emphasis added).  This reference to Section 4d(a)(2) leaves no doubt that the term "any person" in Section 4d(b) can only mean a bank, a trust company, an FCM or a derivatives clearing organization.[9]  Because Sentinel was not an FCM, Section 4d(b) cannot apply to it, nor, by extension, to BNY.  Second, Section 4d(b) cannot apply to BNY because it never received "customer funds" from a *"depositing [FCM],"* as required by Section 4d(b).   In other words, the applicability of either subsection of Section 4d depends entirely on whether Sentinel was an FCM under the CEA.  As has been demonstrated, it was not.

The segregation requirements of Section 4d also do not apply because Sentinel did not receive "customer funds."  As discussed in BNY's opening brief, CFTC Rule 1.20(a) states that the segregation requirements of Section 4d apply only to "customer funds," defined as "money, securities, and property received by [the FCM] to margin, guarantee, or secure the trades or contracts of any customer of such [FCM]."  Sentinel is not alleged to have received "customer funds," and to this the Trustee has no response.[10]

Finding no support in Section 4d, the Trustee – relying on a 1981 letter from the CFTC's Division of Trading and Markets and allegations made in a complaint recently filed by the CFTC in a separate action – is forced to fall back on the fact that the CFTC allowed Sentinel to register

---

[9]     Section 4d(a)(2) is clear that "customer funds" may *only* be deposited with "any bank or trust company or with the clearing house organization of such contract market or derivatives transaction execution facility."  § 6d(a)(2).  By regulation, FCMs (as that term is defined by the CEA) that have registered are also qualified to accept "customer funds" for deposit within the meaning § 6d(a)(2).  *See* 17 C.F.R. §§ 1.20(c),1.49(d).

[10]     The Trustee's argument that the public policy interest in "protecting the funds of commodity customers" would be eviscerated by BNY's reading of Section 4d has no merit for this exact reason.  *See* Opp. at 11.  Section 4d was intended only to protect a subset of commodity customer assets; specifically, "customer funds."

as an FCM and supposedly regulated it even though it did not meet the statutory definition of FCM. *See* Opp. at 11-12. Neither the views of agency staff from 27 years ago nor unproven allegations in a different case require this Court to overlook the plain language of the CEA. Although CFTC staff letters may be entitled to some deference, they are not accorded the weight of law, *see Shalala v. Guernsey Mem. Hosp.*, 514 U.S. 87, 99 (1995), and the Division of Trading and Markets expressly acknowledged that its opinion with respect to Sentinel was "not necessarily the opinion of the Commission or of any other unit of the Commission."[11] Cmplt., Ex. A at 3. Moreover, allegations in the CFTC's complaint against Sentinel are merely that – they carry absolutely no weight until they have been proven. *See, e.g., Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388-89 (2d Cir. 1992).

Finally, the Trustee claims that BNY is estopped from disclaiming the applicability of the segregation requirements by purported contractual promises and by alleged statements to the CFTC. There is no basis for an estoppel under either of these theories. With respect to the first, the Trustee claims that a party that has contracted or dealt with an entity as a particular type of entity is estopped from later denying that entity's status. Opp. at 13. But the Trustee relies on cases that apply the doctrine of corporation by estoppel, pursuant to which one who has dealt with a corporation *as such* is estopped from escaping contractual liability based on its counterparty's technical failure to incorporate.[12] BNY has never denied Sentinel's corporate

---

[11]    Moreover, the letter itself makes clear that it relied upon a business model that Sentinel abandoned when it terminated its relationship with Continental Bank and retained the services of BNY. For example, BNY is not alleged to have received the names or contact information for Sentinel's customers or "handle[d] all daily routine contact" with them as Continental Bank apparently did. Cmplt., Ex. A at 2. As a result, the 1981 letter addressed a factual situation that no longer exists. *Id.* at 3.

[12]    *See, e.g., Pharm. Sales & Consulting Corp. v. J.W.S. Delavau Co.*, 59 F. Supp. 2d 398 (D.N.J. 1999) (applying the doctrine "where defendant attempted to avoid potential contractual liability by asserting that [its counterparty] lacked corporate status [because of its defective incorporation] and thus the capacity to contract"); *Boslow Family Ltd. P'ship v. Glickenhaus & Co.*, 860 N.E.2d 711 (N.Y. 2006) (same); *see*

existence. And even if the doctrine somehow could be read to extend far beyond its reach, BNY never contracted with Sentinel *as an FCM*; to the contrary, the parties' agreements were in no way premised on, and make no reference to Sentinel's purported status as an FCM. *See generally* Cmplt., Exs. F-I.[13]

As for the Trustee's second estoppel theory, the Trustee argues that a party is estopped from taking a position contrary to a previous representation made to a regulatory entity. Opp. at 13-14. But BNY made no representations to any regulatory entity concerning Sentinel, and the Complaint's alleges none. Furthermore, the Trustee's cases are completely inapposite. *Chaveriat* held that a litigant may not "obtain a victory on one ground and then repudiate that ground in a different case in order to win a second victory." *Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1427 (7th Cir. 1993). And in *Remcor Products v. Scotsman Group, Inc.*, the court relied on *Chaveriat* in holding that a "favorable result from an administrative body ... sufficiently constitutes an administrative equivalent to a judgment such that *judicial estoppel* could apply." 860 F. Supp. 575, 579 (N.D. Ill. 1994) (emphasis added). These cases have nothing to do with the facts here.

>    2.    The Complaint fails to allege that BNY "substantially
>           assisted" Sentinel's violation of the Advisers Act

As explained in BNY's opening brief, assuming the Trustee somehow could take the place of the SEC and assert a private action against BNY, the Complaint fails to allege that BNY

---

*also Lettinga v. Agristor Credit Corp.*, 686 F.2d 442 (6th Cir. 1982) (estopping a lender from attempting to pierce its debtor's corporate veil where the lender itself had required the entity to incorporate as a prerequisite to the lending agreement).

[13]    The Trustee's reliance on letters from 1997 (prior to Sentinel's transition to BNY's clearing division) in which BNY simply acknowledged that Sentinel was establishing segregated customer accounts (Cmplt. Exs. C-E), is misplaced because those letters are not contracts. They contain no promises of any kind by either party and were provided to Sentinel for no consideration. In any event, they are no longer valid – on their face, they apply only to specific accounts that were closed eleven years ago.

"substantially assisted" a violation of Section 206 or SEC Rule 206(4)-2.  In response, the Trustee makes three principal arguments.  First, he cites a series of allegations that constitute nothing more than bare legal conclusions or omissions in disguise, or that ignore (or blatantly misrepresent) other allegations in the Complaint.  *See* Opp. at 14-15 (citing Opp. at 5-6); Cmplt. ¶ 49.  This is plainly insufficient.  *See infra* Part III.B.1.  Second, the Trustee suggests that alleged inaction by BNY is sufficient to support aiding and abetting liability even where the defendant owed no fiduciary duty to the persons harmed.  Opp. at 15.  But the Trustee relies on cases that are either distinguishable or actually undermine his point because they involve defendants owing some duty (not present here) to prevent the alleged breach.[14]

Finally, the Trustee refers to purported "smoking gun" correspondence that, according to the Trustee, demonstrates that BNY somehow recognized that Sentinel's insiders were improperly using customer securities to collateralize BNY's loan.  *See* Opp. at 15 (citing Cmplt. ¶ 135).  But that correspondence is nothing of the sort and, in fact, undermines the very premise of the Trustee's case.  The full text of the correspondence, which is misleadingly omitted from the Trustee's brief and the Complaint, completely belies the notion that BNY engaged in any misconduct and, to the contrary, demonstrates plainly that BNY acted in good faith compliance with the terms of the  parties' agreements.  *See* Ex. A (in response to question concerning

---

[14]   In *Appley v. West*, 832 F.2d 1021 (7th Cir. 1987), for example, the principal whose assets were misappropriated by breach of a fiduciary duty was also the defendant bank's customer, which is not the case here.  In *Dexia Credit Local v. Rogan*, 2003 WL 22349111 (N.D. Ill. Oct. 14, 2003), the bank was the plaintiff, not a defendant, and the defendants in that case were all controlled by the same person, who also controlled the principal and the alleged primary violators.  The Trustee's parenthetical completely ignores these facts.  *See* Opp. Br. at 15.  Finally, in *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 287-90 (2d Cir. 2006), the court concluded that a duty of inquiry was triggered by repeated overdrafts in attorney trust accounts, which constituted "strong evidence" of misappropriation.  The basis for this determination – as in several state cases on which the *Lerner* court relied – was the "scale and scope of [the fiduciary's] pattern of dishonored checks," which reasonably supported the "sole inference" that misappropriation was intended.  *Id.* (citation omitted).  No such inference is supportable here, where a series of contractual representations supported a very different inference.

whether BNY had rights to all of the Collateral, a BNY employee writes, "We have a clearing agreement which gives us a full lien on [that] box position.").[15]   To say that this constitutes "substantial assistance" ignores these facts.[16]

### C.    The Alleged Regulatory Violations Did Not Cause The Losses In Question

BNY's alleged regulatory violations could not have caused the harm alleged in the Complaint.  Defs. Br. at 17-19.  Allegations that a flawed account structure permitted all of the alleged regulatory violations and other alleged misconduct could not, as a matter of law, have caused Sentinel's customers' losses because the law allows – and, in fact, requires – FCMs to transfer customer funds out of segregation in certain circumstances.  The Trustee misunderstands or simply ignores BNY's causation argument:  BNY is not asking the Court to decide whether BNY's conduct did, in fact, cause the losses but whether it *could have* caused them as a matter of law.  *See, e.g.*, *Vacuum Indus. Pollution, Inc. v. Union Oil Co.*, 764 F. Supp. 507, 516 (N.D. Ill. 1991) (dismissing claims because "[plaintiff's] allegations failed, as a matter of law, to show proximate causation...").  Because Sentinel could have committed the very same alleged wrongs regardless of how its accounts were structured, the BNY account structure was neither the but-for nor the proximate cause of the alleged losses.  *See* Defs. Br. at 17-19.[17]

---

[15]   In support of a motion to dismiss, a defendant may rely on documents not attached to a complaint where (i) the complaint refers to the document and (ii) the document is central to the plaintiff's claims. *See Venture Assocs. Corp. v. Zenith Data Sys.*, 987 F.2d 429, 431 (7th Cir. 1993).  Because the Trustee has described this e-mail as "smoking gun" evidence of BNY's alleged regulatory violations, it is indisputably central to his claims.  *See* Opp. at 15.

[16]   Finally, the transfer of assets that allegedly should have been segregated does not, as the Trustee erroneously claims (Opp. at 15-16), violate the Advisers Act or SEC Rule 206(4)-2.  In fact, Rule 206(4)-2 is completely silent on the issue of transfers of customer assets.  *See* 17 C.F.R. § 275.206(4)-2.

[17]   The Trustee's argument that the injury to Sentinel's customers was the foreseeable result of BNY's allegedly flawed account structure misses the point, *see* Opp. at 17; it assumes that the account structure allowed Sentinel's misuse of its customers' assets, a theory that BNY has shown to have no legal merit.  Additionally, the Trustee's reliance on *Palay v. United States*, 349 F.3d 418, 433 (7th Cir. 2003), and

## II.    THE TRUSTEE'S CLAIMS ARE BARRED BY UCC SECTION 8-503

The Trustee argues that the UCC is preempted by the Bankruptcy Code under the Supremacy Clause of the U.S. Constitution because, although state law defines property rights, the Bankruptcy Code provides a mechanism to enforce property rights.  The Trustee then asserts that, in any event, Section 8-503 does not apply because this action is not the type contemplated by its bar.  Opp. at 18-19.  These arguments are meritless.

With respect to preemption, the Trustee misses the point.  Although the Bankruptcy Code provisions cited in the Complaint would (to the extent they had any merit) permit recovery of property interests, those property interests must belong to the debtor, as determined by state law. *See, e.g.*, 11 U.S.C. §§ 544(b)(1), 547(b), 548(a)(1)(A); 740 Ill. Stat. Ann. 160/5(a)(1), 160/8(a); *Butner v. United States*, 440 U.S. 48, 55 (1979) (under the Bankruptcy Code, "[property interests are created and defined by state law"); *In re Atchison*, 925 F.2d 209, 210 (7th Cir. 1991) (noting, in the context of Section 548(a), that the Bankruptcy Code "does not define what constitutes an interest in property").[18]  As discussed *infra* at Part III.A.1, the property at issue here is not, and never was, property belonging to the debtor; it is traceable customer assets that Sentinel allegedly transferred improperly from the segregated customer accounts to the Street Account at BNY.  That is very premise of the Trustee's Complaint.

The relevant state law – Section 8-503 – applies where, as here, a trustee seeks recovery of property interests belonging to the customers of a failed securities intermediary that were

---

*Brennan v. Midwestern United Life Insurance Co.*, 286 F. Supp. 702, 725-26 (N.D. Ind. 1968), is misplaced as both decisions involved questions of fact that are not presented here.

[18]    The Trustee apparently does not dispute this point.  He cites *In re Bright*, 241 B.R. 664 (9th Cir. 1999), which held that since the debtor had no interest in property *under state law*, the property could not be recovered under the fraudulent transfer provisions of the Bankruptcy Code.  *Id.* at 672; *see also id. at* 666 n.3 (declaring that the "existence of an interest in 'property' is a question of state law" and that a court "would first have to determine whether there was an interest in property to be transferred" before applying the fraudulent transfer provisions of the Bankruptcy Code).

pledged as collateral to a "purchaser." *See* N.Y. U.C.C. § 8-503(d). Section 8-503 makes clear that the "entitlement holders" (Sentinel's customers) hold the interest in the property at issue, and defines when a trustee may nevertheless, pursuant to state law, seek to recover that property. *Id.* (setting out the precise, limited conditions under which the "trustee or other liquidator, acting on behalf of all entitlement holders having security entitlements with respect to a particular financial asset, may recover the financial asset, or interest therein, from the purchaser"). Section 8-503 thus does not conflict with the Bankruptcy Code, and in such circumstances, as even the Trustee admits, the Supremacy Clause is not implicated. *See* Opp. at 19.

For a trustee to pursue a claim "acting on behalf of all entitlement holders" under Section 8-503(d) to recover a financial asset from a purchaser, the purchaser must not be protected by Section 8-503(e). *See* N.Y. U.C.C. § 8-503(d)(4). Based on the allegations in the Complaint, and for the reasons set forth in BNY's opening brief, (Defs. Br. at 20-30), BNY clearly is entitled to such protection. None of the counterarguments in the Trustee's response have any merit. First, as noted above and discussed below, the Complaint plainly asserts claims based on the property interests of "entitlement holders" because it seeks to recover assets – namely, those assets subject to the alleged improper transfer from segregated accounts to the Street Account – that are alleged to belong to Sentinel's customers, the entitlement holders. *See* Defs. Br. at 20-21. The Trustee's conclusory assertion that the Complaint is instead "grounded in the Trustee's rights to avoid fraudulent transfer under the UFTA and to bring breach of fiduciary duty claims for the benefit of the Estate" is a non-sequitur because at its core this case seeks the recovery of the property of Sentinel's customers. *See* Opp. at 21.

Second, the Complaint seeks to recover "particular financial assets" because the Complaint seeks, *inter alia*, the recovery and turnover of the Collateral held by BNY. *See*

Cmplt. at pp. 44, 46, 47, 57. The Trustee only argues that his claims are not ones for replevin, conversion or others "specified by the statute," and therefore Section 8-503 does not apply. Opp. at 21. But once again, the Trustee's argument ignores the plain language of the statute – this time, Section 8-503, which applies to any "action based on the entitlement holder's property interest with respect to a particular financial asset … whether framed in conversion, replevin, constructive trust, equitable lien, *or other theory*." N.Y. U.C.C. § 8-503(e) (emphasis added).

Third, the Trustee's suggestion that Sentinel was not a securities intermediary because it did not "maintain" securities accounts for its customers, (*see* Opp. at 21-22), is flatly contradicted by the UCC itself. A "securities intermediary" is defined as either a clearing corporation or "a person … that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity." § 8-102(a)(14). Under Section 8-504(a), however, "[a] securities intermediary may maintain … financial assets directly *or through one or more other securities intermediaries*," *e.g.*, BNY. § 8-504(a) (emphasis added).

Finally, the Complaint completely fails to allege that BNY colluded *with Sentinel* to violate Sentinel's duties *to its customers*, the entitlement holders. The passing mention of the word "collusion" on the last page of the Complaint, and the references to purported omissions by BNY, clearly do not meet the UCC's "collusion." *See* § 8-503, cmt. 3. Furthermore, even if the bare reference to "collusion" were somehow sufficient, the Complaint alleges only that BNY colluded with Sentinel's insiders to violate their fiduciary duties *to Sentinel itself*. *See* Opp. at 21. The Complaint does not allege that BNY colluded with Sentinel to violate Sentinel's specific duties to its customers under Section 8-504, as Section 8-503 requires.

14

III.    **EACH INDIVIDUAL COUNT FAILS TO STATE A**
        **CLAIM UPON WHICH RELIEF MAY BE GRANTED**

    A.    **Avoidance of Allegedly Fraudulent and Preferential Transfers (Counts I–III)**

        1.    The transfers at issue were not of an "interest of the debtor in property"

The Trustee mistakenly contends that this Court has already rejected the argument that the alleged fraudulent and preferential transfers were not of an "interest of the debtor in property." Opp. at 22. In *Grede v. Bloom*, the Trustee sought to avoid transfers made from Sentinel to the Sentinel insiders in the form of "more than $20 million to themselves." Complaint ¶ 117, *Grede v. Bloom*, No. 07 B 14987 (Bankr. N.D. Ill. filed Oct. 11, 2007). These transfers were allegedly made from Sentinel's clearing accounts to the Sentinel insiders personally or to non-Sentinel entities controlled by them. *Id.* ¶¶ 118-42. In rejecting the Sentinel insiders' argument that the transferred assets were not property of the estate, this Court observed that Sentinel's corporate accounts may have contained funds belonging both to Sentinel and to Sentinel's customers. *See* Opp. Ex. B at 44-45. As a result, the Court could not be certain of the ownership of the transferred assets. *See id.* at 46-47.

Here, by contrast, there is no such uncertainty. Indeed, the Trustee only seeks to avoid transfers of assets out of Sentinel's segregated accounts. *See* Cmplt. ¶¶ 169, 176, 184. According to the Complaint, those assets belonged exclusively to Sentinel's customers, and not to Sentinel itself. *See* Cmplt. ¶¶ 62, 80, 88. The basis for the Court's concern about pre-transfer commingling in *Bloom*, therefore, is not present here.

The Trustee's other arguments are equally unavailing. First, it is not enough to summarily allege that the transfers sought to be avoided "were of an interest of the debtor in property." *See, e.g.*, Cmplt. ¶¶ 169-70. These allegations are nothing more than bare legal conclusions and are belied by the Trustee's other allegations that the segregated assets were, in

fact, being held in trust for Sentinel's customers. *See* Defs. Br. at 25-26 (citing Cmplt. ¶¶ 3, 48, 51, 127, 135). Second, the Trustee's assertion that the assets lost their trust character when they allegedly were commingled with the debtor's property fails for the same reason that the *Bloom* decision is inapposite. Because the Complaint seeks to recover only transfers of segregated assets that are alleged to have been owned exclusively by Sentinel's customers, the Complaint concedes that the property in question retained its trust character at all times.[19]

Once again, the Trustee cites cases that are irrelevant; specifically, cases in which the transfers were out of an account in which the creditor's assets had been commingled with those of other creditors. *See, e.g., Cunningham v. Brown*, 265 U.S. 1, 11-13 (1924) (holding that a trustee could avoid a preferential transfer where the creditors could not trace their money because it had been deposited with the debtor into a single account and then spent). It is not commingling of assets at any time that destroys the trust nature of creditor funds, but commingling that *precedes* the allegedly relevant transfer, because commingling after the fact does not destroy the ability of the claimant "to identify the property in its original or substituted form in the hands of the (debtor)." *Sonnenschein v. Reliance Ins. Co.,* 353 F.2d 935, 936 (2d Cir. 1965) (quoting 4 COLLIER ON BANKRUPTCY ¶ 70.25(2) (14th ed. 1964)). Here, the allegedly fraudulent and preferential transfers indisputably were not made *out of* a commingled account. Accordingly, it is possible "to identify the [transferred] property in its original or substituted form." *Sonnenschein*, 353 F.2d at 936.

---

[19]    The Trustee's argument that his use of the terms "customer assets" and "customer securities" does not refer to assets belonging to Sentinel's customers is absurd. *See* Opp. at 23 n.9. For one thing, Sentinel would have had no reason to segregate assets "for the benefit of customers" if they did not belong to customers. *See id.* (citing Cmplt. ¶ 3 n.1). More fundamentally, the Trustee would have no basis to argue that anybody did anything wrong in this case if all of the assets in question belonged at all times to Sentinel. The entire premise of the Complaint is that customer assets were mishandled.

2.    The Complaint fails to allege that the allegedly fraudulent
      <u>transfers were made with the intent to defraud Sentinel's creditors</u>

Even if this Court somehow determines that the transfers sought to be avoided by the Trustee were of "an interest of the debtor in property," Counts I and II still fail because there is no allegation that the allegedly fraudulent transfers were made with an intent to defraud Sentinel's creditors. The Trustee does not even attempt to demonstrate otherwise. Instead, the Trustee merely repeats the allegations in the Complaint that "the Sentinel insiders transferred … securities that should have been segregated for customers to the accounts over which [BNY] asserted a lien," and that the transfers were "fundamental to the insiders' massive, undisclosed commingling and leveraging scheme" which "led to hundreds of millions of dollars in losses." Opp. at 24. Even if this were true, however, it says nothing about Sentinel's insiders' *intent* in making the transfers. *See Helms v. Arboleda (In re Arboleda)*, 224 B.R. 640, 650 (Bankr. N.D. Ill. 1998) (Squires, J.) (dismissing fraudulent transfer claims on the basis of conclusory, "bare bones" allegations of fraudulent intent do not satisfy the particularity requirement). And as BNY noted, the Complaint alleges that the transfers in question were made to secure Sentinel's loan from BNY, a purpose that is compatible with many benign states of mind. *See* Defs. Br. at 27.

Finally, the Complaint contains no allegations about Sentinel's "creditors;" it speaks only to its customers. But under *Daly v. Kennedy (In re Kennedy)*, 279 B.R. 455, 462 (Bankr. D. Conn. 2002), the requisite intent must be to defraud ***then-current*** creditors; that a transfer may create ***new*** creditors (i.e., Sentinel's customers) is irrelevant. Defs. Br. at 27 n.17.

3.    The Complaint fails to allege that the allegedly preferential
      <u>transfers were made "on account of an antecedent debt"</u>

The crux of the Trustee's argument that the allegedly preferential transfers were made "on account of an antecedent debt" is that the Court must accept all well-pleaded allegations as

true. Once again, the Trustee confuses well-pleaded factual allegations with unsupported legal conclusions, which should not be accepted as true. *See Dudnikov v. Chalk & Vermilion Fine Arts*, 514 F.3d 1063, 1070 (10th Cir. 2008); *United States v. Hicks*, 2008 WL 1990436, at *1 (S.D. Ill. May 5, 2008). The Trustee's allegation that "[t]he June 25-29 Transfers were made on account of antecedent debt owed by the Debtor before the June 25-29 Transfers were made," (Cmplt. ¶ 186), is far from the kind of "plausible, non-conclusory and non-speculative" allegation that may be considered well-pleaded. *Dudnikov*, 515 F.3d at 1070.

The Trustee also accuses BNY of attempting to "skirt" the Complaint by ignoring the Trustee's allegation that the transfers were made "on account of an antecedent debt" in favor of allegations suggesting that they were contemporaneous exchanges for new value. *See* Opp. at 26. In fact, BNY quoted directly from the Complaint; the Trustee is simply backtracking from his own allegations. *See* Defs. Br. at 29; *see also* Cmplt. ¶¶ 113, 137-41. As pleaded, the Complaint concedes that the June 25-29 Transfers of collateral were made in exchange for an infusion of ***new capital***. *See id.* Such contemporaneous transfers are not on account of an "antecedent" debt. *See Pine Top Ins. Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n,* 969 F.2d 321, 328 (7th Cir. 1992) (holding that a transfer of collateral to a bank was not "on account of an antecedent debt" even though it occurred two weeks after the related extension of credit because it was intended to be a contemporaneous exchange for new value and was in fact such an exchange).

**B.**   **Equitable Subordination (Count IV)**

1.   The Complaint fails to allege sufficient inequitable conduct

As discussed above at Part I.A.2, the mere fact that a claimant's conduct was "illegal" does not alone mean that it was sufficiently inequitable to warrant the extraordinary remedy of

equitable subordination. Rather, when the claimant is not a fiduciary of the debtor, the objecting party must "prove that the claimant is guilty of gross misconduct tantamount to fraud, overreaching or spoliation to the detriment of others." *Badger Freightways, Inc. v. Cont'l Ill. Nat'l Bank & Trust Co. of Chi. (In re Badger Freightways, Inc.)*, 106 B.R. 971, 976 (Bankr. N.D. Ill. 1989) (citation omitted). Accordingly, the Trustee is simply wrong in his contention that any illegality automatically warrants equitable subordination.

As for the purported "plethora" of inequitable conduct not involving the alleged "illegalities," the Trustee's bullet-point summary of the Complaint's allegations comes nowhere near alleging the kind of "gross misconduct" required to warrant the equitable subordination of BNY's claim. *See* Opp. at 27 (citing Opp. at 5-6). Points 1, 5 and 7 (alleging that BNY aided and abetted a breach of fiduciary duty, violated contractual promises and participated in misconduct for a pecuniary motive, respectively) are bare legal conclusions that are as unsupported in the Trustee's brief as they are in the Complaint. Points 3 and 6 (alleging that BNY refused to segregate assets and continued to extend credit to Sentinel, respectively) are omissions in disguise, which, in the absence of some duty to intervene, can hardly be regarded as "egregious." In fact, Point 3 is wholly consistent with the parties' contractual agreements, *see* Cmplt., Ex. F at § 3.04; Ex. H at § 5.2, and it is well established that Point 6 does not constitute inequitable conduct. *See In re Lifschultz Fast Freight*, 132 F.3d 339, 343-45 (7th Cir. 1997) (holding that extending credit to an undercapitalized company is not alone inequitable conduct, particularly where the loan is made by a non-insider). And because the Trustee concedes the possibility that Point 4 (alleging that BNY unilaterally desegregated assets) occurred in error and notes that it was immediately rectified, (Cmplt. ¶¶ 162-63), it was hardly "gross misconduct tantamount to fraud, overreaching or spoliation." Finally, Point 2 (alleging that, by transferring

assets from one account to another, BNY knew that Sentinel was defrauding creditors) ignores the allegations of the Complaint. With the exception of one erroneous transfer of assets out of the segregated accounts, all transfers were made upon Sentinel's instructions, (*see* Cmplt. ¶¶ 134-63), a fact that, again, is wholly supported by the parties' contractual agreements. *See* Defs. Br. at 4.[20] In summary, the Trustee simply has failed to allege the kind of inequitable conduct that, even if proven, would allow for equitable subordination.

## C.    Disallowance (Count V)

Although a claim for disallowance under Section 502(d) of the Bankruptcy Code can be pleaded as a contingent claim under Fed. R. Civ. P. 18(b), that is not what the Trustee has asserted. Instead, the Complaint alleges a claim for disallowance as an independent remedy, which as a matter of law does not exist. *See* Defs. Br. at 34-35. Furthermore, even if the Trustee had pleaded a contingent claim, disallowance is appropriate only if BNY refuses to turn over property that is determined by this Court to have been unlawfully transferred or to otherwise comply with Section 550. *See* 11 U.S.C. § 502(d). The Trustee has no factual basis for his allegation that BNY has refused such a turnover; indeed, there has been no determination by this Court that property was unlawfully transferred.[21]

---

[20]    *See also In re Clark Pipe & Supply Co.*, 893 F.2d 693, 699-702 (5th Cir. 1990) ("The purpose of equitable subordination is to distinguish between the unilateral remedies that a creditor may properly enforce pursuant to its agreements with the debtor and other inequitable conduct such as fraud, misrepresentation, or the exercise of such total control over the debtor as to have essentially replaced its decision-making capacity with that of the lenders."); *In re S.N. Acquisitions Co.*, 332 B.R. 346, 355 (Bankr. N.D. Ill. 2005) (holding that a bank's efforts to protect its collateral did not support subordination of its claim where "it appears to have done nothing more than any prudent lender would have done under like circumstances"). Here, the very "smoking gun" correspondence cited by the Trustee demonstrates that BNY was acting in good faith compliance with the Agreements. *See* Ex. A.

[21]    As for the Trustee's contention that BNY's claim should be disallowed because its agreements with Sentinel are illegal and unenforceable (Opp. At 30; Cmplt. ¶ 208), that argument ignores that the Trustee has failed to allege sufficiently that the Agreements – and not simply BNY's *performance* under those agreements – are illegal. *See infra* Part III.E & n.24.

### D.    Equitable Disallowance (Count VI)

BNY does not dispute that a claim for equitable disallowance has been found to be cognizable in a single federal case. Opp. at 30-31. However, the opinion in *Official Committee of Unsecured Creditors of Adelphia Communications Corp. v. Bank of America, N.A. (In re Adelphia Communications Corp.)*, 365 B.R. 24 (Bankr. S.D.N.Y. 2007), is inconsistent with ordinary principles of statutory construction and the authority cited by BNY represents the better and more accepted rule. *See* Defs. Br. at 34-36.

The *Adelphia* court determined that resort to legislative history and pre-Bankruptcy Code case law was appropriate because, in its view, the Code was silent as to whether a claim may be disallowed as a matter of equity. *Adelphia*, 365 B.R. at 71. But the Code is not silent. As the Supreme Court has recognized, Section 502(a) very clearly requires the allowance of a claim unless it falls within one of the nine statutory grounds for disallowing it – and equitable considerations are not one of them. *See Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 127 S. Ct. 1199, 1206 (2007).[22]

### E.    Action to Determine Validity and Extent of Lien and for Turnover of Property (Count VII)

The Trustee argues that Count VII includes three alternative bases for relief (Cmplt. ¶¶ 226-28) and that BNY ignored the first two of these. BNY did not ignore anything; rather,

---

[22]    This conclusion is not foreclosed by *Pepper v. Litton*, 308 U.S. 295 (1939). In *Pepper*, the Supreme Court observed that if an allowed claim may be reallowed or rejected "according to the equities," then "disallowance or subordination in light of equitable considerations may be originally made." *Id.* at 304-05. In making this observation, however, the Court construed the pre-Code counterpart to Section 502(j), Section 57(k) of the Bankruptcy Act, ch. 541, 30 Stat. 544, 561 (1898), and did so in accordance with Section 2 of that Act, 30 Stat. at 544. But as a result of the enactment of the Bankruptcy Code in 1978, bankruptcy courts no longer have the broad equitable powers they had when *Pepper* was decided. *See In re Smart World Techs., LLC*, 423 F.3d 166, 183-84 (2d Cir. 2005) (noting that Section 105(a)'s "equitable scope is plainly limited by the provisions of the Code" and that it does not authorize bankruptcy courts to "create substantive rights that are otherwise unavailable under applicable law, or that constitute a roving commission to do equity") (citation omitted).

BNY addressed the first and third purportedly alternative bases together because the Complaint itself conflates the two.  As for the second, (Cmplt. ¶ 227), as BNY explained in its opening brief, the Agreements flatly contradict the Trustee's argument.  *See* Defs. Br. at 3-4.

The first of the Trustee's responses is that BNY's contracts with Sentinel constitute an agreement to violate the law or to otherwise accomplish some unlawful purpose.  But here, unlike in the case cited by the Trustee, i.e., *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 81-82 (1982), there was no "illegal promise" or unlawful purpose to the Agreements.  The Agreements provide, among other things, that BNY would act as Sentinel's clearing bank and secured lender, that Sentinel would pledge collateral to BNY to secure its debt by issuing instructions to transfer assets into certain clearing accounts, over which BNY had a lien, and that Sentinel was authorized to transfer and pledge the assets to BNY.  *See* Defs. Br. at 3-4.  There is nothing unlawful about these Agreements, and nothing in them violates the CEA or the CFTC Rules.[23] Indeed, the Trustee himself concedes that the contracts were "based on a legitimate subject matter."  Opp. at 7.

By calling into question the account structure, at most, the Trustee challenges the lawfulness of the manner in which BNY ***performed*** its contractual obligations.  *See* Cmplt. ¶¶ 60-63.  But under the circumstances, the argument that the agreements are illegal has not been pleaded.  *See N. Ind. Pub. Serv. Co. v. Carbon County Coal Co.*, 799 F.2d 265, 272-73 (7th Cir. 1986) (concluding that "[s]ince this is not a case where the contract itself is illegal," it is not

---

[23]    Neither of the cases cited by the Trustee supports his argument.  In *Cary Oil Co. v. MG Refining & Marketing, Inc.*, 230 F. Supp. 2d 439 (S.D.N.Y. 2002), the contract was unenforceable as against public policy because it violated a provision of the CEA that expressly made such contracts unlawful.  Indeed, Section 4a of the CEA makes it unlawful to enter into "a contract for the purchase or sale of a commodity for future delivery" unless the transaction is conducted on a commodities exchange approved by the CFTC.  7 U.S.C. § 6(a).  Section 4d of the CEA and Section 206 of the Advisers Act, by contrast, do not speak to the legality of contracts.  *See also United States v. Miss. Valley Generating Co.*, 364 U.S. 520 (1961) (only the circumstances of the contract's formation rendered it unenforceable).

governed by *Kaiser* and that "the defense of illegality does not come into play just because a party to a lawful contract … commits unlawful acts to carry out his part of the bargain").[24]

### F.    Aiding and Abetting/Knowing Participation in Breach of Fiduciary Duty by Sentinel's Insiders (Count VIII)

#### 1.    Under conflicts of law principles, the *Wagoner* rule applies

Foregoing a choice-of-law analysis, the Trustee asserts that the *Wagoner* rule does not apply because Illinois law does not recognize it. As a rule of standing, however, the *Wagoner* rule is a substantive issue subject to a choice-of-law analysis.[25] Where, as here, the parties' relationship is governed by a choice-of-law provision, Illinois courts are required to apply it unless the law selected is "dangerous, inconvenient, immoral, or contrary to public policy." *M. Block & Sons, Inc. v. Int'l Bus. Mach.*, 2004 WL 1557631, at *4 (N.D. Ill. July 8, 2004) (citation omitted). In particular, Illinois courts will apply a contractual choice-of-law provision to claims based in tort where the parties intended it "to govern all claims between them" and where the tort claim is "dependent upon the contract." *Amakua Dev. LLC v. H. TY Warner*, 411 F. Supp. 2d 941, 955 (N.D. Ill 2006). In deciding whether a tort claim is dependent upon a contract, courts examine whether "(1) the claim alleges a wrong based on the construction and interpretation of the contract; (2) the tort claim is closely related to the parties' contractual relationship; or (3) the tort claim would not exist without the contract." *Id.* (collecting cases).

---

[24]    In fact, the only case relied upon by the Trustee purportedly in support of the proposition that unlawful *performance* is enough held that the principle applies only where the performing party was in fact prohibited from performing because of a failure to satisfy a condition precedent (*i.e.* licensing). *U.S. Nursing Corp. v. Saint Joseph Med. Ctr.*, 39 F.3d 790, 792-93 (7th Cir. 1994). Here, the Trustee does not allege that BNY failed to comply with some underlying condition precedent to the legality of its performance under the parties' agreements.

[25]    *See Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991) ("[A] bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself."); *Gonzalez-Jiminez De Ruiz v. United States*, 378 F. 3d 1229, 1230 & n. 1 (11th Cir. 2004) (observing that standing to sue is a substantive question for purposes of a choice-of-law analysis).

Here, it is plain that the parties intended any tort claims to be governed by New York law. The Agreements state explicitly that they "shall be construed and interpreted, and all rights and obligations hereunder shall be determined, in accordance with the laws of the State of New York without regard to principles of conflict of laws." Cmplt. Exs. G, I at 3; *see Amakua*, 411 F. Supp. 2d at 955 (observing that language in choice-of-law provisions can be stated broadly enough to encompass all disputes). Additionally, the Trustee's tort claim is wholly dependent upon the existence of the Agreements; indeed it would not exist without the Agreements. For all these reasons, New York law applies to Count VIII, and the *Wagoner* rule requires its dismissal.

On the substantive question, the Trustee argues that the loans to Sentinel did not serve a corporate purpose because they were "made to finance the unlawful activities of certain insiders" (Opp. at 36), a statement that is contradicted by the Trustee's own allegations; namely, that the purpose of BNY's loans was to allow "Sentinel to obtain the financing it needed to settle its transactions and continue its business." Defs. Br. at 38 (citing Cmplt. ¶ 153). Moreover, the Trustee's blanket assertion that there was an "innocent insider" is not sufficient to preclude application of the *Wagoner* rule where there is no allegation that this anonymous insider had authority to prevent the fiduciary breaches. *See Breeden v. Kirkpatrick & Lockhart LLP (In re Bennett Funding Group, Inc.)*, 336 F.3d 94, 101 (2d Cir. 2003) (concluding that *Wagoner* is not defeated where the purported innocent insiders were "impotent to actually do anything").

2.    The Complaint fails to allege knowledge or substantial assistance

The Trustee's sole argument on this issue is that BNY "cannot avoid liability at this stage merely by invoking the provisions in the clearing agreements" because it "cannot rely on representations that it knew to be false," an issue the Trustee claims is a question of fact. Opp. at 37-38. But the question here is not whether BNY's reliance on its contracts with Sentinel was

24

reasonable.  The question is whether, as a matter of law, the Complaint states a claim for aiding and abetting.  It does not.

As discussed in BNY's opening brief, the Complaint does not sufficiently allege that BNY knew that Sentinel's insiders' actions violated their fiduciary duties to Sentinel, that BNY "colluded" with them, or that BNY substantially assisted them in breaching their fiduciary duties.  The Trustee's bare conclusory assertions to the contrary are insufficient on their own, even at the pleading stage, because a complaint must include "more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007).

## CONCLUSION

For all the foregoing reasons BNY and The Bank of New York Mellon Corp. respectfully request that this Court dismiss the Trustee's Complaint in its entirety with prejudice and grant any other relief that this Court deems just and proper.

Dated:  June 6, 2008                              Respectfully submitted,

**THE BANK OF NEW YORK and**
**THE BANK OF NEW YORK MELLON CORP.**

By:   /s/ Sean T. Scott
          Sean T. Scott

Sean T. Scott (ARDC #6273516)
71 S. Wacker Drive
Chicago, Illinois 60606
(312) 782-0600

-and-

Brian Trust (admitted *pro hac vice*)
Hector Gonzalez (admitted *pro hac vice*)
Matthew D. Ingber (admitted *pro hac vice*)
1675 Broadway
New York, New York 10019
(212) 506-2500

25

# EXHIBIT  E

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SENTINEL MANAGEMENT GROUP, INC., | ) | Case No. 07 B 14987 |
| | ) | |
| Debtor. | ) | Hon. John H. Squires |
| | ) | |
| | ) | |
| FREDERICK J. GREDE, as Chapter 11 Trustee | ) | |
| for Sentinel Management Group, Inc., | ) | |
| | ) | Adv. Proc. No. 08-127 |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | |
| THE BANK OF NEW YORK and | ) | |
| THE BANK OF NEW YORK MELLON CORP., | ) | |
| | ) | |
| Defendants. | | |

## DEFENDANTS' MOTION TO WITHDRAW THE REFERENCE

Defendants The Bank of New York and The Bank of New York Mellon Corp. (together, "BNY") hereby move the District Court for the Northern District of Illinois (the "District Court") for entry of an order withdrawing the reference to the Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Court") of the above-captioned adversary proceeding, and, in support thereof, respectfully state as follows:

1.  Withdrawal of the reference to the Bankruptcy Court is mandatory under 28 U.S.C. § 157(d) because this action will require consideration of significant open and unresolved issues regarding the proper interpretation of non-bankruptcy federal law. Specifically, the Complaint raises three distinct open issues regarding the scope and enforcement of both the Commodity Exchange Act, 7 U.S.C. ch. 1, and the Investment Advisers Act of 1940, 15 U.S.C. § 80b-6(4).

2.    Alternatively, the District Court should exercise its discretion to withdraw the reference for cause because two of the Trustee's eight claims are non-core, those that are core will require consideration of complex non-bankruptcy issues of federal law, and considerations of judicial economy on the whole favor permissive withdrawal.

3.    In further support of this Motion, BNY has filed a Memorandum in Support of Defendants' Motion to Withdraw the Reference contemporaneously herewith.

WHEREFORE, BNY respectfully requests that the District Court enter an Order withdrawing the reference of this action to the Bankruptcy Court and granting such other or further relief as the Court deems just or appropriate.

Dated:  May 2, 2008                    Respectfully submitted,

                                       **THE BANK OF NEW YORK and**
                                       **THE BANK OF NEW YORK MELLON CORP.**

                                       By:   /s/ Sean T. Scott
                                       Sean T. Scott (ARDC #6273516)
                                       MAYER BROWN LLP
                                       71 S. Wacker Drive
                                       Chicago, Illinois 60606
                                       (312) 782-0600

                                       - and -

                                       Brian Trust (admitted *pro hac vice*)
                                       Hector Gonzalez (admitted *pro hac vice*)
                                       Matthew D. Ingber (admitted *pro hac vice*)
                                       MAYER BROWN LLP
                                       1675 Broadway
                                       New York, New York 10019
                                       (212) 506-2500

# CIVIL COVER SHEET

The civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**(a) PLAINTIFFS**
FREDERICK J. GREDE, as Chapter 11 Trustee
for Sentinel Management Group, Inc.

**DEFENDANTS**
THE BANK OF NEW YORK and
THE BANK OF NEW YORK MELLON CORP.

**(b)** County of Residence of First Listed Plaintiff    Cook County, IL
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    New York County, NY
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Jenner & Block, LLP, 330 North Wabash Avenue, Chicago, IL 60611-7603, Telephone: 312-222-9350

Attorneys (If Known)
Mayer Brown, LLP, 71 South Wacker Drive, Chicago, IL 60606, Telephone: 312-782-0600

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

### CONTRACT
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (excl. vet.)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

### REAL PROPERTY
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

### TORTS

**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Inj.

**PERSONAL INJURY**
☐ 362 Personal Injury— Med. Malpractice
☐ 365 Personal Injury — Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 444 Welfare
☐ 445 ADA—Employment
☐ 446 ADA — Other
☐ 440 Other Civil Rights

### PRISONER PETITIONS
☐ 510 Motions to Vacate Sentence
Habeas Corpus:
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

### FORFEITURE/PENALTY
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs.
☐ 660 Occupational Safety/Health
☐ 690 Other

### LABOR
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt.Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

### BANKRUPTCY
☐ 422 Appeal 28 USC 158
☒ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

### SOCIAL SECURITY
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Security/Commodity/Exch.
☐ 875 Customer Challenge 12 USC 3410
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION (Enter U.S. Civil Statute under which you are filing and write a brief statement of cause.)

## VII. PREVIOUS BANKRUPTCY MATTERS (For nature of suit 422 and 423, enter the case number and judge for any associated bankruptcy matter previously adjudicated by a judge of this Court. Use a separate attachment if necessary)

08-CV-2205 (Zagel, J.) *

## VIII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes  ☐ No

**IX. This case**
☒ is not a refiling of a previously dismissed action.
☐ is a refiling of case number _____, previously dismissed by Judge _____

DATE  May 2, 2008

SIGNATURE OF ATTORNEY OF RECORD
*Sean T. Scott*

\* Certain defendants in a related adversary proceeding commenced by the Trustee have a motion to withdraw the reference of such proceeding currently pending before Judge Zagel.

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SENTINEL MANAGEMENT GROUP, INC., | ) Case No. 07 B 14987 |
| | ) |
| Debtor. | ) Hon. John H. Squires |
| | ) |
| FREDERICK J. GREDE, as Chapter 11 Trustee for Sentinel Management Group, Inc., | ) |
| | ) |
| Plaintiff, | ) Adv. Proc. No. 08-127 |
| vs. | ) |
| THE BANK OF NEW YORK and THE BANK OF NEW YORK MELLON CORP., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
OF THEIR MOTION TO WITHDRAW THE REFERENCE**

# TABLE OF CONTENTS

Page

SUMMARY OF ARGUMENT .................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND...........................................2

ARGUMENT.........................................................................................................5

I.    Mandatory Withdrawal of the Reference is Required .........................................5

    A.  Whether Section 6d of the CEA and Related CFTC
    Rules Applied to Sentinel and BNY is an Open and
    Unresolved Issue Mandating Withdrawal of the Reference ...........................6

    B.  The Open Issue of Whether the Trustee May Assert Title 11
    Claims Premised on Violations of the CEA and the Advisers
    Act Mandates Withdrawal .........................................................................9

    C.  The Standard to Which BNY Should Be Held under the CEA
    and Advisers Act is an Open and Unresolved Issue Mandating
    Withdrawal of the Reference ....................................................................11

II.   Cause Exists for Permissive Withdrawal of The Trustee's Action....................12

CONCLUSION....................................................................................................15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Agric. Movement, Inc. v. Board of Trade,*
   977 F.2d 1147 (7th Cir. 1992) ................................................................. 5

*CDX Liquidating Trust v. Venrock Assocs.,*
   No. 04 C 7236, 2005 WL 3953895 (N.D. Ill. Aug. 10, 2005) ................ 13

*City of Rancho Palos Verdes v. Abrams,*
   544 U.S. 113 (2005) ............................................................................... 10

*Diamond Mortgage Corp. of Illinois v. Sugar,*
   913 F.2d 1233 (7th Cir. 1990) ............................................................... 12

*In re Cablevision S.A.,*
   315 B.R. 818 (S.D.N.Y. 2004) ............................................................... 12

*In re Coe-Truman Tech.,*
   214 B.R. 183 (N.D. Ill. 1997) ................................................................ 12

*In re Complete Mgmt., Inc.,*
   No. 02 CIV. 1736 (NRB), 01-03459,
   2002 WL 31163878 (S.D.N.Y. Sept. 27, 2002) .................................... 13

*In re Conseco Fin. Corp.,*
   324 B.R. 50 (N.D. Ill. 2005) .................................................................. 13

*In re Dana Corp.,*
   379 B.R. 449 (S.D.N.Y. 2007) ................................................................. 9

*In re Leedy Mortgage Co., Inc.,*
   62 B.R. 303 (E.D. Pa. 1986) .................................................................. 14

*In re Vicars Ins. Agency, Inc.,*
   96 F.3d 949 (7th Cir. 1996) ................................................. 5, 9, 10, 11

*Lowe v. S.E.C.,*
   472 U.S. 181 (1985) ................................................................................. 5

*Marchese v. Shearson Hayden Stone, Inc.,*
   644 F. Supp. 1381 (C.D. Cal. 1986) ........................................................ 8

*Middlesex County Sewerage Auth. v. Nat'l Sea Clammers,*
   453 U.S. 1 (1981) ................................................................................... 10

*Mirant v. Southern Co.,*
   337 B.R. 107 (N.D. Tex. 2006) .............................................................. 13

*Monetta Fin. Servs., Inc. v. SEC,*
   390 F.3d 952, (7th Cir. 2004) ............................................................... 11

*SEC v. Slocum, Gordon & Co.,*
   334 F. Supp. 2d 144 ............................................................................... 11

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*SEC v. Steadman*,
   967 F.2d 636 (D.C. Cir. 1992) ................................................................. 11

*Transamerica Mortgage Advisors, Inc. v. Lewis*,
   444 U.S. 11 (1979) .................................................................................... 10

**Statutes**

15 U.S.C. § 80b-1 ........................................................................................... 1

17 C.F.R. § 1.20(a) ......................................................................................... 8

28 U.S.C. § 1334(b) ....................................................................................... 1

28 U.S.C. § 157(a) .......................................................................................... 1

28 U.S.C. § 157(d) ................................................................................... passim

42 U.S.C. § 1983 ........................................................................................... 10

7 U.S.C. § 25(a) ............................................................................................ 10

7 U.S.C. § 6d(a) ..................................................................................... 6, 7, 8

7 U.S.C. § 6d(b) .............................................................................................. 7

The Bank of New York ("BNY") and The Bank of New York Mellon Corp., by their undersigned counsel and pursuant to 28 U.S.C. § 157(d) and Fed. R. Bankr. P. 5011(a), respectfully submit this memorandum of law in support of their motion to withdraw the reference of the above-captioned adversary proceeding.

## SUMMARY OF ARGUMENT

Under 28 U.S.C. § 1334(b), federal district courts have original jurisdiction over all proceedings arising under title 11 and in all cases arising in or related to proceedings arising under title 11.  Although the district court in this District has automatically referred all title 11 cases and related proceedings to the bankruptcy court pursuant to 28 U.S.C. § 157(a), upon the motion of a party, the district court shall withdraw the reference of an adversary proceeding "if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." 28 U.S.C. § 157(d).  Alternatively, the district court may withdraw such a reference "for cause shown." *Id.*

Here, the complaint (the "Complaint") filed in the above-captioned proceeding by Frederick J. Grede (the "Trustee"), Chapter 11 trustee for Sentinel Management Group, Inc. ("Sentinel"), makes plain that mandatory withdrawal of the reference is required because resolution of the Trustee's claims will require substantial and material consideration of both the Commodity Exchange Act (the "CEA"), 7 U.S.C. ch. 1, and the Investment Advisers Act of 1940 (the "Advisers Act"), 15 U.S.C. § 80b-1 *et seq.*[1]  The Complaint raises *three* separate issues of apparent first impression, each of which requires mandatory withdrawal:  (i) whether Section 6d of the CEA even applied to Sentinel at all given that it never operated as a futures commission

---

[1]    A true and correct copy of the Complaint (also referred to herein as "Cmplt.") is attached hereto as Exhibit "1".

merchant despite registering as such; (ii) whether the Trustee may rely on purported violations of the CEA and the Advisers Act to assert claims in bankruptcy even though he is prohibited from bringing a private right of action under either federal statute; and (iii) the proper burden of proof that the Trustee faces in establishing purported violations of the CEA and Advisers Act, should he be permitted to pursue such claims.

Alternatively, and at a minimum, the district court should exercise its discretionary authority to withdraw the reference for cause shown, because two of the Trustee's eight claims are non-core, those that are core will nonetheless require consideration of complex non-title 11 issues of law, and considerations of judicial economy on the whole favor permissive withdrawal.

## FACTUAL AND PROCEDURAL BACKGROUND

Before filing for bankruptcy in August 2007, Sentinel was a money manager that accepted deposits of cash from a variety of customers in exchange for proportionate interests in its investment accounts. Cmplt. ¶ 23. For more than 10 years, Sentinel was a BNY customer. *Id.* ¶¶ 53, 60. By the summer of 2007, Sentinel began to experience financial difficulties and on August 13, 2007, announced that it was halting all redemptions of customer assets. Cmplt. ¶¶ 128, 156. Four days later, on August 17, 2007 (the "Petition Date"), Sentinel filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Court"). As of the Petition Date, the principal balance of Sentinel's outstanding indebtedness to BNY was $312,247,000, and on January 18, 2008, BNY filed its proof of claim in Sentinel's Chapter 11 case setting forth this and other secured indebtedness owing from Sentinel to BNY. *Id.* ¶ 167.

On February 28, 2008, BNY filed an adversary proceeding against the Trustee seeking a declaratory judgment that it has a valid, first-priority, perfected security interest in and lien upon all assets held in Sentinel's non-segregated clearing accounts. On March 3, 2008, the Trustee

2

filed his Complaint against BNY asserting eight separate causes of action, including claims for avoidance and recovery of allegedly fraudulent and preferential transfers, equitable subordination and disallowance of BNY's claims, aiding and abetting a breach of fiduciary duty, and an action to determine the validity and extent of BNY's asserted security interest in and lien upon its collateral.[2]  BNY's first responsive pleading to the Complaint is due on May 2, 2008, and concurrently herewith, BNY will file its motion to dismiss the Complaint and supporting memorandum of law attached hereto as Exhibit "3".  The overarching theme to the Trustee's complaint is that BNY established a flawed account structure for Sentinel "in violation of its obligations *under federal law* and its duties to Sentinel."  Cmplt. ¶ 3 (emphasis added).  The Trustee submits that the account structure was flawed because it was intended for broker-dealer customers, not futures commission merchants ("FCMs") or investment advisers, and as a result, the account structure did not satisfy the "strict custodial and segregation requirements" to which Sentinel's activities were allegedly subject.  *Id.* ¶ 59.  The Complaint asserts that BNY violated two principal federal statutes:  (i) the CEA (and rules and regulations promulgated by the Commodity Futures Trading Commission ("CFTC") thereunder (the "CFTC Rules")); and (ii) the Advisers Act (and rules and regulations promulgated by the Securities and Exchange Commission ("SEC") thereunder (the "SEC Rules")).

With respect to the first, the Trustee maintains that, as a result of the flawed account structure, BNY violated the CEA and the CFTC Rules (i) by allowing securities and cash held on behalf of Sentinel's customers to be commingled with those belonging to other customers or

---

[2]    On April 22, 2008, the Bankruptcy Court dismissed BNY's adversary proceeding without prejudice on the grounds that the issues raised therein were "certainly encompassed" in the multiple counts of the Complaint and that parallel adversary proceedings would create unnecessary expenses contrary to Fed. R. Bankr. P. 1001, pursuant to which the Bankruptcy Court must endeavor to "secure the just, speedy and inexpensive determination" of each case and proceeding.  4/22/2008 Hr'g Tr., attached hereto as Exhibit "2", 7:11-16, 8:19-9:10.

Sentinel's own portfolio, *see* Cmplt. ¶¶ 60, 80, 86, 93, and (ii) by accepting and taking as

security for its loans to Sentinel any securities that were held in these clearing accounts, without

regard to whether the securities were Sentinel securities or customer securities. *Id.* ¶¶ 62, 84, 88,

96. According to the Complaint, these actions, and the clearing structure that facilitated them,

violated the CEA as well as a variety of CFTC Rules. *Id.* ¶¶ 66-67, 81-82, 90-91, 94-95.

With respect to the Advisers Act, the Complaint alleges that:

> [BNY] knowingly participated in conduct that violated the
> [Advisers Act] and SEC Rules by permitting customer assets to be
> commingled with Sentinel's own assets, by permitting customer
> assets to be cleared through and maintained in [BNY] accounts
> which were not registered in Sentinel's name as agent or trustee for
> its customers, by maintaining customer assets in a manner different
> than that disclosed to customers, and by assisting Sentinel in the
> use of assets of members of [one Seg account] to cover or secure
> securities purchases for other [Seg accounts], or for Sentinel itself,
> when they did not have sufficient cash to cover securities
> purchases on the settlement date.

Cmplt. ¶ 49. Additionally, the Complaint alleges that the "improper" account structure at BNY

"led to and facilitated the conduct of Sentinel insiders . . . in maintaining client funds and

securities in [a clearing account] which was [not] registered as a custodial account under SEC

Rule 206(4)-2." *Id.* ¶ 63. The Trustee alleges that this flawed account structure allowed the

Sentinel insiders to secure BNY's loans with securities belonging to Sentinel's customers in

violation of the Advisers Act's prohibition against use of client assets for the benefit of the

investment adviser or its other clients. *Id.* ¶¶ 47, 113.

The Trustee's claims under the Bankruptcy Code or under non-bankruptcy law rely

almost entirely on violations of these non-title 11 federal statutes and regulations.[3] The Trustee

asserts that BNY's conduct caused $550 million in customer losses.

---

[3]    The majority of the Complaint's 236 paragraphs, 59 pages, and eight separate claims for relief
relate to BNY's alleged federal regulatory violations. They are the underpinning of Counts IV-VII of the

**ARGUMENT**

**I.    Mandatory Withdrawal of the Reference is Required**

A district court is required to withdraw the reference of an adversary proceeding from a bankruptcy court if "resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." 28 U.S.C. § 157(d).  The Seventh Circuit has made clear that district courts shall withdraw the reference if a referred proceeding will "require the interpretation, as opposed to mere application, of the non-title 11 statute, or when the court must undertake analysis of significant open and unresolved issues regarding the non-title 11 law." *In re Vicars Ins. Agency, Inc.*, 96 F.3d 949, 954 (7th Cir. 1996).  In other words, withdrawal is proper where the proceeding will require "substantial and material consideration" of the non-title 11 statute. *Id.*  "The legal questions involved need not be of 'cosmic proportions,' . . . but must involve more than mere application of existing law to new facts." *Id.* (citation omitted).

The CEA and the Advisers Act are comprehensive federal statutes that regulate FCMs, contract markets, introducing brokers, investment advisers and other types of entities whose business activities broadly impact the securities and commodities markets. *See, e.g., Am. Agric. Movement, Inc. v. Board of Trade*, 977 F.2d 1147, 1155 (7th Cir. 1992) (noting that the CEA "establishes a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex"); *Lowe v. S.E.C.*, 472 U.S. 181, 190, 201 (1985) (observing that the Advisers Act was "designed to eliminate certain abuses in the securities industry" and "to protect the public . . . by making fraudulent practices by investment advisers unlawful").  Therefore, the

Complaint.  Paragraphs 23 through 99 of the Complaint address only those alleged violations.  And on eight separate occasions in the Complaint, the Trustee accuses BNY of having violated federal law.

5

CEA and the Advisers Act are indisputably "other laws of the United States regulating organizations or activities affecting interstate commerce." 28 U.S.C. § 157(d).

Consequently, whether mandatory withdrawal of the Trustee's adversary proceeding is required turns only on whether the Complaint requires "substantial and material consideration" of those statutes. Here, the Complaint raises at least three key open and unresolved legal issues, each of which requires "substantial and material consideration" of non-title 11 federal statutes for their resolution. Withdrawal of the reference is therefore mandated under 28 U.S.C. § 157(d) and the *Vicars* standard.[4]

> A.    *Whether Section 6d of the CEA and Related CFTC Rules Applied to Sentinel and BNY is an Open and Unresolved Issue Mandating Withdrawal of the Reference*

A significant unsettled issue raised by the Complaint is whether Section 6d of the CEA (and consequently the related CFTC Rules) even applied in the first instance to Sentinel (and consequently to BNY). Section 6d(a) provides, in part, as follows:

> It shall be unlawful for any person to engage as [an FCM] . . . in soliciting orders or accepting orders for the purchase or sale of any commodity for future delivery, or involving any contracts of sale of any commodity for future delivery, on or subject to the rules of any contract market or derivatives transaction execution facility unless . . . such person shall, if [an FCM], . . . treat and deal with all money, securities, and property received by such person to margin, guarantee, or secure the trades or contracts of any customer of such person, or accruing to such customer as the result of such trades or contracts, as belonging to such customer. Such money, securities, and property shall be separately accounted for and shall not be commingled with the funds of such [FCM] or be used to margin or guarantee the trades or contracts, or to secure or extend the credit, of any customer or person other than the one for whom the same are held . . . .

---

[4]    The Trustee has filed a related adversary proceeding against Sentinel's prepetition auditors, who have moved to withdraw the reference of that action because, *inter alia*, the Trustee's complaint raises similar issues of first impression as to the application of the CEA and the Advisers Act and such action will require substantial interpretation of non-title 11 law. That motion to withdraw the reference is pending before Judge Zagel in the matter captioned *Grede v. McGladrey & Pullen LLP, et al.*, Case No. 08-cv-02205 (N.D. Ill. filed April 16, 2008).

7 U.S.C. § 6d(a). Section 6d further provides that any depository that receives any assets that are subject to Section 6d(a) may not "hold, dispose of, or use such money, securities, or property as belonging to the depositing [FCM] or any person other than the customers of such [FCM]." 7 U.S.C. § 6d(b).

In the Complaint, the Trustee alleges that Sentinel was subject to Section 6d(a) and that, consequently, BNY was subject to Section 6d(b) as its depository. Cmplt. ¶ 30. The Trustee appears to take the applicability of Section 6d for granted, choosing to rely exclusively on Sentinel's status as a registered FCM and on the allegation that the assets it deposited with BNY were not its own. But the language of Section 6d states that the provision was intended to apply *only* under certain limited circumstances.

*First,* the statute applies on its face only to entities *that are in fact engaged* in the business of an FCM—*i.e.,* engaged "in soliciting orders or accepting orders for the purchase or sale of any commodity for future delivery, or involving any contracts of sale of any commodity for future delivery, on or subject to the rules of any contract market or derivatives transaction execution facility." 7 U.S.C. § 6d(a). But the Trustee in the Complaint concedes that Sentinel never operated as an FCM: "Sentinel did not engage in any commodities trading for its customers, but instead only invested funds deposited by other FCMs and Sentinel's other customers." Cmplt. ¶ 29. Thus, what the Trustee must argue for his claim to be viable is that Section 6d(a) applied to funds that Sentinel accepted solely because Sentinel *was registered* as an FCM. This argument is untenable and conflicts with the plain language of the statute. However, to the extent that the Trustee is unwilling to concede that point, resolution of the Complaint ultimately will require "substantial and material" consideration of the scope of Section 6d(a) and, in particular, whether it can apply by virtue of an entity's status as a registered

FCM despite the fact that such entity never actually engaged in the business of an FCM. And, since we found not a single federal decision that addressed this question and only a few non-binding opinions that even remotely touch upon related issues, the question remains "open and unresolved."

*Second*, Section 6d applies *only* to customer assets that are received by an FCM "to margin, guarantee, or secure the trades or contracts of any customer of such person, or accruing to such customer as the result of such trades or contracts."[5] 7 U.S.C. § 6d(a). *See Marchese v. Shearson Hayden Stone, Inc.*, 644 F. Supp. 1381, 1386 (C.D. Cal. 1986) (concluding that, "[b]y its terms, [Section 6d] provides that only two categories of funds, securities or property, be treated as belonging to the customer—those received by the FCM to margin, guarantee or secure trades or contracts, and those accruing to such customer as a result of trades or contracts"). The Trustee's action thus also will require consideration of whether Sentinel—and, by extension, BNY—ever accepted assets for deposit that constituted "customer funds" within the meaning of the relevant CFTC Rules (if found to be applicable).

BNY submits that in reality, Sentinel's customers—some of whom were not even involved in the commodities industry, Cmplt. ¶ 27—never deposited any "customer funds." Sentinel's FCM customers deposited their own proprietary funds along with their customers' money (*not* "customer funds") with Sentinel to be invested in one or more of Sentinel's investment accounts at BNY. While the FCMs' customers' money may have been initially received to margin, guarantee, or secure trades or contracts within the meaning of Section 6, the Complaint contains no such allegations, and in any event, it is far from clear that Congress

---

[5]    Collectively, these assets are referred to as "customer funds." *See* 17 C.F.R. § 1.20(a) (clarifying that the segregation requirements of Section 6d apply only to "customer funds"); *see also* § 1.3 (defining "customer funds" according to the type of FCM customer to which they belong).

intended for such money to retain that character when it was subsequently deposited first with Sentinel, in its purported role as another FCM/money manager, and then again with BNY as a clearing bank. Indeed, BNY submits that such a reading of the CEA would stretch the reach of the statute's regulatory arm far beyond its intended bounds.[6] But, once again, our research revealed not a single federal opinion on point, and the legislative history is silent. Therefore, this issue remains "open and unresolved." *Vicars*, 96 F.3d at 954. And because the scope of an entire federal regulatory scheme is in question, the issues require "substantial and material" consideration of non-title 11 law. *Id.*; *see also In re Dana Corp.*, 379 B.R. 449, 458 (S.D.N.Y. 2007) (ordering mandatory withdrawal in matter which required extensive interpretation of CERCLA, reasoning that "to resolve these inquiries, both legal and factual, a bankruptcy court would be required to engage in careful and significant consideration of CERCLA, a statute 'outside its realm of expertise'").

> B.    *The Open Issue of Whether the Trustee May Assert Title 11 Claims Premised on Violations of the CEA and the Advisers Act Mandates Withdrawal*

Although the Trustee brings no claims directly under the CEA or the Advisers Act, he contends that BNY's alleged violations of federal law are grounds for the equitable subordination, disallowance and/or equitable disallowance of BNY's secured claim against Sentinel in its pending Chapter 11 case. *See* Cmplt. ¶¶ 189-217. The Trustee also argues that the alleged violations of such statutes render BNY's security interest in and lien upon its collateral unenforceable as a matter of non-bankruptcy law. *See id.* ¶¶ 218-26. These allegations

---

[6]    The CFTC only recently has commenced a multi-count action for injunctive and other equitable relief in the district court against Sentinel and two of its principals for alleged violations of the CEA and related CFTC Rules. The case is captioned *Commodity Futures Trading Comm'n v. Sentinel Management Group, Inc., et al.*, Case No. 08-cv-02410 (N.D. Ill. filed April 28, 2008) (Shadur, J.).

9

unequivocally require the district court's oversight of the action under the terms of 28 U.S.C. § 157(d).

In particular, the Trustee has no private right of action against BNY under either the CEA or the Advisers Act.[7]   Nonetheless, the Trustee effectively seeks to enforce the CEA and the Advisers Act indirectly through claims brought under various provisions of the Bankruptcy Code.   Whether a bankruptcy trustee can do so has not been addressed by any Article III court, and resolution of this question will require significantly more than passing consideration of the relevant statutes and Congressional intent.   BNY submits that the Trustee may not enforce the CEA and Advisers Act indirectly through title 11 claims based upon, among other things, the U.S. Supreme Court's decisions in *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers*, 453 U.S. 1, 20 (1981) (holding that comprehensive statutory enforcement schemes could not be privately "bypassed" by an action under 42 U.S.C. § 1983); and *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120-21 (2005) (holding that Congress did not intend for a judicial remedy expressly authorized by a federal statute to "coexist with an alternative remedy available in a § 1983 action").   However, the applicability of this line of authority to the question presented here has never been decided,[8] and in light of the apparent need to harmonize the federal statutes in question, this issue too will require "substantial and material" consideration of the meaning and scope of such statutes.   *Vicars*, 96 F.3d at 954.

---

[7]    *See* 7 U.S.C. § 25(a) (providing a limited private right of action for violations of the CEA arising directly out of certain kinds of commodities transactions, none of which occurred here); *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 24 (1979) (holding that the Advisers Act confers no private remedies other than the limited right to rescind a contract deemed to be void under Section 215).

[8]    Indeed, our research revealed no federal opinion that considered whether Congress intended the CEA and Advisers Act to be privately enforceable through the broad remedial provisions of the Bankruptcy Code, notwithstanding the fact that those statutes contain comprehensive enforcement schemes of their own.

C.    *The Standard to Which BNY Should Be Held under the CEA and Advisers Act is
      an Open and Unresolved Issue Mandating Withdrawal of the Reference*

Also "open and unresolved" is the extent to which the Trustee must prove the purported

violations of the CEA and the Advisers Act in order to demonstrate a right to various relief under

the Bankruptcy Code (should he be permitted to proceed with such claims).    Although BNY

believes that the Trustee must demonstrate that the alleged violations rise to the level so as to be

actionable by the CFTC or SEC in a primary enforcement action brought directly under the CEA

and the Advisers Act, respectively,[9] once again there appears to be no federal precedent on point.

Moreover, there is very little authority with respect to the types of violations alleged by

the Trustee even if the CFTC or SEC were able to bring, and had brought, an enforcement action

against BNY (rather than the Trustee asserting such claims in the context of a private party

action).    We have found no decision, reported or otherwise, in which the CFTC brought an

enforcement action against a depository for an alleged violation of Section 6d(b) of the CEA.

And, although the SEC has brought enforcement actions against various parties for allegedly

aiding and abetting an investment adviser's violation of SEC Rule 206(4)-2, *see, e.g.*, *SEC v.*

*Steadman*, 967 F.2d 636, 647 (D.C. Cir. 1992), we are aware of no such case ever being brought

against a custodian, which is BNY's alleged role here. Because there is not sufficient case law

from the district courts "for a bankruptcy judge's guidance and application" on these points,

*Vicars*, 96 F.3d at 954-55, the Bankruptcy Court can only guess as to the Trustee's burden of

proof.    As such, mandatory withdrawal is warranted for this reason as well.    *See e.g., In re*

---

[9]    The Complaint alleges a primary violation of the CEA and CFTC Rules, but only "participation"
in a violation of the Advisers Act and SEC Rule 206(4)-2.    Participation in a violation of the Advisers Act
is actionable only if it rises to the level of aiding and abetting. *See, e.g.*, *Monetta Fin. Servs., Inc. v. SEC*,
390 F.3d 952, 956 (7th Cir. 2004) (dismissing an aiding and abetting claim against an investment adviser's
president for failure to prove knowledge of the primary violation); *SEC v. Slocum, Gordon & Co.*, 334 F.
Supp. 2d 144, 184-85 (dismissing an aiding and abetting claim against an investment adviser's partners
for failure to prove knowledge that their "role was part of an activity that was improper").

*Cablevision S.A.*, 315 B.R. 818, 821 n.4 (S.D.N.Y. 2004) ("The case for mandatory withdrawal is further bolstered by the fact that it appears that no Article III court has ever resolved the [federal law issue.]").

For all the foregoing reasons, and based on the abundance of complicated unresolved non-title 11 federal law issues raised by the Complaint, withdrawal of the reference is required here.

## II.    Cause Exists for Permissive Withdrawal of The Trustee's Action

The district court also should withdraw the reference "for cause shown" pursuant to 28 U.S.C. § 157(d). Courts within the Seventh Circuit have relied on the following factors in evaluating whether such permissive withdrawal is warranted: "judicial economy, promotion of uniformity and efficiency in bankruptcy administration, reduction of forum shopping, delay and costs to the parties, the particular court's familiarity with the case, and whether the adversary proceeding is core or non-core." *In re Coe-Truman Tech.*, 214 B.R. 183, 187 (N.D. Ill. 1997). Here, because certain of the Trustee's claims are non-core, and the majority of the others involve knotty issues of non-title 11 federal law, overriding concerns of judicial economy warrant permissive withdrawal.

As an initial matter, two of the claims in the Complaint—the Trustee's claim for aiding and abetting a breach of fiduciary duty (Count VIII of the Complaint), and the Trustee's allegation of fraudulent transfers under state law (Count II of the Complaint)—are not core proceedings.[10] As the Bankruptcy Court stated in an April 22, 2008 hearing, the Trustee's claim for aiding and abetting a breach of fiduciary duty is non-core. *See* Ex. 2, 4/22/2008 Hr'g Tr.,

---

[10]    A proceeding is core only if it "invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case." *Diamond Mortgage Corp. of Illinois v. Sugar*, 913 F.2d 1233, 1239 (7th Cir. 1990).

12

6:3-5; *see also CDX Liquidating Trust v. Venrock Assocs.*, No. 04 C 7236, 2005 WL 3953895, *2 (N.D. Ill. Aug. 10, 2005) (observing that state law causes of action are non-core proceedings). Additionally, the Trustee's fraudulent transfer claim is a non-core proceeding because it is based on the Illinois Uniform Fraudulent Transfer Act. *See CDX Liquidating Trust,* 2005 WL 3953895 at *2 (citing *In re Conseco Fin. Corp.,* 324 B.R. 50, 53-54 (N.D. Ill. 2005)).

Where, as here, an action involves both core and non-core claims, courts have recognized that judicial economy favors withdrawal of the reference by eliminating the need for an appeal to the district court on core claims as well as a *de novo* review of proposed findings as to non-core claims. *See, e.g., Mirant v. Southern Co.*, 337 B.R. 107, 122 (N.D. Tex. 2006) (observing that adjudicating a proceeding involving both core and non-core claims before the district court "eliminates the prospect of an appeal from the bankruptcy judge's adjudications of core claims, and dispenses with the need for the district court to conduct a *de novo* review of proposed findings and conclusions of the bankruptcy judge after a trial in the bankruptcy court as to non-core claims"); *see also Conseco*, 324 B.R. at 54 ("the fact that a proceeding is non-core implicates the weighty considerations of judicial economy and an expedient bankruptcy process").

Moreover, the legal issues raised by the Complaint, as well as the extensive discovery and expert testimony that will be required to resolve this matter, further demonstrate that judicial economy will be best served through withdrawal of the reference. A number of courts have recognized that where an adversary proceeding presents legal issues more frequently resolved by the district courts than the bankruptcy courts, and where extensive discovery and expert testimony will be involved, permissive withdrawal is appropriate. *See In re Complete Mgmt., Inc.*, No. 02 CIV. 1736 (NRB), 01-03459, 2002 WL 31163878, at *3 (S.D.N.Y. Sept. 27, 2002)

(granting permissive withdrawal on the grounds of efficiency and fairness under circumstances where the action "raise[d] legal issues more commonly resolved by [the district courts] than the bankruptcy courts and . . . [would] involve extensive discovery [and] expert testimony"); *In re Leedy Mortgage Co., Inc.*, 62 B.R. 303, 306 (E.D. Pa. 1986) (withdrawing reference for cause shown based on likelihood of extensive discovery including at least thirteen depositions and "many volumes of written material," the need for expert witnesses, and a lengthy and complex trial based on non-title 11 law).

As discussed at length in Section I, *supra*, there can be no question that the Trustee's claims will require substantial consideration of complex non-title 11 federal law issues. Moreover, this proceeding, should it survive BNY's motion to dismiss, will involve extensive discovery and the use of expert witnesses. The Trustee alone has in his possession nearly 200 boxes of hard copy documents, as well as electronic data totaling 11 terabytes, including 3.7 million pages of email, and thousands of recorded telephone calls. *See* 4/8/2008 Hr'g Tr., attached hereto as Exhibit "4", 18:9-24, 27:7-13. BNY has been reviewing and producing to the Trustee emails and documents for twenty-nine of its employees. *See* Ex. 4, 4/8/2008 Hr'g Tr. 14:7-13. The Bankruptcy Court has acknowledged that the case will likely require extensive pre-trial discovery, as well as expert discovery that will not be coordinated with, or relevant to, other portions of the bankruptcy proceedings. *See, e.g.*, Ex. 4, 4/8/2008 Hr'g Tr. 29:25 - 30:14 (anticipating that discovery will need to run through to trial); 2/28/2008 Hr'g Tr., attached hereto as Exhibit "5", 44:6-10 (acknowledging the complex nature of the case and the likely need for experts). And any trial of the Trustee's claims undoubtedly would involve testimony from potentially scores of witnesses on non-title 11 issues. Thus, because resolution of the Trustee's

claims is likely to take the Bankruptcy Court far afield from its core areas of familiarity and

expertise, ample cause exists for this Court to exercise its discretion to withdraw the reference.

## CONCLUSION

For all the foregoing reasons, BNY respectfully requests that this Court withdraw the

reference of the above-captioned proceeding pursuant to 28 U.S.C. § 157(d) and Fed. R. Bankr.

P. 5011(a).

Dated: May 2, 2008                          Respectfully submitted,

**THE BANK OF NEW YORK and**
**THE BANK OF NEW YORK MELLON**
**CORP.**

By: /s/ Sean T. Scott
Sean T. Scott (ARDC #6273516)
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600

-and-

Brian Trust (admitted *pro hac vice*)
Hector Gonzalez (admitted *pro hac vice*)
Matthew D. Ingber (admitted *pro hac vice*)
MAYER BROWN LLP
1675 Broadway
New York, New York 10019
(212) 506-2500

15

# EXHIBIT  F

IN THE UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | |
| Plaintiff, | CIVIL ACTION NO. |
| v. | |
| SENTINEL MANANAGEMENT GROUP, INC., ERIC A. BLOOM, and CHARLES K. MOSLEY, | |
| Defendants. | |

FILED: APRIL 28, 2008
CIVIL ACTION NO. 08CV2410          TG
JUDGE SHADUR
MAGISTRATE JUDGE BROWN

**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT**

## I.    SUMMARY

1.    This action involves fraud and misuse of futures commission merchant ("FCM") commodity customer funds by the Defendants, Sentinel Management Group, Inc. ("Sentinel"), its president, Eric A. Bloom ("Bloom"), and its senior vice president, Charles K. Mosley ("Mosley"), from at least May 21, 2007 through August 17, 2007 ("the relevant time").  Sentinel is registered as a FCM with plaintiff Commodity Futures Trading Commission ("Commission" or "CFTC") and is registered as an investment adviser with the Securities and Exchange Commission ("SEC").  Sentinel provided investment advisory and money management services.

2.      During at least the relevant time, Sentinel improperly commingled customer segregated assets with its assets and the assets of others and misappropriated such customers' assets by using them to secure, extend or pay Sentinel's debt.

3.      Sentinel has engaged, is engaging, or is about to engage in acts or practices that violate the anti-fraud and segregation of customer assets sections of the Commodity Exchange Act, as amended ("Act"), 7 U.S.C. §§ 1 *et seq.* (2002), and Commission Regulations thereunder, 17 C.F.R. §§ 1.1 *et seq.* (2007). Mosley aided and abetted Sentinel's violations and is liable for those violations pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a). Bloom is a controlling person of Sentinel and is liable for Sentinel's violations pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2002).

4.      Accordingly, pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a-1 (2002), the Commission brings this action to enjoin Defendants' unlawful acts and practices, and compel Defendants' compliance with the provisions of the Act and regulations thereunder. In addition, the CFTC seeks civil monetary penalties against Bloom and Mosley and such other equitable relief as to all defendants as this Court may deem necessary or appropriate.

## II.     **JURISDICTION AND VENUE**

5.      This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2002), which provides that whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order promulgated thereunder, the Commission may bring an action in the proper District

Court of the United States against such person to enjoin such practice, or to enforce compliance with the Act, or any rule, regulation or order thereunder.

6.    Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2002), because Sentinel's principal place of business is in this District and acts and practices in violation of the Act and Commission Regulations have occurred within this District.

### III.    THE PARTIES

7.    Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged with administering and enforcing the Act, 7 U.S.C. §§ 1 *et seq.* (2002), and the regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.* (2007).

8.    Defendant **Sentinel Management Group, Inc.** is an Illinois corporation with its principal place of business located in Northbrook, Illinois.  Sentinel provides investment advisory and money management services to various institutional, corporate and individual customers, including FCMs.  Sentinel has been registered with the Commission as a FCM since June 1980 and also has been registered with the SEC as an investment adviser since December 1980.  Sentinel has also been a member of the National Futures Association ("NFA"), a self-regulatory organization for the U.S. futures industry, since July 1982.  Sentinel is currently the subject of a bankruptcy proceeding in the bankruptcy court for this district.  *See In re: Sentinel Management Group, Inc.,* (No. 07-14987, Bankr. N.D. Ill.).

9.      Defendant **Eric A. Bloom** resides in Chicago, Illinois.  Bloom was a principal, director, president and chief executive officer of Sentinel during the relevant time.  Bloom has never been registered with the CFTC in any capacity.

10.     Defendant **Charles K. Mosley** resides in Vernon Hills, Illinois.  Mosley was a director, senior vice-president and a principal of Sentinel during the relevant time. Mosley ceased employment with Sentinel, and his status as a principal was withdrawn on August 15, 2007.  Mosley has not been registered with the CFTC in any capacity since April 1989, when he was registered as an associated person of another registered FCM.

## IV.   FACTS

### A. Statutory and Regulatory Background

11.     A FCM is defined in Section 1a(20) of the Act, 7 U.S.C. § 1a(20), and Commission Regulation 1.3(p), 17 C.F.R. § 1.3(p), with certain qualifications, as an individual, association, partnership, corporation, or trust that is engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any contract market or derivatives transaction execution facility; and in or in connection with such solicitation or acceptance of orders, accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom.

12.     The NFA is a not-for-profit membership corporation and is a self-regulatory organization that is registered with the Commission as a futures association under Section 17 of the Act, 7 U.S.C. § 21.  The NFA conducts audits and investigations of NFA member firms, including registered FCMs, to monitor them for compliance with NFA rules, some of which incorporate by reference Commission Regulations.

**B. Background**

13.    Sentinel managed investments of short-term cash for various customers, including hedge funds, pension funds, other FCMs, customers of other FCMs, individuals and others.  As of August 13, 2007, Sentinel claimed to have $1.2 billion of customer assets under management.

14.    Sentinel offered customers the opportunity to participate in a variety of investment programs, each of which had its own investment policy depending on the needs and preferences of its customers.  Sentinel's general practice was to pool a customer's assets with those of other customers participating in the same investment program in custodial accounts held both at the Bank of New York ("BONY") and J.P. Morgan Chase.  These investment programs and their related accounts were referred to within Sentinel as "Seg 1", "Seg 2" and "Seg 3", depending on the type of customer it serviced.

15.    The Seg 1 program invested and kept segregated the segregated assets of domestic customers of other FCMs registered with the Commission, whose deposits were held for the purchase of commodity futures contracts or options on commodity futures contracts.  The investments for the customers of the FCMs were subject to the rules of the Commission, in particular to the investment standards embodied in Commission Regulation 1.25, 17 C.F.R. § 1.25 (2007).  As relevant here, those standards include restrictions on the investment of the segregated customer funds of the other FCMs consistent with the objectives of preserving principal and maintaining liquidity.

16.    Sentinel expressly acknowledged this duty to adhere to the investment standards of Regulation 1.25 when, in 1981, it also requested the Commission's Division

of Trading and Markets to take a "no-action" position regarding Sentinel's maintenance

of adjusted net capital. As set forth in Commission Regulation 1.17, 17 C.F.R. § 1.17, a

FCM's adjusted net capital is calculated by deducting total liabilities from total current

assets to arrive at net capital, from which certain charges are deducted as a cushion

against potential decreases in market value to arrive at adjusted net capital. Based

partially on Sentinel's representation that it was registered as a FCM solely so that it may

hold customers' funds deposited with it by other FCMs for the exclusive purpose of

investing such funds in Regulation 1.25 approved obligations for the benefit of such other

FCMs, and its representation that customers' funds are segregated, the Commission

issued a "no-action" letter to Sentinel dated May 7, 1981 that, allowed Sentinel to operate

under certain net capital provisions and other restrictions.

　　　　17.　　As a registered FCM, Sentinel was required under the Act and

Commission Regulations to adhere to the standards of segregation and handling of

customer funds as outlined in Sections 4d(a)(2) and 4d(b) of the Act, 7 U.S.C.

§§ 6d(a)(2) and 6d(b) (2002), and Commission Regulations 1.20, 1.22 and 1.23, 17

C.F.R. §§ 1.20, 1.22 and 1.23 (2007).

　　　　18.　　The Seg 2 program invested the assets of customers of FCMs that traded

foreign futures and options.

　　　　19.　　The Seg 3 program invested the assets of all other types of customers,

including hedge funds, trust accounts, pension funds, individuals and others.

　　　　20.　　From at least July 2005 to August 17, 2007, in its standard investment

advisory agreement ("Agreement") with all of its customers, Sentinel represented that the

customers in each portfolio owned a pro rata interest in their particular investment

portfolio. The Agreement also provided discretionary authority to Sentinel to buy and sell securities without requesting authority from customers before executing the trades. The Agreement often had an Addendum specifying the investment policy that was to be used to invest the customer's funds.

## C. Misuse and Misappropriation of Customer Segregated Funds For Sentinel's Benefit

21.    During the relevant time, Sentinel maintained a line of credit with BONY (the "BONY loan"). The credit extended under this line of credit varied during the time period, reaching as high as $500 million in June 2007. One of the purposes of the BONY loan was to allow Sentinel to draw upon the loan to immediately honor Seg 1 FCM redemption requests.

22.    Associated with the BONY loan was a house account in Sentinel's name at BONY. The house account was not segregated and any assets placed in that account were pledged as collateral for the BONY loan.

23.    Sentinel used the BONY loan for various purposes. Among other things, if sufficient Seg 1 cash was not available in the Seg 1 account to honor redemption requests, then Sentinel drew upon the BONY loan to honor the Seg 1 FCMs' redemption requests. On those occasions when house account funds were required to meet FCM redemption requests, a corresponding amount of Seg 1 segregated securities was to be transferred to the house account, held until eventually liquidated, and the proceeds used to pay down the BONY loan.

24.    Sentinel also used the BONY loan to obtain additional leveraged financing for its security purchases.

25.    Sentinel was required to hold in segregated accounts sufficient funds and securities to meet its obligations to customers at all times.  During the relevant time, Sentinel routinely used its Seg 1 FCM segregated customer funds to secure its loan with the BONY by improperly transferring and holding Seg 1 securities in the nonsegregated house account.

26.    Sentinel frequently held customer securities in the nonsegregated house account in excess of the amount required to honor the redemption requests of Seg 1 FCMs for that day.  Sentinel's holding of Seg 1 securities in the nonsegregated house account in excess of the amount previously used to honor the redemption requests of Seg 1 FCMs, absent sufficient excess segregated funds in the Seg 1 account meant that Sentinel thereby pledged or made available those Seg 1 segregated securities as collateral for the BONY loan.  For example:

a) On May 21, 2007, Sentinel held at least $86 million of Seg 1 customer securities in Sentinel's "house" account at BONY.  On that date, Seg 1 FCM redemptions were approximately $14 million, however, FCM deposits in Seg 1 were in excess of $20 million.  Hence, Sentinel's holding of $86 million of Seg 1 securities in the house account on that date was not necessary to honor Seg 1 redemptions.

b) On June 29, 2007, Sentinel held at least $410 million of Seg 1 customer securities in Sentinel's "house" account at BONY.  On that date, Seg 1 FCM redemptions were approximately $27 million, however, FCM deposits to Seg 1 were in excess of $28 million.  Hence, Sentinel's holding of $410 million of

Seg 1 securities in the house account was not necessary to honor Seg 1 redemptions.

c) On July 18, 2007, Sentinel held at least $449 million of Seg 1 customer securities in Sentinel's "house" account at BONY. On that date, Seg 1 FCM redemptions were approximately $14 million and FCM deposits to Seg 1 were $9 million. Hence, Sentinel had approximately $444 million of Seg 1 securities in the house account in excess of the amount required to honor the redemptions for that day.

d) On August 7, 2007, Sentinel held at least $137 million of Seg 1 customer securities in Sentinel's "house" account at BONY. On that date, Seg 1 FCM redemptions were approximately $18 million, however, FCM deposits to Seg 1 were in excess of $29 million. Hence, Sentinel's holding of approximately Seg 1 $137 million securities in the house account was not necessary to honor Seg 1 redemptions.

e) On August 13, 2007, Sentinel held at least $148 million of Seg 1 customer securities in Sentinel's "house" account at BONY. On that date, Seg 1 FCM redemptions were approximately $70 million, however, FCM deposits to Seg 1 were $68 million. Hence, Sentinel had approximately $146 million of Seg 1 securities in the house account in excess of the amount required to honor the redemptions for that day.

27.    Sentinel's use of segregated securities belonging to the customers of the Seg 1 FCMs as collateral in order to obtain or maintain a line of credit with BONY constituted a misappropriation of Seg 1 customer property for Sentinel's own benefit.

Sentinel was not authorized by its Seg 1 customers or the FCMs to use or encumber the securities in this manner.

28.     Mosley customarily was in charge of Sentinel's securities trading for the Seg 1, Seg 2 and Seg 3 portfolios.  During at least the relevant time, Mosley drew upon the BONY loan to fund various securities transactions and received daily reports regarding the amount and status of the BONY loan.  To collateralize the BONY loan, Mosley willfully caused excess Seg 1 securities to be moved from Sentinel's Seg 1 segregated account to Sentinel's house account.

29.     Bloom, president and chief executive officer of Sentinel, was informed on a daily basis of Mosley's trading, and reviewed the daily statements regarding the liability of the BONY loan and transfer of excess Seg 1 assets to the house account. Consequently, he knew that Seg 1 assets were being used improperly to secure Sentinel's loan with BONY.  He also had control over the persons that determined what assets were pledged to secure that loan, including, but not limited to, Mosley.

**D.  Filing of False Reports with the Commission**

30.     Section 4g(a) of the Act, 7 U.S.C. § 6g(a), requires FCMs to make such reports as are required by the Commission regarding its transactions and positions, and the transactions and positions of customers.  Pursuant to Commission Regulation 1.10(b), 17 C.F.R. § 1.10(b), FCMs are required to prepare and file periodic statements of financial condition on Form 1-FRs with the Commission.  These reports are required to contain, *inter alia*, a statement of financial condition as of the date the report was made and a statement of computation of the firm's minimum capital requirements, including its adjusted net capital and its excess adjusted net capital.  Commission Regulation

1.10(d)(1), 17 C.F.R. § 1.10(d)(1), requires that Form 1-FRs be prepared in accordance with generally accepted accounting principles ("GAAP"), except where the regulations specify otherwise, applied on a basis consistent with that of the FCM's preceding financial report, and include all disclosures necessary to make the report a clear and complete statement of the FCM's financial position under the Commission's rules.

31.    Pursuant to its letter agreements with the Commission and Commission Regulation 1.10, 17 C.F.R. § 1.10, Sentinel was required to file Form 1-FR financial reports with the Commission on a monthly basis. The Form 1-FR reports expressly required Sentinel to disclose securities purchased under resale agreements – *i.e.*, repos – and liabilities, including amounts payable to banks.

32.    During the period of at least September 2005 through July 2007, Sentinel filed with the Commission at least 23 Form 1-FRs that falsely reported that Sentinel owned no securities purchased under resale agreements and had no amounts payable, including no amounts payable to BONY, despite the existence of the BONY loan.

**E. Bankruptcy of Sentinel**

33.    On August 13, 2007, Sentinel issued a letter announcing that it was requesting authority from the Commission to suspend customer requests for redemptions ("August 13 letter"). In that letter, Sentinel stated that the reason for the redemption freeze was its fear that redemption requests could force Sentinel to sell securities at deep discounts to their fair value due to the downturn in the credit markets, and this could cause losses to customers.

34.     In fact, Sentinel never requested such authority from the Commission and the Commission did not grant Sentinel any such authority.  Nevertheless, Sentinel did not allow redemptions of investments.

35.     On August 17, 2007, Sentinel filed a voluntary petition for protection under Chapter 11 of the Bankruptcy Code, in the U.S. Bankruptcy Court for the Northern District of Illinois.

36.     According to Sentinel's records, on August 15, 2007, Sentinel owed its Seg 1 customers approximately $561 million.  Since that time, Sentinel has paid its Seg 1 customers approximately $431 million leaving a balance due to its Seg 1 customers of approximately $130 million.

## V.

## VIOLATIONS OF THE ACT AND COMMISSION'S REGULATIONS

### COUNT ONE

### VIOLATIONS OF SECTION 4b(a)(2)(i) OF THE ACT:  FRAUD BY MISAPPROPRIATION

37.     The allegations set forth in paragraphs 1 through 36 are re-alleged and incorporated herein.

38.     Section 4b(a)(2)(i) of the Act, 7 U.S.C. § 6b(a)(2)(i), makes it unlawful in or in connection with orders to make, or the making of, contracts of sale of commodities, for future delivery, made, or to be made, for or on behalf of such other persons where such contracts for future delivery were or may have been used for (a) hedging any transaction in interstate commerce in such commodity, or the products or byproducts thereof, or (b) determining the price basis of any transaction in interstate commerce in

such commodity, or (c) delivering any such commodity sold, shipped, or received in interstate commerce for the fulfillment thereof to cheat or defraud such other person.

39.    On various occasions from May 21, 2007 to August 13, 2007, Sentinel willfully violated Section 4b(a)(2)(i) of the Act, 7 U.S.C. § 6b(a)(2)(i), by removing Seg 1 assets from segregation and misappropriating them for use as collateral for its loan with BONY.

40.    Sentinel engaged in the conduct described in paragraphs 1 through 36 above, in or in connection with orders to make, or the making of, contracts of sale of commodities for future delivery, made, or to be made, for or on behalf of other persons where such contracts for future delivery were or may have been used for (a) hedging any transaction in interstate commerce in such commodity, or the products or byproducts thereof, or (b) determining the price basis of any transaction in interstate commerce in such commodity, or (c) delivering any such commodity sold, shipped, or received in interstate commerce for the fulfillment thereof.

41.    During the relevant time, Mosley willfully aided and abetted Sentinel's violations of Section 4b(a)(i) of the Act and, therefore, pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a) (2002), Mosley is liable for the violations described in this Count One as a principal.

42.    During the relevant time, Bloom directly and indirectly controlled Sentinel and its employees, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations described in this Count One. Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2002), Bloom is liable for the violations described in this Count One.

43.    Each misappropriation of Seg 1 customer funds during the relevant time period, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4b(a)(i) of the Act, 7 U.S.C. § 6b(a)(i) (2002).

## COUNT TWO

### VIOLATIONS OF SECTION 4d(a)(2) OF THE ACT AND COMMISSION REGULATIONS 1.20, 1.22 AND 1.23: FAILURE TO SEGREGATE AND OTHER MISUSE OF CUSTOMER FUNDS

44.    Paragraphs 1 through 36 are realleged and incorporated herein by reference.

45.    Section 4d(a)(2) of the Act, 7 U.S.C. § 6(a)d(2) (2002), requires a FCM to treat and deal with all customer money, securities and property as belonging to such customers and to separately account for such money, securities and property.  Section 4d(a)(2) of the Act further prohibits a FCM from commingling customer money, securities and property with its own funds and from using customer money, securities and property to margin or guarantee the trades or contracts or to secure or extend the credit of any customer or person other than those for whom the same are held.

46.    Commission Regulation 1.20, 17 C.F.R. § 1.20 (2007), requires that all customers' funds be separately accounted for, properly segregated and treated as belonging to such customers, and not commingled with the funds of any other person.

47.    Commission Regulation 1.22, 17 C.F.R. § 1.22 (2007), prohibits a FCM from using, or permitting the use of, funds of a customer to secure or extend the credit of any person other than such customer.

48.    Commission Regulation 1.23, 17 C.F.R. § 1.23 (2007), prohibits a FCM from withdrawing upon customer segregated funds beyond its actual interest therein and the use of such funds of a customer to extend the credit of any other person.

14

49.    The customers of the other FCMs whose funds were invested by those FCMs with Sentinel were in turn customers of Sentinel.

50.    Throughout the relevant time, Sentinel violated Section 4d(a)(2) of the Act, 7 U.S.C. § 6d(a)(2) (2002), and Commission Regulations 1.20, 1.22 and 1.23, 17 C.F.R. §§ 1.20, 1.22 and 1.23 (2007), by:  commingling Seg 1 customer funds with those of Sentinel and others; using those Seg 1 customer funds to secure the BONY loan of Sentinel; failing to treat, deal with, and account for Seg 1 customer funds as belonging to the customer; and withdrawing customer segregated funds beyond Sentinel's actual interest therein.

51.    During the relevant time, Mosley willfully aided and abetted Sentinel's violations of  Section 4d(a)(2) of the Act, 7 U.S.C. § 6d(a)(2) (2002), and Commission Regulations 1.20, 1.22 and 1.23, 17 C.F.R. §§ 1.20, 1.22 and 1.23 (2007).  Therefore, Mosley is liable for the violations described in this Count Two as a principal.

52.    During the relevant time, Bloom directly and indirectly controlled Sentinel and its employees, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations described in this Count Two.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Bloom is liable for the violations described in this Count Two.

53.    Each removal from segregation and commingling of Seg 1 customer funds with those of Sentinel during the relevant time, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Sections 4d(a)(2) of the Act, 7 U.S.C. § 6d(a)(2) (2002), and Commission Regulation 1.20, 17 C.F.R. § 1.20 (2007).

54.    Each use of Seg 1 customer funds to secure Sentinel's BONY loan during the relevant time period, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4d(a)(2) of the Act, 7 U.S.C. § 6d(a)(2) (2002), and Commission Regulation 1.22, 17 C.F.R. § 1.22 (2007).

55.    Each withdrawal of Seg 1 customer funds beyond Sentinel's actual interest therein at the relevant point in time, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4d(a)(2) of the Act, 7 U.S.C. § 6d(a)(2) (2002), and Commission Regulation 1.23, 17 C.F.R. § 1.23 (2007).

## COUNT THREE

### VIOLATIONS OF SECTION 4d(b) OF THE ACT:
### MISUSE OF CUSTOMER FUNDS

56.    Paragraphs 1 through 36 are realleged and incorporated herein by reference.

57.    Section 4d(b) of the Act, 7 U.S.C. § 6d(b) (2002), makes it unlawful for any person including any depository, that has received any money, securities, or property for deposit in a separate account as provide for in Section 4d(a)(2) of the Act, to hold, dispose of, or use any such money, securities, or property as belonging to the depositing futures commission merchant or any person other than the customers of such FCM.

58.    Throughout the relevant time, Sentinel violated Section 4d(b) of the Act, 7 U.S.C. § 6d(b) (2002), by using Seg 1 customer funds to secure the BONY loan of Sentinel.

59.    During the relevant time, Mosley willfully aided and abetted Sentinel's violations of Section 4d(b) of the Act, 7 U.S.C. § 6d(b) (2002). Therefore, Mosley is liable for the violations described in this Count Three as a principal.

60.     During the relevant time, Bloom directly and indirectly controlled Sentinel and its employees, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations described in this Count Three.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Bloom is liable for the violations described in this Count Three.

61.     Each use of Seg 1 customer funds to secure Sentinel's BONY loan during the relevant time period, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section  4d(b) of the Act, 7 U.S.C. § 6d(b) (2002).

## COUNT FOUR

### VIOLATIONS OF SECTION 4g(a) OF THE ACT AND COMISSION REGULATION 1.10(d): FILING FALSE REPORTS WITH THE COMMISSION

62.     The allegations set forth in paragraphs 1 through 36 are re-alleged and incorporated herein.

63.     During the period of at least September 2005 through July 2007, Sentinel violated Section 4g(a) of the Act, 7 U.S.C. § 6g(a), and Commission Regulation 1.10(d), 17 C.F.R. § 1.10(d), by filing with the Commission at least 23 Form 1-FRs that falsely reported that Sentinel owned no securities purchased under resale agreements and had no amounts payable.

64.     During the relevant time, Bloom directly and indirectly controlled Sentinel and its employees, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations described in this Count Four.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Bloom is liable for the violations described in this Count Four.

65.     The filing of each Form 1-FR that falsely reported that Sentinel owned no securities purchased under resale agreements and/or had no amounts payable is alleged as a separate and distinct violation of Section 4g(a) of the Act, 7 U.S.C. § 6g(a), and Commission Regulation 1.10(d), 17 C.F.R. § 1.10(d).

## COUNT FIVE

## VIOLATIONS OF SECTION 6(c) OF THE ACT: WILLFULLY MAKING FALSE REPORTS TO THE COMMISSION

66.     The allegations set forth in paragraphs 1 through 36 are re-alleged and incorporated herein.

67.     Section 6(c) of the Act, 7 U.S.C. § 9, prohibits, *inter alia*, the willful making of a false or misleading statement of material fact in any registration application or any report filed with the Commission under the Act.

68.     During the period of at least September 2005 through July 2007, in at least 23 Form 1-FRs that Sentinel filed with the Commission, Sentinel violated Section 6(c) of the Act by willfully making false statements that Sentinel owned no securities purchased under resale agreements and had no amounts payable.

69.     During the relevant time, Bloom directly and indirectly controlled Sentinel and its employees, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations described in this Count Four.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Bloom is liable for the violations described in this Count Four.

70.     The filing of each Form 1-FR in which Sentinel willfully made false statements that Sentinel owned no securities purchased under resale agreements and/or

had no amounts payable is alleged as a separate and distinct violation of Section 6(c) of the Act, 7 U.S.C. § 9.

## VI.    **RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 12a-1, and pursuant to its own equitable powers:

(1)    Find Sentinel liable for violating Sections 4b(a)(2)(i), 4d(a)(2), 4d(b), 4g(a) and 6(c) of the Act, 7 U.S.C. §§ 6b(a)(2)(i), 6d(a)(2), 6d(b), 6g(a) and 9 (2002), and Commission Regulations 1.10(d), 1.20, 1.22 and 1.23, 17 C.F.R. §§ 1.10(d), 1.20, 1.22 and 1.23 (2007).

(2)    Find Mosley liable as a principal for aiding and abetting Sentinel's violations of Sections 4b(a)(2)(i), 4d(a)(2) and 4d(b) of the Act, 7 U.S.C. §§ 6b(a)(2)(i), 6d(a)(2) and 6d(b) (2002), and Commission Regulations 1.20, 1.22 and 1.23, 17 C.F.R. §§ 1.20, 1.22 and 1.23 (2007).

(3)    Find Bloom liable as a controlling person for Sentinel's violations of Sections 4b(a)(2)(i), 4d(a)(2), 4d(b), 4g(a) and 6(c) of the Act, 7 U.S.C. §§ 6b(a)(2)(i), 6d(a)(2), 6d(b), 6g(a) and 9 (2002), and Commission Regulations 1.10(d), 1.20, 1.22 and 1.23, 17 C.F.R. §§ 1.10(d), 1.20, 1.22 and 1.23 (2007).

(4)    Enter an order of permanent injunction prohibiting the Defendants and any other person or entity associated with them, including any successor thereof, from:

a) engaging in conduct in violation of Sections 4b(a)(2)(i), 4d(a)(2) and 4d(b) of Act, 7 U.S.C. §§ 6b(a)(2)(i), 6d(a)(2) and 6d(b), and Commission Regulations 1.20, 1.22 and 1.23, 17 C.F.R. §§ 1.20, 1.22 and 1.23 (2007); and

b)  applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9), or acting as a principal, agent, officer or employee of any person registered, required to be registered, or exempted from registration with the Commission, except as provided for in Regulation 4.14(a)(9).  This includes, but is not limited to, soliciting, accepting, or receiving any funds, revenue or other property from any other person, giving commodity trading advice for compensation, except as provided in Regulation 4.14(a)(9), or soliciting prospective customers related to the purchase or sale of commodity futures or options.

(5)     Enter an additional order of permanent injunction prohibiting Sentinel and Bloom and any other person or entity associated with them, including any successor thereof, from engaging in conduct in violation of Sections 4g(a) and 6(c) of the Act, 7 U.S.C. §§ 6g(a) and 9, and Regulation 1.10(d), 17 C.F.R. §1.10(d) (2007).

(6)     Enter an order directing Bloom and Mosley to make full restitution to every customer whose funds were lost as a result of the acts and practices that constituted violations of the Act and Commission Regulations, as described herein, including pre-judgment interest.

(7)     Enter an Order directing Bloom and Mosley to each pay a civil monetary penalty in the amount of not more than the higher of (i) triple the monetary gain to that Defendant or (ii) $130,000 for each violation of the Act and Commission Regulations.

(8)     Enter an Order providing such other and further remedial ancillary relief as
the Court may deem appropriate.


Date: 04/28/2008                              Respectfully submitted,


                                              s/ **Mark H. Bretscher**
                                              Mark Bretscher
                                              A.R.D.C. No. 6194945

                                              s/ **William P. Janulis**
                                              William P. Janulis
                                              A.R.D.C. No. 1326449

                                              s/**Rosemary Hollinger**
                                              Rosemary Hollinger
                                              Regional Counsel
                                              A.R.D.C. No. 3123647

                                              Attorneys for Plaintiff
                                              Commodity Futures Trading Commission
                                              525 W. Monroe Street, Suite 1100
                                              Chicago, IL 60661
                                              312-596-0529 (Bretscher)
                                              312 596-0545 (Janulis)
                                              (312) 596-0520 (Hollinger)
                                              (312) 596-0700 (office number)
                                              (312) 596-0714 (facsimile)

# EXHIBIT  G

**SENTINEL**
**MANAGEMENT**
**G R O U P**
**INC.**

EXHIBIT C

10 S. Riverside Plaza, Suite 2150
Chicago, Illinois 60606
Tel (312) 715 · 0001
Fax (312) 715 · 0018

ERIC A. BLOOM
PRESIDENT & CEO

March 14, 1997

Mr. Joseph  Ciaccirelli
The Bank of New York
1 Wall Street
New York, NY  10286

Re:  **Sentinel Management
Group, Inc. Customer
Segregated Funds
Account I (§ 4.d-2)**

Dear Mr. Ciaccirelli:

We propose to maintain accounts with yourselves which
shall be designated as "Sentinel Management Group, Inc.
Customer Segregated Funds Account I ($4.d-2)"  In this
account we, as futures commission merchants, under the
Commodity Exchange Act, shall deposit money, investment
securities, and customer-owned securities.  Such funds are
money and securities deposited by or accruing to our
customers which are commodity customers.  In addition, all
investments shall be made in accordance with the Commodity
Exchange Act.

These accounts are being opened to meet the provisions
of the Commodity Exchange Act.  This statute provides that
such money, segregated and treated as belonging to our
customers rather than as belonging to ourselves.  In
carrying these accounts, you agree that the funds in said
accounts will not be subject to your lien or offset for, and
on account of, any indebtedness now or hereafter owing us to
you and shall not be applied by you upon any such
indebtedness nor will you apply the funds in said accounts
to the indebtedness of either our so-called Seg II or Seg
III accounts.  Furthermore, you agree that this letter shall
supersede any other documents related to this account that
conflict with the terms of this letter.

Please acknowledge that you understand the nature of
the assets in this account by signing (or asking the



BNY-Trustee-00005176

Mr. Joseph Ciaccirelli
March 14, 1997
Page 2



appropriate authorized person to sign) and returning the
enclosed copy of this letter.

Very truly yours,

EAB/ti

Accepted this ____ 31 day of March, 1997.

_____
Authorized Signature

_____
Name and Title

BNY-Trustee-00005177

# EXHIBIT  H

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>**SENTINEL MANAGEMENT GROUP, INC.,**<br><br>Debtor.<br>_____<br><br>**FREDERICK J. GREDE**, as Chapter 11 Trustee for Sentinel Management Group, Inc.,<br><br>Plaintiff,<br><br>v.<br><br>**PHILIP M. BLOOM, ERIC A. BLOOM, CHARLES K. MOSLEY, SENTINEL INVESTMENT GROUP, INC., SENTINEL FINANCIAL SERVICES, INC., SENTINEL MANAGEMENT INTERNATIONAL, LTD., FOUNTAINHEAD INVESTMENTS, INC., EB TRUST 2005, SYBIL BLOOM REVOCABLE TRUST, PHILIP M. BLOOM REVOCABLE TRUST, PHILIP M. BLOOM REMAINDER TRUST, ERIC A. BLOOM LIVING TRUST and PHILIP M. BLOOM GRANTOR ANNUITY TRUST,**<br><br>Defendants. | Chapter 11<br><br>**CASE NO. 07 B 14987**<br><br>Hon. John B. Squires<br><br><br><br><br><br><br><br>**ADV. NO. 07-00981** |

**MEMORANDUM OF LAW IN SUPPORT OF
THE BLOOM DEFENDANTS' MOTION TO DISMISS**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................ iii

PRELIMINARY STATEMENT ........................................................................... 1

STATEMENT OF FACTS ................................................................................... 7

    A.    The Parties ...................................................................................... 7

    B.    The Sentinel Accounts At Issue ....................................................... 8

          1.    The "SEG" accounts ............................................................ 8

          2.    The "House" account ........................................................... 8

    C.    The Allegations Of The Complaint All Concern Defendants' Alleged
        Misuse Or Misappropriation Of The Property Of Sentinel's Customers,
        Not Sentinel Itself ........................................................................... 9

          1.    Alleged improper use of customer assets for leveraging ......... 10

          2.    Alleged diversion of customer assets to collateralize loans ..... 10

          3.    Alleged commingling of customer assets ............................... 10

          4.    Alleged diversion and misallocation of interest income from
              customer accounts ............................................................... 11

          5.    Alleged extraction of unlawful trading profits from customer
              accounts ............................................................................. 11

          6.    Alleged improper allocation of trades for customer accounts ... 11

          7.    Alleged false and misleading customer statements ................. 12

    D.    Two Of Sentinel's Customers Already Have Filed Putative Class Actions
        In District Court Which Seek To Recover The Same Alleged Investment
        Losses Sought Here By The Trustee ................................................ 12

THE STANDARD ON THIS MOTION TO DISMISS ........................................ 13

ARGUMENT ..................................................................................................... 13

I.     THE TRUSTEE LACKS STANDING TO PURSUE CLAIMS THAT SEEK TO
      RECOVER THE INVESTMENT LOSSES ALLEGEDLY SUFFERED BY
      SENTINEL'S CUSTOMERS (COUNTS 9-12, 15 AND 16) ......................... 13

II.    THE TRUSTEE HAS FAILED TO STATE A CLAIM FOR AVOIDANCE OF
       ANY ALLEGED "INSIDER" TRANSFERS (COUNTS 1-8, 19) ................................. 16

       A.    The Trustee Lacks Standing To Avoid Transfers Of Property In Which
             Sentinel Does Not Have An Interest ................................................................... 16

             1.    As a matter of settled law, the Trustee cannot seek recovery of
                   assets in which Sentinel does not own an equitable interest.................... 16

             2.    The Trustee concedes that Sentinel does not own an equitable
                   interest in any its "SEG" customer funds ................................................. 19

             3.    The Trustee also concedes that Sentinel does not own an equitable
                   interest in any funds invested in its "House" portfolio ............................ 21

       B.    Under Sec. 546(e) Of The Code, The Trustee Cannot Avoid "Settlement
             Payments" Made By A "Commodity Broker" ..................................................... 22

III.   THE TRUSTEE LACKS STANDING TO PURSUE STATE LAW DIVIDEND
       CLAIMS (COUNTS 13 AND 14) ................................................................................. 26

CONCLUSION ......................................................................................................................... 27

# TABLE OF AUTHORITIES

***Federal Cases***

*Asch v. Teller, Levit & Silvertrust, P.C.,*
    No. 00 C 3290, 2003 U.S. Dist. LEXIS 16747 (N.D. Ill. Sept. 23, 2003).........................14

*Begier v. IRS,*
    496 U.S. 53 (1990).............................................................................................................19

*Bevill, Bresler & Shulman Asset Mgmt. Corp. v. Spencer Savings & Loan Ass'n (In re Bevill, Bresler & Shulman Asset Mgmt. Corp.),*
    878 F.2d 742 (3d Cir. 1989)..............................................................................................24

*Caplin v. Marine Midland Grace Trust Co.,*
    406 U.S. 416 (1972)....................................................................................................14, 17

*Conley v. Gibson,*
    355 U.S. 41 (1957).............................................................................................................13

*Enron Corp. v. J.P. Morgan Sec., Inc. (In re Enron Corp.),*
    325 B.R. 671 (Bankr. S.D.N.Y. 2005)..............................................................................25

*Henson v. CSC Credit Serv.,*
    29 F.3d 280 (7th Cir. 1994)...............................................................................................12

*Indemnified Capital Invs., SA. v. R.J. O'Brien & Assocs.,*
    12 F.3d 1406 (7th Cir. 1993).......................................................................................14, 15

*Jenkins v. Chase Home Mortg. Corp. (In re Maple Mortg.),*
    81 F.3d 592 (5th Cir. 1996).....................................................................................18, 19, 20

*Jonas v. Resolution Trust Corp. (In re Comark),*
    971 F.2d 322 (9th Cir. 1992)..............................................................................................24

*Kaiser Steel Corp. v. Charles Schwab & Co.,*
    913 F.2d 846 (10th Cir. 1990)............................................................................................24

*Kaiser Steel Corp. v. Pearl Brewing Co. (In re Kaiser Steel Corp.),*
    952 F.2d 1230 (10th Cir. 1991)....................................................................................24, 25

*Kikson v. Underwriters Labs.,*
    No. 02 C 8265, 2005 U.S. Dist. LEXIS 6269 (N.D. Ill. Mar. 31, 2005)..........................14

*Koch Refining v. Farmers Union Cent. Exchange, Inc.*
   831 F.2d 1339 (7th Cir. 1987) ...................................................................17

*Loranger Mfg. Corp. v. PNC Bank (In re Loranger Mfg. Corp.),*
   324 B.R. 575 (Bankr. W.D. Pa. 2005) .......................................................23

*Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.),*
   181 F.3d 505 (3d Cir. 1999)......................................................................24

*Marrs-Winn Co. v. Gilberson Elec. (In re Marrs-Winn Co.),*
   103 F.3d 584 (7th Cir. 1996) ..............................................................17, 18

*Official Comm. of Unsecured Creditors v. Clark (In re Nat'l Forge Co.),*
   344 B.R. 340 (Bankr. W.D. Pa. 2006).......................................................23

*Official Comm. of Unsecured Creditors v. Fleet Retail Fin. Group (In re Hechinger Inv.*
   *Co.),* 274 B.R. 71 (Bankr. D. Del. 2002) ..............................................23, 24

*Papapetropoulous v. Milwaukee Transp. Serv., Inc.,*
   795 F.2d 591 (7th Cir. 1986) ....................................................................13

*Poss v. Morris (In re Morris),*
   260 F.3d 654 (6th Cir. 2001) ....................................................................19

*QSI Holdings, Inc. v. Alford (In re Quality Stores, Inc.),*
   355 B.R. 629 (Bankr. W.D. Mich. 2006)...................................................25

*Scholes v. Schroeder,*
   744 F. Supp. 1419 (N.D. Ill. 1990)...........................................................15

*Solow v. Reinhardt (In re First Commercial Mgmt. Group, Inc.),*
   279 B.R. 230 (Bankr. N.D. Ill. 2002) .......................................................19

*Steinberg v. Buczynski,*
   40 F.3d 890 (7th Cir. 1994) ......................................................................13

*Terry v. June,*
   432 F. Supp. 2d 635 (W.D. Va. 2006) ......................................................19

*Venture Assoc. Corp. v. Zenith Data Sys. Corp.,*
   987 F.2d 429 (7th Cir. 1993) ......................................................................9

*Wayne Film Sys. Corp. v. Film Recovery Sys. Corp.,*
   64 B.R. 45 (N.D. Ill. 1986) .......................................................................14

*Williams v. California 1st Bank*,
    859 F.2d 664 (9th Cir. 1988) ........................................................................................14

**State Cases**

*Hamilton Bancshares, Inc. v. Leroy*,
    131 Ill. App. 3d 907, 476 N.E.2d 788 (4th Dist. 1985) ....................................18

*Regan v. Ivanelli*,
    246 Ill. App. 3d. 798, 617 N.E.2d 808 (2d Dist. 1993) ....................................16

**Docketed Cases**

*Shatkin v. Bloom, et al.*,
    No. 07 CV 5076 (N.D. Ill.) ..............................................................................12

*McKinlay v. Bloom, et al.*,
    No. 07 CV 5759 (N.D. Ill.) ..............................................................................12

**Statutes And Rules**

Fed. R. Civ. P. 12(b)(6) ...................................................................................................6

17 C.F.R. § 1.20 .............................................................................................................20

17 C.F.R. § 4 ..................................................................................................................20

17 C.F.R. § 275.206(4)-(2) ............................................................................................20

7 U.S.C. § 6(d)(2) ..........................................................................................................20

11 U.S.C. § 101 .........................................................................................................24, 25

11 U.S.C. § 502 ...............................................................................................................1

11 U.S.C. § 510 ...............................................................................................................1

11 U.S.C. § 544 ...............................................................................................................4

11 U.S.C. § 546 .............................................................................................6, 23, 24, 25

11 U.S.C. § 547 .........................................................................................4, 16, 18, 19

11 U.S.C. § 548 ...................................................................................................... *passim*

11 U.S.C. § 550 ....................................................................................................4

11 U.S.C. § 741 ..................................................................................................24

15 U.S.C. § 80(b)-6(4) ........................................................................................20

740 ILCS 160/1 *et seq* .......................................................................................4

740 ILCS 160/2 ..................................................................................................16

740 ILCS 160/5 ..................................................................................................16

740 ILCS 160/6 ..................................................................................................16

740 ILCS 160/8 ..................................................................................................16

### *Miscellaneous References*

H.R. Rep. No. 97-420 (1982)...........................................................................22, 23

5 Collier on Bankruptcy ¶ 550.01[1] (Lawrence P. King, Ed., 15th ed. 1999) ............................22

## PRELIMINARY STATEMENT

In this adversary proceeding, the Chapter 11 Trustee seeks to recover from Defendants Philip M. Bloom, Eric A. Bloom, Sentinel Investment Group, Inc., Sentinel Financial Services, Inc., Sentinel Management International, Ltd., Fountainhead Investments, Inc., EB 2005 Trust, Sybil Bloom Revocable Trust, Philip M. Bloom Revocable Trust, Philip M. Bloom Remainder Trust, Eric A. Bloom Living Trust and Philip M. Bloom Grantor Annuity Trust (collectively, the "Bloom Defendants"), and Charles K. Mosley (not a movant herein) (i) in excess of $350,000,000 of investment losses allegedly suffered by the customers of debtor Sentinel Management Group, Inc. ("Sentinel"), and (ii) in excess of $20,000,000 of allegedly fraudulent or preferential transfers, the funds for which are alleged to be proceeds of defendants' alleged "criminal scheme" to pilfer customers' funds. However, as set forth in more detail below, the Trustee's Complaint suffers from the fundamental -- and fatal -- flaw that a Chapter 11 trustee lacks standing to pursue claims which seek the recovery of property in which the debtor has no interest. In the present case, the Trustee therefore lacks standing under any of his asserted theories to either (a) seek to recover the investment losses allegedly suffered by Sentinel's customers, or (b) avoid transfers of the property of Sentinel's customers in which Sentinel did not have an interest.

Although spread over 264 paragraphs and 19 Counts, the Trustee's Complaint essentially reduces to two primary claims.[1] In the first of those claims (Counts 9-12, 15 and 16), the Trustee

---

[1] In Counts 17 and 18, the Trustee asserts stand-alone claims for equitable subordination under § 510(c) of the Bankruptcy Code and disallowance of claims under § 502(d) of the Code. Although it is questionable whether these claims should be asserted in this manner or at this time, the dismissal of these Counts is not sought in this motion.

seeks the recovery of "an amount exceeding Three Hundred Fifty Million Dollars ($350,000,000.00)" (*e.g.,* Cmplt. ¶¶ 216, 226, 248), which is intended to reflect the total investment losses allegedly suffered by Sentinel's customers as a result of the Bloom Defendants' purported "criminal scheme." *Id.* ¶117.  The legal theories upon which the Trustee seeks this recovery are breach of fiduciary duty (Counts 9-12), civil conspiracy (Count 15) and unjust enrichment (Count 16).

Anticipating the serious problems he faces with his lack of standing to bring any claim based on investment losses <u>to customers</u>, the Trustee portrays the allegations as relating to a "long-term, massive fraud against <u>Sentinel and its customers</u>." *Id.* ¶ 1 (emphasis added). Notwithstanding that characterization, however, the Trustee's actual allegations detailing the alleged "massive fraud" make clear that the direct victims of the alleged fraud are Sentinel's customers, not Sentinel itself.  Indeed, the gravamen of the scheme alleged by the Trustee in his Complaint is the alleged misuse of <u>customer</u> assets for the purported benefit of the defendants:

- The scheme "permitted the Individual Defendants to fraudulently convey to themselves tens of millions of dollars generated by misusing <u>customer funds</u>." *Id.* ¶ 2 (emphasis added).

- The Individual Defendants "commingled and misused <u>client funds</u> for their own financial gain, employing a pattern of deception and lies" (*id.* ¶ 3 (emphasis added)), and falsely "represented to <u>their customers</u> . . . that <u>customer funds</u> were segregated" (*id.* ¶ 54 (emphasis added)).

- The Individual Defendants "lied about the nature of investments <u>made on behalf of customers</u>," (*id.* ¶ 4 (emphasis added)), "lied <u>to customers</u> on a daily basis by submitting false and misleading account statements" (*id.* (emphases added)), and the "representations [to customers] were false" regarding the nature of the <u>customers' investments</u>, including representations appearing on Sentinel's website.  (*id.* ¶¶ 39-41) (emphasis added).

- The Individual Defendants "fraudulently concealed <u>from customers</u> the use of leveraging," (*id.* ¶ 4 (emphasis added)), and the "fact that leveraging was actually

being used was never disclosed <u>to clients</u> on their daily account statements." (*id.* ¶ 43) (emphasis added).

- The Individual Defendants "fraudulently used securities required to be <u>segregated for Sentinel customers</u> as collateral for their 'House' loans" (*id.* ¶ 4 (emphasis added)), and they did so "without the <u>customer's knowledge or consent</u>" (*id.* ¶ 50 (emphasis added)).

- The Individual Defendants "commingled and transferred funds and securities among supposedly segregated <u>customer portfolios</u>." *Id.* ¶ 4 (emphasis added).

- The Individual Defendants "fraudulently diverted income earned on <u>securities attributable to customers</u> to service the loans for the benefit of insiders," (*id.* ¶ 4 (emphasis added)), and they falsely represented to "<u>customers</u> on a daily basis that they were receiving their pro rata share of interest income." (*id.* ¶¶ 57-58 (emphasis added)).

- The "'House' loans had been improperly collateralized with supposedly segregated <u>customer securities</u>." *Id.* ¶ 6 (emphasis added).

- Defendant Mosley was able to "disproportionately direct profitable trades to defendants' accounts and unprofitable trades <u>to customers</u>." *Id.* ¶ 70 (emphasis added).

- The defendants achieved over $19 million in trading gains for their own accounts "through the scheme described herein," (*id.* ¶ 61), whereas "<u>customer portfolios</u> sustained millions of dollars in losses" (*id.* ¶ 63 (emphasis added)).

- The Individual Defendants "caused Sentinel to transfer more than $20 million to themselves, <u>substantially all of which</u> constituted fraudulently realized proceeds of <u>the defendants' criminal scheme.</u>" *Id.* ¶ 117 (emphasis added).

Hence, in the Trustee's own words, the so-called "massive fraud" allegedly was directed at customers of Sentinel. As a matter of settled law, each of the claims based on that alleged fraud belongs only to those customers. Indeed, two of Sentinel's customers already have filed class action lawsuits purporting to assert such claims and seeking to recover these same alleged losses. Accordingly, the Trustee does not stand in the shoes of Sentinel's customers and has no standing to pursue any of the $350,000,000 investment losses allegedly sustained by those customers as a result of the alleged misuse, diversion and commingling of their assets and the

alleged false statements made to them concerning the nature, leveraging, and collateralization of their investments.

The second of the Trustee's primary claims, which seeks the recovery of allegedly fraudulent "insider" transfers of interests in Sentinel property, also suffers from a fatal lack of standing. In Counts 1-8, the Trustee seeks the recovery of approximately $20 million of allegedly fraudulent transfers to the Bloom Defendants (as well as Defendant Mosley) of "purported interests in Sentinel's property" in the form of investment withdrawals, dividends, tax payments, administrative fees, salary, bonuses, and expense reimbursement. The legal theories upon which the Trustee seeks this recovery are §§ 544(b)(1), 547(b), 548(a)(1)(A), 548(a)(1)(B) and 550(a) of the Bankruptcy Code, as well as the Illinois Uniform Fraudulent Transfers Act, 740 ILCS 160/1 *et seq.* In addition, in Counts 13 and 14, the Trustee seeks to recover the same dividend payments under state law, and in Count 19, the Trustee seeks a permanent injunction against any further allegedly fraudulent transfers to insiders.[2]

Again anticipating his lack of standing to pursue claims that do not seek to recover Sentinel's property, the Trustee's avoidance Counts dutifully recite that they seek to avoid transfers "of interest in Sentinel's property" (*see* Cmplt. ¶¶ 144, 150, 157, 166, 175, 183, 192, 201). However, dispositive on this motion is the conceded fact that the source of funds for "substantially all" of these allegedly fraudulent transfers was, in the Trustee's own words, the "fraudulently realized proceeds of the defendants' criminal scheme" (*id.* ¶ 117), *i.e.*, their alleged misuse and misappropriation of their <u>customers'</u> investment funds, including a "portfolio of

---

[2]     The Trustee's Complaint also sought a preliminary injunction against any further allegedly fraudulent insider transfers, which was resolved by way of a consent order entered by the Court on October 26, 2007 (Dkt. 25).

securities held for the benefit of" a number the Bloom Defendants by Sentinel in its "House" portfolio (*id.* ¶ 33). Indeed, the Trustee concedes in this Complaint that the lion's share of the "fraudulently realized proceeds" ($14,851,339) constitutes transfers from "accounts within the 'House' portfolio," also characterized by the Trustee as "redemptions or withdrawals from accounts within the House portfolio." *Id.* ¶¶ 128-129. In particular, as the Complaint alleges, the defendants were able to "fraudulently convey to themselves tens of millions of dollars generated by misusing customer funds," a pointed reference to the withdrawals from the accounts within the House portfolio. *Id.* ¶ 2.

Similarly, the Complaint alleges that defendants "extracted fraudulent trading gains for their personal accounts" from the misuse of customer assets, and that they collateralized the "House loan" using customer securities. *Id.* ¶¶ 4, 6. Yet none of those proceeds is alleged to have been taken at the expense of Sentinel. There is no allegation that Sentinel was a participant or owner in any of the House accounts from which those transfers were made. To the contrary, the Complaint explains that each of the accounts in the House portfolio was titled to and owned by the Bloom Defendants or entities controlled by them other than Sentinel. *Id.* ¶¶ 16-22, 33.

The balance of the $20 million in claimed preferential or fraudulent transfers (approximately $5 million) constitutes what the Trustee characterizes as dividends, administrative fees, salary, bonuses and expense reimbursements paid to the defendants. While such transfers sometimes may constitute transfers of interests in the debtor's property,[3] the Trustee's allegations here assert that the proceeds which constituted the transfers came from the

---

[3]     This could never be true for Count 14 of the Complaint, which bizarrely seeks repayment of dividends alleged to have been issued by non-debtor defendants, not the debtor. See Point III below.

- 5 -

"defendant's criminal scheme" -- which only can refer to the scheme to victimize Sentinel's customers. Therefore, those avoidance claims fail for the same reason as the avoidance claims pertaining to transfers out of the House accounts -- the transferred property did not constitute property of the debtor.

Finally, an independent, yet equally strong, basis to dismiss that portion of the preference claims asserted in Counts 2-8, relating to $14.8 million in withdrawals from the so-called "House" portfolio, is that they are "settlement payments" within the meaning of the safe harbor provisions of 11 U.S.C. § 546(e), and therefore are immune from the Trustee's avoidance powers under either the Bankruptcy Code or state law.

\*    \*    \*    \*    \*

Because the motion to dismiss is brought under Rule 12(b)(6), the Bloom Defendants are required to accept the Trustee's well-pled allegations as true for purposes of the motion. Lest there be any confusion, nothing in this motion should be interpreted as acquiescing in the Trustee's factual assertions. Quite to the contrary, the Trustee's one-sided and salacious story regarding Sentinel's collapse and the damages to its customers is just that -- only one side. Although the Trustee levels serious accusations against defendants as a group, the Trustee must present his proof as to each individual, and each individual will be entitled to defend against those charges. The Bloom Defendants, in particular, will be entitled to show that for the last 25 years, hundreds of sophisticated money managers invested billions of dollars of both their clients' and their own money with Sentinel with absolutely no problems until this past summer when, like an ever-growing number of sophisticated investors and investment firms, Sentinel fell victim to the worldwide liquidity crisis in the credit markets. The Bloom Defendants also will be entitled to show that Sentinel was subject to regular audits by several governmental agencies and

its own outside auditing firm, and at no time did any of those audits uncover any problems with the use or alleged misuse of customer assets. And, without doubt, the Bloom Defendants are entitled to demonstrate that when Sentinel was faced with its unprecedented liquidity crisis this past summer, defendant Eric Bloom first alerted Sentinel's regulators of Sentinel's decision to halt redemptions, and then authorized a voluntary bankruptcy filing with the almost certain result being that his entire net worth would be wiped out.

## STATEMENT OF FACTS

### A.     The Parties

Debtor, Sentinel, is an Illinois corporation which maintains its headquarters in Northbrook, Illinois. Cmplt. ¶¶ 12, 13. For more than 25 years prior to the filing of the Trustee's Complaint, Sentinel was, as the Trustee acknowledges, "a registered investment adviser that primarily managed investments of short-term cash for various clients," including hedge funds, financial institutions and commodity brokers. *See id.* ¶ 28.

Plaintiff Frederick J. Grede is the Chapter 11 trustee for Sentinel.

Defendant Philip M. Bloom, who founded Sentinel in 1979, was the Chairman of its Board of Directors. *See id.* ¶ 14. Philip Bloom is alleged to be the beneficiary of Defendants Philip M. Bloom Grantor Annuity Trust and Philip Bloom Revocable Trust. *Id.* ¶¶ 22, 26. Philip Bloom's wife, Sybil Bloom, is alleged to be the beneficiary of Defendant Sybil Bloom Revocable Trust. *Id.* ¶ 21.

Defendant Eric A. Bloom was the President, Chief Executive Officer and a director of Sentinel. *Id.* ¶ 15. Eric Bloom is alleged to be the beneficiary of defendant EB 2005 Trust, which wholly owns Defendant Fountainhead Investments, Inc. ("Fountainhead"), and Defendant Eric A. Bloom Living Trust. *Id.* ¶¶ 20, 23, 25.

Defendant Sentinel Investment Group, Inc. ("SIG") is alleged to be the parent company of Sentinel, and, in turn, is alleged to be owned by Defendants Philip M. Bloom Remainder Trust, the Eric A. Bloom Living Trust, Sentinel Financial Services, Inc. ("SFS"), and Fountainhead Investments, Inc. ("Fountainhead"). *Id.* ¶¶ 17, 18, 20. Defendant Sentinel Management International, Ltd. ("SMI") is alleged to be a wholly owned subsidiary of SIG. *Id.* ¶ 19.

Defendant Charles K. Mosley was Sentinel's head trader until he was terminated on or about August 15, 2007. *Id.* ¶ 16.

## B.    The Sentinel Accounts At Issue

### 1.    The "SEG" accounts

Sentinel is a registered investment adviser that primarily manages short-term cash investments for its customers, which include commodities brokers, hedge funds, financial institutions, and individuals. *Id.* ¶ 28. To accomplish that, Sentinel established three segregated custodial accounts for its customers which, for the past ten years, have been maintained at the Bank of New York:  an account referred to as SEG 1, which, as alleged in the Complaint, contains "customer funds and property of registered commodity brokers, or FCMs (futures commission merchants);" SEG 2, which contains "the funds and property of FCM customers;" and, SEG 3, which contains "assets of all other types of clients." *See id.* ¶¶ 30-32.

### 2.    The "House" account

In addition to the SEG accounts, Sentinel maintained a "House" portfolio, which, as the Complaint expressly recognizes, also did not hold any funds that were property of the estate, but rather, "was a portfolio of securities held for the benefit of defendants Philip Bloom Revocable Trust, Sybil Bloom Revocable Trust, Fountainhead, Charles Mosley, SIG, SFS, and SMI." *Id.*

¶ 33 (emphasis added).  For example, at the time of Sentinel's Chapter 11 petition, the balance in

SIG's investment account was nearly $1.5 million, and the balance in Fountainhead's investment

account was approximately $500,000.[4]

Sentinel's relationships with all of its customers, including the Defendants who invested

millions of their own dollars with Sentinel, were governed by Investment Advisory Agreements,

or, with respect to certain accounts opened during and after 2004, Investment Management

Agreements.  *See id.* ¶ 34.  Among other important provisions, at all times each of those

agreements provided that "All Assets shall be… held for the benefit of Client," and that

"Sentinel shall not own nor have any interest in funds or securities in the [Client's] Account or of

any other funds in which Client has a beneficial interest."[5]

### C.    The Allegations Of The Complaint All Concern Defendants' Alleged Misuse Or Misappropriation Of The Property Of Sentinel's Customers, Not Sentinel Itself

Setting aside its efforts to demonize the Bloom Defendants, the wrongdoing alleged in

the Complaint falls into the following categories, all of which concern property of Sentinel's

customers, not Sentinel:

---

[4]    It is settled that on a motion to dismiss, the Court can consider documents which are referenced in the complaint. *Venture Assoc. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993) ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.").  Here, transfers to from these two accounts are referenced in the Trustee's Complaint (*e.g.*, ¶¶ 62, 118, 130), and the August 2007 statements for these accounts are included as Exhibits 83 and 96 to the previously-filed Declaration of the Trustee's forensic accountant, David Moes.  For ease of reference, copies of these documents are being re-submitted as Exhibits 1 and 2 to this memorandum.

[5]    Sentinel's form agreements with its clients are referenced in the Trustee's Complaint. (*See, e.g.*, ¶ 34), and also were attached as exhibits (34, 35) to the previously-filed Moes Declaration.  For ease of reference, these agreements are also attached as Exhibits 3 and 4 hereto.

- 9 -

### 1. Alleged improper use of customer assets for leveraging

The Trustee alleges that "from at least 2003, defendants Philip Bloom, Eric Bloom, and Charles Mosley employed an unlawful leveraging scheme using funds obtained from customers or borrowed using customer securities." Cmplt. ¶ 44. Further, the Trustee alleges that Sentinel also improperly engaged in repurchase or "repo" transactions in which it would borrow money from the Bank of New York to buy securities, then would transfer those securities to a counterparty in return for cash, and would then use that cash to repay the Bank of New York loans. *Id.* ¶ 45. According to the Complaint, these transactions involved only customer funds, and did not involve any property in which Sentinel had an interest. *See id.* ¶¶ 43-49.

### 2. Alleged diversion of customer assets to collateralize loans

The Trustee alleges that, beginning in 2003, the Individual Defendants obtained a loan for the "House" account from the Bank of New York, using "as collateral for that loan securities that were supposedly segregated for the benefit of customers." *Id.* ¶¶ 50-52; *see also* ¶¶ 82, 92, 94. There is no allegation that any Bloom Defendant misused any securities in which Sentinel had an interest.

### 3. Alleged commingling of customer assets

The Trustee alleges that "[i]n spite of promises that the assets of customers in SEGs 1, 2 and 3 would be segregated from each other, and from the defendant's own funds at the custodial bank, defendants Philip Bloom, Eric Bloom and Charles Mosley commingled funds and securities among the three SEG portfolios, and between those portfolios and the defendant's portfolio." *Id.* ¶ 55. There is no allegation that any Bloom Defendant inappropriately used or commingled funds or securities in which Sentinel had an interest.

- 10 -

### 4.    Alleged diversion and misallocation of interest income from customer accounts

The Trustee alleges that, as part of its investment management strategy, Sentinel used customer funds to purchase securities that generated daily interest income. *Id.* ¶ 56. The Trustee further alleges that a portion of the "customer interest income was being siphoned off by Philip Bloom, Eric Bloom and Charles Mosley to service Sentinel's loan with the Bank of New York." *Id.* ¶ 58. The Trustee further alleges that some of the earned interest was diverted to the "House" account for Defendants' benefit, and that earned interest was inappropriately commingled with the Defendants' own portfolio. *Id.* ¶¶ 58-60. The Trustee does not allege that any of the Bloom Defendants diverted or misused interest income that was property of the Debtor, Sentinel.

### 5.    Alleged extraction of unlawful trading profits from customer accounts

The Trustee alleges that from January 2004 through July 2007, the Defendants' "House" portfolio realized trading gains while customer portfolios sustained millions of dollars in losses. *Id.* ¶¶ 61-63. There is no allegation of any impropriety by any Bloom Defendant with respect to any trading gains (or losses) belonging to Sentinel.

### 6.    Alleged improper allocation of trades for customer accounts

The Trustee alleges that the individual Bloom Defendants engaged in a trading practice under which trades were allocated on the settlement date rather than the date when the trades were made in order to allow defendants to allocate profitable trades to their own accounts and unprofitable trades to customer accounts. *Id.* ¶¶ 65-71. There is no allegation that any Bloom Defendant engaged in any wrongful practice regarding accounts or funds in which Sentinel had an ownership interest.

7.    **Alleged false and misleading customer statements**

The Trustee alleges that the individual Bloom Defendants caused Sentinel to issue false and misleading account statements to its customers. *Id.* ¶¶ 73-84. There is no allegation of any false or misleading customer statements made to Sentinel.

**D.    Two Of Sentinel's Customers Already Have Filed Putative Class Actions In District Court Which Seek To Recover The Same Alleged Investment Losses Sought Here By The Trustee**

As just summarized, the Trustee spends a great deal of his Complaint reciting the Bloom Defendants' alleged misuse or misappropriation of property belonging to Sentinel's customers (but <u>not</u> Sentinel). However, two of Sentinel's customers already have filed putative class actions in U.S. District Court for the Northern District of Illinois on behalf of Sentinel's customers against certain of the defendants herein, including Philip Bloom and Eric Bloom, among former Sentinel personnel who are not parties to this action. *Shatkin v. Bloom, et al.*, No. 07 CV 5076, was filed on September 10, 2007, a month prior to the filing of the Trustee's Complaint, and *McKinlay v. Bloom, et al.*, No. 07 CV 5759, was filed on October 11, 2007, the same day as the Trustee's Complaint.[6]

These class actions, which contain substantively similar factual allegations to the Trustee's Complaint, seek redress on behalf of Sentinel's customers for precisely the same investment losses which the Trustee is seeking to recover in this adversary proceeding.

---

[6]    This Court can take judicial notice of these complaints without converting this motion into a motion for summary judgment. *Henson v. CSC Credit Serv.*, 29 F.3d 280, 284 (7th Cir. 1994) ("[d]espite the express language of Fed. R. Civ. P. 12(b), '[t]he district court may also take judicial notice of matters of public record' without converting a 12(b)(6) motion into a motion for summary judgment." )(citations omitted). For the Court's convenience, copies of these complaints are attached hereon as Exhibits 5 and 6, respectively.

- 12 -

## THE STANDARD ON THIS MOTION TO DISMISS

While on a motion to dismiss the well-pleaded allegations of fact are taken as true and all reasonable inferences are drawn in the plaintiff's favor, to survive such a motion the complaint must state allegations concerning all of the material elements necessary for recovery under the relevant legal theory. *Papapetropoulous v. Milwaukee Transp. Serv., Inc.*, 795 F.2d 591, 594 (7th Cir. 1986). Accordingly, dismissal is appropriate if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

## ARGUMENT

**I.    THE TRUSTEE LACKS STANDING TO PURSUE CLAIMS THAT SEEK TO RECOVER THE INVESTMENT LOSSES ALLEGEDLY SUFFERED BY SENTINEL'S CUSTOMERS (COUNTS 9-12, 15 AND 16)**

The law is well settled that a Chapter 11 Trustee lacks standing to pursue claims that the debtor's creditors may have against third parties, regardless of whether the legal theory advanced by the Trustee is any of three theories advanced in the present case, *i.e.*, breach of fiduciary duty (Counts 9-12), civil conspiracy (Count 15) or unjust enrichment (Count 16). As explained by the Seventh Circuit in *Steinberg v. Buczynski*, 40 F.3d 890, 893 (7th Cir. 1994) (Posner, J.), in dismissing an adversary proceeding brought by a trustee:

> [T]he trustee is confined to enforcing entitlements of the corporation. He has no right to enforce entitlements of a creditor. He represents the unsecured creditors of the corporation; and in that sense when he is suing on behalf of the corporation he is really suing on behalf of the creditors of the corporation. But there is a difference between a creditor's interest in the claims of the corporation against a third party, which are enforced by the trustee, and the creditor's own direct--not derivative--claim against the third party, which only the creditor himself can enforce.

- 13 -

*Accord Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 428 (1972)(trustee has

no authority to enforce claims other than those belonging to the debtor); *Wayne Film Sys. Corp.*

*v. Film Recovery Sys. Corp.*, 64 B.R. 45, 50 (N.D. Ill. 1986) ("[A] trustee does not stand in the

shoes of the bankrupt's creditors for all purposes. Rather, if a creditor has a claim against a third

party . . . the trustee has no standing to pursue that creditor's claim against the third party, even if

the claim is common to many creditors."); *Asch v. Teller, Levit & Silvertrust, P.C.*, No. 00 C

3290, 2003 U.S. Dist. LEXIS 16747, at *24 (N.D. Ill. Sept. 23, 2003) ("The court cannot

conclude that the Illinois Supreme Court intended to create a claim for unjust enrichment where

a plaintiff claims *damages that rightfully belong to a third party*.") (emphasis added); *Kikson v.*

*Underwriters Labs.*, No. 02 C 8265, 2005 U.S. Dist. LEXIS 6269, at *11-13 (N.D. Ill. Mar. 31,

2005) (holding that former officer of dissolved company did not have standing to assert claims,

including claims for civil conspiracy to defraud, on behalf of company); *Williams v. California*

*1st Bank*, 859 F.2d 664, 666-67 (9th Cir. 1988) (dismissing securities law claims brought by

trustee on behalf of investors for lack of standing because the investing customers were the real

parties in interest).

    The Seventh Circuit also has held that an investment advisor such as Sentinel lacks

standing to bring suit for losses suffered by its customers -- which is exactly what the Trustee

seeks to do here. In *Indemnified Capital Invs., SA. v. R.J. O'Brien & Assocs.*, 12 F.3d 1406 (7th

Cir. 1993), an investment advisor, Indemnified Capital Investments ("ICI"), received money

from investors, which it then invested in a commodity futures trading account with the defendant

investment broker. ICI later brought claims for breach of fiduciary duty against the defendant,

alleging that investors lost funds when the defendant failed to manage the invested funds

according to ICI's requests. *Id.* at 1407-08. The District Court for the Northern District of

Illinois dismissed the complaint for lack of standing, and the Seventh Circuit affirmed, holding

that ICI had not suffered any injury because it was the investors, rather than ICI, who lost

money. *Id.* at 1409 ("[T]he losses incurred by the ICI customer accounts accrued only to ICI's

customers and are too attenuated to create standing for ICI."). *Accord Scholes v. Schroeder*, 744

F. Supp. 1419, 1422 (N.D. Ill. 1990) ("Fraud on the investors that damages those investors is for

those investors to pursue -- not the receiver.")

In the present case, the majority of the Trustee's factual allegations, as well as Counts 9-

12 (state law claims for breach of fiduciary duty and knowing participation in breach of fiduciary

duty), Count 15 (civil conspiracy) and Count 16 (unjust enrichment), seek the recovery of

damages in excess of $350 million for investment losses allegedly suffered by Sentinel's

customers and other non-debtor entities, such as the creditors of defendants SIG, SFS and SMI.

*See* Cmplt. ¶¶ 215-16, 221-26, 228, 247-48, 250.  Under the foregoing authorities, the claims that

the Trustee asserts on behalf of Sentinel's customers seeking to recover their alleged investment

losses are prototypical examples of claims that belong to Sentinel's customers.  For example, the

Trustee alleges breaches of fiduciary duty not just to Sentinel, but also to Sentinel's creditors

and, in Counts 11 and 12, to non-debtor defendants SIG, SFS and SMI.  See Cmplt. ¶¶ 225,

228.  Even as to the alleged breaches of fiduciary duty to Sentinel, the allegations of the

Complaint make clear that the alleged damages were sustained by Sentinel's customers, and are

not alleged to result in any way from any breach of a duty owed by any Bloom Defendant to

Sentinel.  Similarly, with respect to the Trustee's civil conspiracy claim, although the Trustee

again recites that the victim of the alleged conspiracy was "Sentinel and its creditors," the

allegations of the Complaint itself make clear that the $350,000,000 in alleged damages are

solely meant to encompass the alleged investment losses of Sentinel's customers.

For this very reason, two of the same Sentinel customers that the Trustee here purports to represent already have filed putative class action lawsuits which seek recovery of the same alleged investment losses that the Trustee here purports to seek. Putting aside for present purposes whether any of Sentinel's customers would prevail on a claim to recover their investment losses against the Bloom Defendants under any theory, the pendency of these class action lawsuits confirms that the Trustee lacks standing to assert claims against the Bloom Defendants which seek the recovery of investment losses suffered not by Sentinel, but by its customers. Accordingly, Counts 9-12, 15 and 16 of the Trustee's Complaint must be dismissed as a matter of law.

## II. THE TRUSTEE HAS FAILED TO STATE A CLAIM FOR AVOIDANCE OF ANY ALLEGED "INSIDER" TRANSFERS (COUNTS 1-8, 19)

### A. The Trustee Lacks Standing To Avoid Transfers Of Property In Which Sentinel Does Not Have An Interest

#### 1. As a matter of settled law, the Trustee cannot seek recovery of assets in which Sentinel does not own an equitable interest

Sections 547 and 548 of the Bankruptcy Code, which form the basis for Counts 1, 3, 6 and 7 of the Trustee's Complaint, allow for avoidance of only transfers "of an interest of the debtor in property." 11 U.S.C. §§ 547(b), 548(a)(1). Similarly, the sections of the Illinois UFTA (740 ILCS 160/5, 6, 8) which form the basis of Counts 2, 4, 5 and 8 of the Trustee's Complaint similarly allow avoidance of "transfers," which are defined in 740 ILCS 160/2 as "disposing of or parting with an asset or an interest in an asset . . . ," with "asset" defined as "property of a debtor." 740 ILCS 160/2(b) & (l), 160/5 (a), 160/6 (a & b), 160/8(a)(1); *see Regan v. Ivanelli*, 246 Ill. App. 3d. 798, 804, 617 N.E.2d 808, 814 (2d Dist. 1993) (interpreting the statute and holding that "the only property which can be conveyed to defraud creditors is that in which the debtor has an interest").

- 16 -

It is axiomatic that a trustee cannot seek to collect funds -- whether under the Trustee's

avoidance powers under the Bankruptcy Code or under state law -- that are not property of the

estate. In *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 428 (1972), the U.S.

Supreme Court held that the Bankruptcy Act did not include any provision enabling the trustee

"to collect money not owed to the estate." *Id.* There, the trustee had brought suit against the

indenture trustee, Marine Midland, claiming that holders of the debtor's debentures were harmed

because Marine Midland failed to discover that the debtor had violated the indenture agreement.

*Id.* at 419-20. The Supreme Court affirmed the decisions below, holding that the trustee had no

standing to raise claims "on behalf of debenture holders." *Id.* at 420, 435. The Court also found

that the trustee's suit on behalf of debenture holders could be "inconsistent with any independent

actions that they might bring themselves." *Id.* at 431-32. The Court saw no reason to believe

that "by giving petitioner standing to sue on behalf of the debenture holders we would reduce

litigation." *Id.* at 434. When Congress rewrote the bankruptcy laws in 1978, it rejected a

provision which would have expressly overruled *Caplin,* and therefore *Caplin* remains the law

under the Bankruptcy Code. *Koch Refining v. Farmers Union Cent. Exchange, Inc.,* 831 F.2d

1339, 1348, n. 11 (7th Cir. 1987).

As recognized by the Seventh Circuit, where a debtor does not have an equitable interest

in property, that property is not property of the estate:

> Although a debtor's bankruptcy estate includes 'all legal or
> equitable interests of the debtor in property as of the
> commencement of the case,' 11 U.S.C. § 541(a)(1), the Code
> recognizes that the property of the bankruptcy estate does not
> include any interest in which the debtor holds only bare legal title.

*Marrs-Winn Co. v. Gilberson Elec. (In re Marrs-Winn Co.),* 103 F.3d 584, 589 (7th Cir. 1996)

(emphasis added).

In *Jenkins v. Chase Home Mortg. Corp. (In re Maple Mortg.)*, 81 F.3d 592 (5th Cir. 1996), the court affirmed a bankruptcy court's summary dismissal of the trustee's claims under 11 U.S.C. §§ 547 and 548 because the debtor, a mortgage servicer, "had no equitable interest in the funds transferred" -- mortgage payments that federal law required to be kept in a segregated trust -- despite the debtor having "discretion over the account itself." *Id.* at 596-97. As noted by that Court, "[t]he primary consideration in determining if funds are property of the debtor's estate is whether the payment of those funds diminished the resources from which the debtor's creditors could have sought payment. Conversely, if funds cannot be used to pay the debtor's creditors, then they generally are not deemed an asset of the debtor's estate for preference purposes." *Id.* at 595 (quoting *In re Southmark*, 49 F.3d 1111, 1117 (5th Cir. 1995)).

It is not necessary for there to have been a formal trust created for property to be deemed to be held in trust. As the Seventh Circuit held in *Marr-Winns Co.*:

> It is a well-settled principle that debtors do not own an equitable interest in property that they hold in trust for another, and thus, those trust funds are not 'property of the estate.' Accordingly, several courts of appeals have held that when a debtor receives money as a trustee pursuant to a <u>statutory, express, or implied trust</u>, the debtor acquires only bare legal title to the trust proceeds and maintains no equitable interest in those proceeds. As such, those trust proceeds can only be distributed to trust beneficiaries, and not to the creditors of the bankruptcy estate.

103 F.3d at 589 (emphasis added; citations omitted). *See Hamilton Bancshares, Inc. v. Leroy*, 131 Ill. App. 3d 907, 910, 476 N.E.2d 788, 790 (4th Dist. 1985) ("When a person accepts possession of personal property with the express or implied understanding to hold it for certain specific purposes or specified persons, a valid and enforceable trust exists.").

Accordingly, a bankruptcy trustee cannot avoid an allegedly fraudulent transfer under §§ 547 or 548 when the transferred property is deemed to be held in trust, or the debtor otherwise

has no equitable interest in the property.  *See Begier v. IRS*, 496 U.S. 53, 59 (1990) ("Because

the debtor does not own an equitable interest in property he holds in trust for another, that

interest is not 'property of the estate.'  Nor is such an equitable interest 'property of the debtor'

for purposes of § 547(b)."); *Maple Mortg.*, 81 F.2d at 597; *Poss v. Morris (In re Morris)*, 260

F.3d 654, 670 (6th Cir. 2001) (quoting *Begier*).

      Finally, the analysis of the avoidance claims asserted under the Illinois UFTA, set forth in

Counts 2, 4, 5 and 8 of the Complaint, is identical to that of the claims asserted under §§ 547 and

548 of the Bankruptcy Code.  The Illinois UFTA is *in pari materia* to § 548, and therefore, if the

trustee has no standing to bring these avoidance claims under federal law, he also has no

standing under the Illinois statute.  *See, e.g., Solow v. Reinhardt (In re First Commercial Mgmt.*

*Group, Inc.)*, 279 B.R. 230, 240 (Bankr. N.D. Ill. 2002) (except for different statutes of

limitations, the Illinois UFTA and § 548(a)(1)(A) & (B) of the Bankruptcy Code  "are functional

equivalents . . . ."); *Terry v. June*, 432 F. Supp. 2d 635, 639 (W.D. Va. 2006) (holding that § 548

and UFTA are "subject to the same analysis").

### 2.      The Trustee concedes that Sentinel does not own an equitable interest in any of its "SEG" customer funds

      With regard to the avoidance claims asserted in Counts 1-8 of the Trustee's Complaint,

the threshold question is whether funds and securities belonging to Sentinel's customers and held

in the segregated accounts (*i.e.*, SEG 1, SEG 2, SEG 3, "House") are "property of the debtor."

The indisputable answer to that question here is <u>no</u>.  The equitable interest in the funds that

allegedly were fraudulently or preferentially transferred remained at all times with Sentinel's

customers.

According to the customer agreements referenced in the Trustee's Complaint, Sentinel structured its customer accounts to ensure that customer funds and securities held in the segregated accounts were owned directly by the customers, not Sentinel. As those agreements stated with respect to each of Sentinel's customers, "[a]ll Assets shall be . . . held for the benefit of Client" and "Sentinel shall not own nor have any interest in funds or securities in the [Client's] Account or of any other funds in which Client has a beneficial interest." *See* Exs. 3 & 4 hereto, ¶¶ 5 (a) & (b). Moreover, as pled in the Complaint (¶ 53), because Sentinel was a registered futures commission merchant, it was subject to CFTC Rule 1.20, 17 C.F.R. §1.20, and § 4(d)(a)(2) of the Commodity Exchange Act, 7 U.S.C. § 6(d)(2), which required that customer funds be segregated for the benefit of customers. As a registered investment advisor, Sentinel was also subject to SEC Rule 206(4)-2, 17 C.F.R. § 275.206 (4)-(2), promulgated under the Investment Advisors Act of 1940 (the "Advisors Act"), 15 U.S.C. § 80(b)-6(4), which prohibited Sentinel from having custody of any customer funds or securities unless they were held in segregated accounts. *See* Cmplt. ¶ 53. By operation of law, these regulations foreclose any equitable interest of Sentinel in these customer funds, even if, as alleged, Sentinel had control over these funds while they were at Sentinel. *See Maple Mortg.*, 81 F.3d at 595.

As the Trustee alleges in the first paragraph of the "Transfers to Insiders" section of the Complaint, "the Individual Defendants caused Sentinel to transfer more than $20 million to themselves, substantially all of which constituted fraudulently realized proceeds of the defendants' criminal scheme." Cmplt. ¶ 117. While the Trustee makes no specific allegation regarding the source of the "Transfers to Insiders" or the misappropriation of funds, there is no allegation in the Complaint regarding the source of those payments other than the four Sentinel accounts, *i.e.*, SEG 1, SEG 2, SEG 3, and the "House" Account. Moreover, as the Complaint

alleges that the defendants were able to "fraudulently convey to themselves tens of millions of dollars generated by misusing customer funds." *Id.* ¶ 2 (emphasis added).

### 3. The Trustee also concedes that Sentinel does not own an equitable interest in any funds invested in its "House" portfolio

The foregoing analysis applies on all fours to all of the alleged "insider transfers" that were made from Sentinel's "House" portfolio. As alleged in the Complaint, each of these transfers, which the Trustee alleges totaled approximately $14.8 million, was made "from accounts within the 'House' portfolio." Cmplt. ¶ 128. For instance, the Trustee seeks to avoid a transfer made on July 18, 2007 in the amount of $5,648,492.43 from Sentinel's "House" portfolio to the Philip M. Bloom Revocable Trust, as well as a transfer in the amount of $5,652,432.83 from Sentinel's "House" portfolio to the Sybil Bloom Revocable Trust. These funds were not held in Sentinel's name, but as the Trustee readily admits, were held in the name of the trusts. *See id.* ¶¶ 95, 128. However, there is no allegation that Sentinel was a participant or owner in any of the House accounts from which those transfers were made. More specifically, as is true for each of Sentinel's customer accounts, each of these trusts was solely responsible for losses incurred in the accounts. Thus, as the Trustee's Complaint explains, each of the accounts in the House portfolio was titled to and owned by the Bloom Defendants or entities controlled by them other than Sentinel. *Id.* ¶¶ 16-22, 33

Simply put, there are no allegations whatsoever which even would suggest that these "House" funds for which the Trustee is seeking avoidance belonged to anyone other than the entities in whose names the accounts were held, which were not Sentinel. Although the Trustee alleges that the trading gains realized in the House account resulted from the defendants' misuse of customer assets, there is no allegation that the gains resulted in any way from the misuse of

Sentinel's property. Because these funds were not <u>Sentinel's</u> property, the Trustee lacks standing to avoid these transfers.

*     *     *     *     *

In sum, the transfers the Trustee seeks to avoid through Counts 1-8 of his Complaint do not involve property of Sentinel itself, but rather that of customers. According to the Complaint, "substantially all" of the proceeds for those transfers allegedly were generated by defendants' misuse of customer funds and securities to foster trading gains in the House portfolio. *Id.* ¶ 2, 4 6, 117. Yet, whether the alleged transfer was of proceeds from the "House" account or from one of the "SEG" accounts, none of those proceeds is alleged to have been taken at the expense of Sentinel. Therefore, the Trustee does not have standing to assert the avoidance claims set forth in those Counts.[7]

**B.      Under Section 546(e) Of The Code, The Trustee Cannot Avoid "Settlement Payments" Made By A "Commodity Broker"**

The Bankruptcy Code contains various safe-harbor provisions for the treatment of financial contracts to assure that the financial markets are insulated from the displacement and ripple effects caused by major bankruptcies. H.R. Rep. No. 97-420, at 1 (1982). Because the reversal of settled securities transactions severely would undermine confidence in the chain of guaranties upon which the markets depend and possibly threaten a collapse of the industry, one of the Code's significant market protections curtails a trustee's powers to avoid "settlement

---

[7]     Moreover, because each of Counts 1-8 fail to state a claim to avoid a transfer under the Code, there can be no recovery on account of the underlying transfers pursuant to § 550. 5 Collier on Bankruptcy ¶ 550.01[1] at 550-3 (Lawrence P. King ed., 15th ed. 1999) (recovery pursuant to § 550 is possible only after avoidance of the transfer).

- 22 -

payments" in the securities industry. *Id.* Section 546(e) of the Code sets forth this critical

exception to the trustee's avoidance powers providing that:

> Notwithstanding sections 544 . . . 547, 548(a)(1)(B), and 548(b) of
> this title, the <u>trustee may not avoid a transfer that is a . . .</u>
> <u>settlement payment,</u> as defined in Section 101 or 741 of this title,
> <u>made by or to a commodity broker,</u> forward contract merchant,
> stockbroker, financial institution, financial participant or securities
> clearing agency, that is made before the commencement of this
> case, except under 548(a)(1)(A) of this title.

11 U.S.C. § 546(e) (emphasis supplied).

Hence, the law is clear that an avoidance action will be dismissed where the transfers are

unavoidable under the safe harbor provisions set forth in Section 546(e).  11 U.S.C. § 546(e).

*See, e.g., Official Comm. of Unsecured Creditors v. Fleet Retail Fin. Group (In re Hechinger*

*Inv. Co.),* 274 B.R. 71, 86-88, 98 (Bankr. D. Del. 2002); *Loranger Mfg. Corp. v. PNC Bank (In*

*re Loranger Mfg. Corp.),* 324 B.R. 575, 583-86 (Bankr. W.D. Pa. 2005).

To determine whether the alleged "Insider Transfers" at issue in Counts 2-8[8] are

protected "settlement payments" that are immune from the Trustee's avoidance powers under

---

[8]  Section 548(a)(1)(A), providing for avoidance of transfers upon a showing of the
Debtor's actual intent to hinder, delay or defraud a creditor, is preserved for the Trustee
under §§ 546(e).  Accordingly, this argument does not apply to Count 1, which relies on
§ 548(a)(1)(A).

While the title of Count 3 of the Complaint references § 548(a)(1)(A) of the Code, which
is preserved for the Trustee under § 546(e), the text of the Count references
§ 548(a)(1)(B), and the allegations follow the requirements of that section of the Code,
not that of § 548(a)(1)(A).

Count 2, which seeks to set aside various transfers based on the Bloom Defendants'
alleged actual intent to defraud Sentinel's creditors under the Illinois UFTA, is also
barred by § 546(e).  *See Official Comm. of Unsecured Creditors v. Clark (In re Nat'l
Forge Co.),* 344 B.R. 340, 369-71 (Bankr. W.D. Pa. 2006) (rejecting the contention that
because intentional fraudulent transfers arising under § 548(a)(1)(A) are preserved for the

either the Bankruptcy Code or the Illinois Uniform Fraudulent Transfer Act, the first inquiry

under Section 546(e) is whether the "Insider Transfers" were "settlement payments" under

sections 101 or 741 of the Code.  Section 741(8) defines "settlement payment" as a preliminary

settlement payment, a partial settlement payment, an interim settlement payment, a settlement

payment on account, a final settlement payment, or any other similar payment commonly used in

the securities trade.  11 U.S.C. § 741(8).  The term "settlement payment" is extremely broad and

must be accorded its plain meaning and interpreted as it is plainly understood within the

securities industry.  *Kaiser Steel Corp. v. Charles Schwab & Co.*, 913 F.2d 846, 848 (10th Cir.

1990) (hereafter "Kaiser I").  *See Jonas v. Resolution Trust Corp. (In re Comark)*, 971 F.2d 322,

325 (9th Cir. 1992); *Bevill, Bresler & Shulman Asset Mgmt. Corp. v. Spencer Savings & Loan

Ass'n (In re Bevill, Bresler & Shulman Asset Mgmt. Corp.)*, 878 F.2d 742, 751-52 (3d Cir. 1989)

(noting that two important legislative policies "are on a collision course here," *to wit,* the power

of a trustee to avoid certain transfers and the preservation of the securities markets).  The aim of

the definition is to encompass all settlement payments commonly used in the securities trade.

*Kaiser Steel Corp. v. Pearl Brewing Co. (In re Kaiser Steel Corp.),* 952 F.2d 1230, 1237 (10th

Cir. 1991) (hereafter "Kaiser II").  *See Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l,

Inc.),* 181 F.3d 505, 515-16 (3d Cir. 1999).

A settlement payment is generally the transfer of cash or securities made to complete a

securities transaction.  *Kaiser I*, 913 F.2d at 849.  A settlement payment does not require the

involvement of a clearing house.  *See Resorts Int'l*, 181 F.3d at 515; *Hechinger Inv. Co.*, 274

---

trustee, that claims asserted as intentional fraudulent conveyances under the Illinois
UFTA are also preserved).

B.R. at 87.  There are two opportunities for settlement in a routine purchase and sale.  The first, the "street-side settlement," takes place between the broker and the clearing agency.  *Kaiser II*, 952 F.2d at 1237-38.  The second, the "customer-side settlement," occurs between the broker and the customer.  *Id.* at 1238.  Thus, it is logical that the term "settlement payment" encompasses payments made to settle a customer's account with its broker.  *Id.*; *QSI Holdings, Inc. v. Alford (In re Quality Stores, Inc.)*, 355 B.R. 629, 634-35 (Bankr. W.D. Mich. 2006) (payment to shareholders were settlement payments protected under § 546(e)); *Enron Corp. v. J.P. Morgan Sec., Inc. (In re Enron Corp.)*, 325 B.R. 671, 684 (Bankr. S.D.N.Y. 2005) (relying on *Kaiser II*, the court recognized the two opportunities for settlement including the customer-side settlement).

Based on the allegations in the Trustee's Complaint, the alleged $14.8 million in Insider Transfers at issue in Counts 2-8 were "settlement payments" on the customer-side that are entitled to the safe harbor shelter of Section 546(e).  Each of these transfers allegedly was made from "accounts within the 'House' portfolio."  Cmplt. ¶ 128.  The "House" portfolio "was a portfolio of securities."  *Id.* ¶ 33.  The Bloom Defendants allegedly received cash "as supposed partial or complete redemptions or withdrawals" from the "House" accounts.  *Id.* ¶ 128.  Accordingly, the term "settlement payment" encompasses Sentinel's settlement of the securities transactions in the "House" accounts, including without limitation, the Bloom Defendants' alleged redemptions and withdrawals from the "House" portfolio.

The final inquiry under Section 546(e) is whether the settlement payments were "made by or to," *inter alia,* a commodity broker.  11 U.S.C. § 546(e).  The Code defines the term "commodity broker" as, *inter alia*, a "futures commission merchant."  11 U.S.C. § 101(6).  The Complaint describes Sentinel as a "futures commission merchant ('FCM')."  Cmplt. ¶ 13.  On

the face of the Complaint, therefore, the Trustee concedes that the challenged transfers were "made by" a "commodity broker."

For these reasons, the $14.8 million in transfers for which avoidance is sought in Counts 2-8 all constitute "settlement payments" made by a "commodity broker." Thus, the Trustee cannot seek to avoid any of these transfers.

## III.   THE TRUSTEE LACKS STANDING TO PURSUE STATE LAW DIVIDEND CLAIMS (COUNTS 13 AND 14)

Counts 13 and 14 of the Complaint assert claims under Illinois law for distributions of allegedly unlawful dividends. There can be no question that the Trustee does not have standing to assert Count 14, which seeks to have Defendants Philip Bloom and Eric Bloom repay the "SIG and SFS Dividends" -- dividends alleged to have been issued to them by non-debtor defendants SIG and SFS. *See* Cmplt. ¶ 244. The Complaint includes no explanation, nor is there any, as to how a state law claim relating to allegedly unlawful dividends issued by non-debtors could be property of the estate. Thus, for the reasons set forth above, Count 14 must be dismissed.

Count 13 seeks repayment, pursuant to state law, of dividends allegedly issued by the Debtor, namely what the Trustee terms "Insider Dividends" (defined at Cmplt. ¶ 122), and one or more of the other "Insider Transfers" (defined at Cmplt. ¶ 136). These transfers are alleged to have "constituted fraudulently realized proceeds of the defendants' criminal scheme" (Cmplt, ¶ 117), which allegedly was to divert customer funds for Defendants' own profit. Because the Complaint alleges it was customer funds that were used to pay the dividends, the Trustee again has no standing to pursue Count 13.

## CONCLUSION

For the foregoing reasons, the Bloom Defendants respectfully request that Counts 1-16 and 19 of the Trustee's Complaint be dismissed against them with prejudice.

Respectfully submitted,

s/Blake T. Hannafan
Michael T. Hannafan
Blake T. Hannafan
HANNAFAN & HANNAFAN, LTD.
One East Wacker Drive
Suite 2800
Chicago, Illinois 60601
Tel:  312-527-0055
Fax: 312-527-0220

- and -

David A. Kotler
DECHERT LLP
Princeton Pike Corporate Center
P.O. Box 5218
Princeton, NJ 08543-5218
Tel: 609-620-3200
Fax: 609-620-3259

**Attorneys for Eric A. Bloom, Sentinel Investment Group, Inc., Sentinel Financial Services, Inc., Sentinel Management International, Inc., Fountainhead Investments, Inc., EB 2005 Trust, and the Eric A. Bloom Living Trust**

s/ Corey B. Rubenstein
Mark L. Rotert
Corey B. Rubenstein
STETLER & DUFFY, LTD.
11 S. LaSalle Street, Suite 1200
Chicago, IL  60603
Tel: 312-338-0209
Fax: 312-338-0070

**Attorneys for Philip M. Bloom, the Philip M. Bloom Revocable Trust, the Sybil Bloom Revocable Trust, the Philip M. Bloom Remainder Trust, and the Philip M. Bloom Grantor Annuity Trust**

Dated:  November 30, 2007

## CERTIFICATE OF SERVICE

### SERVICE LIST
### Adv. Case No. 07-00981

The undersigned, an attorney, hereby certifies that on November 30, 2007 he caused a copy of the foregoing to be served electronically and to be sent by overnight courier upon the following ECF Filing Users:

William T. Neary
Roman Sukley
Gretchen Silver
United States Trustee
227 West Monroe Street
Suite 3350
Chicago, Illinois 60606
Telephone: (312) 886-5785
Facsimile: (312) 886-5694

David A. Kotler
Dechert LLP
Princeton Pike Corporate Center
P.O. Box 5218
Princeton, NJ 08543-5218
Telephone: (609) 620-3200
Facsimile: (609) 620-3259

Abraham Brustein
Paul Greco
Di Monte & Lizak LLC
216 West Higgins Road
Park Ridge, Illinois 60068
Telephone: (847) 698-9600
Facsimile: (847) 698-9623

Mark L. Rotert
Corey B. Rubenstein
Stetler & Duffy, Ltd.
11 South LaSalle
Suite 1200
Chicago, Illinois 60603
Telephone: (312) 338-0200
Facsimile: (312) 338-0070

J. Kevin McCall
Catherine L. Steege
Chris C. Gair
Vincent E. Lazar
Jenner & Block, LLP
330 North Wabash Avenue
Chicago, Illinois 60611-7603
Telephone: (312) 222-9350
Facsimile: (312) 527-2727

Michael I. Goldberg
Joanne Gelfand
AKERMAN SENTERFITT
350 East Las Olas Boulevard, Ste. 1600
Fort Lauderdale, Florida 33301
Tel: 954-463-2700
Fax: 954-463-2224

s/Eric J. Malnar
Eric J. Malnar

13030392.3

# EXHIBIT  I

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Sentinel Management Group, Inc. | ) | Case No. 07-14987 |
| | ) | |
| Debtor. | ) | Hon. John H. Squires |
| | ) | |
| _____ | ) | |
| | ) | |
| | ) | |
| FC Stone, LLC, Fortis Clearing Americas, | ) | Adv. No. |
| LLC, Country Hedging, Inc., Cadent | ) | |
| Financial Services LLC, Frontier Futures, | ) | |
| Inc., Velocity Futures, LP and Peregrine | ) | |
| Financial Group, Inc. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| Frederick R. Grede, solely in his capacity | ) | |
| as the Chapter 11 Trustee for Sentinel | ) | |
| Management Group, Inc. | ) | |
| | ) | |
| Defendant. | ) | |

## <u>COMPLAINT</u>

Plaintiffs FC Stone, LLC, Fortis Clearing Americas, LLC, Country Hedging, Inc.,

Cadent Financial Services LLC, Frontier Futures, Inc., Velocity Futures, LP and Peregrine

Financial Group, Inc. (collectively, the "Plaintiffs"), by their undersigned counsel, as and for

their Complaint against Frederick R. Grede, solely in his capacity as chapter 11 trustee (the

"Trustee") for Sentinel Management Group, Inc.'s (the "Debtor" or "Sentinel") estate, allege as

follows:

## NATURE OF THE ACTION

1.      The Plaintiffs bring this action to seek a declaration that any and all transfers made by the Debtor to the Plaintiffs on or after the date that was 90 days before the Petition Date (as defined below), were transfers of the Plaintiffs' property and not transfers of property of the Debtor's estate under § 541 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code").  Furthermore, the Plaintiffs seek a declaration that the at least $40 million in securities and other assets presently held by the Trustee on behalf of the Debtor's Seg 1 Customers (as defined below) is not property of the Debtor's estate under § 541 of the Bankruptcy Code and that the Trustee should return the Plaintiffs' allocable shares of such assets to the Plaintiffs.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157, 1334 and 2201.

3.      This adversary proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (O).

4.      Venue in this district is proper pursuant to 28 U.S.C. § 1409.

## THE PARTIES AND RELATED PARTIES

5.      FC Stone, LLC is a Delaware Limited Liability Company with its principal place of business located in Chicago, IL.

6.      Fortis Clearing Americas, LLC is an Illinois Limited Liability Company with its principal place of business located in Chicago, IL.

7.      Country Hedging, Inc. is a Delaware Corporation with its principal place of business located in Inver Grove Heights, MN.

2

8.    Cadent Financial Services LLC is an Illinois Limited Liability Company with its principal place of business located in Chicago, IL.

9.    Frontier Futures, Inc. is an Iowa Corporation with its principal place of business located in Cedar Rapids, IA.

10.    Velocity Futures LP is an Illinois Limited Partnership with its principal place of business located in Houston, TX.

11.    Peregrine Financial Group, Inc. is an Illinois Corporation with its principal place of business located in Chicago, IL.

12.    The Trustee, Frederick R. Grede, is the chapter 11 trustee of the Debtor's estate, appointed under § 1104 of the Bankruptcy Code by Orders of this Court entered on August 23, 2007 and August 29, 2007.

13.    The Debtor is an Illinois corporation headquartered in Northbrook, Illinois.  The Debtor was registered with the Commodity Futures Trading Commission ("CFTC") as a non-clearing Futures Commission Merchant ("FCM") and with the Untied States Securities and Exchange Commission ("SEC") as an investment advisor.  The Debtor was also a member of the National Futures Association.

14.    Each Plaintiff was a Seg 1 Customer of the Debtor, as more fully described in paragraphs 17 and 21 through 30 below.  Each Plaintiff was also registered with the CFTC as an FCM.

15.    On August 17, 2007, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Court").  The Debtor's chapter 11 case is being administered under Case No. 07-14987.

3

## FACTUAL BACKGROUND

### I.    Sentinel's Business And Regulatory Requirements

16.    Sentinel managed investments of short-term cash for various customers, including FCMs, as well as hedge funds, financial institutions, pension funds and individuals. Sentinel divided its customers into four groups.

17.    The first customer group, known within Sentinel as Seg 1, was intended and represented to consist solely of the funds and property of customers of other FCMs, which typically invested their customers' funds through Sentinel in order to take advantage of Sentinel's advertised cash management and investment expertise (the "Seg 1 Customers").

18.    The second customer group, known within Sentinel as Seg 2, was intended and represented to consist solely of the funds and property of customers of other FCMs that were engaged in trading at foreign exchanges.

19.    The third customer group, known within Sentinel as Seg 3, was intended and represented to consist of the funds and property of all other types of clients, including hedge funds and other speculators, FCM house (i.e., non-customer) funds, trust accounts, endowments and individuals.

20.    The fourth customer group, known within Sentinel as Seg 4, was intended and represented to consist of the funds and property of Seg 3 Customers whose property was denominated in Euros. In addition to managing investments for the customer portfolios, Sentinel owned a "House" or "Street" portfolio of securities traded by Sentinel for the ultimate benefit of Sentinel's insiders.

## II.    The Strict Requirements Of The CEA And CFTC Rules

21.    FCMs are permitted to deposit their customer funds only with certain types of banks, depositories or other FCMs.  Sentinel registered with the CFTC as an FCM, and thus was able to manage customer funds belonging to other FCMs.  Unlike most FCMs, Sentinel did not engage in any commodities trading for its customers, but instead only invested funds deposited by other FCMs and Sentinel's other customers.

22.    Because Sentinel was an FCM managing funds required to be segregated for the benefit of its Seg 1 Customers, Sentinel and any depository bank selected by Sentinel as custodian for funds belonging to such Customers were subject to the provisions of the Commodity Exchange Act, 7 U.S.C. §§ 1 et seq. (the "CEA"), and related CFTC rules and regulations promulgated pursuant to the CEA, 17 C.F.R. §§ 1.1-190.10, with respect to such funds.

23.    Pursuant to Section 4d(a)(2) of the CEA, Sentinel was required to separately account for the money, securities and property of Seg 1 Customers and could not commingle such Customers' assets with its own funds.

24.    In addition, Section 4d(b) of the CEA provides that "it shall be unlawful for any person . . . that has received any money, securities or property for deposit in a separate account as provided for in [section 4d(a)(2) of the CEA], to hold, dispose of, or use any such money, securities or property as belonging to the depositing futures commission merchant or any person other than the customers of such futures commission merchant."

25.    CFTC regulations recognize an FCM's obligations to segregate customer funds and treat them as belonging to customers as a fundamental tenet of futures regulation.  CFTC Rule 1.20(c) provides that funds of a commodity or option customer shall not be commingled with any other person and that customer funds shall not be used to secure or guarantee the trades,

contracts or commodity options, or to secure or extend the credit, of any person other than the one for whom the same are held.

26.    CFTC Rule 1.20(a) required Sentinel to segregate all funds of Seg 1 Customers as belonging to such Customers, and when such Customer assets were deposited, to deposit such assets under an account name which clearly identified them as customer property.  CFTC Rule 1.20(a) also required that any bank acting as custodian for Sentinel's Seg 1 Customer funds first acknowledge in writing that such funds are customer funds and are being held in accordance with the provisions of the CEA.

27.    The investment of Seg 1 Customer funds was subject to the investment standards embodied in CFTC Rule 1.25.  The Debtor solicited the business of its Seg 1 Customers by offering them an opportunity to participate in its "safe" "125 Portfolio," which was named after Rule 1.25.  Rule 1.25 generally restricts investment of customer funds to only the highest grade corporate and government securities and similarly highly liquid investments.  Under CFTC Rule 1.26, any securities in which Seg 1 Customer funds were invested were also required to be maintained in segregation.

28.    On its now-defunct website, Sentinel defined the "Investment Objective" of the 125 Portfolio as follows:

> The 125 Portfolio is intended to provide Sentinel's FCM clients with a short-term investment alternative that combines safety of principal, liquidity and competitive yields compliant with the CFTC's Rule 1.25.  An investment in the 125 Portfolio provides an indirect, undivided pro-rata interest in the underlying securities.

29.    Sentinel recognized the obligations it had to the Seg 1 Customers under the CEA and CFTC regulations.  When it deposited funds with Sentinel, each Seg 1 Customer sent Sentinel a letter, which was signed by Sentinel, acknowledging that the CEA required Sentinel to

segregate the Seg 1 Customer's assets and treat them as belonging to the Seg 1 Customer's own customers.

30.    Likewise, as an FCM, Sentinel obtained a letter from its bank, the Bank of New York ("BONY") acknowledging that the assets of the Seg 1 Customers were held pursuant to section 4d(2) of the CEA and CFTC regulations for the benefit of the Seg 1 Customers.

**III.    The Customer Agreements With Sentinel**

31.    In addition to the regulatory requirements outlined above, the custodial relationship between Sentinel and its Seg 1 Customers was governed by an "Investment Advisory Agreement" or "Investment Management Agreement" between the Customer and Sentinel (together, the "Customer Agreements").

32.    Pursuant to the Customer Agreements, the Seg 1 Customers appointed Sentinel as a "discretionary investment advisor with respect to those assets deposited with the Seg 1 Customer (as defined in Section 5) and accepted for Investment by Sentinel ('the Assets')." Paragraph 5(b) of the Customer Agreements unequivocally provides that Sentinel does not have any ownership or other property interest in the securities and other assets held in the custodial accounts of the Customers:

> Sentinel shall not own nor have any interest in funds or securities in the Account or of any other funds or securities in which Client has a beneficial interest.

33.    Similarly, Paragraph 5(a) of the Customer Agreements provides that the Seg 1 Customers' assets are deposited in custodial accounts and "held for the benefit of Client."

34.    Sentinel's now-defunct website confirmed that it asserted no ownership interest in its Seg 1 Customers' assets. The website provided that "Sentinel acts solely as agent in investing funds. It cannot and does not have an ownership interest in the assets in custody."

35.    Sentinel issued account statements to its Seg 1 Customers, which reflected the assets held by Sentinel on behalf of each Seg 1 Customer (the "Account Statements"). The

7

Account Statements listed each security owned by a Seg 1 Customer, by cusip number. Sentinel issued its last Account Statements to its Seg 1 Customers on August 13, 2007.

## V.   Sentinel's Collapse And The Citadel Sale

36.     On August 13, 2007, Eric Bloom, the President and Chief Executive Officer of Sentinel, sent a letter to Sentinel's Seg 1 Customers and other customers representing that because of the pending liquidity crisis in the credit markets, Sentinel was halting redemptions out of a concern that it would not be able to meet significant redemption requests without resorting to discount sales that would cause unnecessary losses to its customers (the "No Redemption Letter").

37.     The issuance of the No Redemption Letter resulted in each of the Plaintiffs demanding immediate redemption of their assets held by Sentinel in accordance with the terms of the Customer Agreements. Other Seg 1 Customers and other customers of Sentinel also made demands for redemption. The No Redemption Letter also resulted in repo counterparties to Sentinel closing out at unfavorable prices more than $2 billion in Sentinel's repurchase agreement transactions.

38.     On August 16, 2007, Sentinel entered into an agreement with Citadel Equity Fund, Ltd. ("Citadel") to sell, assign and transfer securities held by Sentinel for the benefit of Seg 1 Customers (the "Citadel Sale"). The aggregate notional value of the securities to be sold was approximately $384 million with an estimated market value of $367 million, including accrued interest (the "Citadel Sale Securities").

39.     The final sales price paid by Citadel to Sentinel for the Citadel Sale Securities was approximately $320 million (the "Citadel Proceeds"). The Citadel Sale Securities were transferred to Citadel on August 16 and 17, 2007.

40.    Approximately $297.5 million of the Citadel Proceeds were transferred to a cash account maintained at BONY (the "Seg 1 BONY Account"). The Seg 1 BONY Account was a cash account maintained by Sentinel for the benefit of Seg 1 Customers. Prior to the deposit of approximately $297.5 million in Citadel Proceeds, the Seg 1 BONY Account had a cash balance of approximately $15.1 million.

41.    On or about August 17, 2007, a security held by Sentinel for the benefit of one or more Seg 1 Customers, with a market value of approximately $4.94 million, was deposited into the Seg 1 BONY Account. Thus, as of August 17, 2007, the Seg 1 BONY Account had a cash balance of approximately $317.6 million.

42.    In addition, as of August 17, 2007, there was $22,524,942 in cash in an account maintained by Sentinel at JP Morgan (the "Seg 1 JPM Account"). The Seg 1 JPM Account was a cash account maintained by Sentinel for the benefit of Seg 1 Customers.

43.    On August 17, 2007, Sentinel transferred $22,524,942 in cash to the Seg 1 Customers from the Seg 1 JPM Account (the "August 17 Transfers").

44.    On August 16 and 17, 2007, several Seg 1 Customers sued Sentinel and sought and obtained temporary restraining orders from the United States District Court for the Northern District of Illinois, *Farr Financial, Inc. v. Sentinel Management Group, Inc.*, Case No. 07 C 4614 (N.D. Ill. Aug. 17, 2007), prohibiting transfers of securities segregated for their benefit.

**IV.    The Chapter 11 Petition And The Authorizations Of The Citadel Distributions**

45.    On the evening of August 17, 2007 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

46.    On August 20, 2007, the Debtor filed an emergency motion (the "Distribution Motion") to compel the distribution of the Citadel Proceeds to the Seg 1 Customers. The Citadel Proceeds were being held by BONY pending an order of the Bankruptcy Court. A hearing on

the Distribution Motion was held that same day in the Bankruptcy Court (the "Distribution Hearing").

47.    At the Distribution Hearing, the Debtor, through counsel, repeatedly represented to the Court that the Citadel Proceeds and other assets of the Seg 1 Customers were not "property of the estate" and should be distributed to the Seg 1 Customers. The Debtor's counsel also stated that "we have got $312 million of money that belongs to somebody else. It doesn't belong to us. It belongs to the customers." The CFTC also supported the distribution of the Citadel Proceeds to the Seg 1 Customers at the Distribution Hearing.

48.    On August 20, 2007, after considering the arguments of counsel at the Distribution Hearing and the evidence submitted, the Bankruptcy Court entered an order authorizing the distribution of the Citadel Proceeds to the Seg 1 Customers, less a $15.6 million holdback amount pending further order of the Bankruptcy Court (the "Citadel Distribution Order"). A true and correct copy of the Citadel Distribution Order is attached hereto as Exhibit A.

49.    Also on August 20, 2007, the SEC filed a complaint (the "SEC Complaint") in the United States District Court for the Northern District of Illinois against Sentinel, alleging violations of Sections 206(1), 206(2) and 206(4) of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 et seq., and violations of SEC Rule 206(4)-2 as a result of the alleged "commingling and transferring [of] client funds and securities between the various client segregated accounts and between client accounts and a 'house' account" and the pledging of those assets "as collateral in order to obtain a line of credit from the Bank of New York" as well as additional leveraged financing.

50.    That same day, the SEC filed a motion for emergency relief (the "Emergency Motion") in the United States District Court for the Northern District of Illinois seeking, among

10

other things, to preclude Sentinel from distributing (through BONY) the Citadel Proceeds to the Seg 1 Customers.  The District Court heard argument on the matter during the afternoon of August 20, 2007.  During that argument, the Debtor, through counsel, represented to the District Court that the Citadel Proceeds "are not the property of the bankruptcy estate because they were not, before the petition was filed, the property of the debtor.  The funds in the segregated account are property of . . . the customers and, therefore, should go to the customers."  The SEC and Discus Master Fund argued in favor of prohibiting the distribution of the Citadel Proceeds to the Seg 1 Customers.

51.    After considering arguments and the evidence submitted, the District Court refused to prohibit the distribution of the Citadel Sale Proceeds to the Seg 1 Customers.  On or about August 21, 2007, BONY transferred $297,050,808 to the Seg 1 Customers (the "August 21 Transfers").

## V.    The Plaintiffs Are Able To Trace The Assets Held By Sentinel On Their Behalf

52.    The securities held by Sentinel on behalf of its Seg 1 Customers were and are identifiable by cusip number.

53.    The Plaintiffs can identify and trace substantially all securities and other assets that are held or were held by Sentinel on behalf of the Seg 1 Customers (collectively, the "Seg 1 Assets") at all relevant times.  Any misappropriation or other improper use of the Seg 1 Assets does not prevent the Plaintiffs from tracing such assets in the hands of Sentinel or the Trustee.

54.    There are at least three sets of records where the securities held by Sentinel on behalf of Seg 1 Customers are indicated:  (1) the Account Statements, (2) Sentinel's books and records, and (3) at BONY (collectively, the "Books").

11

55.    On information and belief, on all relevant dates, substantially all of the securities held by Sentinel of behalf of Seg 1 Customers are identifiable as Seg 1 securities, by cusip number, on each set of Books.

56.    As of April 30, 2008, the Trustee was holding Seg 1 Assets consisting of (a) approximately $36.2 million in cash for the benefit of Seg 1 Customers, and (b) on information and belief, at least an additional $4 million in securities held for the benefit of Seg 1 Customers (together, the "Remaining Seg 1 Assets").

## VI.    **Implications Of The Plaintiffs' Property Rights**

57.    The Seg 1 Customers, including the Plaintiffs, have exclusive ownership interests in the Seg 1 Assets pursuant to the CEA, CFTC regulations, the Customer Agreements and applicable law.  Because the Seg 1 Customers own the Seg 1 Assets, such assets are not property of the Debtor's estate pursuant to § 541 of the Bankruptcy Code.

58.    The Trustee and other parties-in-interest in the Debtor's chapter 11 case have alleged that the August 17 and August 21 Transfers, along with certain other transfers of Seg 1 Assets made to Seg 1 Customers within 90 days of the Petition Date, may be avoidable as preferential transfers under §§ 547, 549 and 550 of the Bankruptcy Code.  Indeed, the proposed chapter 11 plan of liquidation for the Debtor filed by the Trustee and the Official Committee of Unsecured Creditors (the "Committee") on May 12, 2008 contemplates litigation against Seg 1 Customers to avoid alleged preferential transfers.

59.    However, any and all transfers made by the Debtor to the Plaintiffs on or after the date that was 90 days before the Petition Date, including the August 17 and August 21 Transfers, were transfers of the Plaintiffs' property (the Seg 1 Assets) and not transfers of property of the Debtor's estate under § 541 of the Bankruptcy Code.  As a result, such transfers cannot be avoided by the Trustee.

12

60.    The Plaintiffs have also represented to the Trustee that the Remaining Seg 1 Assets are not property of the Debtor's estate and should be returned to the Seg 1 Customers. The Trustee has to date refused to return the Remaining Seg 1 Assets to the Seg 1 Customers.

## COUNT I – DECLARATORY JUDGMENT
## ( SEG 1 ASSETS AND TRANSFERS TO THE PLAINTIFFS)

61.    The Plaintiffs repeat and reallege paragraphs 1-60 above as though fully set forth herein.

62.    As set forth herein, the Seg 1 Assets are not, and never were, property of the Debtor's estate under § 541 of the Bankruptcy Code because, among other things, (a) the CEA and related CFTC regulations prohibit the Debtor from holding any ownership interest in the Seg 1 Assets; (b) the Customer Agreements unambiguously provide that the Debtor had no ownership or other interest in the Seg 1 Assets; and (c) the Seg 1 Assets are traceable in the hands of the Debtor at all relevant times.

63.    The Trustee and other parties-in-interest in the Debtor's chapter 11 case have alleged that the August 17 and August 21 Transfers, along with certain other transfers of Seg 1 Assets made to Seg 1 Customers within 90 days of the Petition Date, may be avoidable as preferential transfers under §§ 547, 549 and 550 of the Bankruptcy Code.  Indeed, the proposed chapter 11 plan of liquidation for the Debtor filed by the Trustee and the Committee on May 12, 2008 contemplates litigation against Seg 1 Customers to avoid alleged preferential transfers.

64.    Any and all transfers made by the Debtor to the Plaintiffs on or after the date that was 90 days before the Petition Date, including the August 17 and August 21 Transfers, were transfers of the Plaintiffs' property (the Seg 1 Assets) and not transfers of property of the Debtor's estate under § 541 of the Bankruptcy Code.  As a result, such transfers cannot be avoided by the Trustee.

65.    There is an actual, substantial and immediate controversy between the Plaintiffs and the Trustee within the meaning of 28 U.S.C. § 2201 regarding (a) whether the Seg 1 Assets are, or ever were, property of the Debtor's estate under § 541 of the Bankruptcy Code, and (b) whether any transfers made to the Plaintiffs on or after the date that was 90 days before the Petition Date, including the August 17 and August 21 Transfers, were transfers of the Plaintiffs' property and not transfers of property of the Debtor's estate under § 541 of the Bankruptcy Code.

WHEREFORE, the Plaintiffs respectfully request that the Court grant the following relief:

a.    A declaration that the Seg 1 Assets are not, and never were, property of the Debtor's estate within the meaning of § 541 of the Bankruptcy Code pursuant to the CEA and related CFTC regulations;

b.    A declaration that the Seg 1 Assets are not, and never were, property of the Debtor's estate within the meaning of § 541 of the Bankruptcy Code pursuant to Customer Agreements between the Debtor and the Seg 1 Customers;

c.    A declaration that to the extent that the Debtor misappropriated any portion of the Seg 1 Assets at any point, such actions constituted misappropriation of customer property within the meaning of the CEA and, furthermore, had no effect upon the ownership of any other assets maintained in segregated accounts at the Debtor; and

d.    A declaration that the Plaintiffs can identify and trace substantially all Seg 1 Assets in the hands of the Debtor at all relevant times.

e.    A declaration that any and all transfers made by the Debtor to the Plaintiffs on or after the date that was 90 days before the Petition Date, including the August 17 and August 21 Transfers, were not transfers of property of the Debtor's estate under § 541 of the Bankruptcy Code and cannot be avoided by the Trustee; and

f.    Any other and further relief as the Court deems just, equitable and proper.

## COUNT II – DECLARATORY JUDGMENT (REMAINING SEG 1 ASSETS)

66.    The Plaintiffs repeat and reallege paragraphs 1-65 above as though fully set forth herein.

67.    As set forth herein, the Remaining Seg 1 Assets are not, and never were, property of the Debtor's estate under § 541 of the Bankruptcy Code because, among other things, (a) the CEA and related CFTC regulations prohibit the Debtor from holding any ownership interest in the Remaining Seg 1 Assets; (b) the Customer Agreements unambiguously provide that the Debtor had no ownership or other interest in the Remaining Seg 1 Assets; and (c) the Remaining Seg 1 Assets are traceable in the hands of the Debtor at all relevant times.

68.    The Plaintiffs are entitled to the immediate return of their allocable shares of the Remaining Seg 1 Assets in amounts traceable at trial.

69.    The Trustee has incorrectly and unlawfully alleged that the Remaining Seg 1 Assets are property of the Debtor's estate.

70.    There is an actual, substantial and immediate controversy between the Plaintiffs and the Trustee within the meaning of 28 U.S.C. § 2201 regarding the respective rights of the Plaintiffs and the Trustee to the Remaining Seg 1 Assets.

WHEREFORE, the Plaintiffs respectfully request that the Court grant the following relief:

a.    A declaration that the Remaining Seg 1 Assets are not, and never were, property of the Debtor's estate within the meaning of § 541 of the Bankruptcy Code; and

b.    Any other and further relief as the Court deems just, equitable and proper.

## COUNT III – EXPRESS TRUST

71.    The Plaintiffs repeat and reallege paragraphs 1-70 above as though fully set forth herein.

72.    Pursuant to the terms of the CEA, CFTC regulations and the Customer Agreements, the Debtor and its Seg 1 Customers intended to create a trust over any assets deposited by the Seg 1 Customers with the Debtor.

73.    The trust purpose is set forth in the CEA and CFTC regulations.  The trust purpose is also set forth in the Customer Agreements and the "Investment Objective" of the 125 Portfolio – i.e., to provide the Seg 1 Customers  "with a short-term investment alternative that combines safety of principal, liquidity and competitive yields compliant with CFTC's Rule 1.25."

74.    The Seg 1 Assets were delivered to the Debtor, as trustee, by the Seg 1 Customers.  The Seg 1 Assets were held in trust by the Debtor for the benefit of its Seg 1 Customers from the date of delivery of such assets by the Seg 1 Customers through the Petition Date and thereafter.

75.    The Remaining Seg 1 Assets constitute the amount of Seg 1 Assets currently held by the Trustee.  Accordingly, the Remaining Seg 1 Assets are currently held in an express trust by the Trustee for the benefit of the Seg 1 Customers.  Because the Remaining Seg 1 Assets are held in an express trust for the benefit of the Seg 1 Customers, such assets are not property of the Debtor's estate under § 541 of the Bankruptcy Code.

76.    The Trustee has incorrectly and unlawfully alleged that the Remaining Seg 1 Assets are not held in an express trust and are property of the Debtor's estate.

77.    The Plaintiffs therefore are entitled to immediate return of their allocable shares of the Remaining Seg 1 Assets in amounts traceable at trial.

WHEREFORE, the Plaintiffs respectfully request that the Court grant the following relief:

a. An order directing the Trustee to immediately return to the Plaintiffs their allocable shares of the Remaining Seg 1 Assets; and

b. Any other and further relief as the Court deems just, equitable and proper.

## COUNT IV - REPLEVIN

78. The Plaintiffs repeat and reallege paragraphs 1-77 above as though fully set forth herein.

79. As set forth herein, the Seg 1 Customers have legal title to all of the Remaining Seg 1 Assets.

80. The Seg 1 Customers have a possessory right to the Remaining Seg 1 Assets that is superior to any possessory right of the Debtor's chapter 11 estate.

81. The Plaintiffs are entitled to immediate possession of their allocable shares of the Remaining Seg 1 Assets in amounts traceable at trial.

82. The Remaining Seg 1 Assets not been taken for any tax, assessment, or fine or seized under any lawful process or held by virtue of any order of replevin.

83. The Plaintiffs have demanded the return of their allocable shares of the Remaining Seg 1 Assets. To date, the Trustee has refused to return any of the Remaining Seg 1 Assets.

84. Accordingly, the Plaintiffs have suffered and will suffer irreparable harm and are entitled to the immediate return of their allocable shares of the Remaining Seg 1 Assets and all other appropriate relief.

WHEREFORE, the Plaintiffs respectfully request that the Court grant the following relief:

    a.    An order directing the Trustee to immediately return to the Plaintiffs their allocable shares of the Remaining Seg 1 Assets; and

    b.    Any other and further relief as the Court deems just, equitable and proper.

Dated: June 9, 2008

Respectfully submitted,

FC Stone, LLC, Fortis Clearing Americas, LLC, Country Hedging, Inc., Cadent Financial Services LLC, Velocity Futures, LP and Peregrine Financial Group, Inc.

By:        /s/ Geoffrey S. Goodman
          One Of Their Attorneys

Mark L. Prager (No. 2246503)
Stephen P. Bedell (No. 3125972)
William J. McKenna (No. 3124763)
Geoffrey S. Goodman (No. 6272297)
Foley & Lardner LLP
321 N. Clark Street, Suite 2800
Chicago, Illinois 60610
312.832.4500 (telephone)
312. 832.4700 (facsimile)

# EXHIBIT  J

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **SENTINEL MANAGEMENT GROUP, INC.,** | ) | Case No. 07–14987 |
| | ) | |
| Debtor. | ) | Honorable John H. Squires |
| | ) | |
| | ) | |
| | ) | |

## DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE FOR THE AMENDED CHAPTER 11 PLAN OF LIQUIDATION

DLA PIPER US LLP
Mark A. Berkoff
Marc Fenton
203 North LaSalle Street, Suite 1900
Chicago, Illinois  60601
(312) 368-7090

-and-

QUINN EMANUEL URQUHART OLIVER
& HEDGES, LLP
Susheel Kirpalani
Benjamin I. Finestone
51 Madison Avenue, 22nd Floor
New York, New York  10010
(212) 849-7000

Attorneys for the Official Committee of
Unsecured Creditors of Sentinel Management Group, Inc.

JENNER & BLOCK LLP
Catherine L. Steege
Vincent E. Lazar
330 N. Wabash Avenue
Chicago, Illinois 60611
(312) 222-9350

Attorneys for Frederick J. Grede,
Chapter 11 Trustee

Dated:  Chicago, Illinois
            June 18, 2008

ALL CUSTOMERS AND OTHER CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT, INCLUDING THE FOLLOWING SUMMARY, ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, OTHER EXHIBITS ANNEXED TO THE PLAN, THE PLAN SUPPLEMENT, AND THIS DISCLOSURE STATEMENT. THE FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE DESCRIPTION OF THE DEBTOR, ITS BUSINESS, AND EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASE, HAS BEEN OBTAINED FROM VARIOUS DOCUMENTS, AGREEMENTS, AND OTHER WRITINGS RELATING TO THE DEBTOR. THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN THE SUBJECT OF A CERTIFIED AUDIT. THIS DISCLOSURE STATEMENT IS ACCURATE TO THE BEST OF THE PLAN PROPONENTS' KNOWLEDGE, INFORMATION AND BELIEF; HOWEVER, THE PLAN PROPONENTS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT INACCURACIES. ANY ESTIMATES OF CLAIMS SET FORTH IN THIS DISCLOSURE STATEMENT MAY VARY FROM THE FINAL AMOUNTS OF CLAIMS ALLOWED BY THE BANKRUPTCY COURT.

THE DESCRIPTIONS OF DISTRIBUTIONS TO BE MADE UNDER THE PLAN ARE BASED ON SEVERAL KEY ASSUMPTIONS INCLUDING, AMONG OTHERS, THE ESTIMATED CLAIMS POOL AND PROJECTED REALIZABLE VALUE FROM PROPERTY (OTHER THAN CAUSES OF ACTION, WHICH HAVE NOT BEEN ASSIGNED ANY PROJECTED VALUE FOR THESE PURPOSES DUE TO THE UNCERTAIN NATURE OF LITIGATION). SIGNIFICANTLY, THESE PROJECTIONS INCLUDE ESTIMATED SECURITIES MARKET VALUES THAT ARE OPINIONS AND ESTIMATES ONLY (SUBJECT TO REVISION), AND ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. NO ASSURANCE, PREDICTION OR INVESTMENT ADVICE REGARDING PAYMENT IS MADE OR IMPLIED. ACTUAL CLAIMANT RECOVERIES COULD VARY SUBSTANTIALLY FROM THOSE SET FORTH IN THIS DISCLOSURE STATEMENT.

ALL CUSTOMERS AND OTHER CREDITORS SHOULD READ CAREFULLY THE "RISK FACTORS" SECTION HEREOF BEFORE VOTING FOR OR AGAINST THE PLAN. SEE "CERTAIN RISK FACTORS TO BE CONSIDERED" SECTION VIII.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW. THIS DISCLOSURE STATEMENT HAS BEEN

NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR THE COMMODITY FUTURES TRADING COMMISSION (THE "CFTC") NOR HAS THE SEC OR CFTC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY ENTITY FOR ANY OTHER PURPOSE.

THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT. AS TO CONTESTED MATTERS, EXISTING LITIGATION, OR POSSIBLE ADDITIONAL LITIGATION, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER, AS SUCH, THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING, ADVERSARY PROCEEDING OR OTHER ACTION INVOLVING THE DEBTOR OR ITS BUSINESS, OR ANY OTHER PARTY IN INTEREST, NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL OR OTHER EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTOR.

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION................................................................................................1

    A.    Holders of Claims Entitled to Vote ...............................................3

    B.    Voting Procedures ..........................................................................4

    C.    Confirmation Hearing.....................................................................4

II. OVERVIEW OF CHAPTER 11 ....................................................................5

III. OVERVIEW OF THE PLAN.........................................................................6

    A.    Introduction.....................................................................................6

    B.    Summary of Distributions...............................................................6

    C.    Summary of Classification and Treatment of Claims and Equity
           Interests Under the Plan.................................................................6

IV. HISTORICAL AND BACKGROUND INFORMATION .........................9

    A.    The Debtor......................................................................................9

    B.    The Business...................................................................................9

    C.    Events Leading to Chapter 11 Filing............................................12

    D.    Sentinel's Collapse ......................................................................13

V. THE CHAPTER 11 CASE ...........................................................................15

    A.    Significant "First Day" Motions During the Chapter 11 Case ....15

           1.    The Citadel Distribution ..................................................15

           2.    The Chapter 11 Trustee ...................................................16

    B.    Official Committee of Unsecured Creditors.................................16

    C.    Schedules and Statement of Financial Affairs.............................16

    D.    Bar Date for Filing Proofs of Claim ............................................16

    E.    Turnover of Customer Property....................................................17

F.    Liquidation of Securities Portfolio ............................................................17

G.    Claims Analysis ........................................................................................17

H.    Causes of Action and Avoidance Claims ..................................................18

I.    Adversary Proceedings ............................................................................19

    1.    Insider Complaint (*Grede v. Bloom*, Adv. Pro. 07-00981 (Bankr. N.D. Ill. Oct. 11, 2007)) ....................................................19

    2.    BONY Adversary Proceedings...........................................................20

    3.    M&P Complaint (*Grede v. McGladrey & Pullen LLP*, Adv. Pro. 08-00167 (Bankr. N.D. Ill. March 20, 2008))........................22

    4.    SEG 1 Complaint (*FC Stone LLC, et al. v. Grede*, Adv. Pro. 08-00445 (Bankr. N.D. Ill. June 9, 2008)) ..............................23

J.    Other Related Litigation ..........................................................................23

    1.    Class Action Complaints ...................................................................23

    2.    SEC Complaint (*SEC v. Sentinel Management Group, Inc.*, Case No. 07CV4684 (N.D. Ill. Aug. 20, 2007))............................24

    3.    CFTC Complaint (*CFTC v. Sentinel Management Group, Inc. et al.*, Case No. 08CV2410 (N.D. Ill. Apr. 28, 2008)) ...........25

K.    Sentinel's Pension Plan............................................................................25

L.    Competing Plan by Certain Citadel-Beneficiary Customers.....................26

VI. SUMMARY OF THE PLAN ........................................................................27

A.    Introduction.............................................................................................27

    1.    Property of the Estate........................................................................27

    2.    Stockbroker Liquidation ...................................................................30

    3.    Claim Calculation .............................................................................30

    4.    Basis for Compromise ......................................................................31

B.    Overall Structure of the Plan ...................................................................32

C.    Classification and Treatment of Administrative Claims, Claims and Equity Interests Under the Plan ................................................................32

|      | 1. | Unclassified — Administrative Claims | 34 |
|      | 2. | Unclassified — Priority Tax Claims | 35 |
|      | 3. | Class 1 — Other Priority Claims | 35 |
|      | 4. | Class 2 — Secured Claims | 36 |
|      | 5. | Class 3—Customer Claims | 36 |
|      | 6. | Class 4—General Unsecured Claims | 37 |
|      | 7. | Class 5—Subordinated Claims | 38 |
|      | 8. | Class 6—Equity Interests | 39 |
| D. | Bar Dates for Administrative Claims | | 39 |
| E. | Professional Fee Claims | | 39 |
| F. | No Discharge of Claims; Injunction. | | 40 |
| G. | Treatment of Executory Contracts and Unexpired Leases | | 40 |
| H. | Plan Administration | | 41 |
|      | 1. | Duties and Compensation of the Liquidation Trustee | 41 |
| I. | Creditors' Committee and Liquidation Trust Committee | | 42 |
|      | 1. | Creation of Liquidation Trust Committee | 42 |
|      | 2. | Duties and Compensation of the Liquidation Trust Committee | 43 |
|      | 3. | No Liability of the Liquidation Trustee or the Liquidation Trust Committee | 43 |
| J. | Method of Distribution Under the Plan | | 44 |
|      | 1. | Distributions for Claims Allowed as of the Effective Date | 44 |
|      | 2. | Interest On Claims | 44 |
|      | 3. | Distributions by Liquidation Trustee | 44 |
|      | 4. | Date and Delivery of Distributions | 44 |
|      | 5. | Unclaimed Property. | 45 |

6. Distributions to Holders as of the Record Date ..............................45

7. Fractional Cents .................................................................45

8. Payments of Less than Ten Dollars ................................................45

9. Setoffs ....................................................................45

K. Disputed Claims...................................................................46

1. Objection Deadline; Prosecution of Objections .............................46

2. No Distributions Pending Allowance ...........................................46

L. Estimation of Claims ...............................................................46

M. Reserves.........................................................................46

1. Disputed Claims Reserve.......................................................46

2. Reserve for BONY Secured Claims ................................................47

3. Reserve for Professional Fee Claims ..........................................48

N. Settlement Offer; Releases .........................................................48

O. Assignment of Private Actions to the Liquidation Trust ...........................52

P. Insider Settlement.................................................................52

Q. Cantor Escrow ....................................................................54

R. Exculpation ......................................................................55

S. Extinguishment of Liens...........................................................55

T. Preservation/Waiver of Causes of Action.....................................55

U. Votes Solicited in Good Faith......................................................56

V. Administrative Claims Incurred after the Confirmation Date ...................56

W. Retention of Jurisdiction..........................................................56

1. Claims and Equity Interests...................................................56

2. Causes of Action...............................................................56

3. Injunction ....................................................................56

4.    Professional Fees ...................................................................... 57

5.    Certain Priority Claims .............................................................. 57

6.    Dispute Resolution..................................................................... 57

7.    Executory Contracts and Unexpired Leases ................................ 57

8.    Actions ...................................................................................... 57

9.    General Matters ......................................................................... 57

10.   Plan Modification ...................................................................... 57

11.   Aid Consummation..................................................................... 57

12.   Protect Property ........................................................................ 58

13.   Abandonment of Property........................................................... 58

14.   Recovery of True-up Amount...................................................... 58

15.   Implementation of Confirmation Order........................................ 58

16.   Liquidation Trustee's Exercise of Power .................................... 58

17.   Close Chapter 11 Case............................................................... 58

X.   Miscellaneous Provisions ................................................................... 58

1.    Payment of Statutory Fees ......................................................... 58

2.    Amendment or Modification of the Plan ...................................... 58

3.    Payment of Attorney's Fees Related to Drafting of Plan............... 59

4.    Governing Law .......................................................................... 59

5.    Filing or Execution of Additional Documents.............................. 59

6.    Withholding and Reporting Requirements ................................... 59

7.    Exemption From Transfer Taxes ................................................. 60

8.    Headings ................................................................................... 60

9.    Exhibits .................................................................................... 60

10.   Notices ..................................................................................... 60

11.    Plan Supplement ................................................................61

12.    Conflict .............................................................................61

13.    Setoff by the United States ..............................................61

VII. CONFIRMATION PROCEDURE ..........................................................61

A.    Solicitation of Votes ..............................................................62

B.    The Confirmation Hearing......................................................63

C.    Confirmation............................................................................63

1.    Acceptance of the Plan ....................................................63

2.    Confirmation Without Acceptance of All Impaired Classes .........63

3.    Feasibility ........................................................................65

4.    Best Interests Test and Liquidation Analysis ................65

VIII. CERTAIN RISK FACTORS TO BE CONSIDERED ...........................70

A.    Failure to Receive Requisite Acceptances.................................70

B.    Failure of Bankruptcy Court to Confirm Plan ..........................70

IX. EFFECTIVENESS OF PLAN................................................................71

A.    Confirmation of the Plan ........................................................71

B.    Conditions Precedent to Confirmation of the Plan ...................71

C.    Conditions Precedent to Effectiveness .....................................71

D.    Waiver of Conditions...............................................................71

E.    Effect of Failure of Conditions ................................................71

X. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN..............................................................................................72

XI. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ............72

A.    Federal Income Tax Consequences to the Debtor .....................73

B.    General Tax Considerations for Holders of Allowed Claims....................74

C.    Accrued but Unpaid Interest.....................................................74

D. Bad Debt Deduction and Worthless Securities Deduction ........................ 75

E. Market Discount ........................................................................... 75

F. Receipt of Cash and/or Liquidation Trust Interests in Exchange for Allowed Claims ........................................................................... 75

G. Treatment of Liquidation Trust ...................................................... 76

H. Treatment of Disputed Claims Reserve ........................................... 78

I. Backup Withholding Tax and Information Reporting Requirements ........ 79

XII. RECOMMENDATION AND CONCLUSION ........................................ 79

# I.

## INTRODUCTION

The Official Committee of Unsecured Creditors (the "Creditors Committee") of Sentinel Management Group, Inc. ("Sentinel" or the "Debtor"), and Frederick J. Grede, solely in his capacity as Chapter 11 trustee for Sentinel (the "Chapter 11 Trustee" and, together with the Creditors Committee, the "Plan Proponents"), in the above-captioned Chapter 11 case (the "Chapter 11 Case"), submit this disclosure statement (this "Disclosure Statement"), pursuant to Section 1125 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy Code"), to holders of Claims against the Debtor in connection with (i) the solicitation of acceptances of the Chapter 11 Plan of Liquidation, dated May 12, 2008, as such plan may be amended (the "Plan"), filed by the Plan Proponents with the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division (the "Bankruptcy Court"), and (ii) the hearing to consider confirmation of the Plan (the "Confirmation Hearing"). Unless otherwise defined herein, all capitalized terms contained herein have the meanings ascribed to them in the Plan, a copy of which is attached hereto as Exhibit A.

Concurrently with the filing of this Disclosure Statement, the Plan Proponents filed the Plan which sets forth how Claims against and Equity Interests in the Debtor will be treated. This Disclosure Statement describes certain aspects of the Plan, the Debtor's prior operations, significant events occurring in the Chapter 11 Case and other related matters. FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS HERETO AND THERETO IN THEIR ENTIRETY.

The Plan constitutes a liquidating Chapter 11 plan for the Debtor. The Plan incorporates a pro rata distribution scheme for all of Sentinel's Customers while preserving the rights of Customers to challenge the propriety of such a scheme and to litigate the issue post-confirmation. The Plan provides for the Debtor's Property to be liquidated, and for the proceeds of the liquidation, and any recoveries obtained from litigation against third-parties, to be distributed to holders of Allowed Claims in accordance with the terms of the Plan and the priority of claims provisions of the Bankruptcy Code. The Plan further provides that, upon the Transfer Date all of the Debtor's Property will be transferred to the Liquidation Trust for the liquidation, administration, and distribution of the Debtor's Property by the Liquidation Trustee.

The Liquidation Trustee, in consultation with the Liquidation Trust Committee will be responsible for implementing and administering the Plan in accordance with the terms of the Plan, the Trust Agreement, and applicable law. Additionally, the Liquidation Trustee will initiate and defend Causes of Action on behalf of the Estate after the Plan is Confirmed and consummated. Creditors do not have to wait until the final resolution of these Causes of Action before they receive distributions under the Plan. Rather, the Plan provides for distributions to occur on the Effective Date or as soon thereafter as is practicable. The Plan also provides for distributions at various intervals after the initial distributions, which will enable the distribution of any resulting

recoveries from disposition or liquidation of the Remaining Assets and/or the Trust Assets, including the Causes of Action, in accordance with the Plan. Assignment of Claims will be recognized with distributions made to valid assignees up through and including December 15, 2008, after which the Liquidation Trust will make distributions to Claim Holders of record as of such date.

In terms of distributions under the Plan, the Plan Proponents believe that those Creditors who were Customers of the Debtor will be treated equally, receiving *pro rata* treatment based on the amount of their Claims. To this end, the Plan includes a mechanism to ensure that any Customers who previously received distributions from the proceeds of the Citadel Transaction (described below in Section IV.D. of the Disclosure Statement), will not be entitled to receive distributions until the other Customers who did not receive distributions from the Citadel Transaction have achieved the same Percentage Recovery including accrued Interest from the respective dates of such distributions. The Plan provides for such a "catch-up" mechanism with regard to both Class 3 and Class 4 Claims of Customers and the imputation of Interest on the Citadel Sale Distributions and the SEG 1 Special Distributions to provide for equal treatment among similarly situated Creditors as required by the Bankruptcy Code. Such provision is pursuant to the Plan's underlying concept that Customers of Sentinel were all similarly situated Creditors prior to the distribution of the Citadel Sale Distributions and the SEG 1 Special Distributions and that, under the Bankruptcy Code, all Customers have an equal right to receive distributions from Sentinel, including the time of such distributions. The Plan further provides Customers who previously received distributions from the proceeds of the Citadel Transaction with the opportunity to settle and limit their potential exposure to avoidance or other claims in the event that the insufficient funds are recovered to permit all Customers to achieve the same Percentage Recovery.

Attached as Exhibits to this Disclosure Statement are copies of the following:

- The Plan (Exhibit A);

- In an effort to aid Creditors in their decisions on how to vote, a liquidation analysis (Exhibit B);

- A term sheet which summarizes the terms of the Settlements embodied in the Plan (Exhibit C);

- In addition, a proposed Ballot for the acceptance or rejection of the Plan is enclosed with this Disclosure Statement for the Holders of Claims that the Plan Proponents believe are entitled to vote to accept or reject the Plan.

The Solicitations Procedures Order sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes, and the standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each Holder of a Claim entitled to vote on the Plan should read in their entirety the Disclosure

Statement, the Plan, the Solicitation Procedures Order, and the instructions accompanying the Ballots before voting on the Plan. These documents contain, among other things, important information concerning the classification of Claims and Equity Interests for voting purposes and the tabulation of votes. No solicitation of votes to accept the Plan may be made except pursuant to Section 1125 of the Bankruptcy Code.

APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

### A.    Holders of Claims Entitled to Vote

Pursuant to the provisions of the Bankruptcy Code, only holders of "allowed" claims or interests in classes of claims or interests that are "impaired" are entitled to vote to accept or reject a proposed Chapter 11 plan. Classes of claims in which the holders of claims are unimpaired under a Chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan.

Classes 1 and 2 of the Plan are Unimpaired (subject to a Bankruptcy Court finding that a Holder of a Claim in Class 2 has had its legal rights altered sufficiently to impair its Claim). Holders of Claims in Classes 1 (Other Priority Claims) and 2 (Secured Claims) are conclusively deemed to have accepted the Plan. Classes 3 (Customer Claims), 4 (General Unsecured Claims), and 5 (Subordinated Claims) of the Plan are Impaired. To the extent Claims in Classes 3 and 4 are not Disputed Claims, Holders of such Claims are entitled to vote to accept or reject the Plan. Holders of Claims in Classes 5 and Holders of Equity Interests in Class 6 are deemed to have rejected the Plan and are therefore not entitled to vote. ***Accordingly, the Plan Proponents are soliciting acceptances only from Holders of Allowed Claims in Classes 3 and 4.***

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan. For a more detailed description of the requirements for confirmation of the Plan, see Section VII., "Confirmation Procedure."

Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan notwithstanding the nonacceptance of a plan by one or more impaired classes of claims or interests. Under that Section, a plan may be confirmed by a court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each nonaccepting class. For a more detailed description of the requirements for confirmation of a nonconsensual plan. See Section VII.C.2., "Confirmation Procedure—Unfair Discrimination and Fair and Equitable Tests." The Plan Proponents reserve the right to amend the Plan or to undertake to have the Bankruptcy Court confirm the Plan under Section 1129(b) of the Bankruptcy Code, if any impaired classes of claims or interests entitled to vote do not accept the Plan by the requisite statutory majorities required under the Bankruptcy Code.

3

In addition, if the Bankruptcy Court is unwilling to approve this Plan, the Creditors Committee reserves its right to file a motion to convert the case to a stockbroker liquidation case under Subchapter III on the basis that Sentinel qualifies as a stockbroker as defined by Section 101(53A) of the Bankruptcy Code, notwithstanding that Sentinel may not have operated as a stockbroker for non-bankruptcy law purposes.

### B.    Voting Procedures

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purposes of voting on the Plan. If you hold Claims in more than one Class, and you are entitled to vote Claims in more than one class, you will receive separate Ballots which must be used for each separate class of Claims. Under the terms of the Solicitation Procedures Order, you are required to vote all Ballots either in favor of or against the Plan. Please note and return (or, for those Creditors with access, electronically file with the Bankruptcy Court's Electronic Case Filing system) your Ballot(s) to:

Clerk of the Court, Room 710, 219 South Dearborn Street, Chicago, IL 60604.

TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE **RECEIVED** NO LATER THAN 4:00 P.M. CENTRAL TIME, ON AUGUST 1, 2008 (THE "VOTING DEADLINE").

Any Claim in an impaired Class as to which (i) an objection or request for estimation is pending or (ii) a proof of claim has not been filed and which is scheduled on the Schedules as unliquidated, disputed, or contingent, is not entitled to vote unless the Holder of such claims has obtained an order of the Bankruptcy Court temporarily allowing such claim for the purpose of voting on the Plan. For additional information on voting. See Section VII.A., "Confirmation Procedure—Solicitation of Votes."

Pursuant to the Solicitation Procedures Order, the Bankruptcy Court set June 16, 2008 as the Voting Record Date for voting on the Plan. Accordingly, only Holders of record as of June 16, 2008 that are otherwise entitled to vote under the Plan will receive a Ballot and may vote on the Plan.

If you are a Holder of a Claim entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot, or lost your Ballot, or if you have any questions concerning the Disclosure Statement, the Plan, or the procedures for voting on the Plan, please contact the Chapter 11 Trustee's counsel, Jenner & Block LLP, Christine L. Childers.

### C.    Confirmation Hearing

Pursuant to Section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on August 12, 2008 at 1:00 p.m. (Central Time) before Judge John H. Squires, Bankruptcy Judge of the Northern District of Illinois, Eastern Division, 219 S. Dearborn Chicago, IL 60604. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served so that they are received on or

4

before August 1, 2008 in the manner described below in Section VII.B., "Confirmation Procedure—The Confirmation Hearing." The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

THE PLAN PROPONENTS BELIEVE THAT THE PLAN WILL PROVIDE THE LARGEST AVAILABLE RECOVERY TO CUSTOMERS AND OTHER CREDITORS. THE PLAN PROPONENTS ALSO BELIEVE THAT ACCEPTANCE OF THE PLAN, AND MAKING THE SETTLEMENT ELECTION EMBODIED THEREIN, IS IN THE BEST INTERESTS OF CREDITORS AND THEREFORE RECOMMEND THAT ALL CREDITORS VOTE TO ACCEPT THE PLAN AND, IF APPLICABLE, THE SETTLEMENT ELECTION.

## II.

## OVERVIEW OF CHAPTER 11

Chapter 11 is one of the principal business Chapters of the Bankruptcy Code. Under Chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize or liquidate its business for the benefit of itself, its creditors and interest holders. Another goal of Chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated interest holders with respect to the distribution of a debtor's assets.

The commencement of a Chapter 11 case creates an estate that consists of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession." The Bankruptcy Code also provides that in certain situations, on request of a party-in-interest or the United States Trustee, the Bankruptcy Court can order the appointment of a Chapter 11 trustee to protect the interests of the debtor's estate, its creditors and other parties-in-interest.

The consummation of a Chapter 11 plan is the principal objective of a Chapter 11 case. A Chapter 11 plan sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan by the bankruptcy court makes the plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or interest holder of a debtor.

After a plan has been filed, certain holders of claims against or equity interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, however, Section 1125 of the Bankruptcy Code requires the plan proponent to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. The Plan Proponents are submitting this Disclosure Statement to Holders of Claims in Class 3 and Class 4 in the Debtor to satisfy the requirements of Section 1125 of the Bankruptcy Code.

## III.

## OVERVIEW OF THE PLAN

### A.    Introduction

Sentinel filed its voluntary petition to commence the Chapter 11 Case on August 17, 2007 (the "Petition Date"). Shortly thereafter, on August 29, 2007, the Bankruptcy Court ordered the appointment of the Chapter 11 Trustee who subsequently uncovered extensive breaches of fiduciary duty and wrongdoing by certain Insiders and others that are the subject of a number of pending lawsuits initiated by the SEC, certain Customers, and the Chapter 11 Trustee, as described more fully below in Section V.I. and J. As a result, Sentinel is a debtor in the Chapter 11 Case, but not a debtor-in-possession.

### B.    Summary of Distributions

Under the Plan, Claims against and Equity Interests in the Debtor are divided into Classes. Certain unclassified Claims, including Administrative Claims and Priority Tax Claims, will be paid in full in Cash once the Claims become Allowed Claims. All other Claims and Equity Interests will be divided into Classes and will receive the distributions and recoveries (if any) described in the table below.

The table (set forth below in Section III.C.) briefly summarizes the classification and treatment of Claims and Equity Interests under the Plan. The Claims estimates included therein are based upon, *inter alia*, knowledge gained from the operation and wind-down of Sentinel's business, as well as a review of Sentinel's records and proofs of claim filed by Creditors. Sentinel's Schedules as filed with the Bankruptcy Court contain outdated information which should not be relied upon in deciding whether to vote in favor of the Plan.

### C.    Summary of Classification and Treatment of Claims and Equity Interests Under the Plan[1]

| Class and Estimated Amount | Type of Claim Or Interest | Treatment | Estimated Recovery |
|---|---|---|---|
| **Unclassified** $7,000,000 | Administrative Claims | **Non-Voting**. Each Holder of an Allowed Administrative Claim will receive payment in full (in Cash). | 100% |

---

[1]    This table is only a summary of the classification and treatment of Claims and Equity Interests under the Plan. Reference should be made to this entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Equity Interests.

6

| Class and Estimated Amount | Type of Claim Or Interest | Treatment | Estimated Recovery |
|---|---|---|---|
| **Unclassified** $0 | Priority Tax Claims | **Non-Voting.** Each Holder of an Allowed Priority Tax Claim will receive payment in full (in Cash). | 100% |
| **Class 1** $0 | Other Priority Claims | **Unimpaired, Non-Voting.** Each Holder of an Allowed Other Priority Claim will receive payment in full (in Cash). | 100% |
| **Class 2** *Estimated Amount: $312,247,000* (BONY Claim is Disputed, however, BONY also asserts interest accruing thereon since the Petition Date and continuing postpetition fees and expenses) | Secured Claims | **Unimpaired, Non-Voting (subject to a Bankruptcy Court finding that a Holder has had its legal rights altered sufficiently to impair its Claim).** Each Holder of an Allowed Secured Claim will receive Cash or Collateral securing its Allowed Secured Claim in an amount equal to such Allowed Secured Claim. | 100% |
| **Class 3** *Estimated Amount: $1,220,320,123* (Holders of Class 3 | Customer Claims (All Claims arising from Customer deposits with Sentinel) | **Impaired, Voting.** Holders of Allowed Class 3 Customer Claims will be entitled to a Pro Rata distribution of Customer Property (property received, acquired, or held by or for, or which should have been held | 35%+[2] |

---

[2]     Estimated recovery on account of Class 3 Customer Claims does not include Citadel Sale Distributions and SEG 1 Special Distributions to the extent received. Further recoveries for Holders of Class 3 Customer Claims in receipt of Citadel Sale Distributions and SEG 1 Special Distributions are entirely contingent upon Causes of Action.

| Class and Estimated Amount | Type of Claim Or Interest | Treatment | Estimated Recovery |
|---|---|---|---|
| Customer Claims are estimated to consist of: $738,964,040 in Claims held by NonCitadel-Beneficiary Customers and $481,356,083 in Claims held by Citadel-Beneficiary Customers (of which approximately $53,677,776 are arising out of participation in SEG 2, SEG 3 or SEG 4) | | by or for, Customers). No distributions will be made to Citadel-Beneficiary Customers until all other Customers receive the same Percentage Recovery distributions as the Citadel-Beneficiary Customers, including Interest as provided for in the Plan. If such Customers do not receive the same Percentage Recovery distributions, Citadel-Beneficiary Customers that elect to enter into the settlement embodied in the Plan will be obligated to repay their True-up Amounts if NonCitadel-Beneficiary Customers do not otherwise receive distributions equivalent to the Release Distribution Threshold. Citadel-Beneficiary Customers who do not elect to enter into the settlement may face suit for avoidance of the Citadel Sale Distributions and the SEG 1 Special Distributions. | |
| **Class 4** *Estimated Amount:* *$10,000,000* (plus deficiency claims on account of Class 3 Customer Claims and unsecured non-subordinated | General Unsecured Claims (all unsecured Claims against Sentinel other than Claims otherwise defined in the Plan.) | **Impaired, Voting.** Holders of Allowed General Unsecured Claims will be entitled to a Pro Rata distribution of Cash and Cash proceeds of all Property not allocated for payment of Allowed Claims in other Classes, provided, however, that subject to Section 10.10 of the Plan, no distributions will be made to Citadel-Beneficiary Customers until all other Customers receive the same | Entirely contingent on the value of assets and Causes of Action that do not constitute Customer Property. |

| Class and Estimated Amount | Type of Claim Or Interest | Treatment | Estimated Recovery |
|---|---|---|---|
| claims of BONY) | | Percentage Recovery distributions as the Citadel-Beneficiary Customers including Interest as provided for in the Plan. | |
| **Class 5**<br><br>*Estimated Amount: $6,088,895* (plus BONY claim, subject to equitable subordination action filed by Chapter 11 Trustee) | Subordinated Claims | **Impaired, Non-Voting.** Subordinated Claims will receive no distributions on account of such Claims and are deemed to reject the Plan. | 0% |
| **Class 6**<br><br>*100% Equity Interests owned by Sentinel Investment Group, Inc.* | Equity Interests | **Impaired, Non-Voting.** Holders of Equity Interests will receive no distributions on account of such Equity Interests and are deemed to reject the Plan. | 0% |

**IV.**

## HISTORICAL AND BACKGROUND INFORMATION

### A.    The Debtor

Sentinel is an Illinois corporation, headquartered in Northbrook, Illinois. Prior to commencing the Chapter 11 Case, Sentinel was registered with (i) the SEC, as an investment adviser under the Investment Advisers Act of 1940 (the "Advisers Act"), and (ii) the CFTC, as a futures commission merchant ("FCM") under the Commodity Exchange Act (7 U.S.C. § 1 et seq., the "CEA").  It was also a member of the National Futures Association, a self-regulatory organization.

### B.    The Business

Sentinel managed investments of short-term cash for various customers, including FCMs, hedge funds, financial institutions, pension funds and individuals.

Sentinel was registered as an FCM with the CFTC so that it could accept and invest cash constituting customer property of other FCMs. As a registered FCM, the Plan Proponents assert that Sentinel was subject to the CFTC regulations governing the segregation and investment of customer funds and the pledging of customer funds as collateral for bank loans. BONY challenges this position and asserts that the CEA (and consequently the related CFTC rules) did not apply to Sentinel.

Sentinel offered investors the opportunity to participate in a variety of investment programs with specified investment parameters, including high-grade, liquid securities such that Sentinel could return its customers' cash upon demand. Sentinel entered into agreements with each of its investing customers (the "Investment Agreements") which governed the terms of the relationship. The Investment Agreements provided Sentinel with limited discretionary authority within specific investment parameters to buy and sell securities without requesting additional authority from its customers before executing trades on its customers' behalf.

While BONY disagrees, the Plan Proponents assert that CFTC regulations and Rule 206(4)-2 of the Advisers Act required Sentinel to deposit the funds it received from customers into segregated custodial accounts (the "Segregated Accounts"). Accordingly, Sentinel represented to its customers that it deposited its customers' assets in segregated custodial accounts at BONY. Sentinel represented that it would pool the assets of similar types of customers in one of four Segregated Accounts maintained at BONY based on the investment program in which a particular customer elected to participate. The Segregated Accounts were referred to as "SEG 1," "SEG 2," "SEG 3," and "SEG 4."

Sentinel represented to its customers that investments in the SEG 1 Segregated Account would contain only funds and property of customers of registered commodity brokers and FCMs. While BONY disagrees, the Plan Proponents assert that Sentinel was subject to the CEA and the rules and regulations promulgated thereunder by the CFTC, including the strict investment standards embodied in CFTC Rule 1.25, 17 C.F.R. § 1.25, which enumerates the permitted investments for customer funds under the CEA.

Sentinel also represented that investments in the SEG 2 Segregated Account were limited to the funds and property of FCM customers that were engaged in trading on foreign exchanges. Pursuant to the Investment Agreements, Sentinel agreed to invest funds deposited in SEG 2 in accordance with CFTC Rule 30.7, 17 C.F.R. § 30.7, which imposes restrictions on the investment of customer funds similar to those in CFTC Rule 1.25.

Sentinel represented to its customers that investments in the SEG 3 Segregated Account would contain assets of all other types of customers, including hedge funds, house funds of FCMs, trust accounts, endowments and individuals. Certain investors participating in SEG 3 elected that their funds be invested in accordance with the investment standards of CFTC Rule 1.25. Approximately 75% of Customers (by

10

dollar amount) participating in SEG 3 elected to invest their funds in accordance with the investment standards of CFTC Rule 1.25.

Finally, Sentinel represented that it maintained the SEG 4 Segregated Account on behalf of customers whose property was denominated in Euros.

Sentinel also owned a "House" or "Street" portfolio of securities traded by Sentinel for the ultimate benefit of certain Sentinel insiders (the "House Account").

In the Investment Agreements between Sentinel and its Customers, among other places, Sentinel represented to its Customers that all funds deposited by both its FCM Customers and its other Customers would be kept in separate, segregated accounts in strict accordance with the rules and regulations of the CFTC and the SEC, and that such Customer funds would be protected from commingling with funds of Sentinel, other Customers of Sentinel, or other creditors.

Customers were unaware, as discovered after the commencement of the Chapter 11 Case, that instead of strictly segregating Customer funds and property, certain Sentinel insiders misused Customer funds for improper and unlawful purposes. As a result of the forensic examination undertaken by the Chapter 11 Trustee and his professionals of Sentinel's activities, books, and records, the Plan Proponents believe that beginning no later than 2004, virtually all Customer funds were misused and diverted from the very first day they were deposited by Customers with Sentinel. When Customers deposited funds with Sentinel, the Chapter 11 Trustee believes, based upon forensic work completed by him and his retained professionals, that instead of segregating those funds and/or purchasing securities segregated for the benefit of a particular SEG, certain Sentinel insiders caused substantially all Customer deposits to be swept to an unsegregated loan and clearing account at BONY, where they were used to reduce and applied against Sentinel's obligations to BONY (the "BONY Loan"). Although those insiders then would purport to allocate interests in securities to specific customer SEGs and accounts, and would cause daily statements to be generated reporting ownership of an interest in those securities to Customers, as a result of the forensic examination undertaken by the Chapter 11 Trustee and his professionals, the Plan Proponents believe that in reality the securities were allocated to Customers without regard to whether the Securities actually were segregated for the benefit of the Customers, and oftentimes the securities already had been pledged to BONY as collateral for the BONY Loan. Moreover, as a result of the forensic examination undertaken by the Chapter 11 Trustee and his professionals, the Plan Proponents believe that both the cost basis and interest rates relating to securities reported on Customer statements were frequently fictitious. The Chapter 11 Trustee asserts that, based upon forensic work completed by him and his retained professionals, interest from all Customer and House securities (segregated or not, repo'd or owned) was pooled and then applied first to pay interest on the BONY Loan, then to pay certain fees, and then to meet arbitrarily determined "return" targets for each customer group. Thus, as a result of the forensic examination undertaken by the Chapter 11 Trustee and his professionals, the Plan Proponents believe that each and every day, certain Sentinel insiders used the returns on

securities in one SEG group to subsidize income allocations made to other SEG groups or to the House and/or to pay interest on the BONY Loan.

Based upon forensic work completed by him and his retained professionals, the Chapter 11 Trustee asserts that, prior to the Petition Date, Sentinel's Customers and the regulatory authorities were unaware of the pooling, commingling, and misuse of funds and securities that were supposed to be segregated for the benefit of Customers because the Customer Account Statements and regulatory filings reported that Customer assets were segregated in accordance with Sentinel's initial representations to its customers. The activities of certain insiders, as well as the role of BONY as custodian for the Segregated Accounts and McGladrey & Pullen LLP as auditors, are the subject of various lawsuits initiated by the Chapter 11 Trustee as described in more detail in Section V.I.

The Trustee has not provided Customers access to all of the forensic work undertaken by the Trustee and his retained professionals. A group of Citadel-Beneficiary Customers dispute the Chapter 11 Trustee's conclusions about the extent of the pooling, commingling, misuse, and diversion of property held by Sentinel in segregation for SEG 1 Customers and dispute that any pooling, commingling, misuse, or diversion defeats their ownership of the Citadel Sale Distributions, the SEG 1 Special Distributions, and property still held in segregated SEG 1 accounts by the Chapter 11 Trustee.

## C.    Events Leading to Chapter 11 Filing

Beginning in 2003, certain Sentinel insiders began purchasing large volumes of securities that were not segregated for customers and that did not appear on customers statements. Typically, these transactions involved the purchase of securities either using the BONY Loan or the funds received from a repurchase or "repo" counterparty.

In its repo transactions, Sentinel typically would deliver the security to its counterparty, who would in turn "loan" a percentage of the value of the security to Sentinel. As part of the agreement, Sentinel was obligated to repurchase the security for the amount it received plus interest. The percentage of the security's value that the repo counterparty would not finance is referred to as the repo "haircut." Sentinel used the BONY Loan to cover the amount of the repo "haircut." As the BONY Loan grew, certain Sentinel insiders began collateralizing it with securities that the Plan Proponents assert were supposed to be segregated for Sentinel's SEG customers.

As of December 31, 2006, certain Sentinel insiders had caused Sentinel to obtain control of over $2 billion of securities in this manner – i.e., with none of its own equity. In addition to the over $2 billion in repurchase obligations to repo counterparties, the BONY Loan had also grown to over $230 million as of December 31, 2006.

During this time, Sentinel only had a few million dollars in net capital, and in actuality appears to have had a net capital deficiency as a result of the conduct of certain insiders. The combined growth of the BONY Loan and Sentinel's large repo

positions, in conjunction with the segregation failures and net capital deficiencies, created a material risk of huge losses – risks that ultimately came to fruition and led to Sentinel's demise.

In mid-2007, many of Sentinel's counterparties under the repo agreements began making margin calls and/or terminating the repo agreements. For example, in May 2007, Fimat, one of Sentinel's major repo counterparties, closed out a number of repo transactions and returned more than $100 million (face value) in securities to Sentinel. In response, to avoid defaulting on the repo agreements and because Sentinel could not meet its repo obligations in any other way, certain Sentinel insiders caused Sentinel to borrow an additional $94 million from BONY, increasing the BONY Loan balance to more than $353 million.

To secure the increased BONY Loan, the Plan Proponents believe that Sentinel insiders and BONY moved large blocks of government securities from both SEG 1 and SEG 3 with a face value of almost $87 million into the BONY collateral account.

Throughout June and July 2007, more repo counterparties refused to roll forward repo transactions and either returned securities to Sentinel that were the subject of repo agreements, or increased the applicable repo "haircuts." As a result, Sentinel continued borrowing money from BONY to meet its repo obligations, and the outstanding loan balance ballooned at times to in excess of $500 million. To collateralize the additional loan amounts, the Plan Proponents believe that the Sentinel insiders and BONY continued to transfer securities from the various SEG accounts to the BONY collateral account.

Sentinel's severe financial stress continued through the end of July and into August as it was unable to simultaneously reduce its loan balance with BONY, sell the higher-risk securities that had been returned by repo counterparties, and meet its redemption obligations to Customers who wanted to withdraw funds.

In the end, Sentinel's liabilities to BONY, repo counterparties, and Customers, coupled with its thin capital and the fact that many of the securities that had been returned by repo counterparties were highly illiquid, led to Sentinel's demise.

### D.    Sentinel's Collapse

On August 13, 2007, (Eric Bloom, the President and Chief Executive Officer of Sentinel) sent a letter to Sentinel's Customers representing that because of the pending liquidity crisis in the credit markets, Sentinel was halting redemptions out of a concern that it would not be able to meet significant redemption requests without resorting to discount sales that would cause unnecessary losses to its Customers. This resulted in immediate demands for redemption by numerous Customers, as well as the declaration of defaults and close out at unfavorable prices of more than $2 billion in repo transactions.

As a result of the forensic examination undertaken by the Chapter 11 Trustee and his professionals, the Plan Proponents believe that on or about the same date, certain Sentinel insiders caused the entire cash balance maintained in the SEG 3 cash account, roughly $112 million, to be transferred to a SEG 1 cash account. The Chapter 11 Trustee's investigation has revealed to the Plan Proponents that roughly $90 million of that amount was used on August 15, 2007 to redeem and pay off in full four SEG 1 Customer accounts. The Chapter 11 Trustee's investigation has revealed to the Plan Proponents that the other $22 million was used to effectuate the SEG 1 Special Distribution (described below).

On August 16, 2007, on the eve of the Petition Date, Sentinel entered into an agreement with Citadel to sell, assign and transfer assets purportedly held for the benefit of the SEG 1 Customers (the "Citadel Transaction"). The aggregate notional value of the securities to be sold was approximately $384 million with an estimated market value of $367 million, including accrued interest (the "Citadel Securities"). From this, Citadel deducted a discount of $47.1 million (under the agreement, Citadel was only supposed to deduct $44.9 million), and the final sales price paid to Sentinel was approximately $320.5 million (the "Citadel Proceeds"). The Citadel Securities were transferred to Citadel on August 16 and 17, 2008. Approximately $302 million of the Citadel Proceeds were transferred to the SEG 1 account maintained at BONY. $16.2 million in proceeds were transferred to a Euroclear account, which BONY asserts is not an account segregated for the benefit of Customers, where those funds remain. The balance attributable to the Citadel Securities sale (roughly $1.2 million in accrued interest attributable to the securities) was not transferred to a SEG account, and instead was used to reduce the BONY Loan balance.

On August 17, 2007, Sentinel effectuated a Cash distribution in the aggregate amount of $22,524,942 to the Citadel-Beneficiary Customers (the "SEG 1 Special Distribution"), which was represented to Customers to be an initial distribution of Citadel Proceeds. According to the Chapter 11 Trustee's investigation, however, it appears that this $22.5 million transfer was a transfer of the balance of the proceeds of the bulk transfer of $112 million from the SEG 3 account to the SEG 1 account on August 14, 2007, as described above.

On August 16 and 17, 2007, several Customers sued Sentinel and sought and obtained temporary restraining orders from the District Court of the Northern District of Illinois, *Farr Financial, Inc.* v. *Sentinel Management Group, Inc.*, Case No. 07 C 4614 (N.D. Ill. Aug. 17, 2007), prohibiting transfers or securities purportedly segregated for their benefit. On the afternoon of August 17, the NFA issued a Member Responsibility Action prohibiting Sentinel from selling, transferring, encumbering or otherwise disposing of any SEG 3 or House securities. That evening, Sentinel filed for bankruptcy protection.

## V.

## THE CHAPTER 11 CASE

On August 17, 2007 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

### A.    Significant "First Day" Motions During the Chapter 11 Case

During the first few days of the Chapter 11 Case, the Debtor filed emergency motions to address its immediate operating needs and concerns about liquidity in the commodities markets.  The Bankruptcy Court subsequently granted such relief by the entry of orders, as more fully described below.

### 1.    The Citadel Distribution

On August 20, 2007, the first business day after the Petition Date, the Debtor filed an emergency motion (the "Distribution Motion") to compel the distribution of the Citadel Proceeds to the Citadel-Beneficiary Customers.  A hearing on the Distribution Motion was held that same day (the "Distribution Hearing").  By the Distribution Motion, the Debtor sought an order requiring BONY to turnover the Citadel Proceeds and distribute such proceeds to the Citadel-Beneficiary Customers.  The Bankruptcy Court entered an order dated August 20, 2007 in connection with the effectuation of the Citadel Distribution (less a $15.6 million holdback amount pending further order of the Bankruptcy Court) to the Citadel-Beneficiary Customers.  There is dispute among Creditors concerning the intent and effect of the Bankruptcy Court's August 20, 2007 order and certain Creditors take the position that the Bankruptcy Court in fact "authorized" the distribution to the Citadel-Beneficiary Customers.  On or about August 21, 2007, pursuant to the August 20, 2007 order, BONY distributed roughly $297 million in Citadel Proceeds (the "Citadel Distribution") to the Citadel-Beneficiary Customers.

Also on August 20, 2007, Judge Kennelly of the United States District Court for the Northern District of Illinois held a hearing related to the distribution of the Citadel Proceeds to the Citadel-Beneficiary Customers.  The parties were before Judge Kennelly on the SEC's Complaint against Sentinel and related motion for emergency relief (the "Emergency Motion") seeking (a) to restrain Sentinel from engaging in any transactions that violate Federal securities laws, (b) for an accounting of all funds received by Sentinel from its clients, (c) to prohibit the destruction of documents by Sentinel, and (d) an order expediting discovery.

With respect to (a) above, the SEC sought an order precluding Sentinel from distributing (through BONY) the Citadel Proceeds to the Citadel-Beneficiary Customers.  After considering arguments and the evidence submitted, the District Court refused to prohibit the distribution of the Citadel Proceeds to the Citadel-Beneficiary Customers.  The District Court, however, did enter an emergency order granting the Emergency Motion with respect to (b), (c) and (d) outlined above.

### 2.     The Chapter 11 Trustee

On August 21, 2007, the Debtor filed an emergency motion to appoint a Chapter 11 trustee in the Chapter 11 Case after the SEC initiated litigation against the Debtor as described in Section V.J. below.  On August 23, 2007, the Bankruptcy Court ordered the appointment of a Chapter 11 trustee.  Shortly thereafter, on August 29, 2007, Frederick J. Grede was appointed as the Chapter 11 Trustee for the Estate by the United States Trustee and the appointment was approved by the Bankruptcy Court.

In the weeks following his appointment, the Chapter 11 Trustee filed various motions seeking orders from the Bankruptcy Court to authorize his retention of professionals, including Jenner & Block LLP as counsel, Navigant Consulting, Inc. as financial advisor and forensic accountants, and Macquarie Securities (USA) Inc. as investment advisor.

### B.     Official Committee of Unsecured Creditors

On September 6, 2007, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Creditors Committee") in the Chapter 11 Case.

The Creditors Committee is currently comprised of BC Capital Fund A, LLC, Discus Master Ltd., JEM Commodity Relative Value Fund LP, Jump Trading, LLC, Rotchford Barker, Kottke Associates LLC, Penson GHCO, and Vision Financial Markets LLC.  The Creditors Committee is represented by the law firms of Quinn Emanuel Urquhart Oliver & Hedges, LLP and DLA Piper US LLP pursuant to orders of the Bankruptcy Court.  BC Capital Fund A, LLC, Discus Master Ltd., JEM Commodity Relative Value Fund LP, Jump Trading, LLC, and Rotchford Barker are all Customers who participated in SEG 3 while Kottke Associates LLC, Penson GHCO, and Vision Financial Markets LLC are all Customers who participated primarily in SEG 1.

### C.     Schedules and Statement of Financial Affairs

On September 14, 2007, the Debtor filed its schedules of assets and liabilities and statement of financial affairs; certain amendments were subsequently filed.

### D.     Bar Date for Filing Proofs of Claim

On December 27, 2007, the Chapter 11 Trustee filed a motion seeking entry of an order (the "Bar Date Order") from the Bankruptcy Court requiring any person or entity holding or asserting a Claim against the Debtor to file a written proof of claim with the Bankruptcy Court on or before March 14, 2008.  On January 7, 2008, the Bankruptcy Court entered the Bar Date Order and established March 14, 2008 as the Bar Date for all Claims, including Claims asserted by governmental units.  Under the Bar Date Order, Persons or Entities whose Claims arise out of the rejection of an executory contract or unexpired lease will file a proof of claim on or before the later of (a) the date set by the Court in the Order authorizing the rejection of such contract or lease; or (b) the general Bar Date.

### E.    Turnover of Customer Property

On October 16, 2007, the Chapter 11 Trustee filed a motion with the Bankruptcy Court to approve a stipulation between the Chapter 11 Trustee and BONY pursuant to which BONY agreed to turn over to the Chapter 11 Trustee certain cash and securities held by BONY in the Segregated Accounts for the benefit of Sentinel's Customers, or proceeds thereof, in which BONY did not assert any claim or lien. On October 18, 2007, the Bankruptcy Court entered an order approving this stipulation (the "Turnover Order"). Pursuant to the Turnover Order, BONY has transferred the property contained in the Segregated Accounts to restricted accounts (the "JPM Accounts") opened by the Chapter 11 Trustee at JPMorgan Chase Bank, N.A. Certain other securities continue to be held in accounts at BONY (the "BONY Accounts") over which BONY asserts a continuing lien and security interest to secure the BONY Loans.

### F.    Liquidation of Securities Portfolio

On December 10, 2007, the Chapter 11 Trustee filed a motion with the Bankruptcy Court to approve a stipulation entered into by the Chapter 11 Trustee, the Creditors Committee, and BONY. The stipulation authorized the Chapter 11 Trustee to liquidate the securities contained in both the JPM Accounts and the BONY Accounts, with the assistance of the Chapter 11 Trustee's investment advisor, Macquarie Securities (USA) Inc., in order to fix the value of the Estate and minimize the effect of further market turbulence by way of an orderly liquidation process. On December 13, 2007, the Bankruptcy Court entered an order approving this stipulation.

Subsequently, on February 25, 2008, the Creditors Committee filed a motion seeking court approval of the retention of Vincent Butkiewicz as their financial consultant to assist in the liquidation of the Estate's securities. The Court entered an order on March 6, 2008, approving Mr. Butkiewicz's retention.

As of May 31, 2008, the Chapter 11 Trustee had liquidated a substantial portion of the securities portfolio, and had realized approximately $415 million from that liquidation, a material portion of which is held at BONY subject to its purported liens. Securities with a face value exceeding $300 million remain to be liquidated. The Chapter 11 Trustee believes that the aggregate market value of these remaining securities is difficult to determine at this time and that such securities could be sold for substantially less than the face value of the securities.

### G.    Claims Analysis

Since his appointment, the Chapter 11 Trustee has engaged in a review and analysis of the Claims to reconcile the amount of outstanding Claims, and identify existing or potential claim disputes. However, because the Bar Date has only recently passed, the claims analysis process is in its preliminary stages.

### H.    Causes of Action and Avoidance Claims

The Chapter 11 Trustee and the Creditors Committee are investigating whether any meritorious Causes of Action exist for the recovery of preferential or fraudulent transfers or other actions commenced pursuant to the avoiding powers of the Bankruptcy Code, including Sections 544 through 551 of the Bankruptcy Code (collectively, the "Avoidance Actions").  The potential Avoidance Actions being investigated by the Chapter 11 Trustee include, but are not limited to, potential claims against certain customers who received partial or full redemptions of their accounts prior to the Petition Date.  The investigation regarding the Avoidance Actions is ongoing, and the fact that a complaint or demand has not yet been made with respect to any particular transfer or transaction is not and must not be deemed to be any admission, concession, or other evidence that a meritorious cause of action does not exist.

As is to be expected with all litigation, any attempt by the Chapter 11 Trustee or the Estate to file Avoidance Actions against Citadel-Beneficiary Customers who choose to not become Electing Holders would likely be met with significant defenses.  Among other things, the Citadel-Beneficiary Customers would likely argue that (a) the Citadel Sale Distributions and the SEG 1 Special Distributions were not transfers of property of the Estate and, therefore, are not avoidable by the Chapter 11 Trustee; and (b) the Citadel Sale Distributions are not recoverable under section 549 of the Bankruptcy Code because they were "authorized" by the Bankruptcy Court and Judge Kennelly.  With respect to other Avoidance Actions concerning transfers made prior to the "no redemption" letter issued on August 13, 2007, recipients of such potentially preferential transfers would likely assert "ordinary course of business" defenses under section 547(c)(2) of the Bankruptcy Code.

In addition, the Chapter 11 Trustee is investigating additional potential claims and causes of action that may be brought on behalf of the Debtor's estate.  The potential claims and causes being investigated by the Chapter 11 Trustee include, but are not limited to: (i) potential claims against Citadel relating to the purchase price paid by Citadel for the Citadel Securities, which the Chapter 11 Trustee believes to have been inadequate; (ii) potential claims against certain repo counterparties arising from the manner in which repo securities were liquidated and the proceeds used to satisfy the Debtor's obligations under repo agreements; and (iii) potential claims against sellers of securities to Sentinel.  The Chapter 11 Trustee's investigation regarding potential claims and causes of action is ongoing, and the fact that a complaint or demand has not yet been made with respect to any particular transfer or transaction, or the fact that a potential claim is not listed in the preceding sentence, is not and must not be deemed to be any admission, concession, or other evidence that a meritorious cause of action does not exist.

In the event the proposed Plan is confirmed, on the Plan's Effective Date, the Liquidation Trustee, in consultation with the Liquidation Trust Committee, will take over the investigation and prosecution of any litigation.  As provided for in the Plan, the Liquidation Trustee may consider a Claim held by any recipient of such preferential or fraudulent transfer Disputed, in his sole discretion, prior to the expiration of the deadline

18

to object to, or seek subordination of, such Claim or Equity Interest under the Plan, unless otherwise ordered by the Court.

I.     **Adversary Proceedings**

1.     **Insider Complaint (*Grede v. Bloom*, Adv. Pro. 07-00981 (Bankr. N.D. Ill. Oct. 11, 2007))**

On October 11, 2007, the Chapter 11 Trustee filed a complaint (the "Insider Complaint") in the Bankruptcy Court, commencing an adversary proceeding against Philip Bloom, the Chairman of the Board of Directors of Sentinel; Eric Bloom, the President and Chief Executive Officer of Sentinel, a director, and shareholder; and Charles Mosley, a director of Sentinel, its Senior Vice President, and head trader (collectively, the "Defendant Insiders") and related companies, trusts and investment vehicles under their control which the Chapter 11 Trustee asserts they used to funnel away profits unlawfully from Sentinel. The Insider Complaint alleges that the Defendant Insiders engaged in extensive breaches of fiduciary duty and wrongdoing against Sentinel and its Customers. As set forth in the Insider Complaint, despite representations that Sentinel would invest client property in securities of a low-risk, highly-liquid nature, observing requirements that client funds be segregated from any non-client funds or between other segregated customer portfolios, the Defendant Insiders utilized a risky leveraged trading strategy and commingled and misused client funds for their own financial gain, employing a pattern of deception and lies.

On October 25, 2007, the Bankruptcy Court entered an order granting the Chapter 11 Trustee's motion for preliminary injunction restraining the disposition of certain assets held by or for the benefit of the Defendant Insiders pending the litigation of the claims against the Defendant Insiders. The Defendant Insiders filed motions to dismiss the Insider Complaint, and the Chapter 11 Trustee filed a response. On February 28, 2008 the Bankruptcy Court entered orders denying the motions, granting leave to the Defendant Insiders to answer the Insider Complaint by March 31, 2008. Pursuant to subsequent order of the Bankruptcy Court, the deadline by which the Defendant Insiders must answer the Insider Complaint was further extended.

On June 9, 2008, the Bankruptcy Court approved a settlement (the "Settlement") by and among the Chapter 11 Trustee and Philip M. Bloom, the Philip M. Bloom Revocable Trust, the Sybil Bloom Revocable Trust, the Philip Bloom Remainder Trust, the Philip M. Bloom Grantor Annuity Trust, Eric A. Bloom, Sentinel Investment Group, Inc., Sentinel Financial Services, Inc., Sentinel Management International, Ltd., Fountainhead Investments, Inc., EB Trust 2005 and Eric A. Bloom Living Trust (the "Settling Defendant Insiders"). Under the Settlement, the Settling Defendant Insiders are to pay to the Estate essentially all of their assets, other than assets which they assert are exempt under applicable state or federal law, and the Trustee has agreed to settle all claims between the Debtor's estate and the Settling Defendant Insiders. Under the Settlement, the Settling Defendant Insiders would (a) pay to the Trustee Ten Million Seven Hundred Thousand Dollars ($10,700,000.00) (the "Settlement Payment"), inclusive of amounts held in escrow pursuant to order of the Court; (b) stipulate to the

19

disallowance of any claims filed by the Settling Defendant Insiders against the Estate; (c) agree not to challenge bankruptcy proceedings by or against Sentinel Investment Group ("SIG"), the Debtor's parent company, and waive all claims or rights to any tax refund due to SIG; and (d) release all of their claims against the Debtor, its estate and the Trustee. In exchange, under the Settlement the Trustee would release on behalf of himself and the Debtor's estate all claims against Philip M. Bloom, the Philip M. Bloom Revocable Trust, the Sybil Bloom Revocable Trust, the Philip Bloom Remainder Trust, the Philip M. Bloom Grantor Annuity Trust, Eric A. Bloom, Fountainhead Investments, Inc., EB Trust 2005, Sentinel Financial Services, Inc. and Eric A. Bloom Living Trust, as well as any claims against Sybil Bloom (Philip M. Bloom's spouse) (the "Estate Releasees"). In addition, as a condition precedent to settlement, the Trustee has obtained a contribution bar order permanently barring, enjoining, and restraining third parties from commencing, prosecuting, or asserting any request, claim, or cause of action for or otherwise seeking contribution or common law indemnification, however denominated, against any of the Estate Releasees based upon, relating to, or arising out of (i) any claims asserted or judgments obtained against the third parties by the Trustee or the estate, or amounts actually paid by the third Parties to the Trustee or the estate based on such claims or judgments, whether by settlement or otherwise, and/or (ii) the costs of defending against claims, causes of action, demands, or requests asserted or made by the Trustee; the contribution bar order provides for a *pro tanto* reduction, by the amount of the Settlement Payment, of any monetary award or judgment obtained by the Trustee from or against any third party for the same injuries alleged in the Insider Complaint, for which contribution or common law indemnification is available from the Settling Defendant Insiders. The Trustee also has obtained a court order permanently barring, enjoining, and restraining all Creditors of the estate from commencing, prosecuting, or asserting any estate claims released by the Trustee, and has agreed to take certain actions with respect to any pending or future lawsuits asserting claims against the Estate Releasees.

The Settlement does not apply to Defendant Insider Charles Mosley, and the date by which he must answer the Insider Complaint has been extended until June 16, 2008.

## 2.    BONY Adversary Proceedings

On March 3, 2008, the Chapter 11 Trustee filed a complaint (the "BONY Complaint"), *Grede v. The Bank of New York*, Adv. Pro. 08-00127 (Bankr. N.D. Ill. March 3, 2008), in the Bankruptcy Court, alleging that BONY engaged in misconduct in each of its three roles in relation to Sentinel that led to the collapse of Sentinel's business: custodian of securities on behalf of Sentinel and its Customers, clearing agent for Sentinel's securities transactions, and lender to Sentinel. Specifically, the BONY Complaint alleges that (i) BONY established a fundamentally flawed account structure for Sentinel's accounts which commingled Customer assets that should have been segregated and pledged Customer assets as security for BONY's loan to Sentinel in violation of its obligations under federal law and its duties to Sentinel; (ii) BONY aided and abetted breaches of fiduciary duty committed by certain Defendant Insiders; (iii) BONY knowingly accepted fraudulent and preferential transfers as part of the

Defendant Insiders' scheme; and (iv) BONY engaged in inequitable conduct.  BONY filed a motion extending its time to respond to the BONY Complaint.

Three days prior to the Chapter 11 Trustee's filing of the BONY Complaint, on February 28, 2008, BONY filed a complaint (the "Declaratory Judgment Complaint"), *The Bank of New York v. Grede*, Adv. Pro. 08-00119 (Bankr. N.D. Ill. February 28, 2008), against the Chapter 11 Trustee seeking a declaratory judgment that BONY has a valid, first-priority, perfected security interest in and lien upon the cash and securities held in certain accounts established and maintained for Sentinel by BONY, which secure loans and other extensions of credit to Sentinel by BONY.  On March 14, 2008 the Chapter 11 Trustee filed a motion to dismiss the Declaratory Judgment Complaint, asserting that BONY had filed the Declaratory Judgment Complaint as an anticipatory suit that served no legitimate purpose as the BONY Complaint is a substantive suit that encompasses all of the issues in dispute between the parties.  On April 22, 2008, the Bankruptcy Court, after holding a hearing on the matter, entered an order dismissing the Declaratory Judgment Complaint.

On May 2, 2008, BONY filed (i) a motion to dismiss the BONY Complaint and (ii) a motion to withdraw the reference.  The Chapter 11 Trustee's response to BONY's motion to dismiss was filed on May 23, 2008 and BONY's reply was filed on June 6, 2008.

BONY's motion to dismiss sought dismissal of the BONY Complaint based on, among other things, the CEA's and CFTC rules' alleged inapplicability to Sentinel and BONY, the CEA's and the Investment Adviser Act's lack of private rights of action, BONY's assertion that BONY's conduct was not the cause of Sentinel's customers' losses, the protections that Article 8 of the Uniform Commercial Code BONY asserts it is afforded, and BONY's position that the Chapter 11 Trustee is barred from asserting an aiding and abetting claim against a third-party in instances where the alleged conduct was done with the cooperation of certain of Sentinel's management.  In addition, BONY asserts that each of the Chapter 11 Trustee's claims should be dismissed for failure to state a claim upon which relief may be granted.  On June 10, 2008, the Bankruptcy Court denied BONY's motion to dismiss the BONY Complaint.

BONY's motion to withdraw the reference has been assigned to the Honorable James B. Zagel, and no briefing schedule on that motion has been set by the Court or agreed to by the parties.  The Chapter 11 Trustee opposes withdrawal of the reference.

On May 16, 2008, the Chapter 11 Trustee filed a motion to have this case reassigned from Judge Zagel to Judge Kocoras, before whom the SEC action against Sentinel (See Section J. below) is pending.  On May 28, 2008, Judge Kocoras denied the motion to reassign without prejudice, pending Judge Zagel's ruling on BONY's motion to withdraw the reference.

The Chapter 11 Trustee is claiming damages in excess of $500 million in the BONY Complaint.  The pending BONY adversary proceeding is in its initial stages and the ultimate relief and recovery, if any, for the Estate is unknown at the present time.

3.  **M&P Complaint (*Grede v. McGladrey & Pullen LLP*, Adv. Pro. 08-00167 (Bankr. N.D. Ill. March 20, 2008))**

On March 20, 2008, the Chapter 11 Trustee filed a complaint (the "M&P Complaint") in the Bankruptcy Court, commencing an adversary proceeding against McGladrey & Pullen LLP ("M&P") and G. Victor Johnson, one of M&P's partners.  M&P or its predecessors served as Sentinel's independent auditors for several years, and audited Sentinel's financial statements for the year ended December 31, 2006 (the "2006 Audit").

The M&P Complaint alleges that M&P's 2006 Audit failed to satisfy the most basic standards of accounting and auditing, ignored blatant violations of federal law being committed by the Defendant Insiders, and failed to fulfill its legal duty to report such violations to Sentinel's regulators.  In addition, the M&P Complaint alleges that M&P issued an unqualified audit opinion that Sentinel's financial statements fairly presented its financial condition, when it knew that those statements materially misstated the facts and obfuscated violations of federal regulations critical to the protection of Sentinel's investors.  The M&P Complaint also alleges that M&P and Johnson aided and abetted breaches of fiduciary duty committed by certain Defendant Insiders.

On April 16, 2008, M&P and Johnson filed a motion to withdraw the reference to the Bankruptcy Court, seeking to have the case adjudicated by the District Court for the Northern District of Illinois.  The motion to withdraw the reference was assigned to the Honorable James B. Zagel.  The Chapter 11 Trustee filed his response to M&P and Johnson's motion to withdraw the reference on May 29, 2008.  Judge Zagel has set a hearing on that motion for July 23, 2008.  The Chapter 11 Trustee opposes withdrawal of the reference at this time.

In order to promote judicial economy and preserve the resources of the estate, the Chapter 11 Trustee has moved to have this case reassigned from Judge Zagel to Judge Kocoras, before whom the SEC action against Sentinel (See Section J. below) is pending.  The CFTC has also filed a complaint against Sentinel, Eric Bloom, and Charles Mosley (See Section J. below), and has moved to have its case reassigned to Judge Kocoras as well.  Briefing on the Chapter 11 Trustee's and CFTC's motions for reassignment to Judge Kocoras is complete.

On May 21, 2008, M&P and Johnson filed a motion to dismiss or in the alternative to strike allegations from the M&P Complaint.  The Chapter 11 Trustee's response to M&P and Johnson's motion to dismiss or in the alternative to strike is due on June 25, 2008.  The Bankruptcy Court is to hold a status hearing in this case on August 12, 2008.

The Chapter 11 Trustee is claiming damages in excess of $500 million in the M&P Complaint. The adversary proceeding against M&P and Johnson is in its initial stages, and the ultimate relief and recovery, if any, for the Estate is unknown at the present time.

4.     **SEG 1 Complaint (*FC Stone LLC, et al. v. Grede*, Adv. Pro. 08-00445 (Bankr. N.D. Ill. June 9, 2008))**

On June 9, 2008, certain SEG 1 Customers filed an adversary complaint (the "SEG 1 Complaint") against the Chapter 11 Trustee related to the "property of the estate issue," seeking a declaration that any and all transfers made by the Debtor to the Plaintiffs on or after the date that was 90 days before the Petition Date (including the Citadel Sale Distributions and the SEG 1 Special Distributions) were transfers of the Plaintiffs' property and not transfers of property of the Debtor's estate under Section 541 of the Bankruptcy Code. The complaint also seeks a declaration that at least $40 million in securities and other assets held by the Chapter 11 Trustee in accounts denominated as SEG 1 is not property of the Estate under Section 541 of the Bankruptcy Code and should be returned to the SEG 1 Customers.

Specifically, the SEG 1 Complaint alleges that Sentinel was statutorily and contractually prevented from having any interest in the assets of its SEG 1 Customers and, as such, those assets are not property of Sentinal's Estate under Section 541 of the Bankruptcy Code. The SEG 1 Complaint also alleges that the SEG 1 Customers can adequately identify and trace such assets held by Sentinel and that such assets are held in trust by Sentinel for the SEG 1 Customers. It is the position of these SEG 1 Customers that the available evidence suggests that all or substantially all of the securities of the SEG 1 Customers can be traced, by CUSIP number, in the hands of Sentinel on all relevant dates, such that even if the Debtor engaged in commingling, as the Chapter 11 Trustee has alleged, such commingling would not prevent tracing of the SEG 1 Customers' assets, and such assets are not property of the Debtor's estate.

The Plan Proponents disagree with the positions taken by such SEG 1 Customers.

J.     **Other Related Litigation**

In addition to adversary proceedings filed in connection with the Chapter 11 Case, there are several other pending lawsuits involving the Debtor's business and the Defendant Insiders, which include:

1.     **Class Action Complaints**

On September 10, 2007, Henry Shatkin, a Customer of Sentinel, filed a complaint (the "Class Action Complaint"), *Shatkin v. Bloom*, Case No. 07CV5076 (N.D. Ill. Sept. 10, 2007), in the District Court for the Northern District of Illinois on behalf of all Customers of Sentinel who had assets managed by Sentinel (the "Class"), against the Defendant Insiders and certain other officers of Sentinel alleging misconduct causing hundreds of millions of dollars of assets belonging to the Class to be missing. On

February 27, 2008, pursuant to an order of the District Court, the parties to the Class Action Complaint filed a joint discovery schedule stating that given the discovery stay in place due to the Chapter 11 Case, and pending factors whereby the plaintiff might obtain relief from the stay, the parties agreed that the plaintiff may serve document discovery requests on the defendants beginning on May 1, 2008 and the parties believe that depositions should commence on December 1, 2008. On May 8, 2008, the Chapter 11 Trustee filed a Complaint for Injunctive Relief and a Motion for Preliminary Injunction, seeking to preliminarily enjoin the Class from prosecuting the Class Action Complaint until confirmation of a plan of liquidation for the Debtor. On May 29, 2008, this Court held an evidentiary hearing on the Motion, and on June 10, 2008 entered an Amended Consent Order and Injunction granting the relief sought in the motion.

Similarly, on September 10, 2007, Henry Shatkin filed a complaint (the "Class Action BONY Complaint"), *Shatkin v. The Bank of New York*, Case No. 07CV7928 (S.D.N.Y. Sept. 10, 2007), in the District Court for the Southern District of New York on behalf of the Class, commencing an adversary proceeding against BONY in its capacity as custodian of the Class's assets alleging misconduct with respect to safeguarding of the assets, causing hundreds of millions of dollars of assets belonging to the Class to be missing. BONY informed the District Court at a pre-motion conference that it would file a motion to dismiss the Class Action BONY Complaint. On January 29, 2008, the District Court set a briefing schedule for BONY's motion to dismiss, whereby briefing would be complete by April 14, 2008, and ordered that all discovery is stayed pending the outcome of the motion(s). On February 29, 2008, BONY filed its motion to dismiss, or alternatively to stay, the Class Action BONY Complaint. The District Court has not yet ruled on BONY's motion and oral argument is scheduled for June 17, 2008.

## 2. SEC Complaint (*SEC v. Sentinel Management Group, Inc.,* Case No. 07CV4684 (N.D. Ill. Aug. 20, 2007))

On August 20, 2007, the SEC filed a complaint (the "SEC Complaint") in the District Court for the Northern District of Illinois against Sentinel alleging violations of Sections 206(1), 206(2) and 206(4) of the Investment Advisers Act and violations of SEC Rule 206(4)-2 as a result of the "commingling and transferring [of] client funds and securities between the various client segregated accounts and between client accounts and a 'house' account" and the pledging of those assets "as collateral in order to obtain a line of credit from the Bank of New York" as well as additional leveraged financing. That same day, the SEC filed the Emergency Motion and the District Court entered an emergency order granting the Emergency Motion with respect to certain relief requested but denied the SEC's request to prohibit the distribution of the Citadel Proceeds to the Citadel-Beneficiary Customers.

On September 24, 2007, pursuant to an agreed order between the parties in lieu of a hearing to show cause, the District Court entered an order superseding the August 20, 2007 emergency order, which granted the prior relief and additionally preliminarily enjoined Sentinel and its directors and officers from taking actions in violation of Federal securities laws, while providing that nothing in the order constrained

the Chapter 11 Trustee's powers in the Chapter 11 Case with respect to the assets held by Sentinel. The next status hearing in the case is scheduled for June 17, 2008.

### 3.    CFTC Complaint (*CFTC v. Sentinel Management Group, Inc. et al.*, Case No. 08CV2410 (N.D. Ill. Apr. 28, 2008))

On April 28, 2008, the CFTC filed a civil action against Sentinel, Eric Bloom, and Charles Mosley, which is currently pending in the District Court for the Northern District of Illinois before the Honorable Milton Shadur. In its Complaint, the CFTC alleges that Sentinel violated: (1) Section 4b(a)(2)(i) of the Commodity Exchange Act ("CEA") by "removing Seg 1 assets from segregation and misappropriating them for use as collateral for its loan with BONY;" (2) Section 4d(a)(2) of the CEA and CFTC Regulations 1.20, 1.22, and 1.23 by "commingling Seg 1 customer funds with those of Sentinel and others; using those Seg 1 customer funds to secure the BONY loan of Sentinel; failing to treat, deal with, and account for Seg 1 customer funds as belonging to the customer; and withdrawing customer segregated funds beyond Sentinel's actual interest therein;" (3) Section 4d(b) of the CEA by using "Seg 1 customer funds to secure the BONY loan of Sentinel;" and (4) Section 4g(a) and 6(c) of the CEA and CFTC Regulation 1.10 by "filing with the Commission at least 23 Form 1-FRs that falsely reported that Sentinel owned no securities purchased under resale agreements and had no amounts payable" to BONY.

The CFTC alleges that with respect to each of those violations, Eric Bloom "directly and indirectly controlled Sentinel and its employees, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations" and that Charles Mosley willfully aided and abetted some of the violations.

In its request for relief, the CFTC seeks injunctive relief, restitution to every customer whose funds were lost as a result of the statutory and regulatory violations and civil monetary penalties against Bloom and Mosley equaling the higher of triple the monetary gain to them or $130,000 for each violation.

On May 8, 2008, the CFTC filed a motion to have its case reassigned as a related case to Judge Kocoras. Briefing on that motion is complete and the parties are awaiting a ruling from Judge Kocoras.

On May 27, 2008, the Chapter 11 Trustee filed an agreed motion for an extension of time to answer the CFTC's complaint, seeking an extension until June 27, 2008 to answer or otherwise respond. The court granted the motion for extension on May 28, 2008.

### K.    Sentinel's Pension Plan

The Debtor maintained a defined benefit pension plan for certain of its employees called the Sentinel Management Group, Inc. Defined Benefit Pension Plan (the "Pension Plan"). The Pension Plan was covered by the plan termination insurance program established by Title IV of the Employee Retirement Income Security Act of

1974 ("ERISA"), as amended, 29 U.S.C. §§ 1301-1461. Title IV is administered by the Pension Benefit Guaranty Corporation ("PBGC"), a government agency.

On April 28, 2008, the Chapter 11 Trustee filed a Motion to Terminate Debtor's Pension Plan and for Related Relief. Under the Bankruptcy Court's Amended Order Authorizing Trustee to Terminate Debtor's Pension Plan And For Related Relief (the "Pension Plan Order"), the Bankruptcy Court authorized the Chapter 11 Trustee to take the necessary steps to terminate the Pension Plan in a standard termination under section 4041(b) of ERISA, 29 U.S.C. § 1341(b). A standard termination can occur if a pension plan has sufficient assets to cover benefit liabilities under the pension plan. The Debtor's actuary has advised that the Pension Plan's assets exceed benefit liabilities by $268,000 as of December 31, 2007. Pension Plan participants were notified of the intent to terminate the Pension Plan on November 1, 2007, with a proposed termination date of December 31, 2007.

In the event of a standard termination of the Pension Plan, PBGC will timely review the determination of the Pension Plan's enrolled actuary as to the sufficiency of the Pension Plan, including all actuarial assumptions and calculations relating to benefit determinations.

On February 26, 2008, PBGC filed unliquidated priority Claims for unfunded benefit liabilities, under 29 U.S.C. § 1362(b), unpaid contributions under 29 U.S.C. § 1362(c), and unpaid premiums under 29 U.S.C. § 1307, with respect to the Pension Plan. If the Chapter 11 Trustee or Liquidation Trustee, as applicable, completes a standard termination of the Pension Plan in accordance with all applicable law and regulations, PBGC will have no claims against the Debtor with respect to the termination of the Pension Plan. The Chapter 11 Trustee or Liquidation Trustee, as applicable, and PBGC expect to have additional discussions with regard to the timing and completion of a standard termination and any related audit. PBGC may request that a reserve amount for pension liabilities be retained by the Liquidation Trust pending completion of the standard termination of the Pension Plan and any related audit.

## L.      Competing Plan by Certain Citadel-Beneficiary Customers

On June 3, 2008, certain Citadel-Beneficiary Customers filed a competing plan of liquidation [Docket No. 533]. The Bankruptcy Court has not set a hearing on the adequacy of the proposed disclosure statement related thereto [Docket No. 539]. The Bankruptcy Court has indicated that it will not consider the competing plan until after the hearing on confirmation of this Plan.

# VI.

## SUMMARY OF THE PLAN

### A.    Introduction

The primary objectives of the Plan are to (a) maximize the value of the ultimate recoveries to creditor groups on a fair and equitable basis and (b) settle, compromise or otherwise dispose of certain Claims and Equity Interests on terms that the Plan Proponents believe to be fair and reasonable and in the best interests of the Estate and Sentinel's Customers and other Creditors. The Plan provides for the liquidation of the Debtor's assets and the distribution of such assets in an orderly manner to Creditors.

The cornerstone of the Plan is a series of interdependent settlements and compromises (the "Settlements") of various inter-creditor disputes (the "Disputes"). The Settlements, which are the product of protracted negotiations between and among various constituencies, represented by the Creditors Committee and its legal professionals, are designed to achieve a global, consensual resolution without litigation of issues which arose in the Chapter 11 Case. The Creditors Committee believes that settlement of the Disputes is the best way to ensure a prompt and fair resolution of the Chapter 11 Case. Although litigation could produce somewhat different absolute and relative recoveries from those embodied in the Plan, the Creditors Committee believes that such litigation would be extraordinarily expensive and would not be finally resolved for years, thus delaying and potentially materially reducing distributions to all creditors. Moreover, the Creditors Committee believes that the recoveries provided under the Plan to Holders of Class 3 Customer Claims and Class 4 General Unsecured Claims are substantially higher than the lowest point in the range of reasonable litigation outcomes in the absence of the Settlements. The Settlements have paved the way for the Plan, which the Plan Proponents believe will enable maximum distributions to all of the Debtor's Creditors, without the cost and delay of litigation.

The Disputes being resolved by the Settlements include, among others:

### 1.    Property of the Estate

A recurring theme in the Chapter 11 Case that affects all Creditors of Sentinel is whether property that was supposed to be held for Customers constitutes "property of the estate" as defined in the Bankruptcy Code. This is important because, among other things, in certain circumstances only Property of the Estate would be recoverable by the Estate from targets of litigation for the ratable benefit of similarly situated Creditors. Indeed, this issue has been raised as a defense to certain Causes of Actions brought by the Chapter 11 Trustee, including by the Insiders and BONY, as well as potential targets of significant Avoidance Actions. Moreover, even if the Bankruptcy Court were to determine that certain property was not Property of the Estate, a significant dispute would still exist as to whether that property should be distributed *pro rata* among customers. In connection with formulation of the Plan, the property of the estate issue was central to forging a compromise over the propriety of the Citadel Sale Distributions

27

that were disbursed to SEG 1 Customers on or about the Petition Date. The following questions have been considered by the Plan Proponents in connection with formulation of the Plan, and their resolution is embedded therein:

> (a)      Whether the Citadel Sale Distributions were transfers of Property of the Estate or merely a return of SEG 1 Customers' own property;

> (b)      Whether the Citadel Sale Distributions were in fact "authorized" by the Bankruptcy Court at all;

> (c)      If such authorization was obtained, whether the Bankruptcy Court was provided with inaccurate or incomplete evidence upon which to grant such authorization; and

> (d)      If such authorization was not obtained, whether the Citadel Sale Distributions are avoidable pursuant to Section 549 of the Bankruptcy Code.

The Chapter 11 Trustee, together with his legal and financial professionals, have expended substantial resources investigating Sentinel's business and the way in which Customer deposits and fractional interests in securities were maintained by the Debtor. As set forth in the Insider Complaint, the BONY Complaint, and the M&P Complaint, see Section V.I., and as described in Section IV. above, the Chapter 11 Trustee has concluded that certain Sentinel insiders engaged in extensive breaches of fiduciary duty and wrongdoing against Sentinel and its Customers where property intended to be held in a custodial capacity was instead commingled among all Customers' property, and with the Insiders' own property, and was pledged to or converted by BONY, notwithstanding Sentinel's and BONY's duties to the contrary. The Chapter 11 Trustee has concluded further that securities were allocated to customer accounts without regard to whether they were available for customers (i.e. had been pledged as collateral for the BONY Loan). Moreover, as a result of the forensic examination undertaken by the Chapter 11 Trustee and his professionals, the Plan Proponents believe that interest paid to Customers or accrued for their benefit prior to the Petition Date did not correlate to specific property purportedly held in specific Customer accounts. Rather, the Insiders manipulated Customer property for their own personal gain, and the Chapter 11 Trustee believes BONY similarly accepted Customer property as collateral for the loans, even though the Chapter 11 Trustee believes BONY should have held such property segregated for Customers. BONY disputes that it had any independent obligation not to accept such Customer property as collateral for the loans or to keep such property segregated and asserts that it was entitled to rely on Sentinel's representations that it could pledge such collateral to BONY.

Certain Customers do not accept the Plan Proponents' position that the assets of certain Customers who invested in SEG 1 are not traceable and that even if commingling and misuse occurred, the Bankruptcy Court can trace their particular securities so as to preserve the benefits of segregation they bargained for. However, as a

result of the manner in which certain Sentinel insiders misused and diverted Customer funds from the very first day funds were deposited by Customers, allocated securities to Customers' SEGs without regard to whether the securities actually were segregated for the benefit of the Customers, reported fictitious cost basis and interest on Customer statements, and engaged in mass transfers of securities to and from SEG accounts during June through August 2007 to the detriment of one group of Customers over another, the Chapter 11 Trustee does not believe that any tracing rules can or should apply. Moreover, based upon his extensive investigation conducted with his retained professionals, the Chapter 11 Trustee has concluded even if the Bankruptcy Court were to apply tracing rules to specific securities from a certain potentially arbitrary date, certain Customers, and in particular the Customers that were the beneficiaries of the August 15, 2007 redemptions or were recipients of the Citadel Sale Distributions, have already received more than that to which they would be entitled if tracing rules were to be applied on such a limited basis.

Certain SEG 1 Customers believe that the Plan is unconfirmable because it provides for the distribution of certain assets contained in accounts denominated as SEG 1 which certain SEG 1 Customers believe are not property of the Estate under section 541 of the Bankruptcy Code pursuant to the CEA, related CFTC regulations, and the Investment Agreements. In addition, certain SEG 1 Customers believe that the Plan's attempt to use such assets is procedurally defective because the Plan Proponents, in their belief that such property is Estate property, have not filed an adversary proceeding to determine the extent of any ownership interest in such assets as certain SEG 1 Customers believe is required by Bankruptcy Rule 7001(2).

The Plan acknowledges the promises made by Sentinel to segregate and protect Customers' custodial property, but also recognizes the Chapter 11 Trustee's assertion of the facts of commingling of such property by certain Sentinel insiders. In the face of such commingling, and the Plan Proponents' belief that tracing cannot apply as both a legal and practical matter, the Chapter 11 Trustee believes a *pro rata* distribution of Remaining Assets is fair. Similarly, the Plan Proponents believe that the Citadel Securities and the Cash used to fund the SEG 1 Special Distribution were commingled and misused just like other custodial property generally, and cannot fairly be allocated to one or more Customer groups. The Plan does not, however, require a finding in this regard as a condition to confirmation. Rather, the Plan proposes a settlement offer to all Citadel-Beneficiary Customers in the hope of avoiding inter-Customer litigation. To the extent any Citadel-Beneficiary Customer refuses to accept the offer, the Plan reserves litigation over the Citadel Sale Distributions for another day. The Plan Proponents believe that Citadel-Beneficiary Customers should enter into the settlement embodied in the Plan so as to realize certainty as to any potential Estate liability arising out of their receipt of Citadel Sale Distributions and SEG 1 Special Distributions. This certainty, in combination with the potential for receiving a release in exchange for no contribution to the Estate constitute the primary consideration offered to Citadel-Beneficiary Customers by the settlement.

Notwithstanding the fact that the settlement embodied in the Plan was negotiated by and agreed upon by all of the NonCitadel-Beneficiary Customers and a

29

Citadel-Beneficiary Customer serving on the Creditors' Committee, and is supported by both the Creditors' Committee and the Chapter 11 Trustee, a group of Citadel-Beneficiary Customers believe that the settlement embodied in the Plan is not an equitable resolution of the disputes between Citadel-Beneficiary Customers and Non-Citadel Beneficiary Customers. Such Customers do not see the settlement as an attractive alternative to litigation.

**2.    Stockbroker Liquidation** The Creditors Committee believes that the stockbroker liquidation provisions of the Bankruptcy Code may be applicable to Sentinel. The basis for the Creditors Committee's position is notwithstanding that Sentinel may not have held itself out as a "stockbroker" in the commonly understood sense, Sentinel in fact operated in a way that could bring it within the definition set forth in Section 101(53A) of the Bankruptcy Code. Section 101(53A) of the Bankruptcy Code defines the term "stockbroker" as a debtor that meets two criteria: (a) the debtor must have "customers"; and (b) the debtor must be engaged in the business of "effecting transactions in securities – for the account of others; or with members of the general public, from or for such person's own account." The term "customer" is defined under Section 741 of the Bankruptcy Code in three ways. First, a person or entity is a customer if securities are received, acquired, or held by the debtor in the ordinary course of the debtor's business for safekeeping, with a view to sale, to cover a consummated sale, pursuant to a purchase, as collateral under a security agreement, or for the purpose of effecting registration or transfer. Second, a person or entity is a customer if it has a claim against the debtor arising out of a sale of a security held pursuant to Section 741(2)(A). Third, and most importantly for the Plan's purposes, a person or entity is a customer if it deposited cash, a security, or other property with the debtor for the purpose of buying or selling a security. Moreover, a person effects transactions if he or she participates in securities transactions at key points in the chain of distribution as did Sentinel.

If Sentinel were liquidated as a stockbroker under Subchapter III, one of the central issues regarding property of the estate would be rendered moot, because all such property deposited by or held for Customers would be pooled and distributed ratably as "customer property."

The Plan Proponents acknowledge that certain SEG 1 Customers disagree that Sentinel should be considered to be a "stockbroker" and that Subchapter III should not apply to the Debtor. The position of such SEG 1 Customers is based upon their belief that a bankruptcy court would not consider Sentinel a "broker" or a "dealer" and therefore not a "stockbroker." This issue of whether Sentinel would qualify for Subchapter III would be a very fact-intensive one, and rather than attempt to litigate the issue of whether Sentinel qualifies as a stockbroker, which would undoubtedly be an expensive and protracted effort, the Plan Proponents devised the Plan to incorporate certain salient features of Subchapter III, while retaining the asset-maximizing benefit of Chapter 11, as an inextricable part of the global compromise and settlement embodied by the Plan.

**3.    Claim Calculation** The Plan Proponents are cognizant of the fact that there are different methods for calculating investors' claims where such investors

30

were the victims of gross misconduct. Rather than leave the matter to be litigated between parties fighting to establish a methodology which would best serve their individual interests, the Plan Proponents believe the Plan provides for the most equitable treatment obtainable for all of Sentinel's Customers. The Plan Proponents believe that, given the extensive breaches of fiduciary duty and wrongdoing that certain insiders of the Debtor have effected upon Sentinel and all Customers, accounting for Customers' Claims as a Customer's "net investment" (cash deposits less cash withdrawals), and not as a Customer's "net equity" (hypothetical liquidation value of the securities allocated to a Customer by Sentinel), is not only the most equitable approach, but the one supported by applicable law under analogous circumstances. Incidentally, as tested by the Plan Proponents over the three and a half year period of time preceding the Petition Date, the notional value that Sentinel reported to Sentinel's Customers on its monthly account statements closely approximated Customers' "net investment" Claim measured over the same period. This is primarily due to the fact that Sentinel's Customers' accounts, as reported to them, never lost money and were allocated a fixed level of monthly interest. Given the proximity of the amount reported to Customers by Sentinel on their customer statements to their actual "net investment" (when provision is made for time value of money), and due to the unreliable and incomplete nature of Sentinel's books and records (which would obfuscate any attempt to arrive at a perfectly accurate measurement of "net investment"), the Plan Proponents believe that the amount reported by Sentinel on Customers' account statement is in fact the most efficient, equitable method to calculate Customer Claims. By providing for the methodology of Claims as an inextricable part of the global compromise and settlement embodied in the Plan, the Estate avoids costly litigation of the matter.

### 4.      Basis for Compromise

While various members of the Creditors Committee and the Chapter 11 Trustee have differing views over the relative strengths and weaknesses of the claims and potential defenses involved in the Disputes and, accordingly, disagree as to how those claims and defenses would fare if litigated to final judgment, they do agree that resolution of the Disputes is crucial to confirmation of any plan and that resolution through litigation would result in substantial delay and expense, to the detriment of all stakeholders. The proposed treatment for the various Classes, which reflects the compromises and settlements embodied in the Plan, gives due consideration to the strengths and weaknesses of the parties' potential litigation positions, and the Plan Proponents assert that the distribution to any particular Creditor is no better than the best possible judicial determination in favor of such Creditor and no worse than the worst possible outcome that would be achieved if such disputes were resolved by judicial determination. Accordingly, the Creditors Committee believes that the compromises and settlements embodied in the Plan are within the range of likely litigation results.

To approve a compromise or settlement, a court must find that it is fair and equitable and in the best interests of the bankruptcy estates. *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968). In making that determination, a court must consider the probability of success in the litigation; the complexity of the litigation; the expense, inconvenience and delay

31

necessarily attending it; and the paramount interests of the creditors, with a proper deference to their reasonable views. The decision to settle ordinarily is a matter of sound business judgment and, because litigation outcomes cannot be predicted with mathematical precision, only if a settlement falls below the low end of possible litigation outcomes will it fail the reasonable equivalence standard. *In re Doctors Hosp. of Hyde Park, Inc.*, 474 F.3d 421, 426 (7th Cir. 2007).

After careful review of the estimated recoveries under a hypothetical Chapter 7 liquidation scenario, the Plan Proponents have concluded that the recovery to Claimants will be maximized by completing the liquidation of the Debtor under Chapter 11 of the Bankruptcy Code and making distributions pursuant to the Plan.

The Plan is annexed hereto as Exhibit <u>A</u> and forms part of this Disclosure Statement. The summary of the Plan set forth below is qualified in its entirety by reference to the more detailed provisions of the Plan.

The statements contained in the Disclosure Statement include summaries of the provisions contained in the Plan and in documents referred to therein. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statements of such terms and provisions.

The Plan itself and the documents referred to therein control and actual treatment of Claims against and Equity Interests in the Debtor under the Plan will, upon the Effective Date, be binding upon all holders of Claims against and Equity Interests in the Debtor and its Estate, the Liquidation Trustee and other parties in interest. In the event of any conflict between this Disclosure Statement, on the one hand, and the Plan, the Trust Agreement or any other operative document, on the other hand, the terms of the Plan, and such other operative document, as the case may be, are controlling.

B.     **Overall Structure of the Plan**

The Plan Proponents believe that the Plan provides the best and most expeditious recovery to the Debtor's Claim Holders. Under the Plan, Claims against and Equity Interests in the Debtor are divided into different classes. If the Plan is confirmed by the Bankruptcy Court and consummated, on the Initial Distribution Date, and at certain Distribution Dates thereafter as Claims are resolved, liquidated, or estimated, the Liquidation Trustee will distribute Cash in respect of Allowed Claims as provided in the Plan. The Classes of Claims against and Equity Interests in the Debtor created under the Plan, the treatment of those Classes under the Plan, and the distributions to be made under the Plan are described below.

C.     **Classification and Treatment of Administrative Claims, Claims and Equity Interests Under the Plan**

Only administrative expenses, claims and equity interests that are "allowed" may receive distributions under a Chapter 11 plan. An allowed administrative

expense, claim or equity interest simply means that the debtor agrees, or in the event of a dispute, that the court determines, that the administrative expense, claim or equity interest, including the amount, is in fact a valid obligation of the debtor. Section 502(a) of the Bankruptcy Code provides that a timely filed administrative expense, claim or equity interest is automatically Allowed unless the debtor or another party in interest objects. However, Section 502(b) of the Bankruptcy Code specifies certain claims that may not be allowed in a bankruptcy case even if a proof of claim is filed. These include, without limitation, claims that are unenforceable under the governing agreement or applicable non-bankruptcy law, claims for unmatured interest, property tax claims in excess of the debtor's equity in the property, claims for certain services that exceed their reasonable value, lease and employment contract rejection damage claims in excess of specified amounts, and late-filed claims. In addition, Bankruptcy Rule 3003(c)(2) prohibits the allowance of any claim or equity interest that either is not listed on the debtor's schedules or is listed as disputed, contingent, or unliquidated, if the holder has not filed a proof of claim or equity interest before the deadline to file proofs of claim and interests.

The Bankruptcy Code also requires that, for purposes of treatment and voting, a Chapter 11 plan divide the different claims against, and equity interests in, the debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are usually classified together, as are interests of a substantially similar legal nature. Because an entity may hold multiple claims and/or interests which give rise to different legal rights, the holders of such claims and/or interests may find themselves members of multiple classes of claims and/or interests. As a result, under the Plan, for example, a creditor that holds both a Secured Claim and a Customer Claim would have its Secured Claim classified in Class 2 and its Customer Claim classified in Class 3. To the extent of this Holder's Secured Claim, the Holder would be entitled to the voting and treatment rights that the Plan provides with respect to Class 2, and, to the extent of the Holder's Customer Claim, the voting and treatment rights that the Plan provides with respect to Class 3.

Under a Chapter 11 plan, the separate classes of claims and interests must be designated either as "impaired" (altered by the plan in any way) or "unimpaired" (unaltered by the plan). If a class of claims is impaired, the Bankruptcy Code affords certain rights to the holders of such claims, such as the right to vote on the plan (unless the plan provides for no distribution to the holder, in which case, the holder is deemed to reject the plan), and the right to receive an amount under the Chapter 11 plan that is not less than the value that the holder would receive if the debtor were liquidated under Chapter 7. Under Section 1124 of the Bankruptcy Code, a class of claims or interests is impaired unless, with respect to each claim or interest of such class, the plan (i) does not alter the legal, equitable, and contractual rights of the holders of such claims or interests or (ii) irrespective of the holder's right to receive accelerated payment of such claims or interests after the occurrence of a default, cures all defaults (other than those arising from, among other things, the debtor's insolvency or the commencement of a bankruptcy case), reinstates the maturity of the claims or interests in the class, compensates the holders of such claims or interests for any damages incurred as a result of their reasonable reliance upon any acceleration rights, and does not otherwise alter their legal, equitable or

33

contractual rights. Typically, this means that the holder of an unimpaired claim will receive, on the later of the effective date of the plan of reorganization or the date on which amounts owing are due and payable, payment in full, in cash, with postpetition interest to the extent permitted and provided under the governing agreement between the parties (or if there is no agreement, under applicable non-bankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms. Thus, other than the loss of its right to accelerate a debtor's obligations, the holder of an unimpaired claim will be placed in the position it would have been in had the debtor's case not been commenced.

Consistent with these requirements, the Plan divides the Claims against, and Equity Interests in, the Debtor into the following Classes:

| Unclassified | Administrative Claims | Unimpaired/Paid in full |
|---|---|---|
| Unclassified | Priority Tax Claims | Unimpaired/Paid in full |
| Class 1 | Other Priority Claims | Unimpaired/Paid in full |
| Class 2 | Secured Claims | Unimpaired/Paid in full (subject to a Bankruptcy Court finding of impairment). |
| Class 3 | Customer Claims | Impaired |
| Class 4 | General Unsecured Claims | Impaired |
| Class 5 | Subordinated Claims | Impaired |
| Class 6 | Equity Interests | Impaired |

For purposes of computing distributions under the Plan, Allowed Claims or Equity Interests do not include postpetition interest unless otherwise specified in the Plan.

### 1.    Unclassified — Administrative Claims

Administrative Claims are Claims for costs and expenses of administration of the Chapter 11 Case Allowed under Section 503(b) of the Bankruptcy Code and entitled to priority under Sections 507(a)(1) or 507(b) of the Bankruptcy Code. Such Claims include (i) any actual and necessary costs and expenses of preserving the Estate; (ii) any actual and necessary costs and expenses of operating the Debtor's business; (iii) all compensation and reimbursement of expenses to the extent awarded by the Bankruptcy Court under Sections 330, 331 or 503 of the Bankruptcy Code; and (iv) any fees or charges assessed against the Estate under Section 1930 of Chapter 123 of title 28 of the United States Code.

Except to the extent the Holder of an Allowed Administrative Claim, not including a Professional Fee Claim, agrees otherwise, each Holder of an Allowed Administrative Claim will be paid in respect of such Allowed Claim (a) the full amount thereof in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim, or upon other agreed terms, or (b) such lesser amount as the Holder of an Allowed Administrative Claim and the Chapter 11 Trustee or the Liquidation Trustee, as applicable (each with the prior consent of the Creditors Committee or the Liquidation Trust Committee, as applicable), might otherwise agree.

The Chapter 11 Trustee estimates that there will be $7 million in Administrative Claims.

### 2.    Unclassified — Priority Tax Claims

A Priority Tax Claim consists of any Claim of a governmental unit of the kind specified in Sections 502(i) and 507(a)(8) of the Bankruptcy Code. These unsecured Claims are given a statutory priority in right of payment. Each Holder of an Allowed Priority Tax Claim will be paid in respect of such Allowed Claim either (a) the full amount thereof, without post-petition interest or penalty, in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim or upon other agreed terms, or (b) such lesser amount as the holder of an Allowed Priority Tax Claim and the Chapter 11 Trustee or the Liquidation Trustee, as applicable, (each with the prior consent of the Creditors Committee or the Liquidation Trust Committee, as applicable), might otherwise agree.

The Chapter 11 Trustee is unaware of any Priority Tax Claims.

### 3.    Class 1 — Other Priority Claims

Other Priority Claims are Claims which are entitled to priority pursuant to Section 507(a) of the Bankruptcy Code — other than Administrative Claims and Priority Tax Claims.  Such Claims include (i) unsecured Claims for accrued employee compensation earned within 180 days prior to the commencement of the Chapter 11 Cases to the extent of $10,950 per employee and (ii) contributions to employee benefit plans arising from services rendered within 180 days prior to the commencement of the Chapter 11 Cases, but only for each such plan to the extent of (a) the number of employees covered by such plan multiplied by $10,950, less (b) the aggregate amount paid to such employees from the Estates for wages, salaries or commissions.

Except to the extent that the Chapter 11 Trustee or the Liquidation Trustee, as applicable (each with the prior consent of the Creditors Committee or the Liquidation Trust Committee, as applicable), and a holder of an Allowed Other Priority Claim agree to a different treatment, each holder of an Allowed Other Priority Claim will receive, in full and final satisfaction of such Claim, payment in full in Cash in an amount equal to such Allowed Other Priority Claim on the later of the Initial Distribution Date and the date when such Other Priority Claim becomes an Allowed Other Priority Claim, or as soon thereafter as is practicable.  All Allowed Other Priority Claims which are not

35

due and payable on or before the Effective Date will be paid by the Liquidation Trustee in the ordinary course of business in accordance with the terms thereof.

The Chapter 11 Trustee is unaware of any Other Priority Claims.

**4.    Class 2 — Secured Claims**Secured Claims include Claims that are secured by a Lien on property or interests in property, in which the Debtor has an interest. Such interests are Secured Claims to the extent of (i) the value as of the Effective Date, or such other date as is established by the Bankruptcy Court, of such interest or Lien determined by a Final Order of the Bankruptcy Court pursuant to Section 506 of the Bankruptcy Code; or (ii) as otherwise agreed upon in writing by the Debtor and the holder of such Claim, to the extent reflected in the Schedules or a proof of Claim as a Secured Claim which is secured by a Lien on collateral to the extent of the value of such collateral; (iii) as determined in accordance with Section 506(a) of the Bankruptcy Code; or (iv) in the event that such Claim is subject to setoff under Section 553 of the Bankruptcy Code, to the extent of such setoff.

Except to the extent that the Chapter 11 Trustee or the Liquidation Trustee, as applicable (each with the prior consent of the Creditors Committee or the Liquidation Trust Committee, as applicable), and a holder of an Allowed Secured Claim agree to a different treatment, in full and final satisfaction of such Claim, in the Liquidation Trustee's sole discretion, (i) each Holder of an Allowed Secured Claim will receive Cash in an amount equal to such Allowed Secured Claim in full and complete satisfaction of such Allowed Secured Claim on the later of the Initial Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable, or (ii) each Holder of an Allowed Secured Claim will receive the Collateral securing its Allowed Secured Claim or the proceeds of such Collateral in full and complete satisfaction of such Allowed Secured Claim on the later of the Initial Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable.

The only Secured Claims of which the Chapter 11 Trustee is aware are the Secured Claim asserted by BONY, which as described in Section V.I. above is contested and the subject of a pending adversary proceeding, and the Secured Claims asserted by Cantor, as described in its proof of claim, and which, if allowed, will be paid from the Cantor Escrowed Funds in accordance with the Cantor Turnover Stipulation. Lehman Brothers Inc. and Lehman Commercial Paper Inc. have asserted a $1.4 million secured right of set off, which the Plan Proponents likely will dispute.

**5.    Class 3—Customer Claims**

Class 3 consists of all Claims arising from Customer deposits with Sentinel (the "Customer Claims"). Each Holder's Class 3 Customer Claim will equal the amount listed as "Net Equity" on such Holder's Customer Account Statements dated August 13, 2007 (or if no such Account Statements were issued, the amount that would have been listed), plus any additional amounts such Holder deposited with Sentinel during the period subsequent to August 13, 2007, through the Petition Date, minus any

additional amounts such Holder received from Sentinel during the period subsequent to August 13, 2007 up through and including the Petition Date; provided, that any distributions made on account of a Class 3 Customer Claim following the Petition Date, including the Citadel Sale Distributions, will be applied towards such Class 3 Customer Claim.

Holders of Allowed Class 3 Customer Claims will be entitled to a Pro Rata distribution of Customer Property[3], including: (a) Cash held by the Estate on the Effective Date after the payment of (if Allowed), or appropriate reservation for, as applicable, the Priority Tax Claims, Professional Fee Claims, Other Priority Claims, and Secured Claims, if any, and (b) net Cash proceeds of the liquidation of the Remaining Assets that are Customer Property. Subject to Section 10.10 of the Plan, any distributions made to the Holders of Allowed Class 3 Customer Claims will be made to Holders of Allowed Class 3 Customer Claims that are NonCitadel-Beneficiary Customers only, and no further distributions shall be made to any Citadel-Beneficiary Customer, unless and until all Holders of Allowed Class 3 Customer Claims that are NonCitadel-Beneficiary Customers will have received a Percentage Recovery equivalent to such Citadel-Beneficiary Customer taking into account all of such Citadel-Beneficiary Customer's Class 3 Customer Claims.

The Chapter 11 Trustee estimates that there are $1,220,320,123 in Class 3 Customers Claims, $738,964,040 of which are Class 3 Customer Claims attributable to NonCitadel-Beneficiary Customers, $427,678,307 of which are Class 3 Customer Claims attributable to Citadel-Beneficiary Customers arising out of participation in SEG 1 and $53,677,776 of which are Class 3 Customer Claims attributable to Citadel-Beneficiary Customers arising out of participation in SEG 2, SEG 3, or SEG 4.

### 6.    Class 4—General Unsecured Claims

Class 4 consists of all unsecured Claims against Sentinel that do not constitute Administrative Claims, Priority Tax Claims, Other Priority Claims, Customer Claims, or Subordinated Claims ("General Unsecured Claims"); provided, however, that to the extent Class 3 Customer Claims are not fully satisfied from Customer Property, such deficiency claims will constitute General Unsecured Claims.

Holders of Allowed Class 4 General Unsecured Claims will be entitled to a Pro Rata distribution of Cash and Cash proceeds of all Property not allocated for payment of Allowed Claims in other Classes.

---

[3]    Customer Property is defined in the Plan to mean:  from and after the Petition Date, Cash, security, or other property, and proceeds of such Cash, security, or property, received, acquired, or held by or for, or which should have been held by or for, a Customer, including any such property even if distributed to a Customer outside of the Plan and subsequently recovered by the Estate, including all funds and securities on deposit at the Bank of New York and in segregated accounts at JPMorgan Chase & Co. in the name of Sentinel or the Chapter 11 Trustee.  BONY disputes that any funds or securities in its possession are Customer Property as defined under the Plan.

An initial calculation of Customer Property and an estimated total Claims pool for potentially allowable Class 3 Customer Claims as of the Petition Date will be made by the Chapter 11 Trustee and used for purposes of arriving at an initial calculation of total deficiency Class 4 General Unsecured Claims on account of Class 3 Customer Claims. This calculation of total deficiency Class 4 General Unsecured Claims on account of Class 3 Customer Claims will be (i) updated periodically based on a reconciliation of Allowed Customer Claims, Disallowed Customer Claims, and the realization or recovery of Customer Property in excess of or less than the nominal calculation and (ii) utilized for purposes of calculating any distributions to Holders of General Unsecured Claims.

With respect to deficiency Class 4 General Unsecured Claims on account of Class 3 Customer Claims only, subject to Section 10.10 of the Plan, no distributions will be made to Holders of Class 4 General Unsecured Claims on account of Class 3 Customer Claims that are Citadel-Beneficiary Customers pending the receipt of a Percentage Recovery for all Holders of Allowed Class 3 Customer Claims that are NonCitadel-Beneficiary Customers equivalent to such Citadel-Beneficiary Customer, as provided in Section 4.4 of the Plan.

For purposes of calculating Percentage Recoveries on Allowed Class 3 Customer Claims, any such recoveries on behalf of Class 4 General Unsecured Claims will be included.

As of the Effective Date, the Plan Proponents do not expect to have any assets which would not be deemed Customer Property. Property that is not Customer Property will be wholly contingent upon the outcome of certain Causes of Action commenced by the Liquidation Trustee for the benefit of the Estate. Assuming "Assets available for distribution to all other Creditors" as set forth in the Liquidation Analysis (attached hereto as Exhibit B) are distributed to NonCitadel-Beneficiary Customers and no additional Customer Property is recovered, the Plan Proponents estimate that roughly $550 to $600 million in Class 3 Customer Claims will not be satisfied from Customer Property, and will constitute Class 4 General Unsecured Claims.

The Chapter 11 Trustee estimates that there are less than $10 million in Class 4 General Unsecured Claims, excluding deficiency Class 4 General Unsecured Claims on account of Class 3 Customer Claims. Additionally, Lehman Brothers Inc. has asserted a $14 million unsecured claim, which the Plan Proponents likely will dispute.

## 7.    Class 5—Subordinated Claims

Class 5 consists of all Claims, if any, which (i) are held by insiders (as defined by 11 U.S.C. § 101(31)), including Sentinel affiliates and persons who directly or indirectly hold an Equity Interest in Sentinel, (ii) are held by anyone whose Claim is subordinated to all other Claims by agreement or pursuant to Section 510 of the Bankruptcy Code, (iii) is a Claim for a fine, penalty, forfeiture, multiple, exemplary or punitive damages, or otherwise not predicated upon compensatory damages, and that would be subordinated in a Chapter 7 case pursuant to Section 726(a)(4) of the

Bankruptcy Code or otherwise, and (iv) unless all other Class 3 Customer Claims have been paid in full, is a Customer Claim held by an insider, a beneficial owner of at least five percent of Equity Interests, an entity that, directly or indirectly, through agreement or otherwise, exercised or had the power to exercise control over the management or policies of the Debtor, or any other entity whose Claim would be subordinated in a Chapter 7 case pursuant to Section 747 of the Bankruptcy Code or otherwise ("Subordinated Claims").

Holders of Subordinated Claims will receive no distributions on account of such Claims.

### 8.    Class 6—Equity Interests

Class 6 consists of all Equity Interests in Sentinel. Holders of Equity Interests will receive no distributions on account of such Equity Interests.

### D.    Bar Dates for Administrative Claims

Unless otherwise ordered by the Bankruptcy Court, requests for payment of Administrative Claims (except for Professional Fee Claims), must be Filed and served on the Chapter 11 Trustee or the Liquidation Trustee, as applicable, and its counsel, the Creditors Committee or the Liquidation Trust Committee, as applicable, and its counsel and the other notice parties set forth in the Administrative Compensation Order, no later than (i) ten (10) days prior to the Voting Deadline for Administrative Claims accrued through the date of the Procedures Order and (ii) thirty (30) days after the Effective Date for all other Administrative Claims (the "Administrative Claims Bar Date"). *Any Person that is required to File and serve a request for payment of an Administrative Claim and fails to timely File and serve such request, will be forever barred, estopped, and enjoined from asserting such Claim or participating in distributions under the Plan on account thereof*. Objections to requests for payment of Administrative Claims (except for Professional Fee Claims) must be Filed and served on the Chapter 11 Trustee or the Liquidation Trustee, as applicable, and its counsel, the Creditors Committee or the Liquidation Trust Committee, as applicable, and its counsel and the other notice parties set forth in the Administrative Compensation Order and the requesting party within thirty (30) days after the Administrative Claims Bar Date.

### E.    Professional Fee Claims

All requests for compensation or reimbursement of Professional Fee Claims for services rendered on or after the Petition Date and prior to the Effective Date will be Filed and served on the Chapter 11 Trustee or the Liquidation Trustee, as applicable, and its counsel, the Creditors Committee or the Liquidation Trust Committee, as applicable, and its counsel, and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or any other order(s) of the Bankruptcy Court, no later than forty-five (45) days after the Effective Date ("Professional Fee Claims Bar Date").

Holders of Professional Fee Claims that are required to File and serve applications for final allowance of their Professional Fee Claims and that do not File and serve such applications by the required deadline will be forever barred from asserting such Professional Fee Claims against the Debtor, and such Professional Fee Claims will be deemed discharged as of the Effective Date. Objections to any Professional Fee Claims must be Filed and served on the requesting Professional, the Chapter 11 Trustee or the Liquidation Trustee, as applicable, and its counsel, the Creditors Committee or the Liquidation Trust Committee, as applicable, and its counsel, and the other notice parties set forth in the Administrative Compensation Order no later than thirty (30) days after the Professional Fee Claims Bar Date.

Except to the extent that a holder of a Professional Fee Claim fails to File and serve appropriate fee applications in a timely manner and the Bankruptcy Court withholds payment of the Professional Fee Claims, holders of Professional Fee Claims will receive Cash in an amount equal to the Allowed amount of their respective Bankruptcy Court approved Professional Fee Claims.

### F.   No Discharge of Claims; Injunction.

Under the Plan, pursuant to Section 1141(d)(3) of the Bankruptcy Code, confirmation will not discharge Claims against the Debtor; provided, however, that no Holder of a Claim against or Equity Interest in the Debtor may, on account of such Claim or Equity Interest, seek or receive any payment or other distribution from, or seek recourse against the Estate or the Liquidation Trust, or Property, except for distributions under the Plan. Accordingly, except as otherwise provided in the Plan, all Persons, other than governmental entities and agencies exercising their police or regulatory powers, who have held, hold, or may hold Claims against or Equity Interests in the Debtor are permanently enjoined under the Plan from taking any of the following actions against the Estate or the Liquidation Trust or any Property on account of any such Claims or Equity Interests: (A) commencing or continuing, in any matter or in any place, any action or other proceeding; (B) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (C) creating, perfecting, or enforcing any Lien or encumbrance; and (D) commencing or continuing in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that (x) nothing shall preclude such Persons from exercising their rights pursuant to and consistent with the terms of the Plan; (y) any rights of setoff or recoupment, to the extent valid, are preserved, and the injunctions referenced in this Section shall not enjoin the valid exercise of such right of setoff or recoupment; and (z) no Holder of any Claim or Equity Interest shall be deemed to have released the Debtor in any way for accepting the terms of the Plan, retaining Citadel Sale Distributions or SEG 1 Special Distributions, or accepting distributions pursuant to the Plan.

### G.   Treatment of Executory Contracts and Unexpired Leases

The Bankruptcy Code grants a debtor the power, subject to the approval of the Bankruptcy Court, to assume and assign, or reject executory contracts and unexpired leases. If an executory contract or unexpired lease is rejected, the other party to the

agreement may file a claim for damages, if any, incurred by reason of the rejection. In the case of rejection of leases of real property, such damage Claims are subject to certain limitations imposed by the Bankruptcy Code.

Any and all pre-petition leases or executory contracts not previously rejected by the Chapter 11 Trustee, unless specifically assumed pursuant to orders of the Bankruptcy Court prior to the Confirmation Date or the subject of a motion to assume or assume and assign pending on the Confirmation Date, will be deemed rejected by the Chapter 11 Trustee on the Confirmation Date.

All proofs of claim with respect to Claims arising from the rejection of executory contracts or leases will, unless another order of the Bankruptcy Court provides for an earlier date, be Filed with the Bankruptcy Court within thirty (30) days after the mailing of notice of entry of the Confirmation Order. All proofs of claim with respect to Claims arising from the rejection of executory contracts will be treated as Class 4 General Unsecured Claims for purposes of a distribution pursuant to the Plan.

## H.    Plan Administration

Subsequent to the Effective Date, the Estate will be administered by the Liquidation Trustee, whom without any further action of the Debtor or the Chapter 11 Trustee, shall become the appointed representative of the Estate in accordance with Section 1123(b)(3) of the Bankruptcy Code, and shall serve as the sole officer and sole director of the post-Effective Date Debtor. The Liquidation Trustee shall be responsible for liquidating and administering the Remaining Assets and for all distributions under the Plan. On the Transfer Date, a grantor's trust will be established in accordance with the Trust Agreement. A copy of the Trust Agreement will be filed prior to the Confirmation Hearing.

### 1.    Duties and Compensation of the Liquidation Trustee

The Liquidation Trustee will be responsible for receiving, liquidating, administering, and distributing (x) prior to the Transfer Date, the Remaining Assets and (y) from and after the Transfer Date, the Trust Assets, all in accordance with the Plan and the Trust Agreement. The Liquidation Trustee, subject to consultation with the Liquidation Trust Committee, will have full authority to take all steps necessary to administer the Estate and the Liquidation Trust, including without limitation, the duty and obligation to make distributions to Creditors hereunder, to review and maintain objections to or compromise Claims, and to pursue Causes of Action. The Liquidation Trustee will have and perform all of the duties, responsibilities, rights and obligations set forth in the Plan.

On or before August 11, 2008, subject to his obligations under Bankruptcy Rule 9011 and any other ethical rule governing his and his counsel's conduct, the Liquidation Trustee will File a motion pursuant to Federal Rule of Civil Procedure 60(b), and other appropriate pleadings, seeking to vacate or modify the Order Approving Turnover and Distribution of Certain Third Party Assets, entered by the Bankruptcy

Court on August 20, 2007 [Docket No. 18], in response to the Debtor's Emergency Motion for Approval of Turnover and Distribution of Certain Third Party Assets [Docket No. 7] Filed that same day in connection with the Citadel Sale Distribution. On or before the expiration of the applicable statute of limitations, including any extensions thereof entered into after consultation with the Liquidation Trust Committee, subject to his obligations under Bankruptcy Rule 9011 and any other ethical rule governing his and his counsel's conduct, the Liquidation Trustee will commence Causes of Action to avoid and recover the Citadel Sale Distributions and the SEG 1 Special Distributions from Citadel-Beneficiary Customers who are not Electing Holders under the Plan, subject to his reasonable judgment as to whether commencing such Causes of Action would be in the best interests of the beneficiaries of the Liquidation Trust, taking into account the result of the Rule 60(b) motion and the collection risk and cost attendant with specific Customers.

The Liquidation Trustee and its retained professionals will be compensated out of a reserve created pursuant to the Plan and the Trust Agreement.

## I.    Creditors' Committee and Liquidation Trust Committee

The Creditors' Committee will continue in existence until the Effective Date to exercise those powers and perform those duties specified in Section 1103 of the Bankruptcy Code and will perform such other duties as it may have been assigned by the Bankruptcy Court prior to the Effective Date. On the Effective Date, the Creditors' Committee will be dissolved and its members will be deemed released of all their duties, responsibilities and obligations in connection with the Chapter 11 Case or the Plan and its implementation, and the retention or employment of the Creditors' Committee's attorneys and other agents will terminate, except with respect to evaluating Professional Fee Claims. All expenses of the Creditors' Committee members and the fees and expenses of their professionals through the Effective Date will be paid in accordance with the terms and conditions of the Administrative Compensation Order, dated November 8, 2007 and other orders and rulings of the Bankruptcy Court.

### 1.    Creation of Liquidation Trust Committee

On the Effective Date, the Liquidation Trust Committee will be formed and shall consist of three representatives, consisting of the following members of the Creditors Committee, Discus Master Ltd., Jump Trading, LLC, and Kottke Associates LLC. JEM Commodity Relative Value Fund LP, Rotchford Barker, and BC Capital Fund A LLC may participate on the Liquidation Trust Committee as *ex officio* members with no voting rights. Penson GHCO and Vision Financial Markets LLC do not support the Plan, and having voiced objections thereto, will not be members (*ex officio* or otherwise) of the Liquidation Trust Committee whose purpose it is, in connection with the Liquidation Trustee, to carry out the terms and provisions of the Plan. Their opposition notwithstanding, Penson GHCO and Vision Financial Markets LLC dispute the makeup of the Liquidation Trust Committee and their exclusion as *ex officio* members.

2.    **Duties and Compensation of the Liquidation Trust Committee**

The members of the Liquidation Trust Committee shall consult with the Liquidation Trustee regarding all material aspects of the Estate's continued operations and all material activities of the Liquidation Trustee, exercising their business judgment but subject to the provisions of the Plan.

In the event that the Liquidation Trustee declines to initiate a Cause of Action and the Liquidation Trust Committee disagrees with the Liquidation Trustee's decision and believes prosecuting such Cause of Action is in the best interests of Creditors generally, then the Liquidation Trust Committee will have standing to initiate such Cause of Action on behalf of the Liquidation Trust. In addition, to the extent that the Liquidation Trust Committee disagrees with any decision or exercise of power by the Liquidation Trustee, including, without limitation, the manner in which securities are liquidated, then the Bankruptcy Court will determine such issue at the request of the Liquidation Trust Committee.

Each member of the Liquidation Trust Committee will serve without compensation for its performance of services as a member of the Liquidation Trust Committee, except that each member will be entitled to reimbursement of its reasonable expenses by the Estate or the Liquidation Trust.

3.    **No Liability of the Liquidation Trustee or the Liquidation Trust Committee**

Neither the Liquidation Trustee, the Liquidation Trust Committee, nor any of its members, designees, attorneys, accountants and other professionals, nor any duly designated agent or representative of the Liquidation Trustee or the Liquidation Trust Committee, or their respective employees, will be liable for the act or omission of any other member, designee, agent, or representative of the Liquidation Trustee or the Liquidation Trust Committee, nor will the Liquidation Trustee, the Liquidation Trust Committee, nor any of its members, designees, attorneys, accountants and other professionals, nor any duly designated agent or representative of the Liquidation Trustee or the Liquidation Trust Committee, or their respective employees, be liable for any act or omission taken or omitted to be taken in its capacity as Liquidation Trustee or as a member, designee, attorney, accountant or other professional of the Liquidation Trust Committee, or as a duly designated agent or representative of the Liquidation Trustee or the Liquidation Trust Committee, or as an employee of any of the foregoing, other than acts or omissions resulting from Liquidation Trustee or such member's willful misconduct or gross negligence. The Liquidation Trustee and the Liquidation Trust Committee may, in connection with the performance of their functions, and in their sole and absolute discretion, consult with counsel, accountants and their agents, and will not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such professionals, other than acts or omissions resulting from such member's willful misconduct or gross negligence. Notwithstanding such authority, neither the Liquidation Trustee nor the Liquidation Trust Committee will be under any obligation to consult with counsel, accountants or its agents, and its

determination to not do so will not result in the imposition of liability on the Liquidation Trustee or the Liquidation Trust Committee, or its members and/or designees, unless such determination is based on willful misconduct or gross negligence.

The Liquidation Trust will indemnify and hold harmless the Liquidation Trustee and the Liquidation Trust Committee and their members, designees, and their and their members' professionals, and any duly designated agent or representative thereof (in their capacity as such), from and against and in response to any and all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, other than as a result of their willful misconduct or gross negligence, with respect to the implementation or administration of the Plan or the pursuit of the Causes of Action.

### J.    Method of Distribution Under the Plan

#### 1.    Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided in the Plan or as ordered by the Bankruptcy Court, distributions to be made on account of Claims that are Allowed Claims as of the Effective Date will be made on the Initial Distribution Date or as soon thereafter as is practicable.  Any payment or distribution to be made on the Effective Date pursuant to the Plan will be deemed as having been made on the Effective Date if such distribution is made on the Effective Date or as soon thereafter as is practicable.  Any payment or distribution required to be made under the Plan on a day other than a Business Day, will be made on the next succeeding Business Day.  Distributions on account of Claims that first become Allowed Claims after the Effective Date will be made by the Liquidation Trustee pursuant to the terms and conditions of the Article IV. of the Plan and the Trust Agreement, where applicable.

#### 2.    Interest On Claims

Unless otherwise specifically provided for in the Plan or Confirmation Order, or required by applicable bankruptcy law, postpetition interest will not accrue or be paid on any Claims, and no holder of a Claim will be entitled to interest accruing on or after the Petition Date on any Claim.

#### 3.    Distributions by Liquidation Trustee

The Liquidation Trustee will make all distributions of Cash required to be distributed under the applicable provisions of the Plan and the Trust Agreement.  The Liquidation Trustee may employ or contract with other entities to assist in or make the distributions required by the Plan and the Trust Agreement.

#### 4.    Date and Delivery of Distributions

Distributions under the Plan will be made by Liquidation Trustee or its designee to the holders of Allowed Claims at the addresses set forth in the Schedules, unless such addresses are superseded by proofs of Claim or transfers of Claim filed

44

pursuant to Bankruptcy Rule 3001 (or at the last known addresses of such holders if the Liquidation Trustee has been notified in writing of a change of address).

### 5.    Unclaimed Property.

If any distribution remains unclaimed for a period of ninety (90) days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the holder of an Allowed Claim entitled thereto, such unclaimed property will be forfeited by such holder, whereupon all right, title and interest in and to the unclaimed property will be held by the Liquidation Trustee and will become Excess Cash.

### 6.    Distributions to Holders as of the Record Date

With respect to all Claims, the Liquidation Trustee, as applicable, will have no obligation to recognize the transfer of, or the sale of any participation in, any Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those Holders of Claims who are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date. The Liquidation Trustee will instead be entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the official claims register as of the close of business on the Distribution Record Date.

### 7.    Fractional Cents

Any other provision of the Plan to the contrary notwithstanding, no payment of fractions of cents will be made. Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment will reflect a rounding down of such fraction to the nearest whole cent.

### 8.    Payments of Less than Ten Dollars

If a Cash payment otherwise provided for by the Plan with respect to an Allowed Claim or Allowed Equity Interest would be less than ten ($10.00) U.S. dollars (whether in the aggregate or on any payment date provided in the Plan), notwithstanding any contrary provision of the Plan, the Liquidation Trustee will not be required to make such payment and such funds will be otherwise distributed to holders of Allowed Claims in accordance with Article IV. of the Plan.

### 9.    Setoffs

Except as otherwise provided for herein with respect to Causes of Action released by or on behalf of the Estate pursuant to the Plan and the Confirmation Order, the Liquidation Trustee may, but will not be required to, set off against any Claim and the payments to be made pursuant to the Plan in respect of such Claim, Causes of Action of any nature whatsoever that the Estate may have against the Holder of such Claim, but neither the failure to do so nor the allowance of a Claim will constitute a waiver or release by the Debtor or its Estate of any Claim it may have against the Creditor.

### K.    Disputed Claims

#### 1.    Objection Deadline; Prosecution of Objections

From and after the Effective Date, the Liquidation Trustee will have the exclusive right to object to any Claims. Objections to Claims will be Filed and served upon each affected Creditor no later than one hundred-eighty (180) days after the Effective Date, or thirty (30) days after the Trigger Date with respect to Citadel-Beneficiary Customers who have become Electing Holders, provided, however, that this deadline may be extended by the Bankruptcy Court upon motion of the Liquidation Trustee, with notice to the United States Trustee and each affected Creditor and with or without notice to Creditors.

Subject to the terms of the Plan, objections to Claims may be litigated to judgment, settled, or withdrawn.

#### 2.    No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, no payments or distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim.

### L.    Estimation of Claims

The Liquidation Trustee may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether an objection has been Filed with respect to such Claim. If the Bankruptcy Court estimates any contingent or unliquidated Claim, the estimated amount will constitute either the Allowed Claim for such Claim or a maximum limitation on such Claim, at the option of the Liquidation Trustee, after consultation with the Liquidation Trust Committee. If the estimated amount constitutes a maximum limitation on such Claim, the Liquidation Trustee may elect to pursue any supplemental proceedings to object to the allowance and ultimate distribution on such Claim. Unless otherwise ordered by the Bankruptcy Court, resolution or compromise of estimated Claims will be done pursuant to the Plan. All Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another. The Creditors Committee or the Liquidation Trust Committee, as applicable, will have the right to move the Bankruptcy Court for disallowance of any such Claim for voting purposes.

### M.    Reserves

#### 1.    Disputed Claims Reserve

On or as soon as practicable after the Effective Date, the Liquidation Trustee will establish and maintain the Disputed Claims Reserve from the Cash on hand on the Effective Date equal to the aggregate amount that would have been distributed to

the holders of Disputed Claims, except the Disputed BONY Secured Claim, had their Disputed Claims been deemed Allowed Claims on the Effective Date or on the Administrative Claims Bar Date, as applicable, or such other amount as may be approved by the Bankruptcy Court upon motion of the Chapter 11 Trustee or Liquidation Trustee. For effectuating the provisions of this Section, the Chapter 11 Trustee, the Liquidation Trustee, the Creditors Committee or the Liquidation Trust Committee, may, at any time, request that the Bankruptcy Court estimate, set, fix or liquidate the amount of the Disputed Secured Claims pursuant to Section 502(c) of the Bankruptcy Code, in which event the amounts so estimated, fixed or liquidated will be deemed the amounts of the Disputed Secured Claims for purposes of the Disputed Claims Reserve.

With respect to such Disputed Claims, if, when, and to the extent any such Disputed Claim becomes an Allowed Claim by Final Order, the relevant portion of the Cash held in the Disputed Claims Reserve therefor will be distributed by the Liquidation Trustee to the Claim holder in a manner consistent with distributions to similarly situated Allowed Claims.  The balance of such Cash, if any remaining after all Disputed Administrative Claims and Disputed Priority Tax Claims have been resolved, will become Excess Cash.

At quarterly intervals commencing ninety (90) days from the Effective Date, the Liquidation Trustee will release any amount held in reserve on account of any Disputed Claim that has been disallowed by Final Order during the preceding ninety (90) day period.  No payments or distributions will be made with respect to a Claim which is a Disputed Claim pending the resolution of the dispute by Final Order.

### 2.     Reserve for BONY Secured Claims

On the Effective Date, the Liquidation Trustee, in consultation with the Liquidation Trust Committee, will establish and maintain a reserve for the payment of the Disputed BONY Secured Claim (the "BONY Reserve").  For purposes of establishing the BONY Reserve, Cash will be set aside from the Cash on hand on the Effective Date in an amount either as agreed to by the Plan Proponents and BONY or, if no such agreement is reached, as determined by the Bankruptcy Court, after notice and a hearing, as constituting an amount adequate to provide for payment in full (including all principal, accrued interest and any other indemnifiable amounts as provided for in the operative BONY credit agreement or related documents) of the Disputed BONY Secured Claim in the amount allowed upon final resolution of the pending BONY adversary proceeding. Until such time, BONY will have and will retain a perfected, first-priority lien on all funds in the BONY Reserve, subject to all defenses to the enforcement and validity of BONY's liens and claims.  Payments or distributions from the BONY Reserve will only be made in accordance with Section 4.3.(a) of the Plan.  For effectuating the provisions of this Section, the Chapter 11 Trustee, the Liquidation Trustee, the Creditors Committee or the Liquidation Trust Committee, may, at any time, request that the Bankruptcy Court estimate, set, fix or liquidate the amount of the Disputed BONY Secured Claim pursuant to Section 502(c) of the Bankruptcy Code, subject to any objection to the ability of such party to do so, in which event the amount so estimated, fixed or liquidated will be

deemed the amount of the Disputed BONY Secured Claim for purposes of the BONY Reserve.

### 3.    Reserve for Professional Fee Claims

On the Effective Date, the Liquidation Trustee, in consultation with the Liquidation Trust Committee, will establish and maintain reserves for payment of estimated unpaid Professional Fee Claims ("Professional Fee Reserve"). For purposes of establishing the Professional Fee Reserve, Cash will be set aside from the Cash on hand on the Effective Date in an amount equal to the amount that the Chapter 11 Trustee and the Creditors Committee anticipate will be incurred for fees and expenses by Professionals retained in the Chapter 11 Case up to and including the Effective Date. If, when, and to the extent any such Professional Fee Claims become Allowed Claims by Final Order, the relevant portion of the Cash held in reserve therefor will be distributed by the Liquidation Trustee to the Professional or as set forth in such Final Order approving the Professional Fee Claim. The balance of such Cash, if any remaining after all Professional Fee Claims have been resolved and paid, will become Excess Cash. No payments or distributions will be made with respect to a Professional Fee Claim until such Professional Fee Claim is Allowed by Final Order.

### N.    Settlement Offer; Releases

As of the Effective Date, in consideration for a Citadel-Beneficiary Customer becoming an Electing Holder and for its treatment under the Plan:

(a.)    With respect to Citadel-Beneficiary Customers who have become Electing Holders only, the Estate will be deemed to release forever, waive, and discharge, *__and third-parties will be enjoined from pursuing__*, all claims that in any way relate to the Citadel Sale Distributions and the SEG 1 Special Distributions which will include any Cause of Action arising therefrom pursuant to, inter alia, Federal Rule of Civil Procedure 60(b), and Sections 549 and 550 of the Bankruptcy Code (the "Release");

(b.)    The Release will be contingent upon NonCitadel-Beneficiary Customers receiving distributions under the Plan equivalent to fifty percent (50%) of their Allowed Class 3 Claims, plus Interest ("Release Distribution Threshold") calculated on the amount NonCitadel-Beneficiary Customers would have received if the Citadel Sale Distributions and the SEG 1 Special Distributions had been made Pro Rata to all Holders of Class 3 Customer Claims, less any interim distributions received under the Plan, from the respective dates of the SEG 1 Special Distributions and the Citadel Sale Distributions through the first point in time that the Release Distribution Threshold is met or exceeded or timely contribution by an Electing Holder of its True-up Amount as provided in subsection (c.) of Section 10.10 of the Plan;

(c.)    In the event that the Release Distribution Threshold has not been met or exceeded as of the date when the BONY Complaint has been concluded by a Final Order adjudicating, or approving the settlement of, such adversary proceeding (the "Trigger Date"), after giving effect to (i) the amount of distributions the NonCitadel-

Beneficiary Customers would be entitled to receive pursuant to such Final Order and the Plan, (ii) the distributions the NonCitadel-Beneficiary Customers have received under the Plan at the time of the Trigger Date, and (iii) the amount of distributions the NonCitadel-Beneficiary Customers would receive pursuant to the liquidation of any securities remaining in the Estate as of the Trigger Date based upon the estimation of such proceeds, then each Citadel-Beneficiary Customer that is an Electing Holder will contribute an amount (the "Dune-up Amount") equal to such Electing Holder's share, calculated as a percentage equivalent to its Class 3 Customer Claim on account of SEG 1 Customer accounts in relation to all Citadel-Beneficiary Customers' Class 3 Customer Claims on account of SEG 1 Customer accounts as of the Petition Date, factored against the lesser of:   (i) the aggregate amount the Citadel-Beneficiary Customers would hypothetically be required to contribute to cause the NonCitadel-Beneficiary Customers to meet the Release Distribution Threshold as of the Trigger Date; and (ii) the aggregate amount the Citadel-Beneficiary Customers would hypothetically be required to contribute to cause the NonCitadel-Beneficiary Customers to achieve a Percentage Recovery equivalent to the Citadel-Beneficiary Customers' Percentage Recovery;

(d.)    The True-up Amount will be due within twenty (20) days of the Trigger Date and will be paid to the Liquidation Trust for Pro Rata distribution on account of the NonCitadel-Beneficiary Customers' Class 3 Claims;

(e.)    In the event that the Liquidation Trustee makes distributions of Trust Assets subsequent to the Trigger Date (such distributions, "Post-Trigger Date Distributions"), the Post-Trigger Date Distributions will be allocated and distributed first to those Electing Holders that timely contributed the True-up Amount in an amount necessary to reimburse such Electing Holders to the extent their contribution exceeds what the True-up Amount would have been if the Post-Trigger Date Distributions had in fact occurred prior to the Trigger Date;

(f.)    In the event that the ultimate liquidation of securities for which the Trustee and his professionals had estimated the proceeds of for purposes of calculating a True-up Amount yields actual proceeds less than estimated, each Citadel-Beneficiary Customer that is an Electing Holder will contribute an amount necessary, within twenty (20) days of such determination, to satisfy what its respective True-up Amount would have been if the liquidation of all of the securities in the Estate had in fact occurred prior to the Trigger Date;

(g.)    Upon the achievement of the same Percentage Recovery for all Holders of Allowed Class 3 Customer Claims, in lieu of the Pro Rata distributions provided for in Sections 4.4(a) and 4.5(c) of the Plan, any Citadel-Beneficiary Customer who is an Electing Holder will receive its share, calculated as a percentage equivalent to its Class 3 Customer Claim on account of SEG 1 Customer accounts in relation to all Citadel-Beneficiary Customers' Class 3 Customer Claims on account of SEG 1 Customer accounts, factored against 20% of the aggregate distributions to be made on account of Allowed Customer Claims and Allowed deficiency General Unsecured Claims under the Plan (the "20% Share Distributions") thereafter; provided that, the difference between such 20% Share Distributions and the distribution that would have been payable to such

Electing Holder under Sections 4.4(a) and 4.5(c) of the Plan, will be distributed Pro Rata to Non-Citadel-Beneficiary Customers (the "80/20 Transfer");

(h.)     By becoming Electing Holders, Citadel-Beneficiary Customers will be deemed to have consented to the jurisdiction of the Bankruptcy Court and deemed to have waived any objection or defense with respect to their unsatisfied obligation to remit the True-up Amount within twenty (20) days of the Trigger Date, and; the Bankruptcy Court will be authorized to enter judgment on the pleadings for the True-up Amount, and any post-judgment remedies, within five (5) Business days of the Filing of a complaint and request therefor;

(i.)     Claims on account of SEG 2, SEG 3, or SEG 4 Customer accounts held by Citadel-Beneficiary Customers that are Electing Holders will be treated under the Plan as if such Claims were held by NonCitadel-Beneficiary Customers only with respect to distributions as provided for in Sections 4.4 and 4.5 of the Plan; and

(j.)     A Citadel-Beneficiary Customer will be ineligible to participate in the settlement described in this Section 10.10 if, as of the date that is ten (10) days prior to the Voting Deadline, such Customer is the subject of a pending adversary proceeding to recover Property for the benefit of the Estate.

The Release provided for in Section 10.10 of the Plan is to be determined (if not previously triggered) as of the conclusion of the adversary proceeding commenced by the Chapter 11 Trustee against BONY. The selection of the Trigger Date was the product of protracted negotiation and consideration of cost/benefit analyses among the Plan Proponents and was ultimately selected because the Plan Proponents expect this Cause of Action to be (1) the most material contingent asset of the Estate, and (2) resolved at a time sufficiently distant to have allowed the liquidation of the Estate's securities to have concluded. Section 10.10 of the Plan also includes provision in the event that Estate securities remain unliquidated as of the resolution of the BONY litigation so as not to prejudice any Citadel-Beneficiary Customer who becomes an Electing Holder if the subsequent liquidation of such securities would have reduced such Electing Holder's True-up Amount.

The total dollar amount of Claims held by NonCitadel-Beneficiary Customers as of the Petition Date is roughly $739 million. Assuming all "Assets available for distribution to all other creditors" as described in the Liquidation Analysis, as well as various items such as interest earned on the cash on hand (cash on hand is measured in the Liquidation Analysis as of the date of this disclosure statement), coupon payments on securities that have not yet been liquidated, and other miscellaneous recoveries that the Trustee expects to receive prior to Plan confirmation, are distributed to NonCitadel-Beneficiary Customers, the Plan Proponents estimate that an additional roughly $50-75 million would need to be recovered in order to trigger the Release for Electing Holders. Thus, for example, under a scenario in which the Liquidating Trustee (i) is completely unsuccessful in pursuing each of the estate's claims against BONY, M&P, Citadel and other potential litigation targets as described in Sections V.H and V.I above (a worst-case scenario the Plan Proponents believe to be very unlikely), and also

50

(ii) fails in pursuing all claims against the Citadel Beneficiary Customers that do not opt to become Electing Holders, if any, and such non-electing Citadel Beneficiary Customers are not required to disgorge any amounts received pre- or post-petition, then the estimated shortfall below the Trigger Amount would be in the $50-75 million range, and each Electing Holder would be responsible in such a scenario for payment of a True-Up Amount equal to its percentage (calculated as described above) of roughly $50-75 million. Given the Estate's Causes of Action and the cost of litigation, the Plan Proponents believe that Citadel Beneficiary Customers who decide not to become Electing Holders and instead litigate the various issues proposed to be resolved under the settlement face substantially greater liability and cost than the amount they might need to contribute as Electing Holders, and in the event of a relatively small shortfall that they face liability several times greater than they would under the settlement.

The 80/20 Transfer is an integral component of the settlement, a product of protracted negotiation, which provides consideration to NonCitadel-Beneficiary Customers upon achieving parity with Citadel-Beneficiary Customers in the form of a transfer of value among Electing Holders in exchange for bearing the risk of reliance upon contingent assets, such as Causes of Action, during the interval between the Release Distribution Threshold and such a point of parity. The incremental recovery transferred to NonCitadel-Beneficiary Customers, provided for by the 80/20 Transfer, is greater than what the Plan would otherwise yield given the approximate ratio of Claims held by Citadel-Beneficiary Customers to Claims held by NonCitadel-Beneficiary Customers of 65/35 at the point of parity.

Claims held by Citadel-Beneficiary Customers on account of SEG 2, SEG 3, or SEG 4 Customer accounts will not be included in calculating an Electing Holder's True-up Amount. Claims held by Citadel-Beneficiary Customers who are Electing Holders on account of SEG 2, SEG 3, or SEG 4 Customer accounts will not be eligible to share with NonCitadel-Beneficiary Customers in distributions made under Section 10.10(d) of the Plan pursuant to the contribution of True-up Amounts.

The recovery under the Plan for Citadel-Beneficiary Customers who opt for the settlement is wholly contingent upon the outcome of litigation commenced by the Chapter 11 Trustee or the Liquidation Trustee against third-parties (including Citadel-Beneficiary Customers that do not opt for the settlement). Depending upon the extent of the Liquidation Trustee's success in this regard, the approximately 71% Percentage Recovery such Holders currently possess could be materially diminished if such Holders are required to contribute the True-up Amounts that are a feature of the settlement.

The recovery under the Plan for Citadel-Beneficiary Customers who do not opt for the settlement is wholly contingent upon the outcome of litigation commenced by the Chapter 11 Trustee or the Liquidation Trustee against third-parties (including litigation commenced against such Citadel-Beneficiary Customers that do not opt for the settlement). Depending upon the extent of the Liquidation Trustee's success in this regard, the approximately 71% Percentage Recovery such Holders currently possess could be materially diminished.

The foregoing is only a summary of Section 10.10 of the Plan. Creditors are directed to Section 10.10 of the Plan for a more precise description of the settlement offer that is being extended to Citadel-Beneficiary Customers.

## O.    Assignment of Private Actions to the Liquidation Trust

On the Transfer Date, a distinct tranche of the Liquidation Trust ("Tranche-P") will be established on the terms set forth in the Trust Agreement. Tranche-P will hold the Non-Estate Claims owned by the Tranche-P Electors and which Non-Estate Claims, even after contribution, will not become Property. Holders of Claims that are not Tranche-P Electors will not receive any distribution on account of Tranche-P. Any recoveries on account of such Non-Estate Claims will be treated as provided for in the Trust Agreement in a manner which will mirror the treatment of Customer Property under the Plan. Tranche-P will be managed and operated by the Liquidation Trustee. The Liquidation Trust Committee will have certain approval rights on key issues relating to the operation and management of Tranche-P.

Notwithstanding anything to the contrary in the Plan, it will be a condition to any Tranche-P Elector's effective transfer of Non-Estate Claims, and therefore a condition to benefiting from Tranche-P, that such Holder evidence its ownership of such Non-Estate Claim to the Liquidation Trustee.

## P.    Insider Settlement

The Plan contains a number of provisions relating to settlement by and between the Chapter 11 Trustee, on the one hand, and Philip M. Bloom, the Philip M. Bloom Revocable Trust, the Sybil Bloom Revocable Trust, the Philip Bloom Remainder Trust and the Philip M. Bloom Grantor Annuity Trust, Eric A. Bloom, Sentinel Investment Group, Inc., Sentinel Financial Services, Inc., Sentinel Management International, Ltd., Fountainhead Investments, Inc., EB Trust 2005 and Eric A. Bloom Living Trust, on the other hand, approved by Bankruptcy Court order entered June 9, 2008 [Docket No. 577] (the "Insider Settlement"). Those provisions include:

(a.)    Contribution Bar Relating to Claims Against Certain Insiders. The Plan provides that all Persons are permanently barred, enjoined, and restrained from commencing, prosecuting, or asserting any request, claim, or cause of action for or otherwise seeking contribution or common law indemnification, however denominated, against any of the Philip M. Bloom, the Philip M. Bloom Revocable Trust, the Sybil Bloom Revocable Trust, the Philip Bloom Remainder Trust, the Philip M. Bloom Grantor Annuity Trust, Eric A. Bloom, Fountainhead Investments, Inc., EB Trust 2005, Sentinel Financial Services, Inc., Eric A. Bloom Living Trust and Sybil Bloom (the "Insider Releasees") based upon, relating to, or arising out of (A) any claims asserted or judgments obtained against any Person by the Chapter 11 Trustee or the Estate, or amounts actually paid by an Person to the Chapter 11 Trustee or the Estate based on such claims or judgments, whether by settlement or otherwise, and/or (B) liability owed, or alleged or claim to be owed, or amounts paid, whether by settlement or otherwise, to the Chapter 11 Trustee or the Estate and (C) the costs of defending against claims, causes of

action, demands, or requests asserted or made by the Chapter 11 Trustee (collectively, the "Contribution Bar"). Entry of the Confirmation Order shall constitute findings that (i) the Insider Settlement was negotiated and reached in good faith and in accordance with applicable law relating to the Contribution Bar, and (ii) all legal requirements relating to the Contribution Bar have been satisfied in connection with the Insider Settlement and the parties have acted in good faith in all respects relating thereto.

(b.)    Injunction Against Certain Insiders.  The Plan provides that *__the Insider Releasees are hereby permanently barred, enjoined, and restrained__* from commencing, prosecuting, or asserting any request, claim, or cause of action for or otherwise seeking contribution or common law indemnification, however denominated, against any Person based upon, relating to, or arising out of (A) any claims asserted or judgments obtained against the Insider Releasees by the Chapter 11 Trustee or the Estate, or amounts actually paid by the Insider Releasees to the Chapter 11 Trustee or the Estate based on such claims or judgments, whether by settlement or otherwise, and/or (B) liability owed, or alleged or claimed to be owed, or amounts paid, whether by settlement or otherwise, to the Chapter 11 Trustee or the Estate and (C) the costs of defending against claims, causes of action, demands, or requests asserted or made by the Chapter 11 Trustee.

(c.)    No Bar Against Estate Claims.  None of the releases pertaining the Insiders shall be construed to discharge any liability of any Person to the Chapter 11 Trustee or the Estate or to preclude any adversary proceeding, claim, cause of action, demand, request for relief, or recovery, whether or not currently pending, by the Chapter 11 Trustee against or from any Person.

(d.)    Pro Tanto Judgment Reduction.  The Plan provides that any monetary award or judgment obtained by the Chapter 11 Trustee from or against any Person for the same injuries alleged in the adversary proceeding *Grede v. Bloom, et al.*, Adv. No. 07-981 (Bankr. N.D. Ill) (the "Insider Adversary Proceeding") for which contribution or common law indemnification is available from the Insider Releasees, shall be reduced *pro tanto* by the amount set forth in the settlement agreements memorializing the Insider Settlement, copies of which were attached to the motion seeking approval of the Insider Settlement [Docket No. 503] (the "Settlement Agreements"), regardless of the Insider Releasees' and the Person's relative fault or any other consideration.

(f.)    Challenge to Contribution Bar or Judgment Reduction.  The Plan provides that if the Contribution Bar is found to be invalid by any court for any reason, or if at any time the method of judgment reduction set forth above and in the order approving the Insider Settlement is found to be invalid, the Contribution Bar and other provisions of the Insider Settlement shall be null and void to the extent set forth in the Settlement Agreements, and the rights and obligations of the Chapter 11 Trustee and Insider Releasees shall be as set forth in the Settlement Agreements. In addition, in the event of any challenge to the Contribution Bar in a judicial or similar proceeding, and for so long as such challenge is pending, the Insider Releasees shall have a lien and claim against any and all funds of the estate (including funds recovered in the future) in an

amount equal to the amount necessary to satisfy the Chapter 11 Trustee's obligations to return certain funds as provided in the Settlement Agreements, subordinate and subject only to costs of administration. Notwithstanding the foregoing, however, nothing herein shall be deemed to require the Chapter 11 Trustee to seek to recover any distributions already made to creditors.

(g.)    Estate Released Claims.    Entry of the Confirmation Order shall constitute findings that (i) the Estate Released Insider Claims constitute the exclusive property of the Estate and (ii) the Chapter 11 Trustee holds the sole and exclusive standing to seek recovery on account of the Estate Released Insider Claims. All creditors of the Estate including, but not limited to contingent creditors, Persons who have filed claims against the Estate and all Persons sued or to be sued by the Estate, are hereby permanently barred, enjoined, and restrained from commencing, prosecuting, or asserting any action or proceeding against the Insider Releasees based on all manners of action, causes of action, suits, debts, accounts, promises, warranties, damages and consequential damages, demands, agreements, costs, expenses, claims or demands whatsoever, of any kind or nature whether known or unknown, liquidated or unliquidated, disputed or undisputed, contingent, inchoate or matured, in law or in equity which the Chapter 11 Trustee, Debtor, or Estate now have or ever had against the Insider Releasees upon or by reason of any manner, cause or thing whatsoever on or at any time prior to May 14, 2008, including, but not limited to claims concerning, arising out of, or relating to the facts, circumstances, events, transactions or transfers alleged or which could have been alleged in the Insider Adversary Proceeding (the "Estate Released Insider Claims").

(h.)    The Insider Settlement does not (i) act as an injunction or bar against any third party, including any Creditor of the Estate, from bringing any direct claims they may have against the Insider Releasees; or (ii) impact or have any effect on the property of the Estate issue/Customer Property issues described in Section VI.A. above.

### Q.    Cantor Escrow

On April 8, 2008, the Chapter 11 Trustee and Cantor Fitzgerald entered into the Cantor Turnover Stipulation, pursuant to which the parties agreed that Cantor would turnover surplus proceeds from the liquidation of repo securities totaling $3,491,573.79 (the "Cantor Escrowed Funds") to the Chapter 11 Trustee to be held in a segregated account pending an order or plan providing for its distribution. The Plan provides for the distribution of the Cantor Escrowed Funds. The notice of the Confirmation Hearing will serve as the notice required by the Cantor Turnover Stipulation to Cantor and all known creditors and customers of the Debtor of the distribution of the Cantor Escrowed Funds in accordance with the Plan. The 20-day filing period referenced in paragraph 3 of the Cantor Turnover Stipulation shall be deemed to expire on the Voting Deadline. If on or before the Voting Deadline (i) Cantor shall have filed a motion or petition seeking payment from the Cantor Escrowed Funds of any setoff, recoupment or other rights (including, without limitation, its rights as a secured creditor with respect to the Cantor Escrow Funds) under the Master Repurchase Agreement by and between Cantor and Debtor dated as of October 25, 2004 or applicable

law, or (ii) any other person or entity asserting an interest in or claim against any of the Cantor Escrowed Funds shall file a motion or petition with the Bankruptcy Court asserting such interest or claim, and such motions or petitions, if any, have not been resolved by Final Order on or before the Effective Date (which may include the Confirmation Order), then the Cantor Escrowed Funds will remain in the Cantor Escrow Account pending resolution by Final Order. In accordance with the Cantor Turnover Stipulation, if Cantor or any other person or entity asserting an interest in or claim against the Cantor Escrowed Funds does not assert such claims or interests prior to the Voting Deadline, then all claims to or against the Cantor Escrowed Funds shall be extinguished and deemed waived, except as provided in the Plan. If such claims or interests are so asserted, such claims or interests shall be determined and paid in accordance with the Cantor Turnover Stipulation, as established by Final Order.

R.    **Exculpation**

Notwithstanding anything herein to the contrary, as of the Effective Date, none of the Chapter 11 Trustee and his advisors, attorneys, financial advisors, accountants, other professionals, the Creditors Committee, the individual members of the Creditors Committee and its and their respective advisors, attorneys, financial advisors, agents, other professionals and affiliates will have or incur any liability for any claim, cause of action or other assertion of liability for any act taken or omitted to be taken since the Petition Date in connection with, or arising out of, the Chapter 11 Case, formulation, negotiation, preparation, solicitation of votes with respect to, the confirmation, consummation, or administration of the Plan, or property to be distributed under the Plan, except for willful misconduct or gross negligence to the maximum extent provided for under 805 ILCS 5/8.75 or federal law; provided, however, nothing in the Plan will be construed to exculpate the Citadel-Beneficiary Customers who do not become Electing Holders in connection with their receipt of Citadel Sale Distributions or SEG 1 Special Distributions; provided, however, that nothing in the Chapter 11 Case or the Plan shall in any way be construed as discharging, releasing, or relieving the Debtor, or any other party, in any capacity, from any responsibility with respect to the Pension Plan under any law or regulatory provision relating to the termination of the Pension Plan, unless the Pension Plan is terminated prior to the confirmation of the Plan.

S.    **Extinguishment of Liens**

On the Effective Date, all Liens against any property of the Debtor, except to the extent provided in the Plan or the Confirmation Order, will be deemed forever extinguished and discharged.

T.    **Preservation/Waiver of Causes of Action**

Pursuant to the Plan, and Sections 544, 547, 548, 549, 550, 551, 553 and 1123(b)(3)(B) of the Bankruptcy Code, the Liquidation Trustee will retain all rights and all Causes of Action accruing to the Debtor including, without limitation, the avoidance of any transfer of an interest of the Debtor in property or any obligation incurred by the Debtor; except as expressly noted in Section 10.10 of the Plan or Confirmation Order,

nothing contained in the Plan or the Confirmation Order will be deemed to be a waiver or relinquishment of any such rights or Causes of Action.  Nothing contained in the Plan or the Confirmation Order will be deemed to be a waiver or relinquishment of any claim, Cause of Action, right of setoff, or other legal or equitable defense which the Debtor had immediately prior to the Petition Date which is not specifically waived or relinquished by the Plan.  The Liquidation Trustee will have, retain, reserve and be entitled to assert all such claims, Causes of Action, rights of setoff and other legal or equitable defenses, which the Debtor had immediately prior to the Petition Date as fully as if the Chapter 11 Case had not been commenced; and all of the Liquidation Trustee's legal and equitable rights respecting any Claim which are not specifically waived or relinquished by the Plan may be asserted after the Effective Date to the same extent as if the Chapter 11 Case had not been commenced.

U.    **Votes Solicited in Good Faith**

The Plan Proponents believe that they have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, and will ask the Bankruptcy Court to so find.

V.    **Administrative Claims Incurred after the Confirmation Date**

Administrative Claims incurred after the date and time of the entry of the Confirmation Order, including (without limitation) Claims for Professionals' fees and expenses incurred after such date, will not be subject to application and may be paid by the Liquidation Trustee, subject to review and objection by the Liquidation Trust Committee, in the ordinary course of business and without application for or Bankruptcy Court approval.

W.    **Retention of Jurisdiction**

Following the Confirmation Date and until such time as all payments and distributions required to be made and all other obligations required to be performed under the Plan have been made and performed by the Liquidation Trustee, the Chapter 11 Case will remain open pending final order of the Bankruptcy Court closing the case and the Bankruptcy Court will have exclusive jurisdiction of all matters arising out of, and relating to, the Chapter 11 Case and the Plan pursuant to, and for the purposes of (among other things):

1.    **Claims and Equity Interests** To determine the allowance, classification, priority or subordination of Claims and Equity Interests against the Debtor upon objection by the Liquidation Trustee or any other party in interest;

2.    **Causes of Action** To determine on a non-exclusive basis, any and all Causes of Action and Non-Estate Claims that have been transferred to the Liquidation Trust on the Transfer Date;

3.    **Injunction** To issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan

or its execution or implementation by any Person, to construe and to take any other action to enforce and execute the Plan, the Confirmation Order, or any other order of the Bankruptcy Court, to issue such orders as may be necessary for the implementation, execution, performance and consummation of the Plan and all matters referred to herein, and to determine all matters that may be pending before the Bankruptcy Court in the Chapter 11 Case on or before the Effective Date with respect to any Entity and, without limiting the generality of the foregoing, to enter appropriate injunctive relief in the event that the Liquidation Trust Committee removes the Liquidation Trustee in a manner contrary to the standard set forth in Section 6.10 of the Plan;

4.     **Professional Fees**To determine any and all applications for allowance of compensation and expense reimbursement of Professionals for periods before the entry of the Confirmation Order, as provided for in the Plan;

5.     **Certain Priority Claims**To determine the allowance and classification of any Priority Tax Claims, Administrative Claims or any request for payment of an Administrative Claim;

6.     **Dispute Resolution**To resolve any dispute arising under or related to the implementation, execution, consummation or interpretation of the Plan and/or Confirmation Order and the making of distributions hereunder and thereunder, including, without limitation, any dispute concerning payment of professional fees and expenses of the Liquidation Trustee;

7.     **Executory Contracts and Unexpired Leases**To determine any and all motions for the rejection, assumption, or assignment of executory contracts or unexpired leases, and to determine the allowance of any Claims resulting from the rejection of executory contracts and unexpired leases;

8.     **Actions**To determine all applications, motions, adversary proceedings, contested matters, actions, and any other litigated matters instituted in the Chapter 11 Case by or on behalf of the Debtor, including, but not limited to, the Causes of Action commenced by the Chapter 11 Trustee or Liquidation Trustee, and any remands;

9.     **General Matters**To determine such other matters, and for such other purposes, as may be provided in the Confirmation Order or as may be authorized under provisions of the Bankruptcy Code;

10.     **Plan Modification**To modify the Plan under Section 1127 of the Bankruptcy Code, remedy any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order so as to carry out its intent and purposes;

11.     **Aid Consummation**To issue such orders in aid of consummation of the Plan and the Confirmation Order notwithstanding any otherwise applicable non-bankruptcy law, with respect to any Entity, to the full extent authorized by the Bankruptcy Code;

**12.    Protect Property**To protect the Property of the Debtor and Property transferred to the Liquidation Trust pursuant to the Plan from adverse Claims or interference inconsistent with the Plan, including to hear actions to quiet or otherwise clear title to such property based upon the terms and provisions of the Plan or to determine a purchaser's exclusive ownership of claims and causes of actions retained under the Plan;

**13.    Abandonment of Property**To hear and determine matters pertaining to abandonment of Property of the Estate or the Liquidation Trust;

**14.    Recovery of True-up Amount**To enter judgment for the Liquidation Trust, as applicable, pertaining to True-up Amounts incurred and owed by Citadel-Beneficiary Customers that are Electing Holders under Section 10.10 of the Plan;

**15.    Implementation of Confirmation Order**To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

**16.    Liquidation Trustee's Exercise of Power**

To enter and implement such orders as may be appropriate to resolve any disagreement between the Liquidation Trustee and the Liquidation Trust Committee over any aspect of the Liquidation Trustee's exercise of powers under the Plan and the Trust Agreement; and

**17.    Close Chapter 11 Case**To enter a Final Order closing the Chapter 11 Case.

**X.    Miscellaneous Provisions**

**1.    Payment of Statutory Fees**

All fees payable on or before the Effective Date pursuant to Section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, will be paid by the Liquidation Trustee on the Effective Date.

**2.    Amendment or Modification of the Plan**

(a)    <u>Pre-Confirmation Modification</u>.  On notice to and with an opportunity to be heard by the United States Trustee, the Plan may be altered, amended or modified by the Plan Proponents before the Confirmation Date as provided in Section 1127 of the Bankruptcy Code.

(b)    <u>Post-Confirmation Immaterial Modification</u>.  With the approval of the Bankruptcy Court and on notice to and an opportunity to be heard by the United States Trustee and the Creditors Committee or the Liquidation Trust Committee, as applicable, and without notice to all holders of Claims and Equity Interests, the Plan Proponents or the

58

Liquidation Trustee, as applicable, may, insofar as it does not materially and adversely affect the interest of holders of Claims, correct any defect, omission or inconsistency in the Plan in such manner and to such extent as may be necessary to expedite consummation of the Plan.

(c)    <u>Post-Confirmation Material Modification</u>.  On notice to and with an opportunity to be heard by the United States Trustee and the Creditors Committee or the Liquidation Trust Committee, as applicable, the Plan may be altered or amended after the Confirmation Date by the Liquidation Trustee in a manner which, in the opinion of the Bankruptcy Court, materially and adversely affects holders of Claims, provided that such alteration or modification is made after a hearing and otherwise meets the requirements of Section 1127 of the Bankruptcy Code.

**3.      Payment of Attorney's Fees Related to Drafting of Plan**

Each of Discus Master Ltd., BC Capital Fund A, LLC, JEM Commodity Relative Value Fund LP, Jump Trading, LLC, and Rotchford Barker will have the right to file a motion with the Bankruptcy Court, which the Creditors Committee will support, seeking allowance of an Administrative Claim pursuant to Section 503(b)(4) of the Bankruptcy Code for reimbursement from the Estate, on a substantial contribution basis, for each movant's respective legal fees and expenses relating to the formulation and drafting of the Plan and Disclosure Statement incurred through April 9, 2008.

**4.      Governing Law**

Unless a rule of law or procedure is supplied by Federal law (including the Bankruptcy Code and Bankruptcy Rules) or such corporate law that may apply, the laws of the State of Illinois (without reference to the conflicts of laws provisions thereof) will govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan.

**5.      Filing or Execution of Additional Documents**

On or before the Effective Date, the Plan Proponents will file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**6.      Withholding and Reporting Requirements**

In connection with the Plan and all instruments issued in connection therewith and distributions thereon, the Liquidation Trustee will comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority and all distributions hereunder will be subject to any such withholding and reporting requirements.

### 7.    Exemption From Transfer Taxes

Pursuant to section 1146(c) of the Bankruptcy Code, any transfer from the Debtor to the Liquidation Trust or otherwise pursuant to the Plan will not be subject to any stamp or similar tax and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax.

### 8.    Headings

Headings used in this Disclosure Statement are for convenience and reference only and will not constitute a part of this Disclosure Statement for any purpose.

### 9.    Exhibits

All Exhibits to this Disclosure Statement are incorporated into and constitute a part of this Disclosure Statement as if set forth herein.

### 10.    Notices

All notices, requests, and demands hereunder to be effective will be in writing and unless otherwise expressly provided herein, will be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

#### If to the Chapter 11 Trustee:

Frederick J. Grede, Chapter 11 Trustee of Sentinel
Management Group, Inc.
c/o Jenner & Block LLP
330 N. Wabash Avenue
Chicago, Illinois 60611

with a copy to:

Jenner & Block LLP
330 N. Wabash Avenue
Chicago, Illinois 60611
Attention: Vincent E. Lazar

**If to the Creditors Committee:**

Philippe Jordan, Chair of the Creditors Committee.
CFM INTERNATIONAL INC.
Discus Master Ltd.
405 Lexington Avenue, 41st Floor
New York, New York 10174

with a copy to:

Quinn Emanuel Urquhart Oliver & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Attention:  Susheel Kirpalani
            Benjamin I. Finestone

**If to the Liquidation Trustee:**

Frederick J. Grede,
c/o Jenner & Block LLP
330 N. Wabash Avenue
Chicago, Illinois 60611

### 11.    Plan Supplement

Forms of the documents relating to the Trust Agreement will be contained in the Plan Supplement which will be filed with the Clerk of the Bankruptcy Court no later than ten (10) days before the Voting Deadline.  The Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.

### 12.    Conflict

The terms of the Plan will govern in the event of any inconsistency with the summaries of the Plan set forth in this Disclosure Statement.

### 13.    Setoff by the United States

The valid setoff rights, if any, of the United States of America will be unaffected by the Plan or confirmation thereof.

## VII.

## CONFIRMATION PROCEDURE

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of Chapter 11, including, among other things, that (i) the Plan has properly classified Claims and Equity Interests, (ii) the Plan complies with applicable provisions of the Bankruptcy Code, (iii) the Plan Proponents

have complied with applicable provisions of the Bankruptcy Code, (iv) the Plan Proponents have proposed the Plan in good faith and not by any means forbidden by law, (v) disclosure of "adequate information" as required by Section 1125 of the Bankruptcy Code has been made, (vi) the Plan has been accepted by the requisite votes of all classes of creditors (except to the extent that "cram-down" is available under Section 1129(b) of the Bankruptcy Code), (vii) the Plan is in the "best interests" of all holders of Claims in an impaired class, and (viii) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of such fees on the Effective Date.

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

### A.    Solicitation of Votes

Each impaired class of Claims that will (or may) receive or retain property or any interest in property under the Plan is entitled to vote to accept or reject the Plan.

Classes 1 and 2 of the Plan are Unimpaired and Holders of Claims in such Classes are conclusively presumed to have accepted the Plan; the Solicitation of acceptances with respect to Classes 1 and 2 is not required. Classes 3 and 4 are Impaired. Holders of Claims in Classes 5 and 6 will not receive or retain any property on account of their Claims or Equity Interests and are conclusively presumed to have rejected the Plan; the Solicitation of acceptances with respect to such Classes is not required. Therefore, in accordance with Sections 1126 and 1129 of the Bankruptcy Code, the Debtor is Soliciting acceptances only from holders of Claims in Classes 3 and 4.

A Holder of a Claim in Class 3 or 4 whose Claim is Impaired under the Plan is entitled to vote to accept or reject the Plan if (i) its Claim has been scheduled by the Debtor and such Claim is not scheduled as disputed, contingent or unliquidated, or (ii) it has filed a proof of claim on or before the applicable Bar Date and no objection to such Claim has been made. Any distributions made by the Debtor on or after the Petition Date on account of a Class 3 Customer Claim shall reduce the amount of such Claim for voting purposes. Certain recipients of post-Petition Date distributions dispute this methodology, believing they should be able to vote an amount inclusive of already-received distributions.

As to classes of claims entitled to vote on a plan, the Bankruptcy Code defines acceptance of a plan by a class of creditors as acceptance by Holders of at least two-thirds in dollar amount and more than one-half in number of the claims of that class that have timely voted to accept or reject a plan.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

### B.    The Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing. The Confirmation Hearing in respect of the Plan has been scheduled for August 12, 2008 at 1:00 p.m. (Central Time). The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing. Any objection to confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim. Any such objection must be filed with the Bankruptcy Court and served so that it is received by the Bankruptcy Court and the notice parties, on or before August 1, 2008 at 5:00 p.m. (Central Time). Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014, although, as disclosed above, certain SEG 1 Customers assert that Bankruptcy Rule 7001 is applicable to the determination of whether certain property is property of the Estate.

### C.    Confirmation

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of Section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of a plan are that the plan is (i) accepted by all impaired classes of claims and interests or, if rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (ii) feasible and (iii) in the "best interests" of creditors that are impaired under the plan.

#### 1.    Acceptance of the Plan

Except as permitted under Section 1129(b) of the Bankruptcy Code, the Code requires, as a condition to confirmation, that each class of impaired claims or interests votes to accept the Chapter 11 plan; however, as provided in Section 1129(b), notwithstanding that (i) a voting class does not accept the Plan or (ii) a non-voting class is deemed to reject the plan, a bankruptcy court can nevertheless confirm the plan if it satisfies the standards for "cram-down."

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims entitled to vote as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class that actually vote. For the purpose of determining the dollar amount and the number of claims accepting the plan, only those who actually vote to accept or reject the plan are counted. Holders of claims who fail to vote are not counted as either accepting or rejecting the plan.

#### 2.    Confirmation Without Acceptance of All Impaired Classes

Pursuant to Section 1129(b) of the Bankruptcy Code, if necessary to confirm the plan, the Plan Proponents may seek confirmation or "cram-down" of the plan. Section 1129(b) contains provisions for confirmation of a Chapter 11 plan even if all impaired classes do not accept the plan, as long as at least one impaired class of claims has accepted it. A bankruptcy court may confirm the plan at the request of the Plan

Proponents if, as to each impaired class that has not accepted the plan, the plan "does not discriminate unfairly" and is "fair and equitable." A Chapter 11 plan "does not discriminate unfairly" within the meaning of the Bankruptcy Code if the dissenting class will receive value relatively equal to the value given to all other similarly situated classes. A plan is "fair and equitable" within the meaning of the Bankruptcy Code if no class receives more than it is legally entitled to receive for its claims or interests. The provisions for confirmation of a plan despite the rejection by one or more impaired classes of claims or interests are set forth in Section 1129(b) of the Bankruptcy Code.

The Plan Proponents intend to seek confirmation pursuant to Section 1129(b) of the Bankruptcy Code with respect to Class 6, which is deemed to reject the plan. In addition, if any other impaired class of claims entitled to vote will not accept the Plan by the requisite majorities provided in Section 1126(c) of the Bankruptcy Code, the Plan Proponents reserve the right to seek to have the Bankruptcy Court confirm the Plan under Section 1129(b) of the Bankruptcy Code.

     (a)     Unfair Discrimination and Fair and Equitable Tests.

To obtain non-consensual confirmation of the Plan, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each impaired, non-accepting Class. The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable." It establishes "cram-down" tests for secured creditors, unsecured creditors and equity holders, as follows:

     (i)     <u>Secured Creditors</u>. Either (i) each impaired secured creditor retains its Liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, or (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of Liens with such Liens to attach to the proceeds of the sale and the treatment of such Liens on proceeds to be as provided in clause (i) or (ii) of this subparagraph.

     (ii)     <u>Unsecured Creditors</u>. Either (i) each impaired unsecured creditor receives or retains under the plan, property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

     (iii)     <u>Interests</u>. Either (i) each holder of an equity interest will receive or retain under the plan, property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of its interest or (ii) the holder of an interest

that is junior to the non-accepting class will not receive or retain any property under the plan.

### 3.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successors to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan. The Plan proposed by the Plan Proponents provides for a liquidation of the Estate's remaining assets and a distribution to creditors in accordance with the priority scheme of the Bankruptcy Code and the terms of the Plan. The ability of the Estate and the Liquidation Trust to make the distributions described in the Plan does not depend on future earnings of the Debtor. Accordingly, the Plan Proponents believe that the Plan is feasible and meets the requirements of Section 1129(a)(11) of the Bankruptcy Code.

### 4.    Best Interests Test and Liquidation Analysis

Section 1129(a)(7) of the Bankruptcy Code requires that any holder of an impaired claim or equity interest voting against a proposed plan must be provided with a value, as of the effective date of the plan, at least equal to the value that the holder would receive if the debtor's operations were terminated and its assets liquidated under Chapter 7 of the Bankruptcy Code. This analysis is commonly referred to as the "best interests" test.

To determine what the holders of claims and interests in each impaired class would receive if a debtor were liquidated in Chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from a liquidation of the debtor's assets in the context of hypothetical liquidation. This determination must take into account the fact that secured claims, and any administrative claims resulting from the Chapter 11 case or from the hypothetical Chapter 7 case, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay unsecured Creditors.

Under the Plan or a hypothetical Chapter 7 case, the Liquidation Trustee or a Chapter 7 trustee, in each case, would be tasked with liquidation of the Estate's Property and Causes of Action and distribution of the proceeds. The Plan Proponents submit that whether the case is converted to Subchapter III or a general Chapter 7 case, applicable law would still require a method of distribution based upon a Creditor's *pro rata* share of Estate assets except to the extent a Creditor can meet its own burden of imposing a trust over distinct, identifiable assets, and the Bankruptcy Court honors such an imposition of a trust. More specifically, the Plan Proponents believe that there exist two possible scenario outcomes that could play out if the Estate were liquidated under Chapter 7.

First, in a generic Chapter 7 liquidation, the Plan Proponents submit that the Bankruptcy Court would find that, due to the level of commingling of Customer

property, failure to honor segregation and other misconduct that has occurred pre-Petition Date, the only equitable scheme of distribution would be to distribute all of the property of the Estate to Creditors *pro rata*, except that the Bankruptcy Court would likely give a priority to all Customers ratably for property deposited and commingled among the Segregated Accounts. As discussed in detail below, due to the expected increased administrative costs of such a liquidation, Creditors would fare worse in the Chapter 7 environment. Certain Citadel-Beneficiary Customers might choose to litigate their belief that the Citadel Sale Distributions were property held in an express trust for the benefit of such Customers and not property of the Chapter 7 estate. Such Customers asserting their position as trust beneficiaries would not fare better under a Chapter 7 liquidation because the Plan provides that any such Customers are free to vote against the Plan and not enter into the settlement embodied within, thereby preserving their right to defend receipt of such property.[4]

Second, if Sentinel were to be liquidated under Subchapter III, a trustee would liquidate of all of the Property of the Estate and distribute such property to Customers *pro rata* just as the Plan provides , but without any settlement option. Again, as discussed below, due to the expected increased administrative costs of such a liquidation, the Plan Proponents assert that Customers and other Creditors would be worse off in such an environment.

Although the Plan's proposed liquidation under Chapter 11 and a Chapter 7 liquidation would have the same goal of liquidating the remainder of the Estate and distributing all of the proceeds to Creditors, the Plan Proponents believe that the Plan provides a more efficient vehicle to accomplish this goal and is therefore the vehicle that maximizes the return to Creditors.

(a)    Variance/Qualification

Estimating assets for distribution in any Chapter 7 case is an uncertain process due to the number of unknown variables such as the net realizable value of assets in an expeditious manner, the projected cost of litigation between the bankruptcy estate and its creditors and third parties, the results of such litigation, and other contingencies beyond a Chapter 7 trustee's control. This uncertainty is further exaggerated by the complexities of the Chapter 11 Case. The underlying projections contained in the liquidation analysis have not been compiled or examined by independent accountants. The Plan Proponents make no representations regarding the accuracy of the projections or

---

[4]     To the extent that any Citadel-Beneficiary Customers seek to impose a trust over any Remaining Property (*i.e.*, aside from the Citadel Sale Distributions, which the Plan Proponents believe need not be litigated at Confirmation), the Plan Proponents believe such Customers will be required to meet their burden of proof in the face of the Chapter 11 Trustee's assertion, based upon the extensive forensic work examination completed by him and his professionals, of such widespread commingling of Sentinel's Property, failure to honor segregation, misconduct on the part of Defendant Insiders, and general principles of equity, to demonstrate the best interests of creditors test has not been met by the Plan.

a Chapter 7 trustee's ability to achieve forecasted results. Many of the assumptions underlying the projections are subject to significant uncertainties. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the ultimate financial results.

Specifically, estimated securities' market values, as reported to the Plan Proponents by professional's retained by the Chapter 11 Trustee, are opinions and estimates only (subject to revision) and are provided for informational purposes only. The ability for the Estate to realize such values is not certain. No assurance, prediction or investment advice regarding payment is made, intended, or implied.

In the event the Chapter 11 Case is converted to Chapter 7, actual results may vary materially from the estimates and projections set forth in the liquidation analysis. As such, the liquidation analysis is speculative in nature and represents the Plan Proponents' combined business judgment.

(b)    <u>Assumptions</u>

(i)    <u>Conversion</u> – The Chapter 11 Case is converted on the date that would otherwise be the Effective Date of the Plan.

(ii)    <u>Start-up Time</u> – Given the complexities of the Chapter 11 Case, specifically the Causes of Action, it is anticipated that a Chapter 7 trustee, and any newly retained professionals for the Chapter 7 trustee will require three to six months to familiarize themselves with the Estate, the Property, the Causes of Action, and related matters.

(iii)    <u>Chapter 7 Committee(s)</u> – No committees are generally formed under Section 705 of the Bankruptcy Code or, to the extent that one or more committees are formed, the Debtor's Estate is not obligated to pay fees or expenses associated with any such committees.

(iv)    <u>Trustee Fees</u> – A Chapter 7 trustee would be compensated in accordance with the guidelines of Section 326 of the Bankruptcy Code.[5]

(v)    <u>Professional Fees</u> – Given that a Chapter 7 trustee and his or her professionals would be required to familiarize themselves with the Debtor, the Estate, the Property, the Causes of Action, and related matters, it is anticipated that a Chapter 7 trustee's professionals fees would be higher than the estimated professional fees to be incurred by the Liquidation Trustee following Confirmation and consummation of the

---

[5]    Pursuant to Section 326 of the Bankruptcy Code, the statutory Chapter 7 Trustee fee will not exceed 25% of the first $5,000 disbursed, 10% on any amount in excess of $5,000 but not in excess of $1,000,000, and reasonable compensation not to exceed 3% on any amounts in excess of $1,000,000.

Plan. Moreover, without the benefit of the Settlements embodied in the Plan, if the Chapter 11 Case were to convert to Chapter 7, the bankruptcy case would be expected to proceed for a considerably longer duration due to the expected increase in litigation of unresolved issues. The estimated Liquidation Trustee Fees were estimated to accrue at $1.8 million per month for twelve months. The Chapter 7 Admin Fees were based upon an assumption that the case extends for eighteen months at an average of $1.8 million per month, including three months to obtain the working knowledge that the Liquidation Trustee will already possess and three months to account for the expected increased litigation. While actual professional fees could in fact be greater or less in either Chapter 7 or Chapter 11, the relative analysis stands.

(vi)    <u>Cash on Hand</u> – Cash on hand is based on Cash balances in the possession of the Chapter 11 Trustee as of the date of the filing of the Disclosure Statement.

(vii)    <u>Estimated Proceeds from Liquidation of Remaining Portfolio Securities</u> – Amounts are based upon estimated liquidation proceeds of securities in the possession of the Chapter 11 Trustee as of the date of the filing of the Disclosure Statement. Although not quantified or relied upon herein, due to the current, volatile state of the credit markets, the proceeds of the liquidation of the Estate's remaining securities is expected to be greater in an orderly Chapter 11 environment as opposed to an expeditious manner under Chapter 7. Among other things, due to the nature of the remaining securities, actual proceeds may vary materially from such estimates and projections set forth in the liquidation analysis.

(viii)    <u>BONY Secured Claim</u> – Amount is based upon the BONY Secured Claim as asserted plus an estimated reserve for legal fees and post-petition interest accrual. This estimated reserve is not to be construed or interpreted as an admission of any sorts as to the rights of BONY to claim such amounts or the liability of the Estate for such amounts and the actual reserve amount could be significantly greater or lesser. BNY asserts that the reserve will be required to be materially higher asserting that postpetition interest and fees and expenses are accruing at the rate of $15 million per annum. In the event that the actual reserve, as established by the Bankruptcy Court, is in an amount higher than as set forth in the liquidation analysis, the Plan Proponents will not re-solicit votes on the Plan.

(ix)    <u>Causes of Action</u> – Consistent with the calculation of the estimated recoveries under the Plan, no values are included for recoveries from Causes of Action. The Plan Proponents do not believe speculation as to the prospect of contingent recoveries is practicable or would be a meaningful indicator of value for creditors. Although the

benefits are not readily quantifiable, there would be no Liquidation Trustee in Chapter 7.

In an effort to aid Creditors in their decisions on how to vote, the Plan Proponents attach a liquidation analysis hereto as Exhibit B.

After consideration of the effect that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to the Debtor's Creditors, the Plan Proponents have determined that a Chapter 11 liquidation plan that mirrors the liquidation provisions of Chapter 7 (given the Plan Proponents' assertions of commingling of Customer funds and securities based upon the Chapter 11 Trustee's forensic examination of the Debtor's activities, books, and records), and of Subchapter III (including the special protections for Sentinel's Customers) is in the best interests of all Creditors for the following reasons.

First, liquidating the Estate pursuant to a Chapter 7 liquidation would require the appointment of a Chapter 7 trustee. Such appointment, as well as the appointment of any professionals retained by such Chapter 7 trustee, including counsel, would potentially create delay and increase the operating costs associated with the liquidation of the Estate. The Chapter 7 trustee and his professionals would lack the knowledge of the Chapter 11 Case possessed by the Chapter 11 Trustee and his professionals and would have to familiarize themselves with the Chapter 11 Case. This would require duplication of substantial amounts of the work performed by the Chapter 11 Trustee, his attorneys and other professional advisors during the course of the Chapter 11 Case. Therefore, the Plan Proponents assert that the administrative expense associated with a Chapter 7 trustee will be in excess of the administrative expenses associated under the Plan in connection with the Liquidation Trustee and the Liquidation Trust Committee. This would not only be unnecessarily wasteful, but also create additional expenses for the Estate, resulting in reduced recoveries for all Impaired Creditors.

Second, the Plan contains Settlements which afford Creditors the choice to avoid litigation of several of the complex issues existing in the Chapter 11 Case. If the Estate is forced to litigate such issues under any scenario, doing so would drain the assets of the Estate and extend the duration of the case both of which would have a negative effect on assets available for Creditors. By including the option to settle and avoid such litigation, the Plan seeks to minimize the cost in time and money of resolving such disputes. If the Chapter 11 Case were to convert to Chapter 7 and the Plan were not confirmed, the Settlements embodied in the Plan would not take effect and the Estate would not realize their benefit.

Finally, the Plan Proponents believe that distributions would occur more expeditiously pursuant to the Plan than if the Estate was liquidated pursuant to a Chapter 7 liquidation. The conversion of the Chapter 11 case to a Chapter 7 case would be expected to be a protracted proceeding. In addition, the Chapter 7 trustee, once appointed, and any professionals hired by the Chapter 7 trustee, would need additional time to familiarize themselves with the Debtor and its Creditors, thus delaying the

distributions to Creditors. This delay would create an additional expense attributable to the time value of money.

After considering the effects that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to Creditors in the Chapter 11 Case, the Plan Proponents have determined that a Chapter 7 liquidation would result in a diminution in the value to be realized by the holders of Claims, and a delay in making distributions to all Classes of Claims entitled to a distribution. Therefore, the Plan Proponents believe that confirmation of the Plan will provide each Holder of a Claim entitled to vote with an equal or greater recovery than such Holder would have received under a Chapter 7 liquidation of the Debtor, and that, therefore, the Plan satisfies the requirements of Section 1129(a)(7) of the Bankruptcy Code.

## VIII.

### CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST THE DEBTOR SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED HEREIN BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### A.    Failure to Receive Requisite Acceptances

If the requisite acceptances of the Plan are received with respect to Classes 3 and 4, the Plan Proponents intend to seek confirmation of the Plan by the Bankruptcy Court. If the requisite acceptances are not received, the Plan Proponents may nevertheless seek confirmation of the Plan notwithstanding the dissent of certain Classes of Claims by confirmation of the Plan pursuant to "cram-down" provisions of the Bankruptcy Code. In order to confirm a plan against a dissenting class, the Bankruptcy Court also must find that at least one impaired class has accepted the plan, with such acceptance being determined without including the acceptance of any "insider" in such class.

### B.    Failure of Bankruptcy Court to Confirm Plan

Even if the requisite acceptances of the Plan are received and, with respect to the Class or Classes deemed to have rejected the Plan, the requirements for "cram-down" are met, the Bankruptcy Court, which as a court of equity may exercise substantial discretion, may choose not to confirm the Plan. Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtor (*i.e.*, "feasibility") and that the value of the distributions to dissenting holders of Claims may

not be less than the value such holders would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code (*i.e.*, "best interests" test).    Although the Plan Proponents believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

## IX.

## EFFECTIVENESS OF PLAN

### A.    Confirmation of the Plan

The Plan can be confirmed either under Section 1129(a) of the Bankruptcy Code or in a non-consensual manner under Section 1129(b) of the Bankruptcy Code so long as the conditions of Section 8.2 of the Plan have been satisfied or waived pursuant to Section 8.4 of the Plan.

### B.    Conditions Precedent to Confirmation of the Plan

The Plan will not be confirmed unless (i) the Confirmation Order will be reasonably acceptable in form and substance to the Plan Proponents; and (ii) the Confirmation Date of this Plan will have occurred on or before July 31, 2008.

### C.    Conditions Precedent to Effectiveness

The Plan will not become effective unless and until it has been confirmed and the following conditions have been satisfied in full or waived pursuant to Section 8.4 of the Plan:  (i) the Bankruptcy Court will have entered the Confirmation Order in form and substance satisfactory to the Plan Proponents; (ii) the Confirmation Order will have become a Final Order; (iii) the Trust Agreement will have been approved and executed; (iv) the Liquidation Trustee will have been appointed in accordance with the Plan; (v) the Liquidation Trust Committee will have been formed in accordance with the Plan; (vi) all statutory fees then due and payable to the United States Trustee will have been paid in full; (vii) all documents to be executed, delivered or Filed pursuant to the Plan, will be executed, delivered or Filed, as the case may be; and (viii) all actions, authorizations, filings, consents and regulatory approvals required (if any) will have been obtained, effected or executed in a manner acceptable to the Plan Proponents, and will remain in full force and effect.

### D.    Waiver of Conditions

The Plan Proponents may at any time, without notice or authorization of the Bankruptcy Court, waive the conditions set forth in Sections 8.2 and 8.3 of the Plan.

### E.    Effect of Failure of Conditions

In the event that the conditions specified in Section 8.3 of the Plan have not occurred or been waived on or before thirty (30) days after the Confirmation Date, upon notification submitted by the Plan Proponents to the Bankruptcy Court: (i) the

71

Confirmation Order will be vacated, (ii) no distributions under the Plan will be made, (iii) the Debtor and all holders of Claims and Equity Interests will be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, (iv) the Estate's obligations with respect to the Claims and Equity Interests will remain unchanged and (v) nothing contained in the Plan will constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtor, or any other person, to prejudice in any manner the rights of the Estate or any Entity in any further proceedings involving the Debtor.

## X.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN

The Plan Proponents believe that the Plan affords holders of Impaired Claims the potential for the greatest realization on Customer Property and Debtor's assets while simultaneously providing Customers with Impaired Claims the special protections of Subchapter III, and, therefore, is in the best interests of the Creditors. If, however, the requisite acceptances of the Plan are not received, or the requisite acceptances are received and the Plan is not subsequently confirmed and consummated, the theoretical alternatives include: (a) an alternative plan of liquidation or (b) liquidation of the Chapter 11 Debtor under Subchapter III.

## XI.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

Subject to the limitations noted below, the following discussion is a summary of certain U.S. federal income tax consequences expected to result from the implementation of the Plan relevant to Holders of Claims entitled to vote with respect to adoption of the Plan. This discussion is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), in effect on the date of this Disclosure Statement, on U.S. Treasury Regulations in effect (or in certain cases, proposed) on the date of this Disclosure Statement, and on judicial and administrative interpretations thereof available on or before such date. All of the foregoing is subject to change, which change could apply retroactively and could affect the tax consequences described below. There can be no assurance that the Internal Revenue Service (the "IRS") will not take a contrary view with respect to one or more of the issues discussed below, and no ruling from the IRS or opinion of counsel has been sought with respect to any issues that may arise under the Plan.

The following summary is for general information only and does not purport to address all of the U.S. federal income tax consequences that may be applicable to any particular Holder. The tax treatment of a Holder of an Allowed Claim may vary depending upon such Holder's particular situation. The following discussion does not address state, local or foreign tax considerations that may be applicable to the Debtor or to a Holder of an Allowed Claim. This summary does not address tax considerations applicable to Holders that may be subject to special tax rules, such as financial

institutions, insurance companies, real estate investment trusts, regulated investment companies, grantor trusts, dealers or traders in securities or currencies, tax-exempt entities, persons that hold an Allowed Claim as a position in a "straddle" or as part of a "hedging," "conversion" or "integrated" transaction for U.S. federal income tax purposes, persons that have a "functional currency" other than the U.S. dollar, and persons who are not U.S. persons (as defined in the Tax Code).

EACH HOLDER OF A CLAIM IS URGED TO CONSULT ITS OWN TAX ADVISOR WITH RESPECT TO THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN.

### TREASURY DEPARTMENT CIRCULAR 230 DISCLOSURE

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, HOLDERS OF ALLOWED CLAIMS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY HOLDERS OF ALLOWED CLAIMS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS OF ALLOWED CLAIMS UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS BEING USED IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE PLAN PROPONENTS; AND (C) HOLDERS OF ALLOWED CLAIMS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

### A.    Federal Income Tax Consequences to the Debtor

Taxpayers generally must include in gross income the amount of any cancellation of indebtedness ("COD") income. COD income is the difference between the amount of a taxpayer's indebtedness that is canceled and the amount or value of the consideration exchanged therefor. Even if indebtedness of the Debtor is discharged under the Plan, the Debtor will not recognize taxable COD income because the discharge will be pursuant to a Chapter 11 bankruptcy proceeding. Although the Debtor will not be required to recognize COD income, it must instead reduce certain tax attributes by the amount of unrecognized COD income after the determination of the tax for the year of discharge in the manner prescribed by Tax Code Section 108(b). Tax attributes include net operating losses ("NOLs"), capital losses and loss carryovers, certain tax credits and, subject to certain limitations, the tax basis of property.

Under the Plan, assets of the Debtor will be transferred to the Liquidation Trust. It is intended that the transfer of assets to the Liquidation Trust will result in the recognition by the Debtor of gain or loss based on the difference between the fair market value and tax basis of the assets transferred. (However, see Section G below for a discussion of potential alternative characterizations of this transaction and the tax effects thereof.) If the Debtor recognizes a net gain from the transfer of assets, such gain will be offset to the extent of the Debtor's NOLs and/or capital loss carryforwards. If the

Debtor's net gain, if any, exceeds the Debtor's NOLs and loss carryforwards, the excess will be subject to regular corporate income tax. In addition, the Debtor may be subject to alternative minimum tax as a result of the transfer of assets, as described below. Any resulting tax will be paid by the Debtor to the IRS.

The Tax Code provides that, for any taxable year, a corporation's federal income tax liability equals the greater of (i) the tax computed at the regular corporate tax income rates (currently up to 35%) on taxable income and (ii) the alternative minimum tax ("AMT") computed at a lower tax rate (20%) but on a broader income base (alternative minimum taxable income or "AMTI"). For purposes of computing a corporation's regular federal income tax liability, all of the income recognized in a taxable year may be offset by available NOLs and other loss carryovers (to the extent permitted under, inter alia, Sections 382 and 383 of the Tax Code). In contrast, for purposes of computing AMTI, NOLs (as determined for AMT purposes) and other loss carryovers generally are taken into account, but may not offset more than 90% of the pre-NOL AMTI. Thus, a corporation that is currently profitable for AMT purposes generally will be required to pay federal income tax at an effective rate of at least 2% of its pre-NOL AMTI (10% of the 20% AMT rate), regardless of the amount of its NOLs. As a result, even if the Debtor is otherwise able to fully offset its income with NOLs, it will be subject to current taxation in any year in which it has positive net pre-NOL AMTI (including as a result of gain and income recognition in connection with the transactions contemplated by the Plan).

**B.      General Tax Considerations for Holders of Allowed Claims**

The U.S. federal income tax consequences to Holders of Allowed Claims arising from the distributions to be made in satisfaction of their Claims pursuant to the Plan may vary, depending upon, among other things: (a) the manner in which a Holder acquired an Allowed Claim; (b) the type of consideration received by the Holder of an Allowed Claim in exchange for the interest it holds; (c) the nature of the indebtedness owed to it; (d) whether the Holder previously claimed a bad debt or worthless securities deduction in respect of the Allowed Claim; (e) whether the Holder of the Allowed Claim is a citizen or a resident of the U.S. for tax purposes; (f) whether the Holder of the Allowed Claim reports income on the accrual or cash basis method of accounting; and (g) whether the Holder receives distributions in more than one taxable year. In addition, where gain or loss is recognized by a Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the Allowed Claim constitutes a capital asset in the hands of the Holder and how long it has been held or is treated as having been held, and whether the Allowed Claim was acquired at a market discount.

**C.      Accrued but Unpaid Interest**

In general, to the extent that a Holder of a Claim receives property in satisfaction of interest accrued during the holding period of the instrument underlying

such claim, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income).

The extent to which property received by a Holder of a Claim will be attributable to accrued but unpaid interest is not clear. Pursuant to the Plan, all distributions in respect of any Allowed Claim will be allocated first to the principal amount of such Allowed Claim, and thereafter to accrued but unpaid interest, if any. However, there is no assurance that such allocation will be respected by the IRS for U.S. federal income tax purposes.

Each Holder of an Allowed Claim is urged to consult its tax advisor regarding the inclusion in income of amounts received in satisfaction of accrued but unpaid interest and the allocation of consideration between principal and interest.

### D.    Bad Debt Deduction and Worthless Securities Deduction

A Holder of an Allowed Claim that does not constitute a security for purposes of Section 165(g) of the Tax Code and who receives, pursuant to the Plan, an amount of consideration that is less than such Holder's tax basis in the Allowed Claim in exchange for that Claim, may be entitled in the year of receipt (or in an earlier year) to a bad debt deduction under Section 166(a) of the Tax Code, or may be entitled to a loss under Section 165(a) in the year of receipt. A Holder of an Allowed Claim that constitutes a security and which is wholly worthless may be entitled to a worthless securities deduction under Sections 165(g) and 165(a) of the Tax Code. The rules governing the timing and amount of such deductions place considerable emphasis on the facts and circumstances of the holder, the obligor, and the instrument with respect to which a deduction is claimed. Any such loss would be limited to the Holder's tax basis in the indebtedness underlying its Claim. Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to their ability to claim such deductions.

### E.    Market Discount

If a Holder of an Allowed Claim purchased the Claim at a discount, the difference may constitute "market discount" for U.S. federal income tax purposes. Any gain recognized by a holder of a debt obligation with market discount should be treated as ordinary interest income to the extent of any market discount accrued on the Claim by the holder on or prior to the date of the exchange.

### F.    Receipt of Cash and/or Liquidation Trust Interests in Exchange for Allowed Claims

In general, the receipt of Cash and/or interests in the Liquidation Trust in exchange for an Allowed Claim should result in the recognition of gain or loss in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value of any interests in the Liquidation Trust received (other than any Cash or interests in the Liquidation Trust attributable to accrued but unpaid interest) and (ii) the Holder's tax basis in its Allowed Claim (other than any Claim for accrued but unpaid interest). Because Holders of Allowed Claims may receive additional

75

consideration from the Disputed Claims Reserve, it is possible that losses with respect to their claims will be deferred until all assets are distributed by the Disputed Claims Reserve. If amounts are received by a Holder in more than one taxable year, a portion of such amounts may be characterized as interest.

The Liquidation Trustee, in consultation with the Liquidation Trust Committee, will determine the fair market value of the assets transferred to the Liquidation Trust and of the beneficial interests in the Liquidation Trust. These values must be used by the Debtor, the Liquidation Trustee, and all beneficiaries of the Liquidation Trust for all federal income tax purposes. It is possible that the IRS may disagree with the Liquidation Trustee's valuations for this purpose. If the IRS were to successfully assert that different valuations should apply, the amount of taxable gain or loss recognized by Holders of Allowed Claims would be subject to adjustment.

G.    **Treatment of Liquidation Trust**

The proper tax treatment of vehicles such as the Liquidation Trust, an escrow account, settlement fund or similar fund is uncertain. Although certain Treasury Regulations have been issued, no Treasury Regulations have been promulgated to address the tax treatment of such funds in a bankruptcy context. Depending on the facts and the relevant law, such funds possibly could be treated as grantor trusts, separately taxable trusts, qualified settlement funds, or otherwise.

The Plan Proponents believe that the Liquidation Trust should qualify as a liquidating trust, as defined in Treasury Regulation Section 301.7701-4(d) and intend to request the IRS to confirm such treatment through the issuance of a private letter ruling in accordance with IRS Revenue Procedure 94-45. A liquidating trust is treated as a grantor trust under the Tax Code. In anticipation of the receipt of such ruling, therefore, the Plan Proponents intend to treat the assets held therein, as held by a grantor trust with respect to which the Liquidation Trust beneficiaries are treated as the grantors. Consistent with the requirements of Revenue Procedure 94-95, the Plan Proponents will treat the transfer of assets to the Liquidation Trust as a transfer of such assets directly from the Debtor to the Liquidation Trust beneficiaries followed by the transfer by such persons of such assets to the Liquidation Trust, in exchange for beneficial interests in the Liquidation Trust.

Consistent with this treatment, Liquidation Trust beneficiaries will be treated for federal income tax purposes as the grantors and owners of their share of the assets held by the Liquidation Trust. No tax should be imposed on the Liquidation Trust on earnings generated by the assets held by the Liquidation Trust. Instead, the Liquidation Trust beneficiaries will be taxed on their allocable shares of such earnings in each taxable year, whether or not they receive any distributions from the Liquidation Trust. The Liquidation Trustee will report each year to each Holder that is a Liquidation Trust beneficiary the amount of items of income, gain, loss, deduction or credit of the Liquidation Trust allocable to such Holder. The amount of distributions a Holder ultimately receives pursuant to the Plan may be less than the amount of earnings generated that are allocated and taxable to such Holder.

Unless and until the IRS issues a private ruling confirming that the Liquidation Trust constitutes a valid liquidating trust under Treasury Regulation Section 301.7701-4(d), there can be no assurance that the IRS will respect the foregoing treatment, and several alternative characterizations are possible. For example, the IRS may characterize some or all of the Liquidation Trust as a grantor trust for the benefit of the Debtor or as otherwise owned by and taxable to the Debtor. Alternatively, the IRS could characterize the Liquidation Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

As another alternative, the IRS could characterize the Liquidation Trust as a Qualified Settlement Fund ("QSF") pursuant to Treasury Regulations under Tax Code Section 468B(g) (the "QSF Regulations"). The QSF Regulations generally do not apply to trusts which are established to satisfy claims of general trade creditors and debt holders in a bankruptcy case. The QSF Regulations, however, do apply to a trust which is established to satisfy liabilities which arise out of a tort, breach of contract, or violation of law or are otherwise designated by the Tax Code. Thus, if the IRS asserted that Allowed Claims arose from such causes, the Liquidating Trust could be treated as a QSF. If the Liquidation Trust were treated as a QSF, it would be treated as a separate taxable entity subject to federal income tax at the maximum tax rate applicable to trusts (currently 35 percent).

If the Liquidation Trust were treated as a grantor trust for the benefit of the Debtor, as a complex trust or as a QSF, it is likely that additional taxes would be imposed on the Liquidation Trust's recoveries, resulting in decreased distributions to Holders of Allowed Claims. Moreover, because the amount received by a Holder of Claims in satisfaction of such Holder's Allowed Claims may increase or decrease, depending upon whether the Liquidation Trust is treated as a grantor trust, such Holder could be prevented from recognizing a loss until the time at which there are no assets at all remaining in the Liquidation Trust against which such Holder has a Claim. Finally, even if the IRS respects the characterization of the Liquidation Trust as a liquidating trust, it may disagree with the allocation of income to the holders of interests therein.

No advance rulings will be requested from the IRS regarding the tax characterization of the Liquidation Trust as a liquidating trust. Although it is contemplated that a private letter ruling on the liquidating trust issue will be requested as promptly as possible following the confirmation of the Plan, there can be no assurance that such ruling will be granted or, even if granted, when such ruling might be received. Nevertheless, to maximize the likelihood of receipt of a favorable ruling, the Liquidation Trust will comply with the requirements and guidelines set forth in Rev. Proc. 94-45 which specifies conditions under which the IRS will consider issuing advance rulings on the tax treatment of liquidating trusts.

Holders of Allowed Claims that receive Liquidation Trust interests are urged to consult their tax advisors regarding the potential U.S. federal income tax treatment of the Liquidation Trust and the consequences to them of such treatment (including the effect of the computation of a Holder's gain or loss in respect of its

77

Allowed Claim and the possibility of recognizing taxable income without a corresponding receipt of cash or property with which to satisfy the resulting tax liability).

**H.      Treatment of Disputed Claims Reserve**

Pursuant to the Plan, the Chapter 11 Trustee will create and fund the Disputed Claims Reserve with Cash, which will be distributed to Holders of Disputed Claims whose claims become Allowed Claims in accordance with the Plan.  The tax consequences to such Holders of such distributions should generally be determined in accordance with the principles discussed above, and will be subject to the uncertainty described above.

Under Section 468B(g) of the Tax Code, amounts earned by an escrow settlement fund or similar fund must be subject to current tax.  Treasury Regulation Section 1.468B-9 permits an election to be made to treat certain such funds as "disputed ownership funds" and sets forth the taxation of funds as to which such election has been made.  Although the matter is not free from doubt, the Plan Proponents believe that the Disputed Claims Reserve should be appropriately characterized as a disputed ownership fund provided the Liquidation Trustee properly elects this classification. The Liquidation Trustee intends to elect to have the Disputed Claims Reserve classified as a disputed ownership fund for federal income tax purposes.

As a disputed ownership fund, the Disputed Claims Reserve will be taxed in one of two possible ways: either as a C corporation or as a QSF.  In either case, the income of the Disputed Claims Reserve will be taxable as a separate entity at the highest marginal federal income tax rate applicable to corporations or trusts, as applicable (currently, the top rate for both is 35%).  The taxable income of the Disputed Claims Reserve will include any taxable income earned with respect to the Cash held in the Disputed Claims Reserve, less any administrative costs and other incidental expenses incurred in connection with the Disputed Claims Reserve.  The Cash funded into the Disputed Claims Reserve by the Chapter 11 Trustee will not constitute taxable income to the Disputed Claims Reserve, and the Disputed Claims Reserve will not be allowed to deduct distributions to Holders of Disputed Claims.

There can be no assurance that the IRS will respect the foregoing treatment.  For example, the IRS might characterize all or some portion of the Disputed Claims Reserve as a "complex trust" in which case the Disputed Claims Reserve would be taxable on its income as a separate entity, but allowed a deduction under certain circumstances for income earned by the Disputed Claims Reserve that is distributed within the same taxable year or shortly thereafter.  In that case, such income would be taxed directly to the distributees.

Alternatively, the IRS could characterize some or all of the Disputed Claims Reserve as a grantor trust for the benefit of the Holders of Disputed Claims in which case (i) a Holder of a Disputed Claim may have taxable gain or loss on the Effective Date measured by reference to the value of property set aside for such Holder and (ii) the Holder may be required to include earnings of the Disputed Claims Reserve

in income.    As another alternative, the IRS could characterize the Disputed Claims Reserve as a grantor trust for the benefit of the Debtor.

Because the amount received by a Holder of a Disputed Claim may increase or decrease, depending upon whether the Disputed Claims Reserve is treated as a disputed ownership fund or grantor trust, such Holder could be prevented from recognizing a loss until the time at which there are no assets at all remaining in the Disputed Claims Reserve against which such Holder has a Claim.

Each Holder of a Disputed Claim is urged to consult its tax advisor regarding the potential tax treatment of the Disputed Claim Reserve, distributions therefrom, and any tax consequences to such Holder relating thereto.

## I.    Backup Withholding Tax and Information Reporting Requirements

U.S. federal backup withholding tax and information reporting requirements generally apply to certain payments to certain noncorporate Holders. Information reporting generally will apply to payments under the Plan, other than payments to an exempt recipient.    A payor will be required to withhold backup withholding tax from any payments made under the Plan, other than payments to an exempt recipient, if such Holder fails to furnish its correct taxpayer identification number or otherwise fails to comply with, or establish an exemption from, such backup withholding tax requirements.

THE ABOVE SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY.    ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN.

## XII.

## RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in the Disclosure Statement, the Plan Proponents believe that confirmation and consummation of the Plan is the best method of maximizing the recoveries of the holders of Claims against the Debtor. Consequently, the Plan Proponents urge all eligible holders of Impaired Claims to vote to ACCEPT the Plan.

Dated: June 18, 2008

CFM INTERNATIONAL INC.
Chair of the Official Committee of Unsecured
Creditors of Sentinel Management Group, Inc.

By: _____
     Philippe Jordan

The Official Committee of Unsecured Creditors of
Sentinel Management Group, Inc.

By: _____
     One of its Attorneys

DLA PIPER US LLP
Mark A. Berkoff
Marc Fenton
203 North LaSalle Street, Suite 1900
Chicago, Illinois 60601
(312) 368-7090

QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
Susheel Kirpalani
Benjamin I. Finestone
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

Dated: June 18, 2008

CFM INTERNATIONAL INC.
Chair of the Official Committee of Unsecured
Creditors of Sentinel Management Group, Inc.


By:    _____
       Philippe Jordan


The Official Committee of Unsecured Creditors of
Sentinel Management Group, Inc.


By:    /s/ Mark A. Berkoff_____
       One of its Attorneys


DLA PIPER US LLP
Mark A. Berkoff
Marc Fenton
203 North LaSalle Street, Suite 1900
Chicago, Illinois 60601
(312) 368-7090

QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
Susheel Kirpalani
Benjamin I. Finestone
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

Frederick J. Grede, Chapter 11 Trustee for Sentinel
Management Group, Inc.

By: _____

Frederick J. Grede

Frederick J. Grede, Chapter 11 Trustee for Sentinel
Management Group, Inc.

By: _____

One of its Attorneys

JENNER & BLOCK LLP
Catherine L. Steege
Vincent E. Lazar
330 N. Wabash Avenue
Chicago, Illinois 60611
(312) 222-9350

# EXHIBIT  K

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SENTINEL MANAGEMENT GROUP, INC., | ) | Case No. 07 B 14987 |
| | ) | |
| Debtor. | ) | |
| | ) | Hon. John H. Squires |

**OBJECTIONS OF THE AD HOC COMMITTEE OF SEG 1 CUSTOMERS
TO THE DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE
BANKRUPTCY CODE FOR THE CHAPTER 11 PLAN OF LIQUIDATION
SUBMITTED BY THE CHAPTER 11 TRUSTEE AND THE CREDITORS COMMITTEE**

The Ad Hoc Committee of Seg 1 Customers (the "Ad Hoc Committee") of Sentinel Management Group, Inc. (the "Debtor"), hereby submits these Objections (the "Objections") to the Disclosure Statement pursuant to Section 1125 of the Bankruptcy Code for the Chapter 11 Plan of Liquidation (the "Disclosure Statement") submitted by the Official Committee of Unsecured Creditors (the "Committee") and Frederick J. Grede, in his capacity as chapter 11 trustee of the Debtor's estate (the "Trustee"). In support of these Objections, the Ad Hoc Committee respectfully states as follows:

## INTRODUCTION

1.     The Ad Hoc Committee consists of ten Seg 1 customers of the Debtor holding in excess of $202 million of the approximately $450 million in Seg 1 claims against the Debtor's estate.[1] The Ad Hoc Committee thus represents a distinct and substantial constituency in this chapter 11 case.

---

[1] The members of the Ad Hoc Committee are FC Stone, LLC, Frontier Futures, Inc., Fortis Clearing Americas, LLC, Country Hedging, Inc., Alaron Trading Corporation, Cadent Financial Services, LLC, Rand Financial Services, Inc., Velocity Futures LP, Crossland Customer Segregated and Peregrine Financial Group, Inc.

2.    This Court should not approve the Disclosure Statement because it describes a

plan that is unconfirmable on its face.

•    First, the plan violates § 541 of the Bankruptcy Code, Bankruptcy Rule
7001 and principles of due process because it attempts to treat the property of the Seg 1
customers as property of the estate without an adversary proceeding or other judicial resolution
of this central issue.

•    Second, the plan violates § 1122(a) of the Bankruptcy Code because it
impermissibly lumps the highly regulated claims of the Seg 1 customers with the dissimilar
claims of the hedge funds in Seg 3.

•    Third, the plan violates § 1123(a)(4) of the Bankruptcy Code because the
Seg 1 customers either (i) voting against confirmation of the plan, or (ii) refusing to accept the
settlement proposed under the plan, receive disparate treatment from other members of the same
customer class.

•    Fourth, the plan inappropriately attempts to charge Seg 1 customers with
interest on the transfers approved by this Court as part of the Citadel transaction, notwithstanding
the lack of any basis in the Bankruptcy Code for doing so.

•    Fifth, the plan violates §§ 502(a) and 1126(a) of the Bankruptcy Code
because it improperly reduces the Seg 1 claims for distribution and voting purposes by the
amount of the Citadel-related transfers.

3.    This Court should also not approve the Disclosure Statement because it fails to

provide adequate information on numerous issues that affect whether creditors and customers

would vote to accept or reject the plan, in contravention of § 1125(b) of the Bankruptcy Code.

Among other things, the Disclosure Statement provides inadequate information on (a) the plan's

attempt to treat Seg 1 assets as property of the estate, (b) the impact of choosing to elect, or not

to elect, into the "property of the estate" settlement proposed under the plan, (c) the assets

available to fund customer distributions under the plan, and (d) the positions of the Seg 1

customers on various key issues under the plan.

4.    This Court should also postpone the scheduled June 10, 2008 hearing on the

Disclosure Statement (a) to allow simultaneous consideration of the Ad Hoc Committee's Plan

and Disclosure Statement filed concurrently with these Objections, and (b) in light of the numerous objections set forth herein and in other objections to the Disclosure Statement.

## BACKGROUND[2]

### I.   Sentinel's Business and Customer "Segs"

5.      Sentinel managed investments of short-term cash for various customers, including Futures Commission Merchants ("FCMs"), hedge funds, financial institutions, pension funds and individuals.  Sentinel divided its customers into four "Seg" groups.

6.      The first customer group, known within Sentinel as Seg 1 (the "Seg 1 Customers"), was supposed to consist solely of the funds and property of customers of other FCMs, which typically invested their customers' funds through Sentinel in order to take advantage of Sentinel's advertised cash management and investment expertise.  The second customer group, known within Sentinel as Seg 2 (the "Seg 2 Customers"), was supposed to consist solely of the funds and property of customers of other FCMs that were engaged in trading at foreign exchanges.

7.      The third customer group, known within Sentinel as Seg 3 (the "Seg 3 Customers"), was supposed to consist of the funds and property of all other types of clients, including hedge funds and other speculators, FCM house (i.e., non-customer) funds, trust accounts, endowments and individuals.

8.      The fourth customer group, known within Sentinel as Seg 4 (the "Seg 4 Customers"), was supposed to consist of the funds and property of Seg 3 Customers whose property was denominated in Euros.  In addition to managing investments for the customer

---

[2] The Ad Hoc Committee submits this summary of material facts surrounding Sentinel's business, the segregated assets of the Seg 1 Customers and Sentinel's collapse because it is necessary to provide this Court with a more complete picture of the relevant facts in this case and the deficiencies in the Disclosure Statement.

portfolios, Sentinel owned a "House" or "Street" portfolio of securities traded by Sentinel for the ultimate benefit of Sentinel's insiders.

## II.    The Strict Requirements of the CEA and CFTC Rules

9.    Pursuant to the Commodity Exchange Act, 7 U.S.C. §§ 1 et seq. (the "CEA"), and related regulations promulgated by the Commodities Futures Trading Commission (the "CFTC"), FCMs are permitted to deposit their customer funds only with certain types of banks, depositories or other FCMs. Sentinel registered with the CFTC as an FCM, and thus was able to manage customer funds belonging to other FCMs—i.e., those investing in Seg 1 and Seg 2. Unlike traditional FCMs, however, Sentinel did not engage in any commodities trading for its customers, but instead only invested funds deposited by other FCMs and Sentinel's other customers.

10.    Because Sentinel was an FCM managing funds required to be segregated for the benefit of its Seg 1 Customers, Sentinel and any depository bank selected by Sentinel as custodian for funds belonging to such Customers were subject to the provisions of the CEA and CFTC rules and regulations promulgated pursuant to the CEA, 17 C.F.R. §§ 1.1-190.10, with respect to such funds. Pursuant to Section 4d(a)(2) of the CEA, Sentinel was required to account separately for the money, securities and property of Seg 1 Customers and could not commingle such Customers' assets with its own funds. See 7 U.S.C. § 6d(a)(2). In addition, Section 4d(b) of the CEA provides that "it shall be unlawful for any person . . . that has received any money, securities or property for deposit in a separate account as provided for in [section 4d(a)(2) of the CEA], to hold, dispose of, or use any such money, securities or property as belonging to the depositing futures commission merchant or any person other than the customers of such futures commission merchant." 7 U.S.C. § 6d(b).

4

11.    CFTC Rule 1.20(a) required Sentinel to segregate all funds of Seg 1 Customers as belonging to such Customers, and when such customer assets were deposited, to deposit such assets under an account name which clearly identified them as customer property. See 17 C.F.R. § 1.20(a). CFTC Rule 1.20(a) also required that any bank acting as custodian for Sentinel's Seg 1 Customer funds first acknowledge in writing that such funds are customer funds and are being held in accordance with the provisions of the CEA. See id.

12.    The investment of Seg 1 Customer funds was subject to the strict investment standards embodied in CFTC Rule 1.25. Rule 1.25 generally restricts investment of customer funds to only the highest grade corporate and government securities and similarly highly liquid investments. See 17 C.F.R. § 1.25. Under CFTC Rule 1.26, any securities in which Seg 1 Customer funds were invested were also required to be maintained in segregation. See id. at § 1.26.

13.    Funds of FCM customers engaged in trading at foreign exchanges (i.e., Seg 2 Customer funds) also must be separately segregated. In addition, such funds must be invested in accordance with CFTC Rule 30.7, which imposes certain restrictions on the investment of customer funds. See 17 C.F.R. § 30.7.

14.    Sentinel's obligations with respect to the funds deposited by Seg 3 and Seg 4 Customers were not governed by the strict requirements of the CEA and CFTC Rules. Rather, Sentinel's obligations with respect to such funds were governed by the Investment Advisers Act of 1940. See 15 U.S.C. § 80b-1 et seq.

5

III.    **The Customer Agreements with Sentinel**

15.    In addition to the regulatory requirements outlined above, the custodial relationship between Sentinel and its Customers was governed by an "Investment Advisory Agreement" or "Investment Management Agreement" between the Customer and Sentinel (together, the "Customer Agreements"). Pursuant to the Customer Agreements, the Customers appointed Sentinel as a "discretionary investment advisor with respect to those assets deposited with the Customer (as defined in Section 5) and accepted for Investment by Sentinel ('the Assets')." Paragraph 5(b) of the Customer Agreements unequivocally provides that Sentinel does not have any ownership or other property interest in the securities and other assets held in the custodial accounts of the Customers:

> Sentinel shall not own nor have any interest in funds or securities
> in the Account or of any other funds or securities in which Client
> has a beneficial interest.

16.    Similarly, Paragraph 5(a) of the Customer Agreements provides that the Customers' assets are deposited in custodial accounts and "held for the benefit of Client."

17.    Sentinel issued account statements to its Customers which reflected the assets held by Sentinel on behalf of each Customer (the "Account Statements"). Sentinel issued its last Account Statements to its Customers on August 13, 2007.

IV.    **Sentinel's Collapse and the Citadel Sale**

18.    On August 13, 2007, Eric Bloom, the President and Chief Executive Officer of Sentinel, sent a letter to Sentinel's Customers representing that because of the pending liquidity crisis in the credit markets, Sentinel was halting redemptions out of a concern that it would not be able to meet significant redemption requests without resorting to discount sales that would cause unnecessary losses to its Customers. This resulted in immediate demands for redemption

CHIC_2975922.5

by numerous Customers, as well as the declaration of defaults and close out at unfavorable prices of more than $2 billion in repurchase (i.e., "repo") transactions.

19.    On August 16, 2007, Sentinel entered into an agreement with Citadel Equity Fund, Ltd. ("Citadel") to sell, assign and transfer securities held for the benefit of Seg 1 Customers (the "Citadel Sale"). The aggregate notional value of the Seg 1 securities to be sold to Citadel was approximately $384 million with an estimated market value of $367 million, including accrued interest (the "Citadel Sale Securities"). From this, Citadel deducted a discount of $47.1 million (under the agreement, Citadel was only supposed to deduct $44.9 million), and the final sales price paid to Sentinel was approximately $320 million (the "Citadel Proceeds"). The Citadel Sale Securities were transferred to Citadel on August 16 and 17, 2007.

20.    Approximately $297.5 million of the Citadel Proceeds were transferred to the Seg 1 account maintained at BONY (the "Seg 1 BONY Account"). Prior to that deposit, the Seg 1 BONY Account had a cash balance of approximately $15.1 million. On or about August 17, 2007, a Seg 1 security (which was not a Citadel Sale Security), with a market value of approximately $4.94 million, was deposited into the Seg 1 BONY Account. Thus, as of August 17, 2007, the Seg 1 BONY Account had a cash balance of approximately $317.6 million. In addition, as of August 17, 2007, there was $22,524,942 in cash in the Seg 1 account maintained at JP Morgan (the "Seg 1 JPM Account"). On August 17, 2007, Sentinel transferred $22,524,942 in cash to the Seg 1 Customers from the Seg 1 JPM Account (the "August 17 Transfers").

## V.    The Chapter 11 Case and the Citadel Distribution

21.    On the evening of August 17, 2007 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. On August 20, 2007, the first business day after the Petition Date, the Debtor filed an emergency motion with this Court

to compel the distribution of the Citadel Proceeds to the Seg 1 Customers (the "Distribution Motion"). BONY was holding the Citadel Proceeds pending an order of this Court. This Court held a hearing on the Distribution Motion that same day (the "Distribution Hearing").

22.    At the Distribution Hearing, the Debtor, through counsel, repeatedly stated that the Citadel Proceeds and other Seg 1 assets were not "property of the estate" and should be distributed to the Seg 1 Customers. The Debtor's counsel also stated that "we have got $312 million of money that belongs to somebody else. It doesn't belong to us. It belongs to the customers." In addition, counsel for Discus Master Fund ("Discus"), the largest Seg 3 Customer and subsequent chairman of the Committee, spoke at the Distribution Hearing. In his presentation, he distinguished on several occasions between the "segregated" Seg 1 assets and the "nonsegregated fund piece"—Seg 3—where Discus had invested its funds.

23.    On August 20, 2007, after considering the arguments of counsel at the Distribution Hearing and the evidence submitted, this Court entered an order authorizing the distribution of the Citadel Proceeds to the Seg 1 Customers, less a $15.6 million holdback amount pending further order of this Court (the "Citadel Distribution Order"). On or about August 21, 2007, BONY transferred $297,050,808 to the Seg 1 Customers (the "August 21 Transfers").

24.    Also on August 20, 2007, Judge Kennelly of the United States District Court for the Northern District of Illinois held a hearing related to the distribution of the Citadel Proceeds to the Seg 1 Customers. The parties were before Judge Kennelly on the SEC's Complaint against Sentinel and related motion for emergency relief seeking (a) to restrain Sentinel from engaging in any transactions that violate Federal securities laws, (b) for an accounting of all

8

funds received by Sentinel from its clients, (c) to prohibit the destruction of documents by Sentinel, and (d) an order expediting discovery.

25.    With respect to (a) above, the SEC sought an order precluding Sentinel from distributing (through BONY) the Citadel Proceeds to the Seg 1 Customers. Judge Kennelly heard argument on the matter during the afternoon of August 20, 2007. During that argument, the Debtor, through counsel, represented to the District Court that the Citadel Proceeds "are not the property of the bankruptcy estate because they were not, before the petition was filed, the property of the debtor. The funds in the segregated account are property of . . . the customers and, therefore, should go to the customers." The SEC and Discus argued in favor of prohibiting the distribution of the Citadel Proceeds. After considering arguments and the evidence submitted, the District Court refused to prohibit the distribution of the Citadel Proceeds to the Seg 1 Customers. The District Court, however, did enter an emergency order granting the Emergency Motion with respect to (b), (c) and (d) outlined above.

26.    On August 21, 2007, the Debtor filed an emergency motion to appoint a Chapter 11 trustee in the Chapter 11 Case. On August 23, 2007, this Court order the appointment of a Chapter 11 trustee. On August 29, 2007, the United States Trustee appointed the Trustee as the Chapter 11 trustee for the Debtor's estate.

27.    On September 6, 2007, the Office of the United States Trustee appointed the Committee pursuant to § 1102(a)(1) of the Bankruptcy Code. The Committee was initially comprised of five Seg 3 Customers and four Seg 1 Customers. Because one Seg 1 Customer has resigned from the Committee, the Committee is now comprised of five Seg 3 Customers and three Seg 1 Customers. Due to its configuration, the Committee has served and pursued the agenda of the Seg 3 Customers.

9

## VI.    The Plan and Disclosure Statement

28.    On May 13, 2008, the Committee and the Trustee (together, the "Plan Proponents") filed their Chapter 11 Plan of Liquidation (the "Seg 3 Plan").[3]  The Seg 3 Plan is wrongfully designed to confer substantial benefits on the Seg 3 Customers at the unfair expense of the Seg 1 Customers.

29.    The centerpiece of the Seg 3 Plan is a proposed "settlement" of the "property of the estate issue" that Seg 1 Customers can choose to elect into under the Plan (the "Plan Settlement").  The Plan Settlement is a coercive "death trap" that attempts to strong arm Seg 1 Customers into electing into a deal that provides little to no consideration to Seg 1 Customers in exchange for agreeing to draconian concessions.   Seg 1 Customers electing into the Plan Settlement agree to, among other things, the following provisions:

•    Agreement to Write Checks to Seg 3 Customers -- If distributions to Seg 3 Customers under the Plan do not reach 50% plus "implied interest" on the August 17 and August 21 Transfers (discussed below) by the conclusion of the BONY litigation, electing Seg 1 Customers agree to transfer cash to Seg 3 Customers of what would be needed to allow Seg 3 Customers to reach distributions of 50% plus implied interest.

•    No Distributions Until "Catch Up" Plus Implied Interest -- Electing Seg 1 Customers will receive no distributions under the Plan until the Seg 3 Customers "catch up" to what Seg 1 Customers received from the August 17 and August 21 Transfers plus implied interest.

•    Diminished Future Distributions -- In addition to foregoing distributions until Seg 3 Customers "catch up" plus implied interest, electing Seg 1 Customers also agree to receive reduced distributions after the "catch up"—with only 20% of future distributions under the Plan going to Seg 1 Customers.  Absent this provision, Seg 1 Customers would receive approximately 36% of all distributions if made on a *pro rata* basis.

30.    Thus, by electing into the Plan Settlement, Seg 1 Customers would agree to (a) waive any defenses to the Trustee's alleged preference claims and hand over cash to the Seg 3

---

[3] The Plan is termed a "Seg 3 Plan" because, as demonstrated by the request for a "substantial contribution" claim set forth in Section 10.5 of the Seg 3 Plan, the authors of the Seg 3 Plan were the large Seg 3 Customers.

CHIC_2975922.5

Customers, (b) forego distributions until the Seg 3 Customers have recovered more than the Seg 1 Customers, and (c) accept reduced upside if the Trustee's litigation against BONY and others is successful.

31.    While the proposed Plan Settlement is offensive to Seg 1 Customers, the Plan Proponents attempt to coerce Seg 1 Customers into electing into the Plan Settlement by making the alternative even more oppressive and draconian.    The central inter-Customer issue in this case is the "property of the estate issue." *The Seg 3 Plan attempts to resolve inappropriately that issue in favor of Seg 3 Customers through a stealth attack on the property rights of the Seg 1 Customers.*    For Seg 1 Customers not electing into the Plan Settlement, the Seg 3 Plan does not merely maintain the status quo on the "property of the estate issue."    Rather, the Seg 3 Plan, among other things, inappropriately attempts to eviscerate the property rights of the Seg 1 Customers by determining—without any adversary proceeding or judicial resolution—that the assets of the Seg 1 Customers are property of the Debtor's estate.

•    Conversion of $40 million in Seg 1 Assets – The Seg 3 Plan provides for the distribution to Seg 3 Customers of approximately $40 million held by the Trustee that the Seg 1 Customers allege is not property of the estate (the "Seg 1 Assets");

•    Distributions Exclusively to Seg 3 Until "Catch Up" – Non-electing Seg 1 Customers will receive no distributions under the Plan until the Seg 3 Customers "catch up" to what Seg 1 Customers received from August 17 and August 21 Transfers plus implied interest. Essentially, the Seg 3 Plan charges Seg 1 Customers interest for receiving their own property.

•    Non-Electing Holders are cut out of "Tranche P" – The Seg 3 Plan provides electing Seg 1 Customers with the option of sharing in a portion of the Liquidation Trust ("Tranche-P") by transferring their individual claims against third party targets such as BONY and Citadel.    Those not electing into the settlement are not given the option of participating in Tranche-P, even though the tranche has nothing to do with the property of the estate issue.

32.    In addition, the Plan *mandates* that the Liquidation Trustee pursue an aggressive litigation strategy against non-electing Seg 1 Customers.

11

• Motion to Vacate Citadel Distribution Order – Section 6.3(c) of the Plan provides that the Liquidation Trustee shall, on or before August 11, 2008, file a motion under Bankruptcy Rule 60(b) to vacate the Citadel Distribution Order, in order to attempt to provide a basis for suing non-electing Seg 1 Customers to recover the August 17 and August 21 Transfers, subject only to ethical rules such as Bankruptcy Rule 9011.[4]

• Suing Non-Electing Seg 1 Customers– Section 6.3(d) of the Plan provides that the Liquidation Trustee shall initiate litigation against non-electing Seg 1 Customers to recover the August 17 and August 21 Transfers, subject only to his "reasonable judgment" and ethical rules such as Bankruptcy Rule 9011.

33.     The Liquidation Trustee's actions will be monitored by a Liquidation Trust Committee composed of five regular and ex officio Seg 3 Customers and only one Seg 1 Customer who, on information and belief, supports the Seg 3 Plan. Moreover, if the Liquidation Trustee somehow decides not to initiate litigation against the Seg 1 Customers despite the provisions of the Seg 3 Plan practically mandating him to do so, Section 6.16(b) of the Plan provides the Liquidation Trust Committee with standing to initiate such litigation.

34.     As discussed in more detail below, the Plan also (a) inappropriately places all Customers in the same class; (b) provides for unequal treatment of Customers in the same class; (c) charges "implied interest" on alleged preferential transfers without any legal basis for doing so; and (d) improperly reduces the amount of the claims of Seg 1 Customers for distribution and voting purposes.

## VII.    The Seg 1 Plan and Disclosure Statement

35.     Concurrently with the filing of these Objections, the Ad Hoc Committee filed its own Plan (the "Seg 1 Plan") and Disclosure Statement in this case. Unlike the Seg 3 Plan, the Seg 1 Plan provides for a resolution of the property of the estate issue that reflects the reasonable range of litigation possibilities and is fair and equitable to all Customers and creditors. In

---

[4] The Ad Hoc Committee does not believe that the Trustee can possibly meet his heavy burden under Rule 60(b) to get this Court (and the District Court) to revisit the Orders authorizing the August 21 Transfers.

addition, unlike the Seg 3 Plan, the Seg 1 Plan does not contain "death traps" or other coercive maneuvers in order to strong arm others into supporting the plan.

## OBJECTIONS AND REQUEST FOR CONTINUANCE

**I.      Request for Continuance of Disclosure Statement Hearing**

36.     The Seg 1 Plan is being offered as a competing plan in this Chapter 11 case. Ultimately, creditors and Customers will have to decide which Plan to support.  In addition, this Court will have to determine which Plan, if any, should be confirmed.

37.     In order to allow all creditors and Customers, as well as this Court, to consider both Plans (and Disclosure Statements) on equal footing, the Ad Hoc Committee requests that this Court continue the hearing on the Seg 3 Disclosure Statement for a period of at least three weeks.  After that, in the event that both Disclosure Statements are ultimately approved, votes on the Plans and the hearing on confirmation of the Plans can proceed on parallel tracks.[5]  Setting the Plans on parallel tracks will also ensure that Seg 1 Customers, who have approximately $450 million at stake in this case and important customer interests to protect, have a full and complete opportunity to protect their interests in this process.

**II.     Standard For Approving A Disclosure Statement**

**A.      A Disclosure Statement Describing An Unconfirmable Plan May Not Be Approved**

38.     It is well established law that this Court should not approve a disclosure statement for a plan that is unconfirmable on its face.  Although the issue of whether a plan is confirmable is usually reserved for the hearing on confirmation, "it is appropriate for the court to consider the issue at the hearing on the disclosure statement.  One such circumstance is where it is readily

---

[5] The timing on confirmation of any Plan will have to take into account discovery on the property of the estate issue.

apparent that the plan accompanying the disclosure statement could never legally be confirmed." In re Unichem Corp., 72 B.R. 95, 98 (Bankr. N.D. Ill. 1987). "It has become standard Chapter 11 practice that 'when an objection raises substantive plan issues that are normally addressed at confirmation, it is proper to consider and rule upon such issues prior to confirmation, where the proposed plan is arguably unconfirmable on its face.'" In re Felicity Assocs., Inc., 197 B.R. 12, 14 (Bankr. D.R.I. 1996) (quoting In re Main Road Properties, 144 B.R. 217, 219 (Bankr. D.R.I. 1992)).

39.    Courts in this district and elsewhere have refused to approve a disclosure statement when it describes a plan that is unconfirmable.  For example, in Unichem, the bankruptcy court refused to approve the disclosure statement because the proposed plan was patently unconfirmable.  In Unichem, the plan proponent was an insider who breached his fiduciary duties to the debtor. Unichem, 72 B.R. at 98.  The insider's plan was designed to force the liquidation of the debtor, which would inure to his benefit.  The court refused to approve the insider's disclosure statement because "any plan proposed by Gurtler could never meet the good faith requirement of § 1129(a)." Id.; see also In re Amigoni, 109 B.R. 341, 342-47 (Bankr. N.D. Ill. 1989) (holding that disclosure statement could not be approved where plan provided modification of restitution payments in violation of §§ 523(a)(7) and 1129(a)(1) of the Bankruptcy Code); Felicity Assocs., 197 B.R. at 15 (disclosure statement disapproved where plan improperly classified party as a secured creditor); In re Eastern Maine Electric Cooperative, Inc., 125 B.R. 329, 334-39 (Bankr. D. Me. 1991) (plan described by disclosure statement violates absolute priority rule, rendering disclosure statement defective).

14

### B.    A Disclosure Statement Must Contain "Adequate Information"

40.    Section 1125(b) of the Bankruptcy Code provides that a disclosure statement may not be approved unless it contains "adequate information."  11 U.S.C. § 1125(b).  Section 1125(a)(1) of the Bankruptcy Code defines "adequate information" as follows:

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan . . . .

11 U.S.C. § 1125(a)(1).

41.    "The primary purpose of a disclosure statement is to provide all material information which creditors and equity security holders affected by the plan need in order to make an intelligent decision whether to vote for or against the plan." Unichem, 72 B.R. at 97; see also In re Egan, 33 B.R. 672, 675-76 (Bankr. N.D. Ill. 1983) ("The Disclosure Statement is intended to be a source of factual information upon which one can make an informed judgment about a reorganization plan."); In re California Fidelity, Inc., 198 B.R. 567, 571 (B.A.P. 9th Cir. 1996) ("The purpose of a disclosure statement is to give all creditors a source of information which allows them to make an informed choice regarding the approval or rejection of a plan."). "Creditors form their ideas about what they will receive out of the debtor's estate from [a] disclosure statement.  It plays a pivotal role in the give and take among creditors and between creditors and the debtor that leads to a confirmed negotiated plan of reorganization by requiring adequate disclosure to the parties so they can make their own decisions on the plan's acceptability." In re A.H. Robins Co., 216 B.R. 175, 180 (E.D. Va. 1997).

15

### III.     The Disclosure Statement Should Not Be Approved Because The Seg 3 Plan Is Unconfirmable On Its Face

42.     The Disclosure Statement should not be approved because the Seg 3 Plan is unconfirmable on its face.  First, the Seg 3 Plan violates § 541 of the Bankruptcy Code, Bankruptcy Rule 7001 and principles of due process because it attempts to treat the Seg 1 Assets as property of the estate without an adversary proceeding or judicial resolution of this central million issue (and without any notice to Seg 1 Customers).

43.     Second, the Seg 3 Plan violates § 1122(a) of the Bankruptcy Code because it impermissibly lumps the Seg 1 Claims in the same class as the dissimilar Seg 3 Claims.

44.     Third, the Seg 3 Plan violates § 1123(a)(4) of the Bankruptcy Code because the Seg 1 Customers either (i) voting against confirmation of the Seg 3 Plan, or (ii) refusing to accept the Plan Settlement, receive disparate treatment from other members of the Customer class.

45.     Fourth, the Seg 3 Plan charges Seg 1 Customers with interest on the August 17 and August 21 Transfers, notwithstanding the lack of any basis in the Bankruptcy Code for doing so.  Fifth, the Seg 3 Plan violates §§ 502(a) and 1126(a) of the Bankruptcy Code because it improperly reduces the Seg 1 Claims for distribution and voting purposes by the amount of the August 17 and August 21 Transfers.

### A.     The Seg 3 Plan Is Patently Unconfirmable Under Sections 541 And 1129(a)(1) Of The Bankruptcy Code And Bankruptcy Rule 7001 Because It Treats Seg 1 Assets As Property Of The Estate Without An Adversary Proceeding Or Other Judicial Resolution Of This Issue

46.     The Seg 3 Plan is patently unconfirmable under §§ 541 and 1129(a)(1) of the Bankruptcy Code and Bankruptcy Rule 7001 because it treats the Seg 1 Assets as property of the estate without an adversary proceeding or judicial resolution of this central issue (and without notice to Seg 1 Customers).  This section (a) summarizes why the Seg 1 Assets are not property

16

of the estate, and (b) establishes that the Plan Proponents' stealth attempt to convert the Seg 1 Assets for the benefit of the Seg 3 Customers is wholly inappropriate under Bankruptcy Rule 7001 and principles of due process.

### 1.    The Seg 1 Assets Are Not Property Of The Estate

47.    As discussed above, the Trustee is holding approximately $40 million in Seg 1 Assets that are not property of the Debtor's estate. The Seg 3 Plan is unconfirmable under §§ 541 and 1129(a)(1) of the Bankruptcy Code because (a) it is based upon the flawed premise that the Seg 1 Assets constitute property of the Debtor's estate that is available for distribution to the Seg 3 Customers, and (b) other provisions in the Seg 3 Plan, such as mandating avoidance actions to recover the August 17 and 21 Transfers and charging implied interest on the August 17 and August 21 Transfers, are byproducts of the Plan Proponents' failure to acknowledge the property rights of the Seg 1 Customers, as recognized under applicable law.

48.    Section 541(a)(1) of the Bankruptcy Code provides that a debtor's estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). The Debtor was statutorily prevented from having any interest in the assets of the Seg 1 Customers. Section 4d(2) of the CEA requires that (a) an FCM separately account for and not commingle customer funds with its own funds, and (b) an FCM treat and deal with its customers' funds "as belonging to the customers of such futures commission merchant." 7 U.S.C. § 6d (emphasis added). In interpreting the requirements of § 4d(2), courts have held that "FCMs must 'treat and deal' with a customer's margin funds and property as the property of such customer, and such funds shall not be commingled with the FCM's own funds or used to margin or guarantee the trades or contracts, or to secure or extend the credit, of any customer or person other than the one for whom the same are held." In re Chicago Discount Commodity Brokers v. Berg, No. 86 C 4036, 1987 WL 5256, at *3 (N.D. Ill. Jan. 5, 1987); Klein

17

& Co. Futures, Inc. v. Board of Trade of the City of New York, No. 00 Civ. 5563, 2005 WL 427713, at *6 (S.D.N.Y. Feb. 18, 2005) (same); see also 17 C.F.R. § 1.20(c).[6]

49.     Because the Seg 1 Assets are unquestionably not property of the Debtor's estate under the CEA and CFTC regulations, as well as the Customer Agreements, the only remaining issue is whether the Seg 1 Customers can adequately identify and trace such assets held by Sentinel. See, e.g., Dameron, 155 F.3d at 723 ("Ordinarily, a party claiming entitlement to a trust must be able to trace its assets into the fund or property that is the subject of the trust."). The commingling of customer assets with the assets of the debtor or other parties is not itself sufficient to defeat a finding that property is identifiable in the hands of the debtor. See id. at 723-24 ("[C]ourts have consistently rejected the notion that commingling of trust property, without more, is sufficient to defeat tracing."); In re Martin Fein & Co., 43 B.R. 623, 628 (Bankr. S.D.N.Y. 1984) ("But even when tracing to specific trust funds is impossible because the trustee has commingled the trust funds with other funds, the right is not necessarily defeated if the beneficiary can trace to the commingled fund."). Accordingly, courts have held that cash-- which is 100% fungible--can be traced into a debtor's commingled assets in order to establish tracing and impose a constructive trust under the "lowest intermediate balance rule" or similar principles. See, e.g., Dameron, 155 F.3d at 724; Martin Fein, 43 B.R. at 627-28; NRT Metals v. Manhattan Metals (Non-Ferrous) Ltd., 576 F. Supp. 1046, 1054-55 (S.D.N.Y. 1983).

---

[6] The terms of the Customer Agreements also support a finding that the Seg 1 Assets are not property of the Debtor's estate. The Customer Agreements provided that the Customers' assets were held in custodial accounts "for the benefit of Client." Moreover, Paragraph 5(b) of the Customer Agreements specifically provides that Sentinel does not have any ownership or other property interest in the Customers' assets. Property held by the debtor in trust or in custody for another is not property of the debtor's estate. See, e.g., Begier v. Internal Revenue Service, 496 U.S. 53, 59 (1990) ("Because the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate.'"); In re Marrs-Winn Co., 103 F.3d 584, 589 (7th Cir. 1996) (progress payments and other funds held by debtor-subcontractor pursuant to express trust not property of the debtor's estate); In re Dameron, 155 F.3d 718, 722-23 (4th Cir. 1998) (funds held in custodial escrow for real estate closings not property of the debtor's estate).

50.    The Trustee has alleged that Sentinel engaged in substantial "commingling" of Customer securities, and that the Seg 1 Customers therefore cannot trace their assets.    The Trustee, however, has not produced any evidence that the assets of the Seg 1 Customers are not traceable.    In fact, all available evidence suggests that all or substantially all of the securities of the Seg 1 Customers can be traced, by cusip number, in the hands of Sentinel on all relevant dates.    As a result, even if the Debtor engaged in the "commingling" that the Trustee alleges, such commingling would not prevent tracing of the Seg 1 Customers' assets, and such assets are not property of the Debtor's estate.

### 2.    Bankruptcy Rule 7001 Requires The Initiation Of An Adversary Proceeding To Resolve The Traceability Of The Seg 1 Assets

51.    The Plan Proponents cannot sidestep dealing with the "property of the estate" issue at the Disclosure Statement hearing by declaring it to be a "confirmation issue."    The Plan Proponents have not taken the necessary steps to allow the property of the estate issue to be litigated at confirmation.    The Seg 3 Plan therefore is unconfirmable.

52.    First, the Plan Proponents have failed to comply with Bankruptcy Rule 7001 because they have not filed an adversary proceeding to determine the property of the estate issue. Bankruptcy Rule 7001(2) requires the filing of an adversary proceeding "to determine the validity, priority, or extent of a lien or other interest in property, other than a proceeding under Rule 4003(d)."    Fed. R. Bankr. P. 7001(2).    Courts have rejected attempts to litigate property rights by contested matter or any other process other than an adversary proceeding.    See, e.g., In re Haedo, 211 B.R. 149, 153 (Bankr. S.D.N.Y. 1997) (holding that an adversary proceeding was necessary to determine the respective ownership rights of the estate and non-debtors in a tax refund); In re Cadiz Properties, Inc., 278 B.R. 744, 746 (Bankr. N.D. Tex. 2002) (holding that dispute over ownership of stock "must be resolved in an adversary proceeding"); In re Miller,

19

302 B.R. 705, 710 (B.A.P. 10th Cir. 2003) (adversary proceeding required to "determine ownership" of personal property claimed by the estate and others); see also In re Denton, 169 B.R. 608, 609-12 (Bankr. W.D. Tex. 1994) (determining certain property of estate issues as part of turnover motion, but "reserv[ing] other issues concerning the estate's interest in the property and restrictions applicable to the trustee, if any, for subsequent review upon the filing of a proper adversary proceeding as contemplated by Bankruptcy Rule 7001(2)").

53.    Second, even courts allowing a property of the estate dispute or other Rule 7001 issue to be litigated outside of an adversary proceeding have required either the consent of the opposing party or such party's waiver of any objections to litigating the issue by contested matter. See, e.g., In re Gee, 124 B.R. 586, 590 (Bankr. N.D. Okla. 1990); In re Mark Twain Indus., Inc., 115 B.R. 948, 949 (Bankr. N.D. Ill. 1990) (Squires, J.).

54.    Here, the Seg 1 Customers have not consented to litigating the property of the estate issue by contested matter and have not waived any objections to the requirement of filing an adversary proceeding.  In addition, even if the property of the estate issue could somehow be litigated as part of a contested matter on plan confirmation without the consent of the Seg 1 Customers (which the Ad Hoc Committee disputes), (a) the Seg 3 Plan fails to request a determination on the issue, and (b) the Disclosure Statement fails to provide any notice to Seg 1 Customers that the Seg 3 Plan is intended to eviscerate their property rights.  Consequently, the Seg 3 Plan operates as a stealth attack on the property rights of the Seg 1 Customers, which would be fundamentally unfair and violate their due process rights.  See In re Altman, 254 B.R. 509, 515-16 (D. Conn. 2000) (Bankruptcy Court's determination that painting claimed by creditor was property of the estate without an adversary proceeding or other appropriate notice was "fundamentally unfair, amounting to a denial of due process").

55.    The Seg 3 Plan's inappropriate and procedurally defective attack on the property rights of the Seg 1 Customers makes it patently unconfirmable. This Court should refuse to approve the Disclosure Statement.

**B.    The Plan Is Unconfirmable Under Sections 1122(a) And 1129(a)(1) Of The Bankruptcy Code Because It Impermissibly Lumps Dissimilar Claims Into The Same Class**

56.    The Plan is patently unconfirmable under §§ 1122(a) and 1129(a)(1) of the Bankruptcy Code because it inappropriately groups dissimilar claims in the same class for voting purposes. Section 1122(a) provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interest of such class." 11 U.S.C. § 1122(a).

57.    The Seventh Circuit has held that when "[s]ignificant disparities" exist between claims, those claims are not "substantially similar" under § 1122(a). In re Woodbrook Assocs., 19 F.3d 312, 317-18 (7th Cir. 1994). Claims that could be paid in full before those of other creditors, depending on the outcome of litigation with the estate, are not "substantially similar" to general unsecured claims. See In re Premiere Network Servs., Inc., 333 B.R. 130, 134 (Bankr. N.D. Tex. 2005); In re Johnston, 21 F.3d 323, 328 (9th Cir. 1994).

58.    Here, the Seg 3 Plan improperly classifies Seg 1 Claims in the same "Customer Class" (Class 3) as Seg 3 Claims. There are "significant disparities" between Seg 1 Claims and Seg 3 Claims, including the following:

•    Possibility of Full Payment – As in Premiere Network and Johnston, Seg 1 Claims could be paid in full, depending on the outcome of property of the estate litigation with the Trustee, before the claims of the Seg 3 Customers.

•    Statutory Rights and Restrictions – The Seg 1 Customers' relationship with the Debtor was governed by the strict requirements of the CEA and CFTC regulations, as well as the investment restrictions set forth in Rule 1.25, which did not apply to the Seg 3 Customers.

21

• Protection of Customer Funds – Seg 1 Claims consist exclusively of the funds invested by public customers through the Seg 1 Customers. The treatment of Seg 1 Claims therefore implicates the integrity of the commodities markets and the U.S. economy as a whole in a way that does not apply to the hedge funds and other speculators included in Seg 3.

• Mandated Litigation – The Seg 3 Plan is designed to sue Seg 1 Customers not electing into the coercive Plan Settlement, embroiling all Seg 1 Claims in litigation in a way inapplicable to Seg 3 Claims.

59. Because of the significant disparities between the Seg 1 Claims and the Seg 3 Claims, such claims are not "substantially similar" as a matter of law. The Seg 3 Plan therefore is unconfirmable on its face and the Disclosure Statement cannot be approved.

**C.    The Seg 3 Plan Is Patently Unconfirmable Under §§ 1123(a)(4) And 1129(a)(1) Of The Bankruptcy Code Because It Provides For Disparate Treatment Of Claims Within The Same Class**

60. The Seg 3 Plan is also patently unconfirmable under §§ 1123(a)(4) and 1129(a)(1) of the Bankruptcy Code because it provides for disparate treatment of claims within the same class. Section 1123(a)(4) requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4); see also In re Modern Steel Treating Co., 130 B.R. 60, 64 (Bankr. N.D. Ill. 1991) ("[Section] 1123(a)(4) provides that a plan must provide the same treatment for each claim or interest of a particular class.").

61. "The most conspicuous inequality that § 1123(a)(4) prohibits is payment of different percentage settlements to co-class members." In re AOV Industries, Inc., 792 F.2d 1140, 1152 (D.C. Cir. 1986). A plan that attempts to pay less to certain members of a class or otherwise treat them differently than other class members violates § 1123(a)(4). See, e.g., Modern Steel, 130 B.R. at 64 (holding that proposed modified plan providing for unequal treatment to shareholders in same class violates § 1123(a)(4) and cannot be approved); In re

22

Finova Group, Inc., 304 B.R. 630, 636 (D. Del. 2004) (holding that § 1123(a)(4) requires that all members of a lender class receive interest under their credit agreements); AOV, 792 F.2d at 1152 (requiring one member of a class to tender additional consideration for the same recovery under a plan violates § 1123(a)(4)); In re Dow Corning Corp., 280 F.3d 648, 659-61 (6th Cir. 2002) (making it procedurally easier for Canadian government to recover on its claims than the U.S. government violated § 1123(a)(4)).

62.    In In re Adelphia Communications Corp., 361 B.R. 337 (S.D.N.Y. 2007), the District Court stayed a confirmation order pending appeal.    The plan provided that class members who voted in favor of the plan received broad releases and exculpations that those not voting against the plan did not receive.    See id. at 362.    The Court found that that this coercive provision likely violated § 1123(a)(4), stating as follows:

> Section 1123(a)(4) guarantees that each class member will be treated equally, regardless of how it votes on a proposed plan.    Where the receipt of valuable benefits is conditioned on a vote to accept *that plan*, there is a very real possibility of dissuading or silencing opposition to the plan.    In this context, the Bankruptcy Court's semantic distinction between the treatment of claims and claimants goes against the spirit of section 1123(a)(4) and what it seeks to protect.    If an appeal of that issue is heard, there is a substantial possibility that Appellants will succeed in their argument that the distribution of certain benefits to some claimants but not others within a class violates section 1123(a)(4).

Id. at 363-64.

63.    Here, the Seg 3 Plan violates § 1123(a)(4) because it provides for unequal treatment among members of the "Customer Class."    Customers who become "Electing Holders" receive more consideration under the Plan than those not becoming "Electing Holders."    An "Electing Holder" is a Customer that (a) votes in favor of the Plan, (b) transfers its claims against third party targets (such as BONY and McGladrey & Pullen) (the "Non-Estate Claims") to the Liquidation Trust, and (c) elects to participate in the coercive Plan Settlement.

64.    Electing Holders receive more consideration that those not becoming Electing Holders in at least two respects. <u>First</u>, Section 10.10(j) of the Seg 3 Plan provides that only Seg 1 Customers who are Electing Holders are entitled to receive distributions on account of their Seg 2, Seg 3 and Seg 4 Claims as if they were not Seg 1 Customers. As such, Seg 1 Customers who are Electing Holders are entitled to receive distributions on account of their Seg 2, Seg 3 and Seg 4 Claims on the effective date of the Plan without regard to any "catch up" by the Seg 3 Customers. Those Seg 1 Customers not becoming Electing Holders receive no distributions on account of their Seg 2, Seg 3 and Seg 4 Claims until Seg 3 Customers "catch up" plus implied interest.

65.    <u>Second</u>, Section 6.12 of the Seg 3 Plan provides that only Electing Holders are entitled to participate in "Tranche-P" of the Liquidation Trust. Tranche P is being created to hold and pursue the Non-Estate Claims and make distributions solely to Electing Holders on account of those claims.

66.    The unequal treatment provided to non-electing Seg 1 Customers could cost them millions of dollars in distributions under the Plan. Many Seg 1 Customers also hold Seg 2 and Seg 3 Claims. In addition, the value of Tranche-P may be substantial, as Non-Estate Claims may give the Liquidation Trust a lot more firepower in litigating with third parties.[7]

67.    There is no basis for providing less consideration under the Seg 3 Plan to Seg 1 Customers who refuse to vote in favor of the Plan or will not accept the Plan Settlement. The Plan violates § 1123(a)(4) of the Bankruptcy Code. This Court should not approve the Disclosure Statement.

---

[7] A similar trust in the Refco chapter 11 case has pursued substantial litigation assigned to it by customers as part of the plan process.

24

**D.**     **The Seg 3 Plan Is Unconfirmable Under Sections 502(a) And 1129(a)(1) Of The Bankruptcy Code Because It Charges Seg 1 Customers With Interest On The August 17 and August 21 Transfers**

68.     The Seg 3 Plan is also patently unconfirmable because it charges Seg 1 Customers with implied interest on the August 17 and August 21 Transfers.  Under the Seg 3 Plan, Seg 3 Customers are not deemed to have received the same "Percentage Recovery" as the Seg 1 Customers (i.e., have "caught up" in distributions), until they recover (a) distributions equaling the amount of the August 17 and August 21 Transfers, plus (b) implied interest on the August 17 and August 21 Transfers.  Implied interest on the August 17 and August 21 Transfers is calculated at the Treasury Bill rate from the date of such transfers until the Seg 3 Customer distributions "catch up" to the Seg 1 Customers.

69.     Charging Seg 1 Customers with interest on the August 17 and August 21 Transfers has no basis in the Bankruptcy Code.  First, there has not been any finding that the August 17 or August 21 Transfers are preferential transfers.  Indeed, Seg 1 Customers have asserted (and continue to assert) that the August 17 and August 21 Transfers were not of property of the estate (and the Plan Proponents have not attempted to show otherwise).  As such, the Plan Proponents cannot charge the Seg 1 Customers with interest for receiving their own property pursuant to Bankruptcy Court and District Court orders.

70.     Second, even if the August 17 and August 21 Transfers were preferential transfers (which they were not), the Plan Proponents' attempt to charge interest on such transfers would still be inappropriate.  It is well established that a bankruptcy trustee can only recover pre-judgment interest on a preferential transfer from the earlier of (a) the date of a demand letter sent to the recipient of the preferential transfer, or (b) the institution of an adversary proceeding to avoid the preferential transfer.  See, e.g., In re Mills, 111 B.R. 186 (Bankr. N.D. Ind. 1988) ("Prejudgment interest in preference litigation accrues from the date of demand on the

25

Defendant, or absent demand, from the date the adversary was filed."); In re Southern Indus. Banking Corp., 87 B.R. 518 (Bankr. E.D. Tenn. 1988) ("Prejudgment interest in preferences litigation accrues from the date of demand on the defendant, or absent demand, from the date the adversary proceeding is filed.").

71.    Here, no demand has been made to the Seg 1 Customers to return the August 17 or August 21 Transfers as preferential transfers. Moreover, the Trustee has filed no adversary proceeding to avoid the August 17 or August 21 Transfers. The Plan Proponents' attempt to charge interest on the August 17 and August 21 Transfers therefore inappropriately dilutes the claims of the Seg 1 Customers in violation of §§ 502(a) and 1129(a)(1) of the Bankruptcy Code and renders the Plan unconfirmable. As such, the Disclosure Statement cannot be approved.

### E.    The Plan Is Unconfirmable Under Sections 502(a), 1126(a) And 1129(b)(1) Of The Bankruptcy Code Because It Improperly Reduces Seg 1 Claims For Both Voting And Distribution Purposes

72.    The Seg 3 Plan is also unconfirmable on its face under §§ 502(a), 1126(a) and 1129(b)(1) of the Bankruptcy Code because it improperly reduces the amount of Seg 1 Claims for both voting and distribution purposes.

73.    First, Section 7.2 of the Seg 3 Plan provides that all Seg 1 Claims will be reduced for purposes of voting on the Seg 3 Plan by the amount of the August 21 Transfers. Sections 502(a) and 1126(a) of the Bankruptcy Code, however, provide that a creditor may vote the full amount of its proof of claim unless an objection to that claim is filed. In re Shilo Inn, Diamond Bar, LLC, 285 B.R. 726 (Bankr. D. Or. 2002), the Court stated as follows:

> Bankruptcy Code § 1126(a) provides that "[t]he holder of a claim or interest allowed under section 502 of this title may accept or reject a plan." Claims are deemed allowed unless a party in interest objects. § 502(a). In this case, the trusts filed proofs of claim in each case and no objections have been filed. Therefore, pursuant to § 502(a), those claims are deemed allowed [for voting purposes].

Id. at 728-29; see also In re Julian Servs. Indus., Inc., 220 B.R. 613, 617 (Bankr. N.D. Ill. 1998) ("Only holders of allowed pre-petition claims may accept or reject a plan.  A proof of claim is deemed allowed unless a party in interest objects to it.") (footnote and citation omitted); In re Quigley Co., 383 B.R. 19, 24 (Bankr. S.D.N.Y. 2008) ("In the typical chapter 11 case, a creditor may vote if he files a proof of claim, and no one objects.  The creditor holds a claim that is 'deemed allowed,' and allowed claims are entitled to vote to accept or reject a plan.") (citation omitted).

74.    Here, many Seg 1 Customers have filed proofs of claim based on the amounts owed by the Debtor to such Customers prior to the August 21 Transfers.  No objections have been filed to those claims.  Accordingly, the Plan Proponents' attempt to use the Seg 3 Plan to substantially dilute the voting rights of Seg 1 Customers violates §§ 502(a) and 1126(a) of the Bankruptcy Code and renders the Plan unconfirmable under § 1129(a)(1) of the Bankruptcy Code.

75.    Second, Section 4.4 of the Seg 3 Plan also attempts to reduce the allowed amount of all Seg 1 Claims for distribution purposes by the amount of the August 17 Transfers.  This provision is inconsistent with the entire structure of the Seg 3 Plan.  The Plan Proponents seek to (a) avoid the August 17 Transfers as preferential transfers, and (b) treat the August 17 Transfers as distributions under the Seg 3 Plan for purposes of the "catch up," yet still want the claim-reduction benefit of treating the August 17 Transfers as unavoidable pre-petition transfers.

76.    The Plan Proponents cannot have it both ways—either the August 17 Transfers are part of the Seg 1 Claims for all purposes, or they are not.  If the August 17 Transfers are not included as part of the Seg 1 Claims (i.e., they are not considered distributions under the Seg 3 Plan), they cannot be included as distributions for determining when Seg 3 Customers have

27

"caught up" to Seg 1 Customers. Because the Seg 3 Plan attempts to have it both ways, it violates the claim allowance provisions in § 502(a) of the Bankruptcy Code and unfairly discriminates against the Seg 1 Customers in violation of § 1129(b)(1) of the Bankruptcy Code. As such, the Disclosure Statement cannot be approved.

IV.    **The Disclosure Statement Should Not Be Approved Because It Does Not Contain "Adequate Information" From Which A Hypothetical Investor Could Make An Informed Judgment About Whether To Support The Plan**

77.    The Seg 1 Customers also object to the Disclosure Statement because it does not contain "adequate information" from which a hypothetical investor could make an informed judgment on whether to support the Plan in the following areas:  (a) the Plan Proponents' attempt to convert the Seg 1 Assets for the benefit of the Seg 3 Customers; (b) the proposed Plan Settlement and expected distributions to Seg 1 Customers; (c) the assets available to fund Customer distributions under the Seg 3 Plan; (d) the parties' positions on various issues raised under the Seg 3 Plan, including the "property of the estate issue" and whether the Debtor is a "stockbroker"; (e) the Plan Proponents' alleged basis for charging interest to the Seg 1 Customers on the August 17 and August 21 Transfers; (f) the description of the Seg 3 Customers and their investments at Sentinel; (g) the composition of the Committee; and (h) how Tranche-P of the Liquidation Trust will function.

A.    **The Disclosure Statement Contains Inadequate Information Regarding The Seg 3 Plan's Conversion Of The Seg 1 Assets**

78.    The Disclosure Statement should not be approved because it fails to provide adequate information regarding the Plan Proponents' attempt to convert the approximately $40 million in Seg 1 Assets for the benefit of the Seg 3 Customers.  As discussed above, nowhere in the Disclosure Statement do the Plan Proponents provide <u>any notice</u> to the Seg 1 Customers that the Seg 3 Plan will operate to eviscerate their property rights in the Seg 1 Assets.  The Seg 3

28

Plan's stealth attack on the property rights of the Seg 1 Customers is fundamentally unfair and violates the due process rights of the Seg 1 Customers. See Altman, 254 B.R. at 515-16 (Bankruptcy Court's determination that painting claimed by creditor was property of the estate without an adversary proceeding or other appropriate notice was "fundamentally unfair, amounting to a denial of due process").

79.    At a minimum, this Court should require the Disclosure Statement to provide that (a) the Seg 1 Customers claim a property interest in the Seg 1 Assets, and (b) the Seg 3 Plan would eliminate any property rights of the Seg 1 Customers in the Seg 1 Assets. In addition, the Disclosure Statement should provide as follows:

> The Ad Hoc Committee of Seg 1 Customers believes that the Plan is unconfirmable because, among other things, it attempts to use the Seg 1 Assets. The Ad Hoc Committee believes that the Seg 1 Assets are not property of Sentinel's estate under § 541 of the Bankruptcy Code pursuant to the Commodity Exchange Act, related CFTC regulations and the Seg 1 customer agreements with Sentinel. In addition, the Ad Hoc Committee believes that the Seg 3 Plan's attempt to use the Seg 1 Assets is procedurally defective because the Plan Proponents have failed to file an adversary proceeding to determine ownership of those assets as required by Bankruptcy Rule 7001(2).

80.    Absent including the language set forth above, the Disclosure Statement should not be approved.

### B.    The Disclosure Statement Contains Inadequate Information Regarding The Plan Settlement And Expected Distributions To Seg 1 Customers

81.    The Disclosure Statement should not be approved because it fails to provide adequate information regarding the Plan Settlement and the impact on Seg 1 Customers if they do not elect into the Plan Settlement. Although the Plan Settlement is allegedly the "cornerstone" of the Seg 3 Plan, the Disclosure Statement is wholly bereft of the information necessary for creditors to assess the reasonableness of the proposed settlement.

29

82.    First, the Disclosure Statement provides inadequate information regarding the merits of electing into the Plan Settlement. Under the Plan Settlement, electing Seg 1 Customers agree to, among other things, give up valuable property rights to the Seg 1 Assets and transfer cash to Seg 3 Customers under certain circumstances. The Disclosure Statement fails to provide any explanation of why they should do so. The Disclosure Statement does not contain estimated distributions to Seg 1 Customers if they elect into the Plan Settlement. Moreover, the Disclosure Statement does not even list the variables that will impact distributions to Seg 1 Customers if they elect into the Plan Settlement.

83.    Second, the timing of electing into the Plan Settlement provides Seg 1 Customers with inadequate information. Seg 1 Customers are forced to decide whether to elect into the Plan Settlement in July, while the Trustee will not file his Rule 60(b) motion to vacate the Citadel Distribution Order and Judge Kennelly's Order until August. Seg 1 Customers thus are being forced to, among other things, agree to a full or partial "clawback" of the August 21 Transfers before they know whether the Trustee can even meet his initial hurdle of persuading this Court and the District Court that he has met his heavy burden under Rule 60(b).

84.    Third, the Disclosure Statement fails to provide any basis for treating Customers differently based on whether they vote in favor of the Plan and elect into the Plan Settlement. These "death trap" provisions in the Seg 3 Plan unfairly discriminate against Seg 1 Customers in violation of § 1129(b) of the Bankruptcy Code and would not survive scrutiny at a hearing on confirmation of the Plan. See In re MCorp Financial, Inc., 137 B.R. 219, 236 (Bankr. S.D. Tex. 1992) (coining the term "death trap" and holding that "[t]here is no authority in the Bankruptcy Code for discriminating against classes who vote against a plan of reorganization"); In re Allegheny Int'l, Inc., 118 B.R. 282, 304 n.15 (Bankr. W.D. Pa. 1990) ("[T]here is no authority in

30

the Bankruptcy Code for discriminating against classes who vote against a plan of reorganization."). The "death trap" provisions in this case are particularly egregious because the Plan Proponents have not, and cannot, explain why certain Customers should have their distributions substantially reduced based on their decision not to vote in favor of the Seg 3 Plan or accept the terms of the Plan Settlement.

85.    Given the potential disparity in distributions based on whether Customers vote in favor of the Plan and elect into the Plan Settlement, creditors should be informed of the basis for the "death trap" provision before making these important decisions.

86.    Fourth, the Disclosure Statement is equally deficient in providing information to Seg 1 Customers regarding the impact of not entering into the Plan Settlement. The Disclosure Statement provides no information regarding the estimated distributions to Seg 1 Customers in the absence of electing into the Plan Settlement. Indeed, there are multiple litigation scenarios under which Seg 1 Customers might fare better by not electing into the Plan Settlement, including when (a) the Seg 1 Customers prevail in the property of the estate litigation, (b) the Seg 1 Customers defeat a claim to avoid the August 21 Transfers under § 549 of the Bankruptcy Code, or (c) the Trustee enjoys at least moderate success in the BONY litigation. However, not only does the Disclosure Statement neglect to identify any of these alternatives and their impact on potential distributions, the Disclosure Statement fails to address why relying on any of these alternatives should be rejected in favor of entering into the Plan Settlement.

87.    Because the Disclosure Statement fails to assess the costs, benefits and estimated distributions related to electing and not electing into the Plan Settlement, Seg 1 Customers do not have sufficient information in order to determine whether electing into the Plan Settlement is in their best interests. The Disclosure Statement therefore should not be approved.

31

C.    **The Disclosure Statement Contains Inadequate information Regarding The Assets Available To Fund Customer Distributions Under The Seg 3 Plan**

88.    The Disclosure Statement should not be approved because it fails to provide adequate information regarding the assets available to fund Customer distributions under the Seg 3 Plan. "A description of available assets and their value is a vital element of necessary disclosure." In re Ligon, 50 B.R. 127, 130 (Bankr. M.D. Tenn. 1985); see also In re Feldman, 53 B.R. 355, 358 (Bankr. S.D.N.Y. 1985) (refusing to approve disclosure statement due to, among other things, inadequate description of value of assets and impact of potential litigation on distributions).

89.    Here, the Seg 3 Plan provides that assets held by the Trustee are split into two groups:  (a) "Customer Property," which is available to fund distributions to Customers (Class 3), and (b) "Excess Cash," which is available to fund distributions to general unsecured creditors (Class 4).[8]  The Disclosure Statement, however, fails to provide any estimate regarding the value of the assets held by the Trustee constituting "Customer Property" and the value of the assets constituting "Excess Cash."  The Disclosure Statement is equally silent on how such a distinction will be made.  Without this information, Customers are unable to estimate their possible recoveries under the Seg 3 Plan or determine whether the Plan's allocation of the assets held by the Trustee is reasonable.

90.    Without having any idea of either the amount or the basis for their potential recoveries, all Customers are without sufficient information to "make an intelligent decision

---

[8] Although not specifically enumerated by the Plan Proponents, this structure appears to be an attempt to track the priority structure of the "stockbroker" provisions in Subchapter III of Chapter 7 of the Bankruptcy Code. For the reasons set forth below, the Ad Hoc Committee does not believe that the Debtor can be considered a "stockbroker" under § 101(53) of the Bankruptcy Code.

CHIC_2975922.5

whether to vote for or against the plan." The Disclosure Statement therefore should not be approved.

### D.    The Disclosure Statement Contains Inadequate Information Regarding The Parties' Positions On Various Issues

91.    The Disclosure Statement contains inadequate information regarding the positions of the parties on various issues. As an initial matter, on various issues, such as the alleged traceability of Seg 1 Assets, the Disclosure Statement inappropriately characterizes the positions of the Plan Proponents as accepted facts rather than beliefs. See generally Disclosure Statement at §§ V.B., VI.A.1. The Disclosure Statement should be amended to provide that the statements of the Plan Proponents are their beliefs rather than accepted facts.

92.    The Disclosure Statement also contains inadequate information regarding the positions of the Seg 1 Customers on the following issues: (a) the property of the estate issue, (b) the Citadel Distribution Order and Judge Kennelly's Order, (c) whether the Debtor is a "stockbroker," as defined under § 101(53) of the Bankruptcy Code, and (d) the defenses Seg 1 Customers would raise to avoidance action claims brought by the Debtor's estate.

### 1.    Property Of The Estate Issue

93.    The Disclosure Statement contains inadequate information regarding the position of the Seg 1 Customers on the property of the estate issue. The entire discussion of the property of the estate issue and alleged "facts" regarding the Debtor is slanted toward the Plan Proponents' theory that no Seg 1 Assets are, or ever were, traceable. The Seg 3 Plan's discussion of traceability of the Seg 1 Assets is all the more remarkable because securities held by the Debtor on behalf of Customers are identifiable by cusip number on Account Statements and other records. In order to inform creditors and Customers more adequately regarding the property of the estate issue, the Ad Hoc Committee submits that the Disclosure Statement should

include paragraphs 47 through 50 of these Objections as the Ad Hoc Committee's statement of position on the issue.

94.    In addition, the Disclosure Statement provides no explanation for the rather bizarre inconsistency between the following statements, which are found side by side on page 23 of the Disclosure Statement (Section VI.A.1):

> . . . the Chapter 11 Trustee does not believe that any tracing rules can or should apply. Moreover, based upon his investigation, the Chapter 11 Trustee has concluded even if the Bankruptcy Court were to apply tracing rules to specific securities, certain Customers, and in particular the Customers that were the beneficiaries of the August 15, 2007 redemptions or were recipients of the Citadel Sale Distributions, have already received more than that to which they would be entitled if tracing rules were to be applied.

95.    The Disclosure Statement does not explain how the Trustee can, on the one hand, affirmatively state that the Customer assets are so commingled as to be beyond tracing, and then also state that under applicable tracing rules, it appears that the Seg 1 Customers have been overpaid. If the Trustee can determine that the Seg 1 Customers have been overpaid, it is apparent that the Trustee knows the Seg 1 Assets <u>can</u> be traced by cusip number. If the Seg 1 Assets have been so commingled with other Customer assets such that they cannot be traced, then the Trustee has no basis for asserting that the Seg 1 Customers have been overpaid under applicable tracing rules.

## 2.    Discussion Of Orders Approving August 21 Transfers

96.    The Disclosure Statement contains an inadequate and misleading discussion of the Orders authorizing the August 21 Transfers entered by this Court and the District Court. The Disclosure Statement incorrectly insinuates that this Court may not have authorized the August 21 Transfers and that there is some dispute (which is not identified) regarding the intent of the

34

Citadel Distribution Order.  See Disclosure Statement at § V.A.1.  In addition, the Disclosure Statement does not even mention that Judge Kennelly refused to enjoin the August 21 Transfers as part of the SEC's Complaint at the hearing on August 20, 2007 and the order entered in connection with that hearing.  Instead, the Disclosure Statement misleadingly suggests that the SEC Complaint—and the hearing before Judge Kennelly—was only about discovery and accounting issues.  See Disclosure Statement at § V.J.2.

97.     In order to correct the Disclosure Statement's inadequate and misleading discussion of the Orders authorizing the August 21 Transfers, this Court should require paragraphs 21 through 25 of these Objections to be included in the Disclosure Statement.

### 3.     Stockbroker Issue

98.     The Disclosure Statement also contains inadequate and misleading information regarding the possibility that the Debtor is a "stockbroker," as defined under § 101(53) of the Bankruptcy Code.  The Plan Proponents attempt to suggest that the Debtor may be a "stockbroker"—and therefore should have been administered under Subchapter III of Chapter 7 of the Bankruptcy Code—because Subchapter III generally provides for *pro rata* distributions to "customers" without regarding to individual "property of the estate" rights.  See 11 U.S.C. §§ 749, 752(a).

99.     The Disclosure Statement states that:

Section 101(53A) of the Bankruptcy Code defines the term "stockbroker" as a debtor that meets two criteria:  (a) the debtor must have "customers"; and (b) the debtor must be engaged in the business of "effecting transactions in securities."

Disclosure Statement at § VI.A.2.

100.     The Disclosure Statement's definition of "stockbroker" is incomplete and misleading.  Section 101(53A) of the Bankruptcy Code defines "stockbroker" as follows:

The term "stockbroker" means a person-

35

(A)    with respect to which there is a customer, as defined in section 741 of this title; and

(B)    that is engaged in the business of effecting transactions in securities –

      (i)    for the account of others; or

      (ii)    with members of the general public, from or for such person's own account.

101.    The Disclosure Statement's recitation of the requirements for being deemed a "stockbroker" thus leaves out the remainder of § 101(53A), which requires that the alleged stockbroker "effect transactions in securities" either (a) for the account of others (i.e., be a "broker"), or (b) with members of the general public, from or for its own account (i.e., be a "dealer"). The Disclosure Statement likely includes an incomplete definition of "stockbroker" because the Plan Proponents know that the Debtor is neither a "broker" nor a "dealer." See In re Dakota Rail, Inc., 104 B.R. 138, 145 (Bankr. D. Minn. 1989) (denying approval of disclosure statement where misrepresentations and omissions rendered it facially deficient).

102.    In order to provide a more complete definition of "stockbroker" and the Ad Hoc Committee's position that the Debtor is not a stockbroker, the Ad Hoc Committee submits that the following language should be included as the Ad Hoc Committee's position on the issue:

The Bankruptcy Code's "definition of stockbroker is a concatenation of the definitions of 'broker' and 'dealer' in the Securities Exchange Act of 1934," and includes both (i) brokers effecting transactions for the account of others, and (ii) dealers effecting transactions for their account with members of the general public. H.R. Rep. No. 95-595, at 268 (1977); see id. at 314 ("[T]he definition, derived from a combination of the definitions of 'broker' and 'dealer' in the ['34 Act], encompasses both brokers and dealers.") Therefore, in order for Sentinel to be a stockbroker as defined in the Bankruptcy Code, it must (1) have a customer and (2) either (a) effect transactions in securities for the account of others (i.e., be a "broker"), or (b) effect transactions in securities with members of the general public, from or for its own account (i.e., be a "dealer").

The Plan Proponents do not believe that there is a reasonable possibility that Sentinel would be deemed a "stockbroker" under § 101(53A) because, even if it

CHIC_2975922.5

has a "customer," it is neither a "broker" nor a "dealer." Sentinel would not be deemed a "broker" for the following, non-exclusive reasons:

- Sentinel was not a registered broker-dealer;

- Sentinel did not effect securities transactions for its customers. Section 15(a) of the CEA makes it unlawful for a broker or a dealer to "effect transactions in, or to induce or attempt to induce the purchase or sale of, any security" unless such broker or dealer is registered with the SEC. The fact that Sentinel was a registered investment adviser, on its own, would not exempt Sentinel from broker-dealer registration if it met the definition of either "broker" or "dealer" in the Exchange Act.

- Sentinel did not engage in activities requiring broker registration;

- Sentinel did not receive transaction-related compensation, hold itself out as a broker or one who executes securities transactions, hold customer funds or securities as a custodian or actively solicit investors to participate in particular securities transactions.

Sentinel would also not be deemed a "dealer" for the following, non-exclusive reasons:

- Sentinel did not act as a "principal" in executing transactions, meaning it did not effect transactions "from or for such person's own account."

- Sentinel did not effect transactions with "members of the general public," as its customers appear to be almost exclusively institutional investors such as other commodity brokers, FCMs, hedge funds, financial institutions, pension funds and sophisticated high net-worth individuals.

### 4. Defenses To Causes Of Action

103. The Disclosure Statement and Seg 3 Plan make it clear that pursuing litigation against non-electing Seg 1 Customers is a cornerstone of the Plan Proponents' strategy in this case. The Disclosure Statement, however, fails to note that the Seg 1 Customers have asserted (and will assert) significant defenses to any claims to avoid the August 17 and 21 Transfers or other litigation initiated by the Trustee.

104. In order to provide parties-in-interest with a more complete description of potential litigation against Seg 1 Customers, the Disclosure Statement should be revised to include the following language:

Any attempt by the Chapter 11 Trustee or the Estate to file Avoidance Actions against Seg 1 Customers would likely be met by significant defenses. Among other things, the Seg 1 Customers would likely argue that (a) any transfers to the Seg 1 Customers were not transfers of property of the estate and, therefore, are not avoidable; (b) the Citadel Sale Distributions are not recoverable under § 549 of the Bankruptcy Code because they were "authorized" by the Bankruptcy Court; and (c) any transfers prior to the " no redemption" letter issued on August 13, 2007 are not avoidable because they were transfers made in the ordinary course of Sentinel's business under § 547(c)(2) of the Bankruptcy Code.

### E. The Disclosure Statement Contains Inadequate Information Regarding The Alleged Basis For Charging Interest On The August 17 And August 21 Transfers

105.    The Seg 3 Plan attempts to charge Seg 1 Customers with interest on the August 17 and August 21 Transfers. The Disclosure Statement is inadequate because it fails to provide the alleged basis for charging interest on such transfers.

106.    As stated above, even if the August 17 and August 21 Transfers were preferential transfers (which they were not), any attempt to charge interest on such transfers would still be inappropriate. It is well established that a bankruptcy trustee can only recover pre-judgment interest on a preferential transfer from the earlier of (a) the date of a demand letter sent to the recipient of the preferential transfer, or (b) the institution of an adversary proceeding to avoid the preferential transfer. See, e.g., Mills, 111 B.R. 186 ("Prejudgment interest in preference litigation accrues from the date of demand on the Defendant, or absent demand, from the date the adversary was filed."); Southern Indus., 87 B.R. 518 ("Prejudgment interest in preferences litigation accrues from the date of demand on the defendant, or absent demand, from the date the adversary proceeding is filed.").

107.    Here, no demand has been made to the Seg 1 Customers to return the August 17 and August 21 Transfers as preferential transfers. Moreover, the Trustee has filed no adversary proceeding to avoid the August 17 and August 21 Transfers. As such, although the Ad Hoc Committee believes the "implied interest" provision makes the Seg 3 Plan patently

38

unconfirmable, at a minimum, the Plan Proponents should be required to describe in the Disclosure Statement (a) any alleged basis in the Bankruptcy Code for charging interest on the August 17 and 21 Transfers, and (b) the Ad Hoc Committee's position that charging interest on such transfers makes the Seg 3 Plan unconfirmable.

F.    **The Disclosure Statement Fails To Provide A Complete Description Of The Seg 3 Customers And Their Investments At Sentinel**

108.    The Disclosure Statement also provides an incomplete and inaccurate description of the Seg 3 Customers.    According to the Disclosure Statement, "[c]ertain investors participating in Seg 3 elected that their funds be invested in accordance with the investment standards of CFTC Rule 1.25." (Discl. St. at 10.) In fact, the Ad Hoc Committee believes that very few of the Seg 3 Customers actually participated in the 1.25 Portfolio. Sentinel maintained the Seg 3 accounts for hedge funds and other speculators, wealthy individuals and trusts, as well as the non-customer funds of FCMs. Consequently, most Seg 3 Customers were engaged in far riskier investments than those comprising the 1.25 Portfolio. Thus, the Ad Hoc Committee submits that page 10 of the Disclosure Statement should be revised to read as follows:

> Certain investors participating in Seg 3 elected that their funds be invested in accordance with the investment standards of CFTC Rule 1.25. However, the majority of the customers associated with the Seg 3 accounts were hedge funds, individuals and trusts, and the non-customer funds of FCMs. Most of these Seg 3 Customers did not elect to invest their funds in accordance with the investment standards of CFTC Rule 1.25.

G.    **The Disclosure Statement Fails To Describe The Composition Of The Committee**

109.    The Seg 3 Plan is a joint plan of the Committee and the Trustee. A majority of the Committee is composed of Seg 3 Customers. As a result, all of the decisions and statements made by the Committee in connection with the Seg 3 Plan and Disclosure Statement have been made under the direction and control of the Seg 3 Customers.

CHIC_2975922.5

110.　Because the Committee ostensibly is the representative of all creditors and Customers of the Debtor, parties-in-interest reading the Disclosure Statement might incorrectly assume that the Seg 3 Plan enjoys the support of the Seg 1 Customers. It does not. The Disclosure Statement should reflect that (a) Seg 3 Customers constitute a majority of the Committee, and (b) the Seg 3 Plan does not enjoy the support of the Ad Hoc Committee. These representations will provide parties-in-interest with a more complete picture of the forces behind the Seg 3 Plan.

### H.　The Disclosure Statement Contains Inadequate Information Regarding Tranche-P Of The Liquidation Trust

111.　The Disclosure Statement contains inadequate information regarding Tranche-P of the Liquidation Trust. As discussed above, Tranche-P is being created to hold and pursue the "Non-Estate Claims" of Customers against third parties such as BONY and McGladrey & Pullen. Only Customers voting in favor of the Plan and electing into the Plan Settlement may participate in Tranche-P.

112.　The Disclosure Statement fails to provide any information on how settlements involving both "Causes of Action" (estate claims) and "Non-Estate Claims" (held by Tranche-P) would be allocated between the general Liquidation Trust and the separate Tranche-P. Nor does the Disclosure Statement specify any procedure for any party to challenge an allocation of recoveries between the general Liquidation Trust and Tranche-P. As a result, Customers do not possess sufficient information regarding whether it is their interests to participate in Tranche-P by assigning their Non-Estate Claims to the Liquidation Trust. Absent additional information on the allocation of recoveries between the general Liquidation Trust and Tranche-P, the Disclosure Statement should not be approved.

## CONCLUSION

113.    This Court should not approve the Disclosure Statement because the Seg 3 Plan is unconfirmable on its face. In addition, the Disclosure Statement fails to satisfy the standards imposed by § 1125 of the Bankruptcy Code because it does not provide creditors and Customers with adequate information from which they can make an informed decision about whether to vote to accept the Plan.

WHEREFORE, the Ad Hoc Committee respectfully request that this Court enter an order (a) denying approval of the Disclosure Statement, (b) continuing the hearing on approval of the Disclosure Statement for a period of at least 21 days, and (c) for such other and further relief as is just and proper.

Dated: June 3, 2008

Respectfully submitted,

Ad Hoc Committee of Seg 1 Customers of
Sentinel Management Group, Inc.

By:  _____/s/ Geoffrey S. Goodman_____
           One Of Their Attorneys

Mark L. Prager (No. 2246503)
Stephen P. Bedell (No. 3125972)
Geoffrey S. Goodman (No. 6272297)
Foley & Lardner LLP
321 N. Clark Street, Suite 2800
Chicago, Illinois 60610
312.832.4500 (telephone)
312. 832.4700 (facsimile)

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| SENTINEL MANAGEMENT GROUP, INC. | ) | Case No. 07 B 14987 |
| | ) | |
| Debtor. | ) | Hon. John H. Squires |
| | ) | |
| | ) | Hearing Date: June 10, 2008 at 10:00am |
| | ) | Objection Deadline: June 3, 2008 |

**OBJECTION OF PENSON GHCO, PENSON FINANCIAL FUTURES, INC.,
VISION FINANCIAL MARKETS LLC AND IPGL LIMITED TO
DISCLOSURE STATEMENT  PURSUANT TO SECTION 1125 OF THE
BANKRUPTCY CODE FOR THE CHAPTER 11 PLAN OF LIQUIDATION**

Penson GHCO ("GHCO"), Penson Financial Futures, Inc. ("PFFI"), Vision Financial
Markets LLC ("Vision") and IPGL Limited ("IPGL", and collectively with GHCO, PFFI and
Vision, the "Objecting Parties") hereby submit this objection (the "Objection") to the Disclosure
Statement Pursuant to Section 1125 of the Bankruptcy Code for the Chapter 11 Plan of
Liquidation (the "Disclosure Statement") filed jointly by the Official Committee of Unsecured
Creditors of Sentinel Management Group (the "Committee") and Frederick J. Grede, solely as
chapter 11 trustee (the "Trustee") for the bankruptcy estate of Sentinel Management Group, Inc.,
the above captioned debtor herein ("Sentinel" or the "Debtor").[1]  In support of their Objection,
the Objecting Parties state as follows:

## BACKGROUND

1.      The Objecting Parties are futures commission merchants and Citadel-Beneficiary
Customers of Debtor within the meaning of the Plan.  This means that they were among the
Customers that received payments on August 17 and 21, 2007, as discussed below.[2]  GHCO had
a Seg 1 account with a Petition Date balance of $33,483,224.21, a Seg 2 account with a Petition
Date balance of $820,472.78 and a Seg 3 account with a Petition Date balance of $653,629.59.
PFFI had a Seg 1 account with a Petition Date balance of $491,730.68.  Vision had a Seg 1

---

[1] Vision and GHCO are members of the Creditors Committee. They file this objection solely as
Customers of the Debtor and not as members of the Creditors Committee.

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the
Plan.

account with a Petition Date balance of $50,239,558.35. IPGL had a Seg 1 account with a Petition Date balance of $30,364,195.16, another Seg 1 account with a Petition Date balance of $18,888,787.19 and a Seg 3 account with a Petition Date balance of $5,620,653.75.[3] The Seg 1 and Seg 2 accounts were monies of the Objecting Parties' customers, which, by regulation and contract, the Objecting Parties and anyone, such as Debtor, that the Objecting Parties entrusted to maintain the funds, had to hold in segregation and invest conservatively pursuant to specified regulatory investment guidelines. The Seg 3 accounts were the Objecting Parties' own funds. The Objecting Parties' Seg 1 account balances represent 31% of total Seg 1 account balances.

2.    The Objecting Parties and other Seg 1 Customers believed that Debtor, as required by law and contract, maintained its Seg 1 Customers' accounts in segregation, separate from the accounts of Debtor's other Customers and from Debtor's own funds and accounts. And, indeed, Debtor purported to honor its obligations. It maintained a segregated Seg 1 account at BONY which held various securities, and it maintained segregated Seg 1 accounts at BONY and JPMorgan which held cash. It maintained separate segregated accounts for Seg 2 and Seg 3 Customers. On August 17, 2007, the day of the bankruptcy filing, Debtor paid $22.5 million from the Seg 1 cash accounts to the Seg 1 Customers. On August 16 or 17, 2007, Debtor closed the sale of most of the securities in the Seg 1 securities account to Citadel Equity Fund and Citadel Limited Partnership for approximately $312 million. On August 20, 2007, Debtor filed an emergency motion with this Court for entry of an order approving the turnover and distribution of certain third party assets, i.e. the $312 million, which were held by BONY and which Debtor asserted were owned by the Citadel-Beneficiary Customers, to the Citadel-Beneficiary Customers. The Court entered the order that same day but with the proviso that $15.6 million be held in escrow pending further order of the Court.

3.    Immediately following this Court's entry of the order, the District Court (Judge Kennelly) held a hearing in a separate proceeding initiated against Debtor by the Securities and Exchange Commission ("SEC") on the SEC's emergency motion for a temporary restraining order and other ancillary relief. A copy of the transcript of the District Court hearing is attached to and made a part of this Objection as Exhibit A. The District Court asked whether the

---

[3] IGPL acquired its claims by assignment from IFX Markets, Inc., an affiliated company. IPGL recently sold its Seg 3 Claim but retains the Seg 1 Claims and certain rights with respect to the Seg 3 Claim.

temporary restraining order would impact this Court's order authorizing BONY's payment of the $297 million to Seg 1 Customers (Transcript at p. 23). The SEC, which argued that the securities sold to Citadel were owned in part by Debtor's Seg 3 Customers, initially opposed the distribution of the funds to Seg 1 Customers but, following Court mandated consultation with the Commodities Futures Trading Commission ("CFTC"), which argued for the distribution and told the Court that eleven Seg 1 Customers would fail if the monies were not paid out, ultimately accepted that any relief granted by the District Court should not impact or interfere with this Court's order (Transcript at pp. 28, 29). Discus Master Fund, the largest Seg 3 Customer with approximately $400 million on deposit at Debtor, then took up the argument that the $297 million included proceeds of property of Seg 3 Customers, and it urged the District Court to stop the distribution and block this Court's order (Transcript at p. 33). The District Court then asked Discus: "So what I am supposed to weigh then is your client's $400 million against what I was told are the ripple effects that will reverberate throughout the economy [if the $297 million were not distributed to Seg 1 Customers]?" Discus answered "yes", to which, the District Court responded: "That's a no-brainer" (Transcript at pp. 33, 34). The District Court then entered the temporary restraining order requested by the SEC but only to the extent that it did not interfere with this Court's order authorizing the distribution of the $297 million to Seg 1 Customers. In accordance with this Court's order and the District Court's order, BONY distributed the $297 million to Seg 1 Customers the next day, August 21, 2007.

4.    For the Seg 1 Customers, and indeed for all Customers, a primary issue in this bankruptcy proceeding is the significance of this Court's and the District Court's orders of August 20, 2007, authorizing the distribution of the $297 million to Seg 1 Customers and whether the Courts should revisit the orders. The Plan provides that the Trustee shall, by not later than August 11, 2008, subject to his obligations under Rule 9011 of the Bankruptcy Rules, file a motion pursuant to Rule 60(b) of the Federal Rules of Civil Procedure seeking to vacate or modify this Court's order of August 20, 2007. A related issue is whether the $22.5 million paid to Seg 1 Customers on August 17, 2007, and the $297 million paid to them on August 21, 2007, was the return of the Seg 1 Customers' own funds or was a distribution of property of Debtor's estate and whether the $36 - $40 million in cash and securities still remaining in one or more segregated Seg 1 accounts at JPMorgan (the "Seg 1 Segregated Accounts"), which includes the

3

$15.6 million held back from the Citadel sale, is owned by Seg 1 Customers or is property of the Debtor's estate.

5.      The Plan and Disclosure Statement acknowledge Debtor's regulatory and contractual obligations to honor segregation, but the Plan is premised on the Committee's and Trustee's highly disputed belief that Debtor so ignored its regulatory and contractual obligations and commingled Seg 1 property with property of other Customers and with Debtor's own funds that all Customer Property and all of Debtor's property must be viewed as part of a single pot to be shared ratably by all Customers.  The Plan accordingly treats the August 17, 2007, and August 21, 2007, payments to Seg 1 Customers as interim distributions on Claims against the estate.  Since these payments represented 70.9% of Seg 1 Customers' account balances, the Plan provides that all further distributions will be paid to the NonCitadel-Beneficiary Customers until they have received 70.9% plus interest.  The Plan further provides that if the NonCitadel-Beneficiary Customers do not ultimately receive 70.9% of their Claims, the Liquidating Trustee may sue the Seg 1 Customers to recover the August 17 and 21, 2007, payments so that these payments and all other property still held by Debtor, including the $36 to $40 million still held in the Seg 1 Segregated Accounts, may be distributed ratably to all Customers.[4]  If the Liquidating Trustee, who is the current Trustee, decides against pursuing such litigation against the Citadel-Beneficiary Customers, the Liquidating Trust Committee, which, like the Committee, will have a majority of Seg 3 Customers, will have the right to pursue the litigation on behalf of the Liquidation Trust.

6.      The Plan's impact on Seg 1 Customers is dramatic.  The Objecting Parties believe that the Committee's and Trustee's liquidation analysis is overly optimistic.  A review of the liquidation analysis, however, leads to the conclusion that if all further distributions are paid to NonCitadel-Beneficiary Customers, these Customers will receive as little as approximately 37% of their Claims if the Trustee's litigation against BONY, the Debtor's auditors and others is unsuccessful.  If so - and the Disclosure Statement does not explicitly say this - the remaining property plus the August 17 and 21, 2007, distributions represent only approximately 48% of all Customer Claims.  Thus, under the Plan, the Citadel-Beneficiary Customers, who have already

---

[4] The Trustee would only be able to seek return of the $297 million if he is able to obtain relief from this Court's and the District Court's orders of August 20, 2007 which, the Seg 1 Customers believe, authorized the distribution.

lost $130 million of their customers' money that they deposited with Debtor, which they had to replace from their own funds, stand to have to repay as much as, if not more than, $105 million, for a total loss of $235 million of the $450 million of their customers funds on deposit with Debtor, every penny of which they will have to replace from their own funds.

7.     The Plan includes a settlement that Citadel-Beneficiary Customers will be bound by if they vote to accept the Plan (the "Plan Settlement"). The Plan Settlement provides that the Liquidating Trustee and the Liquidation Trust Committee will release any claim for repayment of the August 17 and 21, 2007, payments against any Citadel-Beneficiary Customer who votes to accept the Plan and thereby commits to pay its share of the amount, if any, that Citadel-Beneficiary Customers together would need to pay to enable the NonCitadel-Beneficiary Customers to receive 50% of their Claims, plus some interest, or, if less, achieve parity with Citadel-Beneficiary Customers. What this means is that absent recoveries from BONY, the auditors or others, a Citadel-Beneficiary Customer that accepts the Plan Settlement will be committing to pay its share of as much as, if not more than, $105 million.

8.     The Plan Settlement is beneficial to Citadel-Beneficiary Customers if, but only if, the Liquidating Trustee obtains recoveries from BONY, the auditors or others or if the remaining securities held by Debtor are sold for significantly more than the Trustee expects. If not, an Electing Holder, i.e., a Citadel-Beneficiary Customer that accepts the Plan, will be committing to pay the amount that it would be required to pay should the Trustee sue it and win. An Electing Holder would not suffer any downside as a result of any Citadel-Beneficiary Customer becoming an Electing Holder but then being unable to pay. Nor would it suffer any harm if Citadel-Beneficiary Customer rejected the Plan, was sued, lost the suit, and was unable to pay the judgment. Otherwise, however, the Plan requires an electing Citadel-Beneficiary Customer to waive what the Objecting Parties believe are significant legal and factual defenses to repayment, to waive its claim to the $36 million to $40 million currently held in the Seg 1 Segregated Accounts and to waive its claim to share in any non-segregated assets, in exchange for which it may well be agreeing to the treatment it would receive if it were sued and lost anyway.

9.     The Objecting Parties do not expect that the BONY litigation and other litigation will be resolved by the time that they have to vote on the Plan. They do not know if the remaining securities will be sold before they have to vote and do not know whether the securities will sell for more than the low end, if not less, of the range presented in the liquidation analysis.

5

Accordingly, they expect that they will not know by the time they have to vote whether the settlement is preferable to litigation or, indeed, if litigation would ultimately be necessary. They thus expect that they would reject the Plan if they must vote within the time frame envisioned by the Committee and Trustee, and they expect that most other Seg 1 Customers would vote to reject. The Objecting Parties believe that, absent recoveries from BONY, the auditors or others, confirmation of the Plan would lead to extensive litigation of the inter-creditor disputes.

10.    The Objecting Parties do not mean to raise confirmation objections now. They have presented the above summary, however, because their objections to the adequacy of the Disclosure Statement are based in large part on the Disclosure Statement's failure (i) to adequately inform all Customers of the outstanding legal issues and factual questions regarding the inter-creditor disputes and to present a balanced view of these issues and questions, (ii) to present a realistic assessment of whether the Plan will avoid litigation of the inter-creditor disputes, and (iii) to adequately inform Citadel-Beneficiary Customers in particular of the implications of a vote to accept the Plan.

## SUMMARY OF ARGUMENTS

11.    The Disclosure Statement presents a one sided and slanted rendition of the Plan, a Plan that blatantly favors one group of Customers, Seg 3 Customers, over another, Seg 1 Customers. Not only does the Disclosure Statement present a skewed view of the facts of the case, but it fails to provide adequate information for voters to accept or reject the Plan, particularly voters, the Citadel-Beneficiary Customers, that are asked to accept a compromise that could result in them paying money back to the estate while receiving no distribution. Moreover, the Disclosure Statement presents a Plan that is not even confirmable. First, the Plan is not confirmable because it proposes to take the cash and securities segregated in the Seg 1 Segregated Accounts and distribute them for the benefit of NonCitadel-Beneficiary Customers without an adversary proceeding, due process of law or any determination that such property is property of Sentinel's estate. Second, the Plan is not confirmable because it unfairly treats Citadel-Beneficiary Customers that hold Claims due to Seg 2, Seg 3, or Seg 4 accounts in addition to Claims due to Seg 1 accounts differently from NonCitadel-Beneficiary Customers. Third, the Plan improperly limits the Claims that Citadel-Beneficiary Customers may vote on the Plan.

12.　In addition to the Plan being unconfirmable, the Disclosure Statement fails to give information of a type sufficient for Citadel-Beneficiary Customers to make an informed decision whether to accept the Plan and opt in to the Plan Settlement or reject the Plan and risk litigation over repayment of the August 17 and 21, 2007 payments.　First, the Plan fails to give sufficient financial information for Citadel-Beneficiary Customers to determine whether to accept the settlement set forth in Section 10.10 of the Plan.　Second, the Disclosure Statement asserts as true many facts that are the subject of significant dispute.　Third, the Disclosure Statement provides no justification or basis for the proposed composition of the Liquidation Trust Committee and the under-representation of Seg 1 Customers.　Fourth, the Disclosure Statement provides no basis for awarding post-petition interest to NonCitadel-Beneficiary Customers while denying interest to all other creditors.　Fifth, the Disclosure Statement provides no basis for the subordination of the Claims that Citadel-Beneficiary Customers have to estate property to the claims of NonCitadel-Beneficiary Customers.

13.　Because the Disclosure Statement describes a Plan that is not confirmable, and even if the Plan were confirmable, the Disclosure Statement fails to provide sufficient information whether to accept or reject the Plan, the Disclosure Statement cannot be approved.

## ARGUMENT

14.　A disclosure statement may only be approved after notice and hearing, and then only if it includes "adequate information." *See* 11 U.S.C. § 1125(b); Fed.R.Bankr.P. 3017(a); *accord, e.g., In re Unichem Corp.* 72 B.R. 95, 96 (Bankr. N.D. Ill. 1987) aff'd, 80 B.R. 448 (N.D. Ill. 1987).　The phrase "adequate information" is defined in section 1125(a)(1) as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan ...

11 U.S.C. § 1125(a)(1).　"Thus, it is understood that the general purpose of the disclosure statement is to provide 'adequate information' to enable 'impaired' classes of creditors and interest holders to make an informed judgment about the proposed plan and determine whether to vote in favor of or against that plan." *In re Phoenix Petroleum Co.*, 278 B.R. 385, 392 (Bankr.

E.D. Pa. 2001).   The determination of what constitutes adequate information is subjective and should be made on a case by case basis.  *Matter of Texas Extrusion Corp.,* 844 F.2d 1142, 1157 (5th Cir. 1988), 488 U.S. 926, 109 S.Ct. 311, 102 L.Ed.2d 330 (1988).  As the legislative history explains:

> Precisely what constitutes adequate information in any particular instance will develop on a case-by-case basis.  Courts will take a practical approach as to what is necessary under the circumstances of each case, such as the cost of preparation of the statements, the need for relative speed in solicitation and confirmation, and, of course, the need for investor protection.

H.R. Rep. No. 595, 95th Cong, 1st Sess., 408-409 (1977),  U.S. Code Cong. & Admin. News 1978, pp. 5963, 6365.

15.    "Generally, the adequacy of disclosure is dependent upon various factors including: the size and complexity of the chapter 11 case, the type of plan proposed, the type of creditors and claims impaired by the proposed plan, and the access by impaired creditors to relevant information from other sources." *In re Phoenix Petroleum*, 278 B.R. at 393, *citing In re Monroe Well Service, Inc.,* 80 B.R. 324, 330 (Bankr.E.D.Pa.1987). "Depending on the level of sophistication among 'typical' holders in each 'relevant class,' the required information for each relevant class may vary." *In re Bloomingdale Partners*,    155 B.R. 961, 972 (Bankr N.D Ill. 1993). Section 1125(a)(2)(C) further describes "adequate information" by defining the phrase "investor typical of holders of claims or interests of the relevant class" as an investor having the "*ability to obtain such information from sources other than the disclosure* required by this section as holders of claims or interests in such class generally have." *Id.* (emphasis added).

16.    Moreover, where a plan is not confirmable on its face, courts often will not approve the disclosure statement filed with respect to such plan. *See In re Paul O'Leary*, 183 B.R. 338, 338-339 (Bankr D. Mass 1995) ("Courts may refuse to approve disclosure statements that describe plans that cannot be confirmed."); *In re Atlanta West VI*, 91 B.R. 620, 621 (Bankr. N.D. Ga. 1988).

## The Disclosure Statement Cannot Be Approved Because the Plan is Not Confirmable

17.    Here, the Court should deny approval of the Disclosure Statement because the Plan it describes is not confirmable.  First, the Plan purports to take the $36-$40 million currently in the Seg 1 Segregated Accounts, and without any adversary proceeding, judicial determination, or agreement that the property is property of Sentinel's estate and not the Seg 1s, deems it

8

Customer Property, and distributes it *pro rata* to NonCitadel-Beneficiary Customers.  Second, the Plan discriminates unfairly against the Citadel-Beneficiary Customers that also hold Claims due to Seg 2, Seg 3 and/or Seg 4 accounts because the Plan treats non-Seg 1 holdings of such Customers differently than it does similar holdings of Customers that do not hold Seg 1 claims, and limits the recoveries available for such customers on account of their non-Seg 1 claims.  Third, the Plan improperly limits the claims that may be voted by Citadel-Beneficiary Customers.[5]

### The Plan Takes Property Without Due Process of Law

18.    Under the Plan, the Trustee and the Committee propose to take all Customer Property, regardless whether that property is property of Sentinel's estate or whether such property is segregated for the benefit of a specific Customer or group of Customers, and distribute the proceeds *pro rata* for the benefit of holders of NonCitadel-Beneficiary Customer Claims.  Included among the Customer Property as defined in the Plan are the Seg 1 Segregated Accounts holding approximately $36-40 million in cash and securities that is segregated for the benefit of Citadel-Beneficiary Customers.  The Objecting Parties, along with other holders of Seg 1 Claims assert that the funds and securities contained in the Seg 1 Segregated Accounts, along with certain other causes of action, are not property of Sentinel's bankruptcy estate but are property belonging to the Citadel-Beneficiary Customers.  Despite this dispute, the Plan proposes to take this property without any process or judicial determination and distribute it to NonCitadel-Beneficiary Customers.  This blatant confiscation of property for the benefit of certain Customers without the resolution or adjudication of ownership is a violation of the Citadel-Beneficiary Customers' due process rights.  Indeed, Bankruptcy Rule 7001(2) requires the initiation of an adversary proceeding to determine an interest in property.  Here, however, the Committee and the Trustee have no intention of doing even that before taking property Seg 1 Customers assert is theirs.

19.    The Trustee and the Committee are well aware of the dispute over whether Customer Property is property of the estate.  First, there is a significant discussion of the issue in the Disclosure Statement.  Second, the purpose of the Plan Settlement is to avoid litigation over whether Customer Property is property of the estate.  Moreover, as the caption of this case makes

---

[5] The Objecting Parties have other objections to confirmation and reserve all objections.

clear, this case is not a stockbroker liquidation or commodity broker liquidation under chapter 7 of the Bankruptcy Code. Accordingly, whether the Customer Property is property of Sentinel's estate which may be ratably distributed to all Customers of Sentinel is an issue which must be determined before the property can be taken away from Customers that assert it is their property. Without adjudication of whether the funds and securities in the Seg 1 Segregated Accounts are property of Sentinel's bankruptcy estate, such funds and securities cannot be used under the Plan and the Plan cannot be confirmed.

**The Plan Does Not Treat Citadel-Beneficiary Customers that Hold  Seg 2, Seg 3, or Seg 4 Claims the Same As Other Holders of Seg 2, Seg 3 or Seg 4 Claims.**

20.     Section 1123(a)(4) of the Bankruptcy Code provides that, "a plan shall—(4) provide the same treatment for each claim or interest of a particular class unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). The Plan violates section 1123(a)(4) because it provides for disparate treatment for Citadel-Beneficiary Customers that hold Claims in Seg 2, Seg 3 or Seg 4 in addition to their Seg 1 Claims than it does for Customers that hold claims in only Seg 2, Seg 3 or Seg 4.

21.     Under the Plan, Citadel-Beneficiary Customers that are not Electing Holders will not receive any distribution for any accounts held with Sentinel, regardless of whether such account is a Seg 1, Seg 2, Seg 3, or Seg 4 account, until the Percentage Recovery for all Customers is the same as the recovery for the Citadel-Beneficiary Customers.  Citadel-Beneficiary Customers like GHCO and IPGL, however, that also hold Claims in Seg 2 and Seg 3 in addition to Seg 1, have received an overall Percentage Recovery less than the current Percentage Recovery of Citadel-Beneficiary Customers that only hold Seg 1 Claims since such Customer's Seg 1 Claims have received a distribution while their Seg 2 and Seg 3 Claims have received no distributions.

22.     Under the Plan, however, if GHCO and IGPL do not vote in favor of the Plan and become Electing Holders, they will not receive any distribution on account of their Seg 2 and Seg 3 Claims until NonCitadel-Beneficiary Customers receive a higher Percentage Recovery than GHCO and IGPL have already received.  The Plan, as drafted, essentially operates as a punishment to Customers like GHCO and IGPL, rather than as a mechanism to equalize distributions.  By preventing non-Electing Holders from receiving distributions on account of

10

any Seg 2, Seg 3 or Seg 4 claims, GHCO and IGPL and similarly situated Customers are being treated differently than other claimants in Class 3.

23.    GHCO's and IGPL non-Seg 1 Claims should be treated the same as the Claims of other holders in those categories regardless of whether they become Electing Holders. Because the Plan fails to treat all creditors in Class 3 the same, it is not confirmable and therefore the Disclosure Statement cannot be approved.

**The Plan Improperly Limits the Claims of Citadel-Beneficiary Customers for Voting Purposes.**

24.    The Objecting Parties believe that the payments they have received to date, whether from the Seg 1 Special Distribution or the Citadel Sale Distribution, were the return of their own property and are not avoidable or subject to claw-back. They believe that the amount of their Claims against Debtor is indeed the amount of their Petition Date balance minus the August 21, 2007, payment. The Plan provides otherwise. The Plan is based in part on the premise that the August 21, 2007 payment was an interim distribution on a Claim in the amount of the Petition Date account balance. At the same time, however, the Plan limits the vote of Citadel-Beneficiary Customers to the Claim amount remaining after the August 21, 2007, payment. This unfairly limits the total Claims that Citadel-Beneficiary Customers may vote, thereby limiting such Customers' impact on acceptance or rejection of the Plan by Class 3. The Claims of the Citadel-Beneficiary Customers should be calculated for voting purposes as the Petition Date account balances. The Committee and Trustee cannot have it both ways. They cannot treat the August 21, 2007, payment as an interim distribution on a Claim, with the adverse consequences that flow from such treatment, while at the same time treating the payment as reducing the amount of the Claim.

25.    The Plan's limitation of the voting rights of the Citadel-Beneficiary Customers may be seen as an attempt to disenfranchise these Customers. The Citadel-Beneficiary Customers' Seg 1 Claims total 35% of all claims in Class 3, enough to prevent Class 3 from accepting the Plan. Taking into account these Customers' Seg 2, 3 or 4 Claims, these Customers hold approximately 39% of all Class 3 Claims. Quantifying the Seg 1 Claims as provided for in the Plan unfairly limits Citadel-Beneficiary Customers' Claims to only 20% of Class 3 Claims and ensures the ability of NonCitadel-Beneficiary Customers to have Class 3 accept the Plan.

11

**The Disclosure Statement Fails to Provide Adequate and Accurate Information**

26.    Even if the plan were confirmable, the Disclosure Statement could not be approved because it fails to provide sufficient detail to enable a hypothetical reasonable investor typical of Customers in this Case to make an informed judgment about the Plan.  First, the Disclosure Statement does not include information necessary for Citadel-Beneficiary Customers to make an informed decision about the Plan Settlement.  Second, the Disclosure Statement asserts as true many facts that are the subject of significant dispute.  Third, the Disclosure Statement has no discussion regarding the composition of the Liquidation Trust Committee. Fourth, the Disclosure Statement provides no basis for awarding post-petition interest to NonCitadel-Beneficiary Customers while denying interest to all other creditors.  Fifth, the Disclosure Statement provides no basis for the subordination of the Claims that Citadel-Beneficiary Customers have to estate property to those of NonCitadel-Beneficiary Customers.

**The Disclosure Statement Does Not Include Adequate Information On the Plan Settlement**

27.    Under the Plan Settlement, if NonCitadel-Beneficiary Customers receive distributions equal to fifty percent of their allowed Class 3 Claims, plus interest, Electing Holders will receive a release of all claims related to receipt of the Citadel Sale Distributions or the Seg 1 Special Distributions.  If NonCitadel-Beneficiary Customers do not receive distributions equal to fifty percent of their allowed Class 3 Claims, plus interest, then each Electing Holder will be required to pay its share (as a percentage of all Citadel-Beneficiary Customers Claims) of the funds that Citadel-Beneficiary Customers as a group would need to pay to allow NonCitadel-Beneficiary Customers to reach the lesser of (i) the fifty percent threshold, plus Interest or (ii) a percentage equal to that received by Citadel-Beneficiary Customers if they returned the earlier payments and shared ratably.

28.    While the Disclosure Statement lays out the basics and structure of the Plan Settlement, it does not clearly present the economic information necessary for Citadel-Beneficiary Customers to make an informed decision.  The Disclosure Statement provides no information regarding the total amount of Claims that have not received any distributions and must be brought up to the fifty percent threshold.  Nor does the Disclosure Statement explicitly state the amount of additional funds the Trustee must recover, either through sale of securities or

through litigation, to bring the NonCitadel-Beneficiary Customers up to the fifty percent Release Distribution Threshold.

29.     The Trustee knows the total universe of Class 3 Customer Claims. The Trustee knows the total amount of Seg 1 Claims that received the Citadel Sale Distribution and the Seg 1 Special Distribution. The Trustee knows the total amount of Seg 2, Seg 3 and Seg 4 Customer Claims that have received no distributions and the amount of cash currently on hand. With that information, the Trustee can calculate the funds needed to reach the fifty percent Release Distribution Threshold for NonCitadel-Beneficiary Customers. Without a clear presentation of the various Claim amounts and funds necessary for NonCitadel-Beneficiary Customers to reach a fifty percent distribution, it is impossible for a Citadel-Beneficiary Customer to determine the amount that may need to be repaid and its share of the amount and to assess the risks and benefits of the Plan Settlement. Without such information, the Citadel-Beneficiary Customers cannot make an informed decision whether to accept or reject the Plan. Accordingly, the Trustee should be required to provide such information.

30.     Moreover, the Disclosure Statement fails to provide any basis or discussion regarding the selection of what appear to be arbitrary deadlines and thresholds in the Plan Settlement. For example, the Disclosure Statement has no discussion regarding why the Trigger Date in the Plan Settlement (the date for determining whether an Electing Holder will need to pay the True-up Amount) is keyed off only the BONY Litigation and not other adversary proceedings, such as the adversary proceeding against Debtor's auditors, McGladrey & Pullen, for over $500 million in damages, or other potential adversary cases not yet brought by the Trustee. The Trigger Date could just as arbitrarily also relate back to the sale of securities held by the Trustee. In any case, there is no discussion regarding why the Trigger Date was keyed off BONY litigation rather than some other event.

31.     Likewise, there is no meaningful discussion regarding why NonCitadel Beneficiary Customers receive 80% of estate proceeds after achievement of the same Percentage Recovery for all Allowed Class 3 Claims while Electing Holders receive only 20%. Indeed, it appears under the Plan that non-Electing Holders will share *pro rata* with NonCitadel-Beneficiary Customers upon the achievement of the same Percentage Recovery for all Class 3 Claims while Electing Holders will receive only 20% of the proceeds. Despite this inequality

under the Plan, the Disclosure Statement has no discussion regarding why this 80/20% split, rather than a split based on the relative amounts of Seg 3 and Seg 1 Claims, was selected.

32.     Perhaps most importantly, the limited general factual detail contained in the Disclosure Statement fails to convey the stark reality that a Citadel-Beneficiary Customer that votes to elect the Plan Settlement is committing to repay its share of what may be as much as, if not more than, $105 million. Further, the Plan and the Disclosure Statement are not clear on whether non-Seg 1 Claims of Electing Holders will share with Claims of NonCitadel-Beneficiary Customers in any repayment by Citadel-Beneficiary Customers, which would materially impact the amount of repayment, and whether such non-Seg 1 Claims are included in calculating an Electing Holder's share of the repayment obligation. The Plan needs to make clear what the Committee and Trustee intend, and the Disclosure Statement must be amended accordingly. Certainly, the Disclosure Statement in its current form does not contain sufficient detail that would enable a hypothetical reasonable investor to make an informed judgment on the Plan Settlement.

**The Disclosure Statement Asserts Facts the Truth of Which are Disputed**

33.     Throughout the Disclosure Statement, the Committee and the Trustee assert facts, the accuracy of which is disputed by the Objecting Parties and other Seg 1 Customers, without qualifying such statements as being the belief or assertion of the Trustee. For example, on pages 10 and 11 of the Disclosure Statement, the Committee and the Trustee assert that funds deposited by Customers were misused and diverted to unsegregated accounts, that they were used to pay down the BONY Loan and that Sentinel issued false account statements. The Trustee and Committee further assert on page 12 that $112 million in cash was diverted from a Seg 3 account, transferred to a Seg 1 account and used to pay certain Seg 1 Customers.[6] On Page 23 of the Disclosure Statement, the Trustee and Committee further assert without qualification that securities were allocated to Customer accounts without regard to whether they were available to Customers and that interest paid to Customers did not correlate to specific property held in Customer accounts. The Objecting Parties dispute the accuracy of the statements, in part, because there has not been discovery on these allegations and other Customer Property issues.

---

[6] This payment, which was made on August 15, 2007, was separate from the August 17, 2007, and August 21, 2007 payments and went to Iowa Grain, Alaron, Fortis Clearing and Crossland on account of their deposits in a Seg 1 portfolio.

Moreover, on page 24 of the Disclosure Statement, the Trustee and Committee discuss why the stockbroker liquidation provisions of the Bankruptcy Code may be applicable to Sentinel without discussing the many reasons why those provisions are not applicable to Sentinel. Further, the Disclosure Statement contains no discussion on the applicability, or non-applicability, of the commodity broker provisions of chapter 7 of the Bankruptcy Code. In addition, the Trustee and the Committee have failed to discuss, other than in a conclusory fashion, counter arguments to commingling, and the reasons why tracing would not be applicable. "If there are substantial errors in a disclosure statement, the opponents in the reorganization have every incentive to raise them while the disclosure statement or proposed plan can still be modified." *Kaufman v. Public Service Company of New Hampshire*, 43 F. 3d 763, 768 (1st Cir. 1995). Here, the disagreement over the facts presented in the Disclosure Statement should be acknowledged by the Committee and the Trustee.

34.    The Disclosure Statement's assertion at page 10 that "[b]eginning no later than 2004, virtually all Customer funds were misused and diverted from the very first day they were deposited by Customers with Sentinel" is indicative of the problem. The Disclosure Statement does not explain what investigation the Trustee or Committee has performed. Indeed, the Trustee has to date provided to Seg 1 Customers only an analysis of the segregated accounts and the house account for the period from mid-May 2007 to the Petition Date. The Objecting Parties do not believe that analysis establishes that segregation may be ignored, and they have no ability whatsoever to evaluate the Trustee's and the Committee's belief as to segregation and commingling from 2004 through May 2007. At a minimum, the Disclosure Statement should make clear that the statement is opinion. Moreover, the Trustee and Committee should disclose in detail what investigation they conducted and the scope of the investigation so that Class 3 Customers may adequately assess whether the Plan Settlement is a fair and reasonable settlement in light of the legal issues and factual questions.

35.    The Disclosure Statement appears to suggest that the Plan Settlement incorporated in the Plan may well avoid time consuming and expensive litigation of the inter-creditor disputes. The Objecting Parties, who hold 31% of the Seg 1 Claims, however, have advised the Trustee and the Committee that they expect to vote to reject. Counsel for other Seg 1 Customers holding another 35% or so of Seg 1 Claims have advised the Committee that they oppose the Plan.

36.    The reality is that the Objecting Parties and other Seg 1 Customers believe that the Plan Settlement is preferable to litigation of the inter-creditor disputes only if the Trustee obtains recoveries from BONY and others or if the remaining securities sell for prices significantly above what the Trustee expects. Unfortunately, the Seg 1s may need to vote before they know whether there will be any recoveries and possibly even before much more is known about the ultimate sale price of the securities. If so, the Objecting Parties expect that most Seg 1 Customers would vote to reject. If they do, the inter-creditor disputes will likely ultimately be litigated unless recoveries from BONY, the auditors or others are sufficient to make possible a distribution of perhaps over 60% to NonCitadel-Beneficiary Customers. For example, if NonCitadel-Beneficiary Customers were to receive 50% without ratable treatment, they would receive 57% to 58% with ratable treatment, meaning an additional $52 million to $59 million. At 60%, ratable treatment would be 64%, an additional $30 million. Presumably, at some point above 60%, the NonCitadel-Beneficiary Customers might conclude that the benefits of ratable treatment would not be sufficient to justify the expense and uncertainty of litigation. The Disclosure Statement should acknowledge that the Committee and the Trustee do not expect the Plan Settlement alone to avoid litigation of the inter-creditor disputes.

**The Disclosure Statement Provides Basis For Under Representing Seg 1 Holders on the Liquidation Trust Committee**

37.    Under the Plan, two Seg 3 Customers, both Committee members, and one Seg 1 Customer, also a Committee member, will constitute the Liquidation Trust Committee. The one Seg 1 Member of the Liquidation Trust Committee is Kotke Associates LLC. The Plan allows the three Seg 3 Creditors' Committee members that will not be members of the Liquidation Trust Committee to serve as *Ex Officio* members of the Liquidation Trust Committee. It noticeably denies the same opportunity to GHCO and Vision, even though they are members of the Creditors' Committee. There is no discussion in the Disclosure Statement at all regarding the basis for selection of members, and *Ex Officio* members of the Liquidation Trust Committee, let alone of the justification for exclusion. For Seg 1 holders to have confidence in the liquidation process, there should be disclosure of how membership and *Ex Officio* membership on the Liquidation Trust Committee was determined. It is also quite noticeable that the Exculpation provision of the Plan, Section 10.11, exculpates all Committee Members except Committee members that do not vote to accept the Plan and opt into the Plan Settlement. Again, if the Seg 1

Customers are to have confidence in the liquidation process, there needs to be disclosure why certain Committee members were excluded from the protections of Section 10.11.

**The Disclosure Statement Provides No Basis for the Allowance of Post Petition Interest for Citadel-Beneficiary Customers**

38.    The Disclosure Statement further gives no explanation for the inclusion of Interest for the claims of NonCitadel-Beneficiary Claimants in calculating Percentage Recovery. Other than with respect to the Percentage Recovery for claims of NonCitadel-Beneficiary Customers, the Disclosure Statement provides that, "postpetition interest will not accrue or be paid on any Claims, and no holder of a Claim will be entitled to interest accruing on or after the Petition Date on any Claim." See Disclosure Statement, Section VI.I.2., p. 37. As described above, section 1123(a)(4) of the Bankruptcy Code prohibits disparate treatment for claims in the same class. Under the Plan, only NonCitadel-Beneficiary Customers will be entitled to Interest on their claims. The Disclosure Statement contains no explanation of the basis for disparate treatment for claimants in the same class. Absent such explanation, the Disclosure Statement cannot be approved.

**The Disclosure Statement Provides No Basis for the Subordination of Citadel-Beneficiary Customers to NonCitadel-Beneficiary Customers With Respect to Estate Property.**

39.    Under the Plan, Citadel-Beneficiary Customers are prohibited from sharing in the distributions of Estate property on account of their deficiency Class 4 General Unsecured Claims arising from Class 3 Customer Claims. While the Trustee and the Committee articulate a basis, albeit flawed, to distribute remaining Customer Property to NonCitadel-Beneficiary Customers before Citadel-Beneficiary Customers, the Disclosure Statement presents no basis for subordinating Citadel-Beneficiary Customers to NonCitadel-Beneficiary Customers with respect to estate assets. To the extent any Customer has a deficiency, such deficiency will be a Class 4 General Unsecured Claim. There is no basis presented to restrict access of some creditors to a distribution on account of estate property. Essentially, the Plan subordinates Citadel-Beneficiary Customers to NonCitadel-Beneficiary Customers with respect to Class 4 Claims but no basis is presented for such subordination under section 510 of the Bankruptcy Code or otherwise. Moreover, the Plan appears to provide disparate treatment for creditors in the same class in violation of section 1123(a)(4) of the Bankruptcy Code. Accordingly, the Disclosure Statement

cannot be approved unless it provides a basis for the subordination of Citadel-Beneficiary Claims.

WHEREFORE, the Objecting Parties respectfully request that this Court not approve the Disclosure Statement as drafted, and grant such other relief as the Court deems just.

Dated: June 3, 2008

PENSON GHCO, PENSON FINANCIAL FUTURES, INC., VISION FINANCIAL MARKETS LLC AND IPGL LIMITED


By:   /s/ Timothy R. Casey
        Counsel for Penson GHCO and
        Penson Financial Markets, Inc.


By:   /s/ Robert V. Shannon
        Counsel for Vision Financial Markets LLC
        And IPGL Limited

Michael Barry (ARDC #3121539)
Timothy R. Casey (ARDC # 6180828)
Andrew E. Weissman (ARDC # 6273246)
DRINKER BIDDLE & REATH LLP
191 North Wacker Drive, Suite 3700
Chicago, Illinois 60606
Tel: (312) 569-1000
Fax: (312) 569-3000
Counsel for PENSON GHCO and
PENSION FINANCIAL FUTURES, INC.

Robert V. Shannon (ARDC #3127440)
BELL BOYD & LLOYD LLP
70 West Madison Street
Suite 3100
Chicago, Illinois 60602
Tel: (312) 372-1121
Fax: (312) 872-8000
Counsel for VISION FINANCIAL MARKETS LLC
and IPGL LIMITED

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DIVISION OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SENTINEL MANAGEMENT GROUP, INC., | ) | Case No. 07B14987 |
| | ) | |
| Debtor. | ) | Honorable John H. Squires |

**OBJECTION OF CITADEL EQUITY FUND, LTD.**
**TO DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE**
**BANKRUPTCY CODE FOR THE CHAPTER 11 PLAN OF LIQUIDATION**

Citadel Equity Fund, Ltd. ("Citadel"), by and through its undersigned attorneys, hereby submits this objection ("Objection") to the *Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code for the Chapter 11 Plan of Liquidation* [*Docket No. 501*] (the "Disclosure Statement"), relating to the *Chapter 11 Plan of Liquidation* [*Docket No. 499*] (the "Plan"), proposed by the Official Committee of Unsecured Creditors (the "Committee") of Sentinel Management Group, Inc. ("Sentinel" or the "Debtor") and Frederick J. Grede, solely in his capacity as chapter 11 trustee for the Debtor's estate (the "Trustee" and, together with the Committee, the "Proponents"). In support of the Objection, Citadel, as a prospective litigant under the terms of the Plan, respectfully states as follows:

**The Disclosure Statement and Related Plan Are Fatally Flawed and Lack Merit.**

1.    A cornerstone of the proposed Plan is overturning, pursuant to Federal Rule of Civil Procedure 60(b), this Court's August 20, 2007 order (the "Distribution Authorization Order"), a copy of which is attached hereto as Exhibit A, authorizing the distribution of proceeds from the sale of assets from the SEG 1 account to Citadel that occurred on August 16, 2007 (the "SEG 1 Sale"), so as to avoid such distribution and to facilitate a redistribution of the proceeds from that sale among SEG 1 and SEG 3 customers. There is no legal basis to overturn the Distribution Authorization Order, which already contains an equalization mechanism to facilitate any redistribution of those proceeds between the SEG 1 and SEG 3 customers that might be necessary. (*See* Distribution Authorization Order ¶ 3).

2.    The Plan confuses the legitimate issue of commingling of assets between SEG 1 and SEG 3 customers with whether SEG 1 customers received distributions of "property of the estate" pursuant to the Distribution Authorization Order, and unnecessarily attempts to resolve

that issue through the Plan.  That Order provides a mechanism for the resolution of any "commingling" disputes between the SEG 1 and SEG 3 customers.  (*See id.*).  If the Plan seeks to redistribute the proceeds of the SEG 1 Sale among the SEG 1 and SEG 3 customers, the Distribution Authorization Order provides the exclusive appropriate way to do so.

3.      Rather than institute a procedure designed to flout the Distribution Authorization Order, the Court should decline to approve the Disclosure Statement.  In doing so, the Court will leave all SEG 1 customers, SEG 3 customers and third parties, including Citadel, with all of the claims, rights, remedies and defenses retained through the Distribution Authorization Order. Fair and equitable judicial oversight of the competing rights of the parties can best be accomplished by respecting this Court's earlier decision, and declining to start an unnecessary Plan confirmation process that is discriminatory and inequitable.  For these reasons, the Disclosure Statement should not be approved.

## The Prepetition Orders

4.      On Friday, August 17, 2007, certain SEG 1 customers sought a temporary restraining order to enjoin the transfer of any assets in the SEG 1 account, alleging in substance that they had an ownership interest in the assets being transferred.  United States District Court Judge Guzman entered an order (the "August 17, 2007 Order") that provided in pertinent part that:

> as of Friday, August 17, at 3:20 p.m., Sentinel, its officers, agents, servants, employees, attorneys and those persons or entities in active concert or participation with Sentinel, including but not limited to Citadel Investment Group, who receive actual notice of this Order, is enjoined from transferring, selling, assigning, encumbering, pledging, dissipating, concealing or otherwise exchanging in any manner any interest in Farr Financial and Velocity Futures L.P.'s funds, assets or other property placed with Sentinel ....

TRO at 5, *Farr Fin., Inc. et al. v. Sentinel Mgmt. Group, Inc.*, No. 07-cv-4614 (N.D. Ill. Aug. 17, 2007).  Judge Guzman, in open court, however, clarified that the August 17, 2007 Order only applied to securities that the Debtor had not transferred as of 3:20 p.m. Central Time on Friday, August 17, 2007, and that the August 17, 2007 Order did not restrict Citadel's rights to sell any securities that Citadel had purchased and which had been transferred to Citadel before that time. This clarification, however, was not in the written August 17, 2007 Order as entered on the

docket. Accordingly, on August 20, 2007, Citadel sought clarification that the August 17, 2007 Order did not apply to any debt securities and other investment assets that were transferred by the Debtor to Citadel prior to 3:20 p.m. on Friday, August 17, 2007, consistent with Judge Guzman's statements.

5.    United States District Court Judge Kennelly, sitting in Judge Guzman's absence, granted Citadel's motion and clarified that the August 17, 2007 Order:

> was not and is not intended to apply to completed transactions involving securities and other investment assets and cash associated therewith that were fully and finally consummated prior to 3:20 pm central daylight time on Friday, August 17, 2007. A "completed transaction" means a purchase and sales agreement, the transfer of ownership and title, the delivery of securities and other investment assets, full clearance and settlement, and the full payment of all consideration for those securities and other investment assets that were transferred.

Order at 1-2, *Farr Fin., Inc. et al. v. Sentinel Mgmt. Group, Inc.* (Aug. 20, 2007) (the "August 20, 2007 Clarification Order"). None of the plaintiffs that sought the August 17, 2007 Order, all of whom were present before Judge Kennelly, objected to entry of the August 20, 2007 Clarification Order.

6.    On the morning of August 20, 2007, the Debtor presented a motion to this Court seeking entry of an order approving the turnover and distribution of the proceeds from the SEG 1 Sale to the Debtor's SEG 1 customers, as the Bank of New York ("BONY") was refusing to honor the Debtor's wire instructions out of fear of violating the August 17, 2007 Order. The proposed order, as presented to the Court, was heavily negotiated among the Debtor, the Securities and Exchange Commission (the "SEC"), the Commodity Futures Trading Commission (the "CFTC"), certain SEG 1 customers and certain SEG 3 customers (including Discus Master Fund, the largest SEG 3 customer). Indeed, the proposed order provided for a five percent (5%) holdback, approximately $15 million, to provide a fund in the event that there are claims of various kinds arising at various times in the future. (Aug. 20, 2007 Hr'g Tr. at 27:24-28:12, a copy of which is attached hereto as Exhibit B.)

7.    At the hearing on the motion, at which counsel for the Debtor, the CFTC, the SEC, BONY and various SEG 1 and SEG 3 customers appeared and argued, this Court entered the Distribution Authorization Order allowing BONY to "immediately distribute" the proceeds from the SEG 1 Sale to SEG 1 customers. (Distribution Authorization Order ¶ 2.) That same

3

day, in connection with a temporary restraining order entered in a separate matter filed by the SEC against the Debtor, Judge Kennelly issued a related oral "comfort" provision allowing for distribution of the SEG 1 Sale proceeds (the "Comfort Provision"). Thereafter, the proceeds of the SEG 1 Sale (the "SEG 1 Sale Distributions") were distributed to the SEG 1 customers.

Objections

**A.**    **The Plan Is Unconfirmable as a Matter of Law.**

8.    The Plan is premised upon overturning this Court's Distribution Authorization Order, which implicitly finds that the SEG 1 assets were not property of the Debtor's estate. The Proponents' proposed course of action is impermissible, as it ignores three critical facts. First, the SEG 1 Sale Distributions were not property of the bankruptcy estate at the time of this Court's Distribution Authorization Order. Second, no basis exists to file a motion under Federal Rule of Civil Procedure 60(b) ("Rule 60(b)"). Third, the time to file a Rule 60(b) motion has come and gone. Numerous people have relied on the Distribution Authorization Order in the more than nine months since it has been entered, such that the interests of justice require affirming its validity. Finally, the Plan ignores the fact that on August 20, 2007, Judge Kennelly also allowed for distribution of the proceeds from the SEG 1 Sale in his oral Comfort Provision. Moving to revoke or amend the Distribution Authorization Order would not modify Judge Kennelly's Comfort Provision.

***The SEG 1 Sale Distributions were not property of the estate.***

9.    The Trustee has alleged in various pleadings that Sentinel wrongfully commingled customer and purported Sentinel assets and, as a result, that the entirety of those assets should be treated as property of the estate. This argument fails. As an initial matter, the Seventh Circuit has held that a debtor's prepetition transfer "of a property interest that the debtor holds in trust for another person" is not property of the estate. *Dunham v. Kisak*, 192 F.3d 1104, 1009 (7th Cir. 1999). And any wrongful commingling by the Debtor of ill-gotten assets with those segregated accounts cannot convert legitimate customer accounts into property of the estate. Property wrongfully obtained by a debtor is not part of that debtor's estate. *In re Teltronics, Ltd.*, 649 F.2d 1236, 1239 (7th Cir. 1981). Moreover, consistent with what other courts have found, under Illinois law, a constructive trust for the benefit of the SEG 1 customers arose at the point when Sentinel may have breached its fiduciary duty by failing to segregate the SEG 1 assets and treat such assets as property of the SEG 1 customers and, instead, wrongfully

4

commingled those assets in order to collateralize and pay down its BONY loan. *See In re Bake-Line Group, LLC*, 359 B.R. 566, 574 (Bankr. D. Del. 2007) (citation omitted) (under Illinois law, "a constructive trust arises at the time of the wrong"); *In re DVI, Inc.*, 306 B.R. 496, 500 (Bankr. D. Del. 2004) (same) (citing *Stansbury v. U.S.*, 543 F. Supp. 154 (N.D. Ill. 1982), aff'd, 735 F.2d 1367 (7th Cir. 1984)).

10.     Accordingly, as a matter of law, the Proponents cannot allege (let alone prove) that the Debtor owned any of the alleged commingled assets on August 16, 2007 (the date of the SEG 1 Sale), and without that critical fact, cannot maintain that the SEG 1 Sale Distributions made to SEG 1 customers, pursuant to the Distribution Authorization Order, were fraudulent conveyances by the Debtor.

### The Disclosure Statement and Plan must be held in abeyance pending entry of a final order on the Proponents' proposed Rule 60(b) motion.

11.     The Plan is premised upon overturning this Court's Distribution Authorization Order, which implicitly finds that the SEG 1 assets were not property of the Debtor's estate. The Proponents have stated their intent to seek the "extraordinary remedy" of revoking or amending the Distribution Authorization Order *more than nine months* after it was entered and numerous parties have relied on the directives therein. *See Provident Sav. Bank v. Popovich*, 71 F.3d 696, 698 (7th Cir. 1995) ("Relief under Rule 60(b) is an extraordinary remedy that is to be granted only in exceptional circumstances."). Specifically, Section 6.3(c) of the Plan states:

> To the extent not already done, on or before August 11, 2008, the Liquidation Trustee shall file a motion pursuant to Federal Rule of Civil Procedure 60(b), and other appropriate pleadings, seeking to vacate or modify the order of the Bankruptcy Court, entered on August 20, 2007, in response to the Debtor's emergency motion in connection with the SEG 1 Sale Distributions ....

(Plan at § 6.3(c)).[1]

12.     Although the Plan is silent as to the specific grounds under Rule 60(b) upon which the Proponents intend to seek reconsideration of the Distribution Authorization Order, Rule 60(b) provides for such reconsideration only in very limited circumstances. None of those circumstances is present here. Further, the Proponents' motion is untimely under Rule 60(c), and there is no legitimate excuse for the Proponents' delay.

---

[1] Rule 60(b) is applicable to bankruptcy cases. *See* Fed.R.Bank.P. 9024.

13.    Without a final resolution of the critical and pivotal issue of whether the Distribution Authorization Order can be modified, the Plan confirmation process cannot proceed. Because key provisions of the Plan, including the equalization settlement provision between the SEG 1 and SEG 3 customers and the estate's ability to pursue fraudulent conveyance claims against non-settling SEG 1 customers and Citadel, are predicated on entry of a final order overturning the Distribution Authorization Order (and the Comfort Provision) under Rule 60(b), the Plan confirmation process cannot and should not proceed unless and until the Rule 60(b) motion is fully briefed and a final order thereon is entered. To do otherwise would waste the estate's assets, judicial resources and resources of creditors and parties in interest in this case.

**B.    The Plan Is Unnecessary at this Time Where a Chapter 11 Trustee Is Administering the Case and There Is No Exclusivity with Respect to Proposing a Plan.**

14.    Proposal and confirmation of the Plan is premature and unnecessary until, at the very least, the BONY adversary proceeding is settled or finally adjudicated, after which proposed distributions to creditors may be readily determined. With a chapter 11 trustee administering the estate, and no exclusivity periods in place with respect to proposing and soliciting votes on a plan, there is no need to rush to implement the Plan. This Court need look no further than the Disclosure Statement itself for reasons why proposal of the Plan is premature. *See, e.g.*, Disclosure Statement Section V(F), p. 15 (" ... the aggregate market value of ... remaining securities is difficult to determine at this time."); Disclosure Statement § V(G), p. 16 ("... claims analysis is in its preliminary stages."); Disclosure Statement § V(I), pp. 17-19 ("... recoveries to the estate on account of [adversary] proceedings is unknown ..."); Disclosure Statement § VI(A), p. 22 ("[t]he Settlements [the ultimate recoveries under which are wholly unknown] have paved the way for the Plan ...."); Disclosure Statement § VI(C)(3), p. 30-31 ("... no further distributions shall be made to any SEG 1 customer, unless and until all Holders of Allowed Class 3 Customer Claims shall have received the same [unknown] Percentage Recovery ...."); Disclosure Statement § VI(C)(4), p. 31 ("[T]o the [unknown] extent Class 3 Customer Claims are not fully satisfied from Customer Property, such deficiency claims will constitute General Unsecured Claims ....").

## Conclusion

15.    As the proposed Plan is patently unconfirmable (and for that matter, unnecessary) for the above reasons, it is well settled that a disclosure statement should not be approved. *See,*

*e.g., In re Curtis Ltd. P'ship*, 195 B.R. 631, 639 (Bankr. E.D. Pa. 1996); *In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986) (allowing an unconfirmable plan to accompany a disclosure statement not only would constitute inadequate information, but would be misleading and would be a needless expense to the estate).   When the "disclosure statement describes a plan that is so 'fatally flawed' that confirmation is 'impossible,' the court should exercise its discretion and refuse to consider the adequacy of the disclosures." *In re E. Me. Elec. Coop., Inc.*, 125 B.R. 329, 333 (Bankr. D. Me. 1991) (citations omitted).

16.    For the reasons set forth above, Citadel respectfully submits that the Proponents' request for approval of the Disclosure Statement be denied or, in the alternative, be held in abeyance pending entry of a final order on the Proponents' Rule 60(b) motion for reconsideration of this Court's Distribution Authorization Order (and the Comfort Provision), and grant to Citadel such other and further relief as the Court deems just and proper.

Dated: June 3, 2008
          Chicago, Illinois

/s/ Jeff J. Marwil
Jeff J. Marwil (ARDC #6194054)
Stephen Senderowitz (ARDC #2549050)
Peter J. Young (ARDC #6278765)
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois  60601
Telephone:  (312) 558-5600
Facsimile:  (312) 558-5700

*Counsel for Citadel Equity Fund, Ltd.*