# EXHIBIT I

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Sentinel Management Group, Inc. | ) | Case No. 07-14987 |
| | ) | |
| Debtor. | ) | Hon. John H. Squires |
| | ) | |
| | ) | |
| FC Stone, LLC, Fortis Clearing Americas, LLC, Country Hedging, Inc., Cadent Financial Services LLC, Frontier Futures, Inc., Velocity Futures, LP and Peregrine Financial Group, Inc. | ) | Adv. No. |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| Frederick R. Grede, solely in his capacity as the Chapter 11 Trustee for Sentinel Management Group, Inc. | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiffs FC Stone, LLC, Fortis Clearing Americas, LLC, Country Hedging, Inc., Cadent Financial Services LLC, Frontier Futures, Inc., Velocity Futures, LP and Peregrine Financial Group, Inc. (collectively, the "Plaintiffs"), by their undersigned counsel, as and for their Complaint against Frederick R. Grede, solely in his capacity as chapter 11 trustee (the "Trustee") for Sentinel Management Group, Inc.'s (the "Debtor" or "Sentinel") estate, allege as follows:

## NATURE OF THE ACTION

1. The Plaintiffs bring this action to seek a declaration that any and all transfers made by the Debtor to the Plaintiffs on or after the date that was 90 days before the Petition Date (as defined below), were transfers of the Plaintiffs' property and not transfers of property of the Debtor's estate under § 541 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"). Furthermore, the Plaintiffs seek a declaration that the at least $40 million in securities and other assets presently held by the Trustee on behalf of the Debtor's Seg 1 Customers (as defined below) is not property of the Debtor's estate under § 541 of the Bankruptcy Code and that the Trustee should return the Plaintiffs' allocable shares of such assets to the Plaintiffs.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157, 1334 and 2201.

3. This adversary proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (O).

4. Venue in this district is proper pursuant to 28 U.S.C. § 1409.

## THE PARTIES AND RELATED PARTIES

5. FC Stone, LLC is a Delaware Limited Liability Company with its principal place of business located in Chicago, IL.

6. Fortis Clearing Americas, LLC is an Illinois Limited Liability Company with its principal place of business located in Chicago, IL.

7. Country Hedging, Inc. is a Delaware Corporation with its principal place of business located in Inver Grove Heights, MN.

8. Cadent Financial Services LLC is an Illinois Limited Liability Company with its principal place of business located in Chicago, IL.

9. Frontier Futures, Inc. is an Iowa Corporation with its principal place of business located in Cedar Rapids, IA.

10. Velocity Futures LP is an Illinois Limited Partnership with its principal place of business located in Houston, TX.

11. Peregrine Financial Group, Inc. is an Illinois Corporation with its principal place of business located in Chicago, IL.

12. The Trustee, Frederick R. Grede, is the chapter 11 trustee of the Debtor's estate, appointed under § 1104 of the Bankruptcy Code by Orders of this Court entered on August 23, 2007 and August 29, 2007.

13. The Debtor is an Illinois corporation headquartered in Northbrook, Illinois. The Debtor was registered with the Commodity Futures Trading Commission ("CFTC") as a non-clearing Futures Commission Merchant ("FCM") and with the Untied States Securities and Exchange Commission ("SEC") as an investment advisor. The Debtor was also a member of the National Futures Association.

14. Each Plaintiff was a Seg 1 Customer of the Debtor, as more fully described in paragraphs 17 and 21 through 30 below. Each Plaintiff was also registered with the CFTC as an FCM.

15. On August 17, 2007, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Court"). The Debtor's chapter 11 case is being administered under Case No. 07-14987.

**FACTUAL BACKGROUND**

I. <u>Sentinel's Business And Regulatory Requirements</u>

16. Sentinel managed investments of short-term cash for various customers, including FCMs, as well as hedge funds, financial institutions, pension funds and individuals. Sentinel divided its customers into four groups.

