# EXHIBIT  J

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **SENTINEL MANAGEMENT GROUP, INC.,** | ) | Case No. 07–14987 |
| | ) | |
| Debtor. | ) | Honorable John H. Squires |
| | ) | |
| | ) | |
| | ) | |

## DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE FOR THE AMENDED CHAPTER 11 PLAN OF LIQUIDATION

DLA PIPER US LLP
Mark A. Berkoff
Marc Fenton
203 North LaSalle Street, Suite 1900
Chicago, Illinois 60601
(312) 368-7090

-and-

QUINN EMANUEL URQUHART OLIVER
& HEDGES, LLP
Susheel Kirpalani
Benjamin I. Finestone
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

Attorneys for the Official Committee of
Unsecured Creditors of Sentinel Management Group, Inc.

JENNER & BLOCK LLP
Catherine L. Steege
Vincent E. Lazar
330 N. Wabash Avenue
Chicago, Illinois 60611
(312) 222-9350

Attorneys for Frederick J. Grede,
Chapter 11 Trustee

Dated: Chicago, Illinois
June 18, 2008

ALL CUSTOMERS AND OTHER CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT, INCLUDING THE FOLLOWING SUMMARY, ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, OTHER EXHIBITS ANNEXED TO THE PLAN, THE PLAN SUPPLEMENT, AND THIS DISCLOSURE STATEMENT. THE FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE DESCRIPTION OF THE DEBTOR, ITS BUSINESS, AND EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASE, HAS BEEN OBTAINED FROM VARIOUS DOCUMENTS, AGREEMENTS, AND OTHER WRITINGS RELATING TO THE DEBTOR. THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN THE SUBJECT OF A CERTIFIED AUDIT. THIS DISCLOSURE STATEMENT IS ACCURATE TO THE BEST OF THE PLAN PROPONENTS' KNOWLEDGE, INFORMATION AND BELIEF; HOWEVER, THE PLAN PROPONENTS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT INACCURACIES. ANY ESTIMATES OF CLAIMS SET FORTH IN THIS DISCLOSURE STATEMENT MAY VARY FROM THE FINAL AMOUNTS OF CLAIMS ALLOWED BY THE BANKRUPTCY COURT.

THE DESCRIPTIONS OF DISTRIBUTIONS TO BE MADE UNDER THE PLAN ARE BASED ON SEVERAL KEY ASSUMPTIONS INCLUDING, AMONG OTHERS, THE ESTIMATED CLAIMS POOL AND PROJECTED REALIZABLE VALUE FROM PROPERTY (OTHER THAN CAUSES OF ACTION, WHICH HAVE NOT BEEN ASSIGNED ANY PROJECTED VALUE FOR THESE PURPOSES DUE TO THE UNCERTAIN NATURE OF LITIGATION). SIGNIFICANTLY, THESE PROJECTIONS INCLUDE ESTIMATED SECURITIES MARKET VALUES THAT ARE OPINIONS AND ESTIMATES ONLY (SUBJECT TO REVISION), AND ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. NO ASSURANCE, PREDICTION OR INVESTMENT ADVICE REGARDING PAYMENT IS MADE OR IMPLIED. ACTUAL CLAIMANT RECOVERIES COULD VARY SUBSTANTIALLY FROM THOSE SET FORTH IN THIS DISCLOSURE STATEMENT.

ALL CUSTOMERS AND OTHER CREDITORS SHOULD READ CAREFULLY THE "RISK FACTORS" SECTION HEREOF BEFORE VOTING FOR OR AGAINST THE PLAN. SEE "CERTAIN RISK FACTORS TO BE CONSIDERED" SECTION VIII.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW. THIS DISCLOSURE STATEMENT HAS BEEN

NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR THE COMMODITY FUTURES TRADING COMMISSION (THE "CFTC") NOR HAS THE SEC OR CFTC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY ENTITY FOR ANY OTHER PURPOSE.

THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT. AS TO CONTESTED MATTERS, EXISTING LITIGATION, OR POSSIBLE ADDITIONAL LITIGATION, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER, AS SUCH, THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING, ADVERSARY PROCEEDING OR OTHER ACTION INVOLVING THE DEBTOR OR ITS BUSINESS, OR ANY OTHER PARTY IN INTEREST, NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL OR OTHER EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTOR.

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION...........................................................................................................1

    A.    Holders of Claims Entitled to Vote ...............................................................3

    B.    Voting Procedures ........................................................................................4

    C.    Confirmation Hearing ...................................................................................4

II. OVERVIEW OF CHAPTER 11 ..................................................................................5

III. OVERVIEW OF THE PLAN.....................................................................................6

    A.    Introduction..................................................................................................6

    B.    Summary of Distributions.............................................................................6

    C.    Summary of Classification and Treatment of Claims and Equity
           Interests Under the Plan................................................................................6

IV. HISTORICAL AND BACKGROUND INFORMATION ...........................................9

    A.    The Debtor...................................................................................................9

    B.    The Business ................................................................................................9

    C.    Events Leading to Chapter 11 Filing .........................................................12

    D.    Sentinel's Collapse ....................................................................................13

V. THE CHAPTER 11 CASE ........................................................................................15

    A.    Significant "First Day" Motions During the Chapter 11 Case ..................15

           1.      The Citadel Distribution ................................................................15

           2.      The Chapter 11 Trustee .................................................................16

    B.    Official Committee of Unsecured Creditors...............................................16

    C.    Schedules and Statement of Financial Affairs............................................16

    D.    Bar Date for Filing Proofs of Claim ..........................................................16

    E.    Turnover of Customer Property..................................................................17

F.   Liquidation of Securities Portfolio ............................................................. 17

G.   Claims Analysis ......................................................................................... 17

H.   Causes of Action and Avoidance Claims ................................................... 18

I.   Adversary Proceedings .............................................................................. 19

    1.   Insider Complaint (*Grede v. Bloom*, Adv. Pro. 07-00981 (Bankr. N.D. Ill. Oct. 11, 2007)) .................................................... 19

    2.   BONY Adversary Proceedings ...................................................... 20

    3.   M&P Complaint (*Grede v. McGladrey & Pullen LLP*, Adv. Pro. 08-00167 (Bankr. N.D. Ill. March 20, 2008)) ...................... 22

    4.   SEG 1 Complaint (*FC Stone LLC, et al. v. Grede*, Adv. Pro. 08-00445 (Bankr. N.D. Ill. June 9, 2008)) ............................. 23

J.   Other Related Litigation ............................................................................ 23

    1.   Class Action Complaints .............................................................. 23

    2.   SEC Complaint (*SEC v. Sentinel Management Group, Inc.*, Case No. 07CV4684 (N.D. Ill. Aug. 20, 2007)) ........................... 24

    3.   CFTC Complaint (*CFTC v. Sentinel Management Group, Inc. et al.*, Case No. 08CV2410 (N.D. Ill. Apr. 28, 2008)) ........... 25

K.   Sentinel's Pension Plan .............................................................................. 25

L.   Competing Plan by Certain Citadel-Beneficiary Customers .................... 26

VI. SUMMARY OF THE PLAN ............................................................................. 27

A.   Introduction ............................................................................................... 27

    1.   Property of the Estate .................................................................... 27

    2.   Stockbroker Liquidation ............................................................... 30

    3.   Claim Calculation ......................................................................... 30

    4.   Basis for Compromise ................................................................... 31

B.   Overall Structure of the Plan ..................................................................... 32

C.   Classification and Treatment of Administrative Claims, Claims and Equity Interests Under the Plan ................................................................. 32

v

1. Unclassified — Administrative Claims ...........................................34

2. Unclassified — Priority Tax Claims.............................................35

3. Class 1 — Other Priority Claims ..................................................35

4. Class 2 — Secured Claims .........................................................36

5. Class 3—Customer Claims.........................................................36

6. Class 4—General Unsecured Claims.............................................37

7. Class 5—Subordinated Claims ....................................................38

8. Class 6—Equity Interests ...........................................................39

D. Bar Dates for Administrative Claims .........................................................39

E. Professional Fee Claims .........................................................................39

F. No Discharge of Claims; Injunction. .........................................................40

G. Treatment of Executory Contracts and Unexpired Leases .......................40

H. Plan Administration ................................................................................41

1. Duties and Compensation of the Liquidation Trustee ..................41

I. Creditors' Committee and Liquidation Trust Committee .........................42

1. Creation of Liquidation Trust Committee ....................................42

2. Duties and Compensation of the Liquidation Trust Committee.................................................................................43

3. No Liability of the Liquidation Trustee or the Liquidation Trust Committee ...........................................................................43

J. Method of Distribution Under the Plan ...................................................44

1. Distributions for Claims Allowed as of the Effective Date...........44

2. Interest On Claims .......................................................................44

3. Distributions by Liquidation Trustee............................................44

4. Date and Delivery of Distributions...............................................44

5. Unclaimed Property. ....................................................................45

|   | 6. | Distributions to Holders as of the Record Date | 45 |
|   | 7. | Fractional Cents | 45 |
|   | 8. | Payments of Less than Ten Dollars | 45 |
|   | 9. | Setoffs | 45 |
| K. | | Disputed Claims | 46 |
|   | 1. | Objection Deadline; Prosecution of Objections | 46 |
|   | 2. | No Distributions Pending Allowance | 46 |
| L. | | Estimation of Claims | 46 |
| M. | | Reserves | 46 |
|   | 1. | Disputed Claims Reserve | 46 |
|   | 2. | Reserve for BONY Secured Claims | 47 |
|   | 3. | Reserve for Professional Fee Claims | 48 |
| N. | | Settlement Offer; Releases | 48 |
| O. | | Assignment of Private Actions to the Liquidation Trust | 52 |
| P. | | Insider Settlement | 52 |
| Q. | | Cantor Escrow | 54 |
| R. | | Exculpation | 55 |
| S. | | Extinguishment of Liens | 55 |
| T. | | Preservation/Waiver of Causes of Action | 55 |
| U. | | Votes Solicited in Good Faith | 56 |
| V. | | Administrative Claims Incurred after the Confirmation Date | 56 |
| W. | | Retention of Jurisdiction | 56 |
|   | 1. | Claims and Equity Interests | 56 |
|   | 2. | Causes of Action | 56 |
|   | 3. | Injunction | 56 |

4. Professional Fees ................................................................57

5. Certain Priority Claims ........................................................57

6. Dispute Resolution...............................................................57

7. Executory Contracts and Unexpired Leases ...................................57

8. Actions ..............................................................................57

9. General Matters ...................................................................57

10. Plan Modification ...............................................................57

11. Aid Consummation..............................................................57

12. Protect Property ..................................................................58

13. Abandonment of Property......................................................58

14. Recovery of True-up Amount..................................................58

15. Implementation of Confirmation Order .....................................58

16. Liquidation Trustee's Exercise of Power ...................................58

17. Close Chapter 11 Case ..........................................................58

X. Miscellaneous Provisions ...............................................................58

1. Payment of Statutory Fees .....................................................58

2. Amendment or Modification of the Plan ....................................58

3. Payment of Attorney's Fees Related to Drafting of Plan ...............59

4. Governing Law ...................................................................59

5. Filing or Execution of Additional Documents..............................59

6. Withholding and Reporting Requirements ..................................59

7. Exemption From Transfer Taxes ..............................................60

8. Headings ...........................................................................60

9. Exhibits ............................................................................60

10. Notices .............................................................................60

| | | 11. | Plan Supplement | 61 |
| | | 12. | Conflict | 61 |
| | | 13. | Setoff by the United States | 61 |

VII. CONFIRMATION PROCEDURE ............................................................. 61

A. Solicitation of Votes ................................................................. 62

B. The Confirmation Hearing......................................................... 63

C. Confirmation............................................................................. 63

    1. Acceptance of the Plan .................................................. 63

    2. Confirmation Without Acceptance of All Impaired Classes ......... 63

    3. Feasibility ...................................................................... 65

    4. Best Interests Test and Liquidation Analysis ................ 65

VIII. CERTAIN RISK FACTORS TO BE CONSIDERED ........................... 70

A. Failure to Receive Requisite Acceptances................................. 70

B. Failure of Bankruptcy Court to Confirm Plan ........................... 70

IX. EFFECTIVENESS OF PLAN.................................................................. 71

A. Confirmation of the Plan ........................................................... 71

B. Conditions Precedent to Confirmation of the Plan .................... 71

C. Conditions Precedent to Effectiveness ...................................... 71

D. Waiver of Conditions................................................................. 71

E. Effect of Failure of Conditions ................................................. 71

X. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN.......................................................................................................... 72

XI. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ............ 72

A. Federal Income Tax Consequences to the Debtor ...................... 73

B. General Tax Considerations for Holders of Allowed Claims.................... 74

C. Accrued but Unpaid Interest ...................................................... 74

D.      Bad Debt Deduction and Worthless Securities Deduction ........................ 75

E.      Market Discount ........................................................................................ 75

F.      Receipt of Cash and/or Liquidation Trust Interests in Exchange for Allowed Claims ........................................................................................ 75

G.      Treatment of Liquidation Trust .................................................................. 76

H.      Treatment of Disputed Claims Reserve .................................................... 78

I.      Backup Withholding Tax and Information Reporting Requirements ........ 79

XII. RECOMMENDATION AND CONCLUSION ........................................................ 79

# I.

## INTRODUCTION

The Official Committee of Unsecured Creditors (the "Creditors Committee") of Sentinel Management Group, Inc. ("Sentinel" or the "Debtor"), and Frederick J. Grede, solely in his capacity as Chapter 11 trustee for Sentinel (the "Chapter 11 Trustee" and, together with the Creditors Committee, the "Plan Proponents"), in the above-captioned Chapter 11 case (the "Chapter 11 Case"), submit this disclosure statement (this "Disclosure Statement"), pursuant to Section 1125 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy Code"), to holders of Claims against the Debtor in connection with (i) the solicitation of acceptances of the Chapter 11 Plan of Liquidation, dated May 12, 2008, as such plan may be amended (the "Plan"), filed by the Plan Proponents with the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division (the "Bankruptcy Court"), and (ii) the hearing to consider confirmation of the Plan (the "Confirmation Hearing"). Unless otherwise defined herein, all capitalized terms contained herein have the meanings ascribed to them in the Plan, a copy of which is attached hereto as Exhibit A.

Concurrently with the filing of this Disclosure Statement, the Plan Proponents filed the Plan which sets forth how Claims against and Equity Interests in the Debtor will be treated. This Disclosure Statement describes certain aspects of the Plan, the Debtor's prior operations, significant events occurring in the Chapter 11 Case and other related matters. FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS HERETO AND THERETO IN THEIR ENTIRETY.

The Plan constitutes a liquidating Chapter 11 plan for the Debtor. The Plan incorporates a pro rata distribution scheme for all of Sentinel's Customers while preserving the rights of Customers to challenge the propriety of such a scheme and to litigate the issue post-confirmation. The Plan provides for the Debtor's Property to be liquidated, and for the proceeds of the liquidation, and any recoveries obtained from litigation against third-parties, to be distributed to holders of Allowed Claims in accordance with the terms of the Plan and the priority of claims provisions of the Bankruptcy Code. The Plan further provides that, upon the Transfer Date all of the Debtor's Property will be transferred to the Liquidation Trust for the liquidation, administration, and distribution of the Debtor's Property by the Liquidation Trustee.

The Liquidation Trustee, in consultation with the Liquidation Trust Committee will be responsible for implementing and administering the Plan in accordance with the terms of the Plan, the Trust Agreement, and applicable law. Additionally, the Liquidation Trustee will initiate and defend Causes of Action on behalf of the Estate after the Plan is Confirmed and consummated. Creditors do not have to wait until the final resolution of these Causes of Action before they receive distributions under the Plan. Rather, the Plan provides for distributions to occur on the Effective Date or as soon thereafter as is practicable. The Plan also provides for distributions at various intervals after the initial distributions, which will enable the distribution of any resulting

recoveries from disposition or liquidation of the Remaining Assets and/or the Trust Assets, including the Causes of Action, in accordance with the Plan. Assignment of Claims will be recognized with distributions made to valid assignees up through and including December 15, 2008, after which the Liquidation Trust will make distributions to Claim Holders of record as of such date.

In terms of distributions under the Plan, the Plan Proponents believe that those Creditors who were Customers of the Debtor will be treated equally, receiving *pro rata* treatment based on the amount of their Claims. To this end, the Plan includes a mechanism to ensure that any Customers who previously received distributions from the proceeds of the Citadel Transaction (described below in Section IV.D. of the Disclosure Statement), will not be entitled to receive distributions until the other Customers who did not receive distributions from the Citadel Transaction have achieved the same Percentage Recovery including accrued Interest from the respective dates of such distributions. The Plan provides for such a "catch-up" mechanism with regard to both Class 3 and Class 4 Claims of Customers and the imputation of Interest on the Citadel Sale Distributions and the SEG 1 Special Distributions to provide for equal treatment among similarly situated Creditors as required by the Bankruptcy Code. Such provision is pursuant to the Plan's underlying concept that Customers of Sentinel were all similarly situated Creditors prior to the distribution of the Citadel Sale Distributions and the SEG 1 Special Distributions and that, under the Bankruptcy Code, all Customers have an equal right to receive distributions from Sentinel, including the time of such distributions. The Plan further provides Customers who previously received distributions from the proceeds of the Citadel Transaction with the opportunity to settle and limit their potential exposure to avoidance or other claims in the event that the insufficient funds are recovered to permit all Customers to achieve the same Percentage Recovery.

Attached as Exhibits to this Disclosure Statement are copies of the following:

- The Plan (Exhibit <u>A</u>);

- In an effort to aid Creditors in their decisions on how to vote, a liquidation analysis (Exhibit <u>B</u>);

- A term sheet which summarizes the terms of the Settlements embodied in the Plan (Exhibit <u>C</u>);

- In addition, a proposed Ballot for the acceptance or rejection of the Plan is enclosed with this Disclosure Statement for the Holders of Claims that the Plan Proponents believe are entitled to vote to accept or reject the Plan.

The Solicitations Procedures Order sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes, and the standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each Holder of a Claim entitled to vote on the Plan should read in their entirety the Disclosure

Statement, the Plan, the Solicitation Procedures Order, and the instructions accompanying the Ballots before voting on the Plan. These documents contain, among other things, important information concerning the classification of Claims and Equity Interests for voting purposes and the tabulation of votes. No solicitation of votes to accept the Plan may be made except pursuant to Section 1125 of the Bankruptcy Code.

APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

**A.      Holders of Claims Entitled to Vote**

Pursuant to the provisions of the Bankruptcy Code, only holders of "allowed" claims or interests in classes of claims or interests that are "impaired" are entitled to vote to accept or reject a proposed Chapter 11 plan. Classes of claims in which the holders of claims are unimpaired under a Chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan.

