**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **FREDERICK J. GREDE**, as Chapter 11 Trustee for Sentinel Management Group, Inc., ) ) ) | |
| ) | Case No. 08 C 2582 |
| Plaintiff, ) | |
| v. ) | |
| ) | Honorable James B. Zagel |
| **THE BANK OF NEW YORK** and **THE BANK OF NEW YORK MELLON CORP.,** ) ) | |
| ) | (On withdrawal of reference from the |
| ) | Hon. John H. Squires, Bankr. Adv. Pro. |
| Defendants. ) | No. 08-127) |

**TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION
TO BONY'S MOTION FOR LEAVE TO APPEAL**

Chris C. Gair (ARDC # 6190781)
Vincent E. Lazar (ARDC # 6204916)
Jeffrey S. Eberhard (ARDC # 6276471)
JENNER & BLOCK LLP
330 N. Wabash Ave.
Chicago, IL  60611
Phone: (312) 222-9350
Facsimile: (312) 527-0484

### Overview

BONY lost in the Bankruptcy Court on its motion to dismiss the Complaint and now seeks interlocutory review of that ruling.  One fundamental problem with BONY's request to appeal (and there are many) is that the two issues it claims are "controlling" <u>were not even decided by the Bankruptcy Court</u> because they were not necessary to resolve BONY's motion to dismiss. Thus, BONY is insisting on an appeal to reverse Judge Squires on rulings he never made on issues he did not need to decide.

There are four reasons why the issues raised by BONY are not controlling and why interlocutory review would not speed up the litigation.  First, these issues and the proposed appeal pertain to only four of the eight counts in the complaint.  Second, each of the counts that do implicate the statutes on which BONY wants this Court to offer an advisory opinion has alternative bases.  Even in the unlikely event that the Court were to accept BONY's arguments about the statutes, it would not result in the dismissal of a single count of the complaint.  Third, there is nothing to suggest a substantial ground for difference of opinion on the issues raised. Fourth, all of the claims brought by the Trustee rest on a single group of operative facts; if counts or parts of counts were eliminated, it would not effect any significant change in the complexion of the case for discovery or trial and thus would do nothing to accelerate it.

### Statement of Certain Relevant Facts

**1.     Background**

Sentinel Management Group, Inc. ("Sentinel") has been registered as a futures commission merchant ("FCM") with the CFTC for more than 25 years.  (Compl. ¶¶ 21, 28, Exh. A).  FCMs are required by the Commodity Exchange Act, 7 U.S.C. § 1, et seq. ("CEA") and CFTC regulations to maintain all commodity customer funds in segregation – that is separate

from the FCM's own funds and those of other classes of clients.  (Compl. ¶¶ 29-42; 7 U.S.C. § 4d; 17 C.F.R. § 1.20.)

In 1981, Sentinel requested that it be excused from meeting the net capital requirements imposed on FCMs because it was not soliciting or accepting customer orders.  Rather, Sentinel's business was to invest and manage segregated funds belonging to the customers of other FCMs.  (Compl. ¶ 23.)  The CFTC issued a "no-action" letter authorizing Sentinel to operate below the otherwise applicable net capital requirements on the conditions:  (a) that it file the required monthly FCM report with the CFTC (Form 1-FR); (b) that it not solicit or accept orders for commodity trades; and (c) that it hold commodity customer funds in segregation.  (Id. Exh. A.)  Sentinel was regulated by the CFTC and filed monthly financial reports as required by the CEA and CFTC.  (Id. ¶¶ 119-20.)

Sentinel also was registered with the SEC and operated as a registered investment adviser pursuant to the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 et seq.  ("IAA") (Compl. ¶ 43.)  The IAA also imposed segregation requirements.  (Id. ¶ 45; SEC Rule 206(4)-2.)

Sentinel had several classes of customers, for which it purportedly established segregated accounts.  SEG 1 was supposed to consist of commodity customer funds deposited by other FCMs.  (Compl. ¶ 25.)  SEG 2 was supposed to consist of commodity customer funds traded on foreign exchanges that were deposited by other FCMs.  (Id. ¶ 26.)  SEG 3 was supposed to consist of funds of clients like private individuals, hedge funds, and FCMs' own money.  (Id. ¶ 27.)  In addition, Sentinel also had a House portfolio for the benefit of certain insiders. (Id. ¶ 28.)

### 2.    The BONY Relationship

In 1997, Sentinel started banking with BONY.  Pursuant to the CEA, Sentinel required BONY to establish segregated accounts for SEGs 1, 2 and 3.  As required by CFTC Rule 1.20,

BONY signed an agreement with respect to each SEG account promising to keep the funds segregated. (Id. ¶¶ 54, 55, Exhs. C-E.)  In the letter agreement BONY explicitly recognized that Sentinel was acting as "future commission merchants, under the Commodity Exchange Act." BONY also agreed that Sentinel was depositing money and securities belonging to "commodity customers" and that all investments would be made "in accordance with the" CEA.  BONY acknowledged further that "[t]hese accounts are being opened to meet the provisions of the Commodity Exchange Act.  This statute provides that such money [be] segregated and treated as belonging to [Sentinel's] customers rather than [Sentinel itself]."  BONY agreed that the funds deposited would not be subject to BONY's lien and would not be applied to indebtedness of the other SEG accounts.  Finally, the letter agreement provided that it would supersede any other documents relating to the accounts that conflicted with its terms.  (Id. Exhs. C-E.)

### 3.　　BONY Helps Sentinel Raid "Segregated" Accounts.

In addition to being custodian of the customer funds deposited by Sentinel, BONY was Sentinel's lender.  (Id. ¶ 1.)  Sentinel's loan was handled through an unsegregated collateral account "FBO BNY." (Id. ¶ 64.)  BONY would loan Sentinel funds, and Sentinel and BONY would transfer securities into that account as collateral, without regard to whether the securities were supposed to belong to the borrower (Sentinel) or its customers.  (Id. ¶ 65.)  As Sentinel's "House" trading increased, BONY's loan to Sentinel started ballooning.  (Id. ¶¶ 102-109.) Sentinel never had more than a few million dollars in capital (id. ¶ 108), and thus had no assets to collateralize a loan that had reached $280 million by late 2005.  (Id. ¶¶ 109-110.)  In order to secure the loan, Sentinel and BONY simply transferred assets that were supposed to be segregated on behalf of customers into BONY's collateral account, even though the loan was not for the customers' benefit.  (Id. ¶¶ 109, 113.)  Hundreds of millions of dollars in assets that were

supposed to be in segregation for customers were instead held in BONY's collateral account, for BONY's benefit.  (Id.)

In June and July 2007, Sentinel was forced to draw further on the BONY loan to avoid defaulting on transactions with counterparties, and the loan reached as high as $573 million.  (Id. ¶¶ 130-144.)  On several occasions, Sentinel and BONY misappropriated and fraudulently transferred huge blocks of securities – hundreds of millions of dollars worth at a time – into BONY's collateral account to secure the loan.  (Id. ¶ 134, 139, 141, 144, 170-172.)  BONY knew that it had no right to take these securities as collateral because it knew they were supposed to belong to customers.  (Id. ¶¶ 134-35, 142, 145.)

