# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

_____

|  |  |  |
|---|---|---|
| **FREDERICK J. GREDE**, as Chapter 11 Trustee for Sentinel Management Group, Inc., | ) ) ) | |
| Plaintiff, | ) ) | Case No. 08 CV 2582 |
| v. | ) ) | |
| **THE BANK OF NEW YORK** and **THE BANK OF NEW YORK MELLON CORP.**, | ) ) ) ) | Hon. James B. Zagel |
| Defendants. | ) ) | |

_____

## DEFENDANTS' OPPOSITION TO THE TRUSTEE'S MOTION TO RECONSIDER

Brian Trust
Hector Gonzalez
Matthew D. Ingber
MAYER BROWN LLP
1675 Broadway
New York, New York 10019
(212) 506-2500

Sean T. Scott
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, Illinois 60606
(312) 782-0600

*Attorneys for Defendants*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT ................................................................................................................. 3

I.  THE TRUSTEE'S ARGUMENTS ARE WRONG ON THE MERITS,
    AND WITHDRAWAL OF THE REFERENCE WAS PROPER ..................................... 4

    A.  THE BNY ACTION PRESENTS NUMEROUS BASES FOR
        MANDATORY WITHDRAWAL............................................................................ 4

        1.  The Question of Whether Section 6d of the CEA and
            Related CFTC Rules Applied to Sentinel Mandated
            Withdrawal of the Reference ....................................................... 5

        2.  The Open Issue of Whether the Trustee May Assert
            Title 11 Claims Premised on Violations of the CEA
            and Advisers Act Also Mandated Withdrawal of the Reference ............... 8

    B.  PERMISSIVE WITHDRAWAL ALSO IS WARRANTED................................. 9

II. IMMEDIATE AND COMPLETE WITHDRAWAL IS WARRANTED........................ 9

    A.  WITHDRAWAL OF ONLY THE NON-TITLE 11 ISSUES IS
        IMPRACTICAL, IF NOT IMPOSSIBLE ............................................................ 9

    B.  THIS COURT IS MORE THAN CAPABLE OF ADDRESSING
        ANY TITLE 11 ISSUES ................................................................................ 11

    C.  NO REASON EXISTS TO HAVE A DIFFERENT COURT
        HANDLE PRETRIAL MATTERS .................................................................. 13

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ball v. City of Chicago*,
2 F.3d 752 (7th Cir. 1993) ...................................................................................... 3

*Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*,
90 F.3d 1264 (7th Cir. 1996) ............................................................................... 3, 4

*CFTC v. Forefront Investments Corp.*,
2007 WL 2155739 (E.D. Va. July 25, 2007) .......................................................... 6

*City of Rancho Palos Verdes v. Abrams*,
544 U.S. 113 (2005)................................................................................................. 8

*Cox v. Zale Delaware, Inc.*,
239 F.3d 910 (7th Cir. 2001) ................................................................................. 8

*Fogel v. Zell (In re Madison Mgmt. Group, Inc.)*,
1999 WL 160265, (N.D. Ill. March 10, 1999).......................................................11

*Holden Metal v. Wismarq*,
2004 WL 1498152 (N.D. Ill. July 1, 2004).............................................................. 4

*Howard v. McAdory*,
2004 WL 2064358 (N.D. Ill. 2004) ......................................................................... 3

*Hua v. United Airlines, Inc.*,
1999 WL 51791 (N.D. Ill.1999) .............................................................................. 3

*In re English*,
59 B.R. 460 (Bankr. N.D. Ga. 1985) ....................................................................14

*In re Vicars Ins. Agency, Inc.*,
96 F.3d 949 (7th Cir. 1996) ................................................................................. 4, 5

*Kaiser Steel Corp. v. Mullins*,
455 U.S. 72 (1982)................................................................................................... 8

*Levy v. Evans*,
2007 WL 3087204 (S.D. Ill. Oct. 19, 2007) ........................................................... 3

*Middlesex County Sewerage Auth. v. Nat'l Sea Clammers*,
453 U.S. 1 (1981)..................................................................................................... 8

*New York Currency Research Corp. v. CFTC*,
180 F.3d 83 (2d Cir. 1999) ..................................................................................... 6

*Patterson v. Williamson*,
153 B.R. 32 (E.D. Va. 1993) .................................................................................14

*Premex, Inc. v. CFTC*,
785 F.2d 1403 (9th Cir. 1986) ................................................................................ 6

*Publishers Res., Inc. v. Walker-Davis Publ'ns, Inc.*,
762 F.2d 557 (7th Cir. 1985) .............................................................................. 1, 3

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Remcor Products v. Scotsman Group, Inc.*
   860 F. Supp. 575 (N.D. Ill. 1994) ........................................................................... 7

*Sosa v. Alvarez-Mchain,*
   542 U.S. 692 n.9 (2004)..................................................................................... 6, 7

*Wellman Thermal Sys. Corp. v. Columbia*
   *Cas. Co. (In re Wellman Thermal Sys. Corp.),*
   2005 WL 4880619 (S.D. Ind. Oct. 5, 2005) ........................................................ 13

**Statutes and Rules**

7 U.S.C. § 1a(20) ........................................................................................................ 5

7 U.S.C. § 6d(a) .......................................................................................................... 6

7 U.S.C. § 6f(b) ........................................................................................................... 6

7 U.S.C. § 6n(3)(A) ..................................................................................................... 6

11 U.S.C. § 547(b) .................................................................................................... 12

11 U.S.C. § 547(b)(5) ............................................................................................... 10

11 U.S.C. § 548............................................................................................... 10, 12

17 C.F.R. § 120(a)....................................................................................................... 7

28 U.S.C. § 1334(b) ................................................................................................. 11

**Other Authorities**

2A N. Singer, Statutes and Statutory Construction § 46:06 at 194 (6th rev. ed. 2000)...................7

9 Collier On Bankruptcy ¶ 5011.11 (15th ed. 2008) ..................................................14

Defendants The Bank of New York ("BNY") and The Bank of New York Mellon Corp. hereby submit this opposition to the Trustee's Motion to Reconsider Withdrawal of the Reference in its Entirety, or in the Alternative, to Refer All but the Non-Title 11 Issues to the Bankruptcy Court ("Motion to Reconsider"), and in support thereof respectfully state as follows.

## PRELIMINARY STATEMENT

BNY's motion for withdrawal of the reference (the "Withdrawal Motion") of the adversary proceeding brought by Frederick R. Grede (the "Trustee"), Chapter 11 Trustee for Sentinel Management Group, Inc. ("Sentinel"), against BNY (the "BNY Action") was premised on two alternate grounds: (i) that withdrawal was mandatory under 28 U.S.C. § 157, given the abundance of open and unresolved issues of non-title 11 law raised by the Trustee's complaint; and (ii) that overriding concerns of judicial economy warranted permissive withdrawal.[1] Given the clear statutory basis for both mandatory and permissive withdrawal, this Court correctly ordered withdrawal of the BNY Action. Now, having received a ruling he dislikes, the Trustee contends – without citing any supporting authority whatsoever – that he somehow should be entitled to relitigate this Court's June 20 order. There is no legal basis here for reconsideration.

The Trustee fails to even cite to the legal standard that justifies reconsideration, an extraordinary remedy which should be used sparingly. Reconsideration is justified in four circumstances: (1) an intervening change in the law, (2) new evidence not available at the time of the original ruling, (3) a clear legal error, and (4) the prevention of manifest injustice. *See Publishers Res, Inc. v. Walker-Davis Publ'ns, Inc.*, 762 F.2d 557, 561 (7th Cir. 1985).

Here, the Trustee's brief adds no substance to his arguments at the May 13, 2008 hearing, and not one argument in support of the Motion to Reconsider justifies reconsideration. The

---

[1] BNY also filed a memorandum of law in support of the Withdrawal Motion (the "Withdrawal Memo" or "Withdrawal Mem."), attached hereto as Exhibit A.

Trustee simply rehashes his argument at the hearing that the claims do not raise open and unresolved issues of non-title 11 law, despite the fact that BNY's alleged violations of the Commodity Exchange Act (the "CEA") and the Investment Advisers Act of 1940 (the "Advisers Act") are the **only** topic of nearly **half** of the Trustee's factual allegations, *see* Cmplt. ¶¶ 23-99,[2] and there is no case law addressing the liability of any depository institution for such violations, even if proven.  The Trustee also ignores BNY's arguments in support of withdrawal based on the permissive prong of Section 157(d) to no avail; indeed, the judicial economy that will result from permissive withdrawal applies with even greater force now that the Trustee's action against Sentinel's prepetition auditors, *Grede v. McGladrey & Pullen LLP, et al.*, Case No. 08-cv-02205 (N.D. Ill.) (Zagel, J.) ( the "McGladrey Action"), will proceed before this Court.

As a fallback position, the Trustee argues for some sort of bifurcation of this action between the Bankruptcy Court and this one.  This novel argument also presents no basis for reconsideration.  As an initial matter, double-tracking, which the Trustee seeks, would be a waste of judicial and party resources.  Moreover, this Court plainly is more than competent to oversee the action going forward, and the Trustee's suggestion, Tr. Br. at 3,[3] that merely "one aspect" of

---

[2]    A true and correct copy of the complaint (the "Complaint" or "Cmplt.") filed in the BNY Action is attached hereto as Exhibit B.  We have also attached hereto as Exhibit C a version of the Complaint that removes allegations relating to, or arising out of, these alleged regulatory violations.  Purported violations of the CEA and Advisers Act are also the basis of the Sentinel insiders' alleged breaches of their fiduciary duties (which BNY allegedly aided and abetted) (Count VIII) (*see* Cmplt. ¶ 234), and are incorporated by reference into every single one of the Trustee's claims, including the claims to avoid and recover allegedly fraudulent and/or preferential transfers (Counts I-III) (*see* ¶¶ 168, 175, 183).  In fact, the Complaint accuses BNY of having violated federal law on eight separate occasions.

[3]    Citations to "Tr. Br." refer to the Trustee's Memorandum of Law in Support of Motion to Reconsider Withdrawal of Reference in its Entirety, or in the Alternative, to Refer all but the Non-Title 11 Issues to the Bankruptcy Court," filed with this Court on June 24, 2008 (Doc. No. 13).

the Trustee's Complaint involves violations of the CEA and Advisers Act is disingenuous.  *See generally* Ex. C.

In addition, the Trustee's contention that the Bankruptcy Court is better equipped to manage discovery in this case ignores the extensive record to the contrary.   Finally, any argument that reconsideration is warranted because Judge Squires ruled on BNY's motion to dismiss should be disregarded, as even Judge Squires recognized his ruling would be moot in the event of withdrawal.

## ARGUMENT

Nowhere in his brief in support of the Motion to Reconsider does the Trustee explain the legal basis for the reconsideration he seeks.   As best can be determined, the Trustee seeks to obtain reconsideration pursuant to Fed. R. Civ. P. 59(e) because, in his view, the Court committed manifest errors of law in granting the Withdrawal Motion.[4]   Only four grounds justify reconsideration under Rule 59(e):   (1) an intervening change in the law, (2) new evidence not available at the time of the original ruling, (3) a clear legal error, and (4) the prevention of manifest injustice.   *See*, *e.g.*, *Publishers Res., Inc.* 762 F.2d at 561 (explaining that Rule 59(e) motions serve a limited function:   "to correct manifest errors of law or fact or to present newly discovered evidence").   Reconsideration is an extraordinary remedy which should be used sparingly.   *See*, *e.g.*, *Howard v. McAdory*, No. 04 C 2185, 2004 WL 2064358, at *3 (N.D. Ill. 2004); *Hua v. United Airlines, Inc.*, No. 98 C 1324, 1999 WL 51791, at *3 (N.D. Ill. 1999).   The

---

[4]      "Where a substantive motion for reconsideration is filed within ten days of entry of judgment, the Court generally will construe it as a motion pursuant to Rule 59(e); later motions will be construed as pursuant to Rule 60(b)."  *Levy v. Evans*, No. 06-cv-723-JPG, 2007 WL 3087204, at *1 (S.D. Ill. Oct. 19, 2007).  Here, even if the Trustee were seeking reconsideration under Rule 60(b), he has failed to offer any justification for relief under the bases permitted by that rule, which courts generally recognize as presenting an even more difficult standard than Rule 59(e).  *See id.* ("Rule 59(e) generally requires a lower threshold of proof than does Rule 60(b)."); *Ball v. City of Chicago*, 2 F.3d 752, 760 (7th Cir. 1993) (acknowledging that Rule 60(b) presents a more difficult standard than Rule 59(e)).

law is clear that motions to reconsider may not be used to relitigate issues or present arguments which could have been previously addressed. *See*, *e.g.*, *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996) ("Reconsideration is not an appropriate forum for rehashing previously rejected arguments or arguing matters that could have been heard during the pendency of the previous motion."); *see also Holden Metal v. Wismarq*, No. 00 C 191, 2004 WL 1498152, at *1-*2 (N.D. Ill. July 1, 2004) (Zagel, J.) (relying on *Caisse Nationale* in denying motion for reconsideration that rehashed arguments previously rejected by the court).

Here, the Trustee offers a series of arguments that either were already, or should have been, presented in opposition to the Withdrawal Motion. Instead of seeking a briefing schedule on this matter, the Trustee made the strategic choice to argue his basis for contesting the Withdrawal Motion at the May 13, 2008 hearing before this Court. *See* 5/13/2008 Hr'g Tr., Ex. D, at 2:25-3:1. In particular, the Trustee argued at length that the BNY Action did not present key open and unresolved legal issues warranting withdrawal of the reference. *Id.* at 3:3-16, 5:12-6:13. Having seized the opportunity to argue the merits of the Withdrawal Motion at the May 13 hearing, the Motion to Reconsider is nothing more than an attempt to relitigate issues already decided in the Court's June 20, 2008 order, and must be denied for this reason alone. *Caisse Nationale*, 90 F.3d at 1270. But to the extent that the Trustee is entitled to relitigate these points now, he has in any event failed to demonstrate any basis sufficient to warrant reconsideration.

## I.    THE TRUSTEE'S ARGUMENTS ARE WRONG ON THE MERITS, AND WITHDRAWAL OF THE REFERENCE WAS PROPER

### A.    The BNY Action Presents Numerous Bases for Mandatory Withdrawal

As set forth at length in BNY's Withdrawal Memo (at 5-12), because the Complaint raises at least three key open and unresolved legal issues, each of which requires "substantial and material consideration" of non-title 11 federal statutes for their resolution, withdrawal of the

reference is mandated by 28 U.S.C. § 157(d) and the Seventh Circuit's standard for mandatory withdrawal set forth in *In re Vicars Ins. Agency, Inc.*, 96 F.3d 949 (7th Cir. 1996). The Motion to Reconsider offers no credible explanation why withdrawal is not mandatory, and only serves to further demonstrate the open and unresolved issues of federal law presented by the Complaint.

1.     *The Question of Whether Section 6d of the CEA and Related CFTC Rules Applied to Sentinel Mandated Withdrawal of the Reference*

In contending that interpretation of the segregation requirements of Section 6d(a) and obligations relating to depositories under Section 6d(b) of the CEA do not mandate withdrawal of the reference, the Trustee attempts to sidestep the central and novel issues that his Complaint raises by selectively quoting parts of the relevant provisions of the CEA. Tr. Br. at 5-8. In so doing, the Trustee fails to address the full relevant statutory language, ignoring the definition of a futures commission merchant ("FCM") that governs whether the statute applies to Sentinel (and, by extension, to BNY) in the first place. The CEA defines an FCM as an entity that:

(A)     ***is engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery*** on or subject to the rules of any contract market or derivatives transaction execution facility; and,

(B)     in or in connection with such solicitation or acceptance of orders, accepts any money, securities, or property (or extends credit in lieu thereof) ***to margin, guarantee, or secure any trades or contracts that result or may result therefrom***.

7 U.S.C. § 1a(20) (emphases added). The plain language of the CEA cannot apply to Sentinel, because (i) Sentinel was never an FCM under the plain language of the CEA, and (ii) it never received "customer funds" within the meaning of the CEA. Withdrawal Mem. at 7-9.[5]

---

[5]     Because, as the Trustee concedes (Cmplt. ¶ 29), Sentinel **never** operated as an FCM in its nearly thirty-year history, the question of the CEA's application does not – contrary to the Trustee's contention (Tr. Br. at 5) – depend on a daily determination of Sentinel's activities.

The Trustee relies on two cases supposedly for the proposition that Sentinel need not have been an operating FCM to be subject to the segregation requirements of Section 4(d). *See* Tr. Br. at 6 (citing *Premex, Inc. v. CFTC*, 785 F.2d 1403 (9th Cir. 1986) and *CFTC v. Forefront Invs. Corp.*, No. 07CV152, 2007 WL 2155739 (E.D. Va. July 25, 2007)). But those cases interpreted Section 6f(b) of the CEA, which, in contrast to Section 4d, provides only that "each **person** . . . **so registered** [as an FCM] shall at all times continue to meet . . . minimum financial requirements [as prescribed by the CFTC]." 7 U.S.C. § 6f(b) (emphasis added). Put another way, that particular provision of the CEA did not have the additional requirement, set forth in the segregation provisions, that the registrant also "engage as [an FCM] or introducing broker." 7 U.S.C. § 6d(a).

More closely analogous is *New York Currency Research Corporation v. CFTC*, 180 F.3d 83 (2d Cir. 1999), in which the CFTC sought to enforce Section 6n(3)(A) of the CEA, which provides that "[e]very commodity trading advisor and commodity pool operator registered under this chapter shall maintain books and records." 7 U.S.C. § 6n(3)(A). The Second Circuit concluded in *N.Y. Currency* that, according to the plain language of Section 6(n)(3)(A), to impose liability for violating the provision, the CFTC had to prove **both** that the defendant was registered **and** that it was functioning as either a commodity trading advisor or commodity pool operator within the meaning of the CEA. *See N.Y. Currency*, 180 F.3d at 89.[6]

These cases stand for a basic principle of statutory interpretation that when Congress uses different language in different sections of the same statute, it does so intentionally and courts must give effect to the full text of each provision. *See id.* at 90; *see also Sosa v. Alvarez-Mchain*,

---

[6]     Contrary to the Trustee's suggestion, Tr. Br. at 6 n.2, neither *Premex* nor *Forefront* contradicts BNY's position, and *N.Y. Currency* is directly on point. All three cases stand for the basic principle that Congress's use of different language in different sections of the same statute is intentional. For a detailed discussion of *N.Y. Currency*, see 6/10/2008 Hr'g Tr., attached hereto as Ex. E, at 29:3-31:7.

542 U.S. 692, 711 n.9 (2004) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.") (quoting 2A N. Singer, Statutes and Statutory Construction § 46:06 at 194 (6th rev. ed. 2000)). But to the extent that the Trustee will not concede this point, resolution of the Complaint will require "substantial and material" consideration of the scope of Section 6d(a), and withdrawal of the reference. *See* Withdrawal Mem. at 7. By insisting on looking beyond the plain language of the CEA's provisions, the Trustee offers no basis upon which to grant reconsideration, and only underscores that significant interpretational issues exist with respect to that Act.[7]

The Trustee also glosses over the additional element of whether any funds deposited with Sentinel, and subsequently with BNY, constituted "customer funds" within the meaning of the CEA. As discussed in BNY's opening brief in support of its motion to dismiss, attached hereto as Exhibit F, CFTC Rule 1.20(a) states that the segregation requirements of Section 4d apply only to "customer funds," defined as "money, securities, and property received by [the FCM] *to margin, guarantee, or secure the trades or contracts* of any customer of such [FCM]." 17 C.F.R. § 120(a) (emphasis added). But Sentinel is not alleged to have received any property to

---

[7]    The Trustee also contends that BNY is estopped from asserting a statutory-based defense under *Remcor Products v. Scotsman Group, Inc.*, a case which holds that a "favorable result from an administrative body . . . sufficiently constitutes an administrative equivalent to a judgment such that judicial estoppel could apply." 860 F. Supp. 575, 579 (N.D. Ill. 1994). *Remcor* is irrelevant because there is no "result" from an administrative body. But even if *Remcor* stood for the broader proposition that a party is estopped from taking a position contrary to a previous representation made to a regulatory entity, BNY made no representations to any regulatory entity concerning Sentinel, and in the Complaint's 236 paragraphs, the Trustee alleges none. Instead, the Trustee relies on 1997 letters in which BNY simply acknowledged that Sentinel was establishing segregated customer accounts (Cmplt. Exs. C-E). Those letters contain no promises of any kind by either party, were provided to Sentinel for no consideration and, in any event, are no longer valid – since on their face, they apply only to specific accounts that were closed eleven years ago. BNY also never took a lien on any such accounts. In short, *Remcor* has nothing to do with the facts here.

margin, guarantee or secure any trades or contracts of its customers.  And because it did not receive "customer funds," the CEA's segregation requirements do not apply.[8]

In sum, resolution of these statutory questions mandates withdrawal of the reference, and reconsideration is inappropriate.  Indeed, there is no guiding case law to assist the Bankruptcy Court in deciding such issues, they are far afield of its core competency, and in any event Congress and the Supreme Court have reserved such questions to Article III courts.

2.    *The Open Issue of Whether the Trustee May Assert Title 11 Claims Premised on Violations of the CEA and Advisers Act Also Mandated Withdrawal of the Reference*

The Trustee argues he can indirectly enforce the CEA and Advisers Act, in the clear absence of any private right of action, through Bankruptcy Code claims.  He states that the Supreme Court already has "held" that the Trustee can do so.  *See* Tr. Br. at 8 (citing *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72 (1982)).  The Trustee's reading of the "holding" of *Kaiser Steel* is nothing short of remarkable, given that the decision did not involve the Bankruptcy Code, the CEA, the Advisers Act, or any facts even remotely similar to the case here.[9]  The Trustee may not enforce these statutes indirectly through title 11 claims based upon, among other things, Supreme Court's decisions in *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113 (2005) and *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers*, 453 U.S. 1 (1981).  In those cases, the Supreme Court has enforced Congressional intent as expressed in expansive statutory enforcement schemes by preventing plaintiffs from seeking other remedies outside of the

---

[8]    The Trustee's claim that the public policy interest in "protect[ing] commodity customer funds" would be eviscerated by BNY's reading of Section 4d has no merit for this exact reason.  Section 4d was intended only to protect a subset of commodity customer assets; specifically, "customer funds."

[9]    The other case cited by the Trustee in this regard is irrelevant.  *See Cox v. Zale Delaware, Inc.*, 239 F.3d 910, 915-17 (7th Cir. 2001) (holding that, because a certain provision of the Bankruptcy Code provided no private right of action, it precluded any claim not expressly authorized by that provision's "remedial scheme," including an action for rescission of a contract).

schemes at issue.  Withdrawal Mem. at 10. Again, though, the applicability of this line of authority has never been decided, and regardless of how this Court ultimately rules, the Trustee's contentions fail to warrant reconsideration and only further prove that withdrawal was proper.[10]

### B.    Permissive Withdrawal Also Is Warranted

The Trustee also fails to address the permissive withdrawal analysis set forth in BNY's Withdrawal Motion and Withdrawal Memo.  Instead, the Trustee simply rehashes the very same arguments made in briefing on the McGladrey Action that this Court already has rejected. Although the Trustee also seeks to distinguish the two actions on the basis that BNY's case is "not fundamentally a common-law dispute," (Tr. Br. at 5), that is besides the point; the issue is whether "cause exists" under the multiple-factor test used by this Court and others.  Withdrawal Mem. at 12-15.  While ample cause exists for withdrawal if this action were evaluated on a stand-alone basis, the withdrawal of the related McGladrey Action makes the decision even simpler:  both cases should remain before this Court to maximize efficiencies and consistency.

## II.    IMMEDIATE AND COMPLETE WITHDRAWAL IS WARRANTED

The Trustee next urges this Court to (i) bifurcate the BNY Action and withdraw only the non-title 11 statutory issues and/or (ii) vacate its prior order withdrawing the reference and allow the Bankruptcy Court to handle all pre-trial matters.  Neither of these options is appropriate, as each would create unnecessary delay and a considerable waste of judicial and party resources.

### A.    Withdrawal of Only the Non-Title 11 Issues Is Impractical, If Not Impossible

As a threshold matter, parsing out only the non-title 11 statutory issues before this Court (as the Trustee suggests) is not practicable.  The CEA issues are a common thread running

---

[10]    We note that the Trustee has not even bothered to refute – and thereby has waived the opportunity to refute – BNY's third ground for mandatory withdrawal, the standard to which BNY should be held under the CEA and Advisers Act in the event that the Trustee is permitted to proceed with claims based on those violations.  *See* Withdrawal Mem. at 11-12.

through the Trustee's entire case. *See, e.g.*, Ex. C. The majority of the Complaint's 236 paragraphs relate to BNY's alleged federal regulatory violations, and those violations underpin at least half the counts asserted in the Complaint.[11] Even for those counts where the CEA and Advisers Act issues are not directly raised in the Complaint, such issues will affect the ultimate resolution of the Complaint. As one example, while the Complaint's fraudulent transfer claims do not directly reference the CEA's segregation provisions, it is either disingenuous or inaccurate to assert that "whether the CEA and CFTC segregation regulations applied to Sentinel and [BNY] has nothing to do with whether [BNY] received fraudulent transfers." Tr. Br. at 10. There is no dispute that BNY provided value in the form of loans to Sentinel, that were secured by the pledge of securities to BNY that the Trustee attacks as fraudulent. Thus, BNY has a complete defense to the Trustee's fraudulent transfer claims unless the Trustee proffers evidence that such value was not provided in good faith. *See* 11 U.S.C. § 548(c). And in that regard, he certainly will fall back on allegations that BNY violated the CEA and other federal law.[12]

Even if this Court determined that keeping only the non-title 11 issues and re-referring the remainder of this action somehow was feasible, that approach would waste the resources of this Court, BNY, the Trustee, Sentinel's creditors, and the Bankruptcy Court. Considerations of judicial economy always have favored withdrawal of the BNY Action by eliminating the need for appeal to this Court of any rulings on the Trustee's core claims and for its *de novo* review of proposed findings and conclusions on the non-core claims and related allegations. *See*

---

[11]    The Trustee contends that BNY's alleged violations of federal law are grounds for the equitably subordination, disallowance, and/or equitable disallowance of BNY's secured claim against Sentinel, s*ee* Cmplt. ¶¶ 190-220, and that the alleged violations of such statutes render BNY's security interest in and lien upon its collateral unenforceable as a matter of non-bankruptcy law. See *id.* ¶¶ 221-229.

[12]    The preference count also fails unless BNY's liens themselves are first avoided under the other counts (based on regulatory violations), because BNY was, at all times, oversecured. Consequently, such transfers of additional collateral have not entitled BNY to receive more than it would have in a chapter 7 liquidation. *See* 11 U.S.C. § 547(b)(5).

Withdrawal Mem. at 13; *see also Fogel v. Zell (In re Madison Mgmt. Group, Inc.)*, 93 CV 04777, 1999 WL 160265, at *6 (N.D. Ill. March 10, 1999), *rev'd on other grounds*, 221 F.3d 955 (7th Cir. 2000) ("Withdrawal of the reference also conserves the parties' time and financial resources because it eliminates the potential for an intermediate appeal from the bankruptcy court to the district court."). Bifurcating the BNY Action would result in tremendous duplication of effort, particularly because both the Trustee's core and non-core claims rely on the same allegations.[13] This approach would require two trials at two levels of the judiciary – with multiple appearances by witnesses – and then require another, subsequent layer of oversight by this Court in reviewing findings of fact from its trial *de novo*. This would be a bizarre and unprecedented approach to a lawsuit of this complexity and magnitude, and it merits no real consideration.

**B.    This Court is More Than Capable of Addressing Any Title 11 Issues**

The Trustee also suggests that the Bankruptcy Court is best-suited to address the bankruptcy law issues raised in the adversary proceeding, ignoring that this Court is more than capable of handling all issues raised in the adversary proceeding. The District Court has original jurisdiction over all proceedings arising under Title 11, *see* 28 U.S.C. § 1334(b), and while bankruptcy courts are obviously "skilled in dealing with issues arising under Title 11 of the United States Code[,] . . . district courts are also fully competent in bankruptcy law and very capable of resolving disputes in this area of law." *In re Madison Mgmt.*, 1999 WL 160265 at *6. Moreover, the real complexities in this case derive from the CEA and Advisers Act overlay on the Trustee's title 11 claims; the bankruptcy claims themselves are garden-variety.

---

[13]    It is particularly ironic that the Trustee would propose an approach so likely to cause unnecessary delay and procedural complexity while at the same time impliedly accusing BNY of trying to "derail and delay the proceedings." Tr. Br. at 3.

The Trustee also overstates the risk that having this Court determine any bankruptcy-related issues could result in inconsistent rulings. In trying to conjure up the potential for such risk, the Trustee contends that a "major issue" raised in BNY's Motion to Dismiss as well as by other parties in the underlying bankruptcy case is the question of whether certain assets constitute "property of the estate." Tr. Br. at 10. The Trustee misses the mark. The ***actual*** issue BNY raised in the Motion to Dismiss was whether the Complaint ***sufficiently alleged*** a transfer of "an interest of the debtor in property" – a required element of the fraudulent transfer and preference claims asserted in the Complaint. *See* Ex. F; 11 U.S.C. §§ 547(b), 548(a)(1). Indeed, although the Complaint includes conclusory allegations that the transfers at issue were transfers of an interest in Sentinel's property, those statements were flatly contradicted by numerous factual allegations in the Complaint that such property did not belong to Sentinel but should have been held in trust. *See* Cmplt. ¶¶ 3, 48, 51 127, 135. The issue is purely a legal one: accepting the Trustee's allegations as true, any transfers to BNY of Sentinel's customers' property – if Sentinel was in fact required to have held such property in trust – cannot be avoidable as fraudulent or preferential transfers. In any event, even if this becomes an issue, the potential for conflict is highly speculative at this time because it is far from certain whether any issue relating to property of the estate ultimately will need to be addressed by the Bankruptcy Court. Indeed, the Bankruptcy Court already has made clear that property-of-the-estate issues will ***not*** be before that court at any hearing to confirm the Trustee's proposed liquidating plan. *See* 6/16/2008 Hr'g Tr., Ex. G, at 24:19-23 ("I can tell you right now I am not going to be in a position at the time we have confirmation hearing on this plan to decide if a particular asset is or is not part of the bankruptcy estate.").[14]

---

[14] The Trustee also references two adversary proceedings pending in the Bankruptcy Court where the property-of-the-estate issue supposedly is implicated. Tr. Br. at 10. However, neither of these is

C.    **No Reason Exists to Have a Different Court Handle Pretrial Matters**

Lastly, the Trustee's proposal to refer further pretrial matters to the Bankruptcy Court is unwarranted.  BNY submits that this Court, which will ultimately hear and determine dispositive motions in this case and conduct a trial if necessary, will benefit from presiding over matters going forward given the enormous complexities of this case.  Ongoing case management will provide it valuable insight into the nature of the claims and defenses at issue, a benefit which would be lost if the Bankruptcy Court handled pretrial matters.  *See Wellman Thermal Sys. Corp. v. Columbia Cas. Co. (In re Wellman Thermal Sys. Corp.)*, No 05 CV 1191, 2005 WL 4880619, at * 3 (S.D. Ind. October 5, 2005) ("Certain efficiencies would be lost were the bankruptcy court to proceed with pretrial matters; the district court would not gain valuable familiarity with the case that could assist it leading up to and through trial.").

By contrast, there simply is no benefit for such matters going forward in the Bankruptcy Court.  To date, the Bankruptcy Court consistently has expressed little to no desire to manage how discovery will proceed – even refusing to enter a discovery scheduling order mandated by Fed. R. Civ. P. 16(b)(1)(A) after the parties submitted their discovery plan pursuant to Fed. R. Civ. P. 26(f).  *See* 4/08/2008 Hr'g Tr., Ex. H, at 29:5-24.  The Bankruptcy Court has indicated:

- "I don't do discovery like magistrates do for the district judges . . . .  I have got . . . a larger caseload than probably all the district judges in this district have together.  I don't have any magistrates to help me do discovery, okay, which is why I leave it to the attorneys. . . . I don't set scheduling orders like magistrate judges do.  I don't have the time to micromanage discovery.  I have got too much else to do. . . .   So I'm going to leave you to settle it on your own."   4/08/2008 Hr'g Tr., Ex. H, at 29:5-24.

---

likely to result in a decision that could conflict with a decision in this case.  With respect to one of the proceedings, the Trustee's action against certain Sentinel insiders, the Trustee has already settled with all but one of the defendants in the action.  With respect to the other, a declaratory judgment action brought by certain Sentinel customers, the action relates to assets transferred **to those customers** by Sentinel in the 90 days prior to Sentinel's bankruptcy as well as certain other assets currently held by Sentinel.  It does not relate to the assets that the Complaint alleges were fraudulently transferred from Sentinel to BNY.

- "You've got discovery started. It's going to be ongoing for months. And if it's that complicated . . . , I'll allow discovery to go on throughout the trial. I've had to do that before. . . . [T]hat's not a problem." 6/10/2008 Hr'g Tr., Ex. E, at 54:22-55:3.

Moreover, the Bankruptcy Court also has made it clear that it has no particular interest in retaining either this case or the McGladrey Action and has indicated that it would welcome the lightening of its already heavy docket. *See*, *e.g.*, 6/05/2008 Hr'g Tr., Ex. I, at 7:17-21.

Finally, this Court should not countenance Trustee's suggestion that because the Bankruptcy Court denied the Motion to Dismiss, this Court and BNY are bound by that ruling, and withdrawal is not warranted. Tr. Br. at 8-9.[15] Obviously, this Court, having withdrawn the reference, should review *de novo* the briefing on the Motion to Dismiss. *See Patterson v. Williamson*, 153 B.R. 32, 33 (E.D. Va. 1993) (holding that, on an adversary proceeding that had been withdrawn from the bankruptcy court, the bankruptcy court's discovery orders were "null and void, because the bankruptcy court lacked subject matter jurisdiction over the adversary proceeding"); *In re English*, 59 B.R. 460, 470 (Bankr. N.D. Ga. 1985) (recognizing that if district court granted withdrawal of the reference, then bankruptcy court's denial of a motion to dismiss "shall be deemed not to have been determined by this [bankruptcy] court and shall be determined by the district court *ab initio*"); *see also* 9 Collier on Bankruptcy ¶ 5011.11 (15th ed. 2008) (citing *Patterson* for the proposition that "[o]bviously, once an order withdrawing reference is entered by the district court, the bankruptcy court loses jurisdiction over all matters for which the

---

[15] It is ironic that the Trustee, in trying to keep the action before the Bankruptcy Court, now seeks to capitalize upon his own errant predictions of how this Court would rule on the Withdrawal Motion. On June 5, 2008, BNY requested that the Bankruptcy Court stay oral argument and ruling on BNY's Motion to Dismiss pending this Court's disposition of the Withdrawal Motion, so that the court ultimately responsible for adjudicating the BNY Action would address the foundational issues in the Motion to Dismiss. The Trustee vigorously opposed a stay – which would have prejudiced no one – on the basis that BNY's likelihood of success on its Withdrawal Motion was "minimal" and that this Court's failure to rule or set a briefing schedule since BNY presented the Withdrawal Motion constituted "the teeth of evidence to the contrary." *See Grede v. Bank of New York et al.*, No. 08-127 (Bankr. N.D. Ill.), Doc. No. 42, Opposition to BNY's Motion to Stay, at 2.

reference was withdrawn").  Indeed, in denying BNY's request that the Bankruptcy Court stay

oral argument and a decision on the Motion to Dismiss pending this Court's disposition of the

Withdrawal Motion, Judge Squires recognized that any ruling he made on the Motion to Dismiss

would be moot in the event this Court granted BNY's Withdrawal Motion:

> I don't think I see any irreparable harm in denying a stay [of a
> decision on the motion to dismiss] because there is the pendency of
> the motion to withdraw the reference . . . . I am going to deny the
> motion to stay. . . . ***And it will all be mooted out if Judge Zagel
> rises to the bait of your motion to withdraw, which believe me, I
> take no offense at.***  I never have a problem with motions to
> withdraw the reference because if the district court wants to lighten
> my case load by one adversary, I'm always happy about that.

*See* Ex. I, 6/05/2008 Hr'g Tr., 5:7-7:21 (emphasis added).

## <u>CONCLUSION</u>

For all the foregoing reasons, BNY and The Bank of New York Mellon Corp.

respectfully request that the District Court deny the Motion to Reconsider and grant any other

relief that it deems just and proper.

Dated:  July 2, 2008

<div style="margin-left:40%">

Respectfully submitted,

**THE BANK OF NEW YORK and
THE BANK OF NEW YORK MELLON CORP.**

By:   /s/ Sean T. Scott                                      __
Sean T. Scott (ARDC #6273516)
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, Illinois 60606
(312) 782-0600

Brian Trust (admitted *pro hac vice*)
Hector Gonzalez (admitted *pro hac vice*)
Matthew D. Ingber (admitted *pro hac vice*)
MAYER BROWN LLP
1675 Broadway
New York, New York 10019
(212) 506-2500

</div>

## CERTIFICATE OF SERVICE

Matthew V. Wargin, an attorney, hereby certifies that on the 2nd day of July, 2008, he caused to be served, via email a true and correct copy of each of the **DEFENDANTS' OPPOSITION TO THE TRUSTEE'S MOTION TO RECONSIDER** upon (i) Chris Gair, J. Kevin McCall, Daniel Murray, Catherine Steege and Vincent E. Lazar, Jenner & Block, LLP, 330 N. Wabash Avenue, Chicago, IL 60611-7603, cgair@jenner.com, vlazar@jenner.com; jmccall@jenner.com; dmurray@jenner.com; and csteege@jenner.com; (ii) Frederick J. Grede, Chapter 11 Trustee, c/o Jenner & Block, LLP, 330 N. Wabash Avenue, Chicago, IL 60611-7603, c/o cgair@jenner.com; (iii) Roman Sukley, US Trustee's Office, Dirksen Federal Court House, 219 South Dearborn Street, Room 873, Chicago, IL 60604, Roman.L.Sukley@usdoj.gov; (iv) Mark Berkoff and Marc Fenton, DLA Piper US LLP, 203 North LaSalle Street, Suite 1900, Chicago, Illinois 60601-1293, marc.fenton@dlapiper.com and mark.berkoff@dlapiper.com; and (v) Susheel Kirpalani and Benjamin Finestone, Quinn Emanuel Urquhart Oliver & Hedges, LLP, 51 Madison Avenue 22nd Floor, New York, New York 10010, susheelkirpalani@quinnemanuel.com and benjaminfinestone@quinnemanuel.com. Registered members of the Court's CM/ECF system that are participants in these proceedings received electronic notice of this filing.

Dated: July 2, 2008                    /s/ Matthew V. Wargin, Esq.
                                       Matthew V. Wargin, Esq.

# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SENTINEL MANAGEMENT GROUP, INC., | ) | Case No. 07 B 14987 |
| | ) | |
| Debtor. | ) | Hon. John H. Squires |
| | ) | |
| FREDERICK J. GREDE, as Chapter 11 Trustee for Sentinel Management Group, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. 08-127 |
| vs. | ) | |
| THE BANK OF NEW YORK and THE BANK OF NEW YORK MELLON CORP., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
<u>OF THEIR MOTION TO WITHDRAW THE REFERENCE</u>**

# TABLE OF CONTENTS

Page

SUMMARY OF ARGUMENT ...................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND....................................................................2

ARGUMENT ..............................................................................................................................5

I.      Mandatory Withdrawal of the Reference is Required .........................................................5

        A.  Whether Section 6d of the CEA and Related CFTC
            Rules Applied to Sentinel and BNY is an Open and
            Unresolved Issue Mandating Withdrawal of the Reference ...........................................6

        B.  The Open Issue of Whether the Trustee May Assert Title 11
            Claims Premised on Violations of the CEA and the Advisers
            Act Mandates Withdrawal ............................................................................................9

        C.  The Standard to Which BNY Should Be Held under the CEA
            and Advisers Act is an Open and Unresolved Issue Mandating
            Withdrawal of the Reference ......................................................................................11

II.     Cause Exists for Permissive Withdrawal of The Trustee's Action....................................12

CONCLUSION...........................................................................................................................15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Agric. Movement, Inc. v. Board of Trade*,
  977 F.2d 1147 (7th Cir. 1992) ................................................. 5

*CDX Liquidating Trust v. Venrock Assocs.*,
  No. 04 C 7236, 2005 WL 3953895 (N.D. Ill. Aug. 10, 2005)................................. 13

*City of Rancho Palos Verdes v. Abrams*,
  544 U.S. 113 (2005).................................................................... 10

*Diamond Mortgage Corp. of Illinois v. Sugar*,
  913 F.2d 1233 (7th Cir. 1990) ....................................................... 12

*In re Cablevision S.A.*,
  315 B.R. 818 (S.D.N.Y. 2004)......................................................... 12

*In re Coe-Truman Tech.*,
  214 B.R. 183 (N.D. Ill. 1997) ........................................................ 12

*In re Complete Mgmt., Inc.*,
  No. 02 CIV. 1736 (NRB), 01-03459,
  2002 WL 31163878 (S.D.N.Y. Sept. 27, 2002)........................................ 13

*In re Conseco Fin. Corp.*,
  324 B.R. 50 (N.D. Ill. 2005) ......................................................... 13

*In re Dana Corp.*,
  379 B.R. 449 (S.D.N.Y. 2007)......................................................... 9

*In re Leedy Mortgage Co., Inc.*,
  62 B.R. 303 (E.D. Pa. 1986) ......................................................... 14

*In re Vicars Ins. Agency, Inc.*,
  96 F.3d 949 (7th Cir. 1996) ................................................. 5, 9, 10, 11

*Lowe v. S.E.C.*,
  472 U.S. 181 (1985).................................................................... 5

*Marchese v. Shearson Hayden Stone, Inc.*,
  644 F. Supp. 1381 (C.D. Cal. 1986) .................................................. 8

*Middlesex County Sewerage Auth. v. Nat'l Sea Clammers*,
  453 U.S. 1 (1981)..................................................................... 10

*Mirant v. Southern Co.*,
  337 B.R. 107 (N.D. Tex. 2006) ....................................................... 13

*Monetta Fin. Servs., Inc. v. SEC*,
  390 F.3d 952, (7th Cir. 2004) ..................................................... 11

*SEC v. Slocum, Gordon & Co.*,
  334 F. Supp. 2d 144 ................................................................. 11

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*SEC v. Steadman*,
   967 F.2d 636 (D.C. Cir. 1992) ..................................................................... 11

*Transamerica Mortgage Advisors, Inc. v. Lewis*,
   444 U.S. 11 (1979) ..................................................................................... 10

**Statutes**

15 U.S.C. § 80b-1 ............................................................................................ 1

17 C.F.R. § 1.20(a) ......................................................................................... 8

28 U.S.C. § 1334(b) ........................................................................................ 1

28 U.S.C. § 157(a) .......................................................................................... 1

28 U.S.C. § 157(d) ................................................................................... passim

42 U.S.C. § 1983 ........................................................................................... 10

7 U.S.C. § 25(a) ............................................................................................ 10

7 U.S.C. § 6d(a) ..................................................................................... 6, 7, 8

7 U.S.C. § 6d(b) ............................................................................................. 7

The Bank of New York ("BNY") and The Bank of New York Mellon Corp., by their undersigned counsel and pursuant to 28 U.S.C. § 157(d) and Fed. R. Bankr. P. 5011(a), respectfully submit this memorandum of law in support of their motion to withdraw the reference of the above-captioned adversary proceeding.

## SUMMARY OF ARGUMENT

Under 28 U.S.C. § 1334(b), federal district courts have original jurisdiction over all proceedings arising under title 11 and in all cases arising in or related to proceedings arising under title 11.  Although the district court in this District has automatically referred all title 11 cases and related proceedings to the bankruptcy court pursuant to 28 U.S.C. § 157(a), upon the motion of a party, the district court shall withdraw the reference of an adversary proceeding "if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." 28 U.S.C. § 157(d).  Alternatively, the district court may withdraw such a reference "for cause shown." *Id.*

Here, the complaint (the "Complaint") filed in the above-captioned proceeding by Frederick J. Grede (the "Trustee"), Chapter 11 trustee for Sentinel Management Group, Inc. ("Sentinel"), makes plain that mandatory withdrawal of the reference is required because resolution of the Trustee's claims will require substantial and material consideration of both the Commodity Exchange Act (the "CEA"), 7 U.S.C. ch. 1, and the Investment Advisers Act of 1940 (the "Advisers Act"), 15 U.S.C. § 80b-1 *et seq.*[1]  The Complaint raises *three* separate issues of apparent first impression, each of which requires mandatory withdrawal:  (i) whether Section 6d of the CEA even applied to Sentinel at all given that it never operated as a futures commission

---

[1]    A true and correct copy of the Complaint (also referred to herein as "Cmplt.") is attached hereto as Exhibit "1".

merchant despite registering as such; (ii) whether the Trustee may rely on purported violations of the CEA and the Advisers Act to assert claims in bankruptcy even though he is prohibited from bringing a private right of action under either federal statute; and (iii) the proper burden of proof that the Trustee faces in establishing purported violations of the CEA and Advisers Act, should he be permitted to pursue such claims.

Alternatively, and at a minimum, the district court should exercise its discretionary authority to withdraw the reference for cause shown, because two of the Trustee's eight claims are non-core, those that are core will nonetheless require consideration of complex non-title 11 issues of law, and considerations of judicial economy on the whole favor permissive withdrawal.

## FACTUAL AND PROCEDURAL BACKGROUND

Before filing for bankruptcy in August 2007, Sentinel was a money manager that accepted deposits of cash from a variety of customers in exchange for proportionate interests in its investment accounts. Cmplt. ¶ 23. For more than 10 years, Sentinel was a BNY customer. *Id.* ¶¶ 53, 60. By the summer of 2007, Sentinel began to experience financial difficulties and on August 13, 2007, announced that it was halting all redemptions of customer assets. Cmplt. ¶¶ 128, 156. Four days later, on August 17, 2007 (the "Petition Date"), Sentinel filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Court"). As of the Petition Date, the principal balance of Sentinel's outstanding indebtedness to BNY was $312,247,000, and on January 18, 2008, BNY filed its proof of claim in Sentinel's Chapter 11 case setting forth this and other secured indebtedness owing from Sentinel to BNY. *Id.* ¶ 167.

On February 28, 2008, BNY filed an adversary proceeding against the Trustee seeking a declaratory judgment that it has a valid, first-priority, perfected security interest in and lien upon all assets held in Sentinel's non-segregated clearing accounts. On March 3, 2008, the Trustee

filed his Complaint against BNY asserting eight separate causes of action, including claims for avoidance and recovery of allegedly fraudulent and preferential transfers, equitable subordination and disallowance of BNY's claims, aiding and abetting a breach of fiduciary duty, and an action to determine the validity and extent of BNY's asserted security interest in and lien upon its collateral.[2]  BNY's first responsive pleading to the Complaint is due on May 2, 2008, and concurrently herewith, BNY will file its motion to dismiss the Complaint and supporting memorandum of law attached hereto as Exhibit "3".  The overarching theme to the Trustee's complaint is that BNY established a flawed account structure for Sentinel "in violation of its obligations *under federal law* and its duties to Sentinel."  Cmplt. ¶ 3 (emphasis added).  The Trustee submits that the account structure was flawed because it was intended for broker-dealer customers, not futures commission merchants ("FCMs") or investment advisers, and as a result, the account structure did not satisfy the "strict custodial and segregation requirements" to which Sentinel's activities were allegedly subject.  *Id.* ¶ 59.  The Complaint asserts that BNY violated two principal federal statutes:   (i) the CEA (and rules and regulations promulgated by the Commodity Futures Trading Commission ("CFTC") thereunder (the "CFTC Rules")); and (ii) the Advisers Act (and rules and regulations promulgated by the Securities and Exchange Commission ("SEC") thereunder (the "SEC Rules")).

With respect to the first, the Trustee maintains that, as a result of the flawed account structure, BNY violated the CEA and the CFTC Rules (i) by allowing securities and cash held on behalf of Sentinel's customers to be commingled with those belonging to other customers or

---

[2]    On April 22, 2008, the Bankruptcy Court dismissed BNY's adversary proceeding without prejudice on the grounds that the issues raised therein were "certainly encompassed" in the multiple counts of the Complaint and that parallel adversary proceedings would create unnecessary expenses contrary to Fed. R. Bankr. P. 1001, pursuant to which the Bankruptcy Court must endeavor to "secure the just, speedy and inexpensive determination" of each case and proceeding.  4/22/2008 Hr'g Tr., attached hereto as Exhibit "2", 7:11-16, 8:19-9:10.

Sentinel's own portfolio, *see* Cmplt. ¶¶ 60, 80, 86, 93, and (ii) by accepting and taking as security for its loans to Sentinel any securities that were held in these clearing accounts, without regard to whether the securities were Sentinel securities or customer securities. *Id.* ¶¶ 62, 84, 88, 96. According to the Complaint, these actions, and the clearing structure that facilitated them, violated the CEA as well as a variety of CFTC Rules. *Id.* ¶¶ 66-67, 81-82, 90-91, 94-95.

With respect to the Advisers Act, the Complaint alleges that:

> [BNY] knowingly participated in conduct that violated the [Advisers Act] and SEC Rules by permitting customer assets to be commingled with Sentinel's own assets, by permitting customer assets to be cleared through and maintained in [BNY] accounts which were not registered in Sentinel's name as agent or trustee for its customers, by maintaining customer assets in a manner different than that disclosed to customers, and by assisting Sentinel in the use of assets of members of [one Seg account] to cover or secure securities purchases for other [Seg accounts], or for Sentinel itself, when they did not have sufficient cash to cover securities purchases on the settlement date.

Cmplt. ¶ 49. Additionally, the Complaint alleges that the "improper" account structure at BNY "led to and facilitated the conduct of Sentinel insiders . . . in maintaining client funds and securities in [a clearing account] which was [not] registered as a custodial account under SEC Rule 206(4)-2." *Id.* ¶ 63. The Trustee alleges that this flawed account structure allowed the Sentinel insiders to secure BNY's loans with securities belonging to Sentinel's customers in violation of the Advisers Act's prohibition against use of client assets for the benefit of the investment adviser or its other clients. *Id.* ¶¶ 47, 113.

The Trustee's claims under the Bankruptcy Code or under non-bankruptcy law rely almost entirely on violations of these non-title 11 federal statutes and regulations.[3] The Trustee asserts that BNY's conduct caused $550 million in customer losses.

---

[3]    The majority of the Complaint's 236 paragraphs, 59 pages, and eight separate claims for relief relate to BNY's alleged federal regulatory violations. They are the underpinning of Counts IV-VII of the

## ARGUMENT

**I.    Mandatory Withdrawal of the Reference is Required**

A district court is required to withdraw the reference of an adversary proceeding from a bankruptcy court if "resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." 28 U.S.C. § 157(d).  The Seventh Circuit has made clear that district courts shall withdraw the reference if a referred proceeding will "require the interpretation, as opposed to mere application, of the non-title 11 statute, or when the court must undertake analysis of significant open and unresolved issues regarding the non-title 11 law."  *In re Vicars Ins. Agency, Inc.*, 96 F.3d 949, 954 (7th Cir. 1996).  In other words, withdrawal is proper where the proceeding will require "substantial and material consideration" of the non-title 11 statute.  *Id.*  "The legal questions involved need not be of 'cosmic proportions,' . . . but must involve more than mere application of existing law to new facts."  *Id.* (citation omitted).

The CEA and the Advisers Act are comprehensive federal statutes that regulate FCMs, contract markets, introducing brokers, investment advisers and other types of entities whose business activities broadly impact the securities and commodities markets.  *See*, *e.g.*, *Am. Agric. Movement, Inc. v. Board of Trade*, 977 F.2d 1147, 1155 (7th Cir. 1992) (noting that the CEA "establishes a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex"); *Lowe v. S.E.C.*, 472 U.S. 181, 190, 201 (1985) (observing that the Advisers Act was "designed to eliminate certain abuses in the securities industry" and "to protect the public . . . by making fraudulent practices by investment advisers unlawful").  Therefore, the

---

Complaint.  Paragraphs 23 through 99 of the Complaint address only those alleged violations.  And on eight separate occasions in the Complaint, the Trustee accuses BNY of having violated federal law.

CEA and the Advisers Act are indisputably "other laws of the United States regulating organizations or activities affecting interstate commerce."  28 U.S.C. § 157(d).

Consequently, whether mandatory withdrawal of the Trustee's adversary proceeding is required turns only on whether the Complaint requires "substantial and material consideration" of those statutes.  Here, the Complaint raises at least three key open and unresolved legal issues, each of which requires "substantial and material consideration" of non-title 11 federal statutes for their resolution.  Withdrawal of the reference is therefore mandated under 28 U.S.C. § 157(d) and the *Vicars* standard.[4]

A.    *Whether Section 6d of the CEA and Related CFTC Rules Applied to Sentinel and BNY is an Open and Unresolved Issue Mandating Withdrawal of the Reference*

A significant unsettled issue raised by the Complaint is whether Section 6d of the CEA (and consequently the related CFTC Rules) even applied in the first instance to Sentinel (and consequently to BNY).  Section 6d(a) provides, in part, as follows:

> It shall be unlawful for any person to engage as [an FCM] . . . in soliciting orders or accepting orders for the purchase or sale of any commodity for future delivery, or involving any contracts of sale of any commodity for future delivery, on or subject to the rules of any contract market or derivatives transaction execution facility unless . . . such person shall, if [an FCM], . . . treat and deal with all money, securities, and property received by such person to margin, guarantee, or secure the trades or contracts of any customer of such person, or accruing to such customer as the result of such trades or contracts, as belonging to such customer.  Such money, securities, and property shall be separately accounted for and shall not be commingled with the funds of such [FCM] or be used to margin or guarantee the trades or contracts, or to secure or extend the credit, of any customer or person other than the one for whom the same are held . . . .

---

[4]    The Trustee has filed a related adversary proceeding against Sentinel's prepetition auditors, who have moved to withdraw the reference of that action because, *inter alia*, the Trustee's complaint raises similar issues of first impression as to the application of the CEA and the Advisers Act and such action will require substantial interpretation of non-title 11 law.  That motion to withdraw the reference is pending before Judge Zagel in the matter captioned *Grede v. McGladrey & Pullen LLP*, *et al.*, Case No. 08-cv-02205 (N.D. Ill. filed April 16, 2008).

7 U.S.C. § 6d(a). Section 6d further provides that any depository that receives any assets that are subject to Section 6d(a) may not "hold, dispose of, or use such money, securities, or property as belonging to the depositing [FCM] or any person other than the customers of such [FCM]." 7 U.S.C. § 6d(b).

In the Complaint, the Trustee alleges that Sentinel was subject to Section 6d(a) and that, consequently, BNY was subject to Section 6d(b) as its depository. Cmplt. ¶ 30. The Trustee appears to take the applicability of Section 6d for granted, choosing to rely exclusively on Sentinel's status as a registered FCM and on the allegation that the assets it deposited with BNY were not its own. But the language of Section 6d states that the provision was intended to apply *only* under certain limited circumstances.

*First,* the statute applies on its face only to entities *that are in fact engaged* in the business of an FCM—*i.e.*, engaged "in soliciting orders or accepting orders for the purchase or sale of any commodity for future delivery, or involving any contracts of sale of any commodity for future delivery, on or subject to the rules of any contract market or derivatives transaction execution facility." 7 U.S.C. § 6d(a). But the Trustee in the Complaint concedes that Sentinel never operated as an FCM: "Sentinel did not engage in any commodities trading for its customers, but instead only invested funds deposited by other FCMs and Sentinel's other customers." Cmplt. ¶ 29. Thus, what the Trustee must argue for his claim to be viable is that Section 6d(a) applied to funds that Sentinel accepted solely because Sentinel *was registered* as an FCM. This argument is untenable and conflicts with the plain language of the statute. However, to the extent that the Trustee is unwilling to concede that point, resolution of the Complaint ultimately will require "substantial and material" consideration of the scope of Section 6d(a) and, in particular, whether it can apply by virtue of an entity's status as a registered

FCM despite the fact that such entity never actually engaged in the business of an FCM.  And, since we found not a single federal decision that addressed this question and only a few non-binding opinions that even remotely touch upon related issues, the question remains "open and unresolved."

*Second*, Section 6d applies *only* to customer assets that are received by an FCM "to margin, guarantee, or secure the trades or contracts of any customer of such person, or accruing to such customer as the result of such trades or contracts."[5]  7 U.S.C. § 6d(a).  *See Marchese v. Shearson Hayden Stone, Inc.*, 644 F. Supp. 1381, 1386 (C.D. Cal. 1986) (concluding that, "[b]y its terms, [Section 6d] provides that only two categories of funds, securities or property, be treated as belonging to the customer—those received by the FCM to margin, guarantee or secure trades or contracts, and those accruing to such customer as a result of trades or contracts").  The Trustee's action thus also will require consideration of whether Sentinel—and, by extension, BNY—ever accepted assets for deposit that constituted "customer funds" within the meaning of the relevant CFTC Rules (if found to be applicable).

BNY submits that in reality, Sentinel's customers—some of whom were not even involved in the commodities industry, Cmplt. ¶ 27—never deposited any "customer funds." Sentinel's FCM customers deposited their own proprietary funds along with their customers' money (*not* "customer funds") with Sentinel to be invested in one or more of Sentinel's investment accounts at BNY.  While the FCMs' customers' money may have been initially received to margin, guarantee, or secure trades or contracts within the meaning of Section 6, the Complaint contains no such allegations, and in any event, it is far from clear that Congress

---

[5]    Collectively, these assets are referred to as "customer funds."  *See* 17 C.F.R. § 1.20(a) (clarifying that the segregation requirements of Section 6d apply only to "customer funds"); *see also* § 1.3 (defining "customer funds" according to the type of FCM customer to which they belong).

intended for such money to retain that character when it was subsequently deposited first with Sentinel, in its purported role as another FCM/money manager, and then again with BNY as a clearing bank. Indeed, BNY submits that such a reading of the CEA would stretch the reach of the statute's regulatory arm far beyond its intended bounds.[6] But, once again, our research revealed not a single federal opinion on point, and the legislative history is silent. Therefore, this issue remains "open and unresolved." *Vicars*, 96 F.3d at 954. And because the scope of an entire federal regulatory scheme is in question, the issues require "substantial and material" consideration of non-title 11 law. *Id.*; *see also In re Dana Corp.*, 379 B.R. 449, 458 (S.D.N.Y. 2007) (ordering mandatory withdrawal in matter which required extensive interpretation of CERCLA, reasoning that "to resolve these inquiries, both legal and factual, a bankruptcy court would be required to engage in careful and significant consideration of CERCLA, a statute 'outside its realm of expertise'").

      B.      *The Open Issue of Whether the Trustee May Assert Title 11 Claims Premised on Violations of the CEA and the Advisers Act Mandates Withdrawal*

Although the Trustee brings no claims directly under the CEA or the Advisers Act, he contends that BNY's alleged violations of federal law are grounds for the equitable subordination, disallowance and/or equitable disallowance of BNY's secured claim against Sentinel in its pending Chapter 11 case. *See* Cmplt. ¶¶ 189-217. The Trustee also argues that the alleged violations of such statutes render BNY's security interest in and lien upon its collateral unenforceable as a matter of non-bankruptcy law. *See id.* ¶¶ 218-26. These allegations

---

[6]      The CFTC only recently has commenced a multi-count action for injunctive and other equitable relief in the district court against Sentinel and two of its principals for alleged violations of the CEA and related CFTC Rules. The case is captioned *Commodity Futures Trading Comm'n v. Sentinel Management Group, Inc., et al.*, Case No. 08-cv-02410 (N.D. Ill. filed April 28, 2008) (Shadur, J.).

unequivocally require the district court's oversight of the action under the terms of 28 U.S.C. § 157(d).

In particular, the Trustee has no private right of action against BNY under either the CEA or the Advisers Act.[7] Nonetheless, the Trustee effectively seeks to enforce the CEA and the Advisers Act indirectly through claims brought under various provisions of the Bankruptcy Code. Whether a bankruptcy trustee can do so has not been addressed by any Article III court, and resolution of this question will require significantly more than passing consideration of the relevant statutes and Congressional intent. BNY submits that the Trustee may not enforce the CEA and Advisers Act indirectly through title 11 claims based upon, among other things, the U.S. Supreme Court's decisions in *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers*, 453 U.S. 1, 20 (1981) (holding that comprehensive statutory enforcement schemes could not be privately "bypassed" by an action under 42 U.S.C. § 1983); and *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120-21 (2005) (holding that Congress did not intend for a judicial remedy expressly authorized by a federal statute to "coexist with an alternative remedy available in a § 1983 action"). However, the applicability of this line of authority to the question presented here has never been decided,[8] and in light of the apparent need to harmonize the federal statutes in question, this issue too will require "substantial and material" consideration of the meaning and scope of such statutes. *Vicars*, 96 F.3d at 954.

---

[7]    *See* 7 U.S.C. § 25(a) (providing a limited private right of action for violations of the CEA arising directly out of certain kinds of commodities transactions, none of which occurred here); *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 24 (1979) (holding that the Advisers Act confers no private remedies other than the limited right to rescind a contract deemed to be void under Section 215).

[8]    Indeed, our research revealed no federal opinion that considered whether Congress intended the CEA and Advisers Act to be privately enforceable through the broad remedial provisions of the Bankruptcy Code, notwithstanding the fact that those statutes contain comprehensive enforcement schemes of their own.

C.    *The Standard to Which BNY Should Be Held under the CEA and Advisers Act is an Open and Unresolved Issue Mandating Withdrawal of the Reference*

Also "open and unresolved" is the extent to which the Trustee must prove the purported violations of the CEA and the Advisers Act in order to demonstrate a right to various relief under the Bankruptcy Code (should he be permitted to proceed with such claims). Although BNY believes that the Trustee must demonstrate that the alleged violations rise to the level so as to be actionable by the CFTC or SEC in a primary enforcement action brought directly under the CEA and the Advisers Act, respectively,[9] once again there appears to be no federal precedent on point.

Moreover, there is very little authority with respect to the types of violations alleged by the Trustee even if the CFTC or SEC were able to bring, and had brought, an enforcement action against BNY (rather than the Trustee asserting such claims in the context of a private party action). We have found no decision, reported or otherwise, in which the CFTC brought an enforcement action against a depository for an alleged violation of Section 6d(b) of the CEA. And, although the SEC has brought enforcement actions against various parties for allegedly aiding and abetting an investment adviser's violation of SEC Rule 206(4)-2, *see, e.g.*, *SEC v. Steadman*, 967 F.2d 636, 647 (D.C. Cir. 1992), we are aware of no such case ever being brought against a custodian, which is BNY's alleged role here. Because there is not sufficient case law from the district courts "for a bankruptcy judge's guidance and application" on these points, *Vicars*, 96 F.3d at 954-55, the Bankruptcy Court can only guess as to the Trustee's burden of proof. As such, mandatory withdrawal is warranted for this reason as well. *See e.g., In re*

---

[9]    The Complaint alleges a primary violation of the CEA and CFTC Rules, but only "participation" in a violation of the Advisers Act and SEC Rule 206(4)-2. Participation in a violation of the Advisers Act is actionable only if it rises to the level of aiding and abetting. *See, e.g.*, *Monetta Fin. Servs., Inc. v. SEC*, 390 F.3d 952, 956 (7th Cir. 2004) (dismissing an aiding and abetting claim against an investment adviser's president for failure to prove knowledge of the primary violation); *SEC v. Slocum, Gordon & Co.*, 334 F. Supp. 2d 144, 184-85 (dismissing an aiding and abetting claim against an investment adviser's partners for failure to prove knowledge that their "role was part of an activity that was improper").

*Cablevision S.A.*, 315 B.R. 818, 821 n.4 (S.D.N.Y. 2004) ("The case for mandatory withdrawal is further bolstered by the fact that it appears that no Article III court has ever resolved the [federal law issue.]").

For all the foregoing reasons, and based on the abundance of complicated unresolved non-title 11 federal law issues raised by the Complaint, withdrawal of the reference is required here.

## II.    Cause Exists for Permissive Withdrawal of The Trustee's Action

The district court also should withdraw the reference "for cause shown" pursuant to 28 U.S.C. § 157(d).   Courts within the Seventh Circuit have relied on the following factors in evaluating whether such permissive withdrawal is warranted:  "judicial economy, promotion of uniformity and efficiency in bankruptcy administration, reduction of forum shopping, delay and costs to the parties, the particular court's familiarity with the case, and whether the adversary proceeding is core or non-core." *In re Coe-Truman Tech.*, 214 B.R. 183, 187 (N.D. Ill. 1997). Here, because certain of the Trustee's claims are non-core, and the majority of the others involve knotty issues of non-title 11 federal law, overriding concerns of judicial economy warrant permissive withdrawal.

As an initial matter, two of the claims in the Complaint—the Trustee's claim for aiding and abetting a breach of fiduciary duty (Count VIII of the Complaint), and the Trustee's allegation of fraudulent transfers under state law (Count II of the Complaint)—are not core proceedings.[10]  As the Bankruptcy Court stated in an April 22, 2008 hearing, the Trustee's claim for aiding and abetting a breach of fiduciary duty is non-core.  *See* Ex. 2, 4/22/2008 Hr'g Tr.,

---

[10]     A proceeding is core only if it "invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case." *Diamond Mortgage Corp. of Illinois v. Sugar*, 913 F.2d 1233, 1239 (7th Cir. 1990).

6:3-5; *see also CDX Liquidating Trust v. Venrock Assocs.*, No. 04 C 7236, 2005 WL 3953895, *2 (N.D. Ill. Aug. 10, 2005) (observing that state law causes of action are non-core proceedings). Additionally, the Trustee's fraudulent transfer claim is a non-core proceeding because it is based on the Illinois Uniform Fraudulent Transfer Act. *See CDX Liquidating Trust,* 2005 WL 3953895 at *2 (citing *In re Conseco Fin. Corp.,* 324 B.R. 50, 53-54 (N.D. Ill. 2005)).

Where, as here, an action involves both core and non-core claims, courts have recognized that judicial economy favors withdrawal of the reference by eliminating the need for an appeal to the district court on core claims as well as a *de novo* review of proposed findings as to non-core claims. *See, e.g.*, *Mirant v. Southern Co.*, 337 B.R. 107, 122 (N.D. Tex. 2006) (observing that adjudicating a proceeding involving both core and non-core claims before the district court "eliminates the prospect of an appeal from the bankruptcy judge's adjudications of core claims, and dispenses with the need for the district court to conduct a *de novo* review of proposed findings and conclusions of the bankruptcy judge after a trial in the bankruptcy court as to non-core claims"); *see also Conseco*, 324 B.R. at 54 ("the fact that a proceeding is non-core implicates the weighty considerations of judicial economy and an expedient bankruptcy process").

Moreover, the legal issues raised by the Complaint, as well as the extensive discovery and expert testimony that will be required to resolve this matter, further demonstrate that judicial economy will be best served through withdrawal of the reference. A number of courts have recognized that where an adversary proceeding presents legal issues more frequently resolved by the district courts than the bankruptcy courts, and where extensive discovery and expert testimony will be involved, permissive withdrawal is appropriate. *See In re Complete Mgmt., Inc.*, No. 02 CIV. 1736 (NRB), 01-03459, 2002 WL 31163878, at *3 (S.D.N.Y. Sept. 27, 2002)

(granting permissive withdrawal on the grounds of efficiency and fairness under circumstances where the action "raise[d] legal issues more commonly resolved by [the district courts] than the bankruptcy courts and . . . [would] involve extensive discovery [and] expert testimony"); *In re Leedy Mortgage Co., Inc.*, 62 B.R. 303, 306 (E.D. Pa. 1986) (withdrawing reference for cause shown based on likelihood of extensive discovery including at least thirteen depositions and "many volumes of written material," the need for expert witnesses, and a lengthy and complex trial based on non-title 11 law).

As discussed at length in Section I, *supra*, there can be no question that the Trustee's claims will require substantial consideration of complex non-title 11 federal law issues. Moreover, this proceeding, should it survive BNY's motion to dismiss, will involve extensive discovery and the use of expert witnesses. The Trustee alone has in his possession nearly 200 boxes of hard copy documents, as well as electronic data totaling 11 terabytes, including 3.7 million pages of email, and thousands of recorded telephone calls. *See* 4/8/2008 Hr'g Tr., attached hereto as Exhibit "4", 18:9-24, 27:7-13. BNY has been reviewing and producing to the Trustee emails and documents for twenty-nine of its employees. *See* Ex. 4, 4/8/2008 Hr'g Tr. 14:7-13. The Bankruptcy Court has acknowledged that the case will likely require extensive pre-trial discovery, as well as expert discovery that will not be coordinated with, or relevant to, other portions of the bankruptcy proceedings. *See*, *e.g.*, Ex. 4, 4/8/2008 Hr'g Tr. 29:25 - 30:14 (anticipating that discovery will need to run through to trial); 2/28/2008 Hr'g Tr., attached hereto as Exhibit "5", 44:6-10 (acknowledging the complex nature of the case and the likely need for experts). And any trial of the Trustee's claims undoubtedly would involve testimony from potentially scores of witnesses on non-title 11 issues. Thus, because resolution of the Trustee's

claims is likely to take the Bankruptcy Court far afield from its core areas of familiarity and

expertise, ample cause exists for this Court to exercise its discretion to withdraw the reference.

<u>**CONCLUSION**</u>

For all the foregoing reasons, BNY respectfully requests that this Court withdraw the

reference of the above-captioned proceeding pursuant to 28 U.S.C. § 157(d) and Fed. R. Bankr.

P. 5011(a).

Dated: May 2, 2008                                     Respectfully submitted,

                                                        **THE BANK OF NEW YORK and**
                                                        **THE BANK OF NEW YORK MELLON**
                                                        **CORP.**

                                                        By: /s/ Sean T. Scott
                                                        Sean T. Scott (ARDC #6273516)
                                                        MAYER BROWN LLP
                                                        71 S. Wacker Drive
                                                        Chicago, IL 60606
                                                        (312) 782-0600

                                                                -and-

                                                        Brian Trust (admitted *pro hac vice*)
                                                        Hector Gonzalez (admitted *pro hac vice*)
                                                        Matthew D. Ingber (admitted *pro hac vice*)
                                                        MAYER BROWN LLP
                                                        1675 Broadway
                                                        New York, New York 10019
                                                        (212) 506-2500

# EXHIBIT B

# PART 1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **SENTINEL MANAGEMENT GROUP, INC.,** | ) | **CASE NO. 07 B 14987** |
| | ) | |
| Debtor. | ) | Hon. John H. Squires |
| _____ | ) | |
| | ) | |
| **FREDERICK J. GREDE**, as Chapter 11 Trustee | ) | |
| for Sentinel Management Group, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | **ADV. NO. _____** |
| **THE BANK OF NEW YORK** and | ) | |
| **THE BANK OF NEW YORK MELLON** | ) | |
| **CORP.,** | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Frederick J. Grede, not individually but as Chapter 11 Trustee ("the Trustee") for Sentinel Management Group, Inc. ("Sentinel" or "Debtor"), hereby states for his Complaint as follows:

## NATURE OF THE ACTION

1.     This is an adversary proceeding by the Trustee against The Bank of New York and The Bank of New York Mellon Corp. (hereafter collectively referred to as "BONY").  For more than ten years BONY performed three roles for Sentinel, acting as custodian of securities on behalf of Sentinel and its customers, clearing agent for Sentinel's securities transactions, and lender to Sentinel.

2.     In August 2007, Sentinel's business collapsed, costing Sentinel and its customers hundreds of millions of dollars.  BONY's misconduct played a pivotal role in that collapse, in at least four distinct ways.

3.      First, ***BONY established a fundamentally flawed account structure for Sentinel's accounts in violation of its obligations under federal law and its duties to Sentinel.*** The account structure: (a) commingled customer assets,[1] which should have been strictly segregated, with Sentinel's own assets and the assets of other customers; (b) facilitated the misuse of customer assets as security for BONY's loan to Sentinel; and (c) allowed BONY, on a daily basis, to apply the proceeds of virtually every securities transaction involving customer assets to pay down a portion of Sentinel's debt to BONY.

4.      Second, ***BONY aided and abetted breaches of fiduciary duty committed by certain Sentinel insiders***.  These Sentinel insiders misused what were supposed to be customer securities for their own financial benefit, causing Sentinel hundreds of millions of dollars in losses.  BONY colluded in and knowingly facilitated this misconduct.

5.      Third, ***BONY knowingly accepted fraudulent and preferential transfers as part of the Sentinel insiders' scheme***, disregarding the overwhelming evidence that the insiders were acting improperly.

6.      Fourth, ***BONY engaged in inequitable conduct***.   BONY's bad faith and inequitable conduct included:  (a) violating the Commodity Exchange Act and participating in violations of the Investment Advisers Act of 1940; (b) extending credit to Sentinel far in excess of any reasonable line of credit for Sentinel's business, having actual knowledge that Sentinel did not have sufficient assets to secure that credit and would need to use customer assets to secure those loans; (c) illegally transferring securities from a segregated customer account to a collateral account in order to secure its own loan; (d) consistently preferring its own pecuniary

---

[1]      Unless noted otherwise, the terms "customer assets" and "customer securities" are used in this Complaint to describe assets and securities which were supposed to be, but were not, separately accounted for and segregated for the benefit of customers.

interests as a lender to its obligations under federal law and its duty to segregate and hold in custody Sentinel's customer assets; and (e) asserting liens over assets which it knew were intended to be segregated for customers.

7.    BONY's motive to participate in this misconduct was pecuniary: it generated tens of millions of dollars in interest income on its ever-increasing loan to Sentinel. Indeed, as a BONY officer explained in an email to colleagues on April 24, 2006: "Sentinel Investment Management is one of SIBD (and the Bank's) biggest customers in regard to Credit (loans)."

8.    Absent the unlawful account structure established by BONY and BONY's other misconduct, Sentinel's collapse would not have occurred, and Sentinel would not have suffered hundreds of millions of dollars in losses and increased liabilities.

9.    The Trustee brings this action for, among other causes of action, avoidance and recovery of fraudulent and preferential transfers, equitable subordination and transfer of subordinated lien, aiding and abetting breaches of fiduciary duty, disallowance of proof of claim, and a determination that the liens asserted by BONY cannot be enforced and are invalid.

10.    This Complaint seeks damages exceeding Five Hundred and Fifty Million Dollars ($550,000,000).

## JURISDICTION AND VENUE

11.    This Court has jurisdiction pursuant to 28 U.S.C. § 1334(b) because this adversary proceeding arises in, is related to, and arises under the Chapter 11 case, *In Re Sentinel Management Group, Inc.*, pending in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, as Case No. 07 B 14987.

12.    Venue is proper in this District pursuant to 28 U.S.C. § 1409(a).

13.     This Complaint is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (C), (E), (F), (H), (K) and (O).

14.     BONY has expressly submitted itself to the equitable jurisdiction of this Court by, *inter alia*, filing a proof of claim and demanding adequate protection and by filing a complaint for declaratory judgment.

15.     The Trustee is the representative of the Debtor's estate and has standing to bring each of the claims set forth in this Complaint pursuant to section 323 of the Bankruptcy Code. To the extent any of the claims set forth herein seek recovery of, or arise from or relate to, any transfers of customer assets to or for the benefit of BONY, such transferred assets are property of the Debtor's estate by virtue of, among other things, the Debtor's failure to separately account for those assets, the commingling of those assets, Sentinel's treatment of those assets, and the other facts and circumstances of the Debtor's case.

16.     The Debtor's case is pending as a case under chapter 11 of the Bankruptcy Code. In the event that this Court converts the Debtor's case to a case under subchapter III of chapter 7 of the Bankruptcy Code (Stockbroker Liquidation) and/or subchapter IV of chapter 7 of the Bankruptcy Code (Commodity Broker Liquidation), the Trustee reserves the right to assert any additional claims and causes of action which he may be entitled to assert under such subchapters of chapter 7 of the Bankruptcy Code, including but not limited to claims under sections 749 and 764 of the Bankruptcy Code.

## THE PARTIES AND RELATED ENTITIES

17.    Plaintiff Frederick J. Grede is the chapter 11 trustee for the Debtor, duly appointed under section 1104 of the Bankruptcy Code by Orders of this Court dated August 23 and 29, 2007.

18.    Defendant The Bank of New York is, on information and belief, a state-chartered bank with its principal place of business in New York, New York.  It is a subsidiary of Defendant The Bank of New York Mellon Corp.

19.    Defendant The Bank of New York Mellon Corp. is a corporation organized under the laws of Delaware, with its principal place of business in New York, New York.  It is the successor-in-interest to The Bank of New York, Inc. and was formed in July 2007 by a merger between The Bank of New York, Inc. and Mellon Financial Corporation.

20.    BONY has offices in 34 countries on six continents.  It holds itself out to the public as one of the world's leading banks, with more than $20 trillion in assets under custody and administration.  BONY claims on its website that it "has a rich and long history of providing custody and investment services."  It also claims that its "ability to support the highest quality securities processing solutions almost anywhere in the world ensures that we remain the provider of choice for leading institutions around the globe."

21.    Sentinel is an Illinois corporation, headquartered in Northbrook, Illinois.  Sentinel is registered with the Securities and Exchange Commission ("SEC") as an investment adviser ("Investment Adviser"), and with the U.S. Commodity Futures Trading Commission ("CFTC") as a futures commission merchant ("FCM").  It is also a member of the National Futures Association ("NFA"), which is Sentinel's designated self-regulatory organization ("DSRO").

22.     Philip Bloom, Eric Bloom, and Charles Mosley (the "Sentinel Insiders") were officers and directors of Sentinel who participated in a scheme to defraud Sentinel and to breach their fiduciary duties to Sentinel.  There were at all relevant times one or more officers and employees of Sentinel who were not part of the Sentinel Insiders' scheme.

## BACKGROUND

A.     Sentinel's business and the customer "SEGs"

23.     Sentinel managed investments of cash for various clients, including commodity brokers (also known as futures commission merchants or "FCMs"), hedge funds, financial institutions, pension funds, and individuals.

24.     Sentinel divided its customers into three groups and was supposed to strictly segregate the investments of these three customer groups from each other and from Sentinel's own funds.

25.     The first customer group, known within Sentinel as SEG 1, was supposed to consist solely of the funds and property of customers of other FCMs, which typically invested their customers' funds through Sentinel in order to take advantage of Sentinel's purported cash management and investment expertise.

26.      The second customer group, known within Sentinel as SEG 2, was supposed to consist solely of the funds and property of customers of other FCMs that were engaged in trading at foreign exchanges.

27.     The third customer group, known within Sentinel as SEG 3, was supposed to consist of the funds and property of all other types of clients, including FCM house (*i.e.*, non-customer) funds, as well as the funds and property of hedge funds, trust accounts, endowments and individuals.

28.     In addition to managing investments for the SEG 1, SEG 2, and SEG 3 customer portfolios, Sentinel owned  a "House" or "Street" portfolio of securities traded by Sentinel for the ultimate benefit of the Sentinel Insiders.

B.     Regulatory requirements applicable to Sentinel's business

i.     *The Commodity Exchange Act and CFTC Rules*

29.     FCMs are permitted to deposit their customer funds only with certain types of banks, depositories or other FCMs.  Sentinel registered with the CFTC as an FCM, and thus was able to manage customer funds belonging to other FCMs.  Unlike traditional FCMs, however, Sentinel did not engage in any commodities trading for its customers, but instead only invested funds deposited by other FCMs and Sentinel's other customers.

30.     Because Sentinel was an FCM managing funds required to be segregated for the benefit of customers, Sentinel and any depository bank selected by Sentinel as custodian for funds belonging to customers were subject to the provisions of the Commodity Exchange Act, 7 U.S.C. § 1 *et seq*. ("the CEA") and CFTC rules and regulations promulgated pursuant to the CEA, 17 C.F.R. §§ 1.1-190.10, with respect to such funds.

31.     Section 4d(a)(2) of the CEA provides that money, securities and property of customers must be separately accounted for and not commingled with the funds of the FCM.  7 U.S.C. § 6d(a)(2).

32.     Section 4d(b) of the CEA provides that "it shall be unlawful for any person, including . . . any depository, that has received any money, securities and property for deposit in a  separate account as provided for in [section 4d(a)(2) of the CEA], to hold, dispose of, or use any such money, securities or property as belonging to the depositing futures commission

merchant or any person other than customers of such futures commission merchant."  7 U.S.C. § 6d(b).

33.     CFTC Rule 1.20(a) provides that all customer funds shall be segregated as belonging to commodity customers, and that when deposited with any bank, shall be deposited under an account name which clearly identifies them as customer property.

34.     CFTC Rule 1.20 requires that any bank acting as custodian for FCM customer funds must acknowledge in writing that the funds are customer funds and are being held in accordance with the provisions of the CEA.

35.     CFTC Rule 1.20(a) also provides that "Under no circumstances shall any portion of customer funds be obligated to . . . any depository except to purchase, margin, guarantee, secure, transfer, adjust or settle trades, contracts or commodity option transactions of commodity or options customers."  CFTC Rule 1.20(a) thus prohibits the pledging of customer funds to secure a loan for any purpose other than for customer commodity transactions.

36.     The investment of FCM customers' funds is subject to the strict investment standards embodied in CFTC Rule 1.25, 17 C.F.R. § 1.25, and generally is restricted to only the highest grade corporate and government securities and similar highly liquid investments.  (Prior to an amendment to Rule 1.25 which became effective on December 28, 2000, the CFTC's investment standards were even stricter, and FCM customer funds could be invested only in government securities and certain other limited instruments.)

37.     CFTC Rule 1.25 permits FCMs to acquire securities constituting permitted investments under CFTC Rule 1.25 by using repurchase agreements, and to invest customer funds under reverse repurchase agreements.  Customer securities delivered pursuant to any repurchase or reverse repurchase transaction, however, are limited to types of investments

otherwise permitted under Rule 1.25 and are subject to concentration limits and numerous other limitations. *See generally* 17 C.F.R. § 1.25(d). Moreover, any funds received under repurchase agreements or securities received under reverse repurchase agreements are required to be segregated for the benefit of customers (17 C.F.R. §§ 1.20(a) and 1.25(d)), and the delivery of securities to or from the customer segregated account must take place simultaneously with the offsetting transfer of funds to or from the customer segregated account. 17 C.F.R. § 1.25(d)(8). The CEA and CFTC regulations thus prohibit any repurchase or reverse repurchase transactions from taking place outside of customer segregated accounts, and require that all repurchase transactions for the benefit of customers take place and settle solely in segregated accounts.

38. Under CFTC Rule 1.26, any securities in which customer funds are invested also must be maintained in segregation. Like CFTC Rule 1.20, CFTC Rule 1.26 requires that any bank acting as custodian for FCM customer securities must acknowledge in writing that the securities are customer securities and are being held in accordance with the provisions of the CEA.

39. Funds of FCM customers engaged in trading at foreign exchanges also must be separately segregated and invested in accordance with CFTC Rule 30.7, 17 C.F.R. § 30.7, which imposes certain restrictions on the investment of customer funds.

40. Subject to the segregation and other requirements of the CEA and CFTC Rules, under CFTC Rule 1.49 (adopted in 2003), FCM customer funds may be held in certain foreign depositories, namely institutions in the "G-7" countries (the United States, Canada, France, Italy, Germany, Japan, and the United Kingdom), and in the currency denominations of those countries, as well as the Euro.

41.     The CEA and CFTC regulations do not authorize customer funds or securities to be pledged to a bank or other third party to secure loans or other obligations incurred to meet "haircuts" imposed by a repurchase agreement counterparty.

42.     Effective December 31, 1980, the CFTC promulgated regulations which required FCMs to maintain adjusted net capital (essentially liquid assets in excess of customer funds) of no less than 4% of all funds required to be segregated by FCMs for the benefit of its customers. *See generally* 17 C.F.R. § 1.17.  On May 7, 1981, based upon (among other things) Sentinel's representations to the CFTC concerning the trust structure described in paragraphs 50-51 below, Sentinel obtained from the CFTC a "no action" letter exempting Sentinel from the 4% net capital requirement applicable to other FCMs, and requiring that Sentinel maintain only the minimum capital required for FCMs that are not a member of a contract market (at that time $100,000). (Exhibit A attached).

### ii.     The Investment Advisers Act and SEC Rules

43.     Sentinel was also registered as an Investment Adviser, and Sentinel was subject to the provisions of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq.* (the "Investment Advisers Act"), and the rules and regulations of the SEC promulgated thereunder, 17 C.F.R. §§ 275.0-2 – 275.222-2.

44.     Section 206 of the Investment Advisers Act makes it illegal to "employ any device, scheme, or artifice to defraud any client or prospective client" and to "engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client."  15 U.S.C. § 80b-6.

45.     The regulations promulgated by the SEC under section 206 provide that it is a "fraudulent, deceptive, or manipulative act, practice, or course of business" to have custody of

client funds or securities except as provided in SEC Rule 206(4)-2. SEC Rule 206(4)-2, 17 C.F.R. § 275.206(4)-2, requires that client funds and securities be maintained at a "qualified custodian," which includes a depository bank, "[i]n a separate account for each client under that client's name" or "[i]n accounts that contain only [the investment adviser's] clients' funds and securities, under [the investment adviser's] name as agent or trustee for the clients."

46.     SEC Rule 206(4)-2 further provides that if an investment adviser opens an account with a qualified custodian, either under the client's name or its name as agent, it must "notify the client in writing of the qualified custodian's name, address, and the manner in which the funds or securities are maintained, promptly when the account is opened and following any changes to this information."

47.     It also is a violation of Section 206 of the Investment Advisers Act to use one client's assets to cover or secure securities purchases for another client when the former client does not have sufficient cash in its account to cover securities purchases on the settlement date.

### iii.     BONY's conduct in violation of federal law

48.     BONY knowingly violated the CEA and CFTC Rules by permitting customer assets to be pledged to secure BONY's loan to Sentinel, by commingling customer assets with Sentinel's own assets, by clearing customer securities transactions through BONY accounts that were not segregated and on a daily basis applying the proceeds of those transactions to Sentinel's loan balance, and by facilitating billions of dollars of repo transactions outside of the segregated account structure.

49.     BONY also knowingly participated in conduct that violated the Investment Advisers Act and SEC Rules by permitting customer assets to be commingled with Sentinel's own assets, by permitting customer assets to be cleared through and maintained in BONY

accounts which were not registered in Sentinel's name as agent or trustee for its customers, by maintaining customer assets in a manner different than that disclosed to customers, and by assisting Sentinel in the use of assets of members of one SEG group to cover or secure securities purchases for other SEGs, or for Sentinel itself, when they did not have sufficient cash to cover securities purchases on the settlement date.

## SENTINEL'S RELATIONSHIP WITH BONY
## AND THE UNLAWFUL ACCOUNT STRUCTURE

A.    The Inception of the Sentinel-BONY Relationship

50.    Prior to 1980, Sentinel's business consisted almost exclusively of providing cash management services to other FCMs, and Sentinel had established two trust accounts at Continental Illinois Bank and Trust Company of Chicago into which its clients' funds were placed and invested.  One trust account was used to hold the customer funds of other FCMs (SEG 1 funds), and the other trust account was used to hold the house funds of other FCMs (SEG 3 funds).

51.    FCMs for which Sentinel provided cash management services executed trust agreements designating Sentinel as the trustee for funds deposited by them.  Under this trust arrangement, participating FCMs directly notified Continental Bank of the amounts they wished to deposit or withdraw from the trust account and Sentinel merely directed the investment of those funds. Sentinel subsequently moved its custodial business to the First National Bank of Chicago.

52.    In early 1997, the First National Bank of Chicago decided to exit the custodial account business and close its custody division.  BONY competed with several other banking institutions to win Sentinel as a client of BONY's Institutional Custody Division.  Sentinel moved its custodian account business to BONY in or about March 1997.

12

53.    At the outset of the relationship, BONY and Sentinel entered into a Global Custody Agreement, dated March 13, 1997, appointing BONY as the custodian of securities and cash held for the benefit of Sentinel's customers.  (Exhibit B attached).  Under this arrangement, customer cash and securities were maintained by BONY in custodial accounts, and securities purchased and sold were settled by cash credits and debits to those custodial accounts.

54.    As required by CFTC Rules, on or about March 14, 1997, BONY and Sentinel entered into a letter agreement, attached as Exhibit C, in which Sentinel proposed to open an account designated as "Sentinel Management Group, Inc. Customer Segregated Funds Account I (§4.d-2)," into which it would deposit money and securities that were supposed to be segregated for its SEG 1 customers.  BONY acknowledged and agreed that this segregated account was being opened to meet the requirements of the CEA, which provides that such assets must be segregated and treated as belonging solely to Sentinel's SEG 1 customers, rather than to Sentinel itself.  In addition to the requirements set forth in CFTC Rules 1.20(a) and 1.26, BONY further agreed that "the funds in said accounts will not be subject to [its] lien or offset for, and on account of, any indebtedness now or hereafter owing [by] (*sic*) us to [BONY] and shall not be applied by [BONY] upon any such indebtedness nor will [BONY] apply the funds in said accounts to the indebtedness of either our so-called Seg II or Seg III accounts."  BONY further agreed that the letter agreement would supersede any other documents related to the account that conflict with it.

55.    On the same date, Sentinel and BONY entered into two additional letter agreements, one pertaining to "Sentinel Management Group, Inc. Customer Segregated Funds Account II (Part 30)" established for funds and securities attributable to Sentinel's SEG 2 customers, and another pertaining to "Sentinel Management Group, Inc. Customer Segregated

Funds Account III" established for funds and securities deposited by Sentinel's SEG 3 clients. These letter agreements, attached as Exhibits D and E, respectively, are identical in material respects to the SEG 1 segregation letter.

56.    In or about March 1997, BONY opened the three segregated custodial accounts contemplated in the segregation letter agreements and began accepting funds and securities from Sentinel.  Sentinel also established a house or street account.

B.    BONY begins ignoring its custodial obligations

57.    As part of its arrangement with Sentinel, and consistent with Sentinel's arrangements with BONY's predecessors, BONY from time to time made short-term extensions of credit to Sentinel so that Sentinel could meet customer requests for redemption, and thereafter sell the securities that had been attributable to the redeeming customers.  BONY's extensions of credit were made in the form of daytime "overdrafts" which would be eliminated upon sale of the applicable securities.  If necessary, the daytime overdrafts would be converted to short-term overnight loans.

58.    Within a few months of the commencement of BONY's relationship with Sentinel, BONY personnel began to express concern about the custodial account structure required under applicable law.  Specifically, BONY was extending credit in the form of daytime "overdrafts" so that Sentinel could satisfy customer redemptions sought on short notice, and it was difficult for BONY personnel to determine whether there were sufficient "excess" customer securities in the segregated custodial accounts to repay BONY's advances of credit.  In an email dated August 18, 1997, a BONY officer described Sentinel's custodial account structure as "an accident waiting to happen," indicated that he was no longer comfortable clearing Sentinel's

transactions, and insisted on an immediate response from the BONY official in charge of the Sentinel business.

59.     As a result, less than six months after having won Sentinel's custodial business, BONY caused Sentinel to move its business from BONY's Institutional Custody Division to its Broker/Dealer Services Division ("SIBD"), where Sentinel would buy and sell securities through a typical broker/dealer and securities clearing account.  BONY did so even though Sentinel was not a broker/dealer and Sentinel's business as an FCM and Investment Adviser was fundamentally different from the business of a broker/dealer because it involved customer funds and securities that were subject to strict custodial and segregation requirements.  As set forth below, the new SIBD account structure violated the segregation requirements imposed by applicable law and was inconsistent with BONY's commitments in its segregation letter agreements that customer funds would at all times be segregated and not be subject to BONY's lien.

60.     After BONY insisted that Sentinel move its business from BONY's Institutional Custody Division to its Broker/Dealer Services Division, in October 1997 BONY required Sentinel to execute a clearing agreement appointing BONY as Sentinel's clearing agent "in furtherance of [Sentinel's] business as a broker/dealer of securities."  (Exhibit F attached). Sentinel and BONY also entered into a Security Agreement, dated October 21, 1997 (Exhibit G attached), giving BONY a security interest in Sentinel's securities clearing account.

61.     BONY knew that Sentinel was not a broker/dealer and that its form broker/dealer agreement did not fit Sentinel's FCM and Investment Adviser business.  Moreover, the architecture BONY established for Sentinel's accounts guaranteed that BONY could not keep its

contractual promises and meet its statutory obligations to keep customer funds and securities segregated from Sentinel's own assets or from those of other customers.

       C.      <u>The unlawful account architecture established by BONY</u>

      62.     BONY established segregated cash accounts for U.S. denominated funds held for Sentinel's customers in SEGs 1, 2 and 3, respectively.  BONY also established segregated securities accounts for government and government agency securities (hereinafter collectively referred to as "government securities"), such as U.S. Treasury notes, Fannie Mae and Ginnie Mae notes held for Sentinel's customers in SEGs 1, 2, and 3, respectively.

      63.     However, BONY improperly established a single, non-segregated clearing account for all government securities transactions.  Thus, all purchases and sales of government securities had to be processed through this single account, whether they were on behalf of SEGs 1, 2 or 3 or Sentinel itself.  As a result, government securities and cash held by BONY on behalf of one customer SEG were routinely commingled with those belonging to other SEGs or Sentinel's own portfolio, in direct contravention of applicable law and the segregation letter agreements.  This structure led to and facilitated the conduct of Sentinel insiders in commingling customer assets and led to BONY maintaining client funds and securities in an account which was neither segregated as required under Sections 4d(a)(2) and 4d(b) of the CEA and CFTC Rule 1.20, nor registered as a custodial account under SEC Rule 206(4)-2.

      64.     BONY also improperly established this government securities clearing account as the collateral account securing all loans made by BONY to Sentinel.  Indeed, the account is identified in BONY's records and reports as the "SEN Clearance Coll A/C FBO BNY" (Sentinel Clearance Collateral Account For the Benefit Of Bank of New York), and also was known within Sentinel and BONY as the "SLM-SEN Clearance Coll A/C FBO BNY," the "SLM"

account, the "Street" account, "the clearance account," the "collateral account," the "SEN" account, and the "box." (Hereafter, this account is referred to in this Complaint as the "Clearing/ Collateral Account.")

65. BONY continued to make short-term loans to Sentinel, initially so that Sentinel could meet customer requests for redemption. Those loans took place in the form of daytime "overdrafts" of Sentinel's Clearing/Collateral Account, which BONY then converted to overnight loans as necessary. The overnight loans were reversed the next morning, putting the Clearing/Collateral Account back into an overdraft situation if sufficient funds were not deposited (or securities liquidated) to pay off the loan. BONY accepted and took as security for its overnight loans to Sentinel any government securities that were in the Clearing/Collateral Account, without regard to whether those securities were Sentinel House securities or customer securities. Under CFTC Rule 1.20(a), however, customer assets never could be used as security for the BONY loans.

66. To effect a sale of a government security held in a segregated customer account, Sentinel was required to request that BONY "desegregate" the security and move it into the Clearing/Collateral Account. Once there, BONY could take the position that the security was subject to its lien, regardless of whether that security was a customer asset. Worse, because BONY's daytime advances of credit to Sentinel were made in the form of an "overdraft" (negative) balance in the Clearing/Collateral Account, and any sales of customer government securities would automatically settle to the Clearing/Collateral Account, the proceeds of customer securities sales (instead of being available for the applicable customers) were automatically applied against, and reduced the amount of, BONY's "overdraft" loan to Sentinel.

67.    When a government security was purchased for a segregated account, BONY's account structure similarly required that the security be purchased in the Clearing/Collateral Account, and then Sentinel would request that the security be "segregated" to the applicable customer segregated account.  Under the account structure established by BONY, however, BONY retained the ability to refuse to segregate customer securities purchased through the Clearing/Collateral Account if Sentinel did not post sufficient collateral for BONY's loans to Sentinel.

68.    Further, BONY's clearing account structure required that any customer security purchased or sold pursuant to a repo or reverse repo transaction also clear and settle through the Clearing/Collateral Account, instead of directly into the applicable segregated custodial account.

69.    BONY thus established a clearing structure in which it could not fulfill its contractual promises and which violated applicable law including Sections 4d(a)(2) and 4d(b) of the CEA and CFTC Rule 1.20 (which requires that customer funds at all times be segregated as belonging to commodity customers, and be deposited only in accounts which clearly identifies them as customer property); CFTC Rule 1.20(a) (which expressly prohibits the pledging of customer funds to secure a loan for any purpose other than for customer commodity transactions); CFTC Rule 1.25 (which prohibits any repurchase or reverse repurchase transactions from taking place outside of customer segregated accounts, and requires that all repo transactions for the benefit of customers take place and settle solely in segregated accounts); Section 4d(a)(2) of the CEA and CFTC Rule 1.26 (which mandates that any securities in which customer funds are invested must be maintained at all times in segregation); and Section 4(b) of the CEA and CFTC Rule 30.7 (which requires that funds of FCM customers engaged in trading at foreign exchanges also be separately segregated and invested).

70.     In addition, the Clearing/Collateral Account was not registered in the name of Sentinel as agent or trustee for its clients, and therefore, no customer funds or securities could be cleared through or maintained in the Clearing/Collateral Account, even briefly, without violating Section 206 of the Investment Advisers Act and SEC Rule 206(4)-2.

## THE CHANGE IN SENTINEL'S BUSINESS AND BONY'S EXPANSION OF THE UNLAWFUL ACCOUNT STRUCTURE TO CORPORATE SECURITIES

### A.     CFTC Rule 1.25 Amendments and Adoption of CFTC Rule 1.49

71.     Historically, Sentinel typically directed the investment of client funds in high-quality, low-risk government securities, and did not engage in significant repo or reverse repo transactions.  Sentinel's borrowings from BONY typically were used to provide liquidity for customer redemptions, and Sentinel's loan balances (if any) were relatively modest.

72.     However, at the end of 2000, CFTC Rule 1.25 was modified substantially to permit FCMs to invest customer funds in, among other things, high-grade corporate securities, and also to enter into repo and reverse repo agreements utilizing such securities.  Sentinel was a strong proponent of these changes and provided written comments to the CFTC concerning the rule changes.

73.     In addition, with the 2003 adoption of CFTC Rule 1.49, Sentinel began to direct investments in Euroclear registered securities and certain customer funds were held by BONY in Euro and G-7 currency denominations in non-U.S. bank accounts.

### B.     The new accounts

74.     Following the implementation of changes to CFTC Rule 1.25 and the adoption of CFTC Rule 1.49, both Sentinel's business and its relationship with BONY changed dramatically.

75.     In order to accommodate the changes to Sentinel's business, BONY opened a series of new BONY accounts to hold corporate securities registered with the Depository Trust

Corporation (or DTC), corporate securities registered in the Euroclear system, and securities that were not registered in electronic clearing systems (so-called "physical" securities).

76.    Sentinel executed a new broker/dealer clearing agreement with BONY known as the Global Clearing and Custody Agreement.  (Exhibit H attached).  BONY and Sentinel also executed a new Security Agreement.  (Exhibit I attached).  Both agreements were dated January 9, 2003.

77.    Article II, Section 1(a) of the Global Clearing and Custody Agreement appointed BONY as Sentinel's clearing agent.  In Article II, Section 2(a), BONY acknowledged that it "will not have, and will not assert, any claim or lien against Securities held in a Segregated Account."  Article III, Sec. 1(a) authorized BONY to act as custodian of the segregated accounts.

78.    The 2003 Security Agreement provided that BONY, at its discretion, could make loans or otherwise extend credit to Sentinel.  Under Schedule A to the agreement, the collateral for that loan was to be:  "Any and all Securities and other property held in the Account, as these terms are defined in the Global Clearing and Custody Agreement between the Debtor and the Bank, and any cash balances held in any cash account maintained by the Bank in connection therewith."

79.    The Global Clearing and Custody Agreement and the 2003 Security Agreement establish that there is to be only a single combined clearing and collateral Account, against which BONY may assert a lien.

C.    The DTC securities accounts

80.    BONY established three segregated securities accounts to hold DTC-registered corporate securities for Sentinel's customers in SEG 1, SEG 2 and SEG 3, respectively.

81.     BONY also established a DTC clearing account, also known as the "FC1 account" or the "Street Securities Account" ("the DTC Clearing Account" hereafter) to clear both customer and House transactions in DTC securities.   Just like the Collateral/Clearing Account, however, the DTC Clearing Account was not a segregated account.

82.     The DTC Clearing Account was not used for cash transactions.  Cash deposits, withdrawals and settlement payments relating to DTC corporate transactions were processed in the Clearing/Collateral Account.

83.     Because the DTC Clearing Account was not segregated, BONY could not fulfill its statutory duties and promises to Sentinel to keep assets pertaining to different customer SEGs separate from each other and from Sentinel's house assets.  DTC-registered securities clearing through the DTC Clearing Account, like the government securities clearing through the Clearing/Collateral Account, were necessarily commingled with securities belonging to other customer SEGs and with House assets.

84.     In addition, the DTC Clearing Account was not registered in the name of Sentinel as agent or trustee for its clients, and therefore, no customer funds or securities could be cleared through or maintained in the DTC Clearing Account, even briefly, without violating SEC Rule 206(4)-2.

85.     Moreover, because the DTC Clearing Account was not a segregated customer account, it specifically could not be used under CFTC Rules 1.20(a), 1.25(d) and 1.26 to effectuate the delivery of customer securities to or from counterparties in connection with repo or reverse repo transactions.

86.     Further, under the DTC Clearing Account structure, every time a customer security was sold, the cash proceeds of that sale were automatically credited to the

Collateral/Clearing Account and served to reduce the overdraft loan balance in that account, instead of being immediately credited to the appropriate SEG.

87.     In addition, under the DTC Clearing Account structure, every time a customer security was purchased, the customer security cleared into the DTC Clearing Account, against which BONY has asserted a lien.

D.     The Euroclear securities and foreign currency accounts

88.     In 2003, Sentinel also established a series of Euroclear and foreign currency accounts at BONY to hold customer securities registered in the Euroclear system and settled in foreign currencies.  Account number 521010 (the "Euroclear Securities Clearing Account") was denominated as a clearing account for all Euroclear securities, and two other accounts, 521011 and 521012, were denominated as customer segregated Euroclear securities accounts for SEG 1 and SEG 3, respectively.  A series of corresponding cash accounts also were opened in various foreign currency denominations.

89.     Under the structure it established for Euroclear securities, BONY could not fulfill its promise to Sentinel to keep assets pertaining to different customer SEGs separate from each other and from House assets. Euroclear-registered securities clearing through the Euroclear Securities Clearing Account, like the government securities clearing through the Clearing/Collateral Account and DTC securities clearing through the DTC Clearing Account, were necessarily commingled with securities belonging to other customer SEGs and with House assets.

90.      In addition, Sentinel specifically advised BONY that each of the Euroclear and foreign currency accounts, including the Euroclear Securities Clearing Account, needed to be denominated as customer segregated accounts, and provided segregation acknowledgements for

BONY's execution.  Although BONY did execute segregation letters with respect to the SEG 1 and SEG 3 Euroclear securities accounts and certain corresponding foreign currency accounts, BONY failed to provide executed segregation acknowledgements for the Euroclear Securities Clearing Account and some related foreign currency accounts.

91.    Notwithstanding the foregoing, the account statements provided by BONY to Sentinel specifically indicated that the securities maintained in the Euroclear Securities Clearing Account were held in a "segregated" account.  Further, not a single customer transaction ever took place in the SEG 1 and SEG 3 Euroclear securities accounts, and it appears that those accounts were never even activated.  Thus, all Euroclear securities purchased for customers were held by BONY in the Euroclear Securities Clearing Account.

92.    BONY acknowledged in internal communications that the Euroclear Securities Clearing Account was not intended to hold any material amount of securities, and was being used solely for clearing customer transactions.  Nonetheless, BONY has now taken the position that the securities in the Euroclear Securities Clearing Account are not customer securities, and that it may assert a lien against securities held in the Euroclear Securities Clearing Account and related foreign currency accounts.

93.    Moreover, if (as BONY claims) the Euroclear Securities Clearing Account is not a segregated customer account, it specifically could not be used under CFTC Rules 1.20(a), 1.25(d) and 1.26 to effectuate the delivery of customer securities to or from counterparties in connection with repo or reverse repo transactions.

94.    Further, if (as  BONY claims) the Euroclear Securities Clearing Account was not a segregated account in the name of Sentinel as agent or trustee for its clients, no customer funds

or securities could be cleared through or maintained in the Euroclear Securities Clearing Account, even briefly, without violating SEC Rule 206(4)-2.

      E.    <u>Physical securities</u>

      95.    In addition to the DTC and Euroclear securities and related accounts, in connection with the change in Sentinel's business, BONY also established an account to clear and hold physical securities (*i.e.,* certificated securities that were not registered in the DTC or Euroclear systems) (the "Physical Clearing/Custodial Account").    Unlike with the U.S. government, DTC and Euroclear securities, no separate segregated accounts were ever established for physical securities.    Thus, all House and customer transactions in physical securities cleared through the single Physical Clearing/Custodial Account, and all physical securities were held by BONY in that account.    Like the DTC Clearing Account, the Physical Clearing/Custodial Account was not used for cash transactions.    Cash deposits, withdrawals and settlement payments relating to physical securities transactions were processed in the Clearing/Collateral Account.

      96.    As a result of the fact that the Physical Clearing/Custodial Account was not segregated (and BONY made no attempt to establish any segregated accounts for physical securities attributable to Sentinel customers), BONY could not fulfill its statutory duties and promises to Sentinel to keep assets pertaining to different customer SEGs separate from each other and from Sentinel's house assets.    Physical securities held in or clearing through the Physical Clearing/Custodial Account were necessarily commingled with securities belonging to other customer SEGs and with House assets.

      97.    In addition, the Physical Clearing/Custodial Account was not registered in the name of Sentinel as agent or trustee for its clients, and therefore, no customer funds or securities

could be cleared through or maintained in the Physical Clearing/Custodial Account, even briefly, without violating SEC Rule 206(4)-2.

98.     Moreover, because the Physical Clearing/Custodial Account was not a segregated customer account, it specifically could not be used under CFTC Rules 1.20(a), 1.25(d) and 1.26 to effectuate the delivery of customer securities to or from counterparties in connection with repo or reverse repo transactions.

99.     Further, under the Physical Clearing/Custodial Account structure, every time a customer security was sold, the cash proceeds of that sale were automatically credited to the Collateral/Clearing Account and served to reduce the overdraft loan balance in that account, instead of being immediately credited to the appropriate SEG.

## THE SENTINEL INSIDERS' SCHEME AND THE BONY LOAN

A.      The Repo Activity

100.     Following the opening of the DTC Clearing Account, the Euroclear Securities Clearing Account, and the Physical Clearing/Custodial Account, Sentinel radically changed its investment strategies and borrowing.

101.     Sentinel's actions in this regard, and the conduct described in paragraphs 102-167, were undertaken at the instance of the Sentinel Insiders and were adverse to the interests of the company.  (For purposes of clarity and conciseness, that allegation is not reiterated each time Sentinel's actions are described.)

102.     Among other things, Sentinel began purchasing a substantial amount of securities for the Sentinel "House" account, which ultimately benefited the Sentinel Insiders.  Sentinel also dramatically increased its use of leverage, which put both Sentinel and its customers at risk if the market moved adversely.

103. No later than 2003, Sentinel began financing the acquisition of many of the securities it controlled using overnight repurchase agreements. In a typical overnight repurchase or "repo" transaction, the repo borrower (in this case Sentinel) acquires and transfers a security to a repo lender, which in turn makes a repo "loan" to Sentinel and holds the security as collateral. Under most overnight repo agreements, absent a default, Sentinel was entitled to all principal and interest payments received on account of the security that was the subject of the repo transaction.

104. Repo counterparties imposed a "haircut" on the amount loaned to Sentinel in order to provide a sufficient collateral cushion above market value to satisfy Sentinel's repo obligations in the event of a default. Thus, a repo lender advanced to Sentinel, for example, only 90% of the current market value of the security subject to the repo transaction (a 10% "haircut"). Because Sentinel had virtually no capital, the Sentinel Insiders financed the balance of the acquisition cost for securities that were the subject of a repo transaction (*i.e.* the haircut) using Sentinel's overnight loan facility with BONY. Thus, beginning no later than 2003, instead of funding short-term liquidity needs related to Sentinel customer redemptions, Sentinel began using the BONY loan for Sentinel's highly-leveraged speculation in securities, a fact which BONY knew.

105. Although prior to the summer of 2007 most of Sentinel's overnight repo positions were rolled over each day, both Sentinel and the repo counterparty had the right to close out an overnight repo position at any time, in which case the repo counterparty was contractually obligated to return the security to Sentinel, and Sentinel was contractually obligated to pay off the funds borrowed plus interest.

106.    At times, Sentinel also participated in so-called "reverse repo" transactions, in which Sentinel was the repo lender holding securities as collateral for a loan made by Sentinel to a repo borrower.

107.    Over time, Sentinel controlled an ever-increasing number of securities pursuant to repo transactions, subjecting Sentinel and its customers to substantial risk arising from the leverage associated with repo transactions.  All of the securities that were the subject of repo activity cleared through the BONY Collateral/Clearing Account, DTC Clearing Account, Euroclear Securities Clearing Account, and Physical Clearing/Custodial Account.

108.    By the end of 2003, Sentinel had purchased and controlled more than $242 million in securities under repo agreements.  By the end of 2004, that amount had increased to more than $922 million; by the end of 2005 it had increased to more than $1.3 billion; and by the end of 2006 it had increased to more than $2.0 billion.  This $2.0 billion+ repo position put Sentinel, which at all times had, at best, only a few million dollars of capital, at tremendous risk in the event of a decrease in the value of the securities that it controlled.

B.    The BONY Loan

109.    Beginning no later than the end of 2003, the Sentinel Insiders began exploiting the flawed account structure established by BONY and used that account structure to unlawfully and without disclosure to their clients: (a) commingle customer assets among SEGs and with Sentinel's House assets; (b) use securities that were supposed to be held in segregated customer accounts to collateralize loans from BONY, including loans that were used to purchase House securities and to engage in billions of dollars of undisclosed repo transactions; and (c) pay down Sentinel's debt to BONY using customer assets.

110.    The Sentinel Insiders' scheme to use customer assets to secure the purchase of securities for the Sentinel House account and to increase leverage using repo agreements resulted in a dramatic increase in Sentinel's loan balance with BONY.  For example, while Sentinel's loan balance stood at $23 million at the end of 2002, by the end of 2003 the loan had more than doubled to $55 million.  By the end of 2004, the loan had more than doubled again to over $120 million, and by the end of 2005 it had more than doubled yet again, to approximately $280 million.  By June 2007, the loan balance had again more than doubled, to over $570 million.

111.    BONY allowed Sentinel to continue borrowing amounts far in excess of the overnight loan credit limit BONY set for Sentinel, and far in excess of any reasonable line of credit for Sentinel's business (and its very small capital), and continually increased that limit.  In 2000, Sentinel's overnight loan credit limit was $30 million.  By the end of 2004, that limit had increased to $95 million.  By the end of 2005, Sentinel's credit limit with BONY was $175 million, although the credit extended by BONY routinely exceeded $300 million.  In 2006, BONY increased the overnight credit limit to $300 million.  When Sentinel's loan blew through the $300 million credit limit in January and February 2006, BONY extended more credit, notwithstanding the fact that BONY knew that Sentinel's net capital was, at best, only a few million dollars.

112.    Moreover, BONY imposed no daytime overdraft limit whatsoever upon Sentinel. Thus, the Sentinel Insiders could run up tens of millions (and on certain days hundreds of millions) of dollars in additional liability to BONY during any given day.

113.    BONY required that Sentinel post collateral to secure its overnight loans to Sentinel.  Because Sentinel House securities and other House funds Sentinel held were insufficient to secure the loan, and because of the commingling permitted by BONY's account

structure, the insiders began collateralizing the BONY loan with hundreds of millions of dollars in customer securities, in violation of Sections 4(b), 4d(a)(2), and 4d(b) of the CEA and CFTC Rules 1.20, 1.25, 1.26, 1.49 and 30.7, as well as Section 206 of the Investment Advisers Act and SEC Rule 206(4)-2.

> C.    BONY's Knowledge of the Misuse of Customer Assets
> and False Statements to Regulators and the Public

114.    BONY was well aware that Sentinel had fundamentally changed its business model, that it was purchasing large amounts of securities for the House account and for repo activities using credit provided by BONY, and that the Sentinel loan was financed almost exclusively with customer securities that were supposed to be segregated.

115.    BONY, including (as of November 23, 2005) the managing director of BONY in charge of Financial Institutions Credit, was well aware that Sentinel had a leveraged trading strategy.

116.    BONY received and reviewed Sentinel's year-end financial statements for 2005 and 2006.    Those statements, *inter alia*, reflected that "Sentinel purchases securities for customers and for its own account. . . ."

117.    BONY also received copies of numerous financial statements and regulatory reports from Sentinel that revealed that Sentinel was providing false and misleading information to regulators and its customers.

118.    Specifically, at least between September 2005 and June 2007, BONY received from Sentinel nearly every monthly CFTC Form 1-FR report submitted to regulators by Sentinel, which filed each statement approximately three weeks after the end of the month-long period covered by the statement.    BONY routinely received copies of these monthly reports within a few days of the filing date.

119.     Each monthly CFTC Form 1-FR submitted by Sentinel included several different financial reports, including a Statement Of Financial Condition (Sentinel's assets and liabilities); a Statement Of Computation Of Minimum Capital Requirements imposed upon Sentinel; and a Statement Of Segregation Requirements And Funds In Segregation.

120.     Each and every one of the financial reports comprising the Form 1-FR provided by Sentinel to regulators and BONY contained patently false information.  Among other things, each and every Statement Of Financial Condition included as part of Sentinel's monthly Form 1-FR filings reflected that Sentinel owed $0 in loans to BONY (Statement of Financial Condition, Lines 21.A-C).  Each and every Statement Of Financial Condition included as part of Sentinel's monthly Forms 1-FR filings reflected that Sentinel engaged in no repo activity whatsoever (Statement Of Financial Condition, Lines 3, 4 and 29). Each and every Statement Of Computation Of Minimum Capital Requirements included as part of Sentinel's monthly and annual Forms 1-FR carried through the false information provided in the corresponding Statement Of Financial Condition. And each and every Statement Of Segregation Requirements And Funds In Segregation included as part of Sentinel's monthly and annual Forms 1-FR indicated that <u>all</u> of Sentinel and its customers' funds and securities were held in segregated accounts. Statement Of Funds In Segregation, Lines 7.A-C.  Every one of these assertions, as BONY knew, was patently false.

121.     BONY also knew that Sentinel was making flagrant misrepresentations to actual and potential customers about Sentinel's relationship with BONY and how customer assets were held at BONY.  For example, on June 27, 2007, a senior BONY official in charge of Sentinel's account received by email from another BONY officer a Sentinel marketing brochure that included statements that BONY knew were patently untrue.

30

122.    Among other things, the brochure said that Sentinel currently had "over $1.8 billion under management held in fiduciary accounts at our custodian, The Bank of New York." BONY knew that that assertion was untrue and that of the $1.8 billion held by BONY, hundreds of millions of dollars worth of customer assets were not held in fiduciary accounts but instead were held in BONY's Clearing/Collateral Account and subject to BONY's lien or were held in other non-fiduciary accounts.

123.    The brochure also falsely stated that a Sentinel "client retains a pro-rata undivided interest in the underlying securities pool held in a segregated account at The Bank of New York" and that "Securities are held in segregated, bankruptcy proof accounts." BONY knew that these statements were false because substantial customer assets were held in the BONY Clearing/Collateral Account and the DTC Clearing Account, not in a segregated account.

124.    And the brochure indicated that the sale and purchase of securities on behalf of customers at BONY involved movement only between a "Sentinel Client Segregated Cash Account" and a "Sentinel Segregated Client Securities Account." BONY knew that this representation was false and that in fact whenever securities were bought or sold, the cash and securities had to run through clearing accounts which were not segregated and as to which BONY asserted a lien.

125.    BONY also knew that, in order to collateralize Sentinel's loan, Sentinel at times was transferring hundreds of millions of dollars of securities from segregated customer accounts in bulk transfers to the BONY Clearing/Collateral Account under circumstances which plainly could not have related to legitimate investment activities or other transactions authorized by Sentinel's customers. BONY also knew or should have known that Sentinel Insiders caused Sentinel to make these transfers of hundreds of millions of dollars from segregated customer

accounts to the BONY Clearing/Collateral Account or other non-segregated accounts with the intent to hinder, delay or defraud Sentinel's other creditors, including Sentinel's customers.

126.    BONY also knew of but deliberately ignored numerous red flags relating to Sentinel's activities, including: (a) the dramatic increase in the amounts borrowed by Sentinel from BONY, unrelated to customer redemption requests or other short-term liquidity needs; (b) the fact that Sentinel routinely exceeded its large credit limit with BONY; (c) the fact that Sentinel's leverage with repo counterparties had exponentially increased, such that by 2006 more than $2.0 billion in securities were the subject of repo agreements, almost all of which had been financed in part using the BONY loan; (d) Sentinel's purchase of lower-grade and illiquid securities, which was inconsistent with Sentinel's stated purpose of acting as a cash manager; (e) Sentinel was declaring dividends in excess of Sentinel's already minimal net capital; and (f) customer assets were posted to Sentinel's balance sheet as Sentinel assets.

### BONY'S PARTICIPATION IN THE RAIDING OF SEGREGATED ACCOUNTS AND THE COLLAPSE OF SENTINEL

A.    Overview

127.    Leading up to 2007, the unlawful account structure established by BONY, as well as BONY's willingness to turn a blind eye to wrongdoing at Sentinel and its extension of hundreds of millions of dollars in credit, permitted certain Sentinel insiders to reap tens of millions of dollars in profit through the wrongful pledge of customer assets to BONY and excessive leverage.

128.    In the spring and summer of 2007, following a downturn in the credit market and a decrease in the value of the billions of dollars of securities controlled by Sentinel through excessive leverage, Sentinel's business quickly collapsed.  BONY's actions played a pivotal role in the collapse of Sentinel.

129.    BONY's actions were motivated by its own financial interests, at the expense of its duties as custodian of customer assets.  From January 2004 through August 2007, BONY charged Sentinel over $38 million in interest.  More than $28 million of that amount was charged by BONY in just the period January 2006 through August 2007.

B.    Sentinel's collapse

130.    Many of the securities that Sentinel purchased during the 2004 - 2007 time-period were acquired using repurchase agreements under which repo counterparties such as Fimat and Cantor Fitzgerald lent money to Sentinel to finance most of Sentinel's acquisition costs of the securities, with the balance financed by BONY.  Many of the securities that were the subject of those repo agreements were illiquid, highly-structured investments and not the subject of material secondary market trading, and many (the physical securities) were not even registered in the DTC system.

131.    As of May 2007, Sentinel had incurred over $2.4 billion in obligations to repo counterparties.   As the credit market tightened in the spring and summer of 2007, repo counterparties began to refuse to accept these lower-grade securities from Sentinel under repo agreements, increasing their margin (haircut) requirements or simply refusing to continue to engage in repo transactions in such securities.

132.    At the end of May 2007, Fimat became the first major Sentinel counterparty to refuse to continue financing certain securities.  Fimat closed out the repo transactions related to those securities, and returned more than $100 million (face value) in securities to Sentinel through the BONY clearing system.  Pursuant to its repo agreements with Fimat, Sentinel was obliged to pay its repo obligation to Fimat or risk a default.  Because Sentinel could not finance

its repo payment to Fimat in any other way, on June 1, 2007, it borrowed an additional $94 million from BONY, increasing the BONY total loan balance to more than $353 million.

133.    Thereafter, on every business day from June 1, 2007 until August 13, 2007, when Sentinel's business finally collapsed, BONY allowed Sentinel to exceed its already excessive $300 million overnight loan credit limit by tens (and sometimes hundreds) of millions of dollars. At all relevant times during that period, however, BONY attempted to ensure that its loan was fully secured, even though its security was provided by customer assets that BONY had promised would not be used to secure Sentinel's loan.

134.    To secure the increased loan, on June 1, Sentinel and BONY desegregated large blocks of government securities from both the SEG 1 and SEG 3 segregated government securities accounts, with a face value of almost $87 million, and moved those securities into the Clearing/Collateral Account (the "June 1 Transfers"). These transfers took place at the end of the day, and did not coincide with any large customer redemptions or other potentially legitimate customer transactions. This also left less than $15 million in face value of government securities in the SEG 1 segregated government securities account.

135.    BONY personnel recognized that the Sentinel Insiders must be improperly using customer securities to collateralize Sentinel's loan obligations to BONY. After receiving a report on Sentinel's collateral position on June 13, 2007, a senior BONY credit official asked subordinates: "How can they have so much collateral? With less than $20MM in capital I have to assume most of this collateral is for somebody else's benefit. Do we really have rights on the whole $300MM?" (Emphasis added.)

136.    On June 25, 2007, Fimat informed Sentinel that it would no longer finance an additional batch of securities through repo agreements, and it returned another $140 million (face

amount) in securities to Sentinel's physical account at BONY.  As a result, Sentinel was obligated to repay Fimat under its repo agreements with Fimat.  In order to do so, it once again borrowed additional funds from BONY using customer funds as collateral.

137.   Sentinel's loan balance at the end of the day on June 25, 2007 was already a remarkably high $358 million.  By June 27, Sentinel's loan with BONY ballooned to $573 million.  BONY and Sentinel attempted to secure the massive loan in the manner described below.

138.   At first, BONY temporarily accepted the physical securities that had been returned by Fimat as security for the BONY loan.  BONY quickly determined, however, that there was no market for the physical securities.  It therefore demanded additional collateral.

139.   Recognizing that BONY was under-collateralized, on June 26, 2007, Sentinel and BONY transferred virtually all of the remaining government securities in the SEG 1 and SEG 3 segregated government securities accounts, totaling in excess of $66 million in face value, out of segregation and into the Clearing/Collateral Account.  This left no government securities in the SEG 1 government securities account, and only $15,000 face value of government securities in the SEG 3 government securities account.  By this date, of some $463.6 million in face value of government securities held at BONY in connection with the Sentinel accounts, $463.1 million – more than 99% of all of Sentinel's government securities – were being held in the Clearing/Collateral Account for the benefit of BONY, not in segregated customer accounts.

140.   On June 28, BONY informed Sentinel that considering the size of the loan for that day, which was $546 million, the wires still due to go out from Sentinel, and the collateral currently held by BONY, Sentinel's collateral position still was substantially short. Sentinel agreed to post additional securities as collateral for the loan.  Because virtually all customer

government securities already had been moved to the Clearing/Collateral Account, Sentinel agreed to permit BONY to take securities in the DTC Clearing Account as collateral for the loan, and if necessary to move additional securities from segregated accounts into the DTC Clearing Account to collateralize the loan.

141.    On June 29, BONY determined that it would no longer accept any of the physical securities that had been returned by Fimat as collateral for Sentinel's loan.  As a result, at the close of business on June 29, 2007, Sentinel was short $145 million in collateral.  In order to fully collateralize the loan, Sentinel and BONY desegregated approximately $170 million in face value of corporate securities from the SEG 1 DTC account, representing one-half of the total value of that account, and transferred them into the DTC Clearing Account to be used as collateral for the BONY loan (together with the transfers described in paragraph 139 above, the "June 25-29 Transfers").  In the DTC Clearing Account, these customer assets, which were supposed to be segregated, were commingled with assets belonging to the insiders' House account and the assets of other SEGs.

142.    These transfers took place at the end of the day, after the amount of that evening's overnight loan was determined, and did not coincide with any large customer redemptions or other potentially legitimate customer transactions.  BONY further knew that under CFTC Rule 1.20(a), customer assets never could be used as security for the BONY loans.  BONY also knew that Sentinel needed the massive loan in order to pay for the physical security repo positions that had been closed by Fimat and cleared into the Physical Clearing/Custodial Account – an account with no linked customer segregated accounts and which had been used solely to clear House securities trades. Despite its knowledge and the fact that it was unlawful under Section 4d(b) of the CEA for BONY to hold, dispose of, or use any customer assets as belonging to Sentinel or

any person other than Sentinel's customers, BONY allowed and participated in the bulk movement of SEG 1 DTC securities into the Clearing/Collateral Account, where they could then be pledged as collateral to BONY.

143.    Between the end of June and mid-July, Sentinel reduced its loan from BONY to approximately $383 million.  However, on July 17, the loan increased to almost $497 million when another repo counterparty, Cantor Fitzgerald, closed out over $150 million (face amount) in repo positions with Sentinel.

144.    In order to provide additional collateral for the increased loan resulting from this close-out, on July 17, 2007 Sentinel and BONY again moved customer securities from the segregated SEG 1 DTC account into the DTC Clearing Account, this time more than $84 million in face value of DTC securities (the "July 17 Transfers").

145.    BONY knew that Sentinel was desegregating customer assets and transferring them to the DTC Clearing Account for the sole purpose of covering a shortfall in collateral. BONY further knew that under CFTC Rule 1.20(a), customer assets never could be used as security for the BONY loans.  Again, these transfers took place at the end of the day, after the amount of that evening's overnight loan was determined, and did not coincide with any large customer redemptions or other potentially legitimate customer transactions. Despite its knowledge, BONY again allowed and participated in the bulk movement of SEG 1 DTC securities into the Clearing/Collateral Account, where they could then be pledged as collateral to BONY.

146.    By mid-July, the SEG 1 DTC account, which had held about $338 million in face value of securities in segregation until late June, had only $85 million in face value of securities remaining.  All told, over a period of less than seven weeks, Sentinel and BONY had transferred

in bulk transfers, for the sole purpose of providing BONY with securities for its loan to Sentinel, more than $150 million in customer government securities and $250 million in DTC securities from segregated accounts. These transfers were in addition to the more than $300 million in customer government securities BONY already was improperly holding as collateral as of the beginning of May 2007.

147.    Sentinel managed to reduce its loan balance to $362 million by late July. However, BONY continued to hold as collateral for its loan more than $500 million in DTC and government securities that were supposed to be segregated.

148.    On about July 30, Sentinel's chief financial officer determined that SEG 1 customer assets should not have been used as collateral for the bank loan. Sentinel then began a program, with BONY's assistance, to move huge blocks of securities serving as BONY collateral back into segregation. In order to ensure that BONY was fully collateralized on its loan, however, Sentinel and BONY undertook this program at the expense of Sentinel's SEG 3 customers and removed from segregation essentially all remaining SEG 3 customer assets that had not already been pledged for the BONY loan.

149.    As part of this program, on July 30, Sentinel and BONY moved $248 million (face value) in securities out of the DTC Clearing Account, where they had been used as collateral for the loan, and transferred them to the segregated SEG 1 DTC account. On the following day, July 31, Sentinel and BONY moved $264 million (face value) in government securities, which had been sitting in the Clearing/Collateral Account, from that account to the SEG 1 government securities account.

150.    The transfer of over $500 million (face value) of securities to SEG 1 segregated accounts over this two-day period would have created a gaping shortfall in BONY's collateral.

In order to plug that hole, on July 30 Sentinel and BONY took $289 million (face value) of securities from the segregated SEG 3 DTC account and moved them to the DTC Clearing Account, where these customer assets were commingled with assets belonging to the Insiders' House portfolio and were posted to the Clearing Collateral account as security for Sentinel's loan (the "July 30 Transfers").  This action virtually emptied the SEG 3 DTC account, leaving only $900,000 (face value) of DTC registered securities in a segregated account which for months had consistently held more than $250 million (face value) worth of securities.

151.    BONY knew that Sentinel and BONY were desegregating essentially everything in the SEG 3 DTC account and moving it into the DTC Clearing Account in order to secure the BONY loan.  BONY personnel expressed surprise at Sentinel's request to desegregate but did nothing to question or prevent it.

152.    BONY further knew, because Sentinel expressly told BONY personnel, that Sentinel's policy was simply to desegregate sufficient customer assets and put them in the DTC Clearing Account so that they could serve as collateral for the BONY loan.

153.    On or about August 7, a BONY officer asked Eric Bloom, the chief executive officer of Sentinel, what would happen to Sentinel if BONY insisted on cutting its loan to $300 million, Sentinel's supposed credit limit.  Bloom informed BONY in substance that Sentinel would not be able to meet its obligations to its customers.

154.    On August 9, Sentinel entered instructions to move a substantial amount of customer securities from the DTC Clearing Account back to the DTC SEG 1 and SEG 3 accounts.  BONY refused those instructions because carrying them out would have meant that Sentinel would not have enough collateral remaining to cover the BONY loan.

155.    On August 10, Sentinel emailed the assistant treasurer at BONY and asked for a list of all securities that were being held in the DTC Clearing Account that were not being used as collateral "so that we can seg all the securities that you are unable to use as collateral."  This email again explicitly told BONY what it already knew: that customer securities were being moved into and out of segregation based on BONY's need for collateral, not based on customer redemptions or any other legitimate customer transactions.

156.    On August 13, 2007, Sentinel was unable to meet customer redemption requests and issued a letter to customers stating that redemptions had been suspended.  The BONY loan for that date was $415 million.

157.    On August 14, BONY officers traveled from New York to Northbrook, Illinois and met with Sentinel personnel.  At that time, BONY configured its systems so that Sentinel personnel could not effect any further transactions without BONY's express approval. Government regulators also were on Sentinel's premises by that date.

158.    As of August 14, approximately $113 million in customer funds had been delivered to counterparties pursuant to overnight reverse repo agreements; the counterparties had delivered to Sentinel government securities to secure their payment obligations.  These overnight reverse repos had been undertaken for the benefit of certain SEG 1 customers and unwound on a daily basis unless they were renewed.  Although some of the government securities (those securing reverse repo loans totaling $36.2 million) were held in the SEG 1 segregated government securities account, additional government securities securing reverse repo loans of $77.2 million were held in the Clearing/Collateral Account in violation of CFTC Rules 1.25 and 1.26.

159.    On August 14 and 15, Sentinel allowed these overnight reverse repos to unwind. As a result, the securities were returned to the counterparties through the Clearing/Collateral Account.    The counterparties paid their repo obligations to Sentinel through the Clearing/Collateral Account.

160.    Because of the account architecture established by BONY, these reverse repo proceeds initially were not made available to Sentinel's customers, but were instead automatically credited against Sentinel's loan (overdraft) balance, reducing the daytime overdraft in the Clearing/Collateral Account by more than $113 million.    Apparently recognizing the serious flaws in the unlawful account structure that had been established by BONY, BONY permitted Sentinel's overdraft (loan) balance to increase by $36.2 million (the amount of reverse repo proceeds associated with securities that had been held in the SEG 1 government securities account as of August 14, 2007), and permitted Sentinel to transfer that amount to SEG 1 cash accounts.    BONY did not release, however, the more than $77.2 million in reverse repo proceeds associated with securities that had been held in the Clearing/Collateral Account.    Instead, those funds were used to reduce Sentinel's loan balance at the expense of the Sentinel customers.

161.    On August 14, BONY wired $25 million on behalf of Sentinel to Fimat in order to meet a repo agreement margin call by Fimat.    Eric Bloom had informed a bank officer that Bloom would move positions from a DTC SEG account into the DTC Clearing Account in order to provide additional collateral to cover the wires, but did not do so.

162.    On August 15, in blatant violation of Section 4d(b) of the CEA and CFTC Rules 1.20 and 1.26, BONY acted unilaterally to secure its loan.    Without receiving any desegregation instructions from Sentinel or customer instructions, BONY unlawfully moved approximately $52

million (face value) in corporate securities out of the SEG 1 DTC account and into the DTC Clearing Account to serve as collateral for the loan.

163.    The following day, Sentinel contacted BONY's assistant treasurer seeking the return of those securities to the SEG 1 DTC account. The assistant treasurer said that he would only do so upon the instructions of the high-ranking BONY officer who had unilaterally authorized the moves in the first place. That officer approved the return of the securities, and they were in fact returned to the SEG 1 DTC account.

164.    On August 16, 2007, Eric Bloom entered into an agreement with Citadel Equity Fund, Ltd. and Citadel Limited Partnership to sell the SEG 1 portfolio to Citadel, and thereafter consummated that sale. Even though BONY plainly knew that the securities being sold to Citadel were supposed to be segregated for SEG 1 customers, BONY nonetheless refused to release all of the proceeds of the Citadel sale to Sentinel. Instead, beginning on or about August 16, 2007, and continuing thereafter, BONY asserted a lien against the Euroclear Securities Clearing Account. As a result, BONY continued to hold, *inter alia*, $16.1 million in proceeds from the Citadel sale in a cash account associated with the Euroclear Securities Clearing Account.

165.    In addition, BONY asserts a lien against all other securities in the Euroclear Securities Clearing Account, as well as all securities in the DTC Clearing Account and Physical Clearing/Custodial Account. Although on the petition date BONY's loan balance was approximately $312 million, BONY has asserted a lien against, and has refused to release to the Trustee, cash and securities worth hundreds of millions of dollars in excess of that amount.

166.    The transactions described herein and BONY's assertion of liens over funds and securities held in Sentinel's accounts have irreparably harmed Sentinel and have created losses to Sentinel and liabilities of Sentinel to its customers.

167.    BONY has filed a proof of claim in the Debtor's case, which has been assigned claim no. 76 by the Clerk of the Court, in an amount not less than $312,252,000 (the "BONY Proof of Claim'), and alleges that it holds a secured claim against the Debtor's estate by virtue of the Loan Documents (as defined in the BONY Proof of Claim) and sections 506(a) and 553 of the Bankruptcy Code.  BONY further seeks in the BONY Proof of Claim pre- and post-petition interest, indemnification, and other amounts.

## COUNT ONE

### Avoidance and Recovery of Fraudulent Transfers Pursuant to §§ 548(a)(1)(A) and 550(a) of the Bankruptcy Code

168.    Plaintiff restates and realleges paragraphs 1 through 167 of this Complaint as though fully set forth herein.

169.    Each and every transfer of cash or securities made by Sentinel from a segregated account to the Clearing/Collateral Account, DTC Clearing Account, the Euroclear Securities Clearing Account, and the Physical Clearing/Custodial Account made within two years before the Petition Date constituted a transfer of an interest in Sentinel's property.

170.    Without limiting the foregoing, each of the June 1 Transfers, the June 25-29 Transfers, the July 17 Transfers and the July 30 Transfers (the "June-July 2007 Transfers") constituted a transfer of an interest in Sentinel's property.

171.    Each of the transfers made within two years before the Petition Date (other than transfers made in connection with legitimate customer redemptions), and specifically the June-July 2007 Transfers, were made, mediately or immediately, to or for the benefit of BONY.

43

172.    Each of the transfers made within two years before the Petition Date (other than transfers made in connection with legitimate customer redemptions), and specifically the June-July 2007 Transfers, were made with the actual intent to hinder, delay, or defraud Sentinel's creditors.

173.    The Trustee may avoid each of the transfers made within two years before the Petition Date (other than transfers made in connection with legitimate customer redemptions), and specifically the June-July 2007 Transfers, pursuant to section 548(a)(1)(A) of the Bankruptcy Code.

174.    The Trustee may recover, for the benefit of the estate, each of the transfers made within two years before the Petition Date (other than transfers made in connection with legitimate customer redemptions), and specifically the June-July 2007 Transfers, or their value, from BONY as the party that received the transfers or benefited therefrom as described in this Complaint, as either (1) the initial transferee of the transfers or the entity for whose benefit the transfers were made, or (2) the immediate or mediate transferee of such initial transferee, pursuant to section 550(a) of the Bankruptcy Code.

WHEREFORE, Plaintiff respectfully requests that the Court enter an Order: avoiding each of the transfers made within two years before the Petition Date (other than transfers made in connection with legitimate customer redemptions), and specifically the June-July 2007 Transfers, pursuant to section 548(a)(1)(A) of the Bankruptcy Code; ordering the return and recovery of such transfers, or entering judgment against BONY pursuant to section 550(a) of the Bankruptcy Code in the amount of such transfers; awarding the Trustee punitive damages in an amount to be determined by the Court, pre- and post-judgment interest, costs and attorneys' fees and expenses; and granting such other equitable relief as may be just and proper.

## <u>COUNT TWO</u>

**Avoidance and Recovery of Fraudulent Transfers Pursuant to 740 ILCS 160/5(a)(1)
and 160/8(a), and §§ 544(b)(1) and 550(a) of the Bankruptcy Code**

175.     Plaintiff restates and realleges paragraphs 1 through 174 of this Complaint as
though fully set forth herein.

176.     Each and every transfer of cash or securities made by Sentinel from a segregated
account to the Clearing/Collateral Account, DTC Clearing Account, the Euroclear Securities
Clearing Account, and the Physical Clearing/Custodial Account on an after January 1, 2004
constituted a transfer of an interest in Sentinel's property.

177.     Without limiting the foregoing, each of the June 1 Transfers, the June 25-29
Transfers, the July 17 Transfers and the July 30 Transfers (the "June-July 2007 Transfers")
constituted a transfer of an interest in Sentinel's property.

178.     Each of the transfers made on and after January 1, 2004 (other than transfers
made in connection with legitimate customer redemptions), and specifically the June-July 2007
Transfers, was made, mediately or immediately, to or for the benefit of BONY.

179.     Each of the transfers made on and after January 1, 2004 (other than transfers
made in connection with legitimate customer redemptions), and specifically the June-July 2007
Transfers, was made with actual intent to hinder, delay, or defraud Sentinel's creditors within the
meaning of section 5 of the Illinois Uniform Fraudulent Transfer Act ("UFTA"), 740 ILCS 160/1
*et seq.*

180.     A creditor exists that could avoid such transfers, and could obtain further relief,
pursuant to section 8(a) of the UFTA.

181.     Such creditor could obtain a judgment against BONY for the value of the
transfers received by BONY as described in this Complaint, as either (1) the first transferee of

45

the asset or the person for whose benefit the transfers were made, or (2) a subsequent transferee, pursuant to section 9(b) of the UFTA.

182.    The Trustee may avoid the Transfers pursuant to section 544(b)(1) of the Bankruptcy Code and may recover, for the benefit of the estate, each of the transfers made on and after January 1, 2004 (other than transfers made in connection with legitimate customer redemptions), and specifically the June-July 2007 Transfers, or their value, from BONY, as either (1) the initial transferee of the transfers or the entity for whose benefit the transfers were made, or (2) the immediate or mediate transferee of such initial transferee, pursuant to section 550(a) of the Bankruptcy Code.

WHEREFORE, Plaintiff respectfully requests that the Court enter an Order: avoiding each of the transfers made on and after January 1, 2004 (other than transfers made in connection with legitimate customer redemptions), and specifically the June-July 2007 Transfers, pursuant to 740 ILCS 160/8(a) and section 544(b)(1) of the Bankruptcy Code; ordering the return and recovery of the transfers, or entering judgment against BONY pursuant to section 544(b)(1) and 550(a) of the Bankruptcy Code in the amount of the transfers; awarding the Trustee punitive damages in an amount to be determined by the Court, pre- and post-judgment interest, costs and attorneys' fees and expenses; and granting such other equitable relief as may be just and proper.

## COUNT THREE

### Avoidance and Recovery of Preferential Transfers Pursuant to §§ 547(b) and 550(a) of the Bankruptcy Code

183.    Plaintiff restates and realleges paragraphs 1 through 182 of this Complaint as though fully set forth herein.

184.    The June 25-29 Transfers constituted transfers of an interest in Sentinel's property.

185.    The June 25-29 Transfers were made, mediately or immediately, to or for the benefit of BONY.

186.    The June 25-29 Transfers were made on account of antecedent debt owed by the Debtor before the June 25-29 Transfers were made.

187.    The June 25-29 Transfers were made while Sentinel was insolvent.

188.    The June 25-29 Transfers were made on or within 90 days before the Petition Date.

189.    The June 25-29 Transfers enabled BONY to receive more than it would receive if this case was a case under chapter 7 of the Bankruptcy Code, the June 25-29 Transfers had not been made, and BONY received payment in such chapter 7 case to the extent provided by the Bankruptcy Code.

190.    The Trustee may avoid the June 25-29 Transfers pursuant to section 547(b) of the Bankruptcy Code.

191.    The Trustee may recover, for the benefit of the estate, the June 25-29 Transfers or their value from BONY, as either (1) the initial transferee of the June 25-29 Transfers or the entity for whose benefit the June 25-29 Transfers were made, or (2) the immediate or mediate transferee of such initial transferee, pursuant to section 550(a) of the Bankruptcy Code.

WHEREFORE, Plaintiff respectfully requests that the Court enter an Order: avoiding each of the June 25-29 Transfers pursuant to section 547(b) of the Bankruptcy Code; ordering the return and recovery of the June 25-29 Transfers, or entering judgment against BONY pursuant to section 550(a) of the Bankruptcy Code in the amount of the June 25-29 Transfers; awarding the Trustee pre- and post-judgment interest, costs and attorneys' fees and expenses; and granting such other equitable relief as may be just and proper.

## COUNT FOUR

### Equitable Subordination of Claims and Transfer of Subordinated Lien Pursuant to § 510(c) of the Bankruptcy Code

192.    Plaintiff restates and realleges paragraphs 1 through 191 of this Complaint as though fully set forth herein.

193.    BONY established an account structure for Sentinel that violated applicable law and its own contractual promises, in contravention of its duties and responsibilities as a custodian for customer securities, which permitted Sentinel Insiders to engage in wrongdoing that benefited them and BONY.

194.    In addition, as set forth in detail in this Complaint, prior to the Petition Date, BONY engaged in transactions with or involving Sentinel solely for its own benefit and gain, in violation of its duties to Sentinel and Sentinel's customers, and to the extreme detriment of Sentinel and its other creditors, which conduct was inequitable under the circumstances.

195.    The following actions by BONY, among others, constitute inequitable conduct: (a) establishing an account structure that violated the CEA and the Investment Advisers Act and permitted segregated customer funds and securities to be commingled with Sentinel "House" assets and with the assets of other customer segregated accounts in the clearing accounts; (b) establishing an account structure under which, when securities were sold on behalf of segregated customer accounts, the proceeds of those sales automatically reduced the overdraft on Sentinel's

loan, instead of being immediately credited to the segregated customer account; (c) establishing an account structure under which customer cash deposits remaining in the Clearing/Collateral Account at the end of the day would automatically be credited against Sentinel's loan; (d) permitting customer assets to be pledged for the BONY loan in violation of the CEA and CFTC regulations; (e) permitting assets in each of the customer SEGs to be transferred out of segregation and into the Clearing/Collateral Account or the DTC Clearing Account for the sole purpose of collateralizing BONY's loan to Sentinel; (f) permitting Sentinel Insiders to use customer assets to collateralize the House loan; (g) unilaterally moving securities out of segregation and into the DTC Clearing Account in order to permit BONY to assert a lien against those securities; (h) refusing to transfer securities from the Clearing/Collateral Account or the DTC Clearing Account to segregated customer accounts despite instructions to do so, in order to ensure the BONY loan was fully collateralized; (h) clearing repurchase transactions involving customer assets outside of segregated accounts; (i) failing to use account names that clearly identified accounts as belonging to customers, despite its legal obligations and explicit requests by Sentinel that BONY do so; (j) asserting a lien against the segregated customer accounts and against securities in those accounts; and (k) failing to perform its obligations under its contract in good faith.

196.    BONY continued to extend new credit to Sentinel, knowing that Sentinel was undercapitalized and was already in financial trouble. BONY's actions caused other creditors, who were unaware of Sentinel's undercapitalization, its debt and its financial problems, to continue to deposit additional funds with Sentinel and/or to fail to withdraw funds from Sentinel.

197.    BONY took advantage of its position to obtain hundreds of millions of dollars in customer assets as security for its loans to Sentinel, which were delivered to BONY in violation of applicable law.

198.    As a proximate and foreseeable result of BONY's conduct, Sentinel has been damaged in an amount exceeding the amount of BONY's claims.

199.    As a result of BONY's inequitable and unlawful conduct, good cause exists to subordinate payment of all of BONY's claims to a level below all other creditors.

200.    Subordination of BONY's claims is not inconsistent with the Bankruptcy Code.

201.    Pursuant to section 510 of the Bankruptcy Code, BONY's liens, to the extent valid, should be transferred to the estate.

WHEREFORE, Plaintiff respectfully requests that this Court enter an order subordinating, pursuant to 11 U.S.C. § 510(c)(1), all claims asserted by BONY (including the claims set forth in the BONY Proof of Claim) to a level below all other creditors, transferring, pursuant to 11 U.S.C. § 510(c)(2), any lien supporting such claims to the estate, and granting such other and further relief as this Court deems equitable and just.

<u>**COUNT FIVE**</u>

**Disallowance of Proof of Claim**

202.    Plaintiff restates and realleges paragraphs 1 through 201 of this Complaint as though fully set forth herein.

203.    BONY has filed the BONY Proof of Claim in the Debtor's case, seeking an amount not less than $312,252,000 and alleging that it holds a secured claim against the Debtor's estate by virtue of the Loan Documents (as defined in the BONY Proof of Claim) and sections

506(a) and 553 of the Bankruptcy Code.  BONY further seeks in the BONY Proof of Claim pre-
and post-petition interest, indemnification, and other amounts.

204.    BONY has failed to turn over to Plaintiff property of the Debtor's estate which is
recoverable by the Plaintiff, namely the amounts demanded in Counts One through Eight herein.

205.    Pursuant to Section 502(d) of the Bankruptcy Code, each claim asserted by
BONY must be disallowed because property of the Debtor's estate is recoverable from BONY
and BONY has not turned over that property to Plaintiff.

206.    In addition, as set forth in detail in this Complaint, prior to the Petition Date,
BONY engaged in transactions with or involving Sentinel solely for its own benefit and gain, in
violation of its duties to Sentinel and Sentinel's customers, and to the extreme detriment of
Sentinel and its other creditors, which conduct was inequitable under the circumstances.

207.    The following actions by BONY, among others, constitute grounds for the
disallowance of BONY's claim:  (a) establishing an account structure that violated the CEA and
the Investment Advisers Act and permitted segregated customer funds and securities to be
commingled with Sentinel "House" assets and with the assets of other customer segregated
accounts in the clearing accounts;  (b) establishing an account structure under which, when
securities were sold on behalf of segregated customer accounts, the proceeds of those sales
automatically reduced the overdraft on Sentinel's loan, instead of being immediately credited to
the segregated customer account;  (c) establishing an account structure under which customer
cash deposits remaining in the Clearing/Collateral Account at the end of the day would
automatically be credited against Sentinel's loan; (d) permitting customer assets to be pledged
for the BONY loan in violation of the CEA and CFTC regulations; (e) permitting assets in each
of the customer SEGs to be transferred out of segregation and into the Clearing/Collateral

51

Account or the DTC Clearing Account for the sole purpose of collateralizing BONY's loan to Sentinel; (f) permitting Sentinel insiders to use customer assets to collateralize the House loan; (g) unilaterally moving securities out of segregation and into the DTC Clearing Account in order to permit BONY to assert a lien against those securities; (h) refusing to transfer securities from the Clearing/Collateral Account or the DTC Clearing Account to segregated customer accounts despite instructions to do so, in order to ensure the BONY loan was fully collateralized; (h) clearing repurchase transactions involving customer assets outside of segregated accounts; (i) failing to use account names that clearly identified accounts as belonging to customers, despite its legal obligations and explicit requests by Sentinel that BONY do so; (j) asserting a lien against the segregated customer accounts and against securities in those accounts; and (k) failing to perform its obligations under its contract in good faith.

208.    BONY's claim against the Debtor's estate should also be disallowed because the clearing and custody agreements, the security agreements, and the account structure established by BONY contradict the express provisions of and are unlawful under Sections 4(b), 4d(a)(2), and 4d(b) of the CEA and CFTC Rules 1.20, 1.25, 1.26, 1.49 and 30.7, and the agreements are therefore illegal, void and unenforceable by BONY.

209.    As a proximate and foreseeable result of BONY's conduct, including but not limited to the conduct described in paragraphs 1 through 167 of the Complaint, Sentinel has been damaged in an amount exceeding the amount of BONY's claims.

210.    As a result of BONY's conduct, including but not limited to the conduct described in paragraphs 1 through 167 of the Complaint, good cause exists to equitably disallow any and all of BONY's claims against Sentinel.

211.    As a result of BONY's inequitable and improper conduct, the BONY Proof of Claim should be disallowed.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment disallowing each and every claim asserted by BONY against the Debtor's estate, expressly including but not limited to the BONY Proof of Claim, and for such other relief as this Court deems equitable and just.

## COUNT SIX

### Equitable Disallowance of Proof of Claim

212.    Plaintiff restates and realleges paragraphs 1 through 211 of this Complaint as though fully set forth herein.

213.    BONY established an account structure for Sentinel that violated applicable law, in contravention of its duties and responsibilities as a custodian for customer securities, which permitted Sentinel Insiders to engage in wrongdoing that benefited them and BONY.

214.    In addition, as set forth in detail in this Complaint, prior to the Petition Date, BONY engaged in transactions with or involving Sentinel solely for its own benefit and gain, in violation of its duties to Sentinel and Sentinel's customers, and to the extreme detriment of Sentinel and its other creditors, which conduct was inequitable under the circumstances.

215.    The following actions by BONY, among others, constitute grounds for the equitable disallowance of BONY's claim:  (a) establishing an account structure that violated the CEA and the Investment Advisers Act and permitted segregated customer funds and securities to be commingled with Sentinel "House" assets and with the assets of other customer segregated accounts in the clearing accounts; (b) establishing an account structure under which, when securities were sold on behalf of segregated customer accounts, the proceeds of those sales

automatically reduced the overdraft on Sentinel's loan, instead of being immediately credited to the segregated customer account;  (c) establishing an account structure under which customer cash deposits remaining in the Clearing/Collateral Account at the end of the day would automatically be credited against Sentinel's loan; (d) permitting customer assets to be pledged for the BONY loan in violation of the CEA and CFTC regulations; (e) permitting assets in each of the customer SEGs to be transferred out of segregation and into the Clearing/Collateral Account or the DTC Clearing Account for the sole purpose of collateralizing BONY's loan to Sentinel; (f) permitting Sentinel insiders to use customer assets to collateralize the House loan; (g) unilaterally moving securities out of segregation and into the DTC Clearing Account in order to permit BONY to assert a lien against those securities; (h) refusing to transfer securities from the Clearing/Collateral Account or the DTC Clearing Account to segregated customer accounts despite instructions to do so, in order to ensure the BONY loan was fully collateralized; (h) clearing repurchase transactions involving customer assets outside of segregated accounts; (i) failing to use account names that clearly identified accounts as belonging to customers, despite its legal obligations and explicit requests by Sentinel that BONY do so; (j) asserting a lien against the segregated customer accounts and against securities in those accounts; and (k) failing to perform its obligations under the contract in good faith.

216.    BONY continued to extend new credit to Sentinel, knowing that Sentinel was undercapitalized and was already in financial trouble.  BONY's actions caused other creditors, who were unaware of Sentinel's undercapitalization, its debt and its financial problems, to continue to deposit additional funds with Sentinel and/or to fail to withdraw funds from Sentinel.

54

217.    BONY took advantage of its position to obtain hundreds of millions of dollars in customer assets as security for its loans to Sentinel, which were delivered to BONY in violation of applicable law.

218.    As a proximate and foreseeable result of BONY's conduct, Sentinel has been damaged in an amount exceeding the amount of BONY's claims.

219.    As a result of BONY's inequitable and unlawful conduct, good cause exists to equitably disallow any and all of BONY's claims against Sentinel.

220.    Equitable disallowance of BONY's claims is not inconsistent with the Bankruptcy Code.

WHEREFORE, Plaintiff respectfully requests that this Court enter an order equitably disallowing all claims asserted by BONY, including the BONY Proof of Claim, and granting such other and further relief as this Court deems equitable and just.

## COUNT SEVEN

### Action to Determine Validity and Extent of Lien and for Turnover of Property under 11 U.S.C. §§ 542 and 506

221.    Plaintiff restates and realleges paragraphs 1 through 220 of this Complaint as though fully set forth herein.

222.    BONY has asserted in the BONY Proof of Claim and otherwise that Sentinel granted it a valid, perfected and enforceable security interest in the Clearing/Collateral Account, the DTC Clearing Account, the Euroclear Securities Clearing Account, and the Physical Clearing/Custodial Account, the securities contained therein, and in certain cash accounts linked or associated with the foregoing accounts (collectively, the "Alleged Collateral Accounts").

223.    BONY knew that the cash and securities now held in the Alleged Collateral Accounts were supposed to be the property of Sentinel's customers and that Sentinel could not pledge or deliver that property as collateral for BONY's loans to Sentinel.

224.    The clearing and custody agreements and the agreements purportedly granting BONY a security interest in one or more of the Alleged Collateral Accounts contradict the express provisions of the CEA and Investment Advisers Act, including Sections 4d(a)(2) and 4d(b) of the CEA and CFTC Rule 1.20 (which requires that customer funds at all times be segregated as belonging to commodity customers, and be deposited only in accounts which clearly identifies them as customer property); CFTC Rule 1.20(a) (which expressly prohibits the pledging of customer funds to secure a loan for any purpose other than for customer commodity transactions); CFTC Rule 1.25 (which prohibits any repurchase or reverse repurchase transactions from taking place outside of customer segregated accounts, and requires that all repo transactions for the benefit of customers take place and settle solely in segregated accounts); Section 4d(a)(2) of the CEA and CFTC Rule 1.26 (which mandates that any securities in which customer funds are invested must be maintained at all times in segregation); and Section 4(b) of the CEA and CFTC Rule 30.7 (which requires that funds of FCM customers engaged in trading at foreign exchanges also be separately segregated and invested), and are therefore illegal, void and unenforceable by BONY.

225.    The clearing and custody agreements and the agreements purportedly granting BONY a security interest in one or more of the Alleged Collateral Accounts, as well as the account structure established by BONY, are unlawful under Sections 4(b), 4d(a)(2), and 4d(b) of the CEA and CFTC Rules 1.20, 1.25, 1.26, 1.49 and 30.7, and Section 206 of the Investment

Advisers Act and SEC Rule 206(4)-2, and are therefore illegal, void and unenforceable by BONY.

226.    To the extent BONY asserts liens or rights of set-off by reason of its possession or control over cash and securities in the Alleged Collateral Accounts, such liens or rights of set-off are unlawful and cannot be enforced.

227.    In the alternative, the agreements purportedly granting BONY a security interest in one or more of the Alleged Collateral Accounts do not grant BONY a security interest in any of the Alleged Collateral Accounts or the assets held therein.

228.    Further, in the alternative, BONY's claims against the Debtor are not allowed secured claims, and pursuant to section 506(d) of the Bankruptcy Code any liens securing such claims are void.

229.    Pursuant to section 542 of the Bankruptcy Code, BONY is required to turn over the cash and securities held in the Alleged Collateral Accounts to the Trustee.

WHEREFORE, Plaintiff respectfully requests that this Court enter an order, pursuant to 11 U.S.C. § 506, determining that BONY does not have a valid, perfected and enforceable security interest in any of Alleged Collateral Accounts or the securities or cash held therein, ordering pursuant to 11 U.S.C. § 542 the immediate turnover and delivery of all securities and cash held in the Alleged Collateral Accounts to the Trustee, and granting such other and further relief as this Court deems equitable and just.

## COUNT EIGHT

### Aiding and Abetting/Knowing Participation in Breach of Fiduciary Duty by Sentinel Insiders

230.    Plaintiff restates and realleges paragraphs 1 through 229 of this Complaint as though fully set forth herein.

231.    At all times relevant to this Complaint, Philip Bloom, Eric Bloom and Charles Mosley were officers, directors and/or controlling shareholders of Sentinel.

232.    As directors, officers and controlling shareholders of Sentinel, Philip Bloom, Eric Bloom and Charles Mosley owed a fiduciary duty of loyalty to Sentinel.

233.    As directors, officers and controlling shareholders of Sentinel, Philip Bloom, Eric Bloom and Charles Mosley owed a fiduciary obligation to act with due care and to deal honestly and fairly with Sentinel.

234.    Philip Bloom, Eric Bloom and Charles Mosley breached their fiduciary duties to Sentinel, by among other things, commingling customer securities and money with securities and money belonging to the House, commingling customer securities and money from one segregated account with those from another segregated account, pledging customer funds to secure the BONY loan, clearing and maintaining customer funds and securities in accounts that were not registered in Sentinel's name as agent or trustee of its clients, transferring securities out of segregation to collateralize the BONY loan, pledging customer securities to collateralize a loan for the benefit of the Sentinel Insiders themselves, and borrowing funds from BONY far in excess of Sentinel's ability to repay.

235.    BONY colluded with the Sentinel Insiders and knowingly participated in, aided, assisted and benefited from Philip Bloom's, Eric Bloom's and Charles Mosley's breaches of their fiduciary duties to Sentinel.

236.    Sentinel has been damaged as a result of BONY's participation in each of Philip Bloom's, Eric Bloom's, and Charles Mosley's breaches of their fiduciary duties.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and against BONY for compensatory damages, plus punitive damages in an amount to

be determined by the Court, interest, costs and attorneys' fees, and grant such other equitable

relief as may be just and appropriate.

Dated:  March 3, 2008

Respectfully submitted,

FREDERICK J. GREDE, not individually but
as Chapter 11 Trustee of Sentinel Management
Group, Inc.

By:_____
        One of his attorneys

John F. Kinney (ARDC # 1467867)
Daniel R. Murray (ARDC # 1999951)
J. Kevin McCall (ARDC # 3125685)
Catherine L. Steege (ARDC # 6183529)
Chris C. Gair (ARDC # 6190781)
Vincent E. Lazar (ARDC # 6204916)
JENNER & BLOCK LLP
330 N. Wabash Ave.
Chicago, IL  60611
Phone: (312) 222-9350
Facsimile: (312) 527-0484

59

UNITED STATES OF AMERICA
**COMMODITY FUTURES TRADING COMMISSION**
2033 K Street, N.W.
Washington, D.C. 20581



**EXHIBIT A**

May 7, 1981

Terry L. Claassen, Esquire
O'Neal & Claassen, Chartered
Suite 952
600 New Hampshire Avenue, N. W.
Washington, D. C.  20037

Dear Mr. Claassen:

This will acknowledge your letters of December 17, 1980, January 7, February 6, April 15 and April 29, 1981, and the opinion of counsel of Bloom & Tese dated April 8, 1981.  You request on behalf of Sentinel Management Group ("Sentinel") that the Division take a "no-action" position with respect to the requirement, effective December 31, 1980, that all registered futures commission merchants ("FCM's") must maintain adjusted net capital equal to or in excess of the greatest of $50,000, ($100,000 for each person registered as a futures commission merchant who is not a member of a designated self-regulatory organization), or 4 percent of the funds required to be segregated pursuant to the Commodity Exchange Act, as amended, and the regulations issued thereunder, or, for securities brokers and dealers, 4 percent of aggregate debit items computed in accordance with the formula for determination of reserve requirements covered in Exhibit A to Rule 15c3-3, 17 CFR 240.15c3-3.

In support of Sentinel's request, you advise that:

"Sentinel neither solicits nor will it accept orders for the purchase or sale of any commodity for future delivery, or involving contracts for sale of any commodity for future delivery, on or subject to the rules of any contract market. Sentinel is an FCM solely so that it may hold customers' funds deposited with it by other FCMs for the exclusive purpose of investing such funds in Section 1.25 (17 CFR 1.25) approved obligations for the benefit of such other FCMs.  (Although Sentinel also invests house funds, such services would not independently require it to register as an FCM.)  Sentinel has established two accounts within the Trust Department of Continental (Continental Illinois Bank and Trust Company of Chicago).  House and customers' funds are segregated in these respective accounts.  In these trust accounts, Continental can hold both cash and securities which facilitates the purpose of the Sentinel program -- to invest house and customers' funds for its participating FCMs in a more efficient and therefore more profitable manner than the FCM can accomplish for itself.  Continental, therefore, receives and delivers securities against payments using only these trust accounts. Continental processes all security settlements, collects all income for the securities held, and provides the related investment accounting reports.

2 –

Continental handles all daily routine contact with the FCMs as
well as daily funds transfers between the FCMs and the respec-
tive trust accounts. Neither Sentinel nor any of its employees
can direct the transfer of participating FCM's funds except in
connection with the investigation (sic) of the funds or the
return of the same to the depositing FCM. Continental has pro-
vided Sentinel with the required Section 1.26 (17 CFR 1.26)
acknowledgment letter for the customers fund trust account and,
of course, Sentinel has provided acknowledgment letters to each
participating FCM for customers' funds deposited with Sentinel.

Upon enrolling as a participating FCM in the Sentinel program
an FCM must provide Continental Bank, in writing, with the
name of the firm, its mailing address, and the names and tele-
phone numbers of those individuals who are authorized to pro-
vide cash and investment information to Continental and Sentinel
on a daily basis. Subsequently, on a daily basis, in order to
invest its house or customers' funds the FCM must notify Con-
tinental prior to 9 a.m. of the amount of funds available for
investment that day. Similarly, to withdraw funds the FCM
must notify Continental prior to 9 a.m.

Continental then notifies Sentinel of the total amount of
funds available for investment in both trust accounts.
Sentinel makes the investments through independent secur-
ities dealers and notifies Continental with details of the
trades. Continental will then take whatever action is neces-
sary to settle the transactions.

On the same basis Continental notifies Sentinel daily as to
the amount of funds FCMs wish to withdraw. Sentinel makes
the necessary sales and notifies Continental with details
thereof. Continental arranges settlement of the transactions
and transfers the funds from the trust account to the indi-
vidual FCMs requesting withdrawal."

    You have provided us with a copy of the trust agreement ("Customer
Trust Agreement") between Sentinel and participating FCMs, which in the opin-
ion of Bloom & Tese creates a valid trust under Illinois law. The Customer
Trust Agreement designates Sentinel as trustee, with no claim against the
assets it is administering except for its usual and customary fee. You have
also provided us with an acknowledgment from Continental, the custodian bank
for the funds to be managed by Sentinel under the Customer Trust Agreement,
that deposits made through Sentinel are made pursuant to a trust agreement, that
such deposits represent funds of customers of the FCMs who have entered into a
trust agreement with Sentinel, and that such funds do not belong to Sentinel.

    In view of the foregoing, the Division has determined that it will not
recommend that enforcement action be taken against Sentinel based solely on the
fact that it does not maintain adjusted net capital equal to or greater than 4%
of customer segregated funds provided that: -

        (1  Sentinel maintains adjusted net capital equal to or
            greater than the minimum dollar amount required by

TRST01191124

- 3 -

the Commission's regulations for FCMs who are not
members of a contract market;

(2) Sentinel files a Form 1-FR each month, no later
than 30 days after the date for which the report
is made, with the Commission's Chicago regional
office;

(3) Sentinel, as part of the monthly Form 1-FR filed
by Sentinel, separately designates with respect
to each participating FCM the amount of customer
and proprietary funds held by Continental for
management by Sentinel as of a given date;

(4) Sentinel neither solicits nor accepts orders for
the purchase or sale of any commodity for future
delivery, or involving any contracts for sale of
any commodity for future delivery, on or subject
to the rules of any contract market, for either
customer or proprietary accounts;

(5) Sentinel does not trade commodities for its own
account; and

(6) Sentinel does not have the authority to withdraw
funds for itself from the trust accounts other
than from income earned on investments.

The Division's position is based upon the representations set forth
in your December 17 letter, the documentation submitted to us, including the
opinion of counsel of Bloom & Tese, and compliance with the conditions set
forth above. Any additional or changed facts or circumstances regarding this
matter including, but not limited to, any amendments to the Commission's min-
imum financial requirements, or any failure to meet the conditions set forth
herein may cause the Division to reach a different conclusion. The opinion
expressed in this letter is that of the Division of Trading and Markets only.
It is not necessarily the opinion of the Commission or of any other unit of
the Commission.

Very truly yours,

John L. Manley
Director
Division of Trading and Markets

**EXHIBIT B**

THE
BANK OF
NEW
YORK

# GLOBAL CUSTODY AGREEMENT

AGREEMENT, dated as of ~~March 15,1997~~ between Sentinel Management ("Customer") and The Bank of New York ("Custodian").

## ARTICLE 1
## DEFINITIONS

Whenever used in this Agreement, the following words shall have the meanings set forth below:

1.  "Authorized Person" shall be any person, whether or not an officer or employee of Customer, duly authorized by Customer to give Oral and/or Written Instructions with respect to one or more Accounts, such persons to be designated in a Certificate of Authorized Persons which contains a specimen signature of such person.

2.  "BNY Affiliate" shall mean any office, branch or subsidiary of The Bank of New York Company, Inc.

3.  "Book-Entry System" shall mean the Federal Reserve/Treasury book-entry system for receiving and delivering securities, its successors and nominees.

4.  "Business Day" shall mean any day on which Custodian, Book-Entry System and relevant Depositories are open for business.

5.  "Composite Currency Units" shall mean the European Currency Unit ("ECU")or any other composite unit consisting of the aggregate of specified amounts of specified currencies, as such unit may be constituted from time to time.

6.  "Depository" shall include the Book-Entry System, the Depository Trust Company, the Participants Trust Company, Euroclear, Cedel, S.A. and any other securities depository, book-entry system or clearing agency (and their respective successors and nominees) authorized to act as a securities depository, book-entry system or clearing agency pursuant to applicable law and identified to Customer from time to time.

7.  "Oral Instructions" shall mean verbal instructions received by Custodian from an Authorized Person or from a person reasonably believed by Custodian to be an Authorized Person.

8.  "Securities" shall include, without limitation, any common stock and other equity securities, bonds, debentures and other debt securities, notes, mortgages or other obligations, and any instruments representing rights to receive, purchase, or subscribe for the same, or representing any other rights or interests therein (whether represented by a certificate or held in a Depository or a Subcustodian).

9.  "Subcustodian" shall mean a bank or other financial institution which is utilized by Custodian in connection with the purchase, sale or custody of Securities hereunder and identified to Customer from time to time.

10. "Written Instructions" shall mean any notices, instructions or other instruments in writing received by Custodian from an Authorized Person or from a person reasonably believed by Custodian to be an Authorized Person by letter, telex, facsimile transmission, Custodian's on-line communication system, or any other method whereby Custodian is able to verify with a reasonable degree of certainty the identity of the sender of such communications or the sender is required to provide a password or other identification code.

BNY-Trustee-00069535

- 2 -

## ARTICLE II
### APPOINTMENT OF CUSTODIAN; ACCOUNTS;
### REPRESENTATIONS AND WARRANTIES

1.    (a)    Customer hereby appoints Custodian as custodian of all Securities and cash at any time delivered to Custodian during the term of this Agreement, and authorizes Custodian to hold Securities in registered form in its name or the name of its nominees. Custodian hereby accepts such appointment and agrees to establish and maintain one or more securities accounts and cash accounts in which Custodian will hold Securities and cash as provided herein. Such accounts (each, an "Account"; collectively, the "Accounts") shall be in the name of Customer, or with Custodian's prior approval (which may be withheld in Custodian's sole discretion), in the names of third parties.

(b)    Customer acknowledges and agrees for itself and for each third party on whose behalf an Account is established hereunder that they are jointly and severally liable to Custodian for satisfaction of all obligations and liabilities arising or incurred in connection with such Account; it being expressly understood and agreed that Customer shall nevertheless be liable to Custodian as a principal for the satisfaction of all such obligations and liabilities without regard to any rights or recourse Customer may have against any third party for reimbursement of such obligations and liabilities.

2.    (a)    Except as otherwise provided by law, a cash account (including subdivisions maintained in different currencies, including Composite Currency Units) shall constitute one single and indivisible current account. Consequently, Custodian has the right, among others, to transfer the balance of any subaccount of a cash account to any other subaccount at any time and without prior notice.

(b)    Custodian may in accordance with customary practice hold any currency or Composite Currency Unit in which any subdivision of a cash account is denominated on deposit in, and effect transactions relating thereto through, an account (a "Foreign Account") with a BNY Affiliate or another bank in the country where such currency is the lawful currency or in other countries where such currency or Composite Currency Unit may be lawfully held on deposit.

(c)    Custodian shall have no liability for any loss or damage arising from the applicability of any law or regulation now or hereafter in effect, or from the occurrence of any event, which may affect the transferability, convertibility, or availability of any currency or Composite Currency Unit in the countries where such Foreign Accounts are maintained and in no event shall Custodian be obligated to substitute another currency for a currency (including a currency that is a component of a Composite Currency Unit) whose transferability, convertibility or availability has been affect by such law, regulation or event. To the extent that any such law, regulation or event imposes a cost or charge upon Custodian in relation to the transferability, convertibility, or availability of any cash currency or Composite Currency Unit, such cost or charge shall be for the account of Customer. If pursuant to any such law or regulation, or as a result of any such event, Custodian cannot deal in any component currency of a Composite Currency Unit or effect a particular transaction in a Composite Currency Unit on Customer's behalf, Custodian may thereafter treat any account denominated in an affected Composite Currency Unit as a group of separate accounts denominated in the relevant component currencies.

3.    Customer hereby represents and warrants, which representations and warranties shall be continuing and shall be deemed to be reaffirmed upon each Oral or Written Instruction given by Customer, that:

(a)    Customer is duly organized and existing under the laws of the jurisdiction of its organization, with full power to carry on its business as now conducted, to enter into this Agreement and to perform its obligations hereunder;

(b)    This Agreement has been duly authorized, executed and delivered by Customer, constitutes a valid and legally binding obligation of Customer, enforceable in accordance with its terms, and no statute, regulation, rule, order, judgment or contract binding on Customer prohibits Customer's execution or performance of this Agreement;

(c)    With respect to Accounts established in the name of third parties, Customer has been duly authorized to enter into and perform all transactions contemplated hereby and to take actions and give Oral and Written Instructions with legal and binding effect upon such third parties and their respective Accounts; and

(d)    Either Customer owns the Securities in the Accounts free and clear of all liens, claims, security interests and encumbrances (except those granted herein) or, if the Securities in an Account are owned beneficially by others, Customer has the right to pledge such Securities to the extent necessary to secure Customer's and the beneficial owner's obligations hereunder, free of any right of redemption or prior claim by the beneficial owner. Custodian's security interest pursuant to Article V hereof shall be a first lien and security interest subject to no setoffs, counterclaims or other liens prior to or on a parity with it in favor of

BNY-Trustee-00069536

- 3 -

any other party (other than specific liens granted preferred status by statute), and Customer shall take any and all additional steps which Custodian requires to assure itself of such priority and status, including notifying third parties or obtaining their consent to, Custodian's security interest.

ARTICLE III
CUSTODY AND RELATED SERVICES

1.    (a)    Subject to the terms hereof, Customer hereby authorizes Custodian to hold any Securities received by it from time to time for Customer's account. Custodian shall be entitled to utilize Depositories and Subcustodians to the extent possible in connection with its performance hereunder. Securities and cash deposited by Custodian in a Depository will be held subject to the rules, terms and conditions of such Depository. Securities and cash held through Subcustodians shall be held subject to the terms and conditions of Custodian's agreements with such Subcustodians. Subcustodians may be authorized to hold Securities in central securities depositories or clearing agencies in which such Subcustodians participate. Unless otherwise required by local law or practice or a particular subcustodian agreement, Securities deposited with Subcustodians will be held in a commingled account in the name of Custodian as custodian or trustee for its customers. Custodian shall identify on its books and records the Securities and cash belonging to Customer, whether held directly or indirectly through Depositories or Subcustodians.

(b)    Unless Custodian has received Oral or Written Instructions to the contrary or applicable law or the rules of a particular Depository otherwise require, Custodian shall hold Securities indirectly through a Subcustodian or Depository only if (i) the Securities are not subject to any right, charge, security interest, lien or claim of any kind in favor of such Subcustodian or Depository or the creditors or operators of any of them, including a receiver or trustee in bankruptcy or similar authority, except for a claim of payment for the safe custody or administration of Securities or for funds advanced on behalf of Customer by such Subcustodian or Depository, and (ii) beneficial ownership of the Securities is freely transferable without the payment of money or value other than for safe custody or administration.

2.    Custodian shall furnish Customer with an advice of daily transactions and a monthly summary of all transfers to or from the Accounts.

3.    With respect to all Securities held hereunder, Custodian shall, unless otherwise instructed to the contrary:

(a)    Receive all income and other payments and advise Customer as promptly as practicable of any such amounts due but not paid;

(b)    Present for payment and receive the amount paid upon all Securities which may mature and advise Customer as promptly as practicable of any such amounts due but not paid;

(c)    Forward to Customer copies of all information or documents that it may receive from an issuer of Securities which, in the opinion of Custodian, are intended for the beneficial owner of Securities;

(d)    Execute, as custodian, any certificates of ownership, affidavits, declarations or other certificates under any tax laws now or hereafter in effect in connection with the collection of bond and note coupons;

(e)    Hold directly or through a Depository or Subcustodian all rights and similar Securities issued with respect to any Securities credited to an Account hereunder; and

(f)    Endorse for collection checks, drafts or other negotiable instruments.

4.    (a)    Whenever Securities (including, but not limited to, warrants, options, tenders, options to tender or non-mandatory puts or calls) confer optional rights on Customer or provide for discretionary action or alternative courses of action by Customer, Customer shall be responsible for making any decisions relating thereto and for directing Custodian to act. In order for Custodian to act, it must receive Customer's Written Instructions at Custodian's offices, addressed as Custodian may from time to time request, not later than noon (New York time) at least two (2) Business Days prior to the last scheduled date to act with respect to such Securities (or such earlier date or time as Custodian may notify Customer). Absent Custodian's timely receipt of such Written Instructions, Custodian shall not be liable for failure to take any action relating to or to exercise any rights conferred by such Securities.

BNY-Trustee-00069537

- 4 -

(b)    Custodian shall notify Customer of such rights or discretionary actions or of the date or dates by when such rights must be exercised or such action must be taken provided that Custodian has received, from the issuer (with respect to Securities issued in the United States) or from a nationally or internationally recognized bond or corporate action service to which Custodian subscribes, timely notice of such rights or discretionary corporate action or of the date or dates such rights must be exercised or such action must be taken. Absent actual receipt of such notice, Custodian shall have no liability for failing to so notify Customer.

5.    All voting rights with respect to Securities, however registered, shall be exercised by Customer or its designee. For Securities issued in the United States, Custodian's only duty shall be to mail to Customer any documents (including proxy statements, annual reports and signed proxies) relating to the exercise of such voting rights. With respect to Securities issued outside of the United States, Custodian will provide Customer with access to a provider of global proxy services at Customer's request. Customer shall be responsible for all costs associated its use of such services. If Customer determines not to utilize the services of such global proxy services provider, Custodian will endeavor to provide Customer with proxy material actually received by Custodian from Subcustodians, but otherwise shall have no obligations with respect to voting.

6.    Custodian shall promptly advise Customer upon its notification of the partial redemption, partial payment or other action affecting less than all Securities of the relevant class. If Custodian, any Subcustodian or Depositary holds any Securities in which Customer has an interest as part of a fungible mass, Custodian, such Subcustodian or Depositary may select the Securities to participate in such partial redemption, partial payment or other action in any non-discriminatory manner that it customarily uses to make such selection.

7.    Custodian shall not under any circumstances accept bearer interest coupons which have been stripped from United States federal, state or local government or agency securities unless explicitly agreed to by Custodian in writing.

8.    Customer shall be liable for all taxes, assessments, duties and other governmental charges, including any interest or penalty with respect thereto ("Taxes"), with respect to any cash or Securities held on behalf of Customer or any transaction related thereto. Customer shall indemnify Custodian and each Subcustodian for the amount of any Tax that Custodian, any such Subcustodian or any other withholding agent is required under applicable laws (whether by assessment or otherwise) to pay on behalf of, or in respect of income earned by or payments or distributions made to or for the account of Customer (including any payment of Tax required by reason of an earlier failure to withhold). Custodian shall, or shall instruct the applicable Subcustodian or other withholding agent to, withhold the amount of any Tax which is required to be withheld under applicable law upon collection of any dividend, interest or other distribution made with respect to any Security and any proceeds or income from the sale, loan or other transfer of any Security. In the event that Custodian or any Subcustodian is required under applicable law to pay any Tax on behalf of Customer, Custodian is hereby authorized to withdraw cash from any subaccount of the cash account in the amount required to pay such Tax and to use such cash, or to remit such cash to the appropriate Subcustodian, for the timely payment of such Tax in the manner required by applicable law. If the aggregate amount of cash in all subaccounts of the cash account is not sufficient to pay such Tax, Custodian shall promptly notify Customer of the additional amount of cash (in the appropriate currency) required, and Customer shall directly deposit such additional amount in the cash account promptly after receipt of such notice, for use by Custodian as specified herein. In the event that Customer is eligible, pursuant to applicable law or to the provisions of any tax treaty, for a reduced rate of, or exemption from, any Tax which is otherwise required to be withheld or paid on behalf of Customer under any applicable law, Custodian shall, or shall instruct the applicable Subcustodian or withholding agent to, either withhold or pay such Tax at such reduced rate or refrain from withholding or paying such Tax, as appropriate; provided that Custodian shall have received from Customer all documentary evidence of residence or other qualification for such reduced rate or exemption required to be received under such applicable law or treaty. In the event that a reduced rate of, or exemption from, any Tax is obtainable only by means of an application for refund, Custodian and the applicable Subcustodian shall have no responsibility for the accuracy or validity of any forms or documentation provided by Customer to Custodian hereunder, and Customer hereby indemnifies and agrees to hold harmless Custodian and each Subcustodian in respect of any liability arising from any under-withholding or underpayment of any Tax which results from the inaccuracy or invalidity of any such forms or other documentation.

9.    (a)    For the purpose of settling Securities and foreign exchange transactions, Customer shall provide Custodian with sufficient immediately available funds for all transactions by such time and date as conditions in the relevant market dictate. As used herein, "sufficient immediately available funds" shall mean either (i) sufficient cash denominated in the currency of Customer's home jurisdiction to purchase the necessary foreign currency, or (ii) sufficient applicable foreign currency, to settle the transaction. Custodian shall provide Customer with immediately available funds each day which result from the actual settlement of all sale transactions, based upon advices received by Custodian from its Subcustodians and Depositories. Such funds shall be in the currency of Customer's home jurisdiction or such other currency as Customer may specify to Custodian.

BNY-Trustee-00069538

(b)    Any foreign exchange transaction effected by Custodian in connection with this Agreement may be entered with Custodian or a BNY Affiliate acting as principal or otherwise through customary banking channels. Customer may issue standing Written Instructions with respect to foreign exchange transactions but Custodian may establish rules or limitations concerning any foreign exchange facility made available to Customer. Customer shall bear all risks of investing in Securities or holding cash denominated in a foreign currency. Without limiting the foregoing, Customer shall bear the risks that rules or procedures imposed by Depositories, exchange controls, asset freezes or other laws, rules, regulations or orders shall prohibit or impose burdens or costs on the transfer to, by or for the account of Customer of Securities or cash held outside Customer's jurisdiction or denominated in a currency other than its home jurisdiction or the conversion of cash from one currency into another currency. Custodian shall not be obligated to substitute another currency for a currency (including a currency that is a component of a Composite Currency Unit) whose transferability, convertibility or availability has been affected by such law, regulation, rule or procedure. Neither Custodian nor any Subcustodian shall be liable to Customer for any loss resulting from any of the foregoing events.

10.    To the extent that Custodian has agreed to provide pricing information services in connection with this Agreement, Custodian is authorized to utilize any vendor (including brokers and dealers of Securities) reasonably believed by Custodian to be reliable to provide such information. Customer understands that certain pricing information with respect to complex financial instruments (e.g., derivatives) may be based on calculated amounts rather than actual market transactions and may not reflect actual market values, and that the variance between such calculated amounts and actual market values may or may not be material. Where pricing information vendors do not provide information for particular Securities or other property, an Authorized Person may advise Custodian regarding the fair market value of such Securities or property, as determined by it in good faith. Customer agrees to hold Custodian harmless from and against any loss, damage or expense incurred as a result of errors or omissions with respect to any pricing information utilized by Custodian hereunder.

11.    As an accommodation to Customer, Custodian may provide consolidated recordkeeping services pursuant to which Custodian reflects on Account statements Securities positions for which Custodian has no safekeeping or other responsibility under this Agreement ("Non-Custody Securities"). Non-Custody Securities shall be designated on Custodian's books as "shares not held" or by other similar characterization. Customer acknowledges and agrees that Custodian shall rely, without independent verification, on information provided by Customer regarding Non-Custody Securities (including but not limited to Account positions and market valuations) and shall have no responsibility whatsoever with respect to Non-Custody Securities or the accuracy of any information maintained on Custodian's books or set forth on account statements concerning Non-Custody Securities.

ARTICLE IV
PURCHASE AND SALE OF SECURITIES;
CREDITS TO ACCOUNT

1.    Promptly after each purchase or sale of Securities by Customer, Customer shall deliver to Custodian Written Instructions specifying all information necessary for Custodian to settle such purchase or sale. Custodian shall account for all purchases and sales of Securities on the actual settlement date unless otherwise agreed by Custodian.

2.    Customer understands that when Custodian is instructed to deliver Securities against payment, delivery of such Securities and receipt of payment therefor may not be completed simultaneously. Customer assumes full responsibility for all credit risks involved in connection with Custodian's delivery of Securities pursuant to instructions of Customer.

3.    Custodian may, as a matter of bookkeeping convenience or by separate agreement with Customer, credit the Account with the proceeds from the sale, redemption or other disposition of Securities or interest, dividends or other distributions payable on Securities prior to its actual receipt of final payment therefor. All such credits shall be conditional until Custodian's actual receipt of final payment and may be reversed by Custodian to the extent that final payment is not received. Payment with respect to a transaction will not be "final" until Custodian shall have received immediately available funds which under applicable local law, rule and/or practice are irreversible and not subject to any security interest, levy or other encumbrance, and which are specifically applicable to such transaction.

4.    Upon Customer's Oral or Written Instructions, Custodian shall purchase or sell Securities and is authorized to utilize any broker or agent in connection with any such transactions, including BNY Affiliates. Custodian shall not be liable for the acts or omissions of any such broker or agent, other than a BNY Affiliate. Upon Customer's Oral or Written Instructions (which may include standing instructions), Custodian shall also invest cash balances in certificates of deposit, savings accounts or other similar instruments issued by Custodian or a BNY Affiliate or in money market or other mutual funds for which Custodian

BNY-Trustee-00069539

BNY Affiliate may serve as investment advisor, administrator, servicing agent or other capacity, withstanding that Custodian or a BNY Affiliate collects fees from such mutual funds for providing such service.

## ARTICLE V
## OVERDRAFTS OR INDEBTEDNESS

1.     If Custodian in its sole discretion advances funds in any currency hereunder or there shall arise for whatever son an overdraft in an Account (including, without limitation, overdrafts incurred in connection with the settlement of urities transactions, funds transfers or foreign exchange transactions) or if Customer is for any other reason indebted to ustodian, Customer agrees to repay Custodian on demand the amount of the advance, overdraft or indebtedness plus accrued terest at a rate ordinarily charged by Custodian to its institutional custody customers in the relevant currency.

2.     In order to secure repayment of Customer's and each third party's obligations to Custodian hereunder, ustomer hereby pledges and grants to Custodian a continuing lien and security interest in, and right of set-off against, all of ustomer's right, title and interest in and to (a) all Accounts in Customer's name and the Securities, money and other property ow or hereafter held in such Accounts (including proceeds thereof), (b) each Account in respect of which or for whose benefit e advance, overdraft or indebtedness relates and the Securities whose purchase is financed by Custodian (including proceeds ereof), and (c) any other property at any time held by it for the account of Customer. In this regard, Custodian shall be ntitled to all the rights and remedies of a pledgee and secured creditor under applicable laws, rules or regulations as then in ffect.

## ARTICLE VI
## CONCERNING CUSTODIAN

1.     (a)     Except as otherwise expressly provided herein, Custodian shall not be liable for any costs, expenses, damages, liabilities or claims, including attorneys' and accountants' fees (collectively, "Losses"), incurred by or asserted against Customer, except those Losses arising out of the negligence or wilful misconduct of Custodian. Custodian shall have no liability whatsoever for the action or inaction of any Depository. Subject to Section 1(b) below, Custodian's responsibility with respect to any Securities or cash held by a Subcustodian is limited to the failure on the part of Custodian to exercise reasonable care in the selection or retention of such Subcustodian in light of prevailing settlement and securities handling practices, procedures and controls in the relevant market. With respect to any Losses incurred by Customer as a result of the acts or the failure to act by any Subcustodian (other than a BNY Affiliate), Custodian shall take appropriate action to recover such Losses from such Subcustodian; and Custodian's sole responsibility and liability to Customer shall be limited to amounts so received from such Subcustodian (exclusive of costs and expenses incurred by Custodian). In no event shall Custodian be liable to Customer or any third party for special, indirect or consequential damages, or lost profits or loss of business, arising in connection with this Agreement.

(b)     Custodian may enter into subcontracts, agreements and understandings with any BNY Affiliate, whenever and on such terms and conditions as it deems necessary or appropriate to perform its services hereunder. No such subcontract, agreement or understanding shall discharge Custodian from its obligations hereunder.

(c)     Customer agrees to indemnify Custodian and hold Custodian harmless from and against any and all Losses sustained or incurred by or asserted against Custodian by reason of or as a result of any action or inaction, or arising out of Custodian's performance hereunder, including reasonable fees and expenses of counsel incurred by Custodian in a successful defense of claims by Customer; provided however, that Customer shall not indemnify Custodian for those Losses arising out of Custodian's negligence or wilful misconduct. This indemnity shall be a continuing obligation of Customer, its successors and assigns, notwithstanding the termination of this Agreement.

2.     Without limiting the generality of the foregoing, Custodian shall be under no obligation to inquire into, and shall not be liable for, any losses incurred by Customer or any other person as a result of the receipt or acceptance of fraudulent, forged or invalid Securities, or Securities which are otherwise not freely transferable or deliverable without encumbrance in any relevant market.

3.     Custodian may, with respect to questions of law specifically regarding an Account, obtain the advice of counsel and shall be fully protected with respect to anything done or omitted by it in good faith in conformity with such advice.

4.     Custodian shall be under no obligation to take action to collect any amount payable on Securities in default, or if payment is refused after due demand and presentment.

BNY-Trustee-00069540

5.    Custodian shall have no duty or responsibility to inquire into, make recommendations, supervise, or determine the suitability of any transactions affecting any Account.

6.    Customer shall pay to Custodian the fees and charges as may be specifically agreed upon from time to time and such other fees and charges at Custodian's standard rates for such services as may be applicable. Customer shall reimburse Custodian for all costs associated with the conversion of Customer's Securities hereunder and the transfer of Securities and records kept in connection with this Agreement. Customer shall also reimburse Custodian for out-of-pocket expenses which are a normal incident of the services provided hereunder.

7.    Custodian has the right to debit any cash account (or any subaccount thereof) for any amount payable by Customer in connection with any and all obligations of Customer to Custodian, whether or not relating to or arising under this Agreement. In addition to the rights of Custodian under applicable law and other agreements, at any time when Customer shall not have honored any and all of its obligations to Custodian, whether or not relating to or arising under this Agreement, Custodian shall have the right without notice to Customer to retain or set-off, against such obligations of Customer, any Securities or cash Custodian or a BNY Affiliate may directly or indirectly hold for the account of Customer, and any obligations (whether matured or unmatured) that Custodian or a BNY Affiliate may have to Customer in any currency or Composite Currency Unit. Any such asset of, or obligation to, Customer may be transferred to Custodian and any BNY Affiliate in order to effect the above rights.

8.    Custodian shall be entitled to rely upon any Written or Oral Instruction actually received by Custodian and reasonably believed by Custodian to be duly authorized and delivered. Customer agrees to forward to Custodian Written Instructions confirming Oral Instructions by the close of business of the same day that such Oral Instructions are given to Custodian. Customer agrees that the fact that such confirming Written Instructions are not received or that contrary Written Instructions are received by Custodian shall in no way affect the validity or enforceability of transactions authorized by such Oral Instructions and effected by Custodian. If Customer elects to transmit Written Instructions through an on-line communication system offered by Custodian, Customer's use thereof shall be subject to the Terms and Conditions attached hereto as Appendix I.

9.    Upon reasonable request and provided Custodian shall suffer no significant disruption of its normal activities, Customer shall have access to Custodian's books and records relating to the Accounts during Custodian's normal business hours. Upon reasonable request, copies of any such books and records shall be provided to Customer at Customer's expense.

10.    It is understood that Custodian is authorized to supply any information regarding the Accounts which is required by any law, regulation or rule now or hereafter in effect.

11.    Custodian shall not be responsible or liable for any failure or delay in the performance of its obligations under this Agreement arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including without limitation, acts of God; earthquakes; fires; floods; wars; civil or military disturbances; sabotage; epidemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; it being understood that Custodian shall use its best efforts to resume performance as soon as practicable under the circumstances.

12.    Custodian shall have no duties or responsibilities whatsoever except such duties and responsibilities as are specifically set forth in this Agreement, and no covenant or obligation shall be implied against Custodian in connection with this Agreement.

<div align="center">

ARTICLE VII
TERMINATION

</div>

Either party may terminate this Agreement by giving to the other party a notice in writing specifying the date of such termination, which shall be not less than ninety (90) days after the date of such notice. Upon termination hereof, Customer shall pay to Custodian such compensation as may be due to Custodian, and shall likewise reimburse Custodian for other amounts payable or reimbursable to Custodian hereunder. Custodian shall follow such reasonable Oral or Written Instructions concerning the transfer of custody of records, Securities and other items as Customer shall give; provided, that (a) Custodian shall have no liability for shipping and insurance costs associated therewith, and (b) full payment shall have been made to Custodian of its compensation, costs, expenses and other amounts to which it is entitled hereunder. If any Securities or cash remain in any Account, Custodian may deliver to Customer such Securities and cash. Upon termination of this Agreement, except as otherwise provided herein, all obligations of the parties to each other hereunder shall cease.

BNY-Trustee-00069541

ARTICLE VIII
MISCELLANEOUS

1.    Customer agrees to furnish to Custodian a new Certificate of Authorized Persons in the event of any change in the then present Authorized Persons. Until such new Certificate is received, Custodian shall be fully protected in acting upon Oral Instructions and Written Instructions of such present Authorized Persons.

2.    Any notice or other instrument in writing, authorized or required by this Agreement to be given to Custodian, shall be sufficiently given if addressed to Custodian and received by it at its offices at One Wall Street, New York, New York 10286, or at such other place as Custodian may from time to time designate in writing.

3.    Any notice or other instrument in writing, authorized or required by this Agreement to be given to Customer shall be sufficiently given if addressed to Customer and received by it at its offices at 10 S. Riverside Plaza, Chicago IL 60606 , or at such other place as Customer may from time to time designate in writing.

4.    Each and every right granted to either party hereunder or under any other document delivered hereunder or in connection herewith, or allowed it by law or equity, shall be cumulative and may be exercised from time to time. No failure on the part of either party to exercise, and no delay in exercising, any right will operate as a waiver thereof, nor will any single or partial exercise by either party of any right preclude any other or future exercise thereof or the exercise of any other right.

5.    In case any provision in or obligation under this Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions shall not in any way be affected thereby. This Agreement may not be amended or modified in any manner except by a written agreement executed by both parties. This Agreement shall extend to and shall be binding upon the parties hereto, and their respective successors and assigns; provided, however, that this Agreement shall not be assignable by either party without the written consent of the other.

6.    (a)    This Agreement shall be construed in accordance with the substantive laws of the State of New York, without regard to conflicts of laws principles thereof. Customer and Custodian hereby consent to the jurisdiction of a state or federal court situated in New York City, New York in connection with any dispute arising hereunder. Customer hereby irrevocably waives, to the fullest extent permitted by applicable law, any objection which it may now or hereafter have to the laying of venue of any such proceeding brought in such a court and any claim that such proceeding brought in such a court has been brought in an inconvenient forum. Customer and Custodian each hereby irrevocably waives any and all rights to trial by jury in any legal proceeding arising out of or relating to this Agreement.

(b)    For Governmental Entities: To the extent that in any jurisdiction Customer may now or hereafter be entitled to claim, for itself or its assets, immunity from suit, execution, attachment (before or after judgment) or other legal process, Customer irrevocably agrees not to claim, and it hereby waives, such immunity.

7.    Notwithstanding the fact that Custodian may from time to time maintain an Account in the name of a third party, the parties hereto agree that in performing hereunder, Custodian is acting solely on behalf of Customer and no contractual or service relationship shall be deemed to be established hereby between Custodian and any such third party or any other person.

8.    This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but such counterparts shall, together, constitute only one instrument.

BNY-Trustee-00069542

- 9 -

IN WITNESS WHEREOF, Customer and Custodian have caused this Agreement to be executed by their respective officers, thereunto duly authorized, as of the day and year first above written.

SENTINEL MANAGEMENT

By: _____

Title: President - CEO

Tax Identification No: 36-308312ᵌ

THE BANK OF NEW YORK

By: _____

Title:



smcust.doc
11/96

BNY-Trustee-00069543

APPENDIX I

THE BANK OF NEW YORK
ON-LINE COMMUNICATIONS SYSTEM (THE "SYSTEM")

TERMS AND CONDITIONS

1.    License; Use.  Upon delivery to Customer of software enabling Customer to obtain access to the System (the "Software"), Custodian grants to Customer a personal, nontransferable and nonexclusive license to use the Software solely for the purpose of transmitting and receiving communications to and from Custodian in connection with Customer's Account(s). Customer shall not sell, lease or otherwise provide, directly or indirectly, the Software or any portion thereof to any other person or entity without the prior written consent of Custodian. To the extent that Custodian provides such written consent, Customer shall cause such person or entity to be subject to the same terms and conditions as set forth in this Appendix I.

2.    Equipment.  Customer shall obtain and maintain at its own cost and expense all equipment and services, including but not limited to communications services, necessary for it to utilize the Software and obtain access to the System, and Custodian shall not be responsible for the reliability or availability of any such equipment or services.

3.    Proprietary Information.  Customer acknowledges that the Software, all data bases made available to Customer through the System, and any proprietary data, processes, information and documentation (other than which are or become part of the public domain or are legally required to be made available to the public) (collectively, the "Information"), are the exclusive and confidential property of Custodian. Customer shall keep the Information confidential by using the same care and discretion that Customer uses with respect to its own confidential property and trade secrets and shall neither make nor permit any disclosure without the prior written consent of Custodian. Upon termination of the Agreement or the Software license granted hereunder for any reason, Customer shall return all copies of the Information to Custodian.

4.    Modifications.  Custodian reserves the right to modify the Software from time to time and Customer shall install new releases of the Software as Custodian may direct. Customer agrees not to modify or attempt to modify the Software without Custodian's prior written consent. Customer acknowledges that any modifications to the Software, whether by Customer or Custodian and whether with or without Custodian's consent, shall become the property of Custodian.

5.    No Representations or Warranties.  Custodian makes no warranties or representations of any kind with regard to the Software or the System, including but not limited to any implied warranties of merchantability or fitness for a particular purpose.

6.    Security Reliance; Unauthorized Use.  Customer will cause all persons utilizing the Software and System to treat all applicable user and authorization codes, passwords and authentication keys with extreme care. Custodian is hereby irrevocably authorized to act in accordance with and rely on Written Instructions received by it through the System. Customer acknowledges that it is its sole responsibility to assure that only Authorized Persons use the System and that Custodian shall not be responsible nor liable for any unauthorized use thereof.

7.    System Acknowledgements.  Custodian shall acknowledge through the System its receipt of each transmission communicated through the System, and in the absence of such acknowledgement Custodian shall not be liable for any failure to act in accordance with such transmission and Customer may not claim that such transmission was received by Custodian.

BNY-Trustee-00069544

## CERTIFICATE OF AUTHORIZED PERSONS
(Customer - Oral and Written Instructions)

The undersigned hereby certifies that he/she is the duly elected and acting _____Secretary_____ of Sentinel Management (the "Corporation"), and further certifies that the following officers or employees of the Corporation have been duly authorized in conformity with the Corporation's Articles of Incorporation and By-Laws to deliver Oral and Written Instructions to The Bank of New York ("BNY") pursuant to the Custody Agreement between the Corporation and BNY dated _March 13 1997_, and that the signatures appearing opposite their names are true and correct.

| Name | Title | Signature |
|------|-------|-----------|
| Eric A. Bloom | President & CEO | |
| Barbara M. Spasska | Vice President | |
| John W. Green | Exec. VP | |
| Philip M. Bloom | Chairman | |

This certificate supercedes any certificate of authorized individuals you may currently have on file.

[corporate
seal]

Title: Corp. Secretary

Date: 13 March 997

BNY-Trustee-00069545

CERTIFICATE OF AUTHORIZED PERSONS
(Customer - Foreign Exchange)

The undersigned hereby certifies that he/she is the duly elected and acting _Secretary_ of Sentinel Management (the "Corporation"), and further certifies that the following officers or employees of the Corporation have been duly authorized in conformity with the Corporation's Articles of Incorporation and By-Laws to enter into contracts with The Bank of New York ("BNY") to buy and sell foreign currency (on a spot and forward basis) and options to buy and sell foreign currency on behalf of the Corporation or any Account ("F/X Transactions"), and that the signatures appearing opposite their names are true and correct:

| Name | Title | Signature |
|------|-------|-----------|
| Eric A Bloom | President + CEO | _signature_ |
| John W Green | Exec VP | _signature_ |
| Barbara M Sapienza | Vice President | _signature_ |
| Philip M Bloom | Chairman | _signature_ |
| | | |

and further certifies that the following officers or employees of the Corporation have been duly authorized in conformity with the Corporation's Articles of Incorporation and By-Laws to confirm, orally and in writing, the terms of F/X Transactions entered with BNY, and that the signatures appearing opposite their names are true and correct:

| Name | Title | Signature |
|------|-------|-----------|
| Regina E Sapienza | | Regina E Sapienza |
| Any Authorized Person in Section 1 (Above) | | |
| | | |
| | | |

This certificate supercedes any certificate of authorized individuals you may currently have on file.

[corporate
seal]

Title: _Secretary_

Date: _March 13, 1997_

BNY-Trustee-00069546

CERTIFICATION

The undersigned, _John W. Ferson_, hereby certifies that he or she is the duly elected and acting _Secretary_ of _Sentinel Mgmt Group, Inc._ an _Illinois_ corporation (the "Corporation"), and further certifies that the following resolution was adopted by the Board of Directors of the Corporation on _March 13, 1997_, and that such resolution has not been modified or rescinded and is in full force and effect as of the date hereof:

RESOLVED, that the Corporation is hereby authorized to enter into any contracts to buy and sell foreign currency (on a spot and forward basis) and options to buy and sell foreign currency, whether pursuant to oral, telex, SWIFT, telecopier or electronic instructions or otherwise, and that The Bank of New York is hereby authorized to act and rely on any such instructions, as understood by it and believed by it to be genuine; and, in connection with any such transaction, any officer, employee or agent as designated by the Corporation may execute and deliver, in the name and on behalf of the Corporation, any and all agreements and confirmations containing any terms, conditions, representations, warranties, covenants, amendments, waivers, releases and instructions whatsoever and incur and pay any fees, costs, expenses, liabilities and claims, all without limitation.

[seal]

_____
Secretary

BNY-Trustee-00069547

**EXHIBIT C**

# SENTINEL
## MANAGEMENT
# G R O U P
### INC.

10 S. Riverside Plaza, Suite 2150
Chicago, Illinois 60606
Tel (312) 715 · 0001
Fax (312) 715 · 0018

ERIC A. BLOOM
PRESIDENT & CEO

March 14, 1997

Mr. Joseph Ciaccirelli
The Bank of New York
1 Wall Street
New York, NY 10286

Re:   **Sentinel Management
Group, Inc. Customer
Segregated Funds
Account I (§ 4.d-2)**

Dear Mr. Ciaccirelli:

We propose to maintain accounts with yourselves which
shall be designated as "Sentinel Management Group, Inc.
Customer Segregated Funds Account I ($4.d-2)"   In this
account we, as futures commission merchants, under the
Commodity Exchange Act, shall deposit money, investment
securities, and customer-owned securities.  Such funds are
money and securities deposited by or accruing to our
customers which are commodity customers.  In addition, all
investments shall be made in accordance with the Commodity
Exchange Act.

These accounts are being opened to meet the provisions
of the Commodity Exchange Act.  This statute provides that
such money, segregated and treated as belonging to our
customers rather than as belonging to ourselves.   In
carrying these accounts, you agree that the funds in said
accounts will not be subject to your lien or offset for, and
on account of, any indebtedness now or hereafter owing us to
you and shall not be applied by you upon any such
indebtedness nor will you apply the funds in said accounts
to the indebtedness of either our so-called Seg II or Seg
III accounts.  Furthermore, you agree that this letter shall
supersede any other documents related to this account that
conflict with the terms of this letter.

Please acknowledge that you understand the nature of
the assets in this account by signing (or asking the



BNY-Trustee-00005176

Mr. Joseph Ciaccirelli
March 14, 1997
Page 2



appropriate authorized person to sign) and returning the
enclosed copy of this letter.

                                        Very truly yours,

EAB/ti
1246001.DOC   14-03-97 12:51

Accepted this __ _ _31 day of March, 1997.


_____
Authorized Signature


_____
Name and Title

BNY-Trustee-00005177

EXHIBIT D

# SENTINEL
## MANAGEMENT
### G R O U P
#### INC.

10 S. Riverside Plaza, Suite 2150
Chicago, Illinois 60606
Tel (312) 715 - 0001
Fax (312) 715 - 0018

**ERIC A. BLOOM**
**PRESIDENT & CEO**

March 14, 1997

Mr. Joseph  Ciaccirelli
The Bank of New York
1 Wall Street
New York, NY  10286

Re:  **Sentinel Management
Group, Inc. Customer
Segregated Funds
Account II (Part 30)**

Dear Mr. Ciaccirelli:

We propose to maintain accounts with yourselves which
shall be designated as "Sentinel Management Group, Inc.
Customer Segregated Funds Account II (Part 30)"  In this
account we, as futures commission merchants, under the
Commodity Exchange Act, shall deposit money, investment
securities, and customer-owned securities.  Such funds are
money and securities deposited by or accruing to our
customers which are commodity customers.  In addition, all
investments shall be made in accordance with the Commodity
Exchange Act.

These accounts are being opened to meet the provisions
of the Commodity Exchange Act.  This statute provides that
such money, segregated and treated as belonging to our
customers rather than as belonging to ourselves.  In
carrying these accounts, you agree that the funds in said
accounts will not be subject to your lien or offset for, and
on account of, any indebtedness now or hereafter owing us to
you and shall not be applied by you upon any such
indebtedness nor will you apply the funds in said accounts
to the indebtedness of either our so-called Seg I or Seg III
accounts.  Furthermore, you agree that this letter shall
supersede any other documents related to this account that
conflict with the terms of this letter.

Please acknowledge that you understand the nature of
the assets in this account by signing (or asking the



BNY-Trustee-00005178

Mr. Joseph Ciaccirelli
March 14, 1997
Page 2



appropriate authorized person to sign) and returning the enclosed copy of this letter.

Very truly yours,

EAB/ti
1768003.DOC    11-03-97 12:51

Accepted this ___31___ day of March, 1997.

_____
Authorized Signature

Joseph Ciaccirelli V.P
_____
Name and Title

BNY-Trustee-00005179

**EXHIBIT E**

# SENTINEL
## MANAGEMENT
### G R O U P
#### INC.

10 S. Riverside Plaza, Suite 2150
Chicago, Illinois 60606
Tel (312) 715 • 0001
Fax (312) 715 • 0018

ERIC A. BLOOM
PRESIDENT & CEO

March 14, 1997

Mr. Joseph Ciaccirelli
The Bank of New York
1 Wall Street
New York, NY .10286

Re:  **Sentinel Management
Group, Inc. Customer
Segregated Funds
Account III**

Dear Mr. Ciaccirelli:

We propose to maintain accounts with yourselves which shall be designated as "Sentinel Management Group, Inc. Customer Segregated Funds Account II (Part 30)"  In this account we, as futures commission merchants, under the Commodity Exchange Act, shall deposit money, investment securities, and customer-owned securities.  Such funds are money and securities deposited by or accruing to our customers which are commodity customers.  In addition, all investments shall be made in accordance with the Commodity Exchange Act.

These accounts are being opened to meet the provisions of the Commodity Exchange Act.  This statute provides that such money, segregated and treated as belonging to our customers rather than as belonging to ourselves.  In carrying these accounts, you agree that the funds in said accounts will not be subject to your lien or offset for, and on account of, any indebtedness now or hereafter owing us to you and shall not be applied by you upon any such indebtedness nor will you apply the funds in said accounts to the indebtedness of either our so-called Seg I or Seg II accounts.  Furthermore, you agree that this letter shall supersede any other documents related to this account that conflict with the terms of this letter.

Please acknowledge that you understand the nature of the assets in this account by signing (or asking the



BNY-Trustee-00005180

Mr. Joseph Ciaccirelli
March 14, 1997
Page 2



appropriate authorized person to sign) and returning the
enclosed copy of this letter.

Very truly yours,

EAB/ti

Accepted this __3|__ day of March, 1997.

_____
Authorized Signature

_____
Name and Title

BNY-Trustee-00005181

SECURITIES CLEARING AGREEMENT                                    **EXHIBIT F**

AGREEMENT, dated as of *October 24, 1997*, between Sentinel Management Group, Inc., a Illinois corporation ("Customer"), and The Bank of New York ("Bank").

WHEREAS, Customer has requested Bank to act as its clearing agent for the purpose of receiving and delivering securities, either in definitive form, through a securities depository or clearing agency or through the Federal Reserve/Treasury Book-Entry System in furtherance of Customer's business as a broker/dealer of securities; and

WHEREAS, to induce Bank to act as clearing agent for Customer, Customer is willing to enter into this Agreement;

NOW, THEREFORE, the parties hereto agree as follows:

## WITNESSETH:

### ARTICLE I
### DEFINITIONS

As used herein, the following terms shall have the meanings set forth below:

1.    **"Account"** shall mean the clearing account in the name of Customer.

2.    **"Authorized Person"** shall mean any officer of Customer and any other person duly authorized by Customer to give Bank Instructions on behalf of Customer, such persons to be designed in a certificate signed by a duly authorized officer of Customer.

3.    **"Book-Entry System"** shall mean the Federal Reserve/Treasury Book-Entry System for receiving and delivering securities maintained therein, its successors and nominees.

4.    **"Bulk Input Instructions"** shall mean instructions delivered to Bank by bulk input computer tape or electronic file.

5.    **"Business Day"** shall mean any day on which Bank and either FRBNY or the relevant, subcustodian or correspondent bank (as necessary for the particular transaction involved) is open for business.

6.    **"Computer to Computer Instructions"** shall mean instructions delivered to Bank in data format as specified in Bank's computer to computer communication process specifications (as such specifications may be amended from time to time).

7.    **"Definitive Securities"** shall mean Securities (whether issued and sold in, or outside, the United States) evidenced by physical certificates whose transfer is effected by "street" delivery in the relevant market.

8.    **"Depository"** shall mean any clearing agency or securities depository in or outside the United States (including but not limited to The Depository Trust Company, Participants Trust Company, Euroclear and Cedel S.A.) authorized under applicable law to act as a clearing agency or securities depository.

9.    **"Depository Securities"** shall mean Securities other than FRB Securities (whether issued and sold in, or outside, the United States) which are cleared through or held by a clearing agency or securities depository registered with the Securities and Exchange Commission or otherwise authorized pursuant to applicable law to act as a securities depository or clearing agency.

10.    **"Desegregation Instructions"** shall mean Written Instructions pursuant to which Bank is requested to transfer Securities from a Segregated Account to the Account.

11.    **"FRB Securities"** shall mean Securities maintained in the Book-Entry System.

12.    **"FRBNY"** shall mean the Federal Reserve Bank of New York.

13.    **"GSCS"** shall mean Government Securities Clearance System for receiving and delivering Securities pursuant to this Agreement.

BNY-Trustee-00070175

- 2 -

14.    "**Instructions**" shall mean Bulk Input Instructions, Computer to Computer Instructions, Oral Instructions, Remote Clearance Instructions or Written Instructions.

15.    "**Market Value**" shall mean the amount as calculated by Bank as the market value of each Security based on the most recent closing bid price of such Security, plus accrued interest thereon, as made available to Bank usually the next Business Day by a pricing information service which Bank uses generally for pricing Securities.

16.    "**Oral Instructions**" shall mean verbal instructions.

17.    "**Remote Clearance Instructions**" shall mean instructions delivered to Bank by remote terminal located at Customer's premises linked to Bank's securities processing systems.

18.    "**Securities**" shall mean FRB Securities, Depository Securities and Definitive Securities.

19.    "**Segregated Account**" shall mean an account or subaccount established and maintained by Bank in the name of Customer pursuant to the provisions of this Agreement.

20.    "**Segregation Instructions**" shall mean Written Instructions pursuant to which Bank is requested to transfer Securities from the Account to a Segregated Account.

21.    "**Written Instructions**" shall mean instructions in writing, including facsimile transmissions.

All references to time in this Agreement (including any Schedule) shall mean the time in effect in New York on the relevant day.

## ARTICLE II
## CLEARING AGENCY

Section 2.01.    <u>Appointment of Clearing Agent; Use of Agents</u>.  Customer hereby appoints Bank as its clearing agent for the purpose of accepting receipt and making delivery of Securities.  Bank hereby accepts such appointment and shall act as Customer's clearing agent for the types of Securities as are mutually agreed from time to time, all of which arrangements shall be subject to the terms hereof.  Bank is authorized and directed to use, to the extent possible, the Book-Entry System, any Depository and any banking institution located outside of the United States (whether as subcustodian or correspondent) in connection with its performance hereunder; <u>provided</u>, in the case of any such banking institution, that Bank has acted with reasonable care in selecting such institution.

Section 2.02.    <u>Clearing Account</u>.  Bank shall establish and maintain the Account in which it will hold on behalf of Customer Securities and monies incidental to clearing Securities.  Bank shall maintain accurate records with respect to each transaction cleared through the Account, and is hereby authorized to make appropriate debit and credit entries of Securities and monies in the Account to effect the execution of each Instruction of Customer for the receipt or delivery of Securities.

Section 2.03.    <u>Delivery and Payment Risk</u>.  (a) Customer understands that when Bank is instructed to deliver Definitive or Depository Securities against payment, delivery of such Securities and receipt of payment therefor may not be completed simultaneously.  Customer assumes all responsibility and liability for all credit risks associated with Bank's delivery of Definitive and Depository Securities pursuant to Instructions of Customer, which responsibility and liability shall continue until final payment in full has been received by Bank.

(b)    Bank may, as a matter of bookkeeping convenience, credit the Account with the proceeds from the sale, redemption or other disposition of Definitive and Depository Securities prior to its actual receipt of final payment therefor and Customer agrees that such bookkeeping credits may also be reflected on its books, and otherwise, as "immediately available" or "same day" funds or by some other characterization.  Notwithstanding any such credit or characterization, all such credits shall be conditional upon Bank's actual receipt of final payment and may be reversed by Bank to the extent that final payment is not received.  If Bank, in its sole discretion, permits Customer to use funds credited to the Account prior to receipt by Bank of final payment thereof, Customer shall nonetheless continue to bear the risk of, and liability for, Bank's nonreceipt of final payment in full, and to the extent that final payment in full for any Definitive or Depository Securities delivered on any Business Day is not received by Bank by the close of business on such day, Customer shall immediately upon demand reimburse Bank for the amount so used in anticipation of final payment, plus interest thereon from and including the Business Day such final payment should have been received until such amount is repaid in full at a rate per annum equal to (i) prior to demand and for up to twenty-four (24) hours immediately following demand,

BNY-Trustee-00070176

- 3 -

as determined in accordance with Section 3.03(a) hereof, and (ii) beginning twenty-four (24) hours after demand, Bank's prime commercial lending rate as publicly announced by Bank to be in effect from time to time, such rate to be adjusted on the effective date of any change in such prime commercial lending rate. The rights of Bank and the obligations of Customer under this Section 2.03(b) are absolute and unconditional whether or not Bank would be entitled to indemnification pursuant to Section 4.05 hereof.

(c)    For all purposes of this Agreement, payment with respect to a transaction will not be "final" until Bank shall have received immediately available funds which under applicable law or rule are irreversible, which are not subject to any security interest, levy or other encumbrance, and which are specifically applicable, or deemed by Bank to be specifically applicable, to such transaction. A debit by Bank to any other account of Customer maintained by Bank or to an account of any third party to whom or for whose account Securities have been delivered shall not constitute final payment to the extent that such debit creates an overdraft or does not otherwise result in the receipt by Bank of immediately available, irreversible and unencumbered funds.

Section 2.04.    Segregation Accounts: Segregation and Desegregation Instructions.   (a) Upon Customer's execution and delivery to Bank of such agreements as Bank shall require, Bank shall establish and maintain for and in the name of Customer one or more Segregated Accounts for the purpose of segregating fully paid for Securities of customers of Customer, Securities subject to repurchase agreements, and for other purposes acceptable to Bank. Subject to Bank's rights under Article III, Customer shall be entitled to deliver to Bank a Segregation Instruction to transfer fully paid for Securities and freely available cash balances into a Segregated Account. Each such Segregation Instruction shall set forth (i) the specific issue of each Security including CUSIP number (or other securities identification number acceptable to Bank, if any), (ii) the Segregated Account into which such Security is to be transferred, and (iii) the aggregate number of units of such Security to be so transferred. Customer acknowledges and agrees that its issuance to Bank of a Segregation Instruction and Bank's compliance therewith shall constitute the sole means by which Customer shall identify to Bank any Securities as fully paid for Securities of Customer's customers or Securities subject to repurchase agreements or other purposes acceptable to Bank. Bank will not have, and will not assert, any claim or lien against Securities held in a Segregated Account nor will Bank grant any third party, including any Federal Reserve Bank, any interest in such Securities.

(b)    Customer shall be entitled to deliver to Bank a Desegregation Instruction to transfer Securities from a Segregated Account to the Account. Each Desegregation Instruction shall set forth (i) the specific issue of each Security including CUSIP number (or other securities identification number acceptable to Bank, if any), (ii) an instruction to transfer each such Security to the Account, and (iii) the aggregate number of units of such Security to be so transferred. Customer's delivery of a Desegregation Instruction shall constitute a representation and warranty by Customer to and for the benefit of Bank that Customer is authorized to issue such Desegregation Instruction and by so doing to transfer and pledge to Bank the full value of any and all such Securities. Customer acknowledges and agrees that upon delivery of Securities to the Account pursuant to a Desegregation Instruction, any and all claims to such Securities by any third party, including without limitation, claims of or by customers or counterparties of Customer, are discharged, extinguished, released and terminated.

(c)    On any Business Day that Bank receives Segregation and/or Desegregation Instructions from Customer, Bank shall issue to Customer an electronic notification of each Security held in the appropriate Segregated Account as of the close of such Business Day. Customer shall notify Bank within twenty-four (24) hours of any material discrepancy between any electronic notification issued by Bank to Customer hereunder and Customer's record of Segregated Account positions.

(d)    Nothing in this Agreement shall create or give rise to, or be interpreted or construed as creating or giving rise to, any contractual, bailment, agency, fiduciary, or relationship of any nature whatsoever between Bank and any non-party to this Agreement, including without limitation, customers or counterparties of Customer.

Section 2.05.    Clearance Instructions.   As mutually agreed, Customer shall give Bank Instructions to direct it to receive, deliver or transfer Securities. It is Customer's obligation and responsibility to deliver all such Instructions in accordance with the procedures, practices and operational guidelines prescribed by Bank from time to time as to information required, manner of delivery, timeliness of delivery and otherwise.

Section 2.06.    Effectiveness of Instructions.   Bank shall conclusively presume that all Instructions (other than Oral and Written Instructions) received by it hereunder have been duly authorized and delivered and is hereby irrevocably authorized and directed to act in accordance therewith. Bank shall be entitled to rely upon any Oral Instructions or Written Instructions received by it and believed to have been given by an Authorized Person. Customer agrees to forward to Bank Written Instructions confirming Oral Instructions by the close of the same Business Day that such Oral Instructions are given to Bank. Customer agrees that the fact that such confirming Written Instructions are not received or that contrary instructions are received by Bank shall in no way affect the validity or enforceability of transactions authorized by Customer. Bank shall not be liable for failures to execute, or "DKs", due to incorrect, incomplete, conflicting or untimely Instructions or any other failure by Customer to comply with the requirements prescribed by Bank from time to time.

BNY-Trustee-00070177

- 4 -

Section 2.07.    Settlements.  (a) Transactions in FRB Securities and Depository Securities will settle in accordance with the rules, procedures and policies of the Book-Entry System or applicable Depository.  Transactions in Definitive Securities shall be settled in accordance with accepted industry practices and the standard settlement time frames for trades in the particular Definitive Securities in the relevant markets.  All Definitive Securities cleared through Bank must be in good deliverable form.

(b)    In order for Bank to complete same-day settlements, Bank must receive Instructions in accordance with the time frames established by Bank as set forth in Schedule I.  Except as expressly provided in Schedule I, Bank shall have no obligation to perform same-day settlements.

Section 2.08.    Same-Day Turnaround Guarantee.  (a) Whenever Bank has been given proper and timely Instructions both to accept delivery of the types of Securities identified on Schedule II and to make delivery of those same Securities, both transactions to settle on the same Business Day, Bank guarantees to tender for delivery such Securities on such Business Day, subject to the following provisions and the conditions set forth on Schedule II.

(b)    In the event Bank fails to complete a same-day turnaround transaction on any Security after receiving proper and timely Instructions as provided hereunder, Bank's sole liability to Customer shall be to make an interest free overnight loan to Customer if as a result of such failure it is necessary for Customer to finance overnight such Security.  For all purposes other than the overnight rate of interest, such loan shall be subject to the provisions of Article III.  Bank shall incur no other liability to Customer nor to any non-party to this Agreement as a result of its failure to complete a guaranteed same-day turnaround.

(c)    Except as expressly provided in Schedule II, Bank shall not be liable for its failure to complete a same-day turnaround.

Section 2.09.    Foreign Currency. (a)  For the purpose of receiving non-U.S. Securities, Customer shall provide Bank or its correspondent with sufficient immediately available funds for all transactions by such time and date as local conditions (i.e., country of settlement) dictate. As used herein, "sufficient immediately available funds" shall mean either (i) sufficient United States currency to purchase the necessary foreign currency, or (ii) sufficient applicable foreign currency, to cover scheduled purchases. Bank shall provide Customer with immediately available funds each day which result from the actual settlement of all sale transactions, based upon advices received by Bank from its agents and Depositories. Such funds shall be in United States dollars or such other currency as Customer may specify to Bank.

(b)    Bank is authorized and hereby agrees to effect currency exchange transactions in connection with transactions in non-U.S. Securities, or as otherwise may be requested by Customer and agreed to by Bank, through customary banking channels, including with Bank or an affiliate of Bank acting as principal.  All expenses and risks incident to such currency exchange transactions shall be assumed by Customer, including but not limited to fluctuations in currency exchange rates.

Section 2.10.    Fees.  For its services hereunder, Customer agrees to pay Bank the fees and charges set forth on a Fee Schedule delivered to Customer. Such fees or charges may be amended or supplemented by Bank from time to time upon thirty days prior written notice to Customer. Bank is hereby authorized to deduct the fees and charges payable hereunder from the cash balances in the Account. Bank shall generally debit the Account in arrears on the fifteenth day (or next succeeding Business Day) of each month for fees incurred during the prior month, although Bank reserves the right to debit the Account or to demand payment simultaneously with clearing any Securities.

Section 2.11.    Third Party Claims.  In the event a claim is made against Bank for interest, penalty or any other amount in accordance with the rules or regulations of FRBNY, any Depository or any regulatory authority on account of any action or inaction by Customer and Bank determines such claim is justified under applicable laws, rules or regulations, Bank shall promptly inform Customer of such claim.  In the event Customer does not settle the claim or pay Bank such amount within two Business Days after notification of the claim, Bank is authorized to debit the Account in the amount of such claim.

Section 2.12.    Customer Training; Equipment.  (a)  Any computer or other remote terminal utilized by Customer in connection with this Agreement shall be provided at Customer's expense and must be fully compatible with GSCS.  Customer assumes all responsibility for maintenance of such terminal and assumes all liability resulting from any interruption of its ability to deliver Computer to Computer or Remote Clearance Instructions due to any problem associated with the terminal not caused by GSCS.

BNY-Trustee-00070178

- 5 -

(b)     If Bulk Input Instructions are to be delivered by bulk input computer tape, it must be on computer tape fully compatible with GSCS. Two separately run original tapes, not merely duplicate tapes, must be delivered to Bank. Bank will promptly advise an Authorized Person if for any reason Bank is unable to input such Bulk Input Instructions into GSCS.

## ARTICLE III
## FINANCING ARRANGEMENTS

Section 3.01.     Fail Financing.  Subject to the terms of this Agreement, Bank hereby agrees to make loans to Customer for the purpose of financing failed deliveries of Securities (each, a "Fail Financing Loan"). Each Fail Financing Loan shall be in a principal amount not to exceed the Market Value of the Securities financed thereby and shall be due and payable by 10:00 a.m. on the next Business Day after the making thereof. In the event that Bank shall have extended credit to Customer in receiving Securities on its behalf in an amount greater than the Market Value of the Securities financed hereunder, Customer agrees as a condition to obtaining such Fail Financing Loan to promptly pay Bank an amount equal to the difference between the credit so extended and the Market Value of such Securities or provide Bank with additional collateral acceptable to Bank. For purposes of this Section 3.01, "DKs" shall not be deemed to be failed deliveries, and the financing of "DKs" shall be governed by the provisions of Section 3.02 below. Notwithstanding any of the foregoing, Bank reserves the right, upon notice to Customer, not to make Fail Financing Loans secured by certain types of Securities.

Section 3.02.     Position Financing.  With the prior agreement of Bank to provide a credit facility to Customer, Bank may make loans to Customer to finance its position in Securities (each, a "Position Financing Loan"). Each Position Financing Loan shall be in a principal amount not to exceed the Collateral Value thereof (as defined below), and shall be due and payable by 10:00 a.m. on the next Business Day after the making thereof. Customer shall conduct its business in such a way that the aggregate principal amount outstanding of all Position Financing Loans shall not exceed the amount set forth on Schedule III. Although Bank may in its sole discretion make Position Financing Loans from time to time exceeding such aggregate principal amount as an accommodation to Customer, Customer shall in no event rely upon Bank to do so. In the event the principal amount of a Position Financing Loan exceeds the Collateral Value thereof, Customer agrees as a condition to obtaining such Position Financing Loan to promptly pay Bank an amount equal to the difference between such Position Financing Loan and the Collateral Value thereof or provide Bank with additional collateral acceptable to Bank. Schedule III may be amended or supplemented by Bank from time to time in its sole discretion by delivery to Customer of a revised Schedule III, and any such amendment or supplement shall be effective upon receipt by Customer, unless otherwise stated therein. For purposes hereof, the "Collateral Value" of a Position Financing Loan shall mean the Market Value of the Securities financed thereby minus the applicable Margin Percent of the Market Value thereof (as set forth on Schedule III).

Section 3.03.     Interest.  Customer agrees to pay Bank interest as follows:

(a)     Rate Determination.  Fail Financing Loans, Position Financing Loans and any other loans or extensions of credit arising hereunder or in connection with clearing Securities (collectively, "Loans") shall bear interest at the rate set by Bank in light of money market conditions, availability of funds and amount required, such rate to be made available to Customer on request. If Bank makes Position Financing Loans available to Customer, Fail Financing Loans shall generally bear interest at the same rate, although Bank reserves the right to set a different rate in light of money market conditions and availability of funds as it deems necessary.

(b)     Payment of Interest.  Customer agrees to pay Bank interest monthly in arrears, which amount Bank is authorized to debit from the cash balances in the Account; however, Bank reserves the right to charge interest daily in arrears.

Section 3.04.     Collateral Security.  As security for the repayment of Loans and for the payment of interest thereon and all other amounts due under this Agreement, Customer hereby grants Bank a security interest in any and all Securities which may now or hereafter be held in the Account and in any and all cash balances now or hereafter deposited in the Account (collectively, the "Collateral"). Bank shall be entitled to its rights as a pledgee under common law and as a secured party under Articles 8 and 9 of the New York Uniform Commercial Code and any and all other applicable laws and/or regulations as then in effect with respect to the Collateral. Notwithstanding the interest of any other party in the Collateral, whether arising from transactions with Customer in Securities or from any other circumstances, Bank shall have a first and prior lien on the Collateral. Customer hereby grants Bank the right to foreclose upon the Collateral and to liquidate the Collateral upon the occurrence of an Event of Default (as defined in Article IV). Upon receipt from Customer of instructions to deliver any Security to any subaccount or other account maintained by Bank on behalf of Customer or to any third party, Bank shall be entitled to hold such Security in the Account and subject to the security interest in favor of Bank until Bank determines it has no loans, overdrafts or losses on its books for Customer or until Bank has received satisfactory collateral for all such loans, overdrafts or losses and until all money payments are final and irreversible.

BNY-Trustee-00070179

- 6 -

Section 3.05.    General Loan and Security Agreement.  To further assure Bank of its rights to the Collateral under this Article III and secure repayment of Customer's obligations to Bank hereunder, Customer agrees to execute and deliver to Bank a General Loan and Security Agreement substantially in the form of Exhibit A attached hereto (the "Security Agreement").

**ARTICLE IV**
**GENERAL CONDITIONS**

Section 4.01.    Representations and Warranties.  Customer hereby represents and warrants to Bank, which representations and warranties shall be deemed to be continuing and to be reaffirmed upon the delivery to Bank of any Instructions under Article II:

(a)    Organization.  Customer is duly organized and existing under the laws of the jurisdiction of its organization, with full power and authority to carry on its business as now conducted, to enter into this Agreement and the Security Agreement and to perform its obligations hereunder and thereunder;

(b)    Binding Obligations.  This Agreement and the Security Agreement have been duly authorized, executed and delivered by Customer in accordance with all requisite corporate action and constitute valid and legally binding obligations of Customer, enforceable in accordance with their respective terms;

(c)    Compliance with Laws.  Customer is conducting its business in compliance with all applicable laws and regulations, both state and federal, and has obtained all regulatory licenses, approvals and consents necessary to carry on its business as currently conducted; there is no statute, regulation, rule, order or judgment binding on Customer and no provision of its charter or by-laws, nor of any mortgage, indenture, credit agreement or other contract binding on Customer or affecting its property which would prohibit the execution or performance by Customer of this Agreement or the Security Agreement;

(d)    Security Interest.  Customer owns the Securities in the Account free and clear of all liens, claims, security interests and encumbrances (except those granted herein) or, if the Securities in the Account are owned beneficially by others, Customer has the right to pledge such Securities to the extent financed by Bank hereunder, free of any right of redemption or prior claim by the beneficial owner; Bank's security interest in the Collateral shall be a first lien and security interest subject to no setoffs, counterclaims or other liens prior to or on a parity with it in favor of any other party (other than specific liens granted preferred status by statute) and Customer shall take any and all additional steps which Bank requires to assure itself of such priority and status, including notifying third parties or obtaining their consent to, Bank's security interest; no Securities in the Account are "securities carried for the account of any customer" within the meaning of Rules 8c-1 or 15c2-1 of the Securities Exchange Act of 1934, as amended;

(e)    Conduct of Business.  Customer is conducting its business in a prudent manner and has established and presently maintains audit and compliance policies and procedures reasonably designed to prevent Customer from incurring unreasonable or unwarranted risks or speculative exposures in light of its capital base; and

(f)    Financial Position.  The annual and interim balance sheets and income statements of Customer ("Financial Statements") heretofore delivered to Bank, which are the most recent available, are true and correct, fairly present the financial position of Customer as of their dates and have been prepared in accordance with generally accepted accounting principles consistently applied; there has been no material adverse change in the financial position or business operations of Customer since the date of the most recent audited Financial Statements.

Section 4.02.    Covenants.  Customer covenants with Bank as follows:

(a)    Delivery of Financial Statements.  Customer shall deliver to Bank promptly as they become available the annual, audited Financial Statements of Customer, unaudited interim Financial Statements on a quarterly basis, and any other financial statements which Bank shall reasonably request;

(b)    Material Adverse Change.  Customer shall notify Bank promptly of any material adverse change in its position, financial or otherwise, since the date of the most recent audited Financial Statements;

(c)    Inspection.  Customer shall allow Bank from time to time to visit its offices, inspect its books and records and discuss Customer's business with its management and officers, all at reasonable times and with prior notice.

(d)    No Actions in Violation of Law.  Customer shall not use the services provided by Bank hereunder in any manner that is in violation of or will result in the violation of any law, rule or regulation (including but not limited to, those of any self-regulatory organization) applicable to Customer or Bank;

BNY-Trustee-00070180

- 7 -

(e)    <u>Customer Confirmations.</u>  Customer shall not issue any confirmation to any third party with respect to any Security held by Bank in connection with this Agreement unless and until such Security has been transferred to a Segregated Account in accordance with this Agreement; and

(f)    <u>Federal Reserve Form U-1.</u>  Upon Bank's request from time to time, Customer shall execute and deliver a properly completed Federal Reserve Form U-1 (i.e., Statement of Purpose for an Extension of Credit Secured by Margin Stock) to Bank.

Section 4.03.    <u>Events of Default.</u>  Bank shall have the right to terminate this Agreement, to demand repayment of any Loans and other amounts owing hereunder and to liquidate any Collateral upon the occurrence of any of the following events (each, an "Event of Default");

(i)    The filing of any petition with respect to Customer under Bankruptcy Code, as amended, or the Securities Investor Protection Act, as amended, or any other similar statute for the liquidation or reorganization of Customer;

(ii)    The appointment of a receiver, trustee or custodian for Customer or the property of Customer;

(iii)    The failure to pay, when due and payable, the principal amount of any Loan or the failure to pay, when due and payable, any additional amount owing under Sections 3.01 or 3.02;

(iv)    The failure to pay within one (1) business day after the same shall become due and payable the interest on any Loan or any other amount owing hereunder;

(v)    The failure to comply with any other provision of this Agreement, which failure shall continue for thirty (30) days; or

(vi)    Any default under the Security Agreement which shall continue uncured beyond any applicable grace period.

Section 4.04.    <u>Effectiveness of Agreement.</u>  This Agreement shall become effective upon the delivery to Bank of the following in form satisfactory to Bank:

(a)    <u>Agreements.</u>  Duly executed originals of this Agreement and the Security Agreement, together with such officer's certificates and opinions of counsel as to corporate action and the matters set forth in Section 4.01 as Bank shall request;

(b)    <u>Financial Statements.</u>  The most recent audited and interim unaudited Financial Statements of Customer; and

(c)    <u>Certificate of Authorized Persons.</u>  Certificate, executed by the chief executive officer, chief financial officer or other officer of Customer acceptable to Bank, identifying the Authorized Persons who may give Bank Instructions hereunder.

Section 4.05.    <u>Standard of Care; Indemnification.</u>  (a) It is expressly understood and agreed that in exercising its rights and performing its obligations hereunder, Bank owes no fiduciary duty to Customer.  Bank shall not be liable for any costs, expenses, damages, liabilities or claims, including attorney's and accountant's fees (collectively, "Losses") incurred by Customer, except those Losses arising out of the gross negligence or willful misconduct of Bank.  Bank shall not be liable for any Losses sustained or incurred by reason of any action or inaction by FRBNY, any Depository, subcustodian, correspondent or any of their respective successors or nominees; it being understood that with respect to any such Losses, Bank shall take appropriate action to recover such Losses from such third parties, and Bank's sole responsibility and liability to Customer shall be limited to amounts so received from such third parties (exclusive of costs and expenses incurred by Bank).  In no event will Bank be liable to Customer or any third party for special, indirect or consequential damages, or lost profits or loss of business, arising under or in connection with this Agreement, even if previously informed of the possibility of such damages and regardless of the form of action.

(b)    Customer agrees to indemnify Bank and hold it harmless against any and all Losses, sustained or incurred by, or which may be asserted against, Bank as a result of its operating hereunder, including reasonable fees and expenses of counsel incurred by Bank in a successful defense of claims by Customer, excepting only those Losses arising from Bank's gross negligence or willful misconduct.  This indemnity shall be a continuing obligation of Customer, its successors and assigns, notwithstanding the termination of this Agreement or Bank ceasing to clear Securities hereunder.  Upon written demand from Bank, Customer agrees to pay promptly amounts owing under this indemnity free and clear of any right of offset, counterclaim or other deduction asserted by Customer.

BNY-Trustee-00070181

- 8 -

Bank's determination of amounts owing hereunder shall be binding. Customer shall be entitled to an accounting for any amounts owing hereunder, but this shall not affect Customer's obligation to pay such amounts promptly on demand.

Section 4.06.    Limitation of Liability. Without limiting the generality of the foregoing, Bank shall be under no duty or obligation to inquire into, and shall not be liable for, the validity of any Securities received, delivered or held by it hereunder, the legality of their purchase or sale, or the propriety of the amount paid or received upon purchase or sale.

Section 4.07.    No Obligation to Extend Credit. Notwithstanding the fact that Bank from time to time, and whether or not as a regular pattern, makes Loans to Customer or makes funds available to Customer in anticipation of final payment for Securities delivered, Bank may at any time decline to continue or re-extend any such Loan or credit, or any other credit, if Bank in its sole discretion deems any of such obligations to be insecure, or the risk of non-payment or non-performance by Customer to be increased.

Section 4.08.    Force Majeure. Bank shall not be liable for any failure or delay in the performance of its obligations under this Agreement arising out of or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any act of God; earthquake; fire; flood; war; civil or military disturbance; sabotage; epidemic; riot; interruption or suspension of any communication or wire facilities or services; loss or malfunction of utilities, transportation, computer (hardware or software) or communications service; accident; labor dispute; act of civil or military authority; governmental action or inability to obtain labor, material, equipment or transportation.

.   Section 4.09.    Termination. (a) This Agreement shall remain effective for a period of two years from the date of this Agreement and thereafter may be terminated by either party at any time upon not less than thirty (30) days prior written notice delivered to the other party specifying the date of termination; provided however, that Bank shall be entitled to terminate this Agreement immediately upon notice to Customer if (i) Bank for any reason determines that there is or has been a material adverse change in the financial position of Customer which might expose Bank to potential losses if it continued to act hereunder or that any Loan is insecure or that the risk of non-payment or non-performance of any of Customer's obligations hereunder is increased, or (ii) any representation or warranty made by Customer hereunder is incorrect or misleading in any material respect when made or repeated; and provided further, that Bank shall be entitled to terminate this Agreement immediately and without notice upon the occurrence of an Event of Default.

(b)    Upon termination of this Agreement and provided that all Loans, interest thereon and all other amounts due to Bank under this Agreement are paid in full, Bank shall transfer all Securities and cash balances in the Account as follows:

(i)    if not less than five (5) Business Days prior to the termination date Customer shall have given Bank Written Instructions for the delivery of such Securities and cash balances, then in accordance with such Written Instructions; and

(ii)    if no such Written Instructions have been given by Customer, then on the termination date, with respect to FRB Securities, Depository Securities and Non-U.S. Definitive Securities, Bank may establish a custody account and hold such Securities in escrow for the benefit of and at the expense of Customer, and with respect to U.S. Definitive Securities and cash balances, Bank shall deliver such Definitive Securities and cash balances (which may be by certified or official bank check) to Customer at the address provided below.

(c)    Customer will upon demand reimburse Bank for all shipping and insurance costs associated with the foregoing deliveries.

Section 4.10.    Cumulative Rights and No Waiver. Each and every right granted to Bank hereunder or under any other document delivered hereunder or in connection herewith, or allowed it by law or equity, shall be cumulative and may be exercised from time to time. No failure on the part of Bank to exercise, and no delay in exercising, any right will operate as a waiver thereof, nor will any single or partial exercise by Bank of any right preclude any other or future exercise thereof or the exercise of any other right.

Section 4.11.    Severability. In case any provision in or obligation under this Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

Section 4.12.    Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to conflict of laws principles thereof.

BNY-Trustee-00070182

- 9 -

Section 4.13.   Judicial Proceedings.  Customer hereby consents to the jurisdiction of a state or federal court situated in New York City, New York in connection with any dispute arising hereunder.  Customer hereby waives its right to trial by jury in any proceeding brought by Customer involving, directly or indirectly, any matter in any way arising out of, related to, or connected with, this Agreement.

Section 4.14.   Notices.  Any notice, demand or other communication hereunder, other than those given pursuant to Article II, shall be delivered in writing and shall be effective upon receipt:

If to Customer, at

Sentinel  Management Group, Inc.
10 South Riverside Plaza
Suite 2150
Chicago, Illinois 60606
Attn: Eric Bloom

If to Bank, at

The Bank of New York
Broker/Dealer Services
One Wall Street - 5th Floor
New York, New York 10286

With a copy to

The Bank of New York
Securities Industry Banking Division
One Wall Street
New York, New York 10286

BNY-Trustee-00070183

- 10 -

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed and delivered as of the date first above written.

SENTINEL MANAGEMENT GROUP, INC.

By: _____

Title: PRESIDENT & COO

THE BANK OF NEW YORK

By: _____

Broker/Dealer Services

Title:

By: _____

Securities Industry
Banking Division

Title: Vice President

smgiclea.doc
7/97

BNY-Trustee-00070184

**SCHEDULE I**

**TIME DEADLINES FOR RECEIPT OF
SAME DAY SETTLEMENT INSTRUCTIONS
(FRB SECURITIES)**

(A)     Bulk Input Instructions: not later than one (1) hour prior to the close of the Book-Entry System on the date of settlement.

(B)     Computer to Computer Instructions: not later than two (2) minutes prior to the close of the Book-Entry System on the date of settlement.

(C)     Oral Instructions: are acceptable only if Written Instruction confirming Oral Instructions are received by 1:00 p.m. on the date of settlement for cash same day settlements.

(D)     Remote Clearance Instructions: not later than two (2) minutes prior to the close of the Book-Entry System on the date of settlement.

(E)     Remote Job Entry: not later than one (1) hour prior to the close of the Book-Entry System on the date of settlement.

(F)     Written Instructions: by 1:00 p.m. on the date of settlement for cash same day settlements.

BNY-Trustee-00070185

- 2 -

**SCHEDULE I**

**TIME DEADLINES FOR RECEIPT OF
SAME DAY SETTLEMENT INSTRUCTIONS
(PTC SECURITIES)**

(A)    <u>Bulk Input Instructions</u>: not later than one (1) hour prior to the close of PTC on the date of settlement.

(B)    <u>Computer to Computer Instructions</u>: not later than two (2) minutes prior to the close of PTC on the date of settlement.

(C)    <u>Oral Instructions</u>: are acceptable only if Written Instructions confirming Oral Instructions are received by 1:00 p.m. on the date of settlement for cash same day settlements

(D)    <u>Remote Clearance Instructions</u>: not later than two (2) minutes prior to the close of PTC on the date of settlement.

(E)    <u>Remote Job Entry</u>: not later than one (1) hour prior to the close of PTC on the date of settlement.

(F)    <u>Written Instructions</u>: by 1:00 p.m. on the date of settlement for cash same day settlements.

BNY-Trustee-00070186

- 3 -

**SCHEDULE I**

**TIME DEADLINES FOR RECEIPT OF**
**SAME DAY SETTLEMENT INSTRUCTIONS**
**(U.S. DEFINITIVE SECURITIES)**

(A)    <u>Bulk Input Instructions</u>: not later than 45 minutes prior to the applicable securities delivery deadline.

(B)    <u>Computer to Computer Instructions</u>: not later than 45 minutes prior to the applicable securities delivery deadline.

(C)    <u>Oral Instructions</u>: are acceptable only if Written Instructions confirming Oral Instructions are received not later than 45 minutes prior to the applicable securities delivery deadline.

(D)    <u>Remote Clearance Instructions</u>: not later than 45 minutes prior to the applicable securities delivery deadline.

(E)    <u>Remote Job Entry</u>: not later than 45 minutes prior to the applicable securities delivery deadline.

(F)    <u>Written Instructions</u>: not later than 45 minutes prior to the applicable securities delivery deadline.

BNY-Trustee-00070187

- 4 -

## SCHEDULE I

### TIME DEADLINES FOR RECEIPT OF
### SAME DAY/NEXT DAY SETTLEMENT INSTRUCTIONS
### (DEPOSITORY TRUST COMPANY SECURITIES)

(A)    Bulk Input Instructions: (i) for same day settlements, not later than 2:00 p.m. on the date of settlement, (ii) for next-day settlement, not later than 4:00 p.m. on the Business Day prior to the date of settlement.

(B)    Oral Instructions: are acceptable only if Written Instructions confirming Oral Instructions are received by 1:00 p.m. on the date of settlement for cash same day settlements.

(C)    Remote Clearance Instructions: (i) for same day settlements, not later than 1:00 p.m. on the date of settlement, (ii) for next-day settlement, not later than 4:00 p.m. on the Business Day prior to the date of settlement.

(D)    Remote Job Entry: (i) for same day settlements, not later than 2:00 p.m. on the date of settlement, (ii) for next-day settlement, not later than 4:00 p.m. on the business day prior to the date of settlement.

(E)    Written Instructions: (i) for same day settlements, not later than 1:00 p.m. on the date of settlement (ii) for next-day settlement, not later than 4:00 p.m. on the business day prior to the date of settlement.

BNY-Trustee-00070188

**SCHEDULE II**

**SAME-DAY TURNAROUND GUARANTEE**
**(FRB SECURITIES)**

Bank must receive (as determined below) the FRB Securities at least two (2) minutes prior to the close of FRBNY for FRB Securities to be delivered through the Book-Entry System to accounts outside GSCS. Instructions will be received by Bank and acknowledged by Bank's Communication "Front End" and such instructions will then be sent to the "GSCS Application" to be validated, time stamped and queued for outbound delivery. FRB Securities shall be deemed to have been received by the Account (i) through FRBNY from another participant on the Book-Entry System at the time the transaction message confirming delivery to Bank's account at the Book-Entry System is received by the GSCS Application or (ii) through GSCS from an account of another participant in GSCS at the time the transaction message confirming delivery into the Account is logged onto GSCS, which time is printed on Bank's confirmation as the GSCS "Receive Time". FRB Securities shall be deemed to have been tendered for delivery out of the Account at the time the transaction message is stamped by FRBNY with its GSCS "Delivery Time" (x) for delivery to another participant on the Book-Entry System or (y) to another participant in GSCS. Bank only guarantees turnaround times within GSCS and is not responsible for delays or processing backlogs on the Book-Entry System or for the Book-Entry System going down. Transaction messages which do not reach Bank within the time frames set forth, regardless of when such transaction messages had been queued by FRBNY for delivery to Bank, are not covered by the turnaround guarantee.

BNY-Trustee-00070189

- 2 -

## SCHEDULE II

## SAME-DAY TURNAROUND GUARANTEE
## (PARTICIPANTS TRUST COMPANY SECURITIES)

Bank must receive PTC Securities at least two (2) minutes prior to the close of PTC for PTC Securities to be delivered through PTC to accounts outside GSCS. Instructions will be received by Bank and acknowledged by Bank's Communication "Front End" and such instructions will then be sent to the "GSCS Application" to be validated, time stamped and queued for outbound delivery. PTC Securities shall be deemed to have been received by the Account (i) through PTC from another participant of PTC at the time the transaction message confirming delivery to Bank's account at PTC is received by the GSCS Application or (ii) through GSCS from an account of another participant in GSCS at the time the transaction message confirming delivery into the Account is logged onto GSCS, which time is printed on Bank's confirmation as the GSCS "Receive Time". PTC Securities shall be deemed to have been tendered for delivery out of the Account at the time the transaction message is stamped by GSCS with the GSCS "Delivery Time" (x) for delivery to another participant on the PTC system or (y) to another participant in GSCS. Bank only guarantees turnaround times within GSCS and is not responsible for delays or processing backlogs on the PTC system or for the PTC system going down. Transaction messages which do not reach Bank within the time frames set forth, regardless of when such transaction messages had been queued by PTC for delivery to Bank, are not covered by the turnaround guarantee.

BNY-Trustee-00070190

- 3 -

### SCHEDULE II

#### SAME-DAY TURNAROUND GUARANTEE
#### (DEPOSITORY TRUST COMPANY SECURITIES)

Same-day turnaround for Depository Trust Company Securities will be subject to the rules, procedures and policies of DTC and subject to such time deadlines as Bank may specify from time to time. Bank shall not be liable hereunder for its failure to complete same-day turnarounds as a result of delays or processing backlogs at any depository.

BNY-Trustee-00070191

- 4 -

## SCHEDULE II

### SAME-DAY TURNAROUND GUARANTEE
### (U.S. DEFINITIVE SECURITIES)

Bank must receive (as determined below) the Definitive Securities in good deliverable form at least thirty (30) minutes prior to the close of business by Bank for clearing Definitive Securities (for deliveries within the downtown financial district in Manhattan, New York City). Bank shall inform Customer of any changes in the above time. Definitive Securities shall be deemed received by Bank when accepted at the securities cage window, One Wall Street, New York, New York 10286 (or such other place hereafter designated by Bank), which time is stamped on Bank's receipt confirmation. Bank shall be deemed to have tendered delivery of Definitive Securities at the time they are accepted by the other clearing bank, which time is customarily stamped on its receipt form. Bank does not guarantee same-day turnaround of Definitive Securities received hereunder when the delivery of such Definitive Securities by Bank must be accompanied by a Bank check representing accrued interest or other payment, but Bank agrees to use its best efforts to tender for same-day delivery such Definitive Securities.

BNY-Trustee-00070192

5

**SCHEDULE III**

**POSITION LINE**

| SECURITY TYPE | MARGIN PERCENT |
|---|---|
| U.S. Treasury < 1 yr | 100.75% |
| U.S. Treasury 2 yr | 102% |
| U.S. Treasury > 2 yr | 104% |

The Aggregate principal amount of all Position Financing Loans that may be outstanding at any one time is $_____ .

SENTINEL MANAGEMENT GROUP, INC.

By: _____

Title: PRESIDENT + CEO

THE BANK OF NEW YORK

By: _____
           Securities Industry
           Banking Division

Title: Vice President

BNY-Trustee-00070193

# EXHIBIT B

# PART 2

**EXHIBIT G**

### SECURITY AGREEMENT

_____
One Wall Street
(Banking Office)

*21 October*, 19*97*

FOR VALUE RECEIVED, and in order to induce THE BANK OF NEW YORK (the "Bank"), in its discretion, to make loans or otherwise extend credit at any time, and from time to time to, or at the request of, the undersigned (the "Debtor"), whether the loans or credit so extended shall be absolute or contingent, the Debtor hereby grants to the Bank, as security for all present or future obligations or liabilities of any and all kinds of the Debtor to it, whether due or to become due, secured or unsecured, absolute or contingent, and howsoever or whensoever acquired by the Bank, including interest accruing thereon before or after the commencement of any insolvency, bankruptcy or reorganization proceeding of the Debtor (whether or not such interest is an allowable claim in any proceeding and irrespective of the discharge or release of the Debtor in such proceeding) (all of which are referred to collectively as the "Obligations"), a security interest in and a lien upon all personal property and fixtures of the Debtor or in which the Debtor has an interest wherever located and whether now or hereafter existing or now owned or hereafter acquired and whether or not subject to the Uniform Commercial Code as in effect in the State of New York (the "Code"), including but not limited to any property specified in Schedule A hereto, and also including all interest, dividends and other distributions thereon paid and payable in cash or in property, and all replacements and substitutions for, and all accessions and additions to, and all products and proceeds of, all of the foregoing (all of which are referred to as the "Collateral").

The Debtor hereby agrees to deliver to the Bank whenever called for by it such additional collateral security of a kind and of a market value satisfactory to the Bank, so that there will, at all times, be with the Bank a margin of security for the payment of all Obligations which shall be satisfactory to it. In addition to the Bank's security interest in the Collateral, it shall have, and the Debtor hereby grants to the Bank, a security interest and a lien for all the Obligations in and upon any personal property of the Debtor or in which the Debtor may have an interest which is now or may at any time hereafter come into the possession or control of the Bank, or of any third party acting on its behalf, whether for the express purpose of being used by the Bank as collateral security or held in custody or for any other or different purpose, including such personal property as may be in transit by mail or carrier for any purpose, or covered or affected by any documents in the Bank's possession or control, or in the possession or control of any third party acting on its behalf (said additional personal property is also referred to as the "Collateral"). The Debtor hereby authorizes the Bank in its discretion, at any time, whether or not the Collateral is deemed by it adequate, to appropriate and apply upon any of the Obligations, when due, any of such property of the Debtor and to charge any of the Obligations against any balance of any account standing to the credit of the Debtor on the books of the Bank.

Upon failure of the Debtor to pay any Obligation when becoming or made due, in accordance with its terms, the Bank shall have, in addition to all other rights and remedies allowed by law, the rights and remedies of a secured party under the Code and, without limiting the generality of the foregoing, the Bank may immediately, without demand of performance and without notice of intention to sell or otherwise dispose of Collateral, or of time or place of sale or other disposition, or of redemption or other notice or demand whatsoever to the Debtor, all of which to the extent permitted by law are hereby expressly waived, and without advertisement, sell at public or private sale, grant options to purchase or otherwise realize upon, in the State of New York, or elsewhere, the whole or from time to time any part of the Collateral upon which the Bank shall have a security interest or lien as aforesaid, or any interest which the Debtor may have therein. After deducting from the proceeds of any such sale or other disposition of the Collateral all expenses (including, but not limited to, reasonable attorneys' fees and expenses and other expenses as set forth low), the Bank shall apply the remaining proceeds toward the payment of the Obligations, in such order as the Bank shall elect, the Debtor remaining liable for any deficiency remaining unpaid after such application, plus interest thereon. If notice of any sale or other disposition is required by law to be given, the Debtor hereby agrees that a notice sent at least five days before the time of any intended public sale or of the time after which any private sale or other disposition of the Collateral is to be made, shall be reasonable notice of such sale or other disposition. The Debtor also agrees to assemble the Collateral at such place or places as the Bank designates by written notice.

At any such sale or other disposition the Bank or any other person designated by the Bank may itself purchase the whole or any part of the Collateral sold, free from any right of redemption on the part of the Debtor, which right, to the extent permitted by law, is hereby waived and released.

The Bank may, without any notice to the Debtor, in its discretion, whether or not any of the Obligations are due, in its name or in the name of the Debtor, demand, sue for, collect and receive any money or property at any time due, payable or receivable on or on account of or in exchange for, and may compromise, settle or extend the time of payment of, any of the demands or obligations represented by any of the Collateral, and may also exchange any of the Collateral for other property upon the reorganization, recapitalization or other readjustment of the issuer, maker or other person who is obligated on or otherwise has liabilities with respect to the Collateral, and in connection therewith may deposit any of the Collateral with any committee or depositary upon such terms as the Bank may in its discretion deem appropriate, and the Debtor does hereby constitute and appoint the Bank the Debtor's true and

2

lawful attorney to compromise, settle or extend payment of said demands or obligations and exchange such Collateral as the Debtor might or could do personally; all without liability or responsibility for action herein authorized and taken or not taken in good faith. The Bank is entitled at any time in its discretion to notify an account debtor or the obligor on any instrument to make payment to it, regardless of whether or not the Debtor had been previously making collections on the Collateral, and the Bank may take control of any proceeds of any of the Collateral. Upon request of the Bank, the Debtor shall receive and hold all proceeds of the Collateral in trust for the Bank and not commingle any collections with any of its own funds and immediately deliver such collections to the Bank.

The Debtor agrees that the Collateral secures, and further agrees to pay on demand, all expenses (including, but not limited to, reasonable attorneys' fees and expenses and costs of any insurance and payment of taxes or other charges) of, or incidental to, the custody, care, sale or collection of, or realization upon, any of the Collateral or in any way relating to the enforcement or protection of the rights of the Bank hereunder, whether or not litigation is commenced.

The Debtor agrees to mark its books and records as the Bank shall request in order to reflect the rights of the Bank granted herein, and the Bank may, in its sole discretion, take possession of the Collateral at any time, either prior to or subsequent to a default under any of the Obligations. The Debtor agrees to maintain such insurance on the Collateral as the Bank may require. The Bank may, without notice to the Debtor, in its discretion, and for its own benefit, lend, use, transfer or repledge to any third party all or any part of the Collateral by itself or commingled with the property of others, in bulk or otherwise. The Bank may, without notice to the Debtor, sell, assign or transfer any of the Obligations and the Bank's rights and duties hereunder, and may deliver the Collateral, or any part thereof, to the assignee or transferee of any of the Obligations, who shall become vested with all the rights, remedies, powers, security interests and liens herein given to the Bank in respect thereto; and the Bank shall thereafter be relieved and fully discharged from any liability or responsibility in the premises.

The Bank may, without notice to the Debtor, in its discretion, transfer, or cause to be transferred, all or any part of the Collateral to its name, or to the name of its nominee, vote the Collateral so transferred, and receive income and make or receive collections, including money, thereon and hold said income and collections as Collateral or apply said income and collections to any of the Obligations, the manner and distribution of the application to be made as the Bank shall elect.

Calls for Collateral, demand for payment or notice to the Debtor may be given by leaving same at the address given below or any other address hereafter filed with the Bank, or by mailing same to such address with the same effect as if delivered personally. Such notice given in the manner herein provided shall be effective whether or not received by the Debtor.

With respect to the Collateral, the Bank shall be under no duty to send notices, perform services, exercise any rights of collection, enforcement, conversion or exchange, vote, pay for insurance, taxes or other charges or take any action of any kind in connection with the management thereof and its only duty with respect thereto shall be to use reasonable care in its custody and preservation while in its possession, which shall not include any steps necessary to preserve, obtain, secure or acquire rights or property against or from any parties.

The Debtor authorizes the Bank, at the Debtor's expense, to file one or more financing statements and amendments thereto to perfect the security interests granted herein, without the Debtor's signature thereon, and the Debtor agrees to do, file, record, make, execute and deliver all such acts, deeds, things, agreements, notices, instruments and financing statements as the Bank may request in order to perfect and enforce the rights of the Bank herein.

If at any time it is necessary in the opinion of counsel to the Bank that any or all of the securities held as Collateral (the "Pledged Securities") be registered under the Securities Act of 1933, as amended, or that an indenture with respect thereto be qualified under the Trust Indenture Act of 1939, as amended, in order to permit the sale or other disposition of the Pledged Securities, the Debtor shall at the Bank's request and at the expense of the Debtor use its best efforts promptly to cause the registration of the Pledged Securities and the qualification of such indenture and to continue such registration and qualification under such laws and in such jurisdictions and for as long as deemed appropriate by the Bank.

The Debtor hereby authorizes the Bank to date this agreement as of the date of the granting of any Obligation secured hereby and to complete any blank space herein (including any schedule hereto) according to the terms upon which said Obligation was granted.

This agreement may not be amended orally or by course of dealing, but only by a writing signed by an authorized officer of the Bank.

No failure on the part of the Bank to exercise, and no delay in exercising, any right, remedy or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise by the Bank of any right, remedy or power preclude any other or future exercise thereof or the exercise of any other right, remedy or power.

3

Each and every right, remedy and power hereby granted to the Bank or allowed it by law or other agreement shall be cumulative and not exclusive of any other right, remedy or power, and may be exercised by the Bank at any time and from time to time.

This agreement may be assigned by the Bank and its benefits shall inure to the successors, indorsees and assigns of the Bank.

This agreement shall be construed and interpreted, and all rights and obligations hereunder shall be determined, in accordance with the laws of the State of New York without regard to principles of conflict of laws.

Unless otherwise defined or the text otherwise requires, all terms used herein shall have the meanings specified in the Code.

Every provision of this agreement is intended to be severable; if any term or provision of this agreement shall be invalid, illegal or unenforceable for any reason whatsoever, the validity, legality and enforceability of the remaining provisions hereof shall not in any way be affected or impaired thereby.

Any notice to the Bank shall be effective only upon receipt by the Bank at its banking office set forth above or any other address hereafter specified by written notice from the Bank to the Debtor.

The Debtor represents and warrants to the Bank that any information furnished to the Bank regarding the Collateral shall be true and correct on the date hereof and is complete in all material respects.

IF DEBTOR IS A CORPORATION:

The Debtor represents and warrants that it is a corporation duly organized, validly existing and in good standing under the laws of the state of its incorporation; that the execution, delivery and performance of this agreement are within the Debtor's corporate powers and have been duly authorized by all necessary action of its board of directors and shareholders; and that each person executing this agreement has the authority to execute and deliver this agreement on behalf of the Debtor.

IF DEBTOR IS A LIMITED LIABILITY COMPANY:

The Debtor represents and warrants that it is a limited liability company duly organized, validly existing and in good standing under the laws of the state of its organization; that the execution delivery and performance of this agreement are within the Debtor's company powers and have been duly authorized by all necessary action of its members; and that each person executing this agreement has the authority to execute and deliver this agreement on behalf of the Debtor.

IF DEBTOR IS A PARTNERSHIP:

The Debtor represents and warrants that it is a partnership duly formed under the laws of the state of its formation; that the execution, delivery and performance of this agreement are within the Debtor's partnership powers and have been duly authorized by all necessary action of its partners and do not contravene the provisions of its partnership agreement; and that each person executing this agreement has the authority to execute and deliver this agreement on behalf of the Debtor.

**THE DEBTOR SUBMITS TO THE JURISDICTION OF STATE AND FEDERAL COURTS LOCATED IN THE CITY AND STATE OF NEW YORK IN PERSONAM AND AGREES THAT ALL ACTIONS AND PROCEEDINGS RELATING DIRECTLY OR INDIRECTLY TO THIS AGREEMENT SHALL BE LITIGATED ONLY IN SAID COURTS OR IN COURTS LOCATED ELSEWHERE AS THE BANK MAY SELECT AND THAT SUCH COURTS ARE CONVENIENT FORUMS AND WAIVES PERSONAL SERVICE UPON IT AND CONSENTS TO SERVICE OF PROCESS OUT OF SAID COURTS BY MAILING A COPY THEREOF TO IT BY REGISTERED OR CERTIFIED MAIL.**

BNY-Trustee-00070196

4

THE DEBTOR AND THE BANK WAIVE THE RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

SENTINEL MANAGEMENT GROUP, INC.
(Name of Debtor)

By _____

Name: *Eric A. Bloom*

Title: *President & CEO*

ADDRESS OF DEBTOR

10 South Riverside Plaza
Suite 2150
Chicago, Illinois 60606
Attn: Eric Bloom

---

SCHEDULE A

TO

SECURITY AGREEMENT

EXECUTED BY

_____

(Name of Debtor)

Property specifically included as "Collateral" for purposes of the within Security Agreement:

Any and all Securities and other property held in the Account, as these terms are defined in the Securities Clearing Agreement between the Borrower and the Bank, and any cash balances held in any cash account maintained by the Bank in connection therewith.

BNY-Trustee-00070197



**EXHIBIT H**

# GLOBAL CLEARING AND CUSTODY AGREEMENT

AGREEMENT, dated as of _9 January 2003_ between _Sentinel Management Group, Inc._ ("Customer") and The Bank of New York ("Clearing Agent").

**ARTICLE I**
**DEFINITIONS**

Whenever used in this Agreement, the following words shall have the meanings set forth below:

1.      **"Authorized Person"** shall be any person, whether or not an officer or employee of Customer, duly authorized by Customer to give Oral and/or Written Instructions with respect to one or more Accounts, such persons to be designated in a Certificate of Authorized Persons which contains a specimen signature of such person.

2.      **"BNY Affiliate"** shall mean any office, branch or subsidiary of The Bank of New York Company, Inc.

3.      **"Business Day"** shall mean any day on which Clearing Agent and relevant Depositories are open for business.

4.      **"Depository"** shall include the Federal Reserve/Treasury book-entry system, the Depository Trust Company, Euroclear, Clearstream Banking S.A. and any other securities depository, book-entry system or clearing agency (and their respective successors and nominees) authorized to act as a securities depository, book-entry system or clearing agency pursuant to applicable law and identified to Customer from time to time.

5.      **"Desegregation Instructions"** shall mean Oral or Written Instructions pursuant to which Clearing Agent is requested to transfer Securities or cash balances from a Segregated Account to the Account.

6.      **"Oral Instructions"** shall mean instructions received verbally by Clearing Agent.

7.      **"Securities"** shall include, without limitation, any common stock and other equity securities, bonds, debentures and other debt securities, notes, mortgages or other obligations, and any instruments representing rights to receive, purchase, or subscribe for the same, or representing any other rights or interests therein (whether represented by a certificate or held in a Depository or a Subcustodian).

8.      **"Segregated Account"** shall mean an account established and maintained by Clearing Agent on behalf of Customer pursuant to the provisions of this Agreement.

9.      **"Segregation Instructions"** shall mean Oral or Written Instructions pursuant to which Clearing Agent is requested to transfer Securities or cash balances from the Account to a Segregated Account.

10.      **"Subcustodian"** shall mean a bank or other financial institution which is utilized by Clearing Agent in connection with the purchase, sale or custody of Securities hereunder and identified to Customer from time to time.

11.      **"Written Instructions"** shall mean written communications actually received by Clearing Agent by S.W.I.F.T., tested telex, letter, facsimile transmission, or other method or system specified by Clearing Agent as available for use in connection with the services hereunder.

BNY-Trustee-00004635

- 2 -

**ARTICLE II**
**APPOINTMENT OF CLEARING AGENT; ACCOUNTS;**
**REPRESENTATIONS, WARRANTIES AND COVENANTS**

1.     (a)     Customer hereby appoints Clearing Agent as clearing agent for all Securities and cash at any time delivered to Clearing Agent during the term of this Agreement, and authorizes Clearing Agent to hold Securities in registered form in its name or the name of its nominees. Clearing Agent hereby accepts such appointment and agrees to establish and maintain one or more securities accounts and cash accounts in which Clearing Agent will hold Securities and cash as provided herein. Such accounts (each, an "Account"; collectively, the "Accounts") shall be in the name of Customer, or with Clearing Agent's prior approval (which may be withheld in Clearing Agent's sole discretion), in the names of third parties, it being understood and agreed that nothing in this Agreement shall create or give rise to, or be interpreted or construed as creating or giving rise to, any contractual, bailment, agency, fiduciary, or other relationship of any nature whatsoever between Clearing Agent and any non-party to this Agreement, including without limitation, customers or counterparties of Customer.

(b)     Customer acknowledges and agrees that it is liable to Clearing Agent for satisfaction of all obligations and liabilities arising or incurred in connection with this Agreement and each Account as a principal, without regard to any rights or recourse Customer may have against any third party for reimbursement of such obligations and liabilities.

2.     (a) Subject to Clearing Agent's rights under Article V, Customer shall be entitled to deliver to Clearing Agent a Segregation Instruction to transfer fully paid for Securities and freely available cash balances from the Account to a Segregated Account. Each Segregation Instruction shall set forth (i) the specific issue of each Security including CUSIP number (or other securities identification number acceptable to Clearing Agent, if any), (ii) the Segregated Account into which such Security is to be transferred, and (iii) the aggregate number of units of such Security to be so transferred. Customer acknowledges and agrees that its issuance to Clearing Agent of a Segregation Instruction and Clearing Agent's compliance therewith shall constitute the sole means by which Customer shall identify to Clearing Agent any Securities as fully paid for Securities of Customer's customers or Securities subject to repurchase agreements or other purposes acceptable to Clearing Agent. Clearing Agent will not have, and will not assert, any claim or lien against Securities held in a Segregated Account. Customer acknowledges and agrees that Subcustodians and Depositories may have a lien over and rights of retention and sale in relation to Securities held in a Segregated Account in relation to claims for payment of obligations including administration and safe custody charges.

(b)     Customer shall be entitled to deliver to Clearing Agent a Desegregation Instruction to transfer Securities from a Segregated Account to the Account. Each Desegregation Instruction shall set forth (i) the specific issue of each Security including CUSIP number (or other securities identification number acceptable to Clearing Agent, if any), (ii) an instruction to transfer each such Security to the Account, and (iii) the aggregate number of units of such Security to be so transferred. Customer's delivery of a Desegregation Instruction shall constitute a representation and warranty by Customer to and for the benefit of Clearing Agent that Customer is authorized to issue such Desegregation Instruction and by so doing to transfer and pledge to Clearing Agent the full value of any and all such Securities. Customer acknowledges and agrees that upon delivery of Securities to the Account pursuant to a Desegregation Instruction, any and all claims to such Securities by any third party, including without limitation, claims of or by customers or counterparties of Customer, are discharged, extinguished, released and terminated.

3.     Customer hereby represents and warrants, which representations and warranties shall be continuing and shall be deemed to be reaffirmed upon each Oral or Written Instruction given by Customer, that:

(a)     Customer is duly organized and existing under the laws of the jurisdiction of its organization, with full power to carry on its business as now conducted, to enter into this Agreement and the Security Agreement (as defined in Article V hereof) and to perform its obligations hereunder and thereunder;

(b)     This Agreement and the Security Agreement have been duly authorized, executed and delivered by Customer and constitute valid and legally binding obligations of Customer, enforceable in accordance with their respective terms, and no statute, regulation, rule, order, judgment or contract binding on Customer prohibits Customer's execution or performance of this Agreement or the Security Agreement;

(c)     Either Customer owns the Securities in the Accounts free and clear of all liens, claims, security interests and encumbrances (except those granted herein) or, if the Securities in an Account are owned beneficially by others, Customer has the right to pledge such Securities to the extent financed by Clearing Agent hereunder, free of any right of redemption or prior claim by the beneficial owner. Clearing Agent's security interest pursuant to Article V hereof shall be a first lien and security interest subject to no setoffs, counterclaims or other liens prior to or on a parity with it in favor of any other party (other than specific liens granted preferred status by statute), and Customer shall take any and all additional steps which Clearing Agent requires to assure itself of such priority and status, including notifying third parties or obtaining their consent to, Clearing Agent's security interest; and

BNY-Trustee-00004636

- 3 -

(d)    The annual and interim balance sheets and income statements of Customer ("Financial Statements") heretofore delivered to Clearing Agent, which are the most recent available, are true and correct, fairly present the financial position of Customer as of their dates and have been prepared in accordance with generally accepted accounting principles consistently applied; there has been no material adverse change in the financial position or business operations of Customer since the date of the most recent audited Financial Statements.

4.    If any Account holds assets beneficially owned by one or more third-parties, Customer further represents and warrants to Clearing Agent that:

(a)    Customer has established and presently maintains policies and procedures requiring Customer to obtain and verify information about the identity of its customers and which are reasonably designed to ensure that Customer is not being used as a conduit for money laundering or other illicit purposes; and

(b)    Customer has verified the identity of each third party in whose name an Account is established and maintained hereunder and made reasonable inquiries regarding the source of funds credited to such Account, and to the best of Customer's knowledge, no transaction through any Account is prohibited by applicable law, regulation or rule.

5.    Customer covenants with Clearing Agent as follows:

(a)    Customer shall deliver to Clearing Agent promptly as they become available the annual audited Financial Statements of Customer, unaudited interim Financial Statements on a quarterly basis, and any other financial statements which Clearing Agent shall reasonably request;

(b)    Customer shall notify Clearing Agent promptly of any material adverse change in its position, financial or otherwise, since the date of the most recent audited Financial Statements;

(c)    Customer shall allow Clearing Agent from time to time to visit its offices, inspect its books and records and discuss Customer's business with its management and officers, all at reasonable times and with prior notice; and

(d)    Customer shall not use the services provided by Clearing Agent hereunder in any manner that is in violation of or will result in the violation of any law, rule or regulation (including but not limited to, those of any self-regulatory organization) applicable to Customer.

## ARTICLE III
## CUSTODY AND RELATED SERVICES

1.    (a)    Subject to the terms hereof, Customer hereby authorizes Clearing Agent to hold any Securities received by it from time to time for Customer's account. Clearing Agent shall be entitled to utilize Depositories and Subcustodians to the extent possible in connection with its performance hereunder. Securities and cash deposited by Clearing Agent in a Depository will be held subject to the rules, terms and conditions of such Depository. Securities and cash held through Subcustodians shall be held subject to the terms and conditions of Clearing Agent's agreements with such Subcustodians. Subcustodians may be authorized to hold Securities in central securities depositories or clearing agencies in which such Subcustodians participate. Unless otherwise required by local law or practice, the rules of a particular Depository or a particular subcustodian agreement, Securities deposited with a Depository or Subcustodian will be held in an account in the name of Clearing Agent as agent for the Customer. Clearing Agent shall identify on its books and records the Securities and cash belonging to Customer, whether held directly or indirectly through Depositories or Subcustodians.

(b)    Unless Clearing Agent has received Oral or Written Instructions to the contrary or applicable law otherwise requires, Clearing Agent shall hold Securities indirectly through a Subcustodian only if (i) the Securities are not subject to any right, charge, security interest, lien or claim of any kind in favor of such Subcustodian or the creditors or operators of any of them, including a receiver or trustee in bankruptcy or similar authority, except for a claim of payment for the safe custody or administration of Securities or for funds advanced on behalf of Customer by such Subcustodian, and (ii) beneficial ownership of the Securities is freely transferable without the payment of money or value other than for safe custody or administration.

2.    Clearing Agent shall furnish Customer with an advice of daily transactions and a monthly summary of all transfers to or from the Accounts. Clearing Agent shall send all advices, confirmations and statements in hard copy form to the address specified by Customer. Customer may elect to receive advices, confirmations or statements electronically through the Internet to an email address specified by it for such purpose. By electing to use the Internet for this purpose, Customer acknowledges that such

BNY-Trustee-00004637

- 4 -

transmissions are not encrypted and therefore are insecure. Customer further acknowledges that there are other risks inherent in communicating through the Internet such as the possibility of virus contamination and disruptions in service, and agrees that Clearing Agent shall not be responsible for any loss, damage or expense suffered or incurred by Customer or any person claiming by or through Customer as a result of the use of such methods.

3.     With respect to all Securities held hereunder, Clearing Agent shall, unless otherwise instructed to the contrary:

(a)     Receive all income and other payments and advise Customer as promptly as practicable of any such amounts due but not paid;

(b)     Present for payment and receive the amount paid upon all Securities which may mature and advise Customer as promptly as practicable of any such amounts due but not paid;

(c)     Forward to Customer copies of all information or documents that it may receive from an issuer of Securities which, in the opinion of Clearing Agent, are intended for the beneficial owner of Securities;

(d)     Execute, as Clearing Agent, any certificates of ownership, affidavits, declarations or other certificates under any tax laws now or hereafter in effect in connection with the collection of bond and note coupons;

(e)     Hold directly or through a Depository or Subcustodian all rights and similar Securities issued with respect to any Securities credited to an Account hereunder; and

(f)     Endorse for collection checks, drafts or other negotiable instruments.

4.     (a)     Clearing Agent shall notify Customer of such rights or discretionary actions or of the date or dates by when such rights must be exercised or such action must be taken provided that Clearing Agent has received, from the issuer or the relevant Depository (with respect to Securities issued in the United States) or from the relevant Subcustodian, Depository or a nationally or internationally recognized bond or corporate action service to which Clearing Agent subscribes, timely notice of such rights or discretionary corporate action or of the date or dates such rights must be exercised or such action must be taken. Absent actual receipt of such notice, Clearing Agent shall have no liability for failing to so notify Customer.

(b)     Whenever Securities (including, but not limited to, warrants, options, tenders, options to tender or non-mandatory puts or calls) confer optional rights on Customer or provide for discretionary action or alternative courses of action by Customer, Customer shall be responsible for making any decisions relating thereto and for directing Clearing Agent to act. In order for Clearing Agent to act, it must receive Customer's Written Instructions at Clearing Agent's offices where the Account is administered, addressed as Clearing Agent may from time to time request, not later than noon at least two (2) Business Days prior to the last scheduled date to act with respect to such Securities (or such earlier date or time as Clearing Agent may notify Customer). Absent Clearing Agent's timely receipt of such Written Instructions, Clearing Agent shall not be liable for failure to take any action relating to or to exercise any rights conferred by such Securities.

5.     All voting rights with respect to Securities, however registered, shall be exercised by Customer or its designee. For Securities issued in the United States, Clearing Agent's only duty shall be to mail to Customer any documents (including proxy statements, annual reports and signed proxies) relating to the exercise of such voting rights. With respect to Securities issued outside of the United States, Clearing Agent will provide Customer with access to a provider of global proxy services at Customer's request. Customer shall be responsible for all costs associated with its use of such services. If Customer determines not to utilize the services of such global proxy services provider, Clearing Agent will endeavor to provide Customer with proxy material actually received by Clearing Agent from Subcustodians, but otherwise shall have no obligations with respect to voting.

6.     Clearing Agent shall promptly advise Customer upon its notification of the partial redemption, partial payment or other action affecting less than all Securities of the relevant class. If Clearing Agent, any Subcustodian or Depository holds any Securities in which Customer has an interest as part of a fungible mass, Clearing Agent, such Subcustodian or Depository may select the Securities to participate in such partial redemption, partial payment or other action in any non-discriminatory manner that it customarily uses to make such selection.

7.     Clearing Agent shall not under any circumstances accept bearer interest coupons which have been stripped from United States federal, state or local government or agency securities unless explicitly agreed to by Clearing Agent in writing.

8.     Customer shall be liable for all taxes, assessments, duties and other governmental charges, including any interest or penalty with respect thereto ("Taxes"), with respect to any cash or Securities held on behalf of Customer or any transaction related

BNY-Trustee-00004638

- 5 -

thereto. Customer shall indemnify Clearing Agent and each Subcustodian for the amount of any Tax that Clearing Agent, any such Subcustodian or any other withholding agent is required under applicable laws (whether by assessment or otherwise) to pay on behalf of, or in respect of income earned by or payments or distributions made to or for the account of Customer (including any payment of Tax required by reason of an earlier failure to withhold). Clearing Agent shall, or shall instruct the applicable Subcustodian or other withholding agent to, withhold the amount of any Tax which is required to be withheld under applicable law upon collection of any dividend, interest or other distribution made with respect to any Security and any proceeds or income from the sale, loan or other transfer of any Security. In the event that Clearing Agent or any Subcustodian is required under applicable law to pay any Tax on behalf of Customer, Clearing Agent is hereby authorized to withdraw cash from any cash account in the amount required to pay such Tax and to use such cash, or to remit such cash to the appropriate Subcustodian, for the timely payment of such Tax in the manner required by applicable law. If the aggregate amount of cash in all cash accounts is not sufficient to pay such Tax, Clearing Agent shall promptly notify Customer of the additional amount of cash (in the appropriate currency) required, and Customer shall directly deposit such additional amount in the appropriate cash account promptly after receipt of such notice, for use by Clearing Agent as specified herein. In the event that Customer reasonably believes that Customer is eligible, pursuant to applicable law or to the provisions of any tax treaty, for a reduced rate of, or exemption from, any Tax which is otherwise required to be withheld or paid on behalf of Customer under any applicable law, Clearing Agent shall, or shall instruct the applicable Subcustodian or withholding agent to, either withhold or pay such Tax at such reduced rate or refrain from withholding or paying such Tax, as appropriate; provided that Clearing Agent shall have received from Customer all documentary evidence of residence or other qualification for such reduced rate or exemption required to be received under such applicable law or treaty. In the event that Customer reasonably believes that a reduced rate of, or exemption from, any Tax is obtainable only by means of an application for refund, Clearing Agent and the applicable Subcustodian shall have no responsibility for the accuracy or validity of any forms or documentation provided by Customer to Clearing Agent hereunder. Customer hereby agrees to indemnify and hold harmless Clearing Agent and each Subcustodian in respect of any liability arising from any underwithholding or underpayment of any Tax which results from the inaccuracy or invalidity of any such forms or other documentation, and such obligation to indemnify shall be a continuing obligation of Customer , its Successors and Assigns, notwithstanding the termination of this Agreement.

9.     (a)     For the purpose of settling Securities and foreign exchange transactions, Customer shall provide Clearing Agent with sufficient immediately available funds for all transactions by such time and date as conditions in the relevant market dictate. As used herein, "sufficient immediately available funds" shall mean either (i) sufficient cash denominated in the currency of Customer's home jurisdiction to purchase the necessary foreign currency, or (ii) sufficient applicable foreign currency, to settle the transaction. Clearing Agent shall provide Customer with immediately available funds each day which result from the actual settlement of all sale transactions, based upon advices received by Clearing Agent from its Subcustodians and Depositories. Such funds shall be in the currency of Customer's home jurisdiction or such other currency as Customer may specify to Clearing Agent.

(b)     Any foreign exchange transaction effected by Clearing Agent in connection with this Agreement may be entered with Clearing Agent or a BNY Affiliate acting as principal or otherwise through customary banking channels. Customer may issue standing Written Instructions with respect to foreign exchange transactions but Clearing Agent may establish rules or limitations concerning any foreign exchange facility made available to Customer. Customer shall bear all risks of investing in Securities or holding cash denominated in a foreign currency. Without limiting the foregoing, Customer shall bear the risks that rules or procedures imposed by Depositories, exchange controls, asset freezes or other laws, rules, regulations or orders shall prohibit or impose burdens or costs on the transfer to, by or for the account of Customer of Securities or cash held outside Customer's jurisdiction or denominated in a currency other than its home jurisdiction or the conversion of cash from one currency into another currency. Clearing Agent shall not be obligated to substitute another currency for a currency whose transferability, convertibility or availability has been affected by such law, regulation, rule or procedure. Neither Clearing Agent nor any Subcustodian shall be liable to Customer for any loss resulting from any of the foregoing events.

10.     To the extent that Clearing Agent has agreed to provide pricing information services in connection with this Agreement, Clearing Agent is authorized to utilize any vendor (including brokers and dealers of Securities) reasonably believed by Clearing Agent to be reliable to provide such information. Customer understands that certain pricing information with respect to complex financial instruments (e.g., derivatives) may be based on calculated amounts rather than actual market transactions and may not reflect actual market values, and that the variance between such calculated amounts and actual market values may or may not be material. Where pricing information vendors do not provide information for particular Securities or other property, an Authorized Person may advise Clearing Agent regarding the fair market value of such Securities or property, as determined by it in good faith. Customer agrees to hold Clearing Agent harmless from and against any loss, damage or expense incurred as a result of errors or omissions with respect to any pricing information utilized by Clearing Agent hereunder.

11.     As an accommodation to Customer, Clearing Agent may provide consolidated recordkeeping services pursuant to which Clearing Agent reflects on Account statements Securities positions for which Clearing Agent has no safekeeping or other responsibility under this Agreement ("Non-Custody Securities"). Non-Custody Securities shall be designated on Clearing Agent's books as "shares not held" or by other similar characterization. Customer acknowledges and agrees that Clearing Agent shall rely,

BNY-Trustee-00004639

- 6 -

without independent verification, on information provided by Customer regarding Non-Custody Securities (including but not limited to Account positions and market valuations) and shall have no responsibility whatsoever with respect to Non-Custody Securities or the accuracy of any information maintained on Clearing Agent's books or set forth on account statements concerning Non-Custody Securities.

      12.     From time to time Clearing Agent may make available to Customer or its agent(s) certain investment and analytic tools ("Tools") which may be used to evaluate Securities in the Account and compliance with Customer's investment guidelines and investment criteria. Such Tools, whether or not modified to meet specific needs of Customer, are provided "AS IS" and CLEARING AGENT DISCLAIMS ANY AND ALL WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THE TOOLS, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY, TITLE, NON-INFRINGEMENT AND FITNESS FOR A PARTICULAR PURPOSE. ANYTHING IN THIS AGREEMENT TO THE CONTRARY NOTWITHSTANDING, CLEARING AGENT SHALL NOT BE LIABLE FOR ANY LOSS, EXPENSE, DAMAGE, LIABILITY OR CLAIM SUFFERED OR INCURRED BY CUSTOMER OR ANY OTHER PERSON AS A RESULT OF USE OF, OR RELIANCE UPON, ANY TOOLS BY CUSTOMER OR ANY OTHER PERSON.

### ARTICLE IV
### PURCHASE AND SALE OF SECURITIES;
### CREDITS TO ACCOUNT

      1.     Promptly after each purchase or sale of Securities by Customer, Customer shall deliver to Clearing Agent Written Instructions specifying all information necessary for Clearing Agent to settle such purchase or sale. Clearing Agent shall account for all purchases and sales of Securities on the actual settlement date unless otherwise agreed by Clearing Agent. The parties intend that all purchases and sales of Securities by Customer shall be settled by Clearing Agent solely through the Account(s), and Customer shall not deliver to Clearing Agent any Oral or Written Instructions to settle any such transaction through any Segregated Account.

      2.     Customer understands that when Clearing Agent is instructed to deliver Securities against payment, delivery of such Securities and receipt of payment therefor may not be completed simultaneously. Customer assumes full responsibility for all credit risks involved in connection with Clearing Agent's delivery of Securities pursuant to instructions of Customer.

      3.     Clearing Agent may, as a matter of bookkeeping convenience or by separate agreement with Customer, credit the Account with the proceeds from the sale, redemption or other disposition of Securities or interest, dividends or other distributions payable on Securities prior to its actual receipt of final payment therefor. All such credits shall be conditional until Clearing Agent's actual receipt of final payment and may be reversed by Clearing Agent to the extent that final payment is not received. Payment with respect to a transaction will not be "final" until Clearing Agent shall have received immediately available funds which under applicable local law, rule and/or practice are irreversible and not subject to any security interest, levy or other encumbrance, and which are specifically applicable to such transaction.

### ARTICLE V
### OVERDRAFTS OR INDEBTEDNESS

      1.     If Clearing Agent in its sole discretion advances funds in any currency hereunder or there shall arise for whatever reason an overdraft in an Account (including, without limitation, overdrafts incurred in connection with the settlement of securities transactions, funds transfers or foreign exchange transactions) or if Customer is for any other reason indebted to Clearing Agent, Customer agrees to repay Clearing Agent on demand the amount of the advance, overdraft or indebtedness plus accrued interest at a rate set by Clearing Agent in light of money market conditions, availability of funds and amount required, such rate to be made available to Customer on request.

      2.     In order to secure repayment of Customer's and each third party's obligations to Clearing Agent hereunder, Customer hereby pledges and grants to Clearing Agent a continuing lien and security interest in, and right of set-off against, all of Customer's right, title and interest in and to (a) all Accounts in Customer's name and the Securities, money and other property now or hereafter held in such Accounts (including proceeds thereof), (b) each Account in respect of which or for whose benefit the advance, overdraft or indebtedness relates and the Securities, money and other property now or hereafter held in such Account (including proceeds thereof), and (c) any other property at any time held by it for the account of Customer (collectively, the "Collateral"). In this regard, Clearing Agent shall be entitled to all the rights and remedies of a pledgee and secured creditor under applicable laws, rules or regulations as then in effect. Notwithstanding the interest of any other party in the Collateral, whether arising from transactions with Customer in Securities or from any other circumstances, Clearing Agent shall have a first and prior lien on the Collateral. Customer hereby grants Clearing Agent the right to foreclose upon the Collateral and to liquidate the Collateral upon the occurrence of an Event of Default (as defined in Article VII). Upon receipt from Customer of instructions to deliver any Security to any Segregated Account or other account maintained by Clearing Agent on behalf of Customer or to any third party, Clearing Agent shall be entitled to hold

BNY-Trustee-00004640

- 7 -

such Security in the Account and subject to the security interest in favor of Clearing Agent until Clearing Agent determines it has no loans, overdrafts or losses on its books for Customer or until Clearing Agent has received satisfactory collateral for all such loans, overdrafts or losses and until all money payments are final and irreversible.

3.      In connection with Securities whose purchase is financed by Clearing Agent hereunder, Clearing Agent may upon notice to Customer establish margin requirements applicable to such Securities.  Customer agrees to comply with such margin requirements and to provide Clearing Agent with additional collateral acceptable to Clearing Agent (also referred to herein as "Collateral") promptly upon demand whenever Clearing Agent determines that the market value of Securities financed by it hereunder plus applicable margin falls below the value of Collateral required by Clearing Agent to be maintained hereunder.

4.      To further assure Clearing Agent of its rights to the Collateral under this Agreement and secure repayment of Customer's obligations to Clearing Agent hereunder, Customer agrees to execute and deliver to Clearing Agent at any time and from time to time a security agreement in form and substance acceptable to Clearing Agent (the "Security Agreement").

## ARTICLE VI
## GENERAL TERMS AND CONDITIONS

1.      (a)      Except as otherwise expressly provided herein, Clearing Agent shall not be liable for any costs, expenses, damages, liabilities or claims, including attorneys' and accountants' fees (collectively, "Losses"), incurred by or asserted against Customer, except those Losses arising out of the gross negligence or wilful misconduct of Clearing Agent.  Clearing Agent shall have no liability whatsoever for the action or inaction of any Depository.  Subject to Section 1(b) below, Clearing Agent's responsibility with respect to any Securities or cash held by a Subcustodian is limited to the failure on the part of Clearing Agent to exercise reasonable care in the selection or retention of such Subcustodian in light of prevailing settlement and securities handling practices, procedures and controls in the relevant market.  With respect to any Losses incurred by Customer as a result of the acts or the failure to act by any Subcustodian (other than a BNY Affiliate), Clearing Agent shall take appropriate action to recover such Losses from such Subcustodian; and Clearing Agent's sole responsibility and liability to Customer shall be limited to amounts so received from such Subcustodian (exclusive of costs and expenses incurred by Clearing Agent).  In no event shall Clearing Agent be liable to Customer or any third party for special, indirect or consequential damages, or lost profits or loss of business, arising in connection with this Agreement.

(b)      Clearing Agent may enter into subcontracts, agreements and understandings with any BNY Affiliate, whenever and on such terms and conditions as it deems necessary or appropriate to perform its services hereunder.  No such subcontract, agreement or understanding shall discharge Clearing Agent from its obligations hereunder.

(c)      Customer agrees to indemnify Clearing Agent and hold Clearing Agent harmless from and against any and all Losses sustained or incurred by or asserted against Clearing Agent by reason of or as a result of any action or inaction, or arising out of Clearing Agent's performance hereunder, including reasonable fees and expenses of counsel incurred by Clearing Agent in a successful defense of claims by Customer; provided however, that Customer shall not indemnify Clearing Agent for those Losses arising out of Clearing Agent's gross negligence or wilful misconduct.  This indemnity shall be a continuing obligation of Customer, its successors and assigns, notwithstanding the termination of this Agreement.

2.      Without limiting the generality of the foregoing, Clearing Agent shall be under no obligation to inquire into, and shall not be liable for, any losses incurred by Customer or any other person as a result of the receipt or acceptance of fraudulent, forged or invalid Securities, or Securities which are otherwise not freely transferable or deliverable without encumbrance in any relevant market.

3.      Clearing Agent may, with respect to questions of law specifically regarding an Account, obtain the advice of counsel and shall be fully protected with respect to anything done or omitted by it in good faith in conformity with such advice.

4.      Clearing Agent shall be under no obligation to take action to collect any amount payable on Securities in default, or if payment is refused after due demand and presentment.

5.      Clearing Agent shall have no duty or responsibility to inquire into, make recommendations, supervise, or determine the suitability of any transactions affecting any Account.

6.      Customer shall pay to Clearing Agent the fees and charges as may be specifically agreed upon from time to time and such other fees and charges at Clearing Agent's standard rates for such services as may be applicable.  Customer shall reimburse Clearing Agent for all costs associated with the conversion of Customer's Securities hereunder and the transfer of Securities and

BNY-Trustee-00004641

- 8 -

records kept in connection with this Agreement. Customer shall also reimburse Clearing Agent for out-of-pocket expenses which are a normal incident of the services provided hereunder.

7.    Clearing Agent has the right to debit any cash account for any amount payable by Customer in connection with any and all obligations of Customer to Clearing Agent, whether or not relating to or arising under this Agreement. In addition to the rights of Clearing Agent under applicable law and other agreements, at any time when Customer shall not have honored any and all of its obligations to Clearing Agent, Clearing Agent shall have the right without notice to Customer to retain or set-off, against such obligations of Customer, any Securities or cash Clearing Agent or a BNY Affiliate may directly or indirectly hold for the account of Customer, and any obligations (whether matured or unmatured) that Clearing Agent or a BNY Affiliate may have to Customer in any currency. Any such asset of, or obligation to, Customer may be transferred to Clearing Agent and any BNY Affiliate in order to effect the above rights.

8.    (a)    Subject to the terms below, Clearing Agent shall be entitled to rely upon any Written or Oral Instructions actually received by Clearing Agent and reasonably believed by Clearing Agent to be duly authorized and delivered. Customer agrees to forward to Clearing Agent Written Instructions confirming Oral Instructions by the close of business of the same day that such Oral Instructions are given to Clearing Agent. Customer agrees that the fact that such confirming Written Instructions are not received or that contrary Written Instructions are received by Clearing Agent shall in no way affect the validity or enforceability of transactions authorized by such Oral Instructions and effected by Clearing Agent.

(b)    If Clearing Agent receives Written Instructions which appear on their face to have been transmitted by Customer via (i) computer facsimile, email, the Internet or other insecure electronic method, or (ii) secure electronic transmission containing applicable authorization codes, passwords and/or authentication keys, Customer understands and agrees that Clearing Agent cannot determine the identity of the actual sender of such Written Instructions and that Clearing Agent shall conclusively presume that such Written Instructions have been sent by an Authorized Person. Customer shall be responsible for ensuring that only Authorized Persons transmit such Written Instructions to Clearing Agent and that all Authorized Persons treat applicable user and authorization codes, passwords and/or authentication keys with extreme care.

(c)    Customer acknowledges and agrees that it is fully informed of the protections and risks associated with the various methods of transmitting Written Instructions to Clearing Agent and that there may be more secure methods of transmitting Written Instructions than the method(s) selected by Customer. Customer agrees that the security procedures (if any) to be followed in connection with its transmission of Written Instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances.

(d)    If Customer elects to transmit Written Instructions through an on-line communication system offered by Clearing Agent, Customer's use thereof shall be subject to the Terms and Conditions attached hereto as Appendix I. If Customer elects (with Clearing Agent's prior consent) to transmit Written Instructions through an on-line communications service owned or operated by a Third Party, Customer agrees that Clearing Agent shall not be responsible or liable for the reliability or availability of any such service.

9.    Upon reasonable request and provided Clearing Agent shall suffer no significant disruption of its normal activities, Customer shall have access to Clearing Agent's books and records relating to the Accounts during Clearing Agent's normal business hours. Upon reasonable request, copies of any such books and records shall be provided to Customer at Customer's expense.

10.    It is understood that Clearing Agent is authorized to supply any information regarding the Accounts which is required by any law, regulation or rule now or hereafter in effect.

11.    Clearing Agent shall not be responsible or liable for any failure or delay in the performance of its obligations under this Agreement arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including without limitation, acts of God; earthquakes; fires; floods; wars; civil or military disturbances; sabotage; epidemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; it being understood that Clearing Agent shall use its best efforts to resume performance as soon as practicable under the circumstances.

12.    Notwithstanding the fact that Clearing Agent from time to time, and whether or not as a regular pattern, makes loans or advances to Customer or makes funds available to Customer in anticipation of final payment for Securities delivered, Clearing Agent may at any time decline to continue or re-extend any such loan or advance, or any other credit, if Clearing Agent in its sole discretion deems any of such obligations to be insecure, or the risk of non-payment or non-performance by Customer to be increased.

BNY-Trustee-00004642

- 9 -

13.    Clearing Agent shall have no duties or responsibilities whatsoever except such duties and responsibilities as are specifically set forth in this Agreement, and no covenant or obligation shall be implied against Clearing Agent in connection with this Agreement.

## ARTICLE VII
## EVENTS OF DEFAULT

Clearing Agent shall have the right to terminate this Agreement, to demand repayment of any loans and other amounts owing hereunder and to liquidate any Collateral upon the occurrence of any of the following events (each, an "Event of Default"): (i) the commencement of a case or other proceeding seeking liquidation, reorganization or other similar relief with respect to Customer or its debts under any bankruptcy, insolvency or similar law or seeking the appointment of a receiver, trustee, liquidator, conservator, administrator, custodian or other similar official for Customer or Customer's property; (ii) the failure to pay, when due and payable, the principal amount of any advance, overdraft or indebtedness pursuant to Article IV hereof, (iii) the failure to pay within one (1) Business Day after the same shall become due and payable the interest on any advance, overdraft or indebtedness pursuant to Article V hereof, (iv) the failure to comply with any other provision of this Agreement, which failure shall continue for thirty (30) days; or (v) any default under the Security Agreement.

## ARTICLE VIII
## TERMINATION

Either party may terminate this Agreement by giving to the other party a notice in writing specifying the date of such termination, which shall be not less than thirty (30) days after the date of such notice; provided however, that Clearing Agent shall be entitled to terminate this Agreement immediately upon notice to Customer if (i) Clearing Agent for any reason determines that there is or has been a material adverse change in the financial position of Customer which might expose Clearing Agent to potential losses if it continued to act hereunder or that any advance, overdraft or indebtedness is insecure or that the risk of non-payment or non-performance of any of Customer's obligations hereunder is increased, or (ii) any representation or warranty made by Customer hereunder is incorrect or misleading in any material respect when made or repeated; and provided further, that Clearing Agent shall be entitled to terminate this Agreement immediately and without notice upon the occurrence of an Event of Default. Upon termination hereof, Customer shall pay to Clearing Agent such compensation as may be due to Clearing Agent, and shall likewise reimburse Clearing Agent for other amounts payable or reimbursable to Clearing Agent hereunder. Clearing Agent shall follow such reasonable Oral or Written Instructions concerning the transfer of custody of records, Securities and other items as Customer shall give; provided that (a) Clearing Agent shall have no liability for shipping and insurance costs associated therewith, and (b) full payment shall have been made to Clearing Agent of its compensation, costs, expenses and other amounts to which it is entitled hereunder. If any Securities or cash remain in any Account, Clearing Agent may deliver to Customer such Securities and cash. Upon termination of this Agreement, except as otherwise provided herein, all obligations of the parties to each other hereunder shall cease.

## ARTICLE IX
## MISCELLANEOUS

1.    Customer agrees to furnish to Clearing Agent a new Certificate of Authorized Persons in the event of any change in the then present Authorized Persons. Until such new Certificate is received, Clearing Agent shall be fully protected in acting upon Oral Instructions and Written Instructions of such present Authorized Persons.

2.    Any notice or other instrument in writing, authorized or required by this Agreement to be given to Clearing Agent, shall be sufficiently given if addressed to Clearing Agent and received by it at Clearing Agent's office as follows: **New York:** One Wall Street, New York, New York 10286; **Brussels:** 35 Avenue des Arts, 1040, Brussels, Belgium; **London:** One Canada Square, London E14 5AL; **Singapore:** One Temasek Avenue, 02-01Millenia Tower, Singapore 039192, or at such other place as Clearing Agent may from time to time designate in writing.

3.    Any notice or other instrument in writing, authorized or required by this Agreement to be given to Customer shall be sufficiently given if addressed to Customer and received by it at its offices at 650 DUNDEE ROAD, SUITE 400, NORTHBROOK IL 60062 USA                    , or at such other place as Customer may from time to time designate in writing.

4.    Each and every right granted to either party hereunder or under any other document delivered hereunder or in connection herewith, or allowed it by law or equity, shall be cumulative and may be exercised from time to time. No failure on the part of either party to exercise, and no delay in exercising, any right will operate as a waiver thereof, nor will any single or partial exercise by either party of any right preclude any other or future exercise thereof or the exercise of any other right.

BNY-Trustee-00004643

- 10 -

5.    In case any provision in or obligation under this Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions shall not in any way be affected thereby. This Agreement may not be amended or modified in any manner except by a written agreement executed by both parties. This Agreement shall extend to and shall be binding upon the parties hereto, and their respective successors and assigns; provided, however, that this Agreement shall not be assignable by either party without the written consent of the other.

6.    (a)    This Agreement shall be construed in accordance with the substantive laws of the State of New York, without regard to conflicts of laws principles thereof. Customer and Clearing Agent hereby consent to the jurisdiction of a state or federal court situated in New York City, New York in connection with any dispute arising hereunder. Customer hereby irrevocably waives, to the fullest extent permitted by applicable law, any objection which it may now or hereafter have to the laying of venue of any such proceeding brought in such a court and any claim that such proceeding brought in such a court has been brought in an inconvenient forum. Customer and Clearing Agent each hereby irrevocably waives any and all rights to trial by jury in any legal proceeding arising out of or relating to this Agreement.

(b)    **For Governmental Entities:** To the extent that in any jurisdiction Customer may now or hereafter be entitled to claim, for itself or its assets, immunity from suit, execution, attachment (before or after judgment) or other legal process, Customer irrevocably agrees not to claim, and it hereby waives, such immunity.

7.    Notwithstanding the fact that Clearing Agent may from time to time maintain an Account in the name of a third party, the parties hereto agree that in performing hereunder, Clearing Agent is acting solely on behalf of Customer and no contractual or service relationship shall be deemed to be established hereby between Clearing Agent and any such third party or any other person.

8.    This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but such counterparts shall, together, constitute only one instrument.

BNY-Trustee-00004644

- 11 -

**IN WITNESS WHEREOF,** Customer and Clearing Agent have caused this Agreement to be executed by their respective officers, thereunto duly authorized, as of the day and year first above written.

Sentinel Management Group, Inc.

By: _____

Title: President

Tax Identification No: 36-3083123

THE BANK OF NEW YORK

By: _____
Broker/Dealer Services

Title: Vice President

By: _____
Securities Industry
Banking Division

Title: Vice President

THE
BANK OF
NEW
YORK

globalc.doc
(4/02)

BNY-Trustee-00004645

APPENDIX I

THE BANK OF NEW YORK
ON-LINE COMMUNICATIONS SYSTEM (THE "SYSTEM")

TERMS AND CONDITIONS

1.      License; Use. (a) This Appendix I shall govern Customer's use of the System and any computer software provided by BNY to Customer in connection herewith (collectively, the "Software"). In the event of any conflict between the terms of this Appendix I and the main body of this Agreement with respect to Customer's use of the System, the terms of this Appendix I shall control.

(b) Upon delivery to Customer of Software and/or System access codes, Custodian grants to Customer a personal, nontransferable and nonexclusive license to use the Software and the System solely for the purpose of transmitting Written Instructions, receiving reports, making inquiries or otherwise communicating with Custodian in connection with the Account(s). Customer shall use the Software and the System solely for its own internal and proper business purposes and not in the operation of a service bureau. Except as set forth herein, no license or right of any kind is granted to Customer with respect to the Software or the System. Customer acknowledges that Custodian and its suppliers retain and have title and exclusive proprietary rights to the Software and the System, including any trade secrets or other ideas, concepts, know-how, methodologies, or information incorporated therein and the exclusive rights to any copyrights, trademarks and patents (including registrations and applications for registration of either), or other statutory or legal protections available in respect thereof. Customer further acknowledges that all or a part of the Software or the System may be copyrighted or trademarked (or a registration or claim made therefor) by Custodian or its suppliers. Customer shall not take any action with respect to the Software or the System inconsistent with the foregoing acknowledgments, nor shall Customer attempt to decompile, reverse engineer or modify the Software. Customer may not copy, sell, lease or provide, directly or indirectly, any of the Software or any portion thereof to any other person or entity without Custodian's prior written consent. Customer may not remove any statutory copyright notice or other notice included in the Software or on any media containing the Software. Customer shall reproduce any such notice on any reproduction of the Software and shall add any statutory copyright notice or other notice to the Software or media upon Custodian's request.

(c) If Customer subscribes to any database service provided by Custodian in connection with its use of the System, delivery of such database to Customer shall constitute the granting by Custodian to Customer of a non-exclusive, non-transferable license to use such database for so long as this Appendix I is in effect. It is understood and agreed that any database supplied by Custodian is derived from sources which Custodian believes to be reliable but Custodian does not, and cannot for the fees charged, guarantee or warrant that the data is correct, complete or current. All such databases are provided as an accommodation by Custodian to its customers and are compiled without any independent investigation by Custodian. However, Custodian will endeavor to update and revise each database on a periodic basis as Custodian, in its discretion, deems necessary and appropriate. Customer also agrees that Customer will promptly install all updates and revisions to each database which Custodian provides and that Custodian cannot bear any responsibility whatsoever for Customer's failure to do so. CUSTODIAN IS NOT RESPONSIBLE FOR ANY RESULTS OBTAINED BY CUSTOMER FROM USE OF DATABASE SERVICES PROVIDED BY CUSTODIAN.

2.      Equipment. Customer shall obtain and maintain at its own cost and expense all equipment and services, including but not limited to communications services, necessary for it to utilize the Software and obtain access to the System, and Custodian shall not be responsible for the reliability or availability of any such equipment or services.

3.      Proprietary Information. The Software, any data base and any proprietary data, processes, information and documentation made available to Customer (other than which are or become part of the public domain or are legally required to be made available to the public) (collectively, the "Information"), are the exclusive and confidential property of Custodian or its suppliers. However, for the avoidance of doubt, reports generated by Customer containing information relating to the Account(s) are not deemed to be within the meaning of the term "Information". Customer shall keep the Information confidential by using the same care and discretion that Customer uses with respect to its own confidential property and trade secrets, but not less than reasonable care. Upon termination of the Agreement or the licenses granted herein for any reason, Customer shall return to Custodian any and all copies of the Information which are in its possession or under its control. The provisions of this Section 3 shall not affect the copyright status of any of the Information which may be copyrighted and shall apply to all information whether or not copyrighted.

4.      Modifications. Custodian reserves the right to modify the Software from time to time and Customer shall install new releases of the Software as Custodian may direct. Customer agrees not to modify or attempt to modify the Software without Custodian's prior written consent. Customer acknowledges that any modifications to the Software, whether by Customer or Custodian and whether with or without Custodian's consent, shall become the property of Custodian.

5.      NO REPRESENTATIONS OR WARRANTIES. CUSTODIAN AND ITS MANUFACTURERS AND SUPPLIERS MAKE NO WARRANTIES OR REPRESENTATIONS WITH RESPECT TO THE SOFTWARE, THE SYSTEM, ANY SERVICES OR ANY DATABASE, EXPRESS OR IMPLIED, IN FACT OR IN LAW, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. CUSTOMER ACKNOWLEDGES THAT THE SOFTWARE, THE SYSTEM, ANY SERVICES AND ANY DATABASE ARE PROVIDED "AS IS." TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT SHALL CUSTODIAN OR ANY SUPPLIER BE LIABLE FOR ANY DAMAGES, WHETHER DIRECT, INDIRECT SPECIAL, OR CONSEQUENTIAL, WHICH CUSTOMER MAY INCUR IN CONNECTION WITH THE SOFTWARE, SERVICES OR ANY DATABASE, EVEN IF CUSTODIAN OR SUCH SUPPLIER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT SHALL CUSTODIAN OR ANY SUPPLIER BE LIABLE FOR ACTS OF GOD, MACHINE OR COMPUTER BREAKDOWN OR MALFUNCTION, INTERRUPTION OR MALFUNCTION OF COMMUNICATION FACILITIES, LABOR DIFFICULTIES OR ANY OTHER SIMILAR OR DISSIMILAR CAUSE BEYOND THEIR REASONABLE CONTROL.

6.      Security; Reliance; Unauthorized Use. Custodian will establish security procedures to be followed in connection with the System. Customer understands and agrees that the security procedures are intended to determine whether instructions received by Custodian through the System are authorized but are not (unless otherwise specified in writing) intended to detect any errors contained in such instructions. Customer will cause all persons utilizing the Software and the System to treat all applicable user and authorization codes, passwords and authentication keys with the highest degree of care and confidentiality. Custodian is hereby irrevocably authorized to comply with and rely upon Written Instructions, whether or not authorized, received by it through the System in accordance with the security procedures. Customer acknowledges that it is its sole responsibility to assure that only Authorized Persons use the System and that to the fullest extent permitted by applicable law Custodian shall not be responsible nor liable for any unauthorized use thereof or for any losses sustained by Customer arising from or in connection with the use of the System or Custodian's reliance upon and compliance with Written Instructions received through the System.

BNY-Trustee-00004646

7.    <u>System Acknowledgments</u>. Custodian shall acknowledge through the System its receipt of each transmission communicated through the System, and in the absence of such acknowledgment Custodian shall not be liable for any failure to act in accordance with such transmission and Customer may not claim that such transmission was received by Custodian.

8.    <u>EXPORT RESTRICTIONS</u>. EXPORT OF THE SOFTWARE IS PROHIBITED BY UNITED STATES LAW. CUSTOMER MAY NOT UNDER ANY CIRCUMSTANCES RESELL, DIVERT, TRANSFER, TRANSSHIP OR OTHERWISE DISPOSE OF THE SOFTWARE (IN ANY FORM) IN OR TO ANY OTHER COUNTRY.  IF CUSTODIAN DELIVERED THE SOFTWARE TO CUSTOMER OUTSIDE OF THE UNITED STATES, THE SOFTWARE WAS EXPORTED FROM THE UNITED STATES IN ACCORDANCE WITH THE EXPORT ADMINISTRATION REGULATIONS. DIVERSION CONTRARY TO U.S. LAW IS PROHIBITED. Customer hereby authorizes Custodian to report its name and address to government agencies to which Custodian is required to provide such information by law.

9.    <u>Encryption</u>.  Customer acknowledges and agrees that encryption may not be available for every communication through the System, or for all data.  Customer agrees that Custodian may deactivate any encryption features at any time, without notice or liability to Customer, for the purpose of maintaining, repairing or troubleshooting the System or the Software.

10.    <u>On-Line Inquiry and Modification of Records</u>. In connection with Customer's use of the System, Custodian may, at Customer's request, permit Customer to enter data directly into a Custodian database for the purpose of modifying certain information maintained by Custodian's systems, including, but not limited to, change of address information.  To the extent that Customer is granted such access, Customer agrees to indemnify and hold Custodian harmless from all loss, liability, cost, damage and expense (including attorney's fees and expenses) to which Custodian may be subjected or which may be incurred in connection with any claim which may arise out of or as a result of changes to Custodian database records initiated by Customer.

BNY-Trustee-00004647

**EXHIBIT I**

<div align="center">SECURITY AGREEMENT</div>

_New York_
(Banking Office)

_1/9/200 3_
(date)

FOR VALUE RECEIVED, and in order to induce THE BANK OF NEW YORK (the "Bank"), in its discretion, to make loans or otherwise extend credit at any time, and from time to time to, or at the request of, the undersigned (the "Debtor"), whether the loans or credit so extended shall be absolute or contingent, the Debtor hereby grants to the Bank, as security for all present or future obligations or liabilities of any and all kinds of the Debtor to it, whether due or to become due, secured or unsecured, absolute or contingent, and howsoever or whensoever acquired by the Bank, including interest accruing thereon before or after the commencement of any insolvency, bankruptcy or reorganization proceeding of the Debtor (whether or not such interest is an allowable claim in any proceeding and irrespective of the discharge or release of the Debtor in such proceeding) (all of which are referred to collectively as the "Obligations"), a security interest in and a lien upon all personal property and fixtures of the Debtor in or which the Debtor has an interest wherever located and whether now or hereafter existing or now owned or hereafter acquired and whether or not subject to the Uniform Commercial Code as in effect in the State of New York (the "Code"), including but not limited to any property specified in Schedule A hereto, and also including all interest, dividends and other distributions thereon paid and payable in cash or in property, and all replacements and substitutions for, and all accessions and additions to, and all products and proceeds of, all of the foregoing (all of which are referred to as the "Collateral").

The Debtor hereby agrees to deliver to the Bank whenever called for by it such additional collateral security of a kind and of a market value satisfactory to the Bank, so that there will, at all times, be with the Bank a margin of security for the payment of all Obligations which shall be satisfactory to it. In addition to the Bank's security interest in the Collateral, it shall have, and the Debtor hereby grants to the Bank, a security interest and a lien for all the Obligations in and upon any personal property of the Debtor or in which the Debtor may have an interest which is now or may at any time hereafter come into the possession or control of the Bank, or of any third party acting on its behalf, whether for the express purpose of being used by the Bank as collateral security or held in custody or for any other or different purpose, including such personal property as may be in transit by mail or carrier for any purpose, or covered or affected by any documents in the Bank's possession or control, or in the possession or control of any third party acting on its behalf (said additional personal property is also referred to as the "Collateral"). The Debtor hereby authorizes the Bank in its discretion, at any time, whether or not the Collateral is deemed by it adequate, to appropriate and apply upon any of the Obligations, when due, any of such property of the Debtor and to charge any of the Obligations against any balance of any account standing to the credit of the Debtor on the books of the Bank.

Upon failure of the Debtor to pay any Obligation when becoming or made due, in accordance with its terms, the Bank shall have, in addition to all other rights and remedies allowed by law, the rights and remedies of a secured party under the Code and, without limiting the generality of the foregoing, the Bank may immediately, without demand of performance and without notice of intention to sell or otherwise dispose of Collateral, or of time or place of sale or other disposition, or of redemption or other notice or demand whatsoever to the Debtor, all of which to the extent permitted by law are hereby expressly waived, and without advertisement, sell at public or private sale, grant options to purchase or otherwise realize upon, in the State of New York, or elsewhere, the whole or from time to time any part of the Collateral upon which the Bank shall have a security interest or lien as aforesaid, or any interest which the Debtor may have therein. After deducting from the proceeds of any such sale or other disposition of the Collateral all expenses (including, but not limited to, reasonable attorneys' fees and expenses and other expenses as set forth low), the Bank shall apply the remaining proceeds toward the payment of the Obligations, in such order as the Bank shall elect, the Debtor remaining liable for any deficiency remaining unpaid after such application, plus interest thereon. If notice of any sale or other disposition is required by law to be given, the Debtor hereby agrees that a notice sent at least five days before the time of any intended public sale or of the time after which any private sale or other disposition of the Collateral is to be made, shall be reasonable notice of such sale or other disposition. The Debtor also agrees to assemble the Collateral at such place or places as the Bank designates by written notice.

At any such sale or other disposition the Bank or any other person designated by the Bank may itself purchase the whole or any part of the Collateral sold, free from any right of redemption on the part of the Debtor, which right, to the extent permitted by law, is hereby waived and released.

The Bank may, without any notice to the Debtor, in its discretion, whether or not any of the Obligations are due, in its name or in the name of the Debtor, demand, sue for, collect and receive any money or property at any time due, payable or receivable on or on account of or in exchange for, and may compromise, settle or extend the time of payment of, any of the demands or obligations represented by any of the Collateral, and may also exchange any of the Collateral for other property upon the reorganization, recapitalization or other readjustment of the issuer, maker or other person who is obligated on or otherwise has liabilities with respect to the Collateral, and in connection therewith may deposit any of the Collateral with any committee or depositary upon such terms as the Bank may in its discretion deem appropriate, and the Debtor does hereby constitute and appoint the Bank the Debtor's true and

BNY-Trustee-00004648

lawful attorney to compromise, settle or extend payment of said demands or obligations and exchange such Collateral as the Debtor might or could do personally; all without liability or responsibility for action herein authorized and taken or not taken in good faith. The Bank is entitled at any time in its discretion to notify an account debtor or the obligor on any instrument to make payment to it, regardless of whether or not the Debtor had been previously making collections on the Collateral, and the Bank may take control of any proceeds of any of the Collateral. Upon request of the Bank, the Debtor shall receive and hold all proceeds of the Collateral in trust for the Bank and not commingle any collections with any of its own funds and immediately deliver such collections to the Bank.

The Debtor agrees that the Collateral secures, and further agrees to pay on demand, all expenses (including, but not limited to, reasonable attorneys' fees and expenses and costs of any insurance and payment of taxes or other charges) of, or incidental to, the custody, care, sale or collection of, or realization upon, any of the Collateral or in any way relating to the enforcement or protection of the rights of the Bank hereunder, whether or not litigation is commenced.

The Debtor agrees to mark its books and records as the Bank shall request in order to reflect the rights of the Bank granted herein, and the Bank may, in its sole discretion, take possession of the Collateral at any time, either prior to or subsequent to a default under any of the Obligations. The Debtor agrees to maintain such insurance on the Collateral as the Bank may require. The Bank may, without notice to the Debtor, in its discretion, and for its own benefit, lend, use, transfer or repledge to any third party all or any part of the Collateral by itself or commingled with the property of others, in bulk or otherwise. The Bank may, without notice to the Debtor, sell, assign or transfer any of the Obligations and the Bank's rights and duties hereunder, and may deliver the Collateral, or any part thereof, to the assignee or transferee of any of the Obligations, who shall become vested with all the rights, remedies, powers, security interests and liens herein given to the Bank in respect thereto; and the Bank shall thereafter be relieved and fully discharged from any liability or responsibility in the premises.

The Bank may, without notice to the Debtor, in its discretion, transfer, or cause to be transferred, all or any part of the Collateral to its name, or to the name of its nominee, vote the Collateral so transferred, and receive income and make or receive collections, including money, thereon and hold said income and collections as Collateral or apply said income and collections to any of the Obligations, the manner and distribution of the application to be made as the Bank shall elect.

Calls for Collateral, demand for payment or notice to the Debtor may be given by leaving same at the address given below or any other address hereafter filed with the Bank, or by mailing same to such address with the same effect as if delivered personally. Such notice given in the manner herein provided shall be effective whether or not received by the Debtor.

With respect to the Collateral, the Bank shall be under no duty to send notices, perform services, exercise any rights of collection, enforcement, conversion or exchange, vote, pay for insurance, taxes or other charges or take any action of any kind in connection with the management thereof and its only duty with respect thereto shall be to use reasonable care in its custody and preservation while in its possession, which shall not include any steps necessary to preserve, obtain, secure or acquire rights or property against or from any parties.

The Debtor authorizes the Bank, at the Debtor's expense, to file one or more financing statements and amendments thereto to perfect the security interests granted herein, without the Debtor's signature thereon, and the Debtor agrees to do, file, record, make, execute and deliver all such acts, deeds, things, agreements, notices, instruments and financing statements as the Bank may request in order to perfect and enforce the rights of the Bank herein.

If at any time it is necessary in the opinion of counsel to the Bank that any or all of the securities held as Collateral (the "Pledged Securities") be registered under the Securities Act of 1933, as amended, or that an indenture with respect thereto be qualified under the Trust Indenture Act of 1939, as amended, in order to permit the sale or other disposition of the Pledged Securities, the Debtor shall at the Bank's request and at the expense of the Debtor use its best efforts promptly to cause the registration of the Pledged Securities and the qualification of such indenture and to continue such registration and qualification under such laws and in such jurisdictions and for as long as deemed appropriate by the Bank.

The Debtor hereby authorizes the Bank to date this agreement as of the date of the granting of any Obligation secured hereby and to complete any blank space herein (including any schedule hereto) according to the terms upon which said Obligation was granted.

This agreement may not be amended orally or by course of dealing, but only by a writing signed by an authorized officer of the Bank.

No failure on the part of the Bank to exercise, and no delay in exercising, any right, remedy or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise by the Bank of any right, remedy or power hereunder preclude any other or future exercise thereof or the exercise of any other right, remedy or power.

BNY-Trustee-00004649

Each and every right, remedy and power hereby granted to the Bank or allowed it by law or other agreement shall be cumulative and not exclusive of any other right, remedy or power, and may be exercised by the Bank at any time and from time to time.

This agreement may be assigned by the Bank and its benefits shall inure to the successors, indorsees and assigns of the Bank.

This agreement shall be construed and interpreted, and all rights and obligations hereunder shall be determined, in accordance with the laws of the State of New York without regard to principles of conflict of laws.

Unless otherwise defined or the text otherwise requires, all terms used herein shall have the meanings specified in the Code.

Every provision of this agreement is intended to be severable; if any term or provision of this agreement shall be invalid, illegal or unenforceable for any reason whatsoever, the validity, legality and enforceability of the remaining provisions hereof shall not in any way be affected or impaired thereby.

Any notice to the Bank shall be effective only upon receipt by the Bank at its banking office set forth above or any other address hereafter specified by written notice from the Bank to the Debtor.

The Debtor represents and warrants to the Bank that any information furnished to the Bank regarding the Collateral shall be true and correct on the date hereof and is complete in all material respects.

IF DEBTOR IS A CORPORATION:

The Debtor represents and warrants that it is a corporation duly organized, validly existing and in good standing under the laws of the state of its incorporation; that the execution, delivery and performance of this agreement are within the Debtor's corporate powers and have been duly authorized by all necessary action of its board of directors and shareholders; and that each person executing this agreement has the authority to execute and deliver this agreement on behalf of the Debtor.

IF DEBTOR IS A LIMITED LIABILITY COMPANY:

The Debtor represents and warrants that it is a limited liability company duly organized, validly existing and in good standing under the laws of the state of its organization; that the execution delivery and performance of this agreement are within the Debtor's company powers and have been duly authorized by all necessary action of its members; and that each person executing this agreement has the authority to execute and deliver this agreement on behalf of the Debtor.

IF DEBTOR IS A PARTNERSHIP:

The Debtor represents and warrants that it is a partnership duly formed under the laws of the state of its formation; that the execution, delivery and performance of this agreement are within the Debtor's partnership powers and have been duly authorized by all necessary action of its partners and do not contravene the provisions of its partnership agreement; and that each person executing this agreement has the authority to execute and deliver this agreement on behalf of the Debtor.

**THE DEBTOR SUBMITS TO THE JURISDICTION OF STATE AND FEDERAL COURTS LOCATED IN THE CITY AND STATE OF NEW YORK IN PERSONAM AND AGREES THAT ALL ACTIONS AND PROCEEDINGS RELATING DIRECTLY OR INDIRECTLY TO THIS AGREEMENT SHALL BE LITIGATED ONLY IN SAID COURTS OR IN COURTS LOCATED ELSEWHERE AS THE BANK MAY SELECT AND THAT SUCH COURTS ARE CONVENIENT FORUMS AND WAIVES PERSONAL SERVICE UPON IT AND CONSENTS TO SERVICE OF PROCESS OUT OF SAID COURTS BY MAILING A COPY THEREOF TO IT BY REGISTERED OR CERTIFIED MAIL.**

**THE DEBTOR AND THE BANK WAIVE THE RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

BNY-Trustee-00004650

SENTINEL MANAGEMENT Group, Inc.
(Name of Debtor)

By _____

Name: ERIC A. BLOOM

Title: PRESIDENT

Address: 650 DUNDEE RD
STE 460
NORTHBROOK IL 60062

---

## SCHEDULE A

### TO

### SECURITY AGREEMENT

### EXECUTED BY

SENTINEL MANAGEMENT Group, Inc.
(Name of Debtor)

Property specifically included as "Collateral" for purposes of the within Security Agreement:

Any and all Securities and other property held in the Account, as these terms are defined in the Global Clearing and Custody Agreement between the Debtor and the Bank, and any cash balances held in any cash account maintained by the Bank in connection therewith.

BNY-Trustee-00004651

# EXHIBIT C

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| **SENTINEL MANAGEMENT GROUP, INC.,** | ) | **CASE NO. 07 B 14987** |
|  | ) |  |
| Debtor. | ) | Hon. John H. Squires |
| ——————————————————— | ) |  |
|  | ) |  |
| **FREDERICK J. GREDE**, as Chapter 11 Trustee | ) |  |
| for Sentinel Management Group, Inc., | ) |  |
|  | ) |  |
| Plaintiff, | ) | **ADV. NO. _____** |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| **THE BANK OF NEW YORK** and | ) |  |
| **THE BANK OF NEW YORK MELLON** | ) |  |
| **CORP.,** | ) |  |
|  | ) |  |
| Defendants. | ) |  |

## COMPLAINT

Plaintiff Frederick J. Grede, not individually but as Chapter 11 Trustee ("the Trustee") for Sentinel Management Group, Inc. ("Sentinel" or "Debtor"), hereby states for his Complaint as follows:

### NATURE OF THE ACTION

1.      This is an adversary proceeding by the Trustee against The Bank of New York and The Bank of New York Mellon Corp. (hereafter collectively referred to as "BONY"). For more than ten years BONY performed three roles for Sentinel, acting as custodian of securities on behalf of Sentinel and its customers, clearing agent for Sentinel's securities transactions, and lender to Sentinel.

2.      In August 2007, Sentinel's business collapsed, costing Sentinel and its customers hundreds of millions of dollars. BONY's misconduct played a pivotal role in that collapse, in at least four distinct ways.

3.      ~~First, **_BONY established a fundamentally flawed account structure for Sentinel's_**~~

*accounts in violation of its obligations under federal law and its duties to Sentinel.* ~~The account structure: (a) commingled customer assets,[1] which should have been strictly segregated, with Sentinel's own assets and the assets of other customers; (b) facilitated the misuse of customer assets as security for BONY's loan to Sentinel; and (c) allowed BONY, on a daily basis, to apply the proceeds of virtually every securities transaction involving customer assets to pay down a portion of Sentinel's debt to BONY.~~

4.      Second, ***BONY aided and abetted breaches*** *of **fiduciary duty committed by certain Sentinel insiders.*** These Sentinel insiders misused what were supposed to be customer securities for their own financial benefit, causing Sentinel hundreds of millions of dollars in losses. BONY colluded in and knowingly facilitated this misconduct.

5.      Third, ***BONY knowingly accepted fraudulent and preferential transfers as part*** *of **the Sentinel insiders' scheme,*** disregarding the overwhelming evidence that the insiders were acting improperly.

6.      Fourth, ***BONY engaged in inequitable conduct.*** BONY's bad faith and inequitable conduct included: (a) ~~violating the Commodity Exchange Act and participating in violations of the Investment Advisers Act of 1940;~~ (b) extending credit to Sentinel far in excess of any reasonable line of credit for Sentinel's business, having actual knowledge that Sentinel did not have sufficient assets to secure that credit and would need to use customer assets to secure those loans; (c) ~~illegally transferring securities from a segregated customer account to a collateral account in order to secure its own loan;~~ (d) ~~consistently preferring its own pecuniary interests as a lender to its obligations under federal law and its duty to segregate and hold in custody Sentinel's customer assets; and (e) asserting liens over assets which it knew were intended to be segregated for customers.~~

7.      BONY's motive to participate in this misconduct was pecuniary: it generated tens of

---

1      ~~Unless noted otherwise, the terms "customer assets" and "customer securities" are used in this Complaint to describe assets and securities which were supposed to be, but were not, separately accounted for and segregated for the benefit of customers.~~

millions of dollars in interest income on its ever-increasing loan to Sentinel. Indeed, as a BONY officer explained in an email to colleagues on April 24, 2006: "Sentinel Investment Management is one of SIBD (and the Bank's) biggest customers in regard to Credit (loans)."

8.    ~~Absent the unlawful account structure established by BONY and BONY's other misconduct, Sentinel's collapse would not have occurred, and Sentinel would not have suffered hundreds of millions of dollars in losses and increased liabilities.~~

9.    The Trustee brings this action for, among other causes of action, avoidance and recovery of fraudulent and preferential transfers, equitable subordination and transfer of subordinated lien, aiding and abetting breaches of fiduciary duty, disallowance of proof of claim, and a determination that the liens asserted by BONY cannot be enforced and are invalid.

10.    This Complaint seeks damages exceeding Five Hundred and Fifty Million Dollars ($550,000,000).

## JURISDICTION AND VENUE

11.    This Court has jurisdiction pursuant to 28 U.S.C. § 1334(b) because this adversary proceeding arises in, is related to, and arises under the Chapter 11 case, *In Re Sentinel Management Group, Inc.,* pending in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, as Case No. 07 B 14987.

12.    Venue is proper in this District pursuant to 28 U.S.C. § 1409(a).

13.    This Complaint is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (C), (D), (E), (F), (H), (K) and (O).

14.    BONY has expressly submitted itself to the equitable jurisdiction of this Court by, *inter alia,* filing a proof of claim and demanding adequate protection and by filing a complaint for declaratory judgment.

15.    The Trustee is the representative of the Debtor's estate and has standing to bring each

of the claims set forth in this Complaint pursuant to section 323 of the Bankruptcy Code. To the extent any of the claims set forth herein seek recovery of, or arise from or relate to, any transfers of customer assets to or for the benefit of BONY, such transferred assets are property of the Debtor's estate ~~by virtue of, among other things, the Debtor's failure to separately account for those assets, the commingling of those assets,~~ Sentinel's treatment of those assets, and the other facts and circumstances of the Debtor's case.

16.    The Debtor's case is pending as a case under chapter 11 of the Bankruptcy Code. In the event that this Court converts the Debtor's case to a case under subchapter III of chapter 7 of the Bankruptcy Code (Stockbroker Liquidation) and/or subchapter IV of chapter 7 of the Bankruptcy Code (Commodity Broker Liquidation), the Trustee reserves the right to assert any additional claims and causes of action which he may be entitled to assert under such subchapters of chapter 7 of the Bankruptcy Code, including but not limited to claims under sections 749 and 764 of the Bankruptcy Code.

**THE PARTIES AND RELATED ENTITIES**

17.    Plaintiff Frederick J. Grede is the chapter 11 trustee for the Debtor, duly appointed under section 1104 of the Bankruptcy Code by Orders of this Court dated August 23 and 29, 2007.

18.    Defendant The Bank of New York is, on information and belief, a state-chartered bank with its principal place of business in New York, New York. It is a subsidiary of Defendant The Bank of New York Mellon Corp.

19.    Defendant The Bank of New York Mellon Corp. is a corporation organized under the laws of Delaware, with its principal place of business in New York, New York. It is the successor-in-interest to The Bank of New York, Inc. and was formed in July 2007 by a merger between The Bank of New York, Inc. and Mellon Financial Corporation.

20.    BONY has offices in 34 countries on six continents. It holds itself out to the public as one of the world's leading banks, with more than $20 trillion in assets under custody and

administration. BONY claims on its website that it "has a rich and long history of providing custody and investment services." It also claims that its "ability to support the highest quality securities processing solutions almost anywhere in the world ensures that we remain the provider of choice for leading institutions around the globe."

21.    Sentinel is an Illinois corporation, headquartered in Northbrook, Illinois. Sentinel is registered with the Securities and Exchange Commission ("SEC") as an investment adviser ("Investment Adviser"), and with the U.S. Commodity Futures Trading Commission ("CFTC") as a futures commission merchant ("FCM"). It is also a member of the National Futures Association ("NFA"), which is Sentinel's designated self-regulatory organization ("DSRO").

22.    Philip Bloom, Eric Bloom, and Charles Mosley (the "Sentinel Insiders") were officers and directors of Sentinel who participated in a scheme to defraud Sentinel and to breach their fiduciary duties to Sentinel. There were at all relevant times one or more officers and employees of Sentinel who were not part of the Sentinel Insiders' scheme.

## BACKGROUND

A.    Sentinel's business and the customer "SEGs"

23.    Sentinel managed investments of cash for various clients, including commodity brokers (also known as futures commission merchants or "FCMs"), hedge funds, financial institutions, pension funds, and individuals.

24.    Sentinel divided its customers into three groups and was supposed to strictly segregate the investments of these three customer groups from each other and from Sentinel's own funds.

25.    The first customer group, known within Sentinel as SEG 1, was supposed to consist solely of the funds and property of customers of other FCMs, which typically invested their customers' funds through Sentinel in order to take advantage of Sentinel's purported cash management and investment expertise.

26.     The second customer group, known within Sentinel as SEG 2, was supposed to consist solely of the funds and property of customers of other FCMs that were engaged in trading at foreign exchanges.

27.     The third customer group, known within Sentinel as SEG 3, was supposed to consist of the funds and property of all other types of clients, including FCM house (i.e., non-customer) funds, as well as the funds and property of hedge funds, trust accounts, endowments and individuals.

28.     In addition to managing investments for the SEG 1, SEG 2, and SEG 3 customer portfolios, Sentinel owned a "House" or "Street" portfolio of securities traded by Sentinel for the ultimate benefit of the Sentinel Insiders.

B.     ~~Regulatory requirements applicable to Sentinel's business~~

    i.     *~~The Commodity Exchange Act and CFTC Rules~~*

29.     ~~FCMs are permitted to deposit their customer funds only with certain types of banks, depositories or other FCMs. Sentinel registered with the CFTC as an FCM, and thus was able to manage customer funds belonging to other FCMs. Unlike traditional FCMs, however, Sentinel did not engage in any commodities trading for its customers, but instead only invested funds deposited by other FCMs and Sentinel's other customers.~~

30.     ~~Because Sentinel was an FCM managing funds required to be segregated for the benefit of customers, Sentinel and any depository bank selected by Sentinel as custodian for funds belonging to customers were subject to the provisions of the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.* ("the CEA") and CFTC rules and regulations promulgated pursuant to the CEA, 17 C.F.R. §§ 1.1-190.10, with respect to such funds.~~

31.     ~~Section 4d(a)(2) of the CEA provides that money, securities and property of customers must be separately accounted for and not commingled with the funds of the FCM. 7 U.S.C. §~~

6d(a)(2).

32.     Section 4d(b) of the CEA provides that "it shall be unlawful for any person, including . . . any depository, that has received any money, securities and property for deposit in a separate account as provided for in [section 4d(a)(2) of the CEA], to hold, dispose of, or use any such money, securities or property as belonging to the depositing futures commission merchant or any person other than customers of such futures commission merchant." 7 U.S.C. § 6d(b).

33.     CFTC Rule 1.20(a) provides that all customer funds shall be segregated as belonging to commodity customers, and that when deposited with any bank, shall be deposited under an account name which clearly identifies them as customer property.

34.     CFTC Rule 1.20 requires that any bank acting as custodian for FCM customer funds must acknowledge in writing that the funds are customer funds and are being held in accordance with the provisions of the CEA.

35.     CFTC Rule 1.20(a) also provides that "Under no circumstances shall any portion of customer funds be obligated to . . . any depository except to purchase, margin, guarantee, secure, transfer, adjust or settle trades, contracts or commodity option transactions of commodity or options customers." CFTC Rule 1.20(a) thus prohibits the pledging of customer funds to secure a loan for any purpose other than for customer commodity transactions.

36.     The investment of FCM customers' funds is subject to the strict investment standards embodied in CFTC Rule 1.25, 17 C.F.R. § 1.25, and generally is restricted to only the highest grade corporate and government securities and similar highly liquid investments. (Prior to an amendment to Rule 1.25 which became effective on December 28, 2000, the CFTC's investment standards were even stricter, and FCM customer funds could be invested only in government securities and certain other limited instruments.)

37.     CFTC Rule 1.25 permits FCMs to acquire securities constituting permitted investments under CFTC Rule 1.25 by using repurchase agreements, and to invest customer funds

under reverse repurchase agreements. Customer securities delivered pursuant to any repurchase or reverse repurchase transaction, however, are limited to types of investments otherwise permitted under Rule 1.25 and are subject to concentration limits and numerous other limitations. *See generally* 17 C.F.R. § 1.25(d). Moreover, any funds received under repurchase agreements or securities received under reverse repurchase agreements are required to be segregated for the benefit of customers (17 C.F.R. §§ 1.20(a) and 1.25(d)), and the delivery of securities to or from the customer segregated account must take place simultaneously with the offsetting transfer of funds to or from the customer segregated account. 17 C.F.R. § 1.25(d)(8). The CEA and CFTC regulations thus prohibit any repurchase or reverse repurchase transactions from taking place outside of customer segregated accounts, and require that all repurchase transactions for the benefit of customers take place and settle solely in segregated accounts.

38.    Under CFTC Rule 1.26, any securities in which customer funds are invested also must be maintained in segregation. Like CFTC Rule 1.20, CFTC Rule 1.26 requires that any bank acting as custodian for FCM customer securities must acknowledge in writing that the securities are customer securities and are being held in accordance with the provisions of the CEA.

39.    Funds of FCM customers engaged in trading at foreign exchanges also must be separately segregated and invested in accordance with CFTC Rule 30.7, 17 C.F.R. § 30.7, which imposes certain restrictions on the investment of customer funds.

40.    Subject to the segregation and other requirements of the CEA and CFTC Rules, under CFTC Rule 1.49 (adopted in 2003), FCM customer funds may be held in certain foreign depositories, namely institutions in the "G-7" countries (the United States, Canada, France, Italy, Germany, Japan, and the United Kingdom), and in the currency denominations of those countries, as well as the Euro.

41.    ~~The CEA and CFTC regulations do not authorize customer funds or securities to be pledged to a bank or other third party to secure loans or other obligations incurred to meet "haircuts" imposed by a repurchase agreement counterparty.~~

42.    ~~Effective December 31, 1980, the CFTC promulgated regulations which required FCMs to maintain adjusted net capital (essentially liquid assets in excess of customer funds) of no less than 4% of all funds required to be segregated by FCMs for the benefit of its customers. *See generally* 17 C.F.R. § 1.17. On May 7, 1981, based upon (among other things) Sentinel's representations to the CFTC concerning the trust structure described in paragraphs 50-51 below, Sentinel obtained from the CFTC a "no action" letter exempting Sentinel from the 4% net capital requirement applicable to other FCMs, and requiring that Sentinel maintain only the minimum capital required for FCMs that are not a member of a contract market (at that time $100,000). (Exhibit A attached).~~

ii.    ~~*The Investment Advisers Act and SEC Rules*~~

43.    ~~Sentinel was also registered as an Investment Adviser, and Sentinel was subject to the provisions of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq.* (the "Investment Advisers Act"), and the rules and regulations of the SEC promulgated thereunder, 17 C.F.R. §§ 275.0-2 – 275.222-2.~~

44.    ~~Section 206 of the Investment Advisers Act makes it illegal to "employ any device, scheme, or artifice to defraud any client or prospective client" and to "engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." 15 U.S.C. § 80b-6.~~

45.    ~~The regulations promulgated by the SEC under section 206 provide that it is a "fraudulent, deceptive, or manipulative act, practice, or course of business" to have custody of client funds or securities except as provided in SEC Rule 206(4)-2. SEC Rule 206(4)-2, 17~~

9

C.F.R. § 275.206(4) 2, requires that client funds and securities be maintained at a "qualified custodian," which includes a depository bank, "[i]n a separate account for each client under that client's name" or "[i]n accounts that contain only [the investment adviser's] clients' funds and securities, under [the investment adviser's] name as agent or trustee for the clients."

46.　SEC Rule 206(4) 2 further provides that if an investment adviser opens an account with a qualified custodian, either under the client's name or its name as agent, it must "notify the client in writing of the qualified custodian's name, address, and the manner in which the funds or securities are maintained, promptly when the account is opened and following any changes to this information."

47.　It also is a violation of Section 206 of the Investment Advisers Act to use one client's assets to cover or secure securities purchases for another client when the former client does not have sufficient cash in its account to cover securities purchases on the settlement date.

iii.　*BONY's conduct in violation of federal law*

48.　BONY knowingly violated the CEA and CFTC Rules by permitting customer assets to be pledged to secure BONY's loan to Sentinel, by commingling customer assets with Sentinel's own assets, by clearing customer securities transactions through BONY accounts that were not segregated and on a daily basis applying the proceeds of those transactions to Sentinel's loan balance, and by facilitating billions of dollars of repo transactions outside of the segregated account structure.

49.　BONY also knowingly participated in conduct that violated the Investment Advisers Act and SEC Rules by permitting customer assets to be commingled with Sentinel's own assets, by permitting customer assets to be cleared through and maintained in BONY accounts which were not registered in Sentinel's name as agent or trustee for its customers, by maintaining customer assets in a manner different than that disclosed to customers, and by assisting

10

~~Sentinel in the use of assets of members of one SEG group to cover or secure securities purchases for other SEGs, or for Sentinel itself, when they did not have sufficient cash to cover securities purchases on the settlement date.~~

**SENTINEL'S RELATIONSHIP WITH BONY**
~~**AND THE UNLAWFUL ACCOUNT STRUCTURE**~~

A.    The Inception of the Sentinel-BONY Relationship

50.    Prior to 1980, Sentinel's business consisted almost exclusively of providing cash management services to other FCMs, and Sentinel had established two trust accounts at Continental Illinois Bank and Trust Company of Chicago into which its clients' funds were placed and invested. One trust account was used to hold the customer funds of other FCMs (SEG 1 funds), and the other trust account was used to hold the house funds of other FCMs (SEG 3 funds).

51.    FCMs for which Sentinel provided cash management services executed trust agreements designating Sentinel as the trustee for funds deposited by them. Under this trust arrangement, participating FCMs directly notified Continental Bank of the amounts they wished to deposit or withdraw from the trust account and Sentinel merely directed the investment of those funds. Sentinel subsequently moved its custodial business to the First National Bank of Chicago.

52.    In early 1997, the First National Bank of Chicago decided to exit the custodial account business and close its custody division. BONY competed with several other banking institutions to win Sentinel as a client of BONY's Institutional Custody Division. Sentinel moved its custodian account business to BONY in or about March 1997.

53.    At the outset of the relationship, BONY and Sentinel entered into a Global Custody Agreement, dated March 13, 1997, appointing BONY as the custodian of securities and cash held for the benefit of Sentinel's customers. (Exhibit B attached). Under this arrangement, customer cash and securities were maintained by BONY in custodial accounts, and securities purchased and sold were settled by cash credits and debits to those custodial accounts.

54.    ~~As required by CFTC Rules, on or about March 14, 1997, BONY and Sentinel entered~~

11

into a letter agreement, attached as Exhibit C, in which Sentinel proposed to open an account designated as "Sentinel Management Group, Inc. Customer Segregated Funds Account I (§4.d 2)," into which it would deposit money and securities that were supposed to be segregated for its SEG 1 customers. BONY acknowledged and agreed that this segregated account was being opened to meet the requirements of the CEA, which provides that such assets must be segregated and treated as belonging solely to Sentinel's SEG 1 customers, rather than to Sentinel itself. In addition to the requirements set forth in CFTC Rules 1.20(a) and 1.26, BONY further agreed that "the funds in said accounts will not be subject to [its] lien or offset for, and on account of, any indebtedness now or hereafter owing [by] (sic) us to [BONY] and shall not be applied by [BONY] upon any such indebtedness nor will [BONY] apply the funds in said accounts to the indebtedness of either our so-called Seg II or Seg III accounts." BONY further agreed that the letter agreement would supersede any other documents related to the account that conflict with it.

55.     On the same date, Sentinel and BONY entered into two additional letter agreements, one pertaining to "Sentinel Management Group, Inc. Customer Segregated Funds Account II (Part 30)" established for funds and securities attributable to Sentinel's SEG 2 customers, and another pertaining to "Sentinel Management Group, Inc. Customer Segregated Funds Account III" established for funds and securities deposited by Sentinel's SEG 3 clients. These letter agreements, attached as Exhibits D and E, respectively, are identical in material respects to the SEG 1 segregation letter.

56.     In or about March 1997, BONY opened the three segregated custodial accounts contemplated in the segregation letter agreements and began accepting funds and securities from Sentinel. Sentinel also established a house or street account.

B.     BONY begins ignoring its custodial obligations

57.     As part of its arrangement with Sentinel, and consistent with Sentinel's arrangements with BONY's predecessors, BONY from time to time made short-term extensions of

12

credit to Sentinel so that Sentinel could meet customer requests for redemption, and thereafter sell the securities that had been attributable to the redeeming customers. BONY's extensions of credit were made in the form of daytime "overdrafts" which would be eliminated upon sale of the applicable securities. If necessary, the daytime overdrafts would be converted to short-term overnight loans.

58.    ~~Within a few months of the commencement of BONY's relationship with Sentinel, BONY personnel began to express concern about the custodial account structure required under applicable law. Specifically, BONY was extending credit in the form of daytime "overdrafts" so that Sentinel could satisfy customer redemptions sought on short notice, and it was difficult for BONY personnel to determine whether there were sufficient "excess" customer securities in the segregated custodial accounts to repay BONY's advances of credit. In an email dated August 18, 1997, a BONY officer described Sentinel's custodial account structure as "an accident waiting to happen," indicated that he was no longer comfortable clearing Sentinel's transactions, and insisted on an immediate response from the BONY official in charge of the Sentinel business.~~

59.    As a result, less than six months after having won Sentinel's custodial business, BONY caused Sentinel to move its business from BONY's Institutional Custody Division to its Broker/Dealer Services Division ("SIBD"), where Sentinel would buy and sell securities through a typical broker/dealer and securities clearing account. ~~BONY did so even though Sentinel was not a broker/dealer and Sentinel's business as an FCM and Investment Adviser was fundamentally different from the business of a broker/dealer because it involved customer funds and securities that were subject to strict custodial and segregation requirements. As set forth below, the new SIBD account structure violated the segregation requirements imposed by applicable law and was inconsistent with BONY's commitments in its segregation letter agreements that customer funds would at all times be segregated and not be subject to BONY's lien.~~

60.    After BONY insisted that Sentinel move its business from BONY's Institutional Custody

13

Division to its Broker/Dealer Services Division, in October 1997 BONY required Sentinel to execute a clearing agreement appointing BONY as Sentinel's clearing agent "in furtherance of [Sentinel's] business as a broker/dealer of securities." (Exhibit F attached). Sentinel and BONY also entered into a Security Agreement, dated October 21, 1997 (Exhibit G attached), giving BONY a security interest in Sentinel's securities clearing account.

61.    ~~BONY knew that Sentinel was not a broker/dealer and that its form broker/dealer agreement did not fit Sentinel's FCM and Investment Adviser business. Moreover, the architecture BONY established for Sentinel's accounts guaranteed that BONY could not keep its contractual promises and meet its statutory obligations to keep customer funds and securities segregated from Sentinel's own assets or from those of other customers.~~

C.    ~~The unlawful account architecture established by BONY~~

62.    ~~BONY established segregated cash accounts for U.S. denominated funds held for Sentinel's customers in SEGs 1, 2 and 3, respectively. BONY also established segregated securities accounts for government and government agency securities (hereinafter collectively referred to as "government securities"), such as U.S. Treasury notes, Fannie Mae and Ginnie Mae notes held for Sentinel's customers in SEGs 1, 2, and 3, respectively.~~

63.    ~~However, BONY improperly established a single, non-segregated clearing account for all government securities transactions. Thus, all purchases and sales of government securities had to be processed through this single account, whether they were on behalf of SEGs 1, 2 or 3 or Sentinel itself. As a result, government securities and cash held by BONY on behalf of one customer SEG were routinely commingled with those belonging to other SEGs or Sentinel's own portfolio, in direct contravention of applicable law and the segregation letter agreements. This structure led to and facilitated the conduct of Sentinel insiders in commingling customer assets and led to BONY maintaining client funds and securities in an account which was neither segregated as required under Sections 4d(a)(2) and 4d(b) of the CEA and CFTC Rule 1.20, nor registered as a custodial account~~

14

under SEC Rule 206(4)-2.

64.     BONY also improperly established this government securities clearing account as the collateral account securing all loans made by BONY to Sentinel. Indeed, the account is identified in BONY's records and reports as the "SEN Clearance Coll A/C FBO BNY" (Sentinel Clearance Collateral Account For the Benefit Of Bank of New York), and also was known within Sentinel and BONY as the "SLM-SEN Clearance Coll A/C FBO BNY," the "SLM" account, the "Street" account, "the clearance account," the "collateral account," the "SEN" account, and the "box." (Hereafter, this account is referred to in this Complaint as the "Clearing/ Collateral Account.")

65.     BONY continued to make short-term loans to Sentinel, initially so that Sentinel could meet customer requests for redemption. Those loans took place in the form of daytime "overdrafts" of Sentinel's Clearing/Collateral Account, which BONY then converted to overnight loans as necessary. The overnight loans were reversed the next morning, putting the Clearing/Collateral Account back into an overdraft situation if sufficient funds were not deposited (or securities liquidated) to pay off the loan. BONY accepted and took as security for its overnight loans to Sentinel any government securities that were in the Clearing/Collateral Account, without regard to whether those securities were Sentinel House securities or customer securities. Under CFTC Rule 1.20(a), however, customer assets never could be used as security for the BONY loans.

66.     To effect a sale of a government security held in a segregated customer account, Sentinel was required to request that BONY "desegregate" the security and move it into the Clearing/Collateral Account. Once there, BONY could take the position that the security was subject to its lien, regardless of whether that security was a customer asset. Worse, because BONY's daytime advances of credit to Sentinel were made in the form of an "overdraft" (negative) balance in the Clearing/Collateral Account, and any sales of customer government securities would automatically settle to the Clearing/Collateral Account, the proceeds of customer securities sales

(instead of being available for the applicable customers) were automatically applied against, and reduced the amount of, BONY's "overdraft" loan to Sentinel.

67.     When a government security was purchased for a segregated account, BONY's account structure similarly required that the security be purchased in the Clearing/Collateral Account, and then Sentinel would request that the security be "segregated" to the applicable customer segregated account. Under the account structure established by BONY, however, BONY retained the ability to refuse to segregate customer securities purchased through the Clearing/Collateral Account if Sentinel did not post sufficient collateral for BONY's loans to Sentinel.

68.     Further, BONY's clearing account structure required that any customer security purchased or sold pursuant to a repo or reverse repo transaction also clear and settle through the Clearing/Collateral Account, instead of directly into the applicable segregated custodial account.

69.     BONY thus established a clearing structure in which it could not fulfill its contractual promises and which violated applicable law including Sections 4d(a)(2) and 4d(b) of the CEA and CFTC Rule 1.20 (which requires that customer funds at all times be segregated as belonging to commodity customers, and be deposited only in accounts which clearly identifies them as customer property); CFTC Rule 1.20(a) (which expressly prohibits the pledging of customer funds to secure a loan for any purpose other than for customer commodity transactions); CFTC Rule 1.25 (which prohibits any repurchase or reverse repurchase transactions from taking place outside of customer segregated accounts, and requires that all repo transactions for the benefit of customers take place and settle solely in segregated accounts); Section 4d(a)(2) of the CEA and CFTC Rule 1.26 (which mandates that any securities in which customer funds are invested must be maintained at all times in segregation); and Section 4(b) of the CEA and CFTC Rule 30.7 (which requires that funds of FCM customers engaged in trading at foreign exchanges also be separately segregated and invested).

70.    In addition, the Clearing/Collateral Account was not registered in the name of Sentinel as agent or trustee for its clients, and therefore, no customer funds or securities could be cleared through or maintained in the Clearing/Collateral Account, even briefly, without violating Section 206 of the Investment Advisers Act and SEC Rule 206(4)-2.

### THE CHANGE IN SENTINEL'S BUSINESS AND BONY'S EXPANSION OF THE UNLAWFUL ACCOUNT STRUCTURE TO CORPORATE SECURITIES

A.    CFTC Rule 1.25 Amendments and Adoption of CFTC Rule 1.49

71.    Historically, Sentinel typically directed the investment of client funds in high-quality, low-risk government securities, and did not engage in significant repo or reverse repo transactions.    Sentinel's borrowings from BONY typically were used to provide liquidity for customer redemptions, and Sentinel's loan balances (if any) were relatively modest.

72.    However, at the end of 2000, CFTC Rule 1.25 was modified substantially to permit FCMs to invest customer funds in, among other things, high-grade corporate securities, and also to enter into repo and reverse repo agreements utilizing such securities. Sentinel was a strong proponent of these changes and provided written comments to the CFTC concerning the rule changes.

73.    In addition, with the 2003 adoption of CFTC Rule 1.49, Sentinel began to direct investments in Euroclear registered securities and certain customer funds were held by BONY in Euro and G-7 currency denominations in non-U.S. bank accounts.

B.    The new accounts

74.    Following the implementation of changes to CFTC Rule 1.25 and the adoption of CFTC Rule 1.49, both Sentinel's business and its relationship with BONY changed dramatically.

75.    In order to accommodate the changes to Sentinel's business, BONY opened a series of new BONY accounts to hold corporate securities registered with the Depository Trust Corporation (or DTC), corporate securities registered in the Euroclear system, and securities that were not

registered in electronic clearing systems (so-called "physical" securities).

76.     Sentinel executed a new broker/dealer clearing agreement with BONY known as the Global Clearing and Custody Agreement. (Exhibit H attached). BONY and Sentinel also executed a new Security Agreement. (Exhibit I attached). Both agreements were dated January 9, 2003.

77.     Article II, Section 1(a) of the Global Clearing and Custody Agreement appointed BONY as Sentinel's clearing agent. In Article II, Section 2(a), BONY acknowledged that it "will not have, and will not assert, any claim or lien against Securities held in a Segregated Account." Article III, Sec. 1(a) authorized BONY to act as custodian of the segregated accounts.

78.     The 2003 Security Agreement provided that BONY, at its discretion, could make loans or otherwise extend credit to Sentinel. Under Schedule A to the agreement, the collateral for that loan was to be: "Any and all Securities and other property held in the Account, as these terms are defined in the Global Clearing and Custody Agreement between the Debtor and the Bank, and any cash balances held in any cash account maintained by the Bank in connection therewith."

79.     The Global Clearing and Custody Agreement and the 2003 Security Agreement establish that there is to be only a single combined clearing and collateral Account, against which BONY may assert a lien.

C.     The DTC securities accounts

80.     BONY established three segregated securities accounts to hold DTC-registered corporate securities for Sentinel's customers in SEG 1, SEG 2 and SEG 3, respectively.

81.     BONY also established a DTC clearing account, also known as the "FC1 account" or the "Street Securities Account" ("the DTC Clearing Account" hereafter) to clear both customer and House transactions in DTC securities. Just like the Collateral/Clearing Account, however, the DTC Clearing Account was not a segregated account.

82.     The DTC Clearing Account was not used for cash transactions. Cash deposits,

18

withdrawals and settlement payments relating to DTC corporate transactions were processed in the Clearing/Collateral Account.

83. ~~Because the DTC Clearing Account was not segregated, BONY could not fulfill its statutory duties and promises to Sentinel to keep assets pertaining to different customer SEGs separate from each other and from Sentinel's house assets. DTC-registered securities clearing through the DTC Clearing Account, like the government securities clearing through the Clearing/Collateral Account, were necessarily commingled with securities belonging to other customer SEGs and with House assets.~~

84. ~~In addition, the DTC Clearing Account was not registered in the name of Sentinel as agent or trustee for its clients, and therefore, no customer funds or securities could be cleared through or maintained in the DTC Clearing Account, even briefly, without violating SEC Rule 206(4)-2.~~

85. ~~Moreover, because the DTC Clearing Account was not a segregated customer account, it specifically could not be used under CFTC Rules 1.20(a), 1.25(d) and 1.26 to effectuate the delivery of customer securities to or from counterparties in connection with repo or reverse repo transactions.~~

86. ~~Further, under the DTC Clearing Account structure, every time a customer security was sold, the cash proceeds of that sale were automatically credited to the Collateral/Clearing Account and served to reduce the overdraft loan balance in that account, instead of being immediately credited to the appropriate SEG.~~

87. ~~In addition, under the DTC Clearing Account structure, every time a customer security was purchased, the customer security cleared into the DTC Clearing Account, against which BONY has asserted a lien.~~

D. The Euroclear securities and foreign currency accounts

88. In 2003, Sentinel also established a series of Euroclear and foreign currency accounts at BONY to hold customer securities registered in the Euroclear system and settled in foreign currencies. Account number 521010 (the "Euroclear Securities Clearing Account") was denominated

as a clearing account for all Euroclear securities, and two other accounts, 521011 and 521012, were denominated as customer segregated Euroclear securities accounts for SEG 1 and SEG 3, respectively. A series of corresponding cash accounts also were opened in various foreign currency denominations.

89.    ~~Under the structure it established for Euroclear securities, BONY could not fulfill its promise to Sentinel to keep assets pertaining to different customer SEGs separate from each other and from House assets. Euroclear registered securities clearing through the Euroclear Securities Clearing Account, like the government securities clearing through the Clearing/Collateral Account and DTC securities clearing through the DTC Clearing Account, were necessarily commingled with securities belonging to other customer SEGs and with House assets.~~

90.    ~~In addition, Sentinel specifically advised BONY that each of the Euroclear and foreign currency accounts, including the Euroclear Securities Clearing Account, needed to be denominated as customer segregated accounts, and provided segregation acknowledgements for BONY's execution. Although BONY did execute segregation letters with respect to the SEG 1 and SEG 3 Euroclear securities accounts and certain corresponding foreign currency accounts, BONY failed to provide executed segregation acknowledgements for the Euroclear Securities Clearing Account and some related foreign currency accounts.~~

91.    Notwithstanding the foregoing, the account statements provided by BONY to Sentinel specifically indicated that the securities maintained in the Euroclear Securities Clearing Account were held in a "segregated" account.  Further, not a single customer transaction ever took place in the SEG 1 and SEG 3 Euroclear securities accounts, and it appears that those accounts were never even activated.  Thus, all Euroclear securities purchased for customers were held by BONY in the Euroclear Securities Clearing Account.

92.    BONY acknowledged in internal communications that the Euroclear Securities Clearing Account was not intended to hold any material amount of securities, and was being used solely for clearing customer transactions. Nonetheless, BONY has now taken the position that the securities in

20

the Euroclear Securities Clearing Account are not customer securities, and that it may assert a lien against securities held in the Euroclear Securities Clearing Account and related foreign currency accounts.

93.    ~~Moreover, if (as BONY claims) the Euroclear Securities Clearing Account is not a segregated customer account, it specifically could not be used under CFTC Rules 1.20(a), 1.25(d) and 1.26 to effectuate the delivery of customer securities to or from counterparties in connection with repo or reverse repo transactions.~~

94.    ~~Further, if (as BONY claims) the Euroclear Securities Clearing Account was not a segregated account in the name of Sentinel as agent or trustee for its clients, no customer funds or securities could be cleared through or maintained in the Euroclear Securities Clearing Account, even briefly, without violating SEC Rule 206(4)-2.~~

E.    <u>Physical securities</u>

95.    In addition to the DTC and Euroclear securities and related accounts, in connection with the change in Sentinel's business, BONY also established an account to clear and hold physical securities (i.e., certificated securities that were not registered in the DTC or Euroclear systems) (the "Physical Clearing/Custodial Account"). Unlike with the U.S. government, DTC and Euroclear securities, no separate segregated accounts were ever established for physical securities. Thus, all House and customer transactions in physical securities cleared through the single Physical Clearing/Custodial Account, and all physical securities were held by BONY in that account. Like the DTC Clearing Account, the Physical Clearing/Custodial Account was not used for cash transactions. Cash deposits, withdrawals and settlement payments relating to physical securities transactions were processed in the Clearing/Collateral Account.

96.    ~~As a result of the fact that the Physical Clearing/Custodial Account was not segregated (and BONY made no attempt to establish any segregated accounts for physical securities attributable to Sentinel customers), BONY could not fulfill its statutory duties and promises to Sentinel to keep assets~~

21

pertaining to different customer SEGs separate from each other and from Sentinel's house assets. Physical securities held in or clearing through the Physical Clearing/Custodial Account were necessarily commingled with securities belonging to other customer SEGs and with House assets.

97.     In addition, the Physical Clearing/Custodial Account was not registered in the name of Sentinel as agent or trustee for its clients, and therefore, no customer funds or securities could be cleared through or maintained in the Physical Clearing/Custodial Account, even briefly, without violating SEC Rule 206(4)-2.

98.     Moreover, because the Physical Clearing/Custodial Account was not a segregated customer account, it specifically could not be used under CFTC Rules 1.20(a), 1.25(d) and 1.26 to effectuate the delivery of customer securities to or from counterparties in connection with repo or reverse repo transactions.

99.     Further, under the Physical Clearing/Custodial Account structure, every time a customer security was sold, the cash proceeds of that sale were automatically credited to the Collateral/Clearing Account and served to reduce the overdraft loan balance in that account, instead of being immediately credited to the appropriate SEG.

## THE SENTINEL INSIDERS' SCHEME AND THE BONY LOAN

A.     The Repo Activity

100.     Following the opening of the DTC Clearing Account, the Euroclear Securities Clearing Account, and the Physical Clearing/Custodial Account, Sentinel radically changed its investment strategies and borrowing.

101.     Sentinel's actions in this regard, and the conduct described in paragraphs 102167, were undertaken at the instance of the Sentinel Insiders and were adverse to the interests of the company. (For purposes of clarity and conciseness, that allegation is not reiterated each time Sentinel's actions are described.)

102. Among other things, Sentinel began purchasing a substantial amount of securities for the Sentinel "House" account, which ultimately benefited the Sentinel Insiders. Sentinel also dramatically increased its use of leverage, which put both Sentinel and its customers at risk if the market moved adversely.

103. No later than 2003, Sentinel began financing the acquisition of many of the securities it controlled using overnight repurchase agreements. In a typical overnight repurchase or "repo" transaction, the repo borrower (in this case Sentinel) acquires and transfers a security to a repo lender, which in turn makes a repo "loan" to Sentinel and holds the security as collateral. Under most overnight repo agreements, absent a default, Sentinel was entitled to all principal and interest payments received on account of the security that was the subject of the repo transaction.

104. Repo counterparties imposed a "haircut" on the amount loaned to Sentinel in order to provide a sufficient collateral cushion above market value to satisfy Sentinel's repo obligations in the event of a default. Thus, a repo lender advanced to Sentinel, for example, only 90% of the current market value of the security subject to the repo transaction (a 10% "haircut"). Because Sentinel had virtually no capital, the Sentinel Insiders financed the balance of the acquisition cost for securities that were the subject of a repo transaction (i.e. the haircut) using Sentinel's overnight loan facility with BONY. Thus, beginning no later than 2003, instead of funding short-term liquidity needs related to Sentinel customer redemptions, Sentinel began using the BONY loan for Sentinel's highly-leveraged speculation in securities, a fact which BONY knew.

105. Although prior to the summer of 2007 most of Sentinel's overnight repo positions were rolled over each day, both Sentinel and the repo counterparty had the right to close out an overnight repo position at any time, in which case the repo counterparty was contractually obligated to return the security to Sentinel, and Sentinel was contractually obligated to pay off the funds borrowed plus interest.

106.    At times, Sentinel also participated in so-called "reverse repo" transactions, in which Sentinel was the repo lender holding securities as collateral for a loan made by Sentinel to a repo borrower.

107.    Over time, Sentinel controlled an ever-increasing number of securities pursuant to repo transactions, subjecting Sentinel and its customers to substantial risk arising from the leverage associated with repo transactions. All of the securities that were the subject of repo activity cleared through the BONY Collateral/Clearing Account, DTC Clearing Account, Euroclear Securities Clearing Account, and Physical Clearing/Custodial Account.

108.    By the end of 2003, Sentinel had purchased and controlled more than $242 million in securities under repo agreements. By the end of 2004, that amount had increased to more than $922 million; by the end of 2005 it had increased to more than $1.3 billion; and by the end of 2006 it had increased to more than $2.0 billion. This $2.0 billion+ repo position put Sentinel, which at all times had, at best, only a few million dollars of capital, at tremendous risk in the event of a decrease in the value of the securities that it controlled.

B.    The BONY Loan

109.    Beginning no later than the end of 2003, the Sentinel Insiders began exploiting the flawed account structure established by BONY and used that account structure to unlawfully and without disclosure to their clients: (a) commingle customer assets among SEGs and with Sentinel's House assets; (b) use securities that were supposed to be held in segregated customer accounts to collateralize loans from BONY, including loans that were used to purchase House securities and to engage in billions of dollars of undisclosed repo transactions; and (c) pay down Sentinel's debt to BONY using customer assets.

110.    The Sentinel Insiders' scheme to use customer assets to secure the purchase of securities for the Sentinel House account and to increase leverage using repo agreements resulted in a dramatic

24

increase in Sentinel's loan balance with BONY. For example, while Sentinel's loan balance stood at $23 million at the end of 2002, by the end of 2003 the loan had more than doubled to $55 million. By the end of 2004, the loan had more than doubled again to over $120 million, and by the end of 2005 it had more than doubled yet again, to approximately $280 million. By June 2007, the loan balance had again more than doubled, to over $570 million.

111.    BONY allowed Sentinel to continue borrowing amounts far in excess of the overnight loan credit limit BONY set for Sentinel, and far in excess of any reasonable line of credit for Sentinel's business (and its very small capital), and continually increased that limit. In 2000, Sentinel's overnight loan credit limit was $30 million. By the end of 2004, that limit had increased to $95 million. By the end of 2005, Sentinel's credit limit with BONY was $175 million, although the credit extended by BONY routinely exceeded $300 million. In 2006, BONY increased the overnight credit limit to $300 million. When Sentinel's loan blew through the $300 million credit limit in January and February 2006, BONY extended more credit, notwithstanding the fact that BONY knew that Sentinel's net capital was, at best, only a few million dollars.

112.    Moreover, BONY imposed no daytime overdraft limit whatsoever upon Sentinel. Thus, the Sentinel Insiders could run up tens of millions (and on certain days hundreds of millions) of dollars in additional liability to BONY during any given day.

113.    BONY required that Sentinel post collateral to secure its overnight loans to Sentinel. Because Sentinel House securities and other House funds Sentinel held were insufficient to secure the loan, and because of the commingling permitted by BONY's account structure, the insiders began collateralizing the BONY loan with hundreds of millions of dollars in customer securities, in violation of Sections 4(b), 4d(a)(2), and 4d(b) of the CEA and CFTC Rules 1.20, 1.25, 1.26, 1.49 and 30.7, as well as Section 206 of the Investment Advisers Act and SEC Rule 206(4)-2.

C.    BONY's Knowledge of the Misuse of Customer Assets
        and False Statements to Regulators and the Public

114.    BONY was well aware that Sentinel had fundamentally changed its business model, that it was purchasing large amounts of securities for the House account and for repo activities using credit provided by BONY, and ~~that the Sentinel loan was financed almost exclusively with customer securities that were supposed to be segregated.~~

115.    BONY, including (as of November 23, 2005) the managing director of BONY in charge of Financial Institutions Credit, was well aware that Sentinel had a leveraged trading strategy.

116.    BONY received and reviewed Sentinel's year-end financial statements for 2005 and 2006. Those statements, *inter alia,* reflected that "Sentinel purchases securities for customers and for its own account. . . ."

117.    BONY also received copies of numerous financial statements and regulatory reports from Sentinel that revealed that Sentinel was providing false and misleading information to regulators and its customers.

118.    Specifically, at least between September 2005 and June 2007, BONY received from Sentinel nearly every monthly CFTC Form 1-FR report submitted to regulators by Sentinel, which filed each statement approximately three weeks after the end of the month-long period covered by the statement. BONY routinely received copies of these monthly reports within a few days of the filing date.

119.    Each monthly CFTC Form 1-FR submitted by Sentinel included several different financial reports, including a Statement Of Financial Condition (Sentinel's assets and liabilities); a Statement Of Computation Of Minimum Capital Requirements imposed upon Sentinel; and a Statement Of Segregation Requirements And Funds In Segregation.

120.    Each and every one of the financial reports comprising the Form 1-FR provided by Sentinel to regulators and BONY contained patently false information.  Among other things, each and every Statement Of Financial Condition included as part of Sentinel's monthly Form 1-FR filings reflected that Sentinel owed $0 in loans to BONY (Statement of Financial Condition, Lines 21.A-C).

26

Each and every Statement Of Financial Condition included as part of Sentinel's monthly Forms 1-FR filings reflected that Sentinel engaged in no repo activity whatsoever (Statement Of Financial Condition, Lines 3, 4 and 29). Each and every Statement Of Computation Of Minimum Capital Requirements included as part of Sentinel's monthly and annual Forms 1-FR carried through the false information provided in the corresponding Statement Of Financial Condition. And each and every Statement Of Segregation Requirements And Funds In Segregation included as part of Sentinel's monthly and annual Forms 1-FR indicated that all of Sentinel and its customers' funds and securities were held in segregated accounts. Statement Of Funds In Segregation, Lines 7.A-C). Every one of these assertions, as BONY knew, was patently false.

121.    BONY also knew that Sentinel was making flagrant misrepresentations to actual and potential customers about Sentinel's relationship with BONY and how customer assets were held at BONY. For example, on June 27, 2007, a senior BONY official in charge of Sentinel's account received by email from another BONY officer a Sentinel marketing brochure that included statements that BONY knew were patently untrue.

122.    Among other things, the brochure said that Sentinel currently had "over $1.8 billion under management held in fiduciary accounts at our custodian, The Bank of New York." BONY knew that that assertion was untrue and that of the $1.8 billion held by BONY, hundreds of millions of dollars worth of customer assets were not held in fiduciary accounts but instead were held in BONY's Clearing/Collateral Account and subject to BONY's lien or were held in other non-fiduciary accounts.

123.    The brochure also falsely stated that a Sentinel "client retains a pro-rata undivided interest in the underlying securities pool held in a segregated account at The Bank of New York" and that "Securities are held in segregated, bankruptcy proof accounts." BONY knew that these statements were false because substantial customer assets were held in the BONY Clearing/Collateral Account and the DTC Clearing Account, not in a segregated account.

124.    And the brochure indicated that the sale and purchase of securities on behalf of

27

customers at BONY involved movement only between a "Sentinel Client Segregated Cash Account" and a "Sentinel Segregated Client Securities Account." BONY knew that this representation was false and that in fact whenever securities were bought or sold, the cash and securities had to run through clearing accounts which were not segregated and as to which BONY asserted a lien.

125.    BONY also knew that, in order to collateralize Sentinel's loan, Sentinel at times was transferring hundreds of millions of dollars of securities from segregated customer accounts in bulk transfers to the BONY Clearing/Collateral Account ~~under circumstances which plainly could not have related to legitimate investment activities or other transactions authorized by Sentinel's customers.~~ BONY also knew or should have known that Sentinel Insiders caused Sentinel to make these transfers of hundreds of millions of dollars from segregated customer accounts to the BONY Clearing/Collateral Account or other non-segregated accounts with the intent to hinder, delay or defraud Sentinel's other creditors, including Sentinel's customers.

126.    BONY also knew of but deliberately ignored numerous red flags relating to Sentinel's activities, including: (a) the dramatic increase in the amounts borrowed by Sentinel from BONY, unrelated to customer redemption requests or other short-term liquidity needs; (b) the fact that Sentinel routinely exceeded its large credit limit with BONY; (c) the fact that Sentinel's leverage with repo counterparties had exponentially increased, such that by 2006 more than $2.0 billion in securities were the subject of repo agreements, almost all of which had been financed in part using the BONY loan; (d) Sentinel's purchase of lower-grade and illiquid securities, which was inconsistent with Sentinel's stated purpose of acting as a cash manager; (e) Sentinel was declaring dividends in excess of Sentinel's already minimal net capital; and (f) customer assets were posted to Sentinel's balance sheet as Sentinel assets.

## BONY'S PARTICIPATION IN THE RAIDING OF SEGREGATED ACCOUNTS AND THE COLLAPSE OF SENTINEL

A.    <u>Overview</u>

127.    Leading up to 2007, ~~the unlawful account structure established by BONY, as well as~~ BONY's willingness to turn a blind eye to wrongdoing at Sentinel and its extension of hundreds of millions of dollars in credit, permitted certain Sentinel insiders to reap tens of millions of dollars in profit through the ~~wrongful~~ pledge of customer assets to BONY and excessive leverage.

128.    In the spring and summer of 2007, following a downturn in the credit market and a decrease in the value of the billions of dollars of securities controlled by Sentinel through excessive leverage, Sentinel's business quickly collapsed. BONY's actions played a pivotal role in the collapse of Sentinel.

129.    BONY's actions were motivated by its own financial interests, at the expense of its duties as custodian of customer assets. From January 2004 through August 2007, BONY charged Sentinel over $38 million in interest. More than $28 million of that amount was charged by BONY in just the period January 2006 through August 2007.

B.    Sentinel's collapse

130.    Many of the securities that Sentinel purchased during the 2004 - 2007 time-period were acquired using repurchase agreements under which repo counterparties such as Fimat and Cantor Fitzgerald lent money to Sentinel to finance most of Sentinel's acquisition costs of the securities, with the balance financed by BONY. Many of the securities that were the subject of those repo agreements were illiquid, highly-structured investments and not the subject of material secondary market trading, and many (the physical securities) were not even registered in the DTC system.

131.    As of May 2007, Sentinel had incurred over $2.4 billion in obligations to repo counterparties. As the credit market tightened in the spring and summer of 2007, repo counterparties began to refuse to accept these lower-grade securities from Sentinel under repo agreements, increasing their margin (haircut) requirements or simply refusing to continue to engage in repo transactions in such securities.

132.    At the end of May 2007, Fimat became the first major Sentinel counterparty to refuse to continue financing certain securities. Fimat closed out the repo transactions related to those securities, and returned more than $100 million (face value) in securities to Sentinel through the BONY clearing system. Pursuant to its repo agreements with Fimat, Sentinel was obliged to pay its repo obligation to Fimat or risk a default. Because Sentinel could not finance its repo payment to Fimat in any other way, on June 1, 2007, it borrowed an additional $94 million from BONY, increasing the BONY total loan balance to more than $353 million.

133.    Thereafter, on every business day from June 1, 2007 until August 13, 2007, when Sentinel's business finally collapsed, BONY allowed Sentinel to exceed its already excessive $300 million overnight loan credit limit by tens (and sometimes hundreds) of millions of dollars. At all relevant times during that period, however, BONY attempted to ensure that its loan was fully secured, even though its security was provided by customer assets that BONY had promised would not be used to secure Sentinel's loan.

134.    To secure the increased loan, on June 1, Sentinel and BONY desegregated large blocks of government securities from both the SEG 1 and SEG 3 segregated government securities accounts, with a face value of almost $87 million, and moved those securities into the Clearing/Collateral Account (the "June 1 Transfers"). These transfers took place at the end of the day, and did not coincide with any large customer redemptions or other potentially legitimate customer transactions. This also left less than $15 million in face value of government securities in the SEG 1 segregated government securities account.

135.    BONY personnel recognized that the Sentinel Insiders must be improperly using customer securities to collateralize Sentinel's loan obligations to BONY. After receiving a report on Sentinel's collateral position on June 13, 2007, a senior BONY credit official asked subordinates: "How can they have so much collateral? With less than $20MM in capital I have  to assume most of this collateral is for somebody else's benefit.  Do we really have rights on the whole $300MM?"

(Emphasis added.)

136.    On June 25, 2007, Fimat informed Sentinel that it would no longer finance an additional batch of securities through repo agreements, and it returned another $140 million (face amount) in securities to Sentinel's physical account at BONY. As a result, Sentinel was obligated to repay Fimat under its repo agreements with Fimat. In order to do so, it once again borrowed additional funds from BONY using customer funds as collateral.

137.    Sentinel's loan balance at the end of the day on June 25, 2007 was already a remarkably high $358 million. By June 27, Sentinel's loan with BONY ballooned to $573 million. BONY and Sentinel attempted to secure the massive loan in the manner described below.

138.    At first, BONY temporarily accepted the physical securities that had been returned by Fimat as security for the BONY loan. BONY quickly determined, however, that there was no market for the physical securities. It therefore demanded additional collateral.

139.    Recognizing that BONY was under-collateralized, on June 26, 2007, Sentinel and BONY transferred virtually all of the remaining government securities in the SEG 1 and SEG 3 segregated government securities accounts, totaling in excess of $66 million in face value, out of segregation and into the Clearing/Collateral Account. This left no government securities in the SEG 1 government securities account, and only $15,000 face value of government securities in the SEG 3 government securities account. By this date, of some $463.6 million in face value of government securities held at BONY in connection with the Sentinel accounts, $463.1 million – more than 99% of all of Sentinel's government securities – were being held in the Clearing/Collateral Account for the benefit of BONY, not in segregated customer accounts.

140.    On June 28, BONY informed Sentinel that considering the size of the loan for that day, which was $546 million, the wires still due to go out from Sentinel, and the collateral currently held by BONY, Sentinel's collateral position still was substantially short. Sentinel agreed to post additional securities as collateral for the loan. Because virtually all customer government securities

already had been moved to the Clearing/Collateral Account, Sentinel agreed to permit BONY to take securities in the DTC Clearing Account as collateral for the loan, and if necessary to move additional securities from segregated accounts into the DTC Clearing Account to collateralize the loan.

141.    On June 29, BONY determined that it would no longer accept any of the physical securities that had been returned by Fimat as collateral for Sentinel's loan. As a result, at the close of business on June 29, 2007, Sentinel was short $145 million in collateral. In order to fully collateralize the loan, Sentinel and BONY desegregated approximately $170 million in face value of corporate securities from the SEG 1 DTC account, representing one-half of the total value of that account, and transferred them into the DTC Clearing Account to be used as collateral for the BONY loan (together with the transfers described in paragraph 139 above, the "June 25-29 Transfers"). In the DTC Clearing Account, these customer assets, which were supposed to be segregated, were commingled with assets belonging to the insiders' House account and the assets of other SEGs.

142.    These transfers took place at the end of the day, after the amount of that evening's overnight loan was determined, and did not coincide with any large customer redemptions or other potentially legitimate customer transactions. BONY further knew that under CFTC Rule 1.20(a), customer assets never could be used as security for the BONY loans. BONY also knew that Sentinel needed the massive loan in order to pay for the physical security repo positions that had been closed by Fimat and cleared into the Physical Clearing/Custodial Account – an account with no linked customer segregated accounts and which had been used solely to clear House securities trades. Despite its knowledge and the fact that it was unlawful under Section 4d(b) of the CEA for BONY to hold, dispose of, or use any customer assets as belonging to Sentinel or any person other than Sentinel's customers, BONY allowed and participated in the bulk movement of SEG 1 DTC securities into the Clearing/Collateral Account, where they could then be pledged as collateral to BONY.

143.    Between the end of June and mid-July, Sentinel reduced its loan from BONY to approximately $383 million. However, on July 17, the loan increased to almost $497 million when

another repo counterparty, Cantor Fitzgerald, closed out over $150 million (face amount) in repo positions with Sentinel.

144.     In order to provide additional collateral for the increased loan resulting from this close-out, on July 17, 2007 Sentinel and BONY again moved customer securities from the segregated SEG 1 DTC account into the DTC Clearing Account, this time more than $84 million in face value of DTC securities (the "July 17 Transfers").

145.     BONY knew that Sentinel was desegregating customer assets and transferring them to the DTC Clearing Account for the sole purpose of covering a shortfall in collateral. ~~BONY further knew that under CFTC Rule 1.20(a), customer assets never could be used as security for the BONY loans. Again, these transfers took place at the end of the day, after the amount of that evening's overnight loan was determined, and did not coincide with any large customer redemptions or other potentially legitimate customer transactions. Despite its knowledge, BONY again allowed and participated in the bulk movement of SEG 1 DTC securities into the Clearing/Collateral Account, where they could then be pledged as collateral to BONY.~~

146.     By mid-July, the SEG 1 DTC account, which had held about $338 million in face value of securities in segregation until late June, had only $85 million in face value of securities remaining. All told, over a period of less than seven weeks, Sentinel and BONY had transferred in bulk transfers, for the sole purpose of providing BONY with securities for its loan to Sentinel, more than $150 million in customer government securities and $250 million in DTC securities from segregated accounts. These transfers were in addition to the more than $300 million in customer government securities BONY already was improperly holding as collateral as of the beginning of May 2007.

147.     Sentinel managed to reduce its loan balance to $362 million by late July. However, BONY continued to hold as collateral for its loan more than $500 million in DTC and government securities that were supposed to be segregated.

148.     On about July 30, Sentinel's chief financial officer determined that SEG 1 customer

assets should not have been used as collateral for the bank loan. Sentinel then began a program, with BONY's assistance, to move huge blocks of securities serving as BONY collateral back into segregation. In order to ensure that BONY was fully collateralized on its loan, however, Sentinel and BONY undertook this program at the expense of Sentinel's SEG 3 customers and removed from segregation essentially all remaining SEG 3 customer assets that had not already been pledged for the BONY loan.

149.    As part of this program, on July 30, Sentinel and BONY moved $248 million (face value) in securities out of the DTC Clearing Account, where they had been used as collateral for the loan, and transferred them to the segregated SEG 1 DTC account. On the following day, July 31, Sentinel and BONY moved $264 million (face value) in government securities, which had been sitting in the Clearing/Collateral Account, from that account to the SEG 1 government securities account.

150.    The transfer of over $500 million (face value) of securities to SEG 1 segregated accounts over this two-day period would have created a gaping shortfall in BONY's collateral.  In order to plug that hole, on July 30 Sentinel and BONY took $289 million (face value) of securities from the segregated SEG 3 DTC account and moved them to the DTC Clearing Account, where these customer assets were commingled with assets belonging to the Insiders' House portfolio and were posted to the Clearing Collateral account as security for Sentinel's loan (the "July 30 Transfers"). This action virtually emptied the SEG 3 DTC account, leaving only $900,000 (face value) of DTC registered securities in a segregated account which for months had consistently held more than $250 million (face value) worth of securities.

151.    BONY knew that Sentinel and BONY were desegregating essentially everything in the SEG 3 DTC account and moving it into the DTC Clearing Account in order to secure the BONY loan. BONY personnel expressed surprise at Sentinel's request to desegregate but did nothing to question or prevent it.

152.    BONY further knew, because Sentinel expressly told BONY personnel, that Sentinel's

34

policy was simply to desegregate sufficient customer assets and put them in the DTC Clearing Account so that they could serve as collateral for the BONY loan.

153. On or about August 7, a BONY officer asked Eric Bloom, the chief executive officer of Sentinel, what would happen to Sentinel if BONY insisted on cutting its loan to $300 million, Sentinel's supposed credit limit. Bloom informed BONY in substance that Sentinel would not be able to meet its obligations to its customers.

154. On August 9, Sentinel entered instructions to move a substantial amount of customer securities from the DTC Clearing Account back to the DTC SEG 1 and SEG 3 accounts. BONY refused those instructions because carrying them out would have meant that Sentinel would not have enough collateral remaining to cover the BONY loan.

155. On August 10, Sentinel emailed the assistant treasurer at BONY and asked for a list of all securities that were being held in the DTC Clearing Account that were not being used as collateral "so that we can seg all the securities that you are unable to use as collateral." This email again explicitly told BONY what it already knew: that customer securities were being moved into and out of segregation based on BONY's need for collateral, not based on customer redemptions or any other legitimate customer transactions.

156. On August 13, 2007, Sentinel was unable to meet customer redemption requests and issued a letter to customers stating that redemptions had been suspended. The BONY loan for that date was $415 million.

157. On August 14, BONY officers traveled from New York to Northbrook, Illinois and met with Sentinel personnel. At that time, BONY configured its systems so that Sentinel personnel could not effect any further transactions without BONY's express approval. Government regulators also were on Sentinel's premises by that date.

158. As of August 14, approximately $113 million in customer funds had been

delivered to counterparties pursuant to overnight reverse repo agreements; the counterparties had delivered to Sentinel government securities to secure their payment obligations. These overnight reverse repos had been undertaken for the benefit of certain SEG 1 customers and unwound on a daily basis unless they were renewed. Although some of the government securities (those securing reverse repo loans totaling $36.2 million) were held in the SEG 1 segregated government securities account, additional government securities securing reverse repo loans of $77.2 million were held in the Clearing/Collateral Account in violation of CFTC Rules 1.25 and 1.26.

159.    On August 14 and 15, Sentinel allowed these overnight reverse repos to unwind. As a result, the securities were returned to the counterparties through the Clearing/Collateral Account. The counterparties paid their repo obligations to Sentinel through the Clearing/Collateral Account.

160.    ~~Because of the account architecture established by BONY, these reverse repo proceeds initially were not made available to Sentinel's customers, but were instead automatically credited against Sentinel's loan (overdraft) balance, reducing the daytime overdraft in the Clearing/Collateral Account by more than $113 million. Apparently recognizing the serious flaws in the unlawful account structure that had been established by BONY, BONY permitted Sentinel's overdraft (loan) balance to increase by $36.2 million (the amount of reverse repo proceeds associated with securities that had been held in the SEG 1 government securities account as of August 14, 2007), and permitted Sentinel to transfer that amount to SEG 1 cash accounts. BONY did not release, however, the more than $77.2 million in reverse repo proceeds associated with securities that had been held in the Clearing/Collateral Account. Instead, those funds were used to reduce Sentinel's loan balance at the expense of the Sentinel customers.~~

161.    On August 14, BONY wired $25 million on behalf of Sentinel to Fimat in order to meet a repo agreement margin call by Fimat. Eric Bloom had informed a bank officer that Bloom would move positions from a DTC SEG account into the DTC Clearing Account in order to provide additional

collateral to cover the wires, but did not do so.

162.    ~~On August 15, in blatant violation of Section 4d(b) of the CEA and CFTC Rules 1.20 and 1.26, BONY acted unilaterally to secure its loan. Without receiving any desegregation instructions from Sentinel or customer instructions, BONY unlawfully moved approximately $52 million (face value) in corporate securities out of the SEG 1 DTC account and into the DTC Clearing Account to serve as collateral for the loan.~~

163.    The following day, Sentinel contacted BONY's assistant treasurer seeking the return of those securities to the SEG 1 DTC account. The assistant treasurer said that he would only do so upon the instructions of the high-ranking BONY officer who had unilaterally authorized the moves in the first place. That officer approved the return of the securities, and they were in fact returned to the SEG 1 DTC account.

164.    On August 16, 2007, Eric Bloom entered into an agreement with Citadel Equity Fund, Ltd. and Citadel Limited Partnership to sell the SEG 1 portfolio to Citadel, and thereafter consummated that sale. ~~Even though BONY plainly knew that the securities being sold to Citadel were supposed to be segregated for SEG 1 customers,~~ BONY nonetheless refused to release all of the proceeds of the Citadel sale to Sentinel. Instead, beginning on or about August 16, 2007, and continuing thereafter, BONY asserted a lien against the Euroclear Securities Clearing Account. As a result, BONY continued to hold, *inter alia,* $16.1 million in proceeds from the Citadel sale in a cash account associated with the Euroclear Securities Clearing Account.

165.    In addition, BONY asserts a lien against all other securities in the Euroclear Securities Clearing Account, as well as all securities in the DTC Clearing Account and Physical Clearing/Custodial Account. Although on the petition date BONY's loan balance was approximately $312 million, BONY has asserted a lien against, and has refused to release to the Trustee, cash and securities worth hundreds of millions of dollars in excess of that amount.

166.    The transactions described herein and BONY's assertion of liens over funds and securities held in Sentinel's accounts have irreparably harmed Sentinel and have created losses to Sentinel and liabilities of Sentinel to its customers.

167.    BONY has filed a proof of claim in the Debtor's case, which has been assigned claim no. 76 by the Clerk of the Court, in an amount not less than $312,252,000 (the "BONY Proof of Claim'), and alleges that it holds a secured claim against the Debtor's estate by virtue of the Loan Documents (as defined in the BONY Proof of Claim) and sections 506(a) and 553 of the Bankruptcy Code. BONY further seeks in the BONY Proof of Claim pre- and post-petition interest, indemnification, and other amounts.

## COUNT ONE

### Avoidance and Recovery of Fraudulent Transfers Pursuant to §§ 548(a)(1)(A) and 550(a) of the Bankruptcy Code

168.    Plaintiff restates and realleges paragraphs 1 through 167 of this Complaint as though fully set forth herein.  [To the extent this allegation cross-references Paragraphs that have been stricken above.]

169.    Each and every transfer of cash or securities made by Sentinel from a segregated account to the Clearing/Collateral Account, DTC Clearing Account, the Euroclear Securities Clearing Account, and the Physical Clearing/Custodial Account made within two years before the Petition Date constituted a transfer of an interest in Sentinel's property.

170.    Without limiting the foregoing, each of the June 1 Transfers, the June 25-29 Transfers, the July 17 Transfers and the July 30 Transfers (the "June-July 2007 Transfers") constituted a transfer of an interest in Sentinel's property.

171.    Each of the transfers made within two years before the Petition Date (other than transfers made in connection with legitimate customer redemptions), and specifically the June-July 2007

Transfers, were made, mediately or immediately, to or for the benefit of BONY.

172.    Each of the transfers made within two years before the Petition Date (other than transfers made in connection with legitimate customer redemptions), and specifically the June-July 2007 Transfers, were made with the actual intent to hinder, delay, or defraud Sentinel's creditors.

173.    The Trustee may avoid each of the transfers made within two years before the Petition Date (other than transfers made in connection with legitimate customer redemptions), and specifically the June-July 2007 Transfers, pursuant to section 548(a)(1)(A) of the Bankruptcy Code.

174.    The Trustee may recover, for the benefit of the estate, each of the transfers made within two years before the Petition Date (other than transfers made in connection with legitimate customer redemptions), and specifically the June-July 2007 Transfers, or their value, from BONY as the party that received the transfers or benefited therefrom as described in this Complaint, as either (1) the initial transferee of the transfers or the entity for whose benefit the transfers were made, or (2) the immediate or mediate transferee of such initial transferee, pursuant to section 550(a) of the Bankruptcy Code.

WHEREFORE, Plaintiff respectfully requests that the Court enter an Order: avoiding each of the transfers made within two years before the Petition Date (other than transfers made in connection with legitimate customer redemptions), and specifically the June-July 2007 Transfers, pursuant to section 548(a)(1)(A) of the Bankruptcy Code; ordering the return and recovery of such transfers, or entering judgment against BONY pursuant to section 550(a) of the Bankruptcy Code in the amount of such transfers; awarding the Trustee punitive damages in an amount to be determined by the Court, pre- and post-judgment interest, costs and attorneys' fees and expenses; and granting such other equitable relief as may be just and proper.

## COUNT TWO

**Avoidance and Recovery of Fraudulent Transfers Pursuant to 740 ILCS 16015(a)(1) and 160/8(a), and §§ 544(b)(1) and 550(a) of the Bankruptcy Code**

175.    ~~Plaintiff restates and realleges paragraphs 1 through 174 of this Complaint as though fully set forth herein.~~ [To the extent this allegation cross-references Paragraphs that have

been stricken above.]

176.    Each and every transfer of cash or securities made by Sentinel from a segregated account to the Clearing/Collateral Account, DTC Clearing Account, the Euroclear Securities Clearing Account, and the Physical Clearing/Custodial Account on an after January 1, 2004 constituted a transfer of an interest in Sentinel's property.

177.    Without limiting the foregoing, each of the June 1 Transfers, the June 25-29 Transfers, the July 17 Transfers and the July 30 Transfers (the "June-July 2007 Transfers") constituted a transfer of an interest in Sentinel's property.

178.    Each of the transfers made on and after January 1, 2004 (other than transfers made in connection with legitimate customer redemptions), and specifically the June-July 2007 Transfers, was made, immediately or immediately, to or for the benefit of BONY.

179.    Each of the transfers made on and after January 1, 2004 (other than transfers made in connection with legitimate customer redemptions), and specifically the June-July 2007 Transfers, was made with actual intent to hinder, delay, or defraud Sentinel's creditors within the meaning of section 5 of the Illinois Uniform Fraudulent Transfer Act ("UFTA"), 740 ILCS 160/1 *et seq.*

180.    A creditor exists that could avoid such transfers, and could obtain further relief, pursuant to section 8(a) of the UFTA.

181.    Such creditor could obtain a judgment against BONY for the value of the transfers received by BONY as described in this Complaint, as either (1) the first transferee of the asset or the person for whose benefit the transfers were made, or (2) a subsequent transferee, pursuant to section 9(b) of the UFTA.

182.    The Trustee may avoid the Transfers pursuant to section 544(b)(1) of the Bankruptcy Code and may recover, for the benefit of the estate, each of the transfers made on and after January 1, 2004 (other than transfers made in connection with legitimate customer redemptions), and specifically the June-July 2007 Transfers, or their value, from BONY, as either (1) the initial transferee of the

transfers or the entity for whose benefit the transfers were made, or (2) the immediate or mediate transferee of such initial transferee, pursuant to section 550(a) of the Bankruptcy Code.

WHEREFORE, Plaintiff respectfully requests that the Court enter an Order: avoiding each of the transfers made on and after January 1, 2004 (other than transfers made in connection with legitimate customer redemptions), and specifically the June-July 2007 Transfers, pursuant to 740 ILCS 160/8(a) and section 544(b)(1) of the Bankruptcy Code; ordering the return and recovery of the transfers, or entering judgment against BONY pursuant to section 544(b)(1) and 550(a) of the Bankruptcy Code in the amount of the transfers; awarding the Trustee punitive damages in an amount to be determined by the Court, pre- and post-judgment interest, costs and attorneys' fees and expenses; and granting such other equitable relief as may be just and proper.

## COUNT THREE

### Avoidance and Recovery of Preferential Transfers Pursuant to §§ 547(b) and 550(a) of the Bankruptcy Code

183.    Plaintiff restates and realleges paragraphs 1 through 182 of this Complaint as though fully set forth herein.  [To the extent this allegation cross-references Paragraphs that have been stricken above.]

184.    The June 25-29 Transfers constituted transfers of an interest in Sentinel's property.

185.    The June 25-29 Transfers were made, mediately or immediately, to or for the benefit of BONY.

186.    The June 25-29 Transfers were made on account of antecedent debt owed by the Debtor before the June 25-29 Transfers were made.

187.    The June 25-29 Transfers were made while Sentinel was insolvent.

188.    The June 25-29 Transfers were made on or within 90 days before the Petition Date.

189.    The June 25-29 Transfers enabled BONY to receive more than it would receive if this case was a case under chapter 7 of the Bankruptcy Code, the June 25-29 Transfers had not been made,

and BONY received payment in such chapter 7 case to the extent provided by the Bankruptcy Code.

190.    The Trustee may avoid the June 25-29 Transfers pursuant to section 547(b) of the Bankruptcy Code.

191.    The Trustee may recover, for the benefit of the estate, the June 25-29 Transfers or their value from BONY, as either (1) the initial transferee of the June 25-29 Transfers or the entity for whose benefit the June 25-29 Transfers were made, or (2) the immediate or mediate transferee of such initial transferee, pursuant to section 550(a) of the Bankruptcy Code.

WHEREFORE, Plaintiff respectfully requests that the Court enter an Order: avoiding each of the June 25-29 Transfers pursuant to section 547(b) of the Bankruptcy Code; ordering the return and recovery of the June 25-29 Transfers, or entering judgment against BONY pursuant to section 550(a) of the Bankruptcy Code in the amount of the June 25-29 Transfers; awarding the Trustee pre- and post-judgment interest, costs and attorneys' fees and expenses; and granting such other equitable relief as may be just and proper.

## **COUNT FOUR**

### **Equitable Subordination of Claims and Transfer of Subordinated Lien Pursuant to § 510(c) of the Bankruptcy Code**

192.    ~~Plaintiff restates and realleges paragraphs 1 through 191 of this Complaint as though fully set forth herein.~~ [To the extent this allegation cross-references Paragraphs that have been stricken above.]

193.    ~~BONY established an account structure for Sentinel that violated applicable law and its own contractual promises, in contravention of its duties and responsibilities as a custodian for customer securities, which permitted Sentinel Insiders to engage in wrongdoing that benefited them and BONY.~~

194.    In addition, as set forth in detail in this Complaint, prior to the Petition Date, BONY engaged in transactions with or involving Sentinel solely for its own benefit and gain, in violation of its duties to Sentinel and Sentinel's customers, and to the extreme detriment of Sentinel and its

other creditors, which conduct was inequitable under the circumstances.

195.    The following actions by BONY, among others, constitute inequitable conduct: (a) ~~establishing an account structure that violated the CEA and the Investment Advisers Act and permitted segregated customer funds and securities to be commingled with Sentinel "House" assets and with the assets of other customer segregated accounts in the clearing accounts; (b) establishing an account structure under which, when securities were sold on behalf of segregated customer accounts, the proceeds of those sales automatically reduced the overdraft on Sentinel's loan, instead of being immediately credited to the segregated customer account; (c) establishing an account structure under which customer cash deposits remaining in the Clearing/Collateral Account at the end of the day would automatically be credited against Sentinel's loan; (d) permitting customer assets to be pledged for the BONY loan in violation of the CEA and CFTC regulations; (e) permitting assets in each of the customer SEGs to be transferred out of segregation and into the Clearing/Collateral Account or the DTC Clearing Account for the sole purpose of collateralizing BONY's loan to Sentinel; (f) permitting Sentinel Insiders to use customer assets to collateralize the House loan; (g) unilaterally moving securities out of segregation and into the DTC Clearing Account in order to permit BONY to assert a lien against those securities; (h) refusing to transfer securities from the Clearing/Collateral Account or the DTC Clearing Account to segregated customer accounts despite instructions to do so, in order to ensure the BONY loan was fully collateralized; (h) clearing repurchase transactions involving customer assets outside of segregated accounts; (i) failing to use account names that clearly identified accounts as belonging to customers, despite its legal obligations and explicit requests by Sentinel that BONY do so; (j) asserting a lien against the segregated customer accounts and against securities in those accounts; and (k) failing to perform its obligations under its contract in good faith.~~

196.    BONY continued to extend new credit to Sentinel, knowing that Sentinel was undercapitalized and was already in financial trouble. BONY's actions caused other creditors, who were unaware of Sentinel's undercapitalization, its debt and its financial problems, to continue to

deposit additional funds with Sentinel and/or to fail to withdraw funds from Sentinel.

197.    BONY took advantage of its position to obtain hundreds of millions of dollars in customer assets as security for its loans to Sentinel, which were delivered to BONY in violation of applicable law.

198.    As a proximate and foreseeable result of BONY's conduct, Sentinel has been damaged in an amount exceeding the amount of BONY' s claims.

199.    As a result of BONY's inequitable and unlawful conduct, good cause exists to subordinate payment of all of BONY's claims to a level below all other creditors.

200.    Subordination of BONY's claims is not inconsistent with the Bankruptcy Code.

201.    Pursuant to section 510 of the Bankruptcy Code, BONY' s liens, to the extent valid, should be transferred to the estate.

WHEREFORE, Plaintiff respectfully requests that this Court enter an order subordinating, pursuant to 11 U.S.C. § 510(c)(1), all claims asserted by BONY (including the claims set forth in the BONY Proof of Claim) to a level below all other creditors, transferring, pursuant to 11 U.S.C. § 510(c)(2), any lien supporting such claims to the estate, and granting such other and further relief as this Court deems equitable and just.

## COUNT FIVE

### Disallowance of Proof of Claim

202.    Plaintiff restates and realleges paragraphs 1 through 201 of this Complaint as though fully set forth herein.  [To the extent this allegation cross-references Paragraphs that have been stricken above.]

203.    BONY has filed the BONY Proof of Claim in the Debtor's case, seeking an amount not less than $312,252,000 and alleging that it holds a secured claim against the Debtor's estate by virtue of the Loan Documents (as defined in the BONY Proof of Claim) and sections 506(a)

and 553 of the Bankruptcy Code. BONY further seeks in the BONY Proof of Claim pre-and post-petition interest, indemnification, and other amounts.

204.    BONY has failed to turn over to Plaintiff property of the Debtor's estate which is recoverable by the Plaintiff, namely the amounts demanded in Counts One through Eight herein.

205.    Pursuant to Section 502(d) of the Bankruptcy Code, each claim asserted by BONY must be disallowed because property of the Debtor's estate is recoverable from BONY and BONY has not turned over that property to Plaintiff.

206.    In addition, as set forth in detail in this Complaint, prior to the Petition Date, BONY engaged in transactions with or involving Sentinel solely for its own benefit and gain, in violation of its duties to Sentinel and Sentinel's customers, and to the extreme detriment of Sentinel and its other creditors, which conduct was inequitable under the circumstances.

207.    ~~The following actions by BONY, among others, constitute grounds for the disallowance of BONY's claim: (a) establishing an account structure that violated the CEA and the Investment Advisers Act and permitted segregated customer funds and securities to be commingled with Sentinel "House" assets and with the assets of other customer segregated accounts in the clearing accounts; (b) establishing an account structure under which, when securities were sold on behalf of segregated customer accounts, the proceeds of those sales automatically reduced the overdraft on Sentinel's loan, instead of being immediately credited to the segregated customer account; (c) establishing an account structure under which customer cash deposits remaining in the Clearing/Collateral Account at the end of the day would automatically be credited against Sentinel's loan; (d) permitting customer assets to be pledged for the BONY loan in violation of the CEA and CFTC regulations; (e) permitting assets in each of the customer SEGs to be transferred out of segregation and into the Clearing/Collateral Account or the DTC Clearing Account for the sole purpose of collateralizing BONY's loan to Sentinel; (f) permitting Sentinel insiders to use customer assets to collateralize the House loan; (g) unilaterally moving securities out of segregation and into the DTC~~

~~Clearing Account in order to permit BONY to assert a lien against those securities; (h) refusing to transfer securities from the Clearing/Collateral Account or the DTC Clearing Account to segregated customer accounts despite instructions to do so, in order to ensure the BONY loan was fully collateralized; (h) clearing repurchase transactions involving customer assets outside of segregated accounts; (i) failing to use account names that clearly identified accounts as belonging to customers, despite its legal obligations and explicit requests by Sentinel that BONY do so; (j) asserting a lien against the segregated customer accounts and against securities in those accounts; and (k) failing to perform its obligations under its contract in good faith.~~

208.    ~~BONY's claim against the Debtor's estate should also be disallowed because the clearing and custody agreements, the security agreements, and the account structure established by BONY contradict the express provisions of and are unlawful under Sections 4(b), 4d(a)(2), and 4d(b) of the CEA and CFTC Rules 1.20, 1.25, 1.26, 1.49 and 30.7, and the agreements are therefore illegal, void and unenforceable by BONY.~~

209.    As a proximate and foreseeable result of BONY's conduct, including but not limited to the conduct described in paragraphs 1 through 167 of the Complaint, Sentinel has been damaged in an amount exceeding the amount of BONY's claims.

210.    As a result of BONY's conduct, including but not limited to the conduct described in paragraphs 1 through 167 of the Complaint, good cause exists to equitably disallow any and all of BONY's claims against Sentinel.

211.    As a result of BONY's inequitable and improper conduct, the BONY Proof of Claim should be disallowed.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment disallowing each and every claim asserted by BONY against the Debtor's estate, expressly including but not limited to the BONY Proof of Claim, and for such other relief as this Court deems equitable and just.

## COUNT SIX

### Equitable Disallowance of Proof of Claim

212.    ~~Plaintiff restates and realleges paragraphs 1 through 211 of this Complaint as though fully set forth herein.~~  [To the extent this allegation cross-references Paragraphs that have been stricken above.]

213.    ~~BONY established an account structure for Sentinel that violated applicable law, in contravention of its duties and responsibilities as a custodian for customer securities, which permitted Sentinel Insiders to engage in wrongdoing that benefited them and BONY.~~

214.    In addition, as set forth in detail in this Complaint, prior to the Petition Date, BONY engaged in transactions with or involving Sentinel solely for its own benefit and gain, in violation of its duties to Sentinel and Sentinel's customers, and to the extreme detriment of Sentinel and its other creditors, which conduct was inequitable under the circumstances.

215.    ~~The following actions by BONY, among others, constitute grounds for the equitable disallowance of BONY's claim: (a) establishing an account structure that  the CEA and the Investment Advisers Act and permitted segregated customer funds and securities to be commingled with Sentinel "House" assets and with the assets of other customer segregated accounts in the clearing accounts; (b) establishing an account structure under which, when securities were sold on behalf of segregated customer accounts, the proceeds of those sales automatically reduced the overdraft on Sentinel's loan, instead of being immediately credited to the segregated customer account; (c) establishing an account structure under which customer cash deposits remaining in the Clearing/Collateral Account at the end of the day would automatically be credited against Sentinel's loan; (d) permitting customer assets to be pledged for the BONY loan in violation of the CEA and CFTC regulations; (e) permitting assets in each of the customer SEGs to be transferred out of segregation and into the Clearing/Collateral Account or the DTC Clearing Account for the sole purpose~~

47

of collateralizing BONY's loan to Sentinel; (f) permitting Sentinel insiders to use customer assets to collateralize the House loan; (g) unilaterally moving securities out of segregation and into the DTC Clearing Account in order to permit BONY to assert a lien against those securities; (h) refusing to transfer securities from the Clearing/Collateral Account or the DTC Clearing Account to segregated customer accounts despite instructions to do so, in order to ensure the BONY loan was fully collateralized; (h) clearing repurchase transactions involving customer assets outside of segregated accounts; (i) failing to use account names that clearly identified accounts as belonging to customers, despite its legal obligations and explicit requests by Sentinel that BONY do so; (j) asserting a lien against the segregated customer accounts and against securities in those accounts; and (k) failing to perform its obligations under the contract in good faith.

216.    BONY continued to extend new credit to Sentinel, knowing that Sentinel was undercapitalized and was already in financial trouble. BONY's actions caused other creditors, who were unaware of Sentinel's undercapitalization, its debt and its financial problems, to continue to deposit additional funds with Sentinel and/or to fail to withdraw funds from Sentinel.

217.    BONY took advantage of its position to obtain hundreds of millions of dollars in customer assets as security for its loans to Sentinel, which were delivered to **BONY** in violation of applicable law.

218.    As a proximate and foreseeable result of **BONY's** conduct, Sentinel has been damaged in an amount exceeding the amount of BONY' s claims.

219.    As a result of BONY's inequitable and unlawful conduct, good cause exists to equitably disallow any and all of BONY's claims against Sentinel.

220.    Equitable disallowance of BONY's claims is not inconsistent with the Bankruptcy Code.

WHEREFORE, Plaintiff respectfully requests that this Court enter an order equitably disallowing all claims asserted by BONY, including the BONY Proof of Claim, and granting such

other and further relief as this Court deems equitable and just.

## COUNT SEVEN

### Action to Determine Validity and Extent of Lien and for
### Turnover of Property under 11 U.S.C. §§ 542 and 506

221.    ~~Plaintiff restates and realleges paragraphs 1 through 220 of this Complaint as though fully set forth herein.~~  [To the extent this allegation cross-references Paragraphs that have been stricken above.]

222.    BONY has asserted in the BONY Proof of Claim and otherwise that Sentinel granted it a valid, perfected and enforceable security interest in the Clearing/Collateral Account, the DTC Clearing Account, the Euroclear Securities Clearing Account, and the Physical Clearing/Custodial Account, the securities contained therein, and in certain cash accounts linked or associated with the foregoing accounts (collectively, the "Alleged Collateral Accounts").

223.    BONY knew that the cash and securities now held in the Alleged Collateral Accounts were supposed to be the property of Sentinel's customers and that Sentinel could not pledge or deliver that property as collateral for BONY's loans to Sentinel.

224.    ~~The clearing and custody agreements and the agreements purportedly granting BONY a security interest in one or more of the Alleged Collateral Accounts contradict the express provisions of the CEA and Investment Advisers Act, including Sections 4d(a)(2) and 4d(b) of the CEA and CFTC Rule 1.20 (which requires that customer funds at all times be segregated as belonging to commodity customers, and be deposited only in accounts which clearly identifies them as customer property); CFTC Rule 1.20(a) (which expressly prohibits the pledging of customer funds to secure a loan for any purpose other than for customer commodity transactions); CFTC Rule 1.25 (which prohibits any repurchase or reverse repurchase transactions from taking place outside of customer segregated accounts, and requires that all repo transactions for the benefit of customers take place and settle solely~~

in segregated accounts); Section 4d(a)(2) of the CEA and CFTC Rule 1.26 (which mandates that any securities in which customer funds are invested must be maintained at all times in segregation); and Section 4(b) of the CEA and CFTC Rule 30.7 (which requires that funds of FCM customers engaged in trading at foreign exchanges also be separately segregated and invested), and are therefore illegal, void and unenforceable by BONY.

225. The clearing and custody agreements and the agreements purportedly granting BONY a security interest in one or more of the Alleged Collateral Accounts, as well as the account structure established by BONY, are unlawful under Sections 4(b), 4d(a)(2), and 4d(b) of the CEA and CFTC Rules 1.20, 1.25, 1.26, 1.49 and 30.7, and Section 206 of the Investment Advisers Act and SEC Rule 206(4)-2, and are therefore illegal, void and unenforceable by BONY.

226. To the extent BONY asserts liens or rights of set-off by reason of its possession or control over cash and securities in the Alleged Collateral Accounts, such liens or rights of set-off are unlawful and cannot be enforced.

227. In the alternative, the agreements purportedly granting BONY a security interest in one or more of the Alleged Collateral Accounts do not grant BONY a security interest in any of the Alleged Collateral Accounts or the assets held therein.

228. Further, in the alternative, BONY's claims against the Debtor are not allowed secured claims, and pursuant to section 506(d) of the Bankruptcy Code any liens securing such claims are void.

229. Pursuant to section 542 of the Bankruptcy Code, BONY is required to turn over the cash and securities held in the Alleged Collateral Accounts to the Trustee.

WHEREFORE, Plaintiff respectfully requests that this Court enter an order, pursuant to 11 U.S.C. § 506, determining that BONY does not have a valid, perfected and enforceable security interest in any of Alleged Collateral Accounts or the securities or cash held therein, ordering pursuant to 11 U.S.C. § 542 the immediate turnover and delivery of all securities and cash held in the

Alleged Collateral Accounts to the Trustee, and granting such other and further relief as this Court deems equitable and just.

## COUNT EIGHT

### Aiding and Abetting/Knowing Participation in Breach of Fiduciary Duty by Sentinel Insiders

230.    ~~Plaintiff restates and realleges paragraphs 1 through 229 of this Complaint as though fully set forth herein.~~  [To the extent this allegation cross-references Paragraphs that have been stricken above.]

231.    At all times relevant to this Complaint, Philip Bloom, Eric Bloom and Charles Mosley were officers, directors and/or controlling shareholders of Sentinel.

232.    As directors, officers and controlling shareholders of Sentinel, Philip Bloom, Eric Bloom and Charles Mosley owed a fiduciary duty of loyalty to Sentinel.

233.    As directors, officers and controlling shareholders of Sentinel, Philip Bloom, Eric Bloom and Charles Mosley owed a fiduciary obligation to act with due care and to deal honestly and fairly with Sentinel.

234.    Philip Bloom, Eric Bloom and Charles Mosley breached their fiduciary duties to Sentinel, by among other things, commingling customer securities and money with securities and money belonging to the House, commingling customer securities and money from one segregated account with those from another segregated account, pledging customer funds to secure the BONY loan, clearing and maintaining customer funds and securities in accounts that were not registered in Sentinel's name as agent or trustee of its clients, transferring securities out of segregation to collateralize the BONY loan, pledging customer securities to collateralize a loan for the benefit of the Sentinel Insiders themselves, and borrowing funds from BONY far in excess of Sentinel's ability to repay.

235.    BONY colluded with the Sentinel Insiders and knowingly participated in, aided, assisted

and benefited from Philip Bloom's, Eric Bloom's and Charles Mosley's breaches of their fiduciary duties to Sentinel.

236.    Sentinel has been damaged as a result of BONY's participation in each of Philip Bloom's, Eric Bloom's, and Charles Mosley's breaches of their fiduciary duties.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and against BONY for compensatory damages, plus punitive damages in an amount to be determined by the Court, interest, costs and attorneys' fees, and grant such other equitable relief as may be just and appropriate.

Dated: March 3, 2008

Respectfully submitted,

FREDERICK J. GREDE, not individually but as Chapter 11 Trustee of Sentinel Management Group, Inc.

By:   One of his attorneys

John F. Kinney (ARDC # 1467867)
Daniel R. Murray (ARDC # 1999951) J.
Kevin McCall (ARDC # 3125685)
Catherine L. Steege (ARDC # 6183529)
Chris C. Gair (ARDC # 6190781)
Vincent E. Lazar (ARDC # 6204916)
JENNER & BLOCK LLP
330 N. Wabash Ave.
Chicago, IL 60611
Phone: (312) 222-9350
Facsimile: (312) 527-0484

# EXHIBIT D

1

```
 1            IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS
 2                  EASTERN DIVISION

 3  Frederic j. Grede, as Chapter )
    11 Trustee for the Sentinel   )
 4  Management Group, Inc.,       )
                                  )
 5                                )   No. 08 CV 2582
                                  )
 6         Plaintiff,             )
                                  )
 7  vs.                          )   Chicago, Illinois
                                  )
 8  THE BANK OF NEW YORK, et al., )   May 13, 2008
                                  )
 9         Defendants.            )   10:40 o'clock a.m.

10              TRANSCRIPT OF PROCEEDINGS
11       BEFORE THE HONORABLE JAMES B. ZAGEL

12

13  For the Plaintiff:
                 JENNER & BLOCK
14               BY: Chris C. Gair
                     Jeffrey S. Eberhard
15               One IBM Plaza
                 Chicago Illinois 60611
16
    For the Defendants:
17               MAYER, BROWN, LLP
                 BY: Sean T. Scott
18               71 South Wacker Drive
                 Chicago Illinois 60606
19

20

21  Court reporter:

22               Blanca I. Lara, CSR, RPR
                 219 South Dearborn Street
23                    Room 2504
                 Chicago, Illinois 60604
24                  (312) 435-5895

25
```

10:40AM

1       THE CLERK:   2008 C 2582, Grede versus The
2 Bank of New York.

3       MR. GAIR:   Your Honor, Chris Gair and Jeff
4 Eberhard on behalf of the trustee, Fred Grede.

10:40AM 5       MR. SCOTT:   Good morning, your Honor.

6       Sean Scott appearing on behalf of the movant
7 defendants, The Bank of New York and the Bank of New
8 York Mellon Corp.

9       THE COURT:   I have not read it, which is not
10:40AM 10 a common circumstance, so you can tell me.

11       MR. GAIR:   Judge, this is arising out of the
12 Sentinel bankruptcy case.   There are a number of
13 adversary proceedings and motions to withdraw the
14 reference pending before you now in this case and
10:41AM 15 also in the case in which the trustee sued McGladrey
16 & Pullen.   To add a layer of procedural complexity,
17 we have also moved to relate or are moving to relate
18 these cases to a previously filed action before
19 Judge Kocoras.

10:41AM 20       But with respect to the motions pending,
21 they've moved to withdraw the reference, BONY has
22 moved to withdraw the reference from Judge Squires
23 on the grounds that there is a serious open federal
24 question embedded in this bankruptcy case.

10:41AM 25       We can respond in writing, Judge, but I'll

1  tell you what the issue is, if you want to hear it.

2       THE COURT:   Go ahead.

3       MR. GAIR:   The question is whether Sentinel,

4  and, therefore, The Bank of New York, has been

5  properly registered as an FCM for the last thirty

6  years, a futures commission merchant, for the last

7  thirty years or whether, in fact, everybody,

8  including the bank, Sentinel, and the CFTC has been

9  operating under a mistake for the last thirty years

10  in thinking that Sentinel was an FCM subject to the

11  CEA.

12       If their position was accepted, that Sentinel

13  is not an FCM subject to the CEA, all it would do

14  would be to take out some of our evidence on some of

15  our counts.   It's really not a reason to withdraw

16  the reference from the bankruptcy court.

17       MR. SCOTT:   Your Honor, I think our position

18  is laid out in substantial, more detailed in our

19  memorandum in support, but I will say there are

20  several open unresolved issues of non-Title 11 law,

21  and with all due respect to Mr. Gair, he

22  oversimplifies the nature of our motions.

23       The trustee's claims in the bankruptcy case

24  relied principally on alleged violations of the

25  Commodities Exchange Act and of the Investment

4

1  Advisers Act of 1940.  We think there are serious
2  flaws with attempting to subordinate Bank of New
3  York's claims or disallow its otherwise secured
4  claims on the basis of purported violations of these
5  statutes.  With respect to the Commodities Exchange
6  Act, your Honor, regardless of the registration of
7  Sentinel as an FCM in the early 1980's, the fact is,
8  if you look at what the statute provides and what a
9  futures commission merchant must engage in, Sentinel
10 was not a futures commission merchant, and the
11 trustee has effectively conceded as such in his own
12 complaint.
13       They were not accepting money to margin or
14 secure commodities trades.  They were a money
15 manager, plain and simple.  And the registration
16 with the CFTC originally indicated that they were a,
17 quote, special purpose futures commission merchant,
18 which we think means they weren't, in fact, one that
19 is regulated under the Act.
20       Beyond that, your Honor, both the CEA and the
21 Investment Advisers Act do not provide for private
22 rights of action of the type that the trustee, in
23 our view, is seeking to bootstrap those two
24 statutes, two claims under the bankruptcy code.  And
25 we cited a line of authority that we think would be

10:43AM

10:43AM

10:43AM

10:43AM

10:44AM

5

applicable here, as well, that in light of the
Supreme Court precedent on both those Acts, that
there are not private rights of action for the
violations that Mr. Gair's client has alleged here;
that, in light of that, it would be improper for the
bankruptcy court, or we believe this court if the
reference is withdrawn, to either subordinate or
disallow Bank of New York's claims against the
estate based on alleged violations of acts for which
the trustee would otherwise have no private right of
action.

       MR. GAIR:  Judge, if feel assured that Judge
Squires is very capable of deciding whether or not:
A, there's a private right of action under these
statutes, especially since we are conceding that
there is no private right of action applicable to
us.  But, B, to decide whether we can properly claim
that a violation of federal law is inequitable
conduct which would then sustain our claim of
equitable subordination.

       Basically, we're saying BONY committed
serious violations of federal law and that's one
reason why their secured claims should be
subordinated to the $500 million worth of claims of
the customers who actually lost money here.

1          So this is an issue that Judge Squires is
2     very familiar with.  I don't think there's an open
3     issue of federal law here other than, frankly, a
4     very light one, and I don't think anybody is going
5     to end up deciding that BONY can now say Sentinel
6     should never have been registered as an FCM,
7     therefore, thirty years of regulation is
8     meaningless, BONY's acquiescence to Sentinel being
9     an FCM is meaningless, and I just don't think that's
10    likely to happen, and I think that this will simply
11    delay the proceedings in the bankruptcy court where
12    we're trying to get as much money back for the
13    customers as we can.

14          THE COURT:  What's before Judge Kocoras?

15          MR. GAIR:  Before Judge Kocoras right now is
16    the SEC's action against Sentinel, which the SEC has
17    said to Judge Kocoras that they are likely to amend
18    to add additional parties.

19          We have moved with respect to
20    another adversary, against McGladrey & Pullen, the
21    accounting firm that was assigned to you, we have
22    moved in front of Judge Kocoras to have that case
23    related to Judge Kocoras.

24          There is a case before Judge Shadur, the
25    CFTC's action against Sentinel and certain insiders

1  which they have moved to have reassigned to Judge

2  Kocoras.

3       There is a class action pending before Judge

4  Andersen.

10:47AM  5       Have I got everything?

6       MR. EBERHARD:   Yes.

7       MR. GAIR:   I think that's it, Judge.

8       THE COURT:   I take it because this is in the

9  bankruptcy court, none of this is going to wind up

10:47AM  10  with the MDL.

11       MR. GAIR:   Right.  It's all in this district.

12       THE COURT:   It's all here.

13       MR. GAIR:   Yeah.

14       THE COURT:   Does anybody happen to know Judge

10:47AM  15  Kocoras's number?

16       MR. GAIR:   I don't, off the top of my head.

17       MR. SCOTT:   The case number?  I believe it's

18  07 4684, but ...

19       MR. EBERHARD:   Yeah, 07 4684, it's the lowest

10:47AM  20  numbered case.

21       THE COURT:   Okay, let me read the papers and

22  then I'll tell you if I want responses or if I

23  don't.

24       MR. GAIR:   Thank you, your Honor.

25       MR. SCOTT:   Thank you, your Honor.

8

1       THE COURT:   Thanks, counsel.

2

3

4

5   (Which were all the proceedings in the above

6    entitled cause on this date.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

10:48AM    25

9

* * * * * * * *

I, BLANCA I. LARA, DO CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

_____          _____
Blanca I. Lara                                              Date

# EXHIBIT E

```
     0001
1                   IN THE UNITED STATES BANKRUPTCY COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
2                            EASTERN DIVISION
3
4        In re:                         )
                                        ) No. 07 B 14987
5        SENTINEL MANAGEMENT GROUP,     )
                                        ) Chicago, Illinois
6                                       ) June 10, 2008
                            Debtor.     ) 10:00 a.m.
7
8              TRANSCRIPT OF PROCEEDINGS BEFORE THE
                    HONORABLE JOHN H. SQUIRES
9
10       APPEARANCES:
11       MR. BRIAN HERMANN
         MR. ARTHUR HAHN
12       on behalf of Discus Master, Limited;
13       MR. PAUL CARUSO
         on behalf of Lehman Brothers, Inc.;
14
         MR. CHRIS GAIR
15       MR. VINCE LAZAR
         on behalf of the trustee;
16
         MR. JOHN SIEGER
17       on behalf of Jump Trading, CF/Clutterbuck, Old
         Mutual, Preferred Investments, and SMW;
18
         MR. MARK BERKOFF
19       MR. SUSHELL KIRPALANI
         on behalf of the official committee;
20
         MR. FREDERICK GREDE
21       trustee of Sentinel Management Group;
22       MR. SEAN SCOTT
         MR. BRIAN TRUST
23       MR. MATTHEW INGBER
         on behalf of the Bank of New York;
24
         MR. DAVID GENELLY
25       on behalf of Kotke Associates;
```

1

```
1
            MR. JEFF GOODMAN
2           MR. WILLIAM MCKENNA
            MR. STEPHEN BEDELL
3           on behalf of the ad hoc committee of Seg 1
            Customers;
4
            MR. IRA BODENSTEIN
5           MR. ROBERT FISHMAN
            on behalf of the receiver for Lake Shore Asset
6           Management;
7           MR. JEFF MARWIL
            on behalf of Citadel Equity Fund, Limited;
8
            MR. ROBERT SHANNON
9           on behalf of Vision Financial Markets and IPGL,
            Limited;
10
            MR. TIM CASEY
11          MR. ANDREW WEISMAN
            on behalf of Penson GHCO and Penson Financial
12          Futures.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1            THE CLERK:  Taking up the court's 10:00

2    o'clock matters, Sentinel Management Group, 07

3    B 14987.

4            MR. HERMANN:  Brian Hermann from Paul,

5    Weiss, Rifkind, Wharton & Garrison on behalf of

6    Discus Master, Limited.

7            THE COURT:  Good morning.

8            MR. CARUSO:  Your Honor, Paul Caruso,

9    Sidley Austin, on behalf of Lehman Brothers, Inc.

10           THE COURT:  Good morning.

11           MR. HAHN:  Arthur Hahn on behalf of

12   Discus.

13           MR. GAIR:  Chris Gair for the trustee.

14           MR. SIEGER:  Your Honor, John Sieger,

15   Katten Muchin, for Jump Trading, CF/Clutterbuck, Old

16   Mutual, Preferred Investments, and SMW.

17           THE COURT:  Okay.

18           MR. BERKOFF:  Good morning, Your Honor.

19   Mark Berkoff on behalf of the committee.

20           THE COURT:  Good morning.

21           MR. KIRPALANI:  Good morning, Your Honor.

22   Sushell Kirpalani of Quinn Emanuel on behalf of the

23   official committee.

24           THE COURT:  Good morning.

25           MR. GREDE:  Frederick Grede, trustee,

1    Sentinel Management Group.

2               THE COURT:  Mr. Grede.

3               MR. LAZAR:  Vince Lazar on behalf of the

4    trustee.

5               THE COURT:  Mr. Lazar.

6               MR. SCOTT:  Good morning, Your Honor.

7    Sean Scott appearing on behalf of the Bank of New

8    York.

9               THE COURT:  Mr. Scott.

10              MR. SCOTT:  I also have here with me this

11   morning Brian Trust, who is resident in our New York

12   office, also appearing on behalf of the bank.

13              MR. TRUST:  Good morning, Your Honor.

14   Brian Trust.

15              THE COURT:  Good morning.

16              MR. GENELLY:  Good morning, Your Honor.

17   David Genelly on behalf of Kotke Associates.

18              THE COURT:  Mr. Genelly.

19              MR. GOODMAN:  Good morning, Your Honor.

20   Jeff Goodman, Foley & Lardner, on behalf of the ad

21   hoc committee of Seg 1 Customers.

22              MR. MCKENNA:  Your Honor, William McKenna

23   also on behalf of the ad hoc committee.

24              THE COURT:  Mr. McKenna.

25              MR. BODENSTEIN:  Good morning, Your

4

1    Honor.  Ira Bodenstein on behalf of the receiver for

2    Lake Shore Asset Management.  With me is Robert

3    Fishman.

4              THE COURT:  Gentlemen.

5              MR. BEDELL:  Stephen Bedell, Your Honor,

6    also of Foley & Lardner on behalf of the ad hoc

7    committee.

8              THE COURT:  Good morning.

9              MR. MARWIL:  Good morning, Your Honor.

10   Jeff Marwil on behalf of Citadel Equity Fund,

11   Limited.

12             THE COURT:  Good morning.

13             MR. SHANNON:  Good morning.  Robert

14   Shannon on behalf of Vision Financial Markets and

15   IPGL, Limited.

16             THE COURT:  Good morning.

17             MR. CASEY:  Good morning, Your Honor.

18   Tim Casey on behalf of Penson GHCO and Penson

19   Financial Futures.

20             THE COURT:  Good morning.

21             MR. WEISMAN:  Good morning, Your Honor.

22   Andrew Weisman on behalf of Penson GHCO and Penson

23   Financial Futures.

24             THE COURT:  Good morning.

25                  Okay.  The first thing on the docket

1     is the hearing on the adequacy of the disclosure

2     statement filed by the plan proponents, the trustee

3     and the unsecured creditors committee.  It looks

4     like it produced about half a dozen objections.

5               MR. LAZAR:  That's correct, Your Honor.

6               THE COURT:  I've had a chance to review

7     them.

8                    I understand there was yesterday

9     filed an omnibus response to all of the objections

10    by those plan proponents with a proposed amended

11    disclosure statement.

12              MR. LAZAR:  That's correct, Your Honor.

13    We submitted an omnibus response to all of the

14    objections.  It was a joint response of the

15    committee and trustee.  We attached thereto a

16    black-line tracking changes to the disclosure

17    statement, and also a chart for Your Honor's

18    convenience showing all of the various changes --

19              THE COURT:  Okay.

20              MR. LAZAR:  -- as the second exhibit.

21              THE COURT:  Okay.

22                   Everybody had a chance to review and

23    digest the same?

24              MR. SHANNON:  No, Your Honor.  We've been

25    going through this.  We think there are a certain

 1    amount of inconsistencies still in the language.  I

 2    mean, there's quite a few changes to both the plan

 3    and disclosure statement.  We can address some of

 4    those now.  But that is I think part of the concern.

 5                    This was filed yesterday evening,

 6    and we've really not had an opportunity to make sure

 7    the changes -- you know, to fully understand the

 8    changes and make sure the changes are consistent

 9    internally with what is happening in the plan.

10              THE COURT:  How much time do you need,

11    Mr. Shannon?

12              MR. SHANNON:  I would think we should

13    have a day, maybe two-day continuance to have a

14    chance to look at these documents, Your Honor.  I

15    think a day will do it.

16              MR. LAZAR:  Your Honor, we obviously have

17    a lot of people here, including a lot of people that

18    have traveled from out of town on a hearing that's

19    been scheduled for well over a month.  We understand

20    the timing.

21                    What I suggest we do is we proceed

22    with the hearing.  I think we can address the

23    changes as we go.  And if Mr. Shannon needs some

24    additional time for wordsmithing, you know, some of

25    the changes, I suggest we can, you know, submit an

1    additional red-line within the next day or two and

2    move forward, but that we not continue today's

3    hearing, given the tremendous amount of effort to

4    get everyone here for this hearing.

5            MR. MCKENNA:  Your Honor, on behalf of

6    the ad hoc committee, we also in our objection

7    raised with Your Honor continuing the entire hearing

8    on the disclosure statement to permit the ad hoc

9    committee's plan and disclosure statement to be

10   considered in tandem.

11           THE COURT:  Right.  Well, here's what

12   we're going to do:  One, this is a complicated case,

13   to say the least.  Nobody has asked for a combined

14   hearing on adequacy of a disclosure statement and

15   confirmation, thankfully.  And I don't subscribe to

16   the line of cases that have been cited in most of

17   the objections that somehow the plan is

18   unconfirmable on its face and we should shut it down

19   at the disclosure statement hearing.  I prefer to

20   bifurcate in a complicated case and reserve all plan

21   confirmation objections to the confirmation hearing,

22   which is the main event anyway.

23               The problem I've got with your

24   point, Mr. Lazar, is what you filed in response was

25   just filed yesterday.  We've expanded, what, a

1    68-page disclosure statement to one that's a mere 76

2    pages, which is still a small book.  And I think

3    fundamental concepts of due process militate in

4    favor of notice and opportunity to see if there's

5    continuing problems.  I didn't see any, okay?  But

6    by the same token, I'm not as invested in this

7    matter as you all are.  And in fairness to counsel,

8    especially for the objectors, they ought to have a

9    brief additional amount of time.  If they want to

10   formulate additional objections to the adequacy for

11   1125 purposes of the amended disclosure statement,

12   I'm certainly going to give them a reasonably but

13   short opportunity to do that.

14              But at first blush, I thought that

15   virtually all the adequacy objections have been

16   addressed in the amended disclosure statement.

17         MR. BERKOFF:  May I suggest something,

18   Your Honor?  Since a lot --

19         THE COURT:  What's that?

20         MR. BERKOFF:  Since a lot of people have

21   traveled from out of town, I don't know if it makes

22   sense, but if we could adjourn the hearing for an

23   hour or hour-and-a-half, people could read it, and

24   we could talk if they have concerns about

25   wordsmithing so that everybody doesn't have to fly

1    back in town, make hotel arrangements a day or two

2    from now.

3              THE COURT:  Is that agreeable with

4    counsel, or are you going to need more than a few

5    hours?

6              MR. MCKENNA:  Your Honor, we just got

7    this last night, and we'd really like some

8    reasonable opportunity --

9              THE COURT:  Right.

10             MR. MCKENNA:  -- to address it.  I don't

11   think an hour is going to do it.

12             MR. SHANNON:  And, Your Honor, there are

13   some, you know, what we consider significant

14   changes.  For example, the liquidation analysis

15   shows an increase of cash of $12 million, which is

16   very nice, not a corresponding decrease in the value

17   of securities.  I'm sure that's information that can

18   be provided to us and explained to us.  But that

19   clearly potentially affects what needs to go in the

20   disclosure statement.  I mean, for example, there

21   are changes --

22             THE COURT:  Well, again, how much time do

23   you need, Mr. Shannon?

24             MR. SHANNON:  I would think, Your Honor,

25   a day would do it.

1         MR. MCKENNA:  Your Honor, would the court

2    consider the ad hoc committee's position with

3    respect to putting these two plans on the same

4    track?

5         THE COURT:  No, I'm not going to do that,

6    Mr. McKenna, because it's going to be confusing

7    enough for the average unsecured creditor, if there

8    is one in this case who is unsophisticated, who is

9    unrepresented by counsel.  I haven't had a chance to

10   begin to digest your constituency's competing plan

11   and disclosure statement.

12            What I want to avoid is confusion in

13   the minds of the hypothetical unsophisticated

14   unsecured creditor, and there may be some of them in

15   this case, by having them try and digest both your

16   constituency's plan and the instant plan proponent's

17   plan and disclosure statement at the same time.  To

18   me, the possibility for confusion is enhanced by

19   doing them both at the same time.  I think they

20   ought to be done seriatim, go through a contested

21   confirmation hearing, which I anticipate on this

22   one, after everybody has exercised their franchise,

23   see what happens, and then deal with yours, okay?

24   And I'm not going to delay it.

25            But to me, the main event of any

1    Chapter 11 case is a plan and whether or not it

2    meets the confirmation standards of Section 1129.

3    This case is a lot more complicated than most

4    Chapter 11s that have been crossing my bench in the

5    recent years.  And I don't want to add to the

6    confusion of the hypothetical unsecured creditor who

7    is trying to figure out which plan to support or not

8    by having two of them be considered simultaneously.

9            MR. TRUST:  Your Honor, Brian Trust.

10   From the Bank of New York's perspective, we've had

11   an opportunity last night to review the response to

12   the various objections.  It appears to me that there

13   are certain changes that would have been made to the

14   plan in and of itself.  From the Bank of New York's

15   perspective, the actual changes require and merit

16   further study.

17            More importantly, on the narrow

18   issue of 1125 from a disclosure perspective, at

19   least to me on some very fundamental issues, for

20   example, the characterization of the claim, it looks

21   to me, and I haven't had a chance to fully review

22   carefully the entire revised disclosure statement,

23   as if it's stated to be potentially unimpaired or

24   provisionally unimpaired.  In the response, it looks

25   to me, based on the black-line of the disclosure

1    statement and the chart, page 6, unimpaired, the

2    treatment of the purported reserve relative to the

3    secured claim, description in response one way.

4                Based on my review, page 46 of the

5    disclosure statement, virtually no change, not a

6    substantive one.  Now, I'm not suggesting this is a

7    deep-down analysis of every word.  Candidly, it's

8    not because we simply have had insufficient time.

9                THE COURT:  Right.

10               MR. TRUST:  But the complexities of both

11   the plan --

12               THE COURT:  I understand.

13               MR. TRUST:  -- and disclosure statement

14   merit not just an hour, probably not a day, but I

15   believe some reasonable period of time for the

16   parties to assess what is an extraordinarily

17   complicated plan and disclosure statement attendant

18   thereto.

19               THE COURT:  How much time do you need?

20               MR. TRUST:  I would say, Your Honor,

21   either (A) probably early next week or towards the

22   end of this week, Thursday or Friday.  But I do

23   think it merits some careful study, given the

24   relative complexities of all of the claims, the

25   plan, the structure, and, more importantly, the

1    treatment relative to the secured claim of Bank of

2    New York.

3              MR. MCKENNA:  Your Honor, taking into

4    account Your Honor's comments, the ad hoc committee

5    would support early next week to allow us some time

6    to get through these changes and suggest alternative

7    language.

8              THE COURT:  Okay.  All right.  I can kick

9    it over to next week.  Always avoid Wednesdays

10   because that's my Chapter 13 call, and I don't think

11   you want to come in at the tail end of that.  I

12   don't know that I'd at all want you here after the

13   tail end of that.  And Fridays I do the DuPage call.

14   I can't do it Thursday and Friday of this week

15   because I'm participating in the ABI Central States

16   Workshop, which I help plan.  I've got to

17   participate in that.  And I need continuing

18   education as much as any other lawyer.  So that's

19   why I'm unavailable after tomorrow.

20              What is the best day for everybody's

21   calendar next week on Monday, Tuesday or Thursday?

22   I will try to accommodate especially out-of-town

23   counsel who have the burning desire to come back

24   here for this.

25              MR. LAZAR:  Your Honor, I think Monday is

14

1    probably going to work best from our side.  Thursday

2    I know doesn't work.

3                    THE COURT:  All right.

4                    What about other counsel for

5    especially the objectors?

6                    MR. TRUST:  Your Honor, from Bank of New

7    York's perspective, I'm actually totally unavailable

8    next Tuesday.  However, I can appear on Monday.

9                    THE COURT:  Okay.

10                   MR. TRUST:  If that's acceptable.

11                   MR. BERKOFF:  Monday only works for me.

12                   MR. KIRPALANI:  Monday works.

13                   THE COURT:  Does Monday work for

14   everybody else?

15                   MR. SHANNON:  Yes, Monday works.

16                   THE COURT:  Okay.  Then we'll kick it

17   over to June 16 at -- I think I've got a relatively

18   light call, so we can do that at 10:00 o'clock.

19   We'll put it at the end of the call.  I think that's

20   the best and fairest thing to do for everybody

21   today.

22                   MR. LAZAR:  Your Honor, if we could set a

23   deadline for any further responses to the -- I'd

24   like to limit it to just the disclosure statement

25   comments based on --

1              THE COURT:  Right.

2              MR. LAZAR:  Frankly, Your Honor, we

3     weren't prepared -- it was going to be our

4     recommendation that we push off the plan treatment

5     classification --

6              THE COURT:  No.  I don't -- right.  All

7     that stuff is reserved for confirmation hearing,

8     assuming we can get over the adequacy hurdle, which

9     I think we should be able to do with probably a

10    little more tinkering.

11             MR. LAZAR:  So if we could get, you know,

12    a deadline by which folks need to, you know, file

13    any additional responses to the disclosure we have

14    proposed.

15             MR. KIRPALANI:  Your Honor, if I may?

16             THE COURT:  Yeah.

17             MR. KIRPALANI:  Susheel Kirpalani from

18    Quinn Emanuel.  Perhaps we can ask the objectors to

19    send -- they don't have to file it if they don't

20    want to, but at least send to counsel for the

21    trustee and the committee their objections to the

22    new language by Thursday.  And then we have the

23    court ask the parties or order the parties to meet

24    and confer on Friday to try to resolve things as

25    opposed to everyone just coming back on Monday and

1    doing this again before the court.

2          MR. BERKOFF:  And that way we could

3    narrow the issues, and maybe you only have to

4    preside over four disputes or six disputes.

5          THE COURT:  Right.  Well, however you all

6    can agree on narrowing the issues is fine with me.

7    But if you don't, that's what I'm here for, to

8    decide on the disputes.  But my first impression was

9    the amended disclosure statement seemed to meet most

10   of the objections with respect to adequacy for 1125

11   purposes.  And I'm not passing on any of the plan

12   confirmation objections that were raised in various

13   parts of the various objections.  That's reserved

14   for the confirmation hearing.

15         MR. MCKENNA:  Your Honor, we would not

16   intend to restate --

17         THE COURT:  No.

18         MR. MCKENNA:  -- any of our information

19   objections, just new objections.  But we would like

20   until Friday to get that done.  We'll still reach

21   out and do what we can to try and work with the

22   committee and the trustee.

23         THE COURT:  Okay.

24         MR. BERKOFF:  That just doesn't leave

25   time to confer really before we come back Monday

1    morning.

2            THE COURT:  Well, I thought all you

3    hard-working lawyers worked 24/7.

4            MR. LAZAR:  We're trying to avoid it.

5            THE COURT:  I know I am.

6              If you need until Friday, fine.

7    That gives you the weekend.  You know, this is the

8    age of the phone and the fax machine.  You can have

9    conference calls, you know, 24/7, as far as I know.

10   And you're welcome to do it on your time.  And we'll

11   continue it to 10:00 o'clock on Monday the 16th on

12   the adequacy hearing.

13             Okay.  Next on the docket is the

14   motion to approve solicitation and voting procedures

15   and setting confirmation hearing.

16           MR. GOODMAN:  Your Honor, Jeff Goodman on

17   behalf of the ad hoc committee.  A number of the

18   points raised, and this is part and parcel to our

19   disclosure statement objection, we would request

20   that this proceed in tandem with the disclosure

21   statement hearing on Monday the 16th.

22           THE COURT:  All right.  If anybody has

23   got any objection to that motion on the solicitation

24   and voting procedures, get an objection on file by

25   the close of business on Thursday so that the

1   movants, if they want to reply, can get something on

2   file by the close of business on Friday.  Then I

3   will have hopefully a chance to read it before we

4   have a continued hearing on it on Monday at the time

5   of the disclosure statement.  I think that's fair

6   and reasonable.

7           MR. GOODMAN:  We've already filed ours,

8   Your Honor.

9           THE COURT:  Right.

10          MR. BERKOFF:  Thank you, Your Honor.

11          THE COURT:  Okay.  Next on the docket is

12  the continued status hearing on the trustee's

13  adversary against Mr. Scott's clients, 08 A 00127,

14  and the defense motion to dismiss.

15              I've had a chance to review the

16  papers in support of the motion and in opposition

17  thereto and the reply.  Is there anything else that

18  you gentlemen have to add other than what you've so

19  ably and articulately expressed in the moving

20  papers?

21          MR. INGBER:  Yes, Your Honor.

22              Excuse me.

23              Your Honor, this is Matthew Ingber

24  on behalf of the Bank of New York.  I will do my

25  very best to keep the argument brief.  Your Honor,

1    as you know, we believe that this complaint should

2    be dismissed.  We believe that it should be

3    dismissed in its entirety, and we believe that it

4    should be dismissed now at this stage of the case

5    and on this motion that's before the court.

6              Your Honor, we can continue

7    discovery in this case.  We can review millions of

8    pages of documents.  We could take the depositions

9    of dozens of parties and nonparties.  We can file

10   motions for summary judgment and have a trial in

11   2009.  But every step of the way, the parties are

12   going to be asking Your Honor to rule on the very

13   same purely legal questions that are before the

14   court on this motion to dismiss.

15             Your Honor, we filed this motion,

16   and we ask that you grant it, because, in our view,

17   the trustee simply got the law wrong.  Now, Your

18   Honor, you've seen the complaint.  There's a lot to

19   it.  It's long.  It's 236 paragraphs.  But when you

20   start peeling off the layers of legal conclusions

21   and conclusory allegations and rhetoric, what

22   emerges is a case that at its core, at its core is

23   based on a premise that we believe is deeply flawed.

24   It's based on an assumption that the segregation

25   requirements of the Commodity Exchange Act apply to

20

1    Sentinel and by extension to the Bank of New York by

2    virtue of Sentinel's status as a futures commission

3    merchant or FCM.  Whether explicitly or implicitly,

4    all of the claims in the complaint rest on this

5    theory.

6              Now, it's Sentinel's alleged status

7    as an FCM that is the foundational element of the

8    trustee's assertion that the CEA's segregation

9    requirements apply.  But the trustee doesn't say

10    what an FCM is, or how it's defined in a CEA, or why

11    that definition is important on this motion and in

12    this case.

13              And so today, Your Honor, I'd like

14    to walk you through -- briefly I'd like to walk you

15    through the definition of an FCM.  I'd like to

16    explain why Sentinel was not an FCM as defined under

17    the CEA, and then I'd like to explain the

18    significance of that fact, which, by the way, is

19    undisputed.

20              Now, Your Honor, we submitted an

21    appendix with our reply brief.  It's an appendix --

22    if I could approach, Your Honor?

23              THE COURT:  Sure.

24              MR. INGBER:  It's an appendix that

25    contains all of the relevant statutory provisions

21

 1    and CFTC rules, among other things that we cited in

 2    our brief.  And if you turn to page 1 of the

 3    appendix, okay, this is the provision of the

 4    Commodity Exchange Act that defines a futures

 5    commission merchant.  And it defines an FCM as an

 6    individual, association, partnership, corporation,

 7    or trust that (A) is engaged in soliciting or in

 8    accepting orders for the purchase or sale of any

 9    commodity for future delivery on or subject to the

10    rules of any contract market or derivatives

11    transaction execution facility, and (B) in or in

12    connection with such solicitation or acceptance

13    orders accepts any money, securities or property, or

14    extends credit in lieu thereof to margin, guarantee

15    or secure any trades or contracts that result or may

16    result therefrom.  Now, this money securities or

17    property to margin guarantee or secure any trades,

18    that's called "customer funds" under the CEA.

19                    Your Honor, Sentinel wasn't doing

20    any of this, and the trustee hasn't alleged that

21    they were.  Sentinel wasn't soliciting or accepting

22    orders for the purchase and sale of commodities for

23    future delivery.  It wasn't accepting customer

24    funds.  That is, money, securities or property to

25    margin, guarantee or secure any trades or contracts.

1    That's undisputed.  It's not alleged that they were.

2                   Plain and simple, Your Honor,

3    Sentinel was a money manager, a money manager that

4    invested the excess money of its FCM, hedge fund,

5    and individual customers.  There's no dispute about

6    that.  And this is right out of the complaint,

7    paragraph 29.  Unlike traditional FCMs, however,

8    Sentinel did not engage in any commodities trading

9    for its customers, but instead only invested funds

10   deposited by other FCMs and Sentinel's other

11   customers.

12                   So where does that leave us and why

13   is this important?  Well, Your Honor, it's important

14   because unless Sentinel was a functioning FCM and

15   not simply an FCM registered under the CEA, the

16   CEA's segregation requirements don't apply to it.

17   There's two provisions of the CEA that speak to

18   segregation, and that's Section 4d(a) of the

19   Commodity Exchange Act and 4d(b) of the Commodity

20   Exchange Act.  I'd like to walk you through those

21   provisions very briefly.  (4)d is on page A-3 of the

22   appendix.

23                   Okay.  So the first provision that

24   speaks to segregation, 4d(a).  Now, if we read the

25   preamble to 4d(a), it's clear that it applies only

1    to FCMs functioning as FCMs.  Quote, "It shall be

2    unlawful for any person to engage as futures

3    commissions merchant or introducing broker in

4    soliciting orders or accepting orders for the

5    purchase or sale of any commodity for future

6    delivery or involving any contracts of sale of any

7    commodity for future delivery on or subject to the

8    rules of any contract market or derivatives

9    transaction execution facility unless," and then it

10   goes on to say that they have to meet certain

11   segregation requirements.

12            The threshold requirement of 4d(a)

13   is that you are a functioning FCM, an FCM that is

14   engaged in soliciting orders or accepting orders for

15   the purchase or sale of any commodity for future

16   delivery.  Again, Your Honor, there's no dispute and

17   it's not alleged, Sentinel was not a functioning

18   FCM.  4d(a) has absolutely no application here.

19            Okay.  So that takes us to 4d(b),

20   which is on the very next page.  4d(b) extends the

21   segregation requirements to certain qualified

22   depositories, persons who received customers' funds

23   as provided in Section 4a(2) from depositing FCMs.

24            Now, the entities that are eligible

25   to receive customer funds under the CEA is a -- it's

1    a limited universe of entities.  And the trustee

2    concedes as much also in paragraph 29 of the

3    complaint.  FCMs, the trustee says, are permitted to

4    deposit their customer funds only with certain types

5    of banks, depositories or other FCMs.  And the

6    trustee is absolutely correct, and that's based on a

7    CFTC rule, it's Rule 1.49, which is on page A-23 of

8    the appendix.

9            On page A-23, we see CFCT Rule 1.49,

10   and I'm looking at d(ii).  A depository, if located

11   in the United States, must be a bank or trust

12   company, a futures commission merchant registered as

13   such with the commission, or a derivatives clearing

14   organization.  That's consistent with the trustee's

15   allegation in paragraph 29.

16           It's also consistent with CFTC

17   Rule 1.20 which says that the entities that are

18   eligible to receive customer funds are a bank or

19   trust company, a futures commission merchant, or a

20   derivatives clearing organization.

21           Sentinel was none of these.  It

22   wasn't a bank.  It wasn't a trust company.  It

23   wasn't a derivatives clearing organization.  And, as

24   I just discussed, Your Honor, it wasn't an FCM as

25   defined in the Commodity Exchange Act.

1           THE COURT:  But it was registered?

2           MR. INGBER:  It was registered.  There's

3     no dispute about that.  It was registered as an FCM.

4                   And, in fact, the trustee has argued

5     that all of this is irrelevant really for two

6     reasons.  First -- and this is really the trustee's

7     fallback position.  First, Sentinel sent letters to

8     the Bank of New York in 1997 telling the bank and

9     asking the bank to acknowledge, which it did, that

10    Sentinel would be setting up segregated accounts,

11    and that the bank was not permitted to exercise a

12    lien over those segregated accounts.

13                  Now, putting aside the fact that the

14    Sentinel -- I'm sorry, the Bank of New York never

15    actually exercised a lien over segregated accounts,

16    these letters relate to accounts that were opened

17    and closed in 1997.  These letters are irrelevant.

18    And, Your Honor, the notion that these letters --

19    even if they were relevant, the notion that these

20    letters could override plain and unambiguous

21    statutory language finds absolutely no support in

22    the case law.  And the cases cited by the trustee

23    dealing with corporation by estoppel have nothing to

24    do with the facts here.

25                  But more to the point, Your Honor --

1    and this is the second response by the trustee.

2    More to the point, the trustee would have us believe

3    that registration alone is sufficient to trigger the

4    segregation requirements, the segregation

5    obligations under the CEA.  But let's explore that

6    for a minute.

7                   The trustee cites two cases in his

8    opposition brief, the PREMEX case out of the Ninth

9    Circuit and the Forefront Investment cases out of

10   the Eastern District of New York.  Both cases, by

11   the way, brought by the CFTC and not private

12   plaintiffs.  And both cases interpreted Section 4f

13   of the Commodity Exchange Act dealing with minimum

14   capital requirements.  4f, Your Honor, is in the

15   appendix at page A-5.

16                  Now, both courts conducted the same

17   analysis.  They looked at the plain language of the

18   statute.  They looked at the plain language of

19   Section 4f.  They read it and they applied the plain

20   language.  And they concluded correctly that the

21   minimum capital requirements of 4f apply to FCMs

22   simply because they're registered as FCMs.  And if

23   we read that language of Section 4b, it says,

24   "Notwithstanding any other provisions of this

25   chapter, no person desiring to register as futures

1    commission merchant or as introducing broker shall

2    be so registered unless he meets such minimum

3    financial requirement as the commission may by

4    regulation proscribe as necessary," and it goes on.

5                    And so what those courts held is

6    that, well, this plain language says that -- this

7    plain language applies to any person that is

8    registered as an FCM under the Commodity Exchange

9    Act.

10                   But, Your Honor, contrast the

11   language of Section 4f with the language of Section

12   4d(a) which requires that an FCM engage in the

13   business of an FCM.  That is that the FCM solicitor

14   accept customer orders for the purchase and sale of

15   commodities for future delivery.  And contrast

16   Section 4f to Section 4d(b) which applies to

17   entities that are eligible to receive customer

18   funds.  And look at the language going back to

19   Rule 1.49 at page A-23, d(ii).  It applies to a

20   futures commission merchant registered as such with

21   the commission.  Two requirements, Your Honor:  One,

22   you're a futures commission merchant; and, two,

23   you're registered as a futures commission merchant

24   under the CEA.  That is in sharp contrast to the

25   language of Section 4f which applies to any person

28

1    registered under the Commodity Exchange Act as an

2    FCM.

3                    Now, Your Honor, if my attempts at

4    statutory construction aren't enough, consider the

5    Second Circuit's holding from 1999 in the New York

6    Currency Research Corp. case.  In that case the

7    court was considering Section 4n of the Commodity

8    Exchange Act, and that is on page A-6 of the

9    appendix.

10                    The court looked at the plain

11   language of Section 4n, and it reads as follows:

12   Quote, "Every commodity trading advisor and

13   commodity pool operator registered under this

14   chapter shall maintain books and records," and it

15   goes on.

16                    And the court said, well, this

17   provision of the Commodity Exchange Act requires two

18   things:  One, you need to be a commodity trading

19   advisor or a commodity pool operator; and, two, you

20   need to be registered as a commodity trading advisor

21   or a commodity pool operator under the CEA.  And

22   because the defendant in that case was neither a

23   functioning commodity trading advisor nor a

24   functioning commodity pool operator, this provision

25   didn't apply to it.

1                    The Second Circuit in the New York

2        Currency Research case had a discussion about the

3        PREMEX case cited by the trustee.  They said that in

4        the PREMEX case, it was a totally different factual

5        scenario.  It was distinguishable from the facts

6        here because in that case, Section 4f of the CEA

7        applied to persons that were registered as FCMs

8        under the CEA.  But this provision by contrast

9        applies -- has two requirements:  One, you need to

10       be a commodity pool operator or a commodity trading

11       advisor, and you need to be registered as such under

12       the CEA.

13                    It was a plain language analysis by

14       the court.  It was a plain language analysis by

15       PREMEX and Forefront Investments.  And what we're

16       asking is that Your Honor apply the plain language

17       of 4d(a), (b), and belated Rule 1.49 here.

18                    What we have here, Your Honor, is,

19       on the one hand, an undisputed fact that Sentinel

20       did not meet the definition of an FCM under the CEA,

21       an undisputed fact that it was not a functioning

22       FCM.  And on the other hand, we have plain and

23       unambiguous statutory language.  When you apply that

24       undisputed fact to the plain and unambiguous

25       statutory language, it leads to one conclusion, and

1    that is that the CEA has nothing to do with this

2    case.

3               In order to give effect, Your Honor,

4    to congressional intent, we respectfully submit that

5    the statute needs to be read along the lines that

6    we've suggested.  This is basic, straightforward,

7    simple statutory interpretation.

8               Now, Your Honor, we've said that the

9    CEA allegations are the centerpiece of this lawsuit.

10   And, in fact, they are if they provide the --

11   exclusive report for four of the claims, and they

12   provide at least partial support for the other four.

13   And we've addressed in our moving papers why each of

14   the individual claims should be dismissed, putting

15   aside the CEA allegations.

16              And I'm not going to rehash all of

17   the arguments here, but I do want to focus on just

18   two categories of claims.  The first relates to the

19   fraudulent and preferential transfers.  We briefed

20   the question of whether these transfers involve an

21   interest of the debtor in property.  And we argued

22   that this case is quite unlike the Bloom action

23   where the trustee alleged in the Bloom action that

24   the transfers were out of a nonsegregated, allegedly

25   commingled account to the Sentinel insiders.

1            Here you've got alleged transfers of

2     customer securities, customer assets, they refer to

3     these as customer securities and assets throughout

4     the complaint, from a segregated account into a

5     nonsegregated account.  We believe this is, as

6     alleged, not an interest -- this doesn't involve an

7     interest of the debtor in property.

8            But the bottom line, Your Honor, is

9     that the trustee can't have it both ways.  If this

10    involves an interest of the debtor in property,

11    well, then I'm not sure what we're fighting about in

12    this lawsuit.  And if it involves customer assets

13    and customer securities transferred from one account

14    to another, well, then the fraudulent transfer and

15    preferential transfer claims fail as a matter of

16    law.

17            And finally, Your Honor, I just want

18    to address briefly the equitable subordination

19    claim.  I think it bears repeating that Bank of New

20    York was a noninsider here.  And in order for the

21    trustee to equitably subordinate the claim of a

22    noninsider, such as the Bank of New York, it needs

23    to allege and it ultimately needs to prove that the

24    bank engaged in egregious and gross misconduct

25    tantamount to fraud, okay?  First of all, there's no

1    claim of fraud here and there's no allegations of

2    fraud, nor could there be.

3              But if you peel away some of the

4    spin in this complaint, what you're left with, Your

5    Honor, are legal conclusions that the court should

6    not accept as true on this motion to dismiss.

7    You're left with an allegation that the Bank of New

8    York made money.  Accept that as true, that the Bank

9    of New York made money as a financial institution

10   dealing with Sentinel.  That's hardly egregious

11   misconduct that's tantamount to fraud.

12             You're left with an allegation that

13   the bank provided loans to Sentinel even though it

14   was undercapitalized.  But the Seventh Circuit has

15   already said that that's not the type of egregious

16   misconduct that would allow an equitable

17   subordination claim to go forward.

18             You're left with an allegation that

19   a bank employee made an erroneous transfer of assets

20   out of a customer's segregated account into a

21   nonsegregated account, and the very next day,

22   according to the complaint, reversed it, put the

23   money back into the segregated account.  Your Honor,

24   that is not egregious or gross misconduct as a

25   matter of law.  That is prudent and responsible

1    account management.

2                    And finally, Your Honor, you're left

3    with an allegation of correspondence, which Your

4    Honor can take into account on this motion because

5    it was referred to in the complaint, at least half

6    of the correspondence was referred to in the

7    complaint.  You're left with an allegation of a

8    dialogue between two bank employees.  One bank

9    employee asking the other -- asking whether the bank

10   has full rights to all of the collateral in the

11   nonsegregated account.

12                   And what we don't see in the

13   complaint, what isn't attached to the complaint but

14   is part of that very correspondence, is the other

15   bank employee's response which says "we do because

16   we have an agreement, an agreement with Sentinel

17   that gives us rights to that collateral."  An

18   agreement, Your Honor, in which Sentinel represented

19   to the Bank of New York that it was authorized to

20   transfer assets out of segregated accounts into

21   nonsegregated accounts; that no third party -- once

22   those transfers were made, no third party would have

23   a beneficial interest in those assets; that it was

24   authorized to pledge those assets as collateral for

25   the bank's loans; and that the bank could exercise a

```
 1    lien over the assets in that nonsegregated account.

 2                    Your Honor, if this is egregious

 3    misconduct tantamount to fraud, a bank making money

 4    off of this relationship, a bank acting in good

 5    faith compliance with the terms of a negotiated

 6    agreement, a bank employee reversing an erroneous

 7    transfer of assets the very next day after the

 8    transfer was made, if that is egregious and gross

 9    misconduct tantamount to fraud, we will be setting

10    an awfully dangerous precedent.

11                    Your Honor, the trustee's complaint

12    will get no better than this.  It was drafted based

13    on thousands of documents that the bank had produced

14    to the trustee for months leading up to the filing

15    of the complaint.  Accept the allegations as true,

16    all of them, they don't give rise to the claims

17    asserted by the trustee.

18                    Your Honor, for these reasons, and

19    for the reasons we've discussed at great length and

20    in great detail in our moving papers, we ask that

21    the complaint be dismissed now in its entirety and

22    with prejudice.  Thank you.

23                    THE COURT:  Thank you, counsel.

24                    Mr. Gair?

25                    MR. GAIR:  Let me address briefly the
```

1    three points that Mr. Ingber raised which were

2    indeed, in fact, the same points as made at great

3    length in the papers.

4                    First with respect to the Commodity

5    Exchange Act and the Investment Advisors Act.  He

6    doesn't even mention Investment Advisors Act, and

7    for good reason because his statutory construction

8    argument that he's cobbled together doesn't fit with

9    respect to the Investment Advisors Act.

10                    But the larger point here, Judge, is

11   you don't have to reach any of these issues about

12   the Commodity Exchange Act at this point in time

13   because this is not really a motion to dismiss.

14   What he's really doing is filing a premature motion

15   in limine to exclude some of our evidence on some of

16   our counts.

17                    Let me explain how it works, Judge.

18   The first three counts of our complaint are

19   avoidance counts.  We say, the trustee says, that

20   the Bank of New York received fraudulent and

21   preferential transfers out of somebody else's

22   account, that is out of funds of the -- property of

23   the estate that were transferred to an account that

24   was controlled by the bank.

25                    If there were no Commodity Exchange

1    Act, if there were no such thing in the world as

2    futures commission merchants, it wouldn't matter in

3    the least.  You can't receive a fraudulent transfer

4    or a preferential transfer that is made with the

5    intent to hinder, delay or defraud other creditors.

6    That's what we've alleged.  So the first three

7    counts have zero to do with the Commodity Exchange

8    Act.

9                    The same thing is true with respect

10   to Count VIII, our aiding and abetting a breach of

11   fiduciary duty count.  We have alleged that the

12   insiders breached their fiduciary duty to Sentinel.

13   We have alleged that they aided and abetted and

14   assisted the insiders in committing that breach.

15   The Commodity Exchange Act is required to determine

16   whether or not somebody breached a fiduciary duty.

17   That's a matter of Illinois law.  And as you rightly

18   held yesterday, Illinois law applies to that.  So

19   the Commodity Exchange Act is not an issue in

20   connection with Count VIII.

21                  THE COURT:  That's your one noncore

22   count.

23                  MR. GAIR:  That's our one noncore count.

24                  THE COURT:  Right.

25                  MR. GAIR:  The other counts, Judge, are

1      bankruptcy counts.  And what Mr. Ingber is mistaken

2      about is the suggestion that the only thing that

3      we're relying on in these other counts is violations

4      of the CEA.  We definitely are alleging violations

5      of the CEA, and we think we're right about it.  But

6      for the purposes of this motion, Judge, if we allege

7      anything else than a violation of the CEA in each of

8      these counts, then there is no motion to dismiss.

9      It's a motion in limine to exclude our evidence

10     about violation of the CEA.  And we do allege a lot

11     of things besides violation of the CEA, Judge.

12                    What this complaint is about -- and

13     I don't think Mr. Ingber read it.  What this

14     complaint is really about, Judge, is the fact that

15     they helped the insiders steal a lot of money.  And

16     that's what we say, that they raided what were

17     supposed to be customer assets for the benefit of

18     the insiders and ultimately for the benefit of the

19     Bank of New York as well.  And we've alleged active

20     fraudulent conduct by both the insiders and the

21     bank.

22                    So whether or not there were

23     technical segregation violations, while those are

24     important, they aren't the be all and end all of any

25     of these bankruptcy counts.  If they acted

                                                            38

1    inequitably, we're entitled to show inequitable

2    conduct, and we've alleged lots of inequitable

3    conduct beyond the segregation violations.  So you

4    don't need to reach those issues, Judge.

5              But if you do decide to reach those

6    issues and put a merciful end to this silliness, I

7    would suggest, Judge, that the court look at, first

8    and foremost, Exhibit C to our complaint.  If I may

9    approach to hand it up?

10             THE COURT:  Sure.

11             (Document tendered.)

12             MR. GAIR:  This is a letter agreement,

13   and there are many of these.  This is one letter

14   agreement entered into between the Bank of New York

15   and Sentinel at the outset of their relationship.

16   I'd just like to highlight certain portions of this.

17   This is that we proposed to maintain accounts with

18   you, and those are segregated customer accounts.

19   And it says, "We, as future commissions merchants,

20   under the Commodity Exchange Act shall deposit

21   money, investment securities and customer-owned

22   securities, such funds and money and securities

23   deposited by or accruing to our customers who are --

24   which are commodity customers."

25             And then it says these accounts are

1    all being opened to meet the provisions of the

2    Commodity Exchange Act, and that those -- that that

3    statute requires segregation and that the money be

4    treated as our customers' money, not as our money.

5    And it further requires that you not put a lien on

6    any of this money.

7                    And then it says at the very bottom

8    of the second paragraph, "Furthermore, you agree

9    that this letter shall supersede any other

10   documents."  They're talking about the parts of the

11   account agreements that they want to focus on.  This

12   supersedes any other documents related to this

13   account.  Please acknowledge that you understand the

14   nature of the assets, that these are customer funds.

15   And you know what, Judge?  The Bank of New York --

16   and by the way, Judge, this Joe Cicarelli who signed

17   it, this is the same guy who stole $52 million out

18   of Seg 1 on August the 15th of last year.  He signed

19   this, and he said, "We understand the CEA applies.

20   We understand you're a futures commission merchant.

21   We understand that these are customer segregated

22   funds."

23                   Now, Judge, these are not difficult

24   principles of estoppel.  I can go into the statute.

25   I can go into the policy behind the statute.  I can

1    go into the CFTC's view on this.  But this is a real

2    simple case.  They took this money, and they only

3    got this money by representing that they understood

4    it had to be segregated.  They can't come into this

5    court now and say, "Oh, well, there's a

6    technicality.  It really didn't have to be

7    segregated.  We were free to steal it all along."

8                    Judge, this is the end of their

9    argument, these segregation letters which are still

10   in effect.  There's nothing in the complaint about

11   them being canceled or anything else.

12                   But let's look briefly at the

13   statute and the policy.  I'll focus you on just one

14   portion of the statute, Judge, which is 4b which

15   says that it's unlawful for any person, including a

16   depository, that has received any money, securities

17   or property for deposit in a separate account as

18   provided in paragraph 2.  Well, that's exactly what

19   the terms on which they said they were receiving the

20   money to hold, dispose of or use any such money,

21   securities or property as belonging to the FCM or

22   anyone else.  So this fits directly within the terms

23   of the statute.

24                   It also fits within the policy,

25   Judge.  Their argument is commodity customers had

41

1    funds, margin funds and the like, and they gave them

2    to an FCM, and that FCM was responsible to segregate

3    them.  And then that FCM gave them to Sentinel.

4    Why?  Because 27 years ago the CFTC said you can do

5    this if Sentinel is registered as an FCM and abides

6    by the segregation requirements and doesn't actually

7    trade as an FCM, then you -- it can hold funds, but

8    it's subject to the same statutory requirements of

9    the FCM.  That's what happened when -- that's what

10    the CFTC did.

11                So, Judge, there is a very long

12    regulatory history.  And there's an obvious policy.

13    These are customer commodity funds.  They're just

14    one step removed.  They're with an FCM who is

15    subject to the act whether or not it is operating as

16    an FCM.  In fact, if you look at -- and this is also

17    attached to our complaint.  If you look at the

18    CFTC's no action letter, one of the conditions of it

19    being registered and accepting these customer funds

20    is that it not operate, that it only be an FCM

21    holding money.  So their statutory argument twists

22    and misreads the statute, Judge, and ignores the

23    policy and it ignores the regulatory history.  This

24    is a case where for 27 years the CFTC has regulated

25    Sentinel.

1              The CFTC has sued Sentinel in the

2    United States District Court for this district for

3    violating these very requirements.  And the CFTC's

4    decision on what the statute means is very

5    persuasive, Judge, in this regard.

6              So even if you feel you need to

7    reach the Commodity Exchange Act, feel free, Judge.

8    The violations of that act -- BONY is subject to

9    that act, they promised to be, and they are.

10             Let me move to the property of the

11   estate issue because I think there what we have is a

12   rather simple misunderstanding.  We've alleged in

13   the complaint that the funds transferred that we are

14   seeking avoidance of were property of the estate.

15   That's really the end of the matter, as the court

16   has previously said.  As the court ruled in

17   connection with the insiders, we've alleged massive

18   commingling here.  And that commingling is

19   sufficient to acquit our burden of establishing on a

20   motion to dismiss that this is property of the

21   estate.

22             And, Judge, you know, there's going

23   to be a trial on this property of the estate issue.

24   And when you hear the evidence, you're going to find

25   out how farfetched and ridiculous these arguments

```
1    are that BONY is making.  But you've already ruled

2    on this precise issue with respect to the insiders.

3                   Now, what Mr. Ingber is saying is,

4    look, this can't be property of the estate because

5    it came out of an account that says it was

6    segregated.  And he says, "And we say those are

7    customer assets."  Well, we don't say those are

8    customer assets, Judge.  In fact, if you look at the

9    complaint, page 2, footnote 1, we say, "Unless

10   otherwise noted, the term 'customer assets and

11   customer securities' are used in this complaint to

12   describe assets and securities which were supposed

13   to be but were not separately accounted for and

14   segregated for the benefit of customers."

15                  In other words, they had something

16   that was called "segregated accounts," but the funds

17   in them were commingled before they got into the

18   account.  And, Judge, you're obliged to uphold the

19   complaint if there is any state of facts in which

20   you can hypothesize that it states a claim, and in

21   this case any facts that you can hypothesize that

22   the funds were commingled even before they got into

23   these segregated accounts.  And that's not a hard

24   thing to hypothesize because here's the way that the

25   accounts worked:  Customers would deposit funds.
```

44

1    The funds would initially go into these customer
2    segregated cash accounts.  They only stayed there
3    for a few hours.  At the end of the day, do you know
4    where they went, Judge?  They went into the BONY
5    black hole, the BONY collateral account.  And since
6    the collateral account was always hundreds of
7    millions of dollars negative, it was an overdraft
8    account, it just went to reduce the BONY loan.  The
9    customers' funds were gone a few minutes -- for good
10   a few minutes after they came in.  The customer --
11   the securities that were supposedly segregated --
12   and they weren't really segregated, they were moved
13   around at will.  But the funds that were supposedly
14   segregated were bought with the loan from the Bank
15   of New York, not with customer funds.  And the loan
16   from the Bank of New York was supported by whatever
17   securities BONY and Sentinel happened to grab on
18   that day.  And so those securities didn't pertain or
19   weren't owned by particular customer Segs.  There
20   was one big pool of securities that Sentinel owned.
21   It was bought with a mixture of everybody's money
22   all mixed up in support of the loan, and it was --
23   these securities were allocated today to one person,
24   the next day to someone else, in different
25   proportions.  It was whatever was convenient.  But

```
1    there was no segregation.  These people, and when I
2    say "these people," I mean the insiders and BONY,
3    they thought that Seg was somebody's name.  They
4    didn't have any idea how to segregate funds, and
5    they didn't segregate funds.
6               Now, Judge, on that basis there's no
7    basis whatsoever to dismiss the avoidance counts.
8    We have alleged massive commingling.  That is
9    sufficient on -- to acquit our burden, and we look
10   forward to having a trial on this issue.
11              Now, finally, Judge, with respect to
12   their third issue, which is equitable subordination,
13   again, Mr. Ingber wants to put the cart before the
14   horse.  We're going to have a trial and find out.
15   And you will end up getting to say whether their
16   conduct was egregious enough to constitute
17   inequitable conduct and to subordinate their lien.
18   And that's an issue that you cannot decide now.  But
19   let me help you a little bit by giving you two
20   examples of what we've alleged in the complaint.
21              First, we allege that BONY
22   transferred huge blocks of assets knowing that they
23   were not associated with any customer transaction
24   but were, instead, only to keep BONY's collateral
25   whole.  So BONY says, "Well, we have this
```

46

1    representation.  Don't worry, Judge.  Don't worry

2    about the fact that we've walked into a bank with a

3    machine gun and pointed it at the tellers.  We've

4    assured you that we're not doing anything illegal.

5    And so it's absolutely fine for you to hand over the

6    money."  And that's exactly what BONY's argument is

7    here, Judge.

8              They say that because they were

9    assured by Sentinel in writing that they could do

10   whatever they wanted, that BONY was entitled to

11   do -- to permit whatever they wanted even if they

12   knew it was a fraud, and they knew it was a fraud.

13             On July 30th of last year, Judge,

14   Sentinel's insiders told BONY we want you to move

15   $500 million out of your collateral account and put

16   it back in Seg 1.  And BONY says, "Okay."  And why

17   does BONY say okay?  Because they don't want to be

18   undercollateralized.  They say, "Okay.  But you have

19   to move $300 million from Seg 3 funds into the

20   collateral account."

21             Now, BONY could not have thought

22   that had anything to do with a customer transaction.

23   There were no such customer transactions.  This was

24   simply a shifting of the money around so that the

25   money that was supposedly segregated for Seg 1 would

1    be back in Seg 1, and the money that was supposedly

2    segregated for Seg 3 would be in BONY's collateral

3    account.  That's a fraud.  There's no legitimate

4    explanation for that.

5              And then, Judge, finally I wanted to

6    mention the other incident that we talked about

7    before.  This guy Cicarelli, on August 15th he

8    noticed that BONY was undercollateralized by

9    $52 million.  This is after redemptions have shut

10   down.  This is when regulators are crawling all over

11   Sentinel's offices.  And Cicarelli, with the

12   approval of the highest levels of the bank, says,

13   "We're $52 million short in collateral.  We're going

14   to take funds that are in Seg 1 and we're just going

15   to take them for ourselves," and they stole them.

16             Now, luckily, Judge, there was a CFO

17   at Sentinel named Theresa Arana who saw that the

18   next morning, and she said, "What are you doing?

19   You can't do this."  She caught them and made them

20   put it back.  But, Judge, again, just to use my bank

21   hypothetical, I can't go into the bank and rob the

22   bank, and when I get caught say, "I give it back,"

23   and say, "It was just a mistake."  Maybe it was a

24   mistake, Judge.  Let's have a trial and find out.

25   Nothing further.

1            THE COURT:  Thank you, Mr. Giar.

2            MR. INGBER:  Two minutes, Your Honor?

3    Thank you.

4            Three or four points, Your Honor,

5    and very, very briefly.  First, Mr. Gair refers to

6    the Investment Advisors Act.  There are no direct

7    obligations for the Bank of New York or qualified

8    depository under the Investment Advisors Act.  The

9    only claim that in this case the SEC could have --

10   there's no private cause of action for the trustee,

11   but to the extent the SEC were to bring a claim

12   under the Investment Advisors Act, that's for aiding

13   and abetting a violation.  The bank has no direct

14   obligations under the Investment Advisors Act.  And

15   we briefed exactly why the bank, as alleged, did not

16   substantially assist any violation of the Investment

17   Advisors Act.

18            Two, I'm still waiting for the

19   trustee's interpretation of Section 4d and the

20   related rules.  He made arguments.  He made

21   conclusions.  I want to see him parse out the

22   language of 4d and explain how under 4d a person

23   that is simply registered as an FCM and not

24   functioning as an FCM could be subject to the

25   segregation obligations of the CEA.

1            Third, Your Honor, the Seg letters,

2    the so-called Seg letters.  Again, these were sent

3    to the bank 11 years ago.  The accounts were closed.

4    Their contracts were entered into -- new contracts

5    were entered into with Sentinel after those Seg

6    letters were signed by Mr. Cicarelli.  Those

7    contracts, as we've said from the beginning, govern

8    this dispute.

9            And, Your Honor, Mr. Gair refers to

10   a 1981 no action by the CFTC.  Let's be clear about

11   this.  This was not the CFTC commenting on

12   Sentinel's business or exempting Sentinel from the

13   minimum capital requirements of the CEA.  This was

14   the staff of the CFTC.  If Mr. Gair read the letter,

15   it would say that this is not the opinion of the

16   commission.  It was also based on a business model

17   that Sentinel had and a relationship that Sentinel

18   had with Continental Bank in 1981.  That is an

19   entirely different business model than the one

20   that's actually alleged in the complaint.  That 1981

21   letter is irrelevant.

22           And, finally, I need to say one

23   thing about the theft of $52 million.  I mean, this

24   would be one stupid thief who steals $52 million,

25   transfers that money from one account to another,

50

1    and then the very next day transfers it back.  Mr.

2    Gair is referring to testimony from a Theresa Arana.

3    That's nowhere in the complaint.  The bottom line is

4    that we have a transfer from one account to another

5    account, and a transfer back the next day.

6                    It's inappropriate to stand up in

7    open court, based on the allegations in this

8    complaint, based on any of the review of the

9    documents that the trustee has conducted, and to

10   call a bank employee a thief and to accuse him of

11   stealing when, in fact, and as the trustee alleges,

12   those monies were transferred and were transferred

13   back.  It's inappropriate, and I hope in the future

14   Mr. Gair will be a little more selective with his

15   words.

16                    I have nothing further, Your Honor,

17   but I'm happy to answer any questions that you have.

18            THE COURT:  Thank you, counsel.

19            MR. INGBER:  Okay.

20            THE COURT:  I have no questions.

21                    The bottom line is the motion to

22   dismiss is denied without prejudice.  I think under

23   the Supreme Court's Bell Atlantic versus Twombly,

24   127 Supreme Court 1955, 1964, there is sufficient

25   facts pleaded in this complaint to survive the

```
 1    instant motion to dismiss.  And, again, refer you to
 2    Judge Schmetterer's very learned opinion in this
 3    court in the Irman case, I-r-m-a-n, 379 BR 299,
 4    discussing at that point in time the 12 opinions
 5    that the Seventh Circuit had authored interpreting
 6    and applying Twombly since then.
 7                    I think the complaint alleges enough
 8    factual detail to illuminate the nature of the claim
 9    to allow the defendants to respond.  The gravamen of
10    the first seven counts of the complaint are
11    basically, as I've indicated earlier, core
12    proceedings on which the court has authority to
13    enter final judgment since they all basically arise
14    under various provisions of the Bankruptcy Code.
15                    The eighth count is noncore related,
16    but it does seek to augment the bankruptcy estate
17    with additional damages thereunder on -- and this
18    court can only on the eighth count render proposed
19    findings and conclusions.  But under the extant case
20    law, I think there is sufficient here to withstand
21    the motion to dismiss.
22                    The underlying gravamen of all
23    counts of the complaint is not principally based on
24    the two statutes argued by counsel for the Bank of
25    New York.  They're incidental to and only a part
```

1    thereof, and the proof is in the pudding.  So the

2    motion to dismiss is denied without prejudice.

3               How much time does counsel for the

4    bank need to file their answer, affirmative

5    defenses, and any other pleadings?

6          MR. INGBER:  Your Honor, we'd propose 45

7    days.

8          THE COURT:  Any problem with that?

9          MR. GAIR:  I do, Your Honor.  This

10   complaint has been pending, and they've known about

11   it for months.  I don't think that it should take 45

12   days to respond.  I think we should push this case

13   along as quickly as possible.

14              I also would ask that the court

15   consider setting a status hearing so that we can set

16   a trial date.

17         MR. INGBER:  Your Honor, the case is

18   moving forward.  We're still producing documents.

19   The trustee just produced documents to us.  We will

20   be moving forward with depositions over the summer.

21   This isn't going to slow anything down.  We do need

22   and we'd ask for 45 days to respond.

23         THE COURT:  Okay.  Well, I'll give you

24   the benefit of the 45 days, just like I would to Mr.

25   Gair were he in your position.  But I'm also going

1    to grant his motion, oral motion for a status

2    hearing.  Today is, what, June the 10th.  So 45 days

3    out would be about, what, July 15 --

4                MR. GAIR:  July 25th.

5                THE COURT:  -- or 22nd.  Whatever.

6                At that point I assume we're going

7    to be at issue.  So what my normal procedure is is

8    to enter the usual preliminary pre-trial order, with

9    which some of you are probably familiar, and set it

10   for a pre-trial conference.

11               For those of you not familiar with

12   the order, it doesn't set any discovery cutoffs or

13   anything like that.  It just requires counsel, while

14   you're ongoing with discovery, which I assume is

15   going to be substantial and ongoing, to help narrow

16   the issues for the court, after an answer and

17   affirmative defenses are on file, to give me a joint

18   statement of the disputed issues of fact and law

19   and, equally important, the undisputed issues of

20   fact and law so I can really understand what the

21   fight is going to be about, okay?

22               This is complicated.  You've got

23   discovery started.  It's going to be ongoing for

24   months.  And if it's that complicated and you can

25   convince me at the pre-trial conference, I'll allow

1    discovery to go on throughout the trial.  I've had

2    to do that before in really complicated cases.  So

3    that's not a problem.

4              I assume if we can get the issues

5    sometime in July, that we could by, say, September

6    have a somewhat meaningful pre-trial conference

7    after you get your joint statement on file by that

8    point in time.  We'll give you the whole summer to

9    basically work on it, what's left of the summer

10   anyway.

11             Is there a particular Monday,

12   Tuesday, or Thursday when it would be convenient for

13   counsel for the parties to come in on a pre-trial

14   conference?  I usually do them first thing in the

15   morning at 9:00 o'clock before the original motion

16   call.

17             MR. GAIR:  Your Honor, the first week in

18   September would be best for me because I think after

19   that I'm going to be on trial in North Carolina.

20             THE COURT:  Okay.

21             How about counsel for the bank?

22             MR. INGBER:  How long is your trial?

23             MR. GAIR:  It's probably a two-week

24   trial.

25             MR. INGBER:  I'm not going to be around

1    the end of August or early September.

2                    Can we do Monday, September 22nd or

3    Tuesday, September 23rd?  Is that --

4                    THE COURT:  Does that work for your

5    calendar, do you think, Mr. Gair?

6                    MR. GAIR:  Judge, I think it will.  I

7    just am concerned that if we set it that far out

8    that will we still be able to get to trial in 2009?

9                    THE COURT:  Oh, yeah.

10                   MR. GAIR:  Okay.

11                   THE COURT:  I promised you that before.

12   I keep my word, okay?  We're going to trial on

13   this --

14                   MR. GAIR:  Okay.

15                   THE COURT:  -- in 2009.

16                   MR. GAIR:  Sorry.  I didn't doubt you,

17   Judge.

18                   THE COURT:  I didn't say what month we'd

19   start or what month we'd finish.  But, you know, my

20   trial calendar is moving along, but it's by no means

21   full next year.

22                   MR. GAIR:  I can do either the 22nd or

23   the 23rd.

24                   THE COURT:  Which is best for you?

25                   MR. GAIR:  Let's say the 23rd.

1          MR. INGBER:  Better for me.

2          THE COURT:  Okay.  We'll do it on

3    September 23rd at 9:00.

4              For those of you who've tried stuff

5    in front of me before, you know my pretrials are

6    real short.  I expect a reasonably comprehensive

7    joint pre-trial statement so I can understand the

8    issues a little better, but you're not going to be

9    held to that in stone because it doesn't provide for

10   any discovery cutoff.  I know things can change in

11   complicated cases.

12             But at my pre-trial, all I need to

13   know are basically where you are on possible

14   settlement and, if that doesn't look likely, how

15   much time you need to complete discovery, and then

16   your estimate of trial time in half days.  And it

17   will be set for trial sometime in the calendar year

18   2009 consistent with your needs and what I've got

19   left on my trial calendar.

20             And as I think I've mentioned at an

21   earlier hearing, if not in this adversary, some

22   others, if it's going to be lengthy, which I expect

23   this one would be given the complexity of the

24   factual nexus giving rise to the claims and the

25   defenses, I'd probably only do it on three

```
 1    afternoons a week, on Mondays, Tuesdays and

 2    Thursdays, because I've got to maintain the rest of

 3    my calendar.  And the last time I looked, I've still

 4    got the second or third largest calendar of any of

 5    my colleagues.  And I've got to keep my Chapter 13s

 6    moving.  And the DuPage calendar occupies me all

 7    Fridays.  That gives you time to work --

 8                MR. GAIR:  Right.

 9                THE COURT:  -- in between trial hearings.

10    So I'll work with you if you work with me.

11                MR. GAIR:  Thank you, Your Honor.

12                THE COURT:  I'll give everybody a fair

13    opportunity.

14                      Before I forget, I want to

15    compliment counsel for both sides on doing a nice

16    job on the papers.

17                MR. GAIR:  Thank you, Your Honor.

18                MR. INGBER:  Thank you, Your Honor.

19                THE COURT:  You're welcome.

20                      All right.  Is there anything

21    further I can do for you today?

22                MR. GAIR:  Nothing further, Judge.

23                MR. INGBER:  Thank you, Your Honor.

24                THE COURT:  That completes the hearing.

25    The court is in recess.
```

```
 1                              (Which were all the proceedings

                                had in the above-entitled cause,

 2                              June 10, 2008.)

 3

 4      I, GARY SCHNEIDER, CSR, RPR, DO HEREBY CERTIFY THAT

        THE FOREGOING IS A TRUE AND ACCURATE TRANSCRIPT OF

 5      PROCEEDINGS HAD IN THE ABOVE-ENTITLED CAUSE.

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT F

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| **SENTINEL MANAGEMENT GROUP, INC.,** | ) | Case No. 07 B 14987 |
| | ) | |
| Debtor. | ) | Hon. John H. Squires |
| | ) | |
| **FREDERICK J. GREDE**, as Chapter 11 | ) | |
| Trustee for Sentinel Management Group, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. 08-127 |
| | ) | |
| v. | ) | |
| | ) | |
| **THE BANK OF NEW YORK** and | ) | |
| **THE BANK OF NEW YORK MELLON** | ) | |
| **CORP.,** | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
OF THEIR MOTION TO DISMISS THE COMPLAINT**

Brian Trust
Hector Gonzalez
Matthew D. Ingber
MAYER BROWN LLP
1675 Broadway
New York, New York 10019
(212) 506-2500

Sean T. Scott
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, Illinois 60606
(312) 782-0600

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ iv

PRELIMINARY STATEMENT ...........................................................................1

STATEMENT OF FACTS ...................................................................................3

ARGUMENT .......................................................................................................6

I.    THE ALLEGATIONS THAT BNY VIOLATED FEDERAL LAW SHOULD BE
      REJECTED .................................................................................................6

      A.    The Trustee Has No Right to Recover Directly Under Either the Advisers
            Act or the CEA ..................................................................................7

      B.    The Trustee Cannot Assert Claims Against BNY that are
            Premised Upon Non-Actionable Alleged Regulatory Violations ............................9

      C.    The Complaint Does Not Adequately Plead Violations of the CEA
            and the Advisers Act ..........................................................................11

            1.    The CEA and CFTC Rules do not apply ....................................................11

                  a.    The Complaint fails to allege that Sentinel was engaged
                        in the business of an FCM ...........................................................11

                  b.    The Complaint fails to allege that the funds deposited by
                        Sentinel were "customer funds" subject to the segregation
                        requirement ...........................................................................14

            2.    The Complaint fails to allege that BNY "substantially assisted"
                  Sentinel's violations of the Advisers Act and SEC Rules ..........................15

      D.    As a Matter of Law, BNY's Alleged Regulatory Violations Did Not Cause
            Sentinel's Customers' Losses ...............................................................17

II.   THE COMPLAINT SHOULD BE DISMISSED PURSUANT TO SECTION 8-503
      OF THE UNIFORM COMMERCIAL CODE ...............................................................19

      A.    The Trustee's Right to Enforce the Property Interests of Sentinel's
            Customers is Limited by Section 8-503 ...................................................19

      B.    The Trustee's Claims are Barred by Section 8-503 ..................................20

            1.    Sentinel is a "Securities Intermediary," its customers are "Entitlement

# TABLE OF CONTENTS

**Page**

       Holders" and BNY is a "Purchaser" under UCC Section 8-503 ...............20

2.    This is an action based on the entitlement holder's property interest with respect to a particular financial asset held by BNY ..........................21

3.    Because BNY gave value, obtained control and did not act in collusion with Sentinel, the Complaint must be dismissed........................21

III.   EACH INDIVIDUAL COUNT OF THE COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED ..................................................24

  A.   Avoidance and Recovery of Fraudulent Transfers (Counts I-II) ..........................24

    1.   The Trustee has failed to allege that any purportedly fraudulent transfers were transfers of an "interest of the debtor in property".............25

    2.   The Trustee has failed to allege that any purportedly fraudulent transfers were made with the intent to defraud Sentinel creditors.............26

    3.   The Trustee has failed to identify virtually all of the challenged transfers with specificity ...........................................................................28

  B.   Avoidance and Recovery of Allegedly Preferential Transfers (Count III)............28

    1.   The Trustee has failed to allege that the purportedly preferential transfers were transfers of an "interest of the debtor in property".............28

    2.   The Complaint is self-contradictory as to whether the purportedly preferential transfers were made "on account of an antecedent debt".......29

  C.   Equitable Subordination of BNY's Claim (Count IV) .........................................29

    1.   BNY did not engage in inequitable conduct ..............................................30

    2   BNY's alleged conduct did not injure creditors or confer an unfair advantage on BNY ...................................................................................33

  D.   Disallowance of BNY's Proof of Claim (Count V)................................................33

  E.   Equitable Disallowance of BNY's Proof of Claim (Count VI) .............................34

  F.   Action to Determine Validity and Extent of Lien and for Turnover of Property (Count VII) .......................................................................................36

## TABLE OF CONTENTS

**Page**

G.    Aiding and Abetting/Knowing Participation in Breach of Fiduciary
Duty by Sentinel's Insiders (Count VIII)...............................................................37

1.    The aiding and abetting claim is barred by the *Wagoner* rule ..................37

2.    The Complaint fails to allege that BNY knew of Sentinel's insiders'
fiduciary breaches and provided "substantial assistance" ........................38

CONCLUSION..........................................................................................................40

# TABLE OF AUTHORITIES

**Page**

**Cases**

Alexander v. Sandoval,
    532 U.S. 275 (2001)........................................................................................8, 10

Aluminum Mills Corp. v. Citicorp N. Am., Inc. (In re Aluminum Mills Corp.),
    132 B.R. 869 (Bankr. N.D. Ill. 1992) ...................................................................31

Am. Agric. Movement, Inc. v. Bd. of Trade,
    977 F.2d 1147 (7th Cir. 1992) .............................................................................12

Badger Freightways, Inc. v. Cont'l Ill. Nat'l Bank and Trust Co. of Chi.
(In re Badger Freightways, Inc.),
    106 B.R. 971 (Bankr. N.D. Ill. 1989) .......................................................30, 31, 32

Bank One, Chic., NA v. Flowers,
    183 B.R. 509 (N.D. Ill. 1995) ..............................................................................36

Barnhill v. Johnson,
    503 U.S. 393 (2002)............................................................................................19

Begier v. IRS,
    496 U.S. 53 (1990)..............................................................................................25

Bell Atlantic Corp. v. Twombly,
    127 S. Ct. 1955 (2007)...................................................................................15, 24

Benjamin v. Diamond (In re Mobile Steel Co.),
    563 F.2d 692 (5th Cir. 1977) .....................................................................30, 35, 36

Bennett v. Johnson,
    No. 92-C-6880, 1993 U.S. Dist. LEXIS 8996 (N.D. Ill. June 30, 1993)................19

Borsellino v. Goldman Sachs Group, Inc.,
    477 F.3d 502 (7th Cir. 2007) ...............................................................................27

Breeden v. Kirkpatrick & Lockhart (In re Bennett Funding),
    336 F.3d 94 (2d Cir. 2003)...................................................................................38

Butner v. United States,
    440 U.S. 48 (1979)..............................................................................................19

City of Rancho Palos Verdes v. Abrams,
    544 U.S. 113 (2005)........................................................................................ 10, 11

# TABLE OF AUTHORITIES
(continued)

Conder v. Union Planters Bank, N.A.,
NO. IP01-0086-C-D/F,  2003 U.S. Dist. LEXIS 22215 (S.D. Ind. Sept. 26, 2003)
*aff'd,* 348 F.3d 397 (7th Cir. 2004)...................................................................................17, 18

Cromer Fin. Ltd. v. Berger,
137 F. Supp. 2d 452 (S.D.N.Y. 2001)...................................................................................38

Daly v. Kennedy (In re Kennedy),
279 B.R. 455 (Bankr. D. Conn. 2002) .......................................................................26, 27, 28

Dickerman v. N. Trust Co.,
176 U.S. 181 (1900)...................................................................................22

Dunham v. Kisak,
192 F.3d 1104 (7th Cir. 1999) ...................................................................................25, 26, 29

Ernst & Young v. Bankr. Servs. (In re CBI Holding Co., Inc.),
311 B.R. 350 (S.D.N.Y. 2004)...................................................................................37, 38

First Nat'l Bank of Barnesville v. Rafoth (In re Baker & Getty Fin. Servs., Inc.),
974 F.2d 712 (6th Cir. 1992) ...................................................................................32

Galey & Lord, Inc. v. Arley Corp. (In re Arlco, Inc.),
239 B.R. 261 (Bankr. S.D.N.Y. 1999)...................................................................................21

Georgou v. Fritzshall,
994 WL 685065 (N.D. Ill. Dec. 6, 1994)...................................................................................2

Glidden Co. v. Jandernoa,
5 F. Supp. 2d 541 (W.D. Mich. 1998) ...................................................................................39

Great Am. Ins. Co. v. Bailey (In re Cutty's-Gurnee, Inc.),
133 B.R. 934 (Bankr. N.D. Ill. 1991) ...................................................................................30

Grumman Allied Indus., Inc. v. Rohr Indus., Inc.,
748 F.2d 729 (2d Cir. 1984)...................................................................................17

Helms v. Arboleda (In re Arboleda),
224 B.R. 640 (Bankr. N.D. Ill. 1998) ...................................................................................26

Herzog v. Leighton Holdings, Ltd. (In re Kids Creek Partners, L.P.),
200 B.R. 996 (Bankr. N.D. Ill. 1996) ...................................................................................31

# TABLE OF AUTHORITIES
(continued)

**Page**

Holloway v. IRS (In re Odom Antennas, Inc.),
  340 F.3d 705 (8th Cir. 2003) ...................................................34

In re Busman,
  5 B.R. 332 (Bankr. E.D.N.Y. 1980)...........................................36

In re Dana Corp.,
  367 B.R. 409 (Bankr. N.D. Ill. 2007) .........................................19

In re FBN Food Servs., Inc.,
  82 F.3d 1387 (7th Cir. 1996) ....................................................19

In re Giffune,
  343 B.R. 883 (Bankr. N.D. Ill. 2006) .........................................13

In re Sharp Int'l Corp.,
  302 B.R. 760 (Bankr. E.D.N.Y. 2003).................................39, 40

Katchen v. Landry,
  382 U.S. 323 (1966).................................................................34

Khalid Bin Alwaleed Found. v. E.F. Hutton & Co., Inc.,
  709 F. Supp. 815 (N.D. Ill. 1989) ...............................................8

Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,
  908 F.2d 1351 (7th Cir. 1990) ........................................30, 31, 32

Kolbeck v. LIT Am., Inc.,
  939 F. Supp. 240 (S.D.N.Y. 1996) .......................................16, 39

Log on Am., Inc. v. Promethean Asset Mgmt. L.L.C.,
  223 F. Supp. 2d 435 (S.D.N.Y. 2001)........................................16

Lone Star Indus., Inc. v. Compania Naviera Perez Companc, S.A.C.F.I.M.F.A.
(In re New York Trap Rock Corp.),
  42 F.3d 747 (2d Cir. 1994)........................................................22

Marseilles Hydro Power v. Marseilles Land & Water Co.,
  2003 U.S. Dist. LEXIS 1652 (N.D. Ill. Feb. 4, 2003) .................17

Matrix IV, Inc. v. Am. Nat'l Bank and Trust Co. of Chi. (In re S.M. Acquisitions Co.),
  2006 WL 2290990 (N.D.Ill.Aug. 7, 2006) ................................30

# TABLE OF AUTHORITIES
(continued)

**Page**

Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n,
    453 U.S. 1 (1981)................................................................................................... 9, 10

Mohr v. WCKG, Inc.,
    462000 U.S. Dist. LEXIS 19595 (N.D. Ill. Oct. 17, 2000)..................................... 6

Monetta Fin. Servs., Inc. v. SEC,
    390 F.3d 952 (7th Cir. 2004) ................................................................................16

Neiman v. Irmen (In re Irmen),
    379 B.R. 299 (Bankr. N.D. Ill. 2007) ..............................................................24, 27

Nelson v. Monroe Reg'l Medical Center,
    25 F.2d 1555 (7th Cir. 1991) ..................................................................................2

Nisselson v. Ford Motor Co. (In re Monahan Ford Corp.),
    340 B.R. 1 (Bankr. E.D.N.Y. 2006)......................................................................38

N.W. Bank Worthington v. Ahlers,
    485 U.S. 197 (1988)..............................................................................................35

O'Connell v. Arthur Andersen LLP (In re AlphaStar Ins. Group Ltd.),
    383 B.R. 231 (Bankr. S.D.N.Y. 2008)..............................................................37, 38

Olson v. Potter (In re Potter),
    88 B.R. 843 (Bankr. N.D. Ill. 1988) .....................................................................27

Palombo Farms of Colo., Inc. v. Nat'l Acceptance Corp. of Am., Inc.
(In re Palombo Farms of Colo., Inc.),
    43 B.R. 709 (Bankr. D. Colo. 1984) ................................................................ 36-37

Parker N. Am. Corp. v. Resolution Trust Corp. (In re Parker N. Am. Corp.),
    24 F.3d 1145 (9th Cir. 1994) ................................................................................34

Premier Transp., Ltd. v. Nextel Commc'ns, Inc.,
    2003 WL 21267096 (N.D. Ill. May 30, 2003) ......................................................17

Raleigh v. Ill. Dep't of Revenue,
    530 U.S. 15 (2000)................................................................................................35

Shearson Lehman Hutton, Inc. v. Wagoner,
    944 F.2d 114 (2d Cir. 1991)............................................................................37, 38

# TABLE OF AUTHORITIES
(continued)

**Page**

Stevenson v. J.C. Bradford & Co. (In re Cannon),
   277 F.3d 838 (6th Cir. 2002) ............................................................ 25-26

Stoneridge Inv. Partners v. Scientific-Atlanta, Inc.,
   128 S. Ct. 761 (2008).............................................................................10

Tamari v. Bache & Co. (Lebanon) S.A.L.,
   730 F.2d 1103 (7th Cir. 1984) ....................................................... 12-13

Town of Thornton v. Winterhoff,
   92 N.E.2d 163 (Ill. 1950).......................................................................17

Transamerica Mortgage Advisors, Inc. v. Lewis,
   444 U.S. 11 (1979)................................................................... 7, 8, 10-11

Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.,
   127 S. Ct. 1199 (2007)...........................................................................35

Trepanier v. Ryan,
   No. 00 C 2393, 2004 WL 1102417 (N.D. Ill. May 17, 2004) ................10

Tzaras v. Evergreen Int'l Spot Trading, Inc.,
   No. 01-Civ-10726, 2003 U.S. Dist. LEXIS 2550 (S.D.N.Y. Jan. 25, 2003) ..........................17

Unsecured Creditors' Comm. v. Banque Paribas (In re Heartland Chem., Inc.),
   136 B.R. 503 (Bankr. C.D. Ill. 1992)......................................... 30-31, 33

Voiland v. Gillissie (In re Gillissie),
   215 B.R. 370 (Bankr. N.D. Ill. 1997) ...................................................24

Wight v. BankAmerica Corp.,
   219 F.3d 79 (2d Cir. 2000)....................................................................37

**Statutes**

7 U.S.C. ch. 1 ................................................................................6, 8

7 U.S.C. § 1a(20) ............................................................................12

7 U.S.C. § 6d...................................................................... 11, 14-15

7 U.S.C. § 9.....................................................................................8

## TABLE OF AUTHORITIES
(continued)

**Page**

7 U.S.C. § 13b ............................................................................................................8

7 U.S.C. § 25(a) .........................................................................................................8

11 U.S.C. § 101(6) ...................................................................................................14

11 U.S.C. § 103(d) ...................................................................................................14

11 U.S.C. § 502(b) ...................................................................................................35

11 U.S.C. § 502(d) ..............................................................................................33, 34

11 U.S.C. § 506 ..................................................................................................36, 37

11 U.S.C. § 510(c) .........................................................................................29-30, 35

11 U.S.C. § 544 ..................................................................................................25, 26

11 U.S.C. § 547(b) ...........................................................................................2, 28- 29

11 U.S.C. § 548 ................................................................................24, 25, 26, 27, 28

11 U.S.C. § 550 .......................................................................................................34

11 U.S.C. § 761(9) ...................................................................................................14

15 U.S.C. § 80b-6(4) ....................................................................................6, 15, 16, 17

42 U.S.C. § 1983 .......................................................................................................9

740 ILL. CONS. STAT. ANN. 160/5(a)(1) ..................................................................24

740 ILL. CONS. STAT. ANN. 160/8(a) ......................................................................24

N.Y. U.C.C. § 1-201(29) ......................................................................................20-21

N.Y. U.C.C. § 1-201(30) ......................................................................................20-21

N.Y. U.C.C. § 1-201(44) .........................................................................................21

N.Y. U.C.C. § 8-102 ................................................................................................20

**TABLE OF AUTHORITIES**
(continued)

**Page**

N.Y. U.C.C. § 8-102(7)..................................................................................20

N.Y. U.C.C. § 8-102(14)................................................................................20

N.Y. U.C.C. § 8-503 .............................................................................. *passim*

N.Y. U.C.C. § 8-503(e) ........................................................................... *passim*

N.Y. U.C.C. § 8-504 .............................................................................. *passim*

N.Y. U.C.C. § 8-511(b).................................................................................19

**Regulations**

17 C.F.R. §§ 1.1-190.10..................................................................................6

17 C.F.R. § 1.20(a)........................................................................................14

17 C.F.R. § 1.23 ............................................................................................18

17 C.F.R. § 275.206(4)-2(a)............................................................................6

**Rules**

Fed. R. Bankr. P. 7009 ...................................................................................1

Fed. R. Bankr. P. 7012 ...............................................................................1, 24

Fed. R. Civ. P. 9(b) ...............................................................1, 26, 27, 28

Fed. R. Civ. P. 12(b)(6) ...........................................................................1, 24

**Other Authorities**

1997 N.Y. A.L.S. 566 ...................................................................................23

1997 N.Y. Sess. Laws ch. 566, § 1 (Oct. 10, 1997)................................. 22-23

H.R. Rep. No. 97-565(l) (1982), *reprinted in* 1982 U.S.C.C.A.N. 3871........................8

H.R. Rep. No. 975, 93d Cong., 2d Sess. 1 ..................................................12

*Views of Our Readers*, 55 A.B.A.J. 818 (1969)...........................................13

**TABLE OF AUTHORITIES**

(continued)

<u>**Page**</u>

CFTC Release, Financial and Segregation Interpretation No. 7-1 ................................................18

CFTC Release, Securities Representing Investment of Customer Funds
Held in Segregated Accounts by Futures Commission Merchants,
62 Fed. Reg. 42,398 (Aug. 7, 1997).............................................................................................18

BLACK'S LAW DICTIONARY (8th ed. 2004) .................................................................................22

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (G.&C. Miriam Co. ed. 1976)................22

Defendants The Bank of New York ("BNY") and The Bank of New York Mellon Corp. respectfully submit this memorandum of law in support of their motion to dismiss the complaint ("Complaint" or "Cmplt.") of Plaintiff Frederick J. Grede, as Chapter 11 Trustee (the "Trustee") for Sentinel Management Group, Inc. ("Sentinel"), pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), as incorporated by reference in Fed. R. Bankr. P. 7009 and 7012.

## PRELIMINARY STATEMENT

This case should be nothing more than an ordinary dispute between a secured lender and a debtor in bankruptcy over a pool of collateral that was used to secure a loan.  Under the governing agreements between BNY and Sentinel and by operation of law, BNY has a valid, first-priority, perfected security interest in and lien upon all assets held in Sentinel's non-segregated accounts, including its clearing, or "street," accounts at BNY (collectively, the "Collateral").  That fact is supported by established law and by the plain language of the agreements themselves, in which Sentinel represented to BNY, among other things, that it was authorized to pledge assets to BNY to secure loans and other extensions of credit; that to the extent anyone other than Sentinel once had a beneficial interest in the assets, those rights had been extinguished; and that BNY was granted a first lien and security interest subject to no setoffs, counterclaims or other liens.

By necessity, the Trustee's 59-page, 236-paragraph Complaint purports to tell a much different story, one that culminates in eight separate claims against BNY that share one common thread:  they rise or fall with allegations that BNY violated the Commodity Exchange Act and the Investment Advisers Act of 1940 by "permitting" Sentinel to maintain an account structure – one implicitly, if not explicitly, blessed by Sentinel's outside auditors and various government regulators for more than 10 years – in which Sentinel, if it chose to, could commingle assets.

These central allegations fail as a matter of law.  There is no private right of action under the CEA and Advisers Act, and no mechanism for subverting that fact by seeking to enforce these statutes through the broad remedial provisions of the Bankruptcy Code.  Even if there were, the Trustee comes nowhere near alleging the necessary facts to support a violation of these statutes. And under the Trustee's theory of liability (or any theory), as a matter of law BNY was not and cannot have been the proximate cause of any losses to Sentinel or its customers.  Once these central allegations fail, as they must, the Complaint collapses in its entirety.

But even accepting all of these factual allegations as true[1], the Complaint should still be dismissed as a matter of law:

- *First*, all of the Trustee's claims are barred by Article 8 of the Uniform Commercial Code ("UCC").  BNY is a "purchaser" of the Collateral, "gave value" to Sentinel in the form of loans and other extensions of credit, maintained "control" of the Collateral, and did not engage (and is not alleged to have engaged) in the type of affirmative misconduct that rises to the level of "collusion" as that term is defined by UCC § 8-503.  Accordingly, the Trustee can assert no action to enforce the purported rights of Sentinel's customers.

- *Second*, Counts I and II of the Complaint, for recovery of fraudulent transfers, should be dismissed because the Complaint fails to allege fraud with particularity.  Moreover, because the property that was pledged to BNY as collateral was, according to the Complaint, the property of Sentinel's customers, and not of Sentinel itself, the Complaint does not allege any transfer of "an interest in property of *the debtor*," Consequently, these Counts – along with Count III – must be dismissed.

- *Third*, the allegedly preferential transfers in Count III are not alleged to have been made on account of an antecedent debt and therefore do not fall within 11 U.S.C. § 547(b)(2).

- *Fourth*, because BNY was not an insider of Sentinel, a claim for equitable subordination of BNY's claim (Count IV) must allege conduct that is "egregious" and "severely unfair" to Sentinel's other creditors.  The Complaint, which alleges no affirmative misconduct on the part of BNY, does nothing of the sort.

- *Fifth*, the Trustee's causes of action for disallowance (Count V) and for determination of BNY's lien and turnover of the Collateral (Count VII) are not ripe.  Disallowance of

---

[1]     *See Nelson v. Monroe Reg'l Med. Ctr.*, 925 F.2d 1555, 1559 (7th Cir. 1991) ("[W]e are not required to accept legal conclusions either alleged or inferred from the pleaded facts.") (citation omitted); *Georgou v. Fritzshall*, 1994 WL 685065, at *7 (N.D. Ill. Dec. 6, 1994) (while discussing the standard for a Rule 12(b) motion to dismiss, the court noted that "[it] need not accept as true conclusory legal allegations").

BNY's claim is appropriate only if the Trustee successfully proves his other claims in the Complaint (which he cannot do), and then only if BNY refuses to return the Collateral. Turnover is not ripe because this Court has not disallowed BNY's claim.

- *Sixth*, the Trustee's cause of action for equitable disallowance (Count VI) must be dismissed because that cause of action is not authorized by the Bankruptcy Code.

- And *finally*, Count VIII – aiding and abetting/knowing participation in breach of fiduciary duty – must be dismissed because the Complaint does not (and cannot) adequately allege that BNY knew of the alleged breaches by Sentinel's insiders or that BNY provided substantial assistance to the Sentinel insiders.

### STATEMENT OF FACTS

Before filing for bankruptcy in August 2007, Sentinel was a money manager that accepted deposits of cash from a variety of sophisticated customers in exchange for proportionate interests in its investment accounts. Cmplt. ¶ 23. It was a futures commission merchant ("FCM") in name only. It never, in its history, "engage[d] in any commodities trading for its customers, but instead only invested funds deposited by other FCMs and Sentinel's other customers," including individuals and hedge funds. *Id.* ¶ 29.

For more than 10 years, Sentinel was a BNY customer, first as a client of its custodial services division and then, just months into the relationship, as a client of its clearing services division, which offered Sentinel same-day settlements and credit arrangements that Sentinel viewed as essential to its business model. *Id.* ¶¶ 53, 60. When Sentinel first became one (among hundreds) of BNY's clearing customers, Sentinel's custody accounts were closed, its custody contract was replaced with new agreements (the "1997 Agreements") and Sentinel opened a new set of accounts that remained in place, without incident, for 10 years. *Id.* ¶ 60, Exs. F, G.

BNY was Sentinel's clearing bank and its secured lender. *Id.* Exs. F, G. As a secured lender, BNY provided Sentinel with loans and other extensions of credit on a daily basis and Sentinel pledged collateral to BNY to secure its debt. *Id.* ¶ 65. To pledge assets as collateral to

BNY, Sentinel had only to transfer them to Sentinel's non-segregated accounts – commonly referred to as the "clearing" or "street" accounts ("Street Account") (*id.* Ex. F, § 3.04) – by issuing a "Desegregation Instruction" that only Sentinel was authorized to issue. *Id.* Ex. F, § 2.04(b). In the 1997 Agreements, Sentinel made a number of dispositive representations and warranties about its authority to transfer assets to the Street Account and BNY's rights to the Collateral held in that account. For example, Sentinel represented and warranted that:

- It was "authorized to issue [a] Desegregation Instruction and by so doing to transfer and pledge to [BNY] the full value of any and all such Securities." *Id.* When a Desegregation Instruction was executed, "any and all claims to such Securities by any third party, including without limitation, claims of or by customers or counterparties of [Sentinel, were] discharged, extinguished, released and terminated." *Id.*

- It owned all of the securities transferred to the Street Account "free and clear of all liens, claims, security interests and encumbrances (except those granted herein)." *Id.* Ex. F, § 4.01(d). If any of these securities were beneficially owned by others, Sentinel had "the right to pledge such Securities to the extent financed by [BNY] hereunder, free of any right of redemption or prior claim by the beneficial owner." *Id.*

- BNY's security interest in the pledged assets "shall be a first lien and security interest subject to no setoffs, counterclaims or other liens prior to or on a parity with it in favor of any other party" and agreed to "take any and all additional steps which [BNY] requires to assure itself of such priority and status, including notifying third parties or obtaining their consent." *Id.*

In January 2003, Sentinel entered into additional agreements with the clearing services division that permitted Sentinel to expand its money management activities into the global markets (the "2003 Agreements"). *Id.* ¶¶ 75-76, Exs. H, I. The 2003 Agreements are substantially identical to the 1997 Agreements and contemplated no material change in the way Sentinel's accounts were managed. *Compare id.* Exs. F, G, *with id.* Exs. H, I. Indeed, from the time of Sentinel's transfer to the clearing services division through the Summer of 2007 – during numerous audits by government agencies, including the Commodity Futures Trading Commission ("CFTC") and the National Futures Association ("NFA"), and by experienced

accountants – Sentinel's relationship with BNY was routine:  BNY accepted and executed Sentinel's instructions for the receipt, delivery and transfer of cash and securities, debited and credited Sentinel's account balances accordingly, and made loans to Sentinel after Sentinel's pledge of sufficient collateral to secure such loans.  Cmplt. ¶ 57.

By the summer of 2007, however, Sentinel began to experience financial difficulties and, on August 13, 2007, announced that it was halting all redemptions of customer assets.  Cmplt. ¶¶ 128, 156.  Four days later, on August 17, 2007 (the "Petition Date"), Sentinel filed for Chapter 11 bankruptcy protection in the this Court.  As of the Petition Date, Sentinel's outstanding principal indebtedness to BNY was $312,247,000, and on January 18, 2008, BNY filed a proof of claim in Sentinel's bankruptcy case setting forth the secured indebtedness owing to BNY from Sentinel.  *Id.* ¶ 167.

The Trustee has since filed an adversary complaint against Sentinel's principals alleging that they devised and participated in a series of interrelated schemes to defraud Sentinel and its customers.  *Grede v. Bloom et al. (In re Sentinel Mgmt. Group)*, No. 07 B 14987, Adv. No. 07-981 (Bankr. N.D.Ill. Filed Oct. 11, 2007), Ex. A.  Specifically, that complaint alleges that Sentinel's principals, *inter alia*, made fraudulent misrepresentations about the nature of customer investments; kept inconsistent records of allocations of securities in various bank accounts; fraudulently concealed the existence of leveraging through bank loans; fraudulently diverted income from customers' securities; fraudulently extracted customers' trading gains for personal accounts by insiders; issued false account statements; and engaged in a raft of other fraudulent and wrongful conduct.  *Id.* ¶ 4.

On March 3, 2008, the Trustee filed the instant Complaint against BNY.  The thrust of the Complaint is that BNY "established a fundamentally flawed account structure for Sentinel's

accounts in violation of its obligations under federal law and its duties to Sentinel." Cmplt. ¶ 3. According to the Complaint, BNY "facilitated" Sentinel's misuse of customer funds via the flawed account structure, in particular by "allowing" Sentinel to pledge customer funds to secure BNY's loan to Sentinel and commingling customer assets with Sentinel's own assets. *Id.* ¶ 3. The Trustee alleges that BNY's conduct caused in excess of $550 million in damages. *Id.* ¶ 10.

<div align="center">

**ARGUMENT**[2]

</div>

## I.    THE    ALLEGATIONS    THAT    BNY    VIOLATED    FEDERAL    LAW SHOULD BE REJECTED

The Complaint relies principally on allegations that BNY violated the Commodity Exchange Act ("CEA"), 7 U.S.C. ch. 1, and the rules and regulations promulgated thereunder by the CFTC, 17 C.F.R. §§ 1.1-190.10 (the "CFTC Rules"). To a lesser extent, the Complaint also relies on allegations that BNY "participated in" violations of Section 206 of the Investment Advisers Act of 1940 (the "Advisers Act"), 15 U.S.C. § 80b-6(4), and Rule 206(4)-2 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 275.206(4)-2(a) ("SEC Rule 206(4)-2").

These allegations of statutory violations are a smokescreen. The Trustee does not bring any actual claim under the CEA or the Advisers Act. Indeed, for reasons explained *infra*, the Trustee *cannot* bring such a claim because there is no private right of action for the statutory and regulatory violations the Trustee alleges. Rather, the Trustee seeks to imbue BNY's conduct with the *aura* of illegality, and to use these purported "violations" to underpin other claims for relief. But there is no mechanism for the Trustee to assert indirectly what the law clearly forbids

---

[2]    As an initial matter, defendant The Bank of New York Mellon Corp. should be dropped from this case because it is an improperly named party. The Bank of New York Mellon Corp. is a holding company, and none of the allegations in the Complaint relate to its activities as opposed to those of its subsidiary, BNY. An entity should not be a co-defendant simply by virtue of the fact that another defendant is a subsidiary of that entity. *See Mohr v. WCKG, Inc.*, 2000 WL 1535991, at *1 (N.D. Ill. Oct. 17, 2000) (dismissing parent company as a party defendant pursuant to misjoinder provisions of Rule 21).

him from asserting directly.  In any event, because the Trustee's factual allegations do not support his conclusory legal assertions that these statutes and regulations have, in fact, been violated, the alleged violations cannot serve as a basis for any of the Trustee's claims against BNY, however those claims are framed.  In other words, those legal conclusions must be ignored for purposes of evaluating BNY's motion to dismiss.

Once this Court rejects the conclusion that BNY's alleged conduct violates the CEA and the Advisers Act, the threadbare nature of the Complaint becomes readily apparent.  Absent these allegations, the Complaint deflates to near-nothing and the counts that wholly depend upon BNY's purported statutory violations – in particular, the claims for equitable subordination (Count IV), disallowance of BNY's secured claim (Count V), and equitable disallowance (Count VI), and the Trustee's action to determine the validity and extent of BNY's lien (Count VII) – must be dismissed outright.  *See, e.g.*, ¶¶ 195, 207, 208, 215, 224, 225 (relying on purported violations of the CEA and Adviser's Act to state claims).

### A.    The Trustee Has No Right to Recover Directly under Either the Advisers Act or the CEA

The Trustee has not asserted any claims under the Advisers Act or the CEA, and for good reason:  no private right of action under either statute could arise out of BNY's alleged conduct.

Indeed, there can never be a private right of action for violations of Section 206 of the Advisers Act.  *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 19-20 (1979).  In *Transamerica*, the U.S. Supreme Court held that the Advisers Act confers no private remedies other than the limited right to rescind a contract deemed to be void under Section 215.  *Id.* at 24-25.  That right of rescission does not include "compensation for any diminution in value of the rescinding party's investment alleged to have resulted from the adviser's action or inaction[,]"

7

because such relief "could provide by indirection the equivalent of a private damages remedy that we have concluded Congress did not confer." *Id.* at 25 n.14.

Unlike the Advisers Act, the CEA does provide a private right of action, but only for violations arising directly out of a limited set of transactions not at issue here. *See* 7 U.S.C. § 25(a). Specifically, in order to recover in a private action under the CEA, "the violation must have arisen from a transaction on the futures markets, a regulated option or leverage contract, or participation in a commodity pool." H.R. Rep. No. 97-565(l), at 56-57 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3871, 3905-06. Otherwise, enforcement, if any, falls generally to the CFTC. *See* 7 U.S.C. ch. 1; *see also id.* §§ 9, 13b (authorizing the *CFTC* to issue a cease and desist order, prohibit the violator from trading, suspend or revoke its registration, assess civil penalties, and require restitution to customers of damages proximately caused by the violations).

Under this framework, there can be no private right of action against *Sentinel*, much less a non-FCM depository like BNY that, by definition, does not engage in the activities described in Section 25(a). Cmplt. ¶ 29. The purported violations of the CEA arose out of the allegedly flawed account structure, BNY's clearing activities and BNY's acceptance of certain assets as collateral for Sentinel's loan, which is a far cry from conduct arising from a "transaction on the future markets, a regulated option or leverage contract, or participation in a commodity pool." 7 U.S.C. § 25(a); *see also* Cmplt. ¶ 48. There unquestionably is no private right of action against BNY.[3]

---

[3]     Because the Trustee has no private right of action for BNY's alleged violations of the Advisers Act and the CEA, he likewise has no private right of action for BNY's alleged violations of the CFTC and SEC Rules. *See Alexander v. Sandoval*, 532 U.S. 275, 291 (2001); *Khalid Bin Alwaleed Found. v. E.F. Hutton & Co., Inc.*, 709 F. Supp. 815, 818-19 (N.D. Ill. 1989).

### B.    The Trustee Cannot Assert Claims Against BNY that Are Premised upon Non-Actionable Alleged Regulatory Violations

The majority of the Complaint's 236 paragraphs, 59 pages, and eight separate claims for relief relate to BNY's alleged regulatory violations.    They are the underpinning of Counts IV-VII of the Complaint.    Paragraphs 23 through 99 of the Complaint address *only* those alleged violations.    And on eight separate occasions in the Complaint, the Trustee accuses BNY of having violated federal law.[4]    In short, the Trustee seeks to make an end-run around settled law and unambiguous Congressional intent by pleading bankruptcy claims and seeking damages based on BNY's alleged violations of these statutes.    Because the Trustee cannot do indirectly what he is forbidden from doing directly – namely, obtaining relief for the alleged violations of the CEA and the Advisers Act – Counts IV, V, VI and VII of the Complaint must be dismissed.

There is not a single federal opinion that has allowed a party to privately enforce the CEA or the Advisers Act through the broad remedial provisions of the Bankruptcy Code notwithstanding the fact that those statutes contain comprehensive enforcement schemes of their own.    Under closely analogous facts, the U.S. Supreme Court has uniformly *rejected* such efforts to thwart Congressional intent.    In *Middlesex County Sewerage Authority v. National Sea Clammers Association*, the Court held that the comprehensive enforcement schemes found in the Federal Water Pollution Control Act and the Marine Protection, Research, and Sanctuaries Act of 1972 could not be privately "bypassed" by asserting claims under another federal statute – specifically, 42 U.S.C. § 1983.    *See* 453 U.S. 1, 20 (1981).    In so doing, the Court stated that "[w]hen the remedial devices provided in a particular statute are sufficiently comprehensive,

---

[4]        However, the Trustee does not, and cannot, cite to a single instance over the course of a 10-plus year relationship in which any governmental agency (including the SEC and CFTC), any self-regulatory body (including the NFA), Sentinel's independent accounting firm, or any customer of Sentinel claimed, advised, or notified BNY that the account structure at BNY was flawed or that BNY's management of the accounts was improper or violated any law or regulation.

they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983." *Id.*

Likewise, in *City of Rancho Palos Verdes v. Abrams*, the Court held that Congress did not intend for a judicial remedy expressly authorized by the Communications Act of 1934 to "coexist with an alternative remedy available in a § 1983 action." 544 U.S. 113, 120-21 (2005). In dismissing the complaint, the Court invoked *Sea Clammers*, emphasizing that the statutory remedies were more restrictive than the broad remedy provided by Section 1983. *Id.* at 121; *see also Stoneridge Invest. Partners v. Scientific-Atlanta, Inc.,* 128 S. Ct. 761, 774 (2008) (declining to extend primary liability under a federal statute so as to be "consistent with the narrow dimensions [the Court] must give to a right of action Congress did not authorize when it first enacted the statute and did not expand when it revisited the law"); *Sandoval*, 532 U.S. at 290 ("The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others."); *Trepanier v. Ryan*, 2004 WL 1102417, at *3 (N.D. Ill. May 17, 2004) (precluding a claim under one federal statute that relied on violations of a separate statute that contained a comprehensive enforcement scheme).

The Supreme Court's rationale in *Sea Clammers* and *Abrams* applies equally here. Like the allegations in those cases, the core of the Trustee's allegations arise under federal statutes that have restrictive private remedies. Like the plaintiffs in *Sea Clammers* and *Abrams*, the Trustee relies on a separate federal statutory scheme to seek remedies not available under the statutes that he claims were violated. And like the claims in those cases, the Trustee's claims under the separate statutory scheme – here, the Bankruptcy Code – should fail as a matter of law.

In sum, in both the CEA and the Advisers Act, Congress provided comprehensive enforcement schemes with limited or no private rights of action. Enforcement of these statutes

10

through the Bankruptcy Code to reorder creditors' rights and settled property interests would be wholly inconsistent with these statutory schemes and would "provide by indirection the equivalent of a private damages remedy that . . . Congress did not confer." *Transamerica*, 444 U.S. at 24 n.14; *see also Abrams*, 544 U.S. at 120 ("The crucial consideration is what Congress intended.") (citation omitted). Accordingly, this Court should dismiss Counts IV-VII of the Complaint.

### C.   The Complaint Does Not Adequately Plead Violations of the CEA and the Advisers Act

To the extent the Trustee could, somehow, subvert Congressional intent and assert bankruptcy claims that are wholly premised upon alleged violations for which there is no private right of action, Counts IV-VII still must be dismissed because the Trustee has not adequately pleaded the alleged statutory or regulatory violations.

#### 1.   The CEA and CFTC Rules do not apply

It is axiomatic that there can be no violation of a statute if it does not regulate the activity in question. In support of the Trustee's position that the CEA and CFTC Rules governed Sentinel's activities with BNY (and Sentinel's activities with its own customers), the Complaint alleges only that Sentinel was registered with the CFTC as an FCM and was "managing funds required to be segregated for the benefit of customers." Cmplt. ¶¶ 29-30. Neither of these allegations is sufficient to establish the applicability of the CEA to BNY.[5]

##### a.   The Complaint fails to allege that Sentinel was engaged in the business of an FCM

The CEA governs the activities of FCMs. An FCM is "an individual, association, partnership, corporation, or trust that –

---

[5] Notably, our research has revealed no decision, reported or otherwise, in which any party – including the CFTC – has brought an action against a depository for an alleged violation of Section 4d(b) of the CEA.

11

      (A)     is engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any contract market or derivatives transaction execution facility; and

      (B)     in or in connection with such solicitation or acceptance of orders, accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom.

7 U.S.C. § 1a(20).

The Trustee does not allege that Sentinel functioned as an FCM; rather, the Complaint asserts merely that Sentinel was registered with the CFTC as such. There is no allegation that Sentinel did any of the above activities. Sentinel neither solicited nor accepted orders for the purchase or sale of commodities or commodity options. *See id.* It never made orders on or subject to the rules of a contract market or derivatives transaction execution facility. *See id.* It never accepted money, securities or property in or in connection with such orders. *See* 7 U.S.C. § 1a(20)(B). And it never used any such money, securities or property to margin, guarantee, or secure any trades or contracts resulting from such orders. *See id.* In fact, the Trustee effectively concedes that Sentinel was not an FCM within the meaning of the CEA: "Sentinel did not engage in any commodities trading for its customers, but instead only invested funds deposited by other FCMs and Sentinel's other customers." Cmplt. ¶ 29.

Because Sentinel was not functioning as an FCM, its activities did not fall within the scope of conduct regulated by the CEA or CFTC Rules, which establish "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Am. Agric. Movement, Inc. v. Bd. of Trade*, 977 F.2d 1147, 1155 (7th Cir. 1992) (quoting H.R. Rep. No. 975, 93d Cong., 2d Sess. 1); *see Tamari v. Bache & Co. (Lebanon) S.A.L.*, 730 F.2d 1103, 1106 (7th Cir. 1984) (observing that the CEA's regulatory regime governs "domestic futures exchanges

and the trading of futures contracts on those exchanges").  As a result, the "strict custodial and segregation requirements" of the CEA and CFTC Rules – the alleged basis for BNY's purported violations (Cmplt. ¶¶ 59-61) – did not apply, either to Sentinel's investments of its customers' assets or, by extension, to BNY's conduct as Sentinel's clearing agent and custodian.

It is a bedrock principle that "the applicable statutory language . . . is the best evidence of the purpose of the statutes.  Where a provision is unambiguous, courts must give effect to the plain meaning of the statutory language."  *In re Giffune*, 343 B.R. 883, 891 (Bankr. N.D. Ill. 2006).  Courts should "interpret words and phrases in such a way as to avoid rendering them redundant, superfluous, or meaningless."  *Id.*  In accordance with these principles, this Court should apply the plain language of the CEA's definition of FCM.  There is no ambiguity in that definition, and there can be no dispute that Sentinel did not and does not fall within it.

<center>*    *    *</center>

A story is told of Abraham Lincoln during his trial lawyer days.  Lincoln is said to have cross-examined a witness as follows:

> Q:    How many legs does a horse have?
> A:    Four.
> Q:    Now, if you call the tail a leg, how many legs does a horse have?
> A:    Five.
> Q:    No.  The answer is still four.  Calling a tail a leg doesn't make it a leg.

*See Views of Our Readers*, 55 A.B.A.J. 818 (1969).

<center>*    *    *</center>

So it is here.  The Trustee can call Sentinel an FCM all he wants, but it was not an FCM because it never met the statutory definition of an FCM.  The CEA's segregation requirements simply did not apply. [6]

---

[6]    Along those lines, Sentinel could not have qualified for, and did not file under, the "commodity broker" liquidation provisions of Chapter 7 of the Bankruptcy Code because, to be eligible, it would have

> b.    The Complaint fails to allege that the funds deposited by Sentinel
>        were "customer funds" subject to the segregation requirement

The CEA's segregation requirements are not applicable for the additional reason that Sentinel did not accept (and is not alleged to have accepted) "customer funds" for deposit. Under the plain language of the statute, the segregation requirement applies only to "money, securities, and property received by [the person acting as an FCM] to margin, guarantee, or secure the trades or contracts of any customer of such person, or accruing to such customer as the result of such trades or contracts." CEA § 4d(a)(2) (7 U.S.C. §6d(a)(2)).[7] Collectively, these assets are referred to as "customer funds." *See* 17 C.F.R. § 1.20(a) (clarifying that the segregation requirements of Section 4d apply only to "customer funds").

As noted above, the Trustee alleges that Sentinel's only activity was as a depository of funds belonging to, among others, Sentinel's FCM customers (Cmplt. ¶ 29), and that Sentinel was required to treat any assets received for deposit pursuant to CEA Section 4d(a)(2) as belonging exclusively to the depositing FCM's customers. Cmplt. ¶¶ 30-32. But the Complaint does not allege that Sentinel received any such funds "to margin, guarantee, or secure the trades or contracts" of its customers. To the contrary, the Trustee concedes, as he must, that Sentinel did not receive any funds for the purpose of engaging in commodities trading for its customers.

---

had to have been an FCM with at least one "customer" holding claims against it based on either: (1) commodity contracts "made, received, acquired, or held by or through [Sentinel] in the ordinary course of [its] business as a futures commission merchant from or for the commodity futures account" of such customer; or (2) "the making, liquidation, or change in the value of a commodity contract," "a deposit or payment of cash, a security, or other property with [Sentinel] for the purpose of making or margining such a commodity contract" or "the making or taking of delivery on such a commodity contract." 11 U.S.C. §§103(d),101(6) and 761(9).

[7]    The CEA makes it unlawful for any person to act in the capacity of an FCM unless "such person shall have registered [with the CFTC]" *and* "such person shall, if a futures commission merchant . . . treat and deal with all money, securities, and property received by such person to margin, guarantee, or secure the trades or contracts of any customer of such person, or accruing to such customer as the result of such trades or contracts, as belonging to such customer." 7 U.S.C. § 6d(a)(1)-(2).

Cmplt. ¶ 29.[8]  Even if, at best, Sentinel's FCM customers might have accepted deposits of "customer funds" from their customers (which is not even alleged), there is not a shred of support for the notion that the money retained that character when it was later deposited with Sentinel in its role as money manager, and then again with BNY as a clearing bank.

Accordingly, because Sentinel was not an FCM within the meaning of the CEA and did not receive funds from its customers for the purpose of margining its customers' futures and options trading (*i.e.*, "customer funds"), the segregation regime contemplated in CEA Section 4(d)(2) did not apply.

> 2.    The Complaint fails to allege that BNY "substantially assisted"
> Sentinel's violations of the Advisers Act and SEC Rules

Section 206 of the Advisers Act provides that it "shall be unlawful for any investment adviser . . . directly or indirectly . . . to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative."  15 U.S.C. § 80b-6(4).  The Trustee alleges that BNY "knowingly participated in" Sentinel's conduct that violated this section, in particular by permitting customer assets to be commingled with Sentinel's own assets, by permitting customer assets to be cleared through, and maintained in, accounts that were not properly registered in Sentinel's name, allowing Sentinel to maintain customer assets in a manner different than that disclosed by Sentinel to its customers, and by providing a mechanism for Sentinel to use

---

[8]    Rather than alleging that any of the assets accepted for deposit by Sentinel were accepted for the purposes delineated in Section 4d(a)(2), the Trustee attempts to plead around the statute by means of a footnote that purposefully avoids the statutorily defined term "customer funds" and instead defines "customer assets" and "customer securities" (two terms not defined in the CEA or the CFTC Rules) as any assets that were supposed to be segregated for the benefit of Sentinel's customers.  Cmplt. ¶ 3, n.1.  This circular definition fails to satisfy even the most liberal notice pleading standard because it does not explain whether, and to what extent, Sentinel received deposits of "customer funds," as that term is defined in the CEA.  *See Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (holding that a complaint must include "more than labels and conclusions").  That is hardly surprising, given that Sentinel's agreements with its customers never referred to the funds deposited with Sentinel as "customer funds" as defined in the CEA.

customer assets to cover or secure securities purchases for other customer accounts or for Sentinel itself. Cmplt. ¶ 49. But, as noted *supra* Part I.A, there is no private right of action for violations of Section 206; any violations of Section 206 are actionable by the SEC alone, and then only upon a showing that BNY aided and abetted the violation.

Even operating under this non-existent statutory framework, the Trustee's allegations fail to satisfy the basic elements of an aiding and abetting claim – namely, that (1) Sentinel directly violated Section 206 and SEC Rule 206(4)-2; (2) BNY "generally was aware or knew that [Sentinel's] actions were part of an overall course of conduct that was improper or illegal"; and (3) BNY "substantially assisted the primary violation." *Monetta Fin. Servs., Inc. v. SEC*, 390 F.3d 952, 956 (7th Cir. 2004).

Even assuming *arguendo* that Sentinel's conduct violated Section 206 and SEC Rule 206(4)-2 and that the Trustee's conclusory allegations of "knowledge" are sufficient, as a matter of law BNY's alleged participation did not rise to the level of "substantial assistance" required under *Monetta*. The Trustee alleges nothing more than a series of omissions by BNY. *See, e.g.*, Cmplt. ¶¶ 48-49, 67-70, 83-87, 89-91, 96-99. But "inaction, or a failure to investigate, constitutes actionable participation only when a defendant owes a fiduciary duty directly to the plaintiff; that the primary violator owes a fiduciary duty to the plaintiff is not enough." *Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 247 (S.D.N.Y. 1996) (citation omitted).

There is no allegation (nor could there be) that BNY owed a fiduciary duty to Sentinel, especially given the plain language of the parties' agreement expressly disclaiming any fiduciary duties. *See* Cmplt. Ex. F, § 4.05(a) ("It is expressly understood and agreed that in exercising its rights and performing its obligations hereunder, Bank owes no fiduciary duty to [Sentinel].").[9]

---

[9]    *See also Log on Am., Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp. 2d 435, 450 (S.D.N.Y. 2001) (holding that pursuant to the agreement of the parties, there was no fiduciary duty between

There is also no allegation (nor could there be) that BNY owed a fiduciary duty to Sentinel's customers. *See Conder v. Union Planters Bank, N.A.*, 384 F.3d 397, 399 (7th Cir. 2004) (refusing to impose on banks a general duty of care toward persons who are not their customers and to whom therefore they have no contractual obligations) (citations omitted); *Tzaras v. Evergreen Int'l Spot Trading, Inc.*, 2003 WL 470611, at *6 (S.D.N.Y. Feb. 25, 2003) (holding that, as a matter of law, a bank owes no duty of care to a non-customer defrauded by a bank customer) (citation omitted). As a result, even if it were the SEC seeking to bring a claim based on the Trustee's allegations rather than the Trustee attempting to create a new private right of action, the allegations fall far short of stating a claim for aiding and abetting Sentinel's alleged violations of Section 206 and SEC Rule 206(4)-2.

###    D.    As a Matter of Law, BNY's Alleged Regulatory Violations Did Not Cause Sentinel's Customers' Losses

It is a fundamental principle that liability cannot attach to conduct that did not cause the harm sought to be redressed. *See Premier Transp., Ltd. v. Nextel Commc'ns, Inc.*, 2003 WL 21267096, at *4 (N.D. Ill. May 30, 2003). "[I]n order to [find] a right of action there must be a wrongful act done and a loss resulting from that wrongful act; the wrongful act must be the act of the defendant, and the injury suffered by the plaintiff must be the natural and not merely a remote consequence of the defendant's act." *Town of Thornton v. Winterhoff*, 92 N.E.2d 163, 166 (Ill. 1950); *see also Marseilles Hydro Power v. Marseilles Land & Water Co.*, 2003 WL 259142, at *5 (N.D. Ill. Feb. 4, 2003). Where private rights of action are available, claims for violations of regulatory statutes are no exception. *See, e.g.*, 7 U.S.C. § 25(a) (providing (under circumstances not present here) for private recovery of damages "caused by" violation of CEA).

---

defendants and plaintiffs); *see also Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 735 (2d Cir. 1984) ("[W]here the parties to an agreement have expressly allocated risks, the judiciary shall not intrude into their contractual relationship.").

Here, the Trustee alleges that BNY violated two federal statutes and various regulations by knowingly facilitating Sentinel's misuse of customer funds via a "fundamentally flawed account structure." Cmplt. ¶¶ 3, 48-49, 61. In particular, the Trustee contends that the account structure was flawed because it was intended for broker-dealer customers, not FCMs or investment advisers, and therefore did not satisfy the purported "strict custodial and segregation requirements" of federal law. *Id.* ¶ 59. In the absence of the allegedly flawed account structure, the Trustee claims, Sentinel would not have collapsed and Sentinel's customers would not have suffered any losses. *Id.* ¶ 8.

This argument does not withstand the most basic scrutiny. Regardless of how the accounts were structured, Sentinel would still have had the ability – and, in some cases, the obligation – to transfer funds out of the segregated accounts.[10] Under the governing agreements, no matter how many segregated accounts had been established or in whose name they were maintained, Sentinel would have had the exclusive power to transfer assets between accounts by issuing the same type of Desegregation Instruction that it issued to BNY under the existing account structure. *See* Cmplt., Ex. F. Thus, the allegedly flawed account structure was not, and cannot have been, the proximate cause of Sentinel's customers' losses. *See, e.g., Conder*, 2003 U.S. Dist. LEXIS 22215, at *43 (the acts or omissions of a bank used to facilitate a fraudulent scheme are not the proximate cause of any loss to the investors in the scheme), *aff'd* 348 F.3d 397 (7th Cir. 2004). And if that structure did not cause the injury complained of, then BNY's alleged regulatory violations provide no basis for the relief sought in Counts IV-VII. Those

---

[10]     *See, e.g.*, 17 C.F.R. § 1.23 (regarding FCM transfers of proprietary funds into and out of segregated accounts); CFTC Release, Financial and Segregation Interpretation No. 7-1 (Sept. 10, 1997) (discussing permissible transfers of securities between segregated and non-segregated accounts by an FCM); CFTC Release, Securities Representing Investment of Customer Funds Held in Segregated Accounts by Futures Commission Merchants, 62 Fed. Reg. 42,398 (Aug. 7, 1997) ("prudent and efficient funds management typically requires an FCM to make frequent transfers of funds into and out of segregation").

counts should therefore be dismissed.  *See Bennett v. Johnson,* 1993 U.S. Dist. LEXIS 8996, at *26 (N.D. Ill. June 30, 1993) (dismissing claim for failure to adequately plead proximate cause).

## II.     THE COMPLAINT SHOULD BE DISMISSED PURSUANT TO SECTION 8-503 OF THE UNIFORM COMMERCIAL CODE

As discussed (*supra* at p. 1), despite the length and apparent complexity of the Complaint, at its core, this is a simple dispute between a secured lender and a debtor in bankruptcy over a pool of collateral that was used to secure a loan.  It is governed by Section 8-503 of the UCC, which prohibits the Trustee from bringing any action to enforce the property interests of Sentinel's customers in the Collateral unless it can show that BNY colluded with Sentinel in violating its statutory obligations to its customers under Section 8-504.[11]  Because the Trustee has not met that burden, all counts in the Complaint should be dismissed.

### A.     The Trustee's Right to Enforce the Property Interests of Sentinel's Customers is Limited by Section 8-503

"Property interests are created and defined by state law."  *Butner v. United States*, 440 U.S. 48, 55 (1979); *see also Barnhill v. Johnson*, 503 U.S. 393, 398 (2002) ("In the absence of any controlling federal law, 'property' and 'interests in property' are creatures of state law.") (citation omitted).  They are, therefore, enforceable only to the extent provided for by state law. *See In re FBN Food Servs., Inc.*, 82 F.3d 1387, 1396 (7th Cir. 1996) (looking to state law to determine the scope of a claimed property interest); *In re Dana Corp.*, 367 B.R. 409 (Bankr. S.D.N.Y. 2006) (same).

---

[11]     The UCC also makes clear that BNY's claim to the Collateral takes priority over any claim brought on behalf of Sentinel's customers.  *See* U.C.C. § 8-511(b) ("A claim of a creditor of a securities intermediary who has a security interest in a financial asset held by a securities intermediary has priority over claims of the securities intermediary's entitlement holders who have security entitlements with respect to that financial asset if the creditor has control over the financial asset.").

Section 8-503 of the UCC has been adopted as state law in New York.  *See* N.Y. U.C.C. § 8-503.[12]  Section 8-503 limits the circumstances under which a bankruptcy trustee may bring a claim based on an "entitlement holder's" interest in a financial asset against a "purchaser" of that asset.  Specifically, "[a]n action based on an entitlement holder's property interest with respect to a particular financial asset" may not be asserted against any purchaser of such asset or an interest therein who gave value for the purchase, obtained control and did not act in collusion with the entitlement holder's securities intermediary in violating the securities intermediary's statutory obligations to its customers under Section 8-504.  § 8-503(e).  This prohibition applies to *any* action based on an entitlement holder's interest in a financial asset, regardless of whether it is "framed in conversion, replevin, constructive trust, equitable lien, or other theory."  *Id.*

### B.    The Trustee's Claims Are Barred By Section 8-503

1.    Sentinel is a "Securities Intermediary," its customers are "Entitlement Holders" and BNY is a "Purchaser" under UCC Section 8-503

A "securities intermediary" is either a clearing corporation or "a person, including a bank or broker, that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity."  § 8-102(14).  Because Sentinel maintained securities accounts for its customers in the ordinary course of its business (Cmplt. ¶¶ 23-27), Sentinel was indisputably a "securities intermediary" within the meaning of Section 8-102.

Sentinel's customers are "entitlement holders" – defined under Section 8-102(7) as any person "identified in the records of a securities intermediary [here, Sentinel] as the person having a securities entitlement against the securities intermediary" –  because only Sentinel's customers are alleged to have had a property interest in the assets Sentinel deposited in the BNY accounts (Cmplt. ¶¶ 23-27).  And finally, BNY is a "purchaser" because it has taken assets "by sale, lease,

---

[12]    BNY applies New York law in accordance with the parties' contractual agreements.  *See* Cmplt., Ex. F at § 4.12; Ex. G at 3; Ex. H at § 9.6; Ex. I at 3.

discount, negotiation, mortgage, **pledge**, **lien**, **security interest** . . . or any other voluntary transaction creating an interest in property." § 1-201(29), (30) (emphasis added); *Galey & Lord, Inc. v. Arley Corp. (In re Arlco, Inc.)*, 239 B.R. 261, 268 (Bankr. S.D.N.Y. 1999) ("[T]he definition of purchaser is broad enough to include an Article 9 secured party.").

> 2.  This is an action based on the entitlement holder's property interest with <u>respect to a particular financial asset held by BNY</u>

This is unquestionably "[a]n action based on the entitlement holder's property interest with respect to a particular financial asset" because the Complaint seeks recovery of the value of financial assets. § 8-503(e). The Complaint states repeatedly that the Trustee is seeking to recover the alleged property interests of Sentinel's customers in the particular financial assets that comprise the Collateral. *See, e.g.*, Cmplt. ¶¶ 3, 48, 113, 148; Cmplt. at pp. 44, 46, 47 (seeking recovery of transfers); at p. 57 (seeking turnover of securities and cash held in BNY accounts).

> 3.  Because BNY gave value, obtained control and did not act in collusion <u>with Sentinel, the Complaint must be dismissed</u>

As discussed, under Section 8-503(e), an entitlement holder is *forbidden* from asserting claims against a "purchaser" – BNY – who "gives value, obtains control, and does not act in collusion with the securities intermediary in violating the securities intermediary's obligations under Section 8-504." Because all three conditions have been satisfied here, the Complaint should be dismissed in its entirety.

First, the Trustee concedes, as he must, that BNY gave value to Sentinel – namely, by giving money in the form of loans to Sentinel in consideration for a security interest in the pledged financial assets. Cmplt. ¶ 111; *see also* 127; U.C.C. § 1-201(44) (defining "value" to include "the extension of immediately available credit"). Second, by alleging that the Collateral

was both maintained in accounts established with BNY (Cmplt. ¶¶ 62-63) and pledged as security for extensions of credit to Sentinel by BNY, (*Id.* ¶¶ 48, 65, 127), the Trustee admits that BNY obtained "control" over the Collateral.

Finally, BNY did not act (and is not alleged to have acted) in collusion with Sentinel to violate its duties under Section 8-504. Collusion is a standard legal term that means an "*agreement* to defraud another or to do or obtain something forbidden by law." BLACK'S LAW DICTIONARY (8th ed. 2004) (emphasis added); *see also Dickerman v. N. Trust Co.*, 176 U.S. 181, 190 (1900) (defining collusion as "an agreement between two or more persons to defraud a person of his rights by the forms of law, or to obtain an object forbidden by law"); *Lone Star Indus. v. Compania Naviera Perez Companc, S.A.C.F.I.M.F.A. (In re N.Y. Trap Rock Corp.)*, 42 F.3d 747, 752 (2d Cir. 1994) (defining collusion as "secret cooperation for a fraudulent or deceitful purpose") (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, 446 (G.&C. Miriam Co. ed. 1976)). The drafters of the UCC embraced this definition:

> The use of the collusion test in Section 8-503(e) furthers the interests of investors generally in the sound and efficient operation of the securities holding and settlement system. The effect of the choice of this standard is that customers of a failed intermediary must show that the transferee from whom they seek to recover *was affirmatively engaged in wrongful conduct, rather than casting on the transferee any burden of showing that the transferee had no awareness of wrongful conduct by the failed intermediary*. The rule of Section 8-503(e) is based on the long-standing policy that *it is undesirable to impose upon purchasers of securities any duty to investigate whether their sellers may be acting wrongfully*.

N.Y. U.C.C. § 8-503, cmt. 3 (emphasis added).

In addition to adopting this Official Comment, the New York legislature also discussed the meaning of collusion in a statement of legislative intent when it adopted UCC Article 8:

> The legislature intends collusion to include acting in concert, acting by conspiratorial arrangement, or acting by agreement for the purpose of

> violating the entitlement holder's rights or with actual knowledge that the
> securities intermediary is violating those rights.

1997 N.Y. Sess. Laws ch. 566, § 1 (Oct. 10, 1997).

The clear message of these various definitions of "collusion" is that a purchaser must do something substantially more than passively fail to protect an entitlement holder from a securities intermediary's violation of its duties. Instead, the purchaser must have "affirmatively engaged in wrongful conduct," and is under no independent obligation to investigate whether the securities intermediary is acting wrongfully. *See* 1997 N.Y. A.L.S. 566, *1 (declaring that "nothing in this [collusion] standard imposes a duty of inquiry" and that "a purchaser's knowledge of the precarious financial situation of the financial intermediary coupled with rumors, allegations, or reports of suspected wrongdoing does not amount to collusion").

Based upon the above, it is clear that a purchaser who failed to protect an entitlement holder from a securities intermediary's violation of its duties to that entitlement holder did not collude with the securities intermediary within the meaning of Section 8-503(e). The Complaint nowhere alleges a specific breach by Sentinel of any duty under Section 8-504, and BNY's alleged failure to act in the face of certain alleged "red flags" clearly does not constitute "collusion" within the meaning of the UCC.[13] The Trustee's attempt to shift to BNY (and its shareholders) the losses suffered by Sentinel's customers arising out of Sentinel's wrongful acts and those of its principals is precisely the kind of loss shifting that Article 8 rejects. N.Y. U.C.C. § 8-503 cmt. 3. Accordingly, the Complaint should be dismissed in its entirety.

---

[13]     Furthermore, even if this Court were to consider the alleged violations of federal law, which it should not, those allegations do not even suggest the existence of an illicit agreement between Sentinel and BNY.

III.    **EACH INDIVIDUAL COUNT OF THE COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED**

Under Fed. R. Civ. P. 12(b)(6), as made applicable in this Court by Fed. R. Bankr. P. 7012(b), the Complaint must be dismissed unless it contains "factual allegations that show a right to relief above the speculative level" and states a claim to relief that is "plausible on its face." *Neiman v. Irmen (In re Irmen)*, 379 B.R. 299, 307-08 (Bankr. N.D. Ill. 2007) (citing *Bell Atlantic Corp. v. Twombly,* 127 S. Ct. 1955, 1969, 1974 (2007)).   A complaint must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id.* at 308 (quoting *Twombly*, 127 S. Ct. at 1964-65).   As discussed below, even accepting as true the Trustee's allegations that BNY violated the CEA and the Advisers Act, the Complaint still fails to satisfy the minimum pleading requirements (much less the heightened pleading standard that applies to Counts I and II) and should be dismissed in its entirety.

A.    **Avoidance and Recovery of Fraudulent Transfers (Counts I-II)**

Counts I and II of the Complaint assert claims to avoid and recover allegedly fraudulent transfers from Sentinel to BNY under Section 548(a) of the Bankruptcy Code and the Illinois Uniform Fraudulent Transfer Act ("UFTA"), 740 Ill. Cons. Stat. Ann. 160/5(a)(1), 160/8(a), respectively.[14]  Specifically, the Trustee seeks to avoid and recover, under the actual fraudulent transfer prongs of those statutes, each and every transfer of cash or securities made by Sentinel from a segregated account to any non-segregated clearing account on or after January 1, 2004, unless it was made in connection with a legitimate customer redemption.  Cmplt. ¶¶ 168-74, 175-82.

---

[14]    Because courts have recognized that Section 5 of the UFTA is largely analogous to section 548(a)(1) of the Bankruptcy Code, cases decided under Section 548 are applicable to those decided under the UFTA.  *See, e.g., Voiland v. Gillissie (In re Gillissie)*, 215 B.R. 370, 374 (Bankr. N.D. Ill. 1997) (Squires, J.) ("[P]recedent under § 548(a)(1) is equally applicable to the Illinois version of the UFTA.").

> 1.     The Trustee has failed to allege that any purportedly fraudulent transfers <u>were transfers of an "interest of the debtor in property"</u>

Both Counts I and II must be dismissed because the Trustee cannot avoid, and recover as fraudulent, Sentinel's transfers of property interests that were not its own.  Because the whole underlying predicate for the Trustee's fraudulent transfer claims is that Sentinel originally held all the transferred property *in trust* for its customers, his claims fail as a matter of law.

To state a claim for avoidance of a fraudulent transfer under Section 548(a)(1)(A) or under the UFTA (pursuant to Section 544(b)(1)), the Trustee must allege, as a threshold matter, that there was a transfer of "an interest of the debtor in property."  Importantly, as the Seventh Circuit has held, a debtor's prepetition transfer "of a property interest that the debtor *holds in trust for another person* will not qualify for this purpose."  *Dunham v. Kisak*, 192 F.3d 1104, 1109 (7th Cir. 1999).[15]

Here, the Trustee's bare allegation that transfers from the segregated accounts to the Street Account "constituted a transfer of an interest in Sentinel's property," (Cmplt. ¶¶ 169-70, 176-77), is belied by the Complaint itself.  The Trustee elsewhere alleges that Sentinel provided cash management services to its customers pursuant to a written trust agreement that expressly designated Sentinel as the trustee of its customers' assets.  *Id.* ¶ 51.  The Trustee also alleges – repeatedly – that the Collateral should not have been transferred out of segregated accounts *because it belonged to Sentinel's customers, and not to Sentinel itself.  Id.* ¶¶ 3, 48, 127, 135.[16]

Based on those allegations, the Trustee's case, even if proven, would be factually indistinguishable from *Stevenson v. J.C. Bradford & Co. (In re Cannon)*, 277 F.3d 838, 843-45

---

[15]     *See also Begier v. IRS*, 496 U.S. 53, 59 (1990) ("Because the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate.'").

[16]     That allegation is at the very core of the Trustee's case.  *See, e.g.*, Cmplt. ¶¶ 3, 48, 127, 135. Although BNY obviously does not concede the allegation, it is clear that, taking it as true, Counts I, II and III all nonetheless fail as a matter of law.

(6th Cir. 2002), where the Sixth Circuit held that similar claims for fraudulent transfer were properly dismissed.  There, the debtor attorney opened a brokerage account with an FCM and embezzled funds from his client escrow accounts to use in his trading activities.  277 F.3d at 843-45.  The trustee in the debtor's Chapter 7 case brought an adversary proceeding against the FCM, seeking to recover the client assets under Section 548.  In affirming the district court's dismissal of the claim, the Sixth Circuit agreed that because the funds in the client escrow accounts had been maintained in an express trust, (*id.* at 850), they were never part of the debtor's bankruptcy estate and, therefore, the alleged transfers did not constitute "an interest of the debtor in property" for purposes of Section 548.  *Id.* at 852; *see also Daly v. Kennedy (In re Kennedy)*, 279 B.R. 455, 458 (Bankr. D. Conn. 2002) ("It is axiomatic that funds held in trust by one person for another do not constitute the beneficial property of the former. . . .  Consequently, funds held in trust by a debtor are not property of his bankruptcy estate or, for the specific purposes of Code Section 548 . . . property of the debtor.") (citations omitted).

In sum, because the challenged transfers here were, on the face of the Complaint, transfers "of a property interest that the debtor [held] in trust for another person," *Dunham*, 192 F.3d at 1109, they cannot be avoided as fraudulent transfers under either Section 548 or under the UFTA through Section 544.

2.    The Trustee has failed to allege that any purportedly fraudulent transfers were made with the intent to defraud Sentinel creditors

Claims for avoidance of fraudulent transfers are subject to the heightened pleading standard of Fed. R. Civ. P. 9(b).  *See, e.g., Helms v. Arboleda (In re Arboleda)*, 224 B.R. 640, 650 (Bankr. N.D. Ill. 1998) (Squires, J.) (dismissing fraudulent transfer claims on the grounds that conclusory, "bare bones" allegations of fraudulent intent did not satisfy the particularity requirement).  Moreover, "[m]ere conclusory allegations without a description of the underlying

26

fraudulent conduct will not satisfy the requirements of Rule 9(b) and may warrant dismissal." *Id.* (citation omitted).

The Complaint fails to support the Trustee's conclusory allegation that the transfers to BNY were made with actual fraudulent intent. Although the Trustee loosely alleges that each of the transfers sought to be avoided was "made with the actual intent to hinder, delay, or defraud Sentinel's creditors" (Cmplt. ¶¶ 125, 172, 179), it is well-established that Rule 9(b) "requires facts supporting the allegations; a quotation from a statute will not suffice." *Neiman*, 379 B.R. at 309 (citing *Borsellino v. Goldman Sachs Group, Inc.,* 477 F.3d 502, 507 (7th Cir. 2007)); *see also Olson v. Potter (In re Potter)*, 88 B.R. 843, 847 (Bankr. N.D. Ill. 1988) (holding that Rule 9(b) requires "something more than a quotation from the statute") (citations omitted).

The Complaint provides no such support. The Trustee alleges only that Sentinel made the allegedly fraudulent transfers in order to secure its loan from BNY. S*ee, e.g.*, Cmplt. ¶¶ 114, 125, 134, 137-51. But a desire to obtain credit in connection with Sentinel's money management activities is compatible with many states of mind that are not culpable under Section 548(a) and have nothing to do with hindering creditors, including an intent to continue to conduct its business, to be able to satisfy its obligations to its customers or to attempt to exceed their expectations – namely, effective business strategy. The fact of the "transfer" to BNY suggests nothing about Sentinel's state of mind. Moreover, the mere intent to use others' funds for one's own benefit is not sufficient to create fraudulent transfer liability. *See In re Kennedy*, 279 B.R. at 462.[17] The Trustee's allegations fail to satisfy Rule 9(b).

---

[17]    In *In re Kennedy*, an attorney holding client funds in trust accounts misappropriated them for his own personal use. After the attorney went bankrupt, the trustee sued the debtor's wife to recover the funds as fraudulent transfers. In finding for the wife, the bankruptcy court concluded that there was no evidence that the attorney made the transfers with fraudulent intent as to his creditors. 279 B.R. at 462. As the court explained, "the Debtor's intent *in appropriating* the Trust Account Funds neither proves nor implies anything with respect to his intent vis-à-vis his creditors in *transferring* those funds to the

      3.      The Trustee has failed to identify virtually all of the challenged transfers <u>with specificity</u>

Counts I and II should also be dismissed because the Trustee fails to identify the transfers he seeks to avoid and recover. Indeed, the Complaint describes only a small number of them with any detail – the so-called "June-July 2007 Transfers." Cmplt. ¶¶ 134-50. Beyond that, the Trustee alleges only that all transfers after January 1, 2004, other than those "made in connection with legitimate customer redemptions," are avoidable.[18] But the Complaint does not identify, as it must, which transfers were "made in connection with legitimate customer redemptions" and which were fraudulent. As a result, Counts I and II do not satisfy the heightened pleading standards of Rule 9(b) and should be dismissed.[19]

### B.      <u>Avoidance and Recovery of Allegedly Preferential Transfers (Count III)</u>

      1.      The Trustee has failed to allege that the purportedly preferential transfers <u>were transfers of an "interest of the debtor in property"</u>

Count III of the Complaint asserts a claim to avoid and recover allegedly preferential transfers from Sentinel to BNY under Section 547(b) of the Bankruptcy Code. Specifically, the Trustee seeks to avoid transfers made by Sentinel to BNY on June 26 and 29, 2007 (the "June 25-29 Transfers"). Cmplt. ¶¶ 183-91. However, to avoid a preferential transfer under Section 547(b), a plaintiff must show, *inter alia*, that the allegedly preferential transfer was a transfer of

---

[18] Defendant. . . . And, although he may have *created* creditors by those acts at that time, his intent in transferring was not to evade them, or preexisting creditors, but rather to use the stolen funds for his own benefit." *Id.* (footnote omitted). Here, even if Sentinel's transfers had the effect of creating creditors (i.e. of Sentinel's customers), the Complaint fails to support, with particularity, the Trustee's conclusory allegation that they were made with the intent to defraud those customers.

[18] If this Court were to allow such a catch-all claim to withstand a motion to dismiss, it would, in effect, bless the Trustee's improper attempt to shift the burden to BNY to demonstrate the legitimacy of each of the transfers it received from Sentinel. The Trustee's claims stand each of Section 548(a)'s statutory elements on its head.

[19] Moreover, Section 548(a)(1) limits the Trustee's potential recovery to transfers made "within two years" of the Petition Date. Accordingly, Count I must, at a minimum, be dismissed with respect to all transfers made on or before August 17, 2005.

"an interest of the debtor in property."  11 U.S.C. § 547(b).  As discussed above, a debtor's prepetition transfer "of a property interest that the debtor holds in trust for another person will not qualify for this purpose."  *Dunham*, 192 F.3d at 1109.  Because the Complaint alleges that Sentinel's transfers out of its segregated accounts were of property of Sentinel's customers (Cmplt. ¶¶ 3, 48, 127, 135), Count III similarly fails as a matter of law.

> 2.    The Complaint is self-contradictory as to whether the purportedly preferential transfers were made "on account of an antecedent debt".

To avoid a preferential transfer under Section 547(b), a plaintiff must also show that the transfer was made "for or on account of an antecedent debt owed by the debtor before such transfer was made."  11 U.S.C. § 547(b)(2).  Here, the Trustee seeks to avoid and recover as preferential the June 25-29 Transfers.  Cmplt. ¶¶ 184-91; *see also* ¶¶ 139, 141.  Although the Trustee alleges in conclusory fashion that the June 25-29 Transfers were made on account of an antecedent debt (Cmplt. ¶ 186), once again, his specific allegations demonstrate precisely the opposite, namely that BNY extended an independent loan to Sentinel every night.  *See, e.g.*, *id.* ¶ 113 (alleging that BNY "required that Sentinel post collateral to secure its overnight loans to Sentinel"); ¶¶ 137-41 (acknowledging that the June 25-29 Transfers were each made to secure Sentinel's overnight loan).  The Complaint thus pleads that the June 25-29 Transfers were made in exchange for extensions of new credit, and not on account of "antecedent" debt.  Count III thus fails to state a colorable claim under Section 547.

## C.    Equitable Subordination of BNY's Claim (Count IV)

Count IV of the Complaint seeks to equitably subordinate BNY's secured claim to all other claims of Sentinel's customers pursuant to Section 510(c) of the Bankruptcy Code.  Under Section 510(c), a court may, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim" or "order that any lien securing such a

subordinated claim be transferred to the estate."  11 U.S.C. § 510(c).  As the Seventh Circuit has noted, equitable subordination is an "extraordinary remedy" that is appropriate against a non-insider only upon a showing of misconduct.  *Matrix IV, Inc. v. Am. Nat'l Bank and Trust Co. of Chi. (In re S.M. Acquisitions Co.)*, 2006 WL 2290990, at *8 (N.D.Ill. Aug. 7, 2006); *see also Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990).

Here, the Trustee has failed to state a claim for equitable subordination.  In the Seventh Circuit, a claim may only be equitably subordinated if (1) the claimant engaged in "inequitable conduct"; (2) such conduct injured creditors or conferred an unfair advantage on the claimant; and (3) subordination of the claim would not be inconsistent with the Bankruptcy Code. *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 700 (5th Cir. 1977); *see also Great Am. Ins. Co. v. Bailey (In re Cutty's-Gurnee, Inc.)*, 133 B.R. 934, 958 (Bankr. N.D. Ill. 1991) (applying *Mobile Steel*).  The Complaint satisfies neither of the first two *Mobile Steel* factors.

### 1. BNY did not engage in inequitable conduct

Courts have distinguished between the level of "inequitable conduct" required for equitable subordination based upon the nature of the legal relationship between the debtor and the creditor whose claim is subject to attack.  Critically, when the claimant is neither an insider nor a fiduciary of the debtor (which BNY is not), the party challenging the claim "must prove that the claimant is guilty of gross misconduct tantamount to fraud, overreaching or spoliation to the detriment of others."  *Badger Freightways, Inc. v. Cont'l Ill. Nat'l Bank and Trust Co. of Chi (In re Badger Freightways, Inc.)*, 106 B.R. 971, 976 (Bankr. N.D. Ill. 1989) (citation omitted); *see also Unsecured Creditors' Comm. v. Banque Paribas (In re Heartland Chem., Inc.)*, 136 B.R. 503, 516 (Bankr. C.D. Ill. 1992) (claimant's "inequitable conduct" must have been

"egregious and severely unfair in relation to the other creditors.") (citation omitted)).[20] Allegations of "sharp dealing" are insufficient to support a claim for equitable subordination against a non-fiduciary. *Badger Freightways,* 106 B.R. at 976.

Here, the Trustee does not and cannot allege that BNY was an insider or a fiduciary of, or that it otherwise exercised control over, Sentinel. As a result, the Complaint must allege that BNY engaged in conduct that constituted "gross misconduct" or was "egregious and severely unfair." It unquestionably does not. The majority of the Trustee's allegations of inequitable conduct relate to or arise out of BNY's alleged violations of federal law.[21] The Trustee also alleges that BNY unilaterally transferred segregated assets to collateralize Sentinel's loan (in a single instance, which was immediately corrected), refused (just prior to the Petition Date) Sentinel's instructions to segregate assets in order to ensure that it was fully secured, asserted a lien against segregated accounts, and extended credit to Sentinel despite knowing that Sentinel was undercapitalized and having financial difficulties. Cmplt. ¶¶ 195-96. These allegations fall far short of alleging "gross misconduct" or "egregious and severely unfair" conduct by BNY in relation to Sentinel's creditors.

*First*, it is well-settled that a creditor has every right to act to advance its own interests within its contractual rights. *See Kham*, 908 F.2d at 1357-58 (reversing the equitable subordination of a bank's claim, reasoning, in part, that "[f]irms that have negotiated contracts are entitled to enforce them to the letter" and "do not need to put the interests of [others] first");

---

[20]  *See also Herzog v. Leighton Holdings, Ltd. (In re Kids Creek Partners, L.P.)*, 200 B.R. 996, 1015 (Bankr. N.D. Ill. 1996) (stating that a court may equitably subordinate a non-insider claim only if the claimant's misconduct was "much more egregious" than is required to subordinate a claim of a fiduciary; *Aluminum Mills Corp. v. Citicorp N. Am., Inc. (In re Aluminum Mills Corp.)*, 132 B.R. 869, 896 (Bankr. N.D. Ill. 1992) (same).

[21]  As discussed in detail *supra* Part II, however, these allegations are not a proper basis for relief under the Bankruptcy Code and, in any event, do not adequately plead the violations they assert. They should be disregarded by this Court.

31

*Badger Freightways*, 106 B.R. at 976 (finding that a "non-fiduciary claimant can act strategically to protect its interest to the potential detriment of similarly situated claimants").  Contractual obligations of good faith are not "an invitation to the court to decide whether one party ought to have exercised privileges expressly reserved in the document." *Kham*, 908 F.2d at 1357.

Under these authorities, the Trustee's allegations with respect to BNY's single alleged "refusal" to segregate assets and its decision to extend additional credit to Sentinel do not support a finding of inequitable conduct.  Indeed, as the Trustee concedes (Cmplt. ¶ 67), BNY had the contractual right both to refuse to segregate assets to ensure that it was fully secured (Cmplt., Ex. F at §3.04; Ex. H at § 5.2.), and to extend credit to Sentinel as it saw fit, (Cmplt., Ex. F at Art. III; Ex. H at Art. V).  Even if the Court were to find that BNY's lending policies with respect to Sentinel were liberal or imprudent, that "falls short of imposing culpability for the results which [Sentinel's] actions eventually occasioned." *First Nat'l Bank of Barnesville v. Rafoth (In re Baker & Getty Fin. Servs. Inc.),* 974 F.2d 712, 718-19 (6th Cir. 1992).

*Second*, even if this Court were to accept as true the alleged regulatory violations, it is absurd to suggest that violations of federal regulatory regimes that have been the subject of virtually no jurisprudence in this context constitutes "egregious" misconduct.  At best, any regulatory violation would amount to nothing more than a flawed decision by BNY to rely on Sentinel's unambiguous contractual representations that it was authorized to transfer and pledge segregated assets, rather than to intervene on the basis of purported "red flags."  In the absence of any duty to act (and the Trustee has alleged none), such inaction cannot be "gross misconduct tantamount to fraud, overreaching or spoliation." *Badger Freightways,* 106 B.R. at  976.

*Finally,* with respect to BNY's alleged unilateral transfer of segregated assets, the Complaint itself suggests that it was a mistake and acknowledges that it was reversed

immediately upon Sentinel's request.  *See* Cmplt. ¶¶ 162-63.  And the Trustee's allegation that BNY asserted a lien against *segregated* accounts is not only false, but is contradicted by the Trustee's numerous allegations that Sentinel had to transfer assets *out* of the segregated accounts in order for those assets to be subject to BNY's lien.  *See, e.g., id.* ¶ 109(b).

In short, assuming *arguendo* that every one of the Trustee's allegations is true, as a matter of law the alleged misconduct still falls woefully short of the type of "gross" and "egregious" misconduct that is required.  Because the Complaint fails to state a foundational element of its equitable subordination claim, Count IV should be dismissed.

<div style="text-align:center">

2.    BNY's alleged conduct did not injure creditors or confer an unfair
<u>advantage on BNY</u>

</div>

The Trustee's claim for equitable subordination similarly fails because the Trustee has not alleged how BNY's purportedly improper conduct "injured creditors or conferred an unfair advantage" on it.  As discussed *supra* Part I.C, the allegedly flawed account structure was not, and cannot have been, the proximate cause of Sentinel's customers' losses.  However, a creditor's claim can only be subordinated to the extent that actual harm was suffered by the other creditors as a result of its alleged inequitable conduct.  *See In re Heartland Chem., Inc.*, 136 B.R. at 520.  Here, the Complaint fails to allege any facts even suggesting how BNY's conduct resulted in actual harm to any specific creditors of Sentinel.

**D.    <u>Disallowance of BNY's Proof of Claim (Count V)</u>**

Count V of the Complaint asserts a claim seeking disallowance of BNY's proof of claim under Section 502(d) of the Bankruptcy Code, 11 U.S.C. § 502(d).  In large part, the Trustee regurgitates the allegations of BNY's "inequitable conduct" (Cmplt. ¶¶ 206-07), most of which should be disregarded by this Court for the reasons stated above (*supra* at Part II).  In addition, however, the Trustee claims that BNY has failed to turn over property of the estate that is

<div style="text-align:center">33</div>

recoverable by the Trustee, "namely the amounts demanded in Counts One through Eight" of the Complaint.  Cmplt. ¶ 204.

By its terms, however, Section 502(d) provides that disallowance is appropriate only *after* a determination has been made that BNY was the recipient of a fraudulent or preferential transfer and only then if BNY refused to turn over the unlawfully transferred property or to otherwise comply with Section 550.  *See Katchen v. Landry*, 382 U.S. 323, 330 (1966) ("Unavoidably and by the very terms of the [statute], when a bankruptcy trustee presents a [§ 502(d)] objection to a claim, the claim can neither be allowed nor disallowed until the preference matter is adjudicated.").[22]  Here, no determination has been made that BNY was the recipient of any avoidable transfers and, as noted above, the Trustee's avoidance claims fail as a matter of law.  Even if that were not the case, Count V should be dismissed for failure to state a claim upon which relief may be granted because Section 502(d) provides no independent basis for relief.  *In re Parker N. Am. Corp.*, 24 F.3d 1145, 1155 (9th Cir. 1994) ("Section 502(d) operates to disallow claims of transferees who do not surrender their avoidable transfers.  It does not compel the surrender, nor permit affirmative relief of any kind.").

### E.    Equitable Disallowance of BNY's Proof of Claim (Count VI)

Count VI of the Complaint seeks equitable disallowance of BNY's proof of claim.  This claim fails as a matter of law because the Bankruptcy Code nowhere explicitly or implicitly

---

[22]    As the Eighth Circuit has explained,

> [T]he purpose of section 502(d) is to ensure compliance with judicial orders.  The language of section 502(d) expressly provides that the entity's claim is not disallowed if the entity or transferee "paid the amount, or turned over any such property, for which such entity or transferee is liable."  This language indicates section 502(d) should be used to disallow a claim *after the entity is first adjudged liable*; otherwise, the court could not determine if the exception applies.

*Holloway v. IRS (In re Odom Antennas, Inc.)*, 340 F.3d 705, 708 (8th Cir. 2003) (emphasis added) (internal citations omitted).

authorizes such a claim. As the Supreme Court has noted, the equitable powers of bankruptcy courts are not limitless; such powers "must and can only be exercised within the confines of the Bankruptcy Code." *N.W. Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988). And under that statutory framework, a creditor's claims are to be allowed or disallowed by a bankruptcy court pursuant to the terms of Section 502(b). *See* 11 U.S.C. § 502(b) (a court "shall allow" a claim in the amount set forth in the proof of claim unless it falls within any one of the nine statutory exceptions); *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 127 S. Ct. 1199, 1204-05 (2007) (same). Inequitable conduct does not constitute a ground for disallowance of a claim under Section 502 or any other provision of the Bankruptcy Code.

Because Congress has made clear the bases on which a bankruptcy court may disallow a claim in its entirety, bankruptcy courts have no discretion to fashion extra-statutory reasons for a disallowance. *See, e.g., Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 24-25 (2000). As the U.S. Supreme Court stated in *Raleigh*:

> [T]he scope of a bankruptcy court's equitable power must be understood in light of the principle of bankruptcy law . . . *that the validity of a claim is generally a function of underlying substantive law*. Bankruptcy courts are not authorized to make wholesale substitution of underlying law controlling the validity of creditors' entitlements, *but are limited to what the Bankruptcy Code itself provides.*

*Id.* (emphasis added). Inequitable conduct, if present, may in certain circumstances provide a basis for equitable subordination of a claim under Section 510(c) (as discussed above), but it simply does not empower a court to disallow a claim in its entirety. *See In re Mobile Steel Co.*, 563 F.2d at 699 ("[E]quitable considerations can justify only the subordination of claims, not their disallowance.").[23] As such, the Trustee's action for equitable disallowance of BNY's claim

---

[23]    The *Mobile Steel* court explained as follows:

is not a viable cause of action under the Bankruptcy Code, and consequently Count VI should be dismissed.

### F.     Action to Determine Validity and Extent of Lien and for Turnover of Property (Count VII)

Although Count VII of the Complaint asks this Court to rule that BNY has no valid security interest in the Collateral pursuant to Section 506 of the Bankruptcy Code, 11 U.S.C. § 506, that section provides no independent basis for the relief sought.  By its terms,[24] Section 506 defines the dividing line between secured and unsecured portions of an allowed claim.  *See Bank One, Chi., NA v. Flowers*, 183 B.R. 509, 514-15 (N.D. Ill. 1995).  It also provides a basis for a bankruptcy court to void a lien that secures a claim that has already been disallowed.  The statute has no applicability at all, however, to any claim that has yet to be allowed or disallowed by the court.  *See In re Busman*, 5 B.R. 332, 340 (Bankr. E.D.N.Y. 1980) ("Prior to any determination of the value of the secured creditor's collateral under § 506(a), the secured claim must first be allowed."); *accord Palombo Farms of Colo., Inc. v. Nat'l Acceptance Corp. of Am., Inc. (In re Palombo Farms of Colo., Inc.)*, 43 B.R. 709, 711 (Bankr. D. Colo. 1984) ("It would be a great waste of judicial resources to make a value determination under § 506 only to have the

> Disallowance of claims on equitable grounds would add nothing to the protection against unfairness already afforded the bankrupt and its creditors.  If the claimant's inequitable conduct is directed against the creditors, they are fully protected by subordination.  If the misconduct directed against the bankrupt is so extreme that disallowance might appear to be warranted, then surely the claim is either invalid or the bankrupt possesses a clear defense against it.  Thus, where the bankrupt is the victim it has an adequate remedy at law.  It follows that disallowance of a wrongdoer's claim on nonstatutory grounds would be an inappropriate form of equitable relief.

563 F.2d at 699 n.10 (citations omitted).

[24]     Section 506 provides, in pertinent part, that "[a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim."  11 U.S.C. § 506(a).  Section 506 further provides that a lien is void to the extent that it "secures a claim against the debtor that is not an allowed secured claim."  § 506(d).

entire claim disallowed at some future point in time."). Because there has been no determination as to the allowability of BNY's claim, Section 506 provides the Trustee no basis for relief.

### G.    Aiding and Abetting/Knowing Participation in Breach of Fiduciary Duty by Sentinel's Insiders (Count VIII)

#### 1.    The aiding and abetting claim is barred by the *Wagoner* rule

Count VIII of the Complaint asserts a claim for compensatory and punitive damages on the grounds that BNY aided, abetted, and knowingly participated in Sentinel's insiders' breach of their fiduciary duties. Specifically, the Trustee claims that certain Sentinel insiders owed fiduciary duties of loyalty, care, honesty and fairness to Sentinel, that those insiders breached those duties and that BNY "colluded with the Sentinel Insiders and knowingly participated in, aided, assisted and benefited from " their breaches. Cmplt. ¶¶ 232-35.

Under New York law (which applies here, *see supra* note 12), "[a] claim against a third party for defrauding a corporation with the cooperation of management accrues to the creditors, not to the guilty corporation." *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 120 (2d Cir. 1991). This principal, known as the *Wagoner* rule, "derives from the fundamental principal of agency that the misconduct of managers within the scope of their employment will normally be imputed to the corporation." *Wight v. BankAmerica Corp.*, 219 F.3d 79, 86-87 (2d Cir. 2000). Under *Wagoner* and its progeny, a claim for aiding and abetting a breach of a fiduciary duty to a corporation may not be asserted by the corporation or its trustee if (i) any corporate purpose was served by the breach, and (ii) all of the individuals with authority to prevent the breach instead participated in it. *See Ernst & Young v. Bankr. Servs. (In re CBI Holding Co., Inc.)*, 311 B.R. 350, 370 (Bankr. S.D.N.Y. 2004); *O'Connell v. Arthur Andersen, LLP (In re AlphaStar Ins. Group, Ltd.)*, 383 B.R. 231, 273 (Bankr. S.D.N.Y. 2008).

*Wagoner* requires dismissal of the aiding and abetting claim. *First*, the alleged fiduciary breaches by Sentinel's insiders unquestionably served a corporate purpose – they allowed Sentinel to obtain the financing it needed to settle its transactions and continue its business. According to the Complaint, if BNY had not extended credit to Sentinel, Sentinel would not have been able to meet its obligations to its customers. Cmplt. ¶ 153; *see Ernst & Young*, 311 B.R. at 370 (*Wagoner* rule applies if "*any* corporate purpose was served by the fraud").

And *second*, the Complaint completely fails to allege that any "innocent" Sentinel officers and employees had authority to prevent the fiduciary breaches. As the Second Circuit has explained, the *Wagoner* rule applies "unless at least one decisionmaker in a management role or amongst the shareholders is innocent and could have stopped the fraud." *Breeden v. Kirkpatrick & Lockhart (In re Bennett Funding)*, 336 F.3d 94, 101 (2d Cir. 2003). Thus, the Complaint fails to demonstrate the inapplicability of the *Wagoner* rule to the Trustee's claim. For that reason alone, Count VIII should be dismissed.

2.    The Complaint fails to allege that BNY knew of Sentinel's insiders'
fiduciary breaches and provided "substantial assistance"

To prevail on a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must demonstrate that (1) the fiduciary breached his obligations to the plaintiff; (2) the defendant knew of the breach and provided substantial assistance to the fiduciary; and (3) the plaintiff suffered damages as a result of the breach. *In re AlphaStar Ins. Group, Ltd.*, 383 B.R. at 272 (citing cases). The knowledge required for liability to attach is "knowledge as to the primary violator's status as a fiduciary and knowledge that the primary violator's conduct contravenes a fiduciary duty." *Nisselson v. Ford Motor Co. (In re Monahan Ford Corp.)*, 340 B.R. 1, 43 (Bankr. E.D.N.Y. 2006) (citations omitted). "A defendant provides 'substantial assistance' when he 'affirmatively assists, helps conceal, or by virtue of failing to act when required to do so

enables the fraud to proceed.'" *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001). However, as discussed above (*supra* at p. 20), "inaction, or a failure to investigate, constitutes actionable participation only when a defendant owes a fiduciary duty directly to the plaintiff; that the primary violator owes a fiduciary duty to the plaintiff is not enough." *Kolbeck*, 939 F. Supp. at 247-48 (citation omitted); *see also In re Sharp Int'l Corp.*, 302 B.R. 760, 777 (Bankr. E.D.N.Y. 2003) (finding no "substantial assistance" as a matter of law and dismissing aiding and abetting breach of fiduciary duty claim, reasoning that "although [the bank] may have anticipated that the [the debtor's management] would continue to loot the company, [it] had no duty to intervene to prevent breaches of fiduciary duty by [the debtor's] management").[25]

Here, the Complaint does not allege an essential element of the Trustee's claim – namely, that BNY (i) knew that the actions of Sentinel's insiders violated their fiduciary duties to Sentinel, and (ii) substantially assisted them in spite of that knowledge. On the contrary, under the 1997 and 2003 Agreements, BNY had every reason to believe that Sentinel had the requisite authority to transfer assets between and among its BNY accounts and to pledge assets to BNY to secure its loans. *See* Cmplt. Ex. F, § 2.04(b), Ex. H, Art. II § 2(b) (representing, among other things, that (i) Sentinel was "authorized to issue [a] Desegregation Instruction and by so doing to transfer and pledge to [BNY] the full value of any and all such Securities," and (ii) "any and all claims to such Securities by any third party, including without limitation, claims of or by customers or counterparties of [Sentinel, were] discharged, extinguished, released and terminated."). To the extent the Trustee alleges the existence of certain "red flags," absent a fiduciary duty (*see supra* at Part II.B.3), BNY's mere failure to investigate does not amount to "substantial assistance." *See Kolbeck*, 939 F. Supp. at 246 (FCM had no duty to investigate

---

[25]    *Accord Glidden Co. v. Jandernoa*, 5 F. Supp. 2d 541, 557 (W.D. Mich. 1998) ("A bank cannot be held liable for aiding and abetting fraud or a breach of fiduciary duty merely on the basis that it knew that the party it was lending to was not being forthright in its dealings with others.").

trader's conduct and "no corresponding duty to non-clients, including [the trader's customers]");

*In re Sharp*, 302 B.R. at 775-77 (finding no "substantial assistance" as a matter of law and dismissing aiding and abetting breach of fiduciary duty claim where lender owed no fiduciary duty to debtors or its noteholders to cut off line of credit, despite allegedly having received notice of debtor's fraud).  For all of these reasons, Count VIII should be dismissed.

## CONCLUSION

For all the foregoing reasons, BNY respectfully requests that this Court dismiss the Trustee's Complaint in its entirety with prejudice and grant any other relief that this Court deems just and proper.


Dated:  May 2, 2008                          Respectfully submitted,

                                             **THE BANK OF NEW YORK and**
                                             **THE BANK OF NEW YORK MELLON CORP.**

                                             By:  /s/ Sean T. Scott
                                             Sean T. Scott (ARDC #6273516)
                                             MAYER BROWN LLP
                                             71 S. Wacker Drive
                                             Chicago, IL  60606
                                             (312) 782-0600

                                                      -and-

                                             Brian Trust (admitted *pro hac vice*)
                                             Hector Gonzalez (admitted *pro hac vice*)
                                             Matthew D. Ingber (admitted *pro hac vice*)
                                             MAYER BROWN LLP
                                             1675 Broadway
                                             New York, New York  10019
                                             (212) 506-2500

# EXHIBIT G

```
        0001
1                    IN THE UNITED STATES BANKRUPTCY COURT
                 FOR THE NORTHERN DISTRICT OF ILLINOIS
2                          EASTERN DIVISION
3
4
5        Sentinel Management Group, Inc.,)  No. 07 B 14987
                                         )  Chicago, Illinois
6                                        )  10:00 a.m.
                               Debtor.   )  June 16, 2008
7
8
9                TRANSCRIPT OF PROCEEDINGS BEFORE THE
                      HONORABLE JOHN H. SQUIRES
10
11
12       APPEARANCES:
13       For the Chapter 11 Trustee:   Mr. Vincent Lazar;
14       For Lehman Brothers:          Mr. Paul Caruso;
15       For Discus:                   Mr. Arthur Hahn;
                                       Mr. Brian Herman;
16
         For Jump Trading, Old Mutual,
17       CF/Clutterbuck and SMW:       Mr. John Sieger;
18       For the Committee:            Mr. Mark Berkoff;
                                       Mr. Sushell Kirpalani;
19
         For Bank of New York:         Mr. Sean Scott;
20                                     Mr. Brian Trust;
21       For Kotke Associates:         Mr. David Genelly;
22       For IPGL Limited and
         Vision Financial Markets:     Mr. Robert Shannon;
23
24
25
```

```
 1        APPEARANCES (Continued:)

 2

          For the Ad Hoc Committee
 3        of Seg 1 Customers:           Mr. Jeffrey Goodman;

                                        Mr. Mark Prager;
 4                                      Mr. William McKenna;

 5        For Citadel Equity Fund
          Limited:                      Mr. Jeff Marwil;

 6

          For Penson GHCO and Penson
 7        Financial Future:             Mr. Tim Casey;

 8        For Rob Evans, Receiver of
          Lake Shore Asset
 9        Management:                   Mr. Robert Fishman;

10

11

12

13

          Court Reporter:              Amy Doolin, CSR, RPR
14                                     U.S. Courthouse

                                       219 South Dearborn
15                                     Room 661

                                       Chicago, IL  60604.
16

17

18

19

20

21

22

23

24

25
```

1          THE CLERK:  Sentinel Management Group,

2    Incorporated, 07 B 14987, and related adversaries.

3          MR. CARUSO:  Your Honor, Paul Caruso,

4    Sidley & Austin, on behalf of Lehman Brothers, Inc.

5          MR. HAHN:  Arthur Hahn from Katten

6    Muchin on behalf of Discus.

7          MR. HERMAN:  Brian Herman from Paul

8    Weiss on behalf of Discus.

9          MR. SIEGER:  Good morning, Your Honor.

10   John Sieger, Katten Muchin, on behalf of Jump

11   Trading, CF/Clutterbuck, Old Mutual and SMW.

12         MR. BERKOFF:  Good morning, Judge

13   Squires.  Mark Berkoff on behalf of the committee.

14         THE COURT:  Mr. Berkoff.

15         MR. KIRPALANI:  Good morning, Your

16   Honor.  Sushell Kirpalani of Quinn Emmanuel on behalf

17   of the committee.

18         MR. LAZAR:  Good morning, Your Honor.

19   Vince Lazar on behalf of the trustee.

20         THE COURT:  Mr. Lazar.

21         MR. SCOTT:  Good morning, Your Honor.

22   Sean Scott appearing on behalf of Bank of New York.

23         THE COURT:  Mr. Scott.

24         MR. TRUST:  Good morning, Your Honor.

25   Brian Trust, Mayer Brown, on behalf of the Bank of

1    New York.

2                    MR. GENELLY:  Good morning, Your

3    Honor.  David Genelly on behalf of Kotke Associates,

4    LLC.

5                    MR. SHANNON:  Good morning.  Robert

6    Shannon on behalf of IPGL Limited and Vision

7    Financial Markets.

8                    THE COURT:  Mr. Shannon.

9                    MR. GOODMAN:  Good morning, Your

10   Honor.  Jeff Goodman on behalf of the ad hoc

11   committee of Seg 1 customers.

12                   MR. PRAGER:  Mark Prager and Bill

13   McKenna as well on behalf of the ad hoc committee.

14                   MR. MARWIL:  Jeff Marwil on behalf of

15   Citadel Equity Fund Limited.

16                   THE COURT:  Mr. Marwil.

17                   MR. CASEY:  Good morning, Your Honor.

18   Tim Casey on behalf of Penson GHCO and Penson

19   Financial Futures.

20                   THE COURT:  Mr. Casey.

21                   MR. FISHMAN:  Good morning, Your

22   Honor.  Robert Fishman on behalf of Rob Evans, the

23   Federal District Court receiver for Lakeshore Asset

24   Management.

25                   THE COURT:  Mr. Fishman.

4

1                    Anybody else expected?

2                    MR. LAZAR:  I don't believe so, Your

3      Honor.

4                    THE COURT:  Okay.  All right.  We are

5      here first up on the continued hearing on adequacy of

6      the disclosure statement of the plan proponents as

7      amended, and various objections thereto, and the

8      response and reply.

9                    MR. LAZAR:  That's correct, Your

10     Honor.

11                   After the last hearing, we engaged in

12     discussions with several of the objectors and other

13     parties, circulated some additional language.  We

14     still have a handful of objections.  We tried to

15     resolve those over the weekend.  I think we addressed

16     some, but I believe there are still a handful of

17     objections.

18                   It is certainly the position of the

19     trustee and the committee that we believe the

20     disclosure statement in the black-line form that was

21     filed over the weekend as an exhibit to our response

22     is adequate and meets the requirements of 1125, and

23     therefore, Your Honor, we request that you approve

24     that disclosure statement and set dates for hearing

25     and objections, et cetera, to the plan.

```
1                    THE COURT:  Okay.  The pleading you've
2      referenced as being filed, when was it filed?
3                    MR. LAZAR:  The pleading was filed
4      yesterday midday.
5                    THE COURT:  Right.
6                    MR. LAZAR:  And we delivered a copy to
7      your chambers this morning.
8                    THE COURT:  All right.  This was
9      docket number, what, 586?
10                   MR. LAZAR:  I believe it's the most
11     recent docket entry, Your Honor.  I don't have it
12     handy.
13                   THE COURT:  Right.  Okay.
14                   Who wants to be heard?
15                   MR. SHANNON:  Your Honor, Robert
16     Shannon on behalf of Vision and IPGL Limited.
17                   An important part of this plan
18     includes a proposed settlement of the intercreditor
19     disputes.  And the Seg 1s -- and when I say the Seg
20     1s, I'm referring to Seg 1s holding 80 percent of the
21     Seg 1 claims.
22                   Almost all of the Seg 1 creditors have
23     looked at the resolution, the settlement embodied in
24     the plan, and, unfortunately, have come to the
25     conclusion that under many probably most realistic
```

6

1    scenarios of what may happen in this case, that the

2    settlement provides for exactly the same treatment

3    for the Seg 1 customers as it would if the Seg 1

4    customers were to litigate the property of the estate

5    issue and lose.

6              So for that reason, it is our

7    conclusion that the plan does not contain a benefit

8    for the Seg 1 customers, and Seg 1 customers would,

9    in all likelihood, you know, absent any changes in

10   recovery assumptions, vote to reject the plan, and we

11   would have a nonconsensual plan involving necessary

12   litigation of the intercreditor disputes.

13             We had proposed, with respect to the

14   disclosure statement, certain additional language

15   concerning the Seg 1 position and why 80 percent of

16   the Seg 1s thought the plan was not advantageous or

17   did not represent an equitable settlement of the

18   intercreditor disputes.  We have a little under two

19   pages that we would like inserted into the disclosure

20   statement.  The trustee and the committee have

21   refused our request.

22             If the court pleases, I could hand to

23   the court a copy of what we have requested be

24   included in the disclosure statement.  If this were

25   included in the disclosure statement, speaking for my

7

1    clients, the only other concern I would have is the

2    liquidation analysis.

3              We believe that the liquidation

4    analysis is excessively optimistic, that primarily

5    the reserve for the Bank of New York at $325 million

6    is unrealistic; that is, if the bank's lien is valid

7    and they are entitled to principal, interest and

8    attorney's fees, the number will be significantly

9    higher, and that is certainly something the Bank of

10   New York has said itself.  And that concerns us.

11             If people are going to evaluate this

12   disclosure statement and are going to evaluate what

13   the settlement might do to them, and specifically for

14   the Seg 1s how much of a check they may have to

15   write, then they need a very realistic liquidation

16   analysis.  Our concern, Your Honor, is that if a Seg

17   1 elects into the plan and into the settlement, that

18   Seg 1 will be committing to pay its share of up to a

19   hundred million dollars.  You know, an

20   extraordinarily high number.  Even under the rosy

21   liquidation analysis, it would be probably closer to

22   about 74, $75,000,000.

23             And what we would propose in our

24   requested insert in the disclosure statement is to

25   relatively shortly -- in a relatively short fashion,

```
1    explain our understanding and our thoughts on the
2    plan and exactly how much a Seg 1 may need to pay if
3    it elects to participate in the plan.
4                    And, again, Your Honor, if you would
5    like --
6                    THE COURT:  Sure.  You want to hand it
7    up, Mr. Shannon.
8                    MR. GOODMAN:  Your Honor --
9                    MR. LAZAR:  Your Honor, you want to
10   take these serially?
11                   THE COURT:  Might as well.
12                   MR. LAZAR:  Yes.  Your Honor, with
13   respect to the proposed insert -- and I apologize
14   that the page numbering, I just noticed, has fallen
15   off the red-line, so it's going to be hard to point
16   Your Honor to specific pages.  But we have prepared
17   an extensive paragraph indicating what both the
18   committee and the trustee believe is the likely
19   range.
20                   We disagree with Mr. Shannon in terms
21   of the number.  But both of the estate fiduciaries
22   have reached a different conclusion concerning the
23   likely range.  Your Honor, more importantly, we have
24   gone a couple rounds already here.  As Mr. Shannon
25   indicates, something that they are estimating in the
```

 1    80 percent range, I guess a little less, but, you

 2    know, a significant number of the folks that are

 3    going to be objecting to the plan are already

 4    involved in the process.

 5              The other folks are already involved

 6    because they are on the other side.  I don't know who

 7    we're doing all this drafting for, frankly, Your

 8    Honor.  I did a count, and I counted four Seg 1

 9    customers who are not actively participating in the

10    process.  So we are really spending an awful lot of

11    time preparing a draft disclosure statement for I am

12    not sure who that's not involved in the process.  I

13    understand we have the legal requirements, but as a

14    practical matter, it doesn't make sense.

15              With respect to the liquidation

16    analysis, Mr. Shannon and the other objectors are

17    missing the point of the liquidation analysis.  The

18    point of the liquidation analysis is to compare the

19    hypothetical difference between a Chapter 7 and a

20    Chapter 11 case and show that you do better in a

21    Chapter 11 than a Chapter 7.  It is not a projection.

22    And it is not intended to be a projection.

23              And we have indicated that those

24    reserve numbers might be off, but that's not what the

25    intent of it is.  It's not supposed to give people,

1    you know, a down-to-the-penny guess as to what we

2    think we are going to recover.  We have put a range

3    in the disclosure statement which the trustee and the

4    committee believe is realistic, but it is not

5    necessarily key to the liquidation analysis, which

6    serves a different purpose.

7                    MR. KIRPALANI:  Your Honor, could I be

8    heard, too?

9                    THE COURT:  Sure.

10                   MR. KIRPALANI:  Sushell Kirpalani for

11   the record.

12                   THE COURT:  I assume you're talking

13   about adding the proposed language that Mr. Shannon's

14   concerned with somewhere around page 40 of the last

15   black-line disclosure statement?

16                   MR. LAZAR:  That's correct, Your

17   Honor.

18                   THE COURT:  Okay.

19                   MR. KIRPALANI:  Your Honor, first, in

20   terms of process, it is important to understand that

21   we have taken comments from the objecting parties

22   since before the very first version was even filed.

23   And after last week's recess, we again took more and

24   more.  So the way Mr. Shannon presents it as though,

25   you know, we will not accept -- we've rejected their

1   proposed language, it just gives the court the wrong

2   impression that they have requested one thing and we

3   have just been obstinate.

4              We have not.  We have included 90

5   percent of everything they have asked for.  But the

6   reason we don't include this additional language is

7   because they're trying to litigate their case in our

8   disclosure statement.  They are trying to provide

9   legal and financial advice to unsophisticated

10  customers that may be out there.

11             They represent such a large portion.

12  They know their position.  We don't have to put into

13  our disclosure statement what their legal positions

14  are to the point that they are requesting it; that

15  their legal views are such and that their financial

16  analysis is such.  They are not fiduciaries, Your

17  Honor, and we think that what they are up to is to

18  try to confuse customers who might otherwise be

19  interested in avoiding litigation, which was the

20  purpose of this entire plan.

21             And the second point on the Bank of

22  New York, Your Honor, whether or not the reserve

23  estimate that the trustee puts on the Bank of New

24  York is exactly right or not exactly right, it would

25  be the same assumption in a Chapter 7 as in a Chapter

1    11 case.  So we're doing an apples-to-apples type

2    comparison.

3              The reason this plan makes sense is to

4    avoid administrative expenses.  It's not because

5    there is going to be a greater chance of having a

6    smaller reserve in Chapter 11 or Chapter 7.  We are

7    not confusing people in any way, Your Honor.

8              THE COURT:  Okay.  All right.

9              MR. CASEY:  Your Honor, just on a

10   point that Mr. Shannon raised.  Just so Your Honor

11   understands, part of the problem that we have is

12   based on the information that we have to date, our

13   view is there is not enough information and we would

14   vote to reject the plan.

15             THE COURT:  Okay.

16             MR. CASEY:  But, Your Honor, when we

17   get into the voting procedures is the timing of the

18   voting and what we can get from the trustee that they

19   have spent millions of dollars on over nine months in

20   their extensive investigation.  So that's going to

21   tie into the voting procedures.  But it's also from

22   our standpoint --

23             THE COURT:  Let's just take it one

24   step at a time, gentlemen.  First we have to get the

25   disclosure statement to the point where I can approve

1    it under Section 1125.  Then we will worry about the

2    voting.  And so we'll reserve those issues for that

3    motion.

4                        All right.

5                        MR. LAZAR:  Your Honor, would it be

6    helpful if I hand up the page or get you to the page

7    where we added the language?  My problem is that the

8    page numbering fell off the red-line and I apologize

9    for that.

10                       THE COURT:  All right.  You want to

11   share that with me, so I make sure I'm on the same

12   page numbers you are.

13                       MR. LAZAR:  Your Honor, it is the last

14   paragraph on that page and it carries over into the

15   next page.

16                       THE COURT:  I think, Mr. Shannon, that

17   the disclosure statement is sufficiently adequate

18   vis-a-vis your constituencies concerned and

19   objections so as not to require the additional

20   information and argument basically in your requested

21   insert.

22                       After all, it's the trustee's and the

23   unsecured committee's plan.  But I think it is laid

24   out in there that there are objections thereto by

25   your constituency as well as others.

1          MR. SHANNON:  Your Honor, I might have

2     one small follow-up request, obviously accepting

3     that.  The reference is always to certain Seg 1

4     customers which, you know, could be read as implying

5     that these are an odd few dissenters.

6          I think it would be helpful when they

7     refer to Seg 1 customers that they point out those

8     are Seg 1 customers holding in excess of 80 of the

9     Seg 1 claims.  You can have a defined term.  Certain

10    Seg 1 customers who hold 80 percent, that will be a

11    defined term and then -- from then on.  But otherwise

12    it gives, I think, a very misleading impression of

13    the scope of the Seg 1 opposition to the plan.

14         THE COURT:  Well, the scope of the

15    opposition is only going to be determined when the

16    votes are in.

17         MR. LAZAR:  That's right, Your Honor.

18    And, I mean, I hear what people are saying, but we

19    are -- we remain optimistic that when the clients

20    look at the proposal, look at the settlement --

21         THE COURT:  My concern, gentlemen, is

22    we've got a 93-page disclosure statement with this

23    iteration, according to what's uploaded.  We keep

24    adding stuff, it's going to get over a hundred pages.

25    And how many of even the sophisticated parties in

1    interest, not just the lawyers, but I am talking

2    about the people that have to make the decision to

3    vote to accept or reject are going to be able to

4    understand all this.

5             Granted they are going to need help of

6    counsel, which is fine.  But the more we put in

7    there, the greater the degree for potential

8    confusion.  And without stating the obvious, it's

9    just going to become even more complex.  So I am

10   inclined to overrule the request for the additional

11   insert as unnecessary and surplusage given the

12   comments of counsel.

13            All right.  What next?

14            MR. GOODMAN:  Your Honor.  Jeff

15   Goodman on behalf of the ad hoc committee of Seg 1

16   customers.  We have three points regarding the

17   adequacy of the disclosure statement.  We also have a

18   third point that dovetails with the timing issue,

19   which you may want to take up later.

20            First I want to briefly respond to

21   Mr. Kirpalani about -- he may -- when he said the

22   objectors, he may have meant Mr. Shannon, perhaps

23   Mr. Casey and perhaps Bank of New York.

24            But when they filed this initial

25   disclosure statement, the ad hoc committee hadn't

1       even been formed yet.  So the notion that this is

2       actually the first situation in which we had comments

3       going back and forth there -- so there hasn't been

4       the back and forth on that particular issue, at least

5       with our constituency.

6                   As to the substantive points -- and I

7       know, Your Honor -- and I heard Your Honor's comments

8       vis-a-vis Mr. Shannon.  But I still want to make our

9       points about the inserts that we're requesting.  And

10      these are on central issues in the case.  And we

11      believe that they are important and should be

12      included.

13                  First is, as Your Honor may be aware,

14      on June 9th certain of the Seg 1 customers, actually

15      seven of them holding well in excess of a hundred

16      million dollars in claims, filed an adversary

17      proceeding, a declaratory judgment action and other

18      relief, related to the property-of-the-estate issue.

19                  And it is our position that nothing

20      can be done with the property-of-the-estate issue

21      until that complaint is fully litigated.  The

22      disclosure statement previously contained nothing on

23      the adversary proceeding.

24                  It's now -- I don't have -- because

25      the new black-line which we're going off of doesn't

1    have page numbers, I can't point Your Honor to the

2    particular page it's under.  But it's under the

3    summary of the plan, sub (1) property of the estate.

4    Then it's the next page after that.  It's at the

5    bottom of the red-line.  They have added in a

6    paragraph basically saying that we filed the

7    complaint.

8                     Your Honor, this is the central issue

9    in the case at least vis-a-vis -- certainly an

10   essential inter-customer issue.  In the disclosure

11   statement in terms of what's going on in the Chapter

12   11, it has the equivalent amount of discussion as

13   setting a claims bar date.  And it has nowhere near

14   the amount of discussion that they have with their

15   own litigation.

16                    Now, their own litigation is

17   important.  But even the stuff that's not their own

18   litigation, CFTC having to file a complaint or the

19   SEC, that generates more discussion than a

20   property-of-the-estate complaint where a decision on

21   that issue is going to materially affect the Seg 1

22   recoveries, Seg 3 recoveries and the ultimate

23   disposition of their entire plan.

24                    As a result, we have added in a

25   proposed insert related to the property-of-the-estate

1    issue.  They incorporated the paragraph of the

2    insert, but not the rest.  And if Your Honor -- if it

3    would please the court, I will hand that up to you.

4                    THE COURT:  Would you, please.  I was

5    having difficulty locating it.

6                    MR. LAZAR:  I apologize.  This is the

7    last time I will do a black-line at home on Father's

8    Day instead of trying to come in the office.

9                    MR. GOODMAN:  Your Honor, this

10   particular issue is on Exhibit B.  And we understand

11   that the committee and the trustee, or at least the

12   trustee mentioned that they have issues with

13   including case law.  If that's a problem, fine.

14   Redact the case law and we'll just state the

15   statement of position in terms of why we believe this

16   is not property of the estate.

17                    They spend -- it is the trustee's plan

18   and the committee's plan, but actually it reads --

19   13, 15 pages reads like a brief in support of their

20   property-of-the-estate position.  There is

21   commingling, you can't possibly do this.  Now they at

22   least lighten that up by saying it believes that.

23   They have lightened the language.  They are not

24   stating it as facts.  They are stating it as beliefs.

25   But most of the first part of the plan, the

1    disclosure statement, that isn't dealing with voting

2    procedures is talking about the

3    property-of-the-estate issue and their position on

4    it.

5              Under that circumstance, given the

6    importance of this issue to the case and the

7    confirmability of their plan, a statement of position

8    which will then be, if you take out the case law,

9    instead of one paragraph it's probably going to be

10   three, two and a half, is not unreasonable and

11   consistent with disclosure statements that have

12   statements of position on contested issues and the

13   opposing party stating that.  And just stating the

14   fact that we filed the complaint is insufficient.

15   Giving it the same amount of text as the claims bar

16   date is insufficient and inappropriate in our view.

17             THE COURT:  Mr. Lazar, I could not

18   locate the reference to that new piece of litigation

19   counsel is referring to.

20             MR. LAZAR:  Your Honor, if you could

21   hand that copy back down, I will get you the right

22   page.

23             THE COURT:  Okay.

24             MR. LAZAR:  I apologize again, Judge.

25             MR. GOODMAN:  Your Honor, if I may, if

1    you have the Saturday black-line, I don't think this

2    issue has changed.  It might be easier to find the

3    page.

4                    MR. LAZAR:  Here.

5                    THE COURT:  Okay.  It is a problem

6    because there are no pagination numbers.  I think

7    what needs to be done here is to add a section

8    dealing with this adversary complaint so that it

9    appears in sequence with the other litigations that

10   are referenced.

11                   MR. LAZAR:  Under adversary

12   proceedings we'd add another section there?

13                   THE COURT:  Right, because it is a

14   discrete, you know --

15                   MR. LAZAR:  Understood.

16                   THE COURT:  -- related litigation, and

17   it is.  It's on file.  I don't know anything about it

18   yet.  I haven't had a chance to read it.

19                   But I think where you've got it

20   located in the last iteration, Mr. Lazar, under the

21   property of the estate section, might tend to confuse

22   because it's not listed with the other stuff that's

23   in litigation.

24                   MR. LAZAR:  Understood, Judge.  That

25   makes perfect sense.

1              THE COURT:  I think some of the ad hoc

2      committee's position in Exhibit B that counsel just

3      handed up probably could be incorporated, but I think

4      the point is we don't need to add a lot of case law

5      or argument.  Okay?  That's surplusage.  That's just

6      going to add confusion.

7              But I think if you take the first

8      couple of paragraphs of their Exhibit B, strike the

9      reference to all the case law, you can do it,

10     together with maybe a few sentences out of the last

11     one.  I think you're only going to add a couple,

12     three paragraphs total.  You can get rid of the case

13     law.

14             MR. GOODMAN:  That's fine, Your Honor.

15     I think, so the record is clear, I would specifically

16     want the paragraph that's on the top of page two,

17     which basically stands as our position that we

18     understand what they are alleging and this is what we

19     believe is the evidence --

20             THE COURT:  Right.  I don't have a

21     problem with that.  All I am looking for in

22     discussions of litigation is what the parties'

23     positions are.  They can be 180 degrees apart.  All

24     we need to do is in plain language summarize what the

25     positions of the parties are to let everybody know

1    what it is, and that it's not likely, if it is not

2    settled, to be resolved sooner.

3                 MR. MARWIL:  Your Honor, there's a

4    critical problem with that simplicity, given what the

5    trustee and the committee have said after

6    Mr. Goodman's language, which is they intend to

7    litigate the property-of-the-estate issue in

8    connection with plan confirmation and not in

9    connection with the filed adversary.

10               And as a party in interest, I'm just

11   interested to know what are the rules?  Are we

12   litigating that issue as part of plan confirmation or

13   in the adversary?

14               THE COURT:  Look, when we litigate

15   stuff at confirmation, I don't care what you all want

16   to do as far as making a record.  But the focus is on

17   the 1129(a) and 1129(b) issues, does the plan meet

18   the code requirements for confirmation.  I am not

19   going to get into unnecessary collateral litigation.

20   And if something isn't resolved in the collateral

21   litigation that's properly before the court, it's

22   reserved until we have a hearing on it.  Okay?

23               The purpose of this matter today is to

24   just determine if this disclosure statement meets

25   Section 1125's requirements to send it out so people

1    can decide, if they've got an impaired claim, whether

2    or not they want to vote to accept or reject the

3    plan.  Okay?  I don't care who votes to accept or

4    reject.  I don't have an economic interest in this.

5    Okay?

6                    And if we can get all the requirements

7    under 1129(a) met, wonderful.  Then we've got a

8    confirmable plan.  If we don't, and then they want to

9    try and go to cram down, then we have to see if the

10   (b) requirements are met.  And if we can get a

11   confirmed plan, wonderful.  If we can't, it's not

12   confirmed.  And then we go on to the next matter.

13   Okay?

14                    But I am not going to try and have all

15   the potential issues that may come up in litigation

16   resolved in the context of a contested confirmation

17   hearing.  We need to focus in on what the

18   requirements are.  Okay?

19                    And I can tell you right now I am not

20   going to be in a position at the time we have a

21   confirmation hearing on this plan to decide if a

22   particular asset is or is not part of the bankruptcy

23   estate.  Okay.  That's reserved under Rule 7001 for

24   one or more of the other pieces of adversary

25   litigation that are in front of me or ones that have

```
1    yet to be filed.  Okay.  We'll just take it one step
2    at a time and decide what's before me.
3                    MR. LAZAR:  Your Honor, just to be
4    clear, I mean, that is our proposal that -- you know,
5    as I indicated, hopefully we will have more people
6    signed up than are necessary -- that are telling you
7    right now they are not going to sign up.  But
8    whatever it is, we're prepared to move forward and --
9                    THE COURT:  Right.
10                    MR. LAZAR:  -- to the extent we can't
11    deal with the property-of-the-estate issue at
12    confirmation --
13                    THE COURT:  If we can't get --
14                    MR. LAZAR:  -- we'll reserve --
15                    THE COURT:  -- this plan confirmed,
16    then there is another plan that has been filed that
17    we'll deal with and we'll take it through that.
18                    If we can't get a plan confirmed, I
19    can tell you all this, if we can't get a plan
20    confirmed, there is only two options, either
21    dismissal of the case or conversion to Chapter 7.
22    Those are your only remaining options if you can't
23    come up with a confirmable plan that meets all the
24    code requirements.  It's that simple and in the
25    context of this case that difficult and that complex.
```

1    Okay.  But more than that I can't say today.

2                     All right.  What next?

3                     MR. GOODMAN:  Your Honor, I've got two

4    more.  One I think relates to this

5    property-of-the-estate issue, but I think it is

6    mostly an issue -- you have already addressed it

7    partially and Mr. McKenna is going to address it when

8    we talk about timing.  So I will table that.  It's

9    more of a timing issue and a procedure issue than it

10   is a substantive.  So I will go to the final

11   substantive issue vis-a-vis the disclosure statement

12   in terms of insertions.

13                    And that relates to the competing

14   plan.  We have requested -- it's on Exhibit A of the

15   supplemental objection that was submitted to Your

16   Honor that there be included in the summary the fact

17   that we filed a plan and a summary of the key terms

18   of that plan.

19                    And we do recognize that Section

20   1125(a)(1) says disclosure statements need not

21   include competing plans.  And there are cases that

22   say there is no blanket rule -- they cited to me, you

23   know, informally, no blanket rule that you have to --

24   it's the Aspen case that says you have to include

25   competing plans.

 1                    But in this case -- Your Honor, it

 2       also says -- there are a number of cases that say

 3       disclosure is an issue decided by the court on a

 4       case-by-case basis.  And in this case we have a

 5       situation where in their plan, the cornerstone of

 6       their plan is a proposed settlement to Seg 1

 7       customers saying you either elect in, which includes

 8       essentially agreeing to a preference claw back under

 9       certain circumstances, or you don't and you litigate

10       the thing.  And that's their plan.

11                    Under our plan we don't have any of

12       those kinds -- for Seg 3s or Seg 1s.  And Seg 1

13       customers that are going into a situation, whether

14       they want to vote in favor of that plan or not, want

15       to vote favor in plan, knowing that there is a

16       competing plan out there that's not being sent out at

17       the same time per Your Honor's ruling last time, but

18       there is a competing plan, it provides for different

19       terms, it isn't their settlement or litigate, it's

20       potentially their settlement or our plan.

21                    And that is -- we believe, under the

22       circumstances of this case, a one-page summary of the

23       fact that there is such a plan out there, given the

24       $450 million breadth of the Seg 1 constituency -- and

25       again, approximately 80 percent of those at this

1    point do not support the plan and others are still

2    making up their minds -- it is necessary and

3    appropriate that either what we have proffered to the

4    court or some -- if Your Honor has specific issues

5    with the language, some version that says there is a

6    competing plan out there and here are some of the

7    terms is important to provide disclosure to

8    creditors.

9              Finally, Your Honor, we all forget

10   about the fact that there -- it isn't just Seg 1 and

11   Seg 3.  There are also unsecured creditors, too.  And

12   to the extent our plan provides different treatment,

13   which it does for unsecureds, that's not provided in

14   the Seg 3 plan, that's another reason to say that

15   there is another plan out there.  We understand it is

16   in Your Honor's discretion.  It's not required.  But

17   we would submit that in this case it is appropriate.

18             MR. BERKOFF:  Your Honor, number one,

19   I think you've already determined that this insertion

20   would just lead to more confusion.

21             Number two, this is the ad hoc

22   committee's sort of nutshell summary of certain key

23   provisions of a plan that you haven't even approved

24   the disclosure statement on.  And to have that

25   included in our plan I think is inherently --

1          THE COURT:  You object.  I understand.

2          MR. BERKOFF:  Okay.

3          THE COURT:  Look, we're going to do

4    one plan at a time, one disclosure statement at a

5    time.  There probably needs to be a sentence or two

6    here indicating that there has been a competing plan

7    filed, but that's all.  Okay.  That's all parties

8    need to know is, that there is another game out

9    there.  And if anybody wants, all they have to do is

10   look at the docket and they can see that.  It has

11   been on file and we are just going to take them one

12   at a time and minimize the likelihood of confusion.

13   It's as simple as that.

14          MR. McKENNA:  And, Your Honor, that

15   brings us to the last ad hoc objection, and that's at

16   page 29 of the Saturday black-line.

17          I don't know, Mr. Lazar, would you

18   help us out with that one in terms of where it is on

19   the unpaginated so the court can find it.

20          THE COURT:  Well, the one that's on

21   line at page 29 has a partial paragraph at the top of

22   it and then starts with a subparagraph (g), claims

23   analysis.

24          MR. McKENNA:  Right.  Now, it's in

25   property of the estate, subheading 1.

1                    THE COURT:  All right.  So it's a

2      different page.

3                    MR. McKENNA:  Three pages in.

4                    THE COURT:  It starts out at number 1,

5      property of the estate?

6                    MR. McKENNA:  Yeah, and then, Your

7      Honor, from that point you've got to go to the third

8      page.

9                    THE COURT:  All right.  On the one

10     that's on line, it's page 38 of 93 in the electronic

11     version.

12                    MR. McKENNA:  Right.  This one is in

13     the middle of the page.  The paragraph begins, "the

14     plan proponents disagree with the positions taken by

15     such Seg 1 customers."

16                    THE COURT:  Right.

17                    MR. McKENNA:  Have you found that,

18     Your Honor?

19                    THE COURT:  I think so.

20                    MR. McKENNA:  It's the next sentence

21     that's our problem, Your Honor, the next couple of

22     sentences.  And specifically Your Honor has addressed

23     it just a bit already today in saying the court is

24     not going to make final rulings about what's property

25     of the estate at the confirmation hearing.

1              This part of the disclosure statement

2    really is telling the creditor body out there that

3    there will be issues resolved and that they think it

4    can be resolved without an adversary proceeding.  And

5    then they say they might reserve funds relating to

6    the $40 million in Seg 1 funds that are proposed

7    under their plan to be distributed, but they haven't

8    definitively committed one way or another and we

9    think this is misleading and confusing, Your Honor.

10             And it also leads to a situation where

11   the proponents are going to sort of have their cake

12   and eat it too.  They want to go to a confirmation

13   hearing and say, well, we would like to use this $40

14   million that's at issue in the adversary complaint

15   and we would like to do it under 9019.  And if the

16   court says we can't at confirmation, okay, we will

17   reserve.

18             And that creates a really big

19   practical problem for us, Your Honor, which is we

20   haven't had the months and spent the millions of

21   dollars that they on these factual issues on this

22   tracing.  And if we're heading for a hearing on

23   confirmation sometime in July, there is just no way

24   we can do that.

25             So it's sort of a critical part of the

31

1    disclosure statement that needs to be resolved now so

2    we all know what we're facing at confirmation,

3    because if there's going to be a 9019 evidentiary

4    showing about property of the estate, you know, we

5    think that needs to be resolved through the adversary

6    process and we need to have discovery.  We need to

7    have all the kinds of things you would need for that.

8              And if there's not going to be a 9019

9    or other determination of property of the estate,

10   then that entire $40 million should be reserved just

11   like BONY's full amount of their lien is being

12   reserved while it is litigated.

13             THE COURT:  Okay.

14             MR. LAZAR:  Your Honor, I don't know

15   if we're headed for a contested confirmation hearing

16   or not.

17             THE COURT:  Sounds like it to me.

18             MR. LAZAR:  But if you assume we are,

19   I don't know why this one should be treated any

20   differently than the other contested confirmation

21   hearings.  We have a contested matter.  Folks are

22   entitled to take discovery.  In fact, the trustee is

23   prepared to move forward and get people all of the

24   documentary evidence he is going to rely on

25   concerning 1129 and the requirements of 1129.

1                  The only point of this language is
2        that if Your Honor believes an adversary is necessary
3        to resolve that issue, which we don't think it is,
4        and hearing that adversary is going to delay the plan
5        confirmation hearing, that the plan proponents may
6        set aside that $40 million instead of, you know,
7        tying up days with trial and litigation and save that
8        for another day.
9                  MR. KIRPALANI:  It would actually be,
10       Your Honor, less than 40, in any event, because there
11       may be Seg 1 customers who agree to settle it.  We
12       don't have to litigate it if it's going to be
13       settled.
14                 THE COURT:  Right.  Well, look, I've
15       already indicated I've had big 11s before, gentlemen,
16       where there was a concern and a need for substantive
17       consolidation.  Remember the Grabill estate and the
18       Stoecker estate?  And the parties agreed not to
19       litigate that in those two rather complex cases,
20       perhaps not as bad or complex as this but...
21                 And it got resolved.  Everybody stayed
22       on their side of the water.  And we litigated
23       everything else that needed to be litigated.  That's
24       possible here.  But I don't know.  I'm not
25       foreclosing litigation.  We have got the adversary

1    the Seg 1 folks have filed.  And I am just taking it

2    one step at a time as the matters are brought down.

3                  But believe me when I say I don't

4    think it is necessary to determine whether this

5    particular asset in this supposed account was or was

6    not property of the estate in order to make the

7    determination whether this plan meets the

8    confirmation requirements of Section 1129 and the

9    related section.  They are two different issues.  And

10   if we have to duke it out on a fund-by-fund basis

11   down the line, we will.

12                  MR. CASEY:  Your Honor, if I could

13   just -- the plan as I read it says, though, they are

14   going to take the 40 million from the Seg 1 accounts

15   and distribute it to the Seg 3s.  So if the plan gets

16   confirmed, the money is gone.  They are taking it

17   out.  That's how the plan is written so they can get

18   to their pro rata distribution.

19                  It's not that they are going to

20   segregate -- and it's not 40 million.  It's more

21   because there is Bloom money and other monies or

22   property that we would have a share in pro rata.  So

23   the confirmation says the money is gone.  Your

24   interest is gone, unless they decide maybe that they

25   will escrow the money or reserve the money.  And

1    that's what the point is.  The way the plan is

2    written, it's gone.

3                    THE COURT:  Right, but you're talking

4    about a confirmation objection, Mr. Casey.  We are

5    not at confirmation.  We are just at an adequacy

6    hearing.

7                    MR. CASEY:  No, I understand, Your

8    Honor.  But if part of the disclosure is --

9                    THE COURT:  Which is why I said I

10   thought this was going to be a contested confirmation

11   hearing.

12                   MR. McKENNA:  And, Your Honor, I fully

13   understand that.  And if that's the case, you know,

14   our problem is going to be if that's really the way

15   this disclosure statement and plan go out to

16   creditors, that means that whenever we have a

17   confirmation hearing, we have to be ready to at least

18   prove under 9019 that they can't use that 40 million

19   or whatever it is in Seg 1 money for purposes of this

20   plan.  And there is no way we can do that in a month

21   or two months or three months.  We have got to have

22   discovery.  We have got to have a process to do that.

23   So these issues really are all tied together.

24                   THE COURT:  Well, the problem is where

25   do you start cutting through the Gordian knot?  I

1    mean, if I wanted to be a real hard guy I could say,

2    hey, no fees for anybody until the end of the case.

3    Well, I am not going to do that.  That's ridiculous.

4                    MR. BERKOFF:  Thank you, Your Honor.

5                    THE COURT:  My point is I only take

6    stuff that you present to me, gentlemen.  This

7    isn't -- you know, I don't have an economic interest

8    in this.  I'm just the judge in the case.  Okay.  And

9    your job as counsel is to advocate your client's

10   positions and take it one step at a time.  But we

11   can't decide confirmation issues until confirmation.

12   We can't decide all the related adversary issues

13   until they are ready to go.

14                    All we are doing today is to determine

15   whether this iteration of the disclosure statement

16   meets 1125 purposes for adequacy so we can get this

17   out and get to the main event, which is giving the

18   impaired classes the opportunity to vote.  That's the

19   best thing about Chapter 11.  It gives parties whose

20   claims are impaired an opportunity to accept or

21   reject a plan and take it from there.

22                    Okay.  Next.

23                    MR. TRUST:  Bank of New York.  Brian

24   Trust.  Good morning again.  By the way, I do agree

25   with your observation.  It sounds like a contested

1    confirmation hearing is coming up, but I would not

2    demand that you put that in the disclosure statement.

3                   I do believe that there are some

4    serious 1129 issues.  Obviously, the Bank of New York

5    has and will continue to reserve its rights in

6    respect of that.

7                   I'm going to focus, Your Honor, on a

8    bunch of discrete issues relative to disclosure.

9    First, page 7 of the disclosure statement continues

10   to say, I believe it's in a chart -- and when I say

11   page seven, I'm looking at the prior draft actually.

12   It continues to describe the Bank of New York's

13   secured claim, you know, with respect to overnight

14   secured loans made for a about a decade, it continues

15   to describe it as unimpaired.

16                  Now, I think it is a pretty simple

17   disclosure issue.  I think Section 1124 of the

18   Bankruptcy Code tells us what the word unimpaired

19   means.  I would note that the disclosure statement

20   itself also tells us what the word unimpaired means.

21   It says the claim has to be -- I'm sorry, cannot be

22   altered in any way.

23                  1124 says a claim is unimpaired if the

24   plan leaves unaltered the claimant's legal, equitable

25   and contractual rights.  The plan is written -- the

1    disclosure statement as it describes it, treats the

2    Bank of New York claim, given that there is a pending

3    adversary subject to a dispute, subject to (A) a

4    reserve -- and I will come back to the reserve, Your

5    Honor, in a few minutes and discuss whether it is

6    adequate or inadequate and what that means both to

7    the Bank of New York and other creditors.

8                  And it also posits the possibility of,

9    although we think it would be patently illegal, some

10   sort of estimation proceeding brought upon by the

11   same plaintiff, who would be, if you will,

12   commenced -- having commenced an adversary case

13   against the Bank of New York.

14                  Now, our view is that because it is

15   possible, theoretical, certainly conceivable, nobody

16   has a crystal ball to know, (A) what the reserve

17   would actually be today or whether it will be

18   sufficient -- and I will talk about that -- the claim

19   will be altered at the very end of the day.  If

20   that's the case, we would demand that the disclosure

21   statement, in accordance with 1124, given the

22   possible modification or alteration, say the claim is

23   impaired, subject to vote.

24                  If, however, that turns out not to be

25   the case, that could be done on a provisional basis,

1    we get that.  And if the bank's claim is fully

2    satisfied, as it would otherwise be, such that the

3    unimpaired language of 1124 is not implicated, that's

4    fine, too.  But it cannot say -- assuming that 1124

5    defines the word unimpaired, it cannot say that is

6    unimpaired.  It needs to say impaired.

7                I'm going to touch -- because it's a

8    lot of related points, I'm going to touch on the

9    reserve account concept.  And most significantly,

10    Your Honor, that's reflected in the liquidation

11    analysis.  And in that respect it fails, particularly

12    as to Bank of New York, and I believe as to the other

13    creditors as it informs them as to what they might

14    achieve or receive in a Chapter 7.

15                It probably make sense for me just to

16    get on the record, and I am happy to do that, just

17    some numbers that I think would be very helpful had

18    they been disclosed in the disclosure statement.  For

19    example, the bank's interest accrual rate is the

20    federal reference rate plus three-quarters of one

21    percent, 75 basis points.

22                Since the filing date of August the

23    17th through -- and I will project it because it is

24    neat; it's the end of the month -- through June 30th

25    of 2008, the approximate, including both the actual

1    and the projected, the approximate interest accrual

2    at the Fed reference rate plus a three-quarters of

3    one percent spread is $12,170.065 and some change.

4                 If we just stop there, Your Honor,

5    putting aside indemnifiable fees and expenses as of

6    June 30, the reserve number of $325 million set forth

7    in that liquidation analysis is -- in and of itself

8    is wrong.  It has to be wrong.  This court has set a

9    trial, hopes to get the trial up by the end of '08

10   slash beginning of '09.  It is certainly conceivable

11   and possible that we will go through an appellate

12   process.  But as of June 30th, that reserve number

13   fails.  Accordingly, the liquidation number fails.

14                 Bank of New York, if this case were to

15   liquidate hypothetically and all issues were

16   resolved, but hypothetically if that happened in

17   September of 2008, that number does not inform the

18   Bank of New York as to what it would take on account

19   of its secured claim.  Again, assuming all issues

20   were resolved.  And, obviously, there is a

21   significant and corresponding effect on every other

22   constituent in the case.

23                 There are just a couple of other

24   numbers that I would put out there for Your Honor.  I

25   asked the Bank of New York -- again this, you know,

1    simply informational, but I thought it's

2    constructive.

3                    I asked the Bank of New York, assuming

4    that this process relative to the adversary

5    proceeding continues for call it two years, what

6    would the accrual rate on a raw data basis

7    potentially look like?  And what they did was this,

8    they went to the Federal Reserve.  They took a look

9    at something called the Fed funds futures curve.

10   That's the Fed Reserve's projection as to the Fed

11   rate over a period of time.

12                   They looked at that.  They added the

13   three-quarters of one percent spread that's in

14   effect, and their projection based on the Fed's

15   future rates of interest in this country was about

16   $32,720,000 -- $720,861.  In a nutshell, 32.7, close

17   to $32.8 million of interest if the case ran out to

18   May 31st of 2010.  Just a two-year guess.

19                   Now I know projections by definition

20   are going to be wrong.  Nobody has a clue, not even

21   the Fed as to what the rates look like.  But it

22   informs us.

23                   In a nutshell, Your Honor, the

24   disclosure statement -- as I said, we have a myriad

25   of confirmation objections.  The disclosure statement

1    cannot be approved to the extent it violates 1124 and

2    describes us as unimpaired.  It can't happen.

3                    Two, significantly the reserve number

4    and the liquidation analysis, particularly as it

5    pertains directly to the Bank of New York, somehow

6    has to posit a basic accrual of interest, including

7    the possibility that there will be a continuing

8    accrual of fees and expenses which would be covered

9    under the indemnification under the various clearing,

10   security and loan agreements.

11                   I am not going to, Your Honor, go

12   through any of the other -- pardon me, any of the

13   other objections.  Again, we are going to make them

14   at confirmation.  I would just note parenthetically

15   that it may be very, very important and I think

16   informative for all the creditors to have a sense as

17   to what currently sits in the Bank of New York's

18   accounts, which includes the following:

19                   In total cash today, giving effect to

20   the securities liquidation program which we jointly

21   agreed to with the trustee, the committee and, of

22   course, the Bank of New York, roughly $513 million in

23   cash sits in the lienable or collateral account.

24                   There are roughly -- and, again, this

25   is a moving target because it changes -- roughly 139,

1    136,000 -- $139,136,000 of face value of additional

2    securities, some of which may certainly net less than

3    face based on -- at least to the best of my

4    knowledge, for a total face value of securities of

5    about 653, 366, 272 (sic), slightly more than $653

6    million.

7                    Given all that, (A) I think it is

8    important that it be included in the disclosure

9    statement; (B) the reserve account must reflect

10   accurately what it would take over a reasonable

11   period of time to permit the continued accrual of

12   post-petition interest, as well as the accrual of

13   indemnifiable fees and expenses.

14                   And, lastly, where I started, Your

15   Honor, is that we simply can't have a disclosure

16   statement that calls the bank's claim unimpaired,

17   given at least two and possibly more avenues of

18   impairment, because 1124 has to decide what the word

19   unimpaired means.

20                   For those reasons, we think the

21   adequacy of the disclosure statement at this point

22   fails.

23                   THE COURT:  Okay.

24                   MR. LAZAR:  Your Honor, if I could

25   address those in reverse order.  With respect to the

1    interest, we have put language in the description of

2    the liquidation analysis indicating that BONY asserts

3    that the reserve could be materially higher and that

4    they assert that post-petition interest and fees are

5    accruing at a rate of approximately $15 million a

6    year, just interest.

7            Your Honor, I come back to the same

8    point.  The liquidation analysis is not a projection

9    of recovery.  It is a comparison of what might happen

10   in a Chapter 7 versus a Chapter 11.  And whatever

11   that number is, 325, 345, it flows through equally

12   and, therefore, you know, in many respects it is a

13   plug.  We all recognize that Bank of New York is

14   going to fight over the amount of reserve.  And we

15   believe we adequately described that we are going to

16   have that fight.

17           But that number and the number in the

18   liquidation analysis does not impact the trustee's

19   estimate in the other sections of what a potential

20   shortfall might be in a situation where there are no

21   litigation recoveries; i.e., the 50 to $75 million

22   that the trustee is estimating would be the shortfall

23   that the Citadel beneficiary customers would need to

24   make up to get to the settlement level.  Now, we have

25   already taken that all into account.

44

1              The disclosure statement also

2      describes where the -- you know, how much we have in

3      total cash and how much we have in total securities.

4      I, frankly, don't understand the relevance of whether

5      it's at JP Morgan or Bank of New York.  I think

6      that's just going to confuse people.

7              We all recognize that Bank of New York

8      is far oversecured right now and is going to have to

9      give up a significant piece of that cash and

10     securities, whatever the reserve amount is that Your

11     Honor establishes, and that is adequately described.

12             With respect to the impairment issue,

13     Your Honor, the plan proponents believe that if

14     you're going to set up a cash reserve and Your Honor

15     is going to find that it is enough to cover payment

16     in full of the claim, all interest and all potential

17     fees, that that's enough for it to be unimpaired.

18             We have specifically put in here that

19     in the event we're wrong and Your Honor determines

20     they're impaired, we'll modify the plan.  And we are

21     giving them a ballot to vote in the event that's the

22     case.  I don't understand how Bank of New York can

23     possibly say it's confused about the treatment it is

24     going to receive under the plan.

25                  THE COURT:  Okay.

45

```
1                    MR. TRUST:  Your Honor, may I respond?

2                    THE COURT:  Briefly.

3                    MR. TRUST:  It's not a question of

4     whether the court -- to the extent the parties fail

5     to reach an agreement on a potential reserve number,

6     it's not a question of whether the court fixes the

7     number.  I think that the statute in and of itself

8     and the proposed treatment in the proposed plan today

9     define whether or not the word impaired or unimpaired

10    needs to be used.

11                   The reason that it has to be an

12    impaired claim is that the plan can (A) strip the

13    Bank of New York of its collateral to potentially the

14    reserve number simply can be wrong because none of us

15    have a crystal ball.  If that were to be the case,

16    the ultimate return, assuming that the dust all

17    settles, can potentially be less, thus modifying or

18    altering the bank's recovery.  If that's the case,

19    then 1124 is pretty clear that the plan has to

20    describe this claim as impaired.

21                   MR. KIRPALANI:  I think Mr. Trust's

22    explanation very clearly describes what the confusion

23    is, Your Honor.  The plan does not strip the Bank of

24    New York of anything.  We very carefully ensure that

25    the Bank of New York would have its claim reserved by
```

```
1    the court as if they got everything.  And the only

2    thing that potentially strips Mr. Trust's client of

3    its liens is the properly filed and prosecuted

4    adversary proceeding by Mr. Grede.  That's what may

5    strip him.  It is not going to be the plan.

6              MR. TRUST:  That's not true, though,

7    if the reserve account or the reserve number is

8    incorrect.

9              MR. KIRPALANI:  The court will make

10   that determination.  The court may wind up making a

11   determination that you disagree with.  This plan does

12   not do anything to the Bank of New York's claim.

13             MR. BERKOFF:  Your Honor, we dealt

14   with that, you know, in the National Steel case.  We

15   had confirmation issues and we just set aside an

16   appropriate amount of money and it worked perfectly.

17   We confirmed the plan and it was resolved.

18             MR. LAZAR:  What's before Your Honor

19   is the disclosure statement.  And, Your Honor, I

20   don't understand how this is a disclosure statement

21   issue.  This is a plan issue.  And if they're going

22   to be impaired -- you know, we have -- you know, they

23   get voting rights.  Sobeit.  We're providing for

24   that.

25             THE COURT:  Right.
```

1              MR. SHANNON:  Your Honor, on the 50 to

2    75 million that Mr. Lazar just mentioned, the

3    shortfall, which ties into when electing -- Seg 1

4    would be obligated to pay by electing into the

5    settlement, that 50 to $75 million number, I have

6    looked it very carefully, incorporates an assumption

7    of $325 million for Bank of New York.  If that 325 is

8    low, then the 50 to 75 is also low.  And,

9    unfortunately, we think a more realistic number is 75

10   to a hundred.  It's a huge potential impact for the

11   customers.

12              And, you know, for that reason, I

13   think a more realistic assessment of the Bank of New

14   York, assuming they have a valid claim, which we

15   certainly support the trustee that they don't, but we

16   have got to deal for the reality they may.

17              MR. KIRPALANI:  I think, Your Honor,

18   what's clear here, just very briefly, is the parties

19   that object to the plan want to make sure that as few

20   people as possible think it is a good deal.  That's

21   all that we're dealing with.  There is nothing

22   esoteric about Section 1124 that's been raised by

23   anybody.

24              THE COURT:  All right.  Well, I think

25   all those other matters can be resolved and reserved

1    for another day on another matter.  So I will

2    overrule that objection without prejudice to the

3    substance of it and the confirmation issues.

4                    MR. KIRPALANI:  Thank you, Your Honor.

5                    THE COURT:  Okay.  What's next?

6                    MR. LAZAR:  Your Honor, the next thing

7    up is the balloting procedure, the ballots, the

8    voting procedures and setting some dates.

9                    THE COURT:  Well, when can you get a

10   final, amended disclosure statement with the points

11   that we raised relative to the Seg 1 objection, which

12   I sustained in part?  It shouldn't require a lot of

13   time.

14                   MR. LAZAR:  There is no reason we

15   can't get that on file this afternoon.

16                   THE COURT:  All right.  Then I need an

17   order after it has been circulated to all the

18   parties, together with a final black-line, or however

19   you mark it up, version, incorporating my rulings

20   within the next couple of days.  And then we can move

21   on to the voting procedures motion and the objections

22   thereto.

23                   MR. KIRPALANI:  Your Honor, we put

24   together a kind of time line --

25                   THE COURT:  Good.

49

1                    MR. KIRPALANI:  -- that describes the

2     voting procedures that we propose, if Your Honor

3     doesn't --

4                    THE COURT:  I have got that.  It's the

5     last page of the --

6                    MR. KIRPALANI:  Right.

7                    THE COURT:  -- courtesy copy.  And

8     this is I think in part what Mr. McKenna was

9     concerned with.

10                   MR. KIRPALANI:  Your Honor, from our

11    perspective in terms of the legal issues before we

12    get to the timing, there is only one legal issue in

13    the voting procedures that's really a substantive,

14    articulate legal dispute, and that is, do the Seg 1

15    customers that oppose the plan, do they have the

16    right to vote the almost reinstated amount of the

17    full Seg 1 claim as if they gave back the

18    distributions they got from the debtor a couple of

19    days after the bankruptcy, and that way they could

20    inflate the size of their claim, or as we submit,

21    Your Honor, should they be entitled to vote only the

22    net amount that they are owed?  And I think we have

23    cited the Kmart case, Your Honor.

24                   THE COURT:  Right, which I follow.

25                   MR. KIRPALANI:  The critical vendor

50

1    case.

2                THE COURT:  If you got paid, you don't

3    have a claim to vote.

4                MR. KIRPALANI:  Well, that's our

5    position, Your Honor.

6                THE COURT:  That's my position.

7                MR. KIRPALANI:  It's as brief as that.

8                THE COURT:  The fact that they may be

9    later subject to disgorgement in the event that I

10   would enter an order for disgorgement of what they

11   got, which is an uphill battle, or something else in

12   which somebody might sue them on an avoidance action

13   and win is another matter.  But, you know, we are

14   supposed to try and fix it with what's allegedly

15   owing but unpaid.

16               MR. SHANNON:  But, Your Honor, what

17   they're trying to do is something very different from

18   that type of approach.  What they're basically saying

19   is, all right, if you have a million dollar claim and

20   you have a million dollar preference, we are going to

21   say that your claim is $2 million.  You have already

22   received a 50 percent distribution, and, therefore,

23   you're not going to receive another penny in this

24   case until everybody has received 50 percent.  And by

25   the way, although we're giving you a 2 million claim

```
1    that you've received a 50 percent distribution on,

2    you can only vote your $1 million, and by the way,

3    we're going to sue you to get back the other million

4    dollars.  That we think makes this very difficult.

5              The plan itself, there are numerous

6    provisions of the plan, especially, you know, the

7    waterfall, you know, how money will be distributed,

8    in which we are -- we suffer the result of the full

9    amount of our claim.  And we think it is, you know,

10   inequitable not to be able to vote the full amount of

11   our claim.

12             We certainly agree.  I mean, it's our

13   position we received our money back, not property of

14   the estate.  Our claim's of a lower amount.  But

15   that's not what this plan says.

16             THE COURT:  Well, the question is how

17   much can you vote, not whether you're going to accept

18   or reject it.  I take it as a given, Mr. Shannon,

19   most of your constituency is going to vote to reject,

20   which is no surprise to me.

21             MR. SHANNON:  And that is very

22   important here, because the Seg 1s account for a

23   little under 40 percent of the claims.  Now clearly

24   we know at least one and I think there is certainly

25   two Seg 1s who I would expect would vote yes.  The
```

1    great majority would vote no.  And then the question

2    is would they be able to block acceptance by the

3    single class?  They have put -- you know, obviously

4    they have put Seg 1 in the same class as Seg 3.  And,

5    you know, this becomes a very important issue

6    because, you know, quite clearly --

7                   THE COURT:  You would like to have a

8    blocking position.

9                   MR. SHANNON:  Oh, clearly we would,

10   Your Honor, but we think a plan --

11                  MR. BERKOFF:  You can take judicial

12   notice of that.

13                  MR. SHANNON:  And it's just like, you

14   know, they say that, you know, we would -- you know,

15   we want to put stuff in the disclosure statement that

16   would encourage Seg 1s not to elect.  They want to

17   put stuff in there that is going to encourage them to

18   elect.  And we think, you know, on some of this it's

19   not quite accurate.  That's besides the point.

20                  We're talking solely about the voting.

21   But this is very different, because, again, for all

22   purposes of a plan, our claim is the amount unpaid

23   plus the amount that was paid.  The only way we are

24   treated differently is in the voting.  There they

25   treat it differently.

1              THE COURT:  Because your clients got

2      paid post-petition.

3              MR. SHANNON:  But, again, it governs

4      where we go in the case.  We don't get another penny

5      because they say your claim is really two million,

6      not one million, and we are not going to give you a

7      penny until everybody else has received 50 percent on

8      the dollar.  That is very different from what, you

9      know, normally happens.

10             You know, they cite one other case.  I

11     believe it was the -- you know, in which -- a plan

12     proponent tried to argue that your adequate

13     protection payments should be applied to the

14     unsecured claim, and, accordingly, over time reduce

15     the secured lender's unsecured claim and its vote.

16             And you have mischief that could

17     happen here, Your Honor.  You know, quite clearly

18     they can just inflate our claim amount for their

19     benefit to show that we will not get another penny in

20     the case, but at the same time structure it so that

21     we don't get the vote.

22             It is -- in this case it may very well

23     be, we don't know and we won't know until the vote is

24     received, whether this would basically disenfranchise

25     or prevent Seg 1 from having a blocking position.

```
1                  MR. GOODMAN:  Your Honor, if I may, I

2    support Mr. Shannon's comments and want to add a few

3    others.  This entire plan, I guess mentioned --

4    treats it as if we have the full amount of our claim.

5    Their actual -- their little chart, when they say how

6    much the Seg 1 claims are, includes the full amount

7    of it.  If you decide to elect into the settlement,

8    you're also -- you're electing to give the money

9    back.  Even if you don't decide to elect --

10                 THE COURT:  That's what you do if you

11   get a preference and you want to be able to share in

12   the distribution in a 7.  To have an allowed claim,

13   you have to give it back in order to have your claim

14   allowed.  And to the extent you give any money back,

15   you've got an allowed claim.

16                 MR. GOODMAN:  But, Your Honor, this

17   isn't just a preference issue, because it is set up

18   to be the catch-up.  The catch-up is the key.  If it

19   were just a preference issue, that might be a

20   different matter, Your Honor.  And it was either

21   electing or not.  But it's also the catch-up.  That's

22   the key is the catch-up that you don't receive a

23   penny until they have collected enough on the full

24   amount of our claims.

25                      If they want to give us a small amount
```

55

1    of our claims and start letting us share right away,

2    we wouldn't be here raising this issue.  It's not

3    just the Kmart case.  They weren't dealing with the

4    catch-up.  The catch-up is the key distinction here

5    which applies whether or not you elect into the

6    settlement.

7                    MR. KIRPALANI:  A simple solution to

8    both Mr. Goodman and Mr. Shannon is they can write a

9    check, Mr. Grede can give them the bank account, they

10   can have the full amount of their claim and they can

11   share dollar one.  But they can't have it both ways.

12   They can't say we were owed a hundred million dollars

13   on the petition date, we got a payment from the court

14   two days later, and we want to act as if we never got

15   that payment.  That's what they're trying to do, Your

16   Honor.

17                   MR. BERKOFF:  It writes 502(h) right

18   out of the code.

19                   THE COURT:  Right, you can't do that.

20   You can only vote the extent of your unpaid claim.

21                   MR. KIRPALANI:  That's correct.

22                   THE COURT:  That's the simple result.

23   And my preference analogy is not perfect, but that's

24   the whole point, to get everybody back in the same

25   position so that there can be a pro rata distribution

1    among all allotted claims in a particular class.  To

2    the extent somebody got paid, they don't have an

3    outstanding unpaid claim for the amount they got

4    paid.

5                It is not at all uncommon for

6    preference defendants in my experience, limited as it

7    is, not to give anything back at all.  And only if

8    they lose at trial on the preference claim, if they

9    want to get money back, do they disgorge and then

10   hopefully share in a pro rata dividend along with the

11   other allowed claims in that particular class.  The

12   analogy is the same.

13               MR. SHANNON:  Your Honor, we're not

14   asking to vote the preference amount.  We are asking

15   to vote the amount of our claim on the petition date,

16   the date this bankruptcy was filed.  Yes, there is a

17   preference element.  We're not asking for that.  We

18   are asking simply for the amount of our claim on the

19   petition date.

20               THE COURT:  The problem is that

21   ignores the amounts that were subsequently paid

22   rightly or wrongly.  And the whole purpose of

23   impaired claims is to only be able to vote the amount

24   you haven't gotten paid back.

25               MR. KIRPALANI:  That's right, Your

1    Honor.  In this case in particular it's gratuitous

2    that it was two business days later that they got the

3    significant --

4                    THE COURT:  It could have been 20 --

5                    MR. KIRPALANI:  It could have been two

6    days earlier as the first installment of the Citadel

7    proceeds were.  And the fact that the bankruptcy

8    filing occurred in the middle and in two business

9    days the money was let out the door, that simply

10   doesn't change the analysis.

11                   THE COURT:  So I'm following the Kmart

12   ruling for the reasons articulated in that regard.

13                   MR. KIRPALANI:  Thank you, Your Honor.

14   Now we can just turn to, I believe, the timing

15   issues.

16                   THE COURT:  Right.

17                   MR. KIRPALANI:  In terms of just going

18   over it, Your Honor, today, of course, is the

19   disclosure hearing date on the 16th.  Mr. Lazar said

20   he would get the comments incorporated from Your

21   Honor and turn that as soon as possible and hopefully

22   that can get done in the next day.

23                   THE COURT:  Are you still looking for

24   a mailing on the 20th or do you need an extra few

25   days?

1           MR. LAZAR:  Your Honor, I think it's

2   very -- we're only talking about 200 voting

3   creditors.  I mean, they are owed -- you know, the

4   face amount is a billion.  They're owed a lot, but

5   it's not a lot of plans and disclosure statements

6   that need to go out.

7           THE COURT:  So the 20th is not a

8   problem?

9           MR. LAZAR:  No, shouldn't be.

10          THE COURT:  Okay.

11          MR. KIRPALANI:  Then what we propose,

12  Your Honor, was a deadline to object to claims for

13  voting purposes, one of the objecting or a couple of

14  the objecting parties indicated correctly that we

15  neglected to put in what's the deadline for the

16  trustee to object to a claim for voting purposes in

17  case it's duplicative or it's overstated.  So we put

18  that in, and we have given even more time than the

19  objectors asked.  And that would be July 2nd.

20          THE COURT:  Okay.  Does anybody have a

21  problem with that?

22          MR. McKENNA:  No, Your Honor, but

23  understand when we get to the end of this time line

24  we've got a big problem.

25          THE COURT:  I understand.  I figured

1    that was coming.  I'm just taking this one deadline

2    at a time.

3                MR. McKENNA:  I understand, Your

4    Honor.

5                MR. KIRPALANI:  Moving to the right,

6    Your Honor, the deadline to file Rule 3018 motions

7    for temporary allowance for those creditors that did

8    receive an objection by July 2nd would be July 12th.

9    That's ten days.

10                THE COURT:  Right.  Who has a problem

11    with that?  That's basically a ten-day gap.  Anybody

12    need more than ten days?

13                MR. SHANNON:  No, Your Honor.

14                MR. GOODMAN:  That's fine, Your Honor.

15                MR. BERKOFF:  That's a Saturday.  We

16    should probably make it the 14th.

17                MR. LAZAR:  He's right.

18                MR. KIRPALANI:  We can make it the

19    14th, Your Honor.  Sorry about that.

20                THE COURT:  Okay.  Well, make it the

21    14th because I'd rather give parties a little more

22    time, even though in this age of electronic filing

23    you're all on the clock 24/7 even though I am not.

24    But we will extend that to the 14th.

25                MR. KIRPALANI:  Two days later, Your

1    Honor, would be the objection deadline to

2    confirmation, July 16th.

3                THE COURT:  All right.  So you want to

4    move that a couple more days?

5                MR. KIRPALANI:  I don't think they are

6    related, Your Honor, and I don't think we need to

7    move that at all.

8                THE COURT:  Does anybody have a need

9    for a little additional time to file objections to

10   confirmation?  I know some of you have already got

11   them in your word processors.

12               MR. McKENNA:  Again, Your Honor, we

13   really don't have a problem with that.  We just --

14   the hearing, that's our problem.

15               THE COURT:  Okay.

16               MR. KIRPALANI:  Okay.  And then

17   Mr. Lazar points out that we like to work too much on

18   Saturdays.  Even the voting deadline that we had in

19   here was the 19th.  That should be the 18th, which

20   would be a Friday.

21               THE COURT:  Okay.  Anybody have any

22   problem with that?

23               (No response.)

24               THE COURT:  Okay.

25               MR. CASEY:  Your Honor, just with the

61

1    voting deadline, it ties into the plan confirmation.

2    But it's the same issue that we raised.  In order to

3    be able to vote, at which time we have to make our

4    election to opt into the settlement or not, we have

5    -- that gives us a little more than 30 days.

6              THE COURT:  You need more time?

7              MR. CASEY:  We need more time.

8              THE COURT:  How much time?

9              MR. CASEY:  We would like to have at

10   least until September, Your Honor.  That gives us

11   about 90 days.  And I know it brings a chuckle.  But

12   let's go back to last week.  I mean, we were here

13   with -- you know, and you read the disclosure

14   statement.  It talks about extensive investigation,

15   painstaking investigation.  If you go back to last

16   week, we had the hearing on the BONY motion to

17   dismiss.

18              After Your Honor went through all of

19   the arguments with CFTC regulations, property of the

20   estate issues, Your Honor ended up denying the

21   motion, gave BONY 45 days to answer, set a

22   preliminary pretrial hearing at the end of September.

23   No discovery deadline.  That would be decided, as

24   Your Honor said, in a complex matter you might not

25   even set discovery until trial.  You might let it run

1    through trial.  You said a preliminary pretrial would

2    deal with potentials, settlement or otherwise.

3              So if you take it that we have the

4    same CFTC issues, we have property of the estate

5    issues that everyone wants to ram down our throat in

6    30 days and say you're in or you're out, that's not

7    fair.  We have a lot of work to do.

8              We haven't spent nine months and seven

9    figures of estate money to figure out what it is that

10   they say brings to the disclosure statement, Your

11   Honor, significant detail on the same page that had

12   the insert you looked at that Mr. Goodman raised;

13   that certain customers don't accept the plan

14   proponents' position that the assets of certain

15   customers who invest in Seg 1 are not traceable.  And

16   that even if commingling and misuse occurred, the

17   bankruptcy court can trace their particular

18   securities so as to preserve the benefits of

19   segregation they bargained for.

20             Then, Your Honor, it goes through a

21   long description of diversion of funds, where it was

22   deposited, how they allocated, how they -- fictitious

23   cost basis, engaged in mass transfers of securities

24   to and from Seg 1 during June through August '07 to

25   the detriment of one group of customers to another.

1    The trustee does not believe that any tracing rules

2    can and should apply.

3                    All that ties into numerous statements

4    where it says forensic analysis by the trustee and

5    his professionals, extensive investigation.  And so

6    at the end, we have two court orders that say we can

7    get money.  And yet we are painted as the bad guys

8    here, and it is being told to us opt in or opt out in

9    30 days on a settlement that Your Honor looking at

10   the BONY litigation is saying maybe in 146 days from

11   when that order was entered we could talk about

12   settlement.

13                   I think it's patently unfair, and I

14   think if you look at the plan the Seg 3s are going to

15   get interest.  So they are protecting themselves.

16   There is no detriment to them.  Why the trustee is

17   pushing for this date at this point, I don't know,

18   because the Seg 1s are just as much a customer that

19   should be protected and be allowed to do their

20   analysis as the Seg 3s.

21                   And so from our standpoint to say that

22   we should do all of this in 30 days, discovery and

23   look through all the documents that they took nine

24   months to put together, to hire an expert, to have

25   the expert look at what they have done, to verify if

1    that's what's true, if it's not true to point out to

2    them what isn't, do discovery on whatever other

3    witnesses that may -- we may need to talk to, other

4    documents we have to get.  To do it in 30 days isn't

5    fair.

6              And I think that asking for time into

7    September is not unreasonable.  We're looking at a

8    BONY trial, which is the true-up date that Your Honor

9    has said is a date in '09 unknown at this point.  So

10   the true-up amount that we trigger off of is going to

11   be potentially a year or more away.

12             THE COURT:  It could be years if there

13   is appeals.

14             MR. CASEY:  If there is appeals, but

15   we have to decide in 30 days.

16             THE COURT:  I could be retired by the

17   time all these appeals get done, Mr. Casey.  There is

18   only so much I can do.  But you need more time?

19             MR. CASEY:  Right, we need more time.

20             MR. McKENNA:  And, Your Honor, if I

21   could just chime in on that a little bit, I know Your

22   Honor has been patient with me and listened to it,

23   but I look at footnote 4 to their disclosure

24   statement.  That tells me what they want to do.

25             In footnote 4, which is back on page

65

```
1    66, says, "The plan proponents believe such

2    customers," that's all the Seg 1s -- "will be

3    required to meet their burden of proof" -- this is at

4    the confirmation hearing -- "in the face of the

5    Chapter 11 trustee's assertion based upon the

6    extensive forensic work examination completed by him

7    and his professionals of such widespread commingling

8    of Sentinel's property, failure to honor segregation

9    and misconduct on the part of the defendant

10   insiders."

11              That's their plan.  They want to go to

12   this hearing and they want to prove -- they want to

13   force us on our burden based on --

14              THE COURT:  You don't have any burden

15   at confirmation.  The plan proponent has the burden

16   on confirmation.

17              MR. McKENNA:  Right, Your Honor.

18              THE COURT:  The objector doesn't have

19   any burden at all.

20              MR. McKENNA:  But, nonetheless, Your

21   Honor, they want to force.  That's their plan.

22   That's what they want to try at plan confirmation.

23   And our point simply is, Your Honor, whether it's

24   under 9019 -- and I fully understand the court's

25   position on the adversary complaint being totally
```

66

1    separate.

2                But right now where this disclosure

3    statement and plan stand, they're going to take 40

4    million of Seg 1 money, if confirmed, and there is no

5    reserve and they're going to distribute.

6                And to get there, to get their proof

7    that it is confirmable, they are going to come to the

8    court and they're going to say 9019 falls within the

9    reasonable range.  There is an evidentiary burden

10   there.  We have not had the eight months.  We have

11   not had the forensic examination.

12               They were kind enough to add to the

13   disclosure statement the sentence that says, "The

14   trustee has not provided the customers access to all

15   the forensic work undertaken."  And that's an

16   understatement, Your Honor.  You know, they've got 8

17   months and millions of dollars of a head-start.  We

18   can't be forced to go to a hearing where these

19   issues --

20               THE COURT:  How much time do you think

21   your client needs?

22               MR. McKENNA:  I think September is

23   adequate for the hearing.

24               MR. SHANNON:  Your Honor, I would also

25   support that.  I think part of the problem is that we

1    have run the numbers carefully, you know, and it's

2    our view that if people elected to settle, they're

3    agreeing to pay their share of somewhere in the range

4    of 75 to a hundred million dollars.

5                    Now, the Seg 1s as a group had on

6    deposit $450 million of their customers' money.  They

7    have lost already over 130 million of that, which

8    they had to repay out of their own pockets.  They're

9    out 130.  Now the question is will they need to repay

10   another hundred million, 75 to a hundred million?

11                   It is a major decision.  And it is --

12   you know, that is part of the problem we are facing.

13   If we are forced to vote really, really quickly based

14   upon the totally limited knowledge we currently have,

15   we have no choice but to conclude the settlement is

16   no better than litigation and, therefore, we reject

17   the settlement.

18                   I think even a minimal amount of time

19   could enable us to find out what exactly all this

20   evidence is.  It would be extremely helpful, and we

21   support the request for the September date.

22                   THE COURT:  The September date?

23                   MR. SHANNON:  Yes.

24                   MR. KIRPALANI:  Your Honor, can I just

25   respond to this?

1                   Penson and Vision are members of the

2       creditors committee.  The trustee filed a complaint

3       alleging the core facts that underlie this plan when

4       it filed a complaint against the Blooms.  The same

5       presentations that were made to Seg 1 customers,

6       Kotke, which is a Seg 1 -- Seg 3 customers -- Kotke,

7       which is a Seg 1 customer, who sees the wisdom of

8       settlement, and Penson and Vision and FC Stone were

9       made at the same time.  The same information was

10      given to everyone.

11                  Whether or not private litigants

12      decide I should be vigilant and retain professionals

13      and spend money and start analyzing what this could

14      mean for my client should not derail and delay the

15      entire case.  What's not been told to you, Your

16      Honor, is really, really telling.

17                  The relevant date here is mid August.

18      Mid August is the one-year deadline for Mr. Grede to

19      file a Rule 60(b) motion to revisit -- the one-year

20      period is going to elapse to revisit whether or not

21      the court was misled or misinformed when the order

22      was entered authorizing the distribution -- or not

23      authorizing, but allowing the distribution to go out

24      to Seg 1 customers.

25                  What they would like, Your Honor, more

```
 1    than anything is to know the outcome of that before

 2    they have to decide whether or not to settle.

 3                    THE COURT:  If that motion is filed,

 4    it will be contested.

 5                    MR. KIRPALANI:  It will be contested,

 6    and the answer still won't be known.

 7                    MR. SHANNON:  Your Honor, the trustee

 8    could have filed that objection for a long time.

 9    It's always --

10                    MR. KIRPALANI:  That's correct, but at

11    their request --

12                    MR. SHANNON:  They don't file it --

13                    MR. KIRPALANI:  -- there has been a

14    delay to do this --

15                    MR. SHANNON:  -- simply for strategic

16    reasons.

17                    MR. KIRPALANI:  No, Your Honor.  That

18    is completely false.  The reason it was not filed,

19    and Mr. Lazar can speak for Mr. Grede, but the reason

20    it was not filed is because of the desire to forge a

21    comprise and avoid exactly the dispute.  They want to

22    not only not avoid, but they want to have it done,

23    finished and then they'll vote after they know the

24    answer, and then no one will ever settle any dispute

25    in bankruptcy, Your Honor.
```

1

2            MR. SHANNON:  Well, Your Honor, one

3     thing -- obviously not on that point, but simply on

4     the point of, you know, what is known.  And in

5     response to Mr. Kirpalani's comments, as committee

6     members -- and I certainly invite the trustee to cut

7     me off if I'm saying something I should not say --

8     but as committee members, he has provided us a

9     certain analysis for the period from May 2007 to

10    August 2007.

11            Unquestionably on the petition date

12    the Seg 1 securities were in Seg 1 segregated

13    accounts.  His argument is, while that's true, if you

14    go back during that period, there were times when

15    they weren't.  And then even before that, they were

16    in segregation again.

17            But the disclosure statement discusses

18    far more than the May-to-August period.  It really

19    goes back to 2004.  And even as a committee member,

20    we have received nothing on that whatsoever.

21    Obviously, even with respect to the May-to-August

22    period, we've looked at that, we looked at it

23    carefully.  You know, we see that the assets were

24    segregated on the petition date.  We've see when they

25    weren't.  These are securities.  They can be traced.

1           You know, we don't think that the
2     information provided to us defeats our ownership
3     rights as to those particular securities.  Now,
4     that's obviously a matter that's going to be
5     litigated down the line.  But we have received very
6     little of this extensive forensic evidence for
7     investigation.
8           MR. McKENNA:  Your Honor, just a final
9     point from the ad hoc side.  We don't understand the
10    rush.  There is no prejudice.  There is all this
11    litigation playing out.  If they want to reserve the
12    40 million and just let that play out in the
13    litigation, let them say that.  But if they don't,
14    if they want to take this position maybe we'll
15    reserve, maybe we won't, it depends on what happens
16    at the hearing, we need to be prepared, and we
17    haven't had any access to that forensic examination.
18          We don't believe it should be
19    litigated.  We don't want to litigate those
20    questions.  We're with the court in terms of they
21    ought to play out in the adversary process.  But if
22    we're going to a hearing and they've got footnote 4
23    in their disclosure statement telling us what they
24    intend to litigate, we have to be somewhat prepared.
25    It's not possible by July 24.

1          MR. LAZAR:  Your Honor, as I

2    indicated, the point of the note to which he's

3    referring was that if Your Honor wanted to try the

4    adversary and the confirmation hearing together,

5    determine an adversary is necessary, and the timing

6    was going to work, we were prepared to go forward.

7    But if not, we will reserve on those issues.

8          THE COURT:  Right.  Well, I'm not

9    going to be able to do them both at the same time.

10          MR. LAZAR:  And I hear you loud and

11    clear on that, Judge.  We are prepared to go forward

12    on the 1129 issues.  We are optimistic that

13    notwithstanding the rhetoric here that when people

14    start looking at the numbers -- and we are prepared

15    to meet with the Seg 1s.

16          We have been meeting with them

17    regularly and we're going to continue meeting with

18    them.  We'll meet with them and try walking through

19    this again so they understand why the trustee

20    believes so strongly that this settlement is in their

21    best interest.

22          To the extent we have people that have

23    not signed up, we will reserve their piece of the 40

24    million, and you're not going to have to try property

25    of the estate in July.  We're going to try 1129, and

```
1    I am going to really, really try to get that done in

2    a couple of hours, not a couple of days.

3             MR. GENELLY:  Your Honor, one

4    statement.  I've been quiet here.  I am part of the

5    Seg 1 group.  You've heard a lot of commentary about

6    Seg 1.  Kotke & Associates is a Seg 1 creditor in

7    regards to this and it is a plan proponent.

8             The reason that it is a plan proponent

9    is exactly the thing that we fear our fellow Seg 1s

10   may do in this case, which is to continue this on and

11   on in regards to the timing, to the extent that the

12   administrative costs of the estate, which are

13   currently eating up millions of dollars every

14   month --

15            THE COURT:  I've noticed.

16            MR. GENELLY:  -- is going to continue.

17   And that is something we as a creditor don't want to

18   see happen.

19            THE COURT:  Right.

20            MR. GENELLY:  When the time comes for

21   confirmation, we'll have more to say in terms of

22   being a plan proponent.  But at this point in regards

23   to where we are in front of the court, we would like

24   to see this move along as quickly as possible.

25            You heard the comment, well, what
```

1    prejudice is there?  Each day goes by tens of

2    thousands of dollars are being spent.  That is what

3    the prejudice is, most particularly, and one of the

4    reasons we are a plan proponent.

5              MR. HERMAN:  Your Honor, if I may,

6    Brian Herman from Paul Weiss on behalf of Discus, the

7    largest customer in the case, owed north of

8    $450 million, claims that far outweigh that side of

9    the courtroom.  A delay is extremely prejudicial.  We

10   have gotten zero dollars to date.  Their clients have

11   received, on the other hand, 70 cents on the dollar.

12   This is all about how long can we hold on to the 70

13   cents on the dollar before we may have to give it

14   back.

15              Frankly, the settlement is a red

16   herring in some respects because people can opt in,

17   and if they do, like Mr. Genelly's client, they can

18   cap their downside in the event that a 60(b) motion

19   or adversary is successful.  On the other hand, if

20   you don't want to opt in, then you just run the

21   litigation risk, whatever it is.  We are not saying

22   they have to disgorge under the plan.  They run the

23   litigation risk.  They are more than capable of

24   making that decision right now.

25              THE COURT:  Right.  Okay.  So the big

1    problem is not the voting deadline of July 17 or 18

2    or 19 or whatever it is.  It is when you want the

3    plan confirmation hearing.

4              MR. LAZAR:  I thought we were actually

5    talking about that last box.  I didn't think we were

6    really talking about the deadline.

7              MR. CASEY:  Your Honor, it's as to the

8    voting deadline because I have to elect by the voting

9    deadline.  So I need to have all the information so I

10   can make an informed decision.

11             And if all the administrative expense

12   that has been run up for the trustee to write pages

13   and pages and the committee on why we should take the

14   settlement, I need the time to digest that, have my

15   expert look at it, inform my client this is a good

16   deal or a bad deal, take it or don't take it.  It's

17   the voting deadline.  I have to elect by the voting

18   deadline.

19             THE COURT:  Or your client could not

20   vote at all.

21             MR. CASEY:  Potentially, right.

22             THE COURT:  It happens all the time.

23             MR. SHANNON:  The treatment of the

24   settling parties means you really have to at the

25   voting deadline to elect into the settlement.

```
 1                    THE COURT:  Right.

 2                    MR. SHANNON:  That's your chance.

 3                    THE COURT:  Right.

 4                    MR. SHANNON:  After that, if you don't

 5       vote or you vote not to opt in, you're done.

 6                    THE COURT:  Okay.  I don't think under

 7       all the circumstances, given the history of this

 8       case, we need to drag it out into September.  But in

 9       deference to Mr. Casey's point and Mr. McKenna's

10       point, I don't think it's going to hurt the plan

11       proponents if we extend the voting deadline to the

12       end of July and start the confirmation hearing in

13       August instead of the end of July.

14                    I think that's a way to equitably

15       balance the interests of the parties, especially with

16       the concern articulated by a couple of creditors

17       about the extremely high administrative expenses of

18       the case, which is expected and not insubstantial.

19                    So I think we should extend the voting

20       deadline say to Friday, August 1.  Okay?  That's a

21       couple of additional weeks for people to decide

22       whether they are going to fish or cut bait and

23       support the plan and accept it or reject it or not

24       bother to vote at all, which is an option that very

25       many Chapter 11 creditors seem to be exercising these
```

1    days, from my perspective.

2                    Then instead of starting the

3    confirmation hearing on July 24th as suggested, we

4    will probably need to do it a couple weeks into

5    August to allow time for balloting, for voting

6    reports, et cetera, et cetera, and give you a chance

7    to digest it.  You originally wanted to start it on

8    July 24.  I think we probably ought to start on

9    August 14th.  Okay.

10                    And at that point hopefully we will

11   know how much time is going to be needed for evidence

12   to be submitted in support of the plan and in

13   opposition thereto.

14                    MR. SHANNON:  Your Honor, one

15   question.  As far as -- the objection to

16   confirmation, I believe, is the 16th.  Does it make

17   sense to put that over a week in light of the

18   extension of the other dates?

19                    MR. CASEY:  Can't we just revise the

20   order back?

21                    THE COURT:  You want objections the

22   same time as the voting deadline?

23                    MR. SHANNON:  I think that would make

24   a lot of sense, Your Honor, otherwise we're in a

25   position of --

78

```
1                    MR. BERKOFF:  That gives us less time
2      to --
3                    MR. SHANNON:  -- objecting where,
4      depending how we decide finally to vote, what
5      information we have by then --
6                    THE COURT:  Right.
7                    MR. SHANNON:  -- it might --
8                    THE COURT:  It's more common in my
9      experience to have the objection deadline coterminous
10     with the voting deadline, so I can give you those few
11     additional days.  I don't see a problem.  If that
12     promotes or produces a problem with a start time of
13     August 14th for plan confirmation, I would certainly
14     be willing to have input from the plan proponents to
15     some subsequent date.  But I would be surprised if
16     this is going to be a one-afternoon hearing.
17                    MR. KIRPALANI:  Your Honor, actually
18     working the other way, would it be possible to have
19     the confirmation hearing start on the 12th, so we
20     have the Tuesday and the Thursday that same week and
21     not eat into potentially the last two weeks in
22     August?
23                    MR. LAZAR:  Your Honor, that would
24     work a lot better for us.  Mr. Gair starts his
25     vacation on the 13th.  And I'm cautiously optimistic
```

1    it will be one day, not two days.

2                 THE COURT:  You're a very optimistic

3    man, Mr. Lazar.  The 12th will work for me.

4                 MR. KIRPALANI:  The 12th and the 14th

5    perhaps?

6                 THE COURT:  I can give you both those

7    afternoons, gentlemen.

8                 THE CLERK:  You have a trial on the

9    14th.

10                THE COURT:  I do have a problem.  I

11   already have got another trial, so I couldn't do it

12   on the 14th anyway.  I can give you --

13                MR. KIRPALANI:  The 7th and the 12?

14                THE COURT:  No, the 7th won't work.

15   I'm going to be out of town.  Why don't we do it the

16   12th and 13th.

17                MR. KIRPALANI:  Okay.

18                THE COURT:  The afternoon will be --

19   on the 13th will be after my Chapter 13 call.  I'm

20   never really sure when I get done with that.

21                MR. LAZAR:  Your Honor, when we send

22   the notice should we set it for 1:00?

23                THE COURT:  1:00 o'clock, yes.  1:00

24   o'clock.

25                MR. McKENNA:  Your Honor, how does

1    Your Honor want to handle a prehearing discovery

2    schedule?

3                    THE COURT:  What do you have in mind

4    to suggest?

5                    MR. McKENNA:  Well, perhaps some sort

6    of just scheduling order similar to what we would use

7    in an adversary.

8                    THE COURT:  Okay.  Anybody have any

9    conceptual problem with that?

10                    MR. LAZAR:  Your Honor, my only

11    conceptual problem is it's not clear what folks think

12    they are going to litigate or not litigate at the

13    confirmation hearing.  I have got a pretty good idea

14    what I think we're going to do, which is just 1129

15    and not --

16                    THE COURT:  That's the principal

17    focus.

18                    MR. LAZAR:  -- the property of the

19    estate.

20                    THE COURT:  Yes.  I'm not going to

21    litigate whether something is or is not part of the

22    property of the estate.

23                    MR. LAZAR:  So I'm kind of at a loss

24    as to what discovery we are talking about.  But I

25    think what makes sense, Your Honor, is we've got a

1    lot of folks here who have a lot of experience.

2    There is no reason we can't sit down and work out a

3    schedule and submit something to Your Honor.

4              THE COURT:  All right.  I will have

5    the courtroom deputy give you one of my form

6    prehearing orders for contested matters, which is

7    very similar to ones I use in adversary proceedings.

8    I usually require advance submission of all exhibits

9    usually two weeks before the hearing commences, with

10   a witness list of all possible witnesses, and a very

11   brief summary of each witness's anticipated

12   testimony.

13             And then seven days before the trial

14   begins, the second round is due; namely, any

15   objections to the opponent's witnesses or exhibits

16   need to be filed and served, together with any

17   prehearing brief and memorandum of authorities and

18   proposed findings of fact and conclusions of law.  I

19   can tighten those time frames up if that is --

20             MR. LAZAR:  The only thing that

21   troubles me a little bit is we've had talk of

22   experts.  I mean, again, I don't see what expert

23   testimony we are going to have.  But if we're talking

24   experts, that's going to be tight.  We will work

25   something out, obviously, Your Honor.

```
1                    MR. SHANNON:  Certainly, as Mr. Lazar

2      said, there will be a reserve.  It's just a question,

3      I would imagine -- if the Seg 1s and the trustee and

4      the committee agree on the amount of reserve, that

5      will actually eliminate a number of issues.

6                    THE COURT:  Right.  I mean, if you can

7      resolve it through an augmented reserve and then

8      reserve the remaining disputed issues for another

9      day, that doesn't bother me.  I am sure if you all

10     can stipulate to something, if it doesn't violate the

11     code or the federal rules or the local rules of

12     bankruptcy procedure I'm probably going to agree to

13     it to simplify it.

14                   All right.  What else can we do today,

15     gentlemen?

16                   MR. GOODMAN:  Your Honor, I have one

17     housekeeping matter --

18                   THE COURT:  Sure.

19                   MR. GOODMAN:  -- related to our

20     disclosure statement.  I talked to chambers and they

21     said pick a date 25 days out.  And I understand Your

22     Honor is out on vacation the week of July 7.  So we

23     were going to propose the 14th.  But I wanted to do

24     the same thing that the plan proponents did.

25                   Can I just submit an order to chambers
```

```
1    setting forth an objection deadline in order to

2    afford getting one -- Your Honor, if the 14th is

3    acceptable, getting objections on the 13th?  I was

4    going to propose July 7th for disclosure statement

5    objections, if the 14th is available for the court.

6    And then if that is acceptable to the court, I would

7    submit an order to chambers this afternoon.

8              MR. KIRPALANI:  Your Honor, may I be

9    heard on that?  In terms of what's the rush type of

10   argument that we heard a little while ago, doesn't it

11   make the most sense for the estate and the

12   constituents, including the Seg 1s, to devote their

13   energies to resolving the issues under the pending

14   plan, and if that fails, only then will it ever

15   really be solicited, Your Honor, their competing

16   plan?  There is no need to rush.

17             THE COURT:  Yes, I agree.

18             MR. GOODMAN:  Your Honor, I would ask

19   that we at least get to the disclosure statement

20   stage.  Your Honor can decide at the disclosure

21   statement hearing, if it approves the disclosure

22   statement, to hold off solicitation.

23             But in the event this plan doesn't get

24   confirmed, and we think there are significant issues

25   with it, we want to be able to move forward at that
```

1    point.  Your Honor can always put off solicitation of

2    votes at the time of the disclosure statement

3    hearing.  There is no reason not to get through the

4    disclosure statement.

5              THE COURT:  Well, we're going to be

6    mixing apples and oranges.

7              MR. KIRPALANI:  Yes.  The creditors

8    committee as a fiduciary for all the customers does

9    not want Mr. Grede's professionals to spend one

10   dollar on a plan that may never ever go forward.

11             MR. GENELLY:  That's absolutely right,

12   Your Honor.

13             MR. LAZAR:  Mr. Grede's professionals

14   don't want to do it either.

15             THE COURT:  We will deal with the

16   trustee and the unsecured creditors committee's plan

17   first.

18             MR. KIRPALANI:  Thank you.

19             THE COURT:  And get that done in

20   August.  And then we will turn to your competing plan

21   and we'll start hearing on adequacy sometime later in

22   August.

23             MR. GOODMAN:  And I want to make the

24   record now.  I don't want to get to August and have

25   them claim they have not looked at our disclosure

1   statement and they need another month.  If their plan

2   doesn't get confirmed, I'm just going to preview it

3   now at this point, that -- that I would think that if

4   their plan isn't confirmed we could move

5   expeditiously on our plan.

6           THE COURT:  I don't have a problem

7   with that, but I don't want to augment the confusion

8   to anybody.  Let's deal with it one at a time

9   seriatim.  You know, for all I know a third plan

10  could get filed later today, counsel, by somebody.

11  And the disclosure statement --

12          MR. KIRPALANI:  I'm sure it will.

13          THE COURT:  And, you know, I hope it

14  doesn't happen, but it's possible, in which case we

15  are going to deal with your plan before we deal with

16  that one.

17          MR. GOODMAN:  Thank you.

18          THE COURT:  And let's hope that just

19  remains hypothetical.

20          Okay.  Anything else I can do for you

21  all today?

22          MR. LAZAR:  Your Honor, there was one

23  other thing on the calendar, and it was the

24  adversary, the Shatkin 105.  That's been -- that was

25  resolved by entry of the injunction.

```
1                    THE COURT:  Okay.

2                    MR. LAZAR:  So that can come off the

3      calendar.

4                    THE COURT:  Okay.  Then we will give

5      it no further day, and the courtroom deputy will

6      enter the appropriate order sending it to closing.

7                    Okay.  Anything else I can do for you

8      all today?

9                    MR. LAZAR:  I think that's it, Your

10     Honor.

11                   THE COURT:  That completes the court's

12     call for the day.  Court is in recess.

13                   (Which were all the proceedings had in

14                    the above-entitled cause, June 16,

15                    2008, 10:00 a.m.)

16     I, AMY B. DOOLIN, CSR, RPR, DO HEREBY CERTIFY

       THAT THE FOREGOING IS A TRUE AND ACCURATE

17     TRANSCRIPT OF PROCEEDINGS HAD IN THE ABOVE-

       ENTITLED CAUSE.

18

19

20

21

22

23

24

25
```

# EXHIBIT H

```
      0001
 1                 IN THE UNITED STATES BANKRUPTCY COURT
                FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION
 3
 4        Sentinel Management Group,      )    07 B 14987
                                          )    Chicago, Illinois
 5                                        )    10:00 a.m.
                                 Debtor.  )    April 08, 2008
 6
 7             TRANSCRIPT OF PROCEEDINGS BEFORE THE
                   HONORABLE JOHN H. SQUIRES
 8
 9        APPEARANCES:
10        For Trustee:                Mr. Chris Gair
                                      Mr. Vincent Lazar;
11
          For Bloom Defendans:        Mr. Howard Adelman;
12                                    Mr. Mark Rotert;
13        For Bank of New York:       Mr. Sean Scott
                                      Mr. Matthew Ingber
14                                    Mr. Patrick Gonzales;
15        For Creditors Committee:    Mr. Marc Fenton;
16        For Lake Shore Asset Mgmt.  Mr. Ira Bodenstein;
17        For Cantor Fitzgerald:      Mr. Neville Reed;
18        For Charles Mosley:         Mr. Abraham Brustein;
19        For Eric Bloom:             Mr. Terry Campbell;
20
21        Court Reporter:             Jackleen DeFini, CSR, RPR
                                      U.S. Courthouse
22                                    219 South Dearborn
                                      Room 661
23                                    Chicago, IL  60604.
24
25
```

```
1                    THE CLERK:  Sentinel Management Group,
2      07 B 14987.
3                    MR. GAIR:  Good morning, Your Honor.
4      Chris Gair and Vince Lazar on behalf of the trustee,
5      who is also present.
6                    MR. GREDE:  Fred Grede, trustee for
7      Sentinel Management Group.
8                    MR. FENTON:  Marc Fenton on behalf of
9      the creditors committee.
10                    MR. REED:  Neville Reed on behalf of
11     Cantor Fitzgerald.
12                    MR. SCOTT:  Good morning, Your Honor.
13     Sean Scott appearing on behalf of Bank of New York.
14     Also with me is Matthew Ingber and Patrick Gonzales.
15                    THE COURT:  Gentlemen.
16                    MR. INGBER:  Good morning, Your Honor.
17                    MR. GONZALES:  Good morning, Your
18     Honor.
19                    MR. BODENSTEIN:  Good morning, Your
20     Honor.  Ira Bodenstein on behalf of the receiver of
21     Lake Shore Asset Management.
22                    THE COURT:  Okay.  Anybody else
23     expected?
24                    MR. GAIR:  No.
25                    THE COURT:  Okay.  The first thing
```

1    we've got is the trustee's motion to reject certain

2    executory contracts with Market News International

3    and Neopost, which I have had a chance to review.

4    Heard anything from those parties?

5                        MR. LAZAR:  No, we have not, Your

6    Honor.

7                        THE COURT:  Anybody have any problem

8    with the trustee's motion?

9                        MR. FENTON:  We respect the trustee's

10   business judgment.  We have no objection.

11                       THE COURT:  Accordingly, I will defer

12   to the trustee's better business judgment and approve

13   the rejection and enter the order as proposed.

14                       Next is a motion to approve a

15   stipulation and consent order regarding turnover of

16   net proceeds of repurchase agreement closeout between

17   the debtor and Cantor Fitzgerald, which I think is

18   your client, Mr. Reed.

19                       MR. REED:  Yes, Your Honor.

20                       THE COURT:  I've had a chance to read

21   it.  Anybody have any objection or want to speak to

22   that particular motion?

23                       MR. BODENSTEIN:  Your Honor, I have a

24   question about that motion.  Unfortunately I was

25   unable to hook up with Mr. Lazar this morning.  If

1    this is the one that says the net proceeds including

2    Cantor expenses are going to be turned over to Cantor

3    Fitzgerald, is that my --

4              MR. LAZAR:  No, it's going to be --

5    let me explain what's going on here.  We have two

6    stipulations with Cantor Fitzgerald.  One relates to

7    the closeout of the repurchase agreements between

8    Cantor Fitzgerald and Sentinel where there was excess

9    proceeds remaining after the closeout.  Pursuant to

10   the stipulation, Cantor is turning over those excess

11   proceeds less the amount it asserts are attorneys'

12   fees payable under that stipulation -- excuse me,

13   under the agreements.  The parties were reserving

14   their rights to contest those fees and the amount of

15   those fees.

16             MR. BODENSTEIN:  That was my question.

17   There's nothing, no attachment indicating what

18   Cantor's expenses are, just a blanket statement

19   they're over $300,000.

20             MR. LAZAR:  Well, my understanding is

21   at this point they're asserting it's over $400,000,

22   and we're reserving the right to argue.

23             MR. BODENSTEIN:  How is that going to

24   be resolved then?  Are they going to file a claim in

25   the case, an administrative claim for those fees?

1              MR. REED:  They're primarily fees that

2     were incurred as attorneys' fees under our master

3     repurchase agreement with Sentinel.  If someone has a

4     question, they would simply notify us to that effect.

5     But we are taking the position those are subject to

6     our legitimate setoff right under the agreement.  We

7     would provide a copy of the agreement to anyone who

8     has an interest and/or concern.  And unless and until

9     we hear from them, we would just stand by our rights

10    under this protected contract.

11             MR. LAZAR:  Your Honor, just so it's

12    clear.  This was one, as you may recall this came up

13    in the fall originally, this is one of the issues the

14    trustee has been looking at.  The trustee does not

15    agree with the amount of those fees, whether they're

16    reasonable and whether they're payable.  We'll try

17    working something out.  If we can't work something

18    out, it will either be by way of adversary or an

19    objection to the claim.

20             THE COURT:  Okay.  So all rights are

21    reserved.

22             MR. BODENSTEIN:  That's fine.  And I

23    guess I will make the request of Mr. Reed right now:

24    I would like to see these fees and expenses,

25    something that indicates what time was spent, you

1    know, in the normal format that you'd submit it to

2    anyone.

3                    MR. REED:  In the appropriate manner

4    and time, Judge, we will respond to Mr. Bodenstein's

5    request.

6                    MR. LAZAR:  The other Cantor

7    stipulation relates to funds that were credited to

8    Sentinel's account postpetition relating to these

9    same securities which Cantor had liquidated and sold

10   to a third party, following investigation.  It

11   appears that those funds should not have been

12   credited to Sentinel's account, indeed probably not

13   to Cantor's account but to the purchaser of the

14   securities.  Therefore, we don't believe the estate

15   has an interest in those funds, other than a bare

16   possessory interest.  And, therefore, we are

17   stipulating that the trustee will direct the Bank of

18   New York to return those funds.  And, again, all

19   parties' rights are reserved in the event it turns

20   out to be the case that it's anything other than as

21   our preliminary investigation has determined.

22                    THE COURT:  Okay.  Anybody else want

23   to speak to either of those two motions?

24                    Okay.  Then I will defer to the

25   trustee's better business judgment and grant both

1    motions and approve the stipulations.

2                      MR. REED:  Thank you, Judge.

3                      THE COURT:  The orders are entered.

4    Okay.

5                      Next we've got the application for

6    Navigant Consulting.  And that was amended in light

7    of the court's comments when this was first

8    presented.  The amended application seeks in fees

9    $2,270,373.25 plus costs, totaling now $36,528.90 for

10   the period August 31 of last year through December 31

11   of last year.  And on the costs it looks like there

12   was a substantial voluntary reduction.  I have had a

13   chance to review this.  Anybody have any position or

14   statement for the record?

15                     MR. REED:  Excuse me, Judge.  May I be

16   excused?

17                     THE COURT:  Yes.

18                     MR. REED:  Thank you, Judge.

19                     THE COURT:  Okay.  All right.

20                     After a review of the amended

21   application, I don't have a problem with the reduced

22   expense amount of $36,528.90.

23                     On the fees there are still some

24   duplicative conferencing/meeting, although not a huge

25   amount.  You can get the particulars from my law

1    clerk, Mrs. Pistorius.  There were ten entries in the

2    first section.  It looked like several in the

3    meeting/teleconferencing creditors committee counsel;

4    a couple in the research and analysis for litigation

5    section; some in the, looks like three in the case

6    administration section.  So it doesn't add up to a

7    lot.  Okay?  The fees are allowed in the sum of

8    2,253,829.  And the items in those categories, I

9    think there was one in the tax issues, are all

10   without prejudice to reapplying.  But the amended

11   application didn't show me a compelling necessity for

12   the second or sometimes other third member of the

13   firm.  In one instance it looks like four members of

14   the firm participating.  Okay?  So that's my ruling

15   on the fees, $2,253,829.

16             The difference in the amended app from

17   the two-seventy-three-seventy-three-twenty-five is

18   provisionally disallowed without prejudice.  Okay?

19             MR. LAZAR:  Thank you, Your Honor.

20   We'll send over a confirming order later today.

21             THE COURT:  The same with all the

22   other professionals.  Okay?  So we'll need an order

23   on that.

24             Then, let's see, we've got next on the

25   call the status and motion in what we will call the

1    first adversary against the individual defendants and

2    other entities.  There is a motion by the Bloom

3    defendants to seek an extension of time to plead.

4                      Mr. Adelman.

5                      MR. ADELMAN:  Good morning, Your

6    Honor.

7                      MR. BODENSTEIN:  May I be excused,

8    Your Honor?

9                      THE COURT:  Yes.

10                     MR. ADELMAN:  Howard Adelman on behalf

11   of the Philip Bloom defendants, along with Mark

12   Rotert.

13                     MR. BRUSTEIN:  Good morning, Your

14   Honor.  Abraham Brustein for defendant Charles

15   Mosley.

16                     MR. CAMPBELL:  Judge, Terry Campbell

17   on behalf of Eric Bloom.

18                     THE COURT:  Okay.  The motion alleges

19   that there's been settlement meetings and conferences

20   which are somewhat productive, and the extension is

21   only sought through and including April 28th for

22   those moving defendants in the hopes that everything

23   can be settled vis-a-vis them in this adversary.  Is

24   that basically it?

25                     MR. ADELMAN:  That's it.  Judge, I

1      think that Mr. Gair, Mr. Lazar can speak to it.

2      We're becoming common friends in trying to get this

3      resolved.

4                      MR. GAIR:  Judge, that's right.  We

5      have no opposition to the motion.  We believe with

6      respect to Phil Bloom, Eric Bloom, and the related

7      defendants, to be able to come to you with a proposed

8      settlement agreement in the very near future.

9      Actually I was going to ask the court for a date for

10     --

11                     THE COURT:  Another status?

12                     MR. GAIR:  -- a motion to present our

13     motion for approval.  I was going to propose the week

14     of April 21st.

15                     The 28th?

16                     Sorry, Judge.

17                     MR. ADELMAN:  No problem with that.

18                     THE COURT:  What about Mr. Brustein's

19     client?

20                     MR. BRUSTEIN:  We do not have a motion

21     on file, but we have a -- we have the same type of

22     discussion ongoing with Mr. Gair.  We have reached a

23     verbal understanding that the time may be expendable.

24     That discussion goes on.  And I request that same

25     date for  --

1           THE COURT:  The same date for you?

2           MR. BRUSTEIN:  The same date.

3           THE COURT:  Any problem with that?

4           MR. GAIR:  No, Judge.

5           THE COURT:  Okay.  Then I'll grant Mr.

6    Adelman's motion vis-a-vis his respective clients and

7    that of his colleagues and counsel.  And I'll

8    probably need a separate minute order to be

9    submitted.  Mr. Brustein's oral motion for similar

10   extension is granted for his client.

11          MR. BRUSTEIN:  Thank you.

12          THE COURT:  Do you want to come back

13   later that week?  My problem that week, gentlemen, is

14   I've got a heavy 13 call every Wednesday.  So the

15   30th would not be good.

16          MR. LAZAR:  The first week of May?

17   The 7th or 8th?

18          MR. GAIR:  The 7th is his --

19          THE COURT:  Right.  So I can do it the

20   6th, if that's what you want.

21          MR. GAIR:  How's the 6th?  The 6th

22   looks good to us, Judge.

23          MR. ADELMAN:  Fine.

24          THE COURT:  Then I need an order on

25   your motion, Mr. Adelman.  It was conspicuously

1    absent in your papers.  And if you've got a hard copy

2    to hand up, I will grant your motion.  I will need a

3    minute order from Mr. Brustein granting his oral

4    motion for the same extension.  Then we will continue

5    the matter for status to the 6th of May at

6    10:00 o'clock.

7                    MR. ADELMAN:  And the date for answer

8    date is April 28th?

9                    THE COURT:  Yes.  As requested.

10                   MR. ADELMAN:  Thank you.

11                   THE COURT:  Okay.  Next we've got

12   status hearing on what I will call the adversary with

13   the Bank of New York as the plaintiff.

14                   MR. INGBER:  Good afternoon, Your

15   Honor.  Matthew Ingber on behalf of the Bank of New

16   York.

17                   The parties have submitted a joint

18   discovery plan pursuant to Rule 26(f) for the court's

19   consideration.  And that relates both to the Bank of

20   New York's adversary proceeding against the trustee

21   and also the trustee's action against the Bank of New

22   York and the Bank of New York Mellon Corp.

23                   THE COURT:  Okay.

24                   MR. INGBER:  As you can see, Your

25   Honor, the parties have reached agreement on several

1    issues.  And certainly our hope and expectation with

2    respect to ongoing discovery in this case is we'll be

3    able to continue to work with trustee's counsel to

4    reach agreement on several discovery issues so they

5    don't need to burden the court with those issues.

6              As to two threshold issues, though,

7    the parties have been unable to reach agreement.  And

8    that is with respect to the discovery schedule.  And,

9    second, with respect to the form of the trustee's

10   production of documents to the Bank of New York.  The

11   parties have submitted two proposed schedules for

12   Your Honor's consideration.  We ask that the court

13   adopt the one proposed by the Bank of New York.

14             And let me first start by making clear

15   that the Bank of New York is not interested in

16   delaying this litigation.  We are not seeking delay

17   for the sake of delay.  There are two litigations.

18   We would argue the trustee's action against the Bank

19   of New York is a very complicated and complex

20   litigation.  We want to resolve this as quickly as we

21   can.  But given the nature of the issues, the

22   complexity of the issues, the numbers of depositions

23   and documents that we're talking about, we want to

24   make sure that we have the ability to do this right

25   and to defend the Bank of New York in a lawsuit that

1    was brought by the trustee.

2              We think our proposed schedule is one

3    that should be adopted by the court for two reasons.

4    First, Your Honor, it seeks to allow the parties to

5    be on an even playing field.  For the last seven or

6    eight months the Bank of New York has been producing

7    documents to the trustee.  Without getting too much

8    into the weeds here, we have been collecting

9    documents from 29 bank employees, hard copy

10   documents, email, non-email, non-electronic

11   documents.  We've been conducting a painstaking

12   review of those documents, over a million pages of

13   documents.  And we've been reviewing those documents

14   for responsiveness and privilege.  And we've produced

15   hundreds of thousands of pages of documents to the

16   trustee, responsive, non-privileged documents that

17   the trustee has been reviewing up in the last several

18   months.  In fact, has used in connection with the

19   filing of the lawsuit against the Bank of New York.

20   We've received 18 pages of documents from the

21   trustee, Sentinel-related documents.

22              And so for the last eight months, the

23   trustee has been reviewing both the Bank of New

24   York's documents and all of the Sentinel documents in

25   connection with lawsuits against the bank, a lawsuit

1   against the Sentinel insiders, a lawsuit now against

2   the auditors.  And so we think that schedule that we

3   proposed puts the parties on more of an even playing

4   field because it allows the Bank of New York, in

5   effect, to catch up to where the trustee is right

6   now.

7           We also think that our schedule better

8   reflects the realities of this litigation.  We

9   believe that there is or will be a staggering number

10  of documents that are going to be produced by parties

11  and non-parties in the case.  We think that there

12  will be dozens of party and non-party depositions at

13  the least.  And what we proposed is we think an

14  efficient, orderly staging of discovery, mindful of

15  the court's admonition at the last conference that

16  there needs to be flexibility.  In fact, discovery

17  may well have to continue up until trial.  We think

18  we should endeavor to set deadlines for ourselves so

19  that we can have an orderly, staging discovery.  We

20  should exchange documents, and we should have a

21  chance to review those documents before we have to

22  prepare our witnesses for depositions.

23          We think after those documents are

24  reviewed, we should start depositions.  At the same

25  time we should be able to take depositions of the

1    Sentinel employees at the same time the trustee takes

2    the depositions of the Bank of New York's employees.

3                    We think summary judgment should come

4    after the bulk of fact discovery is completed.  And

5    we think expert reports should be exchanged after

6    there's a full factual record that's developed.

7                    What the trustee is proposing is that

8    depositions start right away.  Of course we are not

9    in a position to do that because we don't have any of

10   Sentinel's documents.  The trustee is proposing that

11   summary judgment motions be filed before the close of

12   fact discovery.  The trustee is proposing that expert

13   reports be exchanged before the close of fact

14   discovery.  Again, we understand that fact discovery

15   may well have to continue after motions are filed or

16   after expert reports are exchanged.  But we do think

17   we should endeavor to set deadlines so that our

18   experts are relying on a full record, a factual

19   record.  And when we file summary judgment motions,

20   we don't need to supplement them with testimony or

21   documents that the parties produce after the close of

22   fact discovery.

23                    Now there is one fundamental issue

24   that is very relevant to scheduling issues in this

25   case, and that is the form of the trustee's

```
1    production to the Bank of New York.  The trustee has

2    proposed to make available to the Bank of New York a

3    database of documents that have not been reviewed for

4    responsiveness and have not been reviewed for

5    privilege.  The Bank of New York has told the trustee

6    that that's unacceptable.

7              And now you may be asking yourself,

8    well, why in the world would the Bank of New York be

9    complaining about getting too many documents.  And

10   there's several answers to that question.  First,

11   Your Honor, this is what the federal rules and the

12   case law requires.  This is what's done in ordinary

13   litigations, parties exchange document requests.  The

14   receiving party reviews the document requests,

15   reviews the files that it has, reviews for

16   responsiveness, reviews for privilege, and produces

17   responsive non-privilege documents.

18             I will refer Your Honor to just a few

19   cases, Levit versus Herbst, H-e-r-b-s-t, that is

20   Northern District of Illinois 2005.  That was on

21   appeal from the bankruptcy court, Judge Black.  And

22   the district court held in that case that the

23   trustee, quote, "remained obligated to sort through

24   the documents himself and produce only those

25   responsive to the document request."  That was
```

1     affirmed by the Seventh Circuit.  And in that

2     district court case there was a cite to another

3     Seventh Circuit case, Rothman versus Emory

4     University.  That was a Seventh Circuit 1997.  It

5     affirmed sanctions against the party who had, quote,

6     "rebuffed his obligation to sort through the

7     documents and produce only those responsive to

8     defendant's requests."

9                     What the trustee has told us, and his

10    counsel can speak for the trustee, is that there are

11    197 boxes of hard copy documents.  There's a database

12    of electronic documents.  There's been -- they have

13    collected electronic documents, and, again, without

14    getting too much into the weeds, apply about 400 or

15    so search terms to those electronic documents.  And

16    that's what's in the database.  There's been no

17    further review of those documents that identify only

18    those that are responsive and not privilege.  So

19    we've got 2.4 in total -- 2.4 million pages of

20    emails, and counting.  We've got 1.7 million pages of

21    Bloom emails.  We have productions to all the other

22    various government agencies.  We have audio tapes,

23    voice recordings ranging from 700 for one custodian

24    to 11,000 for another custodian.  Again, thousands of

25    hours of taped conversations, maybe only a portion of

1    which are going to be actually responsive to document

2    requests that we're going to send to the trustee.

3                We also think that the trustee is in a

4    much better position to conduct this review than the

5    Bank of New York is.  The trustee -- his counsel has

6    told us that the trustee is a stranger to Sentinel,

7    on an equal footing as the Bank of New York.  And

8    maybe that was the case eight months ago, but it's

9    certainly not the case now.  The trustee has reviewed

10   the Sentinel documents in connection with three

11   separate lawsuits, presumably in connection with

12   subpoenas from the SEC, the CFTC, the DOJ.  And so

13   the incremental costs to the trustee of reviewing

14   these documents as opposed to Bank of New York, we

15   would argue is modest.

16               The Bank of New York is conducting

17   this type of review.  It's what we've been doing for

18   the last eight months.  It's what we're going to

19   continue to do.  And we're doing it because that's

20   what, as I said before, the federal rules and the

21   case law contemplates.

22               If I could just give a concrete

23   example of why this approach just doesn't really

24   work.  The electronic documents are maintained in a

25   database, and the trustee has offered to make that

1    database available to the Bank of New York.  But the

2    DOJ, we're told, the SEC, I believe the CFTC as well,

3    the FBI, all have access to the very same database.

4    So we have been told by the trustee that whatever

5    work we do in that database, organizing documents for

6    depositions, having a folder of key documents,

7    organizing documents by custodian, each one of these

8    agencies is going to have access to our work product.

9              I see that Mr. Gair is shaking his

10    head.  I'm hope I'm wrong about that.

11              But he's offered to allow us to make

12    an image of this database at the cost of two cents

13    per page.  But the problem, Your Honor, is that when

14    you justify search terms to these documents and you

15    don't actually review them for responsiveness, you're

16    going to have 60, 70 percent of documents in there

17    that have nothing to do with this case or certainly

18    won't be responsive to our document request.  That's

19    certainly what we're finding when we conduct our

20    review.  So at a cost of two cents per page to copy

21    non-responsive documents, documents that shouldn't be

22    in there in the first place, that's a cost to the

23    Bank of New York on top of the cost of having to

24    review, having our attorneys review millions of

25    pages, possibly millions of pages of documents that

```
1     are just not responsive to our request.

2                    Finally, Your Honor, the trustee has

3     asked us to sign a non-waiver agreement.  The trustee

4     wants to produce documents to us that have not been

5     reviewed for privilege.  We have deep concerns about

6     that approach, principally because of the logistical

7     problems that would arise if the trustee is producing

8     documents to us that we don't know are privileged or

9     not privileged.  Some, we don't know who the

10    attorneys are.  We can't identify and shouldn't have

11    to identify which are privilege documents and

12    non-privilege documents.

13                    And to the extent we put together

14    documents and rely on those documents as we proceed

15    in this case, as we prepare for depositions, as we

16    prepare for motion practice, how are we supposed to

17    know whether the trustee is going to deem that

18    document privileged.  And when we hand a witness at a

19    deposition a document that we don't think is

20    privileged or would have no reason to believe is

21    privilege, the trustee then takes that away and says,

22    no, that's a privileged document.  You can't use it.

23    We think we're at a severe disadvantage at that

24    point.

25                    And so this question of the form of
```

 1      the trustee's production is relevant to the

 2      scheduling issues in this case because we believe the

 3      trustee in the first instance has to review those

 4      documents for responsiveness and privilege.  And we

 5      think that's going to take a substantial amount of

 6      time.  If we were to have to review those documents,

 7      we are confident it would take months to get through

 8      these documents.  We're going to want to review

 9      virtually every one to make sure they're relevant or

10      not relevant to this case.

11                   And so we think that the scheduling in

12      this case needs to take into account this issue and

13      needs to be extended out to allow either the trustee

14      or, if necessary, the Bank of New York to conduct a

15      thorough review of these documents.  At the very

16      least, Your Honor, if the bank is required to incur

17      the cost of having its own attorneys wade through

18      millions of pages of documents, many of which are not

19      going to be responsive to our request, we think that

20      costs or fee sharing would be appropriate.

21                   So, Your Honor, we ask that you adopt

22      the schedule that the Bank of New York has proposed

23      so that we have, like I said, an opportunity to be on

24      an even playing field with the trustee, who's had

25      eight months to prepare for this, and so that we can

1    defend this case in what we believe is the right way.

2    Thank you.

3              MR. GAIR:  Judge, I will be much

4    briefer.

5              With respect to these issues regarding

6    the form of production, they are -- and I'll come

7    back to this in a second, but they are entirely

8    premature.  We haven't even gotten discovery requests

9    yet.  We are talking about ways to produce in the

10   most efficient ways possible, including

11   electronically searchable database.  But you can't

12   come into court on a status hearing and basically ask

13   for a motion to compel when you haven't yet submitted

14   document requests.  I will come back to that.

15             The schedule issues are really very

16   simple, Judge.  There are three primary differences

17   between our schedule and theirs, and we leave out

18   stray days.  First of all, BONY's argument is that we

19   shouldn't be able -- nobody should be able to take

20   depositions until October of this year.  That's

21   another six months, which then in turn adds six

22   months to their discovery cutoff and the trial ends

23   up being six months later.

24             Now, Judge, there is no basis in the

25   rules for delaying a taking of depositions.  In fact,

1    Rule 26(d) says just the opposite.  It says absent a

2    court order or otherwise, anybody can do their

3    discovery at -- any form of discovery at any time

4    they want.  There is -- what they're trying to do is

5    hold our discovery hostage until they do the

6    discovery that they want to do.  That is exactly what

7    the rule forbids.

8             Secondly, BONY wants to spend

9    three-and-a-half months in the summer of 2009 fussing

10   around with summary judgment motions and doing

11   nothing else, Judge.  That's absolutely ridiculous in

12   our view.  There is no reason, especially since they

13   have recognized that discovery could continue even

14   until the trial, there is absolutely no reason not to

15   run summary judgment briefing.  If there are summary

16   judgment motions, run those along with expert

17   discovery or fact discovery.  We're just wasting

18   three-and-a-half months there.

19             And finally, Judge, the third

20   difference between our schedule and their schedule is

21   they won't commit to a trial date.  Now, Judge, I

22   know that you have a procedure by which you normally

23   handle trial dates, but the trial date here is going

24   to govern all these intermediate dates.  And so we

25   have proposed a trial date in March of 2009.  The

1    court's already said it's going to be sometime in

2    2009.  If a trial date is fixed, I think it will hold

3    everybody's feet to the fire to act efficiently.

4                    I want to point out, Judge, that these

5    schedule issues are extremely important to the estate

6    and to the creditors of the estate.  This court knows

7    better than any of us that the longer a lawsuit goes

8    on, the more money gets spent on legal fees.  And

9    that's exactly what's going to happen here.  And this

10   estate, quite frankly, should not be punished with

11   the kind of legal fees that would be anticipated if

12   this trial is on December 31, 2009, which is I think

13   what the Bank of New York would like to do.

14                   Further to the issue of generating

15   punishing legal fees is this question of approach to

16   discovery.  Now, Judge, as I said, it's premature,

17   there's nothing before the court yet, and we haven't

18   even gotten their discovery requests.  Let me just

19   tell you how far off base their suggestion is that we

20   are doing something improper here.  We created an

21   electronically searchable database of the key

22   documents, of the emails and the key data work

23   documents that this company used.  We didn't just do

24   it for ourselves, we did it for the benefit of -- and

25   it has been accepted and used by the SEC, the CFTC,

1    the justice department, the insiders, the FBI, and

2    us.  Everybody else understands that when you have an

3    electronic database, you can apply search terms.  You

4    can pull out whatever documents you want.  Don't use

5    ridiculously broad search terms.  You can get

6    whatever you want.  The cases are absolutely clear

7    that if the database is electronically searchable,

8    that has satisfied our obligation.

9              With respect to the hard copy

10   documents, we have given them a detailed index that

11   you just paid Navigant for creating.  That was one of

12   Navigant's tasks was to go through every document in

13   this case in Sentinel's offices and create a detailed

14   index, which we gave to Mr. Ingber months ago and

15   told him you can have whatever you want, just tell us

16   what you want.

17             So there's a little bit of sleight of

18   hand going on here, Judge.  We are trying to be as

19   forthcoming as we can in discovery.  And one of the

20   things they're complaining about, and you're going to

21   love this, Judge, is we want to make so sure that we

22   don't get arguments later that something was

23   responsive that we should have known about and didn't

24   produce, we took images of every server and every

25   hard drive in this company and we made a copy for

1    them.  We've offered to give it to them two weeks ago

2    and they don't want it.  They don't want an

3    electronic copy of everything that could be searched,

4    could be dealt with, whatever they want to do with it

5    so that they have whatever information is at their

6    disposal.

7                    What do they want to do instead?  They

8    want to impose about 20 or $30 million in legal fees

9    on the estate so that we can review -- how many

10   tarabytes of data is it?

11                   MR. LAZAR:  Many.

12                   MR. GAIR:  I think it's 11 tarabytes

13   of data, Judge.  Whatever it is, it would take years,

14   years to review this.  That's not the way discovery

15   does or should work.  What should happen is we'll

16   identify to them -- we have identified to them the

17   key documents relevant to the claims and defenses.

18   If they want others, certain documents, they can

19   search for them.  We can help them find them.  But

20   this is -- this idea that the trustee, who is in fact

21   a stranger and has not reviewed 99.9 percent of the

22   documents because there are so many, has to do this

23   before the Bank of New York can even start its

24   depositions is absurd.  I would ask that you adopt

25   our case management plan.

1                    THE COURT:  Okay.

2                    MR. INGBER:  May I respond briefly?

3                    THE COURT:  No, I have heard enough.

4                    MR. INGBER:  Okay.

5                    THE COURT:  I don't do discovery like

6     magistrates do for the district judges, gentlemen.  I

7     have got over 3400, the last time I looked, pending

8     bankruptcy cases, which is a larger caseload than

9     probably all the district judges in this district

10    have together.  I don't have any magistrates to help

11    me do discovery, okay, which is why I leave it to the

12    attorneys.  Okay?

13                    In both of these adversaries we are

14    not even at issue.  There's a motion to dismiss

15    that's in the briefing process in the Bank of New

16    York's adversary that it filed.  And we've got a

17    briefing schedule on the trustee's complaint against

18    the Bank of New York.  I don't set scheduling orders

19    like magistrate judges do.  I don't have the time to

20    micromanage discovery.  I have got too much else to

21    do.  Because if I did that in this case and in these

22    two adversaries, I'd have to do it in all of them,

23    and there's just no way I can physically do that.  So

24    I'm going to leave you to settle it on your own.

25                    As far as I'm concerned, if you

```
 1     created a document depository electronically that's
 2     supposedly quicker and more efficient than having it
 3     in physical paper, and I have been in litigation in
 4     my former life where the room was filled up with
 5     documents in antitrust litigation that some of you
 6     may have been involved in, to have the pleasure of
 7     going through it and sifting through all that stuff,
 8     so how you do it really doesn't make any difference
 9     to me.  Once we get at issue and we resolve the
10     motion to dismiss and the probable motion to dismiss
11     in the other adversary, I will enter a preliminary
12     pretrial order that will set the matter for pretrial
13     conference while you do your ongoing discovery.  And
14     I've already indicated in both of these, if they're
15     complex enough I won't enter a discovery cutoff.
16     I'll let you do discovery through the trial.  I've
17     had to do that before because of the complexity and
18     the number of documents, et cetera, et cetera.  But,
19     gentlemen, I am not going to get embroiled in
20     positional jockeying for a perceived tactical
21     advantage for one side or the other with regard to
22     your discovery disputes.
23                    The rules are there.  I don't have any
24     discovery motion in front of me to rule on.  Okay?
25     But I'm telling you, I will leave discovery open
```

```
 1      through trial.  And once I enter a pretrial order and

 2      require you to submit a joint statement of what the

 3      factual and legal issues are that are in dispute to

 4      help me understand what the fight's really going to

 5      be about that also contains a recital of the factual

 6      and legal issues that are undisputed that we don't

 7      have to waste any time on, okay?  I want to focus you

 8      that way on preparing for the trial in the event you

 9      all can't settle it.  It sure doesn't sound likely,

10      not like the first adversary where supposedly a

11      settlement is around the corner.

12                  So I'm anticipating on both of these

13      that they're not going to be resolved consensually

14      and that we'll have to go through to trial.  And I'm

15      here to provide a fair opportunity for trial, but my

16      time is limited.  Okay?  And at the pretrial

17      conference all I'm going to want to know is how much

18      time you're going to need to complete discovery,

19      okay, and then your estimate of trial time in half

20      days.  As I indicated the last time, we'll probably

21      be trying this over multiple days on three afternoons

22      a week.  And we'll book it at that point in time

23      consistent with what your needs are and what I have

24      available on my trial calendar.  Okay?  And if it has

25      to go 50 half days like it did in the Midway versus
```

1    Northwest adversary, it goes 50 days.  Doesn't matter

2    to me.  But I have all these other cases and

3    adversaries proceedings to fit into my docket.  Okay?

4    And while this may be among the most complex that I

5    have, it's not the only one.  And you don't get any

6    special treatment because it's bigger and more

7    complex.  The rights of your client are no greater

8    than the rights of any other clients in any other

9    stuff that's in dispute before me.  So it's just

10   fitting you in as best I can.  And that's the best I

11   can do for you.

12               So I'm not going to worry about

13   scheduling discovery right now, especially since I

14   have already told you I'm going to leave it open

15   through the trial.  And we will try this sometime in

16   calendar year 2009, because the longer I put it off,

17   as Mr. Gair pointed out, the more expensive it gets

18   for both sides.  And if you all don't settle it, just

19   take it as a given, it's going to be really expensive

20   litigation.  You're not charging the hourly rate that

21   I enjoyed when I last practiced over 20 years ago,

22   $45, $50 an hour.  Okay?  Your paralegals charge more

23   than that.  So the expense of this litigation is

24   going to be enormous.  I know that and you know that.

25   Do the best you can to shorten it up.  But I'm not

1    going to shortcut anybody's discovery rights.  The

2    rules are there to follow.  And only bring discovery

3    motions on before me if you've got an impasse and you

4    can't consensually resolve it, then follow the rules

5    and I'll do the best I can to decide fairly.  Okay?

6               These problems you're talking about

7    are matters which over time will likely work out.

8    Okay?  More than that I can't say today, but I'm not

9    going to -- at this point where we've got motions to

10   dismiss and one that's in the process of being

11   briefed, and expected motions challenging the

12   sufficiency and adequacy of the other complaint where

13   we're not even at issue yet, I'm not going to worry

14   about scheduling.  I leave that to you all.  Okay?

15              Anything further?

16              MR. GAIR:  Nothing here, Your Honor.

17              MR. INGBER:  Thank you.

18              (Which were all the proceedings had in

19              the above-entitled cause, April 08,

20              2008, at 10:00 a.m.)

21   I, JACKLEEN DE FINI, CSR, RPR, DO HEREBY CERTIFY

     THAT THE FOREGOING IS A TRUE AND ACCURATE

22   TRANSCRIPT OF PROCEEDINGS HAD IN THE ABOVE-

     ENTITLED CAUSE.

23

24

25

# EXHIBIT I

```
        0001
 1                  IN THE UNITED STATES BANKRUPTCY COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION
 3
 4
 5        Sentinel Management Group, Inc.,)  No. 07 B 14987
                                          )      07 A 00981
 6                                        )  Chicago, Illinois
                                          )   9:30 a.m.
 7                                        )  10:00 a.m.
                              Debtor.     )  June 5, 2008
 8
 9
10              TRANSCRIPT OF PROCEEDINGS BEFORE THE
                     HONORABLE JOHN H. SQUIRES
11
12
13        APPEARANCES:
14        Trustee:                 Mr. Frederick Grede;
15        For the Trustee:         Mr. Christopher Gair;
                                   Mr. Jeff Eberhard;
16
          For Bank of New York:    Mr. Sean Scott;
17
          For the Creditors
18        Committee:               Mr. Marc Fenton;
19        For the Bloom Parties:   Mr. Howard Adelman;
20        For Charles Mosley:      Mr. Derek Samz;
21        For the Eric Bloom
          Parties:                 Mr. Terence Campbell;
22
23        Court Reporter:          Amy Doolin, CSR, RPR
                                   U.S. Courthouse
24                                 219 South Dearborn
                                   Room 661
25                                 Chicago, IL  60604.
```

1               THE CLERK:  Taking up the court's 9:30

2   set matters.  Sentinel Management, et al., 08 A 127.

3               MR. GAIR:  Good morning, Your Honor.

4   Chris Gair and Jeff Eberhard on behalf of the

5   trustee.

6               MR. GREDE:  Frederick Grede, trustee

7   of Sentinel Management Group.

8               MR. FENTON:  Good morning, Judge

9   Squires.  Marc Fenton on behalf of the creditors

10  committee.

11              MR. SCOTT:  Good morning, Your Honor.

12  Sean Scott appearing on behalf of the Bank of New

13  York and the Bank of New York Mellon Group.

14              THE COURT:  Good morning.

15              Okay.  We've got first up the bank's

16  motion for stay pending -- on a pending motion to

17  dismiss, which I have had a chance to read and

18  review, and the recently filed response in opposition

19  thereto, which I had a chance to glance at that this

20  morning.  So I understand that.

21              Do you have any further statements,

22  gentlemen, especially you, Mr. Scott, from that which

23  you've already so eloquently stated in your papers?

24              MR. SCOTT:  Thank you, Your Honor.

25              I think we would just reiterate that

2

1    this is not a motion for a stay of the adversary

2    proceeding.  What we're asking for is a temporary

3    adjournment of the hearing in resolution of the

4    motion to dismiss until the district has an

5    opportunity to decide which court ultimately should

6    hear this adversary proceeding.

7                    We think the motion to dismiss raises

8    critical threshold issues.  There won't be any

9    prejudice to the estate.  We are presenting this

10   morning next on your call a motion for approval of a

11   stipulation under which discovery will proceed.  At

12   this point in time we are not seeking to hold up

13   anything in the adversary proceeding itself.  And

14   based on that, Your Honor, we think that the elements

15   for a temporary stay are met under the four factor

16   test that this court and others have used.

17                    THE COURT:  Okay.  Mr. Gair, anything

18   to add?

19                    MR. GAIR:  It's all in the papers,

20   Judge.

21                    THE COURT:  Okay.

22                    MR. FENTON:  Your Honor, the committee

23   didn't file anything, but we support the trustee's

24   position.  Contrary to the Bank of New York saying

25   that there is no prejudice to creditors, there won't

```
1    be any delay, we believe that there will be delay.

2    And we would ask the court to continue deliberation

3    on the motion to dismiss.

4                    As Your Honor is aware, on Tuesday we

5    are going to be before you for a hearing on the

6    disclosure statement.  We are certainly moving

7    forward with the plan and disclosure statement.  And

8    the litigation with the Bank of New York is critical

9    in terms of the potential outcome of this case.  And

10   we would just ask Your Honor to continue and not

11   impose a stay at this point.

12                   THE COURT:  Okay.  Anybody else have

13   anything to say?

14                   (No response.)

15                   MR. SCOTT:  All right.  Again, for the

16   record, before I forget, I want to compliment counsel

17   for doing a nice job on the papers, both sides.

18                   And I will look at the four factors

19   referenced and discussed in the papers.  The first of

20   which is whether the moving party, Mr. Scott's

21   client, is reasonably likely to be successful on the

22   underlying motion to withdraw the reference.  The

23   bottom line is I don't know.

24                   That's up to Judge Zagel.  What he may

25   view as important -- and I never try to second-guess
```

4

1    the district court on anything that the district

2    court may or may not do.  And to the extent he has

3    some discretion in his view, I am sure he will wisely

4    exercise it.  Okay?

5              The second factor is whether the

6    moving party, Mr. Scott's client, will suffer

7    irreparable harm if a stay is denied.  I don't think

8    I see any irreparable harm in denying a stay because

9    there is the pendency of the motion to withdraw the

10   reference.

11             And if that is successful, and Judge

12   Zagel is usually very prompt in his decisions, at

13   least in matters that I have been involved in, there

14   isn't going to be a particular delay in either court.

15   Okay?  So I don't accept, and reject, the argument

16   that the banks would suffer irreparable harm if I

17   stay on this motion the decision on the threshold

18   motion to dismiss that the banks have filed.

19             The third element, whether the other

20   party will be substantially harmed by the stay, there

21   might be some harm, not a lot, but, you know, time is

22   money.  And that's what this case has always been

23   about and always will be about.  It is trying to

24   divvy up the funds.

25             And the litigation that the trustee

1    has brought against Mr. Scott's client and I think

2    the auditors or accountants, or whoever it is in the

3    other adversary, are substantial elements of claims

4    that the estate is asserting against those entities

5    for very substantial claim damages to augment

6    whatever the trustee has been able to realize out of

7    whatever was left in the debtor's asset base at the

8    time of his appointment and subsequent thereto.

9                    And we've got a liquidating plan

10   that's been filed.  We've got a competing liquidating

11   plan that's been filed and disclosure statements we

12   are going to be fighting over.  And I don't know how

13   long that's going to take to resolve.  But the

14   expense of ongoing litigation is only going to be

15   exacerbated and increased, in my experience of 20

16   years of bankruptcy judging, by the pendency of the

17   matters.  And the longer it drags on, the more

18   expensive it becomes.  I think that's almost a

19   guaranteed truism.  So that's my view on the third

20   element.

21                   And on the fourth element, whether the

22   public interest will be served by granting the stay,

23   I don't think the public interest is really critical

24   or impacted here at all.  This is litigation between

25   the trustee on the one hand, and the banks on the

6

```
1    other.  They are essentially fighting over whether

2    the trustee's claims against the banks should produce

3    a substantial judgment of I think an addendum of like

4    $550 million.

5                Frankly, my view is consummate with

6    Rule 1001, the sooner we get these things resolved,

7    either trial or settlement, the better.  And the

8    public interest is served generally by speedier

9    rather than slower litigation.  And the pace of civil

10   litigation and its expense are slow enough and

11   expensive enough that we don't need to stay anything

12   unless there is a compelling reason to do so.

13                So, therefore, with all due respect to

14   Mr. Scott and his arguments, I am going to deny the

15   motion to stay.  Okay?  And it will all be mooted out

16   if Judge Zagel rises to the bait of your motion to

17   withdraw, which believe me, I take no offense at.  I

18   never have a problem with motions to withdraw the

19   reference because if the district court wants to

20   lighten my case load by one adversary, I'm always

21   happy about that.  Okay?

22                So that motion is denied.  And that

23   constitutes the court's findings and conclusions in

24   accordance with Bankruptcy Rule 7052.  And the

25   courtroom deputy will prepare a minute order denying
```

1    same.

2              Okay.   Next we've got a motion to

3    approve a stipulation regarding a document and

4    deposition depository and some other discovery

5    matters.

6              MR. GAIR:   Yes.   Basically what this

7    is, Judge, is we have created this database at some

8    expense to the estate.   And there's been a dispute

9    between the parties up to now about whether us simply

10   turning over the database to the Bank of New York

11   would be sufficient under the discovery rules.

12              After a lot of wrangling, we have come

13   up with a compromise, which is to create a mirror

14   image of that database for the Bank of New York so

15   that they can work on it without other parties seeing

16   their work product.   And the compromise is that the

17   estate has agreed to, subject to the court's

18   approval, pay about a hundred thousand dollars toward

19   the creation of that database, which we think is

20   probably about 40 percent of the cost.

21              It's a substantial amount of money.

22   But the reason the trustee has entered into this

23   stipulation is the risk that if we did not create

24   this database we would not get the benefit of the

25   Bank of New York's agreement that we don't have to

1    review the database for responsive documents.  We can

2    simply turn over this searchable database to them.

3              If the court were to insist on the

4    bank's motion, which I think would be forthcoming,

5    that the trustee were to -- would have to review for

6    responsiveness all these millions of documents in the

7    searchable database, it would cost the estate

8    millions of dollars.  And so we have come up with

9    what we think is a fair compromise, albeit not an

10   inexpensive one to the estate, and would, therefore,

11   ask the court to approve the stipulation and order.

12             THE COURT:  Okay.  Mr. Scott, anything

13   to add?

14             MR. SCOTT:  No.  That's a fair

15   characterization.

16             THE COURT:  Mr. Fenton.

17             MR. FENTON:  Your Honor, we're in

18   support of the stipulation.  Again, we believe in the

19   long-run it serves to the benefit of the estate and

20   saves the estate money.

21             THE COURT:  Right.  So this is

22   basically just the electronic version of saying,

23   okay, instead of turning over all of these physical

24   documents in the file drawers that we used to have to

25   suffer through with a warehouse filled with stuff,

```
1     it's all electronic and you're just going to give

2     them a duplicative copy of what you've already

3     assembled, rather than spend the time of going

4     through it to respond to their requests, or in the

5     old hard-copy version, turning hoards of associates

6     loose to sift through this stuff at great expense and

7     time, to produce responsive portions that may be

8     relevant to the pertinent discovery request; is that

9     a fair summary of what --

10              MR. GAIR:  You got it, Judge.

11              THE COURT:  Okay.  The motion is

12    granted.  Stipulation approved.

13              MR. GAIR:  Thank you, Your Honor.

14              THE COURT:  Okay.  Anything else I can

15    do for you all today?

16              MR. ADELMAN:  Do you want to take up

17    the other Sentinel matter, Your Honor?  Howard

18    Adelman on behalf of the Philip Bloom parties, which

19    is going to be put over until Monday because we have

20    a settlement hearing set for Monday.

21              MR. GAIR:  I'm not sure if it's going

22    to be put -- just going to be put over until Monday,

23    but it is up to the court if you want to hear the

24    settlement status issue -- or the Sentinel status

25    issue at this time.
```

```
1                  THE COURT:  Is anybody else expected

2     on the 10:00 o'clock set call on that?  Do we have

3     counsel for Mosley here?

4                  MR. ADELMAN:  I think the gentleman

5     who is walking up to the lectern.

6                  MR. GAIR:  It looks like the only

7     lawyer we don't have is counsel for Eric Bloom.

8                  THE COURT:  Okay.

9                  MR. ADELMAN:  And I'm not sure he is

10    coming, unless you talked to him.

11                 MR. GAIR:  He knows that there is a

12    hearing today.  I would suggest we wait until 10:00.

13                 THE COURT:  All right.  Then as a

14    courtesy to him we will pass it.  And if he arrives

15    earlier or you hear that he is definitely not coming,

16    some of my other stuff may take a while.  Tell the

17    courtroom deputy.

18                     (Whereupon other matters were heard

19                     By the court.)

20                 THE CLERK:  The court's 10:00 o'clock

21    set matter, Frederick Grede, trustee, v. Phillip

22    Bloom, et al., 07 A 981.

23                 MR. GAIR:  Your Honor, Chris Gair and

24    Jeff Eberhard for the trustee.

25                 THE COURT:  Gentlemen.
```

11

1              MR. GREDE:  Fred Grede, trustee.

2              THE COURT:  Mr. Grede.

3              Mr. Fenton, you're here for the

4        committee.

5              MR. FENTON:  That's correct, Your

6        Honor.

7              MR. SCOTT:  Mr. Adelman --

8              MR. ADELMAN:  Your Honor, Howard

9        Adelman for the Bloom parties, along with Mark

10       Roeder.

11             MR. SAMZ:  Derek Samz on behalf of

12       Charles Mosley, Your Honor.

13             MR. CAMPBELL:  Terry Campbell on

14       behalf of the Eric Bloom parties.

15             THE COURT:  Okay.

16             MR. GAIR:  Judge, here's the status of

17       the case.

18             With respect to Phil and Eric Bloom,

19       we have an executed settlement agreement.  Notice

20       went out and the 9019 hearing is set for next Monday

21       morning.

22             THE COURT:  Right.

23             MR. GAIR:  So far we have not received

24       any objections, but it's certainly possible that

25       there will be some.

12

1                    There is a small glitch, and I want to

2     just put the court on notice of it, but I'm not

3     asking you to do anything about it today.

4                    As you may remember, there is this

5     class action, Shatkin versus the Blooms, in which you

6     heard evidence last week in support of a preliminary

7     injunction.  The trustee asked for a preliminary

8     injunction of that class action under Section 105.

9                    After the hearing, we entered into the

10    consent-agreed injunction, which you subsequently

11    signed.  I believe it was the day before yesterday.

12    There is some question as to -- in the mind,

13    apparently, of one or more of the Blooms as to

14    whether this injunction complies with our promises in

15    the settlement agreement.

16                    We promise to get -- to preliminarily

17    enjoin the Shatkin action as a condition precedent to

18    the settlement.  We think we've done that with this

19    consent order and injunction.  There's some question

20    in the mind of the Blooms as to whether or not that's

21    really true because the injunction says that it is --

22    it's entered but provides for what happens if a plan

23    is not confirmed.

24                    As you may remember, counsel for

25    Shatkin last week told Your Honor that he didn't

1    think that you had the power to enter an injunction

2    that was basically a permanent injunction, which this

3    temporary injunction could become in the event that

4    there was never a plan confirmed, because it's plan

5    confirmation that terminates the injunction.

6              And so we have been talking back and

7    forth between myself and Mr. Adelman and Mr. Roeder

8    to try and give them some comfort that this is the

9    only injunction that the court can in fact enter.

10             And, again, we are not asking you to

11   decide this today.  We just want to bring to your

12   attention that there's this glitch and we hope to

13   resolve it on Monday.

14             THE COURT:  Okay.

15             MR. ADELMAN:  See you on Monday, Your

16   Honor.

17             THE COURT:  Right.

18             MR. ADELMAN:  That's all we have to

19   do.

20             THE COURT:  It sounds to me,

21   gentlemen, like with all the high powered legal

22   talent assembled before me you ought to be able to

23   draft around this problem.  You know, what I did I

24   did.  It was only a preliminary injunction that was

25   sought to begin with.  But if you're all going to

1    try and get this thing resolved, as I think you are,

2    I think you're headed down the right track, and it's

3    something that ought to be able to be worked around.

4                    Okay?  So you're not going to find any

5    problems with me in that regard.

6                    MR. ADELMAN:  Thank you, Your Honor.

7                    MR. GAIR:  Unfortunately, if we try

8    and draft around it, then we're going to run into

9    problems with client who we agreed to the injunction

10   with, so we --

11                   THE COURT:  Right.

12                   MR. GAIR:  -- hope that we're going --

13   we hope that we're going to be able to convince

14   rather than neglect -- compromise, but we will see

15   you on Monday, Judge.

16                   THE COURT:  Okay.  Well, hopefully it

17   will get resolved over the weekend.

18                   MR. GAIR:  And with respect to

19   Mr. Mosley's -- the third defendant, Mr. Mosley, I

20   think that the time for him to answer has come and

21   gone, and he has not filed an answer and not asked

22   for a further extension.

23                   THE COURT:  Well, there's a provision

24   in the order entered in this adversary on May 8th.

25   The last sentence on the first page in part says that

1    in the event a motion is filed by the trustee to

2    approve a settlement between the trustee and Mosley,

3    then the time within which Mosley may answer the

4    complaint is extended indefinitely pending a ruling

5    on the settlement motion.  The settlement motion is

6    only with regard to the Bloom defendants.

7              MR. GAIR:  Yes.  We don't have a deal

8    with Mr. Mosley.

9              THE COURT:  All right.  Does counsel

10   for Mr. Mosley want some extension?

11             MR. SAMZ:  We do, Your Honor.  We just

12   ask for ten days.

13             THE COURT:  Is that a problem?

14             MR. GAIR:  For ten days, it's okay,

15   Judge.  We need to get this moving.

16             THE COURT:  Okay.  Then why don't you

17   give me a supplemental stipulation and order to

18   protect the record for both sides and sign off on it

19   as soon as you can prepare it on a minute order.  And

20   then we have got that covered while you on-go with

21   your negotiations.

22             MR. GAIR:  Very well, Your Honor.

23   Thank you.

24             THE COURT:  You're welcome.

25             All right.  That completes the court's

1    call for this morning.  Court's in recess.

2                        (Which were all the proceedings had in

3                         the above-entitled cause, June 5,

4                         2008, 9:30 a.m.)

5    I, AMY B. DOOLIN, CSR, RPR, DO HEREBY CERTIFY

     THAT THE FOREGOING IS A TRUE AND ACCURATE

6    TRANSCRIPT OF PROCEEDINGS HAD IN THE ABOVE-

     ENTITLED CAUSE.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25