IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| FREDERICK J. GREDE, as Chapter 11 Trustee for Sentinel Management Group, Inc., | : : : : | Case No. 08 C 2582 |
| Plaintiff, | : : | Honorable James B. Zagel |
| v. | : : |  |
| THE BANK OF NEW YORK and THE BANK OF NEW YORK MELLON CORP., | : : : |  |
| Defendants. | : : |  |

**MOTION OF COMMODITY FUTURES TRADING COMMISSION FOR LEAVE TO FILE *AMICUS CURIAE* MEMORANDUM ON HANDLING OF SENTINAL ACCOUNTS BY BONY**

The Commodity Futures Trading Commission ("CFTC") respectfully moves for leave to file an *amicus curiae* memorandum on certain legal issues concerning the proper interpretation and application of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.*, that have been raised by the parties to this adversary proceeding in connection with defendant Bank of New York's ("BONY's") motion to dismiss the complaint filed by the bankruptcy trustee for Sentinel Management Group, Inc. ("Sentinel"). The *amicus* memorandum is attached. The memorandum addresses the issues of (1) whether BONY's handling of so-called "Seg 1" accounts opened by Sentinel was subject to the requirements of Section 4d of the Commodity Exchange Act ("CEA"), codified as 7 U.S.C. § 6d, and (2) whether BONY should be estopped from asserting otherwise based on representations made in a letter required by CFTC regulations.

The CFTC is the federal agency responsible for enforcing the CEA, including Section 4d, 7 U.S.C. § 6d, which governs the handling of customer funds by futures commissions merchants and their depositories. The CFTC also has promulgated regulations interpreting and implementing 7 U.S.C. § 6d. *See* 17 C.F.R. §§ 1.20 *et seq.* As a result, the CFTC has a strong interest in ensuring the proper application of the CEA and CFTC regulations in this proceeding. Further, as the agency responsible for enforcing the CEA, the CFTC has "a unique perspective" that is likely to be helpful to the Court. *See Voices for Choices v. Illinois Bell Telephone Co.*, 339 F.3d 542, 545 (7th Cir. 2003) (discussing justifications for *amicus* filings).

The CFTC therefore requests leave to file the attached *amicus curiae* memorandum.

    Respectfully submitted,

    Terry S. Arbit
      General Counsel
    Bradford M. Berry
      Deputy General Counsel

    <u>s/Martin B. White</u>
    Martin B. White
      Counsel

    Commodity Futures Trading Commission
    Three Lafayette Centre
    1155 21st Street, N.W.
    Washington, D.C. 20581
    (202) 418-5129 (phone)

Dated: August 1, 2008    (202) 418-5124 (fax)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| FREDERICK J. GREDE, as Chapter 11 Trustee for Sentinel Management Group, Inc., | : : : : | Case No. 08 C 2582 |
| Plaintiff, | : : | Honorable James B. Zagel |
| v. | : : |  |
| THE BANK OF NEW YORK and THE BANK OF NEW YORK MELLON CORP., | : : : |  |
| Defendants. | : : |  |

### *AMICUS CURIAE* MEMORANDUM OF COMMODITY FUTURES TRADING COMMISSION ON HANDLING OF SENTINAL ACCOUNTS BY BONY

The Commodity Futures Trading Commission ("CFTC") respectfully submits this *amicus curiae* memorandum on the issues of (1) whether, on the facts alleged in the Trustee's complaint, defendant Bank of New York's ("BONY's") handling of debtor Sentinel Management Group, Inc.'s ("Sentinel's") so-called "Seg 1" accounts was subject to the segregation requirements of Section 4d of the Commodity Exchange Act ("CEA"), codified as 7 U.S.C. § 6d, and (2) whether BONY should be estopped from asserting otherwise. The CFTC is the federal agency responsible for administering and enforcing the CEA. For the reasons stated herein, BONY's handling of Sentinel's Seg 1 accounts was subject to the requirements of 7 U.S.C. § 6d. Further, the representations made by BONY to obtain Sentinel's business create a regulatory estoppel that bars BONY from denying Sentinel's status as a futures commission merchant ("FCM") for

purposes of applying 7 U.S.C. § 6d or otherwise denying that the Seg 1 accounts are subject to the CEA.[1]

