**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS FROM THE TRUSTEE**

# Exhibit D

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FREDERICK J. GREDE, as Chapter 11 Trustee for Sentinel Management Group, Inc., <br><br> Plaintiff, <br><br> v. <br><br> THE BANK OF NEW YORK and THE BANK OF NEW YORK MELLON CORP., <br><br> Defendants. | No. 08 C 2582 <br> Judge James B. Zagel |

**MEMORANDUM OPINION AND ORDER**

**I. BACKGROUND**

Sentinel Management Group, Inc. was a registered futures commission merchant ("FCM") with the Commodities Future Trading Commission ("CFTC") and a registered investment advisor with the Securities and Exchange Commission ("SEC"). Sentinel did nothing other than manage investments. Its income was derived from its management fees based on the assets it held under management. It marketed itself with an attractive and very commonplace objective: "to achieve the highest yield consistent with the preservation of principal and daily liquidity." Its clients were supposed to be sophisticated investors and included hedge funds, futures commission merchants, financial institutions, pension plans and so forth. Sentinel had customer funds and a house account for its own securities and the benefit of insider investors. It was a privately held corporation, thinly capitalized, owned and operated by its founder, Philip Bloom, and his son, Eric Bloom, both of whom owned a significant percentage of its stock. Its chief trader, Charles Mosley, along with the Blooms, controlled Sentinel's day-to-day operations,

including its website, accounting systems, investments, dealings with Bank of New York ("BNY" or "the Bank"), customer statements and various financial arrangements.

BNY extended a line of credit to provide liquidity, facilitate redemptions, and purchase securities. Sentinel dealt with BNY for many years. It began its relationship as a client of BNY's custodial services division and, some months later, began to use BNY's client services division, which offered same-day settlements and credit arrangements. When Sentinel began to use these services, its custodial accounts were closed and new accounts were opened under a new set of contracts (the "1997 Agreements"). These accounts were in place for a decade and included accounts in which Sentinel client assets were segregated and accounts in which non-segregated assets were held.

BNY was Sentinel's clearing bank and its secured lender during that time. BNY provided daily loans and credit, and Sentinel pledged collateral to secure the debt. To pledge collateral, Sentinel had to transfer securities to Sentinel's non-segregated accounts—its street or clearing accounts. To transfer, Sentinel had to issue a desegregation instruction to the Bank. Only Sentinel had the power to issue the instruction and, as is common, had to make warranties to BNY each time it did so.

Sentinel warranted that (a) it was authorized to issue the instruction and any claims to the securities transferred by customers or counterparties were extinguished; (b) it owned all the transferred securities free and clear; (c) if any securities were beneficially owned by others, Sentinel had the right to pledge them free of any claim by those owners; (d) BNY's interest in the pledged assets was superior in all respects to all other claims on them by any other party; and (e)

it agreed to take all steps that BNY requires to assure itself of its priority rights including notifying or obtaining consent of any owner of the assets.

In January 2003, Sentinel made further agreements in order to take its money management business into global markets. These agreements for clearing services were, for all practical purposes, no different than the 1997 Agreements and, as before, BNY's clearing service division executed Sentinel's instructions concerning receipt, delivery and transfer of cash and securities. The Bank recorded these debits and credits in accounts and made loans to Sentinel after collateral was pledged.

In mid-2007, Sentinel went over the cliff. On August 13, it announced a halt of redemption of customer assets; four days later it filed here for Bankruptcy protection. The Bank filed a proof of claim for $312,247,000.

Less than two months after Sentinel filed for protection, Sentinel's trustee sued the principals of Sentinel. The trustee alleged, in an adversary action, that these individuals had perpetrated a fraud against Sentinel and its customers. Generally speaking, the alleged means of the fraud were diverting customer income and trading gains, and leveraging through bank loans; all of which was concealed and misrepresented. The trustee also alleges repeated and significant violation of clear custodial and segregation requirements with respect to customer accounts.

