**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

FREDERICK J. GREDE, not individually
but as Liquidation Trustee for the Sentinel
Liquidation Trust,

      Plaintiff,                                  Judge James B. Zagel
                                                   08 C 2582
          v.

THE BANK OF NEW YORK MELLON
and THE BANK OF NEW YORK
MELLON CORP.,

      Defendants.

## MEMORANDUM OPINION AND ORDER

## I. BACKGROUND

Plaintiff Liquidation Trustee alleges the following counts against Defendants: (1) avoidance and recovery of fraudulent transfers pursuant to §§ 548(a)(1)(A) and 550(a) of the Bankruptcy Code; (2) avoidance and recovery of fraudulent transfers pursuant to 740 ILL. COMP. STAT. 160/5(a)(1) and 160/8(a), and §§ 544(b)(1) and 550(a) of the Bankruptcy Code; (3) avoidance and recovery of preferential transfers pursuant to §§ 547(b) and 550(a) of the Bankruptcy Code; and (4) equitable subordination of claims and transfer of subordinated lien pursuant to § 510(c) of the Bankruptcy Code.  Defendants filed a counterclaim seeking declaratory judgment that Defendants have a valid, first-priority, perfected security interest in the lien that is the subject of the litigation.  Defendants also allege breach of contract and request indemnification for attorneys' fees and expenses, and, if liable to Trustee, a setoff of any damages due to the Bank as a result of Sentinel's alleged breach of contract and indemnification of fees and expenses.

A bench trial was set in this matter for April 19, 2010. A few weeks prior to the trial date, Defendants moved for summary judgment. I granted Plaintiff's request to take the motion with the case. The following opinion and ruling addresses both the motion for summary judgment and the bench trial.

## II. STATEMENT OF UNDISPUTED FACTS[1]

**Parties**

1. The Sentinel Liquidation Trust (the "Trust") is a liquidating trust created under the Fourth Amended Chapter 11 Plan of Liquidation (the "Plan") for Sentinel Management Group, Inc. ("Sentinel"). The effective date of the Plan was December 17, 2008. Plaintiff Frederick J. Grede was formerly the chapter 11 trustee for Sentinel. On December 17, 2008, pursuant to the terms of the Plan, Grede was appointed Liquidation Trustee of the Trust (the "Trustee").

2. Defendant The Bank of New York (n/k/a The Bank of New York Mellon) is a state-chartered bank with its principal place of business located in New York, New York. It is a

---

[1]Various recordings of conversations between personnel of Sentinel Management Group, Inc. and Bank of New York were played in open court during the trial. The contents of the conversations were interpreted by various witnesses who had participated in the conversations. The words themselves are, in most cases, not inadmissible hearsay since they are statements of opposing parties. Moreover, the evidentiary significance of these statements arises from the fact that the statements were made rather than the truth of the matter stated. I have not included verbatim transcripts of these phone calls in the body of this judgment because much of what is recorded is not of particular significance to my findings. I do incorporate all of the transcripts by reference and, for the sake of public understanding of this disposition, I order the parties to post the transcripts in electronic form on the electronic docket. The primary value of these recordings to the decision is found in the tone of the voices, the reactions of others who hear statements and the nature of the message the speaker wanted to transmit. All these things matter on the question of credibility of witnesses when they testify about what they knew or thought they knew when they took action or failed to do so.

I also incorporate by reference the contents of the various documents cited in the statement of facts. While I quote or describe these documents in this order, most of the documents admitted as exhibits are standard forms containing a large amount of language immaterial to this dispute. Including them verbatim in the order or appending them to the order would not be of value to understanding the ruling and its basis.

To the extent that any conclusions of law may be deemed findings of fact, or vise versa, they should be considered as such, and the labels used herein need not be controlling. See 9 Wright & Miller, Federal Practice & Procedure, § 2579 (3d ed. 2008).

The citations referred to herein include the trial transcript, (Tr.___), Trustee's exhibits (TTX ___),

subsidiary of Defendant The Bank of New York Mellon Corp. (defendants are collectively referred to herein as, "BNYM" or the "Bank").

3. Defendant The Bank of New York Mellon Corp. is a corporation organized under the laws of Delaware, with its principal place of business located in New York, New York. It is the successor-in-interest to The Bank of New York, Inc. and was formed in July 2007 through a merger between The Bank of New York, Inc. and Mellon Financial Corporation.

## Sentinel's Business

4. Sentinel was registered with the Securities and Exchange Commission ("SEC") as an Investment Adviser. (TTX 93A; Tr. 196:5-12.)

5. Sentinel was registered with the Commodity Futures Trading Commission ("CFTC") as a futures commission merchant ("FCM"). (TTX 93A; BTX 1.)

6. On May 7, 1981, Sentinel received a "no-action" letter from the Division of Trading and Markets ("Division") of the CFTC that exempted Sentinel from the net-capital requirements applicable to registered FCMs. (TTX 1; Bjarnason Dep. Tr. 29:21-32:16.)

7. The Division's no-action letter required that Sentinel meet certain conditions in order to remain exempt from the CFTC's net-capital requirements. (TTX 1.)

8. Sentinel never solicited or accepted "orders for the purchase or sale of any commodity for future delivery, or involving contracts for the sale of any commodity for future delivery, on or subject to the rules of any contract market." (TTX 1; TTX 93A; Tr. 2313:16-18.)

9. Sentinel's Designated Self-Regulatory Organization was the National Futures Association ("NFA"). (Tr. 772:17-19.)

10. Sentinel invested FCM's customer money. (TTX 93A; TTX 925; Tr. 234:22- 235:23.)

---

and the Bank's exhibits (BTX ___), as well as other reports referred to by name.

11. Sentinel represented to the public and regulators that its Seg I portfolio consisted of funds and property of customers of other FCMs. (TTX 11; TTX 93A; Tr. 234:22-235:23.)

12. Sentinel had several customer groups with different investment strategies within the Seg I portfolio. (Tr. 311:1-15.)

13. Sentinel also invested proprietary or "house" funds of FCMs and hedge funds. (TTX 93A; Tr. 239:16-22.)

14. Sentinel represented to the public and regulators that its Seg III portfolio consisted of funds and property of FCM proprietary or "house" funds, as well as funds and property of hedge funds, trusts, and individuals. (TTX 93A; Tr. 239:16-22.)

15. Sentinel had several customer groups with different investment strategies within the Seg III portfolio. (TTX 925; Tr. 311:1-15.)

16. Sentinel had two principal investment portfolios: a "125 Portfolio" and a "Prime Portfolio." (TTX 925; BTX 314.) Sentinel represented that the 1.25 Portfolio's and Prime Portfolio's stated investment objectives were preservation of capital and liquidity and to achieve competitive yields. (TTX 925.)

17. Sentinel represented to its customers that the minimum credit rating for securities purchased for the 125 Portfolio would be A1/P1 for short term investments and AA for longterm investments. (TTX 925; BTX 109; BTX 314; Tr. 236:7-16.)

18. Sentinel represented to its customers that the minimum credit rating for securities purchased for the Prime Portfolio would be investment grade, typically defined as BBB or better. (TTX 925; BTX 109; BTX 314; Tr. 238:23-239:11; Tr. 2820:4-8.)

19. By the end of 2005, Sentinel had begun to represent that it purchased securities

for its own house account. (TTX 930; TTX 983.)

**Oversight of Sentinel**

**A. CFTC**

20. Sentinel filed a Form 1-FR on a monthly basis with the CFTC. (Tr. 255:8-14.)

21. Sentinel filed its audited financial statements on an annual basis with the CFTC.

(TTX 85; TTX 118; TTX 120; TTX 165; TTX 225; Tr. 256:21-257:5.)

22. On October 7, 2003, the Division provided Sentinel with a list of questions about its business

that it wanted Sentinel to answer. (BTX 71.)

23. On October 24, 2003, Sentinel responded to the Division's questions. (BTX 74.)

24. On November 21, 2003, Sentinel responded to additional follow-up questions that

had been posed by the Division. (BTX 75.)

25. On January 21, 2004, the Division issued a letter confirming its view that funds deposited at

Sentinel in Seg I would continue to count towards Sentinel's customers' segregation

requirements under the Commodity Exchange Act and CFTC Rules and that Sentinel's client

FCMs' house funds held in Seg III would qualify, for the purpose of computing their minimum

adjusted net capital pursuant to CFTC requirements, as current assets. (TTX 93A; TTX 188; Tr.

217:7-227:9.)

26. The Division received a copy of the 1997 Securities Clearing Agreement between BNYM

and Sentinel. (BTX 11.)

27. The Division received a copy of TTX 11. (TTX 93A; BTX 74.)

**B. NFA**

28. The NFA conducted examinations of Sentinel including in 2003, 2004, and 2006. (BTX 60;

BTX 63; BTX 105; BTX 106; BTX 107; BTX 108; BTX 111; BTX 179; BTX 193; BTX 226; BTX 531.) The last NFA examination of Sentinel was in 2006. (BTX 179; BTX 193; BTX 226.)

29. In connection with the NFA's examination of Sentinel's books and records as of July 31, 2003, BNYM responded to the NFA's account balance confirmation requests. (BTX 60.)

30. In connection with the NFA's examination of Sentinel's books and records as of September 30, 2004, BNYM responded to the NFA's account balance confirmation requests. (BTX 105; BTX 106; BTX 107.)

31. In connection with the NFA's examination of Sentinel's books and records as of March 31, 2006, BNYM responded to the NFA's requests for confirmation of certain account balances. (BTX 193.)

32. In August 2003, NFA employees drafted a memorandum intended to provide an overview of Sentinel and its operations. (BTX 531.)

33. The NFA received a copy of the 1997 Securities Clearing Agreement between BNYM and Sentinel. (BTX 111.)

**C. McGladrey**

34. Sentinel's independent outsider auditor, McGladrey & Pullen LLP and its predecessor Altschuler, Melvoin and Glasser LLP (collectively, "McGladrey"), issued an annual unqualified audit opinion attesting that Sentinel's statement of financial condition presents fairly, in all material respects, the financial position of Sentinel as of the respective year-end date for 2003-2006. (TTX 85; TTX 118; TTX 120; TTX 165; TTX 225.)

35. In connection with McGladrey's audit of Sentinel's financial statements as of December 31, 2005, BNYM responded to McGladrey's account balance confirmation requests. (BTX 162;

BTX 163.)

36. In connection with McGladrey's audit of Sentinel's financial statements as of December 31, 2006, BNYM responded to McGladrey's account balance confirmation requests. (BTX 213; BTX 214; BTX 215; BTX 219.)

**D. SEC**

37. Sentinel filed a Form ADV with the SEC on an annual basis. (BTX 121; BTX 249; BTX 757.)

38. Sentinel's independent auditor, McGladrey, filed with the SEC, on an annual basis, an Independent Accountant's Report stating that it had examined on a test basis Sentinel's books and records and that in its opinion Sentinel had complied with certain provisions of rules 204-2(b) and 206(4)-2 of the Investment Advisers Act of 1940, as of and during the respective period. (BTX 204.)

**Sentinel's Relationship With BNYM**

39. On December 13, 1996, Debra Coscia (of BNYM) sent a letter to Barbara Sapienza (of Sentinel) regarding Sentinel's transition from First Chicago National Bank to BNYM and certain draft "CFTC compliance letters" that Sentinel had provided to BNYM. (BTX 390.)

40. Ms. Coscia told Sentinel that the draft "CFTC compliance letters" were sent to BNYM's legal department for review. (BTX 390.)

41. On March 13, 1997, Sentinel and BNYM executed the Global Custody Agreement, pursuant to which Sentinel became a customer of BNYM's Institutional Custody Division ("Custody Division"). (BTX 5; Tr. 373:19-374:10.)

42. On March 31, 1997, Joseph Ciacciarelli, who ran BNYM's relationship with Sentinel, signed

TTX 11, 12 and 13, dated March 14, 1997. (TTX 11; TTX 12; TTX 13.)

43. On May 20, 1997, Joseph Ciacciarelli sent an email to Jeffrey Tessler, Mike Burns, Charles McGraw, Martin Geffon, and A. Lucia Ferrara, copying John Bhonslay. (TTX 18; Tr. 602:6-607:7.)

44. In the May 20, 1997 email, Mr. Ciacciarelli recommended that Sentinel be transitioned to Broker Dealer Services ("BDS"). (TTX 18.)

45. Mr. Bhonslay responded to Mr. Ciacciarelli's May 20, 1997 email and explained that he agreed. (Id.)

46. In September and August 1997, Eric Bloom (a Sentinel Insider) and Glenn Colletti corresponded regarding the Securities Clearing Agreement and Sentinel's transition from the Custody Division to BDS. (BTX 9; BTX 435; Tr. 608:8-12; Tr. 611:19-612:2.)

47. On October 21, 1997, Sentinel signed the Securities Clearing Agreement and related Security Agreement. (TTX 21; BTX 14; Tr. 387:6-10.)

48. On January 9, 2003, Sentinel signed the Global Clearing and Custody Agreement in connection with its opening of certain Euroclear accounts. (TTX 43.)

49. As of August 13, 2007, Sentinel maintained, among others, the following accounts at BNYM:

> a. Four demand deposit accounts for handling cash called "Sentinel Mgmt Group as agt Cust Seg FDS #1/E. Bloom," "Sentinel Mgmt Group as agt Cust Seg Funds 11 30.7," "Sent Mgmt Group as agt Cust Seg FDS 3/E Bloom," and the "Street Account." (TTX 611; BTX 60; Tr. 208:18-209:24.)

> b. One lienable, clearing account to settle transactions involving government

securities, which was maintained on BNYM's GSCX system (the "GSCX Clearing Account") and was referred to as the "Sen Clearance Coll A/C FBO BNY" account ("SEN account"). (TTX 311; TTX 611; BTX 60; Tr. 210:23-211:6; Tr. 212:1-11.)

c. One lienable account to hold government securities used as collateral for Sentinel's overnight loan, which was maintained on BNYM's GSCX system and was referred to as the SLM account. (TTX 611; BTX 60.)

d. Three segregated, non-clearing accounts to hold government securities, which were maintained on BNYM's GSCX system (respectively, the "GSCX Seg 1 Account," "GSCX Seg 2 Account," and "GSCX Seg 3 Account"). (TTX 611; BTX 60; Tr. 212:12-213:2.)

e. One lienable, clearing account to settle transactions involving securities registered with the Depository Trust Company ("DTC Securities"), which was maintained on BNYM's CLASS system (the "DTC Clearing Account") and was referred to as the FC1 account. (TTX 611; BTX 60; Tr. 213:3-10.)

f. Three segregated, non-clearing accounts to hold DTC Securities, which were maintained on BNYM's CLASS system (respectively, the "DTC Seg 1 Account," "DTC Seg 2 Account," and "DTC Seg 3 Account"). (TTX 611; BTX 60; Tr. 213:3-10.)

g. One lienable, clearing account (Account No. 521010) to settle transactions involving Euroclear registered securities, which was maintained on BNYM's Inform system. (TTX 611; Tr. 214:3-8.)

h. One segregated, non-clearing account (Account No. 521011) to hold Euroclear registered securities, which was maintained on BNYM's Inform system. (TTX 611; BTX 72.) This account was never used. (Tr. 1746:14-21; Tr. 1754:6-11.)

i. Another segregated, non-clearing account (Account No. 521012) to hold Euroclear registered securities, which was maintained on BNYM's Inform system. (TTX 611.) This account was never used. (Tr. 1746:14-21; Tr. 1754:6-11.)

j. Four non-segregated accounts to maintain funds denominated in foreign currencies. (TTX 611.)

k. One segregated cash account (Account No. 8033807113) to hold funds denominated in Euro currency. (TTX 611; BTX 60; BTX 106.)

l. One non-segregated account (Account No. 329079) to settle transactions involving physical securities and to hold physical securities. (TTX 611; Tr. 213:11-214:2.)

