**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| FREDERICK J. GREDE, not individually but as Liquidation Trustee of the Sentinel Liquidation Trust, | ) ) ) ) | Case No. 08 C 2582 |
| Plaintiff, | ) ) | |
| v. | ) ) | Honorable James B. Zagel |
| THE BANK OF NEW YORK and THE BANK OF NEW YORK MELLON CORP., | ) ) ) | (On Remand from the United States Court of Appeals for the Seventh Circuit) |
| Defendants. | ) ) | |

<u>**TRUSTEE'S MOTION FOR ENTRY OF JUDGMENT**</u>

Frederick J. Grede, not individually but as Liquidation Trustee of the Sentinel Liquidation Trust (the "Trustee"), respectfully requests that the Court enter a judgment order against defendant The Bank of New York Mellon ("BONY"). In support, the Trustee states as follows:

**INTRODUCTION**

On August 26, 2013, the Seventh Circuit reversed this Court's November 3, 2010 decision entering judgment against the Trustee on his fraudulent transfer and equitable subordination claims. *In re Sentinel Mgmt. Group, Inc*., 728 F.3d 660, 672 (7th Cir. Aug. 26, 2013). On October 8, 2013, the Seventh Circuit issued its mandate. (Dist.Dkt. 488.)

The Seventh Circuit's judgment order and mandate ask this Court to do two things. *First*, with respect to the Trustee's fraudulent transfer claim, the Seventh Circuit concluded that the Trustee had established his *prima facie* case under 11 U.S.C. § 548(a)(1)(A) to avoid BONY's liens on the securities Sentinel pledged as collateral. *Id*. at 668. It remanded the fraudulent transfer claim to this Court for the limited purpose of deciding BONY's affirmative defenses to

the claim, noting with respect to BONY's only potentially applicable affirmative defense—its Section 548(c) defense—that based on the record before the Seventh Circuit, it was unlikely that BONY could prevail on this defense. *Id*. at 668 n.2.

*Second*, with respect to the Trustee's equitable subordination claim, the Seventh Circuit directed this Court to answer two questions:

> 1.    What exactly did BNYM know before Sentinel's collapse? Did BNYM know that Sentinel was engaged in misconduct of any kind (including abuse of the loan proceeds)?
>
> 2.    Was BNYM's failure to investigate Sentinel before its collapse merely negligent? Or was it reckless? Or was it deliberately indifferent?

*Id.* at 672.  The Seventh Circuit further directed that once this Court answers these two questions, it "can then revisit the ultimate issue of whether the Bank's claim merits equitable subordination." *Id.*

To assist the Court in performing these post-remand tasks, the Trustee provides the following analysis of the controlling legal standards and proposed additional factual findings. As explained herein, BONY failed to prove its one affirmative defense to the Trustee's fraudulent transfer claim and therefore, as directed by the Seventh Circuit, this Court should avoid all of BONY's liens in Sentinel's property.  The record also establishes that BONY was deliberately indifferent to the fact that Sentinel was pledging property to secure BONY's loan to Sentinel when Sentinel should have been holding that property in segregated accounts for the benefit of Sentinel's customers.  BONY knew that Sentinel could not legally pledge customer property to secure BONY's loans to Sentinel.  BONY also acknowledged and agreed that it could not, and would not, take a lien on the property Sentinel was required to hold for its customers and BONY was legally obligated to treat that property as belonging to the customers. Yet, BONY deliberately ignored what Sentinel was doing and accepted property that should have

been held in segregated accounts as its collateral anyway. BONY's conduct in doing so justifies equitable subordination of BONY's liens and claims to the claims of all other creditors. 11 U.S.C. § 510(c). Accordingly, the Trustee requests that the Court make the additional proposed findings attached hereto and enter judgment on both claims in the Trustee's favor.

**ARGUMENT**

**I.    This Court Should Enter Judgment In Favor Of The Trustee Under Section 548(a)(1)(A).**

The Seventh Circuit found that the Trustee proved the elements of his fraudulent transfer claim and that he "should be able to avoid the Bank of New York's lien." *Sentinel*, 728 F.3d at 668. The Court stated that all that remained for this Court to do on remand was "to revisit" BONY's defenses. *Id.* at 668 n.2. Although BONY pled every affirmative defense listed in Rule 8 (and some multiple times) (*see* Dkt. 140 at 73-79), the only affirmative defense potentially applicable to the Trustee's fraudulent transfer claim is its section 548(c) defense, which it pled as its Twelfth Affirmative Defense. (Dkt. 140 at 75.)[1] But, as the Seventh Circuit noted, "based on the record currently before us, we suspect that the Bank will have a very difficult time proving that it was not on inquiry notice of Sentinel's possible insolvency." 728 F.3d at 668 n.2. As set forth herein and in the Trustee's Proposed Additional Findings, BONY failed to sustain its burden of proof on this defense. *See, e.g.*, *Jobin v. McKay* (*In re M&L Bus. Mach. Co.*), 84 F.3d 1330, 1338 (10th Cir. 1996) (defendant bears burden of proof under §548(c).)

---

[1] BONY did not identify which defenses applied to which of the Trustee's claims. It also did not press most of its affirmative defenses because they clearly do not apply or are not affirmative defenses, *see, e.g.*, eighth affirmative defense (parole evidence rule), nineteenth affirmative defense (statute of limitations), twentieth (waiver, laches, estoppel, res judicata, issue preclusion and/or other claim preclusion). (Dkt. 140 at 73-39.) In any event, because the law is clear that the only affirmative defenses to a Bankruptcy Code based fraudulent transfer claim are those set forth in the applicable Code Section, *see, e.g.*, *In re Auto. Prof'l's Inc.*, 398 B.R. 256, 261 (Bankr. N.D. Ill. 2008), BONY's only legally cognizable defense is it Section 548(c) affirmative defense.

