# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

FREDERICK J. GREDE, not individually but as
Liquidation Trustee of the Sentinel Liquidation
Trust,

      Plaintiff,

      v.

THE BANK OF NEW YORK and THE BANK
OF NEW YORK MELLON CORP.,

      Defendants.

No. 08 C 2582
Judge James B. Zagel

## <u>SUPPLEMENTAL OPINION</u>

On November 3, 2010, I issued an opinion concerning three claims on appeal made by

Frederick J. Grede Liquidation Trustee of the Sentinel Liquidation Trust against Bank of New

York Mellon ("BNYM"). *Grede v. Bank of New York Mellon*, 441 B.R. 864 (N.D.Ill. 2010). On

appeal, the Seventh Circuit affirmed in part, reversed in part, and remanded for further

proceedings on two of Grede's theories of liability, to wit, the assertion that fraudulent transfer

law and the doctrine of equitable subordination require a judgment in Trustee's favor. The

Seventh Circuit concluded that this Court's factual findings demonstrated an actual intent to

hinder, delay, or defraud in support of Grede's fraudulent transfer claim, and remanded the case

back to this Court for further analysis of Trustee's claim under 11 U.S.C. § 548(a)(1)(A). In

reversing and remanding Grede's equitable subordination claim, the Seventh Circuit found the

Court's findings of fact to be "internally inconsistent" and sought clarification from this Court on

two critical issues:

(1) What exactly did BNYM know before Sentinel's collapse? Specifically, did BNYM know that Sentinel was engaged in misconduct of any kind (including abuse of the loan proceeds)?

(2) Was BNYM's failure to investigate Sentinel before its collapse merely negligent? Or was it reckless? Or was it deliberately indifferent?

I now clarify my prior opinion and findings of fact which were based, not only on what the witnesses said, but, more importantly, also on the conduct and actions of witnesses.

I incorporate by reference my earlier opinion on the merits and the Seventh Circuit's opinion, and I will reprint both prior opinions as appendices to this ruling.

**I.      Equitable Subordination**

A.      Standard

Trustee seeks to lower all of BNYM's claims to a level below all other creditors' claims and to transfer any liens supporting BNYM's claims to Sentinel's estate under the doctrine of equitable subordination. 11 U.S.C. § 510(c). Courts will subordinate a claim (i.e. chose to disregard an otherwise legally valid transaction) when alleged conduct of a claimant either injured other creditors or conferred an unfair advantage to the claimant, but not when subordination is inconsistent with the Bankruptcy Code. *In re Lifschultz Fast Freight*, 132 F.3d 339, 347 (7th Cir. 1997); *See In re Kreisler*, 546 F.3d 863, 866 (7th Cir. 2008) (quoting *United States v. Noland*, 517 U.S. 535, 538-39, 116 S.Ct.1524, 134 L.Ed.2d 748 (1996)). As the Seventh Circuit acknowledged, subordination of a claim on the grounds of equity upsets legitimate expectations and increases uncertainty, and so, the doctrine of equitable subordination is typically limited to findings of "(1) fraud, illegality, breach of fiduciary duties; (2) under-

capitalization; [or] (3) claimant's use of the debtor as a mere instrumentality or alter ego." *Lifschultz*, at 345.

Additionally, the Seventh Circuit expressed concern regarding the difficulty of proving that a creditor has engaged in inequitable behavior—a difficulty it noted is especially pronounced when subjectively examining the conduct of an outside creditor whose interests are not necessarily aligned with the interests of the debtor. *In re Sentinel Management Group, Inc.*, 728 F.3d 660, 2013 WL 4505152, 70 Collier Bankr.Cas.2d 566, 58 Bankr.Ct.Dec. 93, Comm. Fut. L. Rep. P 32,717 (C.A.7 (Ill.), 2013) (hereafter Grede Appeal). For this reason, the Courts of Appeal have been particularly hesitant to invoke the doctrine of equitable subordination outside of cases involving insiders of closely held corporations and do not ordinarily identify precisely the nature of wrongful conduct that is sufficient to invoke equitable subordination against an outside creditor. *In re Granite Partners, L.P.*, 210 B.R. 508, 515 (Bankr.S.D.N.Y.1997). The reported decisions on this point are not legion. In a prominent case of corporate insiders attempting to convert worthless equity interests into secure debt, the Seventh Circuit, in 1990, did apply equitable subordination and went on to note that "[c]ases subordinating the claims of creditors that dealt at arm's length with the debtor are few and far between." *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1356 (7th Cir. 1990). Based on this precedent and decisions from other circuits, I concluded the trigger for equitable subordination in this case is whether BNYM's conduct is egregious and conscience-shocking.