17. The first customer group, known within Sentinel as Seg 1, was intended and represented to consist solely of the funds and property of customers of other FCMs, which typically invested their customers' funds through Sentinel in order to take advantage of Sentinel's advertised cash management and investment expertise (the "Seg 1 Customers").

18. The second customer group, known within Sentinel as Seg 2, was intended and represented to consist solely of the funds and property of customers of other FCMs that were engaged in trading at foreign exchanges.

19. The third customer group, known within Sentinel as Seg 3, was intended and represented to consist of the funds and property of all other types of clients, including hedge funds and other speculators, FCM house (i.e., non-customer) funds, trust accounts, endowments and individuals.

20. The fourth customer group, known within Sentinel as Seg 4, was intended and represented to consist of the funds and property of Seg 3 Customers whose property was denominated in Euros. In addition to managing investments for the customer portfolios, Sentinel owned a "House" or "Street" portfolio of securities traded by Sentinel for the ultimate benefit of Sentinel's insiders.

4

II. **The Strict Requirements Of The CEA And CFTC Rules**

21. FCMs are permitted to deposit their customer funds only with certain types of banks, depositories or other FCMs. Sentinel registered with the CFTC as an FCM, and thus was able to manage customer funds belonging to other FCMs. Unlike most FCMs, Sentinel did not engage in any commodities trading for its customers, but instead only invested funds deposited by other FCMs and Sentinel's other customers.

22. Because Sentinel was an FCM managing funds required to be segregated for the benefit of its Seg 1 Customers, Sentinel and any depository bank selected by Sentinel as custodian for funds belonging to such Customers were subject to the provisions of the Commodity Exchange Act, 7 U.S.C. §§ 1 et seq. (the "CEA"), and related CFTC rules and regulations promulgated pursuant to the CEA, 17 C.F.R. §§ 1.1-190.10, with respect to such funds.

23. Pursuant to Section 4d(a)(2) of the CEA, Sentinel was required to separately account for the money, securities and property of Seg 1 Customers and could not commingle such Customers' assets with its own funds.

24. In addition, Section 4d(b) of the CEA provides that "it shall be unlawful for any person . . . that has received any money, securities or property for deposit in a separate account as provided for in [section 4d(a)(2) of the CEA], to hold, dispose of, or use any such money, securities or property as belonging to the depositing futures commission merchant or any person other than the customers of such futures commission merchant."

25. CFTC regulations recognize an FCM's obligations to segregate customer funds and treat them as belonging to customers as a fundamental tenet of futures regulation. CFTC Rule 1.20(c) provides that funds of a commodity or option customer shall not be commingled with any other person and that customer funds shall not be used to secure or guarantee the trades,

contracts or commodity options, or to secure or extend the credit, of any person other than the one for whom the same are held.

26. CFTC Rule 1.20(a) required Sentinel to segregate all funds of Seg 1 Customers as belonging to such Customers, and when such Customer assets were deposited, to deposit such assets under an account name which clearly identified them as customer property. CFTC Rule 1.20(a) also required that any bank acting as custodian for Sentinel's Seg 1 Customer funds first acknowledge in writing that such funds are customer funds and are being held in accordance with the provisions of the CEA.

27. The investment of Seg 1 Customer funds was subject to the investment standards embodied in CFTC Rule 1.25. The Debtor solicited the business of its Seg 1 Customers by offering them an opportunity to participate in its "safe" "125 Portfolio," which was named after Rule 1.25. Rule 1.25 generally restricts investment of customer funds to only the highest grade corporate and government securities and similarly highly liquid investments. Under CFTC Rule 1.26, any securities in which Seg 1 Customer funds were invested were also required to be maintained in segregation.

28. On its now-defunct website, Sentinel defined the "Investment Objective" of the 125 Portfolio as follows:

> The 125 Portfolio is intended to provide Sentinel's FCM clients with a short-term investment alternative that combines safety of principal, liquidity and competitive yields compliant with the CFTC's Rule 1.25. An investment in the 125 Portfolio provides an indirect, undivided pro-rata interest in the underlying securities.