Classes 1 and 2 of the Plan are Unimpaired (subject to a Bankruptcy Court finding that a Holder of a Claim in Class 2 has had its legal rights altered sufficiently to impair its Claim). Holders of Claims in Classes 1 (Other Priority Claims) and 2 (Secured Claims) are conclusively deemed to have accepted the Plan. Classes 3 (Customer Claims), 4 (General Unsecured Claims), and 5 (Subordinated Claims) of the Plan are Impaired. To the extent Claims in Classes 3 and 4 are not Disputed Claims, Holders of such Claims are entitled to vote to accept or reject the Plan. Holders of Claims in Classes 5 and Holders of Equity Interests in Class 6 are deemed to have rejected the Plan and are therefore not entitled to vote. ***Accordingly, the Plan Proponents are soliciting acceptances only from Holders of Allowed Claims in Classes 3 and 4.***

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan. For a more detailed description of the requirements for confirmation of the Plan, <u>see</u> Section VII., "Confirmation Procedure."

Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan notwithstanding the nonacceptance of a plan by one or more impaired classes of claims or interests. Under that Section, a plan may be confirmed by a court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each nonaccepting class. For a more detailed description of the requirements for confirmation of a nonconsensual plan. <u>See</u> Section VII.C.2., "Confirmation Procedure—Unfair Discrimination and Fair and Equitable Tests." The Plan Proponents reserve the right to amend the Plan or to undertake to have the Bankruptcy Court confirm the Plan under Section 1129(b) of the Bankruptcy Code, if any impaired classes of claims or interests entitled to vote do not accept the Plan by the requisite statutory majorities required under the Bankruptcy Code.

3

In addition, if the Bankruptcy Court is unwilling to approve this Plan, the Creditors Committee reserves its right to file a motion to convert the case to a stockbroker liquidation case under Subchapter III on the basis that Sentinel qualifies as a stockbroker as defined by Section 101(53A) of the Bankruptcy Code, notwithstanding that Sentinel may not have operated as a stockbroker for non-bankruptcy law purposes.

### B.    Voting Procedures

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purposes of voting on the Plan. If you hold Claims in more than one Class, and you are entitled to vote Claims in more than one class, you will receive separate Ballots which must be used for each separate class of Claims. Under the terms of the Solicitation Procedures Order, you are required to vote all Ballots either in favor of or against the Plan. Please note and return (or, for those Creditors with access, electronically file with the Bankruptcy Court's Electronic Case Filing system) your Ballot(s) to:

Clerk of the Court, Room 710, 219 South Dearborn Street, Chicago, IL 60604.

TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE **RECEIVED** NO LATER THAN 4:00 P.M. CENTRAL TIME, ON AUGUST 1, 2008 (THE "VOTING DEADLINE").

Any Claim in an impaired Class as to which (i) an objection or request for estimation is pending or (ii) a proof of claim has not been filed and which is scheduled on the Schedules as unliquidated, disputed, or contingent, is not entitled to vote unless the Holder of such claims has obtained an order of the Bankruptcy Court temporarily allowing such claim for the purpose of voting on the Plan. For additional information on voting. See Section VII.A., "Confirmation Procedure—Solicitation of Votes."

Pursuant to the Solicitation Procedures Order, the Bankruptcy Court set June 16, 2008 as the Voting Record Date for voting on the Plan. Accordingly, only Holders of record as of June 16, 2008 that are otherwise entitled to vote under the Plan will receive a Ballot and may vote on the Plan.

If you are a Holder of a Claim entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot, or lost your Ballot, or if you have any questions concerning the Disclosure Statement, the Plan, or the procedures for voting on the Plan, please contact the Chapter 11 Trustee's counsel, Jenner & Block LLP, Christine L. Childers.

### C.    Confirmation Hearing

Pursuant to Section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on August 12, 2008 at 1:00 p.m. (Central Time) before Judge John H. Squires, Bankruptcy Judge of the Northern District of Illinois, Eastern Division, 219 S. Dearborn Chicago, IL 60604. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served so that they are received on or

4

before August 1, 2008 in the manner described below in Section VII.B., "Confirmation Procedure—The Confirmation Hearing." The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

THE PLAN PROPONENTS BELIEVE THAT THE PLAN WILL PROVIDE THE LARGEST AVAILABLE RECOVERY TO CUSTOMERS AND OTHER CREDITORS. THE PLAN PROPONENTS ALSO BELIEVE THAT ACCEPTANCE OF THE PLAN, AND MAKING THE SETTLEMENT ELECTION EMBODIED THEREIN, IS IN THE BEST INTERESTS OF CREDITORS AND THEREFORE RECOMMEND THAT ALL CREDITORS VOTE TO ACCEPT THE PLAN AND, IF APPLICABLE, THE SETTLEMENT ELECTION.

## II.

## OVERVIEW OF CHAPTER 11

Chapter 11 is one of the principal business Chapters of the Bankruptcy Code. Under Chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize or liquidate its business for the benefit of itself, its creditors and interest holders. Another goal of Chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated interest holders with respect to the distribution of a debtor's assets.

The commencement of a Chapter 11 case creates an estate that consists of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession." The Bankruptcy Code also provides that in certain situations, on request of a party-in-interest or the United States Trustee, the Bankruptcy Court can order the appointment of a Chapter 11 trustee to protect the interests of the debtor's estate, its creditors and other parties-in-interest.

The consummation of a Chapter 11 plan is the principal objective of a Chapter 11 case. A Chapter 11 plan sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan by the bankruptcy court makes the plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or interest holder of a debtor.

After a plan has been filed, certain holders of claims against or equity interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, however, Section 1125 of the Bankruptcy Code requires the plan proponent to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. The Plan Proponents are submitting this Disclosure Statement to Holders of Claims in Class 3 and Class 4 in the Debtor to satisfy the requirements of Section 1125 of the Bankruptcy Code.

# III.

# OVERVIEW OF THE PLAN

### A.     Introduction

Sentinel filed its voluntary petition to commence the Chapter 11 Case on August 17, 2007 (the "Petition Date").  Shortly thereafter, on August 29, 2007, the Bankruptcy Court ordered the appointment of the Chapter 11 Trustee who subsequently uncovered extensive breaches of fiduciary duty and wrongdoing by certain Insiders and others that are the subject of a number of pending lawsuits initiated by the SEC, certain Customers, and the Chapter 11 Trustee, as described more fully below in Section V.I. and J.  As a result, Sentinel is a debtor in the Chapter 11 Case, but not a debtor-in-possession.

### B.     Summary of Distributions

Under the Plan, Claims against and Equity Interests in the Debtor are divided into Classes.  Certain unclassified Claims, including Administrative Claims and Priority Tax Claims, will be paid in full in Cash once the Claims become Allowed Claims.  All other Claims and Equity Interests will be divided into Classes and will receive the distributions and recoveries (if any) described in the table below.

The table (set forth below in Section III.C.) briefly summarizes the classification and treatment of Claims and Equity Interests under the Plan.  The Claims estimates included therein are based upon, *inter alia*, knowledge gained from the operation and wind-down of Sentinel's business, as well as a review of Sentinel's records and proofs of claim filed by Creditors.  Sentinel's Schedules as filed with the Bankruptcy Court contain outdated information which should not be relied upon in deciding whether to vote in favor of the Plan.

### C.     Summary of Classification and Treatment of Claims and Equity Interests Under the Plan[1]

| Class and Estimated Amount | Type of Claim Or Interest | Treatment | Estimated Recovery |
|---|---|---|---|
| **Unclassified** $7,000,000 | Administrative Claims | **Non-Voting**.  Each Holder of an Allowed Administrative Claim will receive payment in full (in Cash). | 100% |

---

[1]     This table is only a summary of the classification and treatment of Claims and Equity Interests under the Plan.  Reference should be made to this entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Equity Interests.

| Class and Estimated Amount | Type of Claim Or Interest | Treatment | Estimated Recovery |
|---|---|---|---|
| **Unclassified** $0 | Priority Tax Claims | **Non-Voting**. Each Holder of an Allowed Priority Tax Claim will receive payment in full (in Cash). | 100% |
| **Class 1** $0 | Other Priority Claims | **Unimpaired, Non-Voting**. Each Holder of an Allowed Other Priority Claim will receive payment in full (in Cash). | 100% |
| **Class 2** *Estimated Amount: $312,247,000* (BONY Claim is Disputed, however, BONY also asserts interest accruing thereon since the Petition Date and continuing postpetition fees and expenses) | Secured Claims | **Unimpaired, Non-Voting (subject to a Bankruptcy Court finding that a Holder has had its legal rights altered sufficiently to impair its Claim)**. Each Holder of an Allowed Secured Claim will receive Cash or Collateral securing its Allowed Secured Claim in an amount equal to such Allowed Secured Claim. | 100% |
| **Class 3** *Estimated Amount: $1,220,320,123* (Holders of Class 3 | Customer Claims (All Claims arising from Customer deposits with Sentinel) | **Impaired, Voting**. Holders of Allowed Class 3 Customer Claims will be entitled to a Pro Rata distribution of Customer Property (property received, acquired, or held by or for, or which should have been held | 35%+[2] |

---

[2]    Estimated recovery on account of Class 3 Customer Claims does not include Citadel Sale Distributions and SEG 1 Special Distributions to the extent received. Further recoveries for Holders of Class 3 Customer Claims in receipt of Citadel Sale Distributions and SEG 1 Special Distributions are entirely contingent upon Causes of Action.

| Class and Estimated Amount | Type of Claim Or Interest | Treatment | Estimated Recovery |
|---|---|---|---|
| Customer Claims are estimated to consist of: $738,964,040 in Claims held by NonCitadel-Beneficiary Customers and $481,356,083 in Claims held by Citadel-Beneficiary Customers (of which approximately $53,677,776 are arising out of participation in SEG 2, SEG 3 or SEG 4) | | by or for, Customers). No distributions will be made to Citadel-Beneficiary Customers until all other Customers receive the same Percentage Recovery distributions as the Citadel-Beneficiary Customers, including Interest as provided for in the Plan. If such Customers do not receive the same Percentage Recovery distributions, Citadel-Beneficiary Customers that elect to enter into the settlement embodied in the Plan will be obligated to repay their True-up Amounts if NonCitadel-Beneficiary Customers do not otherwise receive distributions equivalent to the Release Distribution Threshold. Citadel-Beneficiary Customers who do not elect to enter into the settlement may face suit for avoidance of the Citadel Sale Distributions and the SEG 1 Special Distributions. | |
| **Class 4**<br><br>*Estimated Amount: $10,000,000* (plus deficiency claims on account of Class 3 Customer Claims and unsecured non-subordinated | General Unsecured Claims<br><br>(all unsecured Claims against Sentinel other than Claims otherwise defined in the Plan.) | **Impaired, Voting.** Holders of Allowed General Unsecured Claims will be entitled to a Pro Rata distribution of Cash and Cash proceeds of all Property not allocated for payment of Allowed Claims in other Classes, provided, however, that subject to Section 10.10 of the Plan, no distributions will be made to Citadel-Beneficiary Customers until all other Customers receive the same | Entirely contingent on the value of assets and Causes of Action that do not constitute Customer Property. |

8

| Class and Estimated Amount | Type of Claim Or Interest | Treatment | Estimated Recovery |
|---|---|---|---|
| claims of BONY) | | Percentage Recovery distributions as the Citadel-Beneficiary Customers including Interest as provided for in the Plan. | |
| **Class 5** *Estimated Amount: $6,088,895* (plus BONY claim, subject to equitable subordination action filed by Chapter 11 Trustee) | Subordinated Claims | **Impaired, Non-Voting.** Subordinated Claims will receive no distributions on account of such Claims and are deemed to reject the Plan. | 0% |
| **Class 6** *100% Equity Interests owned by Sentinel Investment Group, Inc.* | Equity Interests | **Impaired, Non-Voting.** Holders of Equity Interests will receive no distributions on account of such Equity Interests and are deemed to reject the Plan. | 0% |

## IV.

## HISTORICAL AND BACKGROUND INFORMATION

### A.    The Debtor

Sentinel is an Illinois corporation, headquartered in Northbrook, Illinois. Prior to commencing the Chapter 11 Case, Sentinel was registered with (i) the SEC, as an investment adviser under the Investment Advisers Act of 1940 (the "Advisers Act"), and (ii) the CFTC, as a futures commission merchant ("FCM") under the Commodity Exchange Act (7 U.S.C. § 1 et seq., the "CEA").  It was also a member of the National Futures Association, a self-regulatory organization.

### B.    The Business

Sentinel managed investments of short-term cash for various customers, including FCMs, hedge funds, financial institutions, pension funds and individuals.

9

Sentinel was registered as an FCM with the CFTC so that it could accept and invest cash constituting customer property of other FCMs. As a registered FCM, the Plan Proponents assert that Sentinel was subject to the CFTC regulations governing the segregation and investment of customer funds and the pledging of customer funds as collateral for bank loans. BONY challenges this position and asserts that the CEA (and consequently the related CFTC rules) did not apply to Sentinel.

Sentinel offered investors the opportunity to participate in a variety of investment programs with specified investment parameters, including high-grade, liquid securities such that Sentinel could return its customers' cash upon demand. Sentinel entered into agreements with each of its investing customers (the "Investment Agreements") which governed the terms of the relationship. The Investment Agreements provided Sentinel with limited discretionary authority within specific investment parameters to buy and sell securities without requesting additional authority from its customers before executing trades on its customers' behalf.

While BONY disagrees, the Plan Proponents assert that CFTC regulations and Rule 206(4)-2 of the Advisers Act required Sentinel to deposit the funds it received from customers into segregated custodial accounts (the "Segregated Accounts"). Accordingly, Sentinel represented to its customers that it deposited its customers' assets in segregated custodial accounts at BONY. Sentinel represented that it would pool the assets of similar types of customers in one of four Segregated Accounts maintained at BONY based on the investment program in which a particular customer elected to participate. The Segregated Accounts were referred to as "SEG 1," "SEG 2," "SEG 3," and "SEG 4."

Sentinel represented to its customers that investments in the SEG 1 Segregated Account would contain only funds and property of customers of registered commodity brokers and FCMs. While BONY disagrees, the Plan Proponents assert that Sentinel was subject to the CEA and the rules and regulations promulgated thereunder by the CFTC, including the strict investment standards embodied in CFTC Rule 1.25, 17 C.F.R. § 1.25, which enumerates the permitted investments for customer funds under the CEA.

Sentinel also represented that investments in the SEG 2 Segregated Account were limited to the funds and property of FCM customers that were engaged in trading on foreign exchanges. Pursuant to the Investment Agreements, Sentinel agreed to invest funds deposited in SEG 2 in accordance with CFTC Rule 30.7, 17 C.F.R. § 30.7, which imposes restrictions on the investment of customer funds similar to those in CFTC Rule 1.25.

Sentinel represented to its customers that investments in the SEG 3 Segregated Account would contain assets of all other types of customers, including hedge funds, house funds of FCMs, trust accounts, endowments and individuals. Certain investors participating in SEG 3 elected that their funds be invested in accordance with the investment standards of CFTC Rule 1.25. Approximately 75% of Customers (by

dollar amount) participating in SEG 3 elected to invest their funds in accordance with the investment standards of CFTC Rule 1.25.

Finally, Sentinel represented that it maintained the SEG 4 Segregated Account on behalf of customers whose property was denominated in Euros.

Sentinel also owned a "House" or "Street" portfolio of securities traded by Sentinel for the ultimate benefit of certain Sentinel insiders (the "House Account").

In the Investment Agreements between Sentinel and its Customers, among other places, Sentinel represented to its Customers that all funds deposited by both its FCM Customers and its other Customers would be kept in separate, segregated accounts in strict accordance with the rules and regulations of the CFTC and the SEC, and that such Customer funds would be protected from commingling with funds of Sentinel, other Customers of Sentinel, or other creditors.

Customers were unaware, as discovered after the commencement of the Chapter 11 Case, that instead of strictly segregating Customer funds and property, certain Sentinel insiders misused Customer funds for improper and unlawful purposes. As a result of the forensic examination undertaken by the Chapter 11 Trustee and his professionals of Sentinel's activities, books, and records, the Plan Proponents believe that beginning no later than 2004, virtually all Customer funds were misused and diverted from the very first day they were deposited by Customers with Sentinel. When Customers deposited funds with Sentinel, the Chapter 11 Trustee believes, based upon forensic work completed by him and his retained professionals, that instead of segregating those funds and/or purchasing securities segregated for the benefit of a particular SEG, certain Sentinel insiders caused substantially all Customer deposits to be swept to an unsegregated loan and clearing account at BONY, where they were used to reduce and applied against Sentinel's obligations to BONY (the "BONY Loan"). Although those insiders then would purport to allocate interests in securities to specific customer SEGs and accounts, and would cause daily statements to be generated reporting ownership of an interest in those securities to Customers, as a result of the forensic examination undertaken by the Chapter 11 Trustee and his professionals, the Plan Proponents believe that in reality the securities were allocated to Customers without regard to whether the Securities actually were segregated for the benefit of the Customers, and oftentimes the securities already had been pledged to BONY as collateral for the BONY Loan. Moreover, as a result of the forensic examination undertaken by the Chapter 11 Trustee and his professionals, the Plan Proponents believe that both the cost basis and interest rates relating to securities reported on Customer statements were frequently fictitious. The Chapter 11 Trustee asserts that, based upon forensic work completed by him and his retained professionals, interest from all Customer and House securities (segregated or not, repo'd or owned) was pooled and then applied first to pay interest on the BONY Loan, then to pay certain fees, and then to meet arbitrarily determined "return" targets for each customer group. Thus, as a result of the forensic examination undertaken by the Chapter 11 Trustee and his professionals, the Plan Proponents believe that each and every day, certain Sentinel insiders used the returns on

securities in one SEG group to subsidize income allocations made to other SEG groups or to the House and/or to pay interest on the BONY Loan.

Based upon forensic work completed by him and his retained professionals, the Chapter 11 Trustee asserts that, prior to the Petition Date, Sentinel's Customers and the regulatory authorities were unaware of the pooling, commingling, and misuse of funds and securities that were supposed to be segregated for the benefit of Customers because the Customer Account Statements and regulatory filings reported that Customer assets were segregated in accordance with Sentinel's initial representations to its customers. The activities of certain insiders, as well as the role of BONY as custodian for the Segregated Accounts and McGladrey & Pullen LLP as auditors, are the subject of various lawsuits initiated by the Chapter 11 Trustee as described in more detail in Section V.I.

The Trustee has not provided Customers access to all of the forensic work undertaken by the Trustee and his retained professionals. A group of Citadel-Beneficiary Customers dispute the Chapter 11 Trustee's conclusions about the extent of the pooling, commingling, misuse, and diversion of property held by Sentinel in segregation for SEG 1 Customers and dispute that any pooling, commingling, misuse, or diversion defeats their ownership of the Citadel Sale Distributions, the SEG 1 Special Distributions, and property still held in segregated SEG 1 accounts by the Chapter 11 Trustee.

## C.    Events Leading to Chapter 11 Filing

Beginning in 2003, certain Sentinel insiders began purchasing large volumes of securities that were not segregated for customers and that did not appear on customers statements. Typically, these transactions involved the purchase of securities either using the BONY Loan or the funds received from a repurchase or "repo" counterparty.