In late July 2007, Sentinel decided to move about $500 million in securities that were supposed to belong to SEG 1 customers out of BONY's collateral account and into the SEG 1 account.  (Id. ¶ 148.)  Sentinel and BONY made the transfer, knowing that it was unrelated to any legitimate customer transaction.  (Id. ¶¶ 149-150.)  To plug the hole that transfer created in BONY's collateral position, Sentinel and BONY then transferred almost $300 million in securities from the supposedly segregated SEG 3 account into BONY's collateral account.  (Id. ¶ 150.)  BONY knew that there was no legitimate customer purpose to this transaction and indeed that it emptied out the SEG 3 customer account.  (Id. ¶ 151.)  On August 9, BONY refused to segregate certain securities that Sentinel instructed it to return to SEG accounts because doing so would impair BONY's collateral position.  (Id. ¶ 154.) On August 13, 2007, Sentinel suspended customer redemptions, and its business collapsed.  (Id. ¶ 156.)  BONY then asserted liens over the collateral account and certain other allegedly lienable accounts.  On August 15, BONY determined that it needed $52 million more in collateral than it had.   BONY unilaterally

misappropriated the necessary securities out of the SEG 1 "segregated" account and transferred them into a lienable account.  (Id. ¶ 162).

### 4.    The Complaint and the Motion to Dismiss

Counts 1-3 of the Complaint are bankruptcy claims for fraudulent and preferential transfer of hundreds of millions of dollars of assets to BONY.  Count 4 seeks equitable subordination of BONY's $312 million lien, alleging a wide variety of inequitable conduct, including (among others) violations of the CEA and the IAA segregation requirements, collusion, the misappropriation of hundreds of millions of dollars in assets, and unilaterally stealing $52 million from customer accounts.  Counts 5-7 seek to disallow proof of BONY's claim and invalidate its lien based on the same misconduct.  And Count 8 charges BONY with aiding and abetting the breach of fiduciary duty by certain Sentinel insiders.  BONY moved to dismiss the entire complaint.  After a full briefing and oral argument, the Bankruptcy Court denied the motion to dismiss.

## <u>Argument</u>

### I.    An Interlocutory Appeal Is Entirely Unjustified Here.

BONY moves for leave to appeal under 28 U.S.C. § 158(a), which allows for appeals of "interlocutory orders" of the Bankruptcy Court with "leave of the court."  In evaluating such motions, district courts traditionally turn to the standard set forth in 28 U.S.C. § 1292(b) governing interlocutory appeals from district courts to circuit courts.  See *Phoenix Container, Inc. v. Goodman* (*In re Demert & Dougherty, Inc.*), 2001 WL 1539063, at *5 (N.D. Ill. Nov. 30, 2001) (denying motion for leave to appeal).

Under Section 1292(b), an interlocutory appeal is appropriate only when the order appealed

[1] involves a controlling question of law [2] as to which there is substantial ground for difference of opinion and [3] an immediate appeal may materially advance the ultimate termination of the litigation.

This stringent standard ensures that interlocutory appeals are the rare exception, not the rule.  See *Ahrenholz v. Bd. of Trustees*, 219 F.3d 674, 675-76 (7th Cir. 2000).  The party seeking interlocutory review must persuade the court that "exceptional circumstances justify a departure from the basic policy of postponing appellate review until after the entry of final judgment." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 475 (1978).

### A.      There is no controlling issue of law.

BONY asserts that there are two controlling issues of law: (1) whether the segregation requirements of the CEA apply to funds deposited with an FCM like Sentinel, which is registered and regulated as an FCM, but does not accept customer orders for commodities; and (2) whether the Trustee can assert equitable claims against BONY that rely in part on violations of the CEA and the IAA, which do not provide for a private right of action.  Neither issue is a controlling issue of law warranting the extraordinary relief of interlocutory review.

First, these issues cannot be considered "controlling" because the Bankruptcy Court did not even need to reach them, much less opine on the them, in ruling on BONY's motion to dismiss.  See *Phoenix*, 2001 WL 1539063, at *5 (holding proposed issue of law was not controlling because bankruptcy judge could have based decision on an alternative ground). BONY is in effect contending that it should be allowed an interlocutory appeal so that this Court can pass on legal issues that were not decided in the order appealed.  It cites no authority for such an appeal, and the Trustee is aware of none.

Second, BONY admits that its request to appeal is limited to Counts 4-7.  (BONY at 2.) Even if there were no federal laws regulating FCMs or investment advisers, the Trustee would

7

still be entitled to recover fraudulent and preferential transfers from BONY (Counts 1-3) and pursue BONY for aiding and abetting a breach of fiduciary duty under Illinois common law (Count 8). That is sufficient reason by itself to deny BONY's request for leave to appeal. "[I]n cases such as this one, where the pertinent question is relevant only to [a subset] of several claims, the courts have held that . . . interlocutory review should be denied." See, *e.g., In re Brand Name Prescription Drugs Antitrust Litig.*, 878 F. Supp. 1078, 1082 (N.D. Ill. 1995).

Third, while Counts 4-7 do include allegations that BONY participated in violations of the CEA and IAA, they do not depend on these statutes. Each of these counts includes as well a plethora of other improper conduct, like knowingly misappropriating assets, that is inequitable and unlawful regardless of whether or not the assets were required to be segregated by a particular federal regulatory scheme. Similarly, the allegations that BONY aided and abetted a breach of fiduciary duty, standing alone, are sufficient to state a claim for equitable subordination. *In re OODC, LLC*, 321 B.R. 128, 146 (Bankr. D. Del. 2005). Thus, the issues raised by BONY are not even controlling on the four counts as to which it is seeking to appeal.

Fourth, these issues are not "pure" or "abstract" questions of law, which is what Section 1292(b) requires. *Ahrenholz*, 219 F.3d at 677. Whether funds deposited by Sentinel were subject to the segregation requirements of the CEA depends not merely on an interpretation of a statute, but of critical facts concerning the Sentinel-BONY relationship and the CEA's direct application to BONY. Clearly, that requires the court to "delv[e] into the record." *In re Bridgestone/Firestone, Inc. Tires Products Liability Litig.*, 212 F. Supp. 903, 907-908 (S.D. Ind. 2002).

BONY ignores these points but suggests that an interlocutory legal ruling now would somehow focus discovery and trial. There is a single set of facts at issue here, and even if the

Court were to dismiss certain counts it would not change the scope of or reduce discovery in any meaningful way. The suggestion that the Court should make an interlocutory legal determination to focus the issues for trial is even further afield. It is not the office of either a motion to dismiss or an interlocutory appeal of a denial of such a motion to substitute for a motion *in limine*. But that is exactly what BONY is suggesting here: that the Court should rule now that certain evidence or arguments that will be offered in support of certain counts should be excluded.