Section 4d of the CEA, 7 U.S.C. § 6d (hereinafter "Section § 6d"), is intended to ensure the integrity of customer assets given to FCMs to serve as margin for the customers' futures trades.[2] As explained in detail below, the allegations in the Trustee's complaint, if proven true, would make BONY's handling of Sentinel's Seg 1 accounts subject to the requirements of 7 U.S.C. § 6d(b). This subsection makes it unlawful for any person that has received funds for deposit in a customer funds account segregated as provided in §6d(a)(2) to "hold, dispose of, or use such funds as belonging to the depositing futures commission merchant or any person other than the customers of such futures commission merchant."

The Trustee's complaint against BONY alleges that BONY held funds that Sentinel had received for deposit in segregated customer funds accounts. Complaint at ¶¶ 25, 54, 62. The complaint further alleges that Sentinel subjected itself to the regulatory requirements for FCMs in order to conduct its business, and that it deposited its Seg 1 funds with BONY based on BONY's express written understanding—required by law—that Sentinel was depositing segregated customer funds subject to the CEA and was doing so in the capacity of an FCM. Complaint at ¶¶ 29, 54, Ex. A, C. The CFTC believes that these allegations, if proven true, would make BONY's handling of Sentinel's Seg 1 accounts subject to 7 U.S.C. § 6d(b).

---

[1] In filing this *amicus* memorandum, the CFTC takes no position on any issue or legal theory other than those addressed herein.

[2] "Futures commission merchant," generally speaking, is the statutory term for a commodity broker with whom a customer can maintain a margin account. 7 U.S.C. § 1a(20).

**I.     The customer property that Sentinel deposited with BONY is protected under Section 4d(b) of the CEA, 7 U.S.C. § 6d(b).**

Section 6d(b) requires any person that has "received" assets "for deposit in a separate account as provided in paragraph [(a)(2)] of this section" to treat the account as the property of the FCM's customers and not the property of the depositing FCM or any other person.[3] The facts alleged by the Trustee show that BONY received assets from Sentinel for deposit in Seg 1 accounts on the explicit written understanding that Sentinel was depositing the assets as an FCM, that the assets were the property of Sentinel's customers, and that the assets were for deposit in a segregated account as provided in paragraph (a)(2) of 7 U.S.C. § 6d. Because BONY received assets for deposit in the Seg 1 accounts on this basis, BONY's handling of these accounts is governed by the requirements of Section 6d(b).

Section 6d regulates the holding and use of funds entrusted by customers to FCMs for the purpose of margining trades. It requires that such customer funds be treated as the property of the customer and be maintained in accounts strictly segregated from the FCM's own funds. 7 U.S.C. § 6d(a)(2). Such segregated accounts may be held by only a limited class of depositories: banks, trust companies, exchange clearing houses, and persons registered as FCMs. *See* 17 C.F.R. §§ 1.20(a) (referring to deposit of segregated FCM customer funds with a "bank, trust company, clearing organization or another futures commission merchant"); 1.20(c) (FCM can deposit customer funds with a bank, trust company, clearing organization, or "another person registered as a futures commission merchant").

---

[3] The text of Section 6d(b) refers to "paragraph (2) of this section." Subsequent to the original enactment of 7 U.S.C. § 6d(b), paragraph (2) of Section 6d was renumbered as paragraph (a)(2) so the reference to "paragraph (2) of this section" in Section 6d(b) now refers to subsection 6d(a)(2).

3

The purpose of 7 U.S.C. § 6d is to ensure that FCMs and other custodians of customer funds do not place such funds at risk by using them for their own purposes. In particular, the provision is intended to protect customer funds from claims by creditors of FCMs. *See*, *e.g.*, *Craig v. Refco*, 624 F. Supp. 944, 946 (N.D.Ill. 1985), *aff'd* 816 F.2d 347 (7th Cir. 1987) ("Congress was concerned with FCMs' practice of using customer margin funds to satisfy their own debts…."). This is true specifically of subsection 6d(b). H.R. Rep. No. 743, Amendment of Commodity Exchange Act at 5, 90th Cong., 1st Sess. (October 6, 1967) (purpose of language later codified as 7 U.S.C. § 6d(b) is to prevent customer funds from "being used to offset liabilities of the commission merchant"); Senate Rep. No. 947, Amendment of Commodity Exchange Act at 7, 90th Cong., 2d Sess. (January 18, 1968) (purpose of language later codified as 7 U.S.C. § 6d(b) is to prevent customer funds from "being used to offset liabilities of the commission merchant or otherwise being misappropriated").