About five months after that complaint, Sentinel's trustee filed an adversary action against BNY claiming damages of over $550 million because the Bank "established a fundamentally flawed account structure for Sentinel's accounts in violation of its obligations under federal law and its duties to Sentinel." The trustee alleges that the Bank thereby enabled

3

Sentinel's misuse of customer funds by allowing Sentinel to pledge customer assets to secure loans to Sentinel and to commingle customer assets with Sentinel assets.

The Bank moves for dismissal.

## II. STANDARD OF REVIEW

A Rule 12(b)(6) motion tests the sufficiency of a complaint, not the merits of a case. *Autry v. Northwest Premium Servs., Inc.*, 144 F.3d 1037, 1039 (7th Cir. 1998). Defendants' motion to dismiss should be granted only if Plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). Furthermore, I must accept all well-pleaded factual allegations in the complaint as true, drawing all reasonable inferences from those facts in Plaintiff's favor. *Cleveland v. Rotman*, 297 F.3d 569, 571 (7th Cir. 2002). Stated another way, I should not grant Defendants' motion "unless no relief could be granted 'under any set of facts that could be proved consistent with the allegations.'" *Nance v. Vieregge*, 147 F.3d 589, 590 (7th Cir. 1998) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)). That said, Plaintiff's "obligation to provide the grounds of his entitlement for relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1964-65, 167 L.Ed.2d 929 (2007).

## III. DISCUSSION

### A. The Federal Laws and Regulations

The Bank argues that the claim that federal law was violated is impermissible.

The federal laws cited are sections of the Commodity Exchange Act ("CEA") and its cognate rules and regulations adopted by the CFTC, along with the Investment Advisors Act of 1940 ("IAA") and its cognate, Rule 206(4)-2 of the Securities Exchange Commission.

The Bank argues that the claims cannot be brought because there is no private right of action. *See Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11 (1979) (holding that, under the IAA, there exists only a limited private right of action to void an investment advisers contract and no other private causes of action).

The CEA does provide for a private cause of action when the violation charged arises from acts done in future markets, a regulated option or leverage contract, or participation in a commodity pool. *See* H.R. Rep. No. 565, Pt. I, 97th Cong., 2d Sess. 57 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3871, 3905-06. Moreover, disregarding segregation requirements is a very serious violation when committed on the scale alleged here.

But the Bank argues that the CEA claim is not, and cannot be, properly pled. This is because there is a difference between how the Bank—as opposed to Sentinel—is alleged to have acted. If the Bank is liable it must be because it, in the eyes of the law, aided and abetted *Sentinel's* violation of the statute.

The complaint alleges that Sentinel came under the law since it was registered with the CFTC as a futures commission merchant ("FCM") and managed funds required to be segregated for the benefit of its customers.[1] The fact that Sentinel was registered as an FCM does not necessarily mean that it was an FCM. Having the proper registration is not the same thing as

---

[1] The Bank notes that neither the CFTC nor any private party has brought an action of the sort alleged here against a depository like the Bank.

practicing the art. Even a crooked used car salesperson cannot be sued under state realty brokerage regulations simply because he is a registered real estate broker. The statute supports the view that an FCM is one who *acts* as an FCM.

An FCM is defined as:

> an individual, association, partnership, corporation, or trust that . . . (A) is engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any contract market or derivatives transaction execution facility; and (B) in or in connection with such solicitation or acceptance of orders, accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom.