50. Beginning in at least 2003, BNYM received copies of Sentinel's annual audited statements of financial condition that were prepared by its independent outside auditor, McGladrey. (TTX 85; TTX 118; TTX 120; TTX 165; TTX 225; TTX 441; TTX 930.)

51. Joseph Ciacciarelli, Terence Law (a BNYM client executive), and Stephen Brennan (a BNYM managing director) reviewed Sentinel's audited financial statements. (Tr. 447:9-22; Tr. 458:8-14; Tr. 1070:14-1071:6; Tr. 1304:7- 1305:7.)

52. On July 23, 2004, Mark Rogers (a BNYM managing director) sent an email to Joseph Ciacciarelli regarding Sentinel. (TTX 113.)

53. On January 6, 2005, Joseph Ciacciarelli and Mark Rogers exchanged emails regarding Sentinel. (TTX 123.)

54. On February 4, 2005, Mark Rogers sent an email to Joseph Ciacciarelli and Stephen Brennan regarding Sentinel. (TTX 127; Tr. 2651:25-2652:15.)

55. On February 16, 2005, Stephen Brennan sent an email to Joseph Ciacciarelli regarding Sentinel. (TTX 128.)

56. Beginning in November 2005, BNYM received copies of Sentinel's monthly Form 1-FR that Sentinel filed with the CFTC. (TTX 140; TTX 155; TTX 164; TTX 175; TTX 182; TTX 189; TTX 197; TTX 199; TTX 202; TTX 203; TTX 211; TTX 214; TTX 218; TTX 220; TTX 224; TTX 235; TTX 247; TTX 392.)

57. Joseph Ciacciarelli, Terence Law, and Stephen Brennan reviewed Sentinel's Form 1-FRs. (Tr. 449:9-450:12; Tr. 1236:2-11; Tr. 1243:25-1244:2; Tr. 1287:18-1288:14; Tr. 1290:13-22.)

58. From October 2004 through June 2007, Sentinel's 1-FRs and BNYM's credit reviews of Sentinel reflected that Sentinel had approximately $3 million in net capital or less. (TTX 115, 140; TTX 155; TTX 164; TTX 171; TTX 172; TTX 175; TTX 182; TTX 185; TTX 189; TTX 197; TTX 199; TTX 202; TTX 203; TTX 211; TTX 214; TTX 218; TTX 220; TTX 224; TTX 235; TTX 247; TTX 392.)

59. On November 22, 2005, Terence Law circulated a call report regarding his November 9, 2005 visit to Sentinel. (TTX 150.)

60. On November 23, 2005, Mark Rogers sent Stephen Brennan an email regarding Sentinel. (TTX 732.)

61. On January 24, 2006, Terence Law circulated a call report pertaining to his visit to Sentinel

in November, along with Theresa Arana's phone number. (TTX 170.)

62. TTX 171 and 172 are versions of BNYM credit review write-ups of Sentinel dated January 25, 2006. (TTX 171; TTX 172.)

63. On January 26, 2006, Theresa Arana sent an email to Bernard Lambert attaching a copy of Sentinel's revised audited statement of financial condition and Sentinel's most recent monthly 1-FR. (BTX 156.)

64. TTX 179 is a BNYM credit review write-up of Sentinel dated February 6, 2006. (TTX 179.)

65. On February 22, 2006, Joseph Ciacciarelli, Brian Ruane (a BNYM executive vice president), and Mike Burns exchanged emails regarding Sentinel. (TTX 181.)

66. On March 15, 2006, Mark Rogers sent an email to Stephen Brennan and Joseph Ciacciarelli requesting a meeting to discuss Sentinel. (TTX 183.)

67. On March 28, 2006, Bernard Lambert circulated the February 6, 2006 credit review write-up to Stephen Brennan, Joseph Ciacciarelli, Terence Law and Mark Rogers in advance of a meeting regarding Sentinel. (TTX 185.)

68. On March 30, 2006, Mark Rogers met with Stephen Brennan, Joseph Ciacciarelli, Terence Law and Bernard Lambert to discuss Sentinel. (Tr. 2655:1-19.)

69. On March 31, 2006, Mark Rogers sent an email to Joseph Ciacciarelli, Terence Law, Stephen Brennan and Bernard Lambert raising certain questions regarding Sentinel and forwarded a copy of the January 21, 2004 letter from the Division. (TTX 188; Tr. 2664:8- 2666:5.)

70. On April 6, 2006, Terence Law scheduled a conference call with Eric Bloom. (BTX 323.)

71. On April 10, 2006, BNYM had a conference call with Sentinel. (BTX 324; BTX 325; Tr. 634:9-16.)

72. There is no evidence that BNYM received or reviewed Sentinel's Active and Matured Securities Report. (Tr. 280:17-23.)

73. There is no evidence that BNYM received or reviewed Sentinel's Daily Yield Calculation Report. (Tr. 284:8-13.)

74. There is no evidence that BNYM received or reviewed Sentinel's daily statement of segregation. (Tr. 286:25-287:13.)

75. Prior to May 1, 2004, Sentinel's guidance line was $30 million. (TTX 88; TTX 1000; Tr. 254:15-20.)

76. On or about May 2004, BNYM increased Sentinel's guidance line from $30 million to $55 million. (TTX 88; TTX 1000.)

77. On or about December 2004, BNYM increased Sentinel's guidance line from $55 million to $95 million. (TTX 88; TTX 1000.)

78. On or about June 2005, BNYM increased Sentinel's guidance line from $95 million to $175 million. (TTX 88; TTX 1000.)

79. On or about September 2006, BNYM increased Sentinel's guidance line from $175 million to $300 million. (TTX 88; TTX 1000.)

80. The average daily loan balance from November 4, 2005 through August 13, 2007 was $292,632,224. (TTX 1000.) The lowest daily loan balance during that period was $225,983,000. (Id.)

81. The average daily loan balance from June 1, 2007 through August 13, 2007 was $369,084,986. (TTX 1000.) The lowest daily loan balance was $312,945,000. (Id.) The highest daily loan balance was $573.8 million. (Id.)

82. When Sentinel requested a loan in excess of its guidance line, someone from Credit Risk and someone from SIBD would have to approve the loan. (Tr. 836:17-838:16.)

83. Prior to February 2005, BNYM charged Sentinel its cost of borrowing (typically fed funds rate), plus a spread of 50 basis points. (TTX 125; Tr. 858:6-8.)

84. After February 2005, BNYM charged Sentinel its cost of borrowing, plus a spread of 75 basis points. (TTX 125; Tr. 858:6-8.)

**Sentinel's Relationship With Its Customers**

85. Sentinel's customers wired money from their accounts at other institutions into the accounts at BNYM called "Sentinel Mgmt Group as agt Cust Seg FDS #1/E. Bloom," "Sentinel Mgmt Group as agt Cust Seg Funds 11 30.7," and "Sent Mgmt Group as agt Cust Seg FDS 3/E Bloom". (TTX 93A; TTX 611; Tr. 219:12-18; Tr. 723:24-724:11; Tr. 776:4-777:8; Tr. 795:25-797:1; Tr. 1468:3-25.)

86. Cash from multiple sources was commingled in the SEN account. (Tr. 1798:9- 1799:12.)

87. Sentinel treated its and its customers' assets as a single, undifferentiated pool of cash and securities. (Tr. 1795:25-1796:12.)

88. In response to inquiries from current and prospective customers, Sentinel provided copies of its audited statements of financial condition. (BTX 183; BTX 218; BTX 231; Tr. 763:4-18; Tr. 1517:5-12; Tr. 2317:22-2318:8; Tr. 2318:20-25.)

89. Capital Fund Management did not raise any concerns regarding the contents of Sentinel's 2005 audited financial statements. (Tr. 1517:5-1518:17.)

90. It was Sentinel's practice to provide a copy of its current Form ADV to its prospective customers. (BTX 216; BTX 388; BTX 411; Tr. 811:16-812:4; Tr. 2328:10-14.)

91. It was Sentinel's practice to provide its customers with the most current Form ADV on an annual basis. (BTX 109; Tr. 1501:25-1502:1; Tr. 2328:15-18.)

92. On June 22, 2007, Sentinel sent certain of its customers its Form ADV dated March 16, 2007. (BTX 249; BTX 757; BTX 791; Tr. 759:5-760:12.)

93. Capital Fund Management, Kottke and TransAct Futures did not inquire into Sentinel's disclosures in its Form ADV. (Tr. 761:2-763:3; Tr. 1509:12-1510:2; Tr. 1516:9-20.)

94. Sentinel sent daily statements to its customers in substantially the format reflected in TTX 958, TTX 961, and TTX 963.

95. Capital Fund Management had more than $400 million invested with Sentinel at the time of Sentinel's bankruptcy. (Tr. 1499:15-18.)

96. Kottke's balance with Sentinel on August 13, 2007 was approximately $53 million. (Tr. 741:18-21.)

97. TransAct filed a proof of claim in connection with the Sentinel bankruptcy for approximately $13.7 million, reflecting its balance in TransAct's customer segregated funds account (Tr. 804:19-805:4.)

**Sentinel's Relationship with its Repo Counterparties**

98. Starting in 2001, Sentinel entered into numerous repurchase agreements with repo lender FIMAT USA ("FIMAT"). (BTX 20; A. Byrne Tr. 37:19-38:8.)

99. In spring of 2007, FIMAT became more conservative regarding the type of collateral that it would accept as security for its repurchase transactions and closed out certain repurchase transactions with Sentinel. (A. Byrne Tr. 131:19-135:19; A. Byrne Tr. 161:5- 162:12.)

100. Starting in October 2004, Sentinel entered into numerous repurchase agreements with repo

lender Cantor Fitzgerald & Co. ("Cantor"). (BTX 110.)

101. In spring 2007, Cantor became more conservative regarding the collateral pool that it accepted from its counterparties, including Sentinel and closed out certain repurchase transactions with Sentinel. (J. Miller Tr. 89:13-90:8; J. Miller Tr. 90:18-92:8; J. Miller Tr. 92:21-93:22; J. Miller Tr. 94:21-95:11; J. Miller Tr. 96:12-19.)

**JPMorgan Chase Bank**

102. Sentinel had segregated cash accounts at JPMorgan Chase. (BTX 436-468; BTX 470-475; BTX 792; BTX 800.)

103. In 2004, the average monthly balance in Sentinel's segregated accounts at JPMorgan Chase ranged from $27 million to $87 million. (BTX 817A.)

104. In 2005, the average monthly balance in Sentinel's segregated accounts at JPMorgan Chase ranged from $55 million to $139 million. (BTX 817A.)

105. In 2006, the average monthly balance in Sentinel's segregated accounts at JPMorgan Chase ranged from $107 million to $306 million. (BTX 817A.)

106. In 2007, the average monthly balance in Sentinel's segregated accounts at JPMorgan Chase ranged from $3 million to $201 million. (BTX 817A.)

107. From March 2004 through August 2007, a total of approximately $23 billion was deposited into and withdrawn from Sentinel's segregated accounts at JPMorgan Chase. (BTX 823A.)

**Summer 2007**

**A. June 1-August 13, 2007**

108. On May 31, 2007, Sentinel obtained a $259.7 million loan from BNYM. On the loan card for May 31, 2007, BNYM priced certain of the securities held in lienable accounts, including

$304.8 million in government securities, and gave those securities a margined value of $270.9 million. (TTX 831A; Tr. 990:21-992:7.)

109. On June 1, 2007, FIMAT returned to Sentinel approximately $100 million in physical securities. (TTX 1002; Tr. 1174:1-21; Tr. 1833:17-1834:11; Tr. 2891:7-17.)

110. On June 1, 2007, Sentinel transferred approximately $26 million in securities from its GSCX Seg 1 account to its SEN account and approximately $62 million in securities from its GSCX Seg 3 account to its SEN account. (TTX 266; TTX 267; TTX 1002.)

111. There is a recorded phone call on June 1, 2007 at 4:17 p.m. (CDT), between Sentinel Operations Associate Caleb Castillo and GSCX Administrator Kathiann Warren. (TTX 646.)

112. On June 1, 2007, Sentinel obtained a $353 million loan from BNYM. On the loan card for June 1, 2007, BNYM priced certain of the securities held in lienable accounts, including $385 million in government securities, and gave those securities a margined value of $355 million. (TTX 269; Tr. 992:15-993:15.)

113. On June 13, 2007, Mark Rogers sent an email to Terence Law, Stephen Brennan, Joseph Ciacciarelli, and others regarding Sentinel. (TTX 287.)

114. On June 13, 2007, Terence Law replied to Mark Rogers' June 13, 2007 email. (Tr. 1371:3-14; Tr. 1372:7-9; Tr. 1444:2-13.)

115. On June 25, 2007, Sentinel obtained a $358 million loan from BNYM. On the loan card for June 25, 2007, BNYM priced certain of the securities held in lienable accounts, including $388 million in government securities, and gave those securities a margined value of $359 million. (TTX 288; Tr. 1002:23-1003:19.)

116. On June 26, 2007, FIMAT returned to Sentinel approximately $166 million in physical

securities. (TTX 649; TTX 1004; Tr. 1174:1-21; Tr. 1373:10-21; Tr. 1840:13-23; Tr. 2891:7-17.)

117. On June 26, 2007, Sentinel transferred approximately $11 million in securities from its GSCX Seg 1 account to its SEN account and approximately $55.6 million in securities from its GSCX Seg 3 account to its SEN Account. (TTX 307; TTX 308; TTX 1004.)

118. On June 26, 2007, Sentinel obtained a $497.5 million loan from BNYM. On the loan card for June 26, 2007, BNYM priced certain of the securities held in lienable accounts, including $426 million in government securities and $165 million in physical securities, and gave those securities a margined value of $394 and $156.8 million, respectively. (TTX 309.)

119. There is a recorded phone call on June 26, 2007 at 4:00 p.m. (CDT), between Sentinel Back-Office Manager Crystal York and GSCX Administrator Steven Johnson. (TTX 649.)