Although it did not plead section 550 of the Bankruptcy Code, 11 U.S.C. § 550, as an affirmative defense in its Answer (*see generally* Dkt. 140 at 73-79), BONY also argued before trial that the Trustee may not recover a money judgment under section 550.  Section 550, however, is inapplicable here because the Trustee's fraudulent transfer claims seek to avoid a lien, not to affirmatively "recover" property.  *See*, *e.g.*, *Rodriquez v. Drive Fin. Serv., L.P. (In re Trout),* 609 F.3d 1106, 1109-10 (10th Cir. 2010); *see also Peoples Bank & Trust Co. v. Burns*, 95 Fed. App'x 801, 804 (6th Cir. 2004).  Section 551 of the Code automatically preserves avoided liens for the benefit of the estate and its creditors without the need to resort to section 550.  11 U.S.C. § 551.  Accordingly, BONY's  section 550 defense is irrelevant and should be rejected.

## A.     BONY Cannot Establish  A "Good Faith" Defense Under Section 548(c).

### 1.     The Legal Standard.

To establish a good faith defense under section 548(c), BONY was required to prove at trial that: (1) BONY gave Sentinel "value" for the liens securing BONY's claim; and (2) BONY took the liens in "good faith."  11 U.S.C. § 548(c); *M&L Bus. Mach.*, 84 F.3d at 1335-38.  Only BONY's good faith is in dispute.

BONY's "good faith" is measured under an objective standard.  As the Seventh Circuit noted in its decision: "this defense is generally unavailable to any creditor who 'has sufficient knowledge to place him *on inquiry notice* of the debtor's possible insolvency.'"  *Id*. at 7 n.2 (quoting *M&L Bus. Mach.*, 84 F.3d at 1336, in turn quoting *Brown v. Third Nat'l Bank* (*In re Sherman),* 67 F.3d 1348, 1355 (8th Cir. 1995) (emphasis added)).  The two Circuit Court decisions that the Seventh Circuit cites with approval, *Sherman* and *M&L Business Machines,* both hold that the standard for measuring good faith under section 548(c) is an objective one: "courts look to what the transferee objectively 'knew or should have known'" about the transferor's intent, "instead of examining the transferee's actual knowledge from a subjective

standpoint." *Sherman*, 67 F.3d at 1355; *accord M&L Bus. Mach.*, 84 F.3d at 1338; *In re Agric. Research & Tech. Grp.*, 916 F.2d 528, 536 (9th Cir. 1990). In *Scholes v. Lehman*, 56 F.3d 750, 757, 759 (7th Cir. 1995), the Seventh Circuit also held that the comparable inquiry under Illinois fraudulent transfer law was an objective inquiry—whether the transferee "knew or should have known of the [transferor's] fraudulent intent."

As the Court explained in *M&L Business Machines*, under this objective analysis, "the presence of any circumstance placing the transferee on inquiry as to the financial condition of the transferor" will defeat a good faith defense unless an actual investigation by the transferee disclosed the transferor to be in good financial health. 84 F.3d at 1336-37. Moreover, a transferee also lacks good faith when it "ignore[s] facts which would put a reasonable person on inquiry of the [d]ebtor's purpose and would 'excite the suspicions' of a prudent person or 'lead a person of ordinary perception to infer fraud.'" *Helms v. Roti (In re Roti)*, 271 B.R. 281, 298 (Bankr. N.D. Ill. 2002). Put another way, a transferee cannot remain "willfully ignorant of facts which would cause it to be on notice of a debtor's fraudulent purpose," or "put on blinders" when entering into transactions with the debtor. *Cuthill v. Greenmark, LLC (In re World Vision Entm't, Inc.),* 275 B.R. 641, 659 (Bankr. M.D. Fla. 2002).

Good faith is determined on a case-by-case basis. *Sherman*, 67 F.3d at 1355. But in general, a transferee does not take a transfer in good faith if it has received information about the debtor's financial condition indicating the debtor is in financial difficulty. In *Sherman*, for example, the Eighth Circuit upheld the finding that a bank lacked good faith when it knew of the debtor's significant liabilities and the bank's own plan to foreclose on some of the debtor's assets. *Id*. at 1357 (analyzing comparable good faith element of § 550(b)(1)). Other indicia that a transferee has not received a transfer in good faith include evidence that the transferee was

aware of restrictions on the transferor's ability to transfer the property and failed to investigate whether the transfer violated those restrictions. *See Dev. Specialists Inc. v. Hamilton Bank, N.A. (In re Model Imperial, Inc.)*, 250 B.R. 776, 799 (Bankr. S.D. Fla. 2000). Failure to comply with industry standards is another factor that leads courts to conclude that a transferee did not receive a transfer in good faith. *Id.*; *World Vision*, 275 B.R. at 654-55. A transferee also lacks good faith if it is on inquiry notice that a debtor is using investor funds to trade for its own benefit. *See Armstrong v. Collins*, 2010 WL 1141158, at *27 (S.D.N.Y. Mar. 24, 2010). In *Armstrong*, the court denied an investor summary judgment on a good faith defense because of evidence that the investor knew of facts suggesting that the transferor was investing investor money for his own account. *Id.*

### 2. The Evidence Already Presented To The Court Conclusively Demonstrates That BONY Has Not Proved Its Section 548(c) Defense.

The factual findings that this Court has already made conclusively demonstrate that BONY lacked good faith and was not only on inquiry notice, but also had actual knowledge of Sentinel's insolvency and that Sentinel was transferring collateral to BONY that it should have been holding in segregation for its customers. To assist the Court in addressing BONY's section 548(c) defense, the Trustee has prepared proposed supplemental findings of fact, attached hereto as Exhibit A, which set forth the findings this Court has already made and the additional evidence in the record that demonstrate that BONY has not proved its section 548(c) affirmative defense.