The Seventh Circuit did not decide whether that standard is proper because it concluded that my relevant findings of the appropriate facts were internally inconsistent. The Seventh Circuit found two statements, in particular, to be apparently inconsistent with each other: (1) "The evidence at trial revealed BNYM's knowledge that Sentinel users were using at least some

of the loan proceeds for their own purposes;" and (2) credibility of BNYM's employee's testimony that "[BNYM] neither knew nor turned a blind eye to the improper actions of Sentinel." Application of a standard of liability does not work very well when the trial court's facts are not internally consistent.

After review of the extensive briefing in this case, trial transcript, and significant motions, it has become clear to me that my opinion left open more than one legitimate understanding of the grounds for some of my conclusions about important facts. One example of a lack of clarity arises from my failure to note, specifically, what BNYM knew of Sentinel's intent. So too, should some of the wording—my own and those of the litigants—have been more precise. "Know" and its pairing with "knowingly" are not always accurate enough. In some cases, the better word is "believe." One who believes something to be true is, effectively, one who thinks, rightly or wrongly, that he knows it to be true.

This case is one in which BNYM has neither believed nor disbelieved certain things about Sentinel, and thus BNYM concluded that certain things were unimportant or immaterial to BNYM. I should have made my word usage and context clear. I now clarify, first, whether BNYM actually knew, before Sentinel's collapse, that Sentinel was engaged in misconduct of any kind (including abuse of the loan proceeds), and, second, whether BNYM's failure to investigate Sentinel before its collapse was, at most, merely negligent, or rather, reckless or deliberately indifferent.

B.     Subjective Knowledge: Did the Bank Actually Know that Sentinel Engaged in Misconduct?

I address the question of whether BNYM actually knew (i.e. had subjective knowledge) that Sentinel's management was improperly using loan proceeds for their own enrichment, namely, trading for Sentinel's own account with loan proceeds secured by collateral from client's

segregated funds. As sought by the Seventh Circuit, I make clear what I had found to be the extent of BNYM's knowledge about Sentinel's practices, including how BNYM could know that Sentinel users were using at least some of the loan proceeds for their own purposes, without knowing or turning a blind eye to Sentinel's improper actions.

It is true that both the testimony and conduct of BNYM's officials revealed that BNYM knew that Sentinel was using at least some of the loan proceeds for its own purposes. Sentinel claimed to be pursuing a leveraged trading strategy using loaned funds to increase investment with respect to its own assets and the assets of its clients, and BNYM knew that Sentinel used loan proceeds in its proprietary trading, its house account. Sentinel and its insiders had collateral of its own for leveraged investing—approximately $10 million in securities of these Sentinel investors and, according to the Trustee's expert, about $230 million in securities that were not attributed to Sentinel's customer groups. As part of Sentinel's investment practice, Sentinel's own assets and those of its clients were contained in a single, undifferentiated pool of securities and cash, and all resulting gains and losses were shared by all clients and the Sentinel insiders. What followed from this strategy was that not all the collateral used to support loans to finance trading was the property of all the Sentinel investors. Rather, every client had a piece of the pool, as did Sentinel. Any client could redeem the cash value of its share of the pool of assets. Redemptions were made promptly and the deadline for claiming same day redemption did not close until late in the afternoon. Eric Bloom, a Sentinel insider, told BNYM that Sentinel had permission, generally, to use client's segregated funds as collateral for leveraged trading. The evidence does not show that Sentinel secured BNYM's loans with specific assets belonging to specific clients, or that BNYM knew that Sentinel was using specific client assets to secure whatever part of the loan Sentinel might be using for its own leveraged investing.

While BNYM neither had nor sought data to track each transfer of collateral, BNYM did pay attention to the loans. Beginning in November 2005, BNYM received copies of Sentinel's monthly Form 1-FR that Sentinel filed with the CFTC. Over the course of BNYM's ten-year relationship with Sentinel, Joseph Ciacciarelli, Terence Law, and Stephen Brennan on occasion perfunctorily reviewed the Form 1-FRs. I found credible their testimony that, having credited Sentinel's claim that removal from segregation was consented to by its clients, they neither looked for nor found any segregation violations. This was so because BNYM officers believed Eric Bloom's unequivocal statement that his clients gave Sentinel the right to move assets from segregated accounts and place them in lienable accounts to pursue its leveraged trading program through overnight loans.

BNYM had a list of pledged securities. When Sentinel offered securities as collateral, BNYM had to evaluate the specific securities. It believed that the loans were properly secured. Throughout June and July, the loan was over secured. BNYM was attending to its frequent loans and pricing securities in lienable accounts and giving those securities a margined value, a substantial margin below current value to insure that the loan amount would be covered even if the price of the securities (including stocks, bonds, etc.) were to fall. BNYM knew a lot about Sentinel's business, excepting that which matters most in this case: the designation of Sentinel's accounts from which they came.