29. Sentinel recognized the obligations it had to the Seg 1 Customers under the CEA and CFTC regulations. When it deposited funds with Sentinel, each Seg 1 Customer sent Sentinel a letter, which was signed by Sentinel, acknowledging that the CEA required Sentinel to

segregate the Seg 1 Customer's assets and treat them as belonging to the Seg 1 Customer's own customers.

30. Likewise, as an FCM, Sentinel obtained a letter from its bank, the Bank of New York ("BONY") acknowledging that the assets of the Seg 1 Customers were held pursuant to section 4d(2) of the CEA and CFTC regulations for the benefit of the Seg 1 Customers.

### III. The Customer Agreements With Sentinel

31. In addition to the regulatory requirements outlined above, the custodial relationship between Sentinel and its Seg 1 Customers was governed by an "Investment Advisory Agreement" or "Investment Management Agreement" between the Customer and Sentinel (together, the "Customer Agreements").

32. Pursuant to the Customer Agreements, the Seg 1 Customers appointed Sentinel as a "discretionary investment advisor with respect to those assets deposited with the Seg 1 Customer (as defined in Section 5) and accepted for Investment by Sentinel ('the Assets')." Paragraph 5(b) of the Customer Agreements unequivocally provides that Sentinel does not have any ownership or other property interest in the securities and other assets held in the custodial accounts of the Customers:

> Sentinel shall not own nor have any interest in funds or securities in the Account or of any other funds or securities in which Client has a beneficial interest.

33. Similarly, Paragraph 5(a) of the Customer Agreements provides that the Seg 1 Customers' assets are deposited in custodial accounts and "held for the benefit of Client."

34. Sentinel's now-defunct website confirmed that it asserted no ownership interest in its Seg 1 Customers' assets. The website provided that "Sentinel acts solely as agent in investing funds. It cannot and does not have an ownership interest in the assets in custody."

35. Sentinel issued account statements to its Seg 1 Customers, which reflected the assets held by Sentinel on behalf of each Seg 1 Customer (the "Account Statements"). The

7

Account Statements listed each security owned by a Seg 1 Customer, by cusip number. Sentinel issued its last Account Statements to its Seg 1 Customers on August 13, 2007.

## V.  Sentinel's Collapse And The Citadel Sale

36.  On August 13, 2007, Eric Bloom, the President and Chief Executive Officer of Sentinel, sent a letter to Sentinel's Seg 1 Customers and other customers representing that because of the pending liquidity crisis in the credit markets, Sentinel was halting redemptions out of a concern that it would not be able to meet significant redemption requests without resorting to discount sales that would cause unnecessary losses to its customers (the "No Redemption Letter").

37.  The issuance of the No Redemption Letter resulted in each of the Plaintiffs demanding immediate redemption of their assets held by Sentinel in accordance with the terms of the Customer Agreements. Other Seg 1 Customers and other customers of Sentinel also made demands for redemption. The No Redemption Letter also resulted in repo counterparties to Sentinel closing out at unfavorable prices more than $2 billion in Sentinel's repurchase agreement transactions.

38.  On August 16, 2007, Sentinel entered into an agreement with Citadel Equity Fund, Ltd. ("Citadel") to sell, assign and transfer securities held by Sentinel for the benefit of Seg 1 Customers (the "Citadel Sale"). The aggregate notional value of the securities to be sold was approximately $384 million with an estimated market value of $367 million, including accrued interest (the "Citadel Sale Securities").

39.  The final sales price paid by Citadel to Sentinel for the Citadel Sale Securities was approximately $320 million (the "Citadel Proceeds"). The Citadel Sale Securities were transferred to Citadel on August 16 and 17, 2007.

8

40. Approximately $297.5 million of the Citadel Proceeds were transferred to a cash account maintained at BONY (the "Seg 1 BONY Account"). The Seg 1 BONY Account was a cash account maintained by Sentinel for the benefit of Seg 1 Customers. Prior to the deposit of approximately $297.5 million in Citadel Proceeds, the Seg 1 BONY Account had a cash balance of approximately $15.1 million.