In its repo transactions, Sentinel typically would deliver the security to its counterparty, who would in turn "loan" a percentage of the value of the security to Sentinel. As part of the agreement, Sentinel was obligated to repurchase the security for the amount it received plus interest. The percentage of the security's value that the repo counterparty would not finance is referred to as the repo "haircut." Sentinel used the BONY Loan to cover the amount of the repo "haircut." As the BONY Loan grew, certain Sentinel insiders began collateralizing it with securities that the Plan Proponents assert were supposed to be segregated for Sentinel's SEG customers.

As of December 31, 2006, certain Sentinel insiders had caused Sentinel to obtain control of over $2 billion of securities in this manner – i.e., with none of its own equity. In addition to the over $2 billion in repurchase obligations to repo counterparties, the BONY Loan had also grown to over $230 million as of December 31, 2006.

During this time, Sentinel only had a few million dollars in net capital, and in actuality appears to have had a net capital deficiency as a result of the conduct of certain insiders. The combined growth of the BONY Loan and Sentinel's large repo

positions, in conjunction with the segregation failures and net capital deficiencies, created a material risk of huge losses – risks that ultimately came to fruition and led to Sentinel's demise.

In mid-2007, many of Sentinel's counterparties under the repo agreements began making margin calls and/or terminating the repo agreements. For example, in May 2007, Fimat, one of Sentinel's major repo counterparties, closed out a number of repo transactions and returned more than $100 million (face value) in securities to Sentinel. In response, to avoid defaulting on the repo agreements and because Sentinel could not meet its repo obligations in any other way, certain Sentinel insiders caused Sentinel to borrow an additional $94 million from BONY, increasing the BONY Loan balance to more than $353 million.

To secure the increased BONY Loan, the Plan Proponents believe that Sentinel insiders and BONY moved large blocks of government securities from both SEG 1 and SEG 3 with a face value of almost $87 million into the BONY collateral account.

Throughout June and July 2007, more repo counterparties refused to roll forward repo transactions and either returned securities to Sentinel that were the subject of repo agreements, or increased the applicable repo "haircuts." As a result, Sentinel continued borrowing money from BONY to meet its repo obligations, and the outstanding loan balance ballooned at times to in excess of $500 million. To collateralize the additional loan amounts, the Plan Proponents believe that the Sentinel insiders and BONY continued to transfer securities from the various SEG accounts to the BONY collateral account.

Sentinel's severe financial stress continued through the end of July and into August as it was unable to simultaneously reduce its loan balance with BONY, sell the higher-risk securities that had been returned by repo counterparties, and meet its redemption obligations to Customers who wanted to withdraw funds.

In the end, Sentinel's liabilities to BONY, repo counterparties, and Customers, coupled with its thin capital and the fact that many of the securities that had been returned by repo counterparties were highly illiquid, led to Sentinel's demise.

### D.    Sentinel's Collapse

On August 13, 2007, (Eric Bloom, the President and Chief Executive Officer of Sentinel) sent a letter to Sentinel's Customers representing that because of the pending liquidity crisis in the credit markets, Sentinel was halting redemptions out of a concern that it would not be able to meet significant redemption requests without resorting to discount sales that would cause unnecessary losses to its Customers. This resulted in immediate demands for redemption by numerous Customers, as well as the declaration of defaults and close out at unfavorable prices of more than $2 billion in repo transactions.

As a result of the forensic examination undertaken by the Chapter 11 Trustee and his professionals, the Plan Proponents believe that on or about the same date, certain Sentinel insiders caused the entire cash balance maintained in the SEG 3 cash account, roughly $112 million, to be transferred to a SEG 1 cash account. The Chapter 11 Trustee's investigation has revealed to the Plan Proponents that roughly $90 million of that amount was used on August 15, 2007 to redeem and pay off in full four SEG 1 Customer accounts. The Chapter 11 Trustee's investigation has revealed to the Plan Proponents that the other $22 million was used to effectuate the SEG 1 Special Distribution (described below).

On August 16, 2007, on the eve of the Petition Date, Sentinel entered into an agreement with Citadel to sell, assign and transfer assets purportedly held for the benefit of the SEG 1 Customers (the "Citadel Transaction"). The aggregate notional value of the securities to be sold was approximately $384 million with an estimated market value of $367 million, including accrued interest (the "Citadel Securities"). From this, Citadel deducted a discount of $47.1 million (under the agreement, Citadel was only supposed to deduct $44.9 million), and the final sales price paid to Sentinel was approximately $320.5 million (the "Citadel Proceeds"). The Citadel Securities were transferred to Citadel on August 16 and 17, 2008. Approximately $302 million of the Citadel Proceeds were transferred to the SEG 1 account maintained at BONY. $16.2 million in proceeds were transferred to a Euroclear account, which BONY asserts is not an account segregated for the benefit of Customers, where those funds remain. The balance attributable to the Citadel Securities sale (roughly $1.2 million in accrued interest attributable to the securities) was not transferred to a SEG account, and instead was used to reduce the BONY Loan balance.

On August 17, 2007, Sentinel effectuated a Cash distribution in the aggregate amount of $22,524,942 to the Citadel-Beneficiary Customers (the "SEG 1 Special Distribution"), which was represented to Customers to be an initial distribution of Citadel Proceeds. According to the Chapter 11 Trustee's investigation, however, it appears that this $22.5 million transfer was a transfer of the balance of the proceeds of the bulk transfer of $112 million from the SEG 3 account to the SEG 1 account on August 14, 2007, as described above.

On August 16 and 17, 2007, several Customers sued Sentinel and sought and obtained temporary restraining orders from the District Court of the Northern District of Illinois, *Farr Financial, Inc.* v. *Sentinel Management Group, Inc.*, Case No. 07 C 4614 (N.D. Ill. Aug. 17, 2007), prohibiting transfers or securities purportedly segregated for their benefit. On the afternoon of August 17, the NFA issued a Member Responsibility Action prohibiting Sentinel from selling, transferring, encumbering or otherwise disposing of any SEG 3 or House securities. That evening, Sentinel filed for bankruptcy protection.

14

# V.

## THE CHAPTER 11 CASE

On August 17, 2007 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

### A.   Significant "First Day" Motions During the Chapter 11 Case

During the first few days of the Chapter 11 Case, the Debtor filed emergency motions to address its immediate operating needs and concerns about liquidity in the commodities markets. The Bankruptcy Court subsequently granted such relief by the entry of orders, as more fully described below.

#### 1.   The Citadel Distribution

On August 20, 2007, the first business day after the Petition Date, the Debtor filed an emergency motion (the "<u>Distribution Motion</u>") to compel the distribution of the Citadel Proceeds to the Citadel-Beneficiary Customers. A hearing on the Distribution Motion was held that same day (the "<u>Distribution Hearing</u>"). By the Distribution Motion, the Debtor sought an order requiring BONY to turnover the Citadel Proceeds and distribute such proceeds to the Citadel-Beneficiary Customers. The Bankruptcy Court entered an order dated August 20, 2007 in connection with the effectuation of the Citadel Distribution (less a $15.6 million holdback amount pending further order of the Bankruptcy Court) to the Citadel-Beneficiary Customers. There is dispute among Creditors concerning the intent and effect of the Bankruptcy Court's August 20, 2007 order and certain Creditors take the position that the Bankruptcy Court in fact "authorized" the distribution to the Citadel-Beneficiary Customers. On or about August 21, 2007, pursuant to the August 20, 2007 order, BONY distributed roughly $297 million in Citadel Proceeds (the "<u>Citadel Distribution</u>") to the Citadel-Beneficiary Customers.

Also on August 20, 2007, Judge Kennelly of the United States District Court for the Northern District of Illinois held a hearing related to the distribution of the Citadel Proceeds to the Citadel-Beneficiary Customers. The parties were before Judge Kennelly on the SEC's Complaint against Sentinel and related motion for emergency relief (the "<u>Emergency Motion</u>") seeking (a) to restrain Sentinel from engaging in any transactions that violate Federal securities laws, (b) for an accounting of all funds received by Sentinel from its clients, (c) to prohibit the destruction of documents by Sentinel, and (d) an order expediting discovery.

With respect to (a) above, the SEC sought an order precluding Sentinel from distributing (through BONY) the Citadel Proceeds to the Citadel-Beneficiary Customers. After considering arguments and the evidence submitted, the District Court refused to prohibit the distribution of the Citadel Proceeds to the Citadel-Beneficiary Customers. The District Court, however, did enter an emergency order granting the Emergency Motion with respect to (b), (c) and (d) outlined above.

15

2.      **The Chapter 11 Trustee**

On August 21, 2007, the Debtor filed an emergency motion to appoint a Chapter 11 trustee in the Chapter 11 Case after the SEC initiated litigation against the Debtor as described in Section V.J. below.  On August 23, 2007, the Bankruptcy Court ordered the appointment of a Chapter 11 trustee.  Shortly thereafter, on August 29, 2007, Frederick J. Grede was appointed as the Chapter 11 Trustee for the Estate by the United States Trustee and the appointment was approved by the Bankruptcy Court.

In the weeks following his appointment, the Chapter 11 Trustee filed various motions seeking orders from the Bankruptcy Court to authorize his retention of professionals, including Jenner & Block LLP as counsel, Navigant Consulting, Inc. as financial advisor and forensic accountants, and Macquarie Securities (USA) Inc. as investment advisor.

**B.      Official Committee of Unsecured Creditors**

On September 6, 2007, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Creditors Committee") in the Chapter 11 Case.

The Creditors Committee is currently comprised of BC Capital Fund A, LLC, Discus Master Ltd., JEM Commodity Relative Value Fund LP, Jump Trading, LLC, Rotchford Barker, Kottke Associates LLC, Penson GHCO, and Vision Financial Markets LLC.  The Creditors Committee is represented by the law firms of Quinn Emanuel Urquhart Oliver & Hedges, LLP and DLA Piper US LLP pursuant to orders of the Bankruptcy Court.  BC Capital Fund A, LLC, Discus Master Ltd., JEM Commodity Relative Value Fund LP, Jump Trading, LLC, and Rotchford Barker are all Customers who participated in SEG 3 while Kottke Associates LLC, Penson GHCO, and Vision Financial Markets LLC are all Customers who participated primarily in SEG 1.

**C.      Schedules and Statement of Financial Affairs**

On September 14, 2007, the Debtor filed its schedules of assets and liabilities and statement of financial affairs; certain amendments were subsequently filed.

**D.      Bar Date for Filing Proofs of Claim**

On December 27, 2007, the Chapter 11 Trustee filed a motion seeking entry of an order (the "Bar Date Order") from the Bankruptcy Court requiring any person or entity holding or asserting a Claim against the Debtor to file a written proof of claim with the Bankruptcy Court on or before March 14, 2008.  On January 7, 2008, the Bankruptcy Court entered the Bar Date Order and established March 14, 2008 as the Bar Date for all Claims, including Claims asserted by governmental units.  Under the Bar Date Order, Persons or Entities whose Claims arise out of the rejection of an executory contract or unexpired lease will file a proof of claim on or before the later of (a) the date set by the Court in the Order authorizing the rejection of such contract or lease; or (b) the general Bar Date.

16

**E.     Turnover of Customer Property**

On October 16, 2007, the Chapter 11 Trustee filed a motion with the Bankruptcy Court to approve a stipulation between the Chapter 11 Trustee and BONY pursuant to which BONY agreed to turn over to the Chapter 11 Trustee certain cash and securities held by BONY in the Segregated Accounts for the benefit of Sentinel's Customers, or proceeds thereof, in which BONY did not assert any claim or lien.  On October 18, 2007, the Bankruptcy Court entered an order approving this stipulation (the "Turnover Order").  Pursuant to the Turnover Order, BONY has transferred the property contained in the Segregated Accounts to restricted accounts (the "JPM Accounts") opened by the Chapter 11 Trustee at JPMorgan Chase Bank, N.A.  Certain other securities continue to be held in accounts at BONY (the "BONY Accounts") over which BONY asserts a continuing lien and security interest to secure the BONY Loans.

**F.     Liquidation of Securities Portfolio**

On December 10, 2007, the Chapter 11 Trustee filed a motion with the Bankruptcy Court to approve a stipulation entered into by the Chapter 11 Trustee, the Creditors Committee, and BONY.  The stipulation authorized the Chapter 11 Trustee to liquidate the securities contained in both the JPM Accounts and the BONY Accounts, with the assistance of the Chapter 11 Trustee's investment advisor, Macquarie Securities (USA) Inc., in order to fix the value of the Estate and minimize the effect of further market turbulence by way of an orderly liquidation process.  On December 13, 2007, the Bankruptcy Court entered an order approving this stipulation.

Subsequently, on February 25, 2008, the Creditors Committee filed a motion seeking court approval of the retention of Vincent Butkiewicz as their financial consultant to assist in the liquidation of the Estate's securities.  The Court entered an order on March 6, 2008, approving Mr. Butkiewicz's retention.

As of May 31, 2008, the Chapter 11 Trustee had liquidated a substantial portion of the securities portfolio, and had realized approximately $415 million from that liquidation, a material portion of which is held at BONY subject to its purported liens. Securities with a face value exceeding $300 million remain to be liquidated.  The Chapter 11 Trustee believes that the aggregate market value of these remaining securities is difficult to determine at this time and that such securities could be sold for substantially less than the face value of the securities.

**G.     Claims Analysis**

Since his appointment, the Chapter 11 Trustee has engaged in a review and analysis of the Claims to reconcile the amount of outstanding Claims, and identify existing or potential claim disputes.  However, because the Bar Date has only recently passed, the claims analysis process is in its preliminary stages.

### H. Causes of Action and Avoidance Claims

The Chapter 11 Trustee and the Creditors Committee are investigating whether any meritorious Causes of Action exist for the recovery of preferential or fraudulent transfers or other actions commenced pursuant to the avoiding powers of the Bankruptcy Code, including Sections 544 through 551 of the Bankruptcy Code (collectively, the "Avoidance Actions"). The potential Avoidance Actions being investigated by the Chapter 11 Trustee include, but are not limited to, potential claims against certain customers who received partial or full redemptions of their accounts prior to the Petition Date. The investigation regarding the Avoidance Actions is ongoing, and the fact that a complaint or demand has not yet been made with respect to any particular transfer or transaction is not and must not be deemed to be any admission, concession, or other evidence that a meritorious cause of action does not exist.

As is to be expected with all litigation, any attempt by the Chapter 11 Trustee or the Estate to file Avoidance Actions against Citadel-Beneficiary Customers who choose to not become Electing Holders would likely be met by significant defenses. Among other things, the Citadel-Beneficiary Customers would likely argue that (a) the Citadel Sale Distributions and the SEG 1 Special Distributions were not transfers of property of the Estate and, therefore, are not avoidable by the Chapter 11 Trustee; and (b) the Citadel Sale Distributions are not recoverable under section 549 of the Bankruptcy Code because they were "authorized" by the Bankruptcy Court and Judge Kennelly. With respect to other Avoidance Actions concerning transfers made prior to the "no redemption" letter issued on August 13, 2007, recipients of such potentially preferential transfers would likely assert "ordinary course of business" defenses under section 547(c)(2) of the Bankruptcy Code.

In addition, the Chapter 11 Trustee is investigating additional potential claims and causes of action that may be brought on behalf of the Debtor's estate. The potential claims and causes being investigated by the Chapter 11 Trustee include, but are not limited to: (i) potential claims against Citadel relating to the purchase price paid by Citadel for the Citadel Securities, which the Chapter 11 Trustee believes to have been inadequate; (ii) potential claims against certain repo counterparties arising from the manner in which repo securities were liquidated and the proceeds used to satisfy the Debtor's obligations under repo agreements; and (iii) potential claims against sellers of securities to Sentinel. The Chapter 11 Trustee's investigation regarding potential claims and causes of action is ongoing, and the fact that a complaint or demand has not yet been made with respect to any particular transfer or transaction, or the fact that a potential claim is not listed in the preceding sentence, is not and must not be deemed to be any admission, concession, or other evidence that a meritorious cause of action does not exist.

In the event the proposed Plan is confirmed, on the Plan's Effective Date, the Liquidation Trustee, in consultation with the Liquidation Trust Committee, will take over the investigation and prosecution of any litigation. As provided for in the Plan, the Liquidation Trustee may consider a Claim held by any recipient of such preferential or fraudulent transfer Disputed, in his sole discretion, prior to the expiration of the deadline

to object to, or seek subordination of, such Claim or Equity Interest under the Plan, unless otherwise ordered by the Court.

**I.      Adversary Proceedings**

**1.      Insider Complaint (*Grede v. Bloom*, Adv. Pro. 07-00981 (Bankr. N.D. Ill. Oct. 11, 2007))**

On October 11, 2007, the Chapter 11 Trustee filed a complaint (the "Insider Complaint") in the Bankruptcy Court, commencing an adversary proceeding against Philip Bloom, the Chairman of the Board of Directors of Sentinel; Eric Bloom, the President and Chief Executive Officer of Sentinel, a director, and shareholder; and Charles Mosley, a director of Sentinel, its Senior Vice President, and head trader (collectively, the "Defendant Insiders") and related companies, trusts and investment vehicles under their control which the Chapter 11 Trustee asserts they used to funnel away profits unlawfully from Sentinel. The Insider Complaint alleges that the Defendant Insiders engaged in extensive breaches of fiduciary duty and wrongdoing against Sentinel and its Customers. As set forth in the Insider Complaint, despite representations that Sentinel would invest client property in securities of a low-risk, highly-liquid nature, observing requirements that client funds be segregated from any non-client funds or between other segregated customer portfolios, the Defendant Insiders utilized a risky leveraged trading strategy and commingled and misused client funds for their own financial gain, employing a pattern of deception and lies.

On October 25, 2007, the Bankruptcy Court entered an order granting the Chapter 11 Trustee's motion for preliminary injunction restraining the disposition of certain assets held by or for the benefit of the Defendant Insiders pending the litigation of the claims against the Defendant Insiders. The Defendant Insiders filed motions to dismiss the Insider Complaint, and the Chapter 11 Trustee filed a response. On February 28, 2008 the Bankruptcy Court entered orders denying the motions, granting leave to the Defendant Insiders to answer the Insider Complaint by March 31, 2008. Pursuant to subsequent order of the Bankruptcy Court, the deadline by which the Defendant Insiders must answer the Insider Complaint was further extended.