**B.    There is no substantial ground for difference of opinion.**

The second Section 1292(b) factor turns largely on whether there is a substantial likelihood that the lower court's resolution of the issues raised will be reversed on appeal. (BONY at 8-9.) The trouble for BONY is that there is no chance that Judge Squires' decision on either issue will be reversed given that he found it unnecessary to rule on them. In any event, BONY's statutory arguments are incorrect and not subject to substantial difference of opinion.

**1.    Section 4d(a) of the CEA applies to Sentinel.**

Under Section 4d(a) of the CEA, "a futures commission merchant" who receives customer funds or property must treat such property as "belonging to such customer." 7 U.S.C. § 6d(a). In addition, such funds "shall be separately accounted for and shall not be commingled with the funds of such futures commission merchant." *Id;* 17 C.F.R. § 1.20.

BONY offers a tortured statutory argument that even if Sentinel was a registered FCM, and even if the funds at issue were deposited by commodity customers, Sentinel was not "really" operating as an FCM because it was not itself accepting orders for commodity contracts. From that premise, it concludes that Sentinel had no duty to segregate under Section 4d(a) and thus that BONY had no duty to segregate at all. Initially, the statute does not say that only FCMs who are actually operating on a particular day by soliciting or accepting commodity trade orders

and accepting money to margin such orders are subject to the statute.  Indeed, under BONY's view, an FCM could be subject to regulatory requirements on one day, not subject to them the next day, and again under the CEA regime on the third.  BONY's proposed reading of the statute would make it impossible for both commodity customers and the CFTC to know who is subject to the CEA requirements.

In analyzing nearly identical language under another provision of the CEA, the Ninth Circuit held that the obligation to comply with the requirements imposed on FCMs "flows from the registrant's status as an FCM and not from the nature of its current activities."  *Premex, Inc. v. CFTC*, 785 F.2d 1403, 1406 n.7 (9th Cir. 1986); *see also CFTC v. Forefront Invs. Corp.*, 2007 WL 21555739, at *3-4 (E.D. Va. Jul. 25, 2007) (CFTC could enforce requirements because of Forefront's "status as a registered FCM, without regard to the type of transactions in which Forefront engages").[1]  Indeed, that is the position that the CFTC has taken with respect to Sentinel by bringing an enforcement action against it and certain of its insiders for violating Section 4d(a) and Rule 1.20.  (Ex. A, ¶ 17.)

In addition to misreading the language of Section 4d(a) of the CEA, BONY's argument ignores its policy, which is to protect commodity customer funds.  The fact that a customer deposits funds with an FCM, who in turn places the funds under the management of an FCM like Sentinel, cannot possibly be understood to eviscerate the customer-protection requirement of segregation and leave a depository bank like BONY free to take such funds for its own purposes.

---

[1] In order to trump up uncertainty where there is none, BONY relies on *Premex* and *Forefront*, which squarely contradict its position, and seeks to draw distinctions based on *de minimis* differences in the provisions of the CEA at issue.  BONY also relies on *New York Currency Research Corp. v. CFTC*, 180 F.3d 83 (2d Cir. 1999), in which the Court held that a party that had formerly and mistakenly registered as a commodity trading adviser was not subject to the recordkeeping provisions of the CEA governing CTAs.  Here, unlike in *Currency Research*, Sentinel was registered at the relevant time.

Sentinel has been registered as an FCM for more than 25 years.  It caused its client FCMs to deposit commodity customer funds with BONY, and BONY expressly acknowledged that these were commodity customer funds under the CEA and had to be segregated.  Prior to Sentinel's failure in August 2007 and the discovery that Sentinel and BONY had flouted the segregation rules, BONY never offered the slightest hint that it believed that the CEA did not apply or that it did not have to segregate funds.  Meanwhile, every month for years BONY received and reviewed Sentinel's CFTC filings, which feature a "Statement of Segregation Requirements (Section 4d(2) of the CEAct)."  (Compl. ¶¶ 117-120.)

In any event, BONY is estopped from asserting its current position because it bid for and acquired Sentinel's custody business by expressly recognizing the application of the CEA to the funds it was to receive and promising to keep such property in segregated accounts.  See *Remcor Prods. Co. v. Scotsman Group, Inc.*, 860 F. Supp. 575, 578 (N.D. Ill. 1994).

But ultimately it does not matter at all whether Sentinel was operating as an FCM, or indeed whether it existed at all.  The focus on Sentinel's status is, at best, a red herring.  Section 4d(a) indisputably applies to Sentinel's clients, registered and operating FCMs, who deposited their customers' commodity funds in the accounts at BONY.  Section 4d(b) of the Act makes the segregation duties that apply to Sentinel's client FCMs also applicable to the depository bank which holds the funds.  Section 4d(b) provides, "It shall be unlawful for any person, including . . . any depository, that has received any money, securities, or property for deposit in a separate account as provided in [§ 4d(a)(2)], to hold, dispose of or use any such money, securities or property as belonging to the depositing futures commission merchant or any other person other than the customers of such futures commission merchant."  7 U.S.C. § 6d(b).  Even if Sentinel were not an FCM at all, the funds at issue are indisputably property "accruing to [FCM]

customer[s] as the result of [commodity] trades or contracts." 7 U.S.C. § 6d(a)(2).  BONY is just as clearly a person who has received such funds "for deposit in a separate account."  Indeed, it recognized that fact explicitly in its 1997 segregation letter agreements with Sentinel.  Thus BONY is also under a duty to segregate.

> 2.    The Trustee may rely on statutory violations to prove inequitable conduct.

BONY's other supposedly substantial legal dispute is over whether the Trustee can rely on violations of the CEA and the IAA to support his claims for equitable relief.  This legal question is well-settled in favor of the Trustee.

As BONY concedes, the Trustee is not asserting any claim under the CEA or the IAA. Instead, the Trustee has alleged that BONY engaged in inequitable conduct that calls for subordination of its lien and invalidation of its claimed security interest. There is nothing novel about looking to statutes under which there is no private damages remedy to define applicable standards of conduct. See, *e.g.*, *Practico v. Portland Terminal Co*., 783 F.2d 255, 266-67 (1st Cir. 1985).  Indeed, the concept of "inequitable conduct" under the Bankruptcy Code invites reference to other laws.  Inequitable conduct sufficient to subordinate a claim in bankruptcy includes "fraud, illegality [and] breach of fiduciary duties . . . ."  *In re Lifschultz Fast Freight*, 132 F.3d 339, 344-45 (7th Cir. 1997) (emphasis added).