According to the Trustee's complaint, Sentinel has been continuously registered as an FCM and has subjected itself to the regulatory requirements applicable to FCMs since at least 1981. Complaint at ¶ 29 and Ex. A. Sentinel registered as an FCM as a legally necessary prerequisite to conducting its business as a manager of other FCMs' customer assets. *Id*. Otherwise, the FCMs who were Sentinel's customers could not lawfully have turned their own customers' funds over to Sentinel. *See* 17 C.F.R. § 1.20(c). As BONY was aware, both the CFTC and the originating FCMs that deposited customer funds with Sentinel relied on the fact that Sentinel was registered as an FCM and was handling assets in this regulated capacity. *See* Complaint at ¶¶ 114 (BONY knew Sentinel deposited customer securities that were supposed to be segregated), 118 (BONY received copies of CFTC-required financial reporting forms from

4

Sentinel), 122 (BONY knew Sentinel was telling its customers that assets were held in segregated accounts).

Before depositing customer assets with BONY, Sentinel procured the signatures of BONY representatives on a letter setting forth the terms on which Sentinel was depositing those customer funds and securities. Sentinel procured those signatures pursuant to CFTC Rules 1.20(a) and 1.26(a), 17 C.F.R. §§1.20(a) and 1.26(a). Rule 1.20(a) requires that, when depositing FCM customer funds, "[e]ach registrant shall obtain and retain in its files … a written acknowledgement from such [depository] bank … that it was informed that the customer funds deposited therein are those of commodity or option customers and are being held in accordance with the provisions of the [Commodity Exchange] Act and [the CFTC's regulations thereunder.]" Rule 1.26(a) imposes the same requirement for deposits of customer securities. As a condition of BONY obtaining the business opportunity of acting as a depository for Sentinel, Sentinel presented, and BONY countersigned, the acknowledgement required by these regulations. Complaint at Ex. C.

The acknowledgement letter that was countersigned by BONY stated that Sentinel proposed to open, among other accounts, an account to be designated as "Sentinel Management Group, Inc. Customer Segregated Funds Account I (§ 4.d-2)," thus explicitly referring to the segregation requirement of CEA Section 4d(a)(2), 7 U.S.C. § 6d(a)(2).[4] Complaint at Ex. C. The letter further stated that Sentinel was depositing assets "as [a] futures commission [merchant], under the Commodity Exchange Act" and that the assets in question "are money and securities deposited by or accruing to our customers which are commodity customers." *Id*. The letter stated that the accounts in question were being opened to meet the requirements of the

---

[4] As noted earlier, the current CEA Section 4d(a)(2), 7 U.S.C. § 6d(a)(2), was previously codified as Section 4d(2).

CEA and that "this statute provides that such money [be] segregated and treated as belonging to our customers rather than as belonging to ourselves," thus referencing the requirements of 7 U.S.C. § 6d(c). *Id*. Consistent with this provision, the letter required BONY to "agree that the funds in said accounts will not be subject to your [*i.e.* BONY's] lien or offset for, and on account of, any indebtedness now or hereafter owing us to you…." *Id*.

Thus, BONY acknowledged that it would receive money and securities from Sentinel in its capacity as an FCM, that the money and securities belonged to commodity customers, and that the money and securities were for deposit in accounts that were to be segregated for the benefit of commodity customers. Complaint at ¶¶ 53-56, Ex. C. This was done with explicit reference to Sections 4d(a)(2) and 4d(b) of the CEA, 7 U.S.C. §§ 6d(a)(2), 6d(b). BONY thereby acknowledged that it would receive assets for deposit in a separate account as provided in Section 4d(a)(2) of the CEA, 7 U.S.C. § 6d(a)(2), which brings the relevant accounts within the scope of 7 U.S.C. § 6d(b). BONY's acknowledgement that it was receiving deposits on terms falling within the scope of 7 U.S.C. § 6d(b) is particularly telling in light of the purpose of Section 6d(b), which is precisely to protect customer assets from persons in the position of BONY.[5]