7 U.S.C. § 1a(20).

There is no allegation that Sentinel ever did any of these things. The complaint says that "Sentinel did not engage in any commodities trading for its customers, but instead only invested funds deposited by other FCMs and Sentinel's other customers." If Sentinel is not an FCM, then its violation of segregation rules is not a basis for suit under the CEA. Absent violation of the Acts of Congress, there is no violation of the rules and regulations. *See Alexander v. Sandoval*, 532 U.S. 275, 291 (2001) ("Agencies may play the sorcerer's apprentice but not the sorcerer himself."). It should be noted, though, that this is not to say that doing what Sentinel is alleged to have done with customer accounts is lawful under other applicable civil and criminal statutes.[2]

Nor is it proper, the Bank argues, to use alleged violations of those statutes as the basis for relief under separate provisions of the Bankruptcy Code. The Bankruptcy Code provides its own set of remedies. The analogy drawn by the Bank is to the Supreme Court's clear rejection of

---

[2] There is no allegation that Sentinel received money "to margin, guarantee or secure the trades or contracts" of its customers. When it received funds from others, it acted as a custodian or depository, not as an FCM.

attempts to use violations of one comprehensive federal statute to provide the legal basis for a claim under a more general federal statute. *See City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113 (2005) (holding that one may not use violations of the Communications Act of 1934 to provide substance of a § 1983 claim). Both Acts of Congress here provide comprehensive enforcement schemes. *See American Agricultural Movement, Inc. v. Board of Trade*, 977 F.2d 1147, 1155 (7th Cir. 1992) (relying on unambiguous legislative history showing that the CEA was "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex.").

The Bank finally urges that even if Sentinel was in violation of federal law, there are insufficient facts pled to justify a claim that BNY aided and abetted the alleged Sentinel fraud.[3] Sentinel's trustee alleges that the Bank did nothing. It simply did what Sentinel told it to do. Even assuming that it knew that Sentinel was doing wrong, the complaint does not read all that well in establishing the substantial assistance required by *Monetta Financial Services, Inc. v. SEC*, 390 F.3d 952, 956 (7th Cir. 2004). But even if it did read well enough, Sentinel's trustee is the wrong person to bring this claim. Usually the wrongdoer cannot sue another for failing to stop his or her wrongdoing; the victim might be able to sue (although this too is a hard case to make if all that is claimed is a kind of inaction). The wrongdoer might be able to sue if, under the law or by contract, his or her bank had agreed to frustrate suspected or known illegal acts if it could do so by ceasing to follow the wrongdoer's orders. The law does not impose such a duty with respect to non-customers whose money was lost here. *See Conder v. Union Planters Bank*,

---

[3] The fraud statute at issue here is 15 U.S.C. § 80b-6(4), also referred to as section 206 of the Investment Advisors Act, which does not create a private cause of action.

7

384 F.3d 397, 399 (7th Cir. 2004) (citing *Frost Nat. Bank v. Midwest Autohaus, Inc.*, 241 F.3d 862, 873-74 (7th Cir. 2001)). There must be vanishingly few entities that would even want a contract with a bank empowering the bank to disregard its orders. Here, both the Bank and Sentinel disclaimed fiduciary duties to each other.

In any event, Sentinel would have the exclusive power under its agreements with the Bank to issue a desegregation instruction. Thus, it was Sentinel—and not the Bank—that caused the loss.

Sentinel's trustee responds to this argument by relying upon the procedural posture at the motion to dismiss stage. First, there is an internal Bank e-mail which can be read as evincing the Bank's knowledge that certain transfers must have been for the benefit of someone other than the customer. Moreover, the Bank did take actions on its own in disregard of or without the authority of a Desegregation Instruction. At this stage there are no avenues to dispute these facts but they can be explained. The Bank does try and it might succeed but it might not, and that is enough to put them aside in ruling on a motion to dismiss.[4] Second, the question of the degree to which a "flawed account structure" or other failings caused loss is ordinarily factual in nature and is usually answered no sooner than the summary judgment stage. Third, most of the counts do not require proof of loss causation, so the argument fails for Counts I-III, V and VII.