120. There is a recorded phone call on June 26, 2007 at 4:02 p.m. (CDT), between Sentinel Back-Office Manager Crystal York and GSCX Administrator Steven Johnson. (TTX 650.)

121. There is a recorded phone call on June 26, 2007 at 4:13 p.m. (CDT), between Sentinel Back-Office Manager Crystal York and GSCX Administrator Steven Johnson. (TTX 651.)

122. On June 27, 2007, Sentinel obtained a $573 million loan from BNYM. On the loan card for June 27, 2007, BNYM priced certain of the securities held in lienable accounts, including $424 million in government securities, $61 million in DTC securities, and $170 million in physical securities, and gave those securities a margined value of $339, $30.6, and $161 million, respectively. (TTX 330; Tr. 1012:9-1014:19.)

123. There is a recorded phone call on June 27, 2007 at 3:49 p.m. (CDT), between Sentinel Back-Office Manager Crystal York and GSCX Administrator Steven Johnson. (TTX 653.)

124. There is a recorded phone call on June 27, 2007 at 3:54 p.m. (CDT), between Sentinel Back-Office Manager Crystal York and Terence Law. (TTX 842.)

125. There is a recorded phone call on June 27, 2007 at 3:56 p.m. (CDT), between Sentinel Assistant Trader Jeff Logan and Terence Law. (TTX 654.)

126. There is a recorded phone call on June 28, 2007 at 8:44 a.m. (CDT), between Sentinel Back-Office Manager Crystal York and Terence Law. (TTX 657.)

127. During the June 28, 2007 call, Terence Law notified Sentinel for the first time that its internal guidance line at the Bank was $300 million. (TTX 657; Tr. 1402:8-10.)

128. There is a recorded phone call on June 28, 2007 at 4:09 p.m. (CDT), between Sentinel Back-Office Manager Crystal York and GSCX Administrator Vicky Vargas. (TTX 655.)

129. On June 28, 2007, Theresa Arana sent to Terence Law the first of several emails regarding Sentinel's efforts to reduce the size of its loan. (TTX 352; TTX 353.)

130. Ms. Arana and Eric Bloom sent additional email updates to Terence Law throughout the summer of 2007. (TTX 373; TTX 374; TTX 393; TTX 397; TTX 400A; TTX 402; TTX 405; TTX 442; TTX 485; TTX 506-508; TTX 512-513; TTX 518; TTX 522; Tr. 504:17-22.)

131. On June 29, 2007, Sentinel transferred approximately $166 million in securities from its DTC Seg 1 account to its DTC Clearing Account (FC1). (TTX 371; TTX 376; TTX 1006.)

132. On June 29, 2007, Sentinel obtained a $400 million loan from BNYM. (Tr. 1847:23-1848:7.) On the loan card for June 29, 2007, BNYM priced certain of the securities held in lienable accounts, including $404 million in government securities, $116 million in DTC securities, and $127 million in physical securities, and gave those securities a margined value of $374, $93, and $2 million, respectively. (TTX 372; Tr. 913:9-914:17.)

133. On June 29, 2007, Sentinel incurred an additional obligation of $44.5 million from the Bank which was booked as an overdraft. (Tr. 1847:27-1848:3.)

134. There is a recorded phone call on June 29, 2007 at 4:44 p.m. (CDT), between Sentinel Back-Office Manager Crystal York and GSCX Administrator Vicky Vargas. (TTX 661.)

135. There is a recorded phone call on June 29, 2007 at 4:47 p.m. (CDT), between Sentinel Assistant Trader Jeff Logan and DTC Administrator Walter Reid and DTC Manager Mike Scarry. (TTX 662.)

136. There is a recorded phone call on June 29, 2007 at 4:51 p.m. (CDT), between Sentinel Assistant Trader Jeff Logan and DTC Manager Mike Scarry. (TTX 663.)

137. There is a recorded phone call on June 29, 2007 at 5:13 p.m. (CDT), between Sentinel Back-Office Manager Crystal York and GSCX Administrator Kathiann Warren. (TTX 664.)

138. Beginning in late June 2007, BNYM employees, including Stephen Brennan, Joseph Ciacciarelli, Evan Fraser, Terence Law, Mark Rogers and Brian Ruane, had conversations regarding Sentinel's loan and the collateral pledged to secure that loan. (Tr. 870:23-871:20; Tr. 1158:6-9; Tr. 1382:2-1382:21.)

139. Beginning in late June 2007, administrators provided certain reports to the BNYM relationship managers and credit officers responsible for approving Sentinel's overnight loan. (Tr. 870:23-871:20; Tr. 878:8-25; Tr. 1000:10-24.)

140. There is a recorded phone call on July 13, 2007 at 12:44 p.m. (CDT), between Terence Law and Eric Bloom. (BTX 354; Tr. 1411:13-20.)

141. Stephen Brennan, John Vricella and Terence Law participated in a July 13, 2007 conference call with Eric Bloom. (TTX 644.115-116; Tr. 1403:10-13; Tr. 1411:21-1412:11.)

142. On July 17, 2007, Cantor returned to Sentinel approximately $150 million in DTC securities. (TTX 1008; Tr. 508:6-9; Tr. 1855:4-13.)

143. On July 17, 2007, Sentinel transferred approximately $84 million in securities from its DTC Seg 1 Account to its DTC Clearing Account (FC1). (TTX 423; TTX 425; TTX 1008; Tr. 1855:20-25.)

144. On July 17, 2007, Sentinel obtained a $366 million loan from BNYM. On the loan card for July 17, 2007, BNYM priced certain of the securities held in lienable accounts, including $395.8 million in government securities and $169.7 million of DTC securities, and gave those securities a margined value of $366 and $93 million, respectively. (TTX 424; Tr. 1033:7-1034:10.)

145. There is a recorded phone call on July 17, 2007 at 3:53 p.m. (CDT), between Sentinel Back-Office Manager Crystal York and DTC Administrator Walter Reid and DTC manager Ron Silk. (TTX 671.)

146. There is a recorded phone call on July 17, 2007 at 4:09 p.m. (CDT), between Sentinel Back-Office Manager Crystal York and GSCX Administrator Kathiann Warren. (TTX 672.)

147. There is a recorded phone call on July 17, 2007 at 4:16 p.m. (CDT), between Sentinel Back-Office Manager Crystal York and GSCX Administrator Steven Johnson. (TTX 673.)

148. On July 30, 2007, Sentinel obtained a $362 million loan from BNYM. On the loan card for July 30, 2007, BNYM priced certain of the securities held in lienable accounts, including $384.9 million in government securities and $35.5 million of DTC securities, and gave those securities a margined value of $354 and $30 million, respectively. (TTX 462; Tr. 1039:13- 1040:13.)

149. On July 30, 2007, Sentinel transferred approximately $248 million in securities from its DTC Clearing Account (FC1) to its DTC Seg 1 account. (TTX 464; TTX 463; TTX 1010.)

150. On July 31, 2007, Sentinel transferred approximately $289 million in securities from its DTC Seg 3 account to its DTC Clearing Account (FC1). At 5:27 p.m. (EDT), Sentinel transferred approximately $263 million in government securities from its GSCX Clearing Account (SEN) to its GSCX Seg 1 account. (TTX 482; TTX 483; TTX 489; TTX 497; TTX 676; TTX 1012; Tr. 928:19-930:9.)

151. At 5:34 p.m. (EDT) on July 31, 2007, a call was placed from Terence Law's line to Eric Bloom's line at Sentinel. (TTX 929.) At 5:35 p.m. (EST), a call was placed from Mr. Law's line to T.C. Arana's line. (Id.)

152. On July 31, 2007, Sentinel obtained a $356 million loan from BNYM. On the loan card for July 31, 2007, BNYM priced certain of the securities held in lienable accounts, including $127 million in government securities and $323.9 million in DTC securities, and gave those securities a margined value of $122 and $275 million, respectively. (TTX 480; TTX 678; TTX 679; Tr. 1040:20-1042:25.)

153. There is a recorded phone call on July 31, 2007 at 12:09 p.m. (CDT), between Sentinel Assistant Trader Jeff Logan and DTC Administrator Denise Starks. (TTX 676.)

154. There is a recorded phone call on July 31, 2007 at 3:05 p.m. (CDT), between Sentinel Back-Office Manager Crystal York and DTC Administrator Walter Reid. (TTX 678.)

155. There is a recorded phone call on July 31, 2007 at 4:03 p.m. (CDT), between Sentinel Back-Office Manager Crystal York and GSCX Administrator Steve Johnson. (TTX 679.)

156. On August 1, 2007, Mark Rogers sent Stephen Brennan an email regarding Sentinel. (TTX 503.)

157. There is a recorded phone call on August 9, 2007 at 3:22 p.m. (CDT), between Sentinel

Back-Office Manager Crystal York and DTC manager Ron Silk. (TTX 680.)

158. BNYM was over-secured at all times between May 31 and July 31, 2007. (TTX 906A; TTX 883; Tr. 1762-63.)

**B. Week of August 13, 2007**

159. On August 13, 2007, Sentinel told its customers that due to issues in the credit markets it was temporarily halting customer redemptions. (TTX 523.)

160. On August 14, 2007, Sentinel sent to BNYM a copy of its August 13, 2007 letter notifying its customers that Sentinel was temporarily halting customer redemptions. (TTX 523.)

161. After BNYM obtained a copy of the August 13th letter, it established an ad hoc crisis team to manage the Sentinel relationship. (Tr. 1233:13-1233:24.)

162. On August 14, 2007, BNYM turned off Sentinel's remote access to BNYM's systems, which prevented Sentinel from automatically executing transactions and required Bank officer approval in order to execute Sentinel's instructions. (Tr. 527:2-14; Tr. 933:11-934:6; Tr. 1233:25-1234:15.)

163. There is a recorded phone call on August 14, 2007 at 2:39 p.m. (CDT), between Joseph Ciacciarelli and Sentinel Back-Office Manager Crystal York. (BTX 378.)

164. On August 14, 2007, there were numerous calls placed between Joseph Ciacciarelli's line and Eric Bloom's line. (TTX 929.)

165. On August 15, 2007, Terence Law and Brian Ruane arrived at Sentinel's offices. (Tr. 1415:19-24.)

166. On August 15, 2007, Joseph Ciacciarelli approved the movement of eight securities from Sentinel's DTC Seg 1 Account to its DTC Clearing Account. (BTX 294; BTX 295; TTX 553;

TTX 554.)

167. On August 15, 2007, Ron Silk informed Crystal York by email that eight securities had been transferred from Sentinel's DTC Seg 1 account to its DTC Clearing account. (TTX 554; BTX 294; BTX 295; Tr. 955:3-956:5.)

168. On August 15, 2007 at approximately 6:13 p.m. (CDT), Joseph Ciacciarelli received a voicemail from Eric Bloom. (TTX 931; Tr. 665:8-666:1.)

169. On August 15, 2007 at 6:17 p.m. (CDT), Joseph Ciacciarelli called Terence Law. (TTX 931.)

170. On the morning of August 16, 2007, the eight securities that were moved from Sentinel's DTC Seg 1 account to its DTC Clearing account on August 15, 2007 were moved back to Sentinel's DTC Seg 1 account. (BTX 299; BTX 300.)

171. On August 16, 2007, Ron Silk informed Crystal York by email that the eight securities had been moved from Sentinel's DTC Clearing Account to Sentinel's DTC Seg 1 Account. (BTX 300.)

172. On August 16, 2007, Joseph Ciacciarelli sent a letter to Sentinel requesting that it immediately repay its loan in full, and notifying Sentinel of BNYM's intention to commence liquidating the collateral that was pledged to secure the loan. (BTX 579.)

173. On August 17, 2007, Joseph Ciacciarelli sent another letter to Sentinel notifying it that due to its failure to repay its loan, on or after August 22, 2007, BNYM would liquidate the collateral pledged to secure the loan. (BTX 580.)

174. On August 17, 2007, Sentinel filed for bankruptcy. (TTX 867.)

**Post Petition**

175. On August 28, 2007, the United States Trustee for Region 11 appointed Frederick J. Grede to act as chapter 11 Trustee for Sentinel. (TTX 934; Tr. 187:23-188:4.)

176. On August 29, 2007, the bankruptcy court approved the United States Trustee's appointment of Mr. Grede as chapter 11 Trustee for Sentinel. (TTX 934; Tr. 187:23-188:4.)

177. On October 19, 2007, the bankruptcy court entered an order permitting the Trustee to transfer the cash and securities held in segregated accounts at BNYM to accounts at JPMorgan Chase. (TTX 934; Tr. 1705:5-1706:24.)

178. On December 13, 2007, the bankruptcy court entered an order authorizing the sale of certain securities held in the segregated account. (TTX 935; Tr. 1708:3-17.)

## III. DISCUSSION AND FURTHER FINDINGS OF FACT

### A.  Counts I & II - Fraudulent Transfer

Counts I & II of the complaint against the Bank consist of claims brought pursuant to Section 548(a)(1)(A) of the Bankruptcy Code and Section 5(a) of the Illinois Uniform Fraudulent Transfer Act ("UFTA") to avoid and recover allegedly fraudulent transfers that Sentinel made to BNYM.   The Trustee seeks to avoid the following six transfers identified by date: (1) June 1; (2) June 26; (3) June 29; (4) July 17; and (5) July 31 (collectively, the "Transfers").   In order to avoid these transfers as actually fraudulent, Plaintiff must demonstrate that: (1) Sentinel had an interest in the transferred property; (2) Sentinel transferred the property with actual intent to hinder, delay or defraud its creditors; and (3) the Transfers occurred within the applicable statutory period.   11 U.S.C. § 548(a)(1)(A); 740 ILL. COMP. STAT. 160/5/(a)(1).[2]   BNYM maintains that Plaintiff's claims fail because (1) the Transfers did not deplete Sentinel's estate;

---

[2] Plaintiff must prove fraud pursuant to the UFTA by clear and convincing evidence.  *In re Zeigler*, 320 B.R. 362, 372 (Bankr. N.D. Ill. 2005).  This Court noted in *Leibowitz v. Imsorn*, No. 02 cv 4465, 2003 WL 21785620, at *1, n.1 (N.D. Ill. Aug. 1, 2003), that "[b]ecause the state and federal statutes

(2) there is no evidence that Sentinel made the Transfers with the requisite intent to hinder, delay or defraud its creditors; (3) most of the securities have been returned to Sentinel; and (4) the Bank gave value in exchange for the Transfers.