In summary, the Court's findings and the evidence establish that:

- BONY knew that Sentinel was required to hold customer funds in segregation and BONY had entered into an agreement with Sentinel that the property held in segregated accounts would not be available to pay BONY's loan to Sentinel (*see* Proposed Supplemental Findings ¶¶ 1-7);

- BONY maintains a substantial business providing custodial services to its customers and knew or should have known that under section 4d(b) of the CEA it was unlawful for BONY "to hold, dispose of, or use any such money, securities, or property" that Sentinel was required to segregate "as belonging to" Sentinel (7 U.S.C. § 6d(b));[2]

- Despite BONY's industry experience and its knowledge that Sentinel was required to hold property in segregation, it switched Sentinel from the custodial branch of the bank and established an account structure that was atypical for these types of accounts and which allowed BONY to lien property that should have been in segregated accounts (Proposed Supplemental Findings ¶¶ 8-14);

- BONY knew from the inception of the parties' relationship that Sentinel was thinly capitalized (*id.* ¶¶ 15-17);

- BONY knew that the amount and nature of Sentinel's loan had changed, and that beginning in 2001 and increasing after 2004, Sentinel was borrowing large sums of money to finance its own leveraged trading (*id.* ¶¶ 18-25); *Sentinel*, 728 F.3d at 670;

- BONY knew or should have known based upon financial documents it received from Sentinel on a regular basis that Sentinel did not have sufficient property to secure BONY's loan (Proposed Supplemental Findings ¶¶ 18-21, 24-29);

- BONY knew that the financial statements it received contained inaccurate information and that Sentinel's 1-FRs sent to its regulators failed to disclose the existence of the BONY loan or Sentinel's proprietary trading in repos (*id.* ¶¶ 20-21);

- BONY knew by sometime in 2004 or 2005, that Sentinel was borrowing hundreds of millions of dollars and pledging hundreds of millions of dollars in securities to collateralize the BONY loan, but that Sentinel itself did not have the capital to provide that collateral (*id.* ¶ 24);

- By the spring and summer of 2007, BONY knew that Sentinel's repo counter-parties were demanding payment from Sentinel and that Sentinel was using its loan from BONY to repay these repo counterparties and securing its ever increasing BONY loan with securities taken out of the customer segregated accounts (*id.* ¶¶ 36-39);

- BONY knew or suspected that Sentinel was pledging property to secure the BONY loan that Sentinel was required to hold in segregation for the benefit of Sentinel's customers (*id.* ¶¶ 30-31, 34); and

- BONY suspected that Sentinel might file for bankruptcy (*id.* ¶¶ 40-42).

---

[2] "The rule that 'ignorance of the law will not excuse' is deep in our law." *Lambert v. California*, 355 U.S. 225, 228 (1957) (citations omitted); *accord Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 583 (2010).

Despite its knowledge of these facts, BONY did nothing to investigate further and instead demanded more and better collateral from Sentinel and considered demanding changes to its agreements to improve its position in the event of a Sentinel bankruptcy. (*Id.* ¶¶ 32-33, 35, 39-42.) Under these circumstances, both the Trustee's banking expert and BONY's bank expert testified that when BONY failed to investigate whether Sentinel had rights in the collateral it was taking as security for Sentinel's loan it acted contrary to accepted industry standards. (*Id.* ¶¶ 43-45.) When presented with a hypothetical set of facts which conservatively represented what BONY knew in this case, BONY's banking expert, W. Barefoot Bankhead explained that BONY should have reported Sentinel to regulators or law enforcement. (*Id.* ¶ 44.) Similarly, the Trustee's industry expert, former Head of BMO Harris's Financial Institutions Group, Chuck Hohman, testified that BONY should have stopped lending to Sentinel and returned the customer securities to segregated accounts. (*Id.* ¶ 45.)

Based upon these facts, this Court has already found that under an "objective standard" BONY "should have known that Sentinel was violating segregation requirements." *Grede v. Bank of New York*, 441 B.R. 864, 892 (N.D. Ill. 2010). In addition, this Court has found that:

> a simple review of the monthly 1-FRs indicated that the difference between the amount of assets listed as 'funds segregated or in separate accounts pursuant to the CEAct and Regulations' and Sentinel's total assets was never more than approximately $15 million. Therefore, in order for Sentinel to pledge collateral in excess of that difference, it would have to use assets that had been held in segregation and then removed from segregation to allow them to be pledged.

*Id.* at 889. Finally, this Court found that "[t]he evidence at trial revealed the Bank's knowledge that Sentinel insiders were using at least some of the loan proceeds for their own purposes." *Id.* at 883. These three findings alone lead to the conclusion that BONY did not act in good faith when it took liens on customer property because it knew or should have known that the collateral Sentinel pledged to it was actually property that Sentinel was required to hold in its customer

segregated accounts and that Sentinel was improperly using that property to secure loans made to it.

The conclusion that BONY did not take the collateral in good faith is made inescapable by this Court's findings about an email that BONY's head of Financial Institutions Credit, Mark Rogers, sent on June 13, 2007. In that email, "Rogers asked the Sentinel team at BNYM how Sentinel was able to put up as much collateral as it had, with only $2 million in capital. Rogers wrote '... I have to assume most of the collateral is for somebody else's benefit. Do we really have rights on the whole $300MM?'" *Id.* at 889. Instead of asking Sentinel whether it was pledging property that it should have been holding in customer segregation or otherwise investigating the facts before accepting this collateral, Terence Law, a BONY officer responsible for the Sentinel relationship, testified that he consulted with a number of colleagues prior to responding: "Hello. We have a clearing agreement which gives us a full lien on the box position outlined below." *Id.* According to Law, "this was a well-advised and carefully worded statement" and as the Court also found, Rogers was unable to recall why "he would have been satisfied with the response from Law when it did not directly answer his question and consisted of information he already knew." *Id.* at 889-90, 893. This Court found that "Rogers' inquiry is *certainly evidence that he had a suspicion that the securities were not Sentinel's to pledge and he shared this suspicion with Law.*" *Id.* at 890 (emphasis added); *see also Sentinel*, 728 F.3d at 665.