Had BNYM known the amount of any loan which supported Sentinel's own trading, the portion which supported its futures merchants, and the portion from non-futures customers, then BNYM might have been able to calculate the portion of the loan proceeds used for trading. It may have been able to determine whether those assets and the customer assets were held in a single, undifferentiated pool. BNYM did not, however, have access to records showing how

Sentinel, itself, allocated the funds. Two reports that Sentinel did not provide BNYM—Sentinel's daily statement of segregation and Active and Matured Securities Report—would have enabled an outsider, like a regulator, to identify allocation of assets on any given date and the allocation of loan proceeds. In fact, BNYM relied on its knowledge that Sentinel operated a business regulated under federal laws, including the Commodities Exchange Act, and was audited annually by a firm of Certified Public Auditors who issued an annual unqualified audit opinion approving Sentinel's statement of its financial position. In addition, the National Futures Association examined Sentinel annually through 2006. As it was, BNYM did not know, from what Sentinel did report, whether, on any given day, Sentinel transferred customer securities, as well as other assets, as collateral for loan proceeds that Sentinel would use to finance its own trades. Sentinel could legally trade for itself, and BNYM believed it did. BNYM did not know or believe that Sentinel was engaging in misconduct before it collapsed.

One bank employee worried that Sentinel was using the loan money to trade without putting its own collateral up. Mark Rogers wrote a note to those BNYM employees who worked on the Sentinel account and questioned how Sentinel was able to post so much collateral when its capital was $2 million. Rogers answered his own question in these words, "I have to assume most of this collateral is for somebody else's benefit. Do we really have rights on the whole $300MM?" Rogers did not claim he knew or believed that all the collateral was for somebody else's benefit. He came closer to an affirmative statement when he "assumed" that most of the collateral was for somebody else's benefit, but this too was not an assertion of belief or knowledge. Assuming *arguendo* that Rogers knew, rather than guessed, that some portion of the collateral was posted for the benefit of insiders, he did not assume that all of it came from the accounts of Sentinel's clients.

Even so, Rogers' inquiry does not focus on the interests of Sentinel or its clients, but on BNYM's rights to "the whole $300MM." Law replied to Rogers' concern by writing, "We have a clearing agreement which gives [us] a full lien on the box position outlined below." In fact, both Rogers and Law knew before the email was sent that there was a clearing agreement that gave BNYM a lien on any securities in the collateral account. What I conclude Rogers was doing was seeking reassurance that the lien was enforceable. And I conclude Law and his colleagues' response to Rogers was considered and cleared by bank officers who believed it to be a "well-advised and carefully worded statement." And with that, the one question that Rogers raised concerning a matter material to BNYM was answered in mid-June, about two months before Sentinel collapsed.

The testimony and demeanor of the bank officers and others left no doubt in my mind that the sudden demise of Sentinel, precipitated by Sentinel's immediate halt of customer redemptions on August 13, 2007, was a complete surprise to BNYM officials. BNYM believed that there were coming changes in what was useful as collateral and, based on this belief, changed some of its procedures in dealing with Sentinel. Some at BNYM thought that its business with Sentinel, as a customer, would come to an end because of these changes, but it did not know that Sentinel was on the brink of collapse. BNYM officials had not foreseen the possible end of Sentinel as an operating enterprise. BNYM also did not know anything that would have led it to believe that Sentinel, whose loans were over secured and had been so for months, would collapse or need to be looked at more closely. BNYM, in short, did not foresee the possible demise and default of Sentinel, and BNYM did nothing that can properly be labeled as egregious or conscience shocking.

C.    Objective Knowledge: Was BNYM's Conduct Reasonable, Negligent, Reckless, or Deliberately Indifferent?

From the beginning of this litigation to now, the Trustee has continuously invoked the two-part mantra that BNYM "knew or should have known" of Sentinel's misconduct. When this formula is consistently invoked by lawyers, it is usually a signal that proving the "knew" may not be doable, and the Trustee's difficulty, in the end, was that BNYM did not know of misconduct of any sort. Nonetheless, the Trustee mainly, if not entirely, seeks to prove "should have known," so I now turn to whether BNYM should have known about, but was reckless or deliberately indifferent towards, Sentinel's misconduct.

In my prior opinion, I was critical of some of BNYM's course of conduct depending entirely on the security of the collateral. I expressed the view that, while not legally obligated to do so, some bank employees could or should have done a more effective job of protecting BNYM's own interests by taking a closer look at Sentinel's operations and records. To that end, I indicated that, even if BNYM was only concerned with protecting its own interests, a diligence process that excluded verification of whether Sentinel had the right to pledge the relevant collateral, such that it adequately secured BNYM's loans, seemed to be "ineffective and reckless."