41. On or about August 17, 2007, a security held by Sentinel for the benefit of one or more Seg 1 Customers, with a market value of approximately $4.94 million, was deposited into the Seg 1 BONY Account. Thus, as of August 17, 2007, the Seg 1 BONY Account had a cash balance of approximately $317.6 million.

42. In addition, as of August 17, 2007, there was $22,524,942 in cash in an account maintained by Sentinel at JP Morgan (the "Seg 1 JPM Account"). The Seg 1 JPM Account was a cash account maintained by Sentinel for the benefit of Seg 1 Customers.

43. On August 17, 2007, Sentinel transferred $22,524,942 in cash to the Seg 1 Customers from the Seg 1 JPM Account (the "August 17 Transfers").

44. On August 16 and 17, 2007, several Seg 1 Customers sued Sentinel and sought and obtained temporary restraining orders from the United States District Court for the Northern District of Illinois, *Farr Financial, Inc. v. Sentinel Management Group, Inc.*, Case No. 07 C 4614 (N.D. Ill. Aug. 17, 2007), prohibiting transfers of securities segregated for their benefit.

### IV. The Chapter 11 Petition And The Authorizations Of The Citadel Distributions

45. On the evening of August 17, 2007 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

46. On August 20, 2007, the Debtor filed an emergency motion (the "Distribution Motion") to compel the distribution of the Citadel Proceeds to the Seg 1 Customers. The Citadel Proceeds were being held by BONY pending an order of the Bankruptcy Court. A hearing on

the Distribution Motion was held that same day in the Bankruptcy Court (the "Distribution Hearing").

47. At the Distribution Hearing, the Debtor, through counsel, repeatedly represented to the Court that the Citadel Proceeds and other assets of the Seg 1 Customers were not "property of the estate" and should be distributed to the Seg 1 Customers. The Debtor's counsel also stated that "we have got $312 million of money that belongs to somebody else. It doesn't belong to us. It belongs to the customers." The CFTC also supported the distribution of the Citadel Proceeds to the Seg 1 Customers at the Distribution Hearing.

48. On August 20, 2007, after considering the arguments of counsel at the Distribution Hearing and the evidence submitted, the Bankruptcy Court entered an order authorizing the distribution of the Citadel Proceeds to the Seg 1 Customers, less a $15.6 million holdback amount pending further order of the Bankruptcy Court (the "Citadel Distribution Order"). A true and correct copy of the Citadel Distribution Order is attached hereto as <u>Exhibit A</u>.

49. Also on August 20, 2007, the SEC filed a complaint (the "SEC Complaint") in the United States District Court for the Northern District of Illinois against Sentinel, alleging violations of Sections 206(1), 206(2) and 206(4) of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 <u>et seq.</u>, and violations of SEC Rule 206(4)-2 as a result of the alleged "commingling and transferring [of] client funds and securities between the various client segregated accounts and between client accounts and a 'house' account" and the pledging of those assets "as collateral in order to obtain a line of credit from the Bank of New York" as well as additional leveraged financing.

50. That same day, the SEC filed a motion for emergency relief (the "Emergency Motion") in the United States District Court for the Northern District of Illinois seeking, among

other things, to preclude Sentinel from distributing (through BONY) the Citadel Proceeds to the Seg 1 Customers. The District Court heard argument on the matter during the afternoon of August 20, 2007. During that argument, the Debtor, through counsel, represented to the District Court that the Citadel Proceeds "are not the property of the bankruptcy estate because they were not, before the petition was filed, the property of the debtor. The funds in the segregated account are property of . . . the customers and, therefore, should go to the customers." The SEC and Discus Master Fund argued in favor of prohibiting the distribution of the Citadel Proceeds to the Seg 1 Customers.