On June 9, 2008, the Bankruptcy Court approved a settlement (the "Settlement") by and among the Chapter 11 Trustee and Philip M. Bloom, the Philip M. Bloom Revocable Trust, the Sybil Bloom Revocable Trust, the Philip Bloom Remainder Trust, the Philip M. Bloom Grantor Annuity Trust, Eric A. Bloom, Sentinel Investment Group, Inc., Sentinel Financial Services, Inc., Sentinel Management International, Ltd., Fountainhead Investments, Inc., EB Trust 2005 and Eric A. Bloom Living Trust (the "Settling Defendant Insiders"). Under the Settlement, the Settling Defendant Insiders are to pay to the Estate essentially all of their assets, other than assets which they assert are exempt under applicable state or federal law, and the Trustee has agreed to settle all claims between the Debtor's estate and the Settling Defendant Insiders. Under the Settlement, the Settling Defendant Insiders would (a) pay to the Trustee Ten Million Seven Hundred Thousand Dollars ($10,700,000.00) (the "Settlement Payment"), inclusive of amounts held in escrow pursuant to order of the Court; (b) stipulate to the

19

disallowance of any claims filed by the Settling Defendant Insiders against the Estate; (c) agree not to challenge bankruptcy proceedings by or against Sentinel Investment Group ("SIG"), the Debtor's parent company, and waive all claims or rights to any tax refund due to SIG; and (d) release all of their claims against the Debtor, its estate and the Trustee. In exchange, under the Settlement the Trustee would release on behalf of himself and the Debtor's estate all claims against Philip M. Bloom, the Philip M. Bloom Revocable Trust, the Sybil Bloom Revocable Trust, the Philip Bloom Remainder Trust, the Philip M. Bloom Grantor Annuity Trust, Eric A. Bloom, Fountainhead Investments, Inc., EB Trust 2005, Sentinel Financial Services, Inc. and Eric A. Bloom Living Trust, as well as any claims against Sybil Bloom (Philip M. Bloom's spouse) (the "Estate Releasees"). In addition, as a condition precedent to settlement, the Trustee has obtained a contribution bar order permanently barring, enjoining, and restraining third parties from commencing, prosecuting, or asserting any request, claim, or cause of action for or otherwise seeking contribution or common law indemnification, however denominated, against any of the Estate Releasees based upon, relating to, or arising out of (i) any claims asserted or judgments obtained against the third parties by the Trustee or the estate, or amounts actually paid by the third Parties to the Trustee or the estate based on such claims or judgments, whether by settlement or otherwise, and/or (ii) the costs of defending against claims, causes of action, demands, or requests asserted or made by the Trustee; the contribution bar order provides for a *pro tanto* reduction, by the amount of the Settlement Payment, of any monetary award or judgment obtained by the Trustee from or against any third party for the same injuries alleged in the Insider Complaint, for which contribution or common law indemnification is available from the Settling Defendant Insiders. The Trustee also has obtained a court order permanently barring, enjoining, and restraining all Creditors of the estate from commencing, prosecuting, or asserting any estate claims released by the Trustee, and has agreed to take certain actions with respect to any pending or future lawsuits asserting claims against the Estate Releasees.

The Settlement does not apply to Defendant Insider Charles Mosley, and the date by which he must answer the Insider Complaint has been extended until June 16, 2008.

## 2.    BONY Adversary Proceedings

On March 3, 2008, the Chapter 11 Trustee filed a complaint (the "BONY Complaint"), *Grede v. The Bank of New York*, Adv. Pro. 08-00127 (Bankr. N.D. Ill. March 3, 2008), in the Bankruptcy Court, alleging that BONY engaged in misconduct in each of its three roles in relation to Sentinel that led to the collapse of Sentinel's business: custodian of securities on behalf of Sentinel and its Customers, clearing agent for Sentinel's securities transactions, and lender to Sentinel. Specifically, the BONY Complaint alleges that (i) BONY established a fundamentally flawed account structure for Sentinel's accounts which commingled Customer assets that should have been segregated and pledged Customer assets as security for BONY's loan to Sentinel in violation of its obligations under federal law and its duties to Sentinel; (ii) BONY aided and abetted breaches of fiduciary duty committed by certain Defendant Insiders; (iii) BONY knowingly accepted fraudulent and preferential transfers as part of the

Defendant Insiders' scheme; and (iv) BONY engaged in inequitable conduct. BONY filed a motion extending its time to respond to the BONY Complaint.

Three days prior to the Chapter 11 Trustee's filing of the BONY Complaint, on February 28, 2008, BONY filed a complaint (the "Declaratory Judgment Complaint"), *The Bank of New York v. Grede*, Adv. Pro. 08-00119 (Bankr. N.D. Ill. February 28, 2008), against the Chapter 11 Trustee seeking a declaratory judgment that BONY has a valid, first-priority, perfected security interest in and lien upon the cash and securities held in certain accounts established and maintained for Sentinel by BONY, which secure loans and other extensions of credit to Sentinel by BONY. On March 14, 2008 the Chapter 11 Trustee filed a motion to dismiss the Declaratory Judgment Complaint, asserting that BONY had filed the Declaratory Judgment Complaint as an anticipatory suit that served no legitimate purpose as the BONY Complaint is a substantive suit that encompasses all of the issues in dispute between the parties. On April 22, 2008, the Bankruptcy Court, after holding a hearing on the matter, entered an order dismissing the Declaratory Judgment Complaint.

On May 2, 2008, BONY filed (i) a motion to dismiss the BONY Complaint and (ii) a motion to withdraw the reference. The Chapter 11 Trustee's response to BONY's motion to dismiss was filed on May 23, 2008 and BONY's reply was filed on June 6, 2008.

BONY's motion to dismiss sought dismissal of the BONY Complaint based on, among other things, the CEA's and CFTC rules' alleged inapplicability to Sentinel and BONY, the CEA's and the Investment Adviser Act's lack of private rights of action, BONY's assertion that BONY's conduct was not the cause of Sentinel's customers' losses, the protections that Article 8 of the Uniform Commercial Code BONY asserts it is afforded, and BONY's position that the Chapter 11 Trustee is barred from asserting an aiding and abetting claim against a third-party in instances where the alleged conduct was done with the cooperation of certain of Sentinel's management. In addition, BONY asserts that each of the Chapter 11 Trustee's claims should be dismissed for failure to state a claim upon which relief may be granted. On June 10, 2008, the Bankruptcy Court denied BONY's motion to dismiss the BONY Complaint.

BONY's motion to withdraw the reference has been assigned to the Honorable James B. Zagel, and no briefing schedule on that motion has been set by the Court or agreed to by the parties. The Chapter 11 Trustee opposes withdrawal of the reference.

On May 16, 2008, the Chapter 11 Trustee filed a motion to have this case reassigned from Judge Zagel to Judge Kocoras, before whom the SEC action against Sentinel (See Section J. below) is pending. On May 28, 2008, Judge Kocoras denied the motion to reassign without prejudice, pending Judge Zagel's ruling on BONY's motion to withdraw the reference.

The Chapter 11 Trustee is claiming damages in excess of $500 million in the BONY Complaint. The pending BONY adversary proceeding is in its initial stages and the ultimate relief and recovery, if any, for the Estate is unknown at the present time.

### 3. M&P Complaint (*Grede v. McGladrey & Pullen LLP*, Adv. Pro. 08-00167 (Bankr. N.D. Ill. March 20, 2008))

On March 20, 2008, the Chapter 11 Trustee filed a complaint (the "M&P Complaint") in the Bankruptcy Court, commencing an adversary proceeding against McGladrey & Pullen LLP ("M&P") and G. Victor Johnson, one of M&P's partners. M&P or its predecessors served as Sentinel's independent auditors for several years, and audited Sentinel's financial statements for the year ended December 31, 2006 (the "2006 Audit").

The M&P Complaint alleges that M&P's 2006 Audit failed to satisfy the most basic standards of accounting and auditing, ignored blatant violations of federal law being committed by the Defendant Insiders, and failed to fulfill its legal duty to report such violations to Sentinel's regulators. In addition, the M&P Complaint alleges that M&P issued an unqualified audit opinion that Sentinel's financial statements fairly presented its financial condition, when it knew that those statements materially misstated the facts and obfuscated violations of federal regulations critical to the protection of Sentinel's investors. The M&P Complaint also alleges that M&P and Johnson aided and abetted breaches of fiduciary duty committed by certain Defendant Insiders.

On April 16, 2008, M&P and Johnson filed a motion to withdraw the reference to the Bankruptcy Court, seeking to have the case adjudicated by the District Court for the Northern District of Illinois. The motion to withdraw the reference was assigned to the Honorable James B. Zagel. The Chapter 11 Trustee filed his response to M&P and Johnson's motion to withdraw the reference on May 29, 2008. Judge Zagel has set a hearing on that motion for July 23, 2008. The Chapter 11 Trustee opposes withdrawal of the reference at this time.

In order to promote judicial economy and preserve the resources of the estate, the Chapter 11 Trustee has moved to have this case reassigned from Judge Zagel to Judge Kocoras, before whom the SEC action against Sentinel (See Section J. below) is pending. The CFTC has also filed a complaint against Sentinel, Eric Bloom, and Charles Mosley (See Section J. below), and has moved to have its case reassigned to Judge Kocoras as well. Briefing on the Chapter 11 Trustee's and CFTC's motions for reassignment to Judge Kocoras is complete.

On May 21, 2008, M&P and Johnson filed a motion to dismiss or in the alternative to strike allegations from the M&P Complaint. The Chapter 11 Trustee's response to M&P and Johnson's motion to dismiss or in the alternative to strike is due on June 25, 2008. The Bankruptcy Court is to hold a status hearing in this case on August 12, 2008.

The Chapter 11 Trustee is claiming damages in excess of $500 million in the M&P Complaint. The adversary proceeding against M&P and Johnson is in its initial stages, and the ultimate relief and recovery, if any, for the Estate is unknown at the present time.

**4.**     **SEG 1 Complaint (*FC Stone LLC, et al. v. Grede*, Adv. Pro. 08-00445 (Bankr. N.D. Ill. June 9, 2008))**

On June 9, 2008, certain SEG 1 Customers filed an adversary complaint (the "SEG 1 Complaint") against the Chapter 11 Trustee related to the "property of the estate issue," seeking a declaration that any and all transfers made by the Debtor to the Plaintiffs on or after the date that was 90 days before the Petition Date (including the Citadel Sale Distributions and the SEG 1 Special Distributions) were transfers of the Plaintiffs' property and not transfers of property of the Debtor's estate under Section 541 of the Bankruptcy Code. The complaint also seeks a declaration that at least $40 million in securities and other assets held by the Chapter 11 Trustee in accounts denominated as SEG 1 is not property of the Estate under Section 541 of the Bankruptcy Code and should be returned to the SEG 1 Customers.

Specifically, the SEG 1 Complaint alleges that Sentinel was statutorily and contractually prevented from having any interest in the assets of its SEG 1 Customers and, as such, those assets are not property of Sentinal's Estate under Section 541 of the Bankruptcy Code. The SEG 1 Complaint also alleges that the SEG 1 Customers can adequately identify and trace such assets held by Sentinel and that such assets are held in trust by Sentinel for the SEG 1 Customers. It is the position of these SEG 1 Customers that the available evidence suggests that all or substantially all of the securities of the SEG 1 Customers can be traced, by CUSIP number, in the hands of Sentinel on all relevant dates, such that even if the Debtor engaged in commingling, as the Chapter 11 Trustee has alleged, such commingling would not prevent tracing of the SEG 1 Customers' assets, and such assets are not property of the Debtor's estate.

The Plan Proponents disagree with the positions taken by such SEG 1 Customers.

**J.**     **Other Related Litigation**

In addition to adversary proceedings filed in connection with the Chapter 11 Case, there are several other pending lawsuits involving the Debtor's business and the Defendant Insiders, which include:

**1.**     **Class Action Complaints**

On September 10, 2007, Henry Shatkin, a Customer of Sentinel, filed a complaint (the "Class Action Complaint"), *Shatkin v. Bloom*, Case No. 07CV5076 (N.D. Ill. Sept. 10, 2007), in the District Court for the Northern District of Illinois on behalf of all Customers of Sentinel who had assets managed by Sentinel (the "Class"), against the Defendant Insiders and certain other officers of Sentinel alleging misconduct causing hundreds of millions of dollars of assets belonging to the Class to be missing. On

23

February 27, 2008, pursuant to an order of the District Court, the parties to the Class Action Complaint filed a joint discovery schedule stating that given the discovery stay in place due to the Chapter 11 Case, and pending factors whereby the plaintiff might obtain relief from the stay, the parties agreed that the plaintiff may serve document discovery requests on the defendants beginning on May 1, 2008 and the parties believe that depositions should commence on December 1, 2008. On May 8, 2008, the Chapter 11 Trustee filed a Complaint for Injunctive Relief and a Motion for Preliminary Injunction, seeking to preliminarily enjoin the Class from prosecuting the Class Action Complaint until confirmation of a plan of liquidation for the Debtor. On May 29, 2008, this Court held an evidentiary hearing on the Motion, and on June 10, 2008 entered an Amended Consent Order and Injunction granting the relief sought in the motion.

Similarly, on September 10, 2007, Henry Shatkin filed a complaint (the "Class Action BONY Complaint"), *Shatkin v. The Bank of New York*, Case No. 07CV7928 (S.D.N.Y. Sept. 10, 2007), in the District Court for the Southern District of New York on behalf of the Class, commencing an adversary proceeding against BONY in its capacity as custodian of the Class's assets alleging misconduct with respect to safeguarding of the assets, causing hundreds of millions of dollars of assets belonging to the Class to be missing. BONY informed the District Court at a pre-motion conference that it would file a motion to dismiss the Class Action BONY Complaint. On January 29, 2008, the District Court set a briefing schedule for BONY's motion to dismiss, whereby briefing would be complete by April 14, 2008, and ordered that all discovery is stayed pending the outcome of the motion(s). On February 29, 2008, BONY filed its motion to dismiss, or alternatively to stay, the Class Action BONY Complaint. The District Court has not yet ruled on BONY's motion and oral argument is scheduled for June 17, 2008.

## 2. SEC Complaint (*SEC v. Sentinel Management Group, Inc.*, Case No. 07CV4684 (N.D. Ill. Aug. 20, 2007))

On August 20, 2007, the SEC filed a complaint (the "SEC Complaint") in the District Court for the Northern District of Illinois against Sentinel alleging violations of Sections 206(1), 206(2) and 206(4) of the Investment Advisers Act and violations of SEC Rule 206(4)-2 as a result of the "commingling and transferring [of] client funds and securities between the various client segregated accounts and between client accounts and a 'house' account" and the pledging of those assets "as collateral in order to obtain a line of credit from the Bank of New York" as well as additional leveraged financing. That same day, the SEC filed the Emergency Motion and the District Court entered an emergency order granting the Emergency Motion with respect to certain relief requested but denied the SEC's request to prohibit the distribution of the Citadel Proceeds to the Citadel-Beneficiary Customers.

On September 24, 2007, pursuant to an agreed order between the parties in lieu of a hearing to show cause, the District Court entered an order superseding the August 20, 2007 emergency order, which granted the prior relief and additionally preliminarily enjoined Sentinel and its directors and officers from taking actions in violation of Federal securities laws, while providing that nothing in the order constrained

24

the Chapter 11 Trustee's powers in the Chapter 11 Case with respect to the assets held by Sentinel. The next status hearing in the case is scheduled for June 17, 2008.

### 3. CFTC Complaint (*CFTC v. Sentinel Management Group, Inc. et al.*, Case No. 08CV2410 (N.D. Ill. Apr. 28, 2008))

On April 28, 2008, the CFTC filed a civil action against Sentinel, Eric Bloom, and Charles Mosley, which is currently pending in the District Court for the Northern District of Illinois before the Honorable Milton Shadur. In its Complaint, the CFTC alleges that Sentinel violated: (1) Section 4b(a)(2)(i) of the Commodity Exchange Act ("CEA") by "removing Seg 1 assets from segregation and misappropriating them for use as collateral for its loan with BONY;" (2) Section 4d(a)(2) of the CEA and CFTC Regulations 1.20, 1.22, and 1.23 by "commingling Seg 1 customer funds with those of Sentinel and others; using those Seg 1 customer funds to secure the BONY loan of Sentinel; failing to treat, deal with, and account for Seg 1 customer funds as belonging to the customer; and withdrawing customer segregated funds beyond Sentinel's actual interest therein;" (3) Section 4d(b) of the CEA by using "Seg 1 customer funds to secure the BONY loan of Sentinel;" and (4) Section 4g(a) and 6(c) of the CEA and CFTC Regulation 1.10 by "filing with the Commission at least 23 Form 1-FRs that falsely reported that Sentinel owned no securities purchased under resale agreements and had no amounts payable" to BONY.

The CFTC alleges that with respect to each of those violations, Eric Bloom "directly and indirectly controlled Sentinel and its employees, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations" and that Charles Mosley willfully aided and abetted some of the violations.

In its request for relief, the CFTC seeks injunctive relief, restitution to every customer whose funds were lost as a result of the statutory and regulatory violations and civil monetary penalties against Bloom and Mosley equaling the higher of triple the monetary gain to them or $130,000 for each violation.

On May 8, 2008, the CFTC filed a motion to have its case reassigned as a related case to Judge Kocoras. Briefing on that motion is complete and the parties are awaiting a ruling from Judge Kocoras.

On May 27, 2008, the Chapter 11 Trustee filed an agreed motion for an extension of time to answer the CFTC's complaint, seeking an extension until June 27, 2008 to answer or otherwise respond. The court granted the motion for extension on May 28, 2008.

### K. Sentinel's Pension Plan

The Debtor maintained a defined benefit pension plan for certain of its employees called the Sentinel Management Group, Inc. Defined Benefit Pension Plan (the "Pension Plan"). The Pension Plan is covered by the plan termination insurance program established by Title IV of the Employee Retirement Income Security Act of

25

1974 ("ERISA"), as amended, 29 U.S.C. §§ 1301-1461. Title IV is administered by the Pension Benefit Guaranty Corporation ("PBGC"), a government agency.

On April 28, 2008, the Chapter 11 Trustee filed a Motion to Terminate Debtor's Pension Plan and for Related Relief. Under the Bankruptcy Court's Amended Order Authorizing Trustee to Terminate Debtor's Pension Plan And For Related Relief (the "Pension Plan Order"), the Bankruptcy Court authorized the Chapter 11 Trustee to take the necessary steps to terminate the Pension Plan in a standard termination under section 4041(b) of ERISA, 29 U.S.C. § 1341(b). A standard termination can occur if a pension plan has sufficient assets to cover benefit liabilities under the pension plan. The Debtor's actuary has advised that the Pension Plan's assets exceed benefit liabilities by $268,000 as of December 31, 2007. Pension Plan participants were notified of the intent to terminate the Pension Plan on November 1, 2007, with a proposed termination date of December 31, 2007.

In the event of a standard termination of the Pension Plan, PBGC will timely review the determination of the Pension Plan's enrolled actuary as to the sufficiency of the Pension Plan, including all actuarial assumptions and calculations relating to benefit determinations.

On February 26, 2008, PBGC filed unliquidated priority Claims for unfunded benefit liabilities, under 29 U.S.C. § 1362(b), unpaid contributions under 29 U.S.C. § 1362(c), and unpaid premiums under 29 U.S.C. § 1307, with respect to the Pension Plan. If the Chapter 11 Trustee or Liquidation Trustee, as applicable, completes a standard termination of the Pension Plan in accordance with all applicable law and regulations, PBGC will have no claims against the Debtor with respect to the termination of the Pension Plan. The Chapter 11 Trustee or Liquidation Trustee, as applicable, and PBGC expect to have additional discussions with regard to the timing and completion of a standard termination and any related audit. PBGC may request that a reserve amount for pension liabilities be retained by the Liquidation Trust pending completion of the standard termination of the Pension Plan and any related audit.