In *Columbia Gas & Electric Corp. v. United States*, 151 F.2d 461, 469 (6th Cir. 1945), the Sixth Circuit rejected the very argument BONY advances here.  There, Columbia had tried to acquire control over the debtor companies through securities purchases that violated antitrust laws.  In bankruptcy, other creditors sought to preclude Columbia from enforcing its contracts with the debtors, based on the antitrust violation.  Columbia argued that the antitrust laws "provide their own penalties to which the [bankruptcy] court may not add."  *Id*. at 466.  The

Sixth Circuit rejected that argument and held the contracts unenforceable because it is "the power and duty of equity, to reject demands arising out of illegal or inequitable conduct *whenever such conduct is subject to legal penalties imposed by state or federal law . . . .*" *Id.* (emphasis added).

The Supreme Court reached the same conclusion in *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77, 81 (1982), in which a party seeking enforcement of the contract argued that the express remedies under the Sherman Act should not be added to by including avoidance of contracts as a sanction.  The Supreme Court rejected that view, holding that "[r]efusing to enforce a promise that is illegal under [federal law] is not providing an additional remedy contrary to the will of Congress." *Id.* at 81 n.7.  *Kaiser* is dispositive of BONY's argument that the absence of a private damages remedy under the CEA means that the standards of the CEA are irrelevant to determining whether the liens it asserts under certain security agreements are valid.

BONY's argument to the contrary mistakenly relies on a series of cases in which the plaintiffs tried to invoke a general civil rights statute to assert <u>a private damages claim foreclosed under the pertinent statutory regulatory scheme</u>.  (BONY at 13.)  Here, by contrast, the relevant counts do not seek a damages remedy forbidden by Congress, or indeed, any damages remedy at all.  Instead, the Trustee seeks equitable relief that is authorized by the Bankruptcy Code and cites violations of other federal laws, which the Code's concept of inequity makes relevant, to support his claims for subordination and the like.  Where no statutory damages remedy is being sought, whether a private right of action exists under the statute is irrelevant.  *Cox v. Zale Delaware, Inc.*, 239 F.3d 910, 913-14 (7th Cir. 2001).  There is no substantial ground for difference of opinion on the issue presented.

13

**C.    An interlocutory appeal will not materially advance the ultimate termination of the litigation.**

If possible, BONY's suggestion that throwing in an extra appeal now will somehow speed up the course of the litigation is even more implausible than its other contentions. As discussed above, the beginning and end of the matter is that BONY cannot establish that interlocutory review is warranted under § 1292(b) unless reversal would dispose of the entire litigation. See, *e.g.*, *Brand Name*, 878 F. Supp. at 1082; *Norfolk S. Ry. Co. v. Gee Co.*, 158 F. Supp. 2d 878, 883-84 (N.D. Ill. 2001); *Muniz v. Rexnord Corp.*, 2007 WL 257710, at *2 (N.D. Ill. 2007). Here, of course, even BONY admits that winning on its CEA issues would not affect four of the eight counts in the Complaint, and prevailing would not result in the dismissal of a single count because there is other misconduct alleged in each count that does not depend on any statutory violation. And even if one or more counts were dismissed, it would make no difference to advancing the litigation materially because the same evidence will be relevant on all the counts. *Brand Name*, 878 F. Supp. 2d at 1083.

**II.    BONY'S Alternative Request for Reconsideration Should Be Denied.**

BONY's request in a single sentence of it brief for this Court to treat "the instant motion as a motion to reconsider" (BONY at 5) has been waived by failing to spell out its argument. See *Campania Mgt. Co. v. Rooks, Pitts & Poust*, 290 F.3d 843, 852 n.6 (7th Cir. 2002) ("Perfunctory and undeveloped arguments are waived. . . ."). In any event, motions for reconsideration serve a limited purpose and are appropriate only where the movant "present[s] either newly discovered evidence or establish[es] a manifest error of law or fact." *Oto v. Metropolitan Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000). "A manifest error is not demonstrated by the disappointment of the losing party. It is the wholesale disregard, misapplication, or failure to recognize controlling precedent." *Id.* (quotations omitted); *Bank of*

14

*Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990) ("manifest error" is one "not of reasoning but of apprehension").  "Reconsideration is not an appropriate forum for rehashing previously rejected arguments . . . ." *Ahmed v. Ashcroft*, 388 F.3d 247, 249 (7th Cir. 2004); *Conditioned Ocular Enhancement v. Bonaventura*, 458 F. Supp. 2d 704, 707 (N.D. Ill. 2006) (Zagel, J.).  That is all BONY is asking here, a request as ludicrous "as if a movant, when he appealed, had filed two copies of his appeal brief, and when his appeal was rejected asked [the court] to read the second copy." *Ahmed*, 388 F.3d at 249.

Dated: June 30, 2008

Respectfully submitted,

FREDERICK J. GREDE, not individually
but as Chapter 11 Trustee of Sentinel
Management Group, Inc.


By:  s/ Chris C. Gair_____
      One of his attorneys

Chris C. Gair (ARDC # 6190781)
Vincent E. Lazar (ARDC # 6204916)
Jeffrey S. Eberhard (ARDC # 6276471)
JENNER & BLOCK LLP
330 N. Wabash Ave.
Chicago, IL  60611
Phone: (312) 222-9350
Facsimile: (312) 527-0484

## <u>CERTIFICATE OF SERVICE</u>

I, Jeffrey S. Eberhard, an attorney, certify that on June 30, 2008, I caused the foregoing

Memorandum of Law in Opposition to BONY's Motion for Leave to Appeal to be served on the

following via ECF.

Hector Gonzalez                        Sean T. Scott
Matthew D. Ingber                      71 S. Wacker Drive
1675 Broadway                          Chicago, IL 60606
New York, NY 10019                     (312) 782-0600
(212) 506-2500                         stscott@mayerbrown.com
hgonzalez@mayerbrown.com
mingber@mayerbrown.com


                                       _____s/ Jeffrey S. Eberhard_____

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF ILLINOIS

COMMODITY FUTURES TRADING
COMMISSION,

Plaintiff,

v.

SENTINEL MANANAGEMENT
GROUP, INC.,
ERIC A. BLOOM, and
CHARLES K. MOSLEY,

Defendants.

FILED: APRIL 28, 2008

CIVIL ACTION NO. 08CV2410          TG

JUDGE SHADUR

MAGISTRATE JUDGE BROWN

COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND
FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY
EXCHANGE ACT

## I.   SUMMARY

1.      This action involves fraud and misuse of futures commission merchant

("FCM") commodity customer funds by the Defendants, Sentinel Management Group,

Inc. ("Sentinel"), its president, Eric A. Bloom ("Bloom"), and its senior vice president,

Charles K. Mosley ("Mosley"), from at least May 21, 2007 through August 17, 2007

("the relevant time").  Sentinel is registered as a FCM with plaintiff Commodity Futures

Trading Commission ("Commission" or "CFTC") and is registered as an investment

adviser with the Securities and Exchange Commission ("SEC").  Sentinel provided

investment advisory and money management services.

2.      During at least the relevant time, Sentinel improperly commingled customer segregated assets with its assets and the assets of others and misappropriated such customers' assets by using them to secure, extend or pay Sentinel's debt.