Since BONY explicitly acknowledged that it would receive deposits subject to 7 U.S.C. § 6d(b), BONY's handling of the Seg 1 accounts in this case is governed by that provision. The

---

[5] BONY suggests that the original acknowledgment letter it countersigned did not apply to later Sentinel accounts. Reply at 9 n. 13. However, the complaint does not allege that BONY ever repudiated the characterization of Sentinel's Seg 1 deposits in the letter or advised regulators that the letter was no longer operative. Moreover, the complaint alleges that BONY executed additional "segregation letters" at later points in time. Complaint at ¶ 90. ("Segregation letter" is the conventional term for the written acknowledgments required by 17 C.F.R. §§ 1.20(a) and 1.26(a).) The complaint also alleges that BONY made other representations consistent with the original acknowledgement letter. *E.g.*, Complaint at ¶ 77 (BONY written commitment regarding securities in "Segregated Account" in 2003).

manner in which Sentinel did business, moreover, is consistent with the terms of the acknowledgment letter and reinforces the conclusion that the accounts in this case were governed by Section 6d(b). Sentinel registered as an FCM, and, in the capacity of an FCM and subject to the applicable regulations, held assets received from its FCM customers.[6] Had Sentinel not registered and agreed to subject itself to regulation, it could not lawfully have accepted deposits of other FCMs' customer funds under 17 C.F.R. § 1.20. The essence of Sentinel's business model was that it would provide money management and investment services for other FCMs' customer funds while preserving segregation of accounts to protect the underlying customers' assets and ensure compliance with statutory and regulatory requirements, especially Section 6d.[7]

In short, BONY agreed to do business with Sentinel on terms that squarely fall within the language of 7 U.S.C. § 6d(b). The resulting accounts are therefore subject to the requirements of that provision.

## II.   BONY is estopped from denying that Sentinel deposited customer funds with BONY in the capacity of an FCM or that the resulting accounts were subject to 7 U.S.C. § 6(b).

The representations made by BONY in order to obtain Sentinel's business create a regulatory estoppel that bars BONY from denying Sentinel's status as an FCM or otherwise denying that the Sentinel Seg 1 accounts are subject to the requirements of Section 6d(b).

---

[6] Sentinel obtained a "no-action letter" from CFTC staff modifying the normal capital requirements for FCMs, but the letter did not free Sentinel from other regulatory obligations of registered FCMs. Complaint at Ex. A.

[7] In its motion to dismiss, BONY makes much of the fact that Sentinel might not have met the statutory definition of an FCM under 7 U.S.C. § 1a(20). In light of Sentinel's conduct of a business that required it to register as an FCM and BONY's written acknowledgment that it was receiving deposits of customer funds within the meaning of the CEA from Sentinel acting in the capacity of an FCM, we respectfully submit that whether Sentinel performed all of the functions of a conventional FCM should not be determinative of BONY's statutory obligations in this case.

As noted above, 17 C.F.R. §§1.20(a) and 1.26(a) require a depository of commodity customer funds to explicitly acknowledge the status of the deposits as customer funds, and also to explicitly acknowledge the depository's statutory obligations in connection with such deposits. These obligations include, most importantly, the prohibition on depositories treating the resulting accounts as belonging to anyone other than commodity customers. 7 U.S.C. § 6d(b). The CFTC requires written acknowledgments by depositories in order to ensure the prompt availability of customer funds, and to avoid entangling such funds in litigation such as the present case. The regulations require an FCM to retain the acknowledgments in its records, and the CFTC and self-regulatory organizations routinely review these acknowledgements in their audits of FCMs. *See* 17 C.F.R. §§ 1.20(a), 1.26(a). The ability of the CFTC and futures self-regulatory organizations to rely on these acknowledgements is extremely important to their ability to regulate commodity intermediaries and to protect customers.

As discussed above, Sentinel, before depositing funds with BONY, procured the signatures of BONY representatives on a letter acknowledging (1) that BONY would receive money and securities from Sentinel as an FCM, (2) that the money and securities belonged to commodity customers, and (3) that the money and securities were for deposit in accounts to be segregated for the benefit of commodity customers. Complaint at ¶¶ 53-56, Ex. C. This letter further made clear that the deposits were to be made as provided by 7 U.S.C. § 6d(a)(2) and that the resulting accounts were subject to the requirements of 7 U.S.C. § 6d(b).