---

[4] The Bank says the e-mail "completely belies" the notion it did not act in good faith. That it does not do. There is a series of messages raising doubts about the amount of collateral posted by a firm with less than twenty million in capital. The managing director of financial institutions credit says "I have to assume most of this collateral is for somebody else's benefit. Do we really have rights on the whole $30MM?" The response is "Hello, We have a clearing agreement which gives us a full lien on the box position outlined below." A finder of fact could find that this evidences good faith, but it could also find that this was a curt attempt to shut down an inquiry for fear of what they might learn or, perhaps, already knew.

Since these statutes are the explicit basis for Counts IV, V, VI, and VII and implicit basis for the rest of the counts, the Bank concludes, those counts must be thrown out. I am unpersuaded that, on a dismissal motion, it can be said that violations of the federal statutes and regulations are the implicit basis for Counts I, II, III and VIII.

Sentinel's trustee challenges one key aspect of the Bank's argument. He says that violation of the statutes is not the foundation for any count. The trustee says that violations of those laws are relevant to establishing inequitable conduct which, if proved, could serve along with all the facts of the case to support, rather than dictate, a finding of equitable subordination or disallowance of the Bank's claim for millions (Counts IV and VI) or prevent the enforcement of its liens and secured claims (Counts V and VII). It is true that acts of misconduct (under statutes with no private cause of action) may be admitted into evidence to prove mental state or a course of conduct that supports liability for the conduct that is charged. *In re Lifschultz Fast Freight* 132 F.3d 339, 344-45 (7th Cir. 1997) (stating generally that illegality may be sufficient to prove inequitable conduct). It is much too early to decide whether that would be true in this case, and I express no opinion on the issue of admissibility. Since Sentinel's trustee does not invoke the remedies under the CEA or IAA or insist that proof of the violations is enough to establish inequitable conduct, he has not filed a private cause of action under those statutes.

According to the trustee, violations of the federal laws are not the sole basis on which it attacks the Bank for inequitable conduct.[5] So even if the CEA and IAA never saw the light of

---

[5] The cited allegations are that the Bank: (1) to make money, colluded in and helped the insider's misuse of customer securities for their own benefit, (2) moved hundreds of millions of dollars worth of securities from segregated customer accounts to its own collateral accounts, knowing they did not belong to Sentinel and that the movements had nothing to do with customer transactions, (3) and proved that it was able to act on its own without Sentinel's instruction to move securities.

9

day in a trial, Counts IV-VII could still be prosecuted. This is how I read his complaint in light of his briefs, including his citation of *604 Columbus Ave. Realty Trust v. Capitol Bank & Trust Co. (In re 604 Columbus Ave. Realty Trust)*, 119 B.R. 350, 377 (Bankr. D. Mass. 1990) (illegality which justifies equitable subordination must be "egregious"). The alleged violations here are not central to a finding of egregiousness; the underlying regulations simply embody a set of safeguards to try to make it less likely that an entity like Sentinel would be able to use customer money as if it were its own. Egregiousness is judged on the basis of a whole course of conduct of which failure to follow regulations is one element, but is neither necessary nor sufficient for a finding of egregious conduct.

For safety's sake Sentinel's trustee does assert that the CEA applies to Sentinel and is joined in this by the CFTC in an amicus brief. Their arguments are essentially the same and the following paragraphs address the arguments of both.

The CFTC takes the unsurprising position that if you register as an FCM, you concede that you are subject to the CEA and, even if you don't concede, you are bound by the CEA and under the regulatory jurisdiction of the CEA. Further, Sentinel followed some CFTC rules which required an agreement from the Bank that it understood that Sentinel, as an FCM under the CEA, was depositing assets which were to be segregated. This is a shaky foundation for establishing the point offered by the CFTC. The CFTC does not address the more fundamental question of whether someone who registers as an FCM is, in fact, an FCM. The laudable purposes of regulating FCMs, cited by the CFTC, are not achieved by regulating entities who do not operate as FCMs. The law does not generally support the notion that an entity can decide for itself whether it is under the jurisdiction of an agency. The law and courts answer questions of jurisdiction. There is a possible conflict amongst the decided cases. *Premex, Inc. v. CFTC*, 785

10

F.2d 1403 (9th Cir. 1986), can be read to say that registration means the CFTC has jurisdiction, but its rule may be based on the proposition that an FCM cannot escape jurisdiction by ceasing to operate as an FCM. Therefore, I find the contrary holding to be more persuasive. *See New York Currency Research Corp. v. CFTC*, 180 F.3d 83, 91 (2d Cir. 1999) (holding that the CFTC has jurisdiction only where entity actually acted as a commodity trading advisor or a commodity pool advisor).