To prevail, the Trustee must prove that Sentinel made the Transfers to BNYM with the intent to hinder, delay or defraud its creditors. The Trustee may do this either by direct evidence or circumstantial evidence also known as badges of fraud. These badges of fraud include: (1) whether the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer; (2) whether the debtor retained control of the asset; (3) whether the transfer was to a family member; (4) whether the transfer was prior to debtor incurring a substantial debt; (5) whether the transfer was substantially all of debtor's assets, *Leibowitz v. Imsorn*, No. 02 cv 4465, 2003 WL 21785620, at *2, n.1 (N.D. Ill. Aug. 1, 2003); (6) whether the debtor received consideration for the transfer; (7) whether the transfer was disclosed or concealed; (8) whether the debtor made the transfer before or after being threatened with suit by creditors; and (9) whether the debtor absconded. *Frierdich v. Mottaz*, 294 F.3d 864, 870 (7th Cir. 2002). Although a single badge of fraud is, in and of itself, insufficient to establish the requisite intent, the presence of several badges of fraud "may create a presumption of fraudulent intent[.]" *Leibowitz*, 2003 WL 21785620, at *2 (quotations and citations omitted).

Proof of a Ponzi scheme is also sufficient to establish that the scheme's orchestrators acted with the actual intent to hinder, delay or defraud creditors pursuant to § 548(a)(1). *Plotkin v. Pomona Valley Imps., Inc. (In re Cohen)*, 199 B.R. 709, 717 (9th Cir. 1996). A Ponzi scheme is:

---

are functional equivalents, except for the statute of limitations, the analysis is the same."

[a] fraudulent investment scheme in which money contributed by later investors generates artificially high dividends for the original investors, whose example attracts even larger investments. Money from the new investors is used directly to repay or pay interest to earlier investors, [usually] without any operation or revenue-producing activity other than the continual raising of new funds.

BLACK'S LAW DICTIONARY (8th ed. 2004). Transfers in furtherance of a Ponzi scheme "have achieved a special status in fraudulent transfer law" from which intent may be inferred. *Id.* By nature, a Ponzi scheme will eventually collapse, and perpetrators must know that the investors at the end of the line will lose their investment. *Martino v. Edison Worldwide Capital (In re Randy)*, 189 B.R. 425, 438 (N.D. Ill. 1995) (citation omitted). "Knowledge to a substantial certainty constitutes intent in the eyes of the law. Cf. *Restatement (Second) of Torts*, Sec. 8A (1963 & 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them." *Id.* (quoting *Merrill v. Abbott* (*In re Independent Clearing House Co.*), 77 B.R. 843, 860 (D. Utah 1987)).

Based on the evidence presented at trial, Trustee has failed to prove that Sentinel made the Transfers with the actual intent to hinder, delay or defraud its creditors. Trustee presented little direct evidence of Sentinel's intent at trial and claims that the elements of fraudulent transfer are largely uncontested here, asserting that "there is no serious doubt that the Sentinel Insiders acted with the requisite intent to hinder, delay, or defraud customers in de-segregating securities and pledging them as collateral for the [BNYM] loan." However, Trustee has failed to demonstrate that the requisite intent may be inferred through the existence of the badges of fraud. It is true that Sentinel was insolvent at the time of the transfer, and Trustee argues that Sentinel concealed the transfers from its creditors. But a review of the financial statements and forms 1-FR demonstrates that the loan interest was documented and that a significant portion of customer

cash and securities that was to be "segregated and held in trust" was pledged as collateral for the loan.  While each specific Transfer itself does not appear to be revealed in detail to Sentinel clients, the only reasonable inference is that the securities pledged as collateral were somehow transferred to an account that could be liened on by BNYM.  This is just the scheme that Trustee claims was kept hidden from Sentinel's clients.

Trustee argues that where a debtor perpetrates a fraudulent scheme involving the misuse of creditor assets, it is presumed to have acted with actual intent to defraud those creditors.  In support of this argument, Trustee cites *Cuthill v. Greenmark, LLC*, (*In re World Vision Entm't*), 275 B.R. 641 (Bankr. M.D. Fla. 2002), a case involving a Ponzi scheme; however, this case has no application here.  An argument may be made that such a rationale applies in this case, since, as Trustee argues, Sentinel was already insolvent at the time of the transfers.  *See Martino v. Edison Worldwide Capital* (*In re Randy*), 189 B.R. 425, 438 (N.D. Ill. 1995) (citation omitted) (the perpetrator of a Ponzi scheme knows that the scheme will eventually collapse and future investors will not be paid).  But Trustee presented no evidence at trial that Sentinel was engaged in a Ponzi scheme, nor did the Trustee prove that Sentinel Insiders knew or should have known that their scheme would collapse and that investors would go unpaid.  In fact, the evidence at trial proved that Sentinel was engaged in a scheme[3] to pay off certain creditors in order to close out repo positions and refinance or sell the returned securities, or to keep their line of credit open.  Trustee failed to prove that Sentinel knew at the time of the transfers that their scheme

---

[3] The word "scheme" is a synonym of plan and, in itself carries no legal weight. It is commonly seen in England where service providers advertise attractive "schemes" for, say, renting cars, but in this country the word "scheme" is sometimes used as a shorthand for "fraudulent scheme." The law still distinguishes between schemes which are fraudulent and those which are not.  I use the word "scheme" in its legal meaning, recognizing that the common use of scheme in this country is most often meant to describe plans which are, for example, foolish, inept, other worldly or distasteful but not necessarily fraudulent.

would collapse, and the Ponzi presumption does not apply.

Trustee also cites *In re Model Imperial*, 250 B.R. 776 (Bankr. S.D. Fla. 2000), and *McGraw v. Allen* (*In re Bell & Beckwith*), 64 B.R. 620 (Bankr. N.D. Ohio 1986). In *In re Model Imperial*, the court inferred fraudulent intent where there was direct evidence of fraud as well as the existence of five badges of fraud. 250 B.R. at 792. In this case, no direct evidence of fraud was presented, and at most, one badge of fraud.

> [A]lthough the presence of one specific 'badge' will not be sufficient to establish fraudulent intent, the confluence of several can constitute conclusive evidence of an actual intent to defraud. [*Dionne v. Keating (In re XYZ Options, Inc.)*], 154 F.3d [1262,] 1271 n. 17 [(11th Cir.1998)]; *see also General Trading Inc. v. Yale Materials Handling Corp*., 119 F.3d 1485, 1498 (11th Cir. 1997); *Harman v. First American Bank of Maryland (In re Jeffrey Bigelow Design Group, Inc.)*, 956 F.2d 479, 483-84 (4th Cir. 1992) ("While each fact does not have to demonstrate actual fraud, the facts taken together must lead to the conclusion that actual fraud existed."); *In re Young*, 235 B.R. 666, 669 (Bankr. M.D. Fla. 1999) ("While a single badge of fraud may create a suspicion but not the requisite fraud to set aside a conveyance, several considered together may afford a basis to infer fraud.").

*In re Model Imperial*, 250 B.R. at 792.

Significantly, those "badges of fraud" that are more likely to demonstrate fraudulent intent, e.g., whether the debtor retained control of the asset or transferred the asset to an insider; whether the debtor received consideration for the transfer; and whether the debtor made the transfer before or after being threatened with suit by creditors, are missing from the analysis.[4]

---

[4] BNYM contends, in effect, that even if the presence of two badges of fraud together with Sentinel's scheme can satisfy a finding of actual intent, the Trustee would be entitled only to partial recovery. The parties agree that all of the securities transferred out of segregation were returned to segregation, except for the $286 million in securities transferred in connection with the July 31 Transfer. On July 31, 2007, Sentinel transferred $286 million in securities from the Seg 3 accounts to the lienable DTC clearing account. But Trustee is seeking to avoid the value of the transfers, themselves as reflected in the lien, arguing that diminution of the estate is not a necessary element of fraudulent transfer under section 548(a)(1), and debtor's receipt of equivalent value in exchange for the transfer is irrelevant if the requisite intent exists. 5 COLLIER ON BANKRUPTCY ¶ 548.04[3] (16th ed. 2009); *see, e.g., Bayou Superfund, LLC v. WAM Long/Short Fund II*, (*In re Bayou Group, LLC*), 362 B.R. 624, 629-31 (Bankr. S.D.N.Y. 2007) (collecting cases) ("the entirety of the transfer is avoidable whether or not the debtor received value in

In *In re Bell & Beckwith*, the court found that a stock broker's diversion and use of customer funds for his own purposes was "part of a continuing course of conduct which was intended to defraud [his customers]." 64 B.R. at 629. Although the broker did not spend the diverted funds with the intent to defraud, "the availability of those funds was accomplished by and [was] the product of a deliberate fraud." *Id.* This fraud, together with the broker's deposition testimony, his conviction, the evidence at trial, and the defendants' admission that the broker indeed intended to defraud creditors all led the court to the conclusion that the transfers of the diverted funds were avoidable under section 548(a)(1). *Id.*

*In re Bell* is not this case. Here, the Bank has not admitted that Sentinel insiders acted with intent to defraud, nor have the Insiders been convicted or deposed (although Eric Bloom and Charles Mosley have been charged by the SEC with certain securities violations involving the misuse of customer assets). To the extent that *In re Bell* is analogous, I decline to apply it here. While the evidence at trial revealed the Bank's knowledge that Sentinel insiders were using at least some of the loan proceeds for their own purposes, and, we can assume for purposes of argument, that the Bank was aware that availability of those proceeds was, in part, the product of fraud, this alone does not lead to an inference of actual intent. "Section 548 and fraudulent transfer law generally attempt to protect creditors from transactions which are designed, or have the effect, of unfairly draining the pool of assets available to satisfy creditors' claims, or which dilute legitimate creditor claims at the expense of false or lesser claims." 5 COLLIER ON BANKRUPTCY ¶ 548.01[1][a] (16th ed. 2009).

---

exchange, and the plaintiff need not allege and prove that the transfer was for less than fair value if actual intent is alleged and proved under Section 548(a)(1)(A)"). While not dispositive, the receipt of adequate consideration is certainly a factor, reflected in the badges of fraud analysis, in determining whether the transfers were made with fraudulent intent. Because I find that Trustee failed to prove the requisite intent for fraudulent transfer, I need not decide the aforementioned recovery issues.

In order for a transfer to be avoidable, there must be

> some hindrance or delay greater than that implicit in a preferential transfer to certain creditors by an insolvent debtor. *In re Hartley*, 52 B.R. 679, 690 (Bankr. N.D. Ohio, 1985); *Coder v. Arts*, 213 U.S. 223 (1909). *See also In re Decker*, 295 F. Supp. 501 (W.D. Va.1969), aff'd. 420 F.2d 378 (4th Cir.1970). Similarly, transfers motivated by an attempt to protect credit, to continue in business or to rehabilitate are generally held to be outside the scope of § 548(a)(1), even if the debtor is insolvent at the time of transfer. *Harris Trust & Sav. Bank v. Keig*, 98 F.2d 952 (7th Cir.) cert. denied, 305 U.S. 658 (1938).

*Estate of Klein v. Klein, (In re Klein)*, Nos. 86 B 19937, 88 A 357, 1991 WL 242169, at *8 Bankr. N.D. Il. June 21, 1991).

Trustee's own expert witness James Feltman ("Feltman") testified that three of the transfers in question "had to do with closing out of repo positions[,]" and the remaining two were related to what Feltman called "structuring of collateral, the movement of securities between accounts." According to Feltman, the latter transfers were made in response to BNYM's rejection of physical securities as collateral. While Sentinel insiders may have misused the proceeds of the loan, there is no evidence that the transfers to BNYM were made with the actual intent to defraud, hinder or delay creditors. Sentinel's use of the loan proceeds to pay the repo counterparties is no more than a "hindrance or delay greater than that implicit in a preferential transfer to certain creditors by an insolvent debtor." If Trustee is correct that Sentinel was insolvent at the time of the Transfers, it is equally reasonable to infer that the Transfers were made to secure the loan in an attempt to continue conducting business and paying off existing creditors. Even if the Transfers were not designed to drain the assets, they can still be voidable if they result in the draining of the asset pool. But here, this was not the case - in exchange for the collateral, BNYM gave a loan of significant value, thereby adding to the pool.[5]

---

[5] There was some evidence that the Bank may have been overcollateralized at the time of the

Although "[a] general scheme or plan to strip the debtor of its assets without regard to the needs of its creditors can support a finding of actual intent[,]" *see Wieboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488, 504 (N.D. Ill. 1988) (citing *Freehling v. Nielson (In re F & C Servs.)*, 44 B.R. 863, 872 (Bankr. Fla. 1984)), the evidence does not support a finding that Sentinel was engaged in a scheme to strip itself of assets. Rather, Sentinel schemed to pay certain creditors - the repo counterparties – and to keep its line of credit open presumably in an attempt to stay in business, not to drain its assets and make them unavailable to other creditors. Furthermore, it appears that adequate consideration was given in exchange for the Transfers. For these reasons, BNYM is entitled to judgment on Counts I and II.

## B. Count III - Preferential Transfers

In Count III, Trustee seeks to avoid the June 29 and July 31 Transfers as preferential under Section 547(b) of the Bankruptcy Code. Section 547(b) allows a trustee to avoid a transfer to a creditor on account of an antecedent debt, a transfer made while the debtor was insolvent and within 90 days of the date of the filing of the petition. In order to be avoided, the transfer must enable the creditor to receive more than it would have in a Chapter 7 liquidation had the transfer not been made. The Trustee has the burden of proving, by a preponderance of the evidence, that the preferred party's claim is not fully secured. *In re Prescott*, 805 F.2d 719, 726 (7th Cir. 1986). Section 547(c) provides a defense to such claims where the transfer was made as part of a contemporaneous exchange for new value. Typically, "pre-petition transfers to fully secured creditors are protected under the Bankruptcy Code." *Triad Int'l Maint. Corp. v. Southern Air Transp., Inc.* (*In re Southern Air Transp., Inc.*), 511 F.3d 526, 533 (6th Cir. 2007). Such a transfer is not preferential because even in its absence, an oversecured creditor "would

---

Transfers, however, it is clear that the Transfers at issue did not drain the pool of assets.

receive payment up to the full value of his collateral in a Chapter 7 liquidation." *Southern Air*, 511 F.3d at 533.

On summary judgment, BNYM first maintains that the transfers did not improve BNYM's position since BNYM was already fully secured on the date each transfer was made. Had the allegedly preferential transfers not occurred, BNYM contends that it would have simply closed out its position, foreclosed on its collateral, and recovered its full claim. Next, BNYM argues the transfers were substantially contemporaneous exchanges for new value. Regardless of how Sentinel used the loan proceeds, it is clear that the two transfers at issue here were contemporaneous with advances on the BNYM loan or the release of existing collateral securing the BNYM loan. Finally, BNYM urges that because the securities transferred have already been returned to Sentinel, the Trustee is not entitled to recover the transfers even assuming that they could be avoided.

Trustee mainly disputes BNYM's contention that it was oversecured at the time of the transfers. Trustee points first to BNYM's demand for additional collateral prior to the June 29 transfer to replace certain physical securities that BNYM would no longer accept as collateral. Because BNYM would no longer accept the physical securities as collateral, Trustee contends that they should not be considered in any collateral calculation. Similarly, the DTC securities that BNYM would not price should also be excluded. Finally, Trustee contends that the securities that were fraudulently transferred to the lienable accounts in earlier Transfers cannot be considered as part of BNYM's collateral base for purposes of assessing whether subsequent Transfers were preferences.