This Court also found that "a diligence process that excludes [verification that Sentinel had the right to pledge the collateral] seems to be ineffective and reckless in light of the facts of which the Sentinel team at the bank was aware, and a *reasonably prudent person would have taken a closer look at, at least, the 1-FRs sitting in front of him or her.*" 441 B.R. at 892 (emphasis added). Because BONY "was in possession of information more than sufficient to

affirmatively suggest to a reasonable person that the source of [Sentinel's collateral] was an improper use of [customer] funds. [BONY] could not, therefore, 'sit on [its] heels' and yet retain those funds as a good faith transferee . . . ." *See Ameriserv Fin. Bank v. Commercebank, N.A.*, 2009 WL 890583, at *6 (W. D. Pa. Mar. 26, 2009) (quoting *In re Bressman*, 327 F.3d 229, 236-37 (3rd Cir. 2003)). BONY's knowledge of Sentinel's financial condition and its failure to investigate in light of what it knew and what it suspected about the collateral it was receiving defeats BONY's good faith defense. *See World Vision*, 275 B.R. at 659; *Roti*, 271 B.R. at 298. Accordingly, the Trustee requests that the Court enter judgment on Counts I and II in the Trustee's favor, finding that BONY's liens are avoided as fraudulent transfers.

**B.      Section 550 Is Inapplicable Here And Thus, BONY's Section 550 Defense Is Irrelevant.**

BONY also argued before trial (although this defense is not included in its Answer) that even if the Trustee prevails on his fraudulent transfer claim, he is not entitled to a recovery from BONY under 11 U.S.C. § 550. But BONY's argument reflects a fundamental misunderstanding about the interplay between the avoidance provisions of the Code at issue here (sections 544 and 548), and the remedies specified in sections 550 and 551.

Sections 548 and 544 are the statutory provisions at issue in this case that allow the Trustee to avoid BONY's liens as fraudulent transfers. Once this Court determines that BONY's liens are avoided as fraudulent transfers under sections 544 and 548, two additional Code sections then govern the potential remedies available to ensure that the avoidance action results in distributions to the estate's creditors—sections 550 and 551. *Trout*, 609 F.3d at 1109-10. Section 550 applies when title to the property that was fraudulently transferred is vested in a third party, such as when a trustee avoids a payment of cash. In those circumstances, the trustee requires a money judgment against the transferee for the estate to be made whole and section 550

supplies the statutory basis for the court to enter that judgment. But if the avoided transfer is the transfer of a security interest, "upon avoidance of a lien, under §551 the trustee 'steps into the shoes of the former lienholder, with the same rights in the collateralized property that the original lienholder enjoyed.'" *Trout*, 609 F.3d at 1110 (citation omitted). In other words, relief under section 551 is automatic. *Id*.

As the Seventh Circuit noted, in this case, the Trustee is seeking to avoid BONY's $312 million lien on Sentinel's property, *see Sentinel,* 728 F.3d at 668, not to avoid specific payments to BONY, so any arguments about section 550 are irrelevant. *See Peoples State Bank*, 95 Fed. App'x at 804 ("[b]ecause the trustee did not seek recovery" under § 550, "the § 550 defenses are not available.") The Trustee is not asking for a money judgment against BONY under section 550 because such a judgment is unnecessary. Upon avoidance of BONY's liens as fraudulent transfers, section 551 will automatically preserve those liens for the benefit of the estate without further action by the Trustee, and the Trustee will be able to distribute the property that had been subject to BONY's liens to creditors in accordance with the terms of the confirmed plan.[3]

Accordingly, inasmuch as BONY has not established any defenses to the Trustee's fraudulent transfer claim, judgment should be entered avoiding BONY's lien.

---

[3] Under Sentinel's plan of liquidation, at the time this case was filed, the Trustee held $312 million plus interest in a reserve subject to BONY's lien. The Trustee distributed that amount to BONY after this Court's judgment. Section 4.3(a) of Sentinel's confirmed plan provides that this distribution "shall remain subject to disgorgement if and to the extent that such BONY Trial Court Judgment is thereafter reversed or modified on appeal and/or subsequent remand." *In re Sentinel Mgmt. Grp.*, Case No. 07-B-14987 (Bankr. N.D. Ill.) (Dkt. No. 1257). The intent of this plan provision was to put the Trustee back into the position he held when this case was originally filed in the event he lost in the trial court and the appellate court subsequently reversed. The Trustee and BONY heavily negotiated over section 4.3(a), which requires BONY to return the proceeds of its collateral to the estate's escrow account. BONY is bound under the terms of the confirmed plan to return these funds to the Trustee. 11 U.S.C. § 1141(a). Notwithstanding its obligation to do so, to date BONY has refused to return the amounts to the Trustee's reserve account.

II.    **BONY's Claim Should Be Subordinated In Full.**

The Seventh Circuit vacated this Court's ruling denying the Trustee's equitable subordination claim and directed the Court to answer two questions:

1.  What exactly did BNYM know before Sentinel's collapse? Did BNYM know that Sentinel was engaged in misconduct of any kind (including abuse of the loan proceeds)?

2.  Was BNYM's failure to investigate Sentinel before its collapse merely negligent? Or was it reckless? Or was it deliberately indifferent?

*Sentinel*, 728 F.3d at 672.