I further found that a reasonably prudent person would have taken a closer look at the 1-Rs—reports that revealed with relatively cursory review that Sentinel was violating its segregation requirements. As I previously found, Ciacciarelli, Law, and Brennan did indeed review the 1-FRs on occasion, but failed to undergo the closer examination that might have revealed such violations. Nevertheless, BNYM neither knew nor turned a blind eye to the improper actions of Sentinel. There is a range of actions that a reasonably prudent person could have and might have taken in this situation. This is to say that even if a reasonably prudent

person would have, and certainly "could" have, conducted a more rigorous inspection of Sentinel's operations or reporting, it would not be unreasonable for such a person to decline to take a closer look at the 1-FRs or other documentation. While what BNYM elected to do was less than I thought was wise, it remains that mere negligence—or ineptitude—is insufficient to establish inequitable conduct.[1] BNYM was neither "deliberately indifferent" nor "reckless" in dealing with its legal obligations by failing to investigate Sentinel's misconduct.

So too it is not unreasonable for a bank, in general, to protect its interest in having its loan paid back in full by relying solely on the cash value of the collateral. What BNYM must do is to check the quality and suitability of the collateral, which it did by evaluating the securities and fixing their cash values. And it is not necessarily negligent or reckless to accept collateral without further checking its provenance, particularly where pledged securities had been used for a long time without problems for BNYM. After years of successful loans to Sentinel, BNYM had been satisfied with Eric Bloom's representation, on behalf of Sentinel, that it had the right to pledge the securities.[2] BNYM could reasonably accept Bloom's word.

Long term stable banking relationships can give rise to actions based, in some part, on trust. That BNYM did not take further steps to investigate Sentinel's practices for misconduct and, instead, relied on Sentinel's statements is reasonable in the specific setting of this case. Good faith reliance is an inescapable requisite of a banking finance enterprise. BNYM is neither a father's keeper nor a partner (despite the current advertising of some banks) of those

---

[1] For purposes of deciding the question of the Bank's mental state when it decided to go no further in looking at Sentinel, once BNYM decided that its full lien was all BNYM needed to protect itself against Sentinel, I decided that the worst that could be said about BNYM would be that it was negligent in dealing with Sentinel. I did not find as a matter of fact or law that BNYM was negligent in its conduct with respect to the Sentinel loans, let alone reckless. The Trustee argued that bankers believed Rogers' assumption was valid and may have believed that the assumption was true but did not conclude that the bankers did so. I found as a fact that they did not come to believe or credit Rogers' assumption.

[2] I leave aside the question of whether the Trustee has shown that the particular securities posted as collateral were, in fact, securities which Sentinel had the right to pledge.

companies to whom it loans money for business operations. A bank loan is an arm's length deal. It is both legally and economically wrong to require of a bank the kind of systemic oversight that a parent or holding company often chooses to exercise over a subsidiary. Banks can exercise oversight if they choose, but that oversight is to ensure that the bank's interest, and not the interest of the debtor, is protected. Close surveillance of the integrity of the debtor and its conduct might be better for a bank, particularly at the outset of the relationship, but this is not an iron-clad duty a bank owes to its debtor or to the debtor's clients.

Furthermore, close surveillance of a customer is not cheap and it might be reasonably thought unnecessary, particularly when the debtor is regulated or registered by federal agencies or self-regulatory organizations, all of which were essential to the continued existence of Sentinel. As previously noted, the National Futures Association examined Sentinel annually through 2006, and an independent outside auditor, McGladrey & Pullen LLP and its predecessor Altschuler, Melvoid and Glasser LLP (collectively "McGladrey"), was retained that issued annual unqualified audit opinions approving Sentinel's statement of its financial position. There is no evidence in the record that either the auditor or regulator—independent entities with the power of oversight over Sentinel—knew or should have known of wrongdoing before Sentinel's collapse. BNYM management could fairly rest on the protection of the collateral for its loan at least until such time as the NFA or auditors or, in this case, an inability to honor requests for customer redemptions started the bells ringing. BNYM, I concluded, neither knew nor should have known that Sentinel was misusing loan proceeds or participating in any other misconduct.

Based on this and my observations at trial, I found that BNYM acted within the realm of reason when it took great care to insure its loans were backed by adequate collateral. It had lengthy experience banking for Sentinel, which had appeared to BNYM to be professional and

honest.[3] This does not mean that BNYM had blind faith in Sentinel. BNYM paid close attention

to the loans and the collateral. The loans, and there were many, were paid until nearly the end.

Rogers raised questions of Sentinel's conduct which several other bankers considered. These

other bankers concluded that the lien on collateral would be valid and enforceable. BNYM dealt

often with the Sentinel account and at times made efforts to reduce the size of the loan. The

reductions in the loans were neither drastic nor indicative of BNYM's loss of faith in the basic

honesty of Sentinel.

It was also reasonable for BNYM to believe the statement of Eric Bloom that Sentinel

was authorized to transfer securities from segregated accounts to lienable accounts. Unknown to

BNYM was that Bloom's transfer authority was nil. Other than Bloom's lie, undetected by its

own auditors or regulators, nothing in Sentinel's conduct throughout the banking relationship did

lead BNYM to doubt his integrity. BNYM accepted Bloom's word against its own interests

when Bloom instructed BNYM to remove millions of dollars of securities from collateral

accounts to segregated accounts.