51. After considering arguments and the evidence submitted, the District Court refused to prohibit the distribution of the Citadel Sale Proceeds to the Seg 1 Customers. On or about August 21, 2007, BONY transferred $297,050,808 to the Seg 1 Customers (the "August 21 Transfers").

## V. The Plaintiffs Are Able To Trace The Assets Held By Sentinel On Their Behalf

52. The securities held by Sentinel on behalf of its Seg 1 Customers were and are identifiable by cusip number.

53. The Plaintiffs can identify and trace substantially all securities and other assets that are held or were held by Sentinel on behalf of the Seg 1 Customers (collectively, the "Seg 1 Assets") at all relevant times. Any misappropriation or other improper use of the Seg 1 Assets does not prevent the Plaintiffs from tracing such assets in the hands of Sentinel or the Trustee.

54. There are at least three sets of records where the securities held by Sentinel on behalf of Seg 1 Customers are indicated: (1) the Account Statements, (2) Sentinel's books and records, and (3) at BONY (collectively, the "Books").

55. On information and belief, on all relevant dates, substantially all of the securities held by Sentinel of behalf of Seg 1 Customers are identifiable as Seg 1 securities, by cusip number, on each set of Books.

56. As of April 30, 2008, the Trustee was holding Seg 1 Assets consisting of (a) approximately $36.2 million in cash for the benefit of Seg 1 Customers, and (b) on information and belief, at least an additional $4 million in securities held for the benefit of Seg 1 Customers (together, the "Remaining Seg 1 Assets").

## VI. Implications Of The Plaintiffs' Property Rights

57. The Seg 1 Customers, including the Plaintiffs, have exclusive ownership interests in the Seg 1 Assets pursuant to the CEA, CFTC regulations, the Customer Agreements and applicable law. Because the Seg 1 Customers own the Seg 1 Assets, such assets are not property of the Debtor's estate pursuant to § 541 of the Bankruptcy Code.

58. The Trustee and other parties-in-interest in the Debtor's chapter 11 case have alleged that the August 17 and August 21 Transfers, along with certain other transfers of Seg 1 Assets made to Seg 1 Customers within 90 days of the Petition Date, may be avoidable as preferential transfers under §§ 547, 549 and 550 of the Bankruptcy Code. Indeed, the proposed chapter 11 plan of liquidation for the Debtor filed by the Trustee and the Official Committee of Unsecured Creditors (the "Committee") on May 12, 2008 contemplates litigation against Seg 1 Customers to avoid alleged preferential transfers.

59. However, any and all transfers made by the Debtor to the Plaintiffs on or after the date that was 90 days before the Petition Date, including the August 17 and August 21 Transfers, were transfers of the Plaintiffs' property (the Seg 1 Assets) and not transfers of property of the Debtor's estate under § 541 of the Bankruptcy Code. As a result, such transfers cannot be avoided by the Trustee.

60. The Plaintiffs have also represented to the Trustee that the Remaining Seg 1 Assets are not property of the Debtor's estate and should be returned to the Seg 1 Customers. The Trustee has to date refused to return the Remaining Seg 1 Assets to the Seg 1 Customers.

## COUNT I – DECLARATORY JUDGMENT
## ( SEG 1 ASSETS AND TRANSFERS TO THE PLAINTIFFS)

61. The Plaintiffs repeat and reallege paragraphs 1-60 above as though fully set forth herein.

62. As set forth herein, the Seg 1 Assets are not, and never were, property of the Debtor's estate under § 541 of the Bankruptcy Code because, among other things, (a) the CEA and related CFTC regulations prohibit the Debtor from holding any ownership interest in the Seg 1 Assets; (b) the Customer Agreements unambiguously provide that the Debtor had no ownership or other interest in the Seg 1 Assets; and (c) the Seg 1 Assets are traceable in the hands of the Debtor at all relevant times.