## L.    Competing Plan by Certain Citadel-Beneficiary Customers

On June 3, 2008, certain Citadel-Beneficiary Customers filed a competing plan of liquidation [Docket No. 533]. The Bankruptcy Court has not set a hearing on the adequacy of the proposed disclosure statement related thereto [Docket No. 539]. The Bankruptcy Court has indicated that it will not consider the competing plan until after the hearing on confirmation of this Plan.

## VI.

## SUMMARY OF THE PLAN

### A.    Introduction

The primary objectives of the Plan are to (a) maximize the value of the ultimate recoveries to creditor groups on a fair and equitable basis and (b) settle, compromise or otherwise dispose of certain Claims and Equity Interests on terms that the Plan Proponents believe to be fair and reasonable and in the best interests of the Estate and Sentinel's Customers and other Creditors. The Plan provides for the liquidation of the Debtor's assets and the distribution of such assets in an orderly manner to Creditors.

The cornerstone of the Plan is a series of interdependent settlements and compromises (the "Settlements") of various inter-creditor disputes (the "Disputes"). The Settlements, which are the product of protracted negotiations between and among various constituencies, represented by the Creditors Committee and its legal professionals, are designed to achieve a global, consensual resolution without litigation of issues which arose in the Chapter 11 Case. The Creditors Committee believes that settlement of the Disputes is the best way to ensure a prompt and fair resolution of the Chapter 11 Case. Although litigation could produce somewhat different absolute and relative recoveries from those embodied in the Plan, the Creditors Committee believes that such litigation would be extraordinarily expensive and would not be finally resolved for years, thus delaying and potentially materially reducing distributions to all creditors. Moreover, the Creditors Committee believes that the recoveries provided under the Plan to Holders of Class 3 Customer Claims and Class 4 General Unsecured Claims are substantially higher than the lowest point in the range of reasonable litigation outcomes in the absence of the Settlements. The Settlements have paved the way for the Plan, which the Plan Proponents believe will enable maximum distributions to all of the Debtor's Creditors, without the cost and delay of litigation.

The Disputes being resolved by the Settlements include, among others:

### 1.    Property of the Estate

A recurring theme in the Chapter 11 Case that affects all Creditors of Sentinel is whether property that was supposed to be held for Customers constitutes "property of the estate" as defined in the Bankruptcy Code. This is important because, among other things, in certain circumstances only Property of the Estate would be recoverable by the Estate from targets of litigation for the ratable benefit of similarly situated Creditors. Indeed, this issue has been raised as a defense to certain Causes of Actions brought by the Chapter 11 Trustee, including the Insiders and BONY, as well as potential targets of significant Avoidance Actions. Moreover, even if the Bankruptcy Court were to determine that certain property was not Property of the Estate, a significant dispute would still exist as to whether that property should be distributed *pro rata* among customers. In connection with formulation of the Plan, the property of the estate issue was central to forging a compromise over the propriety of the Citadel Sale Distributions

27

that were disbursed to SEG 1 Customers on or about the Petition Date. The following questions have been considered by the Plan Proponents in connection with formulation of the Plan, and their resolution is embedded therein:

> (a)   Whether the Citadel Sale Distributions were transfers of Property of the Estate or merely a return of SEG 1 Customers' own property;

> (b)   Whether the Citadel Sale Distributions were in fact "authorized" by the Bankruptcy Court at all;

> (c)   If such authorization was obtained, whether the Bankruptcy Court was provided with inaccurate or incomplete evidence upon which to grant such authorization; and

> (d)   If such authorization was not obtained, whether the Citadel Sale Distributions are avoidable pursuant to Section 549 of the Bankruptcy Code.

The Chapter 11 Trustee, together with his legal and financial professionals, have expended substantial resources investigating Sentinel's business and the way in which Customer deposits and fractional interests in securities were maintained by the Debtor. As set forth in the Insider Complaint, the BONY Complaint, and the M&P Complaint, see Section V.I., and as described in Section IV. above, the Chapter 11 Trustee has concluded that certain Sentinel insiders engaged in extensive breaches of fiduciary duty and wrongdoing against Sentinel and its Customers where property intended to be held in a custodial capacity was instead commingled among all Customers' property, and with the Insiders' own property, and was pledged to or converted by BONY, notwithstanding Sentinel's and BONY's duties to the contrary. The Chapter 11 Trustee has concluded further that securities were allocated to customer accounts without regard to whether they were available for customers (i.e. had been pledged as collateral for the BONY Loan). Moreover, as a result of the forensic examination undertaken by the Chapter 11 Trustee and his professionals, the Plan Proponents believe that interest paid to Customers or accrued for their benefit prior to the Petition Date did not correlate to specific property purportedly held in specific Customer accounts. Rather, the Insiders manipulated Customer property for their own personal gain, and the Chapter 11 Trustee believes BONY similarly accepted Customer property as collateral for the loans, even though the Chapter 11 Trustee believes BONY should have held such property segregated for Customers. BONY disputes that it had any independent obligation not to accept such Customer property as collateral for the loans or to keep such property segregated and asserts that it was entitled to rely on Sentinel's representations that it could pledge such collateral to BONY.

Certain Customers do not accept the Plan Proponents' position that the assets of certain Customers who invested in SEG 1 are not traceable and that even if commingling and misuse occurred, the Bankruptcy Court can trace their particular securities so as to preserve the benefits of segregation they bargained for. However, as a

result of the manner in which certain Sentinel insiders misused and diverted Customer funds from the very first day funds were deposited by Customers, allocated securities to Customers' SEGs without regard to whether the securities actually were segregated for the benefit of the Customers, reported fictitious cost basis and interest on Customer statements, and engaged in mass transfers of securities to and from SEG accounts during June through August 2007 to the detriment of one group of Customers over another, the Chapter 11 Trustee does not believe that any tracing rules can or should apply. Moreover, based upon his extensive investigation conducted with his retained professionals, the Chapter 11 Trustee has concluded even if the Bankruptcy Court were to apply tracing rules to specific securities from a certain potentially arbitrary date, certain Customers, and in particular the Customers that were the beneficiaries of the August 15, 2007 redemptions or were recipients of the Citadel Sale Distributions, have already received more than that to which they would be entitled if tracing rules were to be applied on such a limited basis.

Certain SEG 1 Customers believe that the Plan is unconfirmable because it provides for the distribution of certain assets contained in accounts denominated as SEG 1 which certain SEG 1 Customers believe are not property of the Estate under section 541 of the Bankruptcy Code pursuant to the CEA, related CFTC regulations, and the Investment Agreements. In addition, certain SEG 1 Customers believe that the Plan's attempt to use such assets is procedurally defective because the Plan Proponents, in their belief that such property is Estate property, have not filed an adversary proceeding to determine the extent of any ownership interest in such assets as certain SEG 1 Customers believe is required by Bankruptcy Rule 7001(2).

The Plan acknowledges the promises made by Sentinel to segregate and protect Customers' custodial property, but also recognizes the Chapter 11 Trustee's assertion of the facts of commingling of such property by certain Sentinel insiders. In the face of such commingling, and the Plan Proponents' belief that tracing cannot apply as both a legal and practical matter, the Chapter 11 Trustee believes a *pro rata* distribution of Remaining Assets is fair. Similarly, the Plan Proponents believe that the Citadel Securities and the Cash used to fund the SEG 1 Special Distribution were commingled and misused just like other custodial property generally, and cannot fairly be allocated to one or more Customer groups. The Plan does not, however, require a finding in this regard as a condition to confirmation. Rather, the Plan proposes a settlement offer to all Citadel-Beneficiary Customers in the hope of avoiding inter-Customer litigation. To the extent any Citadel-Beneficiary Customer refuses to accept the offer, the Plan reserves litigation over the Citadel Sale Distributions for another day. The Plan Proponents believe that Citadel-Beneficiary Customers should enter into the settlement embodied in the Plan so as to realize certainty as to any potential Estate liability arising out of their receipt of Citadel Sale Distributions and SEG 1 Special Distributions. This certainty, in combination with the potential for receiving a release in exchange for no contribution to the Estate constitute the primary consideration offered to Citadel-Beneficiary Customers by the settlement.

Notwithstanding the fact that the settlement embodied in the Plan was negotiated by and agreed upon by all of the NonCitadel-Beneficiary Customers and a

29

Citadel-Beneficiary Customer serving on the Creditors' Committee, and is supported by both the Creditors' Committee and the Chapter 11 Trustee, a group of Citadel-Beneficiary Customers believe that the settlement embodied in the Plan is not an equitable resolution of the disputes between Citadel-Beneficiary Customers and Non-Citadel Beneficiary Customers. Such Customers do not see the settlement as an attractive alternative to litigation.

2. **Stockbroker Liquidation**The Creditors Committee believes that the stockbroker liquidation provisions of the Bankruptcy Code may be applicable to Sentinel. The basis for the Creditors Committee's position is notwithstanding that Sentinel may not have held itself out as a "stockbroker" in the commonly understood sense, Sentinel in fact operated in a way that could bring it within the definition set forth in Section 101(53A) of the Bankruptcy Code. Section 101(53A) of the Bankruptcy Code defines the term "stockbroker" as a debtor that meets two criteria: (a) the debtor must have "customers"; and (b) the debtor must be engaged in the business of "effecting transactions in securities – for the account of others; or with members of the general public, from or for such person's own account." The term "customer" is defined under Section 741 of the Bankruptcy Code in three ways. First, a person or entity is a customer if securities are received, acquired, or held by the debtor in the ordinary course of the debtor's business for safekeeping, with a view to sale, to cover a consummated sale, pursuant to a purchase, as collateral under a security agreement, or for the purpose of effecting registration or transfer. Second, a person or entity is a customer if it has a claim against the debtor arising out of a sale of a security held pursuant to Section 741(2)(A). Third, and most importantly for the Plan's purposes, a person or entity is a customer if it deposited cash, a security, or other property with the debtor for the purpose of buying or selling a security. Moreover, a person effects transactions if he or she participates in securities transactions at key points in the chain of distribution as did Sentinel.

If Sentinel were liquidated as a stockbroker under Subchapter III, one of the central issues regarding property of the estate would be rendered moot, because all such property deposited by or held for Customers would be pooled and distributed ratably as "customer property."

The Plan Proponents acknowledge that certain SEG 1 Customers disagree that Sentinel should be considered to be a "stockbroker" and that Subchapter III should not apply to the Debtor. The position of such SEG 1 Customers is based upon their belief that a bankruptcy court would not consider Sentinel a "broker" or a "dealer" and therefore not a "stockbroker." This issue of whether Sentinel would qualify for Subchapter III would be a very fact-intensive one, and rather than attempt to litigate the issue of whether Sentinel qualifies as a stockbroker, which would undoubtedly be an expensive and protracted effort, the Plan Proponents devised the Plan to incorporate certain salient features of Subchapter III, while retaining the asset-maximizing benefit of Chapter 11, as an inextricable part of the global compromise and settlement embodied by the Plan.

3. **Claim Calculation**The Plan Proponents are cognizant of the fact that there are different methods for calculating investors' claims where such investors

were the victims of gross misconduct. Rather than leave the matter to be litigated between parties fighting to establish a methodology which would best serve their individual interests, the Plan Proponents believe the Plan provides for the most equitable treatment obtainable for all of Sentinel's Customers. The Plan Proponents believe that, given the extensive breaches of fiduciary duty and wrongdoing that certain insiders of the Debtor have effected upon Sentinel and all Customers, accounting for Customers' Claims as a Customer's "net investment" (cash deposits less cash withdrawals), and not as a Customer's "net equity" (hypothetical liquidation value of the securities allocated to a Customer by Sentinel), is not only the most equitable approach, but the one supported by applicable law under analogous circumstances. Incidentally, as tested by the Plan Proponents over the three and a half year period of time preceding the Petition Date, the notional value that Sentinel reported to Sentinel's Customers on its monthly account statements closely approximated Customers' "net investment" Claim measured over the same period. This is primarily due to the fact that Sentinel's Customers' accounts, as reported to them, never lost money and were allocated a fixed level of monthly interest. Given the proximity of the amount reported to Customers by Sentinel on their customer statements to their actual "net investment" (when provision is made for time value of money), and due to the unreliable and incomplete nature of Sentinel's books and records (which would obfuscate any attempt to arrive at a perfectly accurate measurement of "net investment"), the Plan Proponents believe that the amount reported by Sentinel on Customers' account statement is in fact the most efficient, equitable method to calculate Customer Claims. By providing for the methodology of Claims as an inextricable part of the global compromise and settlement embodied in the Plan, the Estate avoids costly litigation of the matter.

### 4. Basis for Compromise

While various members of the Creditors Committee and the Chapter 11 Trustee have differing views over the relative strengths and weaknesses of the claims and potential defenses involved in the Disputes and, accordingly, disagree as to how those claims and defenses would fare if litigated to final judgment, they do agree that resolution of the Disputes is crucial to confirmation of any plan and that resolution through litigation would result in substantial delay and expense, to the detriment of all stakeholders. The proposed treatment for the various Classes, which reflects the compromises and settlements embodied in the Plan, gives due consideration to the strengths and weaknesses of the parties' potential litigation positions, and the Plan Proponents assert that the distribution to any particular Creditor is no better than the best possible judicial determination in favor of such Creditor and no worse than the worst possible outcome that would be achieved if such disputes were resolved by judicial determination. Accordingly, the Creditors Committee believes that the compromises and settlements embodied in the Plan are within the range of likely litigation results.

To approve a compromise or settlement, a court must find that it is fair and equitable and in the best interests of the bankruptcy estates. *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968). In making that determination, a court must consider the probability of success in the litigation; the complexity of the litigation; the expense, inconvenience and delay

31

necessarily attending it; and the paramount interests of the creditors, with a proper deference to their reasonable views. The decision to settle ordinarily is a matter of sound business judgment and, because litigation outcomes cannot be predicted with mathematical precision, only if a settlement falls below the low end of possible litigation outcomes will it fail the reasonable equivalence standard. *In re Doctors Hosp. of Hyde Park, Inc.*, 474 F.3d 421, 426 (7th Cir. 2007).

After careful review of the estimated recoveries under a hypothetical Chapter 7 liquidation scenario, the Plan Proponents have concluded that the recovery to Claimants will be maximized by completing the liquidation of the Debtor under Chapter 11 of the Bankruptcy Code and making distributions pursuant to the Plan.

The Plan is annexed hereto as Exhibit <u>A</u> and forms part of this Disclosure Statement. The summary of the Plan set forth below is qualified in its entirety by reference to the more detailed provisions of the Plan.

The statements contained in the Disclosure Statement include summaries of the provisions contained in the Plan and in documents referred to therein. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statements of such terms and provisions.

The Plan itself and the documents referred to therein control and actual treatment of Claims against and Equity Interests in the Debtor under the Plan will, upon the Effective Date, be binding upon all holders of Claims against and Equity Interests in the Debtor and its Estate, the Liquidation Trustee and other parties in interest. In the event of any conflict between this Disclosure Statement, on the one hand, and the Plan, the Trust Agreement or any other operative document, on the other hand, the terms of the Plan, and such other operative document, as the case may be, are controlling.

**B.     Overall Structure of the Plan**

The Plan Proponents believe that the Plan provides the best and most expeditious recovery to the Debtor's Claim Holders. Under the Plan, Claims against and Equity Interests in the Debtor are divided into different classes. If the Plan is confirmed by the Bankruptcy Court and consummated, on the Initial Distribution Date, and at certain Distribution Dates thereafter as Claims are resolved, liquidated, or estimated, the Liquidation Trustee will distribute Cash in respect of Allowed Claims as provided in the Plan. The Classes of Claims against and Equity Interests in the Debtor created under the Plan, the treatment of those Classes under the Plan, and the distributions to be made under the Plan are described below.

**C.     Classification and Treatment of Administrative Claims, Claims and Equity Interests Under the Plan**

Only administrative expenses, claims and equity interests that are "allowed" may receive distributions under a Chapter 11 plan. An allowed administrative

expense, claim or equity interest simply means that the debtor agrees, or in the event of a dispute, that the court determines, that the administrative expense, claim or equity interest, including the amount, is in fact a valid obligation of the debtor. Section 502(a) of the Bankruptcy Code provides that a timely filed administrative expense, claim or equity interest is automatically Allowed unless the debtor or another party in interest objects. However, Section 502(b) of the Bankruptcy Code specifies certain claims that may not be allowed in a bankruptcy case even if a proof of claim is filed. These include, without limitation, claims that are unenforceable under the governing agreement or applicable non-bankruptcy law, claims for unmatured interest, property tax claims in excess of the debtor's equity in the property, claims for certain services that exceed their reasonable value, lease and employment contract rejection damage claims in excess of specified amounts, and late-filed claims. In addition, Bankruptcy Rule 3003(c)(2) prohibits the allowance of any claim or equity interest that either is not listed on the debtor's schedules or is listed as disputed, contingent, or unliquidated, if the holder has not filed a proof of claim or equity interest before the deadline to file proofs of claim and interests.

The Bankruptcy Code also requires that, for purposes of treatment and voting, a Chapter 11 plan divide the different claims against, and equity interests in, the debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are usually classified together, as are interests of a substantially similar legal nature. Because an entity may hold multiple claims and/or interests which give rise to different legal rights, the holders of such claims and/or interests may find themselves members of multiple classes of claims and/or interests. As a result, under the Plan, for example, a creditor that holds both a Secured Claim and a Customer Claim would have its Secured Claim classified in Class 2 and its Customer Claim classified in Class 3. To the extent of this Holder's Secured Claim, the Holder would be entitled to the voting and treatment rights that the Plan provides with respect to Class 2, and, to the extent of the Holder's Customer Claim, the voting and treatment rights that the Plan provides with respect to Class 3.

Under a Chapter 11 plan, the separate classes of claims and interests must be designated either as "impaired" (altered by the plan in any way) or "unimpaired" (unaltered by the plan). If a class of claims is impaired, the Bankruptcy Code affords certain rights to the holders of such claims, such as the right to vote on the plan (unless the plan provides for no distribution to the holder, in which case, the holder is deemed to reject the plan), and the right to receive an amount under the Chapter 11 plan that is not less than the value that the holder would receive if the debtor were liquidated under Chapter 7. Under Section 1124 of the Bankruptcy Code, a class of claims or interests is impaired unless, with respect to each claim or interest of such class, the plan (i) does not alter the legal, equitable, and contractual rights of the holders of such claims or interests or (ii) irrespective of the holder's right to receive accelerated payment of such claims or interests after the occurrence of a default, cures all defaults (other than those arising from, among other things, the debtor's insolvency or the commencement of a bankruptcy case), reinstates the maturity of the claims or interests in the class, compensates the holders of such claims or interests for any damages incurred as a result of their reasonable reliance upon any acceleration rights, and does not otherwise alter their legal, equitable or

33

contractual rights. Typically, this means that the holder of an unimpaired claim will receive, on the later of the effective date of the plan of reorganization or the date on which amounts owing are due and payable, payment in full, in cash, with postpetition interest to the extent permitted and provided under the governing agreement between the parties (or if there is no agreement, under applicable non-bankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms. Thus, other than the loss of its right to accelerate a debtor's obligations, the holder of an unimpaired claim will be placed in the position it would have been in had the debtor's case not been commenced.