3.      Sentinel has engaged, is engaging, or is about to engage in acts or practices that violate the anti-fraud and segregation of customer assets sections of the Commodity Exchange Act, as amended ("Act"), 7 U.S.C. §§ 1 *et seq.* (2002), and Commission Regulations thereunder, 17 C.F.R. §§ 1.1 *et seq.* (2007). Mosley aided and abetted Sentinel's violations and is liable for those violations pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a). Bloom is a controlling person of Sentinel and is liable for Sentinel's violations pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2002).

4.      Accordingly, pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a-1 (2002), the Commission brings this action to enjoin Defendants' unlawful acts and practices, and compel Defendants' compliance with the provisions of the Act and regulations thereunder. In addition, the CFTC seeks civil monetary penalties against Bloom and Mosley and such other equitable relief as to all defendants as this Court may deem necessary or appropriate.

## II.     JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2002), which provides that whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order promulgated thereunder, the Commission may bring an action in the proper District

Court of the United States against such person to enjoin such practice, or to enforce compliance with the Act, or any rule, regulation or order thereunder.

6.      Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2002), because Sentinel's principal place of business is in this District and acts and practices in violation of the Act and Commission Regulations have occurred within this District.

### III.    THE PARTIES

7.      Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged with administering and enforcing the Act, 7 U.S.C. §§ 1 *et seq.* (2002), and the regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.* (2007).

8.      Defendant **Sentinel Management Group, Inc.** is an Illinois corporation with its principal place of business located in Northbrook, Illinois.  Sentinel provides investment advisory and money management services to various institutional, corporate and individual customers, including FCMs.  Sentinel has been registered with the Commission as a FCM since June 1980 and also has been registered with the SEC as an investment adviser since December 1980.  Sentinel has also been a member of the National Futures Association ("NFA"), a self-regulatory organization for the U.S. futures industry, since July 1982.  Sentinel is currently the subject of a bankruptcy proceeding in the bankruptcy court for this district. *See In re: Sentinel Management Group, Inc.,* (No. 07-14987, Bankr. N.D. Ill.).

3

9.    Defendant **Eric A. Bloom** resides in Chicago, Illinois. Bloom was a principal, director, president and chief executive officer of Sentinel during the relevant time. Bloom has never been registered with the CFTC in any capacity.

10.    Defendant **Charles K. Mosley** resides in Vernon Hills, Illinois. Mosley was a director, senior vice-president and a principal of Sentinel during the relevant time. Mosley ceased employment with Sentinel, and his status as a principal was withdrawn on August 15, 2007. Mosley has not been registered with the CFTC in any capacity since April 1989, when he was registered as an associated person of another registered FCM.

## IV.    FACTS

### A. Statutory and Regulatory Background

11.    A FCM is defined in Section 1a(20) of the Act, 7 U.S.C. § 1a(20), and Commission Regulation 1.3(p), 17 C.F.R. § 1.3(p), with certain qualifications, as an individual, association, partnership, corporation, or trust that is engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any contract market or derivatives transaction execution facility; and in or in connection with such solicitation or acceptance of orders, accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom.

12.    The NFA is a not-for-profit membership corporation and is a self-regulatory organization that is registered with the Commission as a futures association under Section 17 of the Act, 7 U.S.C. § 21. The NFA conducts audits and investigations of NFA member firms, including registered FCMs, to monitor them for compliance with NFA rules, some of which incorporate by reference Commission Regulations.

4

**B. Background**

13.     Sentinel managed investments of short-term cash for various customers, including hedge funds, pension funds, other FCMs, customers of other FCMs, individuals and others.  As of August 13, 2007, Sentinel claimed to have $1.2 billion of customer assets under management.

14.     Sentinel offered customers the opportunity to participate in a variety of investment programs, each of which had its own investment policy depending on the needs and preferences of its customers.  Sentinel's general practice was to pool a customer's assets with those of other customers participating in the same investment program in custodial accounts held both at the Bank of New York ("BONY") and J.P. Morgan Chase.  These investment programs and their related accounts were referred to within Sentinel as "Seg 1", "Seg 2" and "Seg 3", depending on the type of customer it serviced.

15.     The Seg 1 program invested and kept segregated the segregated assets of domestic customers of other FCMs registered with the Commission, whose deposits were held for the purchase of commodity futures contracts or options on commodity futures contracts.  The investments for the customers of the FCMs were subject to the rules of the Commission, in particular to the investment standards embodied in Commission Regulation 1.25, 17 C.F.R. § 1.25 (2007).  As relevant here, those standards include restrictions on the investment of the segregated customer funds of the other FCMs consistent with the objectives of preserving principal and maintaining liquidity.

16.     Sentinel expressly acknowledged this duty to adhere to the investment standards of Regulation 1.25 when, in 1981, it also requested the Commission's Division

of Trading and Markets to take a "no-action" position regarding Sentinel's maintenance

of adjusted net capital.  As set forth in Commission Regulation 1.17, 17 C.F.R. § 1.17, a

FCM's adjusted net capital is calculated by deducting total liabilities from total current

assets to arrive at net capital, from which certain charges are deducted as a cushion

against potential decreases in market value to arrive at adjusted net capital.  Based

partially on Sentinel's representation that it was registered as a FCM solely so that it may

hold customers' funds deposited with it by other FCMs for the exclusive purpose of

investing such funds in Regulation 1.25 approved obligations for the benefit of such other

FCMs, and its representation that customers' funds are segregated, the Commission

issued a "no-action" letter to Sentinel dated May 7, 1981 that, allowed Sentinel to operate

under certain net capital provisions and other restrictions.

17.    As a registered FCM, Sentinel was required under the Act and

Commission Regulations to adhere to the standards of segregation and handling of

customer funds as outlined in Sections 4d(a)(2) and 4d(b) of the Act, 7 U.S.C.

§§ 6d(a)(2) and 6d(b) (2002), and Commission Regulations 1.20, 1.22 and 1.23, 17

C.F.R. §§ 1.20, 1.22 and 1.23 (2007).

18.    The Seg 2 program invested the assets of customers of FCMs that traded

foreign futures and options.

19.    The Seg 3 program invested the assets of all other types of customers,

including hedge funds, trust accounts, pension funds, individuals and others.

20.    From at least July 2005 to August 17, 2007, in its standard investment

advisory agreement ("Agreement") with all of its customers, Sentinel represented that the

customers in each portfolio owned a pro rata interest in their particular investment

6

portfolio. The Agreement also provided discretionary authority to Sentinel to buy and

sell securities without requesting authority from customers before executing the trades.

The Agreement often had an Addendum specifying the investment policy that was to be

used to invest the customer's funds.

## C. Misuse and Misappropriation of Customer Segregated Funds For Sentinel's Benefit

21.    During the relevant time, Sentinel maintained a line of credit with BONY

(the "BONY loan"). The credit extended under this line of credit varied during the time

period, reaching as high as $500 million in June 2007. One of the purposes of the BONY

loan was to allow Sentinel to draw upon the loan to immediately honor Seg 1 FCM

redemption requests.