Under 17 CFR §§ 1.20(a) and 1.26(a), BONY's written acknowledgement of the terms set forth in the Sentinel letter was a legally necessary precondition for Sentinel to do business with BONY. As such, BONY's sign-off on the representations in the letter created a regulatory estoppel that bars BONY from denying these representations in the present proceeding.

8

Regulatory estoppel is a variant of the well established legal principle of judicial estoppel. *Chaveriat* v. *Williams Pipe Line Co.* 11 F.3d 1420, 1427 (7th Cir. 1993). As explained by the 7th Circuit Court of Appeals,

> "A litigant is forbidden to obtain a victory on one ground and then repudiate that ground in a different case in order to win a second victory. Though called *judicial* estoppel, the doctrine has been applied, rightly in our view, to proceedings in which a party to an administrative proceeding obtains a favorable order that he seeks to repudiate in a subsequent judicial proceeding." (citations omitted)

*Id.* The relevant administrative proceeding need not involve a formal hearing. For example, in *Chaveriat*, the Court of Appeals indicated that an estoppel potentially could apply to representations made to the Illinois Environmental Protection Agency by a landowner seeking approval of an environmental cleanup plan, although an estoppel was not justified on the particular facts in that case. *Id.* at 1423, 1428; *see*, *e.g.*, *Zapata Gulf Marine Corp. v. Puerto Rico Maritime Shipping Authority*, 731 F. Supp. 747, 749 (E.D.La. 1990) (estoppel based on representations that persuaded agency to discontinue investigation without reaching the merits). Similarly, in *Simon Wrecking Co.* v. *AIU Ins. Co.*, 541 F.Supp.2d. 714, 717 (E.D. Pa. 2008) (applying Pennsylvania law), the court held that regulatory estoppel requires proof of "two elements …: (1) A party made a statement to a regulatory agency; and (2) Afterward, the party took a position opposite to the one presented to the regulatory agency. Additionally, at trial, [there may need to be a showing] that the party taking an opposite position possessed some requisite level of culpability."

In this case, BONY was seeking a particular regulatory result—to lawfully receive customer funds deposited by Sentinel with BONY to their mutual profit. To achieve this result, BONY made representations in the form of its sign-off on Sentinel's letter setting forth the terms on which Sentinel was doing business (including Sentinel's status as an FCM), the fact that the

9

funds and securities deposited with BONY belonged to customers, and the prohibitions applicable to those funds and securities. If BONY had not signed off on the letter, or had represented that it disagreed with Sentinel's assertion that the funds in question were customer funds protected by the CEA, Sentinel could not have lawfully deposited customer funds with BONY. 17 C.F.R. §§ 1.20 and 1.26. The acknowledgement letter was prepared pursuant to CFTC rules and was required to be maintained in Sentinel's records where it could be reviewed in the regulatory audits to which FCMs are subject.

The representations in BONY's letter provided the grounds for enabling BONY to do business with Sentinel. Having obtained a favorable administrative result based on these representations, BONY is estopped from repudiating them in this proceeding. *See Chaveriat,* 11 F.3d at 1427.

### III. Conclusion

BONY's handling of Sentinel's Seg 1 accounts was subject to the requirements of 7 U.S.C. § 6d. Moreover, the representations made by BONY, which were required by regulation in order for BONY to obtain Sentinel's business, create a regulatory estoppel that bars BONY from denying Sentinel's status as an FCM or otherwise denying that 7 U.S.C. § 6d governs the Seg 1 accounts in this case.

    Respectfully submitted,

    Terry S. Arbit
     General Counsel
    Bradford M. Berry
     Deputy General Counsel

    /sMartin B. White
    Martin B. White
     Counsel

                                              Commodity Futures Trading Commission  
                                              Three Lafayette Centre  
                                              1155 21st Street, N.W.  
                                              Washington, D.C.  20581  
                                              (202) 418-5129 (phone)  
                                              (202) 418-5124 (fax)

Dated:   August 1, 2008