The CFTC's reliance on *Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420 (7th Cir. 1993), is quite surprising since the actions upon which I there relied to find judicial estoppel were far more persuasive than the grounds offered here, and the Court of Appeals found that even those grounds were not enough. I cannot see how in this Circuit the signing of a document routinely required to provide banking services to an FCM is, as we use the term, a "regulatory result." Judicial or regulatory estoppel is applied when "a victory" is obtained. *Chevariat*, 11 F.3d at 1427. Victory implies some form of triumph over opposition. Signing a routine acknowledgment letter required by a CFTC regulation does not strike me as a victory.[6]

---

[6] The CFTC makes no assertion that it routinely or even occassionally examines these documents prior to the start of the banking relationship and, now and then, disapproves them. The reason it does not make this assertion is that it does not receive them. The letters are put in the files of the FCM where, if the CFTC chooses to audit them, they will at last be seen. The acknowledgment by the Bank that it agreed that Sentinel was an FCM opening accounts to meet the provisions of the CEA was made in 1997. I doubt that it would serve as proof that Sentinel ever functioned as an FCM. I suspect these acknowledgments were made in the event that Sentinel did function as an FCM, but I do not know this to be the case and do not take it into account in reaching my decision.

The CFTC has sued Sentinel in this Court where the case is presently before Judge Kocoras. See *CFTC v. Sentinel Management Group Inc.*, 08 C 2410. It is clearly alleged there that Sentinel was subject to the statutes and regulations at issue here. While I would be pleased to have an opinion on this point from Judge Kocoras, I doubt one will soon be available. As of January 22, 2009, both Eric Bloom and Charles Mosley have answered, and that answer from Eric Bloom is a refusal to answer the jurisdictional assertions because they are conclusions of law or because Eric Bloom asserts his right against self-incrimination.

11

I doubt that the CEA applied to Sentinel, but I make no final determination because I find its alleged violation to be a matter relating to the admissibility of evidence which I will determine at a later stage of this litigation.

**B. The Uniform Commercial Code**

The Bank asserts that section 8-503 of the Uniform Commercial Code ("U.C.C.") (N.Y. U.C.C. § 8-503)[7] bars the complaint in its entirety.

The law provides that actions "based on an entitlement holder's property interest with respect to a particular financial asset" may not be asserted against any purchaser of such assets whether framed in conversion, replevin, constructive trust, equitable lien or other theory if certain conditions are met. The conditions are that the purchaser gives value for the asset, obtains control of it and does not act in collusion with the securities intermediary which violates its obligations to the entitlement holder – in other words, the bona fide purchaser rule applied to collateral.

The complaint states that the Bank gave value and obtained control.

The trustee says the action is not "based on an entitlement holder's property interest" but rather on his rights to avoid fraudulent transfers and to claim recovery for breach of fiduciary duties. This argument contrasts with those about federal claims where the trustee disavowed that there were federal claims made but rather allegations which, if proved, would constitute evidence of inequitable conduct and other wrongs. But, in this case, there is a statute which bars any conceivable action based on an entitlement holder's property which I construe to mean actions

---

[7] New York law governs here by agreement between Sentinel and Bank of New York and would, in all probability, govern in the absence of agreement. Sentinel's trustee confines its analysis to New York law.

12

filed by someone other than the entitlement holder. At trial there will need to be proved (or stipulated) that there was an improper transfer of a large number of particular financial assets to make the trustee's case.