BNYM takes issue with the Trustees's use of the Bank's daily loan cards to support the

claim that BNYM was undersecured on the loans. The loan cards, they maintain, were not daily inventories of collateral, and the Bank's collateral was not limited to the securities listed on the loan cards. They were used "simply to ensure that the BNYM loan was adequately collateralized for the night." BNYM notes that the subjective understanding of bank employees as to what was or should have been collateral is irrelevant, but such an understanding may be relevant to exactly how loan cards were used in the valuation process. Trustee provides no valuation analysis of the securities in the lienable accounts on the date of the Transfers,[6] and without any valuation to rebut BNYM's evidence, Trustee cannot prove that BNYM was undersecured. Trustee does note that the securities that were previously fraudulently transferred into lienable accounts cannot be considered as part of BNYM's collateral base, presumably because they would not be recoverable in a Chapter 7 liquidation. Here, Trustee claims, BNYM did not have pre-existing rights to the securities in the Seg accounts, so the transfers at issue did improve BNYM's position. Assuming the Transfers alleged to be fraudulent in Counts I and II are found to be so, Trustee suggests that he may succeed on this Count. This assumes, however, that once the earlier transfers are excluded from the calculation, BNYM would have in fact been undersecured. As part of its summary judgment motion, BNYM submitted expert opinion from Paul Charnetzki that as of the date of the relevant transfers, BNYM was overcollateralized even excluding the unpriced DTC and physical securities. In fact, Feltman testified that the Bank was consistently overcollateralized throughout the summer of 2007. Trustee presented little evidence to the contrary, and seems to have abandoned this claim at the close of trial, presumably for this reason. BNYM is entitled to judgment on Count III.

---

[6] Trustee does suggest that BNYM did not look to the physical securities as collateral, but BNYM's expert attributed no value to these securities and they are therefore not included in the collateralization analysis.

**C. Count IV - Equitable Subordination**

In Count IV, Trustee seeks equitable subordination, pursuant to section 510(c) of the Bankruptcy Code, of all of BNYM's claims in Sentinel's Chapter 11 case to a level below all other creditors' claims and to transfer any liens supporting BNYM's claims to Sentinel's estate. Claims for equitable subordination are evaluated using the three-part test set forth in *Benjamin v. Diamond* (*In re Mobil Steel Co.*), 563 F.2d 692, 699-700 (5th Cir. 1977). *See United States v. Noland*, 517 U.S. 535, 538-39 (1996); *In re Kreisler*, 546 F.3d 863, 866 (7th Cir. 2008). Under this test, for a court to subordinate a claim, it must conclude that: (1) the claimant engaged in some type of inequitable conduct; (2) the misconduct resulted in injury to the creditors or conferred an unfair advantage on the claimant; and (3) subordination is not inconsistent with the provision of the Bankruptcy Code. *In re Mobil Steel Co.*, 563 F.2d at 699-700; *see In re Kreisler*, 546 F.3d at 866. Equitable subordination is an "extraordinary remedy" that "should be invoked only in extreme circumstances and only where a clear inequity has been wrought." *Aetna Bank v. Dvorak*, 176 B.R. 160, 166 (N.D. Ill. 1994). "Absence of statutory criteria commits the subject to the courts, to be worked out in the common law fashion." *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1356 (7th Cir. 1990) (citations omitted).

"Traditionally, equitable subordination has been limited to cases involving (1) fraud, illegality or breach of fiduciary duty, (2) undercapitalization, or (3) control or use of the debtor as an alter ego for the benefit of the claimant." *In re Granite Partners*, *L.P.*, 210 B.R. 508, 514 (Bankr. S.D.N.Y. 1997) (citations omitted). "Where noninsider, non-fiduciary claims are involved, the level of pleading and proof is even higher." *Id*. at 515. "Courts have described the

degree of wrongful conduct warranting equitable subordination of an ordinary creditor's claim as 'gross and egregious', 'tantamount to fraud, misrepresentation, overreaching or spoilation' or 'involving moral turpitude.'" *Id*.

Trustee maintains that BNYM acted inequitably by: (1) taking customer securities as collateral without investigating Sentinel's authority to pledge them; (2) failing to establish a process designed to carry out segregation; (3) demanding additional collateral despite being over secured, and using proceeds of securities sales to pay down the loan; and (4) lying throughout the course of the litigation. According to Trustee, this conduct amounts to: (1) BNYM's participation in the misappropriation of customer assets; (2) violations of section 6(d)(b) of the CEA, which imposes segregation obligations on FCMs and custodians; (3) violation of its letter agreements with Sentinel, which included segregation provisions; (4) violation of segregation requirements under the Investment Advisors Act ("IAA"); (5) violations of statutory, contractual and customary obligations to segregate; and (6) negligence by failing to investigate after being put on notice of a misappropriation. Trustee maintains that this conduct resulted in harm to creditors and benefit to BNYM. The Bank contends that its arm's-length, good-faith transactions were in no way inequitable. According to BNYM, Trustee has failed to prove that BNYM was deliberately indifferent to Sentinel's alleged fraud.

## D.  Whether The Bank Knew Or Suspected That Sentinel Was Engaged In A Fraud

The evidence made clear that BNYM knew that Sentinel was subject to the CEA and that its customer assets had to be segregated. In March 1997, Joseph Ciacciarelli signed, on behalf of BNYM, three letters referred to as Seg Letters. In those letters, the Bank acknowledged that the funds held in Sentinel's customer accounts would be "segregated and

treated as belonging to [Sentinel's] customers" and would "not be subject to [BNYM's] lien or offset for, and on account of, any indebtedness now or hereafter owing [by Sentinel] to [BNYM]." These acknowledgment letters were necessary to demonstrate to the NFA, Sentinel's designated self-regulatory organization, that the accounts opened at BNYM met the legal requirements for segregation of customer funds. If BNYM had been unwilling to make such acknowledgments, Sentinel would have been required by the NFA to find a different depository.[7]

In 2006, Mark Rogers circulated to Ciacciarelli, Law and Brennan, a 2004 no-action letter which states that the funds maintained in the Seg I accounts are held pursuant to relevant provisions of the CEA for the benefit of Sentinel's customers, that BNYM could not use the funds in either the Seg I or the Seg III accounts for its own purposes, and that BNYM cannot offset any Sentinel obligation by funds maintained in the Seg I account. In his accompanying e-mail, Rogers asked the recipients "Operationally: Have we set up the seg accounts and operate them as outlined in the letter? I assume the collateral we lend against is not in the seg accounts." (TTX-188). Finally, in an April 10, 2006 conference call with Law, Rogers, Ciacciarelli, and Brennan, Eric Bloom made clear that money being held by Sentinel on behalf of its FCM clients qualified for those clients' segregation requirements, which is why Sentinel itself was registered as an FCM. Not only was Sentinel registered as an FCM, but Sentinel and its customers relied on and benefitted from its FCM status, largely, if not entirely, because it is simpler for an FCM to park its assets with another FCM than in most other places.

Throughout the litigation, BNYM has maintained that although Sentinel was registered as an FCM, its FCM status was a fiction, and it was reasonable for BNYM to view Sentinel as an

---

[7] The CFTC explains in detail the role of acknowledgment letters within the regulatory scheme in its Supplemental Amicus Curiae Memorandum filed in this case.

investment manager.  While it is true that Sentinel was not a traditional FCM, the evidence shows that BNYM employees knew it was registered as one and that it had to abide by applicable rules.  Eric Bloom's own statements to BNYM about Sentinel's FCM status made Sentinel's reliance on its status clear.

Against the back-drop of the evidence, the issue of whether the Bank knew or suspected that Sentinel was engaged in a fraud is a close question.  BNYM argues that in order for a creditor's claim to be subordinated, the creditor must have actual knowledge that Sentinel was engaging in improper behavior.  *See, e.g., Stratton v. Equitable Bank, N.A.*, 104 B.R. 713, 731 (D. Md. 1989) (granting summary judgment to lender on an equitable subordination claim where the lender was not certain that debtor was engaging in fraud but may have acted negligently in continuing to lend to a grossly undercapitalized debtor committing potential illegalities).  But a creditor cannot be willfully blind to the details of a fraud to avoid actual knowledge.  *Mishkin v. Siclari* (*In re Adler, Coleman Clearing Corp.*), 277 B.R. 520, 554,566 (Bankr. S.D.N.Y. 2002) (subordinating the claim of a defendant who "knowingly closed his eyes to" a fraud).[8]  Trustee argues that in the case of a corporation, "knowledge" of a fact means the collective knowledge of all the company's employees.  *See United States v. Bank of New England, N.A.*, 821 F.2d 844, 856 (1st cir. 1987) ("Corporations compartmentalize knowledge, subdividing the elements of specific duties and operations into smaller components. The aggregate of those components constitutes the corporation's knowledge of a particular operation."); *United States v. Science Applications Intern. Corp.*, 653 F. Supp. 2d 87, 99 (D.D.C. 2009) ("It is both appropriate and

---

[8] It is worth noting that *In re Adler, Coleman Clearing Corp.*, involved wrongdoing by the defendant's agent, and the court held that a principal is liable for the frauds of his agent.  But the court also found that defendant was a willful and knowing participant where he was "willfully blind" to the fraud he disclaimed. *In re Adler, Coleman Clearing Corp.*, 277 B.R. at 554, 566 (Bankr. S.D.N.Y. 2002).

equitable to conclude that a company's fraudulent intent may be inferred from all of the circumstantial evidence including the company's collective knowledge.") (citation omitted); *Camacho v. Bowling*, 562 F. Supp. 1012, 1025 (N.D. Ill. 1983) (Organizations "such as private corporations or partnerships, are held to have constructive notice of the collective knowledge of all the employees and departments within the organization.").  BNYM challenges this standard, and maybe rightfully so since the "all employees" clause might well need some boundary lines.  To decide this case, there is no need for either side to invoke an "all employees" rule.  All the BNYM employees who dealt with Sentinel are, in fact, known to all parties.  Testimony and documents from this pool of employees were subject to discovery and, I believe, in large part introduced at trial.

According to BNYM, proof is wanting that the Bank actually knew of Sentinel's improper conduct.  BNYM had representations and warranties from Sentinel that Sentinel had the right to pledge the securities and it is undisputed that Sentinel used a leveraged investment strategy for certain of its portfolios, a fact which the Bank knew.   According to BNYM, it had no duty to monitor Sentinel's compliance with the CEA.

The remaining "red flags," BNYM argues, were not red flags for these reasons. It was not unusual for a BNYM customer to have relatively little capital and a large loan, especially when the customer is an investment manager, whose purpose is to invest its clients' funds. Furthermore, once Sentinel began employing a leveraged trading strategy (which was disclosed to its clients), it was not unusual that the loan was not paid back with the same frequency. BNYM was unaware that Sentinel was misallocating a disproportionate amount of the loan to its own proprietary trading account, and neither the NFA nor the CFTC took note of this

misallocation, nor of the irregularities on the Forms 1-FR or financial statements. Regardless, BNYM notes, it followed up with Sentinel when it did notice any irregularity and received what it deemed a satisfactory explanation for discrepancies on audited financial statements.

Trustee contends that BNYM employees either knew or turned a blind eye to the fact that Sentinel had used misappropriated securities as collateral for the loan. BNYM had Sentinel's audited financial statements and monthly 1-FRs. For example, the 2005 financial statements showed customer securities "segregated and held in trust" to be approximately $1.14 billion, but that approximately $156 million of this total was pledged as collateral for a $280 million short-term bank loan.

Law and Ciacciarelli, both of whom reviewed these monthly statements, admitted that securities pledged as collateral could not simultaneously be held in segregation.[9] Moreover, a simple review of the monthly 1-FRs indicated that the difference between the amount of assets listed as "funds segregated or in separate accounts pursuant to the CEAct and Regulations" and Sentinel's total assets was never more than approximately $15 million. Therefore, in order for Sentinel to pledge collateral in excess of that difference, it would have to use assets that had been held in segregation and then removed from segregation to allow them to be pledged. The 1-FRs also failed to reflect the loan or the repos, which should have raised questions in the minds of BNYM employees who knew of the loan and the repos.

According to Trustee, other "red flags" include BNYM's awareness that massive amounts of securities were being desegregated for the sole purpose of collateralizing BNYM's loan. BNYM also knew that Sentinel had little capital, a relatively large loan which was being used to

---

[9] The numbers also raise questions about the accuracy of the reporting, in light of the fact that BNYM was oversecured for the loan, however, because the statement of financial condition includes hundreds of millions in "Securities Pledged," separate and apart from customer securities that were held by

fund payments to repo counterparties returning physical securities. Trustee maintains that because there were no segregated accounts for physical securities, BNYM would have known that those securities were house positions, and they could not be placed back in segregation. Therefore, the trustee reasons, BNYM must have known that Sentinel was moving securities out of segregation in order to finance the repurchase of its house positions. BNYM employees also knew that Sentinel was using a leveraged trading strategy and had been conducting proprietary trading.

On June 13, 2007, after reviewing Sentinel's holdings and the large size of the loan, Rogers asked the Sentinel team at BNYM how Sentinel was able to put up as much collateral as it had, with only $2 million in capital. Rogers wrote ". . . I have to assume most of this collateral is for somebody else's benefit. Do we really have rights on the whole $300MM?" Law testified that he consulted with a number of colleagues prior to responding: "Hello. We have a clearing agreement which gives is a full lien on the box position outlined below." According to Law, this was a well- advised and carefully worded statement. But both Rogers and Law knew before the June 13 e-mail that Sentinel had a clearing agreement that gave BNYM a lien on any securities in the collateral account.

Two competing inferences may be drawn from Law's response. The response may be viewed as an effort to halt Rogers' inquiry into the matter, for fear of what BNYM might find. Or, the response can be interpreted to mean that these are questions with which BNYM need not concern itself - the clearing agreement allows the Bank to lien on assets in the box and contains representations and warranties from Sentinel that they had rights to pledge the collateral to the Bank. In either case, Rogers' inquiry is certainly evidence that he had a suspicion that the

Sentinel, this suspicion is not conclusive evidence of knowledge.

securities were not Sentinel's to pledge and he shared this suspicion with Law. But if the response was basically that any further inquiry is unnecessary based on the clearing agreement, then the question is whether Law and BNYM generally were entitled to rely on Sentinel's representations and warranties contained in the Global Clearing and Custody Agreement that

> Either [Sentinel] owns the securities in the Accounts free and clear of all liens, claims, security interests and encumbrances . . . or, if the Securities in an Account are owned beneficially by others, [Sentinel] has the right to pledge such Securities to the extent financed by [BNYM] hereunder, free of any right of redemption or prior claim by beneficial owner.

Rogers and Ruane both acknowledged that it would have been improper for BNYM to rely on such representations and warranties in the face of certain misrepresentations or misconduct by Sentinel.