The answer to the Seventh Circuit's question about whether BONY knew that Sentinel was engaged in misconduct is a resounding "yes." As this Court has already found, "the evidence at trial revealed the Bank's knowledge that Sentinel insiders were using at least some of the loan proceeds for their own purposes." *Grede*, 441 B.R. at 883. This finding was supported by extensive and undisputed evidence. (*See*, *e.g.*, Tr. at 402-03 (Ciacciarelli); Tr. at 1079-82 (Brennan).) Moreover, there can be no doubt that knowledge that Sentinel was pledging *customer* assets to support its own *proprietary* trading amounts to knowledge of misconduct. BONY witnesses admitted as much (Tr. at 2723-24 (Rogers)), and the Seventh Circuit so found, concluding that this finding "indicates that the Bank of New York knew Sentinel was engaged in wrongful conduct before its collapse." *Sentinel*, 728 F.3d at 670. BONY thus had actual, subjective knowledge of wrongdoing. This, alone, is sufficient to answer the Seventh Circuit's first question in the affirmative, but as discussed below, there is in fact much more in the record.

The answer to the Seventh Circuit's second question follows from the answer to the first. Because BONY had actual knowledge that Sentinel was engaged in misconduct, its failure to investigate and BONY's alleged continued reliance on the representations and warranties that Sentinel made in a clearing agreement it had signed years earlier was at the very least deliberate

indifferences and by definition, cannot have been merely negligent. As the Seventh Circuit stated, "if the Bank knew that Sentinel insiders were misusing the loan proceeds, then how could the Bank 'rely on representations and warranties' made by Sentinel?" *Sentinel*, 728 F.3d at 671. "[K]nowledge that insiders were misusing corporate funds should have provided the Bank with more than enough reasons to distrust any representations and warranties made by Sentinel." *Id.* One "may not 'blindly [rely] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.'" *BPI Energy Hldgs., Inc. v. IEC (Montgomery), LLC*, 664 F.3d 131, 139 (7th Cir. 2011) (quoting *Field v. Mans*, 516 U.S. 59, 71 (1995)); *accord State Farm Mutual Auto Ins. Co. v. Abrams*, 2000 WL 574466, at *17 (N.D. Ill. May 11, 2000) (same).

Moreover, BONY's own conduct here was particularly reckless and egregious. This is not just the case of a bank which learned that (but did not report or take action to stop) a bank customer that was misusing the assets of its clients, but to whom the bank owed no duties. Here, BONY was acting as custodian of Sentinel's client assets, and the CEA imposed upon BONY an obligation not to use Sentinel's customer assets as collateral for Sentinel's loan. *See* 7 U.S.C. § 6d(b); CFTC Interpretative Letter No. 79-01, Comm. Fut. L. Rep. (CCH) ¶20,835 (May 29, 1979). Moreover, BONY had committed in the letter agreements it signed that it would respect Sentinel's segregation obligations and not look to segregated funds to satisfy its own claims against Sentinel. *Grede*, 441 B.R. at 871; (TTX 11-13; Proposed Supplemental Findings ¶¶ 1-7.) Because of those independent obligations, once BONY suspected misconduct at Sentinel, BONY did not have the luxury of attempting to work out of Sentinel's troubled loan by continuing to accept customer securities as collateral for loans it was making to Sentinel. But BONY did

precisely that, and that is why its claim must be equitably subordinated to the claims of customers harmed by Sentinel and BONY's misconduct.

### B. BONY Knew That Sentinel Was Engaged In Extensive Misconduct.

The evidence establishing BONY's actual knowledge of Sentinel's misconduct is straightforward: (1) BONY knew the loan was collateralized almost exclusively with Sentinel's customer securities (Tr. at 482-83 (Ciacciarelli); Tr. at 1141-42, 1177 (Brennan); Tr. at 1065, 1353, 1436 (Law); Tr. at 2793-94 (Rogers)); (2) BONY "understood that Sentinel used the loan to finance purchase[s] of securities for its own benefit[]" (Tr. at 402-03 (Ciacciarelli); *accord* Tr. at 1082-83, 1115 (Brennan)); and (3) BONY understood "it would be improper for BONY to accept customer securities as collateral for the loan if BONY knew that Sentinel was using the loan proceeds for Sentinel's own proprietary trading" (Tr. at 2723-24 (Rogers)).

That knowledge constitutes actual knowledge of Sentinel's misconduct. Pledging customer securities to support Sentinel's proprietary trading is a flagrant violation of Section 4d(b) of the Commodity Exchange Act ("CEA"), which makes it "unlawful" to treat customers assets as "belonging to the depositing futures commission merchant" (here, Sentinel). 7 U.S.C. § 6d(b). The same is true even without the protections of the CEA. Using someone else's funds for one's own purposes is the very definition of misappropriation. *Sentinel*, 728 F.3d at 667-68; *United States v. Hamilton*, 499 F.3d 734, 736-37 (7th Cir. 2007).

BONY has never seriously contested that Sentinel's use of customer assets to support proprietary trading was wrongful and cannot plausibly deny its knowledge of that conduct given its own witnesses' testimony. Instead, during closing arguments, BONY's lawyers argued that BONY believed Sentinel's proprietary trading was *de minimis* and thus BONY's knowledge was insignificant. (Def.'s Post Trial Br., Ex. A at 7.) The problem for BONY is that there is not one shred of evidence supporting this contention. Not a single BONY witnesses testified that he

believed Sentinel's proprietary trading was *de minimis*. Nor is the contention plausible in light of the evidence at trial.