When BNYM officers made that choice, they did not know, nor did they believe (with

the possible exception of Rogers), that Sentinel was untruthful in its representations and wrongly

misusing customer assets as collateral. Rogers' view that BNYM needed more information about

how a company with small capital could put up large collateral was not enough to sound an

alarm to which BNYM had to respond. Rogers wrote "I have to assume" when commenting on

his views of Sentinel's practice. Rogers' testimony and his demeanor convinced me that he

thought that BNYM should have investigated Sentinel (how it would do this he did not say).

Rogers had questions but not answers. He made it clear that he did not know what Sentinel did

---

[3] I take judicial notice that the government has charged Sentinel's leader with criminal acts of misrepresentation. I
do not consider the possible significance of the indictment's allegations, the truth of which is still the subject of
post-verdict litigation.

and could not have reached an actionable belief about Sentinel. The opinion of his fellow bank officials Terrence Law, Stephen Brennan, Joseph Ciacciarelli, and others took the view, based on research and a review of its contract, that the clearing agreement gave BNYM a full lien on the box position outlined. In the end, Rogers, and only Rogers, worried—not believed or knew—about the possibility that BNYM's lien might fail to some unknown degree. No other BNYM official agreed with him, all thought the clearing agreement left the loan unimpaired. There is nothing in this exchange of bank personnel that necessitates that a reasonably prudent person would have believed that Sentinel had engaged in misconduct. BNYM did not know or believe that Sentinel was misusing the collateral of others, nor was it unreasonable for BNYM to trust Eric Bloom until it was too late. The decision to rely on the full lien, then, is and was a reasonable policy choice for BNYM to make.[4]

D.     Whether BNYM's Failure to Act on Its Constructive Knowledge Requires That BNYM's Claim Be Subordinated

As I have clarified the extent of BNYM's knowledge, I now revisit the ultimate issue of whether to apply equitable subordination to BNYM's rights to collect on the collateral which secured its large loan to Sentinel. In order to subordinate a claim, I must conclude that (1) the claimant engaged in some type of inequitable conduct; (2) the misconduct resulted in injury to

---

[4] I do not retreat from my view that BNYM's management of its business with Sentinel was not as thorough as it could have been. I wrote that the officers "would have been better bankers if they had made a more rigorous inspection of Sentinel's operations or its reporting." More scrutiny is often useful but not legally required in a case like this. The decision not to go further than reliance on the collateral is neither negligent nor reckless in the context of Sentinel's operations, where a good number of bank officials believed that the lien was enough protection for BNYM. While I believe that a more intrusive examination might be a more effective approach in general, there are no reasons to believe that the bank's officers would have done better than Sentinel's regulators and independent auditors. Sentinel's leadership was not honest, and the firm survived its dishonest practices for quite a long time. I noted in my original decision that "[i]n closing, Trustee (implicitly recognizing the difficulty and impracticality of direct contact with Sentinel's clients) argued that BNYM employees should have at least asked Eric Bloom whether he had the power to transfer assets from segregated or lienable accounts and signed a clearing agreement authorizing the pledge." Bloom had said he had the power to transfer assets from segregated or lienable accounts and signed a clearing agreement which stated that Sentinel had the right to pledge those securities. Given Eric Bloom's willingness to act as he did, the effort of the better banker would not, I believe, have changed anything. We are, in short, a very long way from egregious and conscience-shocking behavior by BNYM.

the creditors or conferred an unfair advantage on the claimant; and (3) subordination is not inconsistent with the provisions of the Bankruptcy Code. *In re Mobile Steel Co.*, 563 F.2d 692, 699-700 (5th Cir. 1977); *see In re Kreisler*, 546 F.3d 863, 866 (7th Cir. 2008). While this test is applicable whether the claim to be subordinated is that of an insider or a non-insider, the Trustee's burden of proof is fairly high when equitable subordination is sought against a bank that was neither a Sentinel insider nor a fiduciary to Sentinel. *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1356 (7th Cir. 1990). What the Trustee must prove is that BNYM knew or was unjustifiably indifferent to Sentinel's misconduct. This was my holding. To prevail, Sentinel had to show that BNYM actually knew (subjectively knew) enough about the facts of what Sentinel was doing to require BNYM to make further investigation of Sentinel's conduct. The Trustee cannot simply show, after the fact, that BNYM could have put together all the objective pieces of information that BNYM had about Sentinel and should have known it had to investigate Sentinel's conduct. It is also not enough simply to say that another more conservative bank could have acquired enough objective information that it is deemed to have known what it did not subjectively know about Sentinel. The primary difficulty with compiling all the objective pieces of information and interpreting them to reach a compelling need for a bank to act is that the risk of hindsight bias often makes the purely objective information an unreliable and unfair ground on which to judge the conduct of BNYM officers. I have found that BNYM employees were neither aware of nor deliberately indifferent toward Sentinel's misconduct. As BNYM's behavior was neither egregious nor conscience shocking, it does not satisfy the requirements for equitable subordination.