63. The Trustee and other parties-in-interest in the Debtor's chapter 11 case have alleged that the August 17 and August 21 Transfers, along with certain other transfers of Seg 1 Assets made to Seg 1 Customers within 90 days of the Petition Date, may be avoidable as preferential transfers under §§ 547, 549 and 550 of the Bankruptcy Code. Indeed, the proposed chapter 11 plan of liquidation for the Debtor filed by the Trustee and the Committee on May 12, 2008 contemplates litigation against Seg 1 Customers to avoid alleged preferential transfers.

64. Any and all transfers made by the Debtor to the Plaintiffs on or after the date that was 90 days before the Petition Date, including the August 17 and August 21 Transfers, were transfers of the Plaintiffs' property (the Seg 1 Assets) and not transfers of property of the Debtor's estate under § 541 of the Bankruptcy Code. As a result, such transfers cannot be avoided by the Trustee.

13

65. There is an actual, substantial and immediate controversy between the Plaintiffs and the Trustee within the meaning of 28 U.S.C. § 2201 regarding (a) whether the Seg 1 Assets are, or ever were, property of the Debtor's estate under § 541 of the Bankruptcy Code, and (b) whether any transfers made to the Plaintiffs on or after the date that was 90 days before the Petition Date, including the August 17 and August 21 Transfers, were transfers of the Plaintiffs' property and not transfers of property of the Debtor's estate under § 541 of the Bankruptcy Code.

WHEREFORE, the Plaintiffs respectfully request that the Court grant the following relief:

a. A declaration that the Seg 1 Assets are not, and never were, property of the Debtor's estate within the meaning of § 541 of the Bankruptcy Code pursuant to the CEA and related CFTC regulations;

b. A declaration that the Seg 1 Assets are not, and never were, property of the Debtor's estate within the meaning of § 541 of the Bankruptcy Code pursuant to Customer Agreements between the Debtor and the Seg 1 Customers;

c. A declaration that to the extent that the Debtor misappropriated any portion of the Seg 1 Assets at any point, such actions constituted misappropriation of customer property within the meaning of the CEA and, furthermore, had no effect upon the ownership of any other assets maintained in segregated accounts at the Debtor; and

d. A declaration that the Plaintiffs can identify and trace substantially all Seg 1 Assets in the hands of the Debtor at all relevant times.

e. A declaration that any and all transfers made by the Debtor to the Plaintiffs on or after the date that was 90 days before the Petition Date, including the August 17 and August 21 Transfers, were not transfers of property of the Debtor's estate under § 541 of the Bankruptcy Code and cannot be avoided by the Trustee; and

f. Any other and further relief as the Court deems just, equitable and proper.

## COUNT II – DECLARATORY JUDGMENT (REMAINING SEG 1 ASSETS)

66. The Plaintiffs repeat and reallege paragraphs 1-65 above as though fully set forth herein.

67. As set forth herein, the Remaining Seg 1 Assets are not, and never were, property of the Debtor's estate under § 541 of the Bankruptcy Code because, among other things, (a) the CEA and related CFTC regulations prohibit the Debtor from holding any ownership interest in the Remaining Seg 1 Assets; (b) the Customer Agreements unambiguously provide that the Debtor had no ownership or other interest in the Remaining Seg 1 Assets; and (c) the Remaining Seg 1 Assets are traceable in the hands of the Debtor at all relevant times.

68. The Plaintiffs are entitled to the immediate return of their allocable shares of the Remaining Seg 1 Assets in amounts traceable at trial.

69. The Trustee has incorrectly and unlawfully alleged that the Remaining Seg 1 Assets are property of the Debtor's estate.

70. There is an actual, substantial and immediate controversy between the Plaintiffs and the Trustee within the meaning of 28 U.S.C. § 2201 regarding the respective rights of the Plaintiffs and the Trustee to the Remaining Seg 1 Assets.

WHEREFORE, the Plaintiffs respectfully request that the Court grant the following relief:

    a. A declaration that the Remaining Seg 1 Assets are not, and never were, property of the Debtor's estate within the meaning of § 541 of the Bankruptcy Code; and

    b. Any other and further relief as the Court deems just, equitable and proper.