Consistent with these requirements, the Plan divides the Claims against, and Equity Interests in, the Debtor into the following Classes:

| | | |
|---|---|---|
| Unclassified | Administrative Claims | Unimpaired/Paid in full |
| Unclassified | Priority Tax Claims | Unimpaired/Paid in full |
| Class 1 | Other Priority Claims | Unimpaired/Paid in full |
| Class 2 | Secured Claims | Unimpaired/Paid in full (subject to a Bankruptcy Court finding of impairment). |
| Class 3 | Customer Claims | Impaired |
| Class 4 | General Unsecured Claims | Impaired |
| Class 5 | Subordinated Claims | Impaired |
| Class 6 | Equity Interests | Impaired |

For purposes of computing distributions under the Plan, Allowed Claims or Equity Interests do not include postpetition interest unless otherwise specified in the Plan.

### 1. Unclassified — Administrative Claims

Administrative Claims are Claims for costs and expenses of administration of the Chapter 11 Case Allowed under Section 503(b) of the Bankruptcy Code and entitled to priority under Sections 507(a)(1) or 507(b) of the Bankruptcy Code. Such Claims include (i) any actual and necessary costs and expenses of preserving the Estate; (ii) any actual and necessary costs and expenses of operating the Debtor's business; (iii) all compensation and reimbursement of expenses to the extent awarded by the Bankruptcy Court under Sections 330, 331 or 503 of the Bankruptcy Code; and (iv) any fees or charges assessed against the Estate under Section 1930 of Chapter 123 of title 28 of the United States Code.

Except to the extent the Holder of an Allowed Administrative Claim, not including a Professional Fee Claim, agrees otherwise, each Holder of an Allowed Administrative Claim will be paid in respect of such Allowed Claim (a) the full amount thereof in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim, or upon other agreed terms, or (b) such lesser amount as the Holder of an Allowed Administrative Claim and the Chapter 11 Trustee or the Liquidation Trustee, as applicable (each with the prior consent of the Creditors Committee or the Liquidation Trust Committee, as applicable), might otherwise agree.

The Chapter 11 Trustee estimates that there will be $7 million in Administrative Claims.

### 2. Unclassified — Priority Tax Claims

A Priority Tax Claim consists of any Claim of a governmental unit of the kind specified in Sections 502(i) and 507(a)(8) of the Bankruptcy Code. These unsecured Claims are given a statutory priority in right of payment. Each Holder of an Allowed Priority Tax Claim will be paid in respect of such Allowed Claim either (a) the full amount thereof, without post-petition interest or penalty, in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim or upon other agreed terms, or (b) such lesser amount as the holder of an Allowed Priority Tax Claim and the Chapter 11 Trustee or the Liquidation Trustee, as applicable, (each with the prior consent of the Creditors Committee or the Liquidation Trust Committee, as applicable), might otherwise agree.

The Chapter 11 Trustee is unaware of any Priority Tax Claims.

### 3. Class 1 — Other Priority Claims

Other Priority Claims are Claims which are entitled to priority pursuant to Section 507(a) of the Bankruptcy Code — other than Administrative Claims and Priority Tax Claims. Such Claims include (i) unsecured Claims for accrued employee compensation earned within 180 days prior to the commencement of the Chapter 11 Cases to the extent of $10,950 per employee and (ii) contributions to employee benefit plans arising from services rendered within 180 days prior to the commencement of the Chapter 11 Cases, but only for each such plan to the extent of (a) the number of employees covered by such plan multiplied by $10,950, less (b) the aggregate amount paid to such employees from the Estates for wages, salaries or commissions.

Except to the extent that the Chapter 11 Trustee or the Liquidation Trustee, as applicable (each with the prior consent of the Creditors Committee or the Liquidation Trust Committee, as applicable), and a holder of an Allowed Other Priority Claim agree to a different treatment, each holder of an Allowed Other Priority Claim will receive, in full and final satisfaction of such Claim, payment in full in Cash in an amount equal to such Allowed Other Priority Claim on the later of the Initial Distribution Date and the date when such Other Priority Claim becomes an Allowed Other Priority Claim, or as soon thereafter as is practicable. All Allowed Other Priority Claims which are not

35

due and payable on or before the Effective Date will be paid by the Liquidation Trustee in the ordinary course of business in accordance with the terms thereof.

The Chapter 11 Trustee is unaware of any Other Priority Claims.

**4.** **Class 2 — Secured Claims**Secured Claims include Claims that are secured by a Lien on property or interests in property, in which the Debtor has an interest. Such interests are Secured Claims to the extent of (i) the value as of the Effective Date, or such other date as is established by the Bankruptcy Court, of such interest or Lien determined by a Final Order of the Bankruptcy Court pursuant to Section 506 of the Bankruptcy Code; or (ii) as otherwise agreed upon in writing by the Debtor and the holder of such Claim, to the extent reflected in the Schedules or a proof of Claim as a Secured Claim which is secured by a Lien on collateral to the extent of the value of such collateral; (iii) as determined in accordance with Section 506(a) of the Bankruptcy Code; or (iv) in the event that such Claim is subject to setoff under Section 553 of the Bankruptcy Code, to the extent of such setoff.

Except to the extent that the Chapter 11 Trustee or the Liquidation Trustee, as applicable (each with the prior consent of the Creditors Committee or the Liquidation Trust Committee, as applicable), and a holder of an Allowed Secured Claim agree to a different treatment, in full and final satisfaction of such Claim, in the Liquidation Trustee's sole discretion, (i) each Holder of an Allowed Secured Claim will receive Cash in an amount equal to such Allowed Secured Claim in full and complete satisfaction of such Allowed Secured Claim on the later of the Initial Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable, or (ii) each Holder of an Allowed Secured Claim will receive the Collateral securing its Allowed Secured Claim or the proceeds of such Collateral in full and complete satisfaction of such Allowed Secured Claim on the later of the Initial Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable.

The only Secured Claims of which the Chapter 11 Trustee is aware are the Secured Claim asserted by BONY, which as described in Section V.I. above is contested and the subject of a pending adversary proceeding, and the Secured Claims asserted by Cantor, as described in its proof of claim, and which, if allowed, will be paid from the Cantor Escrowed Funds in accordance with the Cantor Turnover Stipulation. Lehman Brothers Inc. and Lehman Commercial Paper Inc. have asserted a $1.4 million secured right of set off, which the Plan Proponents likely will dispute.

**5.** **Class 3—Customer Claims**

Class 3 consists of all Claims arising from Customer deposits with Sentinel (the "Customer Claims"). Each Holder's Class 3 Customer Claim will equal the amount listed as "Net Equity" on such Holder's Customer Account Statements dated August 13, 2007 (or if no such Account Statements were issued, the amount that would have been listed), plus any additional amounts such Holder deposited with Sentinel during the period subsequent to August 13, 2007, through the Petition Date, minus any

additional amounts such Holder received from Sentinel during the period subsequent to August 13, 2007 up through and including the Petition Date; provided, that any distributions made on account of a Class 3 Customer Claim following the Petition Date, including the Citadel Sale Distributions, will be applied towards such Class 3 Customer Claim.

Holders of Allowed Class 3 Customer Claims will be entitled to a Pro Rata distribution of Customer Property[3], including: (a) Cash held by the Estate on the Effective Date after the payment of (if Allowed), or appropriate reservation for, as applicable, the Priority Tax Claims, Professional Fee Claims, Other Priority Claims, and Secured Claims, if any, and (b) net Cash proceeds of the liquidation of the Remaining Assets that are Customer Property. Subject to Section 10.10 of the Plan, any distributions made to the Holders of Allowed Class 3 Customer Claims will be made to Holders of Allowed Class 3 Customer Claims that are NonCitadel-Beneficiary Customers only, and no further distributions shall be made to any Citadel-Beneficiary Customer, unless and until all Holders of Allowed Class 3 Customer Claims that are NonCitadel-Beneficiary Customers will have received a Percentage Recovery equivalent to such Citadel-Beneficiary Customer taking into account all of such Citadel-Beneficiary Customer's Class 3 Customer Claims.

The Chapter 11 Trustee estimates that there are $1,220,320,123 in Class 3 Customers Claims, $738,964,040 of which are Class 3 Customer Claims attributable to NonCitadel-Beneficiary Customers, $427,678,307 of which are Class 3 Customer Claims attributable to Citadel-Beneficiary Customers arising out of participation in SEG 1 and $53,677,776 of which are Class 3 Customer Claims attributable to Citadel-Beneficiary Customers arising out of participation in SEG 2, SEG 3, or SEG 4.

### 6.   Class 4—General Unsecured Claims

Class 4 consists of all unsecured Claims against Sentinel that do not constitute Administrative Claims, Priority Tax Claims, Other Priority Claims, Customer Claims, or Subordinated Claims ("General Unsecured Claims"); provided, however, that to the extent Class 3 Customer Claims are not fully satisfied from Customer Property, such deficiency claims will constitute General Unsecured Claims.

Holders of Allowed Class 4 General Unsecured Claims will be entitled to a Pro Rata distribution of Cash and Cash proceeds of all Property not allocated for payment of Allowed Claims in other Classes.

---

[3]   Customer Property is defined in the Plan to mean: from and after the Petition Date, Cash, security, or other property, and proceeds of such Cash, security, or property, received, acquired, or held by or for, or which should have been held by or for, a Customer, including any such property even if distributed to a Customer outside of the Plan and subsequently recovered by the Estate, including all funds and securities on deposit at the Bank of New York and in segregated accounts at JPMorgan Chase & Co. in the name of Sentinel or the Chapter 11 Trustee. BONY disputes that any funds or securities in its possession are Customer Property as defined under the Plan.

An initial calculation of Customer Property and an estimated total Claims pool for potentially allowable Class 3 Customer Claims as of the Petition Date will be made by the Chapter 11 Trustee and used for purposes of arriving at an initial calculation of total deficiency Class 4 General Unsecured Claims on account of Class 3 Customer Claims. This calculation of total deficiency Class 4 General Unsecured Claims on account of Class 3 Customer Claims will be (i) updated periodically based on a reconciliation of Allowed Customer Claims, Disallowed Customer Claims, and the realization or recovery of Customer Property in excess of or less than the nominal calculation and (ii) utilized for purposes of calculating any distributions to Holders of General Unsecured Claims.

With respect to deficiency Class 4 General Unsecured Claims on account of Class 3 Customer Claims only, subject to Section 10.10 of the Plan, no distributions will be made to Holders of Class 4 General Unsecured Claims on account of Class 3 Customer Claims that are Citadel-Beneficiary Customers pending the receipt of a Percentage Recovery for all Holders of Allowed Class 3 Customer Claims that are NonCitadel-Beneficiary Customers equivalent to such Citadel-Beneficiary Customer, as provided in Section 4.4 of the Plan.

For purposes of calculating Percentage Recoveries on Allowed Class 3 Customer Claims, any such recoveries on behalf of Class 4 General Unsecured Claims will be included.

As of the Effective Date, the Plan Proponents do not expect to have any assets which would not be deemed Customer Property. Property that is not Customer Property will be wholly contingent upon the outcome of certain Causes of Action commenced by the Liquidation Trustee for the benefit of the Estate. Assuming "Assets available for distribution to all other Creditors" as set forth in the Liquidation Analysis (attached hereto as Exhibit B) are distributed to NonCitadel-Beneficiary Customers and no additional Customer Property is recovered, the Plan Proponents estimate that roughly $550 to $600 million in Class 3 Customer Claims will not be satisfied from Customer Property, and will constitute Class 4 General Unsecured Claims.

The Chapter 11 Trustee estimates that there are less than $10 million in Class 4 General Unsecured Claims, excluding deficiency Class 4 General Unsecured Claims on account of Class 3 Customer Claims. Additionally, Lehman Brothers Inc. has asserted a $14 million unsecured claim, which the Plan Proponents likely will dispute.

### 7. Class 5—Subordinated Claims

Class 5 consists of all Claims, if any, which (i) are held by insiders (as defined by 11 U.S.C. § 101(31)), including Sentinel affiliates and persons who directly or indirectly hold an Equity Interest in Sentinel, (ii) are held by anyone whose Claim is subordinated to all other Claims by agreement or pursuant to Section 510 of the Bankruptcy Code, (iii) is a Claim for a fine, penalty, forfeiture, multiple, exemplary or punitive damages, or otherwise not predicated upon compensatory damages, and that would be subordinated in a Chapter 7 case pursuant to Section 726(a)(4) of the

Bankruptcy Code or otherwise, and (iv) unless all other Class 3 Customer Claims have been paid in full, is a Customer Claim held by an insider, a beneficial owner of at least five percent of Equity Interests, an entity that, directly or indirectly, through agreement or otherwise, exercised or had the power to exercise control over the management or policies of the Debtor, or any other entity whose Claim would be subordinated in a Chapter 7 case pursuant to Section 747 of the Bankruptcy Code or otherwise ("Subordinated Claims").

Holders of Subordinated Claims will receive no distributions on account of such Claims.

### 8.     Class 6—Equity Interests

Class 6 consists of all Equity Interests in Sentinel. Holders of Equity Interests will receive no distributions on account of such Equity Interests.

### D.     Bar Dates for Administrative Claims

Unless otherwise ordered by the Bankruptcy Court, requests for payment of Administrative Claims (except for Professional Fee Claims), must be Filed and served on the Chapter 11 Trustee or the Liquidation Trustee, as applicable, and its counsel, the Creditors Committee or the Liquidation Trust Committee, as applicable, and its counsel and the other notice parties set forth in the Administrative Compensation Order, no later than (i) ten (10) days prior to the Voting Deadline for Administrative Claims accrued through the date of the Procedures Order and (ii) thirty (30) days after the Effective Date for all other Administrative Claims (the "Administrative Claims Bar Date"). *__Any Person that is required to File and serve a request for payment of an Administrative Claim and fails to timely File and serve such request, will be forever barred, estopped, and enjoined from asserting such Claim or participating in distributions under the Plan on account thereof__*. Objections to requests for payment of Administrative Claims (except for Professional Fee Claims) must be Filed and served on the Chapter 11 Trustee or the Liquidation Trustee, as applicable, and its counsel, the Creditors Committee or the Liquidation Trust Committee, as applicable, and its counsel and the other notice parties set forth in the Administrative Compensation Order and the requesting party within thirty (30) days after the Administrative Claims Bar Date.

### E.     Professional Fee Claims

All requests for compensation or reimbursement of Professional Fee Claims for services rendered on or after the Petition Date and prior to the Effective Date will be Filed and served on the Chapter 11 Trustee or the Liquidation Trustee, as applicable, and its counsel, the Creditors Committee or the Liquidation Trust Committee, as applicable, and its counsel, and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or any other order(s) of the Bankruptcy Court, no later than forty-five (45) days after the Effective Date ("Professional Fee Claims Bar Date").

Holders of Professional Fee Claims that are required to File and serve applications for final allowance of their Professional Fee Claims and that do not File and serve such applications by the required deadline will be forever barred from asserting such Professional Fee Claims against the Debtor, and such Professional Fee Claims will be deemed discharged as of the Effective Date. Objections to any Professional Fee Claims must be Filed and served on the requesting Professional, the Chapter 11 Trustee or the Liquidation Trustee, as applicable, and its counsel, the Creditors Committee or the Liquidation Trust Committee, as applicable, and its counsel, and the other notice parties set forth in the Administrative Compensation Order no later than thirty (30) days after the Professional Fee Claims Bar Date.

Except to the extent that a holder of a Professional Fee Claim fails to File and serve appropriate fee applications in a timely manner and the Bankruptcy Court withholds payment of the Professional Fee Claims, holders of Professional Fee Claims will receive Cash in an amount equal to the Allowed amount of their respective Bankruptcy Court approved Professional Fee Claims.

**F.     No Discharge of Claims; Injunction.**

Under the Plan, pursuant to Section 1141(d)(3) of the Bankruptcy Code, confirmation will not discharge Claims against the Debtor; provided, however, that no Holder of a Claim against or Equity Interest in the Debtor may, on account of such Claim or Equity Interest, seek or receive any payment or other distribution from, or seek recourse against the Estate or the Liquidation Trust, or Property, except for distributions under the Plan. Accordingly, except as otherwise provided in the Plan, all Persons, other than governmental entities and agencies exercising their police or regulatory powers, who have held, hold, or may hold Claims against or Equity Interests in the Debtor are permanently enjoined under the Plan from taking any of the following actions against the Estate or the Liquidation Trust or any Property on account of any such Claims or Equity Interests: (A) commencing or continuing, in any matter or in any place, any action or other proceeding; (B) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (C) creating, perfecting, or enforcing any Lien or encumbrance; and (D) commencing or continuing in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that (x) nothing shall preclude such Persons from exercising their rights pursuant to and consistent with the terms of the Plan; (y) any rights of setoff or recoupment, to the extent valid, are preserved, and the injunctions referenced in this Section shall not enjoin the valid exercise of such right of setoff or recoupment; and (z) no Holder of any Claim or Equity Interest shall be deemed to have released the Debtor in any way for accepting the terms of the Plan, retaining Citadel Sale Distributions or SEG 1 Special Distributions, or accepting distributions pursuant to the Plan.

**G.     Treatment of Executory Contracts and Unexpired Leases**

The Bankruptcy Code grants a debtor the power, subject to the approval of the Bankruptcy Court, to assume and assign, or reject executory contracts and unexpired leases. If an executory contract or unexpired lease is rejected, the other party to the

40

agreement may file a claim for damages, if any, incurred by reason of the rejection. In the case of rejection of leases of real property, such damage Claims are subject to certain limitations imposed by the Bankruptcy Code.

Any and all pre-petition leases or executory contracts not previously rejected by the Chapter 11 Trustee, unless specifically assumed pursuant to orders of the Bankruptcy Court prior to the Confirmation Date or the subject of a motion to assume or assume and assign pending on the Confirmation Date, will be deemed rejected by the Chapter 11 Trustee on the Confirmation Date.

All proofs of claim with respect to Claims arising from the rejection of executory contracts or leases will, unless another order of the Bankruptcy Court provides for an earlier date, be Filed with the Bankruptcy Court within thirty (30) days after the mailing of notice of entry of the Confirmation Order. All proofs of claim with respect to Claims arising from the rejection of executory contracts will be treated as Class 4 General Unsecured Claims for purposes of a distribution pursuant to the Plan.

### H.    Plan Administration

Subsequent to the Effective Date, the Estate will be administered by the Liquidation Trustee, whom without any further action of the Debtor or the Chapter 11 Trustee, shall become the appointed representative of the Estate in accordance with Section 1123(b)(3) of the Bankruptcy Code, and shall serve as the sole officer and sole director of the post-Effective Date Debtor. The Liquidation Trustee shall be responsible for liquidating and administering the Remaining Assets and for all distributions under the Plan. On the Transfer Date, a grantor's trust will be established in accordance with the Trust Agreement. A copy of the Trust Agreement will be filed prior to the Confirmation Hearing.