22.    Associated with the BONY loan was a house account in Sentinel's name

at BONY. The house account was not segregated and any assets placed in that account

were pledged as collateral for the BONY loan.

23.    Sentinel used the BONY loan for various purposes. Among other things,

if sufficient Seg 1 cash was not available in the Seg 1 account to honor redemption

requests, then Sentinel drew upon the BONY loan to honor the Seg 1 FCMs' redemption

requests. On those occasions when house account funds were required to meet FCM

redemption requests, a corresponding amount of Seg 1 segregated securities was to be

transferred to the house account, held until eventually liquidated, and the proceeds used

to pay down the BONY loan.

24.    Sentinel also used the BONY loan to obtain additional leveraged financing

for its security purchases.

7

25.    Sentinel was required to hold in segregated accounts sufficient funds and securities to meet its obligations to customers at all times.  During the relevant time, Sentinel routinely used its Seg 1 FCM segregated customer funds to secure its loan with the BONY by improperly transferring and holding Seg 1 securities in the nonsegregated house account.

26.    Sentinel frequently held customer securities in the nonsegregated house account in excess of the amount required to honor the redemption requests of Seg 1 FCMs for that day.  Sentinel's holding of Seg 1 securities in the nonsegregated house account in excess of the amount previously used to honor the redemption requests of Seg 1 FCMs, absent sufficient excess segregated funds in the Seg 1 account meant that Sentinel thereby pledged or made available those Seg 1 segregated securities as collateral for the BONY loan.  For example:

a) On May 21, 2007, Sentinel held at least $86 million of Seg 1 customer securities in Sentinel's "house" account at BONY.  On that date, Seg 1 FCM redemptions were approximately $14 million, however, FCM deposits in Seg 1 were in excess of $20 million.  Hence, Sentinel's holding of $86 million of Seg 1 securities in the house account on that date was not necessary to honor Seg 1 redemptions.

b) On June 29, 2007, Sentinel held at least $410 million of Seg 1 customer securities in Sentinel's "house" account at BONY.  On that date, Seg 1 FCM redemptions were approximately $27 million, however, FCM deposits to Seg 1 were in excess of $28 million.  Hence, Sentinel's holding of $410 million of

8

Seg 1 securities in the house account was not necessary to honor Seg 1 redemptions.

c) On July 18, 2007, Sentinel held at least $449 million of Seg 1 customer securities in Sentinel's "house" account at BONY. On that date, Seg 1 FCM redemptions were approximately $14 million and FCM deposits to Seg 1 were $9 million. Hence, Sentinel had approximately $444 million of Seg 1 securities in the house account in excess of the amount required to honor the redemptions for that day.

d) On August 7, 2007, Sentinel held at least $137 million of Seg 1 customer securities in Sentinel's "house" account at BONY. On that date, Seg 1 FCM redemptions were approximately $18 million, however, FCM deposits to Seg 1 were in excess of $29 million. Hence, Sentinel's holding of approximately Seg 1 $137 million securities in the house account was not necessary to honor Seg 1 redemptions.

e) On August 13, 2007, Sentinel held at least $148 million of Seg 1 customer securities in Sentinel's "house" account at BONY. On that date, Seg 1 FCM redemptions were approximately $70 million, however, FCM deposits to Seg 1 were $68 million. Hence, Sentinel had approximately $146 million of Seg 1 securities in the house account in excess of the amount required to honor the redemptions for that day.

27.    Sentinel's use of segregated securities belonging to the customers of the Seg 1 FCMs as collateral in order to obtain or maintain a line of credit with BONY constituted a misappropriation of Seg 1 customer property for Sentinel's own benefit.

9

Sentinel was not authorized by its Seg 1 customers or the FCMs to use or encumber the securities in this manner.

28.    Mosley customarily was in charge of Sentinel's securities trading for the Seg 1, Seg 2 and Seg 3 portfolios.  During at least the relevant time, Mosley drew upon the BONY loan to fund various securities transactions and received daily reports regarding the amount and status of the BONY loan.  To collateralize the BONY loan, Mosley willfully caused excess Seg 1 securities to be moved from Sentinel's Seg 1 segregated account to Sentinel's house account.

29.    Bloom, president and chief executive officer of Sentinel, was informed on a daily basis of Mosley's trading, and reviewed the daily statements regarding the liability of the BONY loan and transfer of excess Seg 1 assets to the house account. Consequently, he knew that Seg 1 assets were being used improperly to secure Sentinel's loan with BONY.  He also had control over the persons that determined what assets were pledged to secure that loan, including, but not limited to, Mosley.

**D. Filing of False Reports with the Commission**

30.    Section 4g(a) of the Act, 7 U.S.C. § 6g(a), requires FCMs to make such reports as are required by the Commission regarding its transactions and positions, and the transactions and positions of customers.  Pursuant to Commission Regulation 1.10(b), 17 C.F.R. § 1.10(b), FCMs are required to prepare and file periodic statements of financial condition on Form 1-FRs with the Commission.  These reports are required to contain, *inter alia*, a statement of financial condition as of the date the report was made and a statement of computation of the firm's minimum capital requirements, including its adjusted net capital and its excess adjusted net capital.  Commission Regulation

1.10(d)(1), 17 C.F.R. § 1.10(d)(1), requires that Form 1-FRs be prepared in accordance with generally accepted accounting principles ("GAAP"), except where the regulations specify otherwise, applied on a basis consistent with that of the FCM's preceding financial report, and include all disclosures necessary to make the report a clear and complete statement of the FCM's financial position under the Commission's rules.

31.     Pursuant to its letter agreements with the Commission and Commission Regulation 1.10, 17 C.F.R. § 1.10, Sentinel was required to file Form 1-FR financial reports with the Commission on a monthly basis. The Form 1-FR reports expressly required Sentinel to disclose securities purchased under resale agreements – *i.e.*, repos – and liabilities, including amounts payable to banks.

32.     During the period of at least September 2005 through July 2007, Sentinel filed with the Commission at least 23 Form 1-FRs that falsely reported that Sentinel owned no securities purchased under resale agreements and had no amounts payable, including no amounts payable to BONY, despite the existence of the BONY loan.

**E.  Bankruptcy of Sentinel**

33.     On August 13, 2007, Sentinel issued a letter announcing that it was requesting authority from the Commission to suspend customer requests for redemptions ("August 13 letter"). In that letter, Sentinel stated that the reason for the redemption freeze was its fear that redemption requests could force Sentinel to sell securities at deep discounts to their fair value due to the downturn in the credit markets, and this could cause losses to customers.

34.    In fact, Sentinel never requested such authority from the Commission and the Commission did not grant Sentinel any such authority.  Nevertheless, Sentinel did not allow redemptions of investments.

35.    On August 17, 2007, Sentinel filed a voluntary petition for protection under Chapter 11 of the Bankruptcy Code, in the U.S. Bankruptcy Court for the Northern District of Illinois.