Sentinel's trustee asserts that it was not a securities intermediary but sections 8-102 (a)(14) and 8-504(a) and common sense contradict this. According to those U.C.C. sections, a securities intermediary is a person that, in the ordinary course of its business, maintains securities accounts for others, either directly or through other security intermediaries. It is difficult to conceive that Sentinel did not itself think that it was maintaining accounts for its clients.

This leaves the trustee with two arguments. One is that the U.C.C. is trumped by federal bankruptcy law. State law governs property rights absent controlling federal law. *Butner v. United States*, 440 U.S. 48, 54-55 (1979). The degree to which bankruptcy law affects state property rules is uncertain. There are a scattering of opinions, the vast majority of which are written by Bankruptcy Judges and, because they are nearly all dicta, are left unreviewed. There are few holdings of any sort and no holding on point for the issue presented here. If the issue is to be decided here, the decision ought to be based on a more detailed record than the one currently before me.

In any event, I agree that collusion within the meaning of section 8-503 has been alleged; that is, that the Bank and Sentinel colluded with each other to misuse customer assets to their mutual profit, which is collusion between them to effectuate a violation of Sentinel's duties to its customers. My discussion of the aiding and abetting allegation is relevant here. Allegations of collusion tend to be thin unless some insider speaks up, writes a damning document or has himself recorded in the act of colluding. What Sentinel's trustee has alleged is a set of

13

circumstances from which collusion can be inferred (whether or not he uses the word often enough) if the complaint is read in its best light, as I must read it.

### C. The Individual Counts As Pled

The first two counts allege fraudulent transfers which are defined similarly in section 548(a) of the Bankruptcy Code (Count I) and in the Illinois Uniform Fraudulent Transfer Act. 740 ILCS 160/5(a) (1), 160/8(a) (Count II). Sentinel's trustee wants to void and recover every transfer of money or securities from a segregated account to any non-segregated clearing account after December 31, 2003, absent those involving valid customer redemptions.

The Bank makes the obvious challenge that none of these transfers involved Sentinel's property since, according to the complaint itself, these were assets that belonged to customers and not to Sentinel. Unlike the question of how bankruptcy law relates to the U.C.C., there is clear precedent on this one. Property held by the debtor in trust for another does not constitute an interest of the debtor in property for purposes of the bankruptcy law. *Dunham v. Kisak*, 192 F.3d 1104, 1109 (7th Cir. 1999); *Stevenson v. J.C. Bradford & Co.* (*In re Cannon*), 277 F.3d 838, 849 (6th Cir. 2002). Sentinel's trustee responds, implicitly, that while the greatest part of the assets transferred from segregated accounts, at least some of it was Sentinel's own assets (which Sentinel was free to transfer to the Bank as collateral without violating customer trust), which could have been used to pay its other creditors. Where funds of the debtor are commingled with customers' assets, all of the assets are presumptively property of the estate. *Danning v. Bozek (In re Bullion Reserve of North America)*, 836 F.2d 1214, 1217-18 (9th Cir. 1988). "Presumptively" is enough to overcome a motion to dismiss.[8] Nor will I dismiss on the grounds that failure to

---

[8] I recognize that, in the end, Sentinel's trustee might end with recovery of less than hundreds of millions of dollars because Sentinel's evidence might reveal only a relatively small

14

allege each transfer said to be fraudulent is insufficient. There are five sets of challenged transfers, neither small in number nor amount, and that is enough to sustain the complaint. It is true that proof of the fraudulent nature of each transfer for which relief is sought will have to be made, but the specificity of fraud pleading requirement of Federal Rule of Civil Procedure 9(b) is clearly met as to enough transfers for the case to go forward. Whether the complaint has to be amended to conform to proof at a later stage of the case, I leave to that later time.

The motion to dismiss Counts I and II is denied.