At the April 2006 conference call, Bloom explained: "We never act as principal, only as agent." Law, though, testified that at that time he knew that Sentinel was engaged in proprietary trading, and to conduct proprietary trading, Sentinel would have to act as principal. Bloom later admitted to moving money from segregation to meet margin requirements, but also explained that an investor "can take their entire investment same day." The team knew that same-day liquidity was part of Sentinel's agreement with its customers, which also suggests that Sentinel may not have had the right to pledge customer assets, especially in light of the fact that Sentinel stopped paying the loan off on a daily basis, indicating that the loan was no longer being used only for failed trades and liquidity. It is true that BNYM employees were also aware that some of Sentinel's clients were hedge funds and that the loan was being used for leverage as well as liquidity (both presumably for the benefit of the customers), as had been discussed on the call. But the 1-FRs reviewed by Law and Ciacciarelli in and of themselves contained significant

improper reporting, demonstrating that Sentinel was violating its segregation requirement.[10]

It is clear to me that by June 13, 2009, certain BNYM employees had suspicions that Sentinel may not have had rights to the collateral. Members of the Sentinel team also had access to forms 1-FR which, with relatively cursory review, revealed that Sentinel was violating its segregation requirements. BNYM argues that their employees were not looking at the forms 1-FR for such violations. Indeed, BNYM argues, it had no duty to Sentinel or the public to monitor Sentinel for CEA violations. For their own interests in securing the loan I have little doubt that BNYM should have looked further into whether Sentinel had the right to pledge the securities. BNYM employees were careless in protecting their own interests. It is not these interests that Sentinel is here to enforce.

To secure a finding of equitable subordination, Trustee must prove that BNYM knew of or was deliberately indifferent to Sentinel's misconduct. Trustee maintains that the Bank must be found to know what a reasonable person under the same circumstances should have known, sometimes called an objective standard.

BNYM contends that the standard is more subjective, where, in order to find that BNYM knew of the misconduct, Trustee would have to show that the Bank appreciated the significance of what was before it.

This question of law is quite significant. Under BNYM's standard, it prevails. It was not looking at the forms 1-FR in an effort to determine whether BNYM was violating its segregation requirements. It had a relatively unremarkable ten-year relationship with Sentinel. For years, the overnight loan made to Sentinel was frequently paid back the next day, signaling that the

---

[10] Although in the clearing agreement, Sentinel represented that it had the right to pledge the collateral, it is not entirely clear how such assets should have been reported had this authority actually been granted. However, since Law and Ciacciarelli both testified that securities pledged as collateral could not

securities used as collateral were going back into segregation.  BNYM had assurances from Sentinel that it was authorized to use customer securities for collateral, and customers were aware that Sentinel was using a leveraged trading strategy.  From the collateral reports it had, BNYM would not have seen the movement of collateral to and from seg accounts, and it is unreasonable to expect that the Bank should have sought the information it needed to track each movement.  Indeed, the long-standing, untroubled nature of the banking relationship led Trustee to decide, for tactical reasons, to challenge only those transactions that occurred in the few weeks before Sentinel failed.

If BNYM should have been more diligent with regard to verifying the source of collateral, such a lack of care does not rise to the level of the egregious misconduct necessary for equitable subordination.  The fact remains that BNYM had little reason to conduct such a verification and could rely on representations and warranties. Notwithstanding the evidence that demonstrates that at least one BNYM employee was suspicious, several of the facts that Trustee maintains support a finding of knowledge do not necessarily suggest that Sentinel was misusing customer assets. "[K]nowledge of bookkeeping irregularities of a depositor or suspicions of a few employees of a large banking institution are not the equivalent of knowledge that another party doing business with the bank's depositor is being defrauded."  *Stratton v. Equitable Bank, N.A.*, 104 B.R. 713, 731 (D. Md. 1989) (citation omitted).

Furthermore, the issue of BNYM's motivation is problematic for Trustee's theory that BNYM employees turned a blind eye to facts of Sentinel's fraud.  The Bank argues that it had no motivation to participate in or turn a blind eye to Sentinel's misconduct, and points out that its employees' compensation was not pegged to credit-related revenue. Trustee claims that members

simultaneously be held in segregation for reporting purposes, the proper reporting method is not relevant.

of the Sentinel team were pressured to increase loan revenue, but it is implausible that to do this, career bank employees would put their jobs at risk to lend money to a company that they knew to be stealing from its customers. During the summer of 2007, the Sentinel team at BNYM was working with Sentinel to reduce the size of the loan. BNYM reaped nearly $1 million per month in interest, but revenue of such little intrinsic attraction does not make it worth risking the possibility that a loan in the hundreds of millions could end up a loss for the Bank. It is possible that by June 2007, the time of Rogers' e-mail, the Sentinel team at BNYM had actual knowledge that Sentinel was pledging securities that should have been in segregation, but their behavior seems to contradict this possibility. BNYM asked for better-quality securities without verifying whether Sentinel was authorized to pledge them. Even in July 2007, when Bloom told Law that a client of Sentinel's was "having regulatory problems of his own" with the CFTC, Law paid no mind to this comment and was concerned only with getting the loan balance down. And finally, after Sentinel had halted customer redemptions, and it became clear that the Bank's relationship with Sentinel was coming to a close, Ciacciarelli approved the movement of $16 million in securities out of a lienable collateral account into Seg I after being told by Eric Boom that those securities were to be part of the pending Citadel sale.[11] Ciacciarelli relied on Bloom's representation even to the Bank's detriment, which appears to me here to be inconsistent with the conduct of someone who suspected fraud by Sentinel. The course of conduct serves as contradiction of the assertion that BNYM employees had actual knowledge of, or turned a blind eye to, Sentinel's fraud.

Under Trustee's more objective standard Trustee prevails for some of the time periods at issue, even despite these counter indications. The facts demonstrate that by the middle of June,

_____

[11] Sometime around August 17, Sentinel sold a portion of its assets to Citadel Investment Group.

at least one BNYM employee was suspicious, and others should have known that Sentinel was violating segregation requirements. In light of such notice, it is difficult to see how reliance on Sentinel's representations and warranties contained in the clearing agreement is objectively appropriate. While the size of the loan relative to the capital might, at the time, not have been noteworthy,[12] the 1-FRs certainly put BNYM on notice that Sentinel was violating its segregation obligations. And after years of paying its overnight loan back daily, BNYM suddenly had soaring loan balances that were outstanding on a daily basis. BNYM claims it did ongoing diligence, focused on Sentinel's creditworthiness in an effort to ensure repayment and noticed nothing. But the question of whether Sentinel had the right to pledge the collateral certainly goes to the heart of whether BNYM was adequately secured. Even if the Bank was solely concerned with protecting its own interests, a diligence process that excludes such a verification seems to be ineffective and reckless in light of the facts of which the Sentinel team at the bank was aware, and a reasonably prudent person would have taken a closer look at, at least, the 1-FRs sitting in front of him or her. Moreover, BNYM claims that distribution of Sentinel's 1-FR statements were part of the diligence process, but again, it is difficult to see how such diligence can be considered thorough or effective where the financial statements that clearly indicate segregation violations are part of the diligence yet raise no suspicion. Finally, during their testimony, the demeanor of Rogers, Law and Ciacciarelli was telling. Often, the witnesses appeared to have difficulty accounting for their own motivation during the course of events at issue. For example, Rogers was unable to recall why he wrote the June 13, 2007 e-mail, or why

---

[12] I note here that contrary to BNYM's argument, at least one BNYM employee, a GSCX administrator, exclaimed "Wow!" when Sentinel called in a $496 million loan on July 17, 2007. Having heard the recording, I find the "wow" was an expression of amazement but it is, in its context, not evidence that BNYM "knew of" or "was deliberately indifferent" to Sentinel's misconduct; nor can it be treated as evidence of actual lack of knowledge at BNYM.

he would have been satisfied with the response from Law when it did not directly answer his question and consisted of information he already knew.

There were instances during trial in which bank employees gave testimony I did not believe. Yet, in this case, lies on the witness stand coming from the mouths of some BNYM witnesses do not lead me to infer that the truth would help Trustee.

In this case, it was in the Bank's interest to have been significantly more careful in administering its loan to Sentinel. The Bank employees who ran the Sentinel lending program could defend the Bank here by testifying that they did precisely, and diligently, what good bankers would do, but that the loan went off the tracks anyway. Or, they could say they checked all the procedural boxes but not so diligently; everything was going smoothly, there was good collateral, but a lot of other things on their plate. Both of these versions can be the basis for a defense against the specific claims here. So too would be an admission that Sentinel just outsmarted the bankers.

It often runs against the personal interests of any employee to say anything other than "I did my job perfectly but the train wreck happened anyway. I did not forget to pull the track switch; it was the switch that failed." At times the best retreat is to say "I don't remember why I did what I did or why I accepted someone's word" rather than say "Those things didn't seem significant to me, so I let them go and turned to more important matters." No employee wants to say "I just dropped the ball," even if admitting negligence is the truth. There are a lot of reasons for inattentiveness and failure to follow up. Few, if any, are harmless to employee status. Lies are sometimes told, as they were here, not to help the employer in a lawsuit, but rather to help the employee's career.

One significant employee of the bank exhibited a demeanor and offered answers so preposterous that I thought he was in imminent fear of being fired. Upon questioning he denied this. But I do not believe that he was covering up his or the Bank's knowledge of the pre-collapse mess at Sentinel. He was simply unwilling to concede that he had not performed well in protecting his employer's interests.

I give some small weight to the fact that, had the affected employees wished to cobble together a better, credible version of history, there was at least one plausible one - that the collapse of Sentinel, a solid, long-time client, came rather quickly, and that by early August, BNYM employees, namely Rogers, were concerned that Sentinel might go bankrupt, but at that point it was too late in the game to take preventative measures. On occasion, I regard the failure to offer a readily available, nicely turned defensive tale as a minor reason to conclude that the witnesses were not determined liars. This case is one such occasion. The nervousness and demeanor of the witnesses on the stand, together with their failure to put forth a more plausible and coherent narrative of the events of the summer of 2007, leads me to conclude that the witnesses were not covering up wrongdoing, but were rather worried about the professional consequences of their failure to look more closely at the situation as it unfolded.

BNYM's reaction to the failure of Sentinel is quite consistent with angry surprise. Law's apparent rudeness at certain points during his time at Sentinel's offices for a post-disaster process is consistent with his lack of knowledge about Sentinel's practices. For example, at one point, Law displaced an employee seated in the office of Sentinel's controller, presumably to call and report back to the BNYM team. There was clearly no pre-planned response here. The general response within the Bank was a panicked grasp for whatever control and assets they could secure

to defend their interests. This is consistent with the proposition that no one at BNYM knew of a reason to prepare for Sentinel's failure.

I do find credible, if not at all admirable, the testimony of the Bank employees that they neither knew nor turned a blind eye to the improper actions of Sentinel. The fact that they would have been better bankers if they had made a more rigorous inspection of Sentinel's operations or its reporting is not enough to hold BNYM liable. If some degree of negligence were enough to establish inequitable conduct, the result might be different.

In an effort to demonstrate liability, Trustee relies on the objective test. But the cases he cites do not.

Each equitable subordination case cited by Grede that involved non-insiders addressed creditors that willfully engaged in inequitable conduct. *Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.)*, 277 B.R. 520, 566 (Bankr. S.D.N.Y. 2002) (creditor "willingly" and "knowingly" engaged in conduct that amounted to "fraud, illegality, [and] breach of fiduciary duty"); *Granite Partners*, 210 B.R. at 511, 515 (creditor "was not only aware of the [debtor's] fraudulent scheme; it actively participated in it"); *Aluminum Mills Corp. v. Citicorp N.A., Inc. (In re Aluminum Mills Corp.)*, 132 B.R. 869, 894-5 (Bankr. N.D. Ill. 1991) (lender paid debtor's principals to induce them to breach fiduciary duties to debtor); *Lichtenstein v. MBNA Am. Bank, N.A. (In re Computer Personalities Sys., Inc.)*, 284 B.R. 415, 428 (Bankr. E.D. Pa. 2002) (lender made loans to debtor's customers to finance purchase of debtor's products knowing that debtor would be unable to ship products and that debtor was violating state and federal consumer protection laws); *In re Model Imperial, Inc.*, 250 B.R. 776, 804 (Bankr. S.D. Fla. 2000) (lender made loans to shell corporation to circumvent restrictions on additional borrowing in debtor's

existing loan facility); *Capitol Bank & Trust Co. v. 604 Columbus Ave. Realty Trust (In re 604 Columbus Ave. Realty Trust)*, 968 F.2d 1332, 1338–39, 1361–62 (1st Cir. 1992) (creditor-bank misappropriated loan proceeds and then charged interest on the very proceeds it misappropriated from borrower); *Miller v. Greenwich Capital Fin. Prods., Inc. (In re Amer. Bus. Fin. Servs.)*, 362 B.R. 149, 165 (Bankr. D. Del. 2007) (defendant intentionally suppressed the value of debtor's assets).

Some courts have employed a more objective standard, whereby the claimant's knowledge of the debtor's misconduct or the circumstances supporting the subordination was viewed from the perspective of a reasonable person.[13] In *In re Mobile Steel*, which the Seventh Circuit has cited with approval, the Court discussed whether the claimant knew of the debtor's undercapitalization as a ground to subordinate the claim. 563 F.2d at 702. The Court deemed irrelevant "the intentions of the parties as evidenced by their observance of many of the appropriate formalities[,]" and determined whether the debtor was undercapitalized through the eyes of "reasonably prudent men with a general background knowledge of the particular type of business and its hazards would determine[.]" *Id.* at 702-03 (citation omitted). In *Credit Suisse v. Yellowstone Mountain Club (In re Yellowstone Mountain Club)*, 09-00014, 2009 WL 3094930, at *8-*9 (Bankr. D. Mont. May 12, 2009), the court subordinated the claim of a secured creditor who had loaned the debtor money while conducting minimal due diligence and turning a blind eye to financial statements and circumstances which indicated that the debtor would be unable to service an increased debt load. It is true that the nature of the real estate lending involved in *In*

---

[13] I note here that, in *United States v. Noland*, 517 U.S. at 543, the Supreme Court reserved the question of "whether a bankruptcy court must always find creditor misconduct before a claim may be equitably subordinated." But because the Supreme Court has not yet made its pronouncement, I am bound by the Seventh Circuit's opinion in *Kham & Nate's Shoes*, 908 F.2d at 1357-58, where the Court held that in order to be deemed inequitable conduct, an arm's length transaction must result in something more than

*re Yellowstone* is different from the fast-paced world of overnight loans involved here, but for the purposes of the standard that warrants a finding of knowledge, this factual distinction is irrelevant.[14]   But even following these cases, the Trustee does not prevail.