The events of the summer of 2007 demonstrate that BONY knew Sentinel had massive proprietary positions which were being supported by customer securities. As merely one example, on June 29, the same day that BONY informed Sentinel it would no longer accept physical securities as collateral, Sentinel transferred $166 million (par) in corporate securities from segregated accounts to the Clearing/Collateral account. (TTX 371, 374, 376, 1006.) BONY knew the source of the collateral because it insisted that Sentinel make the transfers in the first place. (Tr. at 482-83 (Ciacciarelli); Tr. at 1177 (Brennan); Tr. at 1373-74 (Law).) BONY further knew that the purpose of the transfers was unrelated to any customer activity, but instead was merely to finance the return of the over $150 million in physical CDOs for Sentinel's own account. (Tr. at 491 (Ciacciarelli); Tr. at 1161 (Brennan); Tr. at 1373 (Law); Tr. at 2698 (Rogers).) The only reasonable conclusion to draw from the June 29 transfer and the other block transfers in the summer of 2007 is that Sentinel was pledging *hundreds of millions of dollars* in customer securities to support the re-purchase of hundreds of millions of dollars in Sentinel's proprietary positions in illiquid CDOs, and that BONY was well aware of those activities— conduct and knowledge that cannot be dismissed as *de minimis*.

BONY's knowledge does not end with the misuse of customer securities to support Sentinel's proprietary trading. BONY also knew the resulting segregation violations these activities caused. Again, the evidence of this knowledge is straightforward and is based on two unavoidable facts: (1) Sentinel was required to segregate customer assets; and (2) Sentinel did not segregate hundreds of millions of dollars in customer securities that were pledged as collateral for the loan.

As this Court found, "[t]he evidence made clear that [BONY] knew that Sentinel was subject to the CEA and that its customer assets had to be segregated." *Grede*, 441 B.R. at 887. BONY, however, knew that upwards of $700 million in securities were *not* segregated but instead were held in lienable, unsegregated accounts. (Tr. at 454-55, 482-85 (Ciacciarelli); Tr. at 1177 (Brennan); Tr. at 1353, 1375, 1436 (Law); Tr. at 2793-94 (Rogers).) BONY witnesses knew and admitted the collateral was comprised of customer securities from segregated accounts. Law admitted all but $2 million pledged in support of the loan were customer securities. (Tr. at 1436.) Ciacciarelli and Brennan admitted that they knew Sentinel lacked the assets to collateralize the loan other than by using customer securities from segregated accounts. (Tr. at 482-83 (Ciacciarelli); Tr. at 1177 (Brennan).) Mark Rogers testified it was his understanding that the only way for Sentinel to pledge collateral to BONY was to "tak[e] assets out of seg accounts and pledg[e] them" to the bank. (Tr. at 2793-94.)

BONY further knew that pledging hundreds of millions of dollars in customer assets left Sentinel undersegrated. BONY's own expert witness, Professor Bradford Cornell, testified that "if you have to segregate, you can't use leverage no matter what because you can't take your securities and pledge them as collateral." (Tr. at 2890.) This Court found that "the 1-FRs reviewed by Law and Ciacciarelli . . . contained significant improper reporting, demonstrating that Sentinel was violating its segregation requirement." *Grede*, 441 B.R. at 890. Sentinel's massive undersegration became even more obvious in the summer of 2007, when hundreds of millions of dollars were removed from segregation unrelated to customer activity without corresponding movements of assets back into segregation. As the Seventh Circuit stated, "[t]here was no way to maintain segregation levels via the returned physical securities because Sentinel did not keep segregated accounts for physical securities." *Sentinel*, 728 F.3d at 665.

BONY's undisputed knowledge of Sentinel's segregation obligations plus its knowledge that Sentinel pledged hundreds of millions of dollars in customer securities as collateral for the loan necessarily amounts to knowledge that Sentinel was violating segregation obligations and thus was engaged in misconduct.[4]

Resolution of the question of whether BONY knew of Sentinel's misconduct does not depend on the applicable standard of knowledge being objective as opposed to subjective. As discussed above, BONY's knowledge of Sentinel's pledging of customer securities to support the loan that was used for its own proprietary trading was actually, subjectively known by the key BONY personnel that dealt with Sentinel. (Tr. at 402-03, 482-83 (Ciaccirelli); Tr. at 1082, 1141-42, 1177 (Brennan); *see also* Tr. at 1353, 1373, 1436 (Law).)

Moreover, there is no doubt that BONY had actual knowledge Sentinel was required to segregate customer assets and was not doing so with respect to the hundreds of millions of dollars in customer securities in lienable accounts. Its refusal to admit the only logical conclusion to be drawn from those facts—that Sentinel was violating the law and misusing customer assets that were supposed to be segregated—does not support a finding that it lacked the requisite knowledge. In the criminal context where knowledge is an element of the crime, courts routinely find knowledge of the ultimate issue based on circumstantial evidence and knowledge of underlying facts. *See United States v. Griffin*, 150 F.3d 778, 785 (7th Cir. 1998); *United States v. Stribling*, 94 F.3d 321, 324-25 (7th Cir. 1996). Indeed, in the criminal context

---

[4] Again, BONY's argument that there may be circumstances under which FCMs can pledge customer securities consistent with CFTC regulations is beside the point. First, this is another excuse manufactured by BONY's lawyers that was not endorsed by any fact witness. Second, whether or not an FCM can *ever* pledge customer securities does not answer the question of whether Sentinel, with no capital and limited assets of its own (facts which BONY witnesses acknowledged knowing), could have legitimately done so. Moreover, BONY made the loan to Sentinel; not to Sentinel's customers.

even suspicion plus deliberate indifference to the truth is sufficient to establish knowledge. *United States v. Ramsey*, 785 F.2d 184, 189 (7th Cir. 1986).

In addition to its actual knowledge—which is more than sufficient to find it liable— BONY is charged with constructive knowledge of all facts which a reasonable investigation would have uncovered. Under *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 288 (2d Cir. 2006), "[f]acts sufficient to cause a reasonably prudent person to suspect that trust funds are being misappropriated will trigger [] a duty of inquiry on the part of a depository bank, and the bank's failure to conduct a reasonable inquiry when the obligation arises will result in the bank being charged with such knowledge as inquiry would have disclosed." *Accord In re Knox,* 64 N.Y.2d 434, 438 (1985); *Diamore Realty Corp. v. Stern*, 855 N.Y.S.2d 206, 207-08 (App. Div. 2008); *Home Sav. Of Am., FSB v. Amoros*, 661 N.Y.S.2d 635, 637-39 (App. Div. 1997). The evidence strongly supports such a duty here based on BONY's actual knowledge of at least some misconduct by Sentinel and this Court's express finding that BONY was in fact suspicious, *Grede*, 441 B.R. at 883, 890.