**II.     Fraudulent Transfer, Counts I and II**

A.     Actual Intent to Defraud

The Trustee seeks to avoid (i.e. eliminate) and recover five transfers from Sentinel to BNYM that occurred on June 1, June 26, June 29, July 17, and July 31, 2007 ("Specific Transfers")[5] as fraudulent under § 548(a)(1)(A) of the Bankruptcy Code and § 5(a) of the Illinois Uniform Fraudulent Transfer Act ("UFTA"). A debtor may seek to avoid a fraudulently made transfer of property that is a barrier to the recovery of assets (e.g., a lien against a property). A lien may identify the specific security attached to a loan for any person who seeks a specific security and give preference to creditors over unsecured and undersecured creditors. Here, the Trustee, at a bare minimum, seeks to avoid BNYM's entire lien against those Sentinel assets which BNYM was entitled to take, and presumably sell, until it collected the amount of the loan which Sentinel was unable to pay back.

At trial, the Trustee's expert witness James Feldman opined that the transfers at issue took place, in one instance, in the closing out of repo positions and, in two instances, the structuring of collateral by moving securities between accounts. Specifically, the Specific Transfers of June 1, 26, 29 and July 17, three of which occurred after a repo lender returned large amounts of collateral in the form of physical securities to Sentinel, were in very large part taken out of segregated accounts and sent to Sentinel's "SEN" clearing account. The July 30th and 31st transfers were very largely transferred out of lienable "clearing" accounts and sent back to Seg I accounts—$263 million in government securities and $248 million in DTC securities. The Trustee seeks a finding that the five Specific Transfers were fraudulent and that, consequently,

---

[5] As the Trustee did not pursue the July 30, 2007 transfer, I decline to address whether this transfer must be avoided as fraudulent.

BNYM's entire lien, as of the Petition Date, on Sentinel's accounts and assets in the amount of $312 million must be avoided.

In order to avoid the Specific Transfers as fraudulent, Plaintiff must first demonstrate that: (1) Sentinel had an interest in the transferred property; (2) Sentinel transferred the property with actual intent to hinder, delay or defraud its creditors; and (3) the Specific Transfers occurred within the applicable statutory period. 11 U.S.C. § 548(a)(1)(A); 740 ILL. COMP. STAT. 160/5(a)(1). Whether Sentinel transferred the property with actual intent to defraud its customers is the question the Seventh Circuit addressed and remanded to this Court.

In my prior opinion, I concluded that the Trustee had not proven Sentinel's actual intent to hinder, delay, or defraud other creditors or to strip itself of assets when it made these transfers. This is largely a result of my belief that Sentinel's conduct arose, instead, from its attempt to stay in business. The Seventh Circuit expressed no doubt that Sentinel's motive was to stay in its legitimate business and even reasoned that Sentinel's actions in wrongfully transferring segregated funds into its clearing accounts were the natural consequence of its attempt to do so. Nonetheless, the Seventh Circuit, citing persuasive precedents, held that even one who has the best intentions, with no thought of harm, could still possess an actual intent to defraud. *United States v. Segal*, 644 F.3d 364, 367 (7th Cir. 2011); *United States v. Davuluri*, 239 F.3d 902, 906 (7th Cir. 2001). Relying on my factual findings, the Seventh Circuit found that Sentinel knowingly exposed its FCM clients to a substantial risk of loss of which they were unaware in violation of the Commodities Exchange Act ("CEA") and, thus, acted with the intent to defraud. Consequently, the Seventh Circuit concluded that the Trustee should be able to avoid BNYM's lien under § 548(a)(1)(A).

After review of the record and consideration of the question anew, I understood I erred when deciding at trial that Sentinel could not have the intent to defraud others without having any intent to cause harm. Here, Sentinel commingled its client assets with Sentinel's assets in an unlawful manner and exposed its FCM clients to a substantial risk of loss of which they were unaware. While Sentinel may have intended to save its business and its client's funds, the actions of Sentinel were in violation of the CEA. The remand noted, however, that, even with this finding of actual intent to defraud, there remained more than a little work to be done with respect to the fraudulent transfer under 11 U.S.C. § 548(a)(1)(A) and stated that there were defenses available to BNYM that had not yet been addressed.

B.      Defenses, 11 U.S.C. §§ 548(c) and 550

BNYM has asserted two defenses under 11 U.S.C. § 548(c) and 11 U.S.C. § 550 against avoiding the Specific Transfers. I address each in turn.