## **COUNT III – EXPRESS TRUST**

71. The Plaintiffs repeat and reallege paragraphs 1-70 above as though fully set forth herein.

72. Pursuant to the terms of the CEA, CFTC regulations and the Customer Agreements, the Debtor and its Seg 1 Customers intended to create a trust over any assets deposited by the Seg 1 Customers with the Debtor.

73. The trust purpose is set forth in the CEA and CFTC regulations. The trust purpose is also set forth in the Customer Agreements and the "Investment Objective" of the 125 Portfolio – i.e., to provide the Seg 1 Customers "with a short-term investment alternative that combines safety of principal, liquidity and competitive yields compliant with CFTC's Rule 1.25."

74. The Seg 1 Assets were delivered to the Debtor, as trustee, by the Seg 1 Customers. The Seg 1 Assets were held in trust by the Debtor for the benefit of its Seg 1 Customers from the date of delivery of such assets by the Seg 1 Customers through the Petition Date and thereafter.

75. The Remaining Seg 1 Assets constitute the amount of Seg 1 Assets currently held by the Trustee. Accordingly, the Remaining Seg 1 Assets are currently held in an express trust by the Trustee for the benefit of the Seg 1 Customers. Because the Remaining Seg 1 Assets are held in an express trust for the benefit of the Seg 1 Customers, such assets are not property of the Debtor's estate under § 541 of the Bankruptcy Code.

76. The Trustee has incorrectly and unlawfully alleged that the Remaining Seg 1 Assets are not held in an express trust and are property of the Debtor's estate.

77. The Plaintiffs therefore are entitled to immediate return of their allocable shares of the Remaining Seg 1 Assets in amounts traceable at trial.

WHEREFORE, the Plaintiffs respectfully request that the Court grant the following relief:

    a.    An order directing the Trustee to immediately return to the Plaintiffs their allocable shares of the Remaining Seg 1 Assets; and

    b.    Any other and further relief as the Court deems just, equitable and proper.

### COUNT IV - REPLEVIN

78. The Plaintiffs repeat and reallege paragraphs 1-77 above as though fully set forth herein.

79. As set forth herein, the Seg 1 Customers have legal title to all of the Remaining Seg 1 Assets.

80. The Seg 1 Customers have a possessory right to the Remaining Seg 1 Assets that is superior to any possessory right of the Debtor's chapter 11 estate.

81. The Plaintiffs are entitled to immediate possession of their allocable shares of the Remaining Seg 1 Assets in amounts traceable at trial.

82. The Remaining Seg 1 Assets not been taken for any tax, assessment, or fine or seized under any lawful process or held by virtue of any order of replevin.

83. The Plaintiffs have demanded the return of their allocable shares of the Remaining Seg 1 Assets. To date, the Trustee has refused to return any of the Remaining Seg 1 Assets.

84. Accordingly, the Plaintiffs have suffered and will suffer irreparable harm and are entitled to the immediate return of their allocable shares of the Remaining Seg 1 Assets and all other appropriate relief.

WHEREFORE, the Plaintiffs respectfully request that the Court grant the following relief:

    a. An order directing the Trustee to immediately return to the Plaintiffs their allocable shares of the Remaining Seg 1 Assets; and

    b. Any other and further relief as the Court deems just, equitable and proper.

Dated: June 9, 2008

Respectfully submitted,

FC Stone, LLC, Fortis Clearing Americas, LLC, Country Hedging, Inc., Cadent Financial Services LLC, Velocity Futures, LP and Peregrine Financial Group, Inc.

By: /s/ Geoffrey S. Goodman
      One Of Their Attorneys

Mark L. Prager (No. 2246503)
Stephen P. Bedell (No. 3125972)
William J. McKenna (No. 3124763)
Geoffrey S. Goodman (No. 6272297)
Foley & Lardner LLP
321 N. Clark Street, Suite 2800
Chicago, Illinois 60610
312.832.4500 (telephone)
312. 832.4700 (facsimile)

18