### 1.    Duties and Compensation of the Liquidation Trustee

The Liquidation Trustee will be responsible for receiving, liquidating, administering, and distributing (x) prior to the Transfer Date, the Remaining Assets and (y) from and after the Transfer Date, the Trust Assets, all in accordance with the Plan and the Trust Agreement. The Liquidation Trustee, subject to consultation with the Liquidation Trust Committee, will have full authority to take all steps necessary to administer the Estate and the Liquidation Trust, including without limitation, the duty and obligation to make distributions to Creditors hereunder, to review and maintain objections to or compromise Claims, and to pursue Causes of Action. The Liquidation Trustee will have and perform all of the duties, responsibilities, rights and obligations set forth in the Plan.

On or before August 11, 2008, subject to his obligations under Bankruptcy Rule 9011 and any other ethical rule governing his and his counsel's conduct, the Liquidation Trustee will File a motion pursuant to Federal Rule of Civil Procedure 60(b), and other appropriate pleadings, seeking to vacate or modify the Order Approving Turnover and Distribution of Certain Third Party Assets, entered by the Bankruptcy

Court on August 20, 2007 [Docket No. 18], in response to the Debtor's Emergency Motion for Approval of Turnover and Distribution of Certain Third Party Assets [Docket No. 7] Filed that same day in connection with the Citadel Sale Distribution. On or before the expiration of the applicable statute of limitations, including any extensions thereof entered into after consultation with the Liquidation Trust Committee, subject to his obligations under Bankruptcy Rule 9011 and any other ethical rule governing his and his counsel's conduct, the Liquidation Trustee will commence Causes of Action to avoid and recover the Citadel Sale Distributions and the SEG 1 Special Distributions from Citadel-Beneficiary Customers who are not Electing Holders under the Plan, subject to his reasonable judgment as to whether commencing such Causes of Action would be in the best interests of the beneficiaries of the Liquidation Trust, taking into account the result of the Rule 60(b) motion and the collection risk and cost attendant with specific Customers.

The Liquidation Trustee and its retained professionals will be compensated out of a reserve created pursuant to the Plan and the Trust Agreement.

### I.    Creditors' Committee and Liquidation Trust Committee

The Creditors' Committee will continue in existence until the Effective Date to exercise those powers and perform those duties specified in Section 1103 of the Bankruptcy Code and will perform such other duties as it may have been assigned by the Bankruptcy Court prior to the Effective Date.  On the Effective Date, the Creditors' Committee will be dissolved and its members will be deemed released of all their duties, responsibilities and obligations in connection with the Chapter 11 Case or the Plan and its implementation, and the retention or employment of the Creditors' Committee's attorneys and other agents will terminate, except with respect to evaluating Professional Fee Claims. All expenses of the Creditors' Committee members and the fees and expenses of their professionals through the Effective Date will be paid in accordance with the terms and conditions of the Administrative Compensation Order, dated November 8, 2007 and other orders and rulings of the Bankruptcy Court.

### 1.    Creation of Liquidation Trust Committee

On the Effective Date, the Liquidation Trust Committee will be formed and shall consist of three representatives, consisting of the following members of the Creditors Committee, Discus Master Ltd., Jump Trading, LLC, and Kottke Associates LLC. JEM Commodity Relative Value Fund LP, Rotchford Barker, and BC Capital Fund A LLC may participate on the Liquidation Trust Committee as *ex officio* members with no voting rights. Penson GHCO and Vision Financial Markets LLC do not support the Plan, and having voiced objections thereto, will not be members (*ex officio* or otherwise) of the Liquidation Trust Committee whose purpose it is, in connection with the Liquidation Trustee, to carry out the terms and provisions of the Plan.  Their opposition notwithstanding, Penson GHCO and Vision Financial Markets LLC dispute the makeup of the Liquidation Trust Committee and their exclusion as *ex officio* members.

### 2.    Duties and Compensation of the Liquidation Trust Committee

The members of the Liquidation Trust Committee shall consult with the Liquidation Trustee regarding all material aspects of the Estate's continued operations and all material activities of the Liquidation Trustee, exercising their business judgment but subject to the provisions of the Plan.

In the event that the Liquidation Trustee declines to initiate a Cause of Action and the Liquidation Trust Committee disagrees with the Liquidation Trustee's decision and believes prosecuting such Cause of Action is in the best interests of Creditors generally, then the Liquidation Trust Committee will have standing to initiate such Cause of Action on behalf of the Liquidation Trust.  In addition, to the extent that the Liquidation Trust Committee disagrees with any decision or exercise of power by the Liquidation Trustee, including, without limitation, the manner in which securities are liquidated, then the Bankruptcy Court will determine such issue at the request of the Liquidation Trust Committee.

Each member of the Liquidation Trust Committee will serve without compensation for its performance of services as a member of the Liquidation Trust Committee, except that each member will be entitled to reimbursement of its reasonable expenses by the Estate or the Liquidation Trust.

### 3.    No Liability of the Liquidation Trustee or the Liquidation Trust Committee

Neither the Liquidation Trustee, the Liquidation Trust Committee, nor any of its members, designees, attorneys, accountants and other professionals, nor any duly designated agent or representative of the Liquidation Trustee or the Liquidation Trust Committee, or their respective employees, will be liable for the act or omission of any other member, designee, agent, or representative of the Liquidation Trustee or the Liquidation Trust Committee, nor will the Liquidation Trustee, the Liquidation Trust Committee, nor any of its members, designees, attorneys, accountants and other professionals, nor any duly designated agent or representative of the Liquidation Trustee or the Liquidation Trust Committee, or their respective employees, be liable for any act or omission taken or omitted to be taken in its capacity as Liquidation Trustee or as a member, designee, attorney, accountant or other professional of the Liquidation Trust Committee, or as a duly designated agent or representative of the Liquidation Trustee or the Liquidation Trust Committee, or as an employee of any of the foregoing, other than acts or omissions resulting from Liquidation Trustee or such member's willful misconduct or gross negligence.  The Liquidation Trustee and the Liquidation Trust Committee may, in connection with the performance of their functions, and in their sole and absolute discretion, consult with counsel, accountants and their agents, and will not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such professionals, other than acts or omissions resulting from such member's willful misconduct or gross negligence.  Notwithstanding such authority, neither the Liquidation Trustee nor the Liquidation Trust Committee will be under any obligation to consult with counsel, accountants or its agents, and its

43

determination to not do so will not result in the imposition of liability on the Liquidation Trustee or the Liquidation Trust Committee, or its members and/or designees, unless such determination is based on willful misconduct or gross negligence.

The Liquidation Trust will indemnify and hold harmless the Liquidation Trustee and the Liquidation Trust Committee and their members, designees, and their and their members' professionals, and any duly designated agent or representative thereof (in their capacity as such), from and against and in response to any and all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, other than as a result of their willful misconduct or gross negligence, with respect to the implementation or administration of the Plan or the pursuit of the Causes of Action.

### J. Method of Distribution Under the Plan

#### 1. Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided in the Plan or as ordered by the Bankruptcy Court, distributions to be made on account of Claims that are Allowed Claims as of the Effective Date will be made on the Initial Distribution Date or as soon thereafter as is practicable. Any payment or distribution to be made on the Effective Date pursuant to the Plan will be deemed as having been made on the Effective Date if such distribution is made on the Effective Date or as soon thereafter as is practicable. Any payment or distribution required to be made under the Plan on a day other than a Business Day, will be made on the next succeeding Business Day. Distributions on account of Claims that first become Allowed Claims after the Effective Date will be made by the Liquidation Trustee pursuant to the terms and conditions of the Article IV. of the Plan and the Trust Agreement, where applicable.

#### 2. Interest On Claims

Unless otherwise specifically provided for in the Plan or Confirmation Order, or required by applicable bankruptcy law, postpetition interest will not accrue or be paid on any Claims, and no holder of a Claim will be entitled to interest accruing on or after the Petition Date on any Claim.

#### 3. Distributions by Liquidation Trustee

The Liquidation Trustee will make all distributions of Cash required to be distributed under the applicable provisions of the Plan and the Trust Agreement. The Liquidation Trustee may employ or contract with other entities to assist in or make the distributions required by the Plan and the Trust Agreement.

#### 4. Date and Delivery of Distributions

Distributions under the Plan will be made by Liquidation Trustee or its designee to the holders of Allowed Claims at the addresses set forth in the Schedules, unless such addresses are superseded by proofs of Claim or transfers of Claim filed

44

pursuant to Bankruptcy Rule 3001 (or at the last known addresses of such holders if the Liquidation Trustee has been notified in writing of a change of address).

### 5.    Unclaimed Property.

If any distribution remains unclaimed for a period of ninety (90) days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the holder of an Allowed Claim entitled thereto, such unclaimed property will be forfeited by such holder, whereupon all right, title and interest in and to the unclaimed property will be held by the Liquidation Trustee and will become Excess Cash.

### 6.    Distributions to Holders as of the Record Date

With respect to all Claims, the Liquidation Trustee, as applicable, will have no obligation to recognize the transfer of, or the sale of any participation in, any Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those Holders of Claims who are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date. The Liquidation Trustee will instead be entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the official claims register as of the close of business on the Distribution Record Date.

### 7.    Fractional Cents

Any other provision of the Plan to the contrary notwithstanding, no payment of fractions of cents will be made. Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment will reflect a rounding down of such fraction to the nearest whole cent.

### 8.    Payments of Less than Ten Dollars

If a Cash payment otherwise provided for by the Plan with respect to an Allowed Claim or Allowed Equity Interest would be less than ten ($10.00) U.S. dollars (whether in the aggregate or on any payment date provided in the Plan), notwithstanding any contrary provision of the Plan, the Liquidation Trustee will not be required to make such payment and such funds will be otherwise distributed to holders of Allowed Claims in accordance with Article IV. of the Plan.

### 9.    Setoffs

Except as otherwise provided for herein with respect to Causes of Action released by or on behalf of the Estate pursuant to the Plan and the Confirmation Order, the Liquidation Trustee may, but will not be required to, set off against any Claim and the payments to be made pursuant to the Plan in respect of such Claim, Causes of Action of any nature whatsoever that the Estate may have against the Holder of such Claim, but neither the failure to do so nor the allowance of a Claim will constitute a waiver or release by the Debtor or its Estate of any Claim it may have against the Creditor.

**K.      Disputed Claims**

**1.      Objection Deadline; Prosecution of Objections**

From and after the Effective Date, the Liquidation Trustee will have the exclusive right to object to any Claims. Objections to Claims will be Filed and served upon each affected Creditor no later than one hundred-eighty (180) days after the Effective Date, or thirty (30) days after the Trigger Date with respect to Citadel-Beneficiary Customers who have become Electing Holders, provided, however, that this deadline may be extended by the Bankruptcy Court upon motion of the Liquidation Trustee, with notice to the United States Trustee and each affected Creditor and with or without notice to Creditors.

Subject to the terms of the Plan, objections to Claims may be litigated to judgment, settled, or withdrawn.

**2.      No Distributions Pending Allowance**

Notwithstanding any other provision of the Plan, no payments or distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim.

**L.      Estimation of Claims**

The Liquidation Trustee may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether an objection has been Filed with respect to such Claim. If the Bankruptcy Court estimates any contingent or unliquidated Claim, the estimated amount will constitute either the Allowed Claim for such Claim or a maximum limitation on such Claim, at the option of the Liquidation Trustee, after consultation with the Liquidation Trust Committee. If the estimated amount constitutes a maximum limitation on such Claim, the Liquidation Trustee may elect to pursue any supplemental proceedings to object to the allowance and ultimate distribution on such Claim. Unless otherwise ordered by the Bankruptcy Court, resolution or compromise of estimated Claims will be done pursuant to the Plan. All Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another. The Creditors Committee or the Liquidation Trust Committee, as applicable, will have the right to move the Bankruptcy Court for disallowance of any such Claim for voting purposes.

**M.      Reserves**

**1.      Disputed Claims Reserve**

On or as soon as practicable after the Effective Date, the Liquidation Trustee will establish and maintain the Disputed Claims Reserve from the Cash on hand on the Effective Date equal to the aggregate amount that would have been distributed to

the holders of Disputed Claims, except the Disputed BONY Secured Claim, had their Disputed Claims been deemed Allowed Claims on the Effective Date or on the Administrative Claims Bar Date, as applicable, or such other amount as may be approved by the Bankruptcy Court upon motion of the Chapter 11 Trustee or Liquidation Trustee. For effectuating the provisions of this Section, the Chapter 11 Trustee, the Liquidation Trustee, the Creditors Committee or the Liquidation Trust Committee, may, at any time, request that the Bankruptcy Court estimate, set, fix or liquidate the amount of the Disputed Secured Claims pursuant to Section 502(c) of the Bankruptcy Code, in which event the amounts so estimated, fixed or liquidated will be deemed the amounts of the Disputed Secured Claims for purposes of the Disputed Claims Reserve.

With respect to such Disputed Claims, if, when, and to the extent any such Disputed Claim becomes an Allowed Claim by Final Order, the relevant portion of the Cash held in the Disputed Claims Reserve therefor will be distributed by the Liquidation Trustee to the Claim holder in a manner consistent with distributions to similarly situated Allowed Claims. The balance of such Cash, if any remaining after all Disputed Administrative Claims and Disputed Priority Tax Claims have been resolved, will become Excess Cash.

At quarterly intervals commencing ninety (90) days from the Effective Date, the Liquidation Trustee will release any amount held in reserve on account of any Disputed Claim that has been disallowed by Final Order during the preceding ninety (90) day period. No payments or distributions will be made with respect to a Claim which is a Disputed Claim pending the resolution of the dispute by Final Order.

### 2. Reserve for BONY Secured Claims

On the Effective Date, the Liquidation Trustee, in consultation with the Liquidation Trust Committee, will establish and maintain a reserve for the payment of the Disputed BONY Secured Claim (the "BONY Reserve"). For purposes of establishing the BONY Reserve, Cash will be set aside from the Cash on hand on the Effective Date in an amount either as agreed to by the Plan Proponents and BONY or, if no such agreement is reached, as determined by the Bankruptcy Court, after notice and a hearing, as constituting an amount adequate to provide for payment in full (including all principal, accrued interest and any other indemnifiable amounts as provided for in the operative BONY credit agreement or related documents) of the Disputed BONY Secured Claim in the amount allowed upon final resolution of the pending BONY adversary proceeding. Until such time, BONY will have and will retain a perfected, first-priority lien on all funds in the BONY Reserve, subject to all defenses to the enforcement and validity of BONY's liens and claims. Payments or distributions from the BONY Reserve will only be made in accordance with Section 4.3.(a) of the Plan. For effectuating the provisions of this Section, the Chapter 11 Trustee, the Liquidation Trustee, the Creditors Committee or the Liquidation Trust Committee, may, at any time, request that the Bankruptcy Court estimate, set, fix or liquidate the amount of the Disputed BONY Secured Claim pursuant to Section 502(c) of the Bankruptcy Code, subject to any objection to the ability of such party to do so, in which event the amount so estimated, fixed or liquidated will be

47

deemed the amount of the Disputed BONY Secured Claim for purposes of the BONY Reserve.

### 3. Reserve for Professional Fee Claims

On the Effective Date, the Liquidation Trustee, in consultation with the Liquidation Trust Committee, will establish and maintain reserves for payment of estimated unpaid Professional Fee Claims ("Professional Fee Reserve"). For purposes of establishing the Professional Fee Reserve, Cash will be set aside from the Cash on hand on the Effective Date in an amount equal to the amount that the Chapter 11 Trustee and the Creditors Committee anticipate will be incurred for fees and expenses by Professionals retained in the Chapter 11 Case up to and including the Effective Date. If, when, and to the extent any such Professional Fee Claims become Allowed Claims by Final Order, the relevant portion of the Cash held in reserve therefor will be distributed by the Liquidation Trustee to the Professional or as set forth in such Final Order approving the Professional Fee Claim. The balance of such Cash, if any remaining after all Professional Fee Claims have been resolved and paid, will become Excess Cash. No payments or distributions will be made with respect to a Professional Fee Claim until such Professional Fee Claim is Allowed by Final Order.