36.    According to Sentinel's records, on August 15, 2007, Sentinel owed its Seg 1 customers approximately $561 million.  Since that time, Sentinel has paid its Seg 1 customers approximately $431 million leaving a balance due to its Seg 1 customers of approximately $130 million.

## V.

## VIOLATIONS OF THE ACT AND COMMISSION'S REGULATIONS

## COUNT ONE

## VIOLATIONS OF SECTION 4b(a)(2)(i) OF THE ACT:  FRAUD BY MISAPPROPRIATION

37.    The allegations set forth in paragraphs 1 through 36 are re-alleged and incorporated herein.

38.    Section 4b(a)(2)(i) of the Act, 7 U.S.C. § 6b(a)(2)(i), makes it unlawful in or in connection with orders to make, or the making of, contracts of sale of commodities, for future delivery, made, or to be made, for or on behalf of such other persons where such contracts for future delivery were or may have been used for (a) hedging any transaction in interstate commerce in such commodity, or the products or byproducts thereof, or (b) determining the price basis of any transaction in interstate commerce in

such commodity, or (c) delivering any such commodity sold, shipped, or received in interstate commerce for the fulfillment thereof to cheat or defraud such other person.

39.     On various occasions from May 21, 2007 to August 13, 2007, Sentinel willfully violated Section 4b(a)(2)(i) of the Act, 7 U.S.C. § 6b(a)(2(i), by removing Seg 1 assets from segregation and misappropriating them for use as collateral for its loan with BONY.

40.     Sentinel engaged in the conduct described in paragraphs 1 through 36 above, in or in connection with orders to make, or the making of, contracts of sale of commodities for future delivery, made, or to be made, for or on behalf of other persons where such contracts for future delivery were or may have been used for (a) hedging any transaction in interstate commerce in such commodity, or the products or byproducts thereof, or (b) determining the price basis of any transaction in interstate commerce in such commodity, or (c) delivering any such commodity sold, shipped, or received in interstate commerce for the fulfillment thereof.

41.     During the relevant time, Mosley willfully aided and abetted Sentinel's violations of Section 4b(a)(i) of the Act and, therefore, pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a) (2002), Mosley is liable for the violations described in this Count One as a principal.

42.     During the relevant time, Bloom directly and indirectly controlled Sentinel and its employees, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations described in this Count One.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2002), Bloom is liable for the violations described in this Count One.

43.     Each misappropriation of Seg 1 customer funds during the relevant time period, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4b(a)(i) of the Act, 7 U.S.C. § 6b(a)(i) (2002).

## COUNT TWO

### VIOLATIONS OF SECTION 4d(a)(2) OF THE ACT AND COMMISSION REGULATIONS 1.20, 1.22 AND 1.23: FAILURE TO SEGREGATE AND OTHER MISUSE OF CUSTOMER FUNDS

44.     Paragraphs 1 through 36 are realleged and incorporated herein by reference.

45.     Section 4d(a)(2) of the Act, 7 U.S.C. § 6(a)d(2) (2002), requires a FCM to treat and deal with all customer money, securities and property as belonging to such customers and to separately account for such money, securities and property. Section 4d(a)(2) of the Act further prohibits a FCM from commingling customer money, securities and property with its own funds and from using customer money, securities and property to margin or guarantee the trades or contracts or to secure or extend the credit of any customer or person other than those for whom the same are held.

46.     Commission Regulation 1.20, 17 C.F.R. § 1.20 (2007), requires that all customers' funds be separately accounted for, properly segregated and treated as belonging to such customers, and not commingled with the funds of any other person.

47.     Commission Regulation 1.22, 17 C.F.R. § 1.22 (2007), prohibits a FCM from using, or permitting the use of, funds of a customer to secure or extend the credit of any person other than such customer.

48.     Commission Regulation 1.23, 17 C.F.R. § 1.23 (2007), prohibits a FCM from withdrawing upon customer segregated funds beyond its actual interest therein and the use of such funds of a customer to extend the credit of any other person.

14

49.    The customers of the other FCMs whose funds were invested by those FCMs with Sentinel were in turn customers of Sentinel.

50.    Throughout the relevant time, Sentinel violated Section 4d(a)(2) of the Act, 7 U.S.C. § 6d(a)(2) (2002), and Commission Regulations 1.20, 1.22 and 1.23, 17 C.F.R. §§ 1.20, 1.22 and 1.23 (2007), by:  commingling Seg 1 customer funds with those of Sentinel and others; using those Seg 1 customer funds to secure the BONY loan of Sentinel; failing to treat, deal with, and account for Seg 1 customer funds as belonging to the customer; and withdrawing customer segregated funds beyond Sentinel's actual interest therein.

51.    During the relevant time, Mosley willfully aided and abetted Sentinel's violations of  Section 4d(a)(2) of the Act, 7 U.S.C. § 6d(a)(2) (2002), and Commission Regulations 1.20, 1.22 and 1.23, 17 C.F.R. §§ 1.20, 1.22 and 1.23 (2007).  Therefore, Mosley is liable for the violations described in this Count Two as a principal.

52.    During the relevant time, Bloom directly and indirectly controlled Sentinel and its employees, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations described in this Count Two.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Bloom is liable for the violations described in this Count Two.

53.    Each removal from segregation and commingling of Seg 1 customer funds with those of Sentinel during the relevant time, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Sections 4d(a)(2) of the Act, 7 U.S.C. § 6d(a)(2) (2002), and Commission Regulation 1.20, 17 C.F.R. § 1.20 (2007).

15

54.    Each use of Seg 1 customer funds to secure Sentinel's BONY loan during the relevant time period, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4d(a)(2) of the Act, 7 U.S.C. § 6d(a)(2) (2002), and Commission Regulation 1.22, 17 C.F.R. § 1.22 (2007).

55.    Each withdrawal of Seg 1 customer funds beyond Sentinel's actual interest therein at the relevant point in time, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4d(a)(2) of the Act, 7 U.S.C. § 6d(a)(2) (2002), and Commission Regulation 1.23, 17 C.F.R. § 1.23 (2007).

## COUNT THREE

### VIOLATIONS OF SECTION 4d(b) OF THE ACT: MISUSE OF CUSTOMER FUNDS

56.    Paragraphs 1 through 36 are realleged and incorporated herein by reference.

57.    Section 4d(b) of the Act, 7 U.S.C. § 6d(b) (2002), makes it unlawful for any person including any depository, that has received any money, securities, or property for deposit in a separate account as provide for in Section 4d(a)(2) of the Act, to hold, dispose of, or use any such money, securities, or property as belonging to the depositing futures commission merchant or any person other than the customers of such FCM.

58.    Throughout the relevant time, Sentinel violated Section 4d(b) of the Act, 7 U.S.C. § 6d(b) (2002), by using Seg 1 customer funds to secure the BONY loan of Sentinel.