Count III is an action to avoid preferential transfers. The Bank says there is no claim that the transfers were made on account of antecedent debt. But it is alleged, and the general scheme set forth in the complaint regarding daily settlements and the occasional lapse in process leads to an inference, that, while many of the transfers were contemporaneous exchanges for new credit rather than transfers to make up deficiencies in collateral, at least some were not. And the complaint does allege that the Bank was often under-collateralized and demanded and received additional assets when that happened.

The action for equitable subordination (Count IV) is also sufficiently pled. The conduct of the Bank, if what is alleged is true, is, on the whole, an example of inequitable conduct. The Bank had no duty to be fair to other creditors. It could protect itself and let other creditors look out for themselves. *Conder*, 384 F.3d at 399. But any misconduct should not confer an unfair advantage on the Bank.[9] *In re Lifschultz Fast Freight*, 132 F.3d at 344. Equitable subordination

---

amount of property in which it had an interest and a relatively small amount of money due creditors (other than customers whose interests may or may not be protected by fraudulent transfer laws) but this is not cause to dismiss the complaint.

[9] Although a non-fiduciary claimant can "act strategically to protect its interest to the potential detriment of similarly situated claimants," BNY's alleged misconduct goes beyond

15

is a difficult case to make where a Bank actually provides cash when it takes a security interest in a debtor's property appropriate to the money it gives to debtor.[10] But here it is alleged, with adequate specificity, that the Bank knew that the debtor tendered, as collateral, securities in which it had no interest. The Bank is also accused of knowing that the money it gave Sentinel was not related to customer transactions. And the Bank did this to profit from the loans presumably in the hope that Sentinel could invest its way out of the trouble which it is inferred underlie its actions. If it failed, the Bank at least had the safety net of the collateral. This is the gross misconduct that allows subordination. Alleging it is one thing, proving it another, but Sentinel's trustee is entitled to try.

Counts V and VI claiming statutory disallowance and equitable disallowance respectively are dismissed. The former count seeks a remedy to which it is entitled only if it prevails on the counts which stand, and the Bank refuses to comply with a court order. It is superfluous. The latter seeks a remedy which is not authorized by the Bankruptcy Code. *See Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 127 S. Ct. 1199, 1206 (2007) (limiting disallowance to the statutory grounds). Both Counts are dismissed.

Count VII is founded on the contention that the Bank's lien on the securities given as

---

sharp dealing, into the realm of gross misconduct. *Badger Freightways, Inc. v. Continental Illinois National Bank and Trust Company of Chicago (In re Badger Freightways, Inc.)*, 106 B.R. 971, 976 (Bankr. N.D. Ill. 1989).

[10] There is a theory that a lender can damage a creditor by deepening its solvency with ill-advised loans, but it is a mystery how this can be so here when lender gives cash value for the collateral it takes. Insolvency is defined in relation to assets and liabilities; a loan of a million dollars to a maker of toasters in exchange for collateral of its machine tools neither deepens nor lessens insolvency. It leaves it as it found it. If a loan is given without collateral, there can be no economically defensible claim that insolvency is greater than it was before, but that is not at issue here so far.

16

collateral is invalid because the agreements which underlie it are unlawful and do not grant a security interest.[11] Even the most generous reading of the complaint alleges solely that the contracts were not well suited to Sentinel's business and that they were badly administered to boot. Sentinel's trustee has alleged that there was a basic structural flaw in the process used by the Bank, and that somehow it is liable for this. There is no clue as to why the flawed process made the contracts illegal nor is there an allegation that the Bank forced the structure on Sentinel in whose shoes the trustee stands. Had the Bank not done the bad things it is alleged to have done, I cannot imagine that the Trustee would have filed a suit seeking to declare the agreements illegal. It was what was done in administering the contracts that is said to be illegal, not the contracts.[12] Count VII is dismissed.