The purpose of the equitable subordination is to remedy the inequity that has resulted from the misconduct of a creditor.  4 COLLIER ON BANKRUPTCY ¶510.05[2] (16th ed. 2009).  I find that the pure objective standard does not fit well with the concepts of inequity and misconduct.  This is why the cases which apply objective standards rest on the premise that bankers and businessmen are to be judged in terms of what they should have known as opposed to what they could have known.  To simply combine the presumed ability of a banker to evaluate risk with the facts that the banker could have discovered in order to anticipate bankruptcy is not enough.  There has to be an element of "should" rather than could.   In the circumstances of this case I am persuaded that the bankers had no legal obligation – no "should" – to seek out or analyze the data which Trustee claims would have led it down the correct path.  Even my criticism of the Bank is based, not on what it should have done, but what it could have done even if it were not bound by the law to do it.

### B.  Whether BNYM's Failure To Act On Its Constructive Knowledge Requires That BNYM's Claim Be Subordinated

Where the debtor and creditor have dealt at arm's length, "subordination depends on a combination of inequitable conduct, unfair advantage to the creditor, and injury to the other creditors."  *Kham & Nate's Shoes No. 2*, *Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1356 (7th

---

simple inequity – breach plus, for example, some kind of advantage taking.
    [14] It is, however, an important factual distinction, in that the behavior that the court found to be egregious in *In re Yellowstone*, may not be so considered in a situation where not only the nature of the lending differed, but the benefit to the lender was lesser and the relationship between the debtor and lender was long and well-established.

Cir. 1990). There is no duty of "kindness" among non-fiduciaries. *Id.* at 1357. Merely enforcing the terms of a contract does not give rise to an equitable subordination claim. *Id.* Indeed, a non-fiduciary may act strategically to protect itself to the potential detriment of others. *Badger Freightways v. Continental Ill. Nat. Bank,* 106 B.R. 971, 976 (Bankr. N.D. Ill. 1989). Inequitable conduct for a non-fiduciary means "breach *plus* some advantage-taking," *Kham & Nate's,* 908 F.2d at 1357, or else "gross misconduct tantamount to fraud, overreaching, or spoliation to the detriment of similarly situated claimants." *Badger Freightways,* 106 B.R. at 976. "Inequitable conduct is that conduct which may be lawful, yet shocks one's good conscience. It means, inter alia, a secret or open fraud, lack of faith or guardianship by a fiduciary; an unjust enrichment, not enrichment by bon chance, astuteness or business acumen, but enrichment through another's loss brought about by one's own unconscionable, unjust, unfair, close or double dealing or foul conduct." *80 Nassau Assocs. v. Crossland Fed. Savgs. Bank* (*In re 80 Nassau Assocs.*), 169 B.R. 832, 837 (Bankr. S.D.N.Y. 1994) (citing *In re Tampa Chain Co.*, 53 B.R. 772, 779 (Bankr.S.D.N.Y.1985)), quoting in turn *In re Harvest Milling Co.*, 221 F. Supp. 836, 838 (D. Or.1963). "[T]he few cases that actually subordinated an ordinary claim did so based upon a finding of actionable wrongdoing." *In re Granite Partners*, *L.P.*, 210 B.R. at 515 (collecting cases).[15]

In order to decide whether BNYM's claim should be subordinated, I consider (1) whether

---

[15] The court cited: *In re Bowman Hardware & Elec. Co.*, 67 F.2d 792, 794-95 (7th Cir.1933) (claimant who participated in scheme to misrepresent to another creditor the existence of the claimant's loan to the debtor was equitably subordinated to that creditor's claim); *604 Columbus Ave. Realty Trust v. Capitol Bank & Trust Co.*, (*In re 604 Columbus Ave. Realty Trust*), 119 B.R. 350, 377 (Bankr. D. Mass.1990) (bank's claim would be equitably subordinated where bank was guilty of misappropriation of loan proceeds, fraud and breach of contract and its conduct caused injury to creditors and gave it an unfair advantage), aff'd in part and vacated in part on other grounds, 968 F.2d 1332 (1st Cir.1992); *Bank of New Richmond v. Production Credit Ass'n* ( *In re Osborne*), 42 B.R. 988, 999-1000 (W.D. Wis.1984) (claimant's misrepresentation to another creditor, coupled with that creditor's justifiable reliance, supported equitable subordination of claimant's claim but only to claim of injured creditor); *see Bojayian v. DeFusco* (*In re*

BNYM violated any duties; (2) whether BNYM's conduct shocks the conscience; and (3) whether BNYM'S misconduct conferred an unfair advantage or caused harm to creditors. Trustee maintains that BNYM has violated several duties, that its conduct is egregious, and that Sentinel's customers have been harmed.   Significant to each argument is whether BNYM knew of Sentinel's misconduct.

First, Trustee maintains that BNYM not only knew of but actively participated in Sentinel's misappropriation of customer securities.  In the alternative, Trustee maintains that BNYM was willfully blind, and should have known of Sentinel's misconduct. There is little dispute that negligence and breach of contract alone do not satisfy the equitable subordination standard.  In *Stratton*, the court found that "knowledge of bookkeeping irregularities of a depositor or suspicions of a few employees of a large banking institution are not the equivalent of knowledge that another party doing business with the bank's depositor is being defrauded." *Stratton*, 104 B.R. at 731 (citation omitted).

BNYM contends that the extent of its duty was not to use funds maintained in the segregated accounts to offset any debt not incurred by Sentinel's customers.  BNYM complied with the segregation requirements under the CEA and in the segregation letter, (discussed *infra*) and never liened on any securities in the segregated accounts.  Moreover, even assuming that BNYM knew that Sentinel was violating its segregation requirements, BNYM was largely unaware of Sentinel's investment decisions, what Sentinel did with the loan, or how securities were allocated among clients and the house account.  From BNYM's perspective, it was giving Sentinel a large loan of significant value that was being used for customers' benefit.

Trustee points out that BNYM had a contractual *right* to require Sentinel to "take any and

all additional steps which [BNYM] requires[,]" to assure itself that Sentinel has the right to pledge customer-owned securities and had an unencumbered "first lien and security interest" in pledged securities, including notifying third parties or obtaining their consent. No one at the Bank took any action, e.g. speaking or emailing a customer, to confirm that Sentinel's customers knew that their assets were being pledged as collateral. But BNYM had no duty to Sentinel to take action, and in practice, it is difficult to see what BNYM's should have done under the circumstances. In closing, Trustee (implicitly recognizing the difficulty and impracticality of direct contact with Sentinel's clients) argued that BNYM employees should have at least asked Eric Bloom whether he had the authority to pledge the securities at issue or asked Bloom to produce customer agreements authorizing the pledge. But would such action have led to a different result? BNYM had a clearing agreement representing that Sentinel had the right to pledge the securities. The agreement was, in effect, Sentinel's position on the issue. BNYM had a ten-year relationship with Sentinel during which time it had no reason to believe that Sentinel was acting inappropriately.

Throughout the litigation, Trustee maintained that Bloom, allegedly engaged in misappropriation, was vague and misleading in his responses, and that as a result of Sentinel's misconduct, BNYM was not entitled to rely on Sentinel's representations and warranties. It is just too difficult to infer, in these circumstances, that had he been asked, Bloom would have said that he had no authority to pledge the assets. It is far more likely that Bloom would have maintained that he was legally allowed to rehypothecate customer securities - something he did, in fact, say during the April 10, 2006 conference call. Moreover, the no-action letter made clear that "[c]lient FCMs do not obtain a direct interest in any particular security or other investments

maintained in the Seg I or Seg III Accounts. Client FCM's share in the profits and losses on the investments made by Sentinel on a pro-rata basis[.]"  This would have made individual assurances from clients with regard to specific transfers of securities impracticable or impossible, since none of the securities within those accounts could be traced to individual investors.  In addition, BNYM employees knew that Sentinel was regularly audited by outside firms and regulated by the NFA- facts from which BNYM employees did take comfort.

In *Kham & Nate's Shoes*, the Seventh Circuit expressed its unwillingness to "to embrace a rule that requires participants in commercial transactions not only to keep their contracts but also do 'more'-just how much more resting in the discretion of a [ ] judge assessing the situation years later."  908 F.2d at 1357.  Here, BNYM was under no obligation to monitor Sentinel's transactions, and to do so would have been nearly impossible given the speed and number of transactions involved in investment management generally.  BNYM exercised its contractual right to lien on the assets Sentinel placed in the collateral account.  It is true that BNYM had in its possession several pieces of evidence which, especially in light of the totality of the circumstances, indicated misconduct.  In fact, the circumstances raised such a suspicion in Rogers, but BNYM employees had little reason to believe that they could not rely on the representations and warranties contained in the contract that Sentinel had the authorization of its clients to pledge the securities at issue.  Even though Law and Ciacciarelli possessed the forms 1-FR, they had no duty to study them for segregation violations (although BNYM's interests would certainly have been served by doing so), and no reason to do so, in light of the representations and warranties.  BNYM may have been negligent, but the transactions were conducted at arm's length and in good faith.   For these reasons, I find that BNYM's conduct does

not rise to the level of egregious and conscience-shocking, and its claim should not be subordinated.

Second, Trustee maintains that BNYM violated certain provisions of the CEA. Section 6d(a) requires FCMs to segregate customer assets. Trustee argues that FCMs are specifically permitted to invest commodity customer funds in securities and are required to segregate those securities even when they are not dealing in futures. As such, the segregation requirements of this section should apply. However BNYM disputes Sentinel's status as an FCM. Even though it was registered as one, it was not acting as one,[16] and is therefore not subject to the segregation requirements of section 6d(a). Furthermore, BNYM argues, BNYM itself was not subject to the segregation requirements because Sentinel was not an FCM, and because there was no privity between Sentinel's FCM customers and BNYM.

The evidence demonstrates that Sentinel considered itself subject to the CEA, and it reaped the benefits of being registered as an FCM. BNYM was aware of both of these facts. But not only was Sentinel subject to segregation requirements, BNYM was independently required to segregate pursuant to section 6d(b) of the CEA. That section provides:

> It shall be unlawful for *any person*, including but not limited to . . *any depository*, that has received any money, securities, or property for deposit in a separate account as provided in (Section 6d(a)(2)), to hold, dispose of, or use any such money, securities, or property as belonging to the depositing futures commission merchant *or any other person* other than the customers of such futures commission merchant.

7 U.S.C. § 6d(b) (emphasis added). According to Trustee, this section does not apply only to depositories receiving monies from FCMs, and to the extent that it does, Sentinel's Seg 1 clients - all of whom were FCMs - wired money directly to BNYM. Privity is not required in order for

---

[16] Sentinel was never engaged in soliciting or accepting orders for the purchase or sale of any

this section to apply. Even if BNYM's narrow interpretation is correct, Sentinel itself may be a "person" that received commodity customer funds from a "depositing futures commission merchant." In its amicus curiae memorandum, the CFTC agrees with the Trustee that (1) Sentinel should be treated as an FCM; (2) BNYM is independently required to segregate pursuant to section 6d(b); (3) no privity is required for duty to attach.

BNYM maintains in no way did it violate this provision of the CEA. It was not BNYM that ordered the desegregation of the accounts. In certain circumstances (e.g., where it was oversegregated), Sentinel was within its rights to transfer excess funds, and it would be impossible for a bank to determine whether an FCM was undersegregated. Sentinel warranted that it had the right to desegregate customers' securities and pledge them as collateral. Moreover, BNYM placed no liens on any of the segregated accounts.

BNYM suggests that Section 6d(b) simply prohibits it from liening on funds in segregated accounts. Trustee and CFTC read the statutory language as imposing a broader duty - once the funds meant to be segregated are deposited, they can only be used for the customer's own benefit. The CFTC explains:

> At a minimum, it prohibits a depository bank from 'holding' or 'disposing of' commodity customer funds in a fashion that facilitates or, a fortiori, actively helps an account-holder's misuse of such funds. The language of section 6d(b) also specifies that the depository's duty with respect to the handling of segregated commodity customer funds applies to the 'money, securities, or property' received for deposit in a segregated account. 7 U.S.C. § 6d(b). Thus, the fact that commodity customer funds may have been transferred out of a segregated account does not, by itself, discharge the depository's duty not to 'hold, dispose of, or use' the funds as belonging to someone other than the underlying customers.

Neither Trustee nor CFTC cite authority in support of this position.

The Trustee and CFTC do suggest that BNYM may be liable for aiding and abetting

---

commodity for future delivery.

Sentinel's breach of the CEA.  In support, the CFTC cites a 1979 interpretative letter which states as follows:

> [I]f a bank, with prior notice, permits or acquiesces in the withdraw[al] of customers' funds by a futures commission merchant for an unlawful purpose, the bank would violate or be aiding and abetting a violation of the [Commodity Exchange] Act. Although the scope of the bank's responsibility in circumstances of less than actual notice appears less clear, we believe it is certainly no less than when dealing with other trust accounts.

CFTC Interpretative Letter No. 79-1 (Responsibilities of Banks as Depositories of Customers' Segregated Funds), Comm. Fut. L. Rpt. (CCH)  20,835 (May 29, 1979).  But the CFTC fails to cite the preceding sentence which states: "There is no case law discussing whether a bank has authority to assure that customers' funds are not misappropriated by futures commission merchants." *Id.*

Because BNYM violated no duty under the CEA, its conduct does not warrant the subordination of its claim.

Third, Trustee maintains that regardless of whether the CEA actually governed, BNYM agreed to segregate Sentinel's customer assets as part of the 1997 letter agreements.[17]  Trustee

---

[17] In March 1997, BNYM established segregated cash and securities accounts for Segs 1, 2, and 3 in its Institutional Custody Division.  BNYM signed letter agreements for each of Sentinel's Seg pools, in which it agreed that Sentinel was an FCM subject to the CEA, that the assets in those accounts belonged to customers and would be segregated, and that BNYM could not assert a lien over those assets (the "Seg Letter Agreements"):

> We propose to maintain accounts with yourselves, which shall be designated as "Sentinel Management Group, Inc. Customer Segregated Funds . . . . In this account we, as futures commission merchants, under the Commodity Exchange Act, shall deposit money, investment securities, and customer-owned securities. Such funds are money and securities deposited by or accruing to our customers which are commodity customers. In addition, all investments shall be made in accordance with the Commodity Exchange Act.

> These accounts are being opened to meet the provisions of the Commodity Exchange Act. This statute provides that such money [be] segregated and treated as belonging to our customers rather than as belonging to ourselves. In carrying these accounts, you agree that the funds in said accounts will not be subject to your lien or offset for, and on account of, any indebtedness now or hereafter owing us to you . . . . Furthermore, you agree that this letter shall

58

maintains that these letters remained in effect even after the accounts were transferred from the bank's Institutional Custody Division to the Broker/Dealer Services Division. In its supplemental amicus curiae memorandum, the CFTC supports Trustee's position that by signing the letters, BNYM was bound by the requirements of section 6d(b). In fact, had BNYM refused to sign the letters, BNYM could not have served as Sentinel's depository bank. As recently as 2004, the CFTC confirmed that one necessary condition to allow Sentinel to do business as a money manager for other FCMs was the existence of the letters outlining BNYM's agreement to segregate funds pursuant to the CEA. The evidence presented at trial demonstrates that Sentinel was subject to the CEA, and that the segregation letters were in fact binding agreements. But even if they were binding agreements, BNYM did not violate them, and their claim against Sentinel's estate should not be subordinated.