BONY has mischaracterized *Lerner* as espousing a negligence standard that is incompatible with equitable subordination, but that is simply wrong. *Lerner* involved a claim against the defendant bank for aiding and abetting breach of fiduciary duty, which requires "actual knowledge." 459 F.3d at 295. Thus, *Lerner*, as well as the other authorities cited above that BONY has never addressed, stand for the proposition that the standard of knowledge for banks like BONY holding trust funds subsumes facts the bank would have learned from a reasonable investigation once such a duty to investigate is triggered (as it plainly was here). This Court found that even a "relatively cursory review" by BONY would have revealed massive segregation violations and that BONY objectively knew of Sentinel's wrongdoing, *Grede*, 441

B.R. at 890, and thus when properly judged under *Lerner's* knowledge standard, BONY plainly

had extensive knowledge of Sentinel's misconduct.

### C. BONY Was Deliberately Indifferent To Sentinel's Misconduct.

The Seventh Circuit noted apparent inconsistencies between this Court's finding that

BONY's conduct was "reckless in light of the facts of which the Sentinel team at the bank was

aware" and its subsequent statement that negligence was insufficient to establish equitable

subordination. *Sentinel*, 728 F.3d at 671. It then posed the question of whether BONY's

admitted failure to investigate whether Sentinel was authorized to pledge hundreds of millions of

dollars of customer securities was "merely negligent," "reckless," or "deliberately indifferent."

*Id*. at 672. The Seventh Circuit suggested that the answer to this question depended on whether

BONY knew Sentinel was engaged in misconduct: "If Bank employees knew that Sentinel

insiders were misusing loan proceeds, then it certainly suggests that Bank employees (at the very

least) turned a blind eye to the rest of Sentinel's misconduct." *Id.* at 671. Because BONY knew

Sentinel wrongfully pledged customer securities to support its proprietary trading, its continued

acceptance of hundreds of millions of dollars in additional customer securities as collateral and

failure to do even a minimal investigation was—as the Seventh Circuit stated—"at the very

least" rises to the level of deliberate indifferentness. *Id.*

Indeed, there actually is no dispute about what BONY should have done in light of the

knowledge it had. BONY's own banking expert, Bankhead, testified that a "universal principle

of lending [is] to make sure that the person pledging the collateral actually has the right to pledge

the collateral." (Tr. at 2494-95.) When presented with a hypothetical set of facts which

conservatively represented what BONY knew in this case, Mr. Bankhead explained that BONY

should have reported Sentinel to regulators or law enforcement. (Tr. at 2601-10.) The Trustee's

industry expert, former Head of BMO Harris's Financial Institutions Group, Chuck Hohman,

testified that BONY should have stopped lending to Sentinel and returned the customer securities to segregated accounts. (Tr. at 1600-01, 1613-14, 1618.)

BONY's continued acceptance of customer securities as collateral and failure to perform any investigation in light of the facts it knew and suspicions it harbored are even more egregious in light of the duties imposed upon it as a custodian of trust funds. *First*, BONY had duties under § 4d(b) of the CEA as a depository of customer funds not to treat such funds as belonging to Sentinel—which is precisely what it did each and every night when it accepted hundreds of millions of dollars in customer securities as collateral for Sentinel's loan. *Second*, BONY contractually agreed not to lien on customer assets in the 1997 Seg letters, which this Court found "were in fact binding agreements." *Grede*, 441 B.R. at 900. *Third*, as a recipient of "special deposits," BONY had a common law duty not to lien on customer funds or take any action to "frustrate the terms of an explicit special deposit" arrangement. *Merrill Lynch Mortgage Capital*, *Inc. v. FDIC*, 293 F. Supp. 2d 98, 110 (D.D.C. 2003).

BONY violated each of those three duties. In the face of its actual knowledge of at least some misuse of customer funds by Sentinel and suspicions about whether it "really ha[d] rights on the whole $300 [million]" that Sentinel had pledged to it, BONY did nothing. *Grede*, 41 B.R. at 890; (TTX 287.) It failed to conduct any investigation and avoided following up on any of the knowledge or suspicions it had. Turning a blind eye to known risks is the very definition of deliberate indifferentness. *BPI Energy*, 664 F.3d at 139; *Archie v. City of Racine*, 847 F.2d 1211, 1219 (7th Cir. 1988); *Ramsey*, 785 F.2d at 189. The Court's findings regarding BONY's knowledge, suspicions, affirmative acts, and inaction are incompatible with a conclusion that it was merely negligent.

At the very least, BONY was reckless, which has repeatedly been found to be sufficient for equitable subordination. In *Branch Banking & Trust Co. of Va. v. M/Y Beowulf*, 883 F. Supp. 2d 1199, 1210, 1218 (S.D. Fla. 2012), the court subordinated a bank's claim, holding that its recklessness in failing to confirm its borrower's ability to pledge the collateral at issue "allowed [the borrower] to bury the fraud which he had orchestrated." In *Picard v. Katz*, 462 B.R. 447, 456 (S.D.N.Y. 2011), the court held that a SIPA trustee "can potentially subordinate [claims] by proving that the defendants invested with Madoff Securities with knowledge, or in reckless disregard, of its fraud." *See also In re Jemsek Clinic, P.A.*, 441 B.R. 756, 784-86, 788 (Bankr. W.D. N.C. 2010) (conduct egregious where defendant was "recklessly indifferent to its legal responsibilities"); *In re Adler, Coleman Clearing Corp.*, 277 B.R. 520, 559 (Bankr. S.D.N.Y. 2002) (subordinating claim of defendant who recklessly "closed his eyes to" wrongdoing); *In re Aluminum Mills Corp.*, 132 B.R. 869, 895-96 (Bankr. N.D. Ill. 1991) (conduct egregious where lender was "party to [debtor's] fraudulent act").