1.      BNYM Acted in Good Faith, 11 U.S.C. § 548(c)

First, BNYM argues that the Specific Transfers should not be avoided under § 548(c) because BNYM, as a transferee, received liens for value in exchange for giving value to Sentinel in good faith. The Trustee argues that BNYM had inquiry notice of Sentinel's possible insolvency and, so, its actions in transacting with Sentinel were not in good faith. The Seventh Circuit, noting that a § 548(c) defense is generally unavailable to any creditor who "has sufficient knowledge to place him on inquiry notice of the debtor's possible insolvency," sought clarification from this Court on what BNYM knew before Sentinel's collapse. *Grede Appeal*; *In re M & L Bus. Mach. Co.*, 84 F.3d 1330, 1334-36 (10th Cir. 1996); *Scholes v. Lehmann*, 56 F.3d 750, 756 (7th Cir.1995).

The Trustee argues that whether BNYM acted with "good faith" must be assessed under the objective standard, *Donohoe v. Consolidated Operating & Production Corp.*, 30 F.3d 907, 912 (1994)(good faith typically determined by examining whether reasonable diligence was used); *Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348, 1357 (8th Cir. 1995), while BNYM argues that a hybrid of the objective and subjective standards must be applied in this case. *In re M & L Bus. Mach. Co.*, 84 F.3d 1330, 1334 (10th Cir. 1996)(good faith is lacking only if "a diligent inquiry would have discovered the fraudulent purpose"). I do not agree that the state law defined by UCC 8-503 is a useful source of guidance in deciding whether BNYM acted in good faith.

To say, as Trustee does here, that the good faith defense fails because BNYM knew or should have known that Sentinel was acting improperly is both understandable and pointless since I have found that BNYM neither knew nor should have known of Sentinel's bad conduct. Perhaps more important than arguments over the precise standard of good faith (and the UCC's collusion standard applicable to a "purchaser" and a "securities intermediary") is the rule that absent BNYM's actual knowledge of bad conduct or its ignoring what it should have known, the only conclusion is that BNYM here has acted in good faith.

I find that, even under a purely objective standard, BNYM acted in good faith.

I do not believe the Trustee argues that BNYM did not act in good faith because law or an accepted practice requires a bank to rule out by investigation any wrongful conduct of Sentinel and BNYM failed to do so. There is no such requirement. However, where there are grounds to believe that a bank *should* have known of the misconduct of its borrower, investigation may be required. The law and practice do not require inquiry, and inquiry notice of a regulated enterprise was not present here.

I find, in large part based on my credibility determinations at trial, that several clues reveal that the loans were made in good faith. First, I found as a fact, that BNYM did not know that the loans were secured with collateral that was not within Sentinel's right to post. Sentinel's investment strategy was based on using pooled funds of Sentinel and its clients, which allowed Sentinel and its customers to maximize the value of the overnight loan to customers. Sentinel had good business reason to use this strategy, and BNYM had no reason to disbelieve Eric Bloom when he represented that Sentinel was allowed to use client's segregated funds as collateral. Moreover, any inquiry BNYM might have made would likely have been fruitless, as BNYM believed, even to its own detriment, the lies told by Eric Bloom.

The Trustee next contends that because BNYM extended enormous loans secured with excess collateral, it was not acting in good faith. Receiving collateral in exchange for a loan is one of the various methods, each with its own costs and benefits, in which a bank can manage the risk it takes in extending a loan. It was within BNYM's rights to use collateral to manage the risk it took in extending a loan to Sentinel, and its reliance, even exclusively, on collateral was reasonable. BNYM and Sentinel had a fairly long history of extending loans and not needing to use the collateral which secured Sentinel's loans. BNYM had made such loans for many months, accepted assets for collateral and, in fairly short order (a day or a few days), Sentinel paid back the loan and BNYM returned the collateral—even as recently as two months prior to Sentinel's bankruptcy. The day came when the loan was not paid and BNYM kept the collateral. There was nothing, I have found, that would have or should have informed BNYM that this long time set of transactions would suddenly change in nature.

The Trustee suggests that BNYM knew that Sentinel was on the verge of a collapse because it forced the loan balance down from a peak of $573 million in June 2007 to around

$312 million by August 17, 2007. It is true that BNYM surmised that Sentinel was going through a rough patch and that its business was not as robust as in the past. It is also true that BNYM sought to increase protection of its own financial interests, in light of these increased risks, by lowering its loan balance and over securing its loans. It is even true that BNYM suspected that its relationship with Sentinel might come to an end. I did not find, however, that BNYM had a premonition that the "rough patch" would lead to Sentinel's ultimate downfall. Rather, it was precisely because of its own stricter lending requirements that BNYM guessed that Sentinel may no longer be BNYM's client in the future if it could find a bank whose lending policies were more lenient than BNYM's newer and tighter ones.