### N. Settlement Offer; Releases

As of the Effective Date, in consideration for a Citadel-Beneficiary Customer becoming an Electing Holder and for its treatment under the Plan:

(a.) With respect to Citadel-Beneficiary Customers who have become Electing Holders only, the Estate will be deemed to release forever, waive, and discharge, *__and third-parties will be enjoined from pursuing__*, all claims that in any way relate to the Citadel Sale Distributions and the SEG 1 Special Distributions which will include any Cause of Action arising therefrom pursuant to, inter alia, Federal Rule of Civil Procedure 60(b), and Sections 549 and 550 of the Bankruptcy Code (the "Release");

(b.) The Release will be contingent upon NonCitadel-Beneficiary Customers receiving distributions under the Plan equivalent to fifty percent (50%) of their Allowed Class 3 Claims, plus Interest ("Release Distribution Threshold") calculated on the amount NonCitadel-Beneficiary Customers would have received if the Citadel Sale Distributions and the SEG 1 Special Distributions had been made Pro Rata to all Holders of Class 3 Customer Claims, less any interim distributions received under the Plan, from the respective dates of the SEG 1 Special Distributions and the Citadel Sale Distributions through the first point in time that the Release Distribution Threshold is met or exceeded or timely contribution by an Electing Holder of its True-up Amount as provided in subsection (c.) of Section 10.10 of the Plan;

(c.) In the event that the Release Distribution Threshold has not been met or exceeded as of the date when the BONY Complaint has been concluded by a Final Order adjudicating, or approving the settlement of, such adversary proceeding (the "Trigger Date"), after giving effect to (i) the amount of distributions the NonCitadel-

Beneficiary Customers would be entitled to receive pursuant to such Final Order and the Plan, (ii) the distributions the NonCitadel-Beneficiary Customers have received under the Plan at the time of the Trigger Date, and (iii) the amount of distributions the NonCitadel-Beneficiary Customers would receive pursuant to the liquidation of any securities remaining in the Estate as of the Trigger Date based upon the estimation of such proceeds, then each Citadel-Beneficiary Customer that is an Electing Holder will contribute an amount (the "Ture-up Amount") equal to such Electing Holder's share, calculated as a percentage equivalent to its Class 3 Customer Claim on account of SEG 1 Customer accounts in relation to all Citadel-Beneficiary Customers' Class 3 Customer Claims on account of SEG 1 Customer accounts as of the Petition Date, factored against the lesser of:  (i) the aggregate amount the Citadel-Beneficiary Customers would hypothetically be required to contribute to cause the NonCitadel-Beneficiary Customers to meet the Release Distribution Threshold as of the Trigger Date; and (ii) the aggregate amount the Citadel-Beneficiary Customers would hypothetically be required to contribute to cause the NonCitadel-Beneficiary Customers to achieve a Percentage Recovery equivalent to the Citadel-Beneficiary Customers' Percentage Recovery;

(d.) The True-up Amount will be due within twenty (20) days of the Trigger Date and will be paid to the Liquidation Trust for Pro Rata distribution on account of the NonCitadel-Beneficiary Customers' Class 3 Claims;

(e.) In the event that the Liquidation Trustee makes distributions of Trust Assets subsequent to the Trigger Date (such distributions, "Post-Trigger Date Distributions"), the Post-Trigger Date Distributions will be allocated and distributed first to those Electing Holders that timely contributed the True-up Amount in an amount necessary to reimburse such Electing Holders to the extent their contribution exceeds what the True-up Amount would have been if the Post-Trigger Date Distributions had in fact occurred prior to the Trigger Date;

(f.) In the event that the ultimate liquidation of securities for which the Trustee and his professionals had estimated the proceeds of for purposes of calculating a True-up Amount yields actual proceeds less than estimated, each Citadel-Beneficiary Customer that is an Electing Holder will contribute an amount necessary, within twenty (20) days of such determination, to satisfy what its respective True-up Amount would have been if the liquidation of all of the securities in the Estate had in fact occurred prior to the Trigger Date;

(g.) Upon the achievement of the same Percentage Recovery for all Holders of Allowed Class 3 Customer Claims, in lieu of the Pro Rata distributions provided for in Sections 4.4(a) and 4.5(c) of the Plan, any Citadel-Beneficiary Customer who is an Electing Holder will receive its share, calculated as a percentage equivalent to its Class 3 Customer Claim on account of SEG 1 Customer accounts in relation to all Citadel-Beneficiary Customers' Class 3 Customer Claims on account of SEG 1 Customers' accounts, factored against 20% of the aggregate distributions to be made on account of Allowed Customer Claims and Allowed deficiency General Unsecured Claims under the Plan (the "20% Share Distributions") thereafter; provided that, the difference between such 20% Share Distributions and the distribution that would have been payable to such

49

Electing Holder under Sections 4.4(a) and 4.5(c) of the Plan, will be distributed Pro Rata to Non-Citadel-Beneficiary Customers (the "80/20 Transfer");

(h.)    By becoming Electing Holders, Citadel-Beneficiary Customers will be deemed to have consented to the jurisdiction of the Bankruptcy Court and deemed to have waived any objection or defense with respect to their unsatisfied obligation to remit the True-up Amount within twenty (20) days of the Trigger Date, and; the Bankruptcy Court will be authorized to enter judgment on the pleadings for the True-up Amount, and any post-judgment remedies, within five (5) Business days of the Filing of a complaint and request therefor;

(i.)    Claims on account of SEG 2, SEG 3, or SEG 4 Customer accounts held by Citadel-Beneficiary Customers that are Electing Holders will be treated under the Plan as if such Claims were held by NonCitadel-Beneficiary Customers only with respect to distributions as provided for in Sections 4.4 and 4.5 of the Plan; and

(j.)    A Citadel-Beneficiary Customer will be ineligible to participate in the settlement described in this Section 10.10 if, as of the date that is ten (10) days prior to the Voting Deadline, such Customer is the subject of a pending adversary proceeding to recover Property for the benefit of the Estate.

The Release provided for in Section 10.10 of the Plan is to be determined (if not previously triggered) as of the conclusion of the adversary proceeding commenced by the Chapter 11 Trustee against BONY. The selection of the Trigger Date was the product of protracted negotiation and consideration of cost/benefit analyses among the Plan Proponents and was ultimately selected because the Plan Proponents expect this Cause of Action to be (1) the most material contingent asset of the Estate, and (2) resolved at a time sufficiently distant to have allowed the liquidation of the Estate's securities to have concluded. Section 10.10 of the Plan also includes provision in the event that Estate securities remain unliquidated as of the resolution of the BONY litigation so as not to prejudice any Citadel-Beneficiary Customer who becomes an Electing Holder if the subsequent liquidation of such securities would have reduced such Electing Holder's True-up Amount.

The total dollar amount of Claims held by NonCitadel-Beneficiary Customers as of the Petition Date is roughly $739 million. Assuming all "Assets available for distribution to all other creditors" as described in the Liquidation Analysis, as well as various items such as interest earned on the cash on hand (cash on hand is measured in the Liquidation Analysis as of the date of this disclosure statement), coupon payments on securities that have not yet been liquidated, and other miscellaneous recoveries that the Trustee expects to receive prior to Plan confirmation, are distributed to NonCitadel-Beneficiary Customers, the Plan Proponents estimate that an additional roughly $50-75 million would need to be recovered in order to trigger the Release for Electing Holders. Thus, for example, under a scenario in which the Liquidating Trustee (i) is completely unsuccessful in pursuing each of the estate's claims against BONY, M&P, Citadel and other potential litigation targets as described in Sections V.H and V.I above (a worst-case scenario the Plan Proponents believe to be very unlikely), and also

(ii) fails in pursuing all claims against the Citadel Beneficiary Customers that do not opt to become Electing Holders, if any, and such non-electing Citadel Beneficiary Customers are not required to disgorge any amounts received pre- or post-petition, then the estimated shortfall below the Trigger Amount would be in the $50-75 million range, and each Electing Holder would be responsible in such a scenario for payment of a True-Up Amount equal to its percentage (calculated as described above) of _roughly_ $50-75 million. Given the Estate's Causes of Action and the cost of litigation, the Plan Proponents believe that Citadel Beneficiary Customers who decide not to become Electing Holders and instead litigate the various issues proposed to be resolved under the settlement face substantially greater liability and cost than the amount they might need to contribute as Electing Holders, and in the event of a relatively small shortfall that they face liability several times greater than they would under the settlement.

The 80/20 Transfer is an integral component of the settlement, a product of protracted negotiation, which provides consideration to NonCitadel-Beneficiary Customers upon achieving parity with Citadel-Beneficiary Customers in the form of a transfer of value among Electing Holders in exchange for bearing the risk of reliance upon contingent assets, such as Causes of Action, during the interval between the Release Distribution Threshold and such a point of parity. The incremental recovery transferred to NonCitadel-Beneficiary Customers, provided for by the 80/20 Transfer, is greater than what the Plan would otherwise yield given the approximate ratio of Claims held by Citadel-Beneficiary Customers to Claims held by NonCitadel-Beneficiary Customers of 65/35 at the point of parity.

Claims held by Citadel-Beneficiary Customers on account of SEG 2, SEG 3, or SEG 4 Customer accounts will not be included in calculating an Electing Holder's True-up Amount. Claims held by Citadel-Beneficiary Customers who are Electing Holders on account of SEG 2, SEG 3, or SEG 4 Customer accounts will not be eligible to share with NonCitadel-Beneficiary Customers in distributions made under Section 10.10(d) of the Plan pursuant to the contribution of True-up Amounts.

The recovery under the Plan for Citadel-Beneficiary Customers who opt for the settlement is wholly contingent upon the outcome of litigation commenced by the Chapter 11 Trustee or the Liquidation Trustee against third-parties (including Citadel-Beneficiary Customers that do not opt for the settlement). Depending upon the extent of the Liquidation Trustee's success in this regard, the approximately 71% Percentage Recovery such Holders currently possess could be materially diminished if such Holders are required to contribute the True-up Amounts that are a feature of the settlement.

The recovery under the Plan for Citadel-Beneficiary Customers who do not opt for the settlement is wholly contingent upon the outcome of litigation commenced by the Chapter 11 Trustee or the Liquidation Trustee against third-parties (including litigation commenced against such Citadel-Beneficiary Customers that do not opt for the settlement). Depending upon the extent of the Liquidation Trustee's success in this regard, the approximately 71% Percentage Recovery such Holders currently possess could be materially diminished.

The foregoing is only a summary of Section 10.10 of the Plan. Creditors are directed to Section 10.10 of the Plan for a more precise description of the settlement offer that is being extended to Citadel-Beneficiary Customers.

**O.    Assignment of Private Actions to the Liquidation Trust**

On the Transfer Date, a distinct tranche of the Liquidation Trust ("Tranche-P") will be established on the terms set forth in the Trust Agreement. Tranche-P will hold the Non-Estate Claims owned by the Tranche-P Electors and which Non-Estate Claims, even after contribution, will not become Property. Holders of Claims that are not Tranche-P Electors will not receive any distribution on account of Tranche-P. Any recoveries on account of such Non-Estate Claims will be treated as provided for in the Trust Agreement in a manner which will mirror the treatment of Customer Property under the Plan. Tranche-P will be managed and operated by the Liquidation Trustee. The Liquidation Trust Committee will have certain approval rights on key issues relating to the operation and management of Tranche-P.

Notwithstanding anything to the contrary in the Plan, it will be a condition to any Tranche-P Elector's effective transfer of Non-Estate Claims, and therefore a condition to benefiting from Tranche-P, that such Holder evidence its ownership of such Non-Estate Claim to the Liquidation Trustee.

**P.    Insider Settlement**

The Plan contains a number of provisions relating to settlement by and between the Chapter 11 Trustee, on the one hand, and Philip M. Bloom, the Philip M. Bloom Revocable Trust, the Sybil Bloom Revocable Trust, the Philip Bloom Remainder Trust and the Philip M. Bloom Grantor Annuity Trust, Eric A. Bloom, Sentinel Investment Group, Inc., Sentinel Financial Services, Inc., Sentinel Management International, Ltd., Fountainhead Investments, Inc., EB Trust 2005 and Eric A. Bloom Living Trust, on the other hand, approved by Bankruptcy Court order entered June 9, 2008 [Docket No. 577] (the "Insider Settlement"). Those provisions include:

(a.)    Contribution Bar Relating to Claims Against Certain Insiders. The Plan provides that all Persons are permanently barred, enjoined, and restrained from commencing, prosecuting, or asserting any request, claim, or cause of action for or otherwise seeking contribution or common law indemnification, however denominated, against any of the Philip M. Bloom, the Philip M. Bloom Revocable Trust, the Sybil Bloom Revocable Trust, the Philip Bloom Remainder Trust, the Philip M. Bloom Grantor Annuity Trust, Eric A. Bloom, Fountainhead Investments, Inc., EB Trust 2005, Sentinel Financial Services, Inc., Eric A. Bloom Living Trust and Sybil Bloom (the "Insider Releasees") based upon, relating to, or arising out of (A) any claims asserted or judgments obtained against any Person by the Chapter 11 Trustee or the Estate, or amounts actually paid by an Person to the Chapter 11 Trustee or the Estate based on such claims or judgments, whether by settlement or otherwise, and/or (B) liability owed, or alleged or claim to be owed, or amounts paid, whether by settlement or otherwise, to the Chapter 11 Trustee or the Estate and (C) the costs of defending against claims, causes of

action, demands, or requests asserted or made by the Chapter 11 Trustee (collectively, the "Contribution Bar"). Entry of the Confirmation Order shall constitute findings that (i) the Insider Settlement was negotiated and reached in good faith and in accordance with applicable law relating to the Contribution Bar, and (ii) all legal requirements relating to the Contribution Bar have been satisfied in connection with the Insider Settlement and the parties have acted in good faith in all respects relating thereto.

(b.)     Injunction Against Certain Insiders.  The Plan provides that **_the Insider Releasees are hereby permanently barred, enjoined, and restrained_** from commencing, prosecuting, or asserting any request, claim, or cause of action for or otherwise seeking contribution or common law indemnification, however denominated, against any Person based upon, relating to, or arising out of (A) any claims asserted or judgments obtained against the Insider Releasees by the Chapter 11 Trustee or the Estate, or amounts actually paid by the Insider Releasees to the Chapter 11 Trustee or the Estate based on such claims or judgments, whether by settlement or otherwise, and/or (B) liability owed, or alleged or claimed to be owed, or amounts paid, whether by settlement or otherwise, to the Chapter 11 Trustee or the Estate and (C) the costs of defending against claims, causes of action, demands, or requests asserted or made by the Chapter 11 Trustee.

(c.)     No Bar Against Estate Claims.  None of the releases pertaining the Insiders shall be construed to discharge any liability of any Person to the Chapter 11 Trustee or the Estate or to preclude any adversary proceeding, claim, cause of action, demand, request for relief, or recovery, whether or not currently pending, by the Chapter 11 Trustee against or from any Person.

(d.)     Pro Tanto Judgment Reduction.   The Plan provides that any monetary award or judgment obtained by the Chapter 11 Trustee from or against any Person for the same injuries alleged in the adversary proceeding _Grede v. Bloom, et al._, Adv. No. 07-981 (Bankr. N.D. Ill) (the "Insider Adversary Proceeding") for which contribution or common law indemnification is available from the Insider Releasees, shall be reduced _pro tanto_ by the amount set forth in the settlement agreements memorializing the Insider Settlement, copies of which were attached to the motion seeking approval of the Insider Settlement [Docket No. 503] (the "Settlement Agreements"), regardless of the Insider Releasees' and the Person's relative fault or any other consideration.

(f.)     Challenge to Contribution Bar or Judgment Reduction.  The Plan provides that if the Contribution Bar is found to be invalid by any court for any reason, or if at any time the method of judgment reduction set forth above and in the order approving the Insider Settlement is found to be invalid, the Contribution Bar and other provisions of the Insider Settlement shall be null and void to the extent set forth in the Settlement Agreements, and the rights and obligations of the Chapter 11 Trustee and Insider Releasees shall be as set forth in the Settlement Agreements. In addition, in the event of any challenge to the Contribution Bar in a judicial or similar proceeding, and for so long as such challenge is pending, the Insider Releasees shall have a lien and claim against any and all funds of the estate (including funds recovered in the future) in an

53

amount equal to the amount necessary to satisfy the Chapter 11 Trustee's obligations to return certain funds as provided in the Settlement Agreements, subordinate and subject only to costs of administration. Notwithstanding the foregoing, however, nothing herein shall be deemed to require the Chapter 11 Trustee to seek to recover any distributions already made to creditors.

(g.) Estate Released Claims. Entry of the Confirmation Order shall constitute findings that (i) the Estate Released Insider Claims constitute the exclusive property of the Estate and (ii) the Chapter 11 Trustee holds the sole and exclusive standing to seek recovery on account of the Estate Released Insider Claims. All creditors of the Estate including, but not limited to contingent creditors, Persons who have filed claims against the Estate and all Persons sued or to be sued by the Estate, are hereby permanently barred, enjoined, and restrained from commencing, prosecuting, or asserting any action or proceeding against the Insider Releasees based on all manners of action, causes of action, suits, debts, accounts, promises, warranties, damages and consequential damages, demands, agreements, costs, expenses, claims or demands whatsoever, of any kind or nature whether known or unknown, liquidated or unliquidated, disputed or undisputed, contingent, inchoate or matured, in law or in equity which the Chapter 11 Trustee, Debtor, or Estate now have or ever had against the Insider Releasees upon or by reason of any manner, cause or thing whatsoever on or at any time prior to May 14, 2008, including, but not limited to claims concerning, arising out of, or relating to the facts, circumstances, events, transactions or transfers alleged or which could have been alleged in the Insider Adversary Proceeding (the "Estate Released Insider Claims").

(h.) The Insider Settlement does not (i) act as an injunction or bar against any third party, including any Creditor of the Estate, from bringing any direct claims they may have against the Insider Releasees; or (ii) impact or have any effect on the property of the Estate issue/Customer Property issues described in Section VI.A. above.

Q.     **Cantor Escrow**

On April 8, 2008, the Chapter 11 Trustee and Cantor Fitzgerald entered into the Cantor Turnover Stipulation, pursuant to which the parties agreed that Cantor would turnover surplus proceeds from the liquidation of repo securities totaling $3,491,573.79 (the "Cantor Escrowed Funds") to the Chapter 11 Trustee to be held in a segregated account pending an order or plan providing for its distribution. The Plan provides for the distribution of the Cantor Escrowed Funds. The notice of the Confirmation Hearing will serve as the notice required by the Cantor Turnover Stipulation to Cantor and all known creditors and customers of the Debtor of the distribution of the Cantor Escrowed Funds in accordance with the Plan. The 20-day filing period referenced in paragraph 3 of the Cantor Turnover Stipulation shall be deemed to expire on the Voting Deadline. If on or before the Voting Deadline (i) Cantor shall have filed a motion or petition seeking payment from the Cantor Escrowed Funds of any setoff, recoupment or other rights (including, without limitation, its rights as a secured creditor with respect to the Cantor Escrow Funds) under the Master Repurchase Agreement by and between Cantor and Debtor dated as of October 25, 2004 or applicable

law, or (ii) any other person or entity asserting an interest in or claim against any of the Cantor Escrowed Funds shall file a motion or petition with the Bankruptcy Court asserting such interest or claim, and such motions or petitions, if any, have not been resolved by Final Order on or before the Effective Date (which may include the Confirmation Order), then the Cantor Escrowed Funds will remain in the Cantor Escrow Account pending resolution by Final Order. In accordance with the Cantor Turnover Stipulation, if Cantor or any other person or entity asserting an interest in or claim against the Cantor Escrowed Funds does not assert such claims or interests prior to the Voting Deadline, then all claims to or against the Cantor Escrowed Funds shall be extinguished and deemed waived, except as provided in the Plan. If such claims or interests are so asserted, such claims or interests shall be determined and paid in accordance with the Cantor Turnover Stipulation, as established by Final Order.

### R.     Exculpation

Notwithstanding anything herein to the contrary, as of the Effective Date, none of the Chapter 11 Trustee and his advisors, attorneys, financial advisors, accountants, other professionals, the Creditors Committee, the individual members of the Creditors Committee and its and their respective advisors, attorneys, financial advisors, agents, other professionals and affiliates will have or incur any liability for any claim, cause of action or other assertion of liability for any act taken or omitted to be taken since the Petition Date in connection with, or arising out of, the Chapter 11 Case, formulation, negotiation, preparation, solicitation of votes with respect to, the confirmation, consummation, or administration of the Plan, or property to be distributed under the Plan, except for willful misconduct or gross negligence to the maximum extent provided for under 805 ILCS 5/8.75 or federal law; provided, however, nothing in the Plan will be construed to exculpate the Citadel-Beneficiary Customers who do not become Electing Holders in connection with their receipt of Citadel Sale Distributions or SEG 1 Special Distributions; provided, however, that nothing in the Chapter 11 Case or the Plan shall in any way be construed as discharging, releasing, or relieving the Debtor, or any other party, in any capacity, from any responsibility with respect to the Pension Plan under any law or regulatory provision relating to the termination of the Pension Plan, unless the Pension Plan is terminated prior to the confirmation of the Plan.

### S.     Extinguishment of Liens

On the Effective Date, all Liens against any property of the Debtor, except to the extent provided in the Plan or the Confirmation Order, will be deemed forever extinguished and discharged.

### T.     Preservation/Waiver of Causes of Action

Pursuant to the Plan, and Sections 544, 547, 548, 549, 550, 551, 553 and 1123(b)(3)(B) of the Bankruptcy Code, the Liquidation Trustee will retain all rights and all Causes of Action accruing to the Debtor including, without limitation, the avoidance of any transfer of an interest of the Debtor in property or any obligation incurred by the Debtor; except as expressly noted in Section 10.10 of the Plan or Confirmation Order,