59.    During the relevant time, Mosley willfully aided and abetted Sentinel's violations of Section 4d(b) of the Act, 7 U.S.C. § 6d(b) (2002).  Therefore, Mosley is liable for the violations described in this Count Three as a principal.

16

60.    During the relevant time, Bloom directly and indirectly controlled Sentinel and its employees, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations described in this Count Three.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Bloom is liable for the violations described in this Count Three.

61.    Each use of Seg 1 customer funds to secure Sentinel's BONY loan during the relevant time period, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4d(b) of the Act, 7 U.S.C. § 6d(b) (2002).

## COUNT FOUR

### VIOLATIONS OF SECTION 4g(a) OF THE ACT AND COMISSION REGULATION 1.10(d): FILING FALSE REPORTS WITH THE COMMISSION

62.    The allegations set forth in paragraphs 1 through 36 are re-alleged and incorporated herein.

63.    During the period of at least September 2005 through July 2007, Sentinel violated Section 4g(a) of the Act, 7 U.S.C. § 6g(a), and Commission Regulation 1.10(d), 17 C.F.R. § 1.10(d), by filing with the Commission at least 23 Form 1-FRs that falsely reported that Sentinel owned no securities purchased under resale agreements and had no amounts payable.

64.    During the relevant time, Bloom directly and indirectly controlled Sentinel and its employees, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations described in this Count Four.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Bloom is liable for the violations described in this Count Four.

65.     The filing of each Form 1-FR that falsely reported that Sentinel owned no securities purchased under resale agreements and/or had no amounts payable is alleged as a separate and distinct violation of Section 4g(a) of the Act, 7 U.S.C. § 6g(a), and Commission Regulation 1.10(d), 17 C.F.R. § 1.10(d).

**COUNT FIVE**

**VIOLATIONS OF SECTION 6(c) OF THE ACT: WILLFULLY MAKING FALSE REPORTS TO THE COMMISSION**

66.     The allegations set forth in paragraphs 1 through 36 are re-alleged and incorporated herein.

67.     Section 6(c) of the Act, 7 U.S.C. § 9, prohibits, *inter alia*, the willful making of a false or misleading statement of material fact in any registration application or any report filed with the Commission under the Act.

68.     During the period of at least September 2005 through July 2007, in at least 23 Form 1-FRs that Sentinel filed with the Commission, Sentinel violated Section 6(c) of the Act by willfully making false statements that Sentinel owned no securities purchased under resale agreements and had no amounts payable.

69.     During the relevant time, Bloom directly and indirectly controlled Sentinel and its employees, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations described in this Count Four.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Bloom is liable for the violations described in this Count Four.

70.     The filing of each Form 1-FR in which Sentinel willfully made false statements that Sentinel owned no securities purchased under resale agreements and/or

18

had no amounts payable is alleged as a separate and distinct violation of Section 6(c) of the Act, 7 U.S.C. § 9.

## VI.    **RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 12a-1, and pursuant to its own equitable powers:

(1)    Find Sentinel liable for violating Sections 4b(a)(2)(i), 4d(a)(2), 4d(b), 4g(a) and 6(c) of the Act, 7 U.S.C. §§ 6b(a)(2)(i), 6d(a)(2), 6d(b), 6g(a) and 9 (2002), and Commission Regulations 1.10(d), 1.20, 1.22 and 1.23, 17 C.F.R. §§ 1.10(d), 1.20, 1.22 and 1.23 (2007).

(2)    Find Mosley liable as a principal for aiding and abetting Sentinel's violations of Sections 4b(a)(2)(i), 4d(a)(2) and 4d(b) of the Act, 7 U.S.C. §§ 6b(a)(2)(i), 6d(a)(2) and 6d(b) (2002), and Commission Regulations 1.20, 1.22 and 1.23, 17 C.F.R. §§ 1.20, 1.22 and 1.23 (2007).

(3)    Find Bloom liable as a controlling person for Sentinel's violations of Sections 4b(a)(2)(i), 4d(a)(2), 4d(b), 4g(a) and 6(c) of the Act, 7 U.S.C. §§ 6b(a)(2)(i), 6d(a)(2), 6d(b), 6g(a) and 9 (2002), and Commission Regulations 1.10(d), 1.20, 1.22 and 1.23, 17 C.F.R. §§ 1.10(d), 1.20, 1.22 and 1.23 (2007).

(4)    Enter an order of permanent injunction prohibiting the Defendants and any other person or entity associated with them, including any successor thereof, from:

a) engaging in conduct in violation of Sections 4b(a)(2)(i), 4d(a)(2) and 4d(b) of Act, 7 U.S.C. §§ 6b(a)(2)(i), 6d(a)(2) and 6d(b), and Commission Regulations 1.20, 1.22 and 1.23, 17 C.F.R. §§ 1.20, 1.22 and 1.23 (2007); and

b)  applying for registration or claiming exemption from registration with

the Commission in any capacity, and engaging in any activity requiring such

registration or exemption from registration with the Commission, except as

provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9), or acting as a

principal, agent, officer or employee of any person registered, required to be

registered, or exempted from registration with the Commission, except as

provided for in Regulation 4.14(a)(9).  This includes, but is not limited to,

soliciting, accepting, or receiving any funds, revenue or other property from any

other person, giving commodity trading advice for compensation, except as

provided in Regulation 4.14(a)(9), or soliciting prospective customers related to

the purchase or sale of commodity futures or options.

(5)     Enter an additional order of permanent injunction prohibiting Sentinel and

Bloom and any other person or entity associated with them, including any successor

thereof, from engaging in conduct in violation of Sections 4g(a) and 6(c) of the Act,

7 U.S.C. §§ 6g(a) and 9, and Regulation 1.10(d), 17 C.F.R. §1.10(d) (2007).

(6)     Enter an order directing Bloom and Mosley to make full restitution to

every customer whose funds were lost as a result of the acts and practices that constituted

violations of the Act and Commission Regulations, as described herein, including pre-

judgment interest.

(7)     Enter an Order directing Bloom and Mosley to each pay a civil monetary

penalty in the amount of not more than the higher of (i) triple the monetary gain to that

Defendant or (ii) $130,000 for each violation of the Act and Commission Regulations.

20

(8)    Enter an Order providing such other and further remedial ancillary relief as the Court may deem appropriate.

Date: 04/28/2008                                    Respectfully submitted,


s/ Mark H. Bretscher
Mark Bretscher
A.R.D.C. No. 6194945

s/ William P. Janulis
William P. Janulis
A.R.D.C. No. 1326449

s/Rosemary Hollinger
Rosemary Hollinger
Regional Counsel
A.R.D.C. No. 3123647

Attorneys for Plaintiff
Commodity Futures Trading Commission
525 W. Monroe Street, Suite 1100
Chicago, IL 60661
312-596-0529 (Bretscher)
312 596-0545 (Janulis)
(312) 596-0520 (Hollinger)
(312) 596-0700 (office number)
(312) 596-0714 (facsimile)