Last is the aiding and abetting count (Count VIII). In securities fraud cases, this is commonly pled because it enables a claim for damages even where a Bank or a service provider has not transgressed any rule applicable to its own conduct, but to prevail the plaintiff may not rely on mere negligence. The Bank here is alleged, with respect to all of the surviving counts, to have gone beyond negligence, and I reject the Bank's assertion that its alleged knowing and substantial assistance to Sentinel is not adequately pled.

---

[11] A third theory is that if the claims are disallowed, the liens are void. This is a remedy available under theories in two other counts which I have dismissed and superfluous if equitable subordination or fraudulent transfer is proved. It simply clutters the case.

[12] Sentinel cites a *U.S. Nursing Corp. v. Saint Joseph Medical Center*, 39 F.3d 790 (7th Cir. 1994) for the proposition that contracts based on a legitimate subject matter that are preformed unlawfully are unenforceable. However, *U.S. Nursing* and the line of cases it cites refer to instances where parties to a contract for services render those services without first obtaining proper state licenses, which have a regulatory purpose. In such instances, the services that are the basis for the contract are, quite literally, performed unlawfully, and the contracts are therefore unenforceable as a matter of public policy. These cases are inapplicable here.

17

The Bank seeks the shield offered under New York law which gives the claim for defrauding a corporation with the cooperation of management to the creditors, not to the guilty corporation, in this case, Sentinel and its trustee. *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 120 (2d Cir. 1991). Sentinel's trustee cannot sue if some corporate purpose was served by the breach of duty, and all the persons with authority to prevent the breach participated in it. Sentinel's trustee alleges in a general way that there was a person with authority to stop the breach who did not participate in it. I do not think this is adequately alleged given the complaint's description of Sentinel and its insiders but I am willing to allow this Count to be repled to address this shortcoming.

Sentinel's trustee asserts that the *Wagoner* rule is not Illinois law. However, Trustee's aiding and abetting claim arises out of a contractual relationship between the Bank and Sentinel, and involves conduct that would not, in any practical sense, have ever occurred without the contracts. The contracts specify that New York law shall apply "without regard to principles of conflict of laws." Moreover conflicts of laws principles would regard New York law as governing. *Amukua Development LLC v. Warner*, 411 F. Supp. 2d 941, 955 (N.D. Ill. 2006) (noting that tort claims that are dependant upon the contract are subject to the specified choice of law provisions)).

What concerns Sentinel's trustee is the possibility of an *in pari delicto* defense which it says is ruled out in this Circuit. In another removed adversary proceeding in the Sentinel bankruptcy I rejected the proposition that this Circuit has rejected the doctrine as applied to trustees in bankruptcy. I did this in light of two facts: (1) that the only Seventh Circuit cases which have actually held against the defense involve the powers of receivers under state law and not trustees in bankruptcy and (2) that every other Circuit that has issued a holding on the point

18

has found that trustees are not immune from an *in pari delicto* defense. *Grede v. McGladrey & Pullen, LLP*, No. 08 C 2205, 2008 WL 4425447, at *3, *4 (N.D. Ill. Sept. 26, 2008).

The Trustee challenges the notion that there was some corporate purpose served by the loans, and he made a similar argument in *McGladrey*. As in *McGladrey*, I am skeptical, but for different reasons, that Sentinel's trustee can prevail on this point. However, I am willing to allow the Count to stand since the case must proceed on the surviving counts, but application of the *Wagoner* rule should be addressed promptly, perhaps by summary judgment. The discovery with respect to this will lie primarily, if not entirely, against Sentinel's trustee and, in light of the Trustee's investigation of Sentinel's affairs. He and the Bank might be able to reach an early end to discovery on the *Wagoner* issue even in the face of possible refusals of Sentinel's principals to answer questions, since the search will be for an insider who did not participate in the alleged scheme and yet had the power to stop it.

The motion to dismiss Counts I-IV and Count VIII is denied.

The motion to dismiss Counts V-VII is granted.

ENTER:

*James B. Zagel*
James B. Zagel
United States District Judge

DATE: January 27, 2009

19