Fourth, Trustee asserts that under the IAA, BNYM "had both a direct obligation" and "an obligation not to subvert the IAA segregation requirement." A plain reading of the relevant section suggests that only investment advisors and not depositories have duties under the IAA. That section reads:

> **If you are an investment adviser** registered or required to be registered under section 203 of the Act (15 U.S.C. 80b-3), it is a fraudulent, deceptive, or manipulative act, practice or course of business within the meaning of section 206(4) of the Act (15 U.S.C. 80b-6(4)) **for you** to have custody of client funds or securities unless [the finds are maintained by a qualified custodian in segregated accounts].

17 C.F.R. § 275.206(4)-2(a) (emphasis added). Trustee derives BNYM's duty from a parenthetical reference in a footnote of a 2009 notice of proposed rulemaking. *Custody of Fund*

supersede any other documents related to this account that conflict with the terms of this Letter.

*or Securities of Clients by Investment Advisers*, 2009 SEC LEXIS 1645, at 5 n.4 (May 20, 2009). There, the SEC suggests that the requirement that funds be maintained with a qualified custodian protects customers because such "institutions' custodial activities are subject to extensive regulation and oversight." In the relevant footnote, the SEC notes that banks have adequate systems in place to monitor risk in custody services areas and ensure segregation of customer accounts. While this note lays out important justification for the requirement of a qualified custodian, I do not see how the IAA directly imposes a duty on BNYM. BNYM's claim cannot be subordinated on this basis.

Fifth, Trustee contends that pursuant to industry practice, BNYM had custodial obligations where special deposits are involved. But only segregated accounts arguably qualify as special deposits, not the clearing accounts which were lienable. Therefore, even assuming that banks are "absolutely prohibited from asserting a lien over assets deposited in a special purpose account," BNYM did not violate that prohibition because it at no time liened on assets in the segregated accounts.

Sixth, Trustee asserts that BNYM was on notice of facts indicating a diversion of customer assets and had a duty to investigate. In *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 287-88 (2d Cir. 2006), the Court held that a bank which has actual or constructive knowledge of the diversion of customer assets "may be liable for participation in [such a] diversion, either by itself acquiring a benefit, or by notice or knowledge that a diversion is intended or being executed." The Court explained that "[a]s a general matter, a depositary bank has no duty to monitor fiduciary accounts maintained at its branches in order to safeguard funds in those accounts from fiduciary misappropriation. The bank has the right to presume that the fiduciary will apply the

funds to their proper purposes under the trust." *Id.* at 287 (citations and quotations omitted).

However, "a bank may be liable for participation in [such a] diversion, either by itself acquiring

a benefit, or by notice or knowledge that a diversion is intended or being executed." *Id. (*quoting

*In re Knox*, 477 N.E.2d 448, 451 (N.Y. 1985). *Id.* "Having such knowledge, [the bank is] under

the duty to make reasonable inquiry and endeavor to prevent a diversion." *Id.* (emphasis added);

*accord Matter of Knox*, 64 N.Y.2d 434, 438 (1985); *Diamore Realty Corp. v. Stern*, 855

N.Y.S.2d 206, 207-08 (App. Div. 2008); *Home Sav. of Am., FSB v. Amoros*, 661 N.Y.S.2d 635,

639-41 (App. Div. 1997). According to Trustee, BNYM's knowledge that (1) it was lending

Sentinel hundreds of times in excess of its net capital on a nightly basis; (2) it was accepting as

collateral securities that were to be segregated; (3) massive amounts of securities were

transferred out of segregation and never back in; and (4) Sentinel was making misrepresentations

to customers and regulators, was enough to trigger a duty to investigate.

BNYM maintains that *Lerner* does not apply here because a duty exists only if the "sole

inference" from a customer's action is that it is misappropriating customer funds. Moreover,

*Lerner* involves a negligent failure to detect misappropriation, which Sentinel admits is

insufficient for equitable subordination. In its defense, BNYM further argues that (1) Sentinel

agreed that it was acting lawfully and with authority; (2) BNYM did not know how Sentinel used

the loan proceeds; (3) Sentinel made general disclosures that it might use some leverage in some

manner; and (4) no other regulatory bodies caught the fraud.

BNYM's actions or inaction cannot support equitable insubordination unless it is

egregious or conscience shocking. Negligence, which is the most that can be said of the conduct

at issue, does not satisfy the requirements of equitable subordination.

## C. The Harm to Sentinel

In making my finding in this case, I have considered what damages were caused by the conduct of the Bank. I do this partly to weigh the equities involved in subordinating the entire lien the Bank holds. Trustee asks in equity for a subordination of the entirety of a lien, which I do not find to be an equitable result. In the course of reaching this conclusion I made a calculation of the amount of the lien that should be subordinated if Trustee prevailed, and I find it prudent to include the calculation in this order. It is, of course, possible that a reviewing court may conclude that BNYM should be held liable. In the event it does so, the existence of a damage calculation might, under certain circumstances, speed disposition of the case as a whole without the necessity for a hearing on remand.

Trustee argues that BNYM's conduct conferred an unfair advantage on the Bank as well as caused harm to creditors. While it is true that the BNYM liens placed assets out of creditors' reach, BNYM did provide significant (if not full) value in exchange. It received relatively little advantage in such an exchange. BNYM benefited from the interest it received in association with the loan, which totaled nearly $4 million during the summer of 2007. This benefit is almost negligible to an institution of BNYM's size, and relative to the risk of the loan, even in light of the facts of which BNYM employees were aware.

I assume *arguendo* that beginning on June 26, BNYM's use of customer assets to pay down the loan further damaged creditors. In response, BNYM notes that it was fully secured at the time, and there was no harm to creditors. Had Sentinel gone into bankruptcy at the end of June, BNYM would have been fully secured and would have recovered the full loan balance. And finally, according to Trustee, Sentinel's July 31 transfer from the Seg 3 account to the

lienable clearing account injured Seg 3 customers. But just before the transfer, Sentinel had segregated $512 million in the Seg I account. Because the liquidation plan in this case contemplates pro rata distribution, the Seg 3 customers will benefit just as much as the Seg 1 customers.

Trustee claims that creditors were also harmed when BNYM continued to lend to Sentinel after June 29, 2007. Had BNYM refused to lend to Sentinel, Sentinel would have been forced to liquidate, and creditors would have been spared further losses attributable to the diminution in value of certain securities. BNYM notes that this "deepening insolvency" theory of damages has been disfavored by some courts. As the Seventh Circuit noted in *Fehribach v. Ernst & Young LLP*, the theory makes little sense "to fix liability on a third party for lending or otherwise investing in a firm and as a result keeping it going, when 'management ... misused the opportunity created by that investment.... [T]hey [management] could have instead used that opportunity to turn the company around and transform it into a profitable business. They did not, and therein lies the harm to [the company].'" 493 F.3d 905, 908-09 (7th Cir. 2007) (citing and quoting *Seitz v. Detweiler, Hershey and Assoc., (In re CitX Corp.)*, 448 F.3d 672, 678 (3d Cir.2006)). But these cases do not involve claims for equitable subordination, or the kind of misconduct alleged here, and were not intended to so apply.

In this case, it is true that BNYM gave Sentinel cash for the securities and it was Sentinel insiders who used the cash for their own purposes. BNYM had no hand in determining how Sentinel used the loan proceeds. The direct cause of the harm to creditors came from Sentinel. But BNYM can, in an uncommon sense, be considered the proximate cause for the reason that had Sentinel insiders been unable to use the securities as collateral, Sentinel would not have

received the loan.

BNYM's expert at trial testified that the delay in liquidating the securities caused little additional harm to Sentinel's customers, and that any damages in this case are deminimis at best. Trustee's expert, Feltman, presented two methods to measure harm to creditors. The first is simply that customers were damaged in the amount of BNYM's final lien ($312 million plus interest), and that subordination of BNYM's entire claim is appropriate, but I disagree. BNYM was not the sole cause of harm to creditors. It was Sentinel that took the cash and used it for its own relatively risky purposes. BNYM had no hand in how the loan proceeds were used. In addition, the parties who stand to benefit from any subordination are sophisticated investors such as FCMs and hedge funds, who had substantial sums at stake. In fact, Discus Fund had invested more than $500 million by the end of 2006. These parties had signed agreements that disclosed that Sentinel might employ a leveraged investment strategy. Many of them had requested and received audited financial statements, and BNYM's expert Professor Cornell testified that any sophisticated investor could have deduced in less than thirty minutes that Sentinel was employing a leveraged strategy. These investors did little diligence.

Trustee's second method, the liquidation shortfall method, is more appropriate to determine damages here. This method attempts to measure the incremental harm to customers between various knowledge dates (dates by which BNYM, one hypothesizes, was on actual or constructive notice of the misuse of customer securities, should have declared a default and begun liquidation, selling enough collateral to pay down the loan and returning any excess to Sentinel) and various trigger dates (dates when the Trustee would have been able to begin liquidating the portfolio).

The analysis conducted by Feltman, however, appears to be flawed in that it compares hypothetical prices on the knowledge date against the value of the actual portfolio on the trigger date - a portfolio which, by the time of the trigger dates, was substantially liquidated at actual, not hypothetical prices.[18] Citadel had purchased $370 million of securities at a price that was 10.2% off the market price. By then, repo counterparties had already liquidated their collateral at prices which yielded little equity for Sentinel, again deviating from hypothetical market prices. Such a comparison yielded a range of harm to customers from $323 million to $364 million depending on the knowledge and trigger dates used in the analysis.

BNYM's expert, Professor Cornell, conducted the same analysis using the same knowledge dates, but trigger dates that were 15 weeks from the knowledge date, to account for the time it would take for a court-appointed fiduciary to obtain authority to liquidate the portfolio. This analysis used a 10.2% discount (just as in the sale to Citadel), and the trigger date preceded the sale to Citadel and the liquidation by repo counterparties. The calculations demonstrate no damages. Cornell applied the discount because the same discount was actually applied in the sale to Citadel, but Trustee takes issue with its, claiming that the Citadel transaction "was not an arm's-length transaction conducted by trustee, but was a coerced fire-sale conducted by a crook who acceded to pressure by regulators in a vain attempt to curry favor and hide his wrongdoing." For this reason, Trustee maintains that no discount should apply, or, any discount should be limited to 3%, resulting in the subordination of $240 million. But this figure appears to be arbitrary, and Trustee presents no support for the use of a 3% discount.

---

[18] The two trigger dates chosen - October 18, 2007, and December 14, 2007 - are the date of the first turnover of assets to Trustee and the date the bankruptcy court entered an order permitting the Trustee to begin selling property of the estate, respectively.

These calculations present a significant question: what discount should apply and why?[19] There is little evidence in the record that answers this question. For this reason, I am persuaded to calculate harm using yet another model created by Cornell, where he calculated the liquidation value and shortfall using hypothetical model prices on three dates: May 31, 2007 (a knowledge date used by Feltman), June 29, 2007 (a knowledge date used by Feltman), and August 14, 2007 (the date BNYM called the loan). The range of harm using this method ranges from $37,543,407 to $61,592,452.

The calculations demonstrate that the difference in shortfall between a May 31, 2007 liquidation, a June 29, 2007 liquidation, and an August 14, 2007 liquidation. The value of Sentinel's portfolio on August 14, the day BNYM called the loan, was $61,592,452 less than it was on May 31. Assuming, as Trustee argues, that by June 1, 2007, BNYM employees should have known that Sentinel was misappropriating customer securities, this is the calculation that would apply had BNYM stopped lending on May 31, the value of the securities that day would have been approximately $62 million more than the value on August 14, when the Bank called the loan. This was the harm the Bank caused by continuing to lend, as well as the $4,699,796.67 in interest it secured for itself that summer. If I assume that BNYM should have known of Sentinel's fraud by June 1 and should be held liable for its failure to call the loan, the $66,292,248.67 of the Bank's claim should be subordinated.

By June 13, Rogers had expressed his suspicion that the collateral was not Sentinel's to pledge, despite not having seen the 1-FRs to which Law and Ciacciarelli had access. Trustee argues in the alternative that at that point, BNYM employees should have taken a closer look at

_____

[19] I am assuming for the purposes of calculating harm that some discount would have had to apply when liquidating a portfolio as large as Sentinel's in a relatively short time frame and given that the time

the 1-FRs and noticed the reported segregation violations.  According to Trustee, on June 29, when BNYM was taking a closer look at the collateral it was holding and deciding whether or not to accept as collateral the physical securities posted by Sentinel, it should have been in a position to understand the extent of Sentinel's misconduct. The value of Sentinel's portfolio on June 29, was $37,543,407 less than it was on August 14, and during this period, BNYM secured for itself $2,894,507.80 in interest.  Assuming that BNYM employees should have known of Sentinel's fraud by June 29 and should be held liable for its failure to call the loan by that date, $40,437,914.80 of BNYM's claim should be subordinated.

IV.  CONCLUSIONS OF LAW

1. This Court has jurisdiction under 28 U.S.C. § 1334(b).

2. The June 1, June 26, June 29, July 17 and July 31 transfers were not fraudulent and cannot be avoided.

3. The June 29 and July 31 transfers were not preferential and cannot be avoided.

4. BNYM's lien on Sentinel's estate issue is valid and not subject to equitable subordination.

V.  COUNTERCLAIMS

Defendants filed a counterclaim seeking declaratory judgment that Defendants have a valid, first-priority, perfected security interest in the lien that is the subject of the litigation. Defendants also allege breach of contract (based on the falseness of Sentinel's representations and warranties), request indemnification for attorneys' fees and expenses, and, if liable to Trustee, request a setoff of any damages due to the Bank as a result of Sentinel's alleged breach

---

market conditions were in flux and the subprime mortgage crisis was well under way.

of contract and indemnification of fees and expenses. The total amount of Sentinel's outstanding indebtedness to BNYM is $312,247,000.00.

On June 27, 2009, Trustee answered the claims, but there has been no briefing since then and they were not addressed in the post-trial briefs. Almost all of the counterclaims, except for indemnification, are the converse of the Trustee's claims. However, I am severing the counterclaims and decline to rule on indemnification at this time as it is my intent to enter my findings in this order as final pursuant to Federal Rule of Civil Procedure 54(b). This appears to reflect the will of the parties as demonstrated by the fact that aside from the counterclaims themselves and an answer to those claims, there has been no other filing on these claims or any arguments directed to them. I conclude that BNYM has essentially put its counterclaims on hold, pending the outcome of the trial.

ENTER:

James B. Zagel
United States District Judge

DATE: November 3, 2010