## D. This Court Should Subordinate BONY's Claim In Its Entirety.

The Seventh Circuit noted that the contours of "inequitable conduct" necessary to subordinate a claim under the Bankruptcy Code were not well-defined in the case law, but suggested that this should not serve as a prohibition against subordinating claims in appropriate cases. *Sentinel*, 728 F.3d at 670, 672. This is such a case. By consciously accepting and indeed requiring hundreds of millions of dollars in customer securities to be pledged as collateral for Sentinel's loan, which BONY knew was being used for proprietary trading and which left Sentinel massively undersegregated, BONY actively participated in wrongdoing.

Although equitable subordination is a remedy that the Trustee is entitled to pursue for the general benefit of the estate, it is a somewhat unique remedy in that equitable subordination focuses on proof of some harm to creditors. *See, e.g., In re Kreisler*, 546 F.3d 863, 865 (7th Cir.

2008) ("[e]quitable subordination is generally appropriate only if a creditor is guilty of misconduct that causes injury to the interests of other creditors"); *accord Schubert v. Lucent Tech. Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 413-14 (3rd Cir. 2009). Moreover, a trustee does not need to provide an exact "quantification" of the injury; rather he need only present evidence sufficient to allow the court to provide a remedy that is proportionate to the harm caused to creditors. *Winstar*, 554 F.3d at 413. In *Winstar*, for example, the Third Circuit upheld a judgment subordinating the creditor's entire $900 million claim based on a finding that the creditor's misconduct caused approximately $710 million in injuries. *Id.* at 414.

Accordingly, this Court should subordinate all of BONY's claim to the claims of customers. The Court's prior ruling that subordinating the entire claim would not be equitable was inextricably tied to its conclusions regarding liability, and the damages that Sentinel (and not its customers) suffered as a result of BONY's conduct. The Seventh Circuit has now questioned those findings and the Trustee respectfully submits that the issue of harm to customers must be revisited.

BONY asserts a secured claim of $312 million—the amount of its loan on August 17, 2007, which was collateralized entirely by what was supposed to be customer securities. The fact that BONY provided Sentinel with loan proceeds did not offset or reduce the harm to customers. The loan proceeds went to *Sentinel*, not the *customers* whose assets were misappropriated. The harm is particularly pronounced in the case of SEG 3 customers. On July 31, 2007, Sentinel transferred $289.9 million in corporate securities from the SEG 3 account to the Clearing/Collateral Account for purposes of collateralizing the BONY loan. (TTX 482, 489, 497, 1012; Tr. at 1855-61 (Feltman).); *Grede v. FCStone, LLC*, 485 B.R. 854, 866 (N.D. Ill. 2013); *Grede*, 441 B.R. at 878. As a result of the collateral swap in late July, the Seg 3 account

22

was virtually emptied. That BONY in exchange released liens on other securities, some of which were then returned to Seg 1 customer segregated accounts, did nothing to mitigate the losses suffered by SEG 3 customers whose assets were misappropriated at the time BONY turned a blind eye to the improper pledging of customer assets. Proportionally, the subordination of BONY's entire claim is justified given the harm its inequitable conduct caused.

Moreover, subordinating the entire claim because specific customers suffered the losses comports better with the facts than the alternative liquidation shortfall analysis, which focuses only on Sentinel. BONY's loan to Sentinel was re-booked each day. (Tr. at 1309, 1339 (Law.) Thus, each and every day throughout the summer of 2007 (after BONY had acquired knowledge and suspected Sentinel of wrongdoing), BONY made two critical choices that give rise to equitable subordination of its claim: first, to continue each day to re-book and make a loan to Sentinel knowing that Sentinel was engaged in serious misconduct, and second, to accept as collateral for each loan customer securities it knew were required to be segregated, and which BONY had a legal obligation not to accept. Having made each of those two improper decisions every day for several months, BONY cannot now seek to revert to the situation that existed prior to the summer of 2007. That option was eliminated when BONY consciously chose to disregard the facts known to it and its suspicions regarding Sentinel's rights to pledge collateral, failed to blow the whistle and instead permitted customers' assets to continue to be misappropriated while attempting to work out its troubled loan to Sentinel. Having made its decisions, BONY should now be called to account for the full extent of customer losses caused by accepting as collateral customer securities to which it was not legally entitled.

## CONCLUSION

For all of the foregoing reasons, the Trustee respectfully requests that this Court enter judgment in his favor on the fraudulent transfer claim avoiding BONY's liens, and subordinate BONY's claim in its entirety and transfer any liens securing its claim to the estate and grant such other relief as may be just.

Dated: November 26, 2013

Respectfully submitted,

FREDERICK J. GREDE, not individually but as Liquidation Trustee of the Sentinel Liquidation Trust,

By: _____*J. Kevin McCall*_____
       One of his attorneys

J. Kevin McCall (ARDC # 3125685)
Catherine Steege (ARDC # 6183529)
Vincent E. Lazar (ARDC # 6204916)
Jeffrey S. Eberhard (ARDC # 6276471)
Christine L. Childers (ARDC # 6277245)
Angela  M. Allen (ARDC # 6295519)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Phone: (312) 222-9350
Facsimile: (312) 527-0484

Chris C. Gair (ARDC # 6190781)
Gair Law Group, Ltd.
1 East Wacker Drive
Suite 2050
Chicago, IL 60601
Phone: (312) 600-490