2.      Recovery Limitations under 11 U.S.C. § 550

Under § 550, a trustee is only allowed to recover property transferred or the value of such property from the transferee; here, because BNYM gave full consideration for the Specific Transfers, BNYM argues that § 550 bars the Trustee from any additional recovery. Additionally, BNYM argues that it returned securities to Sentinel and that avoidance of BNYM's entire lien would allow double recovery to the Trust as prohibited under § 550(d). The Trustee contends that it may recover from multiple entities and that returning some or even all of the securities does not legitimize the avoidable transfer. *Nostalgia Network, Inc. v. Lockwood*, 315 F.3d 717, 720 (7th Cir. 2002). While the Trustee concedes that its recovery is limited to a single satisfaction, *Freeland v. Enodis Corp.*, 540 F.3d 721, 740 (7th Cir. 2008), he argues that BNYM did not truly return the securities, but rather "exchanged" the securities for either replacement securities or the proceeds of the sale of these securities.

As an initial matter, the Trustee argues with faint hope that § 550 does not apply because § 551 automatically preserves the avoided property for the benefit of the estate. *Rodriguez v.*

*Drive Fin. Serv., L.P. (In re Trout)*, 609 F.3d 1106, 1109-10 (10th Cir. 2010); *People's Bank & Trust Co. v. Burns*, 95 Fed. App'x 801, 804 (6th Cir. 2004); *Suhar v. Burns (In re Burns)*, 322 F.3d 421, 427-28 (6th Cir. 2003). Section 551 of the Bankruptcy Code, however, clearly has no relevance or application in this case, and I will apply § 550 here.

Trustee maintains a broad attack against the entirety of BNYM's collateral, but fails to specifically identify the collateral it is seeking. This is significant because the Trustee cannot, in my view, rightfully claim a valid interest in all of the collateral that BNYM had on the eve of Sentinel's bankruptcy unless it can specifically identify the collateral and prove some type of relationship to the collateral held by BNYM. The Trustee in this case faces the complications that arise with repeated overnight (or short term) loans. Assets go in and out of collateral. The relationship between a particular item in collateral and the loan it secures may not be discernable. Transfers of specific collateral for a specific overnight loan may not be clear. Here, there were periods of time during which Sentinel received daily or frequent loans regularly. The Trustee's approach was to deal with the loan and collateral in play close to the demise of Sentinel, and the Trustee did not identify what specific interest in the securities he sought to invoke. There was a loan of $312 million plus interest against collateral of $697 million, but the Trustee never introduced evidence tying the Specific Transfers to specific collateral in BNYM's hands on the Petition Date.

Perhaps it is precisely because the Trustee could not identify through records, accounts, or inventory what Sentinel used to secure its loans, or perhaps it is simply in order to avoid BNYM's right to use the five Specific Transfers of security as collateral that the Trustee has maintained this broad attack against the entirety of BNYM's collateral. The Trustee conceded that BNYM's cushion was $395 million above what BNYM was owed. The Trustee's current

position is that his target is avoidance of all liens granted rather than the value of the transfers. This does not make sense. The lien is not the only method by which BNYM can use collateral to be made whole. Here, BNYM loaned Sentinel $312 million and Sentinel provided an amount of collateral which secured the $312 million and no more. Trustee's right to recover remains only to the extent it leaves the estate in the same position that it would have been without the transfer. *Freeland v. Enodis*, 540 F.3d 721, 739 (7th Cir. 2008) (no recovery can be had from parties who participated in a fraudulent transfer but did not benefit from it). Therefore, Trustee cannot avoid BNYM's entire lien.

I now turn to the question of whether BNYM gave full consideration for the Specific Transfers, and consequently, what claim the Trustee has to be made whole. BNYM delivered $312 million or so which the Trustee has not returned. BNYM has the right to liquidate the collateral up to the amount of the existing loan and return any assets that exceed the amount of the money due under the terms of the loan. All that occurred here was an exchange of collateral for loans of cash. The Specific Transfers at issue were not designed to drain Sentinel's assets, but were attempts to continue conducting business and paying off existing creditors by keeping its line of credit open, presumably to stay in business. Even so, the transfers can be voidable if they resulted in draining of the asset pool. The assets of Sentinel were not depleted; they were held as security for repayment of the loan. Rather, in exchange for the collateral, BNYM gave Sentinel a loan of significant value which only added to Sentinel's asset pool. And the recipient of the millions from BNYM was Sentinel and only Sentinel. What Trustee would have under its plan is a windfall recovery of the millions loaned to Sentinel by BNYM plus the entire collateral that secured these loans. The Trustee cannot force BNYM to pay twice the value of its loan by avoiding the fraudulent Specific Transfers.

**CONCLUSIONS OF LAW**

1. I did not find that BNYM engaged in "egregious misconduct" sufficient to subordinate its lien against Sentinel.

2. The June 1, June 26, June 29, July 17, and July 31 transfers, while made with fraudulent intent, cannot be avoided as they were made in good faith and the Trustee has failed to adequately identify the securities to be avoided.

ENTER:

James B. Zagel
United States District Judge

DATE: